IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: INACOM CORP., et al., Debtors. | Bankruptcy Case No. 00-2426 (PJW) |
| INACOM CORP., on behalf of all affiliated Debtors,<br><br>               Plaintiff,<br>v.<br><br>LEXMARK INTERNATIONAL, INC.,<br><br>               Defendant. | Civil Action No. 04-583 (GMS)<br><br>Adversary Proceeding No. 02-3500 (PJW) |

## LEXMARK'S TRIAL BRIEF

Dated: August 15, 2005

Respectfully submitted,

Culver V. Halliday
Emily L. Pagorski
Stoll, Keenon & Park, LLP
2650 AEGON Center
400 West Market Street
Louisville, Kentucky 40202-3377
Tel: (502) 568-9100
Fax: (502) 568-5700

-and-

Thomas G. Whalen Jr. (No. 4034)
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Tel: (302) 425-3307
Fax: (302) 654-5181

*Attorneys for Third Party Plaintiff,*
*Lexmark International, Inc.*

SL1 564655v1/004907.00003

Pursuant to this Court's Scheduling Order, Defendant, Lexmark International, Inc. ("Lexmark") files this Trial Brief.

## I. Nature of the Case

In this case, Inacom alleges that certain payments made by Inacom to Lexmark before the filing of the bankruptcy case can be set aside as preferences pursuant to 11 U.S.C. § 547 and 11 U.S.C. § 550. The payments were made by Inacom to Lexmark for printer products and services Lexmark sold and Inacom accepted and retained.

Lexmark denies that Inacom was insolvent at the time of the payments and denies that the payments were preferences. Lexmark further contends that, even if Inacom was insolvent, the payments were made in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2) and/or Lexmark provided new value to Inacom pursuant to 11 U.S.C. § 547(c)(4), and therefore, the payments to Lexmark cannot be avoided.

## II. Contested Facts Lexmark Will Establish at Trial

At trial, Lexmark expects the evidence to establish the following:

A.     Inacom was solvent at least through April 22, 2000. Therefore, Inacom is not entitled to recover any payments made to Lexmark prior to April 22, 2000, having failed to satisfy the requirements of 11 U.S.C. § 547(b)(3) as to payments prior to April 22, 2000.

B.     The payments to Lexmark did not allow Lexmark to receive more than Lexmark would have received if the case were a Chapter 7 case, if the payments had not been made, and if Lexmark received payment of such debts to the extent provided by the Bankruptcy code. Therefore, Inacom cannot satisfy the requirements of 11 U.S.C. § 547(b)(5).

C.     All of the payments to Lexmark were made in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2), and more specifically the payments were made:

2

        1)    in payment of a debt incurred by Inacom in the ordinary course of business or financial affairs of Inacom and Lexmark under 11 U.S.C. § 547(c)(2)(A);

        2)    in the ordinary course of business or financial affairs of Inacom and Lexmark under 11 U.S.C. § 547(c)(2)(B); and

        3)    according to ordinary business terms pursuant to 11 U.S.C. § 547(c)(2)(C).

D.    Lexmark gave subsequent new value to Inacom under 11 U.S.C. § 547(c)(4).

### III. Lexmark's Theory of Defense to Inacom's Preference Claim

#### A. Inacom was Not Insolvent at the Time the Payments Were Made

The factual evidence establishes that Lexmark has rebutted the presumption of insolvency and, therefore, Inacom has the burden of proof to establish insolvency at the time of the payments made by Inacom to Lexmark by a preponderance of the evidence. *See In re Trans World Airlines, Inc.*, 180 B.R. 389, 404 (Bankr. D. Del. 1994), *affirmed in part, reversed in part on other grounds*, 203 B.R. 890 (D. Del. 1996), *reversed*, 134 F.3d 188 (3rd Cir. 1998) (Third Circuit affirmed the bankruptcy court and reversed the district court's reversal); *see also In re Lids Corp.*, 281 B.R. 535, 540 (Bankr. D. Del. 2002); 11 U.S.C. § 547(g); FED. R. EVID. 301.

"Insolvency" is defined as a "financial condition such that the sum of . . . [the debtor's] debts is greater than all of . . . [the debtor's] property, at a fair valuation, exclusive of" exempt and fraudulently transferred property. 11 U.S.C. § 101(32)(A); *see also In re Lids Corp.*, 281 B.R. at 540. This test is commonly referred to as the Balance Sheet Test. *See id.* There is no statutory guidance as to the manner of assessing the "fair valuation" of assets so the determination of "[i]nsolvency requires the court to use some practical business judgment about asset valuation." DANIEL R. COWANS, 2 BANKRUPTCY LAW AND PRACTICE 467 (7th ed. 1998).

The Third Circuit, contemplating the proper manner to determine fair valuation, has stated that where "liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer . . . assets [are] valued on a going concern basis," not a liquidation basis. *In re Trans World Airlines, Inc.*, 134 F.3d at 193; *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992); *In re Lids Corp.*, 281 B.R. at 541 (going concern where company planned to continue operations as usual on valuation date). Contrarily, "going concern value is not the proper standard only if the business is 'on its deathbed'" at the time of the

transfer. *Matter of Taxman Clothing Co., Inc.* 905 F.2d 166, 170 (7th Cir. 1990). A company is on its deathbed only when it is "wholly inoperative, defunct, or dead on its feet." *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 (E.D. Pa. 1988). Therefore, a company need not be thriving to receive going concern valuation. *Id.*

Inacom, as of April 22, 2000, employed thousands of people, continued to carry on its business, and was actively engaged in pursuing the Service Business. Inacom was a going concern, through at least April 22, 2000. Therefore, in valuing Inacom for purposes of determining whether Inacom was solvent on the date of the Payments, Inacom as a matter of law should be valued on a going concern basis, not as a company in liquidation.

The Third Circuit has defined the fair valuation of assets, in the going concern context, as "'market value' rather than 'distress value,' but . . . the valuation must be analyzed 'in a realistic framework' considering amounts that can be realized 'in a reasonable time' assuming a 'willing seller' and a 'willing buyer.'" *In re Trans World Airlines, Inc.*, 134 F.3d at 193-94; *see also In re Lids Corp.*, 281 B.R. at 541.

A "reasonable time" is defined as an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claims, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. *In re Trans World Airlines, Inc.*, 134 F.3d at 195 (in that case a reasonable time was twelve (12) to eighteen (18) months); *see also In re Lids Corp.*, 281 B.R. at 541.

In this context, the fair valuation/market value is "the amount that may be realized if the Company's aggregate assets are sold as an entirety with reasonable promptness in an arm's

length transaction under present conditions for the sale of comparable business enterprises, as such conditions can reasonably evaluated by . . ." an expert. *In re Lids Corp.*, 281 B.R. at 541.

Furthermore, the debtor's "assets must be valued at what they are reasonably worth at the time of the allegedly preferential transfers and <u>not what they turned out to be worth at some time after the bankruptcy intervened</u>." *In re Davis*, 120 B.R. 823, 825 (Bankr. W.D. Pa. 1990) (emphasis added); *see also Total Tech. Servs., Inc. v. Whitworth*, 150 B.R. 893, 900 (Bankr. D. Del. 1993). Consistent with this rule, the Third Circuit has stated that "the use of hindsight to evaluate a debtor's financial condition for purposes of the [Bankruptcy] Code's 'insolvency' element has been criticized by courts and commentators alike." *In re R.M.L., Inc.*, 92 F.3d 139, 155 (3d Cir. 1996). Indeed, "[t]here is overwhelming authority to the effect that . . . subsequent dismemberment [of the debtor] . . . should not enter into the picture." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 197-98 (3d Cir. 1998) (quoting Lawrence P. King, 2 Collier on Bankruptcy ¶ 101.32[4], p. 101-16 (15th ed. 1997)), *cert. denied*, 523 U.S. 1138 (1998).

Once the fair value of Debtor is determined, "it is necessary to reduce that value by the liabilities which existed on the Valuation Date to determine if "the debtor was insolvent. *In re Lids Corp.*, 281 B.R. at 545. Unlike assets, debts are measured at their face value and not at market value. *In re Trans World Airlines, Inc.*, 134 F.3d 188, 190, 196 (3rd Cir. 1998); *In re Lids Corp.*, 281 B.R. at 545. Contingent liabilities, however, are "limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *In re Trans World Airlines, Inc.*, 134 F.3d at 196-98; *see also In re Lids Corp.*, 281 B.R. at 546. Therefore, "[c]ontingent liabilities do not include costs associated with liquidation or dissolution of the debtor" as this would inherently contradict the going concern status of the debtor. *In re Lids Corp.*, 281 B.R. at 546; *see also In re Trans World Airlines, Inc.*, 134 F.3d at 197-98.

SL1 564655v1/004907.00003

Further, hindsight is forbidden when a court is assessing whether an entity was on its financial deathbed at the time of the transfer(s). *In re Payless Cashways, Inc.*, 290 B.R. 689, 705 (Bankr. W.D. Mo. 2003); *In re DAK Indus., Inc.*, 195 B.R. 117, 125 (Bankr. C.D. Cal. 1996). Therefore, evidence after April 22 time period, is irrelevant to the inquiry.

Under the foregoing valuation standards, Lexmark has provided sufficient evidence to rebut the presumption of insolvency, thus shifting the burden of persuasion to Inacom to establish by a preponderance of the evidence that Inacom was insolvent during the period of the alleged Preferential Payments at issue in this action.

Inacom was solvent at least through April 22, 2000. Lexmark's expert witnesses, Jason Fensterstock and Rich Whalen, experienced investment bankers, will testify that as of April 22, 2000, Inacom had an aggregate equity value of between $44,000,000 and $144,000,000 and, thus, was solvent by a substantial margin. The conclusion was the result of extensive analysis which is detailed in their valuation reports. Confirming the conclusions of the experts are additional facts, including Inacom's restructuring into a service business that historically provided greater margins and faster growth than the distribution business, which prior to February 16, 2000, had comprised 90% of Inacom's business; the April 2000 income statement prepared by Inacom, reflecting higher gross margins for the recently restructured business; the collective opinions of third parties with substantial expertise in valuing business, including but not limited to Goldman Sachs and Houlhan Lokey; Compaq Computer's determination that it would provide a $55 million dollar subordinated loan facility to Inacom, a three year service level agreement guaranteeing Inacom incremental revenue in the amount of $420 million, and a separate service and support agreement whereby Inacom's employees were to work with

Compaq's in the future; and the revolving credit facility with Deutsche Bank with substantial loan funding availability in the range of $89,681,203 in April.

Because Inacom was solvent through April 22, 2000, Inacom is not entitled to any recovery as to any of the Payments made prior to that date, having failed to satisfy the requirement of 11 U.S.C. § 547(b)(3).

### B.   ORDINARY COURSE OF BUSINESS DEFENSE

Lexmark has asserted an affirmative defense pursuant to 11 U.S.C. § 547(c)(2)(A)-(C) (the "Ordinary Course Defense").  The purpose of the Ordinary Course Defense "is to leave undisturbed normal financial relations between a debtor and its creditors, even as a company approaches bankruptcy." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 512 (3rd Cir. 1999); *see also In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 223 (3rd Cir. 1994). "It protects 'recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee.'" *In re First Jersey Sec., Inc.*, 180 F.3d at 512 (citation omitted).

Under the Ordinary Course Defense, Inacom cannot avoid any alleged preferential payments to the extent such payments are:

    (A)    in payment of a debt incurred by Debtor in the ordinary course of the business or financial affairs of Debtor and Lexmark;

    (B)    made in the ordinary course of business or financial affairs of Debtor and Lexmark; and

    (C)    made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(A)-(C). It is undisputed and the parties have stipulated that the transfers satisfy 11 U.S.C. § 547(c)(2)(A). Therefore, the first element of the Ordinary Course defense is satisfied.

The second element is often referred to as the "subjective" test, as it examines the relationship between the specific debtor and creditor. 11 U.S.C. § 547(c)(2)(B). In addressing this element, courts consistently review the pre-preference period of business and then compare that data to the preference period. *See In re Big Wheel Holding Co.*, 223 B.R. 669, 674 (Bankr. D. Del. 1998) (holding that because the debtor paid invoices late in the pre-insolvency period, then late payments were the ordinary course of business for the preference period); *see also In re Color Tile, Inc.*, 239 B.R. 872, 875 (Bankr. D. Del. 1999) (summary judgment in favor of the defendant; during pre-insolvency period, payments were made in a range of fifteen (15) to seventy-two (72) days; during preference period, payments were made is a range of twenty-two (22) to forty-seven (47) days, well with in the pre-insolvency range). In addition, given the long-standing, seven-year relationship between Inacom and Lexmark, more latitude must be given in determining those practices that are considered in the ordinary course of business. *See In re Molded Acoustical Products, Inc.*, 18 F.3d at 225 ("[W]e adopt the following rule of construction as an aid to resolving these problems: the more cemented (as measured by duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm and yet remain within the safe harbor of § 547(c)(2)."); *See also,; In re First Jersey Securities, Inc.*, 180 F.3d 504, 513 (3d Cir. 1999); *In re U.P. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. .2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *3(Bankr. D. Del. February 20, 2001).

Between Debtor and Lexmark there was an established business relationship in which the form and tender of the alleged preferential transfers parallel the pre-preference period transfers. The practice of holding a check prior to payment, in and of itself, does not automatically disqualify the payment from the ordinary course of business defense. Holding checks may be deemed in the ordinary course of business if such practice is consistent with the actions of the parties prior to the preference period. *See generally, In re T.B. Home Sewing Enterprises, Inc.*, 173 B.R. 790 (Bankr. N.D. Ga. 1993) (holding checks not inconsistent with prior dealings); *see also In re Narragansett Clothing Co.*, 146 B.R. 609 (Bankr. R.I. 1992) (same); *In re Powerine Oil Company*, 126 B.R. 790 (9th Cir. BAP 1991) (holding of checks but one factor in determining whether payments were outside the ordinary course of business; no evidence presented to the court with respect to the debtor's practices prior to the preference period); *In re Braniff*, 154 B.R. 773 (Bankr. D. Fl. 1993) (debtor, during the preference period only, was forced to hold checks due to cash flow problems); *In re Kroh Brothers Development Company*, 115 B.R. 1011 (Bankr. W.D. Mo. 1990) (also a check holding case; "necessary to look to the payment history for the time before the preference period. . . to see how the parties dealt with the payments before.").

In this case, by Inacom's own admission, Inacom held checks for at least the three and one half months prior to the beginning of the Preference Period. Additionally, Inacom started a practice of holding checks as early as 1993. Finally, the payment range, as discussed above, shows no marked difference between the two and one half year Pre-Preference Period and the Preference Period, which substantiates that any alleged holding of checks either occurred both during the Pre-Preference Period and in the Preference Period or that any such holding of checks had no impact on the Payments received. Therefore, the fact that a Payment by Inacom during

the Preference Period was made in connection with a held check does not remove such Payment from the protection afforded by the ordinary course of business defense.

Moreover, the held checks issue is of little import in this case since Lexmark's data is not in any way based on check date in comparison to the date an invoice was paid. The actual applied date is used for the two and a half years of pre-preference period data and the preference period data. The actual application of payments to invoices, rather than when a check was issued or held, is more indicative for the ordinary course of business defense (i.e. comparing the payment history in the pre-preference period to the preference period).

The third element of the ordinary course of business defense is referred to as the "objective" test, as it examines whether transfers were made "according to ordinary business terms." *See In re First Jersey Sec., Inc.*, 180 F.3d at 513; 11 U.S.C. § 547(c)(2)(C). This phrase encompasses "'the practices in which firms similar in some general way to the creditor in question engage.'" *See In re First Jersey Sec., Inc.*, 180 F.3d at 513 (quoting *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 224); *See also In re U.P. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. .2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *3(Bankr. D. Del. February 20, 2001). This element is not a high hurdle for the creditor as "this test may be satisfied as long as the payment was made within the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage . . . [and] only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary." *In re Cocolat, Inc.*, 176 B.R. 540, 550 (Bankr. N.D. Cal. 1995) (emphasis in original); *see also In re First Jersey Sec., Inc.*, 180 F.3d at 513; *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 220 & 224; *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993).

Further, based on a duration of Lexmark's and Inacom's pre-insolvency relationship, eight (8) years, the Third Circuit permits a substantially greater departure from the range of normal industry terms. *See In re Molded Acoustical Products, Inc.*, 18 F.3d at 225 (holding: "the more cemented (as measured by duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm . . . ."); *In re First Jersey Securities, Inc.*, 180 F.3d 504, 513 (3d Cir. 1999); *In re U.S. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. .2005); *In re Cherrydale Farms, Inc.*, 2001 WL 1820323, at *3(Bankr. D. Del. February 20, 2001). Therefore, considering the length of the relationship between Lexmark and Inacom, the transfers meet the third element of the Ordinary Course Defense under 11 U.S.C. § 547(C)(2)(C).

Payments made in a 45-day range cannot be considered so "idiosyncratic" or "unusual" as to fall outside that broad range so as to be deemed extraordinary. In this regard, the payments made to Lexmark by Inacom within the 45-day range of payments are "according to ordinary business terms" pursuant to 11 U.S.C. § 547(C)(2)(C).

To the extent that Inacom asserts that all checks that were "held" by Debtor's before being transferred to Lexmark were not transferred according to ordinary business terms, Inacom is incorrect. Again, courts generally find that the practice of holding a check prior to payment, in and of itself, does not automatically disqualify the payment from the ordinary course of business defense. Instead, the courts examine the practices in which firms similar in some general way to the creditor in question engage. *See In re T.B. Home Sewing Enterprises, Inc.*, 173 B.R. 790 (holding checks not inconsistent with industry); *see also In re Narragansett Clothing Co.*, 146 B.R. 609 (same); *In re L. Bee Furniture Co., Inc.*, 206 B.R. 981 (Bankr. M.D. Fla. 1997) (not adopting objective standard; but stating even if it had the holding of checks was within industry

12

SL1 564655v1/004907.00003

standards). Here it is within industry standards/terms for checks to be held. The practice of holding checks is not "so idiosyncratic as to fall outside that broad range that should be deemed extraordinary." Therefore, as to any held checks received by Lexmark during the Preference Period at issue in Inacom's Complaint, such Payments are "according to ordinary business terms" pursuant to 11 U.S.C. § 547(c)(2)(C).

D.  **NEW VALUE DEFENSE**

In response to Inacom's preference claim, Lexmark has also asserted that, pursuant to 11 U.S.C. § 547(c)(4)(A) & (B) (the "New Value Defense"), Inacom cannot avoid certain transfers. Section 547(c)(4) provides that Inacom may not avoid a transfer that was to or for the benefit Lexmark, to the extent that, after said transfer, Lexmark gave new value to of for the benefit of Debtor that:

(A) was not secured by an otherwise unavoidable security interest; and

(B) on account of which new value Debtor did not make an otherwise unavoidable transfer to or for the benefit of Lexmark.

11 U.S.C. § 547(c)(4)(A) & (B). New value is defined as: "money or money's worth in goods, services, or new credit . . . ." 11 U.S.C. § 547(a)(2). Section 547(a)(2)'s definition is broad enough to encompass any type of consideration that would support a contract. *See In re Discovery Zone, Inc.*, 300 B.R. 856, 860 (Bankr. D. Del. 2003); *see also In re Spada*, 903 F.2d 971, 971 (3rd Cir. 1990) (§ 547(a)(2) construed to codify usual rules of consideration).

Although the Third Circuit has held that new value must remain unpaid, [*see In re New York City Shoes, Inc.*, 880 F.2d 679, 680 (3rd Cir. 1989 ) (debtor must not have fully compensated creditor for new value as of date of bankruptcy petition], this case is distinguishable under the holding of the Bankruptcy Court in the *In re Hechinger Investment Co.*

*of Del., Inc.*, 2004 WL 3113718, *5 (Bankr. D. Del. Dec. 14, 2004) (Unpublished). In that case, just as in this case, there was a long running credit history and repeated extensions of credit to the debtor. The Bankruptcy Court found that there were "thirty-four allegedly preferential transfers at issue . . . [and the case was] more akin to the running account or rolling account analysis . . . than . . . [the Third Circuit case], which dealt with just one transfer . . . in the preference period." *See In re Hechinger Investment Co. of Del., Inc.*, 2004 WL 3113718, *5 (Bankr. D. Del. Dec. 14, 2004) (Unpublished). Therefore, the court refused to apply the "remains unpaid" rule. *See id.* Rather, the court required the creditor to provide evidence that any transfers made by the debtor on account of the new value provided by the creditor (i.e. to pay the new value) were "otherwise avoidable." *See id.* (in other words, if the creditor's other defenses to the preference action were waived or defeated then the transfers that paid the new value were avoidable and, therefore, the creditor could assert a new value defense even though as of the petition date the new value had been fully paid); *see also generally In re JKJ Chevrolet, Inc.*, 412 F.3d 545 (4th Cir. 2005) (new value does not have to remain unpaid; inquiry is whether payment on new value could have been avoided in the bankruptcy proceeding; did not matter that the trustee failed to actually avoid the payments since creditor showed that such payments could have been avoided); *In re Toyota of Jefferson, Inc.*, 14 F.3d 1088 (5th Cir. 1994) (new value does not have to remain unpaid); *In re Roberds, Inc.*, 315 B.R. 443 (Bankr. W.D. Wash. 1994) (new value does not have to remain unpaid); *In re Check Reporting Servs. Inc.*, 140 B.R. 425 (Bankr. W.D. Mich. 1992) (in depth analysis of why "remains unpaid" is not an element of new value defense); *but see In re Braniff, Inc.*, 154 B.R. 773 (Bankr. M.D. Fla. 1993).

## IV.    Lexmark's Theory of Damages

As set forth in detail above, Inacom cannot establish necessary elements of its preference claim. Accordingly, Lexmark denies that Inacom is entitled to any relief or recovery whatsoever against Lexmark.

## V. Lexmark's Theory of Any Anticipated Motion for Directed Verdict

Lexmark reserves the right to assert a Motion for Directed Verdict as circumstances warrant at trial.

## VI. Lexmark's Proposed Jury Instructions and Verdict Forms

Lexmark is filing three sets of marked Proposed Jury Instructions and Verdict Forms concurrently herewith.

Dated: August 15, 2005                    Respectfully submitted,

                                              Culver V. Halliday
                                              Emily L. Pagorski
                                              Stoll, Keenon & Park, LLP
                                              2650 AEGON Center
                                              400 West Market Street
                                              Louisville, Kentucky 40202-3377
                                              Tel: (502) 568-9100
                                              Fax: (502) 568-5700

                                                  - and -

                                              */s/ Thomas G. Whalen Jr.*
                                              Thomas G. Whalen Jr. (No. 4034)
                                              Stevens & Lee, P.C.
                                              1105 North Market Street, 7th Floor
                                              Wilmington, Delaware 19801
                                              Tel: (302) 425-3307
                                              Fax: (302) 654-5181

                                              *Attorneys for Third Party Plaintiff,*
                                              *Lexmark International, Inc.*