UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INACOM CORP., et al.<br><br>    Plaintiffs<br><br>v.<br><br><br>LEXMARK INTERNATIONAL, INC.<br><br>    Defendant and Third-Party Plaintiff<br><br>v.<br><br><br>COMPAQ COMPUTER CORPORATION<br><br>    Third-Party Defendant | Civil Action No. 04-CV-583 (GMS) |

### LEXMARK'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO ITS THIRD PARTY COMPLAINT

Thomas G. Whalen Jr. (No. 4034)
Joseph Grey (No. 2358)
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Tel: (302) 425-3304
Fax: (302) 654-5181

Culver V. Halliday
Emily L. Pagorski
Stoll, Keenon & Park, LLP
2650 AEGON Center
400 West Market Street
Louisville, Kentucky 40202-3377
Tel: (502) 568-9100
Fax: (502) 568-5700

Attorneys for Defendant
Lexmark International, Inc.

Dated: August 15, 2005

SL1 564656v1/004907.00003

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Introduction | 3 |
| II. | Findings of Fact | 4 |
| III. | Conclusions of Law | 13 |
| | A. Lexmark's Claims for Breach of Contract Based on the Asset Purchase Agreement | 13 |
| |     1. The Asset Purchase Agreement Is Governed By Article 2 Of The Uniform Commercial Code | 13 |
| |     2. The Asset Purchase Agreement Is A Simple Contract Under Common Law | 13 |
| |     3. Under Other Common Law Or The Uniform Commercial Code, The Asset Purchase Agreement Was A Valid Contract Enforceable By Lexmark As A Third-Party Beneficiary | 14 |
| | B. Lexmark's Claims for Breach of Contract Based on the Francis Letter Dated February 16, 2000 | 15 |
| | C. Lexmark's Claims for Indemnity Based on the Asset Purchase Agreement and the Francis Letter Dated February 16, 2000 | 16 |

SL1 564656v1/004907.00003

Third-Party Plaintiff Lexmark International, Inc. ("Lexmark"), respectfully submits the following proposed findings of fact and conclusions of law in support of its Third-Party Complaint against the Hewlett Packard Company, Compaq Computer Corp., ITY Corp., and Custom Edge, Inc., the Third-Party Defendants (collectively, "HP"), in accordance with the Court's Scheduling Order entered October 4, 2004 and Rule 16.4 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware.

## I. INTRODUCTION

Lexmark's third party action is contingent upon a finding of liability by Lexmark to Inacom Corp. on account of alleged preferential transfers. Accordingly, the facts and circumstances underlying Inacom's complaint against Lexmark are integral to the statement of Lexmark's third party action against HP and constitute *res gestae* to be considered by the Court in conjunction with this statement of proposed findings of fact and conclusions of law.

Plaintiff InaCom Corp. and its related debtors each filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") on June 16, 2000 (the "Petition Date").

This action was commenced as adversary proceeding by Inacom against Lexmark pursuant to Sections 547 and 550 of the Bankruptcy Code for the recovery of alleged preferential transfers. InaCom filed a Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on May 16, 2002 against Lexmark alleging that it had received certain transfer from InaCom by separate checks totaling $2,928,090.91. Lexmark sought and obtained leave to file its Third-Party Complaint against HP alleging that it is liable to Lexmark for any amount it

may be adjudged liable to InaCom. Lexmark alleges several theories of liability including breach of contract and indemnity against HP. The amount of the damages for which HP will be liable to Lexmark will be equal to the amount of the damages for which Lexmark may be found liable to InaCom.

Also pending before this Court in a related proceeding is a similar Third-Party action against HP that was commenced by Tech Data Corporation ("Tech Data") against HP. By an Order dated June 25, 2004, both of these actions were removed to the United States District Court for the District of Delaware.

Lexmark has alleged that the Court has supplemental jurisdiction over the Third-Party Complaint pursuant to 28 U.S.C. § 1367, and that venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. HP apparently agrees that jurisdiction and venue are proper, but will only stipulate that there is diversity jurisdiction pursuant to 28 U.S.C. § 1332. Despite a good faith effort to resolve this jurisdictional disagreement, it remains unresolved other than to say that the parties agree that the Court has subject matter jurisdiction over the third-party action.

Lexmark and Tech Data expressly invited HP to appear and participate in a mediation conference in Los Angeles with Inacom and Ingram, but it refused.

## II.    PROPOSED FINDINGS OF FACT

Based on the testimony presented at trial and other evidence submitted by the parties, the Court makes the following findings of fact and conclusions of law.

1.    Lexmark is a corporation formed under the laws of the State of Delaware, with its principal place of business located at 740 New Circle Road, Lexington, Kentucky 40511.

SL1 564656v1/004907.00003

Lexmark manufactures and sells printers and certain component parts, as well as a variety of other electronic products.

2. The Debtors were originally in two basic lines of business: computer hardware and peripherals distribution (the "Distribution Business") and a technology service and configuration business (the "Service Business"). Through these businesses, the Debtors delivered personal computer and related information technology products to businesses and provided various technology-related services managing the entire technology lifecycle, including technology planning, technology procurement, technology integration, technology support, and technology management.

3. In late 1999, the Debtors entered into negotiations with Compaq Computer Corporation ("Compaq"), one of their largest distribution vendors, for the sale of their Distribution Business to Compaq. Upon the sale of the Distribution Business to Compaq, Inacom intended to continue operating the Service Business, which historically enjoyed higher margins than the Distribution Business.

4. As a result of these negotiations, on January 4, 2000, the Debtors signed an Asset Purchase Agreement (the "APA"), and certain related operational agreements with Compaq and its acquisition subsidiary ITY Corp., subsequently known as Custom Edge, Inc. (referred to collectively as "Compaq").

5. Under the APA, Compaq agreed to purchase substantially all of the assets of Inacom's Distribution Business (the "Compaq Sale").

6. In connection with the Compaq Sale, Compaq also entered into certain additional agreements with Inacom. Among these related agreements were: (i) a $55.5 million credit facility in which Compaq agreed to extend to Inacom a $55.5 million loan; (ii) a three year, $420

million Services, Supply and Sales Agreement (and a related Service Level Agreement) in which Compaq agreed to utilize Inacom's services and "assist Inacom in a generation of incremental revenues for Inacom service business" in the aggregate amount of $85 million for year 2000, $140 million for year 2001, and $195 million for year 2002; (iii) a three-year outsourcing/agency agreement in which Compaq agreed to pay Inacom a 3.5% distribution fee for the sale of Compaq computer products; and (iv) a Separation and Sharing Agreement, in which Inacom and Compaq would share certain assets and personnel for up to twelve (12) months following the close of the Compaq Sale.

7.  In connection with the APA and at the request of Inacom, Houlihan Lokey Howard & Zukin ("Houlihan Lokey") prepared a solvency opinion, dated February 16, 2000 ("Houlihan Lokey Solvency Opinion"). Under the Houlihan Lokey Solvency Opinion, Houlihan Lokey stated that (i) the fair value and present saleable value of Inacom's assets exceeded the company's stated and identified contingent liabilities; (ii) Inacom would be able to pay its debts as they matured; and (iii) the capital remaining in Inacom after the sale of the Distribution Business to Compaq would not be unreasonably small for the continued operation of the Service Business.

8.  Based on the APA, the related agreements discussed above, the Fourth Amendment and Waiver to the April 9, 2000 Credit Agreement with Deutsche Bank, to provide for the restructuring of Inacom's debt (as discussed below) and the Houlihan Lokey Solvency Opinion, the Compaq Sale closed on February 16, 2000. Compaq paid approximately $369.5 million for Inacom's Distribution Business and also assumed some of Inacom's accounts receivable and debt obligations, including, but not limited to, all of Inacom's previous

obligations owed to Deutsche Financial Services in connection with Inacom's floor planning facility for Compaq product.

9. In connection with the APA, Inacom amended its $450 million revolving credit and amortizing term facility with Deutsche Bank ("Credit Agreement") to modify it to a $225 million revolving credit facility ("Deutsche Bank Credit Facility"). The sale of the Distribution Business to Compaq reduced Inacom's total indebtedness to Deutsche Bank.

10. The Deutsche Bank Credit Facility contained certain financial covenants, including minimum net worth covenants, covenants requiring certain minimum levels of working capital and minimum EBITDA (earnings before interest, taxes, depreciation and amortization) covenants.

11. In addition, a borrowing base requirement was put into place to govern future advances under the Deutsche Bank Credit Facility. The borrowing base was comprised of 60% of eligible inventory, plus 85% of eligible receivables plus 50% of the amount of the Nesbitt Burns Residual Note (a pre-existing debt).

12. After the Compaq Sale, Inacom submitted monthly Borrowing Base Certificates to Deutsche Bank, providing information concerning the eligible inventory, receivables, and outstanding principal of the Nesbitt Burns Residual Note, in order to arrive at the funds available to Inacom under the Deutsche Bank Credit Facility.

13. In the February 26, 2000 Borrowing Base Certificate, Inacom had unused availability under the Deutsche Bank Credit Facility of $79,322,298.40. In the March 25, 2000 Borrowing Base Certificate, Inacom had unused availability under the Deutsche Bank Credit Facility of $54,656,000. In the April 22, 2000 Borrowing Base Certificate, Inacom had unused availability under the Deutsche Bank Credit Facility of $89,681,203.

14.     On April 17, 2000, Thomas Fitzpatrick, Inacom's Chief Financial Officer, learned, by telephone, while on vacation in Cancun, Mexico, that certain accounts receivable allegedly belonging to Compaq, had been mistakenly received in the Inacom lock box and automatically swept the funds as payments upon the Deutsche Bank Credit Facility. Upon learning this information, Mr. Fitzpatrick, nevertheless, chose to continue with his vacation in Mexico and did not return to the United States until the following week.

15.     On April 27, 2000, Compaq notified Deutsche Bank that Compaq claimed that certain receivables owned by Compaq were paid into Inacom's lockbox. Deutsche Bank notified Compaq that it would investigate the matter. Subsequently, Deutsche Bank refused to return the swept funds and refused to advance further funds to Inacom, giving as a reason an alleged material adverse change under the Deutsche Bank Credit Facility.

16.     Regarding the sale from Inacom to Compaq, certain representations of fact were reportedly made to Tech Data by Compaq as to the treatment of pre-closing accounts payable by Inacom to Tech Data.

17.     On January 7, 2000 Inacom filed its Form 8-K with the Securities and Exchange Commission which addressed, in pertinent part, the proposed sale of assets to Compaq, which by virtue of mergers and consolidation is now Hewlett Packard Corporation ("HP").

18.     On February 3, 2000, John Frasca, then an employee of Inacom, directed electronic mail to Mike Ward, of Tech Data, attaching Inacom's Form 8-K, referencing a section of the 8-K as to accounts payable to be assumed by Compaq, and stating that "100% of the payables for Tech Data will be assumed by Compaq" and requesting a credit line increase "based upon this contract."

SL1 564656v1/004907.00003

19. On February 16, 2000, William Francis, Director of Corporate Finance of Compaq, faxed a letter to Misty Atchinson, of Lexmark, regarding "Account Payable # 117403 of Inacom Corporation" (the "Francis Letter"). The Francis Letter stated, in part, that certain assets of Inacom had been purchased by Compaq and would be operated as Custom Edge, with accounts payable to be funded by Compaq. The letter also stated, in part, that Custom Edge "also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of the account."

20. The Francis Letter was sent to Lexmark in order to induce Lexmark to continue fulfilling orders for the purchase of goods by Compaq after the Compaq Sale on credit terms, to maintain and transfer Inacom's existing customer accounts to Compaq for the sake of continued efficiency for the ordering of goods from Lexmark. In reasonable and actual reliance upon the terms of the Francis Letter, Lexmark ultimately agreed to allow for the requested use of the pre-existing accounts by Compaq, thereby conveying valuable and sufficient consideration to Compaq.

21. A letter similar to the Francis Letter was also sent to Tech Data by Mr. Francis.

22. On June 16, 2000 (the "Petition Date"), the Debtors filed a Petition under Chapter 11 of the Bankruptcy Code.

23. On June 30, 2000, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). Thereafter, the Bankruptcy Court approved the Creditors' Committee's retention of Blank Rome LLP, as its general bankruptcy counsel and Executive Sounding Board ("ESB") as its financial consultants.

24. Inacom filed a Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on May 16, 2002 against Lexmark. On June 21, 2002 Lexmark filed its

Answer, denying certain material allegations, asserting various affirmative defenses, and contesting liability. On December 12, 2002 Lexmark filed its Third-Party Complaint against Compaq Computer Corp. and Custom Edge, Inc., now known as HP, for recovery of any damages resulting from Inacom's Complaint. HP filed its Answer to the Third-Party Complaint on January 8, 2003.

25. On March 6, 2003 the Court granted Inacom's Motion for an Order barring the depositions of witnesses in preference actions, which was vacated by the Court upon Inacom's application on January 23, 2004.

26. The bankruptcy court confirmed the Debtors' Chapter 11 Plan on May 23, 2003.

27. On March 23, 2004 Tech Data filed its Motion to Withdraw the Reference and Motion to Determine Core/Non-Core Status, to which Inacom filed Opposition on March 8, 2004.

28. On June 25, 2004 the Court entered an Order withdrawing the reference of the adversary proceeding to the United States District Court for the District of Delaware.

29. For some time prior to the Petition Date, the Debtors purchased printer and peripherals (the "Goods") from Lexmark. This relationship continuously existed for eight (8) years prior to the Petition Date. Generally, the invoice terms directed 75% of the payment be made within 15 days of the invoice, with net payment due in 45 days.

30. After the February 16, 2000 closing of Compaq Sale, Lexmark provided Goods to HP under the same terms as it had prior to the Compaq Sale.

31. Within the ninety (90) day period prior to the Petition Date, InaCom made payments to Lexmark in the amount of $2,911,585.50 (the "Transfers").

SL1 564656v1/004907.00003

32. All of the Transfers were accepted by Lexmark, albeit without regard to any account stated or open, as the assumption of Inacom's account payable obligation through the APA and the Francis Letter had terminated Lexmark's debtor creditor relationship with Inacom.

33. The Transfers were not made to or for the benefit of a "creditor," within the meaning of Section 547(b)(1) of the Bankruptcy Code, due to Compaq's assumption of the indebtedness.

34. The Transfers were not made for or on account of an "antecedent debt" owed by the transferor debtor before such transfers were made, within the meaning of Section 547(b)(2) of the Bankruptcy Code, again due to Compaq's assumption of the indebtedness.

35. The Transfers were not made while the transferor debtor was insolvent, within the meaning of Section 547(b)(3) of the Bankruptcy Code, as Lexmark has demonstrated through the testimony of fact and expert witnesses and other competent evidence that Inacom was not insolvent when it made the Transfers to Lexmark.

36. The Transfers did not enable Lexmark to receive more than it would have received if the case were a chapter 7 case, if the Transfers had not been made, and if Lexmark received payment of such debt to the extent provided by the Bankruptcy Code. Due to Compaq's assumption of Inacom's account payable indebtedness to Lexmark, Lexmark was entitled to payment by Compaq irrespective of any distribution under a hypothetical liquidation of Inacom's estate. In fact, Lexmark was not a creditor of Inacom's estate given the novation of the debtor-creditor relationship by and between Inacom and Lexmark by virtue of Compaq's assumption of the debt.

37. Inacom is not entitled to the recovery of any alleged Transfers pursuant to Section 550 of the Bankruptcy Code. As Inacom cannot prove a prima facie case under Section 547 of

the Bankruptcy Code and has not timely plead any other theory of recovery for the Transfers, it has no basis for recovery pursuant to Section 550 of the Bankruptcy Code.

38. Lexmark was a direct, intended third party beneficiary of the APA.

39. If Lexmark was not an intended third party beneficiary of the APA, it was an implied third party beneficiary of the APA.

40. The APA was a contract for the sale of goods, within the meaning of Article 2 of the Uniform Commercial Code.

41. The APA selected New York law as the applicable law for the APA.

42. The APA satisfies the requirements of the statute of frauds under applicable law, including New York law.

43. The APA satisfies the requirements of the parol evidence rule under applicable law, including New York law, to bar the use of external evidence in interpretation of the contract.

44. The Francis Letter confirmed that HP had assumed Inacom's account payable obligations to Lexmark.

45. The Francis Letter also operates as an independent simple contract between HP and Lexmark, upon which Lexmark reasonably relied and through which Compaq induced Lexmark to provide good and valuable consideration.

46. Through its fact and expert witness testimony and other competent evidence, Lexmark satisfied its burden of rebutting the presumption of insolvency, and shifted the burden of proof on insolvency to Inacom.

47.

# III. PROPOSED CONCLUSIONS OF LAW

## A. Lexmark's Claims For Breach of Contract Based on the Asset Purchase Agreement

### 1. *The Asset Purchase Agreement Is Governed By Article 2 Of The Uniform Commercial Code*

The New York Uniform Commercial Code governs contracts for the sale of goods. N.Y. CLS UCC § 2-102. A contract for the sale of goods may be made in any manner sufficient to show agreement. In this regard, though, the Statute of Frauds requires that a contract for the sale of goods for $500 or more is not enforceable unless there is some writing sufficient to indicate that a contract for the sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. N.Y. CLS UCC § 2-204; N.Y. CLS UCC § 2-201. The APA was a contract for the sale of goods, within the meaning of Article 2 of the Uniform Commercial Code. The APA also satisfies the requirements of the Statute of Frauds under applicable law, as it was signed by the parties who are to be bound by its terms. The APA satisfies the requirements of the parol evidence rule under applicable law to bar the use of external evidence in interpretation of the contract.

### 2. *The Asset Purchase Agreement Is A Simple Contract Under Common Law*

Alternatively, the APA is governed by common law and constitutes a valid and binding contract. Under New York law, the required elements of contract formation are offer, acceptance, and consideration. <u>Deutsche Asset Management, Inc. v. Callaghan,</u> 2004 WL 758303, *15 (S.D.N.Y. 2004); Restatement (Second) of Contracts §§ 24, 50, 71 (1981). The payment obligations to Lexmark were expressly assumed by Custom Edge in the APA. Custom Edge and Compaq represented in the APA that Custom Edge had assumed the payment obligations, and that Compaq would provide the funds to pay these obligations. It is well-settled that a promise which the promisor should reasonably expect to induce action or forbearance on

13

the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. *Martin-Senour Paints v. Delmarva Venture Corp.*, 1988 Del. Super. LEXIS 93, *4 (Del. Super. 1988), citing to Restatement (Second) of Contracts § 90(1). A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made. *Id.* at *7, citing to Restatement (Second) of Contracts § 2(1).

> 3. *Under Either Common Law Or The Uniform Commercial Code, The Asset Purchase Agreement Was A Valid Contract Enforceable By Lexmark As A Third-Party Beneficiary Against The Signatories*

New York law has adopted the Restatement (Second) of Contracts § 302 (1979) in recognizing a third party's right to enforce a contract if that third party is an intended beneficiary of the contract. *In re Miner*, 229 B.R. 561, 566 (2nd Cir. BAP 1999). An intended third party beneficiary is established under New York law by, "showing that the parties to the contract intended at the time of contracting to grant the benefit claimed." *Id.* at 566. New York only requires that the contracting parties intended to benefit a third party on the face of the agreement or through the surrounding circumstances. *Id.* "While a third-party beneficiary is not required to be named in the contract, the contract must demonstrate an intent by the parties to provide the third party with a sufficiently immediate benefit to justify recognition of a cause of action." *Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208, 217-18 (S.D.N.Y. 2002).

Lexmark acted in actual and reasonable reliance of the contractual obligations of Custom Edge and Compaq. Lexmark was a direct, intended third party beneficiary of the APA. *In re Miner*, 229 B.R. at 566. Lexmark qualifies as an intended third party beneficiary under New York Law, because the APA between Compaq and InaCom and the surrounding circumstances show that both Compaq and InaCom intentionally conferred a benefit to Lexmark. The Francis

Letter proves that Compaq intended for Lexmark to rely upon the APA for the same proposition, that Compaq was assuming complete responsibility for the payment of Inacom's accounts payable to Lexmark.

By failing to pay and satisfy the payment obligations to Lexmark, Custom Edge (which merged into Compaq, was acquired by and merged into HP), has breached its obligations to Lexmark. HP, in assuming all liabilities of ITY, Custom Edge and Compaq, is liable to Lexmark equal to the amount of any damages for which Lexmark may be found liable to InaCom. Alternatively, if Lexmark was not an intended third party beneficiary of the APA, it was an implied third party beneficiary of the APA.

Accordingly, judgment is granted against Compaq, Custom Edge, and HP in favor of Lexmark as to Counts I and II.

### B. Lexmark's Claims For Breach of Contract Based on the Francis Letter Dated February 16, 2000

Under New York law, the required elements of contract formation are offer, acceptance, and consideration. *Deutsche*, 2004 WL 758303 at *15; Restatement (Second) of Contracts §§ 24, 50, 71 (1981). The Bill Francis Letter constitutes a valid and binding contractual agreement by and between Custom Edge and Lexmark, pursuant to which Custom Edge agreed to pay to Lexmark the payment obligations. "Consideration is, of course, an essential element of a contract, but so long as 'something of 'real value in the eye of the law' was exchanged' the adequacy of the consideration is not a proper subject of judicial inquiry." *Wood Realty Trust v. N. Storonske Cooperage Co., Inc.*, 229 A.D.2d 821, 822-823 (N.Y.A.D. 3 Dept. 1996). There was adequate and legally sufficient consideration tendered in exchange for the promise of payment to Lexmark. Additionally, the Statute of Frauds requires that promises guaranteeing

the payment of a corporation's liability be in writing and signed by the promisor. The Bill Francis Letter is in writing and satisfies the Statute of Frauds. Lexmark actually and reasonably relied upon the Francis Letter, pursuant to which Compaq intended to induce Lexmark into providing good and valuable consideration, the sufficiency and delivery of which has been proven to the satisfaction of the Court.

Compaq failed to comply with the terms of the Bill Francis Letter. By failing and refusing to pay and satisfy the payment obligations, Custom Edge (which merged into Compaq, was acquired by and merged into HP), has breached its obligations to Lexmark under the Bill Francis Letter. HP, in assuming all liabilities of ITY, Custom Edge and Compaq, is liable to Lexmark equal to the amount of the damages for which Lexmark may be found liable to InaCom.

Accordingly, judgment is granted against Compaq, Custom Edge, and HP in favor of Lexmark as to Counts III and IV.

### C.   Lexmark's Claims For Indemnity Based on the Asset Purchase Agreement and the Francis Letter Dated February 16, 2000

The payment obligations were expressly assumed by Custom Edge in the APA and in the Bill Francis Letter. As the primary obligor for the payment obligations, Custom Edge is the indemnitor of any payments on those obligations that Inacom seeks to recover from Lexmark and an indemnitor of any obligations of Inacom that are not ultimately satisfied.

The Bill Francis Letter created a valid and binding contractual agreement by and between Lexmark and Custom Edge, pursuant to which Custom Edge agreed to pay to Lexmark the payment obligations.

SL1 564656v1/004907.00003

The APA created a valid and binding contractual agreement by and between Lexmark and Custom Edge, pursuant to which Custom Edge agreed to pay to Lexmark the payment obligations.

By suffering or permitting Inacom to pay the payment obligations to Lexmark, notwithstanding the obligations of Custom Edge to do so, Custom Edge placed itself in a surety position owing direct indemnity to Lexmark for any failure by Inacom to fully satisfy the payment obligations. To the extent that Inacom satisfied the obligations of Custom Edge, Custom Edge received a concurrent benefit.

By virtue of its various agreements and actions, Custom Edge is obligated to indemnify Lexmark in the event of any recovery obtained by Inacom in the within adversary proceeding or otherwise, and all cost of defense incurred by Lexmark in opposing the Inacom claims and asserting this third party action.

Accordingly, judgment is granted against Compaq, Custom Edge, and HP in favor of Lexmark as to Count VI.

Dated: August 16, 2005                    Respectfully submitted,

                                          Culver V. Halliday
                                          Emily L. Pagorski
                                          Stoll, Keenon & Park, LLP
                                          2650 AEGON Center
                                          400 West Market Street
                                          Louisville, Kentucky 40202-3377
                                          Tel: (502) 568-9100
                                          Fax: (502) 568-5700


                                          - and -
                                          _____
                                          Thomas G. Whalen Jr. (No. 4034)
                                          Stevens & Lee, P.C.
                                          1105 North Market Street, 7th Floor
                                          Wilmington, Delaware 19801
                                          Tel: (302) 425-3304
                                          Fax: (302) 654-5181
                                          *Attorneys for Third Party Plaintiff,*
                                          *Lexmark International, Inc.*