IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> INACOM CORP., et al., <br><br> Debtors. | Chapter 11 <br><br> Bankruptcy Case No. 00-2426 (PJW) |
| INACOM CORP., on behalf of all affiliated debtors, <br><br> Plaintiff, <br><br> vs. <br><br> LEXMARK INTERNATIONAL, INC., <br><br> Defendant. <br><br> LEXMARK INTERNATIONAL, INC., <br><br> Third-Party Plaintiff, <br><br> vs. <br><br> COMPAQ COMPUTER CORP., ITY CORP., and CUSTOM EDGE, INC., <br><br> Third-Party Defendants. | Civil Action No. 04-CV-583 (GMS) |

**HEWLETT-PACKARD COMPANY'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF KEVIN SARKISIAN REGARDING COMPAQ'S ALLEGED ASSUMPTION OF LIABILITIES OR GUARANTY**

Third-party defendant Hewlett-Packard Company ("HP"), as successor in interest to Compaq Computer Corp. ("Compaq"), moves this Court for an order *in limine* excluding testimony of Kevin Sarkisian ("Mr. Sarkisian") regarding the factual circumstances pursuant to which Compaq allegedly guaranteed certain obligations of Inacom Corporation ("Inacom" or Debtor") to Lexmark International, Inc. ("Lexmark").

## SUMMARY OF ARGUMENT

Mr. Sarkisian is expected to be the star witness Lexmark presents in support of its third party claims against HP. He testified at length in deposition about how he interprets the February 16, 2000 letter Compaq sent to Lexmark in connection with assumption of certain liabilities under the Asset Purchase Agreement.

The problem with Mr. Sarkisian's testimony on any of these topics is that his interpretation is not based on any personal knowledge, and thus has no more relevance to the determination by the trier of fact than counsel's interpretation. Mr. Sarkisian simply was not involved in any way in the communications between Inacom, Lexmark and Compaq. That he holds a strong opinion is evident – it is, however, irrelevant.

At the time of the asset sale, Mr. Sarkisian was the U.S. Credit Manager at Lexmark. His department was not responsible for communicating with customers about delinquent receivables. Instead, that responsibility rested with Lexmark's sales team – an entirely different department with a different chain of command. In fact, it was Lexmark's corporate philosophy that the credit department *not* have any such customer contacts. Mr. Sarkisian testified at his deposition as follows:

Examination by Ms. Dumas:

Q: I think that what you said, or what I have written in my notes, is that the sales team – Lexmark's philosophy is that the sales team owns the customer. Do you recall that testimony?
A: Yes.
Q: Did I get that right?
A: Correct.
Q: And that it was Sales that was ultimately responsible for the customer's performance of its obligations to Lexmark?
A: Correct.

{00203239.DOC v 6}   2

Q: Was that philosophy embodied in any written org chart, policy manual, anything like that?
A: No.
Q: Who did you learn that corporate philosophy from when you first became aware of it?
A: Mr. Ruwe [Lexmark's prior Corporate Credit Manager].
Q: What did Mr. Ruwe tell you?
A: I don't recall the particular words. That would have been in 1992.
Q: Just generally, what do you recall the substance of what he communicated to you about Lexmark's corporate philosophy?
A: That the sales team owns the customer relationship. **They have the contacts with the customers.** They – if we can't get things resolved through the normal course of operations, then we should solicit the sales team's help to get those items resolved.

Sarkisian Depo. 95:14-25; 96:1-17. (Emphasis supplied.)[1]

. . . .

Q: In the normal course at Lexmark where a customer had developed a delinquency or an account receivable that caused you concern, I think you testified earlier that the steps you would take would be to contact the sales team to alert them to the situation, is that right?
A: Correct.
Q: Did you ever when you perceived a situation like this, did you ever contact the customer directly?
A: Rarely.
Q: Why was that?
A: Because that goes back to our philosophy of the sales team owning the relationship. **And typically the credit department didn't have direct contacts with the customer. We relied on the sales team's relationship and contacts.**
Q: And was that true for Inacom?
A: Yes.

Sarkisian Depo. at 99:23-25; 100:1-16. (Emphasis supplied.)

The reason why this issue is so important is because Mr. Sarkisian's interpretation of the February 16, 2000 letter from Compaq to Lexmark (the "Compaq Letter") is diametrically opposed to the interpretation of the letter given by Messrs.

---

[1] A copy of the relevant portions of the transcript of Mr. Sarkisian's deposition are attached as Exhibit A.

Kendrick and Schuette, the two individuals in Lexmark's sales team who actually had the communications with Inacom. Mr. Sarkisian had no communications whatsoever with either Inacom or Compaq. Sarkisian Depo. 106:19-25, 107:1-108:4.

Two letters address the question of Compaq's assumption of Inacom's accounts payable. The first is a letter dated February 15, 2000 from Mr. Schuette of Lexmark to Mr. Oshlo of Inacom. In that letter, Mr. Schuette confirms Lexmark's understanding from its discussions with Inacom that Inacom would pay the invoices that had checks written against them (the "Held Checks"), and Compaq would assume open payables. Both Mr. Schuette and Mr. Kendrick, his direct supervisor in Sales, testified that that is how they understood the transaction, and that the Compaq Letter simply served as confirmation. Mr. Sarkisian alone testified that he believed that the wording of the Compaq Letter *changed* the transaction, and that Compaq also assumed liability for the Held Checks.[2] This testimony constitutes speculation, improper opinion and is prejudicial. As such, it should be excluded *in limine*.

---

[2] Mr. Sarkisian testified:  Q: Did you believe this statement in Mr. Francis's letter to mean that Compaq would also assume a liability to pay amounts that were due but were held checks in Inacom's treasury?  A: It didn't matter to me if checks were held or not, because an unpaid debt to Lexmark is all that mattered to me, and I *assumed* that it meant all unpaid amounts due outstanding on the account. Sarkisian Depo. 114:8-15. (Emphasis supplied.)

In contrast, Mr. Kendrick, the head of the Lexmark sales team on the Inacom account, testified as follows:  Q: The next paragraph, which I think we would all agree is the meat of the coconut of the claim that Lexmark has asserted against Compaq and HP is, and I'll quote, "In connection with such purchase, Custom Edge, Inc. also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account." That sentence I've read, is that what you have been referring to when you've testified that Lexmark got a guarantee from Compaq?  A: Not really. . . . .  Q: When you say not really, what do you mean by that?  A: In my mind, the drawer, as we've referred to it [the Held Checks], was an *Inacom drawer in my mind, and that's why I must speak my mind. It did not relate to the outstanding amount mentioned here on this document, you see.*" Kendrick Depo. 106:7-25, 107:1-2. (Emphasis supplied.) . . . .

(continued . . .)

## **ARGUMENT**

I. **MR. SARKISIAN HAS NO PERSONAL KNOWLEDGE OF THE ASSUMPTION TRANSACTION**

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602; *Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104, 111 (3d Cir. 1982) (a witness ought to state only those facts of which he has personal knowledge). The personal knowledge requirement reflects the common law's insistence on the most reliable source of information. Fed. R. Evid. 602, Adv. Comm. Notes (1972).

Mr. Sarkisian should not be permitted to testify as to the alleged meaning of the Compaq Letter because he had no direct communications with Inacom or Compaq, no personal knowledge of the context in which the Compaq Letter was sent, and no personal knowledge of the asset purchase transaction or the subject of the letter. Mr. Sarkisian's misunderstanding of the Compaq Letter is the direct result of his lack of personal knowledge about the nature of the asset sale, and is exactly why such testimony should be excluded under Rule 602.

---

(. . . continued)
> Q: When you got [the Compaq letter], was it in you mind – was it your understanding that this letter would cover a situation such as we find ourselves in now, with Inacom having filed bankruptcy and being sued for a preference, that Compaq would promise to, in essence, reimburse Lexmark under this scenario?  A: *As I stated before, I saw this as a guarantee of payment for future liabilities* . . . .  Q: In your personal opinion did Compaq perform on its guarantee as you understood it?  A: *As I recall, yes.*  Kendrick Depo. 111:2-22.  A copy of the relevant portions of the transcript of Mr. Kendrick's deposition are attached as Exhibit B.

{00203239.DOC v 6}                          5

## CONCLUSION

For the foregoing reasons, HP requests that the Court grant an *in limine* order precluding Lexmark from presenting testimony from Mr. Sarkisian regarding the Compaq Letter.

## CERTIFICATION OF COUNSEL

Pursuant to Rule 7.1.1 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, the undersigned hereby certifies that counsel for HP have made a reasonable effort to reach agreement with counsel for Lexmark on the matters set forth in this motion, and have been unable to reach such agreement.

Dated: August ___, 2005

Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL

_____
William H. Sudell, Jr. (No. 463)
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 N. Market Street
Wilmington, DE 19899-1347
(302) 658-9200

- and -

FRIEDMAN DUMAS & SPRINGWATER LLP
Ellen A. Friedman
Cecily A. Dumas
Gail S. Greenwood
Brandon C. Chaves
One Maritime Plaza, Suite 2475
San Francisco, CA 94111
(415) 834-3800