# EXHIBIT A

```
 1        Q.      And then between the sales team and the
 2   treasurer, whose point of view on the question of a
 3   shipping hold would prevail?  Whose final decision was
 4   it at that level?
 5        A.      Well, it was the treasurer's.  If the
 6   treasurer said no, then... But I would say if he said
 7   no, then they could move to the CFO.  And if he said no,
 8   they could move to the CEO.
 9        Q.      Let me understand a little bit better of
10   an area that Mr. Nolan briefly touched on this morning.
11   In response to one of his questions, you were saying
12   kind of almost in passing, Lexmark's philosophy with
13   respect to, you know, who's ultimately responsible for a
14   customer.  And I wanted to follow up on that.  I think
15   what you said, or what I have written in my notes, is
16   that the sales team -- Lexmark's philosophy is that the
17   sales team owns the customer.  Do you recall that
18   testimony?
19        A.      Yes.
20        Q.      Did I get that right?
21        A.      Correct.
22        Q.      And that it was sales that was ultimately
23   responsible for the customer's performance of its
24   obligations to Lexmark?
25        A.      Correct.
```

```
 1        Q.    Was that philosophy embodied in any
 2   written org chart, policy manual, anything like that?
 3        A.    No.
 4        Q.    Who did you learn that corporate
 5   philosophy from when you first became aware of it?
 6        A.    Mr. Ruwe.
 7        Q.    What did Mr. Ruwe tell you?
 8        A.    I don't recall the particular words.  That
 9   would have been in 1992.
10        Q.    Just generally, generally what do you
11   recall the substance of what he communicated to you
12   about Lexmark's corporate philosophy?
13        A.    That the sales team owns the customer
14   relationship.  They have the contacts with the customer.
15   They -- if we can't get things resolved through the
16   normal course of operations, then we should solicit the
17   sales team's help to get those items resolved.
18        Q.    Did he tell you anything else?
19        A.    That we held the responsibility or the
20   authority for placing the customer on hold.
21        Q.    So the main, I guess for lack of a better
22   word, remedy that the credit department had with respect
23   to a customer that was accumulating a delinquency in
24   payment was a shipping hold?
25        A.    Correct.
```

*Sarkisian Depo. 99:23-25; 100:1-16 (Motion @ 3)*

```
 1      Q.      Had you ever seen a situation in which you
 2  felt he had been ineffective in performing that function
 3  of getting a customer to be more responsive in payment?
 4      A.      I don't recall any.
 5      Q.      At that time was he respected within
 6  Lexmark?
 7      A.      Yes.
 8      Q.      Not the subject of any kind of
 9  disciplinary action or anything of that nature?
10      A.      Not to my knowledge.
11      Q.      And do you know how long Mr. Kendrick had
12  had the Inacom account within his portfolio in the year
13  2000?
14      A.      I don't recall specifically.  But when he
15  moved to national -- as I recall he was the southeast
16  area manager when I first started at Lexmark, and then
17  when -- through various reorganizations of the sales
18  team when he got sales responsibility for all U.S. -- I
19  think they called them channel partners, distributors --
20  that would have been the time that he would have covered
21  Inacom, because he wouldn't have been in the southeast
22  region when he was the southeast region manager.
23      Q.      In the normal process at Lexmark where a
24  customer had developed a delinquency or an account
25  receivable that caused you concern, I think you
```

```
 1  testified earlier that the steps you would take would be
 2  to contact the sales team to alert them to the situation
 3  ; is that right?
 4       A.    Correct.
 5       Q.    Did you ever when you perceived a
 6  situation like this, did you ever contact the customer
 7  directly?
 8       A.    Rarely.
 9       Q.    Why was that?
10       A.    Because that goes back to our philosophy
11  of the sales team owning the relationship.  And
12  typically the credit department didn't have direct
13  contacts with the customer.  We relied on the sales
14  team's relationship and contacts.
15       Q.    And that was true for Inacom?
16       A.    Yes.
17       Q.    We've been talking about various people
18  who are employed by Lexmark, and you and the other
19  witnesses have mentioned one person who hasn't been
20  identified as to who she was yet, unless I missed it
21  previously.  Misty Atchison, what was her position at
22  Lexmark in late 1999, early 2000?
23       A.    As I recall, it was the accounts
24  receivable CSR, customer service representative.
25       Q.    Was she the -- okay.  And were the CSRs
```

Sarkisian Depo 106:19-25, 107:1-108:4 (Motion @ 4)

```
 1  collection situations --
 2       A.      Yeah.
 3       Q.      -- with other customers?
 4       A.      Yes.
 5       Q.      And you told me about your opinion on
 6  Mr. Kendrick's performance of getting customers to pay.
 7  What was your opinion based on your experience at that
 8  point with Mr. Schuette's effectiveness in getting
 9  customers to pay?
10       A.      That Bill was very effective at getting
11  customers to pay, and it was even enhanced more as -- if
12  Bob Kendrick were his manager.  And as far back as I can
13  remember, Bob was managing Bill.
14       Q.      So your confidence that they could get the
15  job done was enhanced by the fact that Mr. Kendrick was
16  supervising Mr. Schuette.  Is that a fair
17  characterization?
18       A.      Yes.
19       Q.      After you got a copy of this February 15th
20  letter, did you discuss it with anyone?
21       A.      I don't recall discussing it, but I assume
22  that I would have, but I don't recall specific
23  conversations.
24       Q.      At the time you got this letter, at or
25  around 15 February 2000, had you previously talked to
```

1  anybody at Inacom directly about these transactions, the
2  proposed transactions?
3      A.   No, I had not.
4      Q.   After you got this letter did you
5  communicate with anyone directly at Inacom about the
6  Compaq transaction?
7      A.   No, I did not.
8      Q.   Did you communicate with anyone at Inacom
9  after this letter about any subject?
10     A.   No.
11     Q.   Did you give directions to anyone who you
12 supervised to contact anyone directly at Inacom?
13     A.   No, I did not.
14     Q.   And what about Misty Atchison, the CSR,
15 did you direct her to contact anyone directly at Inacom?
16     A.   No, I did not direct her.
17     Q.   So the line of communication between
18 Lexmark and Inacom as it related to this payable and the
19 acquisition transaction was through Schuette and
20 Kendrick; is that right?
21     A.   For the most part.  I mean, Misty would
22 have day-to-day contact with their accounts payable
23 group.  I mean, that would be her normal job
24 responsibility.
25     Q.   But with respect to the subject of the

1  Compaq acquisition and how Inacom intended to take care
2  of this significant payable, that would have been dealt
3  with by Schuette and Kendrick; is that right?
4       A.    That's correct.
5       Q.    Did you at this point ask Schuette,
6  Mr. Schuette to obtain anything from Compaq?
7       A.    As I recall, the two things that I wanted
8  Bill to do were to get us paid for what Inacom owed us
9  and to help us determine who was going to be responsible
10 once Custom Edge came into play, whether that was going
11 to be Compaq or we were just going to be relying on
12 Inacom to pay us, because we felt that was very crucial.
13      Q.    Did you tell these -- did you communicate
14 these requests for information to Mr. Schuette?
15      A.    Yes.
16      Q.    Did he ever report back to you on what, if
17 anything, he had done in response to your requests?
18      A.    He would report back.
19      Q.    And what did he report back to you?
20      A.    Up to this point, up to the 15th letter,
21 it was that Inacom -- the Inacom folks are telling me
22 that we're going to get paid when the Compaq deal is
23 consummated and that -- I mean, that was the main
24 emphasis up until this point. And then when we -- when
25 I got this letter, it certainly made me feel all better,

Sarkisian Depo 114:8-15 (Motion @ 4)

```
 1  any dollars, whether past due or current.
 2       Q.   So your interpretation of that sentence
 3  was that if it was due from Lexmark's perspective, then
 4  Custom Edge was assuming the obligation to pay it?
 5       A.   Yeah, if it were outstanding, which I
 6  would consider current and past due.  And as I said, it
 7  solved both my issues.
 8       Q.   Did you believe this statement in
 9  Mr. Francis's letter to mean that Compaq would also
10  assume a liability to pay amounts that were due but were
11  held checks in Inacom's treasury?
12       A.   It didn't matter to me if checks were held
13  or not, because an unpaid debt to Lexmark is all that
14  mattered to me, and I assumed that it meant all unpaid
15  amounts due outstanding on that account.
16       Q.   Did you have any understanding one way or
17  the other of whether at the time he wrote this letter
18  Mr. Francis was aware that Inacom was holding checks in
19  its treasury?
20       A.   Could you restate the question?
21       Q.   Yeah.  Did you have any understanding at
22  all at the time of whether when Mr. Francis wrote this
23  letter he was aware that Inacom was holding checks in
24  its treasury?
25       A.   Again, I would answer that I didn't really
```