# EXHIBIT B

*Kendrick Depo 106:7-25; 107:1-2 (Motion @ 4)*

```
 1        Q.    And do you know whether or not Compaq
 2   issued a parent company guarantee?
 3        A.    No.
 4        Q.    There are other witnesses lined up in the
 5   lineup who I think those questions might be more
 6   appropriately directed to.
 7              The next paragraph, which I think we would
 8   all agree is the meat of the coconut of the claim that
 9   Lexmark has asserted against Compaq and HP is, and I'll
10   quote, "In connection with such purchase, Custom Edge,
11   Inc., also assumed the obligation to pay all the
12   outstanding amount on the referenced account, subject to
13   the terms and conditions of such account."
14              That sentence I've read, is that what you
15   have been referring to when you've testified that
16   Lexmark got a guarantee from Compaq?
17        A.    Not really.
18        Q.    Is there any other written communication
19   in which this guarantee was communicated to Lexmark?
20        A.    Not to my knowledge.
21        Q.    When you say not really, what do you mean
22   by that?
23        A.    In my mind, the drawer, as we've referred
24   to it, was an Inacom drawer in my mind, and that's why I
25   must speak my mind.  It really did not relate to the
```

1  outstanding amount mentioned here on this document, you
2  see.
3      Q.   Was there some other oral communication
4  between Compaq and Lexmark that -- strike that.
5           Did you do anything or direct anybody on
6  your team to do anything after you got this letter?
7      A.   You mean after jumping for joy?  I'm sure
8  that I did.  I cannot remember.  My next recollection
9  would deal with what any M & A, merger and acquisition,
10 would be, and that is how were we going to get process,
11 fluid process on ordering and scheduling and invoicing,
12 collections, because that's kind of my background.
13     Q.   The logistics of it?
14     A.   Yes.  Working with a client.
15     Q.   I think that you testified a little while
16 ago that the post closing process of the transition from
17 Inacom to Custom Edge may not have been as smooth as
18 would have been desirable; is that a fair statement?
19     A.   Lot of confusion.
20     Q.   In connection with that transition were
21 there open payables that Custom Edge or Compaq let go
22 beyond their ordinary net 30 terms?  Do you recall
23 having delinquencies in connection with the accounts
24 payable that were assumed by Compaq in connection with
25 the transition?

Kendrick Depo 111: 2-22 (Motion @ 5)

```
 1         A.    No.
 2         Q.    When you got this letter, a copy of this
 3    letter that Mr. Francis sent to Ms. Atchinson, was it in
 4    your mind -- was it your understanding that this letter
 5    would cover a situation such as we find ourselves in
 6    now, with Inacom having filed bankruptcy and being sued
 7    for a preference, that Compaq would promise to, in
 8    essence, reimburse Lexmark under this scenario?
 9         A.    As I stated before, I saw this as a
10    guarantee of payment for future liabilities and the
11    ability to work with an account and sustain its business
12    and my business and -- I thought this was a good thing.
13    I would have never speculated beyond that very fact,
14    because we had worked very hard and very long on this
15    whole issue on a daily basis now for three months we're
16    working on this particular issue.  And this was in my
17    mind a significant sign post, and that's what I recall.
18         Q.    In your personal opinion did Compaq
19    perform on its guarantee as you understood it?
20         A.    As I recall, yes.
21               MS. DUMAS:  Mr. Kendrick, I don't have
22    any more questions for you.  Thank you.
23               MR. NOLAN:  I don't have any further
24    questions, either.
25               (DEPOSITION CONCLUDED 1:41)
```