IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: INACOM CORP., et al., Debtors. | Bankruptcy Case No. 00-2426 (PJW) |
| INACOM CORP., on behalf of all affiliated Debtors,<br><br>                              Plaintiff,<br><br>        v.<br><br>LEXMARK INTERNATIONAL, INC.,<br><br>                              Defendant. | Civil Action No. 04-583 (GMS)<br><br>[Adversary Proc. No. 02-3500 (PJW)] |

## PLAINTIFF'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.        FINDINGS OF FACT

#### Procedural Posture

1.        Plaintiff InaCom Corp. and its related debtors each filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") on June 16, 2000 (the "Petition Date").

2.        Plaintiff filed a Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on May 16, 2002 against Defendant. Defendant filed its Answer on June 21, 2002. No counter-claims have been asserted.

#### General Background

3.        Historically, Inacom was in two basic lines of business; computer hardware and peripherals distribution (the "Distribution Business") and a related technology

service and configuration business (the "Service Business"). Through these businesses, Inacom delivered personal computer and related information technology products to businesses together with related support services. Following its merger with Vanstar Corporation on February 17, 1999, Inacom was a Fortune 500 public company, a leading single-source provider of information technology products and technology management services to primarily Fortune 1000 clients. Inacom distributed its products and services through a marketing network of approximately ninety (90) business centers throughout the United States. In 1999, the Distribution Business generated annual revenues of approximately $5.1 billion in annual revenues, while the Service Business generated approximately $800 million.

4.      In late 1999, due to changes in the market that had made the Distribution Business less profitable, Inacom began to explore the sale of the Distribution Business, and to develop a business strategy that would focus on the remaining Service Business. To shepherd the service-oriented entity, Inacom hired a new CEO (Gerald Gagliardi) in early November, 1999, and a new CFO (Thomas Fitzpatrick) in late November.

5.      In early December, 1999, Inacom reached an agreement in principle for sale of the assets of the Distribution Business to Compaq Computer Corporation ("Compaq"), one of Inacom's largest distribution vendors. Inacom's new CEO and CFO spent the balance of December responding to Compaq's due diligence requests and negotiating aspects and details of the transaction. On January 4, 2000, Inacom signed an Asset Purchase Agreement (the "APA"), and certain related operational agreements, with Compaq and its acquisition subsidiary, ITY Corp., subsequently known as Custom Edge, Inc. (also referred to collectively, as "Compaq").

6.      Inacom faced a liquidity crisis beginning in late December, 1999.  Richard Oshlo, Inacom's Treasurer, began to hold checks made payable to many of Inacom's vendors. Inacom's accounts payable department continued the practice of cutting checks when the underlying obligation became due, but Mr. Oshlo physically picked up the checks from the payables department starting in January, 2000 and held them in boxes in his office until funds were available to release them.  Mr. Oshlo maintained a ledger of checks held.  This process continued until the Petition Date.  The checks constituting the Transfers were among those held by Richard Oshlo in his office in Inacom's Treasury department.  Inacom had no prior history of holding checks.

7.      The liquidity crisis became intractable in January.  In mid-January, Inacom defaulted under its accounts receivable securitization facility.  Inacom came within hours of missing payroll for a company of over 10,000 employees, and had to pay a substantial fee in exchange for the lender's waiver to fund the payroll.  The lender, Nesbitt Burns, began sweeping Inacom's accounts of all funds in order to pay down the outstanding obligation under the facility.

8.      In addition, Inacom's new management, including a new Controller hired in late January, 2000, discovered that Inacom's books and records contained many inaccuracies, including what proved to be over $100 million in uncollectible accounts receivable attributed to Inacom's lenders.  Management concluded that the books maintained by and projections prepared by the prior CFO were highly unreliable.  Inacom's financial condition continued to deteriorate as sales continued to under perform projected levels, a trend that began in the third quarter of 1999.

9.    Against this backdrop, Inacom's new CFO, Fitzpatrick, concluded that a chapter 11 filing would be necessary if the Compaq transaction did not close. In addition, Fitzpatrick became convinced that Inacom had no chance of survival without additional concessions from Compaq and Inacom's lenders. Fitzpatrick went back to Compaq and Inacom's lenders and succeeded in obtaining approximately $100 million in cash, additional borrowing capacity and relaxed lending covenants.

10.    After extensive negotiations among Inacom, Compaq and Inacom's secured lenders over the next several weeks, the very complex transaction closed on February 16, 2000. In sum, in exchange for $369.5 million, Compaq purchased the inventory, supply agreements, customer contracts, leases, furniture, fixtures and equipment of the Distribution Business, and assumed certain related outstanding liabilities. Compaq hired essentially all of Inacom's employees and management personnel associated with the Distribution Business, and maintained operations from the same business premises. Compaq also agreed to provide subordinated financing up to $55 million and committed to order over $400 million services over 3 years.

11.    On the date of the Compaq closing, Inacom used $313,836,629 of the Compaq proceeds to pay its secured creditors, DeustcheBank, Nesbitt Burns and IBM Credit. In addition, Inacom paid $78,173,988 to IBM Credit through March 29, 2000, and Nesbitt Burns seized $147,875,991 (from lock box collections) through March 6, 2000. All told, from February 16 through June 16, 2000, Inacom paid $583,291,056 to DeutscheBank, IBM Credit and Nesbitt Burns, net of any new borrowings during this time period.

12.    Through the APA, Compaq agreed to assume only those of Inacom's accounts payable specifically identified in the Asset Purchase Schedules (Accounts Payable) to the APA. This Schedule was reconciled by the parties as of February 12, 2000, and included a detailed computer run of specifically identified invoices to be assumed. These invoices represented outstanding invoices for which Inacom had not already cut checks as of February 12, 2000.

13.    The liquidity crisis continued even after the Compaq closing. Nesbitt Burns continued to sweep Inacom's receivables lock boxes until its facility was satisfied in early March 2000. Thus, there were few funds available to pay outstanding trade debt until mid-March, 2000, following the closing of the Compaq purchase and subsequent satisfaction of Inacom's secured indebtedness, particularly the accounts receivable securitization facility. Nonetheless, Inacom was pressured by the industry leaders, such as Defendant, to be paid.

14.    The Compaq $55 million subordinated financing facility never materialized based on disputes that arose between Inacom and Compaq in April, 2000. Moreover, Compaq never delivered the additional promised service business, despite complaint to that effect from Inacom's CEO beginning in late March, 2000.

15.    Inacom encountered numerous other difficulties following the Compaq closing, resulting in Management's decision, in late April, 2000, to liquidate the remaining businesses. These included: (1) the discovery of further inaccuracies in Inacom's books and records, (2) oft-changing positions by KPMG, Inacom's auditors, which eventually led to much larger and more extensive restatements, for 1998 and 1999, than represented by the auditors on February 15, 2000, (3) the inability of Inacom's auditors to complete the restatement of the

financial statements, which precluded Inacom from qualifying for new business with its

traditional customer base, publicly-held Fortune 1000 customers, (4) unexpectedly poor

performance of the Service Business, resulting in $20 million in monthly losses from operations,

and (5) a claim asserted by Compaq on April 18, 2000, to over approximately $100 million in

disputed receivables collections and overpayments arising out of Compaq's purchase of the

distribution business.

          16.    As a result of the Compaq claims voiced on April 18, and as discussed in

an April 27 meeting between Inacom and its lenders, led by DeutscheBank, it became clear that

Inacom could not certify that it was in compliance with all applicable lending covenants. As a

result, DeutscheBank was unwilling to lend further amounts, and acted to seize Inacom's lock

boxes and accounts. From late April through the June 16 bankruptcy filing, Inacom operated on

budgeted cash releases negotiated with DeustcheBank.

          17.    In late April, Inacom hired investment bankers (The Blackstone Group)

and endeavored to sell the Service Business. One potential buyer, Compucom, proceeded with

negotiations toward a sale that, if successfully negotiated, was to be consummated through an

Inacom chapter 11 proceeding. Under the deal, Compucom was to pay $100 million for all of

the operating assets of the Service Business, including its accounts receivable and furniture,

fixtures and equipment, and to assume Inacom's operating liabilities and employees. Although

Inacom would not receive any effective premium from the transaction over and above the value

of the assets sold, Inacom pursued the transaction primarily to find continued employment for its

remaining 5000 employees. The deal fell through a day or two before the Debtors filed their

chapter 11 petitions on June 16, 2000.

18.    Inacom closed virtually all business operations as of the Petition Date, June 16, 2000, and began to liquidate its remaining assets.

19.    On May 23, 2003, the Bankruptcy Court entered the Order Confirming Debtors' Joint Plan of Liquidation (the "Plan") as Amended Pursuant to Chapter 11 of the United States Bankruptcy Code. Implementation of the Plan accomplished the liquidation of all of the Debtors' remaining assets.

20.    Nonpriority unsecured creditors with allowed claims against the Debtors' estates will recover between 27 and 37 cents on the dollar for their claims, depending on the Estate's litigation recoveries. Under no circumstances will nonpriority unsecured claims be paid in full.

### The Parties' Relationship and the Challenged Transfers

21.    Defendant is a corporation formed under the laws of the State of Delaware, with its principal place of business located at 740 New Circle Rd., Lexington, Kentucky 40511. Lexmark manufactures and sells printers and certain component parts, as well as a variety of other electronic products.

22.    Primarily in the operation of the Hardware Business, the Debtors purchased printers and other electronic products (the "product") from Defendant. This relationship existed for at least 2 years before the Petition Date.

23.    During the course of the parties' relationship, the Debtors purchased many millions of dollars of product from Defendant. The Debtors purchased relatively little product from Defendant after the sale of the Distribution Business to Compaq.

24.    As of the Petition Date, the Debtors owed nothing to Defendant for any invoices for product purchased.  Defendant did not file a proof of claim in the Debtors' bankruptcy cases.

25.    Within the 90 days prior to the Petition Date (March 17-June 16, 2000), the Debtors made payments to the Defendant in the amount of $2,928,090.91 (the "Transfers"), which are more specifically described in Exhibit A attached hereto.

26.    The Transfers were made to or for the benefit of the Defendant, as a creditor of the Debtors.

27.    The Transfers were payments made on account of an antecedent debt, reflected by invoices for product previously shipped by Defendant to the Debtors.

28.    The Transfers enabled the Defendant to receive more than it would have received if the Debtors' case was one under chapter 7, the Transfers had not been made, and Defendant received payment on the debt to the extent provided by the Bankruptcy Code.

29.    Defendant was the initial transferee for whose benefit all of the Transfers were made.

30.    As part of the Asset Purchase Agreement, Compaq agreed to assume responsibility for payment of certain accounts payable of InaCom, including responsibility for certain accounts payable of Inacom owed to Defendant.

31.    On Friday, February 11, 2000, Inacom closed the books on its account payable records in anticipation of closing the asset purchase transaction the following Monday. On or about the same date, Inacom delivered to Compaq an Accounts Payable Aging Report

("AP Report") that describes the Inacom accounts payable assumed by ITY Corp. pursuant to the Asset Purchase Agreement, including the account payable relating to Defendant.

32.    Prior to the February 11 delivery of the AP Report, Inacom wrote several checks in payment of certain of Defendant's outstanding invoices. These checks were not immediately mailed to Defendant, but were held in the office of Inacom's treasurer, Richard Oshlo (the "Held Checks"). The Transfers were among the Held Checks.

33.    The AP Report does not reflect invoices paid by Held Checks because, consistent with Inacom's accounting systems, once Inacom wrote a check the invoice was no longer shown on Inacom's account payable report.

34.    All of Defendant's invoices paid by the preferential payments were not among those on the list of invoices in the AP Report, and thus, were not assumed by Compaq under the Schedule to the APA.

35.    Inacom and Compaq did not intend that Compaq would assume liability for Held Check amounts under the Asset Purchase Agreement.

36.    There is no contract or other form of agreement between Defendant, Inacom and Compaq with respect to liability for invoices for goods delivered by Defendant to Inacom.

37.    At least as of February 15, 2000, Defendant understood, as expressed in writing, that Compaq would not be assuming through the APA any obligation to satisfy invoices for which Inacom had cut checks prior to the February 16, 2000.

38.    Defendant did not at any time agree to release Inacom of its obligation to satisfy invoices unpaid as of February 16, 2000.

39.    Section 13.05 of the Asset Purchase Agreement provides that the agreement shall be construed according to New York law without regard to the conflicts of law rules.

40.    In section 13.08, the APA provides that "No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder."

41.    In section 11.02, the APA provides that "Buyer hereby indemnifies Seller...against and agrees to hold [Seller] harmless from any and all Damages incurred...arising out of (i) any breach of covenant of agreement made or to be performed by Buyer pursuant to this Agreement; or (ii) and Assumed Liability."

42.    Allowed nonpriority unsecured claims against the Debtors' estate will likely receive distributions of approximately $.30 on the dollar, and will surely not receive 100% payment. Payment on nonpriority unsecured claims in a chapter 7 case of the Debtors would result in an even smaller distribution.

43.    If Defendant had not received the Transfers, it would hold a prepetition nonpriority unsecured claim against the Debtors' estate arising out of the invoices satisfied by the Transfers. If the Debtors' case were one under chapter 7, the estate would not have sufficient assets to pay in full any prepetition nonpriority claims of Defendant.

44.    Any finding of fact that may qualify as a conclusion of law shall be equally considered as such.

## II.  CONCLUSIONS OF LAW

### Avoidance of the Transfers Under Bankruptcy Code Section 547

1.  Section 547(b) of the Bankruptcy Code states:

The trustee may avoid any transfer of an interest of the debtor in property—

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent;

    (4) made -
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5) that enables such creditor to receive more than such creditor would receive if –
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

2.  Section 547 "aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor." *In re Molded Acoustical Products, Inc.*, 18 F.3d 217 (3d Cir. 1994). The preference provisions are designed "not to disturb normal debtor-creditor relationships, but

to derail unusual ones which threaten to heighten the likelihood of the debtor filing for

bankruptcy at all and, should that contingency materialize, to then disrupt the paramount

bankruptcy policy of the equitable treatment of creditors." *Id.* at 224.

3.      The purpose of the Preference statute is to discourage creditors from racing to the

courthouse to dismember the debtor during his slide into bankruptcy. *Report of the Committee*

*on the Judiciary, Bankruptcy Law* Revision R.H. Rep. No. 595, 95th Congress 1st sess. 177

(1977). The preference provisions facilitate the prime bankruptcy policy of a equality of

distribution among creditors of the debtor. *Coral Petroleum, Inc. v. Banque Paribas-London,*

797 F.2d 1351, 1355 5th Cir. 1986) (quoting *Report of the Committee on the Judiciary,*

*Bankruptcy Law Revision,* R.H. Rep. No. 595, 95th Congress 1st sess. 177 (1977).

4.      Plaintiff has sufficiently established all of the elements of its *prima facie* case

under Section 547(b) with respect to all of the Transfers. The parties stipulated to proof of

Section 547(b)(1), (2) and (4). As described below, Plaintiff's evidence clearly satisfied the

requirements of Section 547(b)(3) and (5) as well.

### Insolvency (547(b)(3))

5.      Inacom is presumed to have been insolvent during the Preference Period pursuant

to Bankruptcy Code § 547(f). Each defendant bears the burden to put forward sufficient

evidence of the Debtors' solvency to rebut the presumption. *See, e.g., In re Lids Corporation,*

281 B.R. 535, 540 (Bankr. D.Del. 2002)(Walrath, J.), citing Federal Rules of Evidence 301.

6.      A determination of insolvency is a mixed question of law and fact. *See In re*

*Transworld Airlines, Inc.,* 134 F.3d 188, 193 (3rd Cir. 1998); and *In re Roblin Indus,* 78 F.3d 30

(2d Cir. 1996). Evidence amounting merely to speculation that a debtor may have been insolvent

is insufficient to rebut the solvency presumption. *See In re Allegheny Health, Education and Research Foundation*, 292 B.R. 68 (Bankr. W.D. Pa. 2003) and *In re Molded Acoustical Products, Inc.*, 150 B.R. 608 (E.D. Pa. 1993).

7.      The District of Delaware's leading case on the insolvency issue is *In re Transworld Airlines, Inc.*, 180 B.R. 389 (Bkrtcy D. Del. 1994)(Walsh, J.) ("TWA"), *affirmed*, 134 F.3d 188 (3rd Cir. 1998), which explains at length the adjusted balance sheet test appropriate to evaluate a debtor's insolvency for the purposes of Section 547(b)(4). *TWA* expressly rejects the notion that the debtor's schedules or financial statements prepared in accordance with Generally Accepted Accounting Principles (GAAP) are sufficient to rebut the presumption, because they fail to include any showing as to the fair value of the debtor's assets as required by Bankruptcy Code § 101(32). *TWA at* 410. As *TWA* describes, for the purposes of the adjusted balance sheet test, assets are presented at fair value, not book value as required by GAAP, while liabilities are presented at face (book) value.

8.      The Plaintiff presented an adjusted balance sheet analysis in accordance with *TWA*, which conclusively demonstrates that the face value of Debtors' debts exceeded the fair value of their assets by $500 million at the time of the Transfers to Defendant.

| | |
|---|---|
| Assets (at fair value) | $400.2 million |
| Liabilities | $960.2 million |
| Net Financial Position | ($560 million) |

9.      The Bridge report notes: (1) After transitioning to a computer service business in February, 2000, the Debtors' primary asset was its accounts receivable. Its remaining inventory

was quickly becoming obsolete. Its fixed assets were mainly software, office equipment, furniture and leasehold improvements (for over 100 leased locations), which have little recoverable value. (2) The Debtors' long term intangible assets (such as goodwill and deferred taxes) had no value because of large losses and consistent demonstrated lack of income and profit. (3) The Debtors' had large current and long term liabilities, and over $50 million in unrecorded liabilities, including real property leases, which substantially impact a balance sheet analysis. (4) Bridge's conclusions regarding assets and liabilities are consistent with the recoveries projected for creditors through the liquidation of the bankruptcy estates.

10.    The analyses presented by Defendant used methodologies not appropriate to the adjusted balance sheet approach, and in any event, did not result in a conclusion that the Debtors were solvent at the time of the preferential transfers. Defendant's expert report, prepared by Duff & Phelps/Sasco Hill Advisors ("Sasco Hill"), not only fails to follow the adjusted balance sheet approach required by *TWA* (*TWA* at 410), but also relies on unreliable data in performing its alternative analyses (e.g., future financial projections and "comparable" competitor data from companies very different from the Debtors). A complete explanation of the errors in the Sasco Hill report is set forth in the Bridge's May 27, 2005 Rebuttal Report.

11.    Defendant misplaced reliance on a "solvency opinion" of the Debtors given by Houlihan Lokey Howard & Zukin ("HLHZ") at the time of the Compaq Sale on February 16, 2000, over one month before the Preference Period.[1] As described at length in the Plaintiff's

---

[1] The function of the HLHZ analysis was not to perform a balance sheet analysis, but to review pro forma projections (*i.e.*, future forecasts) and determine whether the Debtors would have sufficient capital to execute, e.g., pay bills as they became due, and as a result, would not trip lending covenants or run afoul of fraudulent transfer laws. HLHZ did nothing to independently verify the data which its opinion was based and the opinion was not performed for the purpose of establishing solvency under § 547(b)(3)

expert report of Murray Devine & Co., Inc. ("Murray Devine"), the HLHZ report cannot be relied upon to accurately reflect the Debtors' financial condition as of February 16, 2000, since among other problems, (1) HLHZ did not say how it became comfortable with the revenue growth projected by the Debtors' management when in fact the Debtors' revenues for the Services Business was declining; (2) HLHZ relied on inaccurate and incomplete financial information, particularly projections prepared using information from the Debtors' former chief financial officer, which were determined to be grossly inaccurate shortly after the closing of the Compaq Sale, and misleading representations by the Debtors' outside auditors, KPMG, made on the eve of the Compaq Sale, that restatements of the Debtors' prior publicly filed financial statements would be minimal when in fact those restatements were extensive; (3) HLHZ inaccurately calculated the total funded debt for covenant calculation purposes as required under the Debtors' senior credit agreement; (4) HLHZ performed inconsistent and inaccurate cash flow tests; (5) HLHZ did not take into consideration the possibility that cost savings could not be achieved; (6) HLHZ performed limited or no analyses of the assets and liabilities of the computer hardware business retained by the Debtors and the impact to the Debtors if such assets could not be sold as quickly as projected; and (7) HLHZ does not provide evidence that it either received or reviewed any of the Debtors' quarterly or annual reporting documents.

12.    Over the 60 days following the February 16 Compaq close, the truth regarding the weakness of Inacom's financial position became known through a series of events, leading its new CFO, Fitzpatrick, to conclude that he could not "believe any number coming out of Inacom." Inacom's liquidation within four months after the Compaq closing corroborates the unreliability of the HLHZ opinion.

13.    In addition to the adjusted balance sheet evaluation of insolvency, *TWA* states that the debtors' financial performance in the months preceding the bankruptcy filing is highly relevant. In sum, as noted at length above, the uncontroverted testimony from the Debtors' Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and Treasurer established that the Debtors faced a worsening liquidity crisis beginning in December, 1999. The financial crisis became severe in mid-January 2000. At that time, the Debtors went into default of their accounts receivable securitization facility with Nesbitt Burns, which began sweeping the Debtors' accounts of cash in order to pay down that outstanding obligation. The Debtors' financial crisis was so acute that management concluded bankruptcy would be necessary if the Compaq Sale did not close. The Debtors' financial crisis continued amid a number of difficulties following the Compaq closing, resulting in Management's decision, in late April, 2000, to liquidate the remaining businesses.

14.    Applying the analysis required by *TWA*, it is clear that the Debtors were insolvent during the Preference Period. Thus, the Debtors were insolvent at the time that each of the Transfers was made.

## Liquidation Analysis (547(b)(5))

15.    For purposes of the analysis required under Section 547(b)(5), only payment from the debtor's estate is considered. The right to or prospect of payment from other sources is not to be considered. 11 U.S.C. § 547(b)(5); *In re Powerine Oil Co.*, 59 F. 3d 969, 972-973 (9th Cir. 1995); *In re Virginia-Carolina Fin. Corp.*, 954 F.2d 193, 199 (4th Cir. 1992). *See, Union Bank v. Wolas*, 502 U.S. 151, 160-161, 112 S. Ct. 527, 116 L.Ed. 2d 514 (1991).

16.     Thus, even if Defendant could prove a right to recover from Compaq as a third party beneficiary under the APA following avoidance of the preferential transfers[2], that right is irrelevant to the analysis under Section 547(b)(5).  Since, as noted above, if Defendant had not received the Transfers, it would hold a prepetition nonpriority unsecured claim against the Debtors' estates arising out of the invoices satisfied by the Transfers, and if the Debtors' cases were under chapter 7, the estates would not have sufficient assets to pay in full any prepetition nonpriority unsecured claims.  Plaintiff has clearly satisfied section 547(b)(5).

## Ordinary Course of Business (547(c)(2))

17.     Once the debtor has established that a payment constitutes an avoidable preference under Section 547(b), the burden shifts to the defendant to demonstrate by a preponderance of the evidence that one of the exceptions to avoidance is applicable.  See, 11 U.S.C. § 547(g).

18.     Section 547(c)(2) provides that:

> (c) The trustee may not avoid under this section a transfer-- ...
> (2) To the extent that such transfer was--
> (A) In payment of a debt incurred by the debtor in the ordinary course of business of financial affairs of the debtor and the transferee;

---

[2] Defendant cannot demonstrate that it is a third party beneficiary under the APA under New York law, entitled to enforce any obligation of the APA against Compaq.  A party asserting rights as a third-party beneficiary must establish "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit, and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *State of California Public Employees' Retirement System v. Shearman & Sterling*, 95 N.Y.2d 427, 718 N.Y.S. 256, 259 (2000).  When determining whether a party is an intended beneficiary of an agreement, courts consider both "the intent of the parties – as revealed in their agreement – and the surrounding circumstances." *Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir. 1979). *See Nepco Forged Products, Inc. v. Consolidated Edison*, 470 N.Y.S.2d 680, 681 (N.Y. App. Div. 1984)(express provision [as in the APA] prevents any third party from bringing breach of contract claim). *Accord, Board of Managers v. Broadway/72nd Associates*, 729 N.Y.S.2d 16, 18 (N.Y. App. Div. 2001). Under Section 13.08 of the APA, the parties clearly stated that no third party beneficiaries were intended.  Moreover, the benefit to vendors from assumption of certain accounts payable was clearly incidental to the contract.

(B) Made in the ordinary course of business or financial affairs of
the debtor and the transferee;  and
(C) Made according to ordinary business terms;

19.    The defendant bears the burden of proving all three elements of § 547(c)(2) by a

preponderance of the evidence.  *See In re Midway Airlines, Inc.*, 69 F3d. 792, 797(7th Cir. 1995);

*In re Fred Hawes Org., Inc.*, 957 F.2d 239, 243 (6th Cir. 1992); *In re Cherrydale Farms, Inc.*,

2001 Bankr. LEXIS 156 (Bankr. D.Del. 2001; J. Walsh). *See also In re First Jersey Securities,*

*Inc.*, 180 F.3d 504, 512 (3rd Cir. 1999); *J.P. Fyfe, Inc. of Florida v. Bradic Supply Corp.*, 891

F.2d 66, 69-70 (3rd Cir. 1989).

20.    The determination of whether a defendant has satisfied its burden under §

547(c)(2)(B) is a subjective examination concerning the consistency of dealings between the

debtor and the defendant before and during the preference period. *First Jersey Sec.*, 180 F.3d at

512. The primary factors in determining whether a payment was made in the ordinary course

include (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the

subject transfer was in an amount more than usually paid; (3) whether the payments were

tendered in a manner different than previous payments; and (4) whether there appears to be any

unusual action by the debtor or creditor to collect on or pay the debt *In re Global Tissue*, 302

B.R. 808, 812 (D.Del. 2003). *See In re Hechinger Investment Co. of Delaware, Inc.*, 320 B.R.

541 (Bankr. D. Del. 2004) (emphasis added) and *In re Allegheny Health Education and Research*

*Foundation*, 292 B.R. 68 (Bankr. W.D.Pa. 2003).  This determination depends upon the

particular facts of each case. *In re APS Holding Corp.*, 282 B.R. 795, 802 (Bankr. D. Del. 2002);

*In re Kaypro*, 218 F.3d 1070 (9th Cir. 2000); *In re Molded Acoustical Products, Inc.*, 150 B.R.

608 (E.D. Pa. 1993), *affirmed*, 18 F.3d 217 (3rd Cir. 1994).

21.    Although timing or lateness of the payments are factors to be considered, "if any one of the factors is compellingly inconsistent with prior transactions, the payment is deemed to be outside the ordinary course of business between the parties". *In re Sibilrud*, 308 B.R. 388 (Bankr. D. Minn. 2004) (citing *In re Laclede Steel Co.*, 271 B.R. 127 (8th Cir. BAP 2002)).

22.    One key factor in determining whether a payment was made in the ordinary course of a parties' dealing is whether there was any unusual activity by the debtor in making the payment. *In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir 1986)(the debtor's state of mind in making the challenged payment is a material factor in the evaluation of whether the creditor can avail itself of the ordinary course of business defense). *See also, In re George Rodman, Inc.*, 792 F.2d 125, 127 (10th Cir. 1986); *Global Tissue, supra*, 302 B.R. at 812; *In re Schwinn Bicycle Co.*, 205 B.R. 557 (Bankr. N.D. Ill 1997).

23.    Unprecedented holding of checks by the debtor during the preference period is indicia of activity outside of the ordinary course of business. *In re Braniff, Inc.*, 154 B.R. 773, 778, 782 (Bankr. M.D. Fla. 1993); *In re Miller & Rhoads, Inc.*, 153 BR 725, 726-727 (Bankr. E.D.Va. 1992).

24.    The ordinary course of business exception is narrowly interpreted. *In re Industrial Steel Supply Corp.*, 127 B.R. 62 (N.D. Fla. 1991), *aff'd*, 961 F. 2d 1582 (11th Cir. 1992).

25.    Defendant has not met its burden of establishing that the Transfers were made in the ordinary course of business between Defendant and the Debtors. The invoices paid by the preferential payments were aged much longer than previously, as a result of Inacom's unprecedented check holding activity. Since all of the preferential payments were made with

held checks, they are inherently extraordinary and cannot be shielded from recovery under § 547(c)(2)(B).

26.     In addition, the preferential transfers all fell outside of the ordinary course of business because the invoices paid by the Transfers were aged well beyond the practice established by the parties prior to the preference period.  Plaintiff's evidence depicted the parties' payment history on product purchases from January, 1999 through May, 2000.  From this evidence, it is clear that the parties' payment practice during the preference period (March 17 – June 16, 2000) bore no similarity to the payment practice prior thereto.  Plaintiff's graphs clearly depict a de minimis overlap.

27.     The detail reflects that, prior to the preference period, measuring invoice dollars paid, Inacom paid 85% of Defendant's invoices within 45 days after invoicing.  During the preference period, Inacom paid only 0.5% of invoice dollars within 45 days, and after 85 days, had paid only 8.2%.  Thus, of invoice dollars paid to Defendant during the preference period, 91.8% was paid within 85 and 95 days.

28.     In accordance with the established case law regarding § 547(c)(2)(B), the payments made after the sale of the Debtors' Distribution Business and cessation of business transactions with Defendant, the late aging of the invoices paid by the Transfers, and the Debtors' intentional practice of holding checks are clearly sufficient for the Court to conclude that the Transfers were not made in the ordinary course of business or financial affairs of the Debtors and Defendant, and that Defendant has failed to meet its burden under § 547(c)(2)(B) of the Bankruptcy Code.  For all of the above reasons, none of the Transfers was made in the

ordinary course of business or financial affairs of the Debtors and Defendant pursuant to 11 U.S.C. § 547(c)(2)(B).

29.     It is unnecessary to consider the third independent prong of the ordinary course of business defense, Section 547(c)(2)(C), because Defendant is unable to satisfy the "subjective" test of Section 547(c)(2)(B). Nonetheless, it was clear from the evidence that none of the Transfers was made according to ordinary business terms pursuant to 11 U.S.C. § 547(c)(2)(C).

30.     Section 547(c)(2)(C) "requires that the court examine the transfer from an objective viewpoint, e.g., was it consistent with the industry-wide norm?" *Molded Acoustical, supra*, 150 B.R. at 615. The objective test has been interpreted as "encompassing the practices in which firms similar in some general way to the creditor in question engage. *First Jersey Securities, supra*, 180 F.3d at 513.

31.     The Plaintiff's expert on "ordinary business terms", Stuart A. Gollin of Weiser LLP ("Weiser"), provided the most credible testimony on this issue. Mr. Gollin began by identifying the relevant industry for creditors such as Defendant. Next, a thorough search was conducted to identify Weiser clients in similar industries to Defendant. An additional search was conducted utilizing the services of Dun & Bradstreet, Moores Rowland International, two nationally recognized credit and business data reporting companies, and Strategic Consulting & Research Group, a data gathering organization.

32.     The report of Weiser LLP establishes that the ordinary payment practice in the computer hardware distribution industry, in which Defendant operates as a vendor, is for invoices to be paid within stated terms, and all told, 91% of all invoice dollars paid in this industry are paid within 30 days after invoice due date. Thus, since all of the invoices paid by

the preferential payments were aged more than 30 days after the invoice due date, the payments were outside of ordinary industry practice.

33.     Defendant did not introduce any expert testimony on this issue, instead submitting testimony of its employee, who has no personal knowledge of ordinary payment practices throughout the Defendant's industry, and did not conduct any research thereon.

34.     Defendant has failed to satisfy its burden to establish that each of the Transfers was made in accordance with ordinary business terms under Section 547(c)(2)(C).

### Recovery of the Transfers Under Bankruptcy Code Section 550(a)

35.     Defendant was in the initial transferee of each of the Transfers. As the Plaintiff has established its case for avoidance of the Transfers under Bankruptcy Code Section 547(b), it is entitled to judgment in its favor and against Defendant in the total amount of the Transfers, $2,928,090.91. The Transfers are held to be avoidable under Section 547 and recoverable in full by the Debtors under Section 550 of the Bankruptcy Code.

36.    Any conclusion of law that may qualify as a finding of fact shall be equally

considered as such.

Dated:    August *15*, 2005          PACHULSKI, STANG, ZIEHL, YOUNG, JONES
                                     & WEINTRAUB P.C.


                                     _____
                                     Laura Davis Jones (Bar No. 2436)
                                     Sandra McLamb (Bar No. 4283)
                                     919 North Market Street, 16th Floor
                                     Wilmington, DE  19899-8705 (Courier 19801)
                                     Telephone:  (302) 652-4100
                                     Facsimile:  (302) 652-4400

                                     Andrew W. Caine (CA Bar No. 110345)
                                     Jeffrey P. Nolan (CA Bar No. 158923)
                                     10100 Santa Monica Blvd., Suite 1100
                                     Los Angeles, California 90067
                                     Telephone: (310) 277-6910
                                     Facsimile: (310) 201-0760

                                     Counsel for Plaintiff, INACOM CORP.