# Exhibit B

COPY

U.S. DISTRICT COURT
DISTRICT OF DELAWARE
CASE NO. 04-CV-583

---

**DEPOSITION OF KEVIN SARKISIAN**

---

| | |
|---|---|
| INACOM CORPORATION ON BEHALF OF ALL AFFILIATED DEBTORS | PLAINTIFF |
| v. | |
| LEXMARK INTERNATIONAL, INC. | DEFENDANT |
| LEXMARK INTERNATIONAL, INC. | THIRD-PARTY PLAINTIFF |
| v. | |
| COMPAQ COMPUTER CORP., ITY CORPORATION, AND CUSTOM EDGE, INC. | THIRD-PARTY DEFENDANTS |

---

Pursuant to Notice, the deposition of **KEVIN SARKISIAN** was taken on behalf of the Plaintiff before Patricia A. Seckley, Court Reporter and Notary Public in and for the State of Kentucky at Large, at the offices of Stoll, Keenon & Park, 300 West Vine Street, Suite 2100, Lexington, Kentucky on Monday, August 1, 2005, commencing at the hour of 10:00 a.m.

The deposition was taken for purposes of discovery and for all other purposes permitted under all applicable laws.

---

ACTION COURT REPORTERS
184 North Mill Street
Lexington, Kentucky  40507
859-252-4004

1

## APPEARANCES

**COUNSEL FOR PLAINTIFF:**

Jeffrey P. Nolan
PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB, P.C.
1011 Santa Monica Boulevard
11th Floor
Los Angeles, California  90067-4100


**COUNSEL FOR DEFENDANT LEXMARK INTERNATIONAL, INC.:**

Culver V. Halliday
STOLL KEENON & PARK
400 West Market Street, Suite 2650
Louisville, Kentucky  40202-3377

```
 1   certain guidelines to prevent collusion.  But we do get
 2   a view of what the other vendors are offering to
 3   customers, especially vendors that are very much like
 4   us that are printer companies or have some -- at least
 5   some portion of other company sells printers.  But my
 6   knowledge would tell me that, you know, everyone does
 7   act independently and makes their own decisions
 8   regarding terms and what credit limits they're going to
 9   set and when they're going to become worried about a
10   customer and when they might invoke a stop shipment.
11        Q.    Okay.  The competitor -- you mentioned the
12   competitors of Lexmark in the -- in the printing
13   industry, correct?
14        A.    Uh-huh.
15        Q.    Okay.  Can you tell me who the competitors
16   are of Lexmark in the printing industry.
17        A.    Our main competitors are Hewlett Packard,
18   Canon, and Epson.
19        Q.    And anybody else?
20        A.    Well there's a few smaller groups.
21        Q.    Okay.
22        A.    Xerox, Kodak, Brother International.
23        Q.    Okay.
24        A.    Fuji Xerox, Samsung, Kyocera.  I think it's
25   K-y-o-c-e-r-a, let's see, [phonetic: Kee-oh-seer-uh].
```

1   Q. And when did you -- I'm sorry. I hate to do
2   this again, but when did you start with Lexmark?
3   A. In June of 1992.
4   Q. Previously, Mr. Sarkisian, I asked you about
5   what Lexmark's competitors' payment terms were in 1999.
6   Do you recall that testimony?
7   A. Vaguely.
8   Q. Okay. Let me ask you again. Do you know
9   what any of your competitors that you were kind enough
10  to just mention, do you know what their payment terms
11  were in the 1999 time frame?
12  A. For any customers or for Inacom or --
13  Q. For any of their customers.
14  A. I don't recall specifically in 1999.
15  Q. Do you know whether or not any of those
16  competitors -- and I'll just put them all together --
17  not only the big, large competitors but the smaller
18  medium-sized ones that you mentioned like Xerox and
19  Kodak, do you know whether or not they set payment
20  terms based upon the size of the customer or as opposed
21  to how much the customer purchased from them?
22  A. I do not.
23  Q. And how did Lexmark set the terms for
24  customers such as Inacom? Was it based upon the amount
25  of product that they purchased or based upon the size

1  Inacom was considered a distribution customer, like
2  Ingram Micro, like Tech Data, like the former MicroAge
3  and a couple of other guys.
4      Q.   And the terms that Lexmark utilized in the
5  1999 time frame, that was, if I remember correctly, net
6  15 days with a three-quarter percent discount and
7  otherwise net 45 days?
8      A.   Yes. We refer to it as three-quarters of a
9  percent of a discount if they paid in 15 days or net
10 45.
11     Q.   And that was the same term in both the 1999
12 time frame as well as the 2000 time frame for
13 distributors such as Inacom?
14     A.   Yes.
15     Q.   Do you know what competitors of Lexmark such
16 as HP, Canon, or Epson's payment terms were in the 1999
17 time frame?
18     A.   I do not.
19     Q.   Do you know what they were in the 2000 time
20 frame?
21     A.   I do not.
22     Q.   How about in the 1998 time frame?
23     A.   I do not. If I knew them, I don't recall.
24     Q.   Mr. Sarkisian, do you know what the payment
25 terms were that were issued by competitors on this

1  lower, smaller tier that you mentioned, such as the
2  Xerox, Kodak, Brother International, do you know what
3  they were in the 1990 [sic] 2000 time frame?
4      A.   I do not recall.  I guess I would answer the
5  same way and say, if I knew them at the time, I don't
6  recall now.
7      Q.   Do you know whether or not any of Lexmark's
8  competitors in this larger tier, such as HP, Canon, and
9  Epson, do you know whether or not they used a
10 percentage discount or early pay that you were
11 discussing earlier?
12     A.   I seem to recall that Canon has always
13 offered an early pay discount.  And that's the only
14 thing I can recollect.
15     Q.   Okay.  Do you know that their -- what was
16 early pay to them?
17     A.   No.  I don't recall specifically.
18     Q.   Okay.  Meaning yours, being Lexmark, was 15
19 days.  We don't know if Canon's was five days or ten
20 days?
21     A.   No, I do not.
22     Q.   Do you know whether or not any of the other
23 competitors -- this is in the smaller tier of the Xerox
24 and the Kodaks -- whether or not they had early pay
25 discounts that they offered to their customers?

```
 1        A.    No, I couldn't.
 2        Q.    Do you know whether or not any of Lexmark's
 3   competitors had net 15 day terms?
 4        A.    I don't recall.
 5        Q.    Do you know whether or not any of Lexmark's
 6   competitors, either the large tier or the smaller
 7   tiers, had net 60 day terms?
 8        A.    I don't recall.
 9        Q.    Mr. Sarkisian, do you know if anyone had
10   terms that were longer than net 60 day in the printing
11   industry in the 1998 to 2000 time frame?
12        A.    I don't recall.
13        Q.    Did you ever have any knowledge or did you
14   perform any type of a study to determine what the
15   average interval was between the date an invoice was
16   issued and the date payment was received for
17   competitors of Lexmark?
18        A.    No.  You mean going to -- out and asking
19   them how their customers are paying them and then
20   putting it all together?
21        Q.    Yeah.  I'm trying to get --
22        A.    No.
23        Q.    You testified in your prior deposition as to
24   what was considered a late payment.  And I believe some
25   of the other individuals, when the sales force through
```

1   Lexmark testified as to what was considered a late
2   payment. Do you have any knowledge of what the
3   competitors of Lexmark would term a late payment?
4        A.   Other than discussing with other vendors, I
5   don't have specific information. Again, when we would
6   meet in our credit meetings, our credit association
7   meetings, you know, we would talk about past dues. And
8   certainly anybody would report an invoice being past
9   due when it was beyond the terms that were offered.
10       Q.   Okay.
11       A.   That is, as I know, a universal reporting
12  mechanism.
13       Q.   Okay. But you just don't know what their
14  terms were.
15       A.   I don't recall specifically. Again, I may
16  have known if we talked with a particular vendor about
17  a particular customer. But going back that far, I
18  don't recall specifically what -- what people were
19  offering Inacom and in general what they were offering
20  their other customers. The amount of time that's gone
21  by has influenced that more than anything.
22       Q.   Did you ever perform any -- and this is not
23  recently but in the past -- have you ever performed any
24  type of statistical analysis as to any of the
25  competitors of Lexmark as to what they considered to be

```
 1    the range or the average range for when invoices should
 2    be paid to their business?
 3         A.    No.
 4         Q.    Do you know whether or not -- you know what
 5    the term shipping hold is, correct?
 6         A.    Yes.
 7         Q.    Do you know whether or not other competitors
 8    of Lexmark placed customers on shipping hold?
 9         A.    Could you ask that again, please.
10         Q.    Yeah. Do you -- do you -- you're aware of
11    what the term shipping hold is, correct?
12         A.    Correct.
13         Q.    Since I don't use a different definition
14    than you have in your mind, why don't you tell me what
15    you believe or what you define or what you're
16    comfortable with the term shipping hold to mean, you
17    know, at -- given your capacity at Lexmark.
18         A.    Okay. If an order comes in from a customer
19    and Lexmark determines -- or Lexmark credit department
20    determines that they're not going to ship it because
21    there is a risk involved -- and that risk can be -- can
22    take on many different forms, but the credit department
23    determines that they're not going to ship this new
24    order, then we call that -- we call it a credit hold.
25    But it would also be known as a shipping hold.
```

1  HPs, the Canons, do you know how they viewed held
2  checks?
3      A.   I do not.
4      Q.   And this is in this 1998 to 2000 time frame.
5      A.   Yes.  I do not.
6      Q.   How about the smaller tier, the Xerox, the
7  Kodaks, the Fujis, do you know whether or not or how
8  competitors of Lexmark viewed held checks?
9      A.   No, I do not.
10     Q.   Do you know whether or not some of the
11 competitors of Lexmark in the smaller group actually
12 shared the same view of held checks as you did?
13     A.   I do not.
14     Q.   And I may have asked you this, but did
15 you -- and I apologize, but I'm just going to make sure
16 because I want to make sure I cover anything.  Do you
17 know whether the competitors of Lexmark had differing
18 payment terms for outstanding invoices based on the
19 size of the customer?
20     A.   I do not.
21     Q.   Do you know whether or not any of the
22 customers of Lexmark varied those payment terms based
23 on the amount that the customer actually purchased?
24     A.   No, I do not.
25          MR. NOLAN:  All right.  I don't think I