UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re INACOM CORP., et al.<br>Debtors | Chapter 11<br>Bankruptcy Case No.<br>00-2426 (PJW) |
| INACOM CORP., et al.<br>v.<br>TECH DATA CORPORATION | Civil Action No.<br>04-CV-148 (GMS) |
| INACOM CORP., et al.<br>v.<br>INGRAM MICRO INC. | Civil Action No.<br>04-CV-580 (GMS) |
| INACOM CORP., et al.<br>v.<br>DELL COMPUTER CORP. | Civil Action No.<br>04-CV-582 (GMS) |
| INACOM CORP., et al.<br>v.<br>LEXMARK INTERNATIONAL, INC. | Civil Action No.<br>04-CV-583 (GMS) |
| INACOM CORP., et al.<br>v.<br>RESILIEN, INC. | Civil Action No.<br>04-CV-584 (GMS) |
| INACOM CORP., et al.<br>v.<br>INGRAM ENTERTAINMENT INC. | Civil Action No.<br>04-CV-593 (GMS) |

ORAL DEPOSITION OF

**LAZARUS KRIKORIAN**

January 7, 2005



**FREDERICKS-CARROLL REPORTING & LITIGATION SERVICES, INC.**

| | | | | |
|---|---|---|---|---|
| 7719 Wood Hollow Drive ❖ Suite 156 ❖ Austin, Texas 78731 | ❖ | (800) 234-3376 | ❖ (512) 477-9911 | ❖ (512) 345-1417 Fax |
| 9 Greenway Plaza ❖ Suite 3112 ❖ Houston, TX 77046 | ❖ | (800) 234-3376 | ❖ (713) 572-8897 | ❖ (512) 345-1417 Fax |
| 909 N.E. Loop 410 ❖ Suite 810 ❖ San Antonio, TX 78209 | ❖ | (800) 767-9161 | ❖ (210) 222-9161 | ❖ (210) 225-1476 Fax |

```
 1                UNITED STATES DISTRICT COURT
                       DISTRICT OF DELAWARE
 2

 3   _____ )
     In re INACOM CORP., et al.     ) Chapter 11
 4           Debtors                ) Bankruptcy Case No.
                                    ) 00-2426 (PJW)
 5   _____ )
                                    )
 6   INACOM CORP., et al.           )
             Plaintiffs             )
 7        v.                        ) Civil Action No.
                                    ) 04-CV-148 (GMS)
 8   TECH DATA CORPORATION          )
             Defendant              )
 9   _____ )
                                    )
     INACOM CORP., et al.           )
10           Plaintiffs             )
          v.                        ) Civil Action No.
11                                  ) 04-CV-580 (GMS)
     INGRAM MICRO INC.              )
12           Defendant              )
     _____ )
13                                  )
     INACOM CORP., et al.           )
14           Plaintiffs             )
          v.                        ) Civil Action No.
15                                  ) 04-CV-582 (GMS)
     DELL COMPUTER CORP.            )
16           Defendant              )
     _____ )
17                                  )
     INACOM CORP., et al.           )
18           Plaintiffs             )
          v.                        ) Civil Action No.
19                                  ) 04-CV-583 (GMS)
     LEXMARK INTERNATIONAL, INC.    )
20           Defendant              )
     _____ )
21                                  )
     INACOM CORP., et al.           )
22           Plaintiffs             )
          v.                        ) Civil Action No.
23                                  ) 04-CV-584 (GMS)
     RESILIEN, INC.                 )
24           Defendant              )
     _____ )
25
```

```
 1  _____
                                    )
 2  INACOM CORP., et al.            )
            Plaintiff               )
 3      v.                          )  Civil Action No.
                                    )  04-CV-593 (GMS)
 4  INGRAM ENTERTAINMENT INC.       )
            Defendant               )
 5  _____)
```

\*-\*-\*-\*-\*

## ORAL DEPOSITION OF LAZARUS KRIKORIAN

On the 7th day of January, 2005, between the hours of 9:05 a.m. and 12:40 p.m., at the Wyndham Valley Forge Hotel, 888 Chesterbrook Boulevard, Wayne, Pennsylvania, before me, CYNTHIA VOHLKEN, a Certified Shorthand Reporter for the State of Texas, appeared **LAZARUS KRIKORIAN**, who, being by me first duly sworn, gave an oral deposition at the instance of the Defendant Tech Data Corporation in said cause, pursuant to the Federal Rules of Civil Procedure.

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF INACOM CORP.:

 3        Mr. Andrew W. Caine
          Pachulski, Stang, Ziehl, Young,
 4          Jones & Weintraub
          10100 Santa Monica Boulevard
 5        11th Floor
          Los Angeles, California  90067-4100
 6

 7   FOR THE EXECUTIVE SOUNDING BOARD ASSOCIATION, INC. AS
     PLAN ADMINISTRATOR:
 8
          Mr. Elio Battista, Jr.
 9        Blank Rome LLP
          Chase Manhattan Centre
10        1201 Market Street, Suite 800
          Wilmington, Delaware  19801
11
               -and-
12
          Mr. Earl M. Forte
13        (By Telephonic Means)
          Blank Rome LLP
14        One Logan Square
          18th & Cherry Streets
15        Philadelphia, Pennsylvania 19103-6998

16
     FOR THE DEFENDANT TECH DATA CORPORATION:
17
          Mr. Stephen C. Hunt
18        Adorno & Yoss, LP
          350 East Las Olas Boulevard
19        17th Floor
          Fort Lauderdale, Florida  33301
20

21   FOR THE DEFENDANT DELL COMPUTER CORPORATION:

22        Ms. Sabrina L. Streusand
          Hughes & Luce, LLP
23        111 Congress Avenue
          Suite 900
24        Austin, Texas  78701

25
```

1  Q.  Did that ever change over the time that you
2  were working at InaCom?
3  A.  In the post-petition period, you know, Tom
4  Fitzpatrick left and I sort of reported up through
5  Bridge Associates in a -- in a -- in a manner, sure.     08:19
6  Q.  Would you identify which function Bridge
7  Associates had with respect to InaCom during the
8  post-petition period?
9  A.  The way I look at it is they administered the
10 whole -- the whole post-petition process of -- of the    08:20
11 estate of income, protecting -- you know, protecting
12 and trying to collect as much assets as possible for
13 the estate for the future use of creditors.
14 Q.  Were you involved with the advance planning
15 for the sale of the hardware business to Compaq?         08:20
16 A.  No.
17 Q.  At some point since you joined the company
18 prior to the closing did you have any involvement with
19 the sale?
20 A.  No.                                                  08:20
21 Q.  Isn't it true that at one point prior to the
22 bankruptcy proceeding there was some consideration
23 regarding the sale of the servicing business to
24 CompuCom?
25 A.  Yes.                                                 08:20

```
 1    Q.   Were you involved in any way with the
 2  discussions regarding that proposed sale?
 3    A.   No, not directly.  I was involved in a manner
 4  such that, you know, I was working with KPMG to
 5  facilitate getting audited financials complete for the        08:21
 6  1999 year, which obviously CompuCom would need in
 7  the -- in the subsequent SEC filing.
 8    Q.   Was it in connection with the CompuCom sale
 9  that you discovered a substantial footing error with
10  some reporting?                                               08:21
11    A.   No.  It had nothing to do with the CompuCom
12  sale.
13    Q.   What did that have to do with?
14    A.   It's just, you know, I discovered footing and
15  other mechanical and accounting errors in rebate -- in       08:21
16  the rebate receivables area and I believe it was late
17  February/early March and it was just in the -- in the
18  course of trying to complete the audit.
19    Q.   In functioning as controller of InaCom did
20  you directly interact with any subordinates of the           08:22
21  company?
22    A.   My subordinates?
23    Q.   Yes.
24    A.   Sure.
25    Q.   Please explain for me the types of people             08:22
```

```
 1  recall Chris' last name were involved with service
 2  forecasts for the company in that -- during that time
 3  period.
 4      Q.  In your position as controller would you have
 5  typically reviewed service revenue forecasts?
 6      A.  Not in the circumstances in which I was
 7  operating under, no.
 8      Q.  Were you aware that there had been a downward
 9  revision to the service revenue forecasts for the
10  second quarter of 2000 from those which were
11  originally projected?
12          MR. ABBOTT:  I'm going to object to the
13  form.
14          MR. CAINE:  Object no foundation.
15      A.  No.
16      Q.  (BY MR. HUNT)  Mr. Krikorian, do you know how
17  far the proposed sale to CompuCom proceeded before it
18  was determined it would not happen?
19      A.  I believe it proceeded very far.  And at the
20  end it's my understanding that the deal didn't go
21  through because company management in KPMG could not
22  assure -- safeguard that the -- could not assure them
23  exactly when audited financials would be delivered.
24      Q.  Did that also have an impact in CompuCom
25  being unable to state an 8-K as required by the SEC
```

1  for that closing?
2      A.  I'm sorry, can you repeat the question?
3      Q.  Did that result in CompuCom not being able to
4  state an 8-K for that proposed closing as would have
5  been required by the SEC?                                           11:03
6          MR. CAINE:  Objection, vague and
7  ambiguous.
8      A.  Well, the deal was never consummated, so why
9  would an 8-K be filed?
10     Q.  (BY MR. HUNT)  Okay.  Would you agree that    11:04
11 the deal preceded far enough that it would have closed
12 but for the issues that you mentioned regarding KPMG?
13     A.  That's my understanding.
14     Q.  Would you agree that the reasons that the
15 CompuCom deal did not close were unrelated to the      11:04
16 financial conditions of InaCom?
17         MR. CAINE:  Objection, vague and
18 ambiguous.
19     A.  I don't know.
20     Q.  (BY MR. HUNT)  Do you recall how far into     11:04
21 calendar year 2000 the sale discussions continued with
22 CompuCom before the deal was -- before the deal was
23 settled?
24     A.  My understanding, discussions proceeded
25 either up to a couple days before the actual filing    11:05

1  such a report?

2  A.  I don't recall.

3  Q.  From the time that you joined InaCom in

4  January 2000 through the end of April of 2000 would

5  you agree that InaCom was conducting its remaining            11:10

6  business operations in the ordinary course?

7           MR. CAINE:  Objection, vague and

8  ambiguous.

9           MR. ABBOTT:  Object to the form of the

10  question.                                                    11:11

11  A.  To the best of my knowledge it was.

12  Obviously it was dealing with a lot of obstacles, but

13  yes.

14  Q.  (BY MR. HUNT)  Would you agree it was

15  operating as an entity that was a going concern as           11:11

16  opposed to one that was ready to close the doors in

17  the near future?

18           MR. CAINE:  Hang on a second.  I'll use

19  your object as to form.

20           MR. ABBOTT:  I will do that one.

21           MR. CAINE:  So many problems with it.

22  A.  I think everybody was doing their best --

23  doing their best from an operational standpoint.

24  Q.  (BY MR. HUNT)  Were you aware of any other

25  entities besides CompuCom that expressed an interest         11:12

FREDERICKS-CARROLL REPORTING
AUSTIN  (512) 477-9911  -  HOUSTON  (713) 572-8897
SAN ANTONIO  (210) 222-9161

1  the commingled funds.
2      Q.   Do you know what the liquidity or the
3  borrowing authority InaCom had in April 2001?
4      A.   No.
5      Q.   If it was in the range of 89,681,203, would                12:11
6  that have provided sufficiently liquidity for InaCom?
7           MR. ABBOTT:  I'll object to the form of
8  the question.
9      A.   I don't know.
10     Q.   (BY MS. STREUSAND)  Do you know the amount                 12:11
11 that InaCom agreed in terms -- in terms of the muddied
12 receivables, do you know in April 2000 if that number
13 was quantified?
14     A.   I don't know that there was a -- I don't know
15 that there was any finalization on that number, no.                 12:12
16 I'm not aware that there was.
17     Q.   Later in time do you know what that number
18 was finalized to?
19     A.   No, I don't.
20     Q.   Do you know the sales price that was agreed                12:12
21 to between CompuCom and InaCom?
22     A.   No, I don't.
23     Q.   Do you have any idea of the range?
24     A.   I don't.
25     Q.   Did you provide financial information to                   12:13

1  CompuCom in order to help facilitate that sale?
2       A.   I'm sure I probably did.
3       Q.   Okay.  Can you identify what type of
4  documents you provided to help facilitate that sale?
5       A.   I don't recall what they would have been.                      12:13
6       Q.   Were there forecasts of revenues from the
7  service business provided or prepared by Bank Group in
8  let's just say March or April of 2000?
9       A.   I believe so.
10      Q.   Do you have any memory of what those                           12:14
11 forecasts showed?
12      A.   I do not.
13      Q.   Do you know where they would have been kept
14 in the files of InaCom?
15      A.   I do not.                                                      12:14
16           MS. STREUSAND:  I also make the same
17 request of either Blank Rome or Pachulski, if those
18 documents can be identified or if you want to give us
19 the index we'll try and determine where those are.
20           MR. HUNT:  Join.                                               12:14
21           MR. CAINE:  Okay.
22           MS. STREUSAND:  And to further clarify,
23 I do think it's part of our overall document request,
24 but I notice as the witness is going forward these
25 documents are getting more specific, but we do have    12:15

1  about KPMG as working with InaCom on the financials
2  for '99 and '98 and you also had stated previously
3  that Deloitte & Touche was also working with InaCom.
4  What relationship did Deloitte & Touche have with
5  InaCom versus KPMG's role?                                    12:18
6       A.   Immediately prior to the bankruptcy filing,
7  to the best of my recollection Deloitte & Touche had
8  two primary roles.  One was assisting me with
9  gathering the information that would be required for a
10 bankruptcy filing.  The other one was working with Tom   12:18
11 as it related to the -- I believe bank -- bank
12 related, treasury related issues and matters.
13      Q.   Do you know when Deloitte was retained by
14 InaCom?
15      A.   I believe it was in May 2000.                      12:19
16      Q.   Back to the CompuCom transaction.  The
17 business that was to be sold to CompuCom, was it
18 intended to be what I would call a continuing
19 business, a business that would remain intact or was
20 it going to be liquidated by CompuCom?                       12:19
21           MR. CAINE:  Objection, no foundation.
22      A.   To the best of my knowledge, it was a
23 business that would have continued.  CompuCom would
24 have continued to service the InaCom customers.
25      Q.   (BY MS. STREUSAND)  And the InaCom employees       12:20

```
 1  would continue to have jobs, correct?
 2      A.   I assume so.  Most of them, I assume, you
 3  know, just like any other merger of two giants,
 4  there's always sort of a re-sizing that takes place,
 5  but yeah.                                              12:20
 6      Q.   But InaCom's remaining business fundamentally
 7  was a service business, correct?
 8      A.   That's correct.
 9      Q.   And so if CompuCom was interested in buying
10  it, it was to buy what I would call the brain power    12:20
11  from the InaCom business, correct?
12      A.   Right.
13      Q.   Would goodwill have been included as part of
14  the purchase price that InaCom was going to sell that
15  business to CompuCom?                                  12:21
16           MR. CAINE:  Objection, no foundation,
17  calls for speculation.
18           MR. ABBOTT:  I object to the form, but
19  you can answer.
20      A.   Uh-huh.  The answer to that question depends  12:21
21  on what the sales price was in comparison to what the
22  net assets acquired were.
23      Q.   (BY MS. STREUSAND)  And you don't know?
24      A.   (Shakes head negatively).  I don't have that
25  information.                                           12:21
```