GERALD A. GAGLIARDI

COPY

Page 1

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF DELAWARE
 2
                          -   -   -
 3
     In re:                       : CHAPTER 11
 4   INACOM CORP., et al.,        : BANKRUPTCY CASE
          Debtors                 : NO. 00-2426(PJW)
 5   _____
     INACOM CORP., et al.         : CIVIL ACTION
 6        -vs-                     :
     TECH DATA CORPORATION        : NO. 04-CV-148(GMS)
 7   _____
     INACOM CORP., et al.         : CIVIL ACTION
 8        -vs-                     :
     DELL COMPUTER CORP.          : NO. 04-CV-582(GMS)
 9   _____
     INACOM CORP., et al.         : CIVIL ACTION
10        -vs-                     :
     LEXMARK INTERNATIONAL, INC.  : NO. 04-CV-583(GMS)
11   _____
     INACOM CORP., et al.         : CIVIL ACTION
12        -vs-                     :
     RESILIEN, INC.               : NO. 04-CV-584(GMS)
13   _____
     INACOM CORP., et al.         : CIVIL ACTION
14        -vs-                     :
     INGRAM ENTERTAINMENT, INC.   : NO. 04-CV-593(GMS)
15
                          -   -   -
16
              Oral deposition of GERALD A. GAGLIARDI,
17   was taken pursuant to notice, held at BLANK ROME,
     LLP, One Logan Square, 18th & Cherry Streets,
18   Philadelphia, Pennsylvania, commencing at 9:33 a.m.
     on April 6, 2005, before April J. Foga, Certified
19   Shorthand Reporter and Notary Public, there being
     present:
20
                          -   -   -
21
                 ZANARAS REPORTING AND VIDEO
22            REGISTERED PROFESSIONAL REPORTERS
       1616 Walnut St., Ste. 300      2112 Bay Avenue
23     Philadelphia, PA 19103      Ocean City, NJ 08226
              (215) 790-7857   1-877-GO-DEPOS
24
```

DISK ENCLOSED

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

Page 2

```
 1    A P P E A R A N C E S:

 2

 3          PACHULSKI, STANG, ZIEHL, YOUNG,
            JONES & WEINTRAUB
 4          BY:  ANDREW W. CAINE, ESQUIRE
            10100 Santa Monica Boulevard, 11th Floor
 5          Los Angeles, California 900067
            (310) 277-6910
 6          Counsel for Plaintiff, Inacom, Corp.

 7

            BLANK ROME, LLP
 8          BY:  EARL M. FORTE, ESQUIRE
            One Logan Square
 9          18th & Cherry Street
            Philadelphia, PA 19103
10          (215) 569-5618
            Counsel for Executive Sounding Board Associates,
11          Inc., liquidating agent for Inacom Corp. and
            affiliated debtors

12

13          ADORNO & YOSS, LLP
            BY:  STEPHEN C. HUNT, ESQUIRE
14          350 East Las Olas Boulevard, Suite 1700
            Fort Lauderdale, FL 33301
15          (954) 763-1200
            Counsel for Defendant Tech Data Corporation

16

17          HUGHES, LUCE, LLP
            BY:  SABRINA L. STREUSAND, ESQUIRE
18          111 Congress Avenue, Suite 900
            Austin, Texas 78701
19          (512) 482-6842
            Counsel for Defendant, Dell, Inc.

20

21
      (Appearance Page continued on Page 3.)
22

23

24
```

GERALD A. GAGLIARDI

```
 1    A P P E A R A N C E S:

 2


 3         ZUCKERMAN, SPAEDER, LLP
           BY:  THOMAS G. MACAULEY, ESQUIRE
 4         919 Market Street, Suite 990
           Wilmington, DE 19899
 5         (302) 427-0400
           Counsel for Defendant, Ingram Entertainment,
 6         Inc.


 7
           MORRIS, NICHOLS, ARSHT & TUNNELL
 8         BY:  DEREK C. ABBOTT, ESQUIRE
           1201 North Market Street
 9         Wilmington, DE 19899
           (302) 575-7357
10         Counsel for Defendant, Hewlett-Packard Company

11

12

13

14

15                        -   -   -

16

17

18

19

20

21

22

23

24
```

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

Page 95

1    damaging.  The fact that at the 99th hour when

2    we were trying to sell the assets to Compucom

3    and had a deal and Safeguard Scientific said

4    they couldn't allow the transaction to happen

5    because it was going to affect their tax

6    position.  Compucom was happy with the

7    transaction and the fact that there were no

8    financials.  Safeguard Scientific wouldn't let

9    us honor the contract or wouldn't let them do

10   the contract.  Otherwise, we could have

11   packaged the thing and we could have saved the

12   5,000 jobs that got taken and none of us would

13   have ever met each other.

14          So I can give you a whole host -- I

15   called it a cesspool a while ago.  It was the

16   worst situation I have ever seen in my 30 some

17   odd years of corporate experience.  I've

18   worked in an environment at Unysis where we

19   actually had prepared for bankruptcy some

20   years ago.  This was a completely different

21   situation.  This was misinformation,

22   misrepresentation, people not carrying out

23   things they said they were going to do for us.

24   It was nothing -- the worst mess I've seen in

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

Page 106

1    certain law facilities were actually paid off and

2    closed as a result of monies received from the Compaq

3    closing?

4         A.    I believe so.

5         Q.    Do you recall sitting here today which

6    ones would have been satisfied?

7         A.    I recall that there was one with IBM

8    and I don't recall the others.  I know that bank one

9    was redone.  Those are the ones -- I can remember the

10   IBM one because it was a sticky thing at the very end

11   of it.  We couldn't find the person to sign the

12   document, so they had to agree before we could close

13   and then they would then get their money shot off to

14   them, so --

15        Q.    It sounds to me, Mr. Gagliardi, from

16   the way you described it that the Compucom sale had

17   proceeded fairly well along; is that correct?

18        A.    Yes.

19        Q.    Do you know what remained to be done in

20   order to close that?

21        A.    There was a list of -- as we went down

22   through the period, there was a list of things that

23   had to get done in terms of which employees, which

24   services, which this, which -- you know, commitments

9286d6ed-1a2f-41dc-8221-e231420ced71

1    amongst everyone, the banks, Compucom, ourselves.

2    And we had pretty much ticked our way through all of

3    them.  I can't recall which ones in particular needed

4    to be finished, but we were on a path to close the

5    deal and were actively working to get it done by a

6    certain day in that week, the week that we ended up

7    closing the doors.  And there had been an open issue

8    about this getting financial statements which we did

9    not believe -- it was listed, but it wasn't listed on

10    the critical path and all of a sudden it appeared out

11    of nowhere to be on the critical past.  Safeguard

12    Scientific raised their head and then Tom -- the two

13    Toms dove into that one and we were unable to resolve

14    it.

15            Q.    Actually, I should jump in,

16    Mr. Gagliardi, because on a couple of occasions, you

17    referred to two Toms and I just want to make sure --

18            A.    Tom Molchen and Tom Fitzpatrick.

19            Q.    Thank you, sir.  And your reference to

20    two Toms in the deposition would always be to those

21    gentlemen?

22            A.    Yes.  That's what they were constantly

23    referred to.

24            Q.    Thank you.  Mr. Gagliardi, do you

9286d6ed-1a2f-41dc-8221-e231420ced71

1    recall Mr. Fitzpatrick reporting to the board at the

2    May 1, 2000 meeting that the company was still

3    showing positive EBITDA?

4            A.    No.  I don't recall that.

5            Q.    Did you have an expectation for the

6    revenue projections that would have been derived from

7    the cash generated through the Compucom closing if it

8    had actually taken place?

9                  MR. CAINE:  Can you read that back?

10                 (The court reporter read back the

11          pertinent testimony.)

12                 MR. CAINE:  Two objections as to form

13          and no foundation.

14                 THE WITNESS:  I don't understand the

15          question.

16   BY MR. HUNT:

17           Q.    Mr. Gagliardi, I previously shared with

18   you a letter from the Houlihan, Lokey firm that was

19   marked as an exhibit.  That was exhibit GAG-3.  Do

20   you have any additional recollection regarding the

21   substance of this solvency opinion letter?

22           A.    No.

23           Q.    Do you believe that Inacom, at the time

24   of the actual closing with Compaq, had identified to

9286d6ed-1a2f-41dc-8221-e231420ced71

Page 136

1    BY MS. STREUSAND:

2           Q.    Do you know what financial information

3    was provided to Compucom?

4           A.    I know financial data was provided to

5    Compucom by Mr. Fitzpatrick --

6           Q.    And --

7           A.    -- and Laz.

8           Q.    And do you know what type?  Was it --

9           A.    No.  I didn't participate in those

10   meetings.  They had -- there were meetings I went to

11   and there were a set of meetings between just the

12   financial folks, Tom and a woman who was the CFO at

13   that time of Compucom.

14          Q.    Would balance sheets have been provided

15   to Compucom?

16          A.    I don't know.

17          Q.    Did you review the Houlihan, Lokey

18   solvency opinion of February 16, 2000 before the

19   close of the transaction with Compaq?

20          MR. CAINE:  Objection.  Asked and

21       answered.

22          THE WITNESS:  I did not.

23   BY MS. STREUSAND:

24          Q.    And did you work with anyone at

GERALD A. GAGLIARDI

Page 179

1          A.     In the spring.  Before that, I thought

2     we -- maybe we could get this thing -- maybe they

3     were actually going to do it, but when they began

4     bouncing us from Kansas City to the partners in New

5     York and we couldn't get straight answers, and we

6     actually had one come to the board meeting to tell us

7     what was going to happen and he wouldn't give the

8     board straight answers, I began to believe that there

9     was just no end to this thing.

10         Q.     Do you recall when you first started

11    talking to anyone about a potential sale of the

12    service business?

13         A.     Yes.

14         Q.     When was that?

15         A.     Right after the close -- right after

16    the transaction with Compaq was announced, a guy

17    named Pete Musser, who was with a company named

18    Safeguard Scientific called me.  He was an

19    acquaintance I had had before and he -- Safeguard

20    Scientific was a principal owner in a thing call

21    Compucom and so he called me and said, Gerry, how

22    come you didn't give me a heads up you were thinking

23    about selling anything.  If you guys are thinking of

24    divesting yourself of any more of those assets, we

9286d6ed-1a2f-41dc-8221-e231420ced71

Page 188

1   month and week after week.  And the way we kept it

2   going week after week was the seriousness of the

3   negotiations with Compucom.

4         Q.    At some point, was a deal in principal

5   reach with Compucom?

6         A.    Yes.

7         Q.    What was the purpose for Inacom's

8   perspective of entering into that deal?

9         A.    Really to save the jobs of the 5,000

10  people that were going to get terminated.  There was

11  nothing in it for us.

12        Q.    When you say there was nothing in it

13  for Inacom, what do you mean?

14        A.    Well, Inacom would be in a position to

15  satisfy -- take care of its employees.  Clearly the

16  stockholders were going to be left high and dry and

17  there would have been more cash to pay creditors, so

18  from a fiduciary position, we thought that it was

19  best serving our constituency than just folding the

20  place up.

21        Q.    Was there cash coming to Inacom from

22  Compucom?

23        A.    Yes.  Yeah.  There was some cash.  I

24  don't recall the amount, but again, that would have

9286d6ed-1a2f-41dc-8221-e231420ced71