IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re INACOM CORP., *et al.*, | Bankruptcy Case No. 00-2426 (PJW) |

| | |
|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | Chapter 11 |
| Plaintiff, | |
| v. | Civil Action No. 04-583 (GMS) |
| LEXMARK INTERNATIONAL, INC., | [Adversary Proc. No. 02-3500 (PJW)] |
| Defendant/Third Party Plaintiff. | |

AND RELATED THIRD PARTY ACTION

**DECLARATION OF JEFFREY P. NOLAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT TECH DATA CORPORATION AND LEXMARK INTERNATIONAL, INC.'S JOINT MOTION IN AID OF LITIGANTS' RIGHTS SEEKING REMEDIES FOR PLAINTIFF INACOM CORPORATION'S LATE PRODUCTION OF CERTAIN DISCOVERY MATERIALS**

I, Jeffrey P. Nolan, declare as follows:

1.    I am an attorney at law licensed to practice in the State of California. I am a lawyer at Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., counsel for Plaintiff, The Unsecured Creditors Committee ("Plaintiff" or, the "Committee"), in the above referenced matter. I make this declaration in opposition to the above-referenced Motion. I have personal knowledge of each of the matters set forth herein, and if called as a witness, I could and would testify correctly and competently as to the truth of all said matters.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the document attached to the e-mail from counsel for Inacom on July 13, 2005, which is the subject of the Motion as Defendants claim it was never produced previously in the litigation.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Asset Purchase Schedule, Accounts Payable produced to the Defendants as evidenced by the bates-stamped number ICN 09129.

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of Asset Purchase Schedules, Accounts Payable produced by Hewlett Packard as evidenced by the bates-stamped tab of HP/TD 0153 which this office received from counsel for Third Party Defendant, Hewlett Packard in the course of the litigation.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of portions of the Oral Deposition of Lazarus Krikorian, taken on January 7, 2005.

6.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of portions of the Oral Deposition of Gerald A. Gagliardi, taken on April 6, 2005.

7.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of portions of the Deposition of Richard Charles Oshlo, Jr., taken March 20, 2005.

8.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of portions of the Deposition of Richard Whalen, taken on July 28, 2005.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated:   August 24, 2005

By _____

JEFFREY P. NOLAN

# EXHIBIT A

Inacom Corp
Asset Purchase Schedules
Accounts Payable
As of February 12, 2000

|  | Amount Per Detail |  |
|---|---|---|
| Distribution Operations -trade a/p | 108,901 | |
| Distribution Operations -po accrual | 95,465 | |
| Reseller Division | 34 | |
| BCE Division | 3,314 | |
| Total | 207,714 | |
| | | |
| "Select/Delete" supplier on Dist/Ops Trade A/P | (947) | Supplier # 99999 - used to track fedwires already paid |
| Non-compaq major vendor a/p | (73,694) | HP, IBM, Dell, TOS |
| Lucent a/p | (8,882) | |
| Total Adustment | (83,523) | |
| | | |
| Net Accounts Payable | 124,191 | |
| | | |
| | | |
| Deposits made to Compaq for inventory | (45,276) | |
| Pre-payments made on Compaq | (980) | |
| | | |
| Total | (46,256) | |
| | | |
| | - | |
| | . | |
| | . | |
| | . | |
| | . | |
| | . | |
| | . | |
| | - | |
| | | |
| Total accounts payable per asset schedule | 77,935 | |

# <u>EXHIBIT B</u>

Inacom Corp
Asset Purchase Schedules
Accounts Payable
As of February 12, 2000

008820

| | Amount Per Detail |
|---|---|
| Distribution Operations -trade a/p | 108,901 |
| Distribution Operations -po accrual | 95,465 |
| Reseller Division | 34 |
| BCE Division | 3,314 |
| Total | 207,714 |
| "Select/Delete" supplier on Dist/Ops Trade A/P | (947)  Supplier # 99999 - used to track fedwires already paid |
| Non-compaq major vendor a/p | (73,694)  HP, IBM, Dell, TOS |
| Lucent a/p | (8,882) |
| Total Adustment | (83,523) |
| Net Accounts Payable | 124,191 |
| Deposits made to Compaq for inventory | (45,276) |
| Pre-payments made on Compaq | (980) |
| Total | (46,256) |
| | - |
| | - |
| | - |
| | - |
| Total accounts payable per asset schedule | 77,935 |

1,671
1,671

81,277

△ By HP #
was actually
a On Balance

**ICN 09129**

et purchase schedules-accounts payable.xlsAccounts Payable

3/15/20001:51 PM

# **EXHIBIT C**

Inacom Corp
Asset Purchase Schedules
Accounts Payable
As of February 12, 2000

|  | Amount Per Detail |  |
|---|---|---|
| Distribution Operations -trade a/p | 108,901 | page 417-2157 |
| Distribution Operations -po accrual | 95,465 |  |
| Reseller Division | 34 | page 2174-2176 |
| BCE Division | 3,314 |  |
| Total | 207,714 |  |
|  |  |  |
| "Select/Delete" supplier on Dist/Ops Trade A/P | (947) | Supplier # 99999 – used to track fedwires already paid |
| Non-compaq major vendor a/p | (73,694) | HP, IBM, Dell, TOS |
| Lucent a/p | (8,882) |  |
| Total Adustment | (83,523) |  |
|  |  |  |
| Net Accounts Payable | 124,191 |  |
|  |  |  |
|  |  |  |
| Deposits made to Compaq for Inventory | (45,276) |  |
| Pre-payments made on Compaq | (980) |  |
| Total | (46,256) |  |
|  |  |  |
|  | - |  |
|  | - |  |
|  | - |  |
|  | - |  |
|  | - |  |
|  |  |  |
| Total accounts payable per asset schedule | 77,935 |  |

HP/TD 0153

asset purchase schedules-accounts payable.xlsAccounts Payable

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re INACOM CORP., et al.<br>Debtors | ) Chapter 11<br>) Bankruptcy Case No.<br>) 00-2426 (PJW) |
| INACOM CORP., et al.<br>v.<br>TECH DATA CORPORATION | ) Civil Action No.<br>) 04-CV-148 (GMS) |
| INACOM CORP., et al.<br>v.<br>INGRAM MICRO INC. | ) Civil Action No.<br>) 04-CV-580 (GMS) |
| INACOM CORP., et al.<br>v.<br>DELL COMPUTER CORP. | ) Civil Action No.<br>) 04-CV-582 (GMS) |
| INACOM CORP., et al.<br>v.<br>LEXMARK INTERNATIONAL, INC. | ) Civil Action No.<br>) 04-CV-583 (GMS) |
| INACOM CORP., et al.<br>v.<br>RESILIEN, INC. | ) Civil Action No.<br>) 04-CV-584 (GMS) |
| INACOM CORP., et al.<br>v.<br>INGRAM ENTERTAINMENT INC. | ) Civil Action No.<br>) 04-CV-593 (GMS) |

ORAL DEPOSITION OF

LAZARUS KRIKORIAN

January 7, 2005



**FREDERICKS-CARROLL REPORTING & LITIGATION SERVICES, INC.**

| | | | | |
|---|---|---|---|---|
| 7719 Wood Hollow Drive ✦ Suite 156 ✦ Austin, Texas 78731 | ✦ | (800) 234-3376 | ✦ | (512) 477-9911 ✦ (512) 345-1417 Fax |
| 9 Greenway Plaza ✦ Suite 3112 ✦ Houston, TX 77046 | ✦ | (800) 234-3376 | ✦ | (713) 572-8897 ✦ (512) 345-1417 Fax |
| 909 N.E. Loop 410 ✦ Suite 810 ✦ San Antonio, TX 78209 | ✦ | (800) 767-9161 | ✦ | (210) 222-9161 ✦ (210) 225-1476 Fax |

1

```
 1                UNITED STATES DISTRICT COURT
                      DISTRICT OF DELAWARE
 2

 3     _____ )
       In re INACOM CORP., et al.   ) Chapter 11
 4             Debtors              ) Bankruptcy Case No.
       _____ ) 00-2426 (PJW)
 5                                   )
       INACOM CORP., et al.          )
 6             Plaintiffs           )
                                     )
 7          v.                      ) Civil Action No.
                                     ) 04-CV-148 (GMS)
       TECH DATA CORPORATION         )
 8             Defendant            )
       _____ )
 9                                   )
       INACOM CORP., et al.          )
10             Plaintiffs           )
                                     )
11          v.                      ) Civil Action No.
                                     ) 04-CV-580 (GMS)
       INGRAM MICRO INC.             )
12             Defendant            )
       _____ )
13                                   )
       INACOM CORP., et al.          )
14             Plaintiffs           )
                                     ) Civil Action No.
15          v.                      ) 04-CV-582 (GMS)
                                     )
       DELL COMPUTER CORP.           )
16             Defendant            )
       _____ )
17                                   )
       INACOM CORP., et al.          )
18             Plaintiffs           )
                                     ) Civil Action No.
19          v.                      ) 04-CV-583 (GMS)
       LEXMARK INTERNATIONAL, INC. )
20             Defendant            )
       _____ )
21                                   )
       INACOM CORP., et al.          )
22             Plaintiffs           )
                                     ) Civil Action No.
23          v.                      ) 04-CV-584 (GMS)
       RESILIEN, INC.                )
24             Defendant            )
       _____ )
25
```

```
1   _____
                             )
2   INACOM CORP., et al.     )
            Plaintiff        )
3       v.                   )  Civil Action No.
                             )  04-CV-593 (GMS)
4   INGRAM ENTERTAINMENT INC.)
            Defendant        )
5   _____)

6

7
                        * - * - * - * - *
8

9

10          ORAL DEPOSITION OF LAZARUS KRIKORIAN

11

12

13          On the 7th day of January, 2005, between

14  the hours of 9:05 a.m. and 12:40 p.m., at the Wyndham

15  Valley Forge Hotel, 888 Chesterbrook Boulevard, Wayne,

16  Pennsylvania, before me, CYNTHIA VOHLKEN, a Certified

17  Shorthand Reporter for the State of Texas, appeared

18  LAZARUS KRIKORIAN, who, being by me first duly sworn,

19  gave an oral deposition at the instance of the

20  Defendant Tech Data Corporation in said cause,

21  pursuant to the Federal Rules of Civil Procedure.

22

23

24

25
```

```
 1                A P P E A R A N C E S

 2  FOR THE PLAINTIFF INACOM CORP.:

 3             Mr. Andrew W. Caine
              Pachulski, Stang, Ziehl, Young,
 4                 Jones & Weintraub
              10100 Santa Monica Boulevard
 5            11th Floor
              Los Angeles, California  90067-4100

 6

 7  FOR THE EXECUTIVE SOUNDING BOARD ASSOCIATION, INC. AS
    PLAN ADMINISTRATOR:
 8
              Mr. Elio Battista, Jr.
 9            Blank Rome LLP
              Chase Manhattan Centre
10            1201 Market Street, Suite 800
              Wilmington, Delaware  19801
11
                    -and-
12
              Mr. Earl M. Forte
13            (By Telephonic Means)
              Blank Rome LLP
14            One Logan Square
              18th & Cherry Streets
15            Philadelphia, Pennsylvania 19103-6998

16
    FOR THE DEFENDANT TECH DATA CORPORATION:
17
              Mr. Stephen C. Hunt
18            Adorno & Yoss, LP
              350 East Las Olas Boulevard
19            17th Floor
              Fort Lauderdale, Florida  33301
20
21  FOR THE DEFENDANT DELL COMPUTER CORPORATION:

22            Ms. Sabrina L. Streusand
              Hughes & Luce, LLP
23            111 Congress Avenue
              Suite 900
24            Austin, Texas  78701

25
```

1    Q.    Did that ever change over the time that you

2    were working at InaCom?

3    A.    In the post-petition period, you know, Tom

4    Fitzpatrick left and I sort of reported up through

5    Bridge Associates in a -- in a -- in a manner, sure.    08:19

6    Q.    Would you identify which function Bridge

7    Associates had with respect to InaCom during the

8    post-petition period?

9    A.    The way I look at it is they administered the

10   whole -- the whole post-petition process of -- of the    08:20

11   estate of income, protecting -- you know, protecting

12   and trying to collect as much assets as possible for

13   the estate for the future use of creditors.

14   Q.    Were you involved with the advance planning

15   for the sale of the hardware business to Compaq?    08:20

16   A.    No.

17   Q.    At some point since you joined the company

18   prior to the closing did you have any involvement with

19   the sale?

20   A.    No.    08:20

21   Q.    Isn't it true that at one point prior to the

22   bankruptcy proceeding there was some consideration

23   regarding the sale of the servicing business to

24   CompuCom?

25   A.    Yes.    08:20

19

1    Q.    Were you involved in any way with the

2    discussions regarding that proposed sale?

3    A.    No, not directly.  I was involved in a manner

4    such that, you know, I was working with KPMG to

5    facilitate getting audited financials complete for the    08:21

6    1999 year, which obviously CompuCom would need in

7    the -- in the subsequent SEC filing.

8    Q.    Was it in connection with the CompuCom sale

9    that you discovered a substantial footing error with

10   some reporting?                                            08:21

11   A.    No.  It had nothing to do with the CompuCom

12   sale.

13   Q.    What did that have to do with?

14   A.    It's just, you know, I discovered footing and

15   other mechanical and accounting errors in rebate -- in    08:21

16   the rebate receivables area and I believe it was late

17   February/early March and it was just in the -- in the

18   course of trying to complete the audit.

19   Q.    In functioning as controller of InaCom did

20   you directly interact with any subordinates of the        08:22

21   company?

22   A.    My subordinates?

23   Q.    Yes.

24   A.    Sure.

25   Q.    Please explain for me the types of people       08:22

1  recall Chris' last name were involved with service

2  forecasts for the company in that -- during that time

3  period.

4      Q.    In your position as controller would you have

5  typically reviewed service revenue forecasts?                    11:02

6      A.    Not in the circumstances in which I was

7  operating under, no.

8      Q.    Were you aware that there had been a downward

9  revision to the service revenue forecasts for the

10  second quarter of 2000 from those which were            11:02

11  originally projected?

12          MR. ABBOTT:   I'm going to object to the

13  form.

14          MR. CAINE:   Object no foundation.

15      A.    No.                                            11:02

16      Q.    (BY MR. HUNT)  Mr. Krikorian, do you know how

17  far the proposed sale to CompuCom proceeded before it

18  was determined it would not happen?

19      A.    I believe it proceeded very far.  And at the

20  end it's my understanding that the deal didn't go            11:03

21  through because company management in KPMG could not

22  assure -- safeguard that the -- could not assure them

23  exactly when audited financials would be delivered.

24      Q.    Did that also have an impact in CompuCom

25  being unable to state an 8-K as required by the SEC            11:03

1  for that closing?

2      A.    I'm sorry, can you repeat the question?

3      Q.    Did that result in CompuCom not being able to

4  state an 8-K for that proposed closing as would have

5  been required by the SEC?                                    11:03

6              MR. CAINE:   Objection, vague and

7  ambiguous.

8      A.    Well, the deal was never consummated, so why

9  would an 8-K be filed?

10     Q.    (BY MR. HUNT)   Okay.   Would you agree that   11:04

11 the deal preceded far enough that it would have closed

12 but for the issues that you mentioned regarding KPMG?

13     A.    That's my understanding.

14     Q.    Would you agree that the reasons that the

15 CompuCom deal did not close were unrelated to the         11:04

16 financial conditions of InaCom?

17             MR. CAINE:   Objection, vague and

18 ambiguous.

19     A.    I don't know.

20     Q.    (BY MR. HUNT)   Do you recall how far into    11:04

21 calendar year 2000 the sale discussions continued with

22 CompuCom before the deal was -- before the deal was

23 settled?

24     A.    My understanding, discussions proceeded

25 either up to a couple days before the actual filing     11:05

1  such a report?

2    A.    I don't recall.

3    Q.    From the time that you joined InaCom in

4  January 2000 through the end of April of 2000 would

5  you agree that InaCom was conducting its remaining          11:10

6  business operations in the ordinary course?

7          MR. CAINE:  Objection, vague and

8  ambiguous.

9          MR. ABBOTT:  Object to the form of the

10 question.                                                    11:11

11   A.    To the best of my knowledge it was.

12 Obviously it was dealing with a lot of obstacles, but

13 yes.

14   Q.    (BY MR. HUNT)  Would you agree it was

15 operating as an entity that was a going concern as          11:11

16 opposed to one that was ready to close the doors in

17 the near future?

18         MR. CAINE:  Hang on a second.  I'll use

19 your object as to form.

20         MR. ABBOTT:  I will do that one.

21         MR. CAINE:  So many problems with it.

22   A.    I think everybody was doing their best --

23 doing their best from an operational standpoint.

24   Q.    (BY MR. HUNT)  Were you aware of any other

25 entities besides CompuCom that expressed an interest       11:12

1  the commingled funds.

2       Q.    Do you know what the liquidity or the

3  borrowing authority InaCom had in April 2001?

4       A.    No.

5       Q.    If it was in the range of 89,681,203, would          12:11

6  that have provided sufficiently liquidity for InaCom?

7             MR. ABBOTT:   I'll object to the form of

8  the question.

9       A.    I don't know.

10      Q.    (BY MS. STREUSAND)   Do you know the amount          12:11

11  that InaCom agreed in terms -- in terms of the muddied

12  receivables, do you know in April 2000 if that number

13  was quantified?

14      A.    I don't know that there was a -- I don't know

15  that there was any finalization on that number, no.          12:12

16  I'm not aware that there was.

17      Q.    Later in time do you know what that number

18  was finalized to?

19      A.    No, I don't.

20      Q.    Do you know the sales price that was agreed          12:12

21  to between CompuCom and InaCom?

22      A.    No, I don't.

23      Q.    Do you have any idea of the range?

24      A.    I don't.

25      Q.    Did you provide financial information to          12:13

1    CompuCom in order to help facilitate that sale?

2        A.    I'm sure I probably did.

3        Q.    Okay.  Can you identify what type of

4    documents you provided to help facilitate that sale?

5        A.    I don't recall what they would have been.            12:13

6        Q.    Were there forecasts of revenues from the

7    service business provided or prepared by Bank Group in

8    let's just say March or April of 2000?

9        A.    I believe so.

10       Q.    Do you have any memory of what those            12:14

11   forecasts showed?

12       A.    I do not.

13       Q.    Do you know where they would have been kept

14   in the files of InaCom?

15       A.    I do not.            12:14

16             MS. STREUSAND:  I also make the same

17   request of either Blank Rome or Pachulski, if those

18   documents can be identified or if you want to give us

19   the index we'll try and determine where those are.

20             MR. HUNT:  Join.            12:14

21             MR. CAINE:  Okay.

22             MS. STREUSAND:  And to further clarify,

23   I do think it's part of our overall document request,

24   but I notice as the witness is going forward these

25   documents are getting more specific, but we do have            12:15

1   about KPMG as working with InaCom on the financials

2   for '99 and '98 and you also had stated previously

3   that Deloitte & Touche was also working with InaCom.

4   What relationship did Deloitte & Touche have with

5   InaCom versus KPMG's role?                                    12:18

6       A.   Immediately prior to the bankruptcy filing,

7   to the best of my recollection Deloitte & Touche had

8   two primary roles.  One was assisting me with

9   gathering the information that would be required for a

10  bankruptcy filing.  The other one was working with Tom    12:18

11  as it related to the -- I believe bank -- bank

12  related, treasury related issues and matters.

13      Q.   Do you know when Deloitte was retained by

14  InaCom?

15      A.   I believe it was in May 2000.                      12:19

16      Q.   Back to the CompuCom transaction.  The

17  business that was to be sold to CompuCom, was it

18  intended to be what I would call a continuing

19  business, a business that would remain intact or was

20  it going to be liquidated by CompuCom?                      12:19

21           MR. CAINE:  Objection, no foundation.

22      A.   To the best of my knowledge, it was a

23  business that would have continued.  CompuCom would

24  have continued to service the InaCom customers.

25      Q.   (BY MS. STREUSAND)  And the InaCom employees      12:20

 1   would continue to have jobs, correct?

 2       A.   I assume so.  Most of them, I assume, you

 3   know, just like any other merger of two giants,

 4   there's always sort of a re-sizing that takes place,

 5   but yeah.

 6       Q.   But InaCom's remaining business fundamentally

 7   was a service business, correct?

 8       A.   That's correct.

 9       Q.   And so if CompuCom was interested in buying

10   it, it was to buy what I would call the brain power

11   from the InaCom business, correct?

12       A.   Right.

13       Q.   Would goodwill have been included as part of

14   the purchase price that InaCom was going to sell that

15   business to CompuCom?

16            MR. CAINE:   Objection, no foundation,

17   calls for speculation.

18            MR. ABBOTT:   I object to the form, but

19   you can answer.

20       A.   Uh-huh.  The answer to that question depends

21   on what the sales price was in comparison to what the

22   net assets acquired were.

23       Q.   (BY MS. STREUSAND)  And you don't know?

24       A.   (Shakes head negatively).  I don't have that

25   information.

# **EXHIBIT E**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re
INACOM CORP., et al.      Bankruptcy Case No. 00-2426 PJW

---

INACOM CORP., on behalf          :
of all affiliated Debtors,       : Civil Action No. 04-148 GMS
                                 : (Original filed in this Action)
            Plaintiff,           : Adversary Case No. 02-03496 PJW
      v.                         :
                                 :
TECH DATA CORP.,                 :
                                 :
            Defendant.           :        COPY

---

INACOM CORP., on behalf of       :
all affiliated Debtors,          :
                                 :
            Plaintiff,           : Civil Action No. 04-582 GMS
                                 :
      v.                         : Adversary Case No. 02-03499 PJW
                                 :
DELL COMPUTER CORPORATION,       :
                                 :
            Defendant.           :

---

INACOM CORP., on behalf of       :
all affiliated Debtors,          :
                                 :
            Plaintiff,           : Civil Action No. 04-583 GMS
                                 :
      v.                         : Adversary Case No. 02-03500 PJW
                                 :
LEXMARK INTERNATIONAL, INC.,     :
                                 :
            Defendant.           :

---

DEPOSITION OF RICHARD CHARLES OSHLO, JR.,
March 20, 2005


KATHRYN POWERS- CERTIFIED SHORTHAND REPORTER

2

| | | |
|---|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 04-584 GMS |
| | : | |
| v. | : | Adversary Case No. 02-03501 PJW |
| | : | |
| RESILIEN, INC., et al., | : | |
| | : | |
| Defendant. | : | |
| INACOM CORP., on behalf of all affiliated Debtors, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 04-593-GMS |
| | : | |
| v. | : | Adversary Case No. 02-03960 PJW |
| | : | |
| INGRAM ENTERTAINMENT, INC., Successor in interest to NASHVILLE COMPUTER LIQUIDATORS, | : | |
| | : | |
| Defendant. | : | |
| INACOM CORP., on behalf of all affiliated Debtors, | : | Civil Action No. 04-601 GMS |
| | : | |
| Plaintiff, | : | Adversary Case No. 02-04441 PJW |
| | : | |
| v. | : | |
| | : | |
| SIGMA DATA, INC, | : | |
| | : | |
| Defendant. | : | |

DEPOSITION OF RICHARD CHARLES OSHLO, JR.,

taken by the Defendants before Kathryn Powers, Certified
Shorthand Reporter of the State of Iowa, at the Renaissance
Savery Hotel, Room 210, Des Moines, Iowa, commencing at
9:45 a.m., Sunday, March 20, 2005.

PETERSEN COURT REPORTERS
515/243-6596

```
                                                                3

 1   APPEARANCES:

 2   For InaCom Corp.:          JEFFREY P. NOLAN, ESQ.
                                Pachulski, Stang, Ziehl,
 3                               Young, Jones & Weintraub, P.C.
                                10100 Santa Monica Blvd.
 4                              Eleventh Floor
                                Los Angeles, California 90067-4100
 5
     For Executive Sounding     EARL M. FORTE, ESQ.
 6   Board Associates, Inc.,    Blank & Rome, LLP
     Liquidating Agent of       One Logan Square
 7   InaCom Corp.:              18th and Cherry Streets
                                Philadelphia, Pennsylvania 19103-6998
 8
     For Defendant Dell:        SABRINA L. STREUSAND, ESQ.
 9                              G. JAMES LANDON, ESQ.
                                Hughes & Luce, LLP
10                              111 Congress Avenue, Suite 900
                                Austin, Texas  78701
11
     For Defendant Tech         STEPHEN C. HUNT, ESQ.
12   Data:                      Adorno & Yoss
     (by telephone)             350 East Las Olas Blvd.
13                              Seventh Floor
                                Fort Lauderdale, Florida  23301
14
     For Defendant Lexmark:     CULVER V. HALLIDAY, ESQ.
15                              Stoll, Keenon & Park, LLP
                                2650 Aegon Center
16                              400 West Market St.
                                Louisville, Kentucky 40202-3377
17
     For Defendant Ingram:      JONATHAN P. HERSEY, ESQ.
18   (by telephone)             Bingham McCutchen, LLP
                                600 Anton Road, 18th Floor
19                              Costa Mesa, California  92626

20   For Third-Party            GAIL S. GREENWOOD, ESQ.
     Defendant Hewlett          Friedman, Dumas & Springwater, LLP
21   Packard, Successor in      One Maritime Plaza
     Interest to Compaq         Suite 2475
22   Computer:                  San Francisco, California  94111

23
     Also Present:              Jason Fensterstock
24   (by telephone)             Duff & Phelps

25
```

4

1                  I N D E X

2   WITNESS                                   PAGE

3   Richard Charles Oshlo, Jr.

4         Examination By Ms. Streusand          6

5         Examination by Mr. Halliday          132

6         Examination by Mr. Hunt              168

7         Examination By Mr. Nolan             173

8         Examination by Ms. Greenwood         210

9         Examination by Mr. Nolan             211

10        Examination by Mr. Forte             231

11        Examination by Ms. Streusand         237

12        Examination by Mr. Halliday          242

13        Examination by Mr. Hunt              249

14

15

16

17

18

19

20

21

22

23

24

25

5

E X H I B I T S

| EXHIBITS | MARKED |
|---|---|
| 1 - InaCom Corp. Officer's Certificate | 37 |
| 2 - Third Amendment and Waiver | 41 |
| 3 - 8-K March 2000 | 44 |
| 4 - Borrowing Base/Non-Default Certificate February 26, 2000 | 51 |
| 5 - Fourth Amendment and Waiver | 56 |
| 6 - 2/16/00 Memo from Davis Polk | 65 |
| 7 - Borrowing Base/Non-Default Certificate March 25, 2000 | 68 |
| 8 - Borrowing Base Certificate 4/22/00 | 70 |
| 9 - Summary of Impact of disposed Assets and Operations | 72 |
| 10 - Treasury Released Checks by Date | 78 |
| 11 - Attachment E, Collateral Mang. Report | 80 |
| 12 - (This number was skipped in marking) | |
| 13 - 3/29/00 Ltr. to Bachner | 90 |
| 14 - 4/4/00 Memo to Tom from Dick | 93 |
| 15 - 3/24/00 Memo to Tom rom Dick | 102 |
| 16 - Board of Directors Minutes | 104 |
| 17 - Intercreditor Agreement | 104 |
| 18 - Separation and Sharing Agreement | 108 |
| 19 - Fifth Amendment and Waiver | 110 |
| 20 - Sixth Amendment and Waiver | 112 |
| 21 - Form Notice of Borrowing | 115 |
| 22 - March 2000 - Wires | 127 |
| 23 - 2/15/00 Ltr. to Oslo from Schuette | 161 |

6

P R O C E E D I N G S

1          MS. STREUSAND: Would you please swear

2    the witness.

3          ROBERT CHARLES OSHLO, JR.,

4    called as a witness by the Defendants, being first

5    duly sworn by the Certified Shorthand Reporter,

6    was examined and testified as follows:

7                     EXAMINATION

8    BY MS. STREUSAND:

9        Q.   Good morning, Mr. Oshlo. We met just

10   briefly a moment ago. Let me reintroduce myself.

11   I'm Sabrina Streusand. Along with James Landon,

12   we represent Dell, Inc., in an adversary

13   proceeding brought by InaCom.

14         Can you please state your full name for

15   the record.

16       A.   Richard Charles Oshlo, Jr.

17       Q.   And your address, sir, please?

18       A.   3818 Lincoln Place Drive, Des Moines,

19   Iowa, 50312.

20       Q.   And have you had your deposition taken

21   before, sir?

22       A.   Yes.

23       Q.   How many times?

24       A.   Probably about five times.

25

130

1       A.    No.

2       Q.    Did you work on a proposed purchase of

3   business units with CompuCom and InaCom?

4       A.    The only thing I know about CompuCom is a

5   conversation I had with Tom Fitzpatrick, probably

6   the Wednesday, middle of the week, before we laid

7   off that Friday numerous employees.

8       Q.    That would have been June of 2000, sir?

9       A.    I forget when, but he told me that--and I

10  think a couple other individuals in the Omaha

11  finance office, that they had been trying to sell

12  something to CompuCom, and that it failed, and

13  that as of that Friday they were going to lay off

14  most of the employees of InaCom and an X number of

15  us would, you know, stay around until God knows

16  what.

17      Q.    And did you know any details with respect

18  to the transaction of CompuCom?

19      A.    No.   I just knew--that was the first I

20  heard of it, and that it had failed.

21      Q.    And I'm sorry, I know you've told me

22  this, but when did you leave InaCom?

23      A.    September 2000.

24      Q.    2000.   Several months after the

25  bankruptcy proceeding?

# EXHIBIT F



GERALD A. GAGLIARDI

Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF DELAWARE
 2
                       -   -   -
 3
    In re:                  : CHAPTER 11
 4  INACOM CORP., et al.,    : BANKRUPTCY CASE
         Debtors            : NO. 00-2426(PJW)
 5  _____
    INACOM CORP., et al.     : CIVIL ACTION
 6       -vs-               :
    TECH DATA CORPORATION    : NO. 04-CV-148(GMS)
 7  _____
    INACOM CORP., et al.     : CIVIL ACTION
 8       -vs-               :
    DELL COMPUTER CORP.      : NO. 04-CV-582(GMS)
 9  _____
    INACOM CORP., et al.     : CIVIL ACTION
10       -vs-               :
    LEXMARK INTERNATIONAL, INC. : NO. 04-CV-583(GMS)
11  _____
    INACOM CORP., et al.     : CIVIL ACTION
12       -vs-              .:
    RESILIEN, INC.           : NO. 04-CV-584(GMS)
13  _____
    INACOM CORP., et al.     : CIVIL ACTION
14       -vs-               :
    INGRAM ENTERTAINMENT, INC. : NO. 04-CV-593(GMS)
15
                       -   -   -
16
              Oral deposition of GERALD A. GAGLIARDI,
17  was taken pursuant to notice, held at BLANK ROME,
    LLP, One Logan Square, 18th & Cherry Streets,
18  Philadelphia, Pennsylvania, commencing at 9:33 a.m.
    on April 6, 2005, before April J. Foga, Certified
19  Shorthand Reporter and Notary Public, there being
    present:
20
                       -   -   -
21
               ZANARAS REPORTING AND VIDEO
22          REGISTERED PROFESSIONAL REPORTERS
     1616 Walnut St., Ste. 300     2112 Bay Avenue
23   Philadelphia, PA 19103      Ocean City, NJ 08226
             (215) 790-7857   1-877-GO-DEPOS
24
```

DISK
ENCLOSED

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

Page 2

```
 1    A P P E A R A N C E S:

 2

 3         PACHULSKI, STANG, ZIEHL, YOUNG,
           JONES & WEINTRAUB
 4         BY:  ANDREW W. CAINE, ESQUIRE
           10100 Santa Monica Boulevard, 11th Floor
 5         Los Angeles, California 900067
           (310) 277-6910
 6         Counsel for Plaintiff, Inacom, Corp.

 7

           BLANK ROME, LLP
 8         BY:  EARL M. FORTE, ESQUIRE
           One Logan Square
 9         18th & Cherry Street
           Philadelphia, PA 19103
10         (215) 569-5618
           Counsel for Executive Sounding Board Associates,
11         Inc., liquidating agent for Inacom Corp. and
           affiliated debtors

12

13         ADORNO & YOSS, LLP
           BY:  STEPHEN C. HUNT, ESQUIRE
14         350 East Las Olas Boulevard, Suite 1700
           Fort Lauderdale, FL 33301
15         (954) 763-1200
           Counsel for Defendant Tech Data Corporation

16

17         HUGHES, LUCE, LLP
           BY:  SABRINA L. STREUSAND, ESQUIRE
18         111 Congress Avenue, Suite 900
           Austin, Texas 78701
19         (512) 482-6842
           Counsel for Defendant, Dell, Inc.

20

21
       (Appearance Page continued on Page 3.)
22

23

24
```

Zanaras Reporting & Video

GERALD A. GAGLIARDI

Page 3

```
 1    A P P E A R A N C E S:

 2

 3         ZUCKERMAN, SPAEDER, LLP
           BY:   THOMAS G. MACAULEY, ESQUIRE
 4         919 Market Street, Suite 990
           Wilmington, DE 19899
 5         (302) 427-0400
           Counsel for Defendant, Ingram Entertainment,
 6         Inc.

 7

           MORRIS, NICHOLS, ARSHT & TUNNELL
 8         BY:   DEREK C. ABBOTT, ESQUIRE
           1201 North Market Street
 9         Wilmington, DE 19899
           (302) 575-7357
10         Counsel for Defendant, Hewlett-Packard Company

11

12

13

14

15
                            -   -   -
16

17

18

19

20

21

22

23

24
```

GERALD A. GAGLIARDI

1    damaging.  The fact that at the 99th hour when

2    we were trying to sell the assets to Compucom

3    and had a deal and Safeguard Scientific said

4    they couldn't allow the transaction to happen

5    because it was going to affect their tax

6    position.  Compucom was happy with the

7    transaction and the fact that there were no

8    financials.  Safeguard Scientific wouldn't let

9    us honor the contract or wouldn't let them do

10   the contract.  Otherwise, we could have

11   packaged the thing and we could have saved the

12   5,000 jobs that got taken and none of us would

13   have ever met each other.

14       So I can give you a whole host -- I

15   called it a cesspool a while ago.  It was the

16   worst situation I have ever seen in my 30 some

17   odd years of corporate experience.  I've

18   worked in an environment at Unysis where we

19   actually had prepared for bankruptcy some

20   years ago.  This was a completely different

21   situation.  This was misinformation,

22   misrepresentation, people not carrying out

23   things they said they were going to do for us.

24   It was nothing -- the worst mess I've seen in

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

Page 106

```
1    certain law facilities were actually paid off and
2    closed as a result of monies received from the Compaq
3    closing?
4           A.    I believe so.
5           Q.    Do you recall sitting here today which
6    ones would have been satisfied?
7           A.    I recall that there was one with IBM
8    and I don't recall the others.  I know that bank one
9    was redone.  Those are the ones -- I can remember the
10   IBM one because it was a sticky thing at the very end
11   of it.  We couldn't find the person to sign the
12   document, so they had to agree before we could close
13   and then they would then get their money shot off to
14   them, so --
15          Q.    It sounds to me, Mr. Gagliardi, from
16   the way you described it that the Compucom sale had
17   proceeded fairly well along; is that correct?
18          A.    Yes.
19          Q.    Do you know what remained to be done in
20   order to close that?
21          A.    There was a list of -- as we went down
22   through the period, there was a list of things that
23   had to get done in terms of which employees, which
24   services, which this, which -- you know, commitments
```

GERALD A. GAGLIARDI

1    amongst everyone, the banks, Compucom, ourselves.

2    And we had pretty much ticked our way through all of

3    them. I can't recall which ones in particular needed

4    to be finished, but we were on a path to close the

5    deal and were actively working to get it done by a

6    certain day in that week, the week that we ended up

7    closing the doors. And there had been an open issue

8    about this getting financial statements which we did

9    not believe -- it was listed, but it wasn't listed on

10   the critical path and all of a sudden it appeared out

11   of nowhere to be on the critical past. Safeguard

12   Scientific raised their head and then Tom -- the two

13   Toms dove into that one and we were unable to resolve

14   it.

15        Q.    Actually, I should jump in,

16   Mr. Gagliardi, because on a couple of occasions, you

17   referred to two Toms and I just want to make sure --

18        A.    Tom Molchen and Tom Fitzpatrick.

19        Q.    Thank you, sir. And your reference to

20   two Toms in the deposition would always be to those

21   gentlemen?

22        A.    Yes. That's what they were constantly

23   referred to.

24        Q.    Thank you. Mr. Gagliardi, do you

GERALD A. GAGLIARDI

Page 108

```
 1    recall Mr. Fitzpatrick reporting to the board at the

 2    May 1, 2000 meeting that the company was still

 3    showing positive EBITDA?

 4         A.    No.  I don't recall that.

 5         Q.    Did you have an expectation for the

 6    revenue projections that would have been derived from

 7    the cash generated through the Compucom closing if it

 8    had actually taken place?

 9              MR. CAINE:  Can you read that back?

10              (The court reporter read back the

11         pertinent testimony.)

12              MR. CAINE:  Two objections as to form

13         and no foundation.

14              THE WITNESS:  I don't understand the

15         question.

16    BY MR. HUNT:

17         Q.    Mr. Gagliardi, I previously shared with

18    you a letter from the Houlihan, Lokey firm that was

19    marked as an exhibit.  That was exhibit GAG-3.  Do

20    you have any additional recollection regarding the

21    substance of this solvency opinion letter?

22         A.    No.

23         Q.    Do you believe that Inacom, at the time

24    of the actual closing with Compaq, had identified to
```

GERALD A. GAGLIARDI

Page 136

1    BY MS. STREUSAND:

2          Q.    Do you know what financial information

3    was provided to Compucom?

4          A.    I know financial data was provided to

5    Compucom by Mr. Fitzpatrick --

6          Q.    And --

7          A.    -- and Laz.

8          Q.    And do you know what type?  Was it --

9          A.    No.  I didn't participate in those

10   meetings.  They had -- there were meetings I went to

11   and there were a set of meetings between just the

12   financial folks, Tom and a woman who was the CFO at

13   that time of Compucom.

14         Q.    Would balance sheets have been provided

15   to Compucom?

16         A.    I don't know.

17         Q.    Did you review the Houlihan, Lokey

18   solvency opinion of February 16, 2000 before the

19   close of the transaction with Compaq?

20              MR. CAINE:  Objection.  Asked and

21         answered.

22              THE WITNESS:  I did not.

23   BY MS. STREUSAND:

24         Q.    And did you work with anyone at

GERALD A. GAGLIARDI

Page 179

1          A.      In the spring.  Before that, I thought

2     we -- maybe we could get this thing -- maybe they

3     were actually going to do it, but when they began

4     bouncing us from Kansas City to the partners in New

5     York and we couldn't get straight answers, and we

6     actually had one come to the board meeting to tell us

7     what was going to happen and he wouldn't give the

8     board straight answers, I began to believe that there

9     was just no end to this thing.

10          Q.      Do you recall when you first started

11     talking to anyone about a potential sale of the

12     service business?

13          A.      Yes.

14          Q.      When was that?

15          A.      Right after the close -- right after

16     the transaction with Compaq was announced, a guy

17     named Pete Musser, who was with a company named

18     Safeguard Scientific called me.  He was an

19     acquaintance I had had before and he -- Safeguard

20     Scientific was a principal owner in a thing call

21     Compucom and so he called me and said, Gerry, how

22     come you didn't give me a heads up you were thinking

23     about selling anything.  If you guys are thinking of

24     divesting yourself of any more of those assets, we

GERALD A. GAGLIARDI

Page 188

1    month and week after week.  And the way we kept it

2    going week after week was the seriousness of the

3    negotiations with Compucom.

4          Q.    At some point, was a deal in principal

5    reach with Compucom?

6          A.    Yes.

7          Q.    What was the purpose for Inacom's

8    perspective of entering into that deal?

9          A.    Really to save the jobs of the 5,000

10   people that were going to get terminated.  There was

11   nothing in it for us.

12         Q.    When you say there was nothing in it

13   for Inacom, what do you mean?

14         A.    Well, Inacom would be in a position to

15   satisfy -- take care of its employees.  Clearly the

16   stockholders were going to be left high and dry and

17   there would have been more cash to pay creditors, so

18   from a fiduciary position, we thought that it was

19   best serving our constituency than just folding the

20   place up.

21         Q.    Was there cash coming to Inacom from

22   Compucom?

23         A.    Yes.  Yeah.  There was some cash.  I

24   don't recall the amount, but again, that would have

# EXHIBIT G



1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:  INACOM CORP., et al.,
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                     Plaintiff,      Civ Act No.
                                04-148 GMS
          -against-         Adversary No.
TECH DATA CORP.,
                     Defendant.   02-03496 PJW
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                     Plaintiff,      Civ Act No.
                                04-582 GMS
          -against-         Adversary No.
DELL COMPUTER CORPORATION,
                     Defendant.   02-03499 PJW
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                     Plaintiff,      Civ Act No.
                                04-583 GMS
          -against-         Adversary No.
LEXMARK INTERNATIONAL, INC.,
                     Defendant.   02-03500 PJW
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                     Plaintiff,      Civ Act No.
                                04-593 GMS
          -against-         Adversary No.
INGRAM ENTERTAINMENT, INC.,      02-03960 PJW
successor in interest to
NASHVILLE COMPUTER LIQUIDATORS,
                     Defendant.
------------------------------------x


July 28, 2005

5:19 p.m.


Deposition of RICHARD A. WHALEN

**Computer Reporting Incorporated**   

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

44

R. *Whalen*

1

2    get information that was reasonable knowledge by a

3    willing buyer as of the valuation date, and you

4    should endeavor to get as much information as they

18:09:53  5    can, but things that are put out there, published,

6    become public or become available after the

7    valuation date, you can't use, you can't consider

8    them, unless you pick a new valuation date.

9         Q.    Let's say hypothetically you have a

18:10:25  10   valuation date of June 30?

11        A.    Okay.

12        Q.    And the most recent projection you

13   have in order to perform your analysis, have been

14   completed on January 1st, and those projections

18:10:40  15   relied on actual data prior to January 1st?

16        A.    And the thinking on January 1st.

17        Q.    Right.

18             MR. POWELL:  Which January 1st?

19             MR. CAINE:  Of the same year.

18:10:52  20            THE WITNESS:  Before.

21        Q.    You would use those January 1st

22   projections in preparing your valuation as of June

23   30?

24        A.    Yes, or what I would try and do is

18:11:03  25   update those projections, make sure they are

43

R. Whalen

1

2    Blackstone report.  Would it be appropriate to

3    consider the information in the Blackstone report?

4        A.    You don't need it, you already have

18:08:42    5    it.  You mean that particular balance sheet and

6    those balances, current assets, $10, fixed assets,

7    $12.

8        Q.    There may be additional data

9    underlying the balance sheet that's contained in

18:08:53    10    the Blackstone report that you don't see in the

11    balance?

12        A.    I suppose if it is factual data that

13    was around on the valuation date, then I'm

14    thinking no matter where it comes from, you should

18:09:06    15    consider it.  There is a difference between

16    creating a report with all the judgment that goes

17    into it, and the thinking cap on in May of 2000,

18    which is different than perhaps a thinking cap in

19    April, or March, or February.  The difference

18:09:26    20    between assertions made in a report and financial

21    statement data on a page.  Maybe that's where we

22    are diverging here.

23        Q.    We are not, I'm just trying to

24    understand your opinion.

18:09:42    25        A.    I think in general wherever you can