# EXHIBIT A

BRIDGE ASSOCIATES LLC

747 Third Avenue
Suite 32A
New York, NY 10017
800-838-6966
877-711-6966 fax

www.bridgellc.com

April 19, 2005



BRIDGE ASSOCIATES LLC
New York, Cleveland, Naples, Houston

**InaCom Corp. and Affiliated Entities**
**Insolvency/Valuation Analysis As of March 25, 2000**

1. VALUATION OVERVIEW

    a.  As of March 25, 2000, InaCom's ("the Company") primary business was to provide computer services; thus, its tangible assets were not significant.  The make-up of the Company's fixed assets was primarily software, office equipment, leasehold improvements (associated with over 100 leased offices), and furniture.  (InaCom sold its product distribution business in February, 2000.)

    b.  The appropriate measure of the value of InaCom's assets as of March 25, 2000 is "fair value", which assumes conversion of the assets to cash during a reasonable period of time, usually the value that the debtor can obtain to promptly effect payment of its debts. (*See, In re Trans World Airlines, Inc.*, 134 F.3d 188, 194-195 (3rd Cir. 1998).

1

c.  This valuation approach was particularly appropriate because
the income approach was neither effective nor feasible;
InaCom used a significant amount of cash. InaCom used $19
million of cash in the period between March 25 and the
Petition Date (June 16, 2000). The cash use would have been
much greater had the Company not used $90 million of cash
deposited in the Company's bank accounts, and which
belonged to Compaq. Discovery of this event in April 2000
ultimately led to a default under the terms of InaCom's credit
agreement. Also, the company experienced large operating
losses totaling $466 million in 1999 and $35 million for the
thirteen weeks ended March 25, 2000. These events among
others led to failed attempts to sell substantially all operating
assets as a going concern.

d.  As of March 25, 2000, Generally Accepted Accounting
Principles ("GAAP") would have required that InaCom write
down its long-term assets to liquidation value because the
assets were not generating positive cash flow.[1]

e.  On March 25, 2000, InaCom's liabilities, including over $50
million of unrecorded liabilities, amounted to $960.2 million,
or well above the fair value of its assets. (It is worth noting

---

[1] See, FAS 144, para. 7, Accounting for the Impairment of Disposal of Long Lived Assets,
provides that: "An impairment loss shall be recognized only if the carrying amount of a
long-lived asset is not recoverable and exceeds its fair value. The carrying amount of a

that this assessment is in line with current estimates of

distribution to creditors of InaCom's bankruptcy estate).

2. <u>MARCH 25,2000 "FAIR VALUE" OF ASSETS AS COMPARED TO BOOK VALUE</u>:

| Asset | Book Value (millions) | Recovery (% of Book) | Fair Value (millions) |
|---|---|---|---|
| Cash | $51 | 100% | $51 |
| Accounts Receivable | 378 | 65% | 245.7 |
| Vendor AR | 40 | 0% | 0 |
| Inventory | 77 | 75% | 57.8 |
| Other Current Assets | 7 | 10% | .7 |
| FF&E, Net | 79 | 5% | 4.0 |
| Goodwill | 257 | 8% | 20.6 |
| Deferred tax | 188 | 0% | 0 |
| Other assets | 41 | 50% | 20.5 |
| *Total Assets* | *$1,118* | *36%* | *$400.2* |

3. <u>Accounts receivable</u> -$378 million book value with an overall 65%

recovery.   Receivables remaining from InaCom's product distribution

business totaled approximately $180 million (retained after the sale of

the distribution business to Compaq in February 2000), and the

majority of the remaining balance was associated with InaCom's

service business; InaCom faced several problems in connection with

collection of its receivables.

As of March 25, 2000, InaCom's primary business was to provide

computer repair and maintenance services to Fortune 1000

manufacturing and service companies for their entire domestic

operations. In addition, InaCom provided turn-key upgrade services

whereby organizations such as Sun Trust would replace and upgrade

---

long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows

IT infrastructure. These projects were long term in nature, and generally provided for milestone billing. The factors associated with the 35% discount, in line with the ultimate recovery value of the accounts receivable balance, from book value include the following:

    a.  Customer offset claims.

        i.  The service contracts generally contained liquidated damage clauses for failure to provide appropriate service. The vast majority of InaCom's customers asserted these damages including General Electric, Alcoa, Blue Cross of Michigan, Blue Cross of MA, and Bridgestone/Firestone. The discounts could run up to 80% of the face value of the receivable depending on the circumstances.

    b.  Poor documentation of services provided.

      Documentation for services provided by InaCom was evidenced by work orders signed, in general, by customers. These documents were maintained on a decentralized basis in over 100 field office locations. The work order information was not recorded in a centralized computer database or other program that would allow for the access to and reconciliation of the information. If a customer questioned the validity of an invoice, InaCom

---

expected to result from the use and eventual disposition of the asset."

would often be unable to produce the underlying work order or other supporting documentation.

c.  Valuation of lease AR.

The Company's largest leases were with Lockheed Martin. The recorded book value of the leases was $24 million, but they were sold in 2001 and 2002 after a complex negotiation and closing process for only approximately $13 million. A number of issues resulted in the variance between the book value and market value of the leases, including:

1.  The leases should have been recorded at the net present value of the future lease stream. The discount based on the term of the leases (generally five years) would have required a substantial discount from the face amount. InaCom did not note specific reserves for these items.

2.  Payments made by the lessee were not recorded against the face amount of the receivable.

3.  The leases provided for the bundling of hardware and services; when InaCom was unable to provide service to the equipment, damages associated with the service arose.

4. The cash stream from the leases was assigned by InaCom to a third party prior to March 25, 2000, as part of an amendment to a service agreement. As a result, InaCom was not, in March, 2000, realizing any cash for the services that it provided under the leases, or otherwise realizing any value from these receivables.

d. General age of the Service AR.

i. As of the Petition Date, 38% of the service AR was over 60 days old. In March, 2000, the AR aging was likely to have been worse given the liquidity issues that InaCom faced in the 90 days prior to bankruptcy.

e. Vendor/Product Accounts Receivable - $40 million book value with 0% recovery. Collection of these receivables for product distributed by InaCom prior to the sale of its distribution business in February, 2000, faced unique challenges. The vendors making up this balance questioned the validity of InaCom's receivable claims as evidenced by the Company's decision to take substantial charge/write down of at least $100 million of vendor AR because of its inability to prove and recover the amounts recognized; the total amount was never resolved and remained as an issue in the anticipated

6

restatement of previously issued financial statements that never

occurred.

4.  Inventory - $77 million book value with 75% recovery. The inventory

consisted solely of computer related components and systems

primarily remained on hand following the mid-February, 2000 sale of

InaCom's distribution business to Compaq. The general age of the

inventory made much of this equipment obsolete, and required a

substantial discount from cost. Since InaCom thereafter operated

primarily as a service business, it did not purchase any additional

inventory other than spare parts.

5.  Furniture, Fixtures & Equipment - $79 million net book value with a

recovery value of 5%. This asset category was composed of the

following:

a.  Computer software: $17.5 million net book value – this relates

to the capitalized cost associated with the implementation of an

Oracle system for financial accounting, a PeopleSoft system

for Human Resources, and a custom built service management

system (NOVA). The value of these systems was unique to

InaCom; the systems were custom configured to the operations

of InaCom's business, and customized to the manner in which

InaCom ran its business processes. An attempt was made to

market the Nova systems, but the Company was unable to

locate any interested party.

b. Leasehold improvements: $5 million net book value – all but approximately five of the more than 100 office leases were at or below market. This indicates the underlying improvement value was not able to be recovered for significant value.

6. Other Current Assets - $7 million net book value – this category is comprised of office furniture and fixtures. Given the large number of leased locations, the majority of this equipment was ultimately disposed of through abandonment or transfer to the lessors.

a. Computer equipment: $22 million book value – this equipment was used to operate the business, and included servers, laptops, desktops and printers. Used computer equipment in general based on the speed of obsolescence does not realize significant value.

b. Other equipment: $5 million book value – this equipment consisted of various telephone and office equipment, which given the nature and age of the equipment, had minimal recovery value.

7. Goodwill -- $257 million net book value, which arose from various acquisitions made by InaCom over the previous ten years, with a recovery of $20.6 million.

a. The only operation that made money in 2000 was InaCom Communications, which was disposed of for $20.6 million in excess of net book value. This sale amount accounts for the

8

$20.6 goodwill valuation. Due to the significant operating losses and cash use, InaCom would have been required to write-down goodwill significantly per the terms of Financial Accounting Standard 142.

b. According to Financial Accounting Standard 142 (FAS 142) Accounting for Goodwill and Other Intangible Assets (¶ 15), Recognition and Impairment of Loss, "an impairment loss shall be recognized if the carrying amount of an intangible asset is not recoverable and its carrying amount exceeds its fair value."

c. Continuing to paragraph 17, "the impairment test shall consist of a comparison of the fair value of an intangible asset with its carrying amount. If the carrying amount of an intangible asset exceeds its fair value, an impairment loss shall be recognized in an amount equal to that excess." In paragraph 19, the impairment test is further defined as the "fair value of a reporting unit with its carrying amount including goodwill."

d. Any market measure values of InaCom on March 25, 2000 were vastly overstated, as they did not contemplate the following:

   i. $40 million of unrecorded liabilities associated with the Compaq transactions, of which the Company was unaware in March 2000.

9

      ii.  Substantial financial restatements had not been finalized.

     iii.  In March 2000, the Company's operational cash requirements were masked by the significant amount of cash received by InaCom, but intended for and belonging to Compaq. From February, 2000 through mid April, 2000, InaCom received approximately $90 million in funds from Compaq Computer. This occurred after the sale of the distribution business to Compaq because Compaq account debtors were not instructed to change direct payments to Compaq bank accounts. As a result, these account debtors continued to remit payments to InaCom bank accounts.

     iv.  Issues associated with the marketability of the Company, including the fact that Compaq did not buy the service business, and that InaCom was unable to find a buyer for the service business in the spring of 2000.

8.  <u>Deferred Taxes</u> - $188 million book value with 0% recovery.

    a.  This represents an asset that InaCom could theoretically offset against future taxable income. Based on InaCom's historical financial performance and expected financial performance, it

would have been unable to realize these benefits. This is based on the following:

    i. InaCom received $43 million in tax refunds in the six months prior to the bankruptcy. FAS 109, Accounting for Income Taxes in paragraph 8, states "the measurement of deferred tax assets is reduced, if necessary by the amount of any tax benefits that, based on available evidence, are not expected to be realized." Paragraph 20 states that "all available evidence both positive and negative should be considered to determine whether based on the weight of that evidence, a valuation allowance is needed. Information about an enterprise's current financial position and its results of operations for the current and preceding years ordinarily is readily available. That historical information is supplemented by all currently available information about future years."

    ii. As of March 25, 2000, the following facts, among others, support such a "valuation allowance" for InaCom:

        1. The IRS filed a claim of $17 million, disputing a portion of the refunds received by InaCom in 2000.

11

2. InaCom had an operating loss of $466 million in 1999 and $34 million for the thirteen weeks ended March 25, 2000.

3. During fiscal 2000, the cash balance decreased by $40 million even after use of approximately $90 million of Compaq accounts receivable cash.

4. The Company was unable to sell its service business. In fact, Compaq decided, after due diligence, not to purchase the service business.

5. The Computer Service industry was trending strongly towards OE manufacturers (IBM, HP and Compaq) providing turn-key services including, the hardware, installation, maintenance, management and financing. InaCom was unable to provide hardware, IT management and financing at cost competitive position.

iii. In the over two years since its liquidation, InaCom has unsuccessfully attempted to market the NOLs to a potential third party.

9. <u>Other assets</u> - $41 million book value with a 50% recovery.

    a.  These are comprised generally of investments in outside entities including illiquid debt and equity instruments in certain franchises and investments in various publicly traded companies.

    b.  The bulk of the recovery relates to 125,000 shares of common stock in TMP Worldwide and an 8% investment in Computerland Poland, a Company traded on the Warsaw stock exchange. The remainder of the recovery primarily relates to investments in franchises ultimately yielding between 0%-30% of book value.

10.  <u>LIABILITIES</u> - The following represents a list of the categories of InaCom's liabilities as of March 25, 2000, along with the applicable face value of the obligations:

| Description | Face Value (millions) |
|---|---|
| Trade Accounts Payable | $362 |
| Other Current Liabilities | $188 |
| Long Term Liabilities | $165 |
| MIPS | $195 |
| *Sub Total* | *$910* |
| <u>Unrecorded Liabilities:</u> | |
| Due to Compaq | $40 |
| Real property lease obligations | $10.2 |
| *Total Liabilities* | *$960.2* |

13

11. <u>Trade Accounts Payable and Other Current Liabilities</u> – These

primarily consist of:

    a.  Trade debt associated with the distribution business – InaCom

        largely retained responsibility for its trade debt in the Compaq

        sale transaction.

    b.  Lease and operating expense payable.

    c.  Employee wages and benefits payable.

    d.  Sales tax payable.

12. <u>Long Term Liabilities</u> – In April 1999, InaCom entered into a $450

million revolving credit and amortizing term loan facility with a group

of lenders led by Deutsche Bank AG, as agent (the "Prepetition Credit

Facility"). In addition, InaCom had obligations under a floor planning

facility for IBM product purchases with IBM Credit Corporation, and

certain of InaCom's bank accounts were directly controlled by Pooled

Accounts Receivable Capital Corporation pursuant to certain

"lockbox" and blocked account agreements. InaCom used the cash

proceeds of the Compaq Sale to reduce the Prepetition Credit Facility

to a $225 million revolving credit facility, and to satisfy and retire

various other then-outstanding secured credit facilities as conditions to

the Compaq Sale. Following the Compaq Sale, InaCom's primary

source of liquidity was provided through the Prepetition Credit

Facility.

14

13.  <u>MIPS</u> – These are subordinated debentures for which InaCom assumed responsibility as a result of its merger with Vanstar in February, 1999. Vanstar purchased the debentures in 1996, in the original face amount of $207.5 million, to bear interest at 6/75% per annum, with the principal due and payable in 2016. The principal and interest is subordinated and junior in right of payment to the prior payment in full or all existing and future senior indebtedness, and Vanstar had the right to defer interest payments on the debentures at any time for up to twenty months.

14.  <u>Unrecorded Liabilities</u>:

a.  <u>Due to Compaq</u> – This consists primarily of cash received by InaCom in "trust" for Compaq following the sale of InaCom's distribution business to Compaq. After the close of the sale in mid-February, 2000, Compaq did not quickly change the "remit to" address for payments for shipments to its customers (all former InaCom customers). As such, between February 2000 and April 2000, InaCom received approximately $90 million in payment for goods shipped by Compaq. The $40 million liability noted represents the portion received prior to March 2000, in addition to closing adjustments that adversely affected the purchase price of the transaction with Compaq.

b.  <u>InaCom had over 100 leases for real property</u>. The obligation from April 1, 2000 through March 31, 2001 was approximately

$10.2 million. The total obligation for these leases to InaCom
was much greater if the obligation was calculated to term.

    c.  <u>Additional Liabilities Not Noted</u> – The Liabilities chart does
not include contingent liabilities that were later asserted by
various parties.

14.    <u>SUMMARY</u> – As indicated above, the "fair value" of InaCom's
assets amounts to approximately 36% of the book value of InaCom's
assets, and is approximately 41.6% measured against InaCom's liabilities.

Regards,

Dean Vomero
Managing Director
Bridge Associates LLC

16

**DEAN VOMERO**
**Managing Director**

Dean Vomero is a Managing Director of Bridge, LLC, joining the firm in 2000. Mr. Vomero has approximately 15 years of strategic, financial and operational restructuring experience. His Bridge engagements include:

- Co-headed the Bridge Accelerated Strategic Assessment Team, which prepared a business plan feasibility report for <u>UAL Corporation</u> (United Airlines) and its labor leadership.
- Interim CFO and COO for a <u>consumer food company</u> while in that role oversaw a 100% increase in sales from $30 million to $60 million over a nine month period.
- Headed the Bridge Financial Restructuring Team for <u>Hamon Corporation,</u> a $300 million construction firm serving the power generation industry.
- Chief Financial Officer and member of the Board of Directors of <u>Epic Resorts, LLC</u>, a timeshare resort development and management company which prior to bankruptcy had six resorts and over 400 employees.
- Headed the Bridge Wind Down Team for <u>InaCom Corporation</u>., a $5.9 billion (pre-petition) reseller of computer services and hardware.  He also provided an expert financial report associated with various causes of actions.
- Provided Bankruptcy Advisory Services to various Creditors' Committees, including <u>Level Propane Inc.</u>, <u>James River Coal Company</u> and <u>C2 Media</u> in Chapter 11 proceedings.  He has advised these committees in various business and restructuring matters and prepared, presented and defended expert financial reports in connection with various litigation matters in these cases.
- Provided due diligence reports for various private equity funds.  These reports focused on the strategy, projections, business process and performance measures of the target Companies.

Prior to joining Bridge, Mr. Vomero served as Vice President of Strategy and Development for a $60 million Tier 1 metal fabrication and stamping concern serving the automotive, truck and bus markets. As part of the Company's turnaround team, he assisted the primary equity sponsor in stabilizing operations and selling all operating assets.

As Principal Consultant for the Financial and Operational Improvement Group of Pricewaterhouse-Coopers, LLP. Mr. Vomero worked on major cost reduction, productivity improvement and merger integration projects, primarily for Fortune 500 companies.

Mr. Vomero was a Manager in Ernst & Young's Performance Improvement Group. In that role, he managed a variety of revenue enhancement, cost reduction and merger integration projects for primarily Fortune 500 companies.

Mr. Vomero also managed the implementation of a large ERP system for an international telecom engineering and manufacturing concern

Mr. Vomero is a member of the Advisory Board for the Mid-Atlantic Region of the American Bankruptcy Institute. He holds a Bachelors of Science in Business Administration from John Carroll University in Cleveland, Ohio and is a Certified Public Accountant.