# NUMBER 1

| **Witness** | **Page/Line Designation** |
|---|---|
| 1. Robert Kendrick (February 15, 2005) | 13:19 – 14:17 |
| | 27:22 – 29:6 |
| | 31:19 – 32:20 |
| | 39:3 - 10 |
| | 40:13 – 41:22 |
| | 42:1 – 43:10 |
| | 44:22 – 45:3 |
| | 46:13 – 48:3 |
| | 49:11 – 50:9 |
| | 51:11 - 17 |
| | 54:5 – 18 |
| | 55:15- 19 |
| | 59:21 - 61:22 |
| | 68:20 – 69:25 |
| | 70:6 – 71:11 |
| | 74:1 – 76:16 |
| | 82:2 – 12 |
| | 83:17 – 84:7 |
| | 96:20 – 101:5 |
| | 102:5 – 24 |
| | 103:7 – 15 |
| | 103:21 – 104:1 |
| | 104:6 – 14 |
| | 106:4 – 107:2 |
| | 111:2 – 20 |



1    UNITED STATES DISTRICT COURT
      DISTRICT OF DELAWARE
2          CASE NO. 04-CV-583

3    ─────────────────────────────────────

**DEPOSITION OF ROBERT KENDRICK**

4

5    ─────────────────────────────────────

INACOM CORP. on behalf of all            PLAINTIFF
6    affiliated debtors

7    v.

8    LEXMARK INTERNATIONAL, INC.            DEFENDANT

9    LEXMARK INTERNATIONAL, INC.            THIRD-PARTY
                                                  PLAINTIFF
10   v.

11   COMPAQ COMPUTER CORP., ITY CORP.,      THIRD-PARTY
      and CUSTOM EDGE, INC.                  DEFENDANTS
12   ─────────────────────────────────────

13         The deposition of **ROBERT KENDRICK** was taken on

14   behalf of the plaintiff, Inacom Corporation, before Ann

15   Hutchison, Registered Professional Reporter and Notary

16   Public in and for the State of Kentucky at Large, at the

17   law office of Stoll, Keenon & Park, 300 West Vine

18   Street, Suite 2100, Lexington, Kentucky, on Tuesday,

19   February 8, 2005, beginning at the hour of 9:38 a.m.

20   Said deposition was taken pursuant to Rule 30 of the

21   Federal Rules of Procedure and Rule 7030 of the Federal

22   Bankruptcy Procedure.

23   ─────────────────────────────────────

24            **ACTION COURT REPORTERS**
               **184 North Mill Street**
25          **Lexington, Kentucky 40507**
                 **(859) 252-4004**

1                          **APPEARANCES**

2


3    **COUNSEL FOR PLAINTIFF INACOM CORPORATION:**

4        Jeffrey P. Nolan
         Pachulski, Stang, Ziehl, Young & Jones
5        10100 Santa Monica Boulevard, 11th Floor
         Los Angeles, California 90067-4100
6


7    **COUNSEL FOR THIRD-PARTY DEFENDANT COMPAQ:**

8        Cecily A. Dumas
         Friedman, Dumas & Springwater, LLP
9        One Maritime Plaza, Suite 2475
         San Francisco, California 94111
10


11   **COUNSEL FOR DEFENDANT AND THIRD-PARTY PLAINTIFF**
     **LEXMARK INTERNATIONAL, INC.:**
12
         Culver V. Halliday
13       Stoll, Keenon & Park, LLP
         2650 Aegon Center
14       400 West Market Street
         Louisville, Kentucky 40202-3377
15


16   **ALSO PRESENT:**

17       Kevin Sarkisian

18

19

20

21

22

23

24

25

1    today.  It also references on the caption a lawsuit

2    that's been initiated, it's Inacom versus Lexmark, and

3    then there's a third-party complaint by Lexmark against

4    Compaq.  Can you tell me when you first became aware of

5    this lawsuit?

6          A.    In 2003.

7          Q.    Okay.  Any approximate time frame in 2003?

8          A.    I recall it was in the summer.

9          Q.    Okay.  And how did you become aware of the

10   lawsuit?

11         A.    Phone call from Culver Halliday.

12         Q.    And other than the phone call with

13   Mr. Halliday, you haven't had any other phone calls with

14   any other individuals at Lexmark to discuss the

15   substance of this lawsuit?

16         A.    No.

17         Q.    That's correct?

18         A.    That's correct.

19         Q.    Can you tell me when you began employment

20   with Lexmark?

21         A.    October of -- let's see.  October of 1990

22   I was with IBM and was brought in to work on the team to

23   work on the rollout or the formation of a company called

24   Lexmark that would go into business effective April 1st

25   of 1991.  Technically, we were not a company; that's why

1   it's a difficult question to answer.  But in October of

2   1990 we formed the company, took us about six or seven

3   months to do that.  We chartered April 1st of 1991.

4        Q.      Okay.  So Lexmark was a -- Lexmark came

5   into being in 1991.  Correct?

6        A.      Correct.

7        Q.      Okay.  And you were with IBM prior to

8   Lexmark coming into existence?

9        A.      Yes.

10       Q.      And when you started with -- did you hold

11  a role or a title with Lexmark when it started in 1991?

12       A.      Yes.

13       Q.      And what title would that be?

14       A.      Director of sales, southeastern area.

15       Q.      And how long were you with IBM before

16  Lexmark started?

17       A.      Twenty-four years.

18       Q.      And what was your -- strike that.

19               So that's -- 24 years.  Approximately

20  1966?

21       A.      Seven.  April 10, 1967.

22       Q.      And what was your last position with IBM?

23       A.      Branch manager for the state of Florida.

24       Q.      And what time frame did you hold that

25  position?

1    area that you were focusing on in '91 to '96 as far as

2    sales?

3         A.    First tier and second tier.

4         Q.    Was there a separate department -- strike

5    that.

6               From '91 to '96 did Lexmark have an

7    accounting department?

8         A.    Yes.

9         Q.    Do you know who headed up the accounting

10   department in '96?

11        A.    No.

12        Q.    Did Lexmark have a treasury department

13   between 1991 and 1996?

14        A.    Yes.

15        Q.    Do you remember who headed up the treasury

16   department?

17        A.    No.

18        Q.    And did the accounting department and

19   treasury departments operate independent of your

20   position and title between 1991 and 1996?

21        A.    Yes.

22        Q.    What was the next position that you held

23   subsequent to 1996?

24        A.    Vice president of U.S. channel sales and

25   marketing.

1          Q.      And how long did you hold that position?

2          A.      Till November of 2001.

3          Q.      Did you retire from Lexmark?

4          A.      Yes.

5          Q.      As opposed to, you know, quit or something

6     else?

7          A.      Yes.

8          Q.      And when did you retire from Lexmark?

9          A.      April 1, 2003.  Correction.  April 1,

10    2004.

11                 MS. DUMAS:  Is that correct, or is

12    that an April fool?

13                 THE WITNESS:  April 1, 2004.

14         Q.      Can you tell me what your job duties and

15    responsibilities were as the vice president of U.S.

16    channel sales?

17         A.      And marketing.

18         Q.      Why don't we before you even get to that,

19    can I just use -- what's a short term for that title?

20         A.      I think we understand the time frame.

21         Q.      How about VP of sales and marketing?

22         A.      Yeah.

23         Q.      So let me re-ask the question, then make a

24    nice clean record.  As VP of sales and marketing, what

25    were your job duties and responsibilities?

1          A.      To handle responsibilities for Lexmark in

2    the United States for all business printer product

3    resellers, to include sales, marketing programs,

4    marketing incentives, accounts receivable and

5    collections, and the overall customer relationship

6    responsibilities.

7          Q.      At this time, from '96 to 2001, did

8    Lexmark have any other area of focus besides selling

9    printers and peripherals to the printer?

10         A.      Rephrase your question.

11         Q.      I'm just asking because I don't know.

12   Generally what was -- in 1996 what was Lexmark's, you

13   know, particular focus as a business?  As far as product

14   is concerned.

15         A.      We're a printer company.

16         Q.      Okay.  So Lexmark was actually selling

17   printers and peripherals that are surrounding the

18   printers that they sold?

19         A.      Printers and supplies are our business.

20   Was back then.

21         Q.      And as VP of sales and marketing in that

22   time frame, who did you report to?

23         A.      Dee, spelled D-e-e, Allott, A-l-l-o-t-t.

24   And the other individual was Scot, S-c-o-t, Edwards.

25         Q.      And what was Mr. Edwards' title?

1    Q.    So was there one, two, or more directors?

2    A.    Two.

3    Q.    And what were their names?

4    A.    Bob Duff, and the other I don't recall.

5    Q.    And what were their titles?

6    A.    I don't recall.

7    Q.    And what generally would be Mr. Duff and

8    the other individual's responsibilities?

9    A.    To develop demand creation programs coming

10   from a marketing standpoint that could be implemented

11   through the sales organization for resellers and at that

12   time distributors.

13   Q.    When you were VP of sales and marketing,

14   did your responsibilities stay the same during that time

15   frame, or did you take on any different roles as, you

16   know, you moved on further along through the time frame?

17   A.    There were changes, but nothing that I

18   would say significant.

19   Q.    When you're VP of sales and marketing, did

20   you deal personally -- I mean, you individually, deal

21   with customers of Lexmark?

22   A.    Yes.

23   Q.    I mean, did you have -- did you have times

24   when you would actually contact those folks

25   individually?  I mean, would your job duties be more of

1    sending or supervising folks from Lexmark or actually

2    getting involved, you know, day to day with the

3    customers?

4          A.    Customers or people who buy products.

5    Resellers are people who resell them.  And so I would

6    engage our reseller executives frequently.  I talked

7    rarely to customers, end user customers.

8          Q.    When you were talking with resellers,

9    would be it for business development, or would it be for

10   another particular area?

11         A.    Yes.

12         Q.    Were you involved with accounts receivable

13   at that time?

14         A.    I had responsibility for it.

15         Q.    But if somebody was owed money -- if

16   somebody owed money to Lexmark in the '96 to 2001 time

17   frame, a reseller that is, would you have the duties and

18   responsibilities to call that reseller about accounts

19   receivable that were outstanding?

20         A.    Yes.

21         Q.    Would you do that very often or just when

22   it met certain -- got to a certain point?

23         A.    When it got to a certain point.

24         Q.    At this time frame in '96 to 2001, was

25   Lexmark set that there would be one individual assigned

```
 1          Q.      Could you spell his last name for me?

 2          A.      B, as in boy, r-a-u-n.  K-u-r-t.

 3          Q.      And as part of your job duties and

 4   responsibilities as VP of sales and marketing, did you

 5   know what the payment terms were that were set by

 6   Lexmark in the 1999 time frame?

 7          A.      Yes.

 8          Q.      And what were they?  .

 9          A.      Payment due upon shipment, delinquent if

10   not paid within 30 days.

11                  MR. NOLAN:  Can you read my last

12   question back?

13                  (Question read on page 39, line 3).

14                  MR. NOLAN:  I usually have my computer

15   cheater screen out here.

16          Q.      Mr. Kendrick, do you know if the payment

17   terms set by Lexmark in 1999 were different depending

18   upon whether or not the reseller was a first tier or

19   second tier or third tier reseller?

20          A.      Can you rephrase your question?

21          Q.      Yeah.  I'm just trying to get an

22   understanding of whether or not Lexmark had, based on

23   your understanding, one set of payment terms in the 1999

24   time frame which were delinquent if not paid within

25   30 days, or did they have, you know, more stringent or
```

1   more lenient payment terms for different resellers

2   depending upon factors that Lexmark may want to

3   determine?

4         A.    I don't recall.

5         Q.    Okay.  So as best you know as you sit here

6   today, it was the one standard, which is payable upon

7   shipment, delinquent if not paid within 30 days?

8         A.    Yes.

9         Q.    And, Mr. Kendrick, were you aware of these

10  terms based upon your duties and your position in 1999

11  as VP of sales and marketing?

12        A.    Yes.

13        Q.    At some time frame in 1999 did you become

14  aware that Inacom was becoming delinquent in payment of

15  outstanding sums to Lexmark?

16        A.    Yes.

17        Q.    Can you tell me approximately when you

18  became aware of that?

19        A.    In the fourth quarter of 1999.  My most

20  vivid recollection is December.

21        Q.    Now, prior to the fourth quarter in 1999,

22  do you recall ever talking to anyone at Inacom?

23        A.    Yes.

24        Q.    Did you have a contact at Inacom that you

25  went to if you ever needed anything or if you needed to

1    discuss any issue between the two companies?

2         A.    Yes.

3         Q.    And who was your contact?

4         A.    Leon Kerkman.

5         Q.    Do you know what Mr. Kerkman's position

6    was at Inacom?

7         A.    Vice president of something.

8         Q.    Anybody else besides Mr. Kerkman that you

9    dealt with at Inacom?

10        A.    Bill Fairfield.

11        Q.    And what were the -- prior to the fourth

12   quarter of 1999, what were the type of issues that might

13   come up that would necessitate you contacting or talking

14   with Mr. Kerkman?

15        A.    Their performance relative to sales

16   philosophy, their performance relative to implementation

17   of programs and their effectiveness, product shortages,

18   product overages, inventory, balancing and rebalancing,

19   accounts receivable, marketing development funds.

20        Q.    And when you say accounts receivable, are

21   you referring to sums owed by Inacom to Lexmark?

22        A.    Yes.

23        Q.    Do you know in the 1999 time frame whether

24   or not Lexmark bought any products from Inacom?

25        A.    I don't know.

1    Q.    Whenever you talked to Mr. Kerkman, did it

2    always center around Inacom buying product from Lexmark?

3    A.    Yes.

4    Q.    And these conversations that you had with

5    Mr. Kerkman on these various topics that you were kind

6    enough to mention, those conversations occurred prior to

7    the fourth quarter of 1999?

8    A.    Yes.

9    Q.    What kind of topics do you recall --

10   strike that.

11         Do you recall talking to Mr. Fairfield

12   prior to the fourth quarter of 1999?

13   A.    Yes.

14   Q.    And what type of topics would you discuss

15   with Mr. Fairfield?

16   A.    Mr. Fairfield was the CEO, and I met with

17   him, and we discussed the industry in general and

18   Lexmark's progress in the printer business.

19   Q.    Any other topics that you can recall as

20   you sit here?

21   A.    No.

22   Q.    In 1999 can you tell me where on the scale

23   Inacom fell as far as a client of Lexmark?  You can do

24   it in gross dollars or business they gave to Lexmark.

25   Were they one of the smaller customers, one of the

1    larger customers?  Actually, I'm sorry, resellers

2    instead of customer.

3         A.      Large customer reseller, reseller

4    customer.  Very important to Lexmark.

5         Q.      Do you know whether or not they would be

6    within the top ten resellers of Lexmark in the 1999 time

7    frame?

8         A.      Yes.

9         Q.      Would they make the top five?

10        A.      Yes.

11        Q.      Were they the top reseller of Lexmark?

12        A.      No.

13        Q.      Who was the top reseller for Lexmark in

14   the 1999 time frame?

15        A.      I believe it was Ingram, then Tech Data.

16        Q.      Prior to the fourth quarter of 1999, what

17   is your recollection of the business relationship

18   between Inacom and Lexmark in terms of Inacom being a

19   good or bad customer of Lexmark or good or bad reseller

20   of Lexmark?

21        A.      Do you have a specific area that you'd

22   like me to --

23        Q.      Sure.  I'll narrow the question.

24        A.      -- comment on?

25        Q.      Yeah.  As far as accounts receivable, as

1  far as timely paying debts that were owed to Lexmark,

2  prior to the fourth quarter of 1999 do you have a

3  recollection of whether or not Inacom timely paid its

4  outstanding debts to Lexmark?

5          A.      No.

6          Q.      Prior to the fourth quarter of 1999 do any

7  events stand out in your mind where Inacom became

8  delinquent in sums owed to Lexmark such that it came to

9  your attention?

10          A.      I don't recall any.

11          Q.      If there was a large or a significant

12  event where Inacom fell behind in payments to Lexmark

13  prior to the fourth quarter of 1999, would that be an

14  event that should have come to your attention?

15          A.      Yes.

16          Q.      Do you have any recollection as you sit

17  here today of any conversations you had with either

18  Mr. Kerkman or Mr. Fairfield prior to the fourth quarter

19  of 1999 where you discussed outstanding sums or a large

20  delinquency owed by Inacom to Lexmark?

21          A.      No.

22          Q.      What's the first fact or event that you

23  can recall concerning Inacom becoming delinquent to

24  Lexmark in the fourth quarter of 1999?

25          A.      A phone call from the credit department in

1   Lexmark.

2         Q.      And who was the phone call from?

3         A.      My recollection is Bill Ruwe.

4         Q.      Is the credit department independent of

5   the accounting department?

6         A.      Imbedded in, in my view.

7         Q.      And can you spell Mr. Ruwe's last name,

8   please?

9         A.      It's Bill Ruwe, R-u-w-e, credit manager.

10        Q.      Prior to the fourth quarter of 1999, do

11  you ever recall Lexmark placing Inacom on shipping hold?

12        A.      I don't recall.

13        Q.      So as you sit here today, you don't recall

14  an event prior to the fourth quarter of 1999 where

15  Lexmark placed Inacom on shipping hold?

16        A.      I don't recall.

17        Q.      Prior to the fourth quarter of 1999 did

18  you ever recall Lexmark placing any reseller on shipping

19  hold?

20        A.      I don't recall.

21        Q.      Do you understand what I mean --

22        A.      I do.  I do.  I just don't remember.

23        Q.      -- by shipping hold?

24        A.      I understand.

25        Q.      Okay.

1        A.    I understand your question, and I just

2    don't recall a specific situation whereby Lexmark put

3    somebody on shipping hold.

4        Q.    As far as the practice, though, of

5    shipping hold, was that something that Lexmark utilized

6    prior to the fourth quarter of 1999 in dealing with

7    resellers?

8        A.    It was a practice, yes.

9        Q.    I mean, I didn't know if some companies

10   might not use that at all, but I wanted to know whether

11   you were aware Lexmark used it.

12       A.    Yes.

13       Q.    What do you recall about the telephone

14   call from Mr. Ruwe?

15       A.    That the amounts overdue were growing, and

16   encouraging me to become personally involved.

17       Q.    And when you say amounts overdue, do you

18   have any idea of how much he was talking about in

19   dollars?

20       A.    I don't remember, no.

21       Q.    Can you give me just kind of an idea as to

22   how big it would have to be before somebody from the

23   credit department would call you and bring it to your

24   attention?

25       A.    Typically $200,000 in those days.

1   Actually, since our legacy, we had very low thresholds

2   of pain relative to potential lost revenue, debt, very

3   low thresholds of pain.

4          Q.    Okay.  So you think anything over 200,000

5   would, in that time frame, would warrant a call from the

6   credit department to your attention?

7          A.    Yes.

8          Q.    And as a result of the call from -- strike

9   that.

10          Do you recall anything else from the

11   substance of the conversation with Mr. Ruwe?

12          A.    No, I don't recall anything else.

13          Q.    Do you recall what you did as a result of

14   the telephone call from Mr. Ruwe?

15          A.    My recollection is that I called

16   Mr. Kerkman on the telephone.

17          Q.    Okay.  Do you recall the substance of the

18   conversation?

19          A.    Yes.

20          Q.    And would this have still been in 1999?

21          A.    2000.

22          Q.    We're into 2000 now?

23          A.    Uh-huh.

24          Q.    And what do you recall from the

25   conversation with Mr. Kerkman?

1          A.      My side was I'm concerned.  I want my

2    money.  His side was don't worry, you will get your

3    money.

4          Q.      Was this the first -- that first type of a

5    conversation that you had had like that with

6    Mr. Kerkman?

7          A.      It is the only one that I recall in that

8    time frame.

9          Q.      Okay.  If I understand you correctly, you

10   don't recall ever having that type of a conversation

11   with Mr. Kerkman prior to 1999?

12         A.      That's correct.

13         Q.      Any idea?  Because I'm going to pick your

14   memory now, or I'm going to try to.  From that

15   conversation you had with Mr. Kerkman in 2000, do you

16   have any recollection of what the dollar amount was that

17   was in dispute?

18         A.      I don't recall exactly.  My sense is that

19   it was several million dollars.

20         Q.      So at the time of the call to Mr. Kerkman

21   we're way above the $200,000 threshold as far as how

22   serious the debt is that is owed?

23         A.      My voice, my sense of urgency reflected

24   that in the conversation, I'm sure.

25         Q.      Okay.  Was there ever any issue before you

1  called Mr. Kerkman whether or not the amount that was in

2  dispute should have been brought to your attention

3  earlier?

4         A.      No.

5         Q.      Any other calls besides Mr. Kerkman to

6  Inacom that you can recall at that time frame concerning

7  the amount in dispute and when you're going to get paid?

8         A.      From me?

9         Q.      Yes.

10        A.      I don't recall any others.

11        Q.      At or about the time -- or actually prior

12 to the time you called Mr. Kerkman, did you ask anybody

13 else from Lexmark to call someone at Inacom and find

14 out, you know, why Inacom was behind in paying Lexmark?

15        A.      Yes.

16        Q.      Okay.  Who do you recall asking to make a

17 phone call?

18        A.      Prior to what date?

19        Q.      Prior to your call to Mr. Kerkman.

20        A.      Julian Gorman and Bill Schuette.

21        Q.      Do you know what month it was that you

22 called Mr. Kerkman?

23        A.      January.

24        Q.      And what was Mr. Schuette's title in 2000?

25        A.      District sales manager.

1        Q.     And he served underneath you?

2        A.     Yes.

3        Q.     And who was the other individual besides

4  Mr. Schuette?

5        A.     Julian Gorman.

6        Q.     And did Mr. -- do you know if Mr. Schuette

7  ever contacted anyone at Inacom concerning this

8  outstanding debt in the 1999, early 2000 time frame?

9        A.     Yes.

10       Q.     Do you know who he talked to?

11       A.     No.

12       Q.     Did Mr. Schuette come back and -- strike

13  that.

14             Do you have a recollection of whether or

15  not you asked Mr. Schuette to call someone at Inacom?

16       A.     Yes.

17       Q.     And do you know if that was in 1999 as

18  opposed to 2000?

19       A.     Yes.

20       Q.     Okay.  What year was that?

21       A.     2000.

22       Q.     And this was prior to your call to

23  Mr. Kerkman?

24       A.     Subsequent.

25       Q.     Your call to Mr. Kerkman, was that right

1    after Bill Ruwe brought it to your attention?

2         A.    My recollection is triggered by New Year's

3    on coming back to work on my phone call to Mr. Kerkman.

4    I remember that being an event.  My recollection of the

5    phone call from Mr. Ruwe to take action is triggered by

6    the Christmas holidays, frankly.  So I felt in

7    recalling, I felt the void of the holidays.  But the

8    answer to your question is I did not immediately call

9    Mr. Kerkman after hearing from Mr. Ruwe because of the

10   holidays.

11        Q.    I'm just trying to get a sense of between

12   the phone call from Mr. Ruwe did you assign this problem

13   to anybody underneath you, say, you know, get to the

14   bottom of this and get back to me?

15        A.    No.  My personal practice was when the

16   credit management asked me to become personally

17   involved, I was personally involved.  And I was.

18        Q.    Do you have any recollection besides your

19   testimony from Mr. Kerkman that you would be paid as to

20   any of the other conversation you had with Mr. Kerkman?

21   Strike that.

22              Let me ask this question again.

23              Mr. Kerkman said to you you would be paid

24   when you talked to him on the phone?

25        A.    Yes.

1          A.      He was calling different people within the

2     account, his marketing contacts, his accounts payable

3     contacts, his executive contacts, his contacts in the

4     sales organization and treasury.

5          Q.      And as you sit here today, do you have any

6     recollection of any conversations that you had with

7     Mr. Schuette in early 2000 where he kind of summed up

8     how it was going in trying to, you know, get these sums

9     owed from Inacom?

10         A.      Yes.

11         Q.      And what's your understanding or

12    recollection?

13         A.      My most significant recollection was is

14    that we received the commitment that checks were written

15    payable to Lexmark and that we were going to get them

16    and they would be released by a financial executive in

17    Inacom to us at a time and date appropriate but yet

18    unspecified.

19         Q.      How did that sit with you?

20         A.      Clicked my heels.

21         Q.      I think I know what click your heels

22    means.

23         A.      I was happy.

24         Q.      You were happy.  Okay.

25         A.      Demonstration of good faith on

1    Mr. Kerkman's word.

2          Q.     Now, when did you come to that

3    understanding that Inacom had written checks and that

4    they would be released by a financial executive?

5          A.     I don't recall exactly.  The only trigger

6    I have on that is it came seemingly shortly after my

7    phone call from Leon.

8          Q.     So this didn't transpire at the dinner

9    meeting with Mr. Kerkman?

10         A.     The dinner meeting with Mr. Kerkman took

11   place in April.  I'm trying to frame this for you in the

12   mid January time frame, which would be shortly

13   thereafter the first of the year when I remember making

14   a call to Mr. Kerkman.

15         Q.     Okay.  And how did you become aware of

16   this understanding that checks were written but being

17   held?

18         A.     Mr. Schuette reported that to me, as a

19   conversation that he had received from Mr. Kerkman.

20         Q.     At the time that Mr. Schuette reported

21   this -- strike that.

22                Mr. Schuette reported to you, do you know

23   when in 2000 of that event?

24         A.     No.

25         Q.     I'm going to refer to that event of the

1    business persons or business entities concerning Inacom

2    and its financial solvency?

3          A.    No.

4          Q.    After the conversation from Mr. Schuette

5    to you where they discussed held checks, did you report

6    that to anyone at the Lexmark corporation above you?

7          A.    I don't recall.

8          Q.    Did Mr. Schuette tell you who at Inacom

9    would be responsible for releasing the checks?

10         A.    Yes.

11         Q.    Who do you recall Mr. Schuette telling

12   you?

13         A.    I don't recall the name.

14         Q.    After Mr. Schuette reported to you that

15   event, what's the next significant event that you can

16   recall?

17         A.    I told him -- I clearly remember I told

18   him that was unacceptable.

19         Q.    What was unacceptable?

20         A.    That the checks were in the drawer, that

21   they were being held without a date certain for release.

22         Q.    And this is at the same time Mr. Schuette

23   brought you up to speed on this whole practice at

24   Inacom?

25         A.    Right.  Right.

1    Q.    Okay.  Because, I'm sorry, I thought you

2    were happy for a moment.

3    A.    But I didn't tell him that.

4    Q.    Okay.  You didn't tell Mr. Schuette that?

5    A.    That's correct.  I told Mr. Schuette I

6    wanted him to go back into their organization to get

7    date specific for debt resolution.

8    Q.    So you told Mr. Schuette you wanted him to

9    go back to Inacom and find out, get a deadline or a date

10   for release of those checks?

11   A.    Yes.

12   Q.    Anything else you told Mr. Schuette to do?

13   A.    No.

14   Q.    Do you have an impression as you sit here

15   today how old the debt was that was owed by Inacom to

16   Lexmark at this time frame?

17   A.    Of course, that would be only an

18   impression because I don't know for sure, but about

19   three months old would be my impression, 90 days or

20   better, or more.

21   Q.    At the time you asked Mr. Schuette to --

22   strike that.

23          Now, were you the point person at this

24   time, Mr. Kendrick, as far as trying to work this

25   problem out with Inacom, or was there somebody else at

```
 1    Lexmark who was also working on a different front?
 2              A.      I think it would be fair to say my
 3    organization was the point organization.  I think it
 4    would be fair to say I was the executive responsible in
 5    Lexmark, and I think it would be fair to say that Bill
 6    Schuette was the person that I delegated to to keep the
 7    visibility high and the awareness inside of Inacom high.
 8              Q.      Okay.  At the time that this was going on,
 9    did you place any restriction on whether or not Inacom
10    could continue to accumulate more debt with Lexmark?
11              A.      I don't recall.
12              Q.      Do you have any impression as you sit here
13    today, with Inacom owing, I think you said $2 million
14    plus, whether or not you would have put any limitation
15    on them to incur any more debt?
16              A.      I don't recall.  My impression was is that
17    we were really to the point -- we being myself, I was to
18    the point where I was going to have to take a dramatic
19    move, and my impression is stop shipment was an
20    impending event that might just have to happen.  That's
21    my impression of the time frame that you've bracketed.
22              Q.      Okay.  Do you have any recollection of
23    whether or not you gave that impression to Inacom to let
24    them know the gravity of the situation?
25              A.      Yes.
```

1        Q.     And you think you did?

2        A.     Yes.

3        Q.     And would that have been to Mr. Kerkman?

4        A.     Yes.

5        Q.     The name Richard Oshlo ring a bell at all?

6        A.     No.

7        Q.     Do you know whether or not Mr. Schuette

8 made that call to Inacom to try to get a date certain to

9 have the checks released?

10       A.     I'm sure he did.

11       Q.     What's your next recollection of a

12 conversation with Mr. Schuette following those

13 directions you gave him?

14       A.     The next recollection was that they were

15 not going to give them a date, that he had talked to

16 Mr. Kerkman, that Mr. Kerkman was not the decision maker

17 on that, that that set of release decisions would come

18 from a finance executive inside of Inacom in Omaha, and

19 that the debts that were on the books were going to be

20 paid by Inacom by those checks and that Compaq would be

21 sending a letter of guarantee to Lexmark assuring us

22 that all debts would be paid.

23             MR. NOLAN:  Can you reread that last

24 answer, please.

25             (Last answer read.)

1    break.

2                        (11:47 BREAK 11:59.)

3                        MR. NOLAN:  Back on the record.

4         Q.      Mr. Kendrick, at this time, which is in

5    early 2000, would you get a daily A/R report, which is a

6    daily report setting forth the accounts receivables owed

7    to Lexmark for resellers?

8         A.      No.

9         Q.      How often do you think you monitored what

10   was outstanding or owed to Lexmark in the January 2000

11   time frame?

12        A.      Maybe weekly, unless it was a problem

13   account.

14        Q.      And would you categorize the Inacom

15   account as being a problem account in January of 2000?

16        A.      Yes.

17        Q.      What was your response to Mr. Schuette?

18        A.      Schuette.

19        Q.      I'm sorry, Mr. Schuette.  Thank you.

20               What was your response to Mr. Schuette

21   that there was no date set for the release of these

22   checks?

23        A.      Unacceptable.

24        Q.      Did you ask him to do anything with

25   respect to Inacom to get a date certain?

```
1              A.      Yes.

2              Q.      What did you ask?

3              A.      To get a date certain.

4              Q.      Did you ask him to do anything else?

5              A.      No.

6              Q.      Did you ask him if they could provide

7    explanation as to what time frame they could give you a

8    response about releasing the checks?

9              A.      I'm sure that I did.  I don't recall if he

10   told me anything.

11             Q.      As a result of Mr. Schuette telling you

12   that Mr. Kerkman was not the decision maker on this

13   issue of releasing checks, did you do anything?

14             A.      No.

15             Q.      Do you have any recollection as to whether

16   or not you wanted to know who the person was who was

17   pulling the trigger at Inacom with these checks?

18             A.      Sure.  And accordingly suggested that this

19   letter that he was to write for my review would go to

20   that individual.

21             Q.      Do you recall what area that individual in

22   Inacom was involved?

23             A.      Yes.

24             Q.      What area?

25             A.      Finance.
```

1      Q.      Do you have any understanding as you sit

2   here today why the person in the finance department at

3   Inacom was the one that was controlling the release of

4   checks in early 2000?

5      A.      No.

6      Q.      If I understood your testimony correctly,

7   you testified that Mr. Schuette informed you that the

8   debts that were outstanding to Lexmark at this time

9   would be debts that would be paid by Inacom; is that

10   correct?

11      A.      That was my understanding.

12      Q.      Okay.  And was it your understanding that

13   those debts that were owed and outstanding to Lexmark at

14   this time frame were debts that were going to be retired

15   by these release checks?

16      A.      Yes.

17      Q.      Did you have any understanding that there

18   were -- strike that.

19          Was it your understanding that the total

20   amount that was owed by Lexmark at this time, there was

21   a corresponding group of held checks that equalled that

22   amount?

23      A.      Yes.

24      Q.      As opposed to a proportion of it?

25      A.      That's correct.

1          Q.        Okay.    Now, you mentioned previously

2    something about checks being held in a desk?

3          A.        Yes.

4          Q.        What do you recall in January 2000 or

5    February of 2000 how you became aware that checks were

6    being held in a desk?

7          A.        It came as a result of a report from

8    Mr. Schuette that Mr. Kerkman had told him that the

9    checks had been cut and were being held by an executive

10   in finance and being held in his desk and that they

11   would be released.

12         Q.        They would be released at Inacom's -- when

13   Inacom made the decision?

14         A.        By this financial executive in Inacom in

15   Omaha.

16         Q.        And if I understand your testimony

17   correctly, you're not sure why Inacom was holding --

18   you're not sure if you had an understanding back in

19   early 2000 as to why Inacom was holding those checks?

20         A.        I am sure that I had an understanding.    I

21   do not recall what that understanding would have been.

22   I do not understand what that -- I do not recall what

23   that understanding was.

24         Q.        And is it your understanding that the

25   checks that were being held in the Inacom treasury were

1          Q.       Okay.  That's fair.  Tell me about how you

2   had the -- how the dinner was set up with Mr. Kerkman in

3   April of 2000.

4          A.       I can't speculate on the why, other than

5   the importance of the accounts receivable issues being

6   one of the reasons; but I found the best way to meet

7   with Mr. Kerkman was at dinner because of -- he is an

8   individual, enjoyed business dinners.

9          Q.       And this dinner took place in April 2000?

10         A.       Yes.

11         Q.       And it was in Omaha, I think you said?

12         A.       Yes.

13         Q.       Anyone else present from Inacom?

14         A.       No.

15         Q.       Did you go to Omaha specifically to see

16  Mr. Kerkman?

17         A.       Yes.

18         Q.       What do you recall from that dinner

19  meeting?

20         A.       I recall that I was very interested in

21  knowing how the new arrangement was going to work

22  relative to their marketing and their sales activities,

23  whether we were going to be calling on the same people

24  in Omaha, a lot of organizational questions.  And I

25  recall specifically touching on future accounts

1    receivables and getting some assurances that there was

2    lubrication in the system to ensure that we were paid

3    with speed and precision and that there would be no

4    problems.

5          Q.      Okay.  And this is future business between

6    Lexmark and Custom Edge?

7          A.      As of that day -- the call was made in

8    April, and it had to do with everything that day

9    forward, I would -- that's my recollection.

10         Q.      Okay.  Well, do you recall when you had

11   this meeting with Mr. Kerkman, was it a meeting for

12   prospective business as opposed to past dealings?

13         A.      No.  It was one that was based upon what

14   are the logistical implications of this new organization

15   structure that we now are going to serve.

16         Q.      And that new organ --

17         A.      How would the bills get paid.  Because we

18   had received a guarantee letter, and I was pleased that

19   the Compaq Corporation had guaranteed the debts, and

20   certainly I was confident that there was minimal risk to

21   debt.  My concern was one of logistics and precision on

22   getting through the payables process, per se, as I

23   recall.

24         Q.      And this new organization you referred to

25   is Custom Edge?

1      A.      Yes.  And his boss was in Houston.

2      Q.      So Mr. Kerkman --

3      A.      He tells me.

4      Q.      So Mr. Kerkman worked for Custom Edge at

5  this time, April 2000?

6      A.      That's correct.  Truthfully, I don't know

7  who the hell he worked for.  Because all I recall was

8  his boss was in Houston.  I remember him specifically

9  saying that, he said I take orders from Houston, and I'm

10  going to Houston and -- you know, I don't recall whether

11  they were a wholly owned subsidiary, a division thereof

12  or what have you, so I can't say for sure.

13      Q.      And Houston was the headquarters for

14  Compaq at the time?

15      A.      Indeed.  Indeed.  And the letter came from

16  Houston, Compaq in Houston.

17      Q.      Now, as far as -- strike that.

18              At some time did you become aware that the

19  checks were released from the Inacom treasury?

20      A.      Yes.

21      Q.      When do you recall that occurring?

22      A.      I don't recall specifically.

23      Q.      Did you have any -- other than what you've

24  testified to here today, did you have any other further

25  contacts with Inacom concerning the release of the

1      Q.      Okay.  Thank you.

2              When Mr. Nolan was asking you questions,

3      you told him that Julian Gorman was the district sales

4      manager in charge of the -- or in whose supervision the

5      Inacom account was.  He asked about late 1999, and I

6      wanted to ask you at some point did Mr. Schuette become

7      the district sales manager -- or Schuette become the

8      district sales manager in whose portfolio the Inacom

9      account was?

10     A.      Yes.

11     Q.      And when was that?

12     A.      January 1st of 2000.

13     Q.      Okay.  That ties that back.  Thank you.

14             And was Mr. Schuette newly hired at that

15     time, or had he been involved -- responsible for other

16     accounts, or was he promoted?  How did he become to be

17     district sales manager as of January 1?

18     A.      I believe Julian may have retired.

19     Q.      Was Mr. Schuette employed by Lexmark prior

20     to January 1, 2000?

21     A.      Yes.

22     Q.      What was his role immediately before that?

23     A.      District sales manager.

24     Q.      Okay.

25     A.      Different accounts.

1          Q.      Okay.

2          A.      Pinacor.

3          Q.      Apropos of our lunch break conversation.

4               So on January 1, 2000, Mr. Schuette as a

5     district sales manager first assumed responsibility for

6     overseeing the Inacom account; is that right?

7          A.      Yes.

8          Q.      You mentioned having looked at some

9     correspondence in preparation for your deposition, so

10    let's take a look at some of it.

11               MR. HALLIDAY:  Did you get those

12    copies?

13               MS. DUMAS:  Yes, I did.  Thanks.

14               MR. NOLAN:  Why don't we hand the depo

15    notice back to me.  I did not mark that as an exhibit; I

16    don't see any reason we need to.

17               MS. DUMAS:  I'm going to mark my

18    exhibits in chron order, and let's mark all three of

19    them now to save time.  Exhibit No. 1 to Mr. Kendrick's

20    deposition is a chain of e-mails, two-page chain of

21    e-mails.  The top e-mail says Todd Pinkston, 2/03/2000,

22    11:40 a.m.  That will be Exhibit 1.  And Madame Reporter

23    will hand you your copy, Mr. Kendrick.

24               (Exhibit No. 1 marked and attached.)

25               MS. DUMAS:  While you're looking at

1    that, I'll mark the others.  Exhibit 2 is a letter,

2    one-page letter on the letterhead of Lexmark, dated

3    February 15, 2000, from Mr. Schuette to Mr. Oshlo.

4                    (Exhibit No. 2 marked and attached.)

5                    MS. DUMAS:  Exhibit 3 is a letter on

6    the letterhead of Compaq dated February 16, 2000 from

7    Bill Francis to Misty Atchison.

8                    (Exhibit No. 3 marked and attached.)

9                    MR. HALLIDAY:  The letter to Atchison

10   is 3 and the Oshlo letter is 2?

11                   MS. DUMAS:  Yeah, they're in

12   chronological order.

13                   MR. HALLIDAY:  Thank you.

14       Q.     So the first -- when you're ready, the

15   first exhibit I'm going to direct your attention to is

16   the e-mail chain.

17       A.     I'm ready.

18       Q.     I guess the chronologically last e-mail in

19   this series is at the top of the first page, and it is

20   addressed to Bob Kendrick, cc Bill Schuette, Brad Funk;

21   subject Inacom Del., and it's signed by Todd.  Is that

22   Mr. Pinkston?  Todd Pinkston?

23       A.     Yes.

24       Q.     Okay.  Did you receive this e-mail at or

25   around February 3, 2000 at 11:40 a.m. or shortly

1  closed?

2          A.      I believe on February 15th of 2000.

3          Q.      With your counsel's permission, I'll

4  refresh your memory that it was actually February 16,

5  2000.  But you were very close.

6          A.      Yeah.

7          Q.      Having that date fixed in your mind,

8  February 16, 2000, my next question is:  Did you

9  personally have any communication with anybody at the

10 Compaq organization about this acquisition from their

11 perspective?

12         A.      No.

13         Q.      Did you direct Mr. Schuette or anyone else

14 in your organization to contact Compaq directly?

15         A.      No.

16         Q.      Do you know whether anybody in the finance

17 department, Mr. Sarkisian's group, contacted Compaq

18 before the sale?

19         A.      I don't know.

20         Q.      Let's put aside Exhibit 1, and if you

21 would refer to Exhibit 2, which is dated February 15,

22 2000, from William A. Schuette to Mr. Dick Oshlo,

23 Treasurer, Inacom, at an address in Omaha, Nebraska.

24 Earlier -- well, strike that.  Have you ever seen this

25 letter before?

1       A.    Yes.

2       Q.    Did you receive a copy of this letter --

3  you're indicated as a cc on the bottom.  Did you receive

4  a copy of this letter at or shortly after February 15,

5  2000?

6       A.    Yes.

7       Q.    Did you review this letter in draft form

8  before Mr. Schuette sent it off to Mr. Oshlo?

9       A.    Yes.

10      Q.    Did you revise it?

11      A.    Yes.

12      Q.    So when you testified this morning that

13  you wanted to see the draft to put your personal spin on

14  it, that's what you were referring to?

15      A.    Yes.

16      Q.    Do you remember what you changed about his

17  original draft?

18      A.    Most of it.

19      Q.    Would you say that as a result of your

20  revisions you primarily wrote this letter?

21      A.    That would be my recollection.

22      Q.    Request that you turn your attention to

23  the second paragraph of the letter, and I'll read it for

24  the record.  "It is my understanding from Leon Kerkman,

25  with whom I met last week, that any invoices that have

```
 1    had checks written against them will be held until the

 2    sale is completed between Inacom and Compaq.  The

 3    proceeds from the sale will then cover those checks and

 4    they will be disbursed over a period of 1 to 10 weeks.

 5    Additionally, Compaq will assume the liability of

 6    Lexmark invoices that have not had not checks written

 7    against them."

 8              My first question is, it was actually

 9    Mr. Schuette who met with Mr. Kerkman; is that correct?

10         A.    True.

11         Q.    Okay.  You didn't meet with Mr. Kerkman?

12         A.    That's true.

13         Q.    So the information in this is what

14    Mr. Schuette relayed to you that Mr. Kerkman had told

15    him?

16         A.    Correct.

17         Q.    In the second sentence it says, "The

18    proceeds from the sale will then cover these checks and

19    they will be disbursed over a period of 1-10 weeks."

20    What's your understanding of exactly what Mr. Kerkman

21    communicated to Mr. Schuette in that regard?

22         A.    I'm not sure because I'm unable to recall

23    other than what I told previous counsel is that my

24    recollection is tied to the fact that there was

25    significant debt that was owed and that we were getting
```

```
 1   ready to get solution and a positive resolution to a

 2   very significant amount of money based upon commitment

 3   from Leon Kerkman and commitment that Compaq would pick

 4   up liabilities.  It's clear as that.  There's a lot of

 5   little details that I wish that I could remember, but

 6   they are far overshadowed by those very two significant

 7   feelings that I had, the old and the new, and knew

 8   Leon -- I felt Leon was good for his commitment, and I

 9   felt one hundred percent sure that the Compaq

10   Corporation was good on theirs.

11        Q.     Did you ask someone in your organization

12   to get the assurance from Compaq that you've mentioned?

13   Was that done at your request?

14        A.     Most likely.

15        Q.     Do you recall any more specifically who

16   you might have spoken with about it?

17        A.     A little bit.  What I recall is is that we

18   were categorized by Inacom as a squeaky wheel and that

19   there would be a small number of squeaky wheels that

20   would get a letter from Compaq.  That is here.  That's

21   what I recall.

22        Q.     Is it most likely that you got that

23   understanding from Mr. Schuette, or somebody else in

24   your organization, or directly from Leon?

25        A.     Mr. Schuette.
```

1          Q.     Okay.  The letter goes on to say,

2     "Additionally, Compaq will assume the liability of

3     Lexmark invoices that have not had checks written

4     against them."  Is that consistent with your

5     understanding of what the deal was at that time?

6          A.     I don't know about what the deal is.  It

7     was consistent with what our agreement was or our

8     implied understanding was conceptually.  The checks in

9     the drawer would equal the old debt.  The go forward

10    amount would be paid by Inacom.  The go forward amount

11    on the 16th of February would be assumed -- the

12    liability would be assumed by Compaq.

13         Q.     Was it your understanding that Compaq

14    would assume the liability for payment of amounts that

15    were reflected by the held checks?

16         A.     Not in my mind.  Checks in the drawer

17    equals the amount owed coming from Inacom, 16th on by

18    Compaq, in my mind.  Dick Oshlo would do this part and

19    Compaq would do that part, if I make myself clear.

20         Q.     Was there any question in your mind this

21    February 15, 2000 time frame that Inacom wouldn't

22    release those held checks?

23         A.     Is there any question?

24         Q.     Yeah, that those checks wouldn't get

25    released?

1    A.    Yes.

2    Q.    Do you know whether they eventually all

3  got released, all the checks that were sitting in the

4  treasury drawer payable to Lexmark?

5    A.    I seem to recall they all did.

6    Q.    Was there any thought in the part of

7  Lexmark -- or strike that.

8         Did you have concern that when Inacom

9  released the held checks they would bounce?

10    A.    No.

11    Q.    Why not?

12    A.    Can you repeat your question again?

13    Q.    Did you have concern in your mind that

14  when Inacom did release those held checks that they

15  would bounce for not sufficient funds?

16    A.    No question whatsoever.

17    Q.    So you didn't think that they would

18  bounce?

19    A.    I did not think they would bounce.

20    Q.    Why?

21    A.    I had no reason to believe that they

22  would.

23    Q.    Is that because Inacom had -- was

24  expecting to get or had received $369 million from

25  Compaq?

1          A.     I can't tell you what I was thinking back

2    then, but I can assure you when I got those checks we

3    declared victory that we got them.  And it never entered

4    my mind.

5          Q.     How long had you known Leon Kerkman in

6    February 2000?  How long had you been doing business

7    with him?

8          A.     I want to say about a year.  I knew Bill

9    Fairfield for close to 20 years.

10         Q.     Did you believe Mr. Fairfield to be a man

11   of his word?

12         A.     Absolutely.

13         Q.     How about Mr. Kerkman?  Had you had

14   sufficient time to form an understanding of his

15   character in that regard?

16         A.     Yes.

17         Q.     And did you believe him to be a man of his

18   word?

19         A.     Yes.

20         Q.     When Inacom filed bankruptcy in June 2000

21   did that come as a surprise?

22         A.     No.

23         Q.     Why not?

24         A.     The trades were writing about it.

25         Q.     Do you recall having heard anything about

1  Inacom having overstated the value of its A/R assets in

2  its financial statements?

3       A.      I do not.

4       Q.      Did you hear from any source of a dispute

5  brewing between Compaq and Inacom about the acquisition?

6       A.      No.

7       Q.      So what exactly were the trades reporting

8  about Inacom shortly before it filed bankruptcy?

9       A.      My general recollection is is that the

10  trades -- typically before these people get into

11  financial trouble, they write about it.  And, in

12  general, they discuss exorbitant SG&A expense compared

13  to the world class providers in the deal.  I mean, it's

14  all the same stuff.  So there would be no reason for me

15  to have been surprised on the day that they did that.

16       Q.      Was there any report in the, you know,

17  trade publications about Inacom's revenues from its

18  services, maintenance contact, et cetera, business not

19  being what it had hoped it would be?

20       A.      I don't recall that.

21       Q.      All right.  You can put aside Exhibit

22  No. 2 and let's move on to Exhibit No. 3, letter dated

23  February 16, 2000 from Bill Francis, Director, Corporate

24  Finance to Lexmark International, Inc., Misty Atchinson.

25  Have you ever seen this letter before, Mr. Kendrick?

1        A.      Yes.

2        Q.      Is this one of the letters that you looked

3    at yesterday to refresh your recollection for your

4    deposition?

5        A.      Yes.

6        Q.      When is the first time you recall having

7    seen this letter?

8        A.      Very close to February 16th of 2000.  Very

9    close.

10       Q.      It's addressed to Ms. Atchinson.  Who is

11   Misty Atchinson?

12       A.      I believe her to be a Lexmark employee

13   that works in our accounts receivable department, or did

14   at that time.

15       Q.      When you got a copy of the letter shortly

16   after February 16, 2000, did you get it from

17   Ms. Atchinson or from somebody in your organization?

18       A.      I do not know.

19       Q.      The letter says in the first paragraph,

20   "This letter is to inform you that effective

21   February 16, 2000, a wholly-owned subsidiary of Compaq

22   Computer Corporation purchased certain assets of Inacom

23   Corporation.  The Compaq subsidiary will operate under

24   the name of Custom Edge, Inc., and its A/P accounts will

25   be funded by Compaq."

1        Q.      And do you know whether or not Compaq

2   issued a parent company guarantee?

3        A.      No.

4        Q.      There are other witnesses lined up in the

5   lineup who I think those questions might be more

6   appropriately directed to.

7                The next paragraph, which I think we would

8   all agree is the meat of the coconut of the claim that

9   Lexmark has asserted against Compaq and HP is, and I'll

10  quote, "In connection with such purchase, Custom Edge,

11  Inc., also assumed the obligation to pay all the

12  outstanding amount on the referenced account, subject to

13  the terms and conditions of such account."

14               That sentence I've read, is that what you

15  have been referring to when you've testified that

16  Lexmark got a guarantee from Compaq?

17       A.      Not really.

18       Q.      Is there any other written communication

19  in which this guarantee was communicated to Lexmark?

20       A.      Not to my knowledge.

21       Q.      When you say not really, what do you mean

22  by that?

23       A.      In my mind, the drawer, as we've referred

24  to it, was an Inacom drawer in my mind, and that's why I

25  must speak my mind.  It really did not relate to the

1    outstanding amount mentioned here on this document, you

2    see.

3         Q.    Was there some other oral communication

4    between Compaq and Lexmark that -- strike that.

5              Did you do anything or direct anybody on

6    your team to do anything after you got this letter?

7         A.    You mean after jumping for joy?  I'm sure

8    that I did.  I cannot remember.  My next recollection

9    would deal with what any M & A, merger and acquisition,

10   would be, and that is how were we going to get process,

11   fluid process on ordering and scheduling and invoicing,

12   collections, because that's kind of my background.

13        Q.    The logistics of it?

14        A.    Yes.  Working with a client.

15        Q.    I think that you testified a little while

16   ago that the post closing process of the transition from

17   Inacom to Custom Edge may not have been as smooth as

18   would have been desirable; is that a fair statement?

19        A.    Lot of confusion.

20        Q.    In connection with that transition were

21   there open payables that Custom Edge or Compaq let go

22   beyond their ordinary net 30 terms?  Do you recall

23   having delinquencies in connection with the accounts

24   payable that were assumed by Compaq in connection with

25   the transition?

1    A.    No.

2    Q.    When you got this letter, a copy of this

3  letter that Mr. Francis sent to Ms. Atchinson, was it in

4  your mind -- was it your understanding that this letter

5  would cover a situation such as we find ourselves in

6  now, with Inacom having filed bankruptcy and being sued

7  for a preference, that Compaq would promise to, in

8  essence, reimburse Lexmark under this scenario?

9    A.    As I stated before, I saw this as a

10 guarantee of payment for future liabilities and the

11 ability to work with an account and sustain its business

12 and my business and -- I thought this was a good thing.

13 I would have never speculated beyond that very fact,

14 because we had worked very hard and very long on this

15 whole issue on a daily basis now for three months we're

16 working on this particular issue.  And this was in my

17 mind a significant sign post, and that's what I recall.

18    Q.    In your personal opinion did Compaq

19 perform on its guarantee as you understood it?

20    A.    As I recall, yes.

21         MS. DUMAS:  Mr. Kendrick, I don't have

22 any more questions for you.  Thank you.

23         MR. NOLAN:  I don't have any further

24 questions, either.

25         (DEPOSITION CONCLUDED 1:41)



**Todd Pinkston**
02/03/2000 11:40 AM

To:       Bob Kendrick/Lex/Lexmark@Lexmark
cc:       Bill Schuette/Lex/Lexmark@Lexmark, Brad Funk/Lex/Lexmark@Lexmark
Subject:  Inacom Del.

Bob,

Per the following update, Inacom has cut checks for $3.2M, but they are being held by Treasury. The past due balance will be greatly improved (by $1.8M, of which $274K applies to 90 days delinquent) once these checks are released and received. I spoke to Don Huber yesterday. He confirmed that Treasury is holding the checks and that Dick Oslo is not taking calls. However, Don assured me that the checks would be released and that the A/R situation would improve after the Compaq/Inacom deal closes in a couple of weeks. Per Don, Compaq will assume the liability.

I will work with Brad to stay on top of the A/R situation. Let me know if you would like for me to take additional action.

Thanks,

Todd

--------------------- Forwarded by Todd Pinkston/Lex/Lexmark on 02/03/2000 11:27 AM ---------------------

**Misty Atchison**   02/01/2000 09:05 AM

To:       Todd Pinkston/Lex/Lexmark@Lexmark
cc:       Bill Schuette/Lex/Lexmark@Lexmark, Brad Funk/Lex/Lexmark@Lexmark, Terre M
          Bartley/Lex/Lexmark@Lexmark, Jim Roberts/Lex/Lexmark@Lexmark
Subject:  Inacom Del.

Todd and Brad,

I have an update from yesterday. Sylvie faxed me 17 pages of check information this morning! We have 5 checks totaling $3,193,636.71 in the treasury department at Inacom. These checks are dated 1/4/00 - 1/27/00 but are not mailing yet. Apparently, the treasury department is still holding them. Is there any way either of you can make a phone call or two and get these pushed through? I would love to have these checks hit soon. If they all hit in February, it would clear $1.8 Million in past due invoices with $274K of those over 90 days past due. (The rest of the $3Mill is paying current invoices.)

Let me know if you think you can help!
Thanks
Misty

--------------------- Forwarded by Misty Atchison/Lex/Lexmark on 02/01/2000 08:55 AM ---------------------

**Misty Atchison**   01/31/2000 04:47 PM

To:       Todd Pinkston/Lex/Lexmark@Lexmark
cc:       Bill Schuette/Lex/Lexmark@Lexmark, Brad Funk/Lex/Lexmark@Lexmark
Subject:  Inacom Del.

Todd,


PENGAD-Bayonne, N. J.
EXHIBIT
Kendrick
2-8-05

Here are the current numbers on Inacom and the most recent copy of the spreadsheet. On the spreadsheet, everything highlighted in purple is what Diane and Sylvia told me they were paying back. I would feel better if I had actual check numbers and amounts committed.

| | |
|---|---|
| Current | 5,825,638.38 |
| 1 - 30 | 683,296.79 |
| 31 - 60 | 232,764.09 |
| 61 - 90 | 531,187.81 |
| 91 - 120 | 270,168.87 |
| 121 - 150 | 33,321.10- |
| Over 150 | 52,596.29 |



Inacom.xls

Thanks for all of help!
Misty

FEB 15 2000 13:05 FR LEXMARK-SCOTTSDALE    602 367 8222 TO 16062327003    P.03/03

# LEXMARK

Lexmark International, Inc.
8700 East Via De Ventura
Suite 702
Scottsdale, Arizona 85258
USA

February 15, 2000

Mr. Dick Oslo
Treasurer
Inacom
10810 Farnam Drive
Omaha, NE 68154

Dear Dick,

During the last week I have left several messages in your voice mail and with your assistant requesting to talk with you concerning Inacom's serious past due amount of $4,694,000 with Lexmark, International.

It is my understanding from Leon Kerkman, whom I met with last week, that any invoices that have had checks written against them, will be held until the sale is completed between Inacom and Compaq. The proceeds from the sale will then cover those checks and they will be disbursed over a period of 1-10 weeks. Additionally, Compaq will assume the liability of Lexmark invoices that have not had checks written against them.

It is requested that upon the successful completion of the Inacom and Compaq sale, that Lexmark be notified immediately the timing of the payments for our now seriously past due invoices. It is critical that these checks that have been written, and are now being held by Inacom, be released immediately upon the completion of your sale.

I would like to discuss this further with you, and can be reached at 480-367-0120.

Sincerely,

*William A. Schuette*

William A. Schuette
U.S. West Sales Manager

cc:    Mr. Leon Kerkman,  Senior V.P. of Distribution and Operations
       Mr. Robert S. Kendrick,  Lexmark V.P. of U.S. Channel Sales and Marketing

100% Recycled Paper



EXHIBIT 04
2
Kendrick 2-8-05

FEB-16-00 WED 06:43 PM                    FAX:                    PAGE 2

Compaq Computer Corporation          20555 SH 249
P.O. Box 692000                      Houston, TX 77070-2698
Houston, TX 77269-2000               Tel 713-370-0670

# COMPAQ

February 16, 2000

Lexmark International, Inc.
Ms. Misty Atchinson
Fax  800.732.9539

RE:     Account Payable # 117403 of Inacom Corporation

Dear Ms. Atchinson:

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of
Compaq Computer Corporation purchased certain assets of Inacom Corporation. The Compaq
subsidiary will operate under the name of Custom Edge, Inc., and its' A/P accounts will be funded
by Compaq.

In connection with such purchase, Custom Edge, Inc, also assumed the obligation to pay all of
the outstanding amount on the referenced account, subject to the terms and conditions of such
account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to John Frasca at
402.758.3822.

Thank you for your consideration in this matter.

Sincerely,

*Bill Francis*

Bill Francis
Director, Corporate Finance
Telephone: 281.514.1223
Email: bill.francis@compaq.com


EXHIBIT
3
Kendrick 2-8-05
PENGAD-Bayonne, N. J.