# NUMBER 2

| | **Witness** | **Page/Line Designation** |
|---|---|---|
| 2. | Todd Pinkston (February 15, 2005) | 5:6 – 13<br>7:5 – 20<br>9:13 – 10:7<br>17:2 – 8<br>20:19 – 22:7<br>25:1 – 31:23 |



```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF DELAWARE
 2                 CASE NO. 04-CV-583
```

### DEPOSITION OF TODD PINKSTON

| | |
|---|---|
| INACOM CORP. on behalf of all affiliated debtors | PLAINTIFF |
| v. | |
| LEXMARK INTERNATIONAL, INC. | DEFENDANT |
| LEXMARK INTERNATIONAL, INC. | THIRD-PARTY PLAINTIFF |
| v. | |
| COMPAQ COMPUTER CORP., ITY CORP., and CUSTOM EDGE, INC. | THIRD-PARTY DEFENDANTS |

The deposition of **TODD PINKSTON** was taken on behalf of the plaintiff, Inacom Corporation, before Ann Hutchison, Registered Professional Reporter and Notary Public in and for the State of Kentucky at Large, at the law office of Stoll, Keenon & Park, 300 West Vine Street, Suite 2100, Lexington, Kentucky, on Wednesday, February 9, 2005, beginning at the hour of 2:22 p.m. Said deposition was taken pursuant to Rule 30 of the Federal Rules of Procedure and Rule 7030 of the Federal Bankruptcy Procedure.

**ACTION COURT REPORTERS**
184 North Mill Street
Lexington, Kentucky 40507
(859) 252-4004

```
 1                        APPEARANCES
 2

 3    COUNSEL FOR PLAINTIFF INACOM CORPORATION:

 4         Jeffrey P. Nolan
           Pachulski, Stang, Ziehl, Young & Jones
 5         10100 Santa Monica Boulevard, 11th Floor
           Los Angeles, California 90067-4100
 6

 7    COUNSEL FOR THIRD-PARTY DEFENDANT COMPAQ:

 8         Cecily A. Dumas
           Friedman, Dumas & Springwater, LLP
 9         One Maritime Plaza, Suite 2475
           San Francisco, California 94111
10

11    COUNSEL FOR DEFENDANT AND THIRD-PARTY PLAINTIFF
      LEXMARK INTERNATIONAL, INC.:
12
           Culver V. Halliday
13         Stoll, Keenon & Park, LLP
           2650 Aegon Center
14         400 West Market Street
           Louisville, Kentucky 40202-3377
15

16    ALSO PRESENT:

17         Kevin Sarkisian

18

19

20

21

22

23

24

25
```

1       Q.      Thank you.  Are you currently employed,
2   Mr. Pinkston?
3       A.      Yes.
4       Q.      And who is your employer?
5       A.      Lexmark.
6       Q.      How long have you been employed by
7   Lexmark?
8       A.      It will be 14 years in July, July 1 of
9   '91 -- July 8 of '91.
10      Q.      What position do you currently hold at
11  Lexmark?
12      A.      I'm the director of finance for CPD, North
13  America.
14      Q.      And could you -- is CPD an acronym for --
15      A.      It is consumer printer division.
16      Q.      How long have you been the director of
17  Finance for CPD, North America?
18      A.      I've been the director since December 1st
19  of '03.  I was in that position -- I've been in the
20  position since July 1 of '03, made director December 1.
21      Q.      Did you have a different title between
22  July '03 --
23      A.      Manager of finance.
24      Q.      What position at Lexmark did you occupy
25  before July '03?

```
 1        Q.    And that takes us back, I think, if I'm
 2  calculating right, to roughly the end of 2000, beginning
 3  of 2001?  Do I have that right?
 4        A.    That's correct.
 5        Q.    Okay.  What was your position just prior
 6  to --
 7        A.    In all of 2000 I was a dealer account rep,
 8  calling on Reynolds and Reynolds, Standard Register, and
 9  other accounts.
10        Q.    Was Inacom one of your accounts when you
11  were a dealer account rep?
12        A.    Not in 2000.
13        Q.    What was your position prior to dealer
14  account rep in the year 2000?
15        A.    I was a dealer account rep in '99 calling
16  on Inacom.
17        Q.    And how long were you a dealer -- what's
18  the total period in which you were a dealer account rep
19  at Lexmark?
20        A.    About two years.
21        Q.    Okay.  So prior to your becoming a dealer
22  account rep, what was your position at Lexmark?  This is
23  not a test.
24        A.    Well, I'm trying to -- should have brought
25  my resume.
```

```
 1        A.      Bachelor's in business administration.
 2        Q.      Did you have an emphasis in your business
 3   administration?
 4        A.      Business management.
 5        Q.      Have you obtained any other higher
 6   education degrees besides your bachelor's in business
 7   administration?
 8        A.      I've got a two-year architectural degree.
 9        Q.      From where?
10        A.      Lexington Community College.
11        Q.      And when did you get that?
12        A.      '86, I think.
13        Q.      Since you obtained your degree in business
14   administration, have you taken any additional courses in
15   business or any other topic of a professional nature?
16        A.      I had some finance courses within the
17   General Electric Corporation.
18        Q.      Were you in General Electric's -- were you
19   in a training program at General Electric?
20        A.      Yes.
21        Q.      What was that training program called?
22        A.      Financial Management and Training program.
23        Q.      And how long were you in that program?
24        A.      Two years.
25        Q.      What years were those?
```

1  A.    '89 through 2001.

2  Q.    '89 to '91?

3  A.    I'm sorry. Yes, '91, yeah.

4  Q.    I have some familiarity with that program, and I understand it's rigorous. Is that a fair characterization?

7  A.    Yes.

8  Q.    Do you hold any accreditations or certificates in your field?

10 A.    No.

11 Q.    Not a CPA?

12 A.    No.

13 Q.    In 1999 time frame when your -- the position you held was dealer account representative at Lexmark, would you describe what your duties and responsibilities were in that role?

17 A.    What I would call account management, primarily interfacing with a buyer, selling business printer division products, primarily hardware, that entailed working with the account, tracking their sell through, tracking their inventory levels, and ensuring that the orders came in and the product shipped out.

23 Q.    For what period of time were you the account rep for the Inacom account at Lexmark?

25 A.    Jointly called on the account from January

```
 1          A.      Yes, it is.
 2          Q.      Excellent.  Madame Reporter, would you
 3   mark the document, one-page document which I've handed
 4   to Mr. Pinkston, as Exhibit 1 to the Pinkston
 5   deposition?
 6                  (Exhibit No. 1 marked and attached.)
 7          Q.      You finished looking at that?
 8          A.      Uh-huh.
 9          Q.      Before I ask you specific questions about
10   that handwritten log, I'm just going to ask you a few
11   more general questions.  Within your duties and
12   responsibilities as a dealer account rep, you indicated
13   that you reported to Julian Gorman.  I want to next ask
14   you, did you have any other dotted line or indirect
15   reports in that capacity, or were you solely reporting
16   to Mr. Gorman and through him to Mr. Kendrick?
17          A.      To Julian.
18          Q.      Did you in the course of your
19   responsibilities as dealer account rep, did you -- was
20   part of your responsibility communicating with other
21   divisions within Lexmark who had different functions
22   such as the credit department, the accounts receivable
23   department?
24          A.      Yes.
25          Q.      Would you describe the nature of those
```

1  Q. At some point did Bill Schuette join the
2  organization that you've described to me of Julian
3  Gorman -- and you reporting to Gorman, and Gorman
4  reporting to Kendrick?
5  A. Brad Funk reported to Bill Schuette.
6  Q. So Schuette coming on occurred in
7  conjunction with you stepping off the account and Brad
8  Funk stepping on the account?
9  A. Correct.
10 Q. And as best as you can pinpoint that, that
11 was in early 2000?
12 A. Officially, yes.
13 Q. When did you actually accomplish the
14 transition off the Inacom account, to the best of your
15 recollection?
16 A. In January.
17 Q. January 2000?
18 A. Yes.
19 Q. Take a look at these notes I've handed
20 you. It's one page of what looks like a calendar up at
21 the top, it says February 4, 2000, and it's entitled
22 Daily Record of Events. What is the document that this
23 comes from?
24 A. Franklin Day Planner.
25 Q. Was this your Franklin Day Planner?

```
 1         A.    Yes.
 2         Q.    Did you maintain this when you were
 3   working as a district -- or excuse me, a dealer account
 4   rep?
 5         A.    Off and on.
 6         Q.    Is this in the nature of a to-do list,
 7   that sort of thing?
 8         A.    Yes.  This is a call log.
 9         Q.    So this reflects who you spoke with on the
10   phone on that day or intended to call on that day or --
11   describe for me what this reflects.
12         A.    It was notes for the day, whether it be
13   conversation, phone mail, just notes.
14         Q.    Okay.  Does anybody else's handwriting
15   appear on it besides yours?
16         A.    No.
17         Q.    It's on the calendar day February 4, 2000.
18   Did you make the notes on this calendar at or around the
19   date that the situations that you're describing
20   occurred?
21         A.    Yes.
22         Q.    About a third down -- I have it
23   highlighted in pink on my copy -- this is just what I
24   want to talk to you about, the word Leon, and then
25   there's three or four bullet points underneath that.
```

```
 1  Does that refer to Leon Kerkman at Inacom?
 2         A.    Yes.
 3         Q.    And could you read your handwriting of
 4  what your bullet points are?  Aloud.
 5         A.    "Can't release prior to close.  Compaq
 6  assumes open payables.  7 to 8 days of closure.  8K web
 7  site."
 8         Q.    What were you referring to in making these
 9  notes?
10         A.    I don't remember.  I don't recall.
11         Q.    Do you recall whether you spoke with
12  Mr. Kerkman on the telephone on February 4, 2000 or
13  around that date?
14         A.    I don't remember.
15         Q.    Do you know whether you discussed these
16  notes with Mr. Gorman or Mr. Kendrick or anyone else at
17  Lexmark?
18         A.    I don't recall.
19         Q.    Because it says -- I know you don't
20  remember the specific conversation, and that's
21  understandable given the passage of time.  Based on your
22  custom and practice of entering this in your Daytimer,
23  is it fair to assume that this reflects -- these notes
24  reflect a conversation that you had with Mr. Kerkman on
25  or about February 4, 2000?
```

```
 1        Q.    In the next bullet point it says Compaq
 2  assumes open payables.  You wrote that term "open
 3  payables."  What did you mean by that?
 4        A.    What they owed Lexmark.
 5        Q.    What who owed Lexmark?
 6        A.    Inacom.
 7        Q.    So that reference -- just to make sure I
 8  understand your testimony, that reference means that
 9  Compaq was assuming what Inacom owed to Lexmark?
10        A.    As best I remember, yes.
11        Q.    What's your understanding of the meaning
12  of the term "open payables" from your business
13  administration training?
14        A.    Dollar amount owed, not yet closed, not
15  yet paid.
16        Q.    What's a closed payable?
17        A.    Paid.
18        Q.    Paid as in check cut and payment?
19        A.    My definition would be we still have -- if
20  it's an open payable, we still have an open receivable,
21  and if --
22        Q.    Go ahead.
23        A.    If it got much deeper than that, I'd
24  probably call the accounts receivable department.
25        Q.    Okay.  That's -- you've hit on an
```

1  important distinction. This reflects a note of some
2  communication from or about Mr. Kerkman which
3  communicates the terms "open payables" as opposed to
4  receivables as reflected on Lexmark's books. So my
5  question is from the standpoint of it being Inacom's
6  payable, what's your understanding based on your finance
7  background of what Inacom's open payable referred to?
8         A.     Open payable referred to products or
9  dollar amounts that they had not yet paid for.
10        Q.     And were not yet closed; is that right?
11        A.     Open.
12        Q.     Open meaning a check hadn't yet been cut
13 by Inacom to pay the payable. Right?
14        A.     Don't know about -- don't know if the
15 check had been cut or not. It was not closed. Check
16 could have been cut, but as of when I wrote that, in my
17 mind it was still open, so it was still an open issue
18 with Lexmark. I cannot comment whether the check had
19 been cut or not.
20        Q.     I understand very clearly that from
21 Lexmark's perspective there were open receivables. But
22 that's not what I'm asking. You have a finance
23 background.
24        A.     Uh-huh.
25        Q.     You've been through GE Capital's training

```
 1  program, which I know to be a fine program and rigorous,
 2  and what I'm asking you is given your experience, isn't
 3  it true that open payable is a term of art that reflects
 4  a payable reflected in an accounts payable report of a
 5  company that has not been closed by a check being cut,
 6  thereby taking that account off of a payable report?
 7  Isn't that true?
 8              MR. HALLIDAY:  Objection.  Asked and
 9  answered four times, maybe five.  If you want to answer
10  it again, feel free to.
11       A.     When I wrote the note, I said it was an
12  open payable.  I cannot comment on the status on
13  Inacom's books:  cut, not cut; cleared, not cleared.
14  When I wrote that note, I jotted down open payable.
15              MS. DUMAS:  Move to strike the answer
16  as nonresponsive.  Will you read back my last question,
17  please?
18              (Last two questions read.)
19              MR. HALLIDAY:  Are you putting that
20  question to him again?
21              MS. DUMAS:  He didn't answer the
22  question.  It was a general experience question.
23              MR. HALLIDAY:  I'm going to object to
24  the question once again for the same reason:  It's been
25  asked; it's been answered.  It's been answered
```

1  repeatedly, and I'd ask counsel to stop asking the
2  question because it's becoming cumulative to the extent
3  that it's becoming a little burdensome and a little bit
4  abusive.
5      Q.   Will you answer the question?
6           MR. HALLIDAY:  Do you have anything to
7  add to your previous answer to that question?
8           THE WITNESS:  I don't.
9           MR. HALLIDAY:  Thank you.
10     Q.   Putting aside the note that you made which
11 you've testified about, what's your understanding based
12 on your experience in finance of an open payable of a
13 company?
14     A.   I think I've answered that.  Dollar amount
15 owed, as I said.  The definition of how different groups
16 define open or closed and when the check is cut, not
17 cut, I'm not sure.  I'm sure that varies.
18     Q.   Let me make sure I understand your
19 testimony.  You would consider a company's payable that
20 already had a check cut -- written against it to
21 continue to be an open payable.  Is that your testimony?
22     A.   Ask the question again.
23     Q.   Your opinion is -- I'll re-ask it in a
24 better way.  Your opinion is, based on your finance
25 background, that a company's payable that has had a

```
 1   check against it continues to be an open payable; is
 2   that correct?
 3          A.     It could be.
 4          Q.     Okay.  Would it show up on an accounts
 5   payable report of the company in your experience?
 6          A.     If it hasn't cleared off the report, yes.
 7          Q.     And when in your experience does a payable
 8   clear off an accounts payable report?
 9          A.     I don't have accounts payable experience.
10          Q.     Isn't it true that it comes off an
11   accounts payable report when it -- when a check is cut
12   in the treasury department?
13          A.     Not always the case.  There's batch runs.
14   There's different processes within different companies.
15          Q.     So you believe there's no standard for
16   finance practice with respect to this; is that your
17   testimony?
18          A.     I didn't say that.  There are different
19   processes.
20          Q.     Will you describe the different processes
21   for me?
22          A.     I don't know that I need to describe
23   different accounts payable processes.  I'm just not that
24   familiar with account payable processing.
25          Q.     I'm entitled to the ones that you are
```

1  familiar with.
2      A.    I'm not familiar -- I don't have accounts
3  payable experience.
4      Q.    I'm entitled to your general
5  understanding.
6      A.    Payables are open until they're cleared
7  off of the accounts payable report. What clears that
8  could be a batch run, could be check cut. I do not -- I
9  can't comment on different companies' accounts payable
10 processes.
11     Q.    What do you mean when you use the term
12 batch run?
13     A.    It's file processing. The batch updates
14 the system to take open payables to closed payables or
15 as paid.
16     Q.    A batch of what?
17     A.    Cut checks.
18     Q.    So there could be one check or there could
19 be a batch of closed checks to take the -- there could
20 be a batch of checks reflecting a closed payable; is
21 that what you're saying?
22     A.    Could be, yes.
23     Q.    Is there any other circumstance of which
24 you're aware in which you believe a payable can remain
25 an open payable after a check has been cut?

```
 1        A.    Ask the question again.
 2        Q.    Yeah.  You indicated previously that you
 3   believe that a payable can continue to be an open
 4   payable after a check has been cut against that payable;
 5   is that correct?
 6        A.    The report could show it as an open
 7   payable.  A report could show it as an open payable.
 8        Q.    Until the report is updated to reflect all
 9   the checks that have been cut.  Right?
10        A.    Against that payable, correct.
11        Q.    So once a check has been cut against a
12   payable, it's no longer an open payable.  Right?
13        A.    The check has been cut against it, but a
14   report could show it open.
15        Q.    But once -- but the event pursuant to
16   which the report will be updated is the cutting of a
17   check to pay that payable.  Correct?
18        A.    That is correct.  I understand.
19        Q.    So that whether or not an accounts payable
20   report has been updated, the event pursuant to which an
21   open payable becomes closed is the cutting of a check.
22   Correct?
23        A.    Yes.
24        Q.    The next bullet point is 7 to 8 days of
25   closure.  Do you know if that refers to the closure of
```

*Those whom we support hold us up in life.*
— Marie von Ebner Eschenbach

**4**
Friday
February 2000

Monthly Focus:
Relationships—
Who are the people
that matter most?

## Daily Record of Events

35th Day  331 Left  Week 5

→ Sold To  5019374/
1) Meg - X 616 Brochure
   50 - of 614 Brochure
   50 - Binders
2) Jenny Marshal - 174460 - 4/5
                 - 174427 - 5/5
3) Aimee -
4) Brad -
5) Jain Carrell - (919)796-4041
6) Corwin Stouffer - 937-485-9086

LEON
- Can't release pim to close
- Ongoing causing open payables.
- 7-8 pay of [illegible]
- [illegible] web site.

7) Jim Carrel - 5% money taken out of payday
8) Chuck Stang - 937-224-1151
9) Jerry Marshal - rehate
10) Biff → NCR - last month.
11) Aimee
12) Chuck
13) Dan Dupont - 1255, 1625
    (603) 826 7967

    Chuck Stang
    132991
14) Bill Selvick - Mah Bergman
15) Karen Alsop, place an order
    Lee Miller
    - Bill to
    - Ship to [illegible]
    (937) - 445 - 0534

Journal
- Worked until 5:30 - Moved Office
- Aimee + I went to Frankfort
- picked up kids from Mom & Dad

© 1998 Franklin Covey Co.   www.franklincovey.com   Original-Classic

EXHIBIT 1
PINKSTON 2-9-05