# NUMBER 4

|              | **Witness**                              | **Page/Line Designation** |
| ------------ | ---------------------------------------- | ------------------------- |
| 4.           | William Schuette (February 15, 2005)     | 12:9 - 13                 |
|              |                                          | 12:21 - 25                |
|              |                                          | 67:7 - 69:4               |
|              |                                          | 69:21 – 72:9              |
|              |                                          | 75:16 – 76:17             |
|              |                                          | 77:24 – 79:8              |
|              |                                          | 79:22 – 84:14             |
|              |                                          | 85:22 – 86:14             |
|              |                                          | 89:11 – 90:13             |

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF DELAWARE
2                 CASE NO. 04-CV-583

3   ─────────────────────────────────────────────

4          **DEPOSITION OF WILLIAM A. SCHUETTE**

5   ─────────────────────────────────────────────

6   INACOM CORP. on behalf of all              PLAINTIFF
    affiliated debtors

7   v.

8   LEXMARK INTERNATIONAL, INC.                DEFENDANT

9   LEXMARK INTERNATIONAL, INC.             THIRD-PARTY
                                              PLAINTIFF
10  v.

11  COMPAQ COMPUTER CORP., ITY CORP.,       THIRD-PARTY
    and CUSTOM EDGE, INC.                    DEFENDANTS
12  ─────────────────────────────────────────────

13           The deposition of **WILLIAM A. SCHUETTE** was

14  taken on behalf of the plaintiff, Inacom Corporation,

15  before Ann Hutchison, Registered Professional Reporter

16  and Notary Public in and for the State of Kentucky at

17  Large, at the law office of Stoll, Keenon & Park, 300

18  West Vine Street, Suite 2100, Lexington, Kentucky, on

19  Tuesday, February 8, 2005, beginning at the hour of 1:55

20  p.m.  Said deposition was taken pursuant to Rule 30 of

21  the Federal Rules of Procedure and Rule 7030 of the

22  Federal Bankruptcy Procedure.

23  ─────────────────────────────────────────────

24              **ACTION COURT REPORTERS**
                **184 North Mill Street**
25           **Lexington, Kentucky 40507**
                 **(859) 252-4004**

```
 1                         APPEARANCES

 2


 3      COUNSEL FOR PLAINTIFF INACOM CORPORATION:

 4          Jeffrey P. Nolan
            Pachulski, Stang, Ziehl, Young & Jones
 5          10100 Santa Monica Boulevard, 11th Floor
            Los Angeles, California 90067-4100
 6

 7      COUNSEL FOR THIRD-PARTY DEFENDANT COMPAQ:

 8          Cecily A. Dumas
            Friedman, Dumas & Springwater, LLP
 9          One Maritime Plaza, Suite 2475
            San Francisco, California 94111
10

11      COUNSEL FOR DEFENDANT AND THIRD-PARTY PLAINTIFF
        LEXMARK INTERNATIONAL, INC.:
12
            Culver V. Halliday
13          Stoll, Keenon & Park, LLP
            2650 Aegon Center
14          400 West Market Street
            Louisville, Kentucky 40202-3377
15

16      ALSO PRESENT:

17          Kevin Sarkisian

18

19

20

21

22

23

24

25
```

```
 1   in the sales end?
 2          A.      Yeah.
 3          Q.      So you were basically selling product to
 4   these folks, and they are customers or resellers?
 5          A.      They were resellers.
 6          Q.      And what type of product were you selling?
 7          A.      Personal computers, printers, displays,
 8   some software.
 9          Q.      And the next position you held, I think
10   1990 when you said you were a district sales manager?
11          A.      1991; I believe that's the year I moved to
12   Atlanta as a district sales manager for Lexmark,
13   correct.
14          Q.      And were your job duties any different?
15          A.      I didn't have a marketing manager working
16   for me.  It was more like first line level manager job.
17   And it was still -- obviously, we didn't sell PCs
18   anymore because we're the printer division, so I had
19   gone back, then, selling typewriters, supplies and
20   printers, and primary selling to resellers.
21          Q.      How long were you district sales manager
22   down in Atlanta?
23          A.      Until January of '97.  That's when I moved
24   to Phoenix.  Same job, different set of resellers but
25   the same job.
```

1    and he was doing that on purpose because those questions

2    relate more to Compaq's part of the case than Inacom's.

3           A.    Okay.

4           Q.    So he was deferring.  And let me get to

5    some of that stuff.

6           A.    Okay.

7           Q.    I'm going to hand you what we marked in

8    Mr. Kendrick's deposition as Exhibit 2.  Are you

9    familiar with this letter, sir?

10          A.    Yes.

11          Q.    Is that your signature that appears on it?

12          A.    Yes.

13          Q.    Okay.  And did you send this letter to

14   Mr. Oshlo on or about February 15, 2000?

15          A.    Yes.

16          Q.    And as you testified a little while ago,

17   you copied it to Mr. Leon Kerkman at Inacom --

18          A.    Right.

19          Q.    -- and also to Mr. Kendrick, who was then

20   your boss?

21          A.    Right.

22          Q.    Did you show this letter in draft to

23   Mr. Kendrick before it was sent?

24          A.    We kind of worked together on it.

25          Q.    So it was a product of a mutual effort?

1        A.        Right.

2        Q.        Between you and Mr. Kendrick?

3        A.        Correct.

4        Q.        But the substance of the letter reflects

5    communications that you had with Inacom, not that

6    Mr. Kendrick had with Inacom; is that right?

7        A.        That's correct.

8        Q.        So you're the one with the personal

9    knowledge --

10        A.        Right.

11        Q.        -- of the statements reflected in the

12    letter?

13        A.        Correct.

14        Q.        Okay.  The second paragraph, and I'll read

15    it for the record, says, "It is my understanding from

16    Leon Kerkman, with whom I met last week, that any

17    invoices that have had checks written against them will

18    be held until the sale is completed between Inacom and

19    Compaq.  The proceeds from the sale would then cover

20    these checks, and they will be disbursed over a period

21    of one to ten weeks.  Additionally, Compaq will assume

22    the liability of Lexmark invoices that have had not

23    checks written against them."

24                Was your understanding that Compaq was

25    going to assume the liabilities of what Inacom owed to

ACTION COURT REPORTERS                                        68

1   Lexmark other than the held checks?

2        A.      Yes.

3        Q.      Who did you have that understanding from?

4        A.      Leon.

5        Q.      Anybody else at Inacom?

6        A.      Well, at that time, no.

7        Q.      I just have to --

8        A.      Right.

9        Q.      I always have to pin down if there's any

10  other source of your information.

11       A.      Right.  No.

12       Q.      And Inacom was going to go ahead and

13  release the checks that it was holding in the treasury

14  department and the held checks would be satisfied,

15  obviously, by Lexmark negotiating those checks.  Right?

16       A.      I don't know what you mean by us

17  negotiating.

18       Q.      Them clearing your bank account?

19       A.      Oh, okay.  Yeah, we would -- once they

20  cleared, then we would consider the stuff paid, right.

21       Q.      Did you have any understanding about

22  whether Compaq was also assuming the liability to make

23  good on the held checks after they had been released and

24  paid?

25       A.      Well, my assumption always was that Compaq

1   would make good the payments, but I don't think at the

2   time I knew whether or not the checks were going to be

3   written from Inacom.  I mean, I don't think I knew the

4   source of the money, who was actually going to be paying

5   for the checks, if it was going to be coming out of an

6   Inacom account or it was going to be coming out of a

7   Compaq account.  I don't think I knew the source of the

8   money, but I felt like Compaq would cover the invoices.

9            Q.      All invoices?

10           A.      All of them, yeah.

11           Q.      So any invoice that was outstanding?

12           A.      Right.

13           Q.      Okay.  Then why does it say here Compaq

14  will assume the liability of Lexmark invoices that have

15  not had checks written against them?  Did you write an

16  incorrect statement in that letter?

17           A.      No.  No.  Maybe I'm not saying it right.

18  I believed that the checks that were being held -- I

19  don't know who was the ultimate source of the funds.  I

20  don't know if it was coming from Inacom or it was coming

21  from Compaq, but I believed that we would be paid

22  that -- those checks and that they would clear and that

23  we would be paid for it.  And anything that was not --

24  had not had a check written on it previously, that

25  Compaq would assume that liability.  That was my

1  understanding.  I don't think I ever asked Leon who was

2  really paying -- you know, what billfold it was coming

3  out of.  My assumption was that we would be paid when

4  the transaction was completed off the proceeds of the

5  sale.  So whether or not it was -- I never asked that

6  question.

7      Q.      So from your point of view, if Inacom was

8  going to use the money that it got from Compaq for the

9  sale to pay Lexmark, that didn't matter to you.  It

10  didn't matter where it was coming from as long as

11  Lexmark got paid?

12      A.      From my perspective, I would say that's

13  true.

14      Q.      Was it your expectation that these held

15  checks would be -- strike that.

16          Was it your expectation that the checks

17  they were holding in Treasury would eventually be paid

18  through the proceeds that -- of the Compaq --

19      A.      I think I put that in there, didn't they?

20          (Witness reviews document.)

21      A.      "Proceeds from the sale will then cover

22  those checks, and they will be disbursed over a

23  period...."

24      Q.      Okay.  So it was your understanding

25  that --

1          A.        I didn't know where the funds were coming

2    from, but -- I didn't know if Compaq would be paying the

3    funds or Inacom would be paying the funds, but it was my

4    expectation that the checks that were being held,

5    whether or not Compaq gave Inacom the money or Inacom

6    gave Compaq, those checks that were being held were

7    going to paid, and then anything else that was

8    outstanding Compaq would assume the liability.  That was

9    my understanding.

10         Q.        Okay.  Did you know how much Compaq was

11   paying Inacom for its distribution business?

12         A.        No.

13         Q.        Did Leon tell you?

14         A.        I don't remember him telling me, no.  How

15   much they were paying them?

16         Q.        Yeah.

17         A.        No.  I don't ever remember him telling me

18   how much they were paying them.  He may have, but I

19   don't remember that.  I would think that would be

20   confidential.  I don't know.

21         Q.        So he never mentioned to you -- well,

22   let's put a framework and some dates.  Do you know when

23   the sale closed?

24         A.        I think in March, sometime in March,

25   middle of March.

1          A.       Right.

2          Q.       -- specifics of the transaction.  Did he

3    advise you that it was a purchase of assets as opposed

4    to a stock purchase?

5          A.       Gosh, I don't remember him taking me

6    through anything like that.  You know, as I recall,

7    everybody was pretty secretive until the due diligence

8    was over.  And, you know, I just don't recall having any

9    conversations with anybody about we're going to take

10   this and put it here.  I don't recall that at all.  I

11   don't think -- I don't think I ever had a conversation

12   about that because that just doesn't ring anything.

13         Q.       But he advised you that the money was

14   going from Inacom to Compaq.  Right?

15         A.       No, not from Inacom, Compaq.

16         Q.       I'm sorry, I said that backwards.  He

17   advised you that money was going from Compaq to Inacom?

18         A.       Right.  I mean, there was going to be --

19   the sale was going to be completed, and my assumption

20   would be, then, that if -- see, I don't know on the back

21   end the stack of invoices or checks or whatever you want

22   to say, I wasn't sure if Inacom was going to be paying

23   those or Compaq was going to be paying those, and I

24   didn't know the source.  My assumption was that they're

25   waiting to be paid by Compaq to pay the invoices.  But

1  that's an assumption.  No one specifically said -- I

2  can't remember him saying, well, we're waiting for

3  Compaq to pay us so we can pay you.  I don't remember

4  that.  It was -- money was going to be released, but I

5  don't remember delving into the details.  I was more

6  concerned with just are we going to get paid, you know,

7  that kind of thing.

8       Q.     Were the checks that were eventually

9  released by Inacom -- well, strike that.

10             Who notified you when -- that Inacom held

11  checks were eventually released in late March?

12       A.     I think I got that from our accounts

13  receivable people.  It was either Misty or Kevin.  I

14  don't think -- I don't remember Inacom calling me up and

15  telling me that they were being released.  I think I got

16  it from -- and I'm not even sure we received -- I don't

17  know.  They could have wired the money.  I don't know.

18       Q.     So you don't know if it was wire transfers

19  or checks?

20       A.     I don't recall.  No.

21       Q.     Mr. Sarkisian would be more knowledgeable

22  about that than you?

23       A.     He would be, yeah, because none of that

24  flowed through us.

25       Q.     I'm still trying to make sure I understand

1  your understanding of the transaction, so I apologize
2  for repeating myself.
3       A.    I apologize for not explaining myself.
4       Q.    I understand that so long as Lexmark got
5  paid, it wasn't really of particular concern to you how
6  Lexmark got paid --
7       A.    Right.
8       Q.    -- between Inacom and Compaq.  But I am
9  trying to get your -- the most concrete testimony I can
10 about what you did think at the time was going to
11 happen.
12            You understood that some money was going
13 to flow from Compaq to Inacom at the sale closing.
14 Right?
15      A.    Yeah.  That would be a safe assumption,
16 yes.
17      Q.    And that therefore Inacom's bank account
18 would have sufficient funds for those checks that were
19 being held in the treasury department to be good so that
20 they could be sent to Lexmark --
21      A.    Correct.
22      Q.    -- to be paid?
23      A.    Correct.
24      Q.    And how is it that Compaq in your
25 understanding was involved in that process other than

```
 1   funding the money for the purchase of these assets?
 2         A.      I think that -- I don't have any -- I
 3   mean, the extent of -- you just said it.  I mean, I
 4   think Compaq was the provider of the funds for Inacom.
 5   I don't -- you know.
 6         Q.      Okay.  But it wasn't a gift and it wasn't
 7   lending funds.
 8         A.      No.
 9         Q.      It was buying something --
10         A.      Okay.
11         Q.      -- so that Inacom then had money in its
12   bank account?
13                 MR. HALLIDAY:  Let her finish the
14   question, and then when you answer, let's just tell her
15   what we know.  Okay?
16                 THE WITNESS:  Yeah.
17         A.      You want to ask the question one more
18   time?
19         Q.      Sure.  You said that Compaq was providing
20   the funds.
21         A.      I think they were providing the funds.
22         Q.      Okay.
23         A.      I don't know that for sure, but I think
24   they probably were, yeah.
25         Q.      But Inacom owed you the money.
```

1          A.      Right.

2          Q.      And Compaq bought some of Inacom's assets

3   and paid a purchase price.

4          A.      Right.

5          Q.      So the reason that Compaq was providing

6   the funds is just because it was paying a contractual

7   obligation in exchange for which it got assets.

8          A.      Correct.

9               MR. HALLIDAY:  Wait.  We need to get a

10  question.  I don't think she was finished.  There wasn't

11  a question mark at the end of that.  It was a

12  declarative statement.

13              THE WITNESS:  Okay.

14              MR. HALLIDAY:  Cecily, I've been quiet

15  all day.  This area, we're just getting a little bit --

16  and it's kind of like okay, okay, okay.  So I don't

17  think he knows what the transaction was about.  I think

18  that's pretty darn clear.

19              MS. DUMAS:  I understand.

20              MR. HALLIDAY:  I'm not trying to --

21              MS. DUMAS:  No, no, no, no, no.

22         Q.      And the reason that I'm doing this is

23  because this letter really -- well, this letter says

24  that the proceeds from the sale will cover the checks

25  and they will be disbursed over a period of one to ten

1   weeks.  And I'm reading that as the checks will be

2   disbursed by Inacom over a period of one to ten weeks.

3   Is that your understanding as well?

4        A.    I'm kind of asking for a declaration of

5   what its going to be in this letter.  I'm trying to get

6   a confirmation.  I'm not trying to say this is the way

7   it's going to -- I'm trying to go to Dick and say, okay,

8   my understanding from Leon is that this is what's going

9   to happen.  Is that true?  And that's why I sent him a

10  letter to just get a confirmation, that is this the way

11  it's going to happen?  I mean, I was just looking for a

12  confirmation.  I'm not -- I don't know all the specifics

13  of the transaction that occurred between Inacom and

14  Compaq.  I'm just trying to understand -- Leon said we

15  were going to be paid, we're going to be paid when the

16  disbursement happened.  Is this the way it's going to

17  happen.  That's what I was trying to understand.

18        Q.    I appreciate that explanation.  Thank you.

19              Does this letter accurately reflect what

20  your understanding was from what Leon Kerkman told you?

21        A.    Yes.

22        Q.    And when Dick Oshlo called you back after

23  you got this letter, did he confirm to you that the

24  understanding reflected in this letter was correct?

25        A.    Yes.

1          Q.      So when the letter says Compaq will assume

2   the liability of Lexmark invoices that have not had

3   checks written against them, weren't you confirming that

4   Compaq was only assuming open payables and Inacom was

5   going to pay the held checks?

6          A.      No, I don't think I was confirming that.

7   Again, I wasn't sure who was paying the -- I mean, I

8   didn't know the source of the funds that were paying

9   for -- you could say that I -- my assumption is that

10  Compaq was paying for assets, but I'm not sure that the

11  exact money that they paid was the money that was used

12  to pay the invoice.  You know, I didn't have any of the

13  inside information on it.

14         Q.      What did you mean when you wrote this

15  sentence:  Compaq will assume the liability of Lexmark

16  invoices that have not had checks written against them?

17         A.      That means any invoices that were still

18  outstanding, Compaq would assume the responsibility of

19  paying for them.  In other words, any checks -- if we

20  had any invoices that they didn't have written, that

21  Compaq would still pay for those as well, if Inacom

22  didn't pay.  Now, I didn't write this letter by myself,

23  but that's what I believe was the intent of this letter.

24         Q.      And what is your understanding, as

25  reflected in this letter, of who would pay invoices that

1  did have checks written against them?

2      A.    If -- I don't know who would be the

3  signer, but the Inacom checks would -- the checks that

4  we had sent to Inacom with the name Inacom would be

5  paid.  But again, I don't know if it would be coming out

6  of an Inacom checking account or a Compaq checking

7  account.  I don't think I was concerned about that at

8  the time.  I just wanted to make sure that we're going

9  to get paid.  I mean, you know.

10      Q.    Okay.  Let's start again.

11          MR. HALLIDAY:  No.  We've started

12  through it six or seven times.  I know you're

13  frustrated, Cecily.  You've asked him that same question

14  six or seven times.

15          MS. DUMAS:  No, I haven't.

16          MR. HALLIDAY:  No, no.  You have.  And

17  asked and answered.  Let's move on, please.  Please.

18      Q.    From whose -- all right.  Let's go back to

19  this notion of holding checks.  In the second or third

20  week of January Leon Kerkman advised you that this

21  treasury department of Inacom had written checks but

22  they were being held in a drawer.  Right?

23      A.    I don't know if they were -- they were

24  being held, right.

25      Q.    They were being held.

```
 1           A.      Right.

 2           Q.      By Inacom.

 3           A.      Yes.

 4           Q.      Before the sale closing.

 5           A.      It was before the transaction went final,

 6   correct.

 7           Q.      Before they had Compaq's money, they had

 8   written checks off their bank account.

 9           A.      I don't know what the check looked like,

10   so I don't know how the check was written.  But it was

11   my understanding that the checks had been written, but

12   they had not been released, and they were waiting for

13   funds to hit the account.  That's...

14           Q.      And those funds could be from any source?

15           A.      They could be from any source.

16           Q.      Inacom was waiting for funds to hit its

17   operating account so that it had sufficient money?

18           A.      Let's backtrack one more time here.  I

19   don't know if because of the transaction that was going

20   on that -- I don't know the details of the Inacom/Compaq

21   transaction.  All I know is that I don't believe any

22   invoices were being paid in this interim time period,

23   and I don't know what was causing it.  I don't know if

24   they were waiting on Compaq funds or they were just

25   waiting on the sale to be completed before they paid the
```

1   funds.  So I'm not sure that I want to go on record as

2   saying that we're waiting on Compaq funds because I

3   don't know if we were waiting on Compaq funds or we were

4   just waiting on the transaction to be completed.  Okay?

5   Because I don't know where -- I mean, for all I know,

6   Inacom could have had the money sitting in the bank but

7   they were waiting on the transaction to close before

8   they paid it.  I don't know.

9        Q.      And Inacom eventually released the checks

10  it was holding.  Right?

11       A.      That's right.

12       Q.      And Lexmark eventually got paid everything

13  that Inacom owed it.  Right?

14       A.      I believe so.  I think we got it all.

15       Q.      Is it your understanding that Compaq paid

16  the accounts payable that it assumed under the

17  transaction?

18       A.      I don't think I have that knowledge as to

19  who actually paid it.  I mean, I would have had to have

20  seen the check or the wire to see who it came from, and

21  I have no idea.

22       Q.      Who would be more knowledgeable than you

23  about that subject?

24       A.      Kevin Sarkisian.

25       Q.      I think maybe -- I'm trying to understand

1  where the disconnect is between us, because I don't

2  understand your answers, and I think you're getting

3  frustrated with my questions.  Are you drawing a

4  distinction between the phrase:  Compaq will assume the

5  liability of invoices versus Compaq will make funds

6  available to fund checks that have already been written?

7  Is that the distinction?

8       A.    No.  I'm making the assumption --

9            MR. HALLIDAY:  Wait.  Let her ask

10  another question.

11            THE WITNESS:  Okay.

12            MR. HALLIDAY:  You just answer.

13            MS. DUMAS:  No, I've asked the

14  question.  And it's another question.

15            MR. HALLIDAY:  And he said no.  Now

16  it's another question.

17            MS. DUMAS:  Well, he can explain his

18  no.

19            MR. HALLIDAY:  Well, I'm telling him

20  not to explain it.  I'm telling him to answer your

21  questions.

22       Q.    What did you mean when you wrote the

23  sentence:  Additionally, Compaq will assume the

24  liability of Lexmark invoices that have not had checks

25  written against them?

1          A.        That all back debt would be -- would be

2     paid and that Compaq would assume any liability that was

3     left over.

4          Q.        Thank you.  All back debt would be paid by

5     whom?

6          A.        By Compaq.

7          Q.        If that's your -- and that's your

8     testimony:  All back debt would be paid by Compaq?

9          A.        Anything that was not in that stack, yeah.

10    I mean, that's what I recall the statement being.

11         Q.        Okay.  So anything that was not in the

12    stack of held checks, Compaq would assume that debt; is

13    that what you're saying?

14         A.        Yes.

15         Q.        Okay.

16         A.        I mean, I'm not making that a statement of

17    fact.  I'm looking for confirmation.

18         Q.        Right.  That's what you were being told?

19         A.        Yeah, that's what I'm being told.  I'm

20    looking for confirmation.

21         Q.        I understand that.

22         A.        I'm getting a lot of different -- tell me

23    what the deal is going to be.  That's what I'm looking

24    for in this letter.

25         Q.        Okay.  And the confirmation you got is

1    That's what I'm trying to say in that paragraph.  Now, I

2    may not have done a good job explaining myself or

3    perhaps writing the letter, but that's my understanding.

4            I'm trying to make sure that I understand

5    that we're going to be paid for the invoices that are

6    outstanding, and anything else that might be out there

7    Compaq will then assume, because that was my

8    understanding.  Nothing else.  That's all I'm trying to

9    do in this particular paragraph.  And then, by the way,

10   we need to be paid as quickly as you can pay us.

11           Q.     When you wrote this letter, at any time

12   before you wrote this letter, had you had any

13   communication directly with anybody from Compaq?

14           A.     No.

15           Q.     So you don't know whether or not Compaq

16   had any idea that Inacom's treasury department was

17   sitting on checks to vendors?

18           A.     Well, I don't know who was sitting on the

19   checks.  I don't know if Inacom was sitting on the

20   checks or Compaq was sitting on the checks.

21           Q.     But what I'm saying is you don't

22   personally know if Compaq knew about Inacom's held

23   checks?

24           A.     I personally don't know whether or not --

25   that's true.

```
 1          Q.      And you don't have any personal knowledge

 2   of what the deal was, the actual terms of the contract

 3   were between Inacom and Compaq --

 4          A.      No.

 5          Q.      -- as to the assumption of liabilities?

 6          A.      No.

 7          Q.      So your best understanding of what the

 8   intention was is reflected in this February 15th letter?

 9          A.      That's -- that was my understanding, and I

10   was trying to get some kind of a confirmation that that

11   was in fact -- that we would be paid those invoices once

12   the deal took place, and that going forward that Compaq

13   would then assume all liability.

14          Q.      And you got that confirmation from

15   Mr. Oshlo after he received this letter; is that

16   correct?

17          A.      I can clearly recall him saying about the

18   invoices.  I don't recall specifically asking him about

19   Compaq will assume the liability of going forward.  I

20   mean, it happened four years ago.  I don't remember.

21          Q.      Did you have any conversations with

22   Mr. Huber about this topic, what Inacom would pay and

23   what Compaq would pay?

24          A.      I asked him about it, but I didn't believe

25   that he really had any knowledge.  I mean, it was always
```