Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

42

1  was filed in the Inacom bankruptcy.  Just scan it,

2  you don't have to study it.

3          (Pause.)

4      Q.   Was that your title in 2000, vice

5  president of US credit services?

6      **A.   Yes.**

7      Q.   Do you have a recollection as you sit here

8  today of filing this proof of claim?

9      **A.   I have a recollection, well, specifically**

10 **no, but I recall the amount of the claim and signing**

11 **it, yes.**

12     Q.   Have you filed proofs of claim in other

13 bankruptcies besides the Inacom case?

14     **A.   Yes.**

15     Q.   Can I have you look at page 1 which is a

16 couple pages in the document.  There is a column

17 underneath the heading of type.  What does DM stand

18 for?

19     **A.   Debit memo.**

20     Q.   What's a debit memo?

21     **A.   Deduction by the customer.**

22     Q.   Was that an ordinary entry?

23     **A.   Yes.**

24     Q.   Can you tell me -- strike that.

25          What could a deduction by the customer be

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

43

1  in that time frame, what could be the possible

2  source or explanation?

3      A.    It could be a pricing discrepancy where

4  the customer believes they got X price and the

5  supplier charged them Y.   It could be a shortage

6  issue where the customer ordered ten and only

7  received eight or claim they only received eight.

8          It could be the wrong product.   There's

9  probably about 50 different categorizations.

10 Generally where the customer is disagreeing with

11 what you are billing them and then deducting it from

12 a subsequent payment to you.

13     Q.    A debit memo, is there a form of some type

14 that was typically forwarded by Tech Data in this

15 time frame to the customer indicating that there was

16 going to be a debit on the account?

17     A.    No, the customer would actually debit, for

18 instance, on their remittance to Tech Data, they

19 would list out the amount of the check, there would

20 be the total amount of the invoices that they were

21 going to be paying, they would actually put minus

22 debit memo blah blah blah, blah blah blah and we

23 would then take that debit memo with hopefully

24 enough explanation to figure out what it's all about

25 and refer it to whichever department should handle

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

44

1    the issuance of a credit and if it had been a

2    deduction we would reinstate it under the customer's

3    account normally under their numbering scheme, that

4    is credits would come if they came and we would

5    match the credits against the debits.

6        Q.    Would there be any type of a report that

7    would be generated by Tech Data when the customers

8    would go ahead and send an amount that was less than

9    the full amount of the invoice by Tech Data?

10       A.    Any kind of report generated?

11       Q.    Like a reconciliation report.

12       A.    Generally speaking the statement which you

13   are looking at, a printed customer statement would

14   be the record of that item.

15       Q.    There wouldn't be another document that

16   would be generated for each particular invoice or

17   check that had more detail on it?

18       A.    No, we have certain data bases that we use

19   to track this because obviously customers of this

20   stature deduct often and within the scope of those

21   access data bases will categorize the kinds of

22   deductions and shoot them off to the various

23   departments and indeed we do share those

24   spreadsheets with the customers when we are trying

25   to reconcile accounts.

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

45

1    Q.    And the column next to type appears to be

2  doc number.  Can you tell me what that refers to?

3    **A.    Likely that is the customer's debit memo**

4  **number.  In other words, they likely numbered their**

5  **deduction when they sent it to us.  Now, there is**

6  **another, we could also use debits to correct pricing**

7  **when we make an error too, so it could be that type**

8  **of thing as well.**

9    Q.    There is a DM 64422, would that also refer

10  to debit memo?

11    **A.    Yes.**

12    Q.    Underneath the type heading there is IN,

13  can you tell me what that refers to?

14    **A.    Invoice.**

15    Q.    Can you just tell me generally what would

16  that refer to, that being invoice as far as of this

17  reconciliation report?

18    **A.    It should be, an invoice would be the**

19  **billing for a specific item that's shipped, a copy**

20  **of that obviously would have detail as to what the**

21  **item was and what the pricing was.**

22    Q.    So that's actually an invoice for product

23  that wasn't paid --

24    **A.    Unpaid invoice, yes.**

25    Q.    According to the records at Tech Data?

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

46

1      A.    Right.

2      Q.    There is also a heading I think on the

3  following page for CM.  Can you tell me what that

4  is?

5      A.    Credit memo.

6      Q.    Can you tell me just generally what that

7  would refer to?

8      **A.    Generally speaking a credit memo is in**

9  **response to a claim on an error, you know, I was**

10 **priced incorrectly on this $2,000 invoice, you**

11 **overpriced me by $500 and our pricing people would**

12 **look at that.  If indeed that were true, they would**

13 **issue a credit memo for that or for some other**

14 **amount if they disagree.**

15     Q.    Do you have any recollection of what

16 documents you reviewed in preparing for this claim?

17     A.    Personally?

18     Q.    Yes.

19     A.    None.

20     Q.    Do you know who underneath you in the year

21 2000 would have assisted you in preparing this proof

22 of claim?

23     **A.    We have an advanced debt recovery area**

24 **that is sort of a collection/proof of claim**

25 **filing/type of area and that area would be**

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

47

1    responsible for creating the document.

2        Q.    Do you typically work with someone in the

3    advanced debt recovery unit?

4        A.    I have the manager of that advanced debt

5    recovery unit that usually reports to me.  I don't

6    recall exactly who that was in 2000 but I have had

7    some turnover there in the last few years.

8        Q.    Was there a customary practice -- strike

9    that.

10            At Tech Data, was there a typical time

11    frame that you are aware of that you would issue

12    debit memos or try to reconcile pricing or shortage

13    issues as far as product shipped to a customer?

14        A.    There is a desired time frame but there is

15    also the reality of the customer not responding in

16    many cases to multiple requests.  So it is not

17    unusual in an account with several thousand line

18    items that we have some pretty old because there's

19    been no response by the customer.

20            The desired time frame is always within 30

21    days.

22        Q.    And that would be, the desired time frame

23    would be to reconcile any payments on invoices

24    within 30 days?

25        A.    Correct.

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

48

1      Q.    Would there be any type of a report that

2  would be generated by the advanced debt recovery

3  unit or any other unit to you if there amounted to a

4  certain discrepancy or dollar still at issue with

5  credit and debit memos?

6      **A.    That doesn't work with the reconciliation**

7  **type of things.  We have reconciliation specialists**

8  **in each area like the national retail and VAR units.**

9  **It is their job to work the old reconciliation**

10 **items.  As far as any specific report by customer or**

11 **by area, there isn't any specific report, but**

12 **rather, you can determine if there is an issue there**

13 **by past due agings of a certain area.**

14     Q.    Would you see a past due agings report

15 every day in the year 2000?

16     **A.    Yes, I did.**

17     Q.    Would you have an opportunity to go over

18 the past due aging reports in the year 2000 with any

19 of your directors if you thought it was appropriate?

20     **A.    Quarterly, I actually would go over them**

21 **quarterly with each director.**

22     Q.    Would there be a certain time frame --

23 strike that.

24          In the year 2000 would there be a certain

25 time frame that would pass before Tech Data would

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

49

1  write off certain accounts receivable as not

2  collectible?

3      A.    There are several different definitions of

4  that.  When you say writeoff, if there is a dispute

5  with regard to a claim and it goes unresolved and

6  for whatever reason we believe everyone is equally,

7  we are at fault or maybe we are at fault; if we note

8  there is an item, we may write it off at a point in

9  time once that resolution has been obtained.

10          A bad debt is a bit of a different cycle.

11 Once it's been determined that X amount of days have

12 been without payment or without resolution, et

13 cetera, we will write it off to bad debt at an

14 appropriate time.

15          So I don't want to be ambiguous on that,

16 there are specific time frames we try to follow but

17 there's nothing fixed in stone.  If it needs to be

18 written off upon discovery, then it will be.

19      Q.    What time would your normal practice be

20 for reconciling an account and writing off a bad

21 debt?

22      A.    Of course they are two completely

23 different issues.

24      Q.    Reconciling an account and bad debt are?

25      A.    Yes, reconciliation is a day-to-day

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

50

1    behavior with any and all customers.  There is some

2    degree of reconciliation that always occurs, minor

3    deductions, overpayments, et cetera.  We have

4    full-time reconcilers that do that type of work.

5        Q.    Putting aside the fact that individual

6    circumstances are involved, in the year 2000 --

7    strike that -- in the year 1999, what's generally

8    the time frame when you are looking at a past due

9    aging report and you see something starting to go

10   way out there that it would be written off as a bad

11   debt or would be somehow categorized by Tech Data

12   that this sum was not going to be recovered?

13            MR. HUNT:  Object to form.

14       A.    That's a hard question to answer.  From a

15   miscellaneous standpoint, and again categorically,

16   that's completely different than bad debt.  We hope

17   to address them as quickly as we can get a response

18   from the customer or vendor who is supposed to do

19   something.  It could be one day, it could be two

20   days.

21            On the larger multi-million dollar

22   accounts with many, many line items, you could have

23   a segment that got overlooked for a long, long time,

24   and in fact that did happen during that time frame

25   as a matter of normalcy.  I would call it normalcy,

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

51

1  we had some sizable accounts, with 40, 50, 60, 70,

2  80, 90, 100,000 line items on the account that might

3  be overlooked for a period of time.  So the normal

4  time would be 30 to 60 days but we had lots of

5  exceptions to that.

6      Q.   When you got a past due aging report, what

7  did it look like?

8      A.   In those days, in that particular time

9  period, not very bad.  If you are looking across,

10 probably about 70 percent current.

11          MR. TATELBAUM:  Excuse me, I think

12     he is asking what was on the form.

13     Q.   Physically, I just want to know what the

14 categories were.

15     A.   Total, current, past due, 1 to 30, 31 to

16 60, 61 to 90, 91 and over.

17     Q.   If somebody was out two, three years with

18 the sum that Tech Data showed they owed in that

19 category?

20     A.   Yes, 91 and over.

21     Q.   The amounts reflected in those columns,

22 would those reflect the amount of the invoice or

23 would they also reflect any debit memos or any other

24 type of corrections to the amount that Tech Data

25 thought was owed?

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

52

1    **A.    They would reflect it all if there were**

2  **debit memos or invoices aging to that degree and**

3  **credit memos aged as well.**

4    Q.    Would there be anywhere else in this daily

5  report that would be categorized with any degree of

6  greater specificity than the 91 to over category?

7    **A.    There is a 91 and over category.**

8    Q.    Right, but would there be any other detail

9  on the report that would give you in addition to a

10  91 and over, if it was out a thousand days?

11    **A.    We can pull and still can pull ad hoc**

12  **reports to determine that.  In the 1999-2000 time**

13  **frame compared to today is quite different for a**

14  **myriad of reasons.  We are much better able to track**

15  **that kind of data than we were back then.**

16    Q.    With the current customers -- strike that.

17        In the year 1999 with the customers that

18  you were involved in and even with the national

19  accounts, would there come times when you would

20  write off certain amounts that were owed to Tech

21  Data as bad debt?

22    **A.    Of course.  I mean, yes.**

23    Q.    What circumstances might require that you

24  write it off as a bad debt?

25    **A.    Uncollectibility, 90 to 120 days of**

1b5faba1-bb21-475d-af59-a8fabb1b5859

53

```
 1   inability to collect.  I mean, there would be a
 2   myriad.  Our bad debt writeoff is a normal
 3   occurrence on an annual basis.  It could be a number
 4   of things, lots of stuff.
 5        Q.   When you wrote it off as a bad debt,
 6   physically what did you do at Tech Data?
 7        A.   What did we do at Tech Data?
 8        Q.   Yes, physically when you came to the
 9   conclusion that -- strike that.
10             When you made a categorization that a
11   customer had bad debt, what's the significance of
12   that finding at Tech Data?
13        A.   What's the significance of that?  I don't
14   quite understand.  What do you mean, the
15   significance of what do we do thereafter or what did
16   it mean when it was written off to Tech Data?
17        Q.   There is a significance when you come to
18   the conclusion that something is bad debt from an
19   accounting standpoint, is that correct?
20        A.   Right.
21        Q.   And I just want to know not from the
22   accounting standpoint but from the purposes of how
23   Tech Data looked at it, what the significance was
24   when they categorized an amount that was allegedly
25   owed by a customer's bad debt.
```

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

54

1        MR. HUNT: I am going to object to

2     the form.  There's a problem with the

3     term significance in the way that it is

4     being used multiply.

5        Answer if you can.

6     **A.    I'm not quite getting that.**

7     Q.    If I understand your testimony, there

8  would come a point in time in the year 1999 that

9  Tech Data might categorize certain accounts

10 receivable as bad debt.

11    **A.    Correct.**

12    Q.    The fact that Tech Data might refer to

13 something or an accounts receivable as bad debt,

14 would that conclusion be that Tech Data did not

15 expect to recover those sums?

16    **A.    Yes and no.  That's a contradictory**

17 **question -- or answer, I understand what you are**

18 **saying.  We do write bad debt off in a specific**

19 **period of time when we do understand a debt is**

20 **uncollectible, the company is out of business, we**

21 **have not received payment or any communication or**

22 **cooperation in X period of time.  However, once we**

23 **write it off to bad debt, we don't necessarily stop**

24 **proceeding to collect that bad debt and we do indeed**

25 **collect some back.**

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

55

1    Q.    As far as the bad debt, do you assign that

2 to some other company to try to collect that?

3    **A.    No, well, it could be through a collection**

4 **agency and normally at a certain stage it goes**

5 **through a collection agency, yes.**

6    Q.    At Tech Data with respect to customers

7 that haven't gone out of business that you are

8 currently having a relationship with, would there be

9 someone at Tech Data or some department that you

10 would assign the duty and responsibility of trying

11 to collect sums that were outstanding more than 91

12 days?

13    **A.    Yes, that would be within my department.**

14 **Again, there's quite a swing between those**

15 **deductions and those miscellaneous items and bad**

16 **debt.**

17        **The miscellaneous items are the**

18 **responsibility of those individual reconcilers and**

19 **the areas, et cetera, it is just a part of doing**

20 **business.  You can't stop companies, particularly**

21 **large companies from deducting.**

22        **The bad debt is where the company is out**

23 **of business or they just won't pay you and you have**

24 **to initiate litigation which is a different side of**

25 **the coin.**

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                     1/26/2005                      MICHAEL ZAVA

56

1      Q.   Here's the gist of it, I would like to

2   know, when you have a current customer that you are

3   doing business with in the 1999 time frame.

4      **A.    Right.**

5      Q.   And you have a sum, say it's greater than

6   $500,000 that you show is in the 91 and older

7   column, who at Tech Data if anybody would be

8   assigned the duty and responsibility of trying to

9   collect on that sum?

10      **A.    That would be my group and that would be,**

11   **if it is an ongoing customer still purchasing in**

12   **good standing, that would be the responsibility of**

13   **our reconciliation people.**

14      Q.   Would that be someone underneath one of

15   your directors?

16      **A.    Someone within their groups, yes.**

17      Q.   And would there ever be a time where that

18   amount would get past a certain percentage or a

19   certain dollar amount that that would come directly

20   to your attention?

21      **A.    Possibly depending on the extent of the**

22   **over 90, I would obviously review that and depending**

23   **on the customer and the size of the account, be**

24   **concerned or not be concerned or speak to the**

25   **directors about hastening the reconciliation**

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                          1/26/2005                          MICHAEL ZAVA

57

1  process, yes.

2      Q.    When would that typically, how far past 91

3  days would you have that process go on if it met a

4  certain threshold?

5      **A.    Again, I would see these things on a**

6  **monthly or quarterly basis and I would always be**

7  **concerned about them and always be talking to**

8  **someone about the reconciliation, but each customer**

9  **is a different type of situation if there are**

10 **deductions involved.**

11          **Some customers, what we'll ultimately end**

12 **up doing is try to work out a settlement with the**

13 **customer covering X period of time and saying, well,**

14 **I'll take 50 percent, you take 50 percent.**

15     Q.    If you look at Exhibit 1, in the column of

16 120 days on page 1 it says $818,197.46.  It's on

17 page 1.

18          MR. HUNT:  And there's a row on the

19     top right corner.

20     Q.    I assume and you can correct me that it is

21 referring to 120 days?

22     **A.    Yes, 120 days.**

23     Q.    So would this row here, 120 days, reflect

24 that according to Tech Data's records, $818,197.46

25 was in excess of 120 days in age?

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                          1/26/2005                          MICHAEL ZAVA

58

1          MR. TATELBAUM:  Excuse me, from what

2     date?

3          MR. NOLAN:  That's my next, from the

4     date of the proof of claim is going to be

5     the question.

6     **A.    It should be, I mean, as of the date of**

7  **this document, and I don't know the date, 6-27-2000.**

8  **So as of the date of this document it says 120.**

9  **Now, have I added it up and checked its correctness,**

10 **no, but that statement should show the aging of the**

11 **dollars that it is billing out on.**

12         MR. TATELBAUM:  From the date of the

13    document?

14         THE WITNESS:  6-27-2000 looks like

15    the date on the bottom.

16         MR. NOLAN:  Chuck, at this point it

17    might be useful to, I want to talk to the

18    witness about any -- strike that, let me

19    ask the witness first.

20    Q.    Mr. Zava, did you ever have a chance to

21 review the answer of Tech Data to the first amended

22 complaint in this case?

23         MR. HUNT:  I would just instruct the

24    witness again and to the extent that this

25    question calls for attorney-client

1b5faba1-bb21-475d-af59-a8fabb1b5859

1          privileged communications, that you

2          answer it other than from that

3          perspective.

4               MR. TATELBAUM:  In other words, he

5          is asking you did you look at the

6          document as opposed to discussing it with

7          anyone.

8          Q.   I will hand it over to you.

9               MR. NOLAN:  Let's mark this as

10         Exhibit 2.

11         (Thereupon, proof of claim re Inacom was

12         marked as Deposition Exhibit 2 for

13         Identification.)

14         (Pause.)

15         **A.   And the question is, did I look at this**

16    **document?**

17    **BY MR. NOLAN:**

18         Q.   Have you ever seen that document before

19    today.

20         **A.   Have I ever seen this document?**

21         Q.   Yes.

22         **A.   I believe I have, yes.**

23         Q.   Did you review Exhibit 2 or a copy of

24    Exhibit 2 in preparation for your deposition?

25         **A.   And is this Exhibit 2?**

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

60

1      Q.    Yes, sir.

2      **A.    No, other than I've seen this document and**

3   **I scanned this document but did I review it in**

4   **preparation for the deposition?**

5      Q.    Yes.

6      **A.    Specifically, no.**

7      Q.    If I can have you just look at Exhibit 1

8   again, the proof of claim.

9      **A.    This one?**

10      Q.    Yes.  Sorry to switch gears on you here.

11  If you go to page 1, the age column that refers to

12  the amount of days that have passed since the

13  invoice was issued, would that be correct?

14      **A.    Yes.**

15          MR. HUNT:  I will object to form

16      only because there are multiple

17      categories of documents that it refers

18      to.

19          MR. NOLAN:  I am looking just at the

20      column for age.

21          MR. TATELBAUM:  For the documents

22      that are not invoices.

23          MR. HUNT:  I don't mean to make a

24      speaking objection, but just to save

25      time.

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

61

1          MR. NOLAN:  Okay, thank you.

2      **A.    When debits are put on accounts, an**

3  **invoice may be aged X past due and the debit when**

4  **it's put on an account will age current.  For**

5  **whatever reason we can't make it do differently so**

6  **to be accurate on exactly what it is, we have to go**

7  **through and age them by hand to be a hundred percent**

8  **accurate, because I notice in the 30-day category**

9  **and in the 60-day category they look pretty small**

10 **but there's a lot of credit memos too so the actual**

11 **aging is a bit skewed, I believe.**

12     Q.   So from Tech Data's perspective, would

13 there be an actual date of a debit memo?

14     **A.    The date that we put it on an account.**

15 **The check comes in and if we apply the check that**

16 **day, that would be the date it is put on the**

17 **account.**

18     Q.   Say I owe you a million dollars, I am a

19 customer of Tech Data and according to the invoice,

20 that is, and I send you a check for 900,000,

21 obviously there's $100,000 missing.

22     **A.    Right.**

23     Q.   We can utilize whatever category or

24 whatever, it is a price discrepancy or a shortage

25 and such, there would be an investigation on behalf

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

62

1   of Tech Data as to the reason for the --

2       A.    Deduction.

3       Q.    -- deduction?

4       A.    Right.

5       Q.    Then if I understand correctly, there

6   would be a determination by Tech Data that the

7   hundred thousand dollar deduction was either proper

8   or improper?

9       A.    Correct.

10      Q.    When Tech Data makes that determination,

11  do they issue some type of a memo to the customer?

12      A.    If it is an affirmative and they are

13  issuing credit for it then they will issue a credit

14  memo to cover that.

15      Q.    And the date of that credit memo would be

16  the date that the determination is made by Tech

17  Data?

18      A.    Yes.

19      Q.    Would that be put into the aging column,

20  would that be the date you would use in the aging

21  column for Exhibit 1?

22      A.    Right, but on the larger accounts, again,

23  we usually use spreadsheets for those so if the

24  credit is also coming, our people would

25  automatically match it up against the debit and just

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

63

1    **remove it if it were equivalent.**

2         Q.    There is a column here, it says INV date

3    or DT, I take it that means invoice date?

4         **A.    Yes.**

5         Q.    As far as an invoice, an entry for an INV

6    invoice, that would be the actual date for the

7    invoice?

8         **A.    Invoice date, yes.**

9         Q.    The invoice, do you know whether or not

10   the invoice date would be the date that the product

11   was actually shipped to the customer as opposed to

12   the date that they received it?

13        **A.    It's the date shipped, right.**

14        Q.    So the invoice is dated the day that Tech

15   Data ships the product to the customer?

16        **A.    Right.**

17        Q.    And then the customer is then, depending

18   upon what terms they have at Tech Data, they pay

19   thereafter, correct?

20        **A.    Right.**

21        Q.    Do you have any knowledge as you sit here

22   today as far as Inacom is concerned in 1999 or 2000

23   that Tech Data would ship product to Inacom and

24   would be paid at the same time that the product was

25   received by Inacom?

1b5faba1-bb21-475d-af59-a8fabb1b5859