Case 1:04-cv-00583-GMS   Document 127-5   Filed 03/14/2006   Page 1 of 20

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

64

1  A.   You mean like a COD shipment?
2  Q.   Correct?
3  A.   To Inacom?
4  Q.   Yes, sir.
5  A.   I have no knowledge of that.
6       MR. HUNT:  Might I go off the record
7  a moment?
8       MR. NOLAN:  Sure.
9       (Discussion off the record.)
10      (Recess.)
11      MR. HUNT:  After colloquy between
12 counsel off the record, counsel for Tech
13 Data has advised that it intends to
14 abandon certain affirmative defenses.  It
15 will abandon its following affirmative
16 defenses to the complaint:  Defense
17 Numbers 1, 2, 3, 4, 5, 6, 8, and 11.  It
18 will be maintaining the balance of those.
19      MR. NOLAN:  And these are, in
20 looking at Exhibit 2, these are the
21 answers to the first amended complaint.
22      MR. HUNT:  Yes, as stated in Exhibit
23 2.
24 (Thereupon, person most knowledgeable
25 notice served by Inacom was marked as

Case 1:04-cv-00583-GMS   Document 127-5   Filed 03/14/2006   Page 2 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

65

1       Deposition Exhibit 3 for Identification.)
2  BY MR. NOLAN:
3       Q.   Mr. Zava, we'll have another exhibit.
4  Let's mark it as Exhibit 3.  I will represent to
5  you, Exhibit 3 is pages out of a person most
6  knowledgeable notice of deposition that was served
7  by the plaintiff, Inacom Corporation, in this
8  lawsuit.  I'd like to just run through certain of
9  these categories with you to find out to the extent
10 you have knowledge or you are the most knowledgeable
11 person concerning these certain categories.
12           With respect to category 1, do you have
13 knowledge, and let me go ahead and strike that.  Let
14 me just go ahead and give you where I'm going to go
15 with these things.  I am going to ask you if you
16 have knowledge and I am going to ask you if you have
17 personal knowledge.  The difference is, you may have
18 knowledge from all different sources after the fact,
19 picking up a 10 Q, 10-K.
20           Then I'm going to ask you to go into
21 specific knowledge, if you had communications with
22 somebody at Inacom Corporation concerning something.
23 That's what I meant when I said personal knowledge,
24 I am going to be referring to just you individually
25 with somebody at Inacom.

Case 1:04-cv-00583-GMS    Document 127-5    Filed 03/14/2006    Page 3 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

66

1          With respect to the sale of the
2    distribution business or asset purchase sale between
3    Inacom and Compaq, do you have knowledge concerning
4    that particular category?
5        A.   Yes.
6        Q.   Do you have personal knowledge concerning
7    category 1, meaning, did you have any communications
8    with anyone at Inacom concerning the sale of the
9    distribution business or asset purchase division to
10   Compaq?
11            MR. HUNT:  I am going to object to
12        the form only to ask that the term
13        communications be explained.
14       Q.   Did you ever talk with anyone at Inacom or
15   send any correspondence to anyone at Inacom
16   concerning the sale of the distribution business of
17   Inacom to Compaq or some other entity?
18       A.   **I'm just trying to think of the timing on**
19   **how this stuff works so I answer this correctly.**
20   **Did I have personal communication with someone with**
21   **regard to this, no.  After the fact, later, yes,**
22   **after knowledge was known, I guess, is the way to**
23   **put it.**
24       Q.   Would that be with somebody at Inacom?
25       A.   **I participated in a conference call, okay.**

Case 1:04-cv-00583-GMS   Document 127-5   Filed 03/14/2006   Page 4 of 20

Inacom vs. Tech Data                  1/26/2005                    MICHAEL ZAVA

67

1    Q.    After the sale of the asset division to
2  Compaq, I am going to call it Compaq.  I know there
3  will be a reference later on about Custom Edge.  Do
4  you know if Tech Data had any business relations
5  with Inacom, the service division?
6    **A.    I believe we did to some small degree for**
7  **education.**
8    Q.    I am going to skip -- actually, category
9  2, do you have knowledge concerning the terms of the
10 asset sale between Inacom and Compaq prior to
11 February 15, 2000?
12   **A.    Yes.**
13   Q.    As your duties and responsibilities at
14 Tech Data, have you -- strike that.
15         Do you know with category 3, are you the
16 person most knowledgeable concerning the issuance of
17 invoices between Tech Data and Inacom?
18   **A.    Am I the person most knowledgeable on**
19 **Number 3?**
20   Q.    Correct.
21   **A.    No.**
22   Q.    Do you know who that would be?
23   **A.    I would believe that to be the director or**
24 **someone under the director responsible for that**
25 **account.**

Case 1:04-cv-00583-GMS    Document 127-5    Filed 03/14/2006    Page 5 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA
68

```
 1        Q.    And the director for the Inacom account
 2   was Mr. Ward?
 3        A.    Yes.
 4        Q.    As far as category 4 and the facts and
 5   documents with respect to the handling of payments
 6   from Inacom, would the person most knowledgeable
 7   also be Mr. Ward?
 8        A.    Yes.
 9        Q.    Category 6, would you be the person most
10   knowledgeable concerning accounts receivable and
11   collections?
12        A.    Yes.
13        Q.    At any time when you were at Tech Data,
14   did you ever become familiar with the phrase, held
15   checks with respect to Inacom?
16        A.    With respect to Inacom?
17        Q.    Correct.
18        A.    Held checks like what?  I mean, whether we
19   were asked to hold checks?
20        Q.    No.  Let me state the question a little
21   differently.  Did you ever become aware in 1999 or
22   2000 that Inacom was holding checks that were actual
23   checks that paid invoices issued by Tech Data?
24        A.    My knowledge on that would be extremely
25   limited.  I do recall seeing something in some
```

Case 1:04-cv-00583-GMS    Document 127-5    Filed 03/14/2006    Page 6 of 20

Inacom vs. Tech Data                 1/26/2005                      MICHAEL ZAVA

69

```
 1  correspondence but I was not familiar or aware of
 2  what that meant.
 3      Q.   So you are not, as you sit here today, you
 4  don't have any personal recollection of a practice
 5  at Inacom of holding checks that were payable to
 6  Tech Data?
 7      A.   No.
 8      Q.   Do you ever recall in 1999 or 2000, there
 9  being an issue with Inacom being unable to pay
10  certain amounts owed to Tech Data?
11      A.   Being unable to pay?
12      Q.   Yes, unable to pay on amounts that were
13  invoiced for a product that was shipped by Tech Data
14  to Inacom.
15      A.   No.
16      Q.   In 1999 or early 2000, did you ever become
17  aware of an issue concerning Inacom having
18  difficulties or problems with their cash flow?
19      A.   Problems with their cash flow as far as
20  related to payments or just knowledgeable of cash
21  flow issues?
22      Q.   With respect to making payments to
23  customers of theirs such as Tech Data?
24      A.   With respect to making payments, no.  I
25  mean, I obviously reviewed the Qs and the Ks and the
```

Case 1:04-cv-00583-GMS  Document 127-5  Filed 03/14/2006  Page 7 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

70

1  restructure which seemed to be typical of certain
2  companies at certain times.
3       Q.   You don't have any recollection of someone
4  at Inacom ever calling you or sending a letter or
5  communicating with anyone underneath you at Tech
6  Data during that time frame somehow relaying the
7  gist that Inacom was having a liquidity crisis?
8       A.   No.
9       Q.   Category Number 8, do you have any
10 knowledge or do you think you are the most
11 knowledgeable person concerning any attempts at
12 collecting the amounts outstanding at Inacom from
13 January 1, 1999 to June 16, 2000?
14      A.   I have knowledge but I don't have the most
15 knowledge.  I have major knowledge, I guess is the
16 way you refer to it.
17      Q.   Can you tell me what knowledge you have of
18 any attempts to collect amounts from Inacom in that
19 time frame?
20      A.   Obviously when the transaction occurred
21 and Compaq purchased the organization, then the
22 methodology, or we were looking to clear out the
23 account according to their stipulation or their
24 assumption, but really beyond that, the disputes
25 that you pointed out before were not resolved.

Case 1:04-cv-00583-GMS    Document 127-5    Filed 03/14/2006    Page 8 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

71

```
 1      Q.   Would the person with the most knowledge
 2 be Mr. Ward or someone else?
 3      A.   Yes, Mr. Ward and those under him
 4 reconciling and working on the account.
 5      Q.   Category 9, I think we have already talked
 6 about actual receipt of the checks that were issued
 7 from Inacom to Tech Data.  Would you have any
 8 knowledge concerning the receipt of checks from
 9 Inacom to Tech Data in the 1999-2000 time frame?
10      A.   Actually, no.
11      Q.   Do you know who that person would be that
12 would be the most knowledgeable at Tech Data?
13      A.   That would be the director responsible and
14 his employees.
15      Q.   That's Mr. Ward again?
16      A.   Right.
17           MR. NOLAN:  I have no further
18      questions for you at this time.  I just
19      reserve my right after Cecily goes.
20           MR. HUNT:  Cecily, do you want to go
21      now?
22           MS. DUMAS:  I would prefer if we get
23      lunch first before I go.
24           (Luncheon recess.)
25
```

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

72

```
 1                    AFTERNOON SESSION
 2                       12:30 p.m.
 3                    CROSS-EXAMINATION
 4   BY MS. DUMAS:
 5       Q.   Mr. Zava, my name is Cecily Dumas and I
 6   represent Hewlett-Packard Company in connection with
 7   this action.  The questions that I am going to be
 8   asking you, just to get our nomenclature straight
 9   relate to Compaq Computer Corporation which H-P
10   acquired in 2001 so I am going to refer to Compaq
11   because that was the company that was involved in
12   these transactions that we have been discussing this
13   morning.
14       A.   Right.
15       Q.   And in doing so, you will understand that
16   I am referring to the entity that is now called H-P
17   Company.  Is that acceptable?
18       A.   Yes.
19            MR. HUNT:  May I inquire, Ms. Dumas,
20       does that include as well the Custom
21       Edge?
22            MS. DUMAS:  We'll be going into
23       that.
24            MR. HUNT:  Thank you.
25   BY MS. DUMAS:
```

Case 1:04-cv-00583-GMS   Document 127-5   Filed 03/14/2006   Page 10 of 20

Inacom vs. Tech Data					1/26/2005					MICHAEL ZAVA

73

1    Q.   Let me just start by asking you some more
2  general questions to fill out the background that
3  Mr. Nolan asked you this morning. What type of
4  business is Tech Data Corporation in?
5    A.   **Tech Data is a wholesale distributor of**
6  **computer products.**
7    Q.   You mentioned earlier this morning that
8  Inacom in 1999 was a customer of Tech Data, is that
9  right?
10   A.   **Yes, correct.**
11   Q.   What did Tech Data sell to Inacom?
12   A.   **I don't know the specific details of**
13 **products that were sold. I believe it was a wide**
14 **selection of products, but I have no information**
15 **with regard to specifically what they were.**
16   Q.   What type of computer products did Tech
17 Data sell in the 1999 time frame?
18   A.   **PCs, printers, memory, networking, just**
19 **about every PC-related accessory available.**
20   Q.   Tech Data was not a manufacturer of
21 computer equipment, correct?
22   A.   **No.**
23   Q.   So Tech Data had suppliers that were
24 manufacturers of computers and PCs and peripherals
25 and PC-related equipment, correct?

Case 1:04-cv-00583-GMS   Document 127-5   Filed 03/14/2006   Page 11 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

74

1    A.    Supplying us, yes.
2    Q.    I think you mentioned that Tech Data in
3  the 1999 time frame had an existing relationship
4  with Compaq Computer Corporation.  My question is,
5  was Compaq a supplier to Tech Data?
6    A.    Yes.
7    Q.    Do you know how much business Compaq,
8  before the acquisition that we have been talking
9  about, when Compaq was supplying product to Tech
10 Data?
11   A.    I do not specifically know.  I know that
12 Compaq was, and by virtue of the combined entity, is
13 a substantial supplier to Tech Data.
14   Q.    Here today?
15   A.    Today and before, then.
16   Q.    Before the merger between Compaq and
17 Hewlett-Packard Company, was Compaq at that time a
18 major supplier to Tech Data?
19   A.    Yes.
20   Q.    Was it in, say, the top five suppliers to
21 your company?
22   A.    Not being on my side of the business, I
23 really don't know, wouldn't know that.
24   Q.    Let me back up.  As Mr. Nolan cautioned
25 you, you shouldn't guess if you don't know the

Case 1:04-cv-00583-GMS    Document 127-5    Filed 03/14/2006    Page 12 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

75

1  answers to my questions.
2      A.    Right.
3      Q.    Having said that, though, I am entitled to
4  your best estimate based on your general
5  understanding.  So with that kind of qualifier, do
6  you have a best estimate as to how important or
7  significant a supplier Compaq was for Tech Data in,
8  generally, the 1999-2000 time frame?
9      A.    I really, the information that I have with
10 regard to them as a supplier would come strictly by,
11 I guess, publicity or what you might read as Compaq
12 is a major supplier, IBM is a major supplier, that
13 type of thing.  But I had no contact with the
14 purchasing side of the organization nor was I privy
15 to reports that would show me whether they were,
16 where they were ranked.  I knew by virtue of
17 conversation with other executives.
18     Q.    What was your general understanding based
19 on, any source of conversation, conversation with
20 executives, reading publicity reports?
21     A.    Are you asking me for a best guess on
22 that?
23     Q.    Yes.
24     A.    My best guess would be among the top 10 or
25 15 suppliers, if that is a guess.

Case 1:04-cv-00583-GMS   Document 127-5   Filed 03/14/2006   Page 13 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

76

1  Q. Would you have considered Compaq to be a
2  major supplier of Tech Data in 1999?
3  A. I would.
4  Q. On the customer side, you said that Tech
5  Data was a wholesale distributor. To whom generally
6  speaking did Tech Data sell its products?
7  A. Basically three categories of customer,
8  the S & B, small VAR marketplace would be one. The
9  retail marketplace to a more limited degree, Best
10 Buy's, Comp USAs, and then thirdly a category we
11 generally refer to as national which is really a
12 conglomeration of everybody else, large accounts.
13 Q. Just so the record is clear, when you are
14 saying the word VAR, you are referring to the term
15 value added resale, correct?
16 A. Yes.
17 Q. In 1999 Inacom was a customer of Tech
18 Data, correct?
19 A. Correct.
20 Q. In these three categories, VARs, retailer,
21 national, which category did Inacom fall into?
22 A. National.
23 Q. What's your best recollection of the
24 revenues of Tech Data, say, annual in 1999?
25 A. Fiscal '99 for us would be the year ending

Case 1:04-cv-00583-GMS   Document 127-5   Filed 03/14/2006   Page 14 of 20

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

77

1  January of '99, so fiscal 2000 would be the year
2  ending January 2000 but represented by many months
3  in '99. So you would be speaking of the months in
4  '99 even though we go one month into 2000?
5      Q. Thank you for that explanation. That will
6  help me to ask a better question.
7      A. Okay, just trying to pick out the right
8  spot you want the answer.
9      Q. May I break it up into asking you about
10 your fiscal year 1999 revenues and then if your
11 counsel will allow me to ask a compound question,
12 your revenues for your fiscal year 2000.
13     MR. TATELBAUM: Just this once.
14     A. I know in fiscal 2000 which was January
15 2000 that worldwide it did 20 billion in revenue
16 because that was somewhat of a watershed mark, but
17 in fiscal '99 I'm guessing, and my guess would be
18 somewhere around 16 or 17 billion.
19     Q. And you said that was worldwide, correct?
20     A. Worldwide.
21     Q. Can you break it down into US sales only?
22     A. I'm trying to remember; probably 50-50 at
23 that juncture.
24     Q. In terms of the total revenue of Tech Data
25 in, let's focus on fiscal year 2000, how big of a

Case 1:04-cv-00583-GMS   Document 127-5   Filed 03/14/2006   Page 15 of 20

Inacom vs. Tech Data                 1/26/2005                    MICHAEL ZAVA

78

1  customer was Inacom in terms of percentage of
2  revenues, 3 percent, 10 percent, 50 percent?
3      A.  I don't remember them having to be
4  reported in our financial statements and I believe
5  there is a specific percentage that they have to
6  hit.  They were a large customer for a number of
7  years in the category of hundreds of millions in
8  purchases.
9      Q.  Do you remember how much business, do you
10 happen to remember how much business Inacom did with
11 Tech Data as a customer in fiscal year 2000?
12     A.  I don't recall that.  It didn't stick with
13 me and I didn't look back.  It was likely in excess
14 of a hundred million but I can not state exactly
15 where.
16     Q.  How many customers did Tech Data have in
17 fiscal year 2000 that did in excess of a hundred
18 million business with Tech Data?
19     A.  I have to give you an educated guess
20 because I don't specifically know, but a dozen, two
21 dozen.
22     Q.  By fiscal year 2000, how long-standing of
23 a customer had Inacom been with Tech Data?
24     A.  Over ten years.
25     Q.  In that ten-year period, was Inacom

Case 1:04-cv-00583-GMS    Document 127-5    Filed 03/14/2006    Page 16 of 20

Inacom vs. Tech Data                 1/26/2005                      MICHAEL ZAVA

79

1  consistently one of the top 12 to 24 customer
2  accounts or was it really up and down? How would
3  you characterize that relationship?
4      A.    **I wouldn't go back ten years to make that**
5  **statement, maybe five years and say they were**
6  **consistently a top customer.**
7      Q.    Who is the largest customer of Tech Data
8  in fiscal year 2000?
9      A.    I should know that.
10     MR. TATELBAUM: If you don't know --
11     A.    **I can tell you who it might be. I can't**
12 **tell you who I know it was.**
13     MR. HUNT: Actually, may I have a
14     sidebar?
15     (Discussion off the record.)
16     MR. HUNT: Go ahead.
17     A.    **That would likely be either a Comp USA or**
18 **a CDW.**
19     Q.    Going back to the questions I asked you
20 about Tech Data's relationship with Compaq, again
21 focusing on fiscal year 2000, you testified that
22 Compaq was somewhere in the top 10 or 15 suppliers
23 of Tech Data. Do you know how much Tech Data
24 purchased dollar-wise from Compaq in fiscal year
25 2000?

Case 1:04-cv-00583-GMS    Document 127-5    Filed 03/14/2006    Page 17 of 20

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

80

1    A.    I would not normally have access to that.
2    Q.    You gave a lot of testimony about your
3  background in credit management and I want to focus
4  a little bit more on that. I want to focus on your
5  practices in the time frame of late '99, early 2000
6  because that's the time frame in which a lot of the
7  events that are relevant to this lawsuit happened.
8    A.    Okay.
9    Q.    So the extent to which you can bring your
10 mind back to what your practices were in that time
11 frame, I'd appreciate it.
12   A.    Okay.
13   Q.    Were you responsible for establishing any
14 type of credit requirements associated with a new
15 customer of Tech Data?
16   A.    I have been responsible for establishing
17 that in totality for the lower level customers and
18 then in conjunction with senior management for the
19 higher level or higher line customers.
20   Q.    Is there a dollar figure associated with a
21 proposed credit limit that you would have to bring
22 that type of decisionmaking into senior management
23 as opposed to handling it yourself?
24   A.    Yes.
25   Q.    What was that in 2000?

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

81

1    A.    It was either a million or a million and a
2 half.  We had a changeover and I don't remember
3 exactly what the date was.
4    Q.    I used a term that hadn't previously been
5 used and you seem to understand but I want to make
6 sure that we are communicating with each other.
7 When I used the term credit limit, do you have a
8 general understanding of that term in your business?
9    A.    Well, credit limit as related to my
10 business, yes.  A credit line, a limitation up to
11 which someone can go, yes, that's my definition.
12   Q.    I will adopt your definition in my
13 questions.
14   A.    Okay.
15   Q.    And explain it a little bit more because
16 the deposition transcript may be read by someone at
17 some point who is not a finance person.  By credit
18 line you mean the -- how about if I have you explain
19 what you mean by the term credit line.
20   A.    Much like our credit card credit limits,
21 our individual credit card credit limits, each
22 account is reviewed and adjudged due to their
23 financial condition, their credit history, how much
24 exposure we will accept on an unsecured basis and
25 that credit line is established in our machinery and

Case 1:04-cv-00583-GMS    Document 127-5    Filed 03/14/2006    Page 19 of 20

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

82

as long as that customer is current within our terms, then orders will flow through those credit lines pretty much unmolested.

Q. How would you go about establishing a credit limit for a new customer generally speaking in 2000?

A. Well, there are many parameters that come into play. One thing is what does the customer want or how much of a credit line does the customer ask for, what is their estimated amount of purchases, how long have they been in business, what is their equity position, do they have experience in management, have they set a good record with other suppliers, are there no suits or liens against them or judgments, are we going to do this secured or unsecured. The list can go on and on.

Q. Would you, and correct me if I am wrong in making this generalization, but would you characterize all the factors that you have just listed as figuring out whether the proposed customer is creditworthy?

A. Correct, yes.

Q. What type of information would you request from the proposed customer to make that determination?

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

83

1    A.    Again, it would depend.  If a customer is
2  coming in and looking only for ten or $15,000 worth
3  of credit line, likely very little information.  But
4  if a credit line is sizable, we would request
5  financial data.
6          If they were a public company, we would
7  get the Qs and Ks.  We would utilize Dun &
8  Bradstreet reports, what we call NACM reports,
9  things of that nature.
10   Q.   Let's say they came in asking for a credit
11 line of a million dollars or more.  Is there
12 anything that you would add to the list that you
13 just gave me for that size of a credit line?
14   A.   Again, we look for longevity, equity,
15 performance capability, character, if that's
16 possible to judge and track records.  A million
17 dollars we would definitely ask for financial data,
18 preferably audited.
19   Q.   You mentioned two other terms that I'm
20 very familiar with in my line of business as you
21 are, secured and unsecured.
22   A.   Right.
23   Q.   I think you also indicated that you were
24 talking about how much credit would you extend to a
25 customer on an unsecured basis.