Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 1 of 19

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

84

1  A.  Right.
2  Q.  What do you mean by secured?
3  A.  In some few cases we do as banks do or
4  others do, we get security agreements and file UCCs.
5  In other cases we request standby letters of credit,
6  if we are not familiar with the company or there's
7  no background, nothing we can find.
8      Those two methods are generally the
9  favored; a very small percentage, though.
10 Q.  Did Inacom as a customer of Tech Data in
11 this time frame, fiscal year 2000, have any security
12 or was it an unsecured line of credit?
13 A.  No, they were always an unsecured.
14 Q.  Was net 30 terms, could you characterize
15 net 30 terms as the standard payment terms that Tech
16 Data imposed on its customers?
17     MR. TATELBAUM:  When?
18     MR. NOLAN:  In fiscal year 2000.
19 A.  Yes.
20 Q.  I am trying to generally relate my
21 questions to that time period and if I forget to add
22 that qualifier on I appreciate that counsel does
23 that.
24 A.  I appreciate you are talking in that time
25 period.

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

85

```
 1      Q.    But other terms could be imposed on a
 2 customer on a specific basis?
 3      A.    Yes.
 4      Q.    For example, COD?
 5      A.    Yes.
 6      Q.    In what kind of circumstances would you
 7 require a customer to pay on a COD basis?
 8      A.    Poor to no credit, although COD, the COD
 9 basis unto itself is pretty dangerous.  It would be
10 more like, COD can imply company checks are accepted
11 and if someone is that bad credit-wise we'll
12 probably ask for cash upon delivery or wire
13 transfer.  We have very little in that category.
14      Q.    Did you have any customers in this fiscal
15 year 2000 for which the standard payment terms were
16 greater than net 30, like net 45 or net 60?
17      A.    We did not, although we may have had an
18 incident or a transaction specific to some extended
19 terms in extremely limited circumstances on a
20 specific deal, on a specific transaction with a
21 specific end user involved, we may have had
22 something a little bit beyond that.  I have no
23 specific recollection of that but I just know that
24 that's possible.
25      Q.    But as a general matter, net 30 would be
```

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 3 of 19

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA
86

```
 1  the standard payment terms?
 2       A.   As it is today.
 3       Q.   I asked you about large credit limits of
 4  above either a million or a million-five, whichever
 5  that number was, you would have to confer with some
 6  member of senior management to establish that size
 7  credit limit?
 8       A.   Yes.
 9       Q.   Who in fiscal year 2000 would you have
10  looked to to give you some feedback on a credit
11  limit and that was their title in the company?
12       A.   That would be our executive credit
13  committee.  The moratorium in the executive credit
14  committee is held by our CFO.
15       Q.   Who was the CFO at that time?
16       A.   Jeff Howells.
17       Q.   So to make sure I understand what you are
18  explaining to me correctly, if a new customer came
19  and they wanted to establish a credit line over a
20  million or a million-five, you would take that
21  request to the executive credit committee?
22       A.   If I thought it were a viable request
23  supported financially, yes.
24       Q.   How did the executive credit committee
25  make its decision, if you know?
```

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 4 of 19

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

87

1    A.    The executive credit committee meets every
2  month, it has for a long time. We review accounts
3  of that size every 90 days and it is a consensus,
4  files would be prepared, it is very bank-like and a
5  recommendation is made and discussed at the meeting.
6         And then if there is agreement, it is
7  signed off. If there is disagreement, it doesn't
8  happen.
9    Q.    Is that majority rules?
10   A.    Sort of.
11   Q.    Or a unanimous agreement?
12   A.    Sort of. But it is for the larger
13 accounts, and it is consistent and files are
14 prepared for that and reviewed in that group.
15   Q.    If a customer, a proposed new customer
16 came and they wanted, say, a $20 million credit line
17 and you brought that request to the executive credit
18 committee, would there ever be a circumstance where
19 they would approve something other than 20 million,
20 exercise their judgment and say, we won't do 20 but
21 we'll do like 10 million, for example?
22   A.    It has happened, yes.
23   Q.    That's based on the executive credit
24 committee's determination that the proposed customer
25 might be creditworthy for a $10 million exposure but

Case 1:04-cv-00583-GMS   Document 127-6   Filed 03/14/2006   Page 5 of 19

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

88

1  not a $20 million exposure?
2     A.   Yes.
3     Q.   What I want to switch now to is the area
4  of questions that you and Mr. Nolan touched on
5  briefly about the Compaq acquisition of some of the
6  Inacom business which he only stirred it around
7  because it relates more to my side of the case so I
8  want to get into that in a little bit more detail.
9          Just to do the transition and I know this
10 is a question that has been asked and answered, but
11 when did you first become aware that Compaq was
12 going to buy Inacom's distribution and configuration
13 business?
14    A.   Again, even though I can not specifically
15 name the date, there was an announcement, I believe,
16 a public announcement, but my real notification came
17 from my director who was made aware.
18    Q.   That was Mr. Ward?
19    A.   Right.
20    Q.   What did Mr. Ward tell you to the best of
21 your recollection?
22    A.   Essentially that Compaq had made a
23 decision to purchase a certain portion or a large
24 portion of our large customer, Inacom, and he
25 probably told me the estimated time of the

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 6 of 19

Inacom vs. Tech Data               1/26/2005                    MICHAEL ZAVA

89

```
 1  transaction.
 2      Q.   Sir, I will try not to take up too much of
 3  your time writing, more asking questions.  By the
 4  fact that you mentioned that he told you about the
 5  estimated time of the transaction, is it fair for me
 6  to assume that you had this conversation with Mr.
 7  Ward before the sale had actually closed?
 8      A.   Yes.
 9      Q.   So sometime between when it was announced
10  in the press and when the closing happened?
11      A.   Right.
12      Q.   As you sit here today, do you have any
13  independent recollection of when that sale closed?
14      A.   I believe it was in February.
15      Q.   Of 2000?
16      A.   February of 2000 and somewhere, I don't
17  know the exact date, I was made aware of that
18  transaction sometime prior to that.  I don't know
19  when the announcement date was, things like that.
20      Q.   Do you remember anything else Mr. Ward
21  told you other than the fact that Compaq was going
22  to buy a portion or a large portion of the business
23  and the estimated time of the transaction?
24      A.   Only basic conversation about the
25  structure of how we would orchestrate the accounts
```

Case 1:04-cv-00583-GMS   Document 127-6   Filed 03/14/2006   Page 7 of 19

Inacom vs. Tech Data                  1/26/2005                  MICHAEL ZAVA

90

1  internally as it was a purchase and as we were
2  advised. My understanding was that Compaq was
3  taking our liability and it was a simple matter of
4  back room or administrative handling.
5      Q.   This all happened in one conversation, all
6  the things that you have described to me?
7      A.   I'm sure there were ongoing conversations
8  about status. We meet at least once a month on an
9  ongoing basis to discuss current affairs, what's
10 going on here, there, wherever.
11     Q.   Was this -- let me preface my question.
12 There is another vendor to Inacom that's involved in
13 these preference actions. You haven't been singled
14 out. As a matter of fact Mr. Nolan sued over a
15 hundred former vendors. But my question relates to
16 the fact that the other vendor that I was
17 communicating with was a reseller of Compaq PCs and
18 peripherals to Inacom.
19     A.   Okay.
20     Q.   So the consequence of this transaction was
21 that this business would be lost because Compaq
22 wouldn't go buy its own stuff off the market. So
23 that was bad news to that particular Inacom vendor.
24     A.   Okay.
25     Q.   So I guess my question to you is, how did

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 8 of 19

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

91

1  Tech Data perceive the news of this acquisition,
2  good news, bad news or indifferent?
3      A.   I don't know how the other parts of Tech
4  Data, for instance, the sales or marketing group, I
5  never really heard anything from them because
6  Compaq, really, there was no misstep. We did not to
7  my knowledge lose any business but I am a credit
8  person. I don't know.
9           I didn't hear any negative or positive
10 comments with regard to the transaction, more like
11 neutral.
12     Q.   From your perspective as a credit manager,
13 how did you perceive this transaction?
14     A.   From my point of view as a credit manager
15 and based upon the structure of what was happening,
16 I was rather neutral as well.
17     Q.   Did you perceive Compaq to be from a
18 credit perspective, a good customer, a good
19 potential customer?
20     A.   Certainly.
21     Q.   Was it your belief at that time that
22 Compaq would be a better customer from a credit
23 perspective than Inacom?
24     A.   I don't know that I saw it that way. I
25 don't remember feeling that Compaq was a better

Case 1:04-cv-00583-GMS   Document 127-6   Filed 03/14/2006   Page 9 of 19

Inacom vs. Tech Data					1/26/2005					MICHAEL ZAVA

92

1  customer because I felt Inacom was a pretty good
2  customer, so it felt to me like nothing lost as far
3  as customer, one replaces the other.
4      Q.   So from a credit perspective, your
5  reaction was, Inacom had been a good customer and
6  you expected Compaq would be a good customer in the
7  future?
8      A.   Correct.
9      Q.   It was again your recollection when Mr.
10 Nolan was asking you questions that you didn't
11 recall any credit difficulties with Inacom in
12 1999-early 2000?
13     A.   No.  Inacom was a good customer for years.
14     Q.   Had Mr. Ward become aware of any
15 circumstances about Inacom's creditworthiness would
16 it have been his responsibility to come in and
17 advise you?
18     A.   Absolutely.
19     Q.   Did it come as a surprise to you that
20 Inacom was selling its distribution business?
21     A.   Yes, it did.
22     Q.   So that wasn't something that was
23 speculated about in your industry before the Compaq
24 acquisition was announced?
25     A.   Not by me, perhaps others.  I don't know

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 10 of 19

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

93

1  again what the sales and marketing side may have
2  speculated, but Inacom was a successful, good
3  company and that was a bit of a surprise.  But one
4  never knows some of the workings and reasons behind
5  why Compaq would want to do that.
6      Q.   Again, I am completely ignorant because it
7  isn't my business so whatever you are telling me is
8  new information.  I really want to understand.
9          So from your perspective, that came to
10 your attention, there wasn't industry speculation
11 about Inacom was in distress or any circumstances
12 like that?
13     A.   My recollection was quite the opposite,
14 that Inacom was the survivor of the aggregators and
15 had figured out the formula as opposed to others.
16     Q.   I am going to remember once again to ask
17 you to explain a term that you used because it is a
18 technical term.  What is an aggregator?
19     A.   And I'm not an expert on this, I just know
20 what I think an aggregator is.  I'd just look in the
21 dictionary, I don't know what you would call it.
22 Prior to one sourcing, that would be when Compaq and
23 IBM broadened the scope of who would sell their
24 product, companies like Microage, Intelligent
25 Electronics, Inacom, and for the most part they

Case 1:04-cv-00583-GMS   Document 127-6   Filed 03/14/2006   Page 11 of 19

Inacom vs. Tech Data               1/26/2005                MICHAEL ZAVA

94

1  would aggregate from these vendors and not offer
2  much in the way of services back in those days but
3  sell the boxes out generally through the floor plan
4  with very little back room inside.  But their
5  biggest problem was they didn't provide all these
6  services that the customers wanted.  My
7  understanding of these services is these were the
8  people called aggregators.
9       Q.   You mentioned in fiscal year 2000 that
10 Tech Data didn't do a substantial amount of business
11 with the service side, is that right?
12      A.   We did know that they had a service side,
13 probably one of the reasons why they were more
14 successful than the others.  But a service side of a
15 business is not going to buy that much hardware.
16 Usually it's going to be parts and such so I don't
17 really have any recollection of being familiar with
18 what they were doing there.
19      Q.   Had you heard any time in this time frame
20 before the Compaq acquisition was announced that
21 Inacom intended to move straight to a services
22 business?
23      A.   No.
24      Q.   Are you familiar with the term profit
25 margin in your business?

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 12 of 19

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

95

```
 1      A.    Unfortunately not familiar enough.  There
 2  is no profit margin in our business.  The vendors
 3  keep it all.
 4      Q.    We try.  You anticipated my next question.
 5            Is it fair to state that profit margins in
 6  the business in which Inacom was engaged in early
 7  2000 were very narrow, very razor-thin profit
 8  margins?
 9      A.    Margins in this industry period are razor
10  thin and aren't much more today.
11            MR. TATELBAUM:  Remember, she asked
12      for Inacom.
13            THE WITNESS:  Right.
14      A.    As far as relating specifically, the
15  question specifically to Inacom and specifically the
16  time, I am not familiar with the margins that they
17  were drawing at the time.  I do recall the 10-Qs and
18  the 10-Ks indicated at least up to a point that they
19  were continuing profitably but had taken some
20  restructuring charges which seemed normal.
21      Q.    Do you know whether the profit margin is
22  greater on the service business as opposed to the
23  hardware business?
24      A.    Generally speaking, yes, that's what I
25  hear.
```

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 13 of 19

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

96

1    Q.    Would that have been true from your
2    general knowledge in that early 2000 time frame as
3    well?
4    A.    I think so, yes.
5    Q.    Did you hear anything in early 2000 when
6    you learned of the acquisition, hear of anything
7    from any source, the media, talking to other people
8    in your industry, talking to other executives within
9    your company about why Compaq wanted to buy or was
10   acquiring Inacom's distribution and configuration
11   business?
12   A.    I didn't.
13   Q.    Did you have any conversations about the
14   proposed acquisition with anybody in your company
15   other than Mr. Ward.
16   A.    **I don't remember specific conversations**
17   **but it would be normal for me to pass this**
18   **information on to our CFO.**
19   Q.    The information you had learned from Mr.
20   Ward?
21   A.    **Right, right.**
22   Q.    Do you remember having a conversation
23   with --
24   A.    **Specifically, no.**
25   Q.    I'm terrible with names.  Mr. Howells.

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

97

1   A.   Specifically with regard to this topic,
2   no, I don't remember. But it would be normal to
3   have that conversation. I'm certain it happened.
4   Q.   When you had the initial conversation with
5   Mr. Ward about the proposed acquisition by Compaq,
6   do you recall having given him any instructions to
7   do anything or marching orders?
8   A.   Not specific orders or marching orders, as
9   this transaction was brought to us, in our opinion
10  we just needed to follow up to see whether things
11  occurred as we were told they did, you need to make
12  sure that this purchase happened when. They are
13  assuming liabilities, how will they handle it, that
14  kind of stuff.
15       Mike is a very experienced director, he's
16  been around for a long time. These transactions
17  occur all the time, purchases and consolidations and
18  mergers occur all the time so we had no reason to
19  believe there was anything particularly unusual
20  about this one except for its size.
21  Q.   So the type of, if you had given him any
22  direction it would have been relative to this back
23  office function that you talked about earlier making
24  sure the transition was smooth?
25  A.   Correct.

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 15 of 19

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

98

```
 1        MR. HUNT:  May we go off the record
 2   for a moment?
 3        MS. DUMAS:  Absolutely.
 4        (Recess.)
 5   BY MS. DUMAS:
 6        Q.  Do you remember whether or not you read in
 7   any press reports, industry magazines, et cetera in
 8   this time frame, '99-2000, that Compaq needed to or
 9   Compaq had a desire to get into the configuration
10   business as a result of Dell's business strategy of
11   building computers and selling them directly to
12   companies?
13        A.  I don't specifically remember reading that
14   Compaq had to do that because of Dell's competitive
15   issue.  I do remember reading about Dell's impact on
16   the industry which would include Compaq and impact
17   on us as well as a wholesale distributor.  But
18   specifically as related to Compaq, I don't remember
19   that.
20        Q.  Let me turn back to the acquisition.
21   Probably the fastest way for me to do this, if your
22   counsel will permit me, is to just recite some
23   information into the record about how that
24   acquisition was done through corporate entities and
25   maybe then we can get a name clarification.  I
```

Case 1:04-cv-00583-GMS   Document 127-6   Filed 03/14/2006   Page 16 of 19

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

99

1  believe it is not in dispute that to facilitate this
2  acquisition, Compaq formed a subsidiary called
3  Custom Edge Incorporated and Custom Edge was the
4  subsidiary which was actually going to acquire the
5  Inacom distribution business.
6      A.    I am aware of that.
7      Q.    Good.
8            MS. DUMAS:  Is that all right?
9            MR. TATELBAUM:  Fine.
10     Q.    So that the actual business partner or
11 customer of Tech Data who would be placing the
12 orders, et cetera would be Custom Edge Incorporated,
13 not Compaq directly.  Is that your recollection?
14     **A.    We were aware of the creation of the**
15 **subsidiary of Custom Edge in that they would be**
16 **sustaining the business.**
17     Q.    And that they would be placing, Custom
18 Edge would be placing purchase orders with Tech Data
19 going forward?
20     A.    Yes.
21     Q.    And that it would not be Compaq Computer
22 Corporation directly placing the purchase orders?
23     A.    Right.
24     Q.    So Custom Edge would be a new customer of
25 Tech Data, correct?

Case 1:04-cv-00583-GMS   Document 127-6   Filed 03/14/2006   Page 17 of 19

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

100

1    A.    Yes.
2    Q.    In connection with Custom Edge becoming a
3  new customer of Tech Data, did you or people under
4  your supervision conduct any sort of
5  creditworthiness type analysis that we talked about
6  earlier this afternoon?
7    A.    **As Custom Edge was a wholly owned**
8  **subsidiary of Compaq and as Compaq was a large and**
9  **trusted supplier of ours, we may have done some due**
10 **diligence but not what one would define as looking**
11 **at them individually without the ownership of**
12 **Compaq.**
13   Q.    So is it fair to say that in establishing
14 credit for Custom Edge, you were looking to the
15 creditworthiness of its parent, Compaq Computer
16 Corporation?
17   A.    Essentially, yes.
18   Q.    Did you have any discussions about that
19 fact with Mr. Ward in this time frame after you
20 learned about the acquisition?
21   A.    Probably.
22   Q.    Let me fill this out a little bit.  You
23 said it was your best recollection that the
24 acquisition closed in February 2000 which is an
25 accurate recollection.  It in fact closed on

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 18 of 19

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

101

1  February 16, 2000.
2          Did you have any discussions in that time
3  frame with Mr. Ward about establishing a credit
4  limit for Custom Edge?
5      A.   **We would have had to, and I don't mean**
6  **that facetiously but that would be the normal**
7  **behavior in order to do so.**
8      Q.   But you don't specifically recall five
9  years later the exact words that you may have
10 discussed with him?
11     A.   No.
12     Q.   That's fair.  Do you remember as you sit
13 here today what dollar size credit limit Custom Edge
14 requested?
15     A.   I don't.
16     Q.   Do you recall whether it was more than a
17 million dollars such that it would have to go to the
18 executive credit committee?
19     A.   **It would have had to be substantial to**
20 **sustain the amount of business.**
21     Q.   So would it have had to be more than a
22 million?
23     A.   Yes.
24     Q.   Do you remember whether or not Tech Data
25 required any -- strike that.  That's going to be a

Case 1:04-cv-00583-GMS    Document 127-6    Filed 03/14/2006    Page 19 of 19

Inacom vs. Tech Data					1/26/2005					MICHAEL ZAVA

102

1  bad question.
2         Did Tech Data agree to supply product to
3  Custom Edge just based on Custom Edge's promise to
4  pay alone or were there additional requirements made
5  of its parent company, Compaq?
6      A.    I recall some conversation with regard to
7  that, but I believe the ultimate decision was with
8  the strength of Compaq behind them that we felt
9  comfortable with the sizable line for the new
10 entity.  That's more or less a relationship-based
11 decision.
12     Q.    Do you recall whether or not Tech Data
13 asked Compaq, the parent company, to provide a
14 corporate guarantee of Custom Edge's obligations to
15 Tech Data?
16     A.    That is a possibility but I don't remember
17 specifically whether that happened.
18     Q.    But it may have had happened?
19     A.    It may have.
20     Q.    You just don't remember.
21        If it did happen, who within your
22 organization would have been working on obtaining a
23 guarantee?
24     A.    Again, Mike Ward was the director in
25 charge of the account.