Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

124

1   **was responsible in my mind for the payout.  So I**

2   **would not have, I don't recall hearing it that way,**

3   **but I had mentioned before I did have a very faint**

4   **recollection of some checks being cut but I didn't**

5   **really understand quite what they meant by that.**

6        Q.   Did you have an understanding from this

7   initial discussion with Mr. Ward about what

8   structure the acquisition would take, and by that I

9   mean, companies are bought and sold in a number of

10  different ways.

11       **A.   Right.**

12       Q.   Sometimes the stock is purchased,

13  sometimes the acquirer just buys assets and not the

14  stock of the company.  Are you generally familiar

15  with those distinctions?

16       **A.   Generally.  We were made aware that it was**

17  **a purchase of assets of this particular part of the**

18  **organization, it was around 80 percent of the**

19  **organization and liabilities were being assumed as**

20  **well, at least our liability was being assumed, that**

21  **was our understanding.**

22       Q.   And you got that understanding from Mr.

23  Ward, is that right?

24       **A.   Yes, subsequently confirmed by a letter**

25  **from Compaq.**

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

125

1    Q.   Did you ask anybody at Inacom to send you

2    any kind of confirmation of what the terms of the

3    transaction between Compaq and Inacom were?

4    **A.   It would be normal procedure for us to ask**

5    **that.  As to whether we get that or not, that's not**

6    **necessarily normal.  It's difficult.**

7    Q.   Do you know whether or not Inacom ever

8    provided you with a written description of the terms

9    of the transaction with Compaq?

10   **A.   Other than the conversations relayed to me**

11   **by Mr. Ward and the letter subsequently from Compaq,**

12   **no, I don't recall receiving that.**

13   Q.   If such a letter had been received, where

14   would it be placed in Tech Data's filing system?

15   **A.   In the customer file.**

16   Q.   So your understanding of the transaction,

17   if I can paraphrase, and tell me if I am

18   paraphrasing wrongly, is that Inacom advised Tech

19   Data that Tech Data was an account that Compaq was

20   assuming under the purchase?

21   **A.   Yes.**

22   Q.   And you had no recollection that a

23   distinction was drawn between checks that Inacom had

24   already cut to pay certain of the accounts payable

25   and other accounts payable that Compaq was going to

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

126

1  assume liability to pay?

2      A.    No.

3      Q.    Mr. Ward never told you that that was the

4  understanding between Inacom and Compaq?

5      A.    That what was the understanding?

6      Q.    That Inacom would pay, Inacom had already

7  written checks for certain of its accounts payable

8  to Tech Data and those would be paid by Inacom

9  because the checks had been written and then with

10  respect to payables that the checks had not yet been

11  written, Compaq would assume the liability to pay

12  those open payables.

13      A.    I don't know that, I was never advised

14  that by Mike Ward, nor would I have assumed that

15  based upon what we were hearing or how we were

16  hearing the transaction would occur and the

17  subsequent letter that we received from Compaq.

18      Q.    I guess what I'm trying to get at is, who

19  were you hearing about how the transaction would

20  occur other than from Mr. Ward and in this

21  conference call?

22      A.    That's generally the people involved and

23  at that juncture, once we became aware, I guess the

24  news reports, but that would be correct.

25      Q.    Other than what's memorialized in this

1b5faba1-bb21-475d-af59-a8fabb1b5859

1  February 9th letter, this conference call, were you

2  personally on the line with any representatives of

3  Inacom on the subject of this Compaq acquisition?

4      **A.    It's possible, with Dave Guenthner,**

5  **however you pronounce that.**

6      Q.    I have been told it's "Guenthner" but I

7  don't know.  So it's possible that you had other

8  calls with Mr. Guenthner?

9      **A.    Yes.**

10      Q.    Do you have a recollection of anything

11  discussed in any other call?

12      **A.    The calls would have been really trying to**

13  **determine timing, when is what going to happen,**

14  **what's the schedule for this transaction, that type**

15  **of thing, but if I did, there were a few, not a lot.**

16  **Generally speaking, Mr. Ward was the communicator**

17  **and communicated back to me.  Guenthner would be the**

18  **main person.**

19      Q.    Do you remember any specific conversations

20  with Mr. Guenthner?  I have to ask you these

21  questions.

22      **A.    I understand and I apologize for not**

23  **having a more sterling memory, but billions of**

24  **transactions have passed through my hands since and**

25  **it is difficult to specifically remember these very**

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

128

1    specific details.

2         I do recall having a conversation or two

3    with Guenthner and they would have been normal.   I

4    would have it with any organization in which there

5    was such a transaction occurring.

6         Q.   But you don't remember what specifically

7    was discussed?

8         A.   When will it close, when was this going to

9    happen, when will this line be needed here, that

10   kind of thing.

11        Q.   This letter also in the fourth paragraph,

12   I will read for the record says,  "An important item

13   of note as discussed is that Compaq will assume all

14   vendor liabilities on account at closing unless

15   Inacom is holding a check in its treasury to pay

16   such liabilities.  Such checks from Inacom will then

17   be released over several days to its vendors," the

18   next word is crossed out, "no sooner than," and this

19   part is also crossed out but you can read, "at least

20   a week after the closing."

21        My question to you is do you recall that

22   being discussed, that Compaq will assume all vendor

23   liabilities unless Inacom is holding a check in its

24   treasury to pay such liabilities?

25        A.   Actually I don't remember that being

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

129

1  discussed.  I know this is a confirmation of a

2  conference call but I don't remember that specific

3  item being discussed.

4      Q.   Take a look at the next to the last

5  paragraph, and I'll read it out loud.  "Our

6  conference call ended with all parties acknowledging

7  and understanding that until the closing is indeed

8  consummated, there will be no further forwarding of

9  funds to Tech Data Corporation nor any resumption of

10  product shipping."

11          Does that refresh your recollection that

12  Tech Data was not shipping to Inacom at the time of

13  this letter, February 9, 2000?

14      A.   Well, it refreshes my understanding that

15  due to the transaction and somewhat ambiguity of the

16  transaction, that would be normal for us to stop

17  shipping until we know exactly where it stands.

18  This was coming from Inacom getting purchased by

19  Compaq.

20      Q.   So it doesn't trigger any memory for you

21  that Inacom had already been placed on shipping hold

22  by Tech Data for delinquent payment?

23      A.   Could have been placed on shipping hold

24  but my assumption here would be the causes of this

25  transaction are unclear in our understanding at that

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

130

1    **juncture when and where and how.**

2        Q.    The last paragraph reads, "David, please

3    update or correct me immediately with any

4    information that is incorrect or misunderstood as

5    outlined in this letter."

6            My question to you is, did you receive a

7    call or letter or any communication from Mr.

8    Guenthner shortly after or after February 9th in

9    which he told you, Mr. Ward's letter is incorrect?

10       **A.    I don't recall any such communication.**

11       Q.    Did you have any discussions with Mr. Ward

12   in which he reported to you, I got a call from Dave

13   Guenthner and he says my letter is inaccurate?

14       **A.    I don't recall that either.**

15       Q.    Whichever version is easier for you to

16   look at of this letter, I just want to ask you

17   whether you recognize the handwriting that

18   interlineates Mr. Ward's letter.

19       **A.    No.**

20       Q.    Do you recognize that as being Mr. Ward's

21   signature on the second version of this, the one

22   numbered page 391, Bates Number 391?

23       **A.    That appears to be his signature.**

24           MR. TATELBAUM:  If you are going to

25       go on to the next one, can we take a

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

131

1       break?

2              MS. DUMAS:  Sure.

3              (Recess.)

4              MS. DUMAS:  During the break I

5       premarked to speed things up, Exhibit 6

6       which is a February 11, 2000 letter from

7       Mr. Guenthner to Mr. Ward and Exhibit 7

8       which is a letter dated February 16, 2000

9       from Mr. Francis at Compaq to yourself.

10             Chuck, when we had these copied I

11      only got the one copy of the transmittal

12      letter, so I don't have an extra of that,

13      and then here's your copy.

14             MR. TATELBAUM:  I know what that is.

15             MS. DUMAS:  I am not going to spend

16      a lot of time on that.

17      (Thereupon, letter from Guenther to Ward

18      2-11-00 was marked as Deposition Exhibit

19      6 for Identification.)

20      (Thereupon, letter from Francis to Zava

21      2-16-00 was marked as Deposition Exhibit

22      7 for Identification.)

23      (Pause.)

24  BY MS. DUMAS:

25      Q.   Let me ask you about Mr. Guenthner's

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

132

1  letter first.  Really all I want to know about it

2  is, in the letter he states,  "Dear Mike," referring

3  to Mr. Ward, "we have reviewed your letter of

4  Wednesday, February 9 summarizing our conference

5  call which took place on Tuesday, February 8th and

6  have made the appropriate adjustments.  Thanks," and

7  it is signed by Mr. Guenthner.

8          My question to you is, when you were

9  copied on this letter dated February 9th that Mr.

10  Ward sent to Mr. Guenthner, did you see it as Mr.

11  Ward had it typed up or did you see it hand marked

12  with Mr. Guenthner's comments?

13      **A.    I don't recall.**

14      Q.    Before you reviewed the February 9th

15  letter in preparation for your deposition, do you

16  recall ever having seen it with the handwritten

17  notes on it?

18      **A.    No.**

19      Q.    Back to the second version of the February

20  9th letter, just one more question on this topic.

21  In handwriting, it says,  "Mike, with the above

22  changes this generally reflects our conversation.

23  There are, however, no guarantees that the date

24  reference will occur as outlined.  You will be

25  informed," and then it appears to say Dave.

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

133

1      Do you have any recollection of whether or

2  not you saw that confirmation from Mr. Guenthner of

3  Mr. Ward's recitation in his February 9th letter?

4      A.   No.

5      Q.   You can put Exhibit 6 aside and Exhibit 5

6  aside.

7           This letter from Mr. Francis is dated

8  February 16, 2000.  Do you recall having received

9  this letter on or shortly after February 16, 2000?

10     A.   Yes.

11     Q.   At the time you received this letter, did

12 you already know who Mr. Francis was?

13     A.   **I did not know Mr. Francis at the time.  I**

14 **had heard his name.**

15     Q.   When had you heard his name?

16     A.   **In conversations with Mr. Ward, apparently**

17 **this was the name that was given as our Compaq**

18 **contact.**

19     Q.   Before you got this letter from Mr.

20 Francis, you never communicated with Mr. Francis

21 personally in any other way, right?

22     A.   **I do not recall that.  I can't swear to**

23 **it.  Again, my memory is a little light.**

24     Q.   Do you know why he sent you this letter?

25     A.   **Obviously we would be concerned about the**

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

134

1  liabilities owed to us and we would be wanting

2  confirmation from Compaq.

3      Q.    Did you request that this letter be sent

4  to Tech Data?

5      A.    Possibly, but do I remember specifically

6  requesting the letter, no.  I remember requesting

7  something from Compaq as we had only been

8  communicating with Inacom.

9      Q.    As far as you know, was this the first

10 communication Tech Data had directly with Compaq

11 about the transaction?

12     A.    Written.

13     Q.    This was the first written communication?

14     A.    Yes.

15     Q.    Were there other verbal communications

16 before this letter?

17     A.    I'm not certain.  I was not privy to them

18 or I do not recall them, but I do recall a reference

19 to conversations in which Mike or someone within his

20 organization had spoken to someone at Compaq.

21     Q.    After you received this letter, did you

22 have any conversations with Mr. Francis?

23     A.    I don't recall that, no.

24     Q.    Did you have any conversations with Mr.

25 Ward after you received this letter about the

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

135

1  substance of this letter?

2       **A.    Likely, yes.**

3       Q.    What's your best recollection?

4       **A.    Again, this would be confirmation to us of**

5  **what we believed how the transaction would**

6  **transpire.**

7       Q.    So when you got this letter from Mr.

8  Francis, is it fair to say it was consistent with

9  what you had already thought the transaction would

10  involve?

11      **A.    Yes.**

12      Q.    And your understanding was formed by your

13  discussions with Mr. Ward in the conference call you

14  had had with Inacom representatives and other people

15  at Tech Data?

16      **A.    Yes.**

17      Q.    You see where it says in the first

18  paragraph, second sentence,  "The Compaq subsidiary

19  will operate under the name of Custom Edge Inc. and

20  its AP accounts will be funded by Compaq"?

21      **A.    Yes.**

22      Q.    Is that consistent with your recollection

23  of what we talked about earlier in the deposition

24  about Custom Edge being the subsidiary of Compaq

25  that was going to run the business that had been

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

136

1  formerly operated by Inacom?

2      A.    Yes.

3      Q.    And at the end where it says, "its AP

4  accounts will be funded by Compaq," I think you told

5  me earlier that Tech Data felt assured about

6  receiving payment because of Compaq being a

7  creditworthy customer?

8      A.    Yes, in the relationship.

9      Q.    It says in the third paragraph,

10  "Inquiries to Custom Edge Inc. regarding your

11  account should be directed to John Frasca at", and

12  then it gives a telephone number.  Did you contact

13  Mr. Frasca?

14      A.    No.

15      Q.    Have you ever spoken to Mr. Frasca?

16      A.    According to Exhibit 6, he was on the

17  conference call, purchasing and at that time he was

18  an Inacom employee.

19      Q.    Any other time you have talked to Mr.

20  Frasca that you recall?

21      A.    I don't recall.

22      Q.    You have no recollection of having called

23  Mr. Frasca with any inquiries regarding your

24  account?

25      A.    No.

1b5faba1-bb21-475d-af59-a8fabb1b5859

137

1      Q.    Have you directed Mr. Ward to contact Mr.
2  Frasca?

3      **A.    Likely.**

4      Q.    Do you have any specific recollection of
5  asking Mr. Ward to follow up with John Frasca?

6      **A.    I can only speak to what would be normal**
7  **behavior and procedure.**

8      Q.    The paragraph number two which seems to be
9  the meat of the coconut says, "In connection with
10  such purchase, Custom Edge Inc. also assumed the
11  obligation to pay all of the outstanding amount on
12  the referenced account subject to the terms and
13  conditions of such account."

14          When you stated earlier your understanding
15  that Compaq was going to assume the liabilities,
16  were you referring to that statement that I have
17  just read in the letter?

18      **A.    Yes.**

19      Q.    When he says, "Custom Edge also assumed
20  the obligation to pay all of the outstanding amount
21  on the referenced account", did you take that to
22  mean, everything that was owing to Tech Data at that
23  point in time?

24      **A.    Yes.**

25      Q.    So when you got this letter, was it your

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

138

1  understanding that as of the point in time Tech

2  Data -- strike that.

3          When you got this letter shortly after

4  February 16, 2000, was it your understanding that

5  everything that was then owing Tech Data by Inacom

6  would henceforth be paid by Compaq?

7      **A.    Yes.**

8      Q.    Do you have a recollection as you sit here

9  today of how much in accounts receivable Tech Data

10 had on its books for Inacom as of this February 16,

11 2000?

12     **A.    I don't know.**

13     Q.    When you got this letter, is it correct to

14 state that you considered Inacom to be a regular

15 performing customer, performing according to payment

16 terms?

17     **A.    Yes.**

18     Q.    I should break it up into two pieces.

19     **A.    Sorry.**

20     Q.    And this letter was simply advising you

21 that due to this acquisition Compaq through Custom

22 Edge would start to pay the accounts?

23     **A.    Yes.**

24     Q.    So your understanding in this time frame

25 was -- strike that.

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

139

1       You didn't have any understanding in this

2   time frame of Inacom being in financial distress of

3   any sort?

4       **A.    No.**

5       Q.    Let me focus on this phrase in the second

6   paragraph, the outstanding amount on the referenced

7   account.  Is it your understanding that when he is

8   using the term, the outstanding amount on the

9   referenced account, he is referring to everything

10  that Inacom owed Tech Data at that point in time?

11      **A.    Yes.**

12      Q.    And it is not your understanding on the

13  other hand that what he was referring to was the

14  outstanding accounts payable reflected on Inacom's

15  books as to what Inacom owed Tech Data?  Do you

16  understand the difference?

17      **A.    I understand what you are saying.  No, my**

18  **understanding was the obligation to pay all the**

19  **outstanding amount on the referenced account, that**

20  **was what was owed to us.**

21      Q.    And you had no basis for understanding in

22  February 2000 that the outstanding amount owed to

23  you might be different from what was reflected on

24  Inacom's books as its outstanding account payable

25  balance?

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                        1/26/2005                        MICHAEL ZAVA

140

1      **A.    No, no reason to believe there was a**

2  **difference.**

3      Q.    When I use the term accounts payable, do

4  you have an understanding of what that term means in

5  business?

6      **A.    Yes.**

7      Q.    Would you explain what it means in your

8  understanding?

9      **A.    It's what we owe H-P at a given point in**

10 **time, what's a receivable on your books for Tech**

11 **Data or vice versa, what you owe us at a given point**

12 **in time, yes.  A product shipped and invoiced.**

13     Q.    As part of your job responsibilities, do

14 you have any direct responsibility with regard to

15 Tech Data's accounts payable?

16     **A.    Thankfully, no.**

17     Q.    Do you have a general understanding of how

18 accounts payable reporting works within a company?

19     **A.    Yes.**

20     Q.    Let me give you a hypothetical and let me

21 know if you agree or disagree with what I'm

22 describing based on your understanding of how

23 accounts payable reporting works.  When an invoice

24 is submitted by a vendor to a company, the amount

25 stated in that invoice would be then placed on an

1b5faba1-bb21-475d-af59-a8fabb1b5859

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

141

1  accounts payable report within the company, right?

2      A.    (Indicating.)

3          MR. TATELBAUM:  You have to say yes

4  or no.

5      A.    Yes, sorry.

6      Q.    When that amount, when that invoice is

7  paid, then that amount comes off the accounts

8  payable report, correct?

9      A.    Correct.

10     Q.    So if a company, say if Tech Data were to

11  write a check in satisfaction of an invoice, then

12  that invoice after that check is written, would that

13  invoice still show up on an accounts payable report

14  or would that invoice be removed from an accounts

15  payable report?

16          MR. TATELBAUM:  I am going to object

17      on the grounds that he said he has no

18      knowledge of it and this is beyond the

19      hypothetical.  Now you are asking him

20      something on Tech Data processing.

21          MS. DUMAS:  I will go back to the

22      hypothetical.

23     A.    You want to repeat that?

24     Q.    Sure.  Once a check is cut to pay the

25  invoice, the amount reflected by that invoice is

1b5faba1-bb21-475d-af59-a8fabb1b5859