Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 1 of 17

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

142

1  removed from the accounts payable report, isn't that
2  correct?
3       A.   Yes.
4       Q.   So if Compaq asked Inacom to produce a
5  report, an accounts payable aging report advising
6  Compaq of what the payables were at closing, amounts
7  that Inacom had already written checks on wouldn't
8  be reflected in an accounts payable report, correct?
9            MR. TATELBAUM:  Objection.
10           You can answer.
11      A.   **Sounds like we are talking about a Sarping**
12 **Zocksly issue.**
13           MR. TATELBAUM:  Mr. Zava, just look
14      at the question if you would and answer
15      it the best you can.  And I maintain an
16      objection to the form of that question.
17           (Pause.)
18      A.   **I can not answer that question.  I don't**
19 **know the answer to that question.**
20      Q.   What I'm driving at is when Mr. Francis is
21 preparing his letter on the closing date -- let me
22 see if there's a better way I can put this.
23           When Mr. Francis is referring to the
24 outstanding amount on the referenced account,
25 wouldn't that ordinarily be reflected in an accounts

Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 2 of 17

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

143

1  payable aging report?
2           MR. TATELBAUM:  Objection.
3           If you know, but I object any way.
4      You are calling for him to read Mr.
5      Francis' mind.
6      **A.    That's a difficult question for me to**
7  **answer.  I know what normal accounting process**
8  **should require happen but I don't know, I can not**
9  **speak for another company.**
10     Q.    The most astute thing said all afternoon.
11 What would be normal accounting practice?
12          MR. TATELBAUM:  Objection, I think
13     the proper question is, what would they
14     do, what would Tech Data do.  I don't
15     think he has been qualified and I don't
16     want to qualify him because he says he is
17     not a CPA.
18          MS. DUMAS:  I wasn't meaning to try
19     to qualify him through the back door.  He
20     said, I know what normal accounting
21     practice would be in his last answer.
22          MR. TATELBAUM:  And every question
23     was referencing Tech Data, not generally
24     accepted accounting principles.
25          MS. DUMAS:  I apologize.

Case 1:04-cv-00583-GMS   Document 127-9   Filed 03/14/2006   Page 3 of 17

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

144

1  Q.  What would Tech Data's normal policy be.
2  A.  **The check would be immediately mailed and**
3  **the items would be removed, yes.**
4  Q.  So do you know whether or not Tech Data
5  knew before February 16 of Inacom's practice of
6  cutting checks and holding them before they were
7  mailed?
8  A.  **No.**
9  Q.  Do you know if Mr. Ward knew of Inacom's
10 practice of holding checks for a period of time
11 before they were mailed?
12 A.  **No, I don't know how we would know that**
13 **that was the normal practice of Inacom if it was.**
14 Q.  Unless somebody told Mr. Ward.
15 A.  **I am unaware.**
16 Q.  Do you know whether or not when Mr.
17 Francis wrote this letter, he knew of Inacom's
18 practice of holding checks before mailing them?
19      MR. TATELBAUM:  Objection.
20      Go ahead.
21 A.  **No.**
22 Q.  So it is entirely possible that when Mr.
23 Francis wrote this letter, he also had in his mind
24 normal accounting practices where outstanding amount
25 would refer to what's on the accounts payable

Case 1:04-cv-00583-GMS   Document 127-9   Filed 03/14/2006   Page 4 of 17

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

145

```
 1  report, isn't that true?
 2          MR. TATELBAUM:  I am going to object
 3     and instruct him not to answer because it
 4     would call for at best mind reading as to
 5     what Mr. Francis knew or didn't know and
 6     any answer could be misinterpreted
 7     because that's a question that doesn't
 8     have an answer because he doesn't know
 9     what's in his mind based upon the prior
10     questions.
11          MS. DUMAS:  He could have told him.
12          MR. TATELBAUM:  He said he didn't
13     know so I am going to instruct him not to
14     answer the question because it could be
15     misconstrued.
16  BY MS. DUMAS:
17     Q.   Did you ever have a conversation with Mr.
18  Francis in which he told you that he knew about
19  these held checks by Inacom?
20     A.   I don't have any recollection of any
21  conversation with Mr. Francis.
22     Q.   Do you have any knowledge from any source
23  about whether Compaq was even aware of this practice
24  that Inacom held checks?
25          MR. TATELBAUM:  Objection on the
```

Case 1:04-cv-00583-GMS   Document 127-9   Filed 03/14/2006   Page 5 of 17

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

146

1  grounds that it hasn't been proved that
2  they held checks.
3         But you can answer that question
4  without accepting the fact that the
5  premise is held true.
6     A.   **Would you repeat it?**
7     Q.   Sure. Are you aware from any source at
8  all, anybody telling you that Compaq was aware that
9  Inacom had a practice of holding checks?
10    A.   **No.**
11    Q.   Isn't it possible that between Compaq and
12 Tech Data there was a misunderstanding evidenced by
13 this second paragraph as to what the outstanding
14 amount was at the time he wrote this letter?
15         MR. TATELBAUM: Objection.
16         You can answer it.
17    A.   **A misunderstanding?**
18    Q.   As to what the dollar amount of the
19 outstanding amount was.
20    A.   **Anything is possible but commentary states**
21 **all the outstanding amount. Anything is possible.**
22 **I can't speak for that.**
23    Q.   After Mr. Francis delivered this letter,
24 February 16, 2000, did -- excuse me, let me start
25 again.

Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 6 of 17

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

147

1            After the date of this letter, February
2    16, 2000, did Tech Data continue to try to collect
3    any amounts due from Inacom to Tech Data?
4        A.   **Well, there was a balance at that time**
5    **based upon this letter.  Of course we would**
6    **communicate to clear the balance, yes.**
7        Q.   I probably stated a bad question.  Let me
8    try again.  I think that was confusing.
9            You testified earlier that your
10   interpretation of this letter on February 16, 2000
11   was that Compaq was going to assume all the
12   liabilities on Inacom's account to Tech Data.
13       A.   **Correct.**
14       Q.   After the date of this letter, did Tech
15   Data continue to try to collect any amounts on its
16   account directly from Inacom?
17       A.   **That's difficult to answer exactly the way**
18   **you put it as individuals that were at Inacom were**
19   **now employed by Compaq or Custom Edge.  So my**
20   **understanding is the communications were with people**
21   **like John Frasca, now a Compaq employee.  And yes,**
22   **there would be communication as to clearing the**
23   **balance and setting up the new account and all that.**
24       Q.   Did anyone under your supervision at Tech
25   Data, after February 16, 2000, continue to try to

Case 1:04-cv-00583-GMS   Document 127-9   Filed 03/14/2006   Page 7 of 17

Inacom vs. Tech Data					1/26/2005					MICHAEL ZAVA
																148

1  collect amounts owing directly from Inacom people
2  who did not go to Compaq?
3       A.   I don't know the answer to that because I
4  believe the majority of the people that we were
5  speaking with went to Compaq.
6       Q.   So you are not aware of any efforts by
7  anybody in your credit department to pursue
8  collections from Inacom directly after February 16,
9  2000?
10      A.   I'm not aware of that although the
11 communication may have been with some people that
12 were still Inacom in our minds representing whatever
13 Compaq told them to do.  So I can't give you, I
14 don't think I can give you an accurate answer on
15 that.
16      Q.   You said doing whatever Compaq told them
17 to do.
18      A.   Right.
19      Q.   What's the basis of your understanding
20 that Compaq was telling Inacom to do anything after
21 the closing?
22      A.   The entity was a new entity essentially
23 taken over by Compaq, so the same people were there,
24 the same organization was there.  That's who we were
25 calling.

Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 8 of 17

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

149

```
 1        Q.   Is it your understanding that there was no
 2   more Inacom after February 16, 2000?
 3        A.   There was a small, my understanding was
 4   there was a small piece of Inacom related to
 5   services.
 6        Q.   That small piece of Inacom relating to
 7   services, that's who I am referring to as Inacom.
 8   Are you aware of anybody on your team calling
 9   anybody at Inacom after February 16th to collect
10   amounts that were owing from Inacom before this
11   acquisition?
12        A.   I am unaware of that although we did deal
13   with Inacom as a service organization on a smaller
14   basis.
15        Q.   So you are not aware of collection efforts
16   having continued by Tech Data of Inacom, not Custom
17   Edge or Compaq.
18        A.   I understand.  No, if that occurred, we
19   were calling someone, we were unaware of the right
20   person to call.  I'm sure they would have corrected
21   that.
22        Q.   So if someone called Inacom after the
23   February 16th closing, you believe that would have
24   been a mistake and they would have corrected it?
25        A.   Right.
```

Case 1:04-cv-00583-GMS   Document 127-9   Filed 03/14/2006   Page 9 of 17

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

150

1  Q. And instead called the Custom Edge people?

2  **A. Correct, who were former Inacom people.**

3  Q. So that if the practice of calling Inacom,
4  not Custom Edge, occurred over the course of several
5  months to try to collect amounts still owing, how
6  would you explain that?

7  **A. Unless Compaq directed us to that**
8  **individual who may have been administratively**
9  **handling it, there was a relationship with Inacom in**
10 **a minor way going forward, a small credit line in a**
11 **minor way for services and education. But the**
12 **people that we spoke with, we were dealing with**
13 **Compaq/Custom Edge both on the liabilities and on**
14 **the new shipments going out.**

15 Q. Were you aware that Mr. Ward and other
16 people on your team were contacting Inacom after the
17 closing of February 16, 2000 to try to ascertain
18 when certain held checks would be delivered to Tech
19 Data's lock box?

20 **A. I'm sure that they were calling to see**
21 **when certain of the remaining liabilities would be**
22 **paid. With regard to the held checks, I don't know**
23 **really what that means. All I know is in my mind**
24 **Compaq/Custom Edge purchased this customer and if we**
25 **directed any calls to the remaining Inacom it was at**

Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 10 of 17

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

151

 1  the direction of Compaq/Custom Edge who were
 2  maintaining some of these existing personnel.
 3         MS. DUMAS:  Strike the answer as
 4     non-responsive.
 5         MR. TATELBAUM:  Excuse me, you can't
 6     strike the answer.
 7         MS. DUMAS:  I can.
 8         MR. TATELBAUM:  It's in the record.
 9     If you don't like it, you don't like it.
10         MS. DUMAS:  I can certainly move to
11     strike an answer as non-responsive.
12         MR. TATELBAUM:  The court reporter
13     isn't the judge.  You can move to strike
14     it, you can't strike it.
15         MS. DUMAS:  I move to strike the
16     answer as non-responsive.  Sorry for
17     shorthanding the record.
18  BY MS. DUMAS:
19     Q.   Who told you that Compaq was directing
20  Inacom after the closing or that Inacom was doing
21  anything at the direction of Compaq after the
22  closing?
23     A.   That's an assumption on my part.  If we
24  called someone that we didn't know wasn't at Inacom,
25  the other entity was an employee.  The people that

Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 11 of 17

Inacom vs. Tech Data                         1/26/2005                        MICHAEL ZAVA

152

1  we called again were Inacom employees now employed
2  by Compaq/Custom Edge.
3      Q.   Would it change your answer if you were
4  aware that Mr. Ward called a gentleman named Mr.
5  Oshlo who was employed by Inacom who never went to
6  Custom Edge multiple times over a month-long period
7  to try to get three big checks released from Inacom?
8      A.   Would what?
9      Q.   Would it change your answer?
10     A.   No, it would refer to what I said before
11 perhaps at the direction or instruction of Compaq
12 during the transition, it would not be abnormal for
13 them to do something like that.
14     Q.   Are you personally aware of any such
15 direction or instruction from Compaq?
16     A.   No.
17     Q.   Did Custom Edge ask to establish a credit
18 limit with Tech Data after this acquisition?
19     A.   Yes.
20     Q.   Do you recall how much the credit limit
21 was?
22     A.   No, I don't.
23     Q.   Do you recall if it was more than a
24 million dollars?
25     A.   I'm sure it was.

Case 1:04-cv-00583-GMS   Document 127-9   Filed 03/14/2006   Page 12 of 17

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

153

```
 1      Q.   Do you recall the question of Custom
 2  Edge's credit limit being discussed by the executive
 3  credit committee?
 4      A.   It's possible, depending on the level.
 5      Q.   Do you have any recollection of it?
 6      A.   No.
 7      Q.   Do you recall whether or not the executive
 8  credit committee required Compaq Computer Corp. to
 9  execute a guarantee of the line of credit extended
10  by Tech Data to Custom Edge?
11      A.   I do not recall that as a condition of a
12  credit line.
13      Q.   Is there a customer file?
14      A.   Yes.
15      Q.   For Custom Edge?
16      A.   Yes.
17      Q.   That's now called?
18      A.   H-P.
19      Q.   If a guarantee had been requested, that
20  copy would be in the customer file, is that correct?
21      A.   Possibly.
22      Q.   Where else would it be?
23      A.   If the request had been made, it could
24  have been made verbally in conversations.
25           MR. TATELBAUM:  Are you asking him
```

Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 13 of 17

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA
154

```
 1      would the guarantee be in the file or the
 2      request?  He is literally listening to
 3      your question, would the request be in
 4      the file.
 5      Q.    Would a copy of the guarantee be in the
 6  file?
 7      A.    Yes, it would.
 8      Q.    Did you in preparation for your deposition
 9  review any materials in the H-P customer file?
10      A.    No.
11      Q.    So earlier in answering Mr. Nolan's
12  questions about the customer file you reviewed, it
13  was the Inacom customer file, is that right?
14      A.    Yes.
15      Q.    Do you know if Tech Data maintained a
16  separate Inacom and Custom Edge file as two
17  accounts?
18      A.    I believe we created a new file for Custom
19  Edge, yes.
20      Q.    Why was a new file created?
21      A.    New company, new customer.
22      Q.    So it wasn't to distinguish the amount
23  owing by each entity?
24      A.    It was to support the credit line issued
25  to Custom Edge.
```

Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 14 of 17

Inacom vs. Tech Data                        1/26/2005                        MICHAEL ZAVA

155

1    Q.   Was a balance transferred over from the
2  Inacom account to the Custom Edge account when it
3  was opened?
4    A.   I don't recall.
5    Q.   Do you recall, do you have any
6  recollection of communications by Mr. Ward with
7  Custom Edge of roughly $2.2 million owing to Tech
8  Data from Compaq because that was the amount of the
9  liability assumed?
10   A.   No.
11   Q.   Do you have any knowledge of
12 communications between Mr. Ward and Inacom to try to
13 collect or try to get released, three checks in the
14 aggregate amount of 4.5 million because that was the
15 amount that Inacom was holding in its treasury
16 department?
17   A.   Do I have any what?
18   Q.   Knowledge of that.
19   A.   **I have knowledge of Mike making calls to**
20 **the appropriate people, we thought, to clear out the**
21 **balance of Inacom, yes.**
22   Q.   But my question is, did you know at the
23 time that Mr. Ward was calling Inacom to try to get
24 4.5 million in held checks released and he was
25 calling Custom Edge to try to get 2.2 million in

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

156

1  assumed liabilities paid?
2      A.   That's not the picture I see, no.
3      Q.   That's not the picture you saw at the
4  time?
5      A.   Right.
6      Q.   So if Tech Data's customer profile
7  revealed otherwise, you would be surprised?
8      A.   It might indicate calls were made to
9  someone at Inacom or Custom Edge, whatever.  In our
10 minds we were talking Custom Edge or Compaq.
11     Q.   In your mind or Mr. Ward's mind or Tech
12 Data's mind?
13     A.   Possibly all.
14     Q.   But you can only refer to what was in your
15 mind.
16     A.   Correct.
17     Q.   Had Mr. Francis not delivered the letter
18 that you understood to indicate that Custom Edge was
19 assuming all the payables owing to Tech Data, what
20 would you have done as the credit manager?
21         MR. TATELBAUM:  Objection, if you
22     speculate.  But don't speculate; if you
23     know.
24     A.   We would have reacted differently.  As to
25 what exactly we would have done, I can not say, but

Case 1:04-cv-00583-GMS    Document 127-9    Filed 03/14/2006    Page 16 of 17

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

157

1  we would have reacted quite differently to the
2  entire situation.
3      Q.   I may have asked you this and if I did, I
4  apologize: Do you know what the outstanding
5  receivable was from Inacom as of this closing,
6  February 16, 2000?
7      A.   I don't.
8      Q.   Do you know if it was less than a million
9  dollars or more than $10 million?
10     A.   It was several million, I know that much.
11     Q.   Was it less than 10 million?
12     A.   I can't say without going back and
13 looking.
14     Q.   Did whatever the number was, the several
15 million, did everything eventually get paid?
16     A.   No.
17     Q.   Do you recall how much didn't get paid?
18     A.   Eight or 900,000, something of that
19 nature.
20     Q.   So all but eight or 900,000 got paid?
21     A.   Yes.
22     Q.   Have you attempted to collect that eight
23 or 900,000 from H-P?
24     A.   No.
25     Q.   Why not?

Case 1:04-cv-00583-GMS   Document 127-9   Filed 03/14/2006   Page 17 of 17

Inacom vs. Tech Data					1/26/2005					MICHAEL ZAVA

158

1   A.   That was more or less the disputed kind of
2   things we were talking about before.
3   Q.   In what sense?
4   A.   Some very, very old.
5   Q.   In what sense?
6   A.   Deductions, disputes, accumulations over
7   years.
8   Q.   I see. I wasn't tracking. The emphasis
9   in my question was, did you try to collect it from
10  Compaq or H-P after the Compaq/H-P merger as opposed
11  to collecting it from Inacom?
12       MR. TATELBAUM: Asked and answered.
13       THE WITNESS: What?
14       MR. TATELBAUM: You already answered
15  it. You didn't.
16  A.   No.
17  Q.   But you didn't try to collect it, you
18  answered that you didn't try to collect it from H-P
19  and I think that's correct, you didn't try to
20  collect it from H-P at all.
21  A.   Right.
22  Q.   But Tech Data did try to collect it from
23  Inacom.
24  A.   I'm not sure about that either. I can't
25  give you an accurate answer on that. I'm not sure