Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

159

1  we did.
2      Q.   Do you have Exhibit 1 in front of you?
3      A.   I know what you are referring to.
4      Q.   So that's a proof of claim that Tech Data
5  filed in Inacom's bankruptcy case.
6      A.   Right.
7      Q.   Seeking payment of that eight or 900,000.
8      A.   I don't know what transpired between the
9  collection of the other dollars and the bad debt of
10 these dollars, as to whether H-P said, that's
11 disputed items, we're not going to pay it or that's
12 Inacom's because of such-and-such.  I don't know
13 what transpired on that so I can't give you an
14 accurate answer.
15     Q.   Do you know if demand was ever made on H-P
16 with respect to those amounts?
17     A.   I don't know.
18     Q.   Do you know if Tech Data ever accepted
19 payments from Inacom, not Custom Edge, after
20 February 16, 2000?
21     A.   I would assume that we did with regard to
22 the entity, the service entity which did get a
23 credit line, a small credit line.  I would have to
24 assume that indeed they paid against that credit
25 line for some period of time.

Inacom vs. Tech Data                      1/26/2005                      MICHAEL ZAVA

160

1   Q.   Do you know whether Tech Data accepted
2  payment from Inacom after February 16, 2000 with
3  respect to invoices delivered in connection with the
4  distribution and the hardware side of the business?
5   A.   I'm sorry, say that again, please.
6   Q.   Do you know whether Tech Data accepted
7  payment from Inacom, not Custom Edge, after February
8  16, 2000 with respect to invoices submitted to
9  Inacom's distribution and configuration business?
10  A.   So what you are saying is did Inacom, the
11 new entity of services, make payment against the
12 other distribution piece assumed by Compaq?
13  Q.   Right.
14  A.   I don't know the answer to that.  I would
15 assume not but I don't know the answer to that.
16  Q.   Do you know if Tech Data accepted payments
17 from Inacom with respect to invoices that had been
18 submitted to Inacom before the acquisition by
19 Compaq?
20      MR. HUNT:  Objection, for what
21  period?
22  A.   No, I don't.
23  Q.   So you are unaware of the fact that Tech
24 Data accepted payments of almost $5 million from
25 Inacom after the merger, a month after the merger?

Case 1:04-cv-00583-GMS    Document 127-10    Filed 03/14/2006    Page 3 of 15

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

161

1    A.    We were paid X amount of dollars after
2  such time as Compaq/Custom Edge told us that they
3  were responsible for that debt.  Now, how Compaq
4  arranged the payment through any arrangement or
5  agreement with Inacom or checks or whatever was not
6  important to us at that juncture as long as we got
7  paid per their agreement to pay those liabilities.
8    Q.    Again, you have no knowledge whatsoever
9  regarding whether or not Compaq knew about Inacom's
10 held checks?
11   A.    I actually don't understand that question
12 quite, you know.
13   Q.    I can restate it.
14   A.    I understand what you are saying but I
15 guess I'm not getting the point.
16   Q.    I can explain it.
17         MR. TATELBAUM:  I am going to object
18    again because the question presupposes he
19    knows what's in the mind of somebody at
20    Compaq and he has not been qualified as a
21    soothsayer.
22   Q.    You keep saying in a half a dozen answers
23 to my questions that Compaq must have directed
24 Inacom to do something and all I'm trying to
25 ascertain is what's the basis for your having made

Case 1:04-cv-00583-GMS   Document 127-10   Filed 03/14/2006   Page 4 of 15

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

162

1  these statements to me.  I keep asking you for
2  personal knowledge of such direction and you keep
3  repeating as I recall that you don't have any such
4  personal knowledge.
5       A.    No.
6       Q.    That's all I want to confirm, that when
7  you make these statements about Compaq directing
8  Inacom to pay --
9       A.    That's an assumption.
10      Q.    It is an assumption?
11      A.    Right, we were told Compaq/Custom Edge
12 assumed these liabilities and that payment would be
13 made and it was.
14      Q.    So it would come as a complete surprise to
15 you if you learned that your staff was actually
16 trying to collect some amounts after the closing
17 from Inacom through the release of held checks and
18 other amounts from Custom Edge with respect to
19 assumed liabilities?
20            MR. HUNT:  Is that a question?
21      A.    Is that a question?
22      Q.    Yes.
23      A.    I'm not sure.
24      Q.    I can say, so would it come as a surprise
25 to you to learn that your staff was trying to

Case 1:04-cv-00583-GMS    Document 127-10    Filed 03/14/2006    Page 5 of 15

Inacom vs. Tech Data                        1/26/2005                    MICHAEL ZAVA

163

1  collect some amounts from Inacom after the closing
2  and other amounts from Custom Edge/Compaq?
3      A.   I don't know if I would structure that
4  comment that way.  What I would say is my staff was
5  calling the people they were directed to call in
6  order to clear the balance and those people may have
7  been employed by Inacom and ended up being employed
8  by Compaq.  Many times we didn't know until the end
9  of the conversation, are you, I'm now a Compaq
10 employee.  So my staff was not intentionally going
11 after a separate entity to collect this balance that
12 was owed to us and assumed by Compaq.  Why would
13 they do that?
14     Q.   They did in fact do that.
15     A.   If they did that, they did that
16 unintentionally because we were doing, we were going
17 upon information that was given to us by the
18 purchaser as to what the entity is going to be.
19     Q.   So just to make sure I have got this
20 right, and I think I do, and I appreciate your
21 indulgence, you were not aware that people on your
22 staff were making repeated calls to Mr. Oshlo or Mr.
23 Oshlo's staff in the months of February and March
24 after the closing to try to get Mr. Oshlo to release
25 Inacom's checks to Tech Data in payment of invoices

Case 1:04-cv-00583-GMS   Document 127-10   Filed 03/14/2006   Page 6 of 15

Inacom vs. Tech Data						1/26/2005						MICHAEL ZAVA

164

1  that Tech Data had submitted to Inacom before the
2  closing?
3           MR. HUNT:  Objection, asked and
4      answered, compound.
5           Answer if you can.
6      A.   I was aware that my staff was in contact
7  with whoever they were supposed to be in contact to
8  generate payment, orchestrate payment per Compaq's
9  guarantee on this account.  If it was the man in the
10 moon, they would have called that person as well;
11 whoever they were directed to to call to get the
12 money that Compaq agreed to pay us.
13     Q.   Directed by Compaq?
14     A.   Yes.  So if Mr. Ward called Mr. Frasca and
15 Mr. Frasca said call Mr. Oshlo or whomever, that's
16 who he would call.
17     Q.   What if nobody at Compaq, let me represent
18 to you that no one at Compaq ever told anyone at
19 Tech Data to follow up with Inacom with respect to
20 the 4.5 million in held checks, that they even knew
21 about it.
22          MR. TATELBAUM:  I suggest we stop
23     this because you are divulging
24     attorney-client.  I don't want to open up
25     that door and have to talk to the people

Case 1:04-cv-00583-GMS   Document 127-10   Filed 03/14/2006   Page 7 of 15

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

165

1  you are getting that supposition from.
2  If you want to say based upon my
3  conversations with people at Compaq, they
4  are telling me this, that's fine.  But I
5  think it is a dangerous area to go into.
6  I just don't want to be accused of saying
7  anything about that.
8        MS. DUMAS:  I never said anybody
9  told me that.
10       THE WITNESS:  Do I have a question
11 here?
12       MS. DUMAS:  Would you read back the
13 last question?
14       (Thereupon, a portion of the record
15 was read by the reporter.)
16    **A.    What's my question?  I'm still not getting**
17 **it.**
18    Q.    This may be an area of examination better
19 left for Mr. Ward because he was personally doing
20 this.  If you don't know about a topic, then you
21 won't be a witness on that topic, so I just need to
22 close out so that your attorney doesn't later submit
23 a declaration with a detailed explanation of
24 something that you have told me you don't know
25 anything about which is why I have to repeatedly

Case 1:04-cv-00583-GMS    Document 127-10    Filed 03/14/2006    Page 8 of 15

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

166

1  say, do you personally know about this.
2         So you did not personally have any
3  conversations with Mr. Ward about Mr. Ward's efforts
4  to get Inacom to release checks that were written by
5  Inacom before the closing that had nothing to do
6  with Compaq -- that were written by Inacom before
7  the closing and sitting in a drawer in Inacom's
8  treasury department?
9         MR. HUNT: Objection to form.
10        Answer it again.
11    A.  **I had conversations with Mr. Ward about**
12  **calling to get checks to clear the balances, yes,**
13  **probably repeatedly, yes.**
14    Q.  What specifically did you discuss with Mr.
15  Ward in that regard?
16    A.  **Specifically, when are we going to get**
17  **paid out on this obligation by Compaq.**
18    Q.  When did you have these conversations with
19  Mr. Ward?
20    A.  **I imagine they occurred in those months**
21  **following the closing when there was a balance.**
22    Q.  When you had those conversations with Mr.
23  Ward, did it at all refresh your recollection as to
24  the statement that Mr. Ward made in his letter to
25  Mr. Guenthner on February 9th, just a few days

Case 1:04-cv-00583-GMS   Document 127-10   Filed 03/14/2006   Page 9 of 15

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

167

1  before the February 16th letter, "An important item
2  of note as discussed is that Compaq will assume all
3  vendor liabilities on account at closing unless
4  Inacom is holding a check in its treasury to pay
5  such liabilities"?
6      A.   Did our conversations include any comments
7  about that, is that what the question is?
8      Q.   Yes, it is.
9      A.   No.
10     Q.   Did you make any connection between your
11 discussing with Mr. Ward, him contacting Inacom to
12 try to get these checks mailed and the statement in
13 this letter that Compaq was assuming vendor
14 liabilities unless Inacom is holding a check in its
15 treasury?
16     A.   No, I did not.
17     Q.   So you didn't know that what Mr. Ward was
18 doing was trying to collect amounts from Inacom that
19 Compaq did not assume?
20          MR. TATELBAUM:  Objection, that
21      presupposes a fact.  I am instructing him
22      not to answer because it is based upon a
23      fact that has not been proven.
24          MS. DUMAS:  Just object as to form.
25      He can answer it.

Case 1:04-cv-00583-GMS   Document 127-10   Filed 03/14/2006   Page 10 of 15

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

168

1    A.    Would you repeat that?
2    Q.    Sure. So you didn't know that what Mr.
3  Ward was doing in trying to get Inacom to mail held
4  checks, checks that were being held in its treasury
5  was to get Inacom to pay invoices that Compaq had
6  not assumed?
7          MR. TATELBAUM: Objection as to
8     form.
9          THE WITNESS: Can I answer that or
10    not?
11         MR. TATELBAUM: You can answer, if
12    you can.
13   A.    Absolutely not.
14   Q.    So was he acting without your
15  authorization?
16         MR. TATELBAUM: Objection.
17   A.    No. He was not acting without my
18  instructions or authority. He was making contact
19  with whomever he had to make contact with after this
20  purchase in order to get checks from whomever they
21  might be. The liability was assumed by Compaq and
22  however they orchestrated the checks back to us was
23  their problem.
24   Q.    When he says in this letter, "An
25  important item of note as discussed is that Compaq

Case 1:04-cv-00583-GMS  Document 127-10  Filed 03/14/2006  Page 11 of 15

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

169

1  will assume all vendor liabilities on accounts at
2  closing unless Inacom is holding a check in its
3  treasury to pay such liabilities," that sentence is
4  not consistent with the testimony you have given
5  that it was Tech Data's understanding that Compaq
6  would assume all liabilities. That has an exception
7  and that's checks that Inacom is holding in its
8  treasury.
9      A.   **You are right, that is not consistent.**
10     Q.   What I am asking you is, did that not
11 occur in this discussion, that information being
12 disclosed on February 9th?
13     A.   **I honestly do not recall that being**
14 **discussed, but even if I had seen this letter or as**
15 **I had seen this letter back then, this would have**
16 **overridden that comment.**
17          MR. TATELBAUM:  This being?
18          THE WITNESS:  This letter, the
19     February 16th letter from Bill Francis.
20     Q.   Why?
21     A.   **Why, in connection with such purchase,**
22 **Custom Edge Inc. also assumed the obligation to pay**
23 **all of the outstanding amount on the referenced**
24 **account. That would be the way I looked at it.**
25     Q.   Because it's later in time?

Case 1:04-cv-00583-GMS    Document 127-10    Filed 03/14/2006    Page 12 of 15

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

170

1   A.   Yes.
2   Q.   So when you got Mr. Francis' letter, it didn't occur to you that Compaq might not be privy to this agreement between Tech Data and Inacom that Tech Data would get held checks after the closing?
6        MR. TATELBAUM:  Objection as to
7   form, not in evidence, no guarantee of an
8   agreement.
9        You can answer it if you can.
10  A.   Can you state that again?
11  Q.   Sure.  I'll try to say it a little bit better.
13       So you don't know whether or not Mr. Francis was aware of this, the understanding that's memorialized in this letter which is an understanding directly between Tech Data and Inacom that Compaq will assume all vendor liabilities at closing unless Inacom is holding a check in its treasury to pay such liabilities?
20       MR. TATELBAUM:  Objection as to
21  form.
22       You want to read the question?
23       THE WITNESS:  Yes.
24       (Pause.)
25  A.   No, I don't.

Case 1:04-cv-00583-GMS   Document 127-10   Filed 03/14/2006   Page 13 of 15

Inacom vs. Tech Data                  1/26/2005                    MICHAEL ZAVA
                                                                           171

1    Q.   You have no information from any source as
2  to whether or not Mr. Francis even knew about these
3  holding checks in treasury prior to the closing?
4    **A.   I personally don't know.**
5    Q.   But Tech Data knew about Inacom holding
6  these checks in treasury prior to the closing?
7    **A.   Well, according to this letter, yes.**
8    Q.   I have no more questions.  I apologize for
9  the time, Mr. Zava.
10        MR. NOLAN:  Just a couple of
11     followup, though.
12 REDIRECT EXAMINATION
13 BY MR. NOLAN:
14   Q.   Could you look at Exhibit 7 again.
15        MR. TATELBAUM:  February 16th
16     letter.
17        MR. NOLAN:  Yes, the one signed by
18     Mr. Francis.
19   Q.   Before you received this letter, had you
20 ever talked to Mr. Francis before?
21   A.   No.
22   Q.   Did that name ring a bell at all prior to
23 February 16, 2000?
24   A.   No.
25   Q.   When you received this February 16, 2000

Case 1:04-cv-00583-GMS   Document 127-10   Filed 03/14/2006   Page 14 of 15

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

172

1  letter from Mr. Francis, did you believe it related
2  to the earlier conference call you had with Mr.
3  Guenthner and the other individuals?
4       A.   **I do recall that we were at this juncture,**
5  **we were looking for confirmation of feedback from**
6  **the purchaser, who do we speak to.**
7       Q.   But at the time you received Exhibit 7,
8  the February 16, 2000 letter, did you think that
9  letter was in followup to the conference call that
10 you had on or about February 9, 2000 with Mr.
11 Guenthner and those other individuals?
12      A.   **Could have been, yes.**
13      Q.   Any other conference call that you were
14 aware of between February 9, 2000 and receiving this
15 letter dated February 16, 2000?
16      A.   **I don't recall.**
17      Q.   I'd like to just show you briefly, we'll
18 mark it as Exhibit 8, it is a copy of the first
19 amended complaint.  It is actually the pleading.
20 You can give it to the court reporter afterwards.
21 It is a first amended complaint for avoidance and
22 recovery of preferential transfers.
23           I don't need you to read the whole thing.
24 I would like you to look at Exhibit A which is
25 attached to the complaint.  It is kind of in a graph

Case 1:04-cv-00583-GMS   Document 127-10   Filed 03/14/2006   Page 15 of 15

Inacom vs. Tech Data                 1/26/2005                MICHAEL ZAVA

173

1  form like this, Mr. Zava (indicating).
2       (Thereupon, first amended complaint for
3       avoidance and recovery of preferential
4       transfers was marked as Deposition
5       Exhibit 8 for Identification.)
6       (Pause.)
7  BY MR. NOLAN:
8       Q.   Do you have any recollection of seeing the
9  first amended complaint or this schedule, Exhibit A,
10 prior to coming here into this deposition?
11      A.   **What's the date of it?**
12      Q.   June 5, 2002 it was signed.
13      A.   **It's possible that I have, but I don't**
14 **recall.**
15      Q.   Any recollection that you may have
16 reviewed Exhibit 8, the first amended complaint
17 prior to your having looked at the answer to the
18 first amended complaint?
19      A.   **I don't recall reviewing it, no.**
20      Q.   Looking at Exhibit 8, this Tech Data
21 preference period payments, do you have any
22 knowledge as you sit here today that Tech Data did
23 not receive any of the checks that are listed in
24 this exhibit?
25      A.   **Without checking the records, I would have**