Inacom vs. Tech Data                          3/4/2005                          MIKE WARD

23

1      A.    It would have been somewhere around I

2   would imagine January of 2000, maybe late December

3   of 1999.

4      Q.    What did you learn, what did you hear?

5      A.    Well, I heard the common knowledge was

6   that Inacom was going to be purchased by Compaq,

7   which then became more refined that Compaq was going

8   to purchase the configuration business of Inacom.

9      Q.    Who did you hear it from, or how did you

10  learn it?

11     A.    Quite frankly, there was a lot of general

12  discussion about that within Tech Data, so there was

13  enough -- because Inacom, the size of Inacom and the

14  size of Compaq it was more like there was just

15  general discussion around Tech Data about it.  So I

16  can't recall any one specific person who said this

17  event is taking place.

18     Q.    What was the impression at Tech Data as to

19  the impact that this proposed transaction would have

20  on Tech Data's business?

21     A.    At that time we just wanted to make sure

22  that we could work smoothly with both Inacom and

23  Compaq to make the transition be seamless for all

24  parties concerned.

25     Q.    Inacom had two types of business, the

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                        MIKE WARD

24

1　configuration business that you mentioned a minute

2　ago, and then a services business, maintenance

3　support services, et cetera.　Did Tech Data solely

4　do business with Inacom's hardware side or the

5　configuration business?

6　　　A.　　Yes, by virtue of our own business we

7　pretty much could only do that, selling PC hardware

8　and software.　We may have also sold some education

9　services to Inacom which would be an intangible, of

10　course.

11　　　Q.　　Did you do anything in connection with

12　learning that Inacom was planning to sell some of

13　its business to Compaq?

14　　　A.　　Anything in what regard?

15　　　Q.　　In regard to your responsibilities, your

16　job responsibilities.

17　　　A.　　As a credit manager?

18　　　Q.　　Yes.

19　　　A.　　I mean, at that time if anything I would

20　have gone and tried to just get some more

21　information about these two public companies and

22　this -- consummating this transaction, but I had

23　already been responsible for Inacom as a customer

24　and also with Compaq at that time with some limited

25　business they did from us as a customer.

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                          3/4/2005                          MIKE WARD

25

1      Q.    So you had a general familiarity also with

2  Compaq?

3      A.    Oh, yes.

4      Q.    In this time frame when you learned of

5  this transaction was it your recollection that

6  Inacom had a delinquent account with Tech Data?

7      A.    No, not a delinquent account.  Not in the

8  classic sense of a bad debt, no.

9      Q.    Was it your recollection that it was the

10 situation that you had experience with Inacom

11 previously that they had to be prodded from time to

12 time like many other of your customers?

13     A.    Yes.  I mean, Inacom's payments, you know,

14 we would call and say, getting close to your credit

15 line or you're running a little bit too far beyond

16 and we need some check information.

17     Q.    What was the -- what was the payment term

18 for Inacom at that time?

19     A.    Generally, they were on net 30-day terms.

20     Q.    Had you noticed any difference in their

21 payment history over the six months prior to say

22 January 2000?

23     A.    I don't recall any specific change in the

24 way they were paying us.  I mean, it was pretty much

25 the way they did business with Tech Data.  We would

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                          3/4/2005                          MIKE WARD

26

1    ask for money and they would send the money.

2        Q.    A couple minutes ago I think you used the

3    term or the expression we would need check

4    information.   What were you referring to?

5        A.    At that time we would, we would call up

6    the accounts payable department at Inacom and ask

7    them if they had payment information available to us

8    and if so, if they had a check number and an amount

9    and when they believed they would be sending it to

10   us, or our lock box, I should say.

11       Q.    That was going to be my next question.

12   What was the payment procedure whereby Inacom would

13   pay the accounts receivable of Tech Data, yet you

14   have mentioned a lock box account?

15       A.    Uh-huh.

16       Q.    Just mechanically how did their payment

17   system work?

18       A.    I'm not sure exactly how their payment

19   system worked internally, but the process was when

20   they were sending checks to us they would send them

21   to our lock box, one of our bank lock boxes.

22       Q.    Was there, and just again in the regular

23   course of interaction between the two companies, was

24   there a procedure whereby they would phone somebody

25   at Tech Data and say we're transmitting, mailing

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

27

1   checks to your lock box, or was there a fax or

2   e-mail communication, or you would just have to wait

3   and see what hit and when?

4        A.    Well, we would contact Inacom, and

5   whatever person we were able to get a hold of in the

6   accounts payable department or the treasury group,

7   and then they would usually either respond to us

8   right there on the phone or call back the person who

9   called them and update us with the check and check

10  mailing information, usually with the person whoever

11  was trying to get in touch with them.  Generally all

12  by telephone.

13       Q.    Did you come to learn of Inacom holding

14  checks in its treasury department in this time

15  frame?

16       A.    That was somewhat of a normal process with

17  Inacom and my dealings with them over the time

18  period.  Essentially I would be told that the check

19  was released to the treasury department for review,

20  consideration before mailing.

21       Q.    Was that unusual, in your experience?

22       A.    I didn't consider it unusual.  I just

23  considered it as one of their internal controls to

24  make sure that they were managing their cash the

25  right way and not making payments that otherwise

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

28

1   shouldn't be made.  I just pretty much thought of it

2   as an internal control process within their payables

3   group.

4        Q.   So is it fair to say that your

5   understanding was that they would review the checks

6   in the treasury department prior to sending them to

7   make sure there was sufficient cash in the operating

8   account to meet all the checks that they intended to

9   send out?

10       A.   That was one, that was one part of my

11  understanding that was cash management and also to

12  make sure that all the proper internal

13  authorizations were made, as you would expect in a

14  large company before releasing a large amount of

15  cash to a vendor.

16            Mr. Caine:  Off record for a minute.

17       (A recess was taken from 10:00 to 10:02 a.m.)

18  By Ms. Dumas:

19       Q.   Did Tech Data at some point create a new

20  account for -- strike that.

21            What's your recollection of when the sale

22  transaction between Inacom and Compaq closed, if you

23  have one right now as you sit here today?

24            Mr. Hunt:  I'm going to object to the

25       form, because it's a little vague and kind of

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

29

1         broad.   Is there a particular --
2              Ms. Dumas:   Closing is a term of art that
3         lawyers use, but accountants may not use it.
4    By Ms. Dumas:
5         Q.   Do you recall the general time frame of
6    that sale transaction?
7         **A.   Yes, I recall the general time frame.**
8         Q.   And was there a lag time between when you
9    heard about the transaction and when the transaction
10   was consummated?
11        **A.   What do you mean by a lag time?**
12        Q.   There is probably a better way to go about
13   this, but usually parties to a large transaction
14   like that sign an agreement and it's announced to
15   the public.   And then there is a period of time
16   before it actually closes and it becomes effective.
17        **A.   Uh-huh.**
18        Q.   What I'm simply trying to find out is what
19   your awareness was as a supplier to Inacom of that
20   general process and what the time frame was.   And
21   you may not have had any knowledge.
22        **A.   Yeah.   I mean, I don't really know how to**
23   **answer that question.   It was, it was considered a**
24   **big event, but I mean, it was also a wait and see**
25   **attitude, see if it happens or not.**

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

30

1    Q.    Well, it was a bad question, too, so let

2  me see if I can ask you a better one.

3        Was -- when Tech Data first learned about

4  this proposed transaction between Inacom and Compaq,

5  was there an outstanding account receivable due Tech

6  Data from Inacom?

7    **A.    In other words, did Tech Data have an**

8  **accounts receivable on its books from Inacom?**

9    Q.    Yes.

10   **A.    Yes.**

11   Q.    Do you recall how much was that?

12   **A.    It would have been several million**

13  **dollars, I mean, but may not all have been due based**

14  **on the terms of the account.**

15   Q.    Did you give any special instructions to

16  your staff with respect to collecting that account

17  receivable when you learned about the proposed

18  transaction?

19   **A.    I don't recall any special instructions.**

20   Q.    What was your understanding as to how the

21  Tech Data account was going to be handled within

22  Inacom and Compaq in connection with that

23  transaction?

24   **A.    At that time we were trying to gather**

25  **information to see if we needed to do anything**

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                          3/4/2005                          MIKE WARD

31

1    special.

2         Q.    Did you arrive at any conclusion?

3         A.    Not until we were instructed by Compaq

4    what it is they wanted us to do.

5         Q.    And what instructions did you receive from

6    Compaq?

7         A.    That they would assume all the debt of

8    Inacom and that they wanted to maintain the same

9    accounts receivable account that Inacom had been

10   using.

11        Q.    Is that -- when you say they wanted to use

12   the same account receivable account that Inacom had

13   been using, is that the same account number?

14        A.    It's the same account number, the same

15   account setup.

16        Q.    Is it fair to say it was your

17   understanding that that was going to be one account

18   simply transitioned from one customer to another

19   customer?

20        A.    Yes.  We would, we would change the name

21   of the account and we would change whatever other

22   information that Compaq deemed necessary as far as

23   shipping and billing would go.

24        Q.    But other than that, terms would remain

25   the same?

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

1    A.    Yes.

2    Q.    Was a new credit limit established for

3    Compaq?

4    A.    Compaq, I believe, already had a credit

5    limit established since there was a separate -- we

6    were doing business with them separately.  I think

7    we may have looked at the credit limit to make sure

8    that it was sufficient enough for the volume of

9    business that was proposed to come through.

10    Q.    Do you have any recollection of whether

11    the credit limit was increased?

12    A.    I don't recall that we had to do anything

13    drastic.  It was pretty much -- the business volume

14    was pretty much going to stabilize.

15    Q.    I need to clarify some terminology.  I've

16    been referring to the acquiring entity as Compaq.

17    Do you -- have you ever heard of Custom Edge?

18    A.    Yes.

19    Q.    Who is Custom Edge?

20    A.    Custom Edge was the name given to the

21    Inacom configuration business that was purchased by

22    Compaq.

23    Q.    And did you understand Custom Edge to be a

24    wholly owned subsidiary or a division of Compaq?

25    A.    Yes.

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                3/4/2005                        MIKE WARD

33

1    Q.   So just to make sure that we're

2    communicating correctly in the terminology, Custom

3    Edge was the business entity that Compaq used to

4    acquire that Inacom configuration business; is that

5    a fair statement?

6        **A.   Can you repeat that please?  I'm sorry.**

7        Q.   That was a bad question.

8        **A.   I'm sorry.**

9        Q.   No.  I'm sorry.  All I'm trying to do is

10   confirm for the record that when Compaq purchased

11   the configuration business of Inacom the -- it

12   didn't acquire it directly but it formed a wholly

13   owned subsidiary called Custom Edge that then took

14   over the configuration business; that's my

15   understanding; was that your understanding?

16       **A.   I'm not aware of the mechanics of that**

17   **from Compaq other than to say that they wanted that**

18   **business that they purchased now called Custom Edge.**

19       Q.   Did you have any communication with

20   representatives of Inacom in connection with this

21   acquisition about the acquisition before it

22   happened?

23       **A.   Yes, we did have communication.**

24       Q.   Okay.  See if I can -- Mr. Ward, I'm going

25   to hand you a two-page exhibit that was also marked

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

34

1   at Mr. Zava's deposition as Exhibit No. 5.  And I

2   will give you what time you need to review this

3   two-page exhibit.  It's marked as two pages, but it

4   appears to be two different copies of the same

5   letter or portions of the same letter.

6            Let me know when you're --

7       A.   **Okay.**

8       Q.   Okay.  The first page of Exhibit 5, which

9   has a Bates stamp 390 doesn't bear a signature so

10  I'm going to turn your attention to the second page

11  which appears to be another copy of this letter.

12  Does that version bear your signature?

13      A.   **The second page, yes, that's my signature.**

14      Q.   What is this letter?

15      A.   **This letter is a summary of a telephone**

16  **conversation that we had and the parties involved in**

17  **the first paragraph.**

18      Q.   I'll read the first paragraph aloud for

19  the record.  Correct me if I say anything wrong.

20  "This letter is to summarize our conference call

21  yesterday which included the following Inacom senior

22  managers Leon Kirkman," next word is obscured,

23  "purchasing John Frasca," must be "Senior V.P.

24  Purchasing, John Frasca, V.P. Purchasing and Dick

25  Oshlo V.P. Treasury, Mike Zava Tech Data V.P. of

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

35

1  U.S. Credit Services and Donna Platt, Tech Data

2  Territory Sales Manager were also present on this

3  call."  Did I read anything wrong?

4       A.    No, that's a good reading.

5            Mr. Hunt:  Actually, I'm just going to

6       object to the form because the letter says what

7       it says.  I can't read it.  I don't have a

8       copy.

9            Ms. Dumas:  Do you want to take a break so

10      we can make you a copy?

11           Mr. Hunt:  I think the letter says what it

12      says.  I don't -- I mean, if it all --

13           Ms. Dumas:  Steve, I'm just trying to find

14      out if I read the names right because I'm

15      reading a typewritten copy.

16           Mr. Hunt:  Okay.

17  By Ms. Dumas:

18      Q.    Did I read the names right, Mr. Ward?

19      A.    Yes, I believe you pronounced the names

20  correctly.

21      Q.    Thank you.  Was there a conference call

22  the day before this letter, which is dated February

23  9, 2000?

24      A.    From the letter, yes, that would be

25  correct.  That would stand.

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

36

1      Q.    And do you recall having participated in
2  the conference call as you sit here today?
3      **A.    Yes, I do.**
4      Q.    How long did the call last?
5      **A.    I would have to say less than an hour.**
6      Q.    More than a half hour?
7      **A.    Maybe, maybe a little bit more closer to**
8  **half an hour.**
9      Q.    Who is Mr. Kirkman?
10      **A.    I have to say that I really don't know.  I**
11  **never personally met him other than he was sitting**
12  **in the back room on a call.**
13      Q.    And Mr. Frasca?
14      **A.    Mr. Frasca was an individual that I**
15  **communicated with from time to time during this time**
16  **period.**
17      Q.    Had you communicated with Mr. Frasca prior
18  to this time period?
19      **A.    I don't recall.**
20      Q.    What was his -- what was your
21  understanding of his position at Inacom?
22      **A.    At that time my understanding was that he**
23  **was in some sort of management capacity for**
24  **purchasing for Inacom.**
25      Q.    And how about Mr. Oshlo?

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

37

1      A.    As it states here in the letter, it was my

2  understanding that he was a V.P. of Treasury for

3  Inacom.

4      Q.    Before the conference call that's referred

5  to in this letter, had you ever had any

6  communication with Mr. Oshlo?

7      A.    I believe there was some times prior to

8  that that I did at least attempt to talk to him for

9  check information.

10     Q.    And what about Ms. Platt, who was she?

11     A.    She was the Tech Data outside sales

12  representative for Inacom.

13     Q.    Did she work for Tech Data?

14     A.    Yes.

15     Q.    What were her responsibilities?

16     A.    In a sales capacity she was responsible

17  for the territory that Inacom was in and would call

18  on the customer to make sure that relationships were

19  appropriate, and pricing, and whatever questions

20  would come up in the normal course of business

21  between two companies like ourselves.

22     Q.    On this call do you recall whether

23  somebody took the lead from the Inacom side and

24  somebody took the lead from the Tech Data side, or

25  was it a general discussion.  How did it go?

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                         3/4/2005                         MIKE WARD

38

1      A.    Well, the call began with the usual

2   ritualistic formalities and exchanges of weather and

3   things of that nature.   Then from that point on it

4   was pretty much David Guenthner who did most of

5   communicating.

6      Q.    Who is Mr. Guenthner?

7      A.    At that time I believe he was the V.P. of

8   Finance for Inacom.

9      Q.    Had you ever spoken to Mr. Guenthner

10  before this?

11     A.    Maybe, just maybe just once or twice

12  before this teleconference or conference call.

13     Q.    Between you and Mr. Zava at Tech Data, who

14  had more direct communication with Inacom in this

15  time frame about this subject?

16     A.    That would have been me.

17     Q.    So, I interrupted your train of thought.

18  Mr. Guenthner took the lead on the call for Inacom;

19  is that correct?

20     A.    That's correct.

21     Q.    Did anyone take the lead in the call on

22  behalf of Tech Data?

23     A.    It was our purpose at that time to just

24  get an understanding of what was to transpire.

25     Q.    So you were more on the receiving end?

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

39

1      **A.      Yes.**

2      Q.    Did you write this letter?

3      **A.    I wrote the letter that's in the, in the**

4   **printed text.**

5      Q.    Without the handwritten interlineations;

6   is that correct?

7      **A.    No handwritten lineations, I believe you**

8   **said, was my signature on the bottom.**

9      Q.    What was your purpose in writing this

10  letter?

11     **A.    David had provided us quite a bit of**

12  **information within what I think was about a half an**

13  **hour time period.  And the only sole purpose of that**

14  **was to make sure that we understood his**

15  **communication to us correctly.**

16     Q.    Do you believe that this letter accurately

17  summarized his communication to you in that call?

18     **A.    Based on all the changes he made to it I**

19  **assume that I did not make all the right**

20  **understandings as I thought I had.**

21     Q.    Okay.  Take a look at the page 391 which

22  is the second version of this.  Do you know whose

23  handwriting is opposite your signature on the

24  right-hand side of the bottom of the page?

25     **A.    I have to understand that is Dave**

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

40

1  **Guenthner's handwriting.**

2      Q.    Another caution for the deposition.   I

3  don't want you to speculate.   As a matter of fact,

4  I'm not entitled to your speculation.

5      **A.    Uh-huh.**

6      Q.    If you know that to be his handwriting

7  certainly tell me.   If you don't know it to be his

8  handwriting, then it's a hundred percent okay for

9  you to say I simply don't know.

10     **A.    Well, I thank you for that, because I had**

11 **never seen his handwriting before or after or since.**

12     Q.    I figured that might be the case.   Let me

13 see if I can -- let me see if I can --

14          So you sent the letter in just the typed

15 form signed by you to Mr. Guenthner; is that

16 correct?

17     **A.    Yes.   I sent this in a typed form with my**

18 **signature to David Guenthner.**

19     Q.    And then at some point later did you get

20 it back with these interlineations and this note in

21 the bottom?

22     **A.    I believe the next day or two days later**

23 **he sent this back to me -- I assume it's from him**

24 **again -- with these corrections on it.**

25     Q.    Let me show you what I marked in

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

41

1  Mr. Zava's deposition as Exhibit No. 6.

2          Have you seen this before, what I've

3  marked as Exhibit 6?

4      **A.    Yes.**

5      Q.    Did this -- it appears to be a transmittal

6  letter from Dave Guenthner to Michael J. Ward, dated

7  February 11, 2000.  Did this transmittal accompany

8  the marked up copy of your February 9 letter?

9      **A.    Yes.**

10     Q.    He says in his transmittal:  "Dear Mike,

11 we have received your letter of February" -- "of

12 Wednesday, February 9, summarizing our conference

13 call which took place on Tuesday, February 8, and

14 had made the appropriate adjustments.  Thanks.

15 Signed Dave."

16          Is it your view that the corrections that

17 he made to the letter more accurately reflect the

18 discussion on the phone than your original letter?

19     **A.    I wouldn't say there was so much**

20 **discussion as there was Tech Data listening to what**

21 **David was saying.**

22     Q.    And you were, in your letter, simply

23 trying to record the information that had been

24 provided to you; is that correct?

25     **A.    Yes.  We wanted to make sure that all the**

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

42

1    **information that David provided to us, we had a --**

2    **what -- we were to summarize that information so**

3    **that we understood it correctly --**

4        Q.    Okay.

5        **A.    -- as he proposed it to us.**

6        Q.    All right.  And then he -- so when he --

7    you got back his markup, was it your understanding

8    that he was simply clarifying what he, on behalf of

9    Inacom, had expressed to Tech Data?

10       **A.    Yes, that's correct.**

11       Q.    Okay.  The second paragraph of this letter

12   says:  "From this conference call it is Tech Data's

13   understanding that Compaq and Inacom will consummate

14   the reported and expected purchase of Inacom's

15   configuration business by Compaq on February 10,

16   2000 or February 11, 2000 as all legal and trade

17   considerations have been cleared by the proper

18   government and regulatory agencies.  Upon closing

19   Inacom will receive 370 million in cash from Compaq,

20   approximately 162.5 million of outstanding bank

21   debt, 25 million of a revolving line of credit, and

22   50 million due to IBMCC will be required to pay out

23   of these proceeds.  According to Inacom about 137

24   million of a revolver secured by Inacom's accounts

25   receivable will be available after the closing.

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                        MIKE WARD

43

1   There will also be 225 million available from

2   Deutsche bank for borrowing."

3           My question is:  Do you recall

4   Mr. Guenthner describing in this call the

5   consideration that Inacom would receive from Compaq

6   in connection with the transaction in other matters

7   that he's stating in this paragraph?

8       **A.    I'm not sure I follow you.  I thought I**

9   **followed you, but I'm not sure.  I think you lost**

10  **me.**

11          Q.   It was a long question.

12          Mr. Hunt:  May I just clarify?  You're

13          referring to this letter.  Just for clarity of

14          the record, and you referred back to Exhibit 5

15          that's what you're reading from.

16          Ms. Dumas:  That's correct.

17          Mr. Hunt:  Okay.

18  By Ms. Dumas:

19          Q.   Do you remember this discussion?

20      **A.    Do I remember the telephone call?  Yes.**

21          Q.   Did Mr. Guenthner describe the items that

22  he -- that you confirmed in the second paragraph?

23      **A.    Yes.   This information came from David**

24  **Guenthner.**

25          Q.   Do you know -- strike that.

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                3/4/2005                MIKE WARD

44

1            Did you request this information?

2       **A.    I don't remember who initiated the idea of**

3   **this phone call.**

4       Q.    Did you request the information that's

5   specifically set forth in the second paragraph?

6       **A.    I don't recall that I asked him for the**

7   **specifics.**

8       Q.    Do you know why he was telling you

9   essentially how the proceeds of the sale would be

10  used?

11      **A.    I would have to be speculating on why he**

12  **told us that.**

13      Q.    He didn't tell you why?

14      **A.    I don't believe that he told us.  I don't**

15  **recall that.  I can only speculate as to why he told**

16  **us that.**

17      Q.    Does the reason that he told you that have

18  to do with the fact that certain -- strike that.

19            Was he giving you this information in the

20  context of telling you when Tech Data would receive

21  money from Inacom that it owed Inacom?

22      **A.    Again, I don't know why he -- I don't know**

23  **what his reasons or intentions were at that time.**

24      Q.    Was it your understanding that any

25  accounts payable -- any accounts receivable that

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

45

1   Inacom owed Tech Data would be paid immediately out

2   of the -- this 370 million received at closing?

3       **A.    Again, at this point in time we were**

4   **trying to gather as much information as we could**

5   **from all the sources that were becoming available to**

6   **us.  So with this information this was not a "be**

7   **all" and "end all" of anything at that time.  This**

8   **was just get another tile in the mosaic, if you**

9   **will.**

10      Q.    Before this discussion did you already

11  know that Inacom had 162.5 million of outstanding

12  bank debt, 25 million revolving line of credit, 50

13  million due to IBMCC?  Was this information about

14  Inacom that was already in your possession, or were

15  you learning this for the first time?

16      **A.    That's hard to say, because as the credit**

17  **manager on the account and Inacom being a public**

18  **company I may have had such information already in**

19  **the forms of the 10Q's and the 10K's.  It's hard to**

20  **remember exactly what information I did control or**

21  **have access to at that time.**

22      Q.    What do you remember about Mr. Guenthner's

23  description of the new financing of Inacom?

24      **A.    I don't remember anything about that.**

25          **Ms. Dumas:  Take five minutes?**