Inacom vs. Tech Data                3/4/2005                MIKE WARD

46

1        The witness:  Okay.

2        (A recess was taken from 10:32 to 10:50 a.m.)

3    By Ms. Dumas:

4        Q.    Mr. Ward, before the break we were talking

5    about this call that happened on February 8, 2000.

6    Did you say anything in this conversation?

7        A.    I might have just asked questions for

8    clarity sake, understand what I thought I heard as

9    it came across the telephone lines.

10        Q.    Did Mr. Zava say anything of the

11    conversation that you recall?

12        A.    Not anything more than one would expect in

13    a normal conversation.  Again, mostly we were in a

14    listening mode.

15        Q.    And how about Ms. Platt?

16        A.    I recall she stayed in the background.

17        Q.    Is Donna Platt still employed by Tech

18    Data?

19        A.    Yes, she is.

20        Q.    In Clearwater?

21        A.    No.  I believe she's in Chicago.

22        Q.    The third paragraph of the letter --

23            Ms. Dumas:  I'll try to read it correctly,

24    Mr. Hunt.

25        Q.    Says:  "In the meantime, all checks

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

47

1  payable to all Inacom vendors at this time are being

2  held in Inacom's treasury department."  Do you

3  recall Mr. Guenthner describing that information?

4      **A.    Not in any more detail than what I have**

5  **here in this letter.**

6      Q.   Do you remember whether or not he said

7  that they were holding all checks pending the

8  closing or the reason, did he describe a reason for

9  holding checks payable to Inacom's vendors?

10     **A.    I don't recall that he gave a reason.**

11     Q.   It goes on to read:  "This includes five

12 checks totaling 4.9 million today payable to Tech

13 Data.  No checks will be released by Inacom until at

14 least six weeks after the closing.  Inacom's total

15 payables" --

16     **A.    I'm sorry to interrupt.**

17         **Mr. Tatelbaum:  It says a week?**

18     **A.    I think that's "at least a week."**

19     Q.   I'm sorry.  I should be reading the

20 smaller version.  Let me read that again.

21         "No checks will be released by Inacom

22 until at least a week after the closing.  Inacom's

23 total payables to Tech Data are approximately 15

24 million as of this letter."

25         My first question is, simply, does that

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

48

1  last sentence refresh your recollection as to what

2  was the outstanding payable from Inacom as of

3  February 2000 for 15 million?

4      **A.    Yeah.  As I stated earlier, I would have**

5  **thought at that time Inacom would have owed us**

6  **several million dollars.  Again, based on the agings**

7  **it probably would not have all been due.**

8      Q.    And in the first sentence where it says --

9  or excuse me, the second sentence where it says:

10  "This includes five checks totaling 4.9 million

11  today," he's referring to checks that are being held

12  in Inacom's treasury department.  Is that consistent

13  with what you testified to earlier of Inacom's

14  practice of holding checks before they release them?

15      **A.    Yes.**

16      Q.    Did your personnel monitor the status of

17  checks in Inacom's treasury department prior to the

18  date of that letter?

19      **A.    As we did in the normal course of business**

20  **with Inacom, yes.**

21      Q.    The next paragraph reads:  "An important

22  item of note as discussed is that Compaq will assume

23  all vendor liabilities on account at closing unless

24  Inacom is holding a check in its treasury to pay

25  such liabilities."

Inacom vs. Tech Data                3/4/2005                MIKE WARD

49

1          Was that something that Mr. Guenthner

2 stated in this conversation?

3      **A.    I believe it would have been as the nature**

4 **of this letter would indicate so.**

5      Q.    But you have no independent recollection

6 of that as you sit here today?

7      **A.    I can agree that that's what he said at**

8 **that time.**

9      Q.    The next sentence says:  "Such checks from

10 Inacom will then be released over several days to

11 its vendors though no sooner than at least a week

12 after the closing."

13          Was that your understanding of what Inacom

14 was intending to do based on Mr. Guenthner's

15 discussion?

16      **A.    Yes.**

17      Q.    And then the interlineated version is

18 somewhat different and I'm not sure I can read it.

19          What did you understand his interlineation

20 to say when you received it?

21      **A.    Well, I can try and read the same thing**

22 **that we're all looking at here, if that's what**

23 **you're asking me to do, to try and transcribe that.**

24      Q.    No, I'm not asking you to transcribe it,

25 because any of us can do that, as you just said.

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

50

1          Did you -- were you able to read what he
2    interlineated in the letter when you received it on
3    or about February 11?
4          A.    What do you mean, was I able to read it?
5          Q.    Were you able to read his changes?
6          A.    Yes.   I believe I was able to read his
7    changes.
8          Q.    Okay.   What did you -- what did you
9    understand his changes to read when you got it back?
10         A.    That it was a clarification of what I
11   understood or perhaps -- and again, this is
12   speculation maybe.
13              Mr. Tatelbaum:   Don't speculate.
14         A.    Thank you.
15         Q.    It was a clarification of what you had
16   written?
17         A.    Yes.
18         Q.    And what was his clarification?
19         A.    What he has here --
20         Q.    Okay.   Would you --
21         A.    -- in writing.
22         Q.    What does he have there in writing?
23         A.    "After Inacom's AR securitization is
24   posted and terminated about 15 days after closing"
25   -- paid, securitization is paid and terminated

Inacom vs. Tech Data                 3/4/2005                     MIKE WARD

51

1  about 15 days after closing.

2      Q.    Was that your understanding of what that

3  interlineation was at the time?

4      A.    As I just read it, it would have been.

5      Q.    But was it at the time?

6      A.    Yes.

7      Q.    Did you contact Mr. Guenthner after you

8  received his interlineation of the letter?

9      A.    I don't recall contacting him again after

10  this letter.

11     Q.    Do you remember him saying in the

12  discussion that Compaq will assume all vendor

13  payables on account at closing unless Inacom is

14  holding a check in its treasury to pay such

15  liabilities?

16     A.    Yes, I do recall that.

17     Q.    Did you or Mr. Zava say anything in

18  response to that statement?

19     A.    I don't believe there was any response to

20  that of any substance.

21     Q.    You didn't disagree with it?

22     A.    I don't believe we disagreed.  We just,

23  just accepted it for what he said.

24     Q.    Did you say that that's not acceptable to

25  Tech Data?

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                          3/4/2005                          MIKE WARD

52

1    **A.    I don't recall that remark being made.**

2    Q.    The fifth paragraph says:  "After the

3    closing Compaq's subsidiary wishes to maintain the

4    same account number, no. 953001 presently being

5    used."

6          Does that refer to the testimony you gave

7    earlier this morning that it was Compaq's desire to

8    use the same account number of Inacom?

9    **A.    Yes, it is.**

10   Q.    The next paragraph after that says:  "This

11   will require Tech Data to migrate all open invoices

12   dated as of the closing cutoff to a new Tech Data

13   trade account receivable.  These open invoices on

14   this new account would then be paid, reconciled and

15   cleared by both Inacom and Compaq.  Inacom would pay

16   the open invoices via checks held in treasury before

17   the closing but released after the closing.  Compaq

18   will pay the remaining open invoices not covered by

19   Inacom's remittance advices and related checks."

20         Do you recall having that discussion in

21   the conference call?

22   **A.    I recall that, yes.**

23   Q.    Was there any concern you had on the day

24   of this discussion that checks that Inacom was

25   holding in its treasury would not clear?

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                3/4/2005                MIKE WARD

53

1    A.    I recall that we did not have those

2  concerns.

3    Q.    Why was that?

4    A.    At that point in time Inacom, as I recall,

5  was financially sound enough, and in conjunction

6  with the fact that when the deal was closed there

7  would be funds available.

8    Q.    The next paragraph reads:  "Our conference

9  call ended with all parties acknowledging and

10  understanding that until the closing is indeed

11  consummated there will be no further forwarding of

12  funds to Tech Data Corporation nor any resumption of

13  product shipping."

14        Did -- I guess my first question is:  Had,

15  prior to the date of this letter or this conference

16  call, had Tech Data placed Inacom on a shipping

17  hold?

18    A.    Yes.

19    Q.    For clarification of the transcript, what

20  is your understanding of the term shipping hold?

21    A.    It's when, in our business, when Tech Data

22  would discontinue shipping product to Inacom or

23  anyplace that Inacom would have directed shipments

24  to go to.

25    Q.    What was the reason for Tech Data placing

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

54

1    Inacom on a shipping hold in this circumstance?

2        A.    In this circumstance as the letter reads,

3    as a cutoff time to understand and ensure that

4    events were being controlled as they said they were

5    going to be controlled.

6        Q.    So you don't -- Tech Data didn't want to

7    ship any more product until you saw what was going

8    to be the outcome of this sale transaction; is that

9    a fair statement?

10       A.    That's a fair statement.

11       Q.    Did you have any discussion,

12   communication, written or oral, with Mr. Guenthner

13   personally after the conference call reflected in

14   this letter?

15       A.    As I stated earlier, I don't recall any

16   more conversations or communications with David

17   after this letter.  I don't recall any more.

18       Q.    After this letter was sent out did

19   Mr. Zava instruct you to do anything?

20       A.    Not specifically.

21       Q.    What did you believe to be the next steps

22   for Tech Data?

23       A.    The next steps for Tech Data would be to

24   watch and listen and learn to see if the deal was

25   consummated, and based on Compaq's actions and

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

55

1    **Inacom's actions what we would then do going**

2    **forward.   Wait and see.**

3         Q.   Did you, in this call did you -- strike

4    that.

5              As of the date of this call, February 8,

6    had you had any communication at that point with

7    anyone from Compaq about this transaction?

8         A.   **On this specific day did you say?**

9         Q.   No.  Any time before this day?

10        A.   **I can't say for sure.  I can't recall.**

11        Q.   Did you have -- I'm trying to -- just

12   trying to pin things down on dates.  The sale

13   closed, if I'm not mistaken, on February 16, 2000.

14   And you don't have to accept that representation as

15   true if you remember a different day, but I'm simply

16   trying to pin down a time frame.

17             Do you recall whether you had any

18   conversations directly with Compaq as opposed to

19   Inacom personnel before the closing about this

20   transaction?

21        A.   **I can't recall if it was before the**

22   **closing or if it was in the process of the closing**

23   **or subsequent to the closing.**

24        Q.   Okay.  What communication did you have

25   with Compaq?

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                         MIKE WARD

56

1        A.     I had a communication with an individual
2    from Compaq by the name of Mr. Bill Francis.
3        Q.     What was the -- in what form was that
4    communication?
5        A.     The initial contact with Mr. Francis was
6    on telephone.
7        Q.     Who initiated the call?
8        A.     I don't recall.
9        Q.     What was the substance of the discussion
10   as best as you can recall?
11       A.     The substance of the discussion was to --
12   for Compaq to provide to Tech Data some form of
13   comfort that Tech Data's liabilities, trade
14   receivables from Inacom would be assumed by Compaq.
15       Q.     Did you ask Inacom to -- strike that.
16              Was it at Tech Data's request that Compaq
17   provide some form of comfort that Inacom's trade
18   receivables would be assumed by Compaq?
19       A.     I don't recall that anyone in credit
20   initiated that call.
21       Q.     Do you recall whether anyone from Tech
22   Data initiated that call?
23       A.     There were other departments that had
24   interest in this action and there could have been
25   others outside of the credit department acting

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                3/4/2005                MIKE WARD

57

1   **independently from the credit department, but I**
2   **can't -- I don't know.**
3       Q.    So if somebody from sales and marketing
4   initiated the call you wouldn't -- you simply don't
5   know whether or not that happened?
6       **A.    I don't know that.**
7       Q.    Was the phone conversation just you and
8   Mr. Francis?
9       **A.    Yes.**
10      Q.    Let's see if I can place it in time.  You
11  can put aside those letters and I'll show you a new
12  one that was also marked in Mr. Zava's deposition as
13  Exhibit 7.
14      **A.    Yes.**
15      Q.    And while you're looking at that I'll
16  identify it for the record.  It's a letter dated
17  February 16, 2000, to Tech Data Corporation,
18  Mr. Mike Zava, and it's signed by Bill Francis.
19          Are you finished?
20      **A.    I'm finished reading.**
21      Q.    Have you seen this letter before?
22      **A.    Yes.**
23      Q.    When did you see this letter?
24      **A.    Sometime around the date of February 16 if**
25  **not on the date of February 16, 2000.**

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                              MIKE WARD

1    Q.    Who did you get the letter from?

2    **A.    I don't recall exactly if I received it**

3    **directly from Bill Francis or if Mike Zava received**

4    **it and gave it to me.**

5    Q.    Referring back to the questions that I was

6    asking you a few minutes ago, this letter is dated

7    February 16, 2000.

8    **A.    Yes.**

9    Q.    Does looking at this letter refresh your

10   memory about whether your phone call with

11   Mr. Francis was before you saw this letter from him

12   or after you saw this letter from him?

13   **A.    Well, in that context, my phone call was**

14   **before this letter.**

15   Q.    And did you view this letter as in

16   response to your request that Compaq provide some

17   form of comfort to Tech Data?

18   **A.    Again, I'm not sure that I asked for that**

19   **comfort from Compaq.  Again, I'm not sure who**

20   **initiated the phone conversation that I had with**

21   **Bill Francis, but there was a phone conversation,**

22   **whether I answered the phone or whether I actively**

23   **called him, but there was a phone conversation.**

24   Q.    How long did that call last?

25   **A.    I don't think it lasted more than ten**

Inacom vs. Tech Data                  3/4/2005                        MIKE WARD

59

1  minutes.

2      Q.    Who did you understand Mr. Francis to be

3  when this call was placed?

4      A.    I understood Mr. Francis to be the person

5  that he identifies himself as, Director of Corporate

6  Finance for Compaq.

7      Q.    To the best of your recollection, what did

8  he say to you in this call?

9      A.    To the best of my recollection, in summary

10 he said that he was going to send the letter from

11 Compaq to Tech Data saying that Compaq was assuming

12 all the liabilities of Inacom.

13     Q.    And did you say anything to him other than

14 thank you?

15     A.    I probably gave -- you know, thanked him

16 for doing so and directed him where that information

17 should be sent to.

18     Q.    Did you have any communication with

19 Mr. Francis after you got this letter?

20     A.    Yes.

21     Q.    What was the next communication?

22     A.    There was some communication subsequent to

23 this letter regarding a cross corporate guarantee

24 from Compaq on behalf of Custom Edge to Tech Data.

25     Q.    Turning your direction to the text of this

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

60

1  letter from Mr. Francis --

2          Well, first let me ask you, did you have

3  any communication before you got this letter with

4  anyone other than Bill Francis about obtaining some

5  form of comfort from Compaq?

6       A.    I don't recall specifically.

7       Q.    Do you know whether or not you talked to

8  anybody at Inacom about the fact that Tech Data was

9  requesting a comfort letter?

10      A.    Again, I don't recall that specifically.

11      Q.    Okay.  The first paragraph says:  "This

12 letter is to inform you that effective February 16

13 the wholly owned subsidiary of Compaq Computer

14 Corporation purchased certain assets of Inacom

15 Corporation.  The Compaq subsidiary will act under

16 the name of Custom Edge, Inc. and its AP accounts

17 will be funded by Compaq."

18          Does this refresh your memory as to what

19 we were describing earlier about Custom Edge, Inc.

20 being the actual entity that would take over the

21 configuration business?

22      A.    Does it refresh my memory in what way?

23      Q.    Do you recall -- does this help you to

24 recall that the Compaq subsidiary would operate

25 under the name of Custom Edge?

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

61

1      A.    There was, there was some confusion in

2   this time period as exactly to what name the

3   subsidiary was going to have.

4      Q.    So, this, this letter then informed you

5   that the subsidiary would operate under the name of

6   Custom Edge?

7      A.    It helped to inform me, yes.

8      Q.    And it goes on to say:   "and its AP

9   accounts will be funded by Compaq."

10         What did you understand that statement to

11  mean?

12     A.    That Compaq is behind to support the

13  purchases of Custom Edge from Tech Data on its trade

14  payable to Tech Data.

15     Q.    Did Tech Data request that Compaq be

16  behind the accounts payable of Custom Edge?

17     A.    Did we specifically request that?

18     Q.    Did you request Compaq to provide credit

19  support for Custom Edge?

20     A.    I don't recall at this time of February

21  16, 2000.

22     Q.    Did, at some time, Tech Data require or

23  request that Compaq provide credit support for

24  Custom Edge?

25     A.    Yes.   Again, as I stated earlier, probably

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

62

1    in the March 2000 time frame we requested that

2    Compaq provide us a cross corporate guarantee on the

3    Custom Edge purchases from Tech Data.

4         Q.    The form of this letter, the text that's

5    in it, did you provide that to Mr. Francis?

6         A.    No, I did not.

7         Q.    Did anybody from Tech Data provide that to

8    Mr. Francis?

9         A.    I'm not aware that anybody from Tech Data

10   would have provided this to Mr. Francis.

11        Q.    The second paragraph reads:  "In

12   connection with such purchase Custom Edge, Inc. also

13   assumed the obligation to pay all of the outstanding

14   amount on the referenced account subject to the

15   terms and conditions of such account."

16             My question is:  What did you understand

17   that sentence to mean?

18        A.    I understood that sentence to mean that in

19   any and all circumstances Compaq would pay any of

20   the debts owed by Inacom to Tech Data.

21        Q.    Did you have any conversations with

22   Mr. Francis, or did you have any communications with

23   Mr. Francis other than his statement that's set

24   forth in this letter about that understanding?

25        A.    I don't believe I did.  I believe that the

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

63

1   letter spoke for itself as it was written.

2       Q.    The next paragraph reads:   "Inquiries to

3   Custom Edge, Inc. regarding your account should be

4   directed to John Frasca."   And then it provides a

5   telephone number.

6            Did you make any inquiries or communicate

7   with Mr. Frasca after you received this letter --

8       A.    Yes.

9       Q.    -- about the subject of this letter?

10      A.    Yes.

11      Q.    Tell me about that communication.

12      A.    **There would have been calls from me**

13  **regarding, again, the process of payments to Tech**

14  **Data for trade payables owed.**

15      Q.    More than one?

16      A.    Yes.

17      Q.    Do you recall any specific conversations

18  with Mr. Frasca?

19      A.    **I recall one conversation on the phone**

20  **with Mr. Frasca that he said, you know, Compaq is**

21  **going to take care of all the debts, so you should**

22  **have no concerns, something to that effect.**

23      Q.    Do you remember when you had this

24  conversation with him?

25      A.    **That would have been in the late February,**

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

64

1   early March 2000 time frame.  I can't be more

2   specific than that.

3        Q.   But after this letter came out?

4        A.   Yeah, I'm sure of that.

5        Q.   Do you have any knowledge as to whether or

6   not Mr. Zava had any communication with Mr. Francis

7   after this letter was received by Tech Data?

8        A.   I don't believe Mr. Zava had communication

9   with Mr. Francis.

10       Q.   Did you direct anybody on your team to

11  have any communication with Mr. Francis about the

12  subject of this letter?

13       A.   I don't believe I directed anyone to talk

14  to Mr. Francis or not to talk to him.

15       Q.   Are you aware of anybody having had any

16  further communication with him; I mean by somebody

17  telling you that they had or --

18       A.   I don't recall any such communications.

19       Q.   In the conversation in which Mr. Frasca

20  said Compaq is going to take care of all the debt so

21  you should have no concern, do you recall what you

22  said?

23       A.   Again, that's not a verbatim, that's just

24  my impression of what he said at that time.  I would

25  have responded something to the effect of, you know,

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                          3/4/2005                          MIKE WARD

65

1  we understand that now at this time and -- you know,

2  because at that time we were working with Frasca to

3  continue the smooth transition of the business.

4      Q.    Did you understand Mr. Frasca's statement

5  to you to be something different than what was

6  expressed by Mr. Guenthner in the February 9th

7  letter with regard to Compaq assuming the

8  liabilities other than liabilities that Inacom was

9  holding checks for?

10     A.    I understood that conversation with

11  Mr. Frasca on his part to be an affirmation of the

12  Compaq letter.  He also referred me to the Inacom 8K

13  filing that stated that as well in that public

14  information.

15     Q.    Okay.  I appreciate that.  That wasn't

16  exactly my question.  My question was:  Did you

17  understand it to be different from what

18  Mr. Guenthner's letter said, which was that, quote,

19  Compaq will assume all vendor liabilities on account

20  at closing unless Inacom is holding a check in its

21  treasury to pay such liabilities?

22     A.    At that time I understood that this

23  February 16, 2000 letter from Mr. Bill Francis

24  superseded that summarization of a conversation that

25  was unilateral from Mr. Guenthner.

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                    3/4/2005                          MIKE WARD

66

1    Q.   So you understood the February 16 letter

2  to state something different than was stated in the

3  February 9 letter; the difference being that Compaq

4  was going to assume all liabilities, not just the

5  liabilities that were not reflected by a check that

6  was held in treasury; is that right?

7    A.   I understood that we would -- that Compaq

8  had assumed all the debts and from that point

9  forward our conversations and -- I'm sorry, our

10 payables would be assumed by the Compaq

11 Corporation.

12       Ms. Dumas:  Would you read the last answer

13       back?

14  (The answer appearing on page 65, line 9

15 through line 13 was read by the reporter.)

16 By Ms. Dumas:

17   Q.   So at that point after the February 16

18 letter you were no longer looking to Inacom to pay a

19 portion of the debt through the held checks; is that

20 right?

21   A.   We were not relying on Inacom to pay any

22 of its debts to Tech Data.

23   Q.   Was that perceived as good news by Tech

24 Data?

25   A.   In a sense it was since Compaq was such a

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

67

1  **large vendor of Tech Data's.**

2      Q.   Let me go back to the first exhibit that I

3  showed you, this Exhibit No. 4.  And if you'll just

4  let me take a moment to find what I want to ask you

5  about.

6          I guess the first thing I want to ask you,

7  it's just on the first page under the top words

8  that's "AR note management" ANM notes I guess is the

9  abbreviation, it says customer number 953001 HP

10 Direct, this particular printout of the ANM notes

11 appears to have been printed on July 7, 2004 and I'm

12 drawing that conclusion from the upper right-hand

13 corner where it says date 07/07/04.  Am I reading

14 that correctly?

15     **A.   Yes.**

16     Q.   So that, at that point, what had

17 previously been Custom Edge or Compaq, name had been

18 changed to HP to reflect the subsequent merger

19 between Compaq and Hewlett Packard; am I reading

20 that correctly?

21     **A.   Yes.  We can change the names here in the**

22 **customer information center.  Actually, this was**

23 **Inacom -- this account number was Inacom, then it**

24 **was Custom Edge, and then it became HP Direct as**

25 **directed by HP.**

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                3/4/2005                    MIKE WARD

68

1      Q.    Okay.  And I think you testified earlier

2  that the information in the notes cannot be changed

3  once it's input; is that right?

4      **A.    That's correct.**

5      Q.    Would you turn to page 2344 in the Bates

6  stamp numbers?

7      **A.    2344?**

8      Q.    Yeah.

9      **A.    2344.**

10     Q.    At the top of the page there is a note,

11  the second note down it looks like on March 8, 2000,

12  1756, employee 0029, is that Mr. Zava?  And I only

13  ask that because there is a MZ right after that.

14  Does the MZ refer to Mike Zava?

15     **A.    From this transcript he entered those**

16  **notes.  I don't know what his employee number is.**

17     Q.    Right.  It says "MZ approved release of

18  orders to 12 million will discuss with JH."  Who is

19  JH?

20     **A.    Jeff Howells.**

21     Q.    Who is Mr. Howells?

22     **A.    He's Tech Data's CFO.**

23     Q.    Was he in this -- in March 2000 the CFO?

24     **A.    Yes.**

25     Q.    -- "and as tomorrow to formalize.  We

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e

Inacom vs. Tech Data                3/4/2005                        MIKE WARD

69

1   still do not have cross corporate however.  Compaq

2   is holding it because we have not formalized our

3   cross corporate to them."  Have I read that

4   correctly?

5        **A.    Yes.**

6        Q.    Is this a reference to the cross corporate

7   guarantee that you testified to earlier?

8        **A.    This is the cross corporate that I**

9   **testified earlier between Compaq and Custom Edge to**

10  **Tech Data.   There is another cross corporate**

11  **guarantee being referred to here.**

12       Q.    Okay.  What cross corporate is that?

13       **A.    That would be us as a customer to Compaq**

14  **as our vendor on another division or subsidiary of**

15  **Tech Data Corporation.**

16       Q.    So Tech Data was guaranteeing the

17  liabilities of Tech Data's subsidiary in favor of

18  Compaq, and Compaq was guaranteeing the liabilities

19  of Custom Edge on Custom Edge's liabilities to Tech

20  Data; is that correct?

21       **A.    That's the general idea, yes.**

22       Q.    Okay.  And did Tech Data receive a

23  corporate guarantee of Compaq from -- guaranteeing

24  the obligations of Custom Edge?

25       **A.    I'm going to repeat that question.  Did**

14b8e511-fd2d-4d6c-9ced-8e3b6dfe206e