```
 1              MR. FORTE:  OBJECT TO THE FORM.

 2              THE COURT REPORTER:  I'M SORRY.  WHO WAS

 3        SPEAKING?

 4              MR. FORTE:  EARL FORTE.

 5              THE WITNESS:  REPEAT THAT QUESTION,

 6        PLEASE.

 7  BY MR. HALLIDAY:

 8        Q.   WHEN YOU SENT THIS LETTER IN FEBRUARY OF

 9  2000 TO MS. ATCHINSON AT LEXMARK, DID YOU HAVE AN

10  UNDERSTANDING PERSONALLY AS TO ITS IMPORT?

11              MS. DUMAS:  SAME OBJECTION.

12              YOU CAN ANSWER.

13              MR. FORTE:  SAME OBJECTION.  EARL FORTE.

14        A.   WELL, MY UNDERSTANDING WAS THAT, AGAIN,

15  THIS SUPPLIER WAS RELUCTANT TO SHIP GOODS TO CUSTOM

16  EDGE AND JOHN FRASCA AND THOSE FOLKS ASKED THAT WE

17  SEND THIS OUT TO THEM TO GIVE THIS SUPPLIER SOME

18  ASSURANCE OR ENOUGH ASSURANCE, SATISFACTION THAT

19  COMPAQ WAS BEHIND CUSTOM EDGE AND THEIR RECEIVABLES

20  WERE NOT AT RISK ENOUGH TO ALLOW THEM TO SHIP GOODS

21  AND SERVICES AND MATERIALS TO CUSTOM EDGE.

22              I, I DON'T KNOW ANYTHING ABOUT THE DETAILS

23  OF WHAT CAUSED JOHN TO MAKE THE REQUEST.

24        Q.   AND I THINK YOU'VE ALREADY ANSWERED THIS

25  BECAUSE YOU'VE ALREADY TOLD ME YOU HAVEN'T SPOKEN TO
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 26

1  ANYONE AT LEXMARK ABOUT THE LETTER BUT -- STRIKE

2  THAT.  PARDON ME.

3          IF YOU LOOK, SIR, AT THE SECOND-TO-LAST

4  PARAGRAPH OF THE LETTER THAT BEGINS, "INQUIRIES TO

5  CUSTOM EDGE, INC., REGARDING YOUR ACCOUNT SHOULD BE

6  DIRECTED TO JOHN FRASCA," AND THEN GIVES HIS

7  TELEPHONE NUMBER, DO YOU SEE WHERE I'M READING, SIR?

8      A.    THAT'S CORRECT, I SEE THAT.

9      Q.    DID YOU EVER RECEIVE AN INQUIRY FROM

10  ANYONE AT LEXMARK THAT SHOULD HAVE BEEN DIRECTED TO

11  MR. FRASCA?

12      A.    NOT THAT I CAN RECALL.

13      Q.    DID MR. FRASCA EVER REPORT TO YOU OR

14  ADVISE YOU THAT HE HAD RECEIVED AN INQUIRY FROM

15  LEXMARK RELATING TO CUSTOM EDGE, INC.?

16      A.    NOT THAT I CAN RECALL.

17      Q.    WHILE YOU DON'T RECALL, I UNDERSTAND, SIR,

18  SENDING THIS TYPE OF COMFORT LETTER TO ANY OTHER

19  VENDOR AT THE TIME HE -- DON'T RECALL BY NAME -- DO

20  YOU BELIEVE THAT YOU DID SEND LETTERS LIKE THIS

21  COMFORT LETTER TO OTHER VENDORS AT THAT TIME?

22      A.    YES.

23      Q.    WHO IS NONI VITOLS, V I T O L S?  I MAY BE

24  MISPRONOUNCING IT.

25      A.    I HAVE NO IDEA.

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 27

```
 1         Q.   I'M GOING TO GIVE TO YOU, SIR, WHAT I'LL

 2   ASK THE COURT REPORTER TO MARK AS EXHIBIT NO. 2 TO

 3   YOUR DEPOSITION.

 4         (FRANCIS EXHIBIT NO. 2 WAS MARKED BY THE

 5   REPORTER.)

 6         Q.   AND ASK, SIR, IF YOU WOULDN'T MIND,

 7   PLEASE, TAKING A MOMENT TO LOOK AT THAT EXHIBIT.

 8         A.   ALL RIGHT.

 9         Q.   CAN YOU IDENTIFY THIS DOCUMENT, SIR?

10         A.   I WOULD SAY NOT REALLY.  I DIDN'T SIGN IT

11   SO I CAN'T -- SO I CAN'T TELL YOU ANYMORE THAN THAT.

12         Q.   WOULD YOU AGREE WITH ME THAT THE TEXT

13   APPEARS SUBSTANTIALLY SIMILAR, IF NOT IDENTICAL, TO

14   THE TEXT OF EXHIBIT 1?

15         A.   YES.

16         Q.   I WAS HOPING THAT IT MIGHT POSSIBLY

17   REFRESH YOUR RECOLLECTION AS TO WHETHER -- AS TO WHO

18   ELSE MIGHT HAVE RECEIVED SUCH A COMFORT LETTER.

19         A.   NO, IT DOESN'T DO THAT AND I -- SINCE I

20   NEVER SIGNED IT, I CAN'T ASSURE YOU THAT IT WAS EVER

21   SENT.

22         Q.   AND YOU DON'T KNOW THE NAME WHICH APPEARS

23   IN THE SECOND-TO-LAST PARAGRAPH, SIR, NONI VITOLS OR

24   VITOLS?

25         A.   I DON'T RECOGNIZE THE NAME.
```

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

1      Q.   OKAY.  AND YOU DON'T RECALL HER ASKING YOU

2  TO SEND A LETTER LIKE THIS TO LOGICARE IN THE SAME

3  FASHION THAT MR. FRASCA HAD ASKED YOU TO SEND ONE TO

4  LEXMARK.

5      **A.   NO.  THE ONLY ONE I RECALL ASKING FOR ONE**

6  **OF THESE LETTERS WAS JOHN.**

7      Q.   AND YOU ONLY RECALL THE ONE WHICH WAS TO

8  LEXMARK SPECIFICALLY.

9      **A.   YES.**

10     Q.   I ASK THE COURT REPORTER TO MARK THIS

11 DOCUMENT AS EXHIBIT 3 TO YOUR DEPOSITION, SIR, AND

12 ASK YOU TO TAKE A LOOK AT IT.

13     (FRANCIS EXHIBIT NO. 3 WAS MARKED BY THE

14 REPORTER.)

15          MR. HUNT:  ACTUALLY, CULVER, FOR THE

16      BENEFIT OF EVERYONE ON THE PHONE CAN I JUST RUN

17      BACK THROUGH THE EXHIBITS SO THEY KNOW WHAT

18      WE'RE WORKING OFF OF?

19          MR. HALLIDAY:  YOU'RE RIGHT.  I SHOULD

20      HAVE BEEN DOING THAT.  THANK YOU.

21          MR. HUNT:  EXHIBIT 1 WAS A LETTER FROM MR.

22      FRANCIS TO LEXMARK DATED FEBRUARY 16 OF 2000;

23      EXHIBIT 2 IS AN UNSIGNED LETTER FROM MR.

24      FRANCIS TO LOGICARE DATED FEBRUARY 17, 2000;

25      AND WHAT'S EXHIBIT 3?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 29

1          MR. HALLIDAY:  EXHIBIT 3 IS A FEBRUARY 17,

2      2000, LETTER FROM NONI VITOLS OF CUSTOM EDGE TO

3      LOGICARE, INC.

4   BY MR. HALLIDAY:

5      Q.   HAVE YOU SEEN THIS LETTER BEFORE, SIR?

6      **A.   NOT THAT I CAN RECALL.**

7      Q.   HAVE YOU SEEN A LETTER WITH TEXT SIMILAR

8   OR IDENTICAL TO THE TEXT OF THIS LETTER BUT ADDRESSED

9   TO SOMEONE ELSE?

10      **A.   I DON'T THINK SO.**

11      Q.   AFTER THE CLOSING OF THE ASSET PURCHASE

12   AGREEMENT BETWEEN COMPAQ AND INACOM DID YOU, SIR,

13   HAVE ANY DEALINGS WITH CUSTOM EDGE?

14      **A.   AFTER THE TRANSACTION DID I HAVE ANY**

15   **DEALINGS WITH CUSTOM EDGE.**

16      Q.   YES, SIR.  DON'T MAKE ME SAY INTERFACE

17   WITH CUSTOM EDGE, BUT IF THAT HELPS --

18      **A.   NO, NO.  I HAVE TO SAY ALMOST EXCLUSIVELY**

19   **ONLY THE FIRST LETTER THAT I SIGNED.**

20      Q.   OKAY.

21      **A.   AND THAT WAS -- THAT WAS THE EXTENT OF MY**

22   **INVOLVEMENT WITH CUSTOM EDGE.**

23      Q.   DO YOU RECALL WHETHER THE ASSET PURCHASE

24   AGREEMENT IDENTIFIED THOSE CUSTOMERS OR VENDORS WHO

25   WERE TO RECEIVE LETTERS SUCH AS EXHIBIT 1?

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 30

1      A.    I DON'T THINK THE AGREEMENT DID THAT.

2  THIS WASN'T PART OF THE AGREEMENT.  IT WAS -- AS FAR

3  AS I KNOW, THERE WAS NOTHING IN THE AGREEMENT THAT

4  SAID SOMETHING LIKE THIS WOULD BE SENT OUT.

5      Q.    IF YOU WOULD, SIR, LOOK AT EXHIBIT 3.  I

6  CAN'T TELL IF THAT'S AN ASTERISK OR A LITTLE SQUARE

7  TO THE LEFT BUT IN THE LAST PARAGRAPH THAT BEGINS

8  ALL, QUOTE, HELD CHECKS, CLOSED QUOTES.

9      A.    UH-HUH.

10      Q.    DO YOU KNOW ANYTHING ABOUT -- WELL, DO YOU

11  KNOW WHAT THIS IS REFERRING TO?

12      A.    I DO NOW SINCE MISS DUMAS SHARED WITH ME

13  WHAT THAT'S ABOUT.

14      Q.    WELL, I'M NOT GOING TO ASK YOU WHAT MS.

15  DUMAS SAID OR WHAT Y'ALL TALKED ABOUT.

16          LET ME PUT IT THIS WAY, SIR:  BACK IN

17  FEBRUARY OF 2000 DID YOU HAVE AN UNDERSTANDING AS TO

18  WHAT THE HELD CHECKS REFERRED TO WERE?

19      A.    NO.

20      Q.    AFTER THE CLOSING OF THE TRANSACTION

21  REFERRED TO IN THE ASSET PURCHASE AGREEMENT IN

22  FEBRUARY OF 2000 DID YOU HAVE ANY INVOLVEMENT, SIR,

23  WITH ISSUES RELATING TO INACOM ACCOUNTS PAYABLE?

24          MR. CAINE:  OBJECTION, VAGUE.

25      A.    DID I HAVE ANY INVOLVEMENT WITH INACOM'S

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 31

```
 1   ACCOUNTS PAYABLE.

 2        Q.   YES, SIR.

 3        A.   NO.

 4        Q.   AFTER THE CLOSING OF THE ASSET PURCHASE

 5   AGREEMENT IN FEBRUARY 2000 DID YOU HAVE ANY

 6   INVOLVEMENT WITH INACOM ACCOUNTS PAYABLE ASSUMED BY

 7   COMPAQ?

 8        A.   NO, I REALLY DIDN'T.

 9        Q.   AT ANY TIME PRIOR TO -- WELL, AT ANY TIME

10   FROM FEBRUARY 16, 2000, TILL YOUR LEAVING COMPAQ'S

11   EMPLOYMENT WERE YOU QUESTIONED BY ANYONE AT COMPAQ

12   REGARDING EXHIBIT NO. 1?

13        A.   YES.

14        Q.   BY WHOM, SIR?

15        A.   I CAN RECALL A CONFERENCE CALL SOMETIME

16   AGO WHERE DARRELL RAIFORD AND SOME OTHER FOLKS WERE

17   ON THE PHONE ASKING ME ABOUT THIS LETTER.

18        Q.   DARRELL --

19        A.   DARRELL RAIFORD WAS THE NORTH AMERICAN

20   CONTROLLER AT COMPAQ WHEN I LEFT.

21        A.   BUT THIS IS OVER A YEAR AGO, MAYBE TWO

22   YEARS NOW.

23        Q.   HOW DO YOU SPELL HIS LAST NAME, SIR?

24        A.   R A I F O R D.

25             MR. HUNT:  I WASN'T EVEN CLOSE.
```

Inacom vs. Tech Data                    3/2/2005                        WILLIAM FRANCIS

Page 32

```
 1        Q.    THANK YOU.   DO YOU RECALL WHO ELSE WAS IN

 2   THAT CONVERSATION OR DISCUSSION?

 3        A.    NO.   I REMEMBER DARRELL AND THERE WAS A

 4   COUPLE OTHER FOLKS BUT I, I DON'T RECALL WHO THEY

 5   WERE.

 6             MR. COLLINS:   MR. FRANCIS, CAN YOU SPEAK A

 7        LITTLE LOUDER, PLEASE?

 8             THE WITNESS:   OKAY.

 9             THE COURT REPORTER:   WHO WAS SPEAKING,

10        PLEASE?

11             MR. COLLINS:   THIS IS PAT COLLINS.

12             THE COURT REPORTER:   THANK YOU.

13   BY MR. HALLIDAY:

14        Q.    WHAT DID Y'ALL DISCUSS DURING THAT

15   CONVERSATION?

16             MS. DUMAS:   OBJECTION.   COUNSEL ISN'T,

17        ISN'T INTENDING TO BUT MAY BE ASKING YOU

18        QUESTIONS ABOUT THE SUBSTANCE OF CONVERSATIONS

19        WHERE SOMEBODY IN H.P. LEGAL WAS ON THE CALL.

20        AND I KNOW YOU'VE SAID THAT YOU DON'T

21        REMEMBER WHO ALL WAS ON THE CALL BUT IF IT WAS

22        A CALL IN WHICH YOU WERE BEING ASKED ABOUT THIS

23        LETTER IN THE CONTEXT OF A LAWSUIT THAT HAD

24        BEEN FILED AGAINST COMPAQ OR HEWLETT PACKARD

25        CORPORATION, THEN YOU MAY NEED TO EXPLORE YOUR
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 33

1    MEMORY A LITTLE BIT MORE TO SEE IF YOU KNOW IF

2    IT WAS LEGAL THAT INITIATED THE CALL OR --

3         A.    WELL, I ACTUALLY GOT THE CALL FROM DARRELL

4    RAIFORD'S SECRETARY BUT IT WAS A CONFERENCE CALL AND

5    DARRELL WAS THERE; AND I JUST DON'T REMEMBER THE

6    NAMES OF THE PEOPLE ON THE PHONE.

7              THERE WAS SOMEBODY FROM LEGAL BUT I DON'T

8    KNOW WHO IT WAS.  I JUST DON'T REMEMBER THE NAMES.

9         Q.    I'M GOING TO ASK --

10        A.    BUT IT WAS PROBABLY SOMEBODY -- I DO

11   REMEMBER IT WAS SOMEONE FROM LEGAL.  SURPRISED TO WHY

12   I WAS EVEN GETTING A CALL.

13        Q.    I'M NOT TRYING TO INVADE THE ATTORNEY-

14   CLIENT PRIVILEGE BUT I DO WANT TO TRY TO FIND OUT

15   ABOUT THE SUBSTANCE OF THE CALL SO WHEN YOU DO

16   RESPOND, I DON'T WANT TO KNOW WHAT THE LAWYER WAS

17   TELLING YOU OR WHAT YOU WERE TELLING THE LAWYER IN

18   THE CONTEXT OF GETTING LEGAL ADVICE OR RECEIVING

19   LEGAL ADVICE AS AN EMPLOYEE OF COMPAQ REGARDING A

20   TRANSACTION.  DO YOU RECALL WHY MR. RAIFORD CALLED

21   YOU?

22              MS. DUMAS:  OBJECTION.  CULVER, MAYBE YOU

23         NEED TO LAY A LITTLE MORE FOUNDATION ABOUT WHEN

24         THIS HAPPENED, WHETHER HE WAS STILL AN

25         EMPLOYEE.

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 34

```
 1          IT'S NOT CLEAR TO ME FROM THE RECORD
 2     THAT'S BEEN ESTABLISHED WHETHER HE GOT A CALL
 3     AFTER HE WASN'T WORKING AT COMPAQ ANYMORE, WHEN
 4     THE LAWSUIT WAS FILED.  I THINK HE SAID --
 5          MR. HALLIDAY:  I THINK I ASKED INITIALLY
 6     FROM FEBRUARY 16, 2000, TO THE END OF HIS
 7     EMPLOYMENT.
 8          MS. DUMAS:  RIGHT, AND I THINK HE SAID THE
 9     CALL MAY HAVE BEEN A YEAR AGO SO --
10  BY MR. HALLIDAY:
11     Q.   WAS THIS AFTER YOU LEFT?
12     A.   OH, YEAH, THE CALL THAT I'M TALKING ABOUT
13  WAS AFTER I LEFT.
14          MR. HALLIDAY:  THANK YOU.
15          MR. HUNT:  BECAUSE YOU LEFT IN APRIL 2001.
16          THE WITNESS:  RIGHT.  THAT'S WHY I SAID I
17     WAS SURPRISED TO GET A CALL.  I WASN'T AN
18     EMPLOYEE OF COMPAQ AT THE TIME.
19          MR. HALLIDAY:  THANK YOU.  I DID
20     MISUNDERSTAND.
21  BY MR. HALLIDAY:
22     Q.   LET ME JUST BACK UP AND BE SURE I'VE GOT
23  IT RIGHT NOW.
24     A.   OKAY.
25     Q.   DO YOU RECALL HAVING A CONVERSATION
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 35

1   BETWEEN FEBRUARY 16, 2000, AND THE DATE THAT YOUR

2   EMPLOYMENT WITH COMPAQ ENDED REGARDING THE FEBRUARY

3   16, 2000, LETTER, EXHIBIT 1?

4        A.   WITH ANYONE AT COMPAQ OR --

5        Q.   LET'S START THERE.  WITH ANYONE AT COMPAQ.

6        A.   NOT, NOT SPECIFICALLY OTHER THAN A CALL

7   FROM JOHN FRASCA WHO WANTED ONE FOR SOME SUPPLIER

8   OR -- YOU KNOW, ONLY IN THAT CONTEXT.

9             I MEAN, ONCE WE SENT OUT THE LETTERS TO

10  THE SUPPLIERS HE NOTED AND ON OCCASION HE WOULD CALL

11  BACK UP OR SEND ME AN E-MAIL AND SAY I HAVE ANOTHER

12  SUPPLIER WHO'S GOT THE SAME CONCERN, CAN YOU SEND HIM

13  A LETTER, THAT'S -- THOSE ARE THE ONLY CONVERSATIONS

14  I HAD.

15       Q.   SO AT THE TIME OF YOUR DEPARTURE FROM

16  COMPAQ YOU WERE NOT AWARE OF AN ISSUE --

17       A.   NO.

18       Q.   JUST A MINUTE -- RELATING TO THE MATTERS

19  DISCUSSED IN THE FEBRUARY 16, 2000, LETTER,

20  EXHIBIT 1.

21       A.   THAT'S CORRECT.

22            MR. HALLIDAY:  LET'S TAKE A FIVE-MINUTE

23       BREAK AND I WILL WRAP UP.

24            THE WITNESS:  OKAY.

25       (A RECESS WAS TAKEN FROM 10:49 A.M. TO 11:07

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 36

```
 1  A.M.)
 2            MR. HALLIDAY:  BACK ON THE RECORD.
 3            MR. FRANCIS, THOSE ARE ALL THE QUESTIONS I
 4      HAVE AND I THANK YOU FOR COMING IN THIS
 5      MORNING.
 6            THE WITNESS:  YOU'RE WELCOME.
 7                    CROSS EXAMINATION
 8  BY MR. HUNT:
 9        Q.   GOOD MORNING, MR. FRANCIS.  MY NAME IS
10  STEPHEN HUNT.  I'M FROM A LAW FIRM CALLED ADORNO &
11  YOSS IN FORT LAUDERDALE AND WE REPRESENT TECH DATA
12  CORPORATION, A CLEARWATER-BASED COMPANY.
13            TECH DATA IS A DEFENDANT IN THE PREFERENCE
14  LAWSUIT AS WELL, AND I HAVE A FEW QUESTIONS AS WELL.
15        A.   ALL RIGHT.
16        Q.   MR. FRANCIS, HAVE YOU RECEIVED ANY
17  PROFESSIONAL OR OCCUPATIONAL LICENSES RELATED TO YOUR
18  WORK WITH AT & T OR ANY OF YOUR LATER JOBS?
19        A.   WHILE AT AT & T, AN AMERICAN PAYROLL
20  ASSOCIATION CERTIFICATION THAT I OBTAINED WHILE I WAS
21  IN THE PAYROLL GROUP.  THAT'S THE ONLY, ONLY ONE THAT
22  I CAN RECALL.
23        Q.   WERE YOU EVER A MEMBER OF THE NATIONAL
24  ASSOCIATION OF CREDIT MANAGERS?
25        A.   NO.
```

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 37

```
1      Q.    HAVE YOU EVER BEEN A PARTY TO A LAWSUIT?

2      A.    NO.

3      Q.    HAVE YOU EVER BEEN CALLED UPON TO TESTIFY

4  AS A WITNESS IN COURT BEFORE?

5      A.    ONE TIME, VERY LONG TIME AGO.

6      Q.    WAS IT PERTAINING TO YOUR EMPLOYMENT WITH

7  COMPAQ?

8      A.    OH, NO.   IT'S A PRIVATE AUTOMOBILE

9  ACCIDENT SITUATION.

10      Q.    PARDON ME FOR AN OBVIOUS QUESTION BUT DO

11  YOU SPEAK, READ AND WRITE THE ENGLISH LANGUAGE

12  FLUENTLY?

13      A.    YES.

14      Q.    ARE YOU ON ANY MEDICATIONS TODAY THAT

15  WOULD IMPAIR YOUR ABILITY TO SPEAK AND -- IN A MANNER

16  THAT'S CONSISTENT WITH YOUR NORMAL BEHAVIOR?

17      A.    NO.

18      Q.    MR. FRANCIS, WHILE YOU WERE EMPLOYED WITH

19  COMPAQ DID YOU SUPERVISE ANY PERSONNEL?

20      A.    YES.

21      Q.    HOW MANY PEOPLE DID YOU HAVE WORKING UNDER

22  YOU APPROXIMATELY?

23      A.    I ONLY HAD PERHAPS FOUR OR FIVE DIRECT

24  REPORT PERSONNEL.   IF YOU INCLUDED THE OUTSOURCE

25  PEOPLE THAT WERE PART OF THE NORTH AMERICAN ACCOUNTS
```

Inacom vs. Tech Data                         3/2/2005                         WILLIAM FRANCIS

Page 38

1   **PAYABLE OPERATION THERE WERE PROBABLY A TOTAL OF 300**

2   **OR SO.**

3        Q.    I BELIEVE I'M CORRECT IN STATING THAT YOU

4   PREVIOUSLY TESTIFIED THAT THERE WERE SEVERAL PEOPLE

5   FROM COMPAQ ON A TRANSITION TEAM FOR THE INACOM/

6   CUSTOM EDGE MERGER?

7        A.    **THAT'S CORRECT.**

8        Q.    WERE THERE ANY PERSONNEL FROM CUSTOM EDGE

9   ALSO ON THAT TRANSITION TEAM, IF YOU RECALL?

10       A.    **I CAN'T RECALL VERY MANY SPECIFICS.  THERE**

11  **WERE SOME AND IT WOULD HAVE BEEN THE COUNTERPART OF**

12  **THE FUNCTIONAL COMPAQ PERSON.  JAY SAMUELSON COMES TO**

13  **MIND AS THE A.P. CONTACT FOR CUSTOM EDGE.**

14            **THE OTHER DISCIPLINES I WASN'T INVOLVED**

15  **WITH SO I DON'T KNOW WHO THEY WERE.**

16       Q.    MR. FRANCIS, DID THE TRANSITION TEAM MEET

17  ON A REGULAR BASIS?

18       A.    **YES.**

19       Q.    WERE THESE PERIODIC MEETINGS ON A WEEKLY

20  BASIS, FOR EXAMPLE, OR SOME OTHER PERIODS OR AS

21  NEEDED?

22       A.    **I WOULD HAVE TO SAY AS NEEDED, AS I**

23  **RECALL.**

24       Q.    I SUPPOSE THIS QUESTION MAY BE JUST OUT OF

25  MY IGNORANCE, NOT HAVING REALLY BEEN A WORKING PERSON

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 39

1   IN THE BUSINESS WORLD BUT LET ME GIVE IT A TRY THIS

2   WAY:

3           DID THE TRANSITION TEAM MEET ON A FORMAL

4   BASIS WHERE THERE HAD TO BE A CERTAIN MINIMUM NUMBER

5   OF PEOPLE BEFORE A MEETING COULD CONVENE?

6       A.   **NO, THERE WAS NO REQUIRED MINIMUM QUORUM-**

7   **TYPE SITUATION THAT I'M AWARE OF.**

8       Q.   DID PEOPLE MEET AND HAVE MINUTES OF THEIR

9   MEETINGS TAKEN BY A SECRETARY OR SOME RECORDING

10  PERSON?

11      A.   **I DO NOT RECALL ANY RECORDING PERSON.  THE**

12  **INDIVIDUALS TOOK THEIR OWN NOTES REGARDING THEIR**

13  **SPECIFIC AREAS OF RESPONSIBILITY BUT THAT'S THE**

14  **EXTENT THAT I CAN RECALL.**

15          MR. HUNT:  I WOULD LIKE TO, MADAM

16      REPORTER, ASK THAT BE MARKED AS THE NEXT

17      EXHIBIT 4, PLEASE.

18      (FRANCIS EXHIBIT NO. 4 WAS MARKED BY THE

19  REPORTER.)

20  BY MR. HUNT:

21      Q.   WOULD YOU PLEASE LOOK AT EXHIBIT 4, MR.

22  FRANCIS.

23      A.   **OKAY.**

24      Q.   AND FOR THE BENEFIT OF THE ATTORNEYS ON

25  THE PHONE, I'LL SAY THAT EXHIBIT 4 IS A LETTER

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 40

```
 1    FROM -- APPEARS TO BE A LETTER FROM MR. FRANCIS AT
 2    COMPAQ TO TECH DATA CORPORATION DATED FEBRUARY -- IS
 3    THAT 17, MR. FRANCIS?
 4         A.   16.
 5         Q.   FEBRUARY 16, 2000.
 6         A.   RIGHT.
 7         Q.   CAN YOU IDENTIFY WHETHER THAT'S YOUR
 8    SIGNATURE ON THE LETTER, MR. FRANCIS?
 9         A.   YES, IT IS.
10         Q.   DOES THE LETTER APPEAR TO BE SIMILAR TO
11    WHAT WAS MARKED AS EXHIBIT 1, THE LETTER DATED
12    FEBRUARY 16 FROM YOURSELF TO LEXMARK INTERNATIONAL?
13         A.   YES.
14         Q.   SO SOME OF THE QUESTIONS I MAY HAVE MAY
15    APPEAR TO BE REDUNDANT AND I APOLOGIZE IN ADVANCE FOR
16    THAT.
17              DID YOU RECEIVE THIS FORM OF LETTER AS
18    WELL FROM AND AT THE REQUEST OF MR. FRASCA?
19         A.   I DON'T RECALL.  I DON'T RECALL WHETHER HE
20    ACTUALLY SENT ME THE ENTIRE LETTER OR JUST GAVE ME
21    THE ADDRESS AND THE CONTACT THAT WE WOULD USE.
22         Q.   DO YOU RECALL WHETHER YOU WOULD THEN HAVE
23    DRAFTED THIS LETTER YOURSELF IF IT WASN'T GIVEN TO
24    YOU BY SOMEONE ELSE?
25         A.   NO.   THIS WAS -- AS I MENTIONED EARLIER,
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 41

1  THIS IS OUR STANDARD COMFORT LETTER THAT WE USED WITH

2  THE SUPPLIERS OF CUSTOM EDGE.

3      Q.   AND WHERE WOULD THE STANDARD BLANK FORM OF

4  THE LETTER THEN COME FROM?

5      A.   WELL, MY ADMIN JUST HAD IT IN THEIR WORD

6  PROCESSOR IN THEIR COMPUTER.

7      Q.   FOR EXHIBIT 4 DID YOU SIMILARLY OBTAIN

8  APPROVAL FROM ANYONE BEFORE YOU WOULD HAVE SENT THIS

9  LETTER OUT?

10      A.   NO.

11      Q.   SO YOU WOULD HAVE UNDERTAKEN TO SEND THIS

12  LETTER OUT YOURSELF?

13      A.   YES.

14      Q.   AND WOULD THIS LETTER HAVE BEEN A TOPIC OF

15  ANYTHING AT ONE OF THE TRANSITION TEAM MEETINGS?

16      A.   IT MIGHT HAVE BEEN.  I DON'T RECALL BUT IT

17  MIGHT HAVE BEEN.

18      Q.   WHY WOULD YOU HAVE OBTAINED APPROVAL FOR

19  THE LEXMARK LETTER AND NOT FOR THE TECH DATA LETTER?

20      A.   I DON'T RECALL THAT I OBTAINED APPROVAL

21  SPECIFICALLY FOR THE LEXMARK LETTER BUT I WOULD HAVE

22  OBTAINED APPROVAL FOR THE LETTER ITSELF, NOT KNOWING

23  NECESSARILY AT THAT TIME WHO IT WOULD HAVE GONE TO.

24      Q.   DO YOU RECALL WHETHER THE LETTER WAS

25  ALTERED OR CHANGED BY ANY OF THE PEOPLE WHO REVIEWED

Inacom vs. Tech Data                           3/2/2005                              WILLIAM FRANCIS

Page 42

1    IT?

2            A.    I DON'T RECALL.

3            Q.    DO YOU HAVE ANY NOTES OR RECORDS THAT

4    WOULD HELP YOU RECALL THIS INFORMATION IN YOUR

5    POSSESSION NOW?

6            A.    NO.

7            Q.    DID YOU TAKE NOTES OF YOUR TRANSITION

8    TEAM'S MEETINGS WHEN YOU HAD MEETINGS?

9            A.    I MAY HAVE TAKEN SOME HANDWRITTEN NOTES

10   MYSELF FOR MY PARTICULAR AREA BUT THAT'S PROBABLY

11   ABOUT ALL I WOULD HAVE DONE.

12           Q.    DO YOU KNOW WHAT HAPPENED TO THOSE NOTES

13   WHEN YOU SEPARATED FROM COMPAQ?

14           A.    NO, I HAVE NO IDEA.  I WOULDN'T HAVE KEPT

15   THEM.  MY MODE OF OPERATION WOULD BE TO GENERALLY

16   KEEP TRACK OF MY AREAS OF RESPONSIBILITY AND MY TO-DO

17   LIST; AND ONCE I ACCOMPLISHED IT, I HAD NO NEED FOR

18   THE NOTES ANYMORE.

19           Q.    DO YOU RECALL THE NAME OF YOUR

20   ADMINISTRATIVE ASSISTANT AT THE TIME THAT THIS LETTER

21   WOULD HAVE BEEN CREATED, THIS EXHIBIT 4 LETTER?

22           A.    JANET PASLEY.

23           Q.    CAN YOU SPELL THE LAST NAME, PLEASE?

24           A.    IT WAS P A S L E Y, I BELIEVE.

25           Q.    I BELIEVE YOU TESTIFIED EARLIER, MR.

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 43

1  FRANCIS, THAT WITH RESPECT TO OBTAINING APPROVAL FOR

2  EITHER THE FORM OF THE LETTER OR EXHIBIT 1 OR WHAT

3  YOUR TESTIMONY IS AS TO THAT, THAT THERE WAS NO

4  EXPRESS POLICY THAT YOU OBTAIN AN APPROVAL BEFORE

5  THAT LETTER WOULD HAVE GONE OUT?

6       **A.    NOT THAT I RECALL.**

7       Q.    AND REFERRING TO POLICY, IS THERE A

8  SPECIFIC WRITTEN POLICY OF AN ORGANIZATION LIKE

9  COMPAQ THAT YOU'RE REFERRING TO, A POLICY MANUAL OR

10 PROCEDURES MANUAL THAT WOULD HAVE COVERED THIS?

11      **A.    NOT THAT I RECALL.**

12      Q.    NOW, TO BE CLEAR ABOUT SOME EARLIER

13 QUESTIONING, MR. FRANCIS, IS IT A FAIR STATEMENT THAT

14 YOU TESTIFIED THAT YOU REALLY WEREN'T INVOLVED

15 SIGNIFICANTLY WITH THE NEGOTIATION OF THE ASSET

16 PURCHASE AGREEMENT FOR THE INACOM DIVISION?

17      **A.    THAT'S CORRECT.**

18      Q.    SEPARATE AND ASIDE FROM THE ASSET PURCHASE

19 AGREEMENT WERE THERE LEVELS OF INVOLVEMENT THAT YOU

20 WOULD HAVE HAD WITH UNDERTAKING ANY DUE DILIGENCE AS

21 TO WHAT WAS BEING PURCHASED BY COMPAQ --

22      **A.    NO.**

23      Q.    -- PRIOR TO THE DEAL?

24      **A.    NO, I WOULD HAVE HAD NO RESPONSIBILITY IN**

25 **THAT AREA.**

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 44

1        Q.    DO YOU RECALL WHETHER ANY OF THE PERSONNEL

2   WHO WERE ON YOUR TRANSITION TEAM HAD THAT

3   RESPONSIBILITY PRIOR TO THE CLOSING?

4        **A.    I CAN'T RECALL.**

5        Q.    DO YOU RECALL HAVING ANY CONVERSATIONS

6   PRIOR TO THE CLOSING OF THE ASSET PURCHASE AGREEMENT

7   IN FEBRUARY OF 2000 WITH ANYONE FROM TECH DATA

8   CORPORATION?

9        **A.    NO.**

10       Q.    DO YOU RECALL HAVING DISCUSSIONS WITH

11  ANYONE FROM TECH DATA CORPORATION IN FEBRUARY OF

12  2000?

13       **A.    NO.**

14       Q.    FOR THAT MATTER DO YOU RECALL EVER HAVING

15  CONVERSATIONS WITH ANYONE FROM TECH DATA CORPORATION?

16       **A.    NO, I DON'T.**

17       Q.    DO YOU RECALL WHETHER MR. FRASCA REQUESTED

18  THAT YOU SEND EXHIBIT 4, THE TECH DATA LETTER, TO

19  TECH DATA?

20       **A.    I DON'T RECALL EXPLICITLY THAT REQUEST BUT**

21  **THE ONLY REASON I WOULD HAVE SENT ONE OF THESE**

22  **LETTERS WAS AT HIS REQUEST.**

23       Q.    DID YOU HAVE ANY KNOWLEDGE OF ANY

24  FINANCIAL PROBLEMS AT INACOM PRIOR TO THE ACQUISITION

25  OF THE DIVISION BY COMPAQ?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 45

1       A.    NO.

2       Q.    MR. FRANCIS, AFTER THIS LETTER WAS SENT --

3  AND THERE IS A FAX COVER PAGE ON THE FIRST PAGE OF

4  EXHIBIT 4.

5       LET ME ASK YOU FIRST CAN YOU IDENTIFY

6  WHETHER THAT APPEARS TO BE THE FORMAL FAX COVER PAGE

7  THAT WOULD HAVE BEEN GENERATED BY YOUR OFFICE?

8       A.    IT APPEARS TO BE, YES.

9       Q.    DO YOU RECALL HAVING ANY CONVERSATION

10  ABOUT THIS LETTER WITH ANYONE SINCE THE TIME IT WAS

11  ISSUED SHORT OF PREPARING FOR THIS DEPOSITION TODAY?

12      A.    NO.

13      Q.    YOU PREVIOUSLY TESTIFIED ABOUT A

14  CONFERENCE CALL TWO YEARS AGO WITH DARRELL RAIFORD

15  AND SOME OTHER PERSONNEL, AND YOU'RE NODDING YOUR

16  HEAD.

17      A.    YES.

18      Q.    DO YOU RECALL WHETHER THE TECH DATA LETTER

19  WOULD HAVE BEEN RAISED DURING THAT CONVERSATION AS

20  WELL?

21      A.    I, I DON'T RECALL.

22      Q.    DO YOU PRESENTLY OWN ANY STOCK IN HEWLETT

23  PACKARD?

24      A.    NO.

25      Q.    ARE YOU --

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 46

```
 1              MS. DUMAS:  GOOD FOR YOU.

 2              MR. HUNT:  IT'S AN OPPORTUNITY.

 3  BY MR. HUNT:

 4       Q.   ARE YOU PRESENTLY RECEIVING ANY

 5  COMPENSATION OR DEFERRED COMPENSATION OF ANY KIND

 6  FROM HEWLETT PACKARD OR --

 7       A.   NO.

 8       Q.   -- COMPAQ?

 9       A.   NO.

10       Q.   DO YOU HAVE ANY FINANCIAL STAKE IN HEWLETT

11  PACKARD OR COMPAQ ANY LONGER?

12       A.   NO -- WELL, I SHOULD SAY I, I HAVE SOME

13  COMPAQ STOCK OPTIONS THAT WERE CONVERTED TO H.P.

14  OPTIONS BUT THEY'RE -- LOOKS LIKE THEY'RE MORE READY

15  FOR WALLPAPER OR ANYTHING ELSE.

16       Q.   I'M SURE THAT'S NOT THE CASE.

17              DID YOU EVER BECOME AWARE OF AN ISSUE

18  BETWEEN CUSTOM EDGE AND INACOM REGARDING THE

19  TREATMENT OF ACCOUNTS RECEIVABLE THAT WERE RECEIVED

20  AFTER THE CLOSING?

21       A.   ACCOUNTS RECEIVABLE?

22       Q.   YES.

23       A.   NO.

24       Q.   WOULD ACCOUNTS RECEIVABLE HAVE BEEN

25  OUTSIDE OF THE AREA OF YOUR AUTHORITY?
```

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 47

1      A.    YES.

2      Q.    DID YOU HAVE ANY INVOLVEMENT ON BEHALF OF

3  HEWLETT PACKARD OR COMPAQ WITH INACOM'S BANKRUPTCY

4  CASE?

5      A.    NO.

6      Q.    HAVE YOU EVER BEEN INVOLVED IN ANY S.E.C.

7  INVESTIGATIONS?

8      A.    NO.

9      Q.    JUST BEAR WITH ME A MOMENT.  CAN YOU

10 IDENTIFY THE NAME DAVID GUENTHNER FOR ME?

11     A.    IT DOES NOT RING ANY BELLS AT ALL.

12     Q.    MR. FRANCIS, CAN YOU TELL ME WHETHER YOUR

13 OPERATION FROM COMPAQ WAS ON AMICABLE TERMS?

14     A.    YES, IT WAS.

15     Q.    DO YOU HAVE A RETENTION AGREEMENT WITH

16 MISS DUMAS OR HER FIRM FOR HER REPRESENTATION OF YOU

17 TODAY?  HAVE YOU SIGNED A LETTER?

18     A.    I HAVEN'T SIGNED ANY AGREEMENTS.

19     Q.    ARE THE SERVICES BEING PROVIDED FOR YOU

20 COMPLIMENTARY, AS FAR AS YOU KNOW?

21     A.    I NEVER HAD A CONVERSATION ABOUT IT SO I

22 DON'T -- I DON'T KNOW THAT EITHER.

23     Q.    MR. FRANCIS, YOU INDICATED THAT YOU LIVE

24 IN CLERMONT, FLORIDA?

25     A.    CLERMONT, RIGHT, THAT'S CORRECT.

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 48

1      Q.    MAY I ASK FOR AN ADDRESS IN THE EVENT THAT

2   SOMEONE WITH YOUR ATTORNEY'S PERMISSION NEEDED TO

3   REACH YOU?

4      **A.    SURE.    4049 GREYSTONE, G R E Y S T O N E.**

5   **THE ZIP IS 34711-5368.**

6      Q.    AND IS THERE A ROAD DESIGNATION FOR

7   GREYSTONE?

8      **A.    GREYSTONE DRIVE, EXCUSE ME, DRIVE, EXCUSE**

9   **ME.**

10     Q.    THANK YOU.

11         MR. HUNT:    WELL, I THINK I'M CRUISING INTO

12         BEING POSSIBLY DONE WITH MY QUESTIONS.    I'LL

13         LET PAT COLLINS KNOW THAT HE'S ON DECK.    I

14         IMAGINE THAT THAT WOULD BE THE NEXT PERSON IN

15         ORDER, AND I WOULD JUST LIKE TO CONFER WITH MY

16         COLLEAGUE, MR. HALLIDAY, FOR A MOMENT OUTSIDE

17         BEFORE I RELINQUISH THE, THE SEAT.

18     (A RECESS WAS TAKEN FROM 11:28 A.M. TO 11:29

19   A.M.)

20   BY MR. HUNT:

21     Q.    MR. FRANCIS, WE HAD A BREAK EARLIER.    DID

22   YOU CONFER WITH YOUR ATTORNEY REGARDING THE SUBSTANCE

23   OF YOUR TESTIMONY?

24     **A.    VERY BRIEFLY.**

25         MR. HUNT:    I HAVE NO FURTHER QUESTIONS;