Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 49

```
 1          AND I WOULD IMAGINE, PAT COLLINS, IF YOU'RE
 2          STILL WITH US, THAT YOU MAY BE THE NEXT PERSON
 3          ON THE LIST.  PAT?
 4              MR. COLLINS:  I AM STILL WITH US.
 5                  CROSS EXAMINATION
 6  BY MR. COLLINS:
 7      Q.   GOOD MORNING, MR. FRANCIS.  MY NAME IS
 8  PATRICK COLLINS.  I'M A LAWYER AT FARRELL FRITZ IN
 9  UNIONDALE, NEW YORK; AND I REPRESENT RESILIEN, INC.,
10  FORMALLY KNOWN AS LOGICARE, INC., ONE OF THE
11  DEFENDANTS IN THE PREFERENCE LAWSUIT.
12          CAN YOU HEAR ME OKAY, FIRST OF ALL?
13      A.   YES, I CAN, PAT.  GOOD MORNING.
14      Q.   GOOD MORNING.  COULD YOU TAKE A LOOK BACK
15  AT EXHIBIT NO. 2, PLEASE.
16      A.   YES, I SEE IT.
17      Q.   IS THAT IN FRONT OF YOU?
18      A.   YES.
19      Q.   I BELIEVE YOU TESTIFIED EARLIER THAT YOU
20  DON'T REMEMBER THIS DOCUMENT AND YOU DON'T KNOW ONE
21  WAY OR ANOTHER WHETHER YOU HAD EVER SEEN IT BEFORE.
22  IS THAT CORRECT?
23      A.   THAT'S CORRECT.
24      Q.   IS THE FORM OF THE LETTER ALSO WHAT YOU
25  WOULD DESCRIBE AS A COMFORT LETTER?
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS
Page 50

1        A.    YES.

2        Q.    AND OTHER THAN THE SUBSTITUTION OF PERHAPS

3   THE CONTACT PERSON AS NONI VITOLS INSTEAD OF JOHN

4   FRASCA, IS IT GENERALLY IN THE SAME FORMAT AS -- I

5   DON'T HAVE IT IN FRONT OF ME -- EXHIBIT NO. 1 AND

6   EXHIBIT NO. 4, THE COMFORT LETTERS THAT WENT TO

7   LEXMARK AT TECH DATA?

8        **A.    YES, IT'S VERY MUCH THE SAME EXCEPT FOR**

9   **THE CONTACT PERSON.**

10       Q.    WERE YOU EVER AN EMPLOYEE OF CUSTOM EDGE?

11       **A.    NO.**

12       Q.    WERE YOU EVER ASSIGNED ANY DUTIES AT

13  CUSTOM EDGE?

14       **A.    NO.**

15       Q.    THE SECOND PARAGRAPH OF THE LETTER THAT'S

16  EXHIBIT NO. 2 I'M REFERRING TO STATES THAT, "IN

17  CONNECTION WITH SUCH PURCHASE, CUSTOM EDGE, INC.,

18  ALSO ASSUMED THE OBLIGATION TO PAY ALL OF THE

19  OUTSTANDING AMOUNT ON THE REFERENCED ACCOUNT, SUBJECT

20  TO THE TERMS AND CONDITIONS OF SUCH ACCOUNT."

21            DO YOU KNOW ONE WAY OR ANOTHER WHETHER

22  THAT STATEMENT WAS TRUE?

23            MS. DUMAS:  OBJECTION, VAGUE.  LACKS

24       FOUNDATION.

25            YOU CAN GO AHEAD AND ANSWER, MR. FRANCIS,

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 51

```
 1        IF YOU CAN.
 2        A.    WELL, I CAN'T SPEAK TO THIS, THIS LETTER
 3   BECAUSE I NEVER SIGNED THIS LETTER AND NEVER SENT IT
 4   OUT.
 5        Q.    I GUESS MY QUESTION IS IF YOU WERE NOT AN
 6   EMPLOYEE OF CUSTOM EDGE HOW DID YOU KNOW ONE WAY OR
 7   ANOTHER WHETHER CUSTOM EDGE HAD ASSUMED OBLIGATIONS
 8   TO PAY OFF OUTSTANDING AMOUNTS?
 9        A.    I HAD A COPY OF THE AGREEMENT THAT TALKED
10   ABOUT THE ASSETS THAT COMPAQ PURCHASED.
11        Q.    YOU'RE REFERRING TO THE ASSET PURCHASE
12   AGREEMENT?
13        A.    THAT'S CORRECT.  SO WHEN IN DOUBT I
14   REFERRED IMMEDIATELY TO THAT DOCUMENT.
15        Q.    AND DID YOU REVIEW THAT DOCUMENT PRIOR TO
16   SENDING OUT THE COMFORT LETTERS?
17        A.    I DON'T RECALL.
18        Q.    I APOLOGIZE FOR PERHAPS ASKING THESE
19   QUESTIONS AGAIN BUT -- THAT MR. HALLIDAY MAY HAVE
20   ASKED.  DO YOU KNOW WHO NONI VITOLS IS?
21        A.    I HAVE NO IDEA.  I HAD NO RECOLLECTION OF
22   THIS NAME AT ALL.
23        Q.    DO YOU RECALL OR DO YOU KNOW ONE WAY OR
24   ANOTHER WHETHER SOME OF THE COMFORT LETTERS WERE SENT
25   OUT UNSIGNED?
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 52

1        A.    WELL, THEY WEREN'T, AS FAR AS I KNEW AT

2    THE TIME.

3        Q.    I BELIEVE YOU TESTIFIED EARLIER THAT THE

4    COMFORT LETTER TO LEXMARK, THE ONE THAT YOU

5    SPECIFICALLY REMEMBER, YOU PUT THAT IN THE MAIL

6    YOURSELF OR ARRANGED FOR IT TO BE MAILED YOURSELF.

7            DID YOU AUTHORIZE ANYBODY ELSE TO SEND THE

8    OTHER COMFORT LETTERS?

9        A.    NO.

10       Q.    SO TO YOUR KNOWLEDGE THE PERSON WHO SENT

11   ALL THE COMFORT LETTERS WAS YOU.

12       A.    I OR MY ADMIN, YES.  LET ME CLARIFY THAT.

13   THOSE THAT I SIGNED.

14       Q.    UNDERSTOOD.  DO YOU RECALL WHETHER YOU

15   EVER SIGNED A COMFORT LETTER ADDRESSED TO LOGICARE OR

16   RESILIEN?

17       A.    I, I DON'T RECALL.

18       Q.    YOU DON'T RECALL ONE WAY OR THE OTHER.

19       A.    THAT'S CORRECT.

20       Q.    THE EXHIBIT NO. 2 IS ADDRESSED TO -- OR IT

21   SAYS, "DEAR CHRIS AND BILL".  DO YOU HAVE ANY IDEA

22   WHO CHRIS AND BILL ARE?

23       A.    NO.

24       Q.    DID THE SIGNED COMFORT LETTERS THAT YOU

25   RECALL SENDING OUT GO ON CUSTOM EDGE LETTERHEAD?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 53

1      **A.    AS I RECALL, IT WAS COMPAQ LETTERHEAD.**

2      Q.    COMPAQ LETTERHEAD?

3      **A.    I BELIEVE SO.**

4      Q.    JUST BECAUSE I'M ON THE PHONE AND I CAN'T

5    SEE EXHIBITS NO. 1 AND NO. 4, COULD YOU LOOK AT THOSE

6    AND TELL ME WHETHER THEY'RE ON COMPAQ LETTERHEAD?

7      **A.    1 WAS ON COMPAQ LETTERHEAD AND 4 WAS ON**

8    **COMPAQ LETTERHEAD.**

9      Q.    THANK YOU.  BEFORE, IN SPEAKING WITH MR.

10   HALLIDAY, YOU DISCUSSED WHAT YOUR UNDERSTANDING WAS

11   OF WHY THE COMFORT LETTERS WERE SENT.

12         COULD YOU ELABORATE ON THAT A LITTLE BIT?

13   I BELIEVE YOU STATED THAT YOU WERE INFORMED BY MR.

14   FRASCA THAT SOME SUPPLIERS WERE UNWILLING TO SHIP

15   GOODS TO CUSTOM EDGE.  IS THAT CORRECT?

16     **A.    THAT IS CORRECT.**

17     Q.    DID MR. FRASCA TELL YOU WHY THAT WAS THE

18   CASE?

19     **A.    I REALLY DON'T RECALL ALL OF THE DETAILS**

20   **OF THE CONVERSATION.**

21     Q.    DID YOU ASK HIM WHY THE SUPPLIERS WERE NOT

22   WILLING TO SHIP?

23     **A.    I MAY HAVE.**

24     Q.    AND YOU DON'T RECALL ASKING AND I GATHER

25   THAT YOU DON'T RECALL, IF YOU DID ASK, WHAT HIS

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 54

1   ANSWER WOULD HAVE BEEN?

2       **A.   NO, I REALLY -- I REALLY DON'T REMEMBER**

3   **THAT CONVERSATION.  THAT WAS FIVE YEARS AGO AND I**

4   **KNOW WE TALKED ABOUT IT, I KNOW THEIR SUPPLIERS WERE**

5   **UNWILLING TO SHIP, YOU KNOW.  BEYOND THAT, I DON'T**

6   **RECALL ANY DETAILS SPECIFIC TO ANY SUPPLIER AS TO WHY**

7   **THEY WOULDN'T SHIP.**

8       Q.   DO YOU KNOW ANYTHING ABOUT WHY CUSTOM EDGE

9   AGREED TO ASSUME OBLIGATIONS TO PAY OFF CERTAIN

10  ACCOUNTS OF INACOM?

11          MR. FORTE:  I'LL OBJECT TO THE FORM.

12          MS. DUMAS:  SAME OBJECTION.

13          THE COURT REPORTER:  I'M SORRY; WHO WAS

14      SPEAKING?

15          MR. FORTE:  EARL FORTE.

16          MS. DUMAS:  SAME OBJECTION.

17  BY MR. COLLINS:

18      Q.   IF YOU UNDERSTAND MY QUESTION, YOU CAN

19  ANSWER IT.

20      **A.   COULD YOU REPEAT IT, PLEASE, PAT?**

21      Q.   DO YOU KNOW WHAT THE REASONING WAS FOR WHY

22  CUSTOM EDGE DID WHAT -- REFERRING TO PARAGRAPH 2 OF

23  EXHIBIT NO. 2, WHY CUSTOM EDGE WOULD HAVE ASSUMED THE

24  OBLIGATION TO PAY OFF OUTSTANDING AMOUNTS TO

25  CREDITORS OF INACOM?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 55

1          MS. DUMAS:  OBJECTION.
2          MR. FORTE:  OBJECTION.  EARL FORTE.
3          MR. CAINE:  I'LL OBJECT.  THERE'S NO
4     FOUNDATION.
5          **A.    THAT WASN'T MY UNDERSTANDING, THAT COMPAQ**
6     **OR CUSTOM EDGE ASSUMED ALL OUTSTANDING LIABILITIES**
7     **WITH THE SUPPLIER.  MY UNDERSTANDING IS BASICALLY IT**
8     **WAS A GOING-FORWARD SITUATION.**
9          Q.   BUT REFERRING TO PARAGRAPH 2 OF EXHIBIT
10    NO. 2, IT STATES THAT, CUSTOM EDGE, INC., HAS ALSO
11    ASSUMED THE OBLIGATION TO PAY ALL OF THE OUTSTANDING
12    AMOUNT OF THE REFERENCED ACCOUNT; AND I REFER YOU TO
13    THE "RE:" LINE OF EXHIBIT NO. 2.  IT SAYS, "ACCOUNT
14    PAYABLE NO. 018647 OF INACOM CORPORATION".
15         **A.    WELL, AS FAR AS I'M CONCERNED, THIS IS A**
16    **BOGUS LETTER.  I MEAN, I NEVER SAW IT, NEVER SIGNED**
17    **IT.**
18         Q.   I UNDERSTAND THAT YOU DON'T REMEMBER ONE
19    WAY OR ANOTHER WHETHER THIS LETTER WAS SENT, BUT YOU
20    SAID THAT THIS IS IN THE SAME FORM AS THE COMFORT
21    LETTERS THAT WERE SENT.
22         MY QUESTION IS IN REFERENCE TO THE SECOND
23    PARAGRAPH -- WELL, LET'S LOOK AT EXHIBIT NO. 1 THEN.
24         **A.    OKAY.**
25         Q.   YOU GOT THAT IN FRONT OF YOU?

Inacom vs. Tech Data                                3/2/2005                                WILLIAM FRANCIS

Page 56

1      A.   YES, I DO.

2          Q.   DO YOU HAVE ANY UNDERSTANDING AS TO WHY

3  CUSTOM EDGE ASSUMED TO PAY -- ASSUMED THE OBLIGATION

4  TO PAY ALL OF THE OUTSTANDING AMOUNTS OF THE

5  REFERENCED ACCOUNT IN EXHIBIT NO. 1?

6              MR. CAINE:   OBJECTION.   NO FOUNDATION.

7              MS. DUMAS:   SAME OBJECTION.

8      A.   AGAIN, MY UNDERSTANDING IS THAT WITHOUT

9  HAVING THE ABILITY TO REFER TO THE ASSET AGREEMENT, I

10  CAN'T ANSWER YOUR QUESTION.

11             MY UNDERSTANDING IS THAT WE -- FOR SOME

12  SPECIFIC SUPPLIERS THERE WERE SPECIFIC ASSETS

13  PURCHASED AND THE LIABILITIES ASSOCIATED WITH THOSE

14  ASSETS, CUSTOM EDGE, SLASH, COMPAQ ASSUMED.

15             OTHER THAN THAT IT WAS ON A GOING-FORWARD

16  BASIS FROM THE DATE OF THE AGREEMENT.   NOW, THERE

17  WAS -- MAY HAVE BEEN A LITTLE FINE-TUNING IN THAT,

18  BUT ESSENTIALLY THAT WAS MY UNDERSTANDING.

19         Q.   AND WITH RESPECT TO THE FORMER, WITH

20  RESPECT TO THE CERTAIN ASSETS ASSUMED ALONG WITH

21  LIABILITIES DO YOU KNOW WHAT THE REASONING WAS FOR

22  THAT DECISION?

23     A.   NO.

24             MS. DUMAS:   OBJECTION.   LACKS FOUNDATION.

25         Q.   I'M SORRY.   DID YOU SAY NO?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 57

1      A.    THE ANSWER'S NO.  I DON'T KNOW WHAT THE

2  RATIONALE WAS THAT CAUSED THE DECISION.

3      Q.    YOU JUST KNOW THAT THAT WAS YOUR

4  UNDERSTANDING OF THE ASSET PURCHASE AGREEMENT.

5      A.    CORRECT.

6      Q.    COULD YOU TAKE A LOOK AT EXHIBIT NO. 3,

7  PLEASE.

8      A.    OKAY.

9      Q.    AND, ONCE AGAIN, I APOLOGIZE FOR PERHAPS

10  ASKING QUESTIONS THAT ARE SIMILAR OR IDENTICAL TO

11  THOSE THAT MR. HALLIDAY ASKED EARLIER.

12          DO YOU RECALL EVER SEEING THIS DOCUMENT

13  BEFORE?

14      A.    AS FAR AS I KNOW, I NEVER SAW IT.  UNTIL

15  TODAY.

16      Q.    THANK YOU.  THE SECOND PARAGRAPH, THE

17  SECOND BULLET POINT OF THE SECOND PARAGRAPH, THE LAST

18  SENTENCE SAYS, "KINDLY DO NOT CONTACT MR. BILL

19  FRANCIS, ACCOUNTING MANAGER AT COMPAQ, AS HE WILL

20  HAVE NO INFORMATION AVAILABLE."

21          DO YOU RECALL EVER SPEAKING WITH ANYONE AT

22  CUSTOM EDGE REQUESTING THAT YOU NOT BE CONTACTED WITH

23  RESPECT TO INACOM ACCOUNTS PAYABLE?

24      A.    NO, I NEVER ADVISED THEM TO NOT CONTACT

25  ME.

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 58

1        Q.    LOOKING AT THE THIRD BULLET POINT OF THE

2    SECOND PARAGRAPH OF EXHIBIT NO. 3, IT STATES, "COMPAQ

3    IS ASSUMING THE OPEN ACCOUNTS PAYABLE BUT NOT THE --"

4    QUOTE, HELD CHECKS, UNQUOTE, PERIOD.

5              DO YOU KNOW WHAT THE REFERENCE TO HELD

6    CHECKS IS IN THAT SENTENCE?

7        **A.    ONLY SINCE YESTERDAY WHEN I WAS GIVEN SOME**

8    **INFORMATION REGARDING WHAT THE HELD CHECKS SITUATION**

9    **WAS.**

10       Q.    DO YOU RECALL EVER HAVING ANY

11   CONVERSATIONS WITH JOHN FRASCA OR ANYONE AT INACOM

12   ABOUT HELD CHECKS?

13       **A.    NO.**

14       Q.    DID YOU EVER HAVE ANY CONVERSATIONS WITH

15   MR. OSHLO ABOUT HELD CHECKS?

16       **A.    I DON'T RECALL EVER TALKING WITH HIM.    I**

17   **DON'T EVEN RECOGNIZE THE NAME.**

18       Q.    I'M REFERRING TO THE NAME IN THE FOURTH

19   BULLET POINT OF PARAGRAPH 2, EXHIBIT NO. 3, MR.

20   RICHARD OSHLO.

21       **A.    YEAH, CORRECT.    I DON'T RECALL EVER**

22   **TALKING WITH HIM.**

23       Q.    HAVE YOU EVER SPOKEN WITH ANY

24   REPRESENTATIVE OF LOGICARE OR RESILIEN?

25       **A.    NOT THAT I CAN RECALL.**

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 59

1      Q.    HAVE YOU EVER COMMUNICATED IN ANY WAY

2  OTHER THAN ORAL CONVERSATION, CORRESPONDED WITH

3  ANYONE AT INACOM OR RESILIEN?

4      **A.    AGAIN, NOT THAT I CAN RECALL.**

5      Q.    WERE YOU INVOLVED OR DID YOU HAVE ANY

6  KNOWLEDGE WITH WHAT WAS DONE BY INACOM WITH THE

7  PROCEEDS OF THE PURCHASE PRICE PAID BY COMPAQ IN

8  CONNECTION WITH THE ASSET PURCHASE AGREEMENT?

9      **A.    I HAVE NO IDEA.**

10      Q.    YOU WERE NOT PART OF ANY CONVERSATIONS OR

11  DISCUSSIONS ON THAT TOPIC?

12      **A.    NONE AT ALL.**

13      Q.    OTHER THAN THE COMFORT LETTERS IN THE

14  FORMS OF EXHIBIT NO. 1 AND 4, ARE YOU AWARE OF ANY

15  OTHER TYPES OF LETTERS SENT TO INACOM SUPPLIERS IN

16  CONNECTION WITH THE ASSET PURCHASE AGREEMENT?

17      **A.    NOT THAT I KNOW OF, NO.**

18      Q.    SO THE ONLY CORRESPONDENCE THAT YOU'RE

19  AWARE OF GOING TO INACOM SUPPLIERS IN CONNECTION WITH

20  THE ASSET PURCHASE AGREEMENT WERE THE COMFORT

21  LETTERS?

22      **A.    YES.   AGAIN, ONLY TO THOSE SELECTED**

23  **SUPPLIERS IDENTIFIED BY JOHN FRASCA.**

24      Q.    DO YOU KNOW WHY JOHN SELECTED THOSE

25  SUPPLIERS?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 60

1      **A.    BECAUSE THOSE WERE THE, THE FOLKS WHO HAD**

2  **A RELUCTANCE TO, TO SHIP PARTS AND MATERIAL.   THAT'S**

3  **MY UNDERSTANDING.**

4          Q.   AND PARTS AND MATERIAL TO CUSTOM EDGE.

5      **A.    YES.**

6          MR. COLLINS:  I HAVE NO FURTHER QUESTIONS.

7      THANK YOU, MR. FRANCIS.

8          THE WITNESS:  YOU'RE WELCOME.

9          MR. LANDON:  THIS IS JAMES LANDON FOR

10     DELL.  IF IT'S OKAY, I JUST HAVE A COUPLE

11     QUESTIONS.  IS THAT OKAY WITH EVERYBODY?

12          MR. FORTE:  YES.

13              CROSS EXAMINATION

14 BY MR. LANDON:

15          Q.   MR. FRANCIS, MY NAME IS JAMES LANDON AND

16 I'M AN ATTORNEY FOR DELL, INC.  HOW ARE YOU?

17     **A.    GOOD, THANK YOU.**

18          Q.   I JUST HAVE A COUPLE QUESTIONS FOR YOU.

19          DO YOU RECALL ONE OF THESE SO-CALLED

20 COMFORT LETTERS BEING SENT TO DELL OR ANY AFFILIATE

21 OF DELL?

22     **A.    NOT THAT I CAN RECALL.**

23          Q.   DO YOU HAPPEN TO RECALL ANY CONVERSATIONS

24 CONCERNING DELL?

25     **A.    NO.**

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 61

1      Q.    NOW, WHAT WAS YOUR UNDERSTANDING OF HOW

2  INACOM SUPPLIERS WOULD BE PAID FOR OUTSTANDING

3  ACCOUNTS, OR I GUESS FOR LACK OF A BETTER TERM, FOR

4  INACOM'S ACCOUNTS PAYABLES AFTER CONSUMMATION OF THE

5  ASSET PURCHASE AGREEMENT?

6          MS. DUMAS:  OBJECTION.  VAGUE, OVER-BROAD.

7      YOU CAN ANSWER --

8      Q.    LET ME REPHRASE THAT.  WHAT IS YOUR

9  UNDERSTANDING OF HOW INACOM WOULD PROCEED TO PAY ITS

10  VENDORS AFTER THE ASSET PURCHASE AGREEMENT WAS

11  EXECUTED?

12          MR. CAINE:  OBJECTION.  NO FOUNDATION.

13      **A.    MY UNDERSTANDING IS THAT THEY WERE IN**

14  **ESSENCE -- WELL, THEY WERE DOING -- RUNNING THEIR OWN**

15  **BUSINESS AND PAYING THEIR OWN SUPPLIERS IN THE SAME**

16  **MANNER THAT THEY HAD BEEN DOING SO IT WAS COMPLETELY**

17  **SEPARATE FROM THE CUSTOM EDGE OPERATION.**

18      Q.    OKAY.

19      **A.    SO I WAS -- I WAS NOT INVOLVED AT ALL WITH**

20  **INACOM AND THEIR SUPPLIERS AND THEIR BUSINESS.**

21      Q.    DO YOU RECALL ANY DISCUSSIONS CONCERNING

22  OTHER VENDORS WHO PERHAPS HAD NOT RAISED ISSUES

23  CONCERNING SHIPMENTS TO CUSTOM EDGE?

24      **A.    NO.**

25      Q.    AND ARE YOU AWARE OF ANYBODY AT CUSTOM

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 62

```
 1   EDGE WHO CONTACTED OR SPOKE TO ANYBODY AT DELL
 2   CONCERNING SHIPMENTS MADE TO CUSTOM EDGE?
 3        A.   NO.
 4             MR. LANDON:  I HAVE NO FURTHER QUESTIONS.
 5             MR. FORTE:  THIS IS EARL FORTE.  I WOULD
 6        LIKE TO ASK A COUPLE OF QUESTIONS UNLESS
 7        SOMEONE WANTS TO GET IN AHEAD OF ME.
 8             MS. DUMAS:  IT'S YOUR TURN, EARL.
 9             MR. FORTE:  ALL RIGHT.
10                  CROSS EXAMINATION
11   BY MR. FORTE:
12        Q.   MR. FRANCIS, MY NAME IS EARL FORTE.  I
13   WORK FOR THE LAW FIRM OF BLACK ROME AND WE REPRESENT
14   EXECUTIVE SOUNDING BOARD, INC., WHICH IS THE
15   LIQUIDATING AGENT OF THE INACOM ESTATE AND WE ARE
16   PROSECUTING AN ACTION AGAINST DELL, MR. LANDON'S
17   CLIENT, ON BEHALF OF THE DEBTOR.
18             NOW, I KNOW YOU JUST SAID THAT YOU'RE
19   UNAWARE OF ANY OF THE SO-CALLED COMFORT LETTERS GOING
20   TO DELL, BUT ARE YOU AWARE OF ANY OTHER PROMISE MADE
21   BY COMPAQ OR C.E.I. TO DELL OR ANY OF ITS AFFILIATES
22   THAT ANY OF ITS OUTSTANDING BILLS FROM INACOM WOULD
23   BE PAID BY EITHER COMPAQ OR C.E.I.?
24        A.   NO.
25        Q.   ARE YOU AWARE OF ANY AGREEMENT BETWEEN
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 63

```
 1    INACOM ON THE ONE HAND AND COMPAQ OR C.E.I. ON THE

 2    OTHER WHEREBY FUNDS FROM THE SALE TO COMPAQ-C.E.I.

 3    WOULD BE SEGREGATED OR SEPARATED BY INACOM TO PAY

 4    OUTSTANDING BILLS TO DELL, ITS AFFILIATES OR ANY

 5    OTHER SUPPLIERS OF INACOM?

 6         A.   NO.

 7         Q.   NOW, YOU USED A TERM IN RESPONSE TO ONE OF

 8    MR. PATRICK'S (SIC) QUESTIONS; I THINK YOU SAID IT

 9    WAS A STRICTLY GOING-FORWARD SITUATION.  DID I

10    REMEMBER IT CORRECTLY?

11         A.   YES.

12         Q.   WHAT DID YOU MEAN BY THAT?

13         A.   WELL, AS OF THE DATE OF THE AGREEMENT IN

14    AN IDEAL WORLD, ANY MATERIALS THAT HAD BEEN SHIPPED

15    WOULD HAVE BEEN PAID FOR BY INACOM AND ANY MATERIALS

16    SHIPPED AND RECEIVED AFTER THAT DATE USED BY CUSTOM

17    EDGE WOULD BE THE RESPONSIBILITY OF CUSTOM EDGE.

18         Q.   ALL RIGHT.

19         A.   SO THAT'S HOW I WOULD DESCRIBE THAT.

20         MR. FORTE:  OKAY.  I HAVE NO FURTHER

21    QUESTIONS OF THE WITNESS.  THANK YOU, MR.

22    FRANCIS.

23         THE WITNESS:  YOU'RE WELCOME.

24         MS. DUMAS:  MR. CAINE, DO YOU HAVE ANY

25    QUESTIONS FOR THE WITNESS?
```

```
 1            MR. CAINE:  NO.
 2            MS. DUMAS:  OKAY.  I WOULD LIKE TO TAKE A
 3       FEW MINUTES AND ASK SOME QUESTIONS.
 4                   CROSS EXAMINATION
 5  BY MS. DUMAS:
 6       Q.   MR. FRANCIS, AS YOU KNOW, I REPRESENT
 7  HEWLETT PACKARD COMPANY.  AS THE RESULT OF A MERGER
 8  THAT OCCURRED AFTER THE TIME PERIOD IN WHICH WE'VE
 9  BEEN DISCUSSING COMPAQ COMPUTER CORPORATION MERGED
10  WITH HEWLETT PACKARD COMPANY, SO ALTHOUGH I REPRESENT
11  H.P., I'M GOING TO REFER TO MY CLIENT AS COMPAQ
12  BECAUSE THAT WAS THE ENTITY INVOLVED IN THESE
13  TRANSACTIONS.  IS THAT A FAIR --
14       A.   YES.
15       Q.   -- UNDERSTANDING?
16       A.   YES.
17       Q.   THANK YOU.  MR. FRANCIS, I BELIEVE YOU
18  PREVIOUSLY TESTIFIED THAT WHEN MR. FRASCA ASKED YOU
19  TO DELIVER THESE COMFORT LETTERS YOU HAD NOT BEEN
20  AWARE OF THE SO-CALLED HELD CHECKS; IS THAT CORRECT?
21       A.   THAT'S CORRECT.
22       Q.   AND YOU DIDN'T BECOME AWARE OF EVEN THE
23  TERM "HELD CHECKS" UNTIL YOU AND I MET YESTERDAY; IS
24  THAT CORRECT?
25       A.   THAT'S CORRECT.
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 65

```
 1        Q.    THE, THE FORM OF THE LETTER -- AND I'LL
 2   JUST REFER TO EXHIBIT 1, THE LETTER TO LEXMARK, THE
 3   FORM OF THE LETTER, PARAGRAPH 2 STATES, "IN
 4   CONNECTION WITH SUCH PURCHASE, CUSTOM EDGE, INC.,
 5   ALSO ASSUMED THE OBLIGATION TO PAY ALL OF THE --" LET
 6   ME START AGAIN.
 7            QUOTE, "IN CONNECTION WITH SUCH PURCHASE,
 8   CUSTOM EDGE, INC., ALSO ASSUMED THE OBLIGATION TO PAY
 9   ALL OF THE OUTSTANDING AMOUNT ON THE REFERENCED
10   ACCOUNT, SUBJECT TO THE TERMS AND CONDITIONS OF SUCH
11   ACCOUNT," END QUOTE.
12            IN THAT PARAGRAPH DID YOU INTEND TO ASSUME
13   THE OBLIGATION TO PAY AMOUNTS THAT MIGHT BE
14   REPRESENTED BY HELD CHECKS --
15            MR. HUNT:   OBJECTION --
16        Q.    -- AT INACOM?
17            MR. HUNT:   -- TO FORM.
18        A.    NO.
19            THE COURT REPORTER:   DID YOU OBJECT?   I'M
20        SORRY.
21            MR. HUNT:   OBJECTION TO FORM.
22   BY MS. DUMAS:
23        Q.    WAS THIS PARAGRAPH INTENDED TO CONSTITUTE
24   A CORPORATE GUARANTEE OF COMPAQ --
25        A.    NO.
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 66

1      Q.    -- TO YOUR UNDERSTANDING?

2      **A.    NO.**

3      Q.    HAVE YOU EVER BEEN INVOLVED WHEN YOU WERE

4    AT COMPAQ IN THE ISSUANCE BY COMPAQ OF A CORPORATE

5    GUARANTEE OF OBLIGATIONS OF CUSTOM EDGE?

6      **A.    NO.**

7      Q.    ARE YOU AWARE OF WHAT PROCEDURE WAS

8    REQUIRED AT COMPAQ AT THIS TIME FRAME, EARLY 2000,

9    FOR THE ISSUANCE OF A CORPORATE GUARANTEE?

10          MR. HUNT:   OBJECTION.  NO FOUNDATION.

11          MS. DUMAS:   THAT'S ACTUALLY A GOOD

12      OBJECTION.   LET ME ASK THAT --

13    BY MS. DUMAS:

14      Q.    DO YOU HAVE ANY PERSONAL UNDERSTANDING OF

15    WHAT TYPES OF PROCEDURES MAY HAVE BEEN IN PLACE AT

16    COMPAQ IN EARLY 2000 WITH REGARD TO THE ISSUANCE OF A

17    CORPORATE GUARANTEE?

18          MR. HUNT:   OBJECTION.  ASSUMES FACTS NOT

19      IN EVIDENCE.

20      **A.    NO.**

21      Q.    AND YOU WERE NEVER PERSONALLY INVOLVED IN

22    THE ISSUANCE OF ANY SUCH GUARANTEE.

23      **A.    NO.**

24      Q.    WHEN YOU SENT OUT THESE COMFORT LETTERS IN

25    THIS FORM WAS IT YOUR UNDERSTANDING THAT THIS LETTER

Inacom vs. Tech Data                  3/2/2005                  WILLIAM FRANCIS

Page 67

```
 1   WOULD OBLIGATE COMPAQ TO MAKE THESE SUPPLIERS WHO

 2   RECEIVED THESE LETTERS WHOLE IN THE CIRCUMSTANCE

 3   WHERE THE SUPPLIERS RECEIVED THE MONEY FROM INACOM,

 4   INACOM LATER FILED A BANKRUPTCY CASE, INACOM'S

 5   TRUSTEE LATER FILED A PREFERENCE ACTION AND THE

 6   ESTATE SOUGHT TO RECOVER THE MONEY BACK FROM THE

 7   SUPPLIERS IN THAT LITIGATION?  WERE THOSE

 8   CIRCUMSTANCES WITHIN YOUR CONTEMPLATION WHEN YOU

 9   DELIVERED THESE COMFORT LETTERS?

10        A.   NO.

11             MR. HUNT:  OBJECTION, COMPOUND; BUT IF YOU

12        CAN UNDERSTAND IT, YOU CAN ANSWER IT.

13        A.   NO.

14        Q.   SO JUST TO MAKE SURE I'M CLEAR, THAT

15   CIRCUMSTANCE WAS NEVER PART OF YOUR INTENTION IN

16   DELIVERING THESE LETTERS --

17        A.   NO.

18        Q.   -- IS THAT CORRECT?

19             MR. HUNT:  SAME OBJECTION.

20        A.   THAT'S CORRECT.

21             MS. DUMAS:  THANK YOU.  I HAVE NO FURTHER

22        QUESTIONS.

23             MR. COLLINS:  THIS IS PAT COLLINS.  I JUST

24        WANT TO FOLLOW UP ON A COUPLE OF MISS DUMAS'

25        QUESTIONS, IF I MAY.
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 68

```
 1              RECROSS EXAMINATION
 2   BY MR. COLLINS:
 3       Q.   REFERRING TO THE SECOND PARAGRAPH OF
 4   EXHIBIT NO. 1, WERE YOU EVEN THINKING ABOUT HELD
 5   CHECKS AT ALL IN CONNECTION WITH THAT -- WHEN YOU
 6   WROTE THAT PARAGRAPH OR SENT OUT THAT LETTER?
 7       A.   FIRST, I DIDN'T WRITE IT.  IT WAS JOHN
 8   FRASCA; AND TO ANSWER YOUR QUESTION, I DIDN'T KNOW
 9   ANYTHING ABOUT HELD CHECKS AT THE TIME THESE LETTERS
10   WERE SENT.
11       Q.   SO WHEN MISS DUMAS ASKED YOU WHETHER YOU
12   INTENDED BY THAT PARAGRAPH TO OBLIGATE CUSTOM EDGE TO
13   PAY HELD CHECKS, YOU ANSWERED NO, THAT'S SOMETHING
14   YOU DIDN'T KNOW ABOUT ONE WAY OR ANOTHER.
15       A.   I DIDN'T HAVE ANY KNOWLEDGE ABOUT THE HELD
16   CHECK SITUATION AT ALL.
17       Q.   THANK YOU.  AND MISS DUMAS ALSO ASKED YOU
18   ABOUT WHETHER YOU INTENDED PARAGRAPH 2 OF THE COMFORT
19   LETTERS TO COVER SITUATIONS WHERE THE SUPPLIER MAY
20   HAVE BEEN PAID BUT THEN LATER ASKED TO RETURN THE
21   MONEY IN THE CONTEXT OF THE BANKRUPTCY CASE.
22           WAS THAT A SITUATION THAT YOU WERE EVEN
23   CONTEMPLATING WHEN THESE COMFORT LETTERS WERE SENT
24   OUT?
25       A.   NO.
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 69

```
 1              MR. COLLINS:  THANK YOU.
 2              MR. CAINE:  I HAVE A COUPLE OF QUESTIONS.
 3                  CROSS EXAMINATION
 4   BY MR. CAINE:
 5       Q.   BY THESE COMFORT LETTERS, MR. FRANCIS, DID
 6   YOU INTEND TO CREATE ANY NEW OBLIGATIONS OF COMPAQ?
 7       A.   NO.
 8       Q.   AT THE TIME THAT YOU SIGNED THESE LETTERS
 9   DID YOU HAVE THE AUTHORITY, TO YOUR KNOWLEDGE AND
10   UNDERSTANDING, TO BIND COMPAQ TO ANY SUCH OBLIGATION?
11       A.   REPEAT THAT QUESTION.
12       Q.   SURE.  AT THE TIME THAT THESE COMFORT
13   LETTERS WERE SENT IN MID FEBRUARY OF 2000 TO YOUR
14   UNDERSTANDING DID YOU HAVE THE AUTHORITY TO BIND
15   COMPAQ TO ASSUME THE OBLIGATION TO PAY ANY OF THE
16   OUTSTANDING AMOUNTS REFERENCED IN THESE LETTERS?
17       A.   NO.
18              MR. CAINE:  I HAVE NOTHING FURTHER.
19              MR. HUNT:  I WOULD LIKE TO FOLLOW UP ON
20         THAT, MR. FRANCIS, BECAUSE I BELIEVE YOU
21         TESTIFIED EARLIER THAT YOU HAD THESE LETTERS
22         APPROVED BEFORE THEY WERE SENT OUT EVEN THOUGH
23         THERE WAS NO POLICY THAT THEY HAD TO BE
24         APPROVED; AND I THINK YOUR ANSWER TO MR. CAINE
25         IS CONTRADICTORY TO THAT.
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 70

```
 1              I THINK -- AND I HAVEN'T ASKED THE

 2         QUESTION YET -- THAT EITHER YOU HAD THE

 3         AUTHORITY TO SEND THEM AND SIGN THEM OR YOU

 4         DIDN'T, AND THAT'S WHY YOU EITHER GOT APPROVAL

 5         OR YOU DIDN'T, SO LET ME ASK YOU TO THINK ABOUT

 6         THAT FOR A MOMENT.

 7              MS. DUMAS:  THERE'S NO QUESTION PENDING --

 8              MR. CAINE:  THERE'S NO --

 9              MR. DUMAS:  -- MR. FRANCIS.

10              MR. CAINE:  -- QUESTION PENDING, AND I

11         COMPLETELY DISAGREE WITH --

12              MS. DUMAS:  AND I --

13              MR. CAINE:  -- COUNSEL'S CHARACTERIZATION.

14              MS. DUMAS:  OBJECTION TO THE BADGERING OF

15         THE WITNESS AND ANY IMPLICATION THAT THE

16         WITNESS' TESTIMONY HAS BEEN ANYTHING OTHER THAN

17         FULLY TRUTHFUL AND RESPONSIVE.

18              MR. CAINE:  AND CONSISTENT.

19                   RECROSS EXAMINATION

20         BY MR. HUNT:

21           Q.   NOW, MR. FRANCIS, WOULD YOU HAVE SENT

22         EXHIBITS 1 AND 4 OUT IF YOU DIDN'T HAVE THE AUTHORITY

23         TO SIGN THEM?

24           A.   I HAD AUTHORITY TO SIGN THESE LETTERS.

25         THE QUESTION WAS DID I HAVE THE AUTHORITY TO COMMIT
```

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 71

1   COMPAQ TO ASSUME OTHER LIABILITIES AND MY ANSWER WAS

2   NO, I DID NOT HAVE THAT LEVEL OF AUTHORITY.  THAT'S

3   NOT WHAT THIS LETTER WAS INTENDED TO DO.

4            MR. HUNT:  WE CAN READ BACK MR. CAINE'S

5        QUESTION BUT IT WAS GROUNDED IN THE TERMS OF

6        THE LETTER AND THAT'S WHY I'M POSING THIS

7        FOLLOW-UP QUESTION.  I'LL LIMIT MY QUESTION TO

8        WHAT WAS ASKED AND ANSWERED THEN, AND I HAVE

9        NOTHING FURTHER.  THANK YOU.

10           MS. DUMAS:  ANYBODY ON THE PHONE?  I THINK

11       WE'RE DONE.

12           MR. FORTE:  NO QUESTIONS MORE FROM ME,

13       EARL FORTE.

14           MR. LANDON:  NONE FROM JAMES LANDON.

15           MR. HUNT:  NO QUESTIONS FURTHER FROM THE

16       PHONE?

17           MR. COLLINS:  NO.

18           MR. FORTE:  NO.

19           MR. HALLIDAY:  I THINK WE'RE DONE.  THANK

20       YOU, MR. FRANCIS.

21           THE WITNESS:  THANK YOU.

22           MR. FORTE:  THIS IS EARL FORTE.  I'D JUST

23       LIKE TO TELL THE COURT REPORTER WHAT KIND OF

24       TRANSCRIPT I WANT.  A MINISCRIPT AND AN ASCII

25       DISK AND HARD COPIES OF THE EXHIBITS.

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 72

1      MR. LANDON:  I'LL HAVE THE MINISCRIPT AND

2   AN ASCII AND AGAIN JUST A HARD COPY OF THE

3   EXHIBITS.

4   (THE DEPOSITION WAS CONCLUDED AT 12:06 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25