UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

In Re:  INACOM CORP, et al.          Chapter 11
    Debtors                          Bankruptcy Case No.
_____      00-2426 (PJW)
INACOM CORP., et al.
          Plaintiffs
    v.
TECH DATA CORPORATION                Civil Action No.
          Defendant                  04-CV-148 (GMS)
_____
INACOM CORP., et al.
          Plaintiffs
    v.
DELL COMPUTER CORP.                  Civil Action No.
          Defendant                  04-CV-582 (GMS)
_____
INACOM CORP., et al.
          Plaintiffs
    v.
LEXMARK INTERNATIONAL, INC.          Civil Action No.
          Defendant                  04-CV-583 (GMS)
_____
INACOM CORP., et al.
          Plaintiffs
    v.
RESILIEN, INC.                       Civil Action No.
          Defendant                  04-CV-584 (GMS)
_____
INACOM CORP., et al.
          Plaintiffs
    v.                               Civil Action No.
INGRAM ENTERTAINMENT INC.            04-CV-593 (GMS)
          Defendant


**********************************************************

**ORAL DEPOSITION OF**

**JOHN T. FRASCA**

**MARCH 30, 2005**

**********************************************************

ORAL DEPOSITION OF JOHN T. FRASCA, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 30th day of March, 2005, from 9:26 a.m. to 11:43 a.m., before Debbie Leonard, CSR, RMR, CRR, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Hewlett-Packard, 20555 State Highway 249, Building CC-A6, Conference Room 6801, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF:
          Mr. Andrew W. Caine
 3        (via telephone)
          PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB
 4        10100 Santa Monica Boulevard
          11th Floor
 5        Los Angeles, California 90067
          FAX:  (310) 201-0760
 6        PHONE:  (310) 277-6910

 7   FOR THE DEFENDANT, TECH DATA CORPORATION:
          Mr. Stephen C. Hunt
 8        ADORNO & YOSS
          350 East Las Olas Boulevard
 9        Suite 1700
          Fort Lauderdale, Florida 33301
10        FAX:  (954) 766-7800
          PHONE:  (954) 763-1200
11
     FOR THE DEFENDANT, DELL COMPUTER CORP.:
12        Mr. G. James Landon
          HUGHES LUCE, LLP
13        111 Congress Avenue
          Suite 900
14        Austin, Texas 78701
          FAX:  (512) 482-6859
15        PHONE:  (512) 482-6880

16   FOR THE DEFENDANT, LEXMARK INTERNATIONAL, INC.:
          Mr. Culver V. Halliday
17        STOLL, KEENON & PARK, LLP
          2650 Aegon Center
18        400 West Market Street
          Louisville, Kentucky 40202-3377
19        FAX:  (502) 568-5700
          PHONE:  (502) 568-9100
20
     FOR THE DEFENDANT, INGRAM ENTERTAINMENT:
21        Mr. Jonathan P. Hersey
          (via telephone)
22        BINGHAM McCUTCHEN, LLP
          600 Anton Boulevard
23        18th Floor
          Costa Mesa, California 92626
24        FAX:  (714) 830-0719
          PHONE:  (714) 830-0619
25
```

1                    A P P E A R A N C E S
                         (Continued)
2

  FOR EXECUTIVE SOUNDING BOARD, INC., LIQUIDATING AGENTS
3 OF DEBTOR, INACOM CORP.:

4        Mr. Earl M. Forte
         (via telephone)
5        BLANK ROME, LLP
         One Logan Square
6        18th & Cherry Streets
         Philadelphia, Pennsylvania 19103
7        FAX:   (215) 832-5618
         PHONE:  (215) 569-5618
8

  FOR THE WITNESS AND THIRD-PARTY DEFENDANT, COMPAQ
9 COMPUTER CORPORATION:

10       Ms. Cecily A. Dumas
         FRIEDMAN, DUMAS & SPRINGWATER, LLP
11       One Maritime Plaza
         Suite 2475
12       San Francisco, California 94111
         FAX:   (415) 834-1044
13       PHONE:  (415) 834-3800

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        I N D E X

2                                                    PAGE

3   Appearances.................................     2

4   JOHN T. FRASCA

5

6        Examination by Mr. Hunt...................    7

7        Examination by Mr. Halliday...............   66

8        Examination by Mr. Landon.................   72

9        Examination by Mr. Hersey.................   73

10       Examination by Mr. Forte..................   76

11       Further Examination by Mr. Hunt...........   77

12

13

14  Changes and Signature.........................   81

15  Reporter's Certificate........................   83

16

17

18

19

20

21

22

23

24

25
```

1                        E X H I B I T S

2    NUMBER             DESCRIPTION                        PAGE

3    Frasca-1           Defendants' First Notice of          7
                        Deposition of John Frasca, six
4                       pages

5    Frasca-2           Forwarding E-mail                   32
                        From: Ward, Michael
6                       Sent:   February 03, 2000
                        To:   Zava Mike et al.
7                       Subject:   Copy of the 8K

8    Frasca-3           Letter to Mr. David Guenthner       36
                        from Michael J. Ward
9                       dated February 9, 2000

10   Frasca-4           Fax Transmittal                     38
                        To:  Mr. Mike Zafa
11                      From:  Bill Francis
                        Dated:  02/16/00
12
     Frasca-5           Letter to Ms. Misty Atchinson       45
13                      from Bill Francis
                        dated February 16, 2000
14
     Frasca-6           Letter to Logicare, Inc.            45
15                      from Bill Francis, dated
                        February 17, 2000
16
     Frasca-7           Letter to The Board of              61
17                      Directors of Inacom
                        Corporation and Compaq
18                      Computer Corporation from
                        Houlihan Lokey Howard & Zukin,
19                      dated February 16, 2000

20   Frasca-8           Résumé of John T. Frasca            63

21

22

23

24

25

```
 1              (Exhibit Frasca-1 marked for

 2              identification.)

 3              JOHN T. FRASCA,

 4    having been first duly sworn, testified as follows:

 5                   EXAMINATION

 6    BY MR. HUNT:

 7         Q.    Good morning, Mr. Frasca.  My name is Stephen

 8    Hunt.  I'm from a law firm called Adorno & Yoss, and I

 9    represent Tech Data Corporation.  Tech Data is a

10    defendant in a lawsuit brought by Inacom, and Tech Data

11    is also a third-party plaintiff as to Compaq and

12    Hewlett-Packard as a successor entity regarding the

13    subject matter of the same lawsuit.

14              Have you ever been deposed before?

15         A.    Yes.

16         Q.    While this may be redundant, let me reiterate

17    some instructions for you for the clarity of the

18    record.

19              Please be sure to respond with a verbal

20    answer.  Do not limit your response to hand gestures or

21    a shake or nod of your head as it will be difficult for

22    the reporter to record your answer.

23              Further, after I've asked a question,

24    please wait for the entire question before you answer.

25              Finally, in the event that you have an
```

1  objection interposed by any of the counsel, please be

2  guided by one of the counsel here as to your next

3  course of action.  You may be instructed by your

4  attorney not to answer a question.  So you should bear

09:27  5  those instructions in mind accordingly.

6              Do you have any questions regarding this

7  procedure?

8      A.   No.

9      Q.   Mr. Frasca, would you state your full legal

09:27  10  name, please?

11      A.   John Thomas Frasca.

12              MR. HUNT:  Can everyone on the phone

13  hear the witness?

14              MR. FORTE:  Yes.

09:27  15      Q.   (By Mr. Hunt)  Mr. Frasca, what is your

16  address, please?

17      A.   12407 Mossy, M-O-S-S-Y, Woods Drive, Tomball,

18  T-O-M-B-A-L-L, Texas 77377.

19      Q.   Thank you.  What is your current position?

09:27  20  And am I correct in assuming that you're at

21  Hewlett-Packard?

22      A.   Yes.  I'm the director of global logistics

23  procurement.

24      Q.   How long have you been employed by

09:28  25  Hewlett-Packard, as Hewlett-Packard?

1    A.    Three years.

2    Q.    Starting month and year, if you could,

3 please.

4    A.    I'm trying to think of when the acquisition

09:28  5 took place.  As an HP employee, the acquisition took

6 place March, May.  Three years ago.

7    Q.    Okay.  Thank you.  Have you had the same

8 title during your tenure with Hewlett-Packard?

9    A.    Yes.

09:28 10    Q.    What are your responsibilities as director of

11 global logistics procurement?

12    A.    I'm responsibility -- I'm responsible for

13 $2.5 billion worth of logistics procurement, which is

14 all of the air freight, all of the parcel, all of the

09:29 15 surface, all of the ocean, all of the third-party

16 logistics, all of the contracts negotiation, all of the

17 metrics associated with those contracts.

18    Q.    During your time in this position, have you

19 had any occasion to have contact with Tech Data or any

09:29 20 of its agents or employees?

21    A.    No.

22    Q.    I'm going to hand you what's been marked as

23 Exhibit Frasca-1, and I'll ask you to take a look at

24 that, please.  I just have the one counsel [sic] for

09:29 25 your counsel to look at as well, but I'll represent to

```
 1  you that that's the deposition notice for today's
 2  deposition.
 3                  (Pause)
 4       A.   Okay.
 5       Q.   You can --
 6       A.   Oh.
 7       Q.   -- keep it handy in case you want to refer
 8  back to it, sir.
 9       A.   Okay.
10       Q.   Mr. Frasca, did you review Page 3 whereon
11  there is a request for any documentation you might have
12  regarding certain topics?
13       A.   I did.
14       Q.   Do you have any documents with you today?
15       A.   I do not.
16       Q.   Okay.  Have you seen this deposition notice
17  before?
18       A.   I have not.
19       Q.   Prior to joining Hewlett-Packard, were you
20  with Compaq Computer Corporation?
21       A.   Yes.
22       Q.   What was your title at Compaq?
23       A.   It was director of global logistics.
24       Q.   Were your responsibilities different from
25  your present responsibilities at Hewlett-Packard?
```

1    A.    It was the same but included all of the

2  freight costs management, all of the security, and all

3  of the claims associated with movement of product.

4    Q.    So your responsibilities have narrowed since

09:31  5  you joined Hewlett-Packard?

6    A.    It has --

7    Q.    Categorically?

8    A.    Categorically, yes.

9    Q.    Do you hold a position as an officer of

09:31  10  Hewlett-Packard?

11    A.    No.

12    Q.    Did you hold a position as an officer of

13  Compaq?

14    A.    No.

09:31  15    Q.    Do you recall when you joined Compaq?

16    A.    Through acquisition, February of 2000.

17    Q.    Other than through acquisition, do you recall

18  when you actually began working for Compaq per se?

19    A.    It was upon close of Compaq purchasing the

09:32  20  assets of Inacom.  I don't know the exact date.

21    Q.    Did you have a title with Custom Edge

22  Corporation?

23    A.    Yes.

24    Q.    What was your title with Custom Edge?

09:32  25    A.    Vice president of supply chain management.

1    Q.    Do you recall how long you were in that

2    position?

3    A.    As Custom Edge, three months, approximately.

4    Q.    Would you explain the circumstances by which

09:33    5    you were no longer working as a Custom Edge employee

6    and became a Compaq employee?

7    A.    Sure.  When Compaq purchased the assets of

8    Inacom, the strategy that was communicated by the

9    executives was to not call it Compaq but rather call it

09:34    10    Custom Edge.

11        The strategy was to offer the customer a

12    multi-vendor solution, which means offering them a Dell

13    computer, a Lexmark printer, a Compaq desktop, and an

14    HP server.  Really offering the customer a suite of

09:34    15    products, not just a Compaq product.

16        That did not go well because IBM decided

17    not to sell Custom Edge product.  So then Compaq

18    decided to change it from Custom Edge to Compaq Direct.

19    Compaq Direct was considered the direct model to the

09:34    20    customers.  So it was more of a marketing strategy

21    title of Custom Edge.

22    Q.    With that transition from Custom Edge to

23    Compaq, did you become a direct employee of Compaq

24    Computer?

09:35    25    A.    I was a direct employee of Compaq when it was

1 called Custom Edge.

2     Q.    Okay.  And after that three-month period of

3 time where you transitioned marketing of the company --

4     A.    It was more of a business card change only.

09:35 5 I don't know from a legal subsidiary or any of that how

6 that worked.  I was not privy to that.  The only

7 fundamental change in my life was a business card

8 change.

9     Q.    I heard you use the name of an entity, unless

09:35 10 I'm mistaken, Compaq Direct?

11     A.    Uh-huh.

12     Q.    Was that a separate entity that you might

13 have been employed by?

14     A.    It was Compaq.

09:35 15     Q.    Okay.  Was that more in the nature of a

16 "doing business as" or trade name?

17     A.    I don't know how it was set up.  You know,

18 from our perspective, it was more of a marketing.

19     Q.    Okay.  Before the acquisition of the Inacom

09:36 20 hardware division by Compaq -- and when I refer to

21 Compaq, perhaps Ms. Dumas would prefer I refer to it as

22 Hewlett-Packard, just for the sake of consistency.

23              MS. DUMAS:  Whatever is a communication

24 where the witness understands you, it makes no

09:36 25 difference to me whether you refer to it as

1    Hewlett-Packard or Compaq.

2            MR. HUNT:  Okay.

3        Q.   (By Mr. Hunt)  Prior to the acquisition of

4    the hardware division of Inacom by Hewlett-Packard --

09:36   5            MS. DUMAS:  Objection.  Assumes facts

6    not in evidence.

7            You can go ahead and answer.

8            MR. HUNT:  Actually, I was still framing

9    the question.

09:36  10            MS. DUMAS:  I'm sorry, Steve.  I'm

11   sorry.

12       Q.   (By Mr. Hunt)  Prior to the sale of Inacom's

13   hardware division, were you employed by Inacom?

14       A.   Yes.

09:37  15            MS. DUMAS:  Objection.  Assumes facts

16   not in evidence.

17            You should wait until I render an

18   objection.

19            THE WITNESS:  Okay.

09:37  20            MS. DUMAS:  He referred to an

21   acquisition of a division instead of assets, so I've

22   got to state my objection.  I think he's saying

23   something that wasn't the case, so --

24            THE WITNESS:  Okay.

09:37  25       Q.   (By Mr. Hunt)  Let me rephrase it then,

1    Mr. Frasca.

2              Prior to the sale of Inacom's hardware

3    assets, were you employed by Inacom?

4        A.    Yes.

09:37 5        Q.    What was your position at the time that you

6    left Inacom?

7        A.    Vice president of supply chain management.

8        Q.    Who was your immediate supervisor?

9        A.    Leon Kerkman.

09:37 10       Q.    Was Mr. Kerkman your immediate supervisor at

11   Custom Edge as well?

12       A.    Yes.

13       Q.    Was he your immediate supervisor at Compaq?

14       A.    No.

09:38 15       Q.    Who was your immediate supervisor there?

16       A.    Robert Gifford.

17       Q.    Was Mr. Kerkman in the chain of command, so

18   to speak, over you at Compaq?

19       A.    Until I moved from Omaha.

09:38 20       Q.    Okay.  Is Mr. Kerkman in a supervisory

21   capacity of you now?

22       A.    No.

23       Q.    Okay.  When did you begin working with

24   Inacom?

09:38 25       A.    1998, July.

1    Q.    What position did you begin with at Inacom?

2    A.    Director of supply chain management.

3    Q.    Did you move directly from director of supply

4  chain management to VP of supply chain management?

09:39   5    A.    Yes.

6    Q.    Was Mr. Kerkman your immediate supervisor

7  when you were the director of supply chain management

8  as well?

9    A.    Yes.

09:39  10    Q.    Did your responsibilities change between

11  serving as VP and director of supply chain management?

12    A.    Yes.

13    Q.    What were your responsibilities as director?

14    A.    I was responsible for forecasting and

09:39  15  material procurement.

16    Q.    Would you tell me a little more, please, of

17  what forecasting means?

18    A.    Inacom did not have a forecasting tool, and

19  so I had designed and implemented a means to signal the

09:40  20  suppliers on how much product that they would need and

21  when they would need it.

22    Q.    In the context of your forecasting

23  responsibilities, did that call for regular

24  communications with Inacom's suppliers?

09:40  25    A.    No.

1    Q.    Okay.  In what manner would you convey the

2  forecast of what products might be needed?

3    A.    Electronically.

4    Q.    Electronic mail?

09:40  5    A.    EDI, electronic data.  And it was -- it's

6  called an 832, and it was electronic means that would

7  send it to our system to another system, and then the

8  supplier would look at it and then send something back

9  saying, "Yes, I can commit to it."

09:41  10    Q.    Other than inputting the data into -- may I

11  call it the EDI system?

12    A.    Uh-huh.

13    Q.    Other than inputting the data into the EDI

14  system, was there any further need for direct

09:41  15  communications with the suppliers in order to fulfill

16  forecasting of orders?

17    A.    Not personally.

18    Q.    Who would communicate with Inacom's suppliers

19  under your responsibilities as director of supply chain

09:41  20  management?

21    A.    For forecasting, it would be the commodity

22  specialist, of which some were underneath my

23  organization and some were not, because forecasting was

24  for the total company, and I did not have the total

09:42  25  material procurement under me.

1    Q.    So in a sense, you had certain dedicated

2  employees for forecasting and others you shared?

3    A.    Yes.

4    Q.    How many people worked in that area while you

09:42  5  were at Inacom as a director?

6    A.    In forecasting?  Three.

7    Q.    Do you recall their names?

8    A.    Robert King, Steve Lambert, and I do not

9  recall the other.

09:42  10    Q.    Fair enough.  You also indicated that your

11  responsibilities as director of supply chain management

12  included materials procurement, and I would ask you if

13  you could just put that in layman's terms for me.

14    A.    Sure.  I was responsible for the procurement

09:43  15  of product from over 600 vendors.  We called those

16  vendors third-party options because they were not large

17  vendors, although there were four distributors that

18  were underneath my responsibility, and then, you know,

19  a balance of over 550 very small material vendors.

09:43  20    Q.    And were those 550 what you term the

21  third-party options?

22    A.    Correct.

23    Q.    Were the four distributors third-party

24  options as well?

09:43  25    A.    Correct.

```
 1         Q.    Did Tech Data fall in the category of a
 2   third-party option?
 3         A.    Correct.
 4         Q.    How about Lexmark?
 5         A.    No.
 6         Q.    Did Logicare fall into the category of a
 7   third-party option?
 8         A.·   I don't recall.
 9         Q.    How about any of the Ingram companies?
10         A.    Yes.
11         Q.    Do you recall which ones?
12         A.    Ingram Micro.
13         Q.    Okay.
14               MR. HALLIDAY:   Ingram Entertainment was
15   Nashville --
16               MR. HUNT:   Thank you.  Nashville --
17               MS. DUMAS:   Computer Liquidators.
18               MR. HALLIDAY:   Thank you.
19               MR. HUNT:   Everyone is acting as my
20   prompt here.
21               MR. HALLIDAY:   Just to move this on.
22         Q.    (By Mr. Hunt)  Nashville Computer
23   Liquidators, did it fall in the category of a
24   third-party option as well?
25         A.    Yes.
```

1          MR. HUNT:  Thank you, everyone.

2      Q.   (By Mr. Hunt)  Did you communicate with the

3  third-party options directly?

4      A.   Some of them.

09:45  5      Q.   Did you communicate with Tech Data directly?

6      A.   On a quarterly basis.

7      Q.   Why on a quarterly basis, sir?

8      A.   Because I had a team of people that

9  interacted with them on a daily basis placing orders,

09:45  10  tracking orders.  My role was more of an executive one

11  that I would meet on a quarterly frequency to discuss

12  strategy, to discuss different opportunities to grow

13  the business or not grow the business, depending upon

14  how they were performing.

09:46  15      Q.   While you served as director of supply chain

16  management, how many people were on your team that

17  handled the day-to-day function, if you will, of

18  contacting third-party options?

19      A.   Approximately 15.

09:46  20      Q.   Were those personnel all dedicated to you in

21  your capacity as director --

22      A.   Yes.

23      Q.   -- or did you -- okay.  You didn't share them

24  with other persons?

09:46  25      A.   No.

1    Q.    When you were elevated to vice president of

2    supply chain management, did your job responsibilities

3    change categorically?

4    A.    Yes.

09:46  5    Q.    Were any responsibilities taken away?

6    A.    No.

7    Q.    What additional responsibilities were added?

8    A.    I ended up getting all of transportation,

9    which included surface, air, and parcel; as well as the

09:47 10   freight costs management system associated with the

11   transportation; as well as security; as well as claims;

12   as well as third-party logistics.

13   Q.    Upon your elevation as a vice president of

14   Inacom, do you know whether you were considered an

09:47 15   executive officer of the company?

16   A.    No.

17   Q.    Do you recall what Mr. Kerkman's title was

18   over you when you were vice president?

19   A.    I don't.

09:48 20   Q.    As a vice president of supply chain

21   management, did you have access to Inacom's internal

22   financial projections, budgets, forecasts of the

23   company's profitability?

24   A.    No.

09:48 25   Q.    Did you have any responsibility with the

1  financing arm of Inacom?

2      A.    No.

3      Q.    Did you participate in any way with

4  negotiations with lenders?

09:48  5      A.    No.

6      Q.    Were you called upon to produce data that

7  might be used in the compilation of financial

8  projections by the company?

9      A.    No.

09:48  10      Q.    In a sense, you were just handling the nuts

11  and bolts of procurement, correct?

12      A.    Correct.

13      Q.    Do you recall when you actually left Inacom's

14  employ?

09:48  15      A.    I do not recall the exact date.

16      Q.    Was it contemporaneous with the sale of the

17  hardware assets to HP?

18      A.    Yes.

19      Q.    How far in advance of the actual closing date

09:49  20  of that sale were you aware that it would be taking

21  place?

22      A.    I actually read about it in the Wall Street

23  Journal, so whenever that article was.    The

24  communication was not that good.

09:49  25      Q.    Did at some point you verify the information

1    that was reported in the Journal with other persons at

2    Inacom?

3        A.    Yeah.    It was a -- it was a company employee

4    letter that went out, an e-mail that went out to

09:49  5    everybody.

6        Q.    Do you recall when that e-mail might have

7    been or when the article in the Journal might have

8    been?

9        A.    I don't.

09:49 10        Q.    Okay.  Did you receive that e-mail shortly

11    after the Journal article?

12        A.    It was sometime after.    It was not the same

13    day.

14        Q.    A matter of days or weeks?

09:50 15        A.    Honestly, I don't recall.

16        Q.    Do you think that would have been in the

17    latter part of 1999?

18        A.    No, I don't know.

19        Q.    Do you recall how far in advance of the sale

09:50 20    of the hardware assets you were beginning to ramp up

21    for the eventual transition of that part of the company

22    to HP?

23        A.    I recall two months.

24        Q.    Do you recall who authored that e-mail to the

09:51 25    Inacom employees confirming the information you read in

1    the Journal?

2        A.    I don't.

3        Q.    Okay.  Is that the type of thing that might

4    have come from the president of the company?

09:51  5            MS. DUMAS:  Objection.  Calls for

6    speculation.

7        Q.    (By Mr. Hunt)  You can speculate.

8        A.    I have no idea.

9            MS. DUMAS:  Well, no, you can't

09:51 10    speculate.

11            THE WITNESS:  I can't speculate.  I

12    mean, yesterday's announcement of our new CEO came

13    from -- you know.  I have no idea.

14            MS. DUMAS:  Steve, I hate to do this so

09:51 15    quickly into your examination, but do you mind if I

16    take a very short bathroom break?

17            MR. HUNT:  Of course not.

18            In fact, I neglected to mention to you,

19    Mr. Frasca, that if at any time you need a break, you

09:51 20    should just please tell me and we'll take one.

21            THE WITNESS:  Okay.

22            (Break taken from 9:51 a.m. to 9:57 a.m.)

23        Q.    (By Mr. Hunt)  Mr. Frasca, we're resuming

24    after a short break.  Earlier, I showed you Exhibit 1

09:58 25    and asked you if you had produced any documents today

that were responsive to the deposition notice, and you

indicated that you had not.  Do you have documents or

access to documents that are responsive to what's been

asked for in the deposition notice?

09:58    A.    No.

Q.    Okay.  I see that you have two items in front

of you today.  One is a journal booklet, it appears to

be.  I'm going to ask you to identify what that is.

A.    It is a -- it's a book that I take notes in

09:58 from all my meetings and action items, Day Planner-type

item, if you will.

Q.    Does it include anything earlier than the end

of 2001?

A.    No.

09:58    Q.    Okay.  And there's another paper in front of

you today as well.  Is that something you're referring

to?

A.    It's my résumé.

MR. HUNT:  Any objection if I look at

09:59 it?  It might shorten some of my questions.

MS. DUMAS:  Absolutely.  Feel free.

MR. HALLIDAY:  We've had several

witnesses in this case go, "Gosh, I wish I brought my

résumé."

09:59    Q.    (By Mr. Hunt)  I commend you on your --

1          MR. HALLIDAY:  It's not a bad idea.

2          MS. DUMAS:  Although it may not be

3  necessary, since Mr. Nolan is not here.  Andy, that was

4  for your benefit.

09:59  5          MR. HUNT:  Certainly there could still

6  be the opportunity for extensive questioning regarding

7  precollege education.

8     Q.    (By Mr. Hunt)  I'll give this back to you,

9  sir.  I may just refer to it momentarily --

09:59  10    A.    That's fine.

11    Q.    -- if I have questions before we get out of

12  here.

13          You indicated that as a director of

14  supply chain management, you had an executive function

10:00  15  that included quarterly communications with certain of

16  your third-party option vendors, correct?

17    A.    Correct.

18    Q.    Did that executive function for quarterly

19  communications continue when you became vice president

10:00  20  of supply chain management at Inacom?

21    A.    Correct.

22    Q.    Did that result in any greater frequency of

23  contact with your third-party option vendors?

24    A.    No.

10:00  25    Q.    Did you have communications with your

1 third-party option vendors to advise them of the sale

2 of Inacom's hardware assets to HP prior to the closing

3 date?

4     A.    Yes.

10:00 5     Q.    Do you recall if you had communications with

6 Tech Data?

7     A.    I don't recall the specific vendors that I

8 communicated to.

9     Q.    Is it possible for you to indicate whether

10:01 10 the response by vendors was -- as to the sale of the

11 hardware assets, was a favorable response?

12     A.    I don't recall.

13     Q.    Do you recall when your quarterly

14 communication with third-party option vendors would

10:01 15 have normally taken place for the period immediately

16 prior to the sale of the Inacom hardware assets in

17 mid-February of 2000?

18     A.    I don't.

19     Q.    That wasn't, for example, something written

10:01 20 in stone where January 1st showed up in your calendar

21 and you said, "Now it's time for my quarterly

22 communications," was it?

23     A.    No.

24     Q.    In having these quarterly communications, did

10:02 25 you generally deal with lower-ranking employees of

1  their third-party option vendors or someone perhaps

2  higher up in their organization?

3      A.    It tended to include the account manager

4  assigned, as well as a VP that was available or

10:02  5  assigned.

6      Q.    And just to clarify the record, we're

7  referring to the account manager and/or VP assigned for

8  the third-party option vendor?

9      A.    Correct.

10:02  10      Q.    Did anyone in addition to yourself

11  participate in those quarterly communications on the

12  Inacom side?

13      A.    Sometimes.  It depended on who was available

14  from -- if Leon Kerkman was available, he would make a

10:02  15  showing, if you will.

16          And oftentime one of my direct reports or

17  their person assigned to that particular account would

18  attend predominantly for their own growth.

19      Q.    Can you tell me more particularly what the

10:03  20  subject matter generally was in these quarterly

21  meetings with third-party option vendors?

22      A.    We took a look at revenue, which defined how

23  much product were we buying from a particular vendor.

24          We also talked about how much revenue we

10:03  25  were buying from them versus a like competitor without

1  naming their name.

2           We talked about their order cycle time

3  and other certain metrics defined as, when an order was

4  placed, how long did it take them to deliver it to the

10:04  5  destination.

6           We talked about claims data, how often

7  that product was lost, damaged, short, over, when

8  compared to the order.

9           We talked about future opportunities and

10:04  10  where the vendor was actually going from a strategic

11  perspective.

12           That's about all the topics that we would

13  discuss.

14      Q.   Did those discussions include then a

10:04  15  reconciling function of disputed accounting issues

16  between Inacom and a third-party vendor?

17      A.   No.

18      Q.   On the Inacom side, who would have handled

19  the reconciliation of the account with a third-party

10:05  20  option vendor?

21      A.   Accounts payable function.

22      Q.   Was there a particular person that you might

23  have dealt with on the accounts payable side?

24      A.   Personally, no.

10:05  25      Q.   Do you recall who was in charge of that

1    function while at Inacom?

2        A.    Nancy Pearson.

3        Q.    Okay.  Mr. Frasca, can you explain to me the

4    circumstances by which you came to join the Inacom

10:05  5    company?

6        A.    I cold-called the executive vice president of

7    HR.  I told him that, although he had no position open,

8    that I could -- based upon looking at his annual

9    report, financial data, that I can make significant

10:06  10    change at Inacom.  And I said I would take him to

11    lunch, and he would have a free lunch and perhaps I

12    would have a job.

13            The next day, I interviewed with Bill

14    Fairfield, the CEO; Dave Guenthner, the CFO; Leon

10:06  15    Kerkman; and Wayne Lallman.  The following day after

16    that, I received an offer.

17        Q.    Very good.  Thank you.  I note from the

18    résumé that you shared with me that you previously

19    worked at Coleman Powermate Company in Omaha, Nebraska.

10:06  20        A.    Correct.

21        Q.    And there as well you indicate director of

22    supply chain management.

23        A.    Correct.

24        Q.    Did you work alongside with any personnel at

10:06  25    Coleman Powermate who later joined Inacom?

1      A.    Yes.

2      Q.    Who would that be, sir?

3      A.    Scott Simmelink.

4      Q.    Did you know Mr. Simmelink on a personal

10:07   5  level outside of Coleman Powermate?

6      A.    No.

7      Q.    Did you contact Mr. Simmelink in order to

8  assist with your hiring by Inacom?

9      A.    No.

10:07  10      Q.    Outside of your quarterly communications with

11  third-party option vendors, do you recall whether you

12  had occasions to have any more frequent discussions

13  with third-party option vendors in relation to the sale

14  by Inacom of the hardware assets?

10:07  15      A.    Verbal communications often would come from

16  the assigned -- the vendor-assigned account manager

17  prodding on what was going on.  I don't recall

18  specifics, but as a good account manager, that's their

19  job, to call and find out what's going on and report

10:08  20  upward.

21      Q.    Did you receive any calls from anyone at Tech

22  Data Corporation in January or February of 2000 before

23  the Inacom closing, if you recall?

24      A.    I don't recall any specific phone call, but I

10:08  25  would not be surprised if Donna Platt, who was the

1  assigned account manager, made phone calls.

2      Q.   Do you recall whether Mr. Mike Ward of Tech

3  Data might have communicated with you?

4      A.   I don't.

10:08  5      Q.   Do you recall whether you might have been on

6  a conference call as a participant with other personnel

7  from Inacom and personnel from Tech Data during that

8  January/February 2000 period?

9      A.   I don't.

10:09  10     Q.   Do you recall whether there were any concerns

11  voiced by Tech Data regarding what would happen to Tech

12  Data accounts payable by Inacom as part of the sale of

13  the hardware assets to Compaq?

14     A.   I don't.

10:09  15     Q.   Did you ever communicate, if you recall, by

16  electronic mail with Tech Data personnel separate and

17  apart from the EDI system?

18     A.   I don't recall any specific e-mail, but most

19  of my communication was done via that form of

10:10  20  communication.

21              MR. HUNT:   Madam Reporter, would you

22  mark this as Frasca-2, please?

23              (Exhibit Frasca-2 marked for

24              identification.)

10:10  25     Q.   (By Mr. Hunt)   Mr. Frasca, I'm handing you a

```
 1   lengthy document.  I'll represent to you the first page

 2   is an electronic mail message thread, and then there's

 3   an 8K from Inacom attached.  And you're welcome to look

 4   at the entire document, but I'll really just be

 5   confining my questions to the first page and the pages

 6   of the attachment that are referenced in what appears

 7   to be an e-mail communication.

 8                    (Pause)

 9        A.   Okay.

10        Q.   Ready, sir?

11        A.   Yeah.

12        Q.   Can you identify the first page of Exhibit 2

13   in any part?

14        A.   Are you asking me if I remember?

15        Q.   Well, let me go about it this way.

16        A.   Okay.

17        Q.   Would you agree that a portion of the first

18   page of Exhibit 2 appears to be an electronic mail

19   message from yourself to M. Ward, Michael Ward, at Tech

20   Data?

21        A.   Yes.

22        Q.   Do you have a recollection of ever sending

23   that e-mail?

24        A.   No.

25        Q.   Reviewing this now, does it refresh your
```

1  recollection at all regarding anything pertaining to

2  this e-mail message?

3      A.   No.

4      Q.   Would you have an ability to recall why you

10:13  5  might have sent it?

6      A.   No.

7      Q.   Also attached to Exhibit 2, as I indicated,

8  is an 8K for Inacom.  It is more particularly

9  identified as filed on 20000107, which appears to be

10:13  10  January 7 of 2000.  Did you have an opportunity to

11  review Pages 54 to 56 of that document?  Actually, 53

12  to 56.

13              (Pause)

14              MR. HUNT:  Just note for the record, the

10:14  15  witness is reviewing the document.

16              (Pause)

17              THE WITNESS:  Okay.

18      Q.   (By Mr. Hunt)  The question I had pending was

19  whether you had an opportunity to review the exhibit,

10:15  20  and may I assume you did?

21      A.   Yes.

22      Q.   Thank you.  Having reviewed this 8K in part,

23  does that refresh your recollection at all as to

24  information surrounding why this e-mail might have been

10:16  25  sent?

1        A.    It does not.

2        Q.    Okay.  Did you normally receive SEC public

3    filings from the company in your capacity as vice

4    president of supply chain management?

10:16  5        A.    No.

6        Q.    Do you know how you might have come in

7    possession of this 8K?

8        A.    I don't.

9        Q.    Would you have any reason to dispute that

10:16  10   this e-mail was sent by you on February 3rd of 2000?

11       A.    No.

12       Q.    I'm going to read the first paragraph of the

13   e-mail.  "I have attached the 8K for your review.  I

14   encourage you to read page 54 thru 56 which indicates

10:16  15   that 100% of the payables for Tech Data will be assumed

16   by Compaq."

17                  Was that your understanding -- let me

18   back up.

19                  Did you have an understanding that

10:17  20   100 percent of the payables for Tech Data would be

21   assumed by Compaq as part of this 8K, if you recall?

22       A.    I don't recall.

23       Q.    The e-mail continues.  "I would like to

24   discuss the opportunity to increase the credit limit

10:17  25   based on this contract."

1          Do you recall whether you ever had a

2  discussion with Tech Data after sending this e-mail

3  regarding increasing the credit limit based on this

4  contract?

10:17  5      A.    I don't.

6              MR. HUNT:  Madam Reporter, I would like

7  to mark these two pages as Exhibit 3, please.

8              (Exhibit Frasca-3 marked for

9              identification.)

10:18 10              MR. HUNT:  Bear with me, Cecily.  I'm

11  getting there.

12              MS. DUMAS:  Take your time.

13      Q.    (By Mr. Hunt)  Begging counsel's indulgence,

14  I'll show you what we've all looked at before in this

10:19 15  case that's been marked as Exhibit 3, and it's a letter

16  from Tech Data to Inacom.

17              THE WITNESS:  Is this the same?

18              MS. DUMAS:  It's actually two different

19  copies of the same letter.  Go ahead.  Take your time.

10:19 20      Q.    (By Mr. Hunt)  I will apologize to the

21  witness.  The exhibit is two pages.  The one,

22  hopefully, is a better copy of at least part of the

23  letter.  It's a letter dated February -- it appears to

24  be February 9th, 2000, from Mr. Michael J. Ward of Tech

10:20 25  Data to Mr. David Guenthner, G-U-E-N-T-H-N-E-R, of

1  Inacom.

2              MR. HUNT:  Do you need a copy, Cecily?

3              MS. DUMAS:  No.  I'm familiar with it.

4  If you've got an extra, I'll take it, but if you don't

10:20  5  have an extra --

6              MR. HUNT:  I'll give it to you when I'm

7  done, if you don't mind.

8              MS. DUMAS:  That's fine.

9              (Pause)

10:21  10     A.    Okay.  (Handing.)

11     Q.    You can retain it for now, Mr. Frasca.

12     A.    Okay.

13     Q.    I'll represent to you, reading from

14  Exhibit 3, that the first paragraph appears to read as

10:21  15  follows:

16              "This letter is to summarize our

17  conference call yesterday which included the following

18  Inacom senior managers:  Leon Kerkman, John Frasca, and

19  Dick Oshlo.  Mike Zafa and Donna Platt were also

10:21  20  present on this call."

21              I've omitted titles from the first

22  paragraph.

23              Do you recall being on a call with these

24  folks, including Mr. Guenthner and Mr. Michael Ward, I

10:21  25  suppose on or about February 8th of 2000?