1          A.    I do not.

2          Q.    And having reviewed the letter, does that

3    refresh your recollection at all about the call?

4          A.    No.

10:22  5    Q.    Okay.  Thank you.

6                MR. HUNT:  Ms. Dumas, here are extra

7    copies for you (handing).

8                Madam Reporter, Exhibit 4, please.

9                (Exhibit Frasca-4 marked for

10:22 10               identification.)

11         Q.    (By Mr. Hunt)  Mr. Frasca, do you recall

12    hearing of a separation and sharing agreement between

13    Compaq and Inacom pertaining to the sale and

14    acquisition of the hardware assets?

10:22 15    A.    No.

16         Q.    Okay.  Isn't it true that, after the sale of

17    the hardware assets, you basically had a business card

18    change and still stayed in the same physical space,

19    performing essentially the same job?

10:23 20    A.    Correct.

21         Q.    Do you recall whether a transition team was

22    created to assist with the facilitation of the transfer

23    of the Inacom hardware asset operations to that of

24    Compaq and Custom Edge?

10:23 25    A.    I -- I would assume so, but I have no -- I

1   did not participate in any transition team.

2       Q.    Okay.  So as far as you recall, you weren't a

3   member of a transition team?

4       A.    Correct.

10:23  5       Q.    Okay.  Can you identify an individual named

6   William Francis?

7       A.    Yes.

8       Q.    Would you tell me who he is, please?

9       A.    He is a Compaq employee that had provided a

10:24  10  letter to us -- "us" being Inacom -- to send out to

11  vendors, explaining the -- explaining the transaction.

12      Q.    I would like to show you, Mr. Frasca, what's

13  been marked as Exhibit 4.  I'll represent, for the sake

14  of counsel on the phone, that it is a letter signed --

10:25  15  appears to be signed by Bill Francis to Tech Data

16  Corporation dated February 16th of 2000.  The first

17  page being a fax cover sheet.  And I'm going to locate

18  an extra copy for Ms. Dumas.

19              I would ask you to just generally

10:25  20  familiarize yourself with that letter, if you would,

21  sir.

22              (Pause)

23      A.    Okay.

24      Q.    Have you seen that document before, sir?  Let

10:25  25  me rephrase that question.

```
 1              Have you seen the second page of

 2   Exhibit 4 before?  I don't expect you would have seen

 3   the first page.

 4        A.    Yes.

 5        Q.    Do you recall when the first time you saw

 6   that document was?

 7        A.    The first time I saw it was at the previous

 8   deposition.  Let me correct that.

 9        Q.    Yes, sir.

10        A.    The substance -- this particular letter I did

11   not see at the last deposition, because this particular

12   letter has Tech Data Corporation referenced.

13        Q.    Okay.  Do you recall when the first time you

14   saw that letter was?

15        A.    The first time that I recall seeing the

16   letter was at the last deposition.

17        Q.    Okay.

18        A.    I did not recall seeing it back in February

19   of 2000.

20        Q.    Okay.  Now, you indicated at the outset of

21   the deposition that you had been deposed before.

22        A.    Uh-huh.

23        Q.    How many times previously, sir?

24        A.    Two.

25        Q.    Do you recall roughly when those depositions
```

1  took place, month and date -- month and year?

2      A.   The last deposition was three months ago.  I

3  don't have the exact month.  I'm going based on memory.

4  Three months ago.  And the first deposition was for me

10:27  5  winning custody of my kids during a divorce proceeding.

6      Q.   I can promise you we'll confine our questions

7  to the second deposition.

8      A.   I figured.

9      Q.   Do you recall in which I assume litigation

10:27 10  that second deposition was given?

11      A.   Restate your question, please.

12      Q.   Who took your deposition the second time,

13  sir?

14      A.   Origin Micro.

10:28 15      Q.   Okay.  And you indicated that, while you had

16  not seen Exhibit 4 per se -- please correct me if I'm

17  misstating what you said -- the substance of it was

18  familiar to you from that prior deposition?

19      A.   Correct.

10:28 20      Q.   Did you have communications with Mr. William

21  Francis prior to the sale of the Inacom hardware assets

22  on February 16th of 2000, if you recall?

23      A.   Yes.

24      Q.   Were you instructed to communicate with him

10:28 25  by anyone?

1       A.    Yes.

2       Q.    Who instructed you, sir?

3       A.    Leon Kerkman.

4       Q.    Do you recall what Mr. Kerkman told you to

10:28   5  do?

6       A.    I don't recall.

7       Q.    Do you know when the first time you spoke to

8  Mr. Francis was?

9       A.    I don't.

10:29   10      Q.    Do you recall the substance of the

11  conversations that you had with Mr. Francis in any

12  detail?

13      A.    The only detail was that, you know, we,

14  Inacom, wanted a letter from Compaq to provide to the

10:29   15  suppliers on the substance of the sale to clear up any

16  confusion of the sale.

17      Q.    And by saying "Inacom," is there a particular

18  person that you can say wanted this letter?

19      A.    It was -- I don't.  But if you recall, there

10:30   20  was 600 vendors that I had, and a good number of them

21  was confused about the transaction.

22      Q.    And how did you reach the conclusion that a

23  good number of them were confused, sir?  And I'll

24  continue with a compound question, with your

10:30   25  counsel's -- subject to your counsel's blessing.

1            Was it because of direct communications

2    by you or information being relayed to you by your

3    subordinates?

4        A.    It was information being relayed to me.

10:30    5        Q.    Okay.  So I assume you contacted Mr. Francis?

6        A.    Yes.

7        Q.    Do you recall whether that was by telephone

8    or some other method of communication?

9        A.    I don't.

10:31    10        Q.    Do you recall what Mr. Francis's response was

11    to the request for a letter?

12        A.    I don't recall his -- any words around it,

13    but I do recall him providing us a form letter to use.

14        Q.    Did you request this letter for -- you

10:31    15    indicated a good number of your vendors were confused

16    about the sale.  Did you request this letter for a good

17    number of your vendors?

18        A.    We actually assembled the names and addresses

19    of all of our vendors.  If you recall, I talked about a

10:31    20    lot of the small vendors.

21        Q.    Yes.

22        A.    There was a lot of confusion between the

23    company called Inacom, the company called Custom Edge,

24    and the company called Compaq and who was ultimately

10:32    25    going to be paying their bills and when, based upon the

1   close of the date.  And so the intent was to clear up

2   any confusion that may be out there.

3        Q.   So Mr. Francis, you're indicating, provided a

4   form letter to you?

10:32  5        A.   Yes.

6        Q.   Was it a signed letter or just a letter in

7   blank?

8        A.   I don't recall how -- his name was not signed

9   on it, and I don't recall how that -- you know, whether

10:32 10   we sent everything down to him and then he signed it or

11   whether he stamped it, but certainly the questions --

12   because of the relationships that Inacom had directly

13   with the vendors, it was determined that phone calls

14   would come to my attention versus somebody who did not

10:33 15   have relationships with those vendors.

16        Q.   Was there more than one version of this

17   letter that was shared with you by Mr. Francis?

18        A.   I don't recall.

19              MR. HUNT:  Madam Reporter, would you

10:33 20   mark this Exhibit 5, please, and Exhibit 6.

21              Exhibit 5 will be a February 16th, 2000,

22   letter from Bill Francis to Lexmark International.

23              And Exhibit 6 will be a February 17th,

24   2000, unsigned letter from Bill Francis to Logicare

10:34 25   Inc.

```
 1                    I'll locate extra copies of those.

 2                    (Exhibits Frasca-5 and Frasca-6 marked

 3                    for identification.)

 4        Q.    (By Mr. Hunt)  Mr. Frasca, I've been

 5   referring to the sale by Inacom of --

 6                    MS. DUMAS:  Did --

 7                    MR. HUNT:  I haven't shared those with

 8   the witness yet.

 9                    MS. DUMAS:  Okay.  Sorry.

10        Q.    (By Mr. Hunt)  Mr. Frasca, I've been

11   referring to the sale of the asset -- the hardware

12   assets by Inacom.  Did that essentially include the

13   packaging and distribution business for hardware

14   components by Inacom?

15        A.    Yes.

16        Q.    Did it include any other components that I

17   might have left out?

18        A.    I think the customer service representatives

19   were part of the package as well, what traditionally is

20   called the call center.

21        Q.    Now, after that sale, do you recall what was

22   left over at Inacom?

23        A.    I don't.

24        Q.    Did you deal with any of the other business

25   operations of Inacom other than your particular
```

Time stamps: 10:35 (line 5), 10:35 (line 10), 10:36 (line 15), 10:36 (line 20), 10:36 (line 25)

1    procurement side?

2         A.    No.

3         Q.    Were you aware that there was a services

4    business that Inacom had?

10:36  5    A.    Yes.

6         Q.    Did you work with any persons at the services

7    side in the performance of your procurement duties?

8         A.    No.

9         Q.    Are you fairly sure that the form of letter

10:37 10  referred to in Exhibit 4 came from Mr. Francis to you?

11        A.    Yes.

12        Q.    Would you be surprised if Mr. Francis said

13   the form came from you to him?

14        A.    Based on my recollection, yes.

10:37 15        Q.    At the time that Exhibit 4 -- well, let me

16   back up.

17              Did there ever come a time when you were

18   aware that Exhibit 4 had actually been sent out to Tech

19   Data?

10:38 20        A.    I don't recall obtaining any confirmation

21   that all letters have been sent.

22        Q.    And do you know how many incarnations of that

23   letter would have been sent out?

24              MR. FORTE:    Objection to form.    Earl

10:38 25  Forte.

1          MR. HUNT:  Let me rephrase the question.

2      Q.   (By Mr. Hunt)  Do you know how many versions

3  of that letter would have been sent out to various

4  vendors?

10:38   5      A.   I would -- no.  I -- I'm guessing that all of

6  the vendors that were on the list under my

7  responsibility received the letter, but I can't confirm

8  whether that was sent to them.  A list of all the

9  vendors was -- and addresses were sent.  I don't know

10:39  10  whether or not they -- they actually got received.

11      Q.   Did you send this list to Mr. Francis of the

12  vendors that were to receive the letter?

13      A.   To the best of my recollection, yes.

14      Q.   Do you recall how many vendors would have

10:39  15  been on that list?

16      A.   The list varied.  Anywhere between five and

17  six hundred.

18      Q.   Five hundred and six hundred?

19      A.   Five to six hundred.  Vendors fell off and

10:39  20  got on the list every month, so the running list was

21  never a set number.

22      Q.   I just need to clarify for myself.  Five

23  meaning, like, five fingers, five to six hundred or

24  five hundred to six hundred?

10:39  25      A.   Five hundred to six hundred.

1    Q.    Okay.  And do you think you sent that list to

2  Mr. Francis by electronic mail or by fax or some other

3  method of communicating?

4    A.    To the best of my recollection, it was sent

10:40  5  electronically via an Excel spreadsheet with names,

6  addresses.

7    Q.    Did you ever subsequently have communications

8  with Mr. Francis about how many entities on that list

9  should actually receive the letter?

10:40  10    A.    No.

11    Q.    Would it surprise you to hear that that

12  letter was only sent out to a handful of entities?

13                MR. FORTE:    Objection to form.

14    Q.    (By Mr. Hunt)  You can answer.

10:40  15    A.    Would I be surprised?  Yeah.  Only because a

16  lot of time was spent putting together the list.

17    Q.    I've previously shared with your counsel

18  documents that have been marked Exhibits 5 and 6.  5

19  being a letter from Mr. Francis to Lexmark.  6 being an

10:41  20  unsigned letter from Mr. Francis to Logicare.  I'm

21  going to show these to you now and ask you to please

22  review them.

23                (Pause)

24                MR. HALLIDAY:  I'm sorry.  5 is which

10:41  25  one?

1                    MR. HUNT:  5 is your letter,

2    Mr. Halliday.

3                    MR. HALLIDAY:  And 6 is Logicare?

4                    MR. HUNT:  Yes.

10:41  5                    MR. HALLIDAY:  Thank you, Mr. Hunt.

6        Q.    (By Mr. Hunt)  Mr. Frasca, do you recall

7    during January 1 of 2000 through the February 16th,

8    2000, sale of the hardware assets ever being contacted

9    by Lexmark and Tech Data and being advised that there

10:42 10   was reluctance on their part to ship parts and material

11   to the new Custom Edge entity?

12                    MS. DUMAS:  Objection.  Compound.

13                    THE WITNESS:  No.

14       Q.    (By Mr. Hunt)  Okay.  Do you recall ever

10:42 15   being apprised by your subordinates of concerns by

16   Lexmark and Tech Data with shipping new parts and

17   materials to the Custom Edge entity?

18                    MS. DUMAS:  Same objection.

19                    THE WITNESS:  Lexmark was not under my

10:42 20   responsibility, so my people would not inform me about

21   something that was not under their responsibility.  I

22   would not be surprised if the balance of the vendors

23   that were under my responsibility would have contacted

24   the associate that dealt with them on a day-to-day

10:43 25   basis.  I just don't have a recollection of whether

1  Tech Data was one of those.

2          MS. DUMAS:  I caution the witness not to

3  speculate.

4          THE WITNESS:  Okay.

10:43  5      Q.  (By Mr. Hunt)  Was Tech Data, in fact, under

6  your responsibility, as you put it?

7      A.  Yes.

8      Q.  At that time?

9      A.  Yes.

10:43  10     Q.  Under whose responsibility was Lexmark?  And

11  I'm, again, referring to this period when you were at

12  the tail end of your term with Inacom.

13     A.  John Cullen was my peer.

14     Q.  What was his title, sir?

10:43  15     A.  He was a director of materials procurement

16  and was responsible for all the -- what we call

17  second-tier vendors.

18     Q.  Second-tier vendors?

19     A.  Correct.

10:43  20     Q.  He was a director and you were a vice

21  president, correct?

22     A.  Correct.

23     Q.  Was he subordinate to you in the Inacom chain

24  of command?

10:44  25     A.  No.

1       Q.   Who did he report to, sir?

2       A.   Leon Kerkman.

3       Q.   Did you have other counterparts that had

4   separate responsibility in the procurement area and

10:44  5   reported directly to Mr. Kerkman?

6       A.   Mike Bjornstad.

7       Q.   Would you spell that for the reporter,

8   please?

9       A.   B-J-O-R-N-S-T-A-D.

10:44 10       Q.   And what was his title, sir?  Was he director

11   of procurement as well?

12       A.   He was a vice president of procurement.

13       Q.   Anyone else, sir, to the extent you recall?

14       A.   I don't recall their names.

10:44 15       Q.   Would you refer to the second page of

16   Exhibit 4 again, please?  I believe it says,

17   Mr. Frasca, that questions are to be directed to you in

18   response to Exhibit 4.  Is that a correct statement?

19       A.   Correct.

10:45 20       Q.   Do you recall ever having received a call

21   regarding this letter?

22       A.   I don't.

23       Q.   Okay.  Thank you.  I'm done with that

24   exhibit.

10:45 25               MR. HUNT:  May we go off the record for

```
 1   a moment?

 2                   (Off-the-record discussion.)

 3                   MR. HUNT:  Back on, please.

 4        Q.   (By Mr. Hunt)  Mr. Frasca, I would ask you to

 5   refer to what's been marked as Exhibit 5, please.

 6                   MR. HUNT:  Again, for the sake of those

 7   who don't have a copy, this is the letter from

 8   Mr. Francis to Lexmark.

 9        Q.   (By Mr. Hunt)  Now, did you testify earlier

10   that you recalled seeing that letter for the first time

11   at your last deposition?

12        A.   The substance of this letter but not the

13   letter to Lexmark.

14        Q.   Okay.  Would you explain to me -- I think I

15   know what you mean, but would you explain to me what

16   you mean by, "the substance of the letter"?  Were you

17   shown a different version of this letter?

18        A.   Version -- it was a different vendor name --

19        Q.   Okay.

20        A.   -- up on top of who it was addressed to, and

21   the account payable number was different.

22        Q.   Was it addressed to Origin Micro?

23        A.   Yes.

24        Q.   Okay.  And was it signed by Mr. Francis as

25   well?
```

1      A.    Yes.

2      Q.    Now, you testified earlier that since Lexmark

3   was a second-tier vendor and not under your direct

4   responsibility, that it's unlikely that you would have

10:47  5   been contacted regarding concerns by Lexmark with the

6   sale of the hardware assets, correct?

7      A.    Correct.

8      Q.    Are you identified nonetheless as the contact

9   person in that letter?

10:47  10      A.    Correct.

11      Q.    Do you recall whether you ever received any

12   questions regarding that letter that's been marked as

13   Exhibit 5?

14      A.    I don't.

10:47  15      Q.    Don't recall --

16      A.    I don't recall.

17      Q.    Is it possible you had questions that were

18   posed to you?

19      A.    You're asking me to speculate.    I --

10:48  20      Q.    Fair enough.    Would you please refer to

21   Exhibit 6.    And am I correct that that's the letter

22   from Mr. Francis, unsigned, to Logicare?

23      A.    Correct.

24      Q.    Was Logicare within your responsibilities as

10:48  25   a vice president of supply chain management?

        1          A.     Correct.

        2          Q.     Are you identified as the contact person on

        3     that letter?

        4          A.     I am not.

10:48   5          Q.     Would you tell me who is?

        6          A.     Noni Vitols.

        7          Q.     Was she employed by Inacom on the procurement

        8     side?

        9          A.     Correct.

10:48   10         Q.     She was not one of your peers, though, was

        11    she --

        12         A.     No.

        13         Q.     -- to use your term?  Do you recall what her

        14    title was at the time that this letter would have been

10:49   15    issued?

        16         A.     Commodity manager.

        17         Q.     Would that have been a position subordinate

        18    to you?

        19         A.     Correct.

10:49   20         Q.     Was she directly under your supervision or

        21    perhaps one of your peers?

        22         A.     She reported to somebody who reported to me.

        23         Q.     Do you recall who that intermediary might

        24    have been?

10:49   25         A.     Kevin Rose.

1        Q.    Do you recall what his title would have been

2   at the time?

3        A.    Procurement manager.

4        Q.    And the last name was Rhoads?

10:49   5        A.    Rose, R-O-S-E.

6        Q.    Thank you.

7        A.    You're welcome.

8              MR. HALLIDAY:  I'm sorry.  Was that

9   Rhoads or Rose?

10:50   10             MR. HUNT:  Like the flower.

11             THE REPORTER:  Rose.

12             MR. HALLIDAY:  Like the flower.  Thank

13  you.

14       Q.    (By Mr. Hunt)  Did you ever participate in

10:50   15  any of Inacom's board of directors meetings?

16       A.    No.

17       Q.    Were you ever present at one of those

18  meetings?

19       A.    No.

10:50   20       Q.    Would you have been privy to minutes of board

21  of directors meetings?

22       A.    No.

23       Q.    Do you recall ever being apprised, either

24  directly or through your subordinates, of delays in

10:51   25  paying accounts payable by Inacom to Tech Data say from

1    mid-1999 through the sale of the hardware business?

2        A.    Yes.

3        Q.    Same question.  Delays pertaining to Tech

4    Data accounts payable by Inacom for the first six

10:51  5    months of 1999.

6                MR. CAINE:  This is Andy.  Objection as

7    to form.

8                MR. FORTE:  Join.  Earl Forte.

9        Q.    (By Mr. Hunt)  You can answer.

10:51 10        A.    Can you restate the question?

11        Q.    Yes.  Do you recall ever hearing directly or

12    through subordinates that Tech Data had concerns

13    regarding delays in payments of accounts payable by

14    Inacom to Tech Data during the first six months of

10:52 15    1999?

16                MR. CAINE:  Objection as to form.

17                MR. FORTE:  Join.  Earl Forte.

18                THE WITNESS:  No.

19        Q.    (By Mr. Hunt)  Now, confining this inquiry to

10:52 20    the first question and answer regarding the second six

21    months of 1999, did you hear this news regarding Tech

22    Data's concerns directly or through your subordinates,

23    if you recall?

24                MR. CAINE:  Andy.  Objection to form.

10:52 25                MR. FORTE:  Join.  Earl Forte.

```
 1              THE WITNESS:  I don't recall any
 2   communications for the second six months of 1999.
 3       Q.   (By Mr. Hunt)  Okay.  Let's move forward then
 4   to early 2000.  From January 1 of 2000 through the
 5   closing date of February 16th, 2000, did you hear news
 6   of the concerns Tech Data had regarding delays of
 7   payment directly or through your subordinates?
 8              MR. CAINE:  Same objection to form.
 9              THE WITNESS:  Directly.
10       Q.   (By Mr. Hunt)  Do you recall with whom you
11   communicated at Tech Data regarding these concerns?
12       A.   Donna Platt.
13       Q.   Was this in conjunction with your quarterly
14   meeting or because of some other out-of-the-ordinary
15   communication?
16       A.   It was some other out-of-the-ordinary
17   communication.
18       Q.   Do you recall whether these concerns were
19   addressed to you after your regularly scheduled
20   quarterly meeting or before?
21       A.   I don't.
22       Q.   Are you able to tell me the substance of
23   those discussions with Ms. Platt?
24       A.   Donna would contact me, and we would serve as
25   the -- because of our relationship, we would serve as
```

1  the intermediary, if you will, to find out what was

2  going on.

3           So as an example, if, in fact, she had a

4  concern that was outside of my organization, I would be

10:54  5  that facilitator to contact whomever she had a concern

6  with or function to provide an update or status.  And

7  then I would communicate back to her.  And then, of

8  course, she would then communicate to whomever is

9  asking the questions within her organization.

10:54  10  Q.   Was there any reason why you would step in as

11  an intermediary as opposed to just telling her to go

12  call somebody else?

13  A.   I had the relationship.  So as the

14  relationship person, it's not good business to shove

10:55  15  off, you know, a larger company that we do business

16  with to somebody else.

17  Q.   Do you know whether Hewlett-Packard still

18  does business with Tech Data?

19  A.   I don't.

10:55  20  Q.   Prior to the sale of the hardware assets, did

21  you ever become aware that checks for certain vendors

22  had been issued but were being held by the treasurer of

23  Inacom?

24  A.   Only through what I call water-cooler

10:56  25  discussions.

1      Q.    Did you ever have any discussions that were

2  more substantial than water-cooler discussions prior to

3  the sale of the hardware assets?

4              MR. CAINE:  Same objection to form.

10:56  5              THE WITNESS:  When we had vendors -- I

6  call them squeaky-wheel vendors -- that were

7  complaining about checks or -- I'm sorry.  Let me

8  rephrase.

9              When we had vendors that were

10:56 10  complaining about aged receivables, I would communicate

11  to Dick Oshlo to the point where, you know, I would

12  communicate, "Here is who are complaining the most."

13  And I would communicate those to Dick, and Dick would

14  turn and tell me how much monies that he would be

10:57 15  committing to paying these vendors.

16      Q.    (By Mr. Hunt)  Am I correct that you used the

17  term "squeaky-wheel vendors"?

18      A.    You're correct.

19      Q.    Was Tech Data at that time period what you

10:57 20  would call a squeaky-wheel vendor?

21              MR. CAINE:  Same objection to form.

22              MS. DUMAS:  Same objection.

23              THE WITNESS:  If you're asking me

24  whether or not Tech Data was one of the people that

10:58 25  frequently called, the answer is yes.

1    Q.   (By Mr. Hunt)  Thank you.  Would you know

2    whether Lexmark was one of the vendors that would

3    frequently call as well?

4    A.   I don't.

10:58  5    Q.   Would you know whether Logicare was one of

6    the vendors that would frequently call as well?

7    A.   I don't.

8    Q.   Was Origin Micro one of the vendors who would

9    frequently call?

10:58 10    A.   No.

11    Q.   Was Nashville Computer one of the vendors

12   that would frequently call?

13    A.   No.

14    Q.   How about the Ingram entities?  Were any of

10:58 15   the Ingram companies vendors that would frequently call

16   to complain as well?

17    A.   Yes.

18    Q.   Do you recall which ones?

19    A.   Ingram Micro.

10:59 20    Q.   Thank you.  Were you privy, during your time

21   at Inacom, to any internal reports that were generated

22   listing checks that were currently being held by the

23   treasury department?

24    A.   No.

10:59 25    Q.   Did you have any participation in the

1  negotiation of the asset purchase agreement by which

2  the hardware assets were sold to HP?

3       A.   No.

4       Q.   Have you since become familiar with the terms

10:59  5  of that asset purchase agreement?

6       A.   Only from what I've read.

7       Q.   Okay.

8       A.   Public documents.

9       Q.   Can you identify a company called Houlihan

11:00 10  Lokey Howard & Zukin?

11       A.   No.

12       Q.   Would you have ever become familiar with a

13  fairness opinion letter that was prepared by Houlihan

14  Lokey Howard & Zukin in relation to the sale of the

11:00 15  hardware assets by Inacom?

16              MR. FORTE:  Objection to form.

17              THE WITNESS:  I don't know what a

18  fairness opinion letter is, so the answer is no.

19              MR. HUNT:  Madam Reporter, would you

11:00 20  mark that as Exhibit 7, please?

21                   (Exhibit Frasca-7 marked for

22                   identification.)

23              MR. HUNT:  Exhibit 7 will be the

24  Houlihan Lokey fairness opinion dated February 16th,

11:00 25  2000.

1                    MR. FORTE:   Object.   It's not a fairness

2  opinion.

3                    MR. HUNT:   Are you objecting to how I'm

4  marking the exhibit, Earl?

11:01  5                    MR. FORTE:   No.   I'm objecting that it's

6  not a fairness opinion.   You're mischaracterizing it.

7                    MR. HUNT:   The exhibit which will be

8  marked will speak for itself.

9                    MR. FORTE:   It's a solvency opinion.

11:01  10                    MR. HUNT:   May I take that as an

11  admission?

12                    MR. FORTE:   No.

13                    MR. HUNT:   I'll apologize, Ms. Dumas,

14  because I don't appear to have more than one copy of

11:01  15  this.

16                    MS. DUMAS:   That's fine.

17       Q.    (By Mr. Hunt)   Mr. Frasca, I'm adding to the

18  pile of papers in front of you with what's been marked

19  as Exhibit 7.   It's the solvency opinion prepared by

11:02  20  the Houlihan Lokey firm.   And I simply ask you, sir, if

21  you've seen this document before.

22       A.    No.

23       Q.    Okay.   I won't belabor you to read it, then,

24  unless you'd like to.

11:02  25       A.    That's okay.

```
 1              THE WITNESS:  I'm sorry.  Do you want to
 2   read it?
 3              MS. DUMAS:  I'm familiar with it.
 4              THE WITNESS:  Okay.
11:02  5   Q.   (By Mr. Hunt)  After your departure from
 6   Inacom and joining Custom Edge, did you participate in
 7   any way with Tech Data's request for a cross-corporate
 8   guaranty from Compaq?
 9              MS. DUMAS:  Objection.  Assumes facts
11:02 10   not in evidence.
11              You can answer.
12              THE WITNESS:  No.
13              MR. HUNT:  Thank you.
14              With everyone's indulgence, I would like
11:03 15   to take a bio break, and perhaps I'll be ready to pass
16   the witness.
17              (Break taken from 11:03 a.m. to
18              11:15 a.m.)
19              (Exhibit Frasca-8 marked for
11:15 20              identification.)
21   Q.   (By Mr. Hunt)  Mr. Frasca, we're resuming
22   after a short break, and we've marked as Exhibit 8 a
23   document that you produced to us today, three pages.
24   It's your résumé.  I thank you for providing that to us
11:15 25   to save us all some time.  Are there any jobs that are
```

1    not listed on your résumé that you've been engaged in

2    since 1985?

3        A.    No.

4        Q.    I see that you have a BS in mechanical

11:15  5    engineering and an MBA in management, certifications in

6    process communication and Myers-Briggs type indicator.

7    Do you have any additional certifications that aren't

8    listed on your résumé?

9        A.    No.

11:16 10        Q.    Okay.  Thank you.  At your most recent

11    deposition by Origin Micro, can you tell me,

12    Mr. Frasca, approximately how long that deposition

13    lasted?

14        A.    Three hours.

11:16 15        Q.    Do you recall whether you were shown

16    additional documents at that deposition that we have

17    not discussed today?

18        A.    Yes.

19        Q.    Is it possible for you to attempt to identify

11:16 20    them for me?

21        A.    It was a letter that further clarified the

22    letter that's dated February 17th -- or 16th.  And I --

23    but the substance of this letter that you presented to

24    me.

11:17 25        Q.    And did that letter pertain to Origin Micro

1  that you're referring to?

2      A.    Yes.

3      Q.    Okay.   Other than meeting with your attorney

4  to prepare for this deposition, did you discuss the

11:17  5  substance of what you would be testifying about with

6  anyone else --

7      A.    No.

8      Q.    -- prior to today?

9      A.    No.

11:17 10      Q.    Are you aware that we took Mr. Leon Kerkman's

11  deposition last week?

12      A.    Yes.

13      Q.    Did you speak with him regarding what he

14  testified about?

11:17 15      A.    No.

16      Q.    Do you speak, read, and write the English

17  language, sir?

18      A.    Yes.

19      Q.    Are you on any medications today which would

11:17 20  impair your reasoning or your mental abilities?

21      A.    No.

22          MR. HUNT:   With that said, Mr. Frasca, I

23  am ready to pass you along to the next attorney.   Thank

24  you for answering my questions.

11:18 25          THE WITNESS:   You're welcome.

**EXAMINATION**

**BY MR. HALLIDAY:**

    Q.   Mr. Frasca, good morning again. My name is Culver Halliday. I am representing Lexmark International Inc. I have some questions for you.

               I believe that Exhibits 4, 5, and 6 are each letters dated February 16, 2000; is that correct?

    A.   I have 5 and 6 in front of me. Here we go. Got it.

    Q.   Is that correct, sir?

    A.   Correct.

    Q.   Do you recall, sir, if on that day you were still an employee of Inacom Corporation?

    A.   I do not know when that date was that I transitioned from Inacom to Compaq.

    Q.   So you might have been an employee of Inacom Corporation, but you don't recall today, on that date, February 16th, 2000?

    A.   Correct.

    Q.   Sir, you have spoken, I believe, today or referred, I believe, today to tiers vendors. Am I correct?

    A.   Correct.

    Q.   And these were tiers established by Inacom Corporation to assist it in managing its vendor

1  relationships; is that correct?

2        A.    Correct.

3        Q.    How many such tiers were there, sir?

4        A.    You had Tier 1, which was HP, Compaq, IBM.

11:20  5              You had Tier 2, which I do not recall the

6  number of, but those that were included in there were

7  Xerox, Lexmark, Dell, Gateway, Toshiba, Targus,

8  Kingston, and some others that I don't recall.

9              And then the third tier, which was my

11:21  10  group, was called the third-party options.  Those were

11  all of the widgets, the smaller parts, the smaller

12  vendors, which then also included the distributor

13  vendors which Tech Data and Ingram Micro were part of.

14        Q.    And you did not say, sir, but am I correct in

11:21  15  assuming that the first-tier vendors were the vendors

16  who, in dollar terms, supplied the most product to

17  Inacom Corporation?

18        A.    Correct.

19        Q.    And again I have assumed, but would I be

11:22  20  correct in having done so and assumed that the

21  second-tier vendors were the vendors who assumed -- who

22  delivered the most product to Inacom Corporation after

23  the vendors in Tier 1?

24        A.    Correct.

11:22  25        Q.    And is it correct, then, that the third-party

1  options, those vendors listed in Tier 3, delivered less

2  product to Inacom Corporation than the vendors listed

3  in Tier 1 and Tier 2?

4       A.   Less dollars amount but more units.

11:23  5       Q.   Okay.  Thank you.  I tried to ask it that

6  way.  I forgot by the time I got to the third tier.

7       A.   That's okay.

8       Q.   Thank you.  Your responsibility, sir, was for

9  the vendors in the third tier?

11:23  10      A.   Correct.

11      Q.   And you reported to Mr. Kerkman?

12      A.   Correct.

13      Q.   And I believe you said that Mr. Cullen was

14  responsible for the vendors in the second tier?

11:23  15      A.   Correct.

16      Q.   And he also reported to Mr. Kerkman?

17      A.   Correct.

18      Q.   And you may have said this.  I apologize if

19  I've already forgotten.  Who was responsible for the

11:23  20 first tier?

21      A.   IBM was Mike Bjornstad.  Compaq was James

22  Stapleton.  And HP, I don't recall.  If you give me an

23  hour, I'll remember that one.

24      Q.   I think we'll be okay.

11:24  25      A.   Okay.