William H. Sudell Jr.
Derek C. Abbott
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, Delaware 19899-1347

and

Cecily Dumas
Gail Greenwood
Friedman Dumas & Springwater, LLP
One Maritime Plaza, Suite 2475
San Francisco, California 94111

Counsel for Third-Party Defendant
Compaq Computer Corporation

William K. Harrington
Richard W. Riley
Duane Morris, LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801

and

Ted A. Berkowitz
Patrick Collins
Farrell Fritz, P.C.
EAB Plaza
Uniondale, New York 11556-0120

Counsel for Defendant
Resilien Inc.

Thomas G. Macauley
Zuckerman Spaeder LLP
919 Market Street, Suite 1705
P.O. Box 1028
Wilmington, Delaware 19899

and

Mark K. Slater
Jonathan P. Hersey
Danielle R. Merida
Bingham McCutchen LLP
3 Embarcadero Center, 18th Floor
San Francisco, California 94111

Counsel for Defendant
Ingram Entertainment Inc.

David L. Finger
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, Delaware 19801-1186

Counsel for Defendant
Sigma Data Inc.

Brett D. Fallon
Morris, James, Hitchens & Williams
222 Delaware Avenue
P.O. Box 2306
Wilmington, Delaware 19899

Counsel for Defendant
Nextel Communications, Inc.

Counsel for Defendant and Third-Party Plaintiff Lexmark International, Inc.

EXHIBIT 2

**Blackmore, Mary Ann**

**From:** Ward, Michael
**Sent:** Thursday, February 03, 2000 12:14 PM
**To:** Zava, Mike; Richter, Roger; Malone, Leslie; Shinnick, Suzanne; Platt, Donna
**Subject:** FW: Copy of the 8K

This is 60 page long....please refer to pages 53 and 54 for what John is referring to.

Thanks.

-Original Message-----
From: John Frasca [mailto:jfrasca@inacom.com]
Sent: Thursday, February 03, 2000 11:11 AM
To: mward@techdata.com
Cc: Leon Kerkman; Richard Oshlo; Dave Guenthner
Subject: Copy of the 8K

I have attached the 8K for your review. I encourage you to read page 54 thru 56 which indicates that 100% of the payables for Tech Data will be assumed by Compaq.

I would like to discuss the opportunity to increase the credit limit based on this contract. I do understand the risk involved in Tech Data doing this if the Compaq/Inacom falls thru but we are 99.99% that it will close between feb 15 thru feb 21.

John

http://www.sec.gov/Archives/edgar/data/818815/0000900440-00-000003.txt

EXHIBIT
Wells-3
DL 3/30/05

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
AH6q4LVlMFw21vypxt88Wc+Jbe9sjOEshiJm7yQEK1iGHLJl65y4ba6OwzROsdE0
gjV7Iq1xNwwT19cCae4zgA==

<SEC-DOCUMENT>0000900440-00-000003.txt : 20000110
<SEC-HEADER>0000900440-00-000003.hdr.sgml : 20000110
ACCESSION NUMBER: 0000900440-00-000003
CONFORMED SUBMISSION TYPE: 8-K
PUBLIC DOCUMENT COUNT: 3
CONFORMED PERIOD OF REPORT: 20000106
ITEM INFORMATION:
ITEM INFORMATION:
FILED AS OF DATE: 20000107

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: INACOM CORP
CENTRAL INDEX KEY: 0000818815
STANDARD INDUSTRIAL CLASSIFICATION: PATENT OWNERS & LESSORS [679
IRS NUMBER: 470681813
STATE OF INCORPORATION: DE
FISCAL YEAR END: 1226

FILING VALUES:
FORM TYPE: 8-K
SEC ACT:
SEC FILE NUMBER: 001-13311
FILM NUMBER: 502699

BUSINESS ADDRESS:
STREET 1: 10810 FARNAMDRIVE SUITE 200
STREET 2: 10810 FARNAM DR
CITY: OMAHA
STATE: NE
ZIP: 68154
BUSINESS PHONE: 4023923900

MAIL ADDRESS:
STREET 1: 10810 FARNAM DRIVE
STREET 2: SUITE 200
CITY: OMAHA
STATE: NE
ZIP: 68154

FORMER COMPANY:
FORMER CONFORMED NAME: VALCOM INC
DATE OF NAME CHANGE: 19910812
</SEC-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<DESCRIPTION>CURRENT REPORT
<TEXT>

2362

---

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

------------

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the

Securities Exchange Act of 1934

January 4, 2000
Date of Report (Date of earliest event reported)

InaCom Corp.

(Exact name of registrant as specified in its charter)

| Delaware (State or other jurisdiction of incorporation) | 0-16114 (Commission File Number | 47-0681813 (IRS Employer Identification No.) |
|---|---|---|

10810 Farnam Drive, Suite 200, Omaha, Nebraska — 68154
(Address of principal executive offices) — (Zip Code)

Registrant's telephone number, including area code
(402) 758-3900

---

<PAGE>

ITEM 5. OTHER EVENTS.

On January 4, 2000, InaCom Corp. issued a press release announcing that it had entered into an agreement for the sale of certain assets to, and the assumption of certain liabilities by, Compaq Computer Corporation. InaCom and Compaq also agreed to enter into a supply and services agreement (attached to the purchase agreement as Exhibit C) which will provide InaCom access to the product customization and logistics capabilities of the assets sold to Compaq and provide for Compaq's use of InaCom's lifecycle and professional services offerings. Copies of the purchase agreement and the press release are attached as exhibits and are incorporated herein by reference.

ITEM 7: FINANCIAL STATEMENTS, PRO FORMA FINANCIAL INFORMATION AND EXHIBITS.

(c) Exhibits.

The following exhibits are filed with this Form 8-K:

2.1 Asset Purchase Agreement, dated as of January 4, 2000 by and between InaCom Corp. and Compaq Computer Corporation.

99.1 Press Release dated January 4, 2000.

<PAGE>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INACOM CORP.

January 6, 2000

/s/ Thomas Fitzpatrick
--------------------------------
Thomas Fitzpatrick
Executive Vice President and
Chief Finance Officer

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.1
<SEQUENCE>2
<DESCRIPTION>ASSET PURCHASE AGREEMENT
<TEXT>

EXHIBIT 2.1

ASSET PURCHASE AGREEMENT

dated as of

January 4, 2000

between

COMPAQ COMPUTER CORPORATION,

ITY CORP.

and

INACOM CORP.

<PAGE>

TABLE OF CONTENTS

---------------------

Page

ARTICLE 1

Definitions

Section 1.01. Definitions.........................................................1

ARTICLE 2

Purchase and Sale

Section 2.01. Purchased Assets....................................................4
Section 2.02. Excluded Assets.....................................................4
Section 2.03. Assumed Liabilities.................................................4
Section 2.04. Excluded Liabilities................................................4
Section 2.05. Assignment of Contracts and Rights..................................5
Section 2.06. Purchase Price; Allocation of Purchase Price........................6
Section 2.07. Closing.............................................................6
Section 2.08. Closing Statement...................................................7
Section 2.09. Adjustment of Purchase Price........................................9

ARTICLE 3

Representations and Warranties of Seller

Section 3.01. Corporate Existence and Power......................................11
Section 3.02. Corporate Authorization............................................11
Section 3.03. Governmental Authorization.........................................11
Section 3.04. Noncontravention...................................................12
Section 3.05. Required and Other Consents........................................12
Section 3.06. Financial Statements...............................................12
Section 3.07. Absence of Certain Changes.........................................12
Section 3.08. No Undisclosed Material Liabilities................................14
Section 3.09. Material Contracts.................................................14
Section 3.10. Litigation.........................................................15
Section 3.11. Compliance with Laws and Court Orders..............................16
Section 3.12. Properties.........................................................16
Section 3.13. Sufficiency of and Title to the Purchased Assets...................17
Section 3.14. Intellectual Property..............................................17
Section 3.15. Licenses and Permits...............................................18
Section 3.16. Finders' Fees......................................................18
Section 3.17. Environmental Compliance...........................................19
Section 3.18. Year 2000 Compliance ..............................................20

<PAGE>

Page

Section 3.19. No Transfer of Substantially All of Seller's Assets.............20
Section 3.20. Financing..........................................................21

ARTICLE 4

Representations and Warranties of Buyer

Section 4.01. Corporate Existence and Power......................................21
Section 4.02. Corporate Authorization............................................21
Section 4.03. Governmental Authorization.........................................21
Section 4.04. Noncontravention...................................................22

Section 4.05. Finders' Fees.....................................................22

ARTICLE 5

Covenants of Seller

Section 5.01. Conduct of the Business.........................................22
Section 5.02. Access to Information; Confidentiality..........................23
Section 5.03. Seller's Sales Personnel........................................24
Section 5.04. ICG Alliance....................................................24
Section 5.05. Leasehold Defaults..............................................24
Section 5.06. Use of Proceeds.................................................24

ARTICLE 6

Covenants of Buyer

Section 6.01. Access..........................................................25
Section 6.02. Products for Seller's Franchisees...............................25

ARTICLE 7

Covenants of Buyer and Seller

Section 7.01. Further Assurances..............................................25
Section 7.02. Certain Filings..................................................26
Section 7.03. Public Announcements.............................................26
Section 7.04. Trademarks; Tradenames...........................................26
Section 7.05. Warn Act.........................................................27
Section 7.06. Notices of Certain Events........................................27
Section 7.07. Operating Agreements.............................................27

<PAGE>

Page

ARTICLE 8

Tax Matters

Section 8.01. Tax Definitions..................................................28
Section 8.02. Tax Matters......................................................28
Section 8.03. Tax Cooperation; Allocation of Taxes.............................28

ARTICLE 9

Employee Benefits

Section 9.01. Employee Benefits Representations................................30
Section 9.02. Employees and Offers of Employment...............................31
Section 9.03. Seller's Employee Benefit Plans..................................32
Section 9.04. Buyer Benefit Plans..............................................34
Section 9.05. Inactive Employees...............................................35
Section 9.06. Severance Benefits...............................................35
Section 9.07. COBRA............................................................36
Section 9.08. Continuation of Certain Administrative Services and Insurance Coverage...............................................36
Section 9.09. Short Term Disability............................................37
Section 9.10. Foreign Benefit Plans............................................37
Section 9.11. Cooperation......................................................38

Section 9.12. No Third Party Beneficiaries....................................38

ARTICLE 10

Conditions to Closing

Section 10.01. Conditions to Obligations of each Party........................39
Section 10.02. Conditions to Obligation of Buyer..............................39
Section 10.03. Conditions to Obligation of Seller.............................40

ARTICLE 11

Survival; Indemnification

Section 11.01. Survival......................................................41
Section 11.02. Indemnification................................................41
Section 11.03. Procedures.....................................................42

<PAGE>

Page

ARTICLE 12

Termination

Section 12.01. Grounds for Termination........................................42
Section 12.02. Effect of Termination..........................................43

ARTICLE 13

Miscellaneous

Section 13.01. Notices........................................................43
Section 13.02. Amendments and Waivers.........................................44
Section 13.03. Fees and Expenses..............................................45
Section 13.04. Successors and Assigns.........................................45
Section 13.05. Governing Law..................................................45
Section 13.06. Jurisdiction...................................................45
Section 13.07. WAIVER OF JURY TRIAL...........................................45
Section 13.08. Counterparts; Third Party Beneficiaries........................46
Section 13.09. Entire Agreement...............................................46
Section 13.10. Bulk Sales Laws................................................46
Section 13.11. Parent Guarantee...............................................46
Section 13.12. Schedules......................................................46

<PAGE>

ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (the "Agreement") dated as of January 4, 2000 among Compaq Computer Corporation, a Delaware corporation ("Parent") (solely for purposes of Section 13.11), ITY Corp., a Delaware corporation ("Buyer") and wholly-owned subsidiary of Parent, and InaCom Corp., a Delaware corporation ("Seller").

The parties hereto agree as follows:

ARTICLE 1

Definitions

Section 1.01. Definitions.

(a) The following terms, as used herein, have the following meanings:

"affiliate" means, with respect to any person, any other person directly or indirectly controlling, controlled by, or under common control with such other person.

"Business" has the meaning set forth in Schedule 1.01.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, encumbrance or other adverse claim of any kind in respect of such property or asset.

"knowledge" means (i) with respect to Seller (A) for purposes of Section 5.01, the actual knowledge of Gerald Gagliardi, Jon Wellman, Thomas Fitzpatrick, Bill Fairfield, William Janeway or Dick Anderson and (B) for all other purposes, the actual knowledge of Gerald Gagliardi, Jon Wellman, Thomas Fitzpatrick, Bill Fairfield, William Janeway, David Guenthner, Mike Steffan, Dick Oshlo or Dick Anderson; and (ii) with respect to any other person, the actual knowledge of such person.

"Material Adverse Effect" means a material adverse effect on the condition (financial or otherwise), business, assets or results of operations of the Business or the Purchased Assets and Assumed Liabilities, except any such effect resulting from or arising in connection with (i) changes in economic conditions in the United States generally, (ii) changes or conditions affecting the computer products or services industry generally or (iii) changes resulting from any adverse

<PAGE>

action taken by any customer or supplier of the Business as a result of the announcement of this Agreement or the transactions contemplated hereby, provided that Seller has used reasonable best efforts to maintain its relationship with such customer or supplier, and has notified Buyer about such adverse action.

"person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"subsidiary" means, with respect to any person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such person.

(b) A reference in this Agreement to any statute shall be to such statute as amended from time to time and to the rules and regulations promulgated thereunder.

(c) Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |

| - ---- | ------- |
| --- | --- |
| Accounting Referee | 2.06 |
| Agreement | preamble |
| Apportioned Obligations | 8.03 |
| Assumed Liabilities | 2.03 |
| Balance Sheet | 2.08 |
| Balance Sheet Date | 3.07 |
| Base Net Worth | 2.09 |
| Business Employees | 9.02 |
| Business Intellectual | 3.14 |
| Business Trademarks and Tradenames | 7.04 |
| Buyer | preamble |
| Buyer 401(k) Plans | 9.03 |
| Closing | 2.07 |
| Closing Date | 2.07 |
| Closing Net Worth | 2.08 |
| Closing Plan Year | 9.03 |
| Closing Statement | 2.08 |
| Code | 8.01 |
| Confidentiality Agreement | 5.02 |
| Configuration Employee | 9.02 |
| Contracts | 2.01 |

<PAGE>

| Term | Section |
| --- | --- |
| - ---- | ------- |
| Damages | 11.02 |
| Employee Plan | 9.01 |
| ERISA | 9.01 |
| ERISA Affiliate | 9.01 |
| Excess Payment | 2.09 |
| Exchange Agreement | 3.03 |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.04 |
| Final Net Worth | 2.09 |
| HSR Act | 3.03 |
| Inactive Business Employee | 9.05 |
| Indemnified Party | 11.03 |
| Indemnifying Party | 11.03 |
| Intellectual Property Rights | 3.14 |
| IT Employee | 9.02 |
| Make-Up Payment | 2.09 |
| Marketing Employee | 9.02 |
| Other Consents | 3.05 |
| Parent | preamble |
| Permits | 3.15 |
| Permitted Liens | 3.12 |
| Post-Closing Tax Period | 8.03 |
| Pre-Closing Tax Period | 8.01 |
| Property Rights | 3.14 |
| Purchased Assets | 2.01 |
| Purchase Price | 2.06 |
| Real Property | 3.12 |
| Required Consents | 3.05 |
| Seller | preamble |

| | |
|---|---|
| Seller 401(k) Plans | 9.01 |
| Seller FSA | 9.04 |
| Seller Indebtedness | 3.20 |
| Tax | 8.01 |
| Tax Allocation Statement | 2.06 |
| Taxing Authority | 8.01 |
| Transfer Taxes | 8.03 |
| Transferred Employee | 9.02 |
| WARN Act | 7.05 |

<PAGE>

ARTICLE 2

Purchase and Sale

Section 2.01. Purchased Assets. Except as otherwise provided in Sections 2.02 and 2.05 and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller and Seller agrees to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered, to Buyer at the Closing, all right, title and interest of Seller and its subsidiaries in, to and under

(a) the assets, properties and business, of every kind and description, held or used primarily in connection with the Business as the same shall exist on the Closing Date, and

(b) the assets, properties and businesses described on Schedule 2.01 (the items in clauses (a) and (b) collectively, the "Purchased Assets"),

in the case of tangible Purchased Assets, free and clear of all Liens, other than Permitted Liens and Liens disclosed on Schedule 3.12(b).

Section 2.02. Excluded Assets. Notwithstanding anything else contained in this Agreement, the Purchased Assets shall not include all right, title and interest of Seller and its subsidiaries in, to and under the assets, properties and businesses described on Schedule 2.02 (such excluded assets, properties and businesses being referred to as the "Excluded Assets").

Section 2.03. Assumed Liabilities. Except as otherwise provided in Section 2.04 and subject to the terms and conditions of this Agreement, Buyer agrees, effective as of Closing, to assume all liabilities or obligations of Seller and its subsidiaries of any kind, character or description (whether known or unknown, accrued, absolute, contingent or otherwise)

(a) primarily relating to or arising out of the conduct of the Business or the ownership or use of the Purchased Assets, or

(b) described on Schedule 2.03 or to be assumed by Buyer in Article 8 or Article 9 (the items in clauses (a) and (b) collectively, the "Assumed Liabilities").

Section 2.04. Excluded Liabilities. Notwithstanding anything else contained in this Agreement, Buyer is not assuming any liability or obligation of Seller or any of its subsidiaries (or any predecessor thereof or any prior owner of all or part of any of their businesses, properties and assets) of

whatever nature,

<PAGE>

whether presently in existence or arising hereafter, known or unknown, accrued, absolute, contingent or otherwise, other than the Assumed Liabilities and, in any event, Buyer is not assuming any of the following:

 (a) except as provided in Article 8 with respect Apportioned Obligations and transfer taxes, any liability or obligation for Taxes of Seller or any of its subsidiaries or any member of any consolidated, affiliated, combined or unitary group of which Seller or any of its subsidiaries is or has been a member, arising on or prior to the Closing Date;

 (b) except to the extent provided in Article 9, all liabilities or obligations relating to employees or their compensation or benefits;

 (c) any liability or obligation under any indebtedness for borrowed money (other than in respect of the Agreement for Wholesale Financing with Deutsche Financial Services Corp. dated as of December 24, 1998, as amended on May 25, 1999 and December 23, 1999);

 (d) any liability or obligation described on Schedule 2.04;

 (e) any liability or obligation relating to Excluded Assets; and

 (f) any liability or obligation arising under or relating to any Environmental Law which does not primarily relate to or arise out of the conduct of the Business or the ownership or use of the Purchased Assets.

All such liabilities and obligations not being assumed by Buyer shall be retained by and remain liabilities and obligations of Seller and its subsidiaries (the "Excluded Liabilities").

 Section 2.05. Assignment of Contracts and Rights. Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right or benefit arising thereunder or resulting therefrom if an attempted assignment, without the consent of a third party thereto, would constitute a breach or other contravention thereof or in any way adversely affect the rights of Buyer or Seller or their affiliates thereunder. Buyer and Seller will use reasonable efforts (but without any payment of money) to obtain any required consents to the assignment of the Purchased Assets to Buyer as Buyer may reasonably request. If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement under which Buyer

<PAGE>

would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

 Section 2.06. Purchase Price; Allocation of Purchase Price. (a) The purchase price for the Purchased Assets (the "Purchase Price") is $369.5 million in cash. The Purchase Price shall be paid as provided in Section 2.07 and shall be subject to adjustment as provided in Section 2.09.

 (b) As soon as practicable after the determination of the Final Net Worth, the Buyer shall deliver to the Seller a statement (the "Tax Allocation

Statement"), allocating the Purchase Price, as adjusted pursuant to Section 2.09 (plus Assumed Liabilities, to the extent properly taken into account under Section 1060 of the Code) among the Purchased Assets in accordance with Section 1060 of the Code. If within 30 days after the delivery of the Tax Allocation Statement the Seller notifies the Buyer in writing that the Seller objects to the allocation set forth in the Tax Allocation Statement, the Buyer and the Seller shall use commercially reasonable efforts to resolve such dispute within 30 days. In the event that the Buyer and the Seller are unable to resolve such dispute within 30 days, the Buyer and the Seller shall jointly retain a nationally recognized accounting firm (the "Accounting Referee") to resolve the disputed items. Upon resolution of the disputed items, the allocation reflected on the Tax Allocation Statement shall be adjusted to reflect such resolution. The costs, fees and expenses of the Accounting Referee shall be borne equally by Buyer and Seller.

(c) Seller and Buyer agree to (i) be bound by the Tax Allocation Statement and (ii) act in accordance with the Tax Allocation Statement in the preparation, filing and audit of any Tax return.

(d) Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, each party shall deliver to the other party a copy of its Form 8594.

Section 2.07. Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York, as soon as possible, but in no event later than 10 business days, after satisfaction of the conditions set forth in Article 10, or at such other time or place as Buyer and Seller may agree. "Closing Date" means the date of the Closing. At the Closing:

(a) Buyer shall deliver to Seller the Purchase Price in immediately available funds by wire transfer to an account of Seller with a bank in New York

<PAGE>

City designated by Seller, by notice to Buyer, not later than three days prior to the Closing Date,

(b) Seller and Buyer shall enter into an Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit A, and

(c) Seller shall deliver to Buyer such deeds, bills of sale, assignments and other good and sufficient instruments of conveyance and assignment as the parties and their respective counsel shall deem reasonably necessary to vest in Buyer all right, title and interest of Seller and its subsidiaries in, to and under the Purchased Assets. Such instruments of conveyance and assignment shall not contain any representation or warranty or covenant in addition to those contained herein; nor shall the parties' rights or obligations thereunder be different from those contained herein.

Section 2.08. Closing Statement. (a) As promptly as practicable but in no event later than 30 days after the Closing Date, Seller will close its books and records relating to the Purchased Assets and Assumed Liabilities in order to permit Buyer to prepare the Closing Statement. As promptly as practicable thereafter but no later than 60 days after the closing of such books and records, Buyer will cause to be prepared and delivered to Seller a closing statement of Purchased Assets and Assumed Liabilities (the "Closing Statement") together with a report of Buyer's independent accountant thereon, and a certificate based on such Closing Statement setting forth Buyer's calculation of

Closing Net Worth. The Closing Statement shall (x) fairly present the Purchased Assets and Assumed Liabilities as at the close of business on the Closing Date in accordance with U.S. generally accepted accounting principles applied on a basis consistent with those used in the preparation of the audited balance sheet of Seller included in Seller's Supplemental Consolidated Financial Statements included in Seller's report on Form 8-K/A dated March 3, 1999 (the "Seller 8-K"), (y) be prepared in accordance with accounting policies and practices consistent with those used in the preparation of such financial statements and (z) include line items substantially consistent with those in the statement of Purchased Assets and Assumed Liabilities as of November 27, 1999 referred to in Section 3.06 (the "Balance Sheet"). "Closing Net Worth" means the excess of the book value of the Purchased Assets over the book value of the Assumed Liabilities as reflected on the Closing Statement. The Closing Statement shall exclude: (i) all assets that in accordance with generally accepted accounting principles would be classified as intangible assets, including, without limitation, goodwill, patents, trademarks, deferred expenses and unamortized debt discount; (ii) all liabilities for which Buyer is indemnified pursuant to this Agreement and the receivable arising from such indemnification obligation; and (iii) the effect (including the Tax effect) of any act, event or transaction occurring after the Closing (but prior to the close of

<PAGE>

business on the Closing Date) and not in the ordinary course of business of the Business. For purposes of the Closing Statement, the amount of any accounts payable due to, or any accounts receivable due from, Buyer or its affiliates will be determined by agreement between Buyer and Seller, or absent such agreement, through arbitration. In auditing the Closing Statement, Buyer's independent accountant will follow generally accepted auditing standards and such other procedures as are customary including, as appropriate, conducting a physical inventory and verifying third party receivables and payables.

(b) If Seller disagrees with Buyer's calculation of Closing Net Worth delivered pursuant to Section 2.08(a), Seller may, within 30 days after delivery of the documents referred to in Section 2.08(a), deliver a notice to Buyer disagreeing with such calculation and setting forth Seller's calculation of such amount. Any such notice of disagreement shall specify those items or amounts as to which Seller disagrees, and Seller shall be deemed to have agreed with all other items and amounts contained in the Closing Statement and the calculation of Closing Net Worth delivered pursuant to Section 2.08(a).

(c) If a notice of disagreement shall be duly delivered pursuant to Section 2.08(b), Buyer and Seller shall, during the 15 days following such delivery, use their reasonable commercial efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Closing Net Worth, which amount shall not be less than the amount thereof shown in Buyer's calculations delivered pursuant to Section 2.08(a) nor more than the amount thereof shown in Seller's calculation delivered pursuant to Section 2.08(b). If during such period, Buyer and Seller are unable to reach such agreement, they shall promptly thereafter cause the Accounting Referee promptly to review this Agreement and the disputed items or amounts for the purpose of calculating Closing Net Worth. In making such calculation, the Accounting Referee shall consider only those items or amounts in the Closing Statement or Buyer's calculation of Closing Net Worth as to which Seller has disagreed. The Accounting Referee shall deliver to Buyer and Seller, as promptly as practicable, a report setting forth such calculation. Such report shall be final and binding upon Buyer and Seller. The cost of such review and report shall be borne (i) by Buyer if the difference between Final Net Worth and Closing Net Worth as set forth in Buyer's calculation of Closing Net Worth delivered pursuant to Section 2.08(a) is greater than the difference between

Final Net Worth and Closing Net Worth as set forth in Seller's calculation of Closing Net Worth delivered pursuant to Section 2.08(b), (ii) by Seller if the first such difference is less than the second such difference and (iii) otherwise equally by Buyer and Seller. "Final Net Worth" means Closing Net Worth (x) as shown in Buyer's calculation delivered pursuant to Section 2.08(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 2.08(b); or (y) if such a notice of disagreement is

<PAGE>

delivered, (A) as agreed by Buyer and Seller pursuant to Section 2.08(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 2.08(c); provided that in no event shall Final Net Worth be less than Buyer's calculation of Closing Net Worth delivered pursuant to Section 2.08(a) or more than Seller's calculation of Closing Net Worth delivered pursuant to Section 2.08(b).

(d) Buyer and Seller agree that they will, and agree to cause their respective independent accountants to, cooperate and assist in the preparation of the Closing Statement and the calculation of Closing Net Worth and in the conduct of the audits and reviews referred to in this Section 2.08, including without limitation, the making available to the extent necessary of books, records, work papers and personnel.

Section 2.09. Adjustment of Purchase Price. (a) The parties will make payments as follows:

(i) If Final Net Worth exceeds $335.9 million, Buyer shall pay to Seller, in the manner and with interest as provided in 2.09(b), an amount equal to such excess (the "Excess Payment").

(ii) If Final Net Worth is less than $335.9 million, Seller shall pay to Buyer, in the manner and with interest as provided in Section 2.09(b), an amount equal to the sum of

(A) the lesser of (x) $19.5 million and (y) 110% of the excess of $335.9 million over Final Net Worth, and

(B) the excess, if any, of $275 million over Final Net Worth (the "Make-Up Payment").

(b) Any payment pursuant to Section 2.09(a) shall be made within 10 days after determination of Final Net Worth (the "Final Payment Date") by the paying party causing such payment to be credited to such account of the receiving party as may be designated by such receiving party. The amount of any payment to be made pursuant to this Section 2.09 shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to LIBOR plus 1.0%. For these purposes, "LIBOR" means "USD-LIBOR-ISDA" (as defined in the 1991 ISDA Definitions published by the International Swaps and Derivatives Association) with a "Designated Maturity" of one month under such definition and reset every month. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of 365 days and the actual number of days elapsed.

<PAGE>

Notwithstanding anything herein to the contrary, the parties agree that:

(i) All payments pursuant Section 2.09(a) shall be made in cash or other immediately available funds except as provided in clause (ii) or (iii) below.

(ii) The Excess Payment shall, at the option of Buyer, be paid in (A) accounts receivable that are, as of the Final Payment Date, not in dispute and not aged over 60 days and are valued on a basis consistent with the Closing Statement or inventory that has been received from the original manufacturer no longer than three weeks prior to the Final Payment Date and valued at the lower of cost or market (including any purchase price protection received thereon), in each case that would have otherwise constituted Purchased Assets or otherwise arises in connection with the Business after the Closing, (B) cash or (C) any combination thereof. To the extent that any such items are transferred to Seller, they shall be treated as Excluded Assets.

(iii) The Make-Up Payment shall, at the option of Seller, be paid in Specified Current Assets, cash or any combination thereof. "Specified Current Assets" means, in each case free and clear of all Liens,

(x) accounts receivable that (A) are, as of the Final Payment Date, not in dispute and not aged over 60 days, (B) are not accounts receivable due from IBM, Hewlett Packard, Dell or Toshiba and (C) are valued on a basis consistent with the Closing Statement, or

(y) product inventory that (A) has been received by Seller from the original manufacturer no longer than three weeks prior to the Final Payment Date, (B) is not IBM, Hewlett Packard, Dell or Toshiba inventory and (C) is valued at the lower of cost or market (including any purchase price protection received thereon).

During the 60-day period after the Final Payment Date, Buyer will use reasonable and customary efforts to collect such receivables and sell such inventory in the ordinary course of business. At the end of such period, Seller will pay to Buyer in cash the excess, if any, of the Make-Up Payment (less the amount of such payment made in cash) over the amounts actually realized by Buyer from such accounts receivable and inventory not to exceed the value used in making the Make-Up Payment. Buyer shall assign such unsold inventory and uncollected accounts

<PAGE>

receivable to Seller. Buyer shall not waive any rights against the account debtor in respect of any accounts receivable so assigned.

ARTICLE 3

Representations and Warranties of Seller

Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date that:

Section 3.01. Corporate Existence and Power. Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted. Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such

qualification is necessary, except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect. Seller has heretofore delivered to Buyer true and complete copies of the certificate of incorporation and bylaws of Seller as currently in effect.

Section 3.02. Corporate Authorization. The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within Seller's corporate powers and have been duly authorized by all necessary corporate action on the part of Seller. This Agreement constitutes a valid and binding agreement of Seller. In connection with the authorization of this Agreement, the Seller's Board of Directors has received an opinion of Goldman, Sachs & Co. to the effect that the consideration to be paid pursuant to this Agreement is fair to Seller from a financial point of view.

Section 3.03. Governmental Authorization. Except as set forth in Schedule 3.03, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby require no action by or in respect of, or filing with, any governmental body, agency or official other than (i) compliance with any applicable requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"); (ii) any actions or filings which, if not taken or made, would not have a Material Adverse Effect or materially adversely affect the ability of Seller to consummate on the transactions contemplated hereby; and (iii) any filings or notices not required to be made or given until after the Closing Date.

<PAGE>

Section 3.04. Noncontravention. Except as set forth in Schedule 3.04, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the certificate of incorporation or bylaws of Seller, (ii) assuming compliance with the matters referred to in Section 3.03, violate any law, rule, regulation, judgment, injunction, order or decree, (iii) assuming the obtaining of all Required and Other Consents, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to the Business or the Purchased Assets or Assumed Liabilities to which Seller or any of its subsidiaries is entitled under any agreement or other instrument or (iv) result in the creation or imposition of any Lien on any Purchased Asset, except, in the case of clauses (ii), (iii) and (iv), for such matters as would not have a Material Adverse Effect.

Section 3.05. Required and Other Consents. (a) Schedule 3.05(a) sets forth each agreement or other instrument binding upon Seller or any of its subsidiaries or any Permit requiring a consent or other action by any person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date (the "Required Consents").

(b) Schedule 3.05(b) sets forth each other consent or action by any person (the "Other Consents") under such agreements or other instruments or Permits that is necessary with respect to the execution, delivery and performance of this Agreement.

Section 3.06. Financial Statements. The November 27, 1999 statement of Purchased Assets and Assumed Liabilities attached hereto as Schedule 3.06 fairly presents the Purchased Assets and Assumed Liabilities as at such date in accordance with U.S. generally accepted accounting principles applied on a basis

consistent with those used in the preparation of the audited balance sheet of Seller included in the Seller 8-K. The revenues, gross margins, pre-coop selling, general and administrative expenses and earnings before taxes for Company 42/Distribution-Operations business for each month in the nine months ended September 25, 1999 fairly present such items in all material respects on a consistent basis.

Section 3.07. Absence of Certain Changes. Except as disclosed on Schedule 3.07, since November 30, 1999 (the "Balance Sheet Date") or, after the date hereof, in respect of transactions required by this Agreement, the Business has been conducted in the ordinary course consistent with past practices and there has not been:

<PAGE>

(a) any event, occurrence, development or state of circumstances or facts which has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b) any declaration, setting aside or payment of any dividend or other distribution with respect to any shares of capital stock of Seller, or any repurchase, redemption or other acquisition by Seller or any of its subsidiaries of any outstanding shares of capital stock or other equity securities of, or other ownership interests in, Seller or any of its subsidiaries;

(c) any incurrence, assumption or guarantee by Seller or any of its subsidiaries of any indebtedness for borrowed money that will constitute an Assumed Liability;

(d) any creation or other incurrence of any Lien on any Purchased Asset other than in the ordinary course of business consistent with past practices;

(e) any damage, destruction or other casualty loss (whether or not covered by insurance) affecting the Business or any Purchased Asset which, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect;

(f) any transaction or commitment made, or any contract or agreement entered into, by Seller or any of its subsidiaries relating to the Business or any Purchased Asset (including the acquisition or disposition of any assets) or any relinquishment by Seller or any of its subsidiaries of any contract or other right, in either case, material to the Business or Purchased Assets and Assumed Liabilities, other than transactions and commitments in the ordinary course of business consistent with past practices and those contemplated by this Agreement;

(g) any change in any method of accounting or accounting practice by Seller with respect to the Business, except for any such change required by reason of a concurrent change in generally accepted accounting principles;

(h) any increase in compensation payable to any Business Employee, other than in the ordinary course of business consistent with past practices; or

(i) any material labor dispute, other than routine individual grievances, or any activity or proceeding by a labor union or representative thereof to organize any Business Employees, which Business Employees were not subject to a collective bargaining agreement at the Balance Sheet Date, or any material lockouts, strikes, slowdowns, work stoppages or threats thereof by or with respect to Business Employees.