<PAGE>

Section 3.08. No Undisclosed Material Liabilities. There are no liabilities or obligations of the Business of any kind (whether known or unknown, accrued, contingent, absolute or otherwise) that will constitute an Assumed Liability and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than:

(a) liabilities or obligations provided for in the Balance Sheet or disclosed in the notes thereto;

(b) liabilities disclosed on Schedule 3.08; and

(c) liabilities or obligations incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date, which in the aggregate are not material to the Business.

Section 3.09. Material Contracts. (a) Except as disclosed in Schedules 3.09, 3.12, 3.14, 3.15 or 9.01, neither Seller nor any of its subsidiaries is a party to or bound by any of the following agreements that will constitute a Purchased Asset or an Assumed Liability:

(i) any lease of personal property (other than forklifts and related equipment) providing for annual rentals of $50,000 or more or any lease of real property;

(ii) any agreement committing Seller to purchase materials, supplies, goods, services, equipment or other assets providing for either (A) annual payments by Seller of $100 million or more or (B) aggregate payments by Seller of $200 million or more;

(iii) any agreement committing Seller to sell materials, supplies, goods, services, equipment or other assets providing for either (A) annual payments to Seller of $50 million or more or (B) aggregate payments to Seller of $100 million or more;

(iv) any partnership, joint venture or other similar agreement or arrangement;

(v) any agreement relating to the prospective acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise);

<PAGE>

(vi) any agreement relating to indebtedness for borrowed money or the deferred purchase price of property (in either case, whether incurred, assumed, guaranteed or secured by any asset), except any such agreement (A) with an aggregate outstanding principal amount not exceeding $10 million and which may be prepaid on not more than 30 days notice without the payment of any penalty and (B) entered into subsequent to the date of this Agreement as permitted by Section 3.07(c);

(vii) any option, license, franchise or similar agreement;

(viii) any sales agency, dealer, sales representative, marketing or other similar agreement that, in the aggregate, accounted for at

least 80% of Seller's revenues from resellers for the nine months ended September 25, 1999;

(ix) any agreement that limits the freedom of Seller or any of its subsidiaries to compete in any line of business or with any person or in any area or to own, operate, sell, transfer, pledge or otherwise dispose of or encumber any Purchased Asset or which would so limit the freedom of Buyer after the Closing Date;

(x) any agreement with or for the benefit of any officer, director, 5% or more shareholder or affiliate of Seller; or

(xi) any other agreement, commitment, arrangement or plan not made in the ordinary course of business that is material to the Business.

(b) Each agreement disclosed in any Schedule to this Agreement or required to be disclosed pursuant to this Section is a valid and binding agreement of Seller and is in full force and effect, and none of Seller or any of its subsidiaries or, to the knowledge of Seller, any other party thereto is in default or breach in any material respect under the terms of any such agreement, and, to the knowledge of Seller, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute any event of default thereunder, except for such matters as would not have a Material Adverse Effect. True and complete copies of each such agreement, including all amendments and modifications thereto, have been delivered to Buyer.

Section 3.10. Litigation. Except as set forth in Schedule 3.10, there is no action, suit, investigation or proceeding pending against, or to the knowledge of Seller, threatened against or affecting, the Business or any Purchased Asset before any court or arbitrator or any governmental body, agency or official which would

<PAGE>

reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.11. Compliance with Laws and Court Orders. Except as set forth in Schedule 3.11, neither Seller nor any of its subsidiaries is in violation of, or has violated, any applicable law, rule, regulation, judgment, injunction, order or decree applicable to the Purchased Assets or the conduct of the Business, except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.12. Properties. (a) Schedule 3.12(a) correctly lists all real property used or held primarily in connection with the Business, including leasehold interests (the "Real Property"), and any Liens thereon (other than Permitted Liens or Liens disclosed on Schedule 3.12(b)), specifying in the case of leases or subleases, the name of the lessor or sublessor.

(b) Seller has good and marketable, indefeasible, fee simple title to, or in the case of leased property, valid leasehold interests in, all tangible Purchased Assets (whether real, personal or otherwise) reflected on the Balance Sheet or acquired after the Balance Sheet Date, except for properties and assets sold since the Balance Sheet Date in the ordinary course of business consistent with past practices. No tangible Purchased Asset is subject to any Lien, except:

(i) Liens disclosed on Schedule 3.12(b);

(ii) Liens securing Assumed Liabilities; or

(iii) Liens that do not materially detract from the value of such Purchased Asset, or materially interfere with any present or intended use of such Purchased Asset (clauses (ii) - (iii) of this Section 3.12(b) are, collectively, the "Permitted Liens").

(c) There are no developments affecting any of the Purchased Assets pending or, to the knowledge of Seller threatened, which are reasonably likely to materially detract from the value, materially interfere with any present or intended use or materially adversely affect the marketability of such Purchased Assets.

(d) Except for the Excluded Assets, the Real Property includes all real property as is used or held primarily in connection with the conduct of the business and operations of the Business as heretofore conducted.

(e) Except as disclosed in Schedule 3.12 and except as would not have a Material Adverse Effect, (i) the plants, buildings, structures and equipment

<PAGE>

included in the Purchased Assets have no defects, are in good operating condition and repair and have been reasonably maintained consistent with standards generally followed in the industry (giving due account to the age and length of use of same, ordinary wear and tear excepted), are adequate and suitable for their present and intended uses and, in the case of plants, buildings and other structures (including, without limitation, the roofs thereof), are structurally sound; (ii) none of the structures on the Real Property encroaches upon real property of another person, and no structure of any other person encroaches upon any Real Property; (iii) the Real Property, and its continued use, occupancy and operation as currently used, occupied and operated, does not constitute a nonconforming use under all applicable building, zoning, subdivision and other land use and similar laws, regulations and ordinances; and (iv) there has been no actual or, to Seller's knowledge, threatened taking of all or any portion of the Real Property by eminent domain or similar governmental power, and no condemnation proceedings are currently pending or, to Seller's knowledge, threatened with respect to the Real Property.

Section 3.13. Sufficiency of and Title to the Purchased Assets. (a) Except for the Excluded Assets, the Purchased Assets constitute all of the property and assets used or held primarily in connection with the Business and are adequate to conduct the Business as currently conducted.

(b) Upon consummation of the transactions contemplated hereby, Buyer will have acquired good and marketable title in and to, or a valid leasehold interest (on the terms of the existing agreement as in effect on the date hereof assuming that the subject asset is used in the same manner as it is currently used by Seller) in, each of the tangible Purchased Assets, free and clear of all Liens, except for Permitted Liens and Liens disclosed in Schedule 3.12(b), and all of the right, title and interest of Seller and its subsidiaries in and to any intangible Purchased Assets.

Section 3.14. Intellectual Property. Except for the Excluded Assets, Seller and its subsidiaries have sufficient rights to use, whether through ownership, licensing or otherwise, all patents, trademarks, service marks, trade names, copyrights, trade secrets, processes and other proprietary rights that are necessary for the Business as now conducted (collectively the "Intellectual Property Rights"). Except as set forth on Schedule 3.14, none of Seller or any of its subsidiaries has assigned, hypothecated or otherwise transferred or encumbered any of the Intellectual Property Rights and none of the Intellectual

Property Rights purport to grant sole or exclusive licenses or other rights to any other person, including, without limitation sole or exclusive licenses limited to specific fields of use. To the best of Seller's knowledge, the patents owned by Seller or its subsidiaries relating to the Business are valid and enforceable and any patent

<PAGE>

issuing from patent applications of Seller or its subsidiaries will be valid and enforceable. Except as disclosed in Schedule 3.14, (i) to the best of the Seller's knowledge, there is no infringement by any other person of any of the Intellectual Property Rights, and (ii) neither Seller nor any of its subsidiaries has entered into any agreement to indemnify any person against any charge of infringement of any of the Intellectual Property Rights except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect. To the best of Seller's knowledge, neither Seller nor any of its subsidiaries has violated or infringed in connection with the Business any intellectual property right of any other person, and neither Seller nor any of its subsidiaries has received any communication alleging that it violates or infringes the intellectual property right of any other person. Except as set forth on Schedule 3.14, neither Seller nor any of its subsidiaries has been sued or is being sued or has reason to believe that it may be sued for infringing in connection with the Business any intellectual property right of another person. None of the processes, techniques and formulae, research and development results or other know-how or show-how relating to the Business, the value of which to the Business is contingent upon maintenance of the confidentiality thereof, has been disclosed by Seller or any affiliate thereof to any person other than those persons who have a need to know thereof and who are bound to hold such information in confidence pursuant to confidentiality agreements or by operation of law.

Section 3.15. Licenses and Permits. Schedule 3.15 correctly describes each material governmental license, authorization, consent and approval to the extent relating to the Business (the "Permits") together with the name of the government agency or entity issuing such Permit. Except as set forth on the Schedule 3.15, (i) the Permits are valid and in full force and effect, (ii) Seller is not in default, and no condition exists that with notice or lapse of time or both would constitute a default, under the Permits and (iii) none of the Permits will, assuming the related Required Consents have been obtained prior to the Closing Date, be terminated or impaired or become terminable, in whole or in part, as a result of the transactions contemplated hereby. Upon consummation of such transactions, Buyer will, assuming the related Required Consents or Other Consents, as the case may be, have been obtained prior to the Closing Date, have all of the right, title and interest in all Permits primarily relating to the Business (other than Excluded Assets).

Section 3.16. Finders' Fees. Except for Goldman Sachs & Co., whose fees will be paid by Seller, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

<PAGE>

Section 3.17. Environmental Compliance. (a) Except for such matters as would not reasonably be expected to have a Material Adverse Effect or as disclosed in Schedule 3.17:

(i) no written notice of violation or liability, demand, request

for information, citations, summons or order has been received, no complaint has been filed, no penalty has been assessed and no investigation, action, claim, suit, proceeding or review is pending, or to the knowledge of Seller or any of its subsidiaries, threatened by any governmental entity or other person with respect to any matters relating to the Business or the Purchased Assets or Assumed Liabilities and relating to or arising out of any Environmental Law;

(ii) no Hazardous Substance has been discharged, disposed of, dumped, injected, pumped, deposited, spilled, leaked, emitted or released at any of the Purchased Assets or Real Property or any property now or previously owned, leased or operated by Seller or any of its subsidiaries and used in connection with the Business, except in compliance with applicable Environmental Laws or where such would not reasonably be expected to result in liability under any Environmental Law; and

(iii) Seller and each of its subsidiaries have all environmental permits necessary for the Business and the Purchased Assets to comply with applicable Environmental Laws and are in compliance with the terms of such permits and all applicable Environmental Laws, and there are no Environmental Liabilities.

(b) There has been no environmental investigation, study, audit, test, review or other analysis conducted of which Seller or any of its subsidiaries has knowledge and possession in relation to the Business or the Purchased Assets which has not been delivered to Parent at least two days prior to the date hereof.

(c) Except as disclosed to Buyer in writing on or prior to the date hereof, neither Seller nor any of its subsidiaries owns, leases or operates any real property in respect of the Business or the Purchased Assets in New Jersey or Connecticut.

(d) For purposes of this Section, the following terms shall have the meanings set forth below:

"Seller" and "subsidiary" shall include any entity which is, in whole or in part, a predecessor of Seller or any of its subsidiaries;

<PAGE>

"Environmental Laws" means any federal, state, local or foreign law (including, without limitation, common law), treaty, judicial decision, regulation, rule, judgment, order, decree, injunction, permit or governmental regulation, or any binding agreement with any governmental authority, relating to the environment or the effect of the environment on human health, or regulating the discharge, release, disposal or emission to the environment of pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substances, wastes or materials;

"Environmental Liabilities" means any and all liabilities or obligations of the Business or the Purchased Assets or Assumed Liabilities, whether accrued, contingent, absolute, determined, determinable or otherwise, arising under any Environmental Law;

"Hazardous Substances" means any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or any substance, waste or material

having any constituent elements displaying of the foregoing characteristics, including, without limitation, petroleum, its derivatives, by-products and other hydrocarbons, which in any event is regulated under Environmental Laws.

Section 3.18. Year 2000 Compliance . Seller has conducted an assessment of its and its subsidiaries' internal operating systems, processes, software, hardware and equipment relating to the Business and based upon this assessment has developed a plan designed to ensure that the same are Year 2000 Compliant on or before December 31, 1999. To the knowledge of Seller, such plan will be implemented and successfully completed on or before December 31, 1999, and the implementation and completion of such plan will not have a Material Adverse Effect. The term "Year 2000 Compliant", as used herein, shall mean that the applicable systems, processes, software, hardware and/or equipment is able to perform the following functions without human intervention: (a) handle date information before, during and after January 1, 2000, including but not limited to accepting date input, providing date output, and performing calculations on dates or portions of dates; (b) function accurately and without interruption before, during and after January 1, 2000, without any change in operations associated with the advent of the new century; (c) respond to two-digit year-date input in a way that resolves the ambiguity as to century in a disclosed, defined and predetermined manner; and (d) store and provide output of date information in ways that are unambiguous as to century.

Section 3.19. No Transfer of Substantially All of Seller's Assets. The transactions contemplated by this Agreement (i) do not require the approval of Seller's stockholders under Delaware law and (ii) do not constitute the

<PAGE>

conveyance, transfer or lease of all or substantially all of Seller's assets substantially as an entirety under the agreements governing the 6 3/4% Convertible Subordinated Debentures due 2016 issued by a subsidiary of Seller and the 6 3/4 Trust Convertible Preferred Securities related thereto.

Section 3.20. Financing. Seller has received and furnished a copy to Buyer of an executed Third Amendment and Waiver dated as of January 4, 2000 (the "Amendment and Waiver") to Seller's Credit Agreement dated as of April 9, 1999, as amended (the "Credit Agreement") attached as Schedule 3.20 hereto. As of the date hereof, Seller has no knowledge, after reasonable inquiry, of any facts or circumstances that would result in any of the conditions set forth in the Amendment and Waiver not being satisfied.

ARTICLE 4

Representations and Warranties of Buyer

Buyer represents and warrants to Seller as of the date hereof and as of the Closing Date that:

Section 4.01. Corporate Existence and Power. Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

Section 4.02. Corporate Authorization. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement constitutes a valid and binding agreement of Buyer.

Section 4.03. Governmental Authorization. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby require no action by or in respect of, or filing with, any governmental body, agency or official other than (i) compliance with any applicable requirements of the HSR Act; (ii) any actions or filings which, if not taken or made, would not have a material adverse effect on Buyer or materially adversely effect the ability of Buyer to consummate the transactions contemplated hereby; and (iii) any filings or notices not required to be made or given until after the Closing Date.

<PAGE>

Section 4.04. Noncontravention. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the certificate of incorporation or bylaws of Buyer, (ii) assuming compliance with the matters referred to in Section 4.03, violate any law, rule, regulation, judgment, injunction, order or decree, or (iii) constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation of Buyer or to a loss of any benefit to which Buyer is entitled under any agreement or other instrument binding upon Buyer, except, in the case of (ii) and (iii), for such matters as would not materially adversely effect the ability of Buyer to consummate the transactions contemplated by this Agreement.

Section 4.05. Finders' Fees. Except for Greenhill & Co., LLC and Salomon Smith Barney Inc., whose fees will be paid by Buyer, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller or any of its affiliates upon consummation of the transactions contemplated by this Agreement.

ARTICLE 5

Covenants of Seller

Seller agrees that:

Section 5.01. Conduct of the Business. From the date hereof until the Closing Date, Seller and its subsidiaries shall conduct the Business in the ordinary course consistent with past practice and shall use their reasonable commercial efforts to preserve intact the business organizations and relationships with third parties and to keep available the services of the present employees of the Business. Without limiting the generality of the foregoing, from the date hereof until the Closing Date and except as otherwise required by this Agreement or the Fulfillment Agreement between Buyer and Seller dated as of the date hereof (the "Fulfillment Agreement"), Seller will not, and will not permit any of its subsidiaries to:

(a) with respect to the Business, acquire a material amount of assets from any other person, other than purchases of materials or products in the ordinary course of business;

<PAGE>

(b) sell, lease, license or otherwise dispose of any Purchased Assets except (i) pursuant to existing contracts or commitments and (ii) sale of inventory in the ordinary course consistent with past practice;

(c) except in the ordinary course consistent with Seller's customary

practices, will not with respect to the Business collect any accounts receivable, delay payment of any accounts payable or sell any inventory;

(d) terminate the employment of any Business Employee (except for (i) terminations of employment in connection with the restructuring of Seller's business as publicly announced prior to the date hereof, which terminations are itemized in Schedule 5.01(d), (ii) termination by an employee and (iii) termination for cause);

(e) agree or commit to do any of the foregoing; or

(f) take or agree or commit to take any action that, to the knowledge of Seller, would or is likely to make any representation or warranty of Seller hereunder inaccurate in any respect at, or as of any time prior to, the Closing Date.

Section 5.02. Access to Information; Confidentiality. (a) From the date hereof until the Closing Date, Seller will (i) give Buyer and its authorized representatives reasonable access to the properties, books and records and employees of Seller and its subsidiaries relating to the Business or the Purchased Assets or Assumed Liabilities and such financial and other information relating to the Business or the Purchased Assets or Assumed Liabilities as such persons may reasonably request and (ii) instruct the employees, counsel and financial advisors of Seller to cooperate with Buyer in its investigation of the Business or the Purchased Assets or Assumed Liabilities. Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller or otherwise unreasonably harm such business. Notwithstanding the foregoing, Buyer shall not have access to personnel records of Seller relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion is sensitive or the disclosure of which could subject Seller to risk of liability. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller hereunder. The foregoing information shall be held in confidence to the extent required by, and in accordance with, the provisions of the letter agreement dated as of November 9, 1999 between Buyer and Seller (the"Confidentiality Agreement") which shall continue in effect.

<PAGE>

(b) After the Closing, Seller and its affiliates will hold, and will use their reasonable commercial efforts to cause their respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning the Business or the Purchased Assets or Assumed Liabilities, except to the extent that such information can be shown to have been (i) in the public domain through no fault of Seller or its affiliates or (ii) later lawfully acquired by Seller on a non-confidential basis from sources other than those related to its prior ownership of the Business. The obligation of Seller and its affiliates to hold any such information in confidence shall be satisfied if they exercise the same care with respect to such information as they would take to preserve the confidentiality of their own similar information.

(c) After the Closing Date, Seller will give Buyer and its authorized representatives reasonable access to properties, books and records and employees of Seller to the extent necessary to permit Buyer to determine any matters relating to its rights or obligations hereunder or any other reasonable business purpose relating to the Business or the Purchased Assets or Assumed Liabilities;

provided that any such access by Buyer shall not unreasonably interfere with the conduct of the business of Seller or otherwise harm such business.

Section 5.03. Seller's Sales Personnel. Seller agrees that for the period from the date hereof until the Closing Date, Seller will review with Buyer any plans of Seller or its subsidiaries to terminate the employment of any of Seller's and its subsidiaries' sales and marketing employees.

Section 5.04. ICG Alliance. At the request of Buyer, Seller will use reasonable commercial efforts to ensure that Buyer becomes a member of the ICG Services alliance prior to the Closing.

Section 5.05. Leasehold Defaults. Seller will as of the Closing cure any payment defaults under any leases of Real Property.

Section 5.06. Use of Proceeds. Seller will use a portion of the Purchase Price for the repayment of Seller Indebtedness and will retain the balance, if any, in Seller for use in its ongoing business.

<PAGE>

ARTICLE 6

Covenants of Buyer

Buyer agrees that:

Section 6.01. Access. After the Closing Date, Buyer will give Seller and its authorized representatives reasonable access to the properties, books and records and employees of Buyer and its affiliates relating to the Business to the extent necessary to permit Seller to determine any matter relating to its rights and obligations hereunder or any other reasonable business purpose relating to any period ending on or before the Closing Date; provided that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer and its affiliates.

Section 6.02. Products for Seller's Franchisees. Buyer will use reasonable efforts to provide product to Seller for resale to Seller's franchisees, but only to the extent such product is available to Buyer for resale, on terms consistent with those Buyer offers to similarly situated resellers

ARTICLE 7

Covenants of Buyer and Seller

Buyer and Seller agree that:

Section 7.01. Further Assurances. (a) Subject to the terms and conditions of this Agreement, Buyer and Seller will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement (including, in the case of Seller, the condition in Section 10.03(b)). Seller and Buyer agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and to vest in Buyer good and marketable title to the Purchased Assets.

(b) Seller hereby constitutes and appoints, effective as of the Closing Date, Buyer and its successors and assigns as the true and lawful attorney of Seller with full power of substitution in the name of Buyer, or in the name of Seller but for the benefit of Buyer, (i) to collect for the account of Buyer any items of Purchased Assets and (ii) to institute and prosecute all proceedings which Buyer

<PAGE>

may in its sole discretion deem proper in order to assert or enforce any right, title or interest in, to or under the Purchased Assets, and to defend or compromise any and all actions, suits or proceedings in respect of the Purchased Assets. Buyer shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof.

Section 7.02. Certain Filings. Seller and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any governmental body, agency, official or authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.03. Public Announcements. The parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except as may be required by applicable law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

Section 7.04. Trademarks; Tradenames. (a) Except as set forth otherwise in this Section 7.04, after the Closing, (i) Seller and its subsidiaries shall not use any of the marks or names used primarily in the Business as set forth on Schedule 7.04(a) the "Business Trademarks and Tradenames") and (ii) Buyer and its subsidiaries shall not use any of the marks or names set forth on Schedule 7.04(b) (the "Seller Trademarks and Tradenames").

(b) After the Closing, Buyer shall have the right to sell existing inventory and to use existing packaging, labeling, containers, supplies, advertising materials, technical data sheets and any similar materials bearing any Seller Trademarks and Tradenames until the earlier of (i) six months after the Closing Date and (ii) the date existing stocks are exhausted. Buyer shall have the right to use the Seller Trademarks and Tradenames in advertising that cannot be changed by Buyer using reasonable efforts for a period not to exceed 90 days after the Closing Date. Buyer shall comply with all applicable laws or regulations in any use of packaging or labeling containing the Seller Trademarks and Tradenames.

(c) Buyer shall not be obligated to change the Seller Trademarks and Tradenames on goods in the hands of dealers, distributors and customers at the time of the expiration of a time period set forth in subsection 7.04(b) above. The

<PAGE>

obliteration of the Seller Trademarks and Tradenames shall be deemed compliance with the covenant not to use the Seller Trademarks and Tradenames pursuant to this Section 7.04 with respect to the property to which such Seller Trademarks

and Tradenames were not affixed.

(d) Buyer agrees to cease using the Seller Trademarks and Tradenames on buildings, cars, trucks and other fixed assets as soon as possible within a period not to exceed six months after the Closing Date.

(e) Seller agrees that its consent to the amendment or extension of this Section will not be unreasonably withheld if Buyer cannot exhaust existing inventory within six months of the Closing Date.

Section 7.05. Warn Act. The parties agree to cooperate in good faith to determine whether any notification may be required under the Worker Adjustment and Retraining Notification Act (the "WARN Act") as a result of the transactions contemplated by this Agreement. Buyer will be responsible for providing any notification that may be required under the WARN Act with respect to any Transferred Employees. Seller will be responsible for providing any notification that may be required under the WARN Act with respect to any employees of the Business that are not Transferred Employees.

Section 7.06. Notices of Certain Events. Buyer and Seller shall promptly notify each other of:

(a) any notice or other communication from any person alleging that the consent of such person is or may be required in connection with the transactions contemplated by this Agreement; and

(b) any notice or other communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement.

Section 7.07. Operating Agreements. On the date hereof, the parties entered into the Fulfillment Agreement in the form set forth as Exhibit B. At Closing, the parties will enter into definitive agreements on the terms set forth in Schedule 7.07 relating to the sharing of (1) Tech Center, (2) Gateway Building, (3) Corporate Headquarters and (4) Corporate IT Function.

<PAGE>

ARTICLE 8

Tax Matters

Section 8.01. Tax Definitions. The following terms, as used herein, have the following meanings:

"Code" means the Internal Revenue Code of 1986.

"Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including, without limitation, withholding on amounts paid to or by any person, together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other person.

Section 8.02. Tax Matters. Seller hereby represents and warrants to Buyer that

(a) Seller has timely paid all Taxes which will have been required to be paid on or prior to the date hereof, the non-payment of which would result in a Lien on any Purchased Asset, would otherwise adversely affect the Business or would constitute an Assumed Liability.

(b) Seller has established, in accordance with generally accepted accounting principles applied on a basis consistent with that of preceding periods, adequate reserves for the payment of, and will timely pay, all Taxes, which arise from or with respect to the Purchased Assets or the operation of the Business and are incurred in or attributable to the Pre-Closing Tax Period, the non-payment of which would result in a Lien on any Purchased Asset, would otherwise adversely affect the Business or would constitute an Assumed Liability.

Section 8.03. Tax Cooperation; Allocation of Taxes. (a) Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets or Assumed Liabilities (including, without limitation, access to books and records) as is reasonably necessary for the filing of all Tax

<PAGE>

returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets and Assumed Liabilities for a period of at least six years following the Closing Date. At the end of such period, each party shall provide the other with at least 10 days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records. Seller and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or Assumed Liabilities or the Business.

(b) All real property taxes, personal property taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be apportioned between Seller and Buyer based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period after the Closing Date (with respect to any such taxable period, the "Post-Closing Tax Period"), provided, however, that Seller shall not be responsible for any increased assessments resulting from the transactions contemplated hereby. Seller shall be liable for the proportionate amount of such taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such taxes that is attributable to the Post-Closing Tax Period.

(c) All excise, sales, use, value added, registration stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and fees (collectively, "Transfer Taxes") incurred in connection with the transactions contemplated by this Agreement shall be borne equally by Seller and Buyer. Buyer and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation. The party that is required by applicable law to make the filings, reports, or returns with respect to any applicable Transfer

Taxes shall do so, and the other party shall cooperate with respect thereto as necessary.

(d) Apportioned Obligations and Transfer Taxes described in Section 8.03(b) or 8.03(c) shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law. The paying party shall be entitled to reimbursement from the non-paying party in accordance with Section 8.03(b) or (c), as the case may be. Upon receipt of any bill for, or payment of, any such Apportioned Obligation or Transfer Tax, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under Section 8.03(b) or (c), as the case may be,

<PAGE>

together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying party shall make such reimbursement promptly but no event later than 10 days after the presentation of such statement. Any payment not made within such time shall bear interest at a rate set forth in Section 2.09(b) for each day until paid.

ARTICLE 9

Employee Benefits

Section 9.01. Employee Benefits Representations. Seller hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date, that:

(a) Schedule 9.01(a) lists each material "employee benefit plan", as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), each material employment, severance or similar contract, plan, arrangement or policy and each other material plan or arrangement (written or oral) providing for compensation, bonuses, profit-sharing, stock option or other stock related rights or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangements), health or medical benefits, employee assistance program, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, severance benefits and post-employment or retirement benefits (including compensation, pension, health, medical or life insurance benefits) which is maintained, administered or contributed to by Seller or any ERISA Affiliate and covers any person who is a Business Employee, as defined in Section 9.02 (any such plan, arrangement or policy, an "Employee Plan"). Copies of each Seller 401(k) Plan (as defined in Section 9.01(b)) and each other Employee Plan that provides for severance, vacation, sick leave or deferred compensation and all amendments thereto and written interpretations thereof have been furnished to Buyer. For purposes of this Agreement, "ERISA Affiliate" of Seller shall mean any other entity which, together with Seller, would be treated as a single employer under Section 414 of the Code. Since December 31, 1998, except as set forth in Schedule 9.01(a), no employee benefit plan or arrangement, including without limitation any Employee Plan, or modification thereto, has been adopted that would, individually or in the aggregate, increase materially the operating cost of the Business.

(b) No Employee Plan is a multiemployer plan, as defined in Section 3(37) of ERISA, and no Employee Plan is subject to Title IV of ERISA. Neither Seller nor any of Seller's ERISA Affiliates has incurred any liability under Title IV of ERISA arising in connection with the termination of any plan covered or

<PAGE>

previously covered by Title IV of ERISA that could become, after the Closing Date, an obligation of Buyer or any of its affiliates. The InaCom Employees Retirement Savings Plan and Trust, the Vanstar Corporation 401(k) Plan, the Office Products of Minnesota Inc. 401(k) Plan, the National Technology Group 401(k) Plan, the Computerland 401(k) Plan and the Mentor Technologies Ltd. 401(k) Plan (the "Seller 401(k) Plans") have been determined to be qualified under Section 401(a) of the Code and nothing has occurred with respect to such plans since such determination that could reasonably be expected to result in the loss of such qualification or exemption from tax. Each plan loan outstanding under the Seller 401(k) Plans is fully secured by the vested Plan account balance of the applicable participant, and each such loan has been extended on such terms and administered in such a manner as to avoid treatment as a distribution under Section 72(p) of the Code.

(c) Neither Seller nor any of its subsidiaries is a party to or subject to, or is currently negotiating in connection with entering into, any collective bargaining agreement or other contract or understanding with a labor union or labor organization.

(d) Neither Seller nor any of its subsidiaries has, in connection with the Business, engaged any individual as an independent contractor or made payments for services to be performed by any individual as an independent contractor who should be considered, under applicable law, an employee of (rather than an independent contractor to) Seller or any of its subsidiaries.

Section 9.02. Employees and Offers of Employment. For purposes of this Agreement, "Business Employees" shall mean the individuals described in Schedule 9.02. As soon as practicable after the date hereof, Seller shall provide Buyer with a list containing the names of all of the Business Employees, and through the Closing Date Seller shall periodically revise such list to include each Business Employee newly hired by Seller or its affiliate, and to reflect termination of employment or similar personnel changes. At Closing, Buyer or its affiliate shall offer employment, in a comparable position and at the same rate of salary (or, if applicable, base hourly rate), to each Business Employee who is actively employed as of the Closing Date, and each inactive Business Employee who is on approved leave on the Closing Date because of jury duty, family or medical leave, sick leave, short-term disability, vacation or military duty; provided, however, that nothing contained herein is intended to confer upon any Business Employee any right to continued employment after the Closing Date. Each Business Employee who accepts (or is deemed to accept) employment with Buyer on the Closing Date is referred to herein as a "Transferred Employee". Seller hereby agrees that neither Seller nor any affiliate shall (i) rehire or continue to employ any Business Employee at any time prior to the first anniversary of the Closing Date; or (ii)

<PAGE>

offer any Business Employee any severance or similar benefits payable on termination of such Employees' employment by Seller or its affiliate; provided, that this clause (ii) shall not apply with respect to any Business Employee unless Buyer offers such Employee employment in accordance with this Article 9, at a location no greater than 50 miles from that in effect at the Closing Date.

Section 9.03. Seller's Employee Benefit Plans. (a) Seller shall retain all obligations and liabilities under the Employee Plans and any other benefit plan or arrangement of Seller or its affiliate in respect of each employee or former employee (including any beneficiary thereof) who is not a Transferred Employee. Except as expressly set forth herein, Seller or its designated

affiliate shall retain all liabilities and obligations in respect of benefits accrued by Transferred Employees under the Employee Plans and any other benefit plan or arrangement of Seller or its affiliate, and neither Buyer nor any of its affiliates shall have any liability with respect thereto. Except as expressly set forth herein, no assets of any Employee Plan shall be transferred to Buyer or any of its affiliates or to any plan of Buyer or any of its affiliates. Seller shall take all actions necessary (including any necessary plan amendments) to cause accrued benefits or account balances of Transferred Employees under the Seller 401(k) Plans to be fully vested as of the Closing Date, and to provide that Transferred Employees shall be entitled to the full benefit of any matching contribution under the Seller 401(k) Plans for the plan year that includes the Closing Date (the "Closing Plan Year") attributable to amounts actually deferred prior to the Closing Date by Transferred Employees under the Seller 401(k) Plans during the Closing Plan Year, to the extent consistent with the governing plan documents and the past practice of Seller, excluding:

(i) any discretionary matching contribution determined after the Closing Date; and

(ii) any nondiscretionary matching contribution the allocation of which to a participant's account is conditioned on such participant's being employed at the end of the Closing Plan Year.

(b) In the event that Seller reasonably determines that the transactions contemplated by this Agreement constitute an event described in Section 401(k)(10)(A)(ii) of the Code, Seller shall take all actions necessary: (i) to permit Transferred Employees to elect to take distributions (subject to applicable law) of their accounts thereunder in accordance with the terms of such plans; and (ii) to the extent Transferred Employees so elect, to roll over the amounts received from the Seller 401(k) Plans (including, to the extent permissible under applicable law, any outstanding loans) to an individual retirement account or to one or more defined contribution retirement plans qualified under Section 401(a) of the Code

<PAGE>

and maintained by Buyer or one of its affiliates (the "Buyer 401(k) Plans"). Buyer shall cause the Buyer 401(k) Plans to accept such rollovers, provided Buyer receives evidence reasonably acceptable to it that the Seller 401(k) Plans are qualified under the applicable provisions of the Code. In the event that Buyer and Seller reasonably determine that the transactions contemplated by this Agreement do not constitute an event described in Section 401(k)(10)(A)(ii) of the Code, then as soon as practical following receipt by Buyer and Seller of favorable determination letters or Buyer's certification to Seller, and Seller's certification to Buyer, in a manner reasonably acceptable to both Seller and Buyer, that Buyer's 401(k) Plans and Seller's 401(k) Plans are qualified under the applicable provisions of the Code, Seller shall cause the trustee of Seller's 401(k) Plans to transfer, solely in the form of cash or notes representing outstanding participant loans, assets representing the full account balances of the Transferred Employees, together with the appropriate net investment return (including unrealized appreciation or depreciation) thereon, reduced by any necessary benefit or withdrawal payments made in respect of Transferred Employees prior to the actual date of transfer, to the trustee of Buyer's 401(k) Plans.

(c) With respect to the Transferred Employees (including any beneficiary or dependent thereof), Seller shall retain (i) all liabilities and obligations arising under any group life, accident, medical, dental or similar arrangement (whether or not insured) to the extent that such liability or