1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re
INACOM CORP., et al.    Bankruptcy Case No. 00-2426 PJW

| | |
|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | : |
| | : Civil Action No. 04-148 GMS |
| | : (Original filed in this Action) |
| Plaintiff, | : Adversary Case No. 02-03496 PJW |
| v. | : |
| | : |
| TECH DATA CORP., | : |
| | : |
| Defendant. | : |
| | : |

| | |
|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | : |
| | : |
| Plaintiff, | : Civil Action No. 04-582 GMS |
| | : |
| v. | : Adversary Case No. 02-03499 PJW |
| | : |
| DELL COMPUTER CORPORATION, | : |
| | : |
| Defendant. | : |

| | |
|---|---|
| INACOM CORP., on behalf of all affiliated Debtors, | : |
| | : |
| Plaintiff, | : Civil Action No. 04-583 GMS |
| | : |
| v. | : Adversary Case No. 02-03500 PJW |
| | : |
| LEXMARK INTERNATIONAL, INC., | : |
| | : |
| Defendant. | : |

DEPOSITION OF RICHARD CHARLES OSHLO, JR.,
March 20, 2005

KATHRYN POWERS- CERTIFIED SHORTHAND REPORTER

2

—————————————————————— :
INACOM CORP., on behalf of  :
all affiliated Debtors,     :
                            :
          Plaintiff,        : Civil Action No. 04-584 GMS
                            :
      v.                    : Adversary Case No. 02-03501 PJW
                            :
RESILIEN, INC., et al.,     :
                            :
          Defendant.        :
—————————————————————— :
                            :
INACOM CORP., on behalf of  :
all affiliated Debtors,     :
                            :
          Plaintiff,        : Civil Action No. 04-593-GMS
                            :
      v.                    : Adversary Case No. 02-03960 PJW
                            :
INGRAM ENTERTAINMENT, INC., :
Successor in interest to    :
NASHVILLE COMPUTER          :
LIQUIDATORS,                :
                            :
          Defendant.        :
—————————————————————— :
                            ;
INACOM CORP., on behalf of  :
all affiliated Debtors,     : Civil Action No. 04-601 GMS
                            :
          Plaintiff,        : Adversary Case No. 02-04441 PJW
                            :
      v.                    :
                            :
SIGMA DATA, INC,            :
                            :
          Defendant.        :
—————————————————————— :

DEPOSITION OF RICHARD CHARLES OSHLO, JR.,

taken by the Defendants before Kathryn Powers, Certified
Shorthand Reporter of the State of Iowa, at the Renaissance
Savery Hotel, Room 210, Des Moines, Iowa, commencing at
9:45 a.m., Sunday, March 20, 2005.

3

```
 1   APPEARANCES:

 2   For InaCom Corp.:          JEFFREY P. NOLAN, ESQ.
                                Pachulski, Stang, Ziehl,
 3                               Young, Jones & Weintraub, P.C.
                                10100 Santa Monica Blvd.
 4                              Eleventh Floor
                                Los Angeles, California 90067-4100
 5
     For Executive Sounding     EARL M. FORTE, ESQ.
 6   Board Associates, Inc.,    Blank & Rome, LLP
     Liquidating Agent of       One Logan Square
 7   InaCom Corp.:              18th and Cherry Streets
                                Philadelphia, Pennsylvania  19103-6998
 8
     For Defendant Dell:        SABRINA L. STREUSAND, ESQ.
 9                              G. JAMES LANDON, ESQ.
                                Hughes & Luce, LLP
10                              111 Congress Avenue, Suite 900
                                Austin, Texas  78701
11
     For Defendant Tech        STEPHEN C. HUNT, ESQ.
12   Data:                     Adorno & Yoss
     (by telephone)            350 East Las Olas Blvd.
13                             Seventh Floor
                               Fort Lauderdale, Florida  23301
14
     For Defendant Lexmark:    CULVER V. HALLIDAY, ESQ.
15                             Stoll, Keenon & Park, LLP
                               2650 Aegon Center
16                             400 West Market St.
                               Louisville, Kentucky 40202-3377
17
     For Defendant Ingram:     JONATHAN P. HERSEY, ESQ.
18   (by telephone)            Bingham McCutchen, LLP
                               600 Anton Road, 18th Floor
19                             Costa Mesa, California  92626

20   For Third-Party           GAIL S. GREENWOOD, ESQ.
     Defendant Hewlett         Friedman, Dumas & Springwater, LLP
21   Packard, Successor in     One Maritime Plaza
     Interest to Compaq        Suite 2475
22   Computer:                 San Francisco, California  94111

23
     Also Present:             Jason Fensterstock
24   (by telephone)            Duff & Phelps

25
```

4

1                    I N D E X

2   WITNESS                                    PAGE

3   Richard Charles Oshlo, Jr.

4           Examination  By Ms. Streusand        6

5           Examination by Mr. Halliday        132

6           Examination by Mr. Hunt            168

7           Examination By Mr. Nolan           173

8           Examination by Ms. Greenwood       210

9           Examination by Mr. Nolan           211

10          Examination by Mr. Forte           231

11          Examination by Ms. Streusand       237

12          Examination by Mr. Halliday        242

13          Examination by Mr. Hunt            249

14

15

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2    EXHIBITS                                    MARKED

3     1 - InaCom Corp. Officer's Certificate     37
      2 - Third Amendment and Waiver             41
4     3 - 8-K March 2000                         44
      4 - Borrowing Base/Non-Default Certificate 51
5         February 26, 2000
      5 - Fourth Amendment and Waiver            56
6     6 - 2/16/00 Memo from Davis Polk           65
      7 - Borrowing Base/Non-DeFault Certificate 68
7         March 25, 2000
      8 - Borrowing Base Certificate 4/22/00     70
8     9 - Summary of Impact of disposed Assets   72
          and Operations
9    10 - Treasury Released Checks by Date       78
     11 - Attachment E, Collateral Mang. Report  80
10   12 - (This number was skipped in marking)
     13 - 3/29/00 Ltr. to Bachner                90
11   14 - 4/4/00 Memo to Tom from Dick           93
     15 - 3/24/00 Memo to Tom rom Dick          102
12   16 - Board of Directors Minutes            104
     17 - Intercreditor Agreement               104
13   18 - Separation and Sharing Agreement      108
     19 - Fifth Amendment and Waiver            110
14   20 - Sixth Amendment and Waiver            112
     21 - Form Notice of Borrowing              115
15   22 - March 2000 - Wires                    127
     23 - 2/15/00 Ltr. to Oslo from Schuette    161

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2           MS. STREUSAND:  Would you please swear

3    the witness.

4               ROBERT CHARLES OSHLO, JR.,

5    called as a witness by the Defendants, being first

6    duly sworn by the Certified Shorthand Reporter,

7    was examined and testified as follows:

8                     EXAMINATION

9    BY MS. STREUSAND:

10      Q.   Good morning, Mr. Oshlo.  We met just

11   briefly a moment ago.  Let me reintroduce myself.

12   I'm Sabrina Streusand.  Along with James Landon,

13   we represent Dell, Inc., in an adversary

14   proceeding brought by InaCom.

15           Can you please state your full name for

16   the record.

17      A.   Richard Charles Oshlo, Jr.

18      Q.   And your address, sir, please?

19      A.   3818 Lincoln Place Drive, Des Moines,

20   Iowa, 50312.

21      Q.   And have you had your deposition taken

22   before, sir?

23      A.   Yes.

24      Q.   How many times?

25      A.   Probably about five times.

1    Q.    Five times?

2    A.    Yes.

3    Q.    And in what context?

4    A.    Two in the context of lawsuits regarding

5    InaCom, and then two or three in two divorces.

6    Q.    In the InaCom context, can you--  Let me

7    just state, I know that you had your deposition

8    taken in the Compaq litigation?

9    A.    Yes.

10    Q.    Was your deposition taken another time in

11    the InaCom bankruptcy matter or InaCom litigation?

12    A.    Yes.

13    Q.    And in what context was that deposition

14    taken?

15    A.    I believe it was with--regarding Aqua

16    Systems.

17    Q.    And what was the dispute with Aqua

18    Systems?

19    A.    I think whether or not payments had been

20    made to Aqua Systems receivables--or payables.

21    Q.    And was this in the context of the

22    bankruptcy case or prior to InaCom's bankruptcy

23    case?

24    A.    No, it was after the bankruptcy case.

25    Q.    Was it part of the--  It was after the

1    bankruptcy case. Was it part of the preference

2    litigation?

3        A.    Yes.

4            MR. LANDON:  Mr. Oshlo, could you speak

5    up just a little bit, if you don't mind, so the

6    people on the phone can hear?

7            THE WITNESS:  Yes.  Who is on the phone?

8            MR. NOLAN:  Can you guys hear okay?

9            MR. HUNT:  It's better.  Thank you.

10           MS. STREUSAND:  Mr. Hunt is on the phone.

11   Let's see.

12           MR. HERSEY:  John Hersey from Bingham

13   McCutchen for Ingram Entertainment.

14           MS. STREUSAND:  And Mr. Fensterstock.

15           MR. NOLAN:  Is there anybody else on the

16   line?

17           MR. HALLIDAY:  Jason Fensterstock.

18   BY MS. STREUSAND:

19       Q.    So your deposition was taken in the

20   context of litigation in the bankruptcy case,

21   correct?

22       A.    Yes.

23       Q.    And was it part of the preference

24   litigation?

25       A.    I believe so, yes.

1          MS. STREUSAND:  Counsel, could we get a

2    copy of that deposition?

3          MR. NOLAN:  Sure.

4    BY MS. STREUSAND:

5      Q.   And do you recall with respect to Aqua

6    Systems, what you generally testified about?  What

7    kind of things were they asking you?

8      A.   When certain payments to Aqua Systems

9    were made, the situation at InaCom at the time of

10   those payments and between, you know--between late

11   '99 to, you know, mid-2000.

12     Q.   Do you recall if there was an issue with

13   respect to checks being held in the Aqua Systems

14   litigation?

15     A.   Yes.

16     Q.   And were there documents that you

17   produced in response to the deposition notice or a

18   document request in the Aqua Systems litigation?

19     A.   I believe there was a document request.

20   I did not produce any documents from any files I

21   have.

22     Q.   And do you recall when that deposition

23   took place, approximately?

24     A.   Three months ago.

25     Q.   Do you recall with respect to Aqua

1    Systems if checks were held in the period before

2    the preference period?  Tell me if you don't

3    understand what the preference period is.

4        A.    I have a vague understanding of it, a

5    vague understanding.

6        Q.    Let me just define the preference period

7    as June 15th and then moving backwards three

8    months to March 18th of 2000.  That would be the

9    preference period.  Do you recall if checks were

10   held prior to that period for Aqua Systems?

11       A.    I can't--I don't recall now when the

12   checks--  I think there were like two or three

13   regarding Aqua Systems, and in my mind I've never

14   distinguished between, you know, February 18th to

15   April 18th, you know.  I understand why the June

16   to March date is relevant, but I just don't recall

17   when the checks were released and, you know, when

18   they were cut.

19       Q.    Would that information be in the

20   transcript from that deposition?

21       A.    I believe it would be, yes.

22            MS. STREUSAND:  Could we also get the

23   documents that were produced by InaCom in the Aqua

24   Systems litigation?

25            MR. NOLAN:  Yeah.  I'll give you a copy

 1   of the transcript.  I'm not sure there were any

 2   documents produced, but I mean there are exhibits

 3   to the transcript.

 4   BY MS. STREUSAND:

 5       Q.    And other than those two occasions in the

 6   InaCom litigation, that was the only time your

 7   deposition was taken, the Compaq litigation and

 8   the Aqua Systems litigation?

 9       A.    Yes.

10       Q.    And have you gotten the transcript back

11   in the Aqua Systems litigation?

12       A.    Yes.

13       Q.    And have you had a chance to review it?

14       A.    Yes.

15       Q.    And do you believe your testimony is

16   accurately reflected in the transcript?

17       A.    I think I made one or two or three minor

18   changes.

19       Q.    And then signed it and returned it to

20   your counsel?

21       A.    Yes.

22       Q.    And you understand, having had your

23   deposition taken on other occasions, that your

24   testimony here today is under oath?

25       A.    Yes.

1      Q.    If at any time you need to take a break,

2   as long as you have completed your answer, just

3   say so and we will stop.

4      A.    Okay.

5      Q.    And if at any time I fail to clearly

6   state my question, just ask me to clarify the

7   question.

8      A.    Thank you.

9      Q.    And you need to answer on the record so

10  that the court reporter can hear you.  She cannot

11  record movements of the head or that sort of

12  thing, so it all has to be oral so that she can

13  take it down.  Could you do that for me, sir?

14     A.    Yes.

15     Q.    What documents did you look at to prepare

16  for your deposition?

17     A.    None.

18           MS. STREUSAND:  Do you want to go off the

19  record for a minute?

20           (Telephone interruption.)

21  BY MS. STREUSAND:

22     Q.    Sir, do you have any documents in your

23  possession that are InaCom documents?

24     A.    The only thing I kept were copies of my

25  bank presentations, presentations to the credit

1  ratings, credit rating agencies.  They were just

2  copies of the presentations we made.

3      Q.    The presentation memos?

4      A.    Yes.

5      Q.    To the bank group, and you're referring

6  to the Deutsche Bank group?

7      A.    It may have been the Deutsche Bank group,

8  it may have been other bank groups.

9      Q.    Could at some point in time you make a

10  copy of those and provide them?

11      A.    Yes, if I can find them.  I haven't

12  looked at them for years.

13      Q.    If you would use reasonable efforts to

14  find them, we'd appreciate it.

15      A.    Yes.

16      Q.    Did you meet with anyone prior to your

17  deposition?

18      A.    Today?

19      Q.    In order to prepare--

20      A.    Yes.

21      Q.    --for this deposition, broader than

22  today.

23      A.    Yes.

24      Q.    Yes, you did.  Who did you meet with?

25      A.    I met with these two gentlemen at this

 1  table.

 2      Q.   Mr. Nolan and Mr. Forte?

 3      A.   Yes.

 4      Q.   And what did you discuss?

 5           MR. NOLAN:  Object to the question to the

 6  extent it is asking for attorney/client privilege

 7  information.  I'm going to represent the witness

 8  for the purpose of this deposition.

 9           MR. FORTE:  I'll join in that.

10  BY MS. STREUSAND:

11      Q.   And how long did you meet for?

12      A.   Thirty, 45 minutes.

13      Q.   And was that today or yesterday?

14      A.   That was this morning.

15      Q.   Could you briefly describe your education

16  post high school, sir?

17      A.   I have a B.A. Degree in political science

18  from Drake University.  I have a Master's in

19  international affairs from the University of

20  Pennsylvania.  I have an MBA Degree from Columbia

21  in finance.

22      Q.   In what year did you get your MBA from

23  Columbia?

24      A.   I think it was 1983.

25      Q.   And after 1983, where did you commence

1    your employment?

2        A.    I commenced it before 1983.   I had gone

3    to graduate school and then worked for several

4    years before getting my MBA Degree.   My first

5    place of employment was with then U.S. Senator

6    John Culver, who was the U.S. Senator from Iowa.

7    I spent 6 years, about 6 1/2 years with him, the

8    last three as his chief of staff.   Then I received

9    my MBA Degree from Columbia, joined JP Morgan and

10   Company out of business school, was there from

11   1983 until 1990, 1991.

12       Q.    And what position did you have at JP

13   Morgan, sir?

14       A.    I was a vice-president and an account

15   officer on the investment banking side of Morgan.

16       Q.    So you would be reviewing financials and

17   helping JP Morgan determine what type of

18   investments they should be making?

19       A.    Well, no.   It wasn't on the investment

20   management side.   It was an account officer

21   representing both tax exempt and taxable bond

22   offerings, and I would go out, arrange for clients

23   to see if we would offer them that type of

24   financing.

25       Q.    And what did you make your determination

1  of how to offer financing?  Were you looking at

2  their financial statements, balance sheets, that

3  sort of thing?

4      A.    Generally, yes.

5      Q.    Okay.  I interrupted you.  You were at JP

6  Morgan from what year to what year?

7      A.    1983 to 1990, '91.  Then was a private

8  consultant for about two, two--about three years,

9  and then moved back to the Midwest and joined a

10  small regional investment banking, investment

11  management firm as an investment banker.

12      Q.    Let's go back.  The private consulting

13  work, what type of--

14      A.    Yes.

15      Q.    Can you just give me a brief description?

16      A.    It was having to do with tax exempt

17  financial consulting.  It wasn't--it was

18  Government entities.

19      Q.    And then when you were an investment

20  banker for--

21      A.    GWR Investments, which was a small--is a

22  small firm in Omaha, Nebraska.  And then in

23  January 1997, joined InaCom.

24      Q.    And when you were working for GWR--

25      A.    Yes.

1    Q.    --what role did you play there?

2    A.    An investment banker for tax exempt real

3    estate issuers.

4    Q.    Describe to me what you were doing as an

5    investment banker at that time.

6    A.    There was principally real estate

7    issuers, and I would go out and market the

8    services of GWR Investments in the kind of greater

9    Omaha area; identify potential clients and then

10   structure the bond offering or private placement,

11   since it was real estate, principally, for that

12   issuer.  They were small transactions.

13   Q.    And then what led you to InaCom in 1999?

14   A.    I had heard that InaCom was looking for--

15   their treasurer had left and heard that they were

16   looking for one and I thought that my capital

17   markets experience would fit their needs.

18   Q.    Did they contact you or did you contact

19   them?

20   A.    No, I contacted them.

21   Q.    And when did you join InaCom?

22   A.    January of 1997.

23   Q.    And what position did you join in?

24   A.    I joined as assistant treasurer.

25   Q.    And what was your role as assistant

 1 | treasurer?

 2 |      A.    I was the acting treasurer, in effect,

 3 | because the treasurer had left six, eight months

 4 | before, and basically when I became treasurer,

 5 | your layer--my functions didn't really change

 6 | other than I probably had a higher signing

 7 | authority, technically.

 8 |           MR. NOLAN:  Mr. Oshlo, make sure you let

 9 | counsel finish her question, if you can, or you're

10 | going to hate to read the transcript.

11 | BY MS. STREUSAND:

12 |      Q.    As the treasurer for InaCom, can you

13 | describe your responsibilities?

14 |      A.    I oversaw the treasury department, which

15 | at that time had the real estate leasing, the risk

16 | management, the capital markets, floor planning

17 | and banking arrangements, helped out with investor

18 | relations--we didn't have an investor relations

19 | person at that time--and worked in the capital

20 | markets issue.

21 |      Q.    When you talk about the capital markets

22 | issue, tell me what that means.

23 |      A.    I worked with Dave Guenthner, the CFO, in

24 | terms of answering questions with investors; when

25 | we had a--interviewed our financial advisors.

1    When we had stock and bond offerings, went on the

2    investor calls, on the road show, and then handled

3    our relationships with credit rating agencies.

4        Q.    Did you also interface with the bank

5    group for InaCom?

6        A.    Yes.  Yes.  And the floor planning

7    companies and the AR securitization, depending on

8    how you define bank group.

9        Q.    Who was the floor planning company?

10       A.    Who was?  There were a couple.  At first

11   it was IBM Credit, and then I think in ninety--

12   late '97, early '98, Deutsche Financial Services

13   became a floor planner for certain product.

14       Q.    When you talk about--  I believe one of

15   the things you said you were in charge of was risk

16   management?

17       A.    Yes.

18       Q.    Can you describe that for me?

19       A.    That's the insurance policies that

20   InaCom--  It was in the treasury department.  We

21   had an individual who handled it who reported to

22   me that has to do with insurance.

23       Q.    And when you're talking about investor

24   relations, who is that with?

25       A.    Well, that was principally handled by

1   Dave Guenther initially, and then our investor

2   relations individual once we filled that position,

3   but it has to do with handling the interface of

4   the company with mostly institutional investors.

5       Q.   Would they be the stockholders?

6       A.   Yes.

7       Q.   And did your responsibilities change or

8   expand during the time--I think you said you

9   started as assistant treasurer in 1997, but

10  essentially your responsibilities as assistant

11  treasurer to treasurer were about the same?

12      A.   Yeah.  I think as treasurer I had a

13  higher signing authority when we signed leases or

14  bank documents, but that, I think, was about the

15  only change from--  And then in sometime either

16  '98 or '99 I became an executive officer of the

17  company and it probably meant, again, higher

18  signing authority.

19      Q.   Did you ever serve on the board of

20  directors?

21      A.   No.

22      Q.   And what year did you leave InaCom, sir?

23      A.   I left September of 2000.

24      Q.   Who reported to you at InaCom?

25      A.   Our cash management--or cash manager, who

1  was Lori Nielsen; Gary Ferguson, who did real

2  estate issues.  He didn't report during my whole

3  tenure there.  Linda Black who handled the real

4  estate leases.  And then when Lori left--I

5  apologize because I don't recall his name

6  completely, but I think it was Neil Goldsworth who

7  did cash management for about a year.

8      Q.    And in terms of cash management, explain

9  to me what that means.

10     A.    That's the handling of the cash flow of

11 InaCom on a daily basis, deciding--you know,

12 sweeping the lock-boxes, making disbursements at

13 the banks, totaling out the cash position on a

14 daily basis.

15     Q.    Did the accounts payable department

16 report to you?

17     A.    No.

18     Q.    Did the accounts receivable department

19 report to you?

20     A.    No.

21     Q.    Who did they report to, if you know?

22     A.    Accounts payable reported to the

23 controller.

24     Q.    Who was Laz Krikorian?

25     A.    Ultimately.  During my period there it

1    last name, took over--in effect, took over Lori

2    Nielsen's position six months or so after she

3    left.

4        Q.    And what type of documents were regularly

5    prepared by your department?

6            MR. NOLAN:  I'll object to the question

7    as vague and ambiguous as to time.

8        A.    I regularly made presentations to the

9    audit committee, and there was a--it was called

10   the treasurer's report which was done, I believe

11   on a monthly basis, but certainly every other

12   month for the audit committee.

13           I was involved in preparing reports

14   informally for our bank--or our financial SEC

15   filings or quarterly filings.  There was--  We

16   prepared compliance reports for the bank group.

17   Coming up through the cash management section,

18   there was a report that was done for AR

19   securitization.

20   BY MS. STREUSAND:

21       Q.    The treasury reports that were prepared

22   on a monthly basis, describe what information was

23   included in those reports.

24       A.    It listed our bank lines, the term amount

25   on the bank lines, the availability under those

1    bank lines.  It listed certain financial ratios,

2    and then it listed our bank covenants, and then

3    the changes I made to the document from when I

4    inherited it was to add our targets for our credit

5    rating agencies.

6        Q.    And were the treasurer reports prepared

7    on a monthly basis throughout the time that you

8    were at InaCom?

9        A.    Pretty much so.

10       Q.    Pretty much?

11       A.    Yes.

12       Q.    That would be 1997 to approximately 2000,

13   September?

14       A.    Yes.  I'm sorry.  I was thinking--  I'll

15   take that back.  I'm not sure how long they were

16   prepared in 2000.

17       Q.    Do you know up to what point they were

18   prepared?

19       A.    I don't.  I know the last one I recall,

20   which would have been whatever was the last audit

21   committee meeting.

22       Q.    And when you're talking about the reports

23   that the bank group got, can you describe to me

24   what--

25       A.    It was whatever--compliance report, our

1    was first Leon Kerkman, and then I think Jay

2    Samuelson, although I'm not sure if--his title may

3    have been assistant controller.   Then Laz

4    Krikorian.

5         Q.    On the AP side?

6         A.    On the AP side.

7         Q.    Excuse me.   I'm saying AP, but what does

8    AP stand for?

9         A.    Accounts payable.

10        Q.    And on the accounts receivable side?

11        A.    My only involvement with accounts

12   receivable was the AR securitization.   Accounts

13   receivable reported up through Scott Simmelink who

14   reported to Dave Guenthner.

15        Q.    And you're saying Scott Simmelink?

16        A.    Simmelink.

17        Q.    Could you spell that for the court

18   reporter, please?

19        A.    I think it's S-I-M-M-E-L-I-N-K.

20        Q.    Thank you.   And I apologize if I

21   interrupted you.   I believe you said Lori Nielsen,

22   Gary Ferguson and Linda--

23        A.    Black.

24        Q.    Anyone else report to you?

25        A.    I said Neil Goldsworth, if that is his

1    bank documents, both floor planning and general

2    banking credit agreements required.

3         Q.    And do you know if they were prepared on

4    a monthly or a quarterly basis?

5         A.    I think quarterly.

6         Q.    And would that be for the Deutsche Bank

7    group or the IBM group or the Nesbit Burns group?

8         A.    Nesbit Burns and its predecessor, JP

9    Morgan, would have been a monthly basis, a very

10   complicated complex report.  The bank documents,

11   compliance for Deutsche Bank, may have been on a

12   quarterly, and its predecessor.  I just don't

13   recall.

14         MS. STREUSAND:  Mr. Nolan, if we could

15   get the bank reports, really, and the treasury

16   reports just for the time period of--let's just

17   say February, March and April, 2000, because we've

18   been through a lot of documents, but I have not

19   seen those particular reports.

20         MR. NOLAN:  The quarterly or the--

21   quarterly reports of which?

22         MS. STREUSAND:  The ones he just

23   described, the bank compliance report and the

24   treasury reports.  There's treasury reports on a

25   monthly basis?

1          MR. NOLAN:  Right.

2          MS. STREUSAND:  We just really need them

3    from, let's say, January 2000 to April 2000.

4          MR. NOLAN:  Okay.  I thought I saw those

5    in the production.

6          MS. STREUSAND:  The treasury reports?

7          MR. NOLAN:  Yes.  The supplemental

8    document production.

9          MS. STREUSAND:  Okay.

10          MR. NOLAN:  I'll look.  I mean obviously

11    it's not going to happen today.

12          MS. STREUSAND:  I understand.  And then

13    the same request with respect to the bank reports

14    that were produced at that time.

15          MR. NOLAN:  Okay.

16          MS. STREUSAND:  Okay.

17     Q.    You also described the--I believe it's

18    the compliance report, sir?  Did I get the name

19    right?

20     A.    Compliance for what?

21     Q.    In terms of what treasury department

22    produced.

23     A.    That would have been for the banks.

24     Q.    Okay.  That is part of the bank group?

25     A.    Yes.

1    Q.    And then there's also AR securitization

2  reports?

3    A.    Yes.

4    Q.    And does that report on the accounts

5  receivable that InaCom had to the banks?

6    A.    It had specifically to do with the AR

7  securitization program first for Norwest and then

8  JP Morgan, and then after the Vanstar merger with

9  Nesbit Burns.

10    Q.    And were those reports certified to the

11  bank groups by InaCom?

12    A.    Just to Nesbit Burns.

13    Q.    Just to Nesbit Burns?

14    A.    Yes.  And before that, Morgan who did the

15  AR securitization, and before that, Norwest who

16  did the AR securitization.

17    Q.    And did InaCom represent at the time that

18  they were preparing those reports and submitting

19  them to the bank group that the information on

20  them was true and correct?

21    A.    Yes.

22    Q.    Did you make those certifications, sir?

23    A.    I signed them, yes.

24    Q.    When you joined InaCom, did you rearrange

25  the treasury department or make any changes to how

1    treasury was reporting?

2            MR. NOLAN:  I'll object to the question

3    as overbroad.  You can answer it.

4        A.    Not how it was reporting, but my

5    objective was to raise the report to our banking

6    group, broadly defined, and that's why we went

7    from Norwest to JP Morgan, for instance.  We

8    brought in Goldman Sachs as our financial advisor.

9    Our bank group before that was mostly local

10   regional banks, and we brought in Deutsche Bank to

11   kind of move to it what could be called a top

12   tier.

13   BY MS. STREUSAND:

14       Q.    Top tier banking relationship?

15       A.    Yes.

16       Q.    With respect to Goldman Sachs, what role

17   did they play?

18       A.    They were our financial advisor

19   principally on--  The merger issues we had, you

20   know, did not involve me, but Bill Fairfield I

21   think had looked at several companies and they

22   were advising him, and then they were our lead

23   underwriter on the bond and stock offering, I

24   think in '97.  I forget when that was done.

25       Q.    Do you recall how long Goldman acted as

1    financial advisors to InaCom, what time period?

2        A.    I handled the RFP, and I think it was

3    done in the summer of '97, and I'm not sure when

4    they resigned.

5        Q.    What did RFP stand for?

6        A.    Request for proposals.

7        Q.    Did Goldman Sachs help InaCom in terms of

8    the sale of the distribution business to Compaq?

9            MS. GREENFIELD:   Objection as vague.

10        A.    I don't recall.

11    BY MS. STREUSAND:

12        Q.    Let me restate the question.   Was Goldman

13    Sachs InaCom's advisors with respect to the sale

14    of the distribution business to Compaq?

15        A.    I don't recall.

16        Q.    Did you interface directly with Goldman

17    Sachs?

18        A.    I and several other individuals based on

19    what the issue was.

20        Q.    And I guess--   Well, what was your--okay.

21            In 1997, what was your involvement with

22    Goldman Sachs?

23        A.    I was on the team who--I would have

24    prepared the request for proposal to several

25    institutions, including Lazard, Morgan, and

1    Goldman Sachs, to have them come from and make a

2    presentation to the company.  I was on the

3    interview team.

4        Q.    And what was Goldman Sachs attempting to

5    do for InaCom?  What were they interviewing for?

6        A.    To be our financial advisor.

7        Q.    And as a financial advisor, did they help

8    InaCom obtain financing?

9        A.    Pardon?

10        Q.    What would they--

11        A.    It was principally more the mergers and

12    acquisition activity, and ultimately led to the

13    senior management of the stock and convertible

14    bond issue in late '97.  Financial advisory is a

15    term that's a loose term.  They would not have

16    advised on bank agreements, things like that.

17        Q.    Did they advise with respect to the

18    Vanstar acquisition?

19        A.    I don't know because I wouldn't have been

20    involved in that.

21        Q.    And do you know if they had any role with

22    respect to attempts to sell the service business

23    in 1999 or 2000?  Well, excuse me.  Strike that.

24    Let's go back.

25              With respect to InaCom, do you understand

1    that the distribution business was sold to Compaq

2    on February 16th, 2000?

3         A.    Yes.

4         Q.    And when I say distribution business, do

5    you understand what I'm referring to?

6         A.    Yes.

7         Q.    And that would be what I would call the

8    hardware part of the business.

9         A.    Yes.

10         Q.    The remaining business, is it fair to

11    characterize it as a service business?

12         A.    Yes.

13         Q.    And can you describe what that service

14    business component at InaCom was?

15         A.    No, I can't.  I'm not--that's not my area

16    of expertise.

17         Q.    That's not your area.  Is it like a

18    service business like EDS is a service business?

19         A.    Somewhat.  We talked about the life cycle

20    management part, and if we took the hardware part,

21    removed it, then the remaining part was the

22    service business.  What Jerry Gagliardi's role is

23    how to expand that, I don't know.

24         Q.    But in terms of the services provided,

25    just give me a general description of the services

1   that were provided by that side of the business.

2          MR. NOLAN:  Object to the question to the

3   extent it has been asked and answered.

4      A.   Yeah.  I'm just not an expert in that,

5   so--

6   BY MS. STREUSAND:

7      Q.   And you don't have a general description

8   for me?

9      A.   No.

10     Q.   Do you know what at the time would be

11  comparable companies that had a service business?

12         MR. FORTE:  I'll object to the form of

13  the question.

14     A.   No.

15  BY MS. STREUSAND:

16     Q.   With the remaining business that is not

17  the distribution business, how would you like to

18  characterize it?  Can we call it the service

19  business or do you want to call it something else?

20     A.   No, we can call it the service business.

21     Q.   With respect to the service business, was

22  Goldman Sachs retained to assist with the sale of

23  that business?

24     A.   I don't believe so, but those were

25  decisions that were being made above me and at a

1    time when other things were going on in the

2    company, particularly in the treasury department.

3        Q.    And you were not involved in that.

4        A.    Yes.

5        Q.    Now, did your group prepare the

6    projections for InaCom?

7        A.    No.

8        Q.    The balance sheets for InaCom?

9        A.    No.

10       Q.    Who prepared the projections, sir?

11       A.    That was done in the controller's

12   department.

13       Q.    And that would have been who?

14       A.    First, Leon Kerkman, and then Jay

15   Samuelson, and then either Laz Krikorian or Dave

16   Lemon.

17       Q.    And how about the balance sheets?  Did

18   your group prepare the balance sheets?

19       A.    That would have been done in the

20   controller's department.

21       Q.    By the same people you just mentioned?

22       A.    Yes.  And of course with Dave Guenthner's

23   approval.

24       Q.    And then over time, Dave Guenthner gets

25   replaced, correct?

```
 1      A.   Yes.

 2      Q.   And Mr. Fitzpatrick takes over for

 3  Mr. Guenthner?

 4      A.   Yes.

 5      Q.   How about the income statements?  Who

 6  prepared the income statements?

 7      A.   The same individuals.

 8      Q.   So with respect to the financial

 9  reporting for InaCom, your department did what I

10  would call the bank reporting?

11      A.   Yes.

12      Q.   And perhaps some of the bond reporting;

13  is that correct?

14      A.   There really wasn't any bond reporting.

15  It was a public bond offering.

16      Q.   Public.

17      A.   A venture that was sold, so it wouldn't

18  have been bond reporting.

19      Q.   So there wasn't any--

20      A.   It wasn't a private placement or anything

21  like that.

22      Q.   Okay.  So your department did the bank

23  reporting?

24      A.   Yes.

25      Q.   Any other type of reporting that you
```