```
 1    haven't mentioned to me already?

 2        A.   Not that I recall.

 3        Q.   Did you believe the information you were

 4    reporting to the bank group was accurate?

 5             MR. NOLAN:  Object to the question as

 6    overbroad.

 7        A.   At the time that it was reported, yes.

 8    BY MS. STREUSAND:

 9        Q.   And you understood that it was important

10    to accurately report to the banks because the

11    banks were lending on the information that you

12    were providing?

13             MR. NOLAN:  Object to the question to the

14    extent it lacks foundation.  You can answer.

15        A.   As a former banker, yes.

16             MR. FORTE:  I'll object; it's argumentative.

17             MR. NOLAN:  Dick, you have to just slow

18    down a little bit and let Sabrina finish, and then

19    if anybody is going to put an objection on the

20    record.

21             THE WITNESS:  Okay.

22    BY MS. STREUSAND:

23        Q.   You said you were a former banker?

24        A.   I said as a former banker, yes.

25        Q.   You understood that the information
```

1    provided to the bank was used as part of what the

2    bank would be lending on, correct?

3        A.    Yes.

4            MR. NOLAN:    Object to the question.    It

5    lacks foundation.

6    BY MS. STREUSAND:

7        Q.    And you also understood that InaCom had

8    an affirmative obligation to be accurate in its

9    reporting to the bank group, correct?

10            MR. FORTE:    Objection to form.

11        A.    Yes.

12    BY MS. STREUSAND:

13        Q.    Do you know who Kathy Heaney is, sir?

14        A.    Yes.

15        Q.    Who is she, please?

16        A.    She's an individual who I believe worked

17    for Jay Samuelson in the controller's department.

18        Q.    And do you know what her responsibilities

19    were?

20        A.    No.

21        Q.    And did your group also help prepare the

22    10-Ks and 8-Ks?

23        A.    I was asked to review certain, you know,

24    segments of those.

25        Q.    And what segments were you asked to

1  review, sir?

2      A.   I think descriptions of the bank

3  documents or bank arrangements.

4          MS. STREUSAND:  Would you mark this as

5  the first exhibit?

6                          (Exhibit No. 1 was marked

7                           for identification.)

8      Q.   Mr. Oshlo, I'm handing you a document

9  that's been labeled Exhibit No. 1, and it is

10  titled "InaCom Corp. Officer's Certificate," and

11  it is signed by Mr. Fitzpatrick as of February

12  2000, and ask you if you played any role with

13  respect to the preparation of that certificate.

14      A.   No.

15      Q.   And on Exhibit A there is a balance

16  sheet.  You can just flip to that and tell me if

17  you had any role in preparing that document.

18      A.   Not that I recall.

19      Q.   Did you work with Houlihan Lokey with

20  respect to preparation of its solvency opinion

21  which was issued in February 2000?

22      A.   I may have talked to somebody or provided

23  them documents.

24      Q.   And do you recall the nature of any of

25  the conversations with the folks at Houlihan?

1    A.    No.

2    Q.    Do you recall who you talked to?

3    A.    No.

4    Q.    And do you recall what documents you

5    provided them?

6    A.    Most likely it would have been copies of

7    our bank documents.

8    Q.    In paragraph 2 of Exhibit 1, it says,

9    "The fair market value of the Purchased Assets as

10   represented by the Purchase Price (as those terms

11   are defined in the Asset Purchase Agreement)

12   accounted for approximately 18.6 percent of the

13   fair market value of the Company's assets as of

14   December 26, 1999."

15        Do you have any opinion with respect to

16   the accuracy of that statement?

17        MR. NOLAN:  Object to the question.  It

18   lacks foundation.

19   A.    No.

20   BY MS. STREUSAND:

21   Q.    Do you know who would have arrived at

22   that calculation, sir?

23   A.    I do not.

24   Q.    Do you know who prepared the officer's

25   certificate?

1          A.    I do not.

2          Q.    Do you know if the assets set forth on

3    the balance sheet are at fair market value or book

4    value?

5          A.    I do not.

6          Q.    You do not?

7          A.    No.

8          Q.    Mr. Oshlo, I'm going to hand you just

9    another document without marking it and just see

10   if you can tell me if you recognize it, and if you

11   recognize it, we'll mark it, but it is a balance

12   sheet dated March 25, 2000, ICN No. 00479.  Have

13   you seen that document before?

14         A.    No.

15         Q.    And did you play any role in preparing

16   it?

17         A.    No.

18         Q.    Okay.

19               MS. GREENFIELD:  May I see it?

20               MS. STREUSAND:  Sure.

21         Q.    And would the same thing be true for any

22   other balance sheet we have?  If I showed you an

23   April one, would you have worked on it?  Because

24   I'd be happy to show it to you.

25         A.    I wouldn't have worked on one in April of

40

```
 1   2000.
 2            MR. NOLAN:  Do you have a copy of that
 3   document for me, Sabrina?
 4            MS. STREUSAND:  Yes.
 5            MR. NOLAN:   Thanks.
 6   BY MS. STREUSAND:
 7       Q.    In terms of the information on the
 8   balance sheets, you would not have been providing,
 9   for example, the inventory analysis, correct, sir?
10       A.    That is correct.
11       Q.    And you did not work on what I would call
12   the reconciliation of accounts receivable for
13   those balance sheets; correct?
14       A.    That is correct.
15       Q.    Perhaps the part that you would have
16   worked on was the cash balances?
17       A.    That would have been submitted.  I
18   wouldn't have provided that.
19       Q.    Okay.
20       A.    That would have been pulled off of our
21   systems, off of the accounting systems.
22       Q.    Did you work with the bank group in 1999
23   with respect to the proposal to sell the
24   distribution business to Compaq?
25       A.    Yes.
```

1        Q.    And I'm using the term Compaq, Compaq the

2    company versus Custom Edge, which I think

3    ultimately is a subsidiary of Compaq.  Do we have

4    an understanding that those terms mean the entity

5    that bought the distribution business?

6        A.    Yes.    '99 and 2000.

7        Q.    '99 and 2000 is when you worked on it?

8        A.    Yes.    The documents were renegotiated in

9    2000.  And I want to clarify that in 2000, Tom

10   Fitzpatrick also worked with the bank group.

11       Q.    And who were you working with

12   predominantly at the bank group, what individual?

13   In 2000.  Excuse me.  Thank you.

14       A.    Primarily Robert Wood and Jeff Smith.

15            MS. STREUSAND:  Let's go ahead and mark

16   this as the next exhibit.

17                    (Exhibit No. 2 was marked

18                    for identification.)

19       Q.    Mr. Oshlo, I'm handing you what has been

20   marked as Deposition Exhibit No. 2, which is

21   labeled "Third Amendment and Waiver" dated January

22   4th, 2000.  If you could look towards the back of

23   that document, page 11.  Is that your signature,

24   sir?

25       A.    Yes.

1     Q.    And at that time would you have reviewed

2  this document with InaCom's legal counsel?

3     A.    Yes, as well as with Tom Fitzpatrick.

4     Q.    Who is the CFO at that time?

5     A.    Yes.

6     Q.    Was one of the purposes of this document

7  to allow for the sale to Compaq Computers?  And if

8  you would turn to page 2(g), that may help--

9        MS. GREENFIELD:  Objection as to form.

10  BY MS. STREUSAND:

11     Q.    --refresh your recollection.

12     A.    Yes.

13     Q.    So that one of the purposes of this

14  document was to allow for the sale of what I call

15  the distribution business to Compaq?

16     A.    Yes.

17     Q.    And in addition, if you would turn with

18  me to page 5, Section 8.24, where it says "Minimum

19  EBITDA."  Are you with me?

20     A.    Yes.

21     Q.    What is EBITDA, sir?

22     A.    Earnings before interest, taxes and

23  depreciation.

24     Q.    And when the ratios are being changed

25  here, what is the purpose of that?

1    A.    Well, it was to tighten up the covenants

2  under which InaCom would have operated under this

3  bank document.

4    Q.    And where did the EBITDA projections come

5  from?

6    A.    I believe they came from the controller's

7  office.

8    Q.    So these are the controller's estimates

9  of what EBITDA would be June 30, 2000, September

10  30 in 2000?

11    A.    Well, generally it would have come

12  from--if you're asking where we were pulling the

13  EBITDA calculation off of, it would have been the

14  controller's office, but this would have been

15  negotiated in conjunction with Tom Fitzpatrick's,

16  I guess, projections.

17    Q.    And would you be part of those

18  negotiations too, sir?

19    A.    I was in the room when this was worked

20  on.

21    Q.    And was there give and take between the

22  bank and InaCom with respect to arriving at these

23  projections?

24    MR. NOLAN:    I object to the form of the

25  question.

1          A.    Generally.

2    BY MS. STREUSAND:

3          Q.    And when you say "generally," can you

4    explain a little bit more on that?

5          A.    I cannot recall at this point in time

6    whether or not the June 30, 2000, EBITDA target on

7    page 5 was specifically negotiated or not.

8          Q.    But this would be something between the

9    bank group and InaCom with respect to what they

10   thought at the time would be accurate projections?

11         A.    Yes.

12         Q.    And in January of 2000, do you recall how

13   much was outstanding to the bank group led by

14   Deutsche Bank?

15         A.    I don't at this point in time.

16              MR. NOLAN:  Whenever you get to a point

17   to take a break to run to the restroom--

18              MS. STREUSAND:  Yes.  Please.  Let's go

19   off the record.

20              (Recess.)

21                        (Exhibit No. 3 was

22                        marked for identification.)

23   BY MS. STREUSAND:

24         Q.    Mr. Oshlo, I'm handing you what's been

25   marked as Exhibit No. 3, and that is the March 8-K

1    for InaCom dated February 16, 2000, and the reason

2    I'm handing you this is if you'd turn to the

3    second page on the liquidity portion and tell me--

4         A.    The second page which is page 3?

5         Q.    Yes.   I think there might have been a

6    cover sheet.

7         A.    Okay.

8         Q.    But where it says "Liquidity," does that

9    refresh your recollection with respect to the

10   amount outstanding on the revolver to the bank

11   group as of December 25, 1999, and it is stated to

12   be 450 million?

13              MR. NOLAN:   Can you read the question

14   back, please?

15              (Question read by the reporter.)

16        A.    The 450 may or may not have been the

17   amount outstanding.   That's what I would call the

18   par amount negotiated under the agreement, the

19   maximum allowable withdrawal under that line.

20        Q.    Fair enough.   Do you recall how much was

21   outstanding in December '99, January 2000?

22        A.    I don't off the top of my head.

23        Q.    But the 450 million is actually the total

24   amount of the revolving credit?

25        A.    The negotiated par amount of the bank

1    loan.

2        Q.    And then it also states there's a $350

3    million asset securitization program with Nesbit

4    Burns Securities?

5        A.    Yes.  That would have been the maximum

6    allowable amount that could have been obtained

7    under that.

8        Q.    And Nesbit Burns' facility was secured by

9    what type of assets, sir?

10       A.    The selected AR, primarily the direct AR.

11       Q.    And what does the direct AR mean?

12       A.    That's the project AR, the business that

13   would have subsequently been sold to Compaq, the

14   hardware AR.

15       Q.    The hardware AR?

16       A.    Yes.  I was trying to recall what we had

17   used earlier to describe that.  With some

18   exclusions.  For instance, I think government AR

19   may have been excluded, things like that.

20       Q.    Do you know with respect to the EBITDA

21   projections, and what was marked I believe as

22   Exhibit No. 2, did Goldman Sachs play any role--

23            MR. FORTE:  Objection, form.

24   BY MS. STREUSAND:

25       Q.    --in helping with those projections?

1    A.    Not that I know of.

2         MR. FORTE:  Excuse me, counsel.  Are you

3  going to mark the 8-K as an exhibit?

4         MR. NOLAN:  Exhibit 3.

5         MS. STREUSAND:  It's Exhibit 3.

6         MR. FORTE:  Okay.  Thank you.

7  BY MS. STREUSAND:

8    Q.    Did Goldman Sachs assist InaCom with

9  respect to a tax-free spin-off?

10   A.    I don't know.

11   Q.    You don't know?

12   A.    No, I don't know.  What do you mean by

13  tax-free spin-off?

14   Q.    I think there was a business that was

15  sold or trying to be sold with respect to certain

16  tax ramifications.

17   A.    Do you know when?  I'm not familiar with

18  that.

19   Q.    You're not familiar with that?

20   A.    No.

21   Q.    Looking back at the Third Amendment and

22  Waiver, do you understand what a borrowing base

23  certificate is, sir?

24   A.    Yes.

25   Q.    And is it a certificate that's supplied

1  by InaCom that states certain assets, specifically

2  eligible AR and eligible inventory?

3      A.    I don't recall specifically what was in

4  this one.  It would have been one of the documents

5  supplied under, my term, compliance documents,

6  but, yes.

7      Q.    If you look at page 7 of Exhibit No. 2,

8  there's a definition for eligible inventory, and

9  with respect to the revolving line of credit, what

10 is the meaning of having eligible inventory versus

11 just inventory?

12     A.    Well, generally it would have been the

13 inventory that they felt was good inventory, that

14 they could generally have a lien on, they

15 generally would have had a lien on.

16     Q.    More of a salable value versus their

17 taking out what they consider to be obsolete or

18 not salable; is that correct?

19         MR. NOLAN:  I'll object to the question.

20 Lacks foundation.

21     A.    I can't go any further than what is

22 described here as to the terms of Deutsche Bank's

23 intent.

24 BY MS. STREUSAND:

25     Q.    All right.  With respect to eligible

1    inventory, though, InaCom, using these definitions

2    that are included in Exhibit 2, the Third

3    Amendment and Waiver, determined what was eligible

4    inventory and eligible receivables and then

5    reported that on its borrowing base certificates

6    to the Deutsche Bank group?

7         MR. NOLAN:  Object to the question.  It

8    lacks foundation.

9    A.    In discussions with Deutsche Bank,

10   because there was always, even after this document

11   was signed, some disagreement between us and

12   Deutsche Bank as to what would be eligible.

13   BY MS. STREUSAND:

14   Q.    And what was InaCom's position; more

15   inventory should be eligible than what was

16   included in the borrowing base?

17   A.    I think generally, if I recall accurately

18   those discussions.

19   Q.    And I'm looking at the eligible inventory

20   list, and what's excluded are things like

21   inventory held on consignment, inventory that has

22   been sale and returned, that's not valid, subject

23   to a valid perfected first lien security interest.

24   Do you understand what the purpose was to

25   determine the eligible inventory for InaCom?

1          MR. FORTE:  Objection as to form.

2     A.   Well, I believe Deutsche Bank's purpose

3  was to reduce, tighten down our borrowing base

4  calculation.

5  BY MS. STREUSAND:

6     Q.   So that they would only be lending on

7  inventory that they could actually--

8     A.   Hard and fast.

9     Q.   Hard and fast that they could realize on,

10 correct?

11    A.   Yes.

12    Q.   Are they trying to get to what I would

13 call salable inventory?

14         MR. FORTE:  Objection to form.

15    A.   I'm not sure.  I think that's a defined

16 term.  I don't know.

17 BY MS. STREUSAND:

18    Q.   With respect to the eligible receivables

19 in terms of what's being reported, again, and

20 required under this third amendment, is that

21 InaCom look at its receivables and make sure they

22 meet the requirement of that definition, isn't

23 that correct?

24         MR. NOLAN:  I'll object to the question.

25 It lacks foundation.

1        A.    Yes.

2        Q.    Yes, that's correct?

3        A.    Yes.

4              MS. STREUSAND:  Would you mark this as

5    the next exhibit, please.

6                        (Exhibit No. 4 was

7                        marked for identification.)

8        Q.    Mr. Oshlo, Im handing you what has been

9    marked on the bottom as Exhibit No. 4, and ask if

10   you can identify this document which is entitled

11   "Borrowing Base/Non-Default Certificate" and it is

12   dated as of February 26, 2000.

13             MR. NOLAN:  This is Exhibit 4, right?

14             MS. STREUSAND:  Yes.

15       A.    Generally I recall it.

16       Q.    And, sir, on the back page, is that your

17   signature?

18       A.    Yes.

19       Q.    And it says Richard Oshlo, and then says

20   the title is JP and treasurer?

21       A.    No, vice-president and treasurer.

22       Q.    Vice-president and treasurer.  Thank you.

23             And on the front is the eligible

24   borrowing base trade and vendor receivables,

25   183,612,489, correct?

1    A.    Yes.

2    Q.    And then a similar number--well, a

3 different number, 22,833,996 of borrowing base

4 inventory, correct?

5    A.    Yes.

6    Q.    And it was your group that would have

7 prepared the information for this document?

8    A.    I think at the time this was done it was

9 probably I and Dave Lemon who worked on this

10 because I would have taken--inventory would have

11 been in my group.  It would have been reported up

12 through the controller's office, and I know I had

13 to go elsewhere to get information.

14    Q.    Did you satisfy yourself, though, that

15 that was a good number to put on the borrowing

16 base certificate?

17        MR. NOLAN:  Object to the question.  It's

18 overbroad and ambiguous.

19    A.    I assume at that time.  I don't recall.

20 BY MS. STREUSAND:

21    Q.    But you certified to the bank these were

22 the correct numbers?

23    A.    Yes.

24    Q.    And so at that time you would have done

25 some type of investigation, correct?

1       A.    Yes.

2             MR. NOLAN:  Object to the question.  It

3    lacks foundation and is overbroad.

4    BY MS. STREUSAND:

5       Q.    Can you answer my question, sir?

6       A.    Yes.

7       Q.    And the answer is yes to the question--

8    Well, let's start over again.

9             MS. STREUSAND:  Off the record.

10            (Discussion off the record.)

11            MS. STREUSAND:  Back on the record.

12      Q.    On the borrowing base certificate, with

13   respect to the numbers set forth, at the time that

14   you made your certification, did you verify that

15   you believed that the numbers were accurate as of

16   that time?

17            MR. NOLAN:  Object to the question to the

18   extent it's overbroad and it has been asked and

19   answered.

20      A.    Yes.

21   BY MS. STREUSAND:

22      Q.    And if you look at Exhibit No. 4, can you

23   tell me the amount of availability that InaCom had

24   as of February 26, 2000?

25      A.    Which is exhibit--

1    Q.    It is the borrowing base certificate as

2    of February 26, 2000, and I believe reading this

3    document on the first page, line 9, would show the

4    amount of availability.

5         MR. NOLAN:  So you're asking him to read

6    line 9?

7         MS. STREUSAND:  I'm asking him to confirm

8    that I'm reading correctly that the amount of

9    availability is $79,322,298.40.

10    A.    Not having looked at this document

11    probably since it was signed, apparently that is

12    the availability.

13    BY MS. STREUSAND:

14    Q.    Yes.  Is that how it works?  I mean you

15    actually--

16    A.    Yes.

17    Q.    You compile the amount of eligible

18    inventory and the eligible accounts receivable and

19    then you take out certain other numbers and then

20    you come down to a bottom line, correct?

21    A.    Yes.

22    Q.    And the bottom line amount of

23    availability, pursuant to this document that your

24    group prepared, Exhibit 4, would be how much?

25    A.    79.3 million.  I think Deutsche Bank,

 1  though, disagreed with that figure, if I recall.

 2      Q.    Is there any document that you know of

 3  where they came back and said that was not a

 4  correct figure?

 5      A.    I recall their coming back.

 6      Q.    In February of 2000?

 7      A.    Well, probably not in February, but

 8  sometime after this document was filed.

 9      Q.    And do you recall why they came back?

10      A.    At the time when they came back, they

11  recalculated, I believe, our accounting of the

12  inventory.

13      Q.    And do you know how much it changed?

14      A.    I don't.

15      Q.    Do you know what they felt was wrong with

16  the calculation of the inventory?

17      A.    No, not now.

18      Q.    Turning to the last page of Exhibit No.

19  4, do you see above your signature there's a

20  certification of the agent on behalf of the

21  borrower?  Could you read that?

22      A.    "InaCom, a Delaware corporation, acting

23  on its own as attorney-in-fact for and on behalf

24  of each borrower."

25      Q.    No.  Actually above that there's a

1  certification, sir.

2      A.    "The undersigned certifies to the

3  agent"--that paragraph?

4      Q.    Yes.

5      A.    You want me to read the whole paragraph?

6      Q.    Well, actually you can read it to

7  yourself.  I'm just going to ask you--

8      A.    Okay.  Yes.

9      Q.    At the time you signed this document, did

10  you believe that certification was true and

11  correct?

12      A.    Yes.

13                    (Exhibit No. 5 was

14                      marked for identification.)

15      Q.    Mr. Oshlo, I've handed you what has been

16  marked as InaCom or Exhibit No.--let me start

17  over.

18          Mr. Oshlo, I've handed you what has been

19  marked as Exhibit No. 5, which is entitled "Fourth

20  Amendment and Waiver," dated February 15th, 2000,

21  and have you seen this document before, sir?

22      A.    I believe so, yes.

23      Q.    And did you discuss this document with

24  the bank group prior to its execution?

25          MR. NOLAN:  Object to the question.  It

1  lacks foundation.

2      A.    Somewhat, yes.  I say "somewhat" because

3  at that point in time there was a lot going on at

4  InaCom, and Tom Fitzpatrick was getting more and

5  more involved with the banks.

6  BY MS. STREUSAND:

7      Q.   Were you still working with the bank

8  group, though, in February of 2000 along with Mr.

9  Fitzpatrick?

10     A.    Yes.

11     Q.   And does it disclose to the bank group

12 the EBITDA losses as of January 2000, and that

13 there were going to be two charges in fiscal 1999?

14          MR. NOLAN:  You want to direct him to a

15 section?

16          MS. STREUSAND:  Yes.  It is page--first

17 page, 2, Amendment (c).

18          MR. NOLAN:  So you want him to read 2(c)?

19          MS. STREUSAND:  Yes.

20          MR. NOLAN:  She'd like you to read 2(c).

21          THE WITNESS:  Yes.

22 BY MS. STREUSAND:

23     Q.   So the special charges for 1999 were

24 disclosed to the bank group in February 2000,

25 correct?

1       A.    Yes.

2       Q.    And was treasury working on the issue

3  with respect to the special charges, or would that

4  have been a different department?

5       A.    That would have been a different

6  department.

7       Q.    And would that--can you identify that

8  department, sir?

9       A.    Well, it would have been Tom Fitzpatrick

10  and maybe someone in the controller's department.

11       Q.    And do you recall as part of the sale of

12  the hardware business to Compaq that there was

13  also going to be a $55 million subordinated debt

14  facility provided by Compaq?

15       A.    I know generally of those discussions.

16       Q.    And if you look on page 2, subparagraph

17  (n), does that also provide for the establishment

18  of a $55.5 million credit facility?

19       A.    Yes.

20       Q.    And then if you'll turn with me to page

21  4, 8.24, the minimum EBITDA projections.

22       A.    Yes.

23       Q.    Were these--

24       A.    I see them.

25       Q.    Yes.   On page 4.

1          MR. NOLAN:  8.24?

2          MS. STREUSAND:  Yes.

3     Q.    And were these also provided by--I

4  believe you stated it was--  You tell me who

5  provided these minimum--

6     A.    I assume these were provided by Tom

7  Fitzpatrick.

8     Q.    Tom Fitzpatrick?

9     A.    Yes.

10    Q.    Did your financial advisors help you

11 prepare these new projections of EBITDA?

12    A.    No.

13    Q.    No.

14    A.    Keep in mind that when I use the term

15 financial advisor to refer to Goldman Sachs, it

16 wasn't--they were handling M and A issues, not

17 internal projections.

18    Q.    Were there any other advisors that

19 assisted InaCom with these particular projections,

20 the ones that are set forth at 8.24, sir?

21    A.    I don't know who prepared these for Tom.

22    Q.    Okay.  Someone did it for Tom?

23    A.    Yes.

24    Q.    So there may have been outside help, but

25 you are not aware of who that is?

1       A.    Yes.

2       Q.    Did you discuss these projections, these

3    EBITDA projections, with the bank group?

4       A.    I don't recall.  I don't recall.  If I

5    did, it would have been with Tom.

6       Q.    But would it have been with Mr. Wood or

7    anybody from Deutsche Bank?

8       A.    I assume the discussions around this

9    document would have been with Robert Wood.

10       Q.    And do you recall any specific

11    discussions with respect to the fourth amendment

12    with the bank group?

13       A.    No, I don't.

14       Q.    Were you aware of what I would call Y2K

15    issues affecting revenues at InaCom?

16       A.    Yes.  I believe they may have increased--

17    in hindsight, increased revenues.

18       Q.    You're thinking the Y2K would have

19    increased revenues?

20       A.    Yes.

21       Q.    Why would that have been?

22       A.    Because, for instance, I think Sun Trust,

23    for instance, was a client where they had been

24    ordered by I believe the Controller of the

25    Currency to do additional purchases to come in

1    compliance with Y2K issues.

2        Q.    And when do you think that would have

3    affected the revenues at InaCom, what month or

4    year, approximately?

5        A.    I think in--sometime in '99.

6        Q.    Do you have your own personal knowledge

7    of why InaCom would be EBITDA negative, let's say,

8    through September 30, 2000, and then turning

9    positive in December 2000?

10       A.    I don't.

11       Q.    You don't.  Did you work with Compaq with

12   respect to the proposed $55 million sub debt

13   facility?

14       A.    No.

15       Q.    Who at InaCom did?

16       A.    I believe that was Tom Fitzpatrick.

17       Q.    Did you work with Compaq with respect to

18   its due diligence on the purchase of InaCom?

19       A.    I was in the initial meeting and maybe

20   the second meeting in New York City.  Certainly

21   the initial meeting was in New York City regarding

22   their due diligence, and would have subsequently

23   after that provided the documentation.

24       Q.    And in terms of the initial meeting,

25   approximately when was that?  Was that in December

1    '99?

2        A.    I believe it was in December '99.

3        Q.    And what type of documentation did you

4    provide Compaq?

5        A.    At that meeting I was asked to explain

6    our bank documents or AR securitization, the

7    general terms and conditions of those documents,

8    and I would have provided copies of those

9    documents.

10       Q.    The bank facility documents?

11       A.    Yes.

12       Q.    Do you know who you provided them to at

13   Compaq?

14       A.    Well, I think we had--if I recall

15   correctly, we had, my term, a holding room to send

16   those documents to.  Very few people at that time

17   knew about the discussions.

18       Q.    Did you work with a man named Mr.

19   Edwards, Kevin Edwards, at Compaq?

20       A.    May have.  I know his name and may have

21   answered questions.  There were a couple people, I

22   know, the treasurer for instance, he and I--I

23   think he was the one who had the questions that

24   night at the due diligence meeting, treasurer-

25   acting CFO at Compaq.

1    Q.    And do you recall besides providing them

2  with financial information--strike that.

3        Besides providing them with the bank

4  documentation, do you recall anything else that

5  you provided Compaq?

6    A.    No, I don't.

7    Q.    Did you work with Greenhill, which is an

8  advisor, financial advisor, to Compaq?

9    A.    No, I did not.

10    Q.    Did you review the accounts receivable of

11  InaCom with folks at Compaq?

12    A.    I do not believe I did.

13    Q.    And the same question with respect to

14  inventory levels?

15    A.    No.

16    Q.    In February 2000 when the Compaq

17  transaction closed, were you the person or was

18  your department responsible for the distribution

19  of funds from that sale?

20    A.    Yes.    We handled the wirings that day

21  that it closed.

22    Q.    And where did the majority of the funds

23  from that sale get paid?

24    A.    At this point in time I don't recall the

25  specifics, and there is a schedule somewhere,

1    probably, but I think Deutsche Bank was paid down.

2    IBM Credit may have been paid.  Maybe Deutsche

3    Financial Services.

4        Q.    Going back to the Fourth Amendment and

5    Waiver, at the time that was entered into between

6    InaCom and the bank group, did the banks question

7    the net worth numbers that were included?

8        A.    I don't recall.  I don't recall.

9        Q.    Would you recall if they had raised a

10   serious concern about that?

11       A.    No.  I think partly because this

12   document, my recollection, is it was principally

13   negotiated between the banks and InaCom by Tom

14   Fitzpatrick.

15       Q.    Did the banks question the EBITDA,

16   minimum EBITDA, the covenants as represented in

17   8.24 of Exhibit No. 5?

18       A.    I don't recall.

19       Q.    If they had questions, though, since you

20   were the interface between the bank group as the

21   head of treasury at InaCom, would they have

22   brought those concerns to you?

23            MR. NOLAN:  Object to the question; lacks

24   foundation, has been asked and answered.

25       A.    They may or may not have.  As I said,

1    Tom Fitzpatrick was the principal negotiator on

2    this document.  I may have sat in some meetings,

3    but I don't recall.

4    BY MS. STREUSAND:

5        Q.    You don't recall?

6        A.    No.

7             MS. STREUSAND:  Can you mark this as the

8    next number?

9                         (Exhibit No. 6 was

10                        marked for identification.)

11       Q.    Mr. Oshlo, I'm handing you what has been

12   marked Exhibit No. 6, and it is a letter dated

13   February 16, 2000.  It's from Davis Polk and

14   Wardwell, and it regards funds flow for Compaq-

15   InaCom closing.

16            The first question is have you seen this

17   letter before?

18       A.    I don't believe so.

19       Q.    When you were discussing the distribution

20   of cash paid by Compaq to InaCom, does this

21   essentially look like how the cash was

22   distributed?

23            MR. FORTE:  Objection to form.

24            MR. NOLAN:  Take her question and review

25   the document, unless you are asking for his

1  recollection independent of the document.

2        MS. STREUSAND:  I want him to look at the

3  document and see if it comports with his

4  understanding.

5     A.    Generally.  There were several what I

6  call cash flow--cash wire instructions, pages,

7  that we had worked on.  It generally comports to

8  what I recall in terms of Deutsche Bank and IBM

9  Credit and Deutsche Financial Services.  I don't

10  recall the actual specific dollar amounts.

11  BY MS. STREUSAND:

12     Q.    Right, exact numbers, but generally--

13  Well, who is Davis Polk?  Who did they represent?

14     A.    I don't know.

15     Q.    You don't know?

16     A.    I don't know.

17     Q.    And who would have treasury gotten its

18  instructions from with respect to the flow of

19  funds from the Compaq transaction?

20     A.    This was being negotiated in New York at

21  this time and so I assume they were wired in by

22  our--well, faxed in to me by our attorney or Tom

23  Fitzpatrick, by InaCom's attorney or Tom

24  Fitzpatrick.

25     Q.    And do you recall who InaCom's attorneys

1   were?

2       A.    Either--I'm drawing a blank--the counsel

3   firm in Omaha which we've used for several years

4   or Wilke Farr.

5       Q.    Would you recall the date the Deutsche

6   Bank group was paid down a significant amount of

7   the Compaq transaction?

8       A.    Could you repeat that?  I didn't hear

9   the--

10      Q.    Sure.  The revolving line of credit with

11  the Deutsche Bank group.

12      A.    Yes.

13      Q.    Was it paid down a significant amount

14  from the Compaq transaction?

15      A.    Yes.

16      Q.    And IBM Credit was also paid down a

17  significant amount from the Deutsche--I'm sorry,

18  from the Compaq transaction?  Excuse me.

19      A.    Yes.

20      Q.    And Deutsche Financial Services was paid

21  directly by Compaq, correct?

22      A.    I believe they were.

23      Q.    And that facility was actually paid off,

24  correct?

25      A.    My recollection, yes.