1    Q.    Approximately $42 million?

2    A.    Yes.

3          MS. STREUSAND:  Would you mark this as

4    the next exhibit, please?

5                         (Exhibit No. 7 was

6                          marked for identification.)

7    Q.    Mr. Oshlo, I've handed you what has been

8    marked as Exhibit No. 7.  It is entitled

9    "Borrowing Base/Non-Default Certificate" as of

10   March 25, 2000.

11         Could you turn to the back of that

12   document and tell me if that is your signature?

13   A.    Yes.

14   Q.    And above your signature there is a

15   paragraph.  Does that have the same certification

16   that was on the prior borrowing base certificate?

17   A.    Bear with me for a moment.

18         It appears to be the same.

19   Q.    So you certified that this borrowing base

20   certificate was correct as of March 25, 2000;

21   correct, sir?

22   A.    Yes.

23   Q.    And if we turn to the front page, again

24   we have eligible AR and eligible inventory that

25   has been provided to the bank group, correct?

1      A.    Yes.

2      Q.    And you satisfied yourself that InaCom

3    was properly representing those amounts to the

4    bank group, correct?

5         MR. NOLAN:    Object to the question.   It

6    lacks foundation.

7      A.    Yes.

8    BY MS. STREUSAND:

9      Q.    And the pages behind actually have the

10   gross eligible receivables and the adjustments

11   that were taken to come to the net eligible

12   receivables, page 2?

13     A.    Yes.

14     Q.    And the same thing for the eligible

15   inventory.  It starts with gross inventory, then

16   there are adjustments made by InaCom to come to a

17   net eligible inventory on page 3?

18     A.    Yes.

19     Q.    And based on the calculations included in

20   this borrowing base certificate, did InaCom have

21   availability in the amount of $54,656,000?

22     A.    As of that date, yes, 54.656 million.

23     Q.    And was this document prepared in the

24   normal course of InaCom's business?

25     A.    How do you define--

1          MR. NOLAN:  I'll object to the question.

2    It lacks foundation.

3       A.   How do you define "normal course of

4    business"?

5    BY MS. STREUSAND:

6       Q.   Just a business record.  That's all I'm

7    really trying to get.

8       A.   Yes.

9       Q.   Is this a business record of InaCom?

10      A.   Yes.

11      Q.   Is the same true for the other borrowing

12   base certificate which is marked as exhibit--

13      A.   Four.

14      Q.   Four.

15      A.   Yes.

16          MS. STREUSAND:  Would you mark this as

17   the next exhibit number.

18                         (Exhibit No. 8 was

19                         marked for identification.)

20      Q.   Mr. Oshlo, I'm handing you what has been

21   marked as Exhibit 8.  It is the Borrowing Base

22   Certificate for InaCom dated April 22, 2000.

23   Could you please turn to the last page and

24   identify if that is your signature.

25      A.   Yes.

1      Q.    And it contains a similar certification,

2   sir, above your signature on that last page?

3      A.    Certification--it's a certification, but

4   I think it's changed from the previous one.

5      Q.    It's a little shorter, correct?

6      A.    Yes.

7      Q.    But it still certifies that there is

8   eligible borrowing base receivables and eligible

9   borrowing base inventory and that the

10  certification is true and correct with respect to

11  the borrowing base certificate?

12     A.    Yes.

13     Q.    With respect--  Turning back to the first

14  page, we again have the calculation both of

15  eligible vendor receivables and eligible

16  inventory; is that correct, sir?

17     A.    Yes.

18     Q.    And is there availability as of April 22,

19  2000, of 89,681,203?

20     A.    As of April--is it the 9th?  I believe

21  so.  I'm not sure what--  I don't see the--

22  April 22.

23     Q.    Is that correct, sir?

24     A.    Yes.

25

1                    (Exhibit No. 9 was

2                    marked for identification.)

3  BY MS. STREUSAND:

4     Q.   Mr. Oshlo, do you recognize this

5  document?  It is entitled "InaCom Corp - Summary

6  of Impact of Disclosed Assets and Operations,"

7  revised February 1, 2000.

8     A.   No.

9     Q.   And your group did not prepare this

10  document?

11    A.   No.

12    Q.   Did you look at or have anything to do

13  with--strike that.

14         On the service side of the business, do

15  you know if the--do you know what the profit

16  margin was with respect to the service side of the

17  business versus what I would call the hardware

18  distribution side of the business?

19         MR. FORTE:  Objection to form.

20    A.   Obviously it changed over a period of

21  time.  The only thing I know is that the service

22  side had higher margins than the distribution

23  side.

24  BY MS. STREUSAND:

25    Q.   I'm going to hand you a document that

1   apparently was prepared by Houlihan Lokey in

2   conjunction with InaCom Corp.  It is entitled

3   "Projection Financial Statements, Scenario Best

4   Case."

5            Do you see where it says margin, 31

6   percent, 32 percent, 33 percent, 34 percent?

7       A.   I see that line, yes.

8       Q.   Is that in line with what you believed

9   was the margin on the service side of the

10  business?

11      A.   I honestly don't recall what--at this

12  point in time what those margins were.

13      Q.   You just know that they were greater on

14  the service side versus the distribution side?

15      A.   Yes.

16      Q.   And this does not refresh your

17  recollection?

18      A.   No.

19      Q.   Okay.  Thank you.

20           MR. FORTE:  Was that marked or not?

21           MS. STREUSAND:  It was not.

22           MR. NOLAN:  No.

23           MR. FORTE:  What are the Bates numbers,

24  Jeff?

25           MR. NOLAN:  Here.

BY MS. STREUSAND:

Q.   Mr. Oshlo, are you aware of a practice of writing and then holding checks at InaCom for vendor payables?

A.   Yes.

Q.   And do you know for what time period this practice occurred?

A.   Recollection is beginning sometime in late December of 1999 and through much of early to mid-2000.

Q.   And you don't recall before '99 holding checks for vendors?

A.   Before '99, no.

Q.   And you're speaking of December '99 or the entire year of '99?

A.   No, December, you know, late '99.

Q.   And do you know how many vendor checks were being held?

MS. GREENFIELD:  Objection as to time.

A.   No.  On some given day in 2000, for instance, I could have had 200, 250 million dollars of checks in my office.

BY MS. STREUSAND:

Q.   And why were they in your office, sir?

A.   Because we were in a liquidity crisis and

1    I had to make sure what was going out so that we

2    had the availability to pay for them.

3        Q.    Why would checks be written if there was

4    not funds to pay those checks?

5        A.    It had to do with accounts payable, and

6    I'm not an accounts payable expert, but they would

7    go ahead on a routine basis, cut the checks, you

8    know, pending release of the--pending release of

9    the check.

10       Q.    And you just said you were in a liquidity

11   crisis, sir?

12       A.    Yes.

13       Q.    We just went through a number of

14   borrowing base reports that showed substantial

15   availability.  Had you attempted to draw down on

16   the bank in order to pay those vendor payables?

17            MR. NOLAN:  Objection.  The question

18   lacks foundation.

19            MR. FORTE:  I'll join.

20       A.    Yes.  Borrowed down--for instance, in

21   January of 2000 we were within an hour of not

22   being able to make payroll because of the default

23   under the Nesbit Burns facility.  We didn't have

24   200, 300 million dollars availability at that time

25   under any of our facilities.

1    BY MS. STREUSAND:

2        Q.    And where are you getting the number 200

3    million from, sir?

4        A.    Just my recollection of how many checks

5    were being held.

6        Q.    And did you keep reports of how many

7    checks were being held?

8        A.    There was an informal document so that I

9    knew--first, a list prepared by payables that came

10   with the checks so I knew what checks were in the

11   boxes.

12       Q.    And how did you determine when to release

13   the checks?

14       A.    When I felt we had the resources to

15   release the checks and still keep the company

16   functioning.

17       Q.    So just kind of as the cash came in, if

18   there was sufficient cash, you released the

19   checks?

20       A.    Yes.

21       Q.    And do you know--  In terms of your

22   reporting that came from the accounts payable

23   people, do you know for what time period you had

24   this reporting?

25       A.    I don't recall now when it began because

1   at first the checks just came over in boxes, but

2   sometime shortly thereafter.

3       Q.    And when you say the checks came--the

4   accounts payable checks came over in boxes to

5   treasury, I assume for your signature, sir?

6       A.    No.

7       Q.    No.   Just for your release?

8       A.    No.   The CFO signed the checks.

9       Q.    If there was a liquidity crisis, why was

10  there so much available credit under the revolving

11  line?

12           MR. NOLAN:   Object to the question.   It

13  is vague and ambiguous and overbroad as to time.

14  BY MS. STREUSAND:

15      Q.    Okay.   Let's talk about in January 2000.

16      A.    I don't recall what the availability was.

17  That was when we didn't have money to make our

18  payroll unless Nesbit Burns at the last minute,

19  about an hour before we were going to default on

20  the payroll, that Norwest Bank and Deutsche Bank

21  reached an agreement to go ahead and fund, or not

22  to, you know, at that moment declare a default.

23      Q.    On the facility?

24      A.    Yes.

25      Q.    But after the Compaq transaction where

```
 1   over $400 million comes into InaCom, is there
 2   still a liquidity crisis?
 3            MR. NOLAN:  I'll object to the
 4   characterization of the question.  Misstates prior
 5   testimony and lacks foundation.
 6            MR. FORTE:  I'll join.
 7       A.   We no longer had the direct business,
 8   revenues were declining, and because Nesbit Burns
 9   controlled the lock-boxes, had not yet rung off,
10   it was very tight.
11   BY MS. STREUSAND:
12       Q.   When did the Nesbit Burns facility get
13   paid off?
14       A.   I think the final AR was collected maybe,
15   I'm just guessing at this point, four to six weeks
16   after the Compaq sale.
17       Q.   And that facility then was completely
18   paid, correct?
19       A.   Yes.
20                    (Exhibit No. 10 was
21                     marked for identification.)
22       Q.   Mr. Oshlo, I've handed you what has been
23   marked as Exhibit No. 10 that says "Treasury
24   Released Checks by Date."  Is that something that
25   your department prepared?
```

1      A.    My department, I think, and ultimately

2  with the help of Dave Lemon's department.

3  Sometime during this period of February, March,

4  people remaining in Omaha at InaCom, particularly

5  in the finance department, was shrinking

6  dramatically, and so the person who was doing my

7  cash management operation would have originally

8  worked on this.  He left, so generally my

9  department.

10      Q.    Well, it is dated on the bottom.  It

11  shows May 10, 2000.

12      A.    Yes.

13      Q.    What does that reference--is that the

14  date--

15      A.    I assume that was the date that this was

16  printed.

17      Q.    And are there other reports for other

18  time periods?

19      A.    Yes.  This would have been done on a

20  daily basis.

21      Q.    And starting when?

22      A.    Probably early 2000, or something similar

23  to this.

24      Q.    And the date released is the date the

25  check was actually released to the particular

1  vendor?

2      A.    Yes.

3      Q.    And the check date is the date that the

4  accounts payable person actually wrote the check?

5      A.    I believe so, yes.

6      Q.    And there are a number of vendors under

7  the vendor account, correct?

8      A.    Yes.

9      Q.    And do you know if this report was

10  written really just to track the checks that were

11  written but not sent out, and then you were then

12  stating when the checks would actually get sent

13  out to the various vendors?

14          MR. NOLAN:  Object to the form of the

15  question.

16      A.    Could you repeat that?

17  BY MS. STREUSAND:

18      Q.    Sure.  The purpose of this report is to

19  track when the checks were actually released by

20  InaCom?

21      A.    Yes.

22          MS. STREUSAND:  Would you mark this as

23  the next exhibit?

24                          (Exhibit No. 11 was

25                           marked for identification.)

1    BY MS. STREUSAND:

2         Q.    Mr. Oshlo, I'm handing you Exhibit No.

3    11, and ask if that's your signature on the

4    left-hand corner.

5         A.    I believe so.

6         Q.    And is this a Collateral Management

7    Report given to IBM Credit Corporation?

8         A.    I believe so, yes.

9         Q.    So that would be part of your reporting

10   requirement to IBM?

11        A.    Yes.

12        Q.    And the date on this report is 7-27-99,

13   correct, sir?

14        A.    Yes.

15        Q.    And there is the gross amount outstanding

16   to IBM, which was 144 million, correct, as stated

17   on the report?

18        A.    Yes.

19        Q.    And then whose handwriting is on that

20   report?

21        A.    That, I don't know.  I think it's an

22   individual from IBM Credit.  It's not mine.

23        Q.    It's not yours.  It says, "Checks held,

24   31,227,000, (rounded)"?

25        A.    Yes.

82

1    Q.   And does that comport with the number of

2  checks that were held by InaCom at that time?

3              MR. NOLAN:  Object to the question.  It

4  lacks foundation.

5    A.   I don't recall.

6  BY MS. STREUSAND:

7    Q.   Was InaCom holding checks in '99?

8    A.   Sometime late '99.  I don't know about

9  this date.

10   Q.   But in '99 it was holding checks?

11   A.   Yes.

12             MR. NOLAN:  Object to the question.  It's

13 been asked and answered.

14 BY MS. STREUSAND:

15   Q.   And this would be, I assume, summer of

16 1999, correct, sir?

17   A.   As of that date, yes.

18   Q.   And do you know if there are other

19 reports like this that were provided to IBM?

20   A.   I assume that is required by the

21 document.

22   Q.   And were these prepared on a monthly

23 basis?

24   A.   I don't recall.  Maybe quarterly.

25   Q.   Maybe quarterly?

1    A.    Yes.

2    Q.    Who else handled the checks that were

3  being basically slowed down from processing the

4  held checks, besides yourself, sir?

5    A.    The only checks that would have been--and

6  I don't know if these are checks in dispute

7  between IBM Credit and InaCom for some billing

8  process, but the only checks I know which were

9  being held would have been those held by myself.

10          MR. HALLIDAY:  I'm sorry?

11          THE WITNESS:  Those held by--in the

12  treasury department.

13          MR. HALLIDAY:  Thank you.

14  BY MS. STREUSAND:

15    Q.    And could you have been holding checks in

16  the amount of $31 million in July of 1999?

17          MR. NOLAN:  I object to the question.

18  It's been asked and answered.

19    A.    I don't recall.

20  BY MS. STREUSAND:

21    Q.    There's a certification on Exhibit No. 11

22  that the information again is to the best of the--

23  Well, let me read it.  "The above officer or

24  delegated individual of InaCom certifies that

25  he/she is authorized to provide this information

1   on behalf of InaCom and agrees that to the best of

2   his/her knowledge the information is accurate."

3          Did you make that certification, sir?

4      A.   Yes.

5          MS. STREUSAND:  Counsel, can we get the

6   rest of these reports?  This is the only report we

7   have like this and it is the IBM Collateral

8   Management Report.

9          MR. NOLAN:  If you want to talk about it

10  off the record, I'd be more than happy to.  I'm

11  not aware of whether--I can't make you a

12  representation whether or not there were other

13  reports or this was a sole event.  I have no

14  knowledge of any.

15         MS. STREUSAND:  All right.  That's fine.

16  We can talk about it off the record, but if

17  someone would undertake--

18         MR. NOLAN:  If we have any documents, we

19  will certainly produce those to you.

20         MS. STREUSAND:  That's fine.  Thank you.

21     Q.   Do you know how many vendors had their

22  checks held, Mr. Oshlo?

23     A.   No, I don't.

24     Q.   Is it a significant number of vendors?

25     A.   I assume most vendors had checks held.

PETERSEN COURT REPORTERS
317 Sixth Avenue, Suite 606
Des Moines, IA 50309-4155
515/243-6596

1      Q.   Who was in charge of the payables

2 department, sir?  I'm sorry.  You may have told me

3 the answer a little bit ago.

4      A.   I forget her name off the top of my head

5 who was the director of payables, but reported up

6 through Jay Samuelson.

7      Q.   And would Mr. Samuelson also have

8 knowledge with respect to checks being held?

9      A.   Checks held in the treasury department?

10      Q.   Well, if the accounts payable people are

11 shipping them over to treasury--

12      A.   Yes.

13      Q.   I think that was your testimony, correct?

14      A.   Yes.

15      Q.   Would they then also know what would

16 happen to them afterwards?

17      A.   Generally.

18      Q.   Because wouldn't there have to be a

19 reporting requirement going back and forth?

20      A.   He knew the checks were being held.

21      Q.   And again, you determined what to release

22 based on cash flows?

23      A.   Yes.

24      Q.   Do you recall any conversations with my

25 client at Dell?

1      A.    The thing I recall is numerous phone

2  messages and from numerous vendors, including

3  Dell, and I don't recall at this point if I

4  specifically talked to someone.

5      Q.    You just got lots of calls from lots of

6  vendors?

7      A.    Yes.

8      Q.    Checking on their accounts payable from

9  their perspective?

10      A.    Multiple calls from lots of vendors.

11      Q.    Okay.  Do you recall speaking to Major

12  Horton at Dell?

13      A.    No.

14           MS. STREUSAND:  Off the record.

15           (Discussion off the record.)

16           MR. NOLAN:  We're going to take a break.

17           (Short recess.)

18           MS. STREUSAND:  Back on the record.

19      Q.    Mr. Oshlo, you stated that the treasury

20  log that's identified as Exhibit No. 10 was

21  prepared on a daily basis?

22      A.    Pretty much so.

23      Q.    Pretty much so.

24           MS. STREUSAND:  Counsel, again, this is

25  the only log we have.  We would again request, and

1    I've actually made this request to Mr. Forte as

2    well, that if there are other treasury logs, we

3    would also like to see those.

4           MR. NOLAN:  Okay.  And I do not know of

5    another treasury release ledger other than this

6    one, of the documents that we've produced to you.

7           MS. STREUSAND:  Thank you.

8           (Discussion off the record.)

9           (Short recess.)

10   BY MS. STREUSAND:

11      Q.    Mr. Oshlo, if you could look at the

12   borrowing base certificate dated February 26,

13   2000.

14           MR. NOLAN:  Which exhibit is that?

15           MS. STREUSAND:  No. 4, please.

16      Q.    Actually, why don't you go ahead and pull

17   out also No. 7.

18      A.    Which one?

19      Q.    The borrowing base certificate, the one

20   dated March 25, 2000, and then the prior is

21   February 26, 2000.  If you look at the March 25,

22   2000, second page, it refers to a prior valid and

23   perfected lien on the second page.  Do you see

24   where it says zero on that page?

25           MR. NOLAN:  Which Roman numeral is it?

BY MS. STREUSAND:

Q.    (ix).  And then compare it to the prior one on February 26, 2000, same (ix).  And what I'm trying to get to is the payment of the Nesbit Burns facility.

A.    Yes.

Q.    Okay.  Is that about the time that the Nesbit Burns facility was paid off, as of March 25, 2000?

MR. NOLAN:  Object to the question.  It lacks foundation.

A.    I just recall--my recollection is it was paid off four to six weeks after the Compaq sale closed.  I don't recall at this point in time the specifics.

BY MS. STREUSAND:

Q.    But four to six weeks.  The Compaq sale closed February 16, 2000, approximately?

A.    Yes.

Q.    And so within four to six weeks of that date, Nesbit Burns had been paid off?

A.    Yes.

Q.    Now, you stated that I believe in January there was a liquidity crisis at InaCom, correct?

A.    Yes.

1      Q.    Do you also believe that there was--

2  Well, did that liquidity crisis continue all the

3  way up to June 2000?

4      A.    Yes.  Yes.

5      Q.    And why do you say that, sir?

6      A.    Number one, our product business was

7  declining before the Compaq sale.  We had sales

8  force resigning.  If you look at--

9      Q.    Let's talk about the sales force

10 resigning.  You also were laying off people in

11 order to bring the revenue line in balance with

12 the expense line, correct?  InaCom was actually

13 laying people off--

14     A.    Yes.

15     Q.    --in order to bring, basically, revenues

16 in line with expenses.

17     A.    Yes.

18     Q.    Because a service business, the way I

19 understand--  I'm in a service business.  The way

20 I understand a service business is that you

21 basically are selling services, so that if you

22 don't have as much demand, you basically lower the

23 number of service providers and that way your

24 expense will go down.

25     A.    Yes.

1          MR. FORTE:  Objection as to the form.

2      A.    Our lock-box had been--was being locked

3   down until the AR securitization was paid off.

4   BY MS. STREUSAND:

5      Q.    But it was paid off, you believe, within

6   four to six weeks of the close of that

7   transaction?

8      A.    Yes, thereabouts, yes.

9      Q.    We just went through the borrowing base

10  certificates.  There appears to be liquidity in

11  terms of the borrowing base.

12          MR. NOLAN:  I'll object to the form of

13  the question.  It lacks foundation, the question.

14      A.    On those given dates, because as I

15  released checks I had to look out and do some

16  projections as to what was going to be our

17  availability over, let's say, the next few weeks

18  or couple months.

19          MS. STREUSAND:  Mark that as the next

20  exhibit.

21                      (Exhibit No. 13 was

22                       marked for identification.)

23      Q.    Mr. Oshlo, I'm handing you what has been

24  marked as Exhibit No. 13, and it is a letter dated

25  March 29, 2000, to Ron Bachner at IBM Credit

1    Corporation.  Turn to the second page and tell me

2    if that's your signature.

3        A.    That is my signature.

4        Q.    And take a moment to review the letter,

5    please.

6            (Pause.)

7        Q.    Have you had a chance to review the

8    letter, sir?

9        A.    Yes.

10       Q.    And it is dated March 29, 2000, correct?

11       A.    Yes.

12            (Interruption.)

13   BY MS. STREUSAND:

14       Q.    Now, what I understand from this letter

15   is that with respect to the IBM facility, you had

16   until May 2000 to make payments on that facility,

17   correct?

18       A.    I don't recall that date.

19       Q.    Okay.  But in terms of the schedule,

20   there's a Scheduled Date/Amounts per Sixth

21   Amendment?

22       A.    Yes.

23            MR. NOLAN:  Are you asking him to look at

24   the exhibit?

25            MS. STREUSAND:  Yes, I am.

1       Q.    It shows that it goes from February 21,

2   2000, to May 8, 2000, correct, sir?

3       A.    Yes.

4       Q.    And the purpose of the letter is to

5   actually pay the 78 million by March 29, 2000,

6   correct?

7       A.    Yes.

8       Q.    So you are actually accelerating the

9   payment schedule to IBM, correct?

10          MR. FORTE:   Objection to form,

11  accelerated.

12          MR. NOLAN:   I'll join.

13      A.    Paid it before the--

14  BY MS. STREUSAND:

15      Q.    Paid it before the due date.

16      A.    Yes.

17      Q.    Approximately $78 million before the due

18  date?

19      A.    Yes.

20      Q.    And did you have sufficient cash flow to

21  pay a credit facility off $78 million more rapidly

22  in March?

23          MR. NOLAN:   Object to the form of the

24  question.

25          MS. STREUSAND:   It's a poor question.

93

1   Let me try again, sir.

2       Q.    You had sufficient liquidity in March to

3   pay a lending facility off approximately three

4   months more quickly than as required?

5           MR. NOLAN:  Object to the form of the

6   question.  It lacks foundation.

7   BY MS. STREUSAND:

8       Q.    Can you answer the question, sir?

9       A.    Apparently, yes.

10      Q.    Yes?  Do you recall the reason that you

11  paid this facility off faster than required?

12      A.    No, I don't.

13      Q.    You don't?

14      A.    No.

15      Q.    It is on InaCom letterhead, sir, correct?

16      A.    Yes.

17      Q.    Referring to Exhibit 13.

18      A.    Yes.

19      Q.    And is it a business record of InaCom?

20      A.    Yes.

21          MS. STREUSAND:  Mark this as the next

22  exhibit, please.

23                      (Exhibit No. 14 was

24                       marked for identification.)

25      Q.    I'm handing you what has been marked as

 1  Exhibit No. 14, which is a memo from Dick dated

 2  4-4-2000 to Tom.

 3      A.   Yes.

 4      Q.   And is the "Dick" referring to yourself,

 5  Mr. Oshlo?

 6      A.   Yes.

 7      Q.   And is the "Tom" referring to Mr.

 8  Fitzpatrick, the CFO of InaCom?

 9      A.   Yes.

10      Q.   Is this your memo, sir?

11      A.   Yes.

12      Q.   And it states that you are holding checks

13  for HP, Compaq, Toshiba--and is that Zapme?

14  Z-A-P-M-E, correct?

15          MR. NOLAN:  Are you asking him if that's

16  what the document reads?

17          MS. STREUSAND:  Yes.

18      A.   Yes.

19      Q.   And based on the time period, does that

20  mean that you are no longer holding checks for

21  other vendors?

22      A.   That, I don't--I don't recall.

23      Q.   Do you recall why you are reporting this

24  to Mr. Fitzpatrick?

25      A.   No.

1    Q.   It says, "Any word on the HP agreement?"

2   What does that refer to?

3    A.   I don't recall what that is at this point

4   in time.

5    Q.   It says, "My revolver is drawn to 154

6   million with only about 18 million to float and no

7   payroll this week.  Most likely I will reduce the

8   revolver again today."  That's in the third

9   paragraph.

10    A.   Yes.

11    Q.   And do you recall if that is a good sign

12   for InaCom?

13    A.   Well, we had a cash--

14         MR. NOLAN:  I'll object to the question.

15   It lacks foundation, it's ambiguous.

16    A.   We had an anti cash-hoarding provision,

17   and I don't know if that was kicking in then.  It

18   would have been applicable.  I just don't--absent

19   any other information, if that's what was--why it

20   was going to draw down or pay down the revolver.

21   I just don't recall.

22    Q.   Do you recall if under the--  Well, I can

23   get to that later.  The cash hoarding provision,

24   InaCom was allowed to keep approximately $30

25   million?

1    A.    Yes.

2    Q.    Thirty million, correct?

3    A.    Yes, over a period of time.

4    Q.    Correct.  And then also payroll account,

5    correct?

6    A.    Yes.

7    Q.    Of about 16.3 million, approximately?

8    A.    I don't recall.

9    Q.    All right.  Paragraph 4 says that, "I

10   have attached the most recent version of my daily

11   projections which shows strong availability (over

12   $100 million) throughout April and early May, even

13   if direct AR receipts slow down more than

14   projected."

15          Do you recall if at the time that

16   statement was correct?

17   A.    I assume, but I don't remember what--at

18   this point in time I have no recollection what the

19   projections were showing.

20   Q.    But when you're talking about

21   availability over a hundred million dollars, is

22   that on the revolving line of credit?

23   A.    I assume so, yes.

24   Q.    And then the fifth amendment to the

25   revolver, that would be the fifth amendment with

1    the credit facility for the Deutsche Bank group

2    that's referred to in paragraph 5?

3        A.    Yes.

4        Q.    And states that the compliance with the

5    10-K deadline was approved Monday so the bank

6    group was still on board?

7        A.    I assume, yes.

8        Q.    So as of April 4th, 2000, InaCom would

9    have had availability in terms of cash

10   availability under its revolving lines of credit

11   with the bank?

12            MR. FORTE:    Objection as to form.

13       A.    As of that day and--

14   BY MS. STREUSAND:

15       Q.    In 2000?

16       A.    Yes.    This document may have been

17   prepared for Tom in order to--    There was a lot

18   going on at InaCom at that time, a lot of

19   decisions were being made in--outside of Omaha,

20   and it may have just been information to show him

21   where things were at that point in time.

22       Q.    Did you prepare memos like this on a

23   normal basis or on a regular basis to Mr.

24   Fitzpatrick?

25       A.    I can't recall at this point in time.    I

1    don't recall if this was in response to specific

2    questions of his or just get a sense of where

3    things were.

4        Q.    But as of April 4th, it looked like

5    things were going well, correct?

6            MR. NOLAN:  I'll object to the form of

7    the question.  The question is vague and ambiguous

8    as to the term "well."

9            MR. FORTE:  I will join.

10       A.    I'm not going to characterize what this

11   document says.

12   BY MS. STREUSAND:

13       Q.    Do you recall when you were first aware

14   that certain of Compaq's receivables were being

15   sent to InaCom's bank accounts?

16       A.    Generally, although at this point in time

17   I don't recall the specific date, but apparently

18   when I was told by--I think someone in Dave

19   Lemon's group apparently called Tom Fitzpatrick or

20   took a call from him who was on vacation, and I

21   just don't recall what date that was.

22       Q.    Do you recall you talked to Mr.

23   Fitzpatrick when he called in from his vacation?

24       A.    Yes.

25       Q.    And do you recall having your deposition

1   taken in the Compaq litigation, sir?

2       A.   Yes.

3       Q.   And if I showed you the page where you

4   testified, it was around April 19th or 20th.  Let

5   me hand that to you and your counsel.  All I'm

6   trying to do is refresh your recollection that

7   it's between April 19th or April 20th that you

8   spoke to Mr. Fitzpatrick and became aware that the

9   funds that were attributable to Compaq's purchased

10  assets were being placed into InaCom's lock-box.

11          MR. NOLAN:  Is there a section you want

12  him to read specifically?

13          MS. STREUSAND:  Yes.  I think lines 18

14  and 19.

15          MR. FORTE:  Page?

16          MS. STREUSAND:  Page 56.

17          MR. NOLAN:  Read 55 and then 56.

18  BY MS. STREUSAND:

19      Q.   Again, sir, I'm just trying for the time

20  period in April.

21      A.   Yeah.  And this was my recollection.

22  It's probably been confirmed through other

23  testimony when that conversation took place.  I

24  assume it was sometime around then.

25      Q.   April 19th or 20th, sometime around

1    there?

2         A.    Yes.

3         Q.    All right.   Thank you.

4         A.    Whenever--

5         Q.    Whenever Mr. Fitzpatrick called in from

6    his vacation.

7         A.    Yes.

8         Q.    Very good.   And in terms of

9    reconciliation of the amounts, was that your team

10   or someone else's team between Compaq and InaCom?

11        A.    That would have been, I believe, in Dave

12   Lemon's operation.

13        Q.    And do you know when you first became

14   aware of the size of the problem between Compaq

15   and InaCom on the reconciliation of those

16   accounts?

17        A.    No.   Sometime around that date the amount

18   changed, so--

19        Q.    And I'm sorry, I just need to clarify for

20   the record.   The time period would be the April

21   19th, 20th period you became aware that there was

22   a problem, correct?

23        A.    Yes.

24        Q.    And then the amounts changed over time,

25   correct, as a part of the reconciliation process?

1      A.    Yes.

2      Q.    Did you work with Compaq--and I'm going

3  back further in time.  I'm no longer in April.

4  I'm in February of 2000.  Did you work with Compaq

5  on the revolving credit facility that was

6  proposed?

7      A.    I don't--

8            MR. FORTE:  Objection as to form.

9      A.    I don't believe I did.

10 BY MS. STREUSAND:

11     Q.    Since this is a financing transaction, it

12 would not have been part of the treasury

13 department?

14     A.    There was a bank meeting sometime in

15 March or April and I was not there, so a lot of

16 these decisions were being made out of Omaha.

17     Q.    You mean outside of Omaha?

18     A.    Outside of Omaha, excuse me.

19     Q.    And who was outside of Omaha?  Was it Mr.

20 Fitzpatrick?

21     A.    Mr. Fitzpatrick, yes.

22     Q.    And who else?

23     A.    The CEO, Jerry Gagliardi.

24           MS. STREUSAND:  Mark this as the next

25 exhibit.

102

1                          (Exhibit No. 15 was

2                          marked for identification.)

3              (Discussion off the record.)

4              MR. FORTE:  Just note for the record that

5    there is no Exhibit 12, so we won't get confused.

6    BY MS. STREUSAND:

7        Q.    Mr. Oshlo, I've handed you Exhibit No.

8    15, which is a memo, again from Dick, dated March

9    24, 2000, to Tom, re:  Accessing Compaq Revolving

10   Credit Facility, and again I'd ask you, is the

11   "From: Dick" referring to yourself, Mr. Oshlo?

12       A.    Yes.

13       Q.    And the Tom is Mr. Fitzpatrick, correct,

14   the CFO?

15       A.    Yes, uh-huh.

16       Q.    And as of March 24th, is this a review of

17   the credit facility with--the proposed credit

18   facility with Compaq and what was necessary for

19   InaCom in order to obtain the credit?

20             MR. NOLAN:  Can we have a second and let

21   the witness review the document?

22             MS. STREUSAND:  Sure.

23             (Pause.)

24       A.    Yes.

25       Q.    Do you want me to read the question back?

1      A.    Please.

2            (Question read by the reporter.)

3      A.    I believe it was, yes, or an update of

4  the status, you know, of what was being done to--

5      Q.    In order to establish that credit

6  facility?

7      A.    Yes.

8      Q.    And certain things are done and then

9  there are certain things to do, meaning that

10  InaCom needed to go ahead and do those in order to

11  establish the credit?

12     A.    Yes.

13     Q.    And, sir, does this refresh your

14  recollection, did you have any further discussions

15  with folks at Compaq with respect to the $55

16  million credit facility?

17     A.    I did not negotiate that document, and

18  whether I had--I don't know if this was Tom asked

19  me to prepare this or--

20     Q.    Exhibit 15?

21     A.    Yes.  And therefore if this was done in

22  response to his request for information, where we

23  were, and I'm not sure if I talked to Compaq about

24  this or our attorneys about, you know, the steps

25  that needed to be taken.

1      Q.   Do you know when the negotiations with

2   respect to the Compaq credit facility ceased?

3      A.   No, I don't.

4                      (Exhibit No. 16 was

5                      marked for identification.)

6      Q.   Mr. Oshlo, I'm handing you what has been

7   marked as Exhibit No. 16, which is a document

8   produced to us, but apparently it's the minutes of

9   the board meetings from February 28, 2000, to July

10  25th, 2000.  And if you could turn with me to the

11  board meeting notes of June 2000.

12     A.   June 2000?

13     Q.   Yes, sir.

14          MR. NOLAN:  You want him to start off

15  with the beginning of the month, June 2000?

16          THE WITNESS:  June 1, 2000?

17          MS. STREUSAND:  Just one second.  I'm

18  sorry.  I'll get you the right page in one second

19  here.

20          Mr. Oshlo, I can't put my finger on it

21  right now so I will get back to that question.

22          Let's mark this as the next exhibit.

23                      (Exhibit No. 17 was

24                      marked for identification.)

25     Q.   I'm handing you, Mr. Oshlo, the

105

1   Intercreditor Agreement which has been marked as

2   Exhibit 17, dated February 16, 2000, between the

3   Deutsche Bank Group, Compaq, and IBM, and ask you

4   if you recognize this document.

5       A.   Yes, in general terms.

6       Q.   General terms.  And if you turn to the

7   last couple pages, your signature appears, I

8   think, on a number of acknowledgment pages.

9       A.   Yes.

10      Q.   And generally speaking, was the purpose

11  of this document to allow for a junior credit

12  facility between InaCom and Compaq and the

13  acknowledgment of the bank group with respect to

14  that facility?

15          MR. NOLAN:  I'll object to the question.

16  It's overbroad and lacks foundation.

17      A.   Kind of from the timing of the date, I

18  assume so.

19  BY MS. STREUSAND:

20      Q.   Do you know what the purpose of the

21  intercreditor agreement was, sir?

22          MR. NOLAN:  Can he--are you going to ask

23  him more questions about it?

24          MS. STREUSAND:  No.  I just want his

25  opinion as to what the purpose of the

1    intercreditor agreement was.

2         A.    I think to allow the Compaq facility.

3         Q.    And that would be the $55 million

4    subordinated credit facility, correct, sir?

5         A.    Yes.

6         Q.    Do you know when--

7               (Interruption.)

8               MS. STREUSAND:  Let's go off the record

9    for just a second.

10               (Recess.)

11   BY MS. STREUSAND:

12        Q.    Were you involved with the agreements

13   that were entered into with Compaq at the time of

14   the sale, and more specifically with respect to

15   the service component and the agreement of Compaq

16   to continue to use InaCom?

17        A.    I did not negotiate those agreements.

18   I'm aware that there was this agreement, and I

19   don't recall at this point the dollar amount of

20   that agreement, but aware of it.

21        Q.    You were aware of it?

22        A.    Yes.

23               MS. STREUSAND:  Let's go off the record

24   and take a break for lunch.

25   (Recess was taken from 12:45 p.m. until 1:15 p.m.)

107

1                    AFTERNOON SESSION

2           MS. STREUSAND:  Is everybody ready to go

3    back on the record?

4                    RICHARD CHARLES OSHLO, JR.,

5    resumed his testimony as follows:

6                    EXAMINATION

7    BY MS. STREUSAND:

8       Q.    Mr. Oshlo, we're back from our break from

9    lunch, and I would direct your attention to the

10   8-K, which I believe is Exhibit No. 3, and I think

11   before we broke you stated that you were generally

12   aware that there was a service level agreement

13   between Compaq and InaCom.

14           I direct you to pages 149 and 150 that's

15   attached to the 8-K, which is a conformed copy of

16   a service level agreement between InaCom and

17   Compaq, and ask you to look at the second--the 1.1

18   section which shows the agreed service levels, 85

19   million for year 2000 period, and then 140 million

20   for 2001, and then 195 million for 2002.  Does

21   that refresh your recollection as to the amount of

22   service level that Compaq had agreed to provide or

23   employ InaCom for?

24           MR. NOLAN:  You are asking if this

25   document refreshes his recollection as to a