1    service agreement between InaCom and Compaq?

2         MS. STREUSAND:  Yes.  He said he was

3    generally aware, right before lunch, of the

4    service level, that there was a services agreement

5    between InaCom.  I have now directed him to the

6    actual agreement and ask him if those numbers

7    appear to be correct as to the amount that Compaq

8    had agreed to employ InaCom for.

9         A.   Yes.

10        Q.   Yes.  And do you know if, in 2000, Compaq

11   provided $85 million worth of service contracts to

12   InaCom?

13        A.   I don't believe they did.

14        Q.   Do you know what amount of services

15   Compaq actually employed InaCom for in 2000?

16        A.   I'm not sure they gave us any of that 85

17   million.

18                       (Exhibit No. 18 was

19                        marked for identification.)

20        Q.   Mr. Oshlo, I'm handing you what is marked

21   as Exhibit No. 18, and it's a Separation and

22   Sharing Agreement between Compaq and InaCom dated

23   February 16 of 2000, and are you familiar with

24   this agreement?

25        A.   I think only in passing.

1      Q.    Do you have an understanding as to how

2   resources were going to be shared between InaCom

3   and Compaq during the transition period?

4          MR. NOLAN:  Are you asking him

5   independent of the document or do you want him to

6   read it?

7          MS. STREUSAND:  Correct.

8      A.    What the type of resources?

9      Q.    Personnel, software, hardware.

10     A.    No.

11     Q.    And that is no for each--like personnel,

12  you don't have any--you were not involved with

13  that part of the transaction?

14     A.    No.

15     Q.    And the same thing for the hardware and

16  the software?

17     A.    I was not involved.

18     Q.    And who would have been the person at

19  InaCom who would have been involved with respect

20  to the sharing of or--well, essentially the

21  sharing of assets with respect to vendor

22  receivables, accounts payable, the things that are

23  identified in this agreement.  I'm just trying to

24  get the point person at InaCom.

25     A.    I assume there were a couple point

1   persons.  Vendor receivables may have been Dave

2   Lemon or, before he went to Compaq, Jay Samuelson.

3   Same way with accounts payable.

4        Q.   The same people?

5        A.   Yes.

6        Q.   And with respect to accounts--you said

7   accounts payable; correct, sir?

8        A.   Yes.

9        Q.   And with respect to accounts receivable?

10       A.   I assume that was Jay Samuelson before he

11  went to Compaq.  It may be Laz.  I'm not sure when

12  Laz joined and Jay left, so the controller's

13  office.

14       Q.   The controller's office.

15            Mr. Oshlo, after reviewing the exhibit,

16  do you recall anything in addition with respect to

17  the Separation and Sharing Agreement between

18  InaCom and Compaq?

19       A.   No.

20            MS. STREUSAND:  Okay.  Go ahead and mark

21  this as the next exhibit.

22                           (Exhibit No. 19 was

23                            marked for identification.)

24       Q.   Mr. Oshlo, I've handed you what has been

25  marked as Exhibit No. 19, which is the Fifth

1    Amendment and Waiver dated March 31, 2000, between

2    InaCom and IBM Credit and Banqué Nationale De

3    Paris and Deutsche Bank; and if you flip to--I

4    think it's page 8 of the agreement, I'm just going

5    to direct you to your signature, sir, and ask you

6    to confirm that that is your signature on the back

7    page of the bank document.

8        A.    Yes, that is.

9        Q.    And does this agreement as of March 31,

10   2000, provide for a lock-box arrangement between

11   the bank group and InaCom?

12       A.    Yes.

13       Q.    Particularly I'm referring to paragraph 2.

14       A.    Yes.

15       Q.    And just for purposes of the record, can

16   you explain what a lock-box arrangement is?

17       A.    Our lock-boxes--InaCom had their revenue,

18   much of their revenue coming into lock-boxes

19   throughout the United States.  I think one was in

20   Chicago, and it is the cash, and this had to do

21   with how those are managed, and I don't recall the

22   details.

23       Q.    It would be the accounts that are then

24   basically transmitted over to banks?

25       A.    Yes.

1                    (Exhibit No. 20 was

2                    marked for identification.)

3          (Discussion off the record.)

4          MS. STREUSAND:  We're going back on the

5    record.

6      Q.    Mr. Oshlo, I've handed you what has been

7    marked Exhibit No. 20, which is entitled "Sixth

8    Amendment and Waiver," dated April 14, 2000.

9    Again, could you turn to the last page and--well,

10   actually the third page of this document and

11   identify if that is your signature, sir?

12     A.    Yes.  Excuse me.  Yes.

13     Q.    And did InaCom apply for this waiver and

14   amendment to the bank group in mid-April?

15     A.    Yes.

16     Q.    And the waiver I believe is in paragraph

17   2 with respect to certain financial reporting; is

18   that correct?

19     A.    Yes.  We were late in submitting our

20   financial statements.

21     Q.    And the banks waived that particular

22   default, correct, sir?

23     A.    Yes.

24     Q.    And did InaCom also warrant and represent

25   that apart from that particular event of default,

1   no other default or event of default had occurred

2   or was occurring as of that date? And that is

3   paragraph 3(a), sir.

4          MR. NOLAN: Object to the question. It

5   lacks foundation.

6          Are you asking for him to read from the

7   document or his personal recollection?

8          MS. STREUSAND: Well, let's do both.

9          MR. NOLAN: Which one do you want to do

10  first?

11  BY MS. STREUSAND:

12      Q.   Let's do your personal recollection

13  first, sir, as of April 14th, the date that this

14  document appears to have been executed.

15      A.   I'm not--I can't say one way or the

16  other. I know what the document reads. At this

17  point in time in my life--

18      Q.   You don't know?

19      A.   I don't. I just don't know what else was

20  going on.

21      Q.   At the time you signed it and certified

22  it, would you have satisfied yourself that what is

23  in the document is correct?

24          MR. NOLAN: I'll object to the question.

25  It's overbroad.

1        A.    I did not negotiate this document.  I

2   signed it as an officer.  It was negotiated in New

3   York.

4   BY MS. STREUSAND:

5        Q.    Well, do you believe it was false at the

6   time you signed it?

7        A.    No.

8        Q.    Do you believe it was true at the time

9   you signed it?

10        A.    Yes.

11        Q.    Do you know if at this time the bank

12   group performed any of its own due diligence prior

13   to entering into the Sixth Amendment?

14              MR. FORTE:   Objection as to form.

15        A.    I assume they had, but I can't say.

16   BY MS. STREUSAND:

17        Q.    It would have been normal course and

18   conduct, though, for the bank to investigate

19   before entering into waiver agreements with a

20   borrower?

21              MR. FORTE:   Objection as to form.

22              MR. NOLAN:   I object.  The question is

23   overbroad.

24        A.    Yes.

25

1  BY MS. STREUSAND:

2      Q.   And this is true with your dealings with

3  the bank group and InaCom, correct, in terms of

4  that they investigated what was going on at InaCom

5  before entering into amendments and waivers to the

6  loan documentation?

7          MR. NOLAN:  Same objection.  The

8  questions is overbroad and calls for information

9  that may be outside this witness's personal

10  knowledge.

11     A.   Yes.

12                          (Exhibit No. 21 was

13                          marked for identification.)

14     Q.   Mr. Oshlo, I'm handing you Exhibit 21

15  which is dated April 28th, 2000, and it says "Form

16  Notice of Borrowing," and it is to Deutsche Bank,

17  and again if you could turn to the second page.

18  Is that your signature, sir?

19     A.   Yes.

20     Q.   And the purpose of this document is to

21  request 54 million in borrowing, correct, sir?

22     A.   Yes.

23     Q.   And if you look above your signature,

24  paragraph (a), there is typewritten in there, "The

25  events and circumstances set forth in the Bank

1   Information Package delivered to you on April 27,

2   2000, may be such that the representation and

3   warranty set forth in Section 6.10(c) of the

4   Credit Agreement may not be true and correct in

5   all material respects."

6        Can you explain to me what that means,

7   sir?

8        A.   Whatever we gave to the banks on April

9   27th, 2000, must have contained information that

10  had either--had subsequently been determined not

11  true.

12       Q.   And what information was that, do you

13  have any recollection, sir?

14       A.   I think that was at the bank meeting and

15  I did not attend.

16       Q.   And apart from attending the bank

17  meeting, do you have any recollection of what was

18  incorrect?

19       A.   No, I don't.

20       Q.   You don't?

21       A.   No, I don't.  I remember having a

22  conversation with, I think, Dan Pape about that

23  addition.

24       Q.   Who is Dan Pape?

25       A.   He is with McGrath North, who was counsel

1   in Omaha.

2       Q.   He's your lawyer.  He was InaCom's

3   lawyer?

4       A.   Yes.

5           MR. NOLAN:  I instruct the witness not

6   to--you can tell her of the existence of the

7   conversation, Mr. Oshlo, but not the substance of

8   the conversation.

9       A.   I don't recall the substance.

10  BY MS. STREUSAND:

11      Q.   We didn't see this qualifying language in

12  any of the prior documents, sir, this language,

13  this qualifying language that there may have been

14  a default.  We've reviewed all the borrowing base

15  reports, and that qualification language is not in

16  there; correct, sir?

17      A.   I assume so.  Without seeing each one, I

18  assume so.

19          MR. NOLAN:  Don't assume.  Tell her if

20  you either know or don't know.

21      A.   At this point I don't know.

22  BY MS. STREUSAND:

23      Q.   Would you like to look at the borrowing

24  base certificates that we previously reviewed this

25  morning?  And I think we actually looked at each

1    certificate.

2        A.    They were not in the ones we reviewed

3    this morning.

4        Q.    Correct.  So it was not in there in terms

5    of the ones we looked at this morning--

6        A.    Yes.

7        Q.    --which I believe is February, March and

8    April?

9        A.    Yes.

10       Q.    And sitting here today, you do not know

11   what rep and warranty--the factual basis behind

12   the statement contained in Exhibit 21 as to what

13   was incorrect about the rep and warranty made to

14   the bank?

15       A.    No.

16       Q.    And do you recall if this is the first

17   time the bank was informed that there may have

18   been a violation of a rep and warranty?

19       A.    As of the date of this document?

20       Q.    Yes.

21       A.    I don't know that.

22       Q.    You don't know?

23       A.    There were other individuals in

24   conversations with the banks at that time.

25       Q.    Is this the first time you yourself

1    informed the bank group that there had been a

2    violation of rep and warranty?

3        A.    I don't know because I don't know what

4    that date pertains to, so at this point in time--

5        Q.    We're talking about the April 28th date

6    pertains to?

7        A.    Well, around this time.  I assume--  I

8    just don't--  I can't recall.

9        Q.    Mr. Oshlo, if you could look in the stack

10   of documents for the Fourth Amendment and Waiver

11   dated February 15th, 2000.

12       A.    Fourth amendment?

13       Q.    Yes, sir.

14       A.    It would be the last one.

15           MR. LANDON:   I think it is Exhibit 5.

16       A.    Yes.

17   BY MS. STREUSAND:

18       Q.    If you look at Amendment No. 2, which I

19   believe is the amended 6.10(c) of the credit

20   agreement?

21       A.    Say that again.

22           MR. NOLAN:   A reference to it.

23           MS. STREUSAND:   The 6.10(c) is hereby

24   amended to read in its entirety as follows.

25           MR. NOLAN:   I think she is reading down

1  here under 2(a).

2  BY MS. STREUSAND:

3      Q.    2(a), and then it states, reading this

4  part, "Section 6.10(c) of the Credit Agreement is

5  hereby amended to read in its entirety as

6  follows."

7          Does that at all refresh your

8  recollection as to the reference to 6.10(c) in the

9  bank letter that is marked as Exhibit 21?

10     A.    No.

11     Q.    No, it doesn't?

12     A.    No.

13     Q.    Mr. Oshlo, are you familiar with an

14  opinion letter issued by Houlihan Lokey as of

15  February 2000 with respect to the solvency of

16  InaCom?

17     A.    I just know that they did one.  I don't

18  recall what was in it at this point in time.

19     Q.    And did you work with anyone at Houlihan

20  Lokey with respect to information they were

21  requesting for the solvency opinion?

22     A.    I think I said earlier that I may have

23  given them information they had requested or

24  answered a question, but it would have been more

25  informational than anything.

121

1    Q.    Do you recall what--  I'm sorry if I've

2  already gone over this, but do you recall what

3  information was requested?

4    A.    It was probably copies of the bank

5  documents and lending agreements.

6    Q.    Did you process the payment for the

7  Houlihan Lokey opinion letter?

8    A.    I don't recall even what was stated in

9  the wiring instructions that day, is the only

10  thing.

11    Q.    Do you recall that InaCom paid

12  approximately $400,000 for the solvency--

13    A.    No.

14    Q.    Did you see the solvency analysis after

15  it was issued?

16    A.    I don't recall I did.

17    Q.    You don't recall?

18    A.    No.

19    Q.    And you did not review it--

20    A.    No.

21    Q.    --in 2000 when it was issued?

22    A.    No.

23    Q.    Going back to April 2000, and you had a

24  conversation with Mr. Fitzpatrick while he was on

25  vacation that there was basically some receivables

1    that were attributable to the asset purchase of

2    the distribution business that may be in the

3    accounts for InaCom.  I'm just trying to put you

4    back in time; okay?

5        A.   Yes.

6        Q.   Did you have an understanding as to how

7    the reconciliation process was to work between

8    InaCom and Compaq?

9             MR. FORTE:  Objection as to form,

10   reconciliation.

11            MR. NOLAN:  Object to the question as

12   compound.

13       A.   After, you know, following that?

14   BY MS. STREUSAND:

15       Q.   Yes, sir.

16       A.   I just know that Dugan and a few other

17   individuals were going to go work out to confirm

18   that, number one, and see what had happened.

19       Q.   Prior to that time, prior to April, did

20   you have an understanding as to how the accounts

21   receivable were going to be basically accounted

22   for and taken care of as part of the asset

23   purchase?

24            MR. FORTE:  Objection as to form.

25       A.   Just generally.  We, InaCom, was going to

PETERSEN COURT REPORTERS
317 Sixth Avenue, Suite 606
Des Moines, IA 50309-4155
515/243-6596

1   maintain the lock-boxes, and based on a meeting

2   that I, Dave Guenthner, John Dugan, a few others,

3   as well as Compaq individuals, including, I think,

4   representatives of their credit manager, they were

5   going to--Compaq was going to hand over--because

6   those individuals were being sold over to Compaq,

7   was going to hand over the reconciliation.

8        Q.   And was it a process that was supposed to

9   take place over time, where both sides would be

10  taking care of the accounting for one period of

11  time?

12       A.   That, I don't know.  That would have been

13  out of my loop.

14       Q.   And do you have an understanding of if

15  Compaq had an immediate right--strike that.

16            Do you have an understanding as to if

17  Compaq had the right to make a demand for

18  immediate payment?

19       A.   I don't know.

20       Q.   You don't know?

21       A.   I don't have that information.

22       Q.   Did Compaq's demand for immediate payment

23  cause a liquidity crisis at InaCom?

24       A.   It was a major concern because I think

25  that's what was discussed at that bank meeting.

1       Q.    The April 2000 meeting?

2       A.    Yes.

3       Q.    April 24th of whatever it is?

4       A.    Yes.

5       Q.    We'll find it.

6       A.    Yes.

7       Q.    April 27, 2000?

8       A.    April 27th.  Okay.

9       Q.    Are you aware of a sale of the

10   communications business by InaCom, and the

11   proposed price was going to run around 40 million?

12      A.    No.

13      Q.    Are you aware of the sale of the

14   communications business segment at InaCom?

15      A.    No, I don't recall at this point in time.

16      Q.    You don't recall.  If you can go back to

17   those board meeting minutes, which is Exhibit No.

18   16, and the April 26th board meeting.

19      A.    Just one second, please.

20      Q.    Sure.

21      A.    April 26th?

22      Q.    April 26.  Exhibit 16.  And it is just

23   the last paragraph on that page.

24            MR. NOLAN:  What's the Bates stamp

25   number?

1          MS. STREUSAND:  Mine is 19516.

2          MR. NOLAN:  19516.

3          MS. STREUSAND:  Yes.

4     Q.    April 26, 2000, board meeting, and the

5     only thing I'm trying to get to is with respect to

6     the communication product business where Mr.

7     Fitzpatrick is reporting to the board that it

8     could bring as much as 40 million and close by the

9     end of June, do you have any information about

10    that?

11    A.    No.

12    Q.    Who would know about that?

13    A.    Tom Fitzpatrick.

14    Q.    Anybody else at InaCom?

15    A.    I doubt it.

16    Q.    And do you know even who the buyer was

17    that they were talking to?

18    A.    I don't.

19    Q.    May 15th.  Just flip over a little

20    further with me to ICN 19522, board meeting notes.

21    Are you on the same page with me?

22    A.    15, right.  021515 stamped at the top, or

23    ICN 19566.

24    Q.    Yes.  I think the thing that's kind of

25    confusing is I guess these were double Bates

1    labeled, but I'm actually referring to the lower

2    Bates number.

3              MR. NOLAN:  You said 19522, right?

4              MS. STREUSAND:  19522.

5              MR. NOLAN:  You have to come back.

6    You're on 19566.

7              MS. STREUSAND:  May 15th, 2000, board

8    meeting.

9              Let's go off the record.

10             (Discussion off the record.)

11             MS. STREUSAND:  Let's go back on.

12       Q.    On InaCom 19522, May 15th, board meeting,

13   Mr. Gagliardi is reporting on Eagle.  Can you tell

14   me who Eagle is or who they are referring to?

15       A.    I have no idea.

16       Q.    You don't have any idea?

17       A.    No.

18       Q.    Do you know at or around May 15, 2000,

19   who was doing diligence on the purchase of assets

20   from InaCom?

21       A.    No, I don't.

22       Q.    You don't.  Okay.  And you were not

23   involved with prospective purchasers of InaCom in

24   the May 2000 time period?

25       A.    No.

1    Q.    It kind of goes without saying, but if

2    you were not involved with prospective purchasers,

3    then you probably would not know the terms of the

4    prospective purchaser sale, correct?

5    A.    Correct.

6         MS. STREUSAND:   Can you mark this the

7    next exhibit?

8                    (Exhibit No. 22 was

9                    marked for identification.)

10    Q.    Mr. Oshlo, I've handed you a document

11    that is dated March 2000.  On top it looks like in

12    handwriting it says "Wires" and then "InaCom

13    Corporate."  Are you familiar with this document?

14    A.    No.  The first time I've ever seen it.

15    Q.    It is.  Okay.  Would you be the person

16    who ultimately would approve wires going out of

17    InaCom in terms of--

18    A.    I or Tom Fitzpatrick at this time.

19    Q.    Would this have been prepared by your

20    department?

21    A.    It looks--  What it looks like, just

22    guessing a little bit, is that we had an account

23    at Bank of America and these may have been wires

24    out of that account.  Whether this was a Bank of

25    America document--and I assume it was, so I

1  wouldn't have been--I might be familiar with some

2  wires, but I wouldn't be familiar with the

3  document.

4      Q.   And do you know just looking at the top

5  heading, I understand what date is, but what's

6  NBD?  Do you know what that refers to?

7      A.   I assume that's National Bank of Detroit.

8      Q.   Is that where one of the accounts for

9  InaCom was held?

10     A.   That was an account that--we had some

11 form of checking or savings account at NBD.

12     Q.   And why would InaCom be using wires for

13 payments of these various accounts?

14          MR. NOLAN:  Object to the question, lacks

15 foundation.

16     A.   Not knowing the specifics around any

17 specific wiring, often that's how we paid for our

18 health benefits and life insurance benefits, and

19 we always paid for the payroll through a wire.

20 BY MS. STREUSAND:

21     Q.   Did you also pay some of your vendors

22 through wires?

23     A.   Occasionally, particularly after, you

24 know, the March, April, May period.

25     Q.   You used wires during that time period?

1      A.    Sometimes, yes.

2      Q.    Do you recall how much was wired to

3  various vendors during that time period?

4      A.    I do not.

5      Q.    And do you recall the circumstances with

6  respect to wires being sent to vendors in that

7  time prior to the May--I think you testified the

8  April, May time period?

9      A.    It's easier.  I knew--during this period

10  there was a concern about, you know, the

11  difference between your checkbook and what's

12  actually in your account at the bank, and it was

13  easier to know whether it was out by just wiring

14  than it was through a check, and so my

15  recollection is that to the extent we wired to a

16  vendor, that was why.

17      Q.    Do you recall if Dell ever--and Dell is

18  my client, sir.  It's been a long time since we

19  talked about this.  But do you recall if Dell ever

20  refused to ship to InaCom?

21      A.    I don't recall that.  Don't know.

22      Q.    Do you know when Blackstone was hired?

23      A.    No, I don't.

24      Q.    And did you interface with Blackstone at

25  all?

1       A.    No.

2       Q.    Did you work on a proposed purchase of

3   business units with CompuCom and InaCom?

4       A.    The only thing I know about CompuCom is a

5   conversation I had with Tom Fitzpatrick, probably

6   the Wednesday, middle of the week, before we laid

7   off that Friday numerous employees.

8       Q.    That would have been June of 2000, sir?

9       A.    I forget when, but he told me that--and I

10  think a couple other individuals in the Omaha

11  finance office, that they had been trying to sell

12  something to CompuCom, and that it failed, and

13  that as of that Friday they were going to lay off

14  most of the employees of InaCom and an X number of

15  us would, you know, stay around until God knows

16  what.

17      Q.    And did you know any details with respect

18  to the transaction of CompuCom?

19      A.    No.  I just knew--that was the first I

20  heard of it, and that it had failed.

21      Q.    And I'm sorry, I know you've told me

22  this, but when did you leave InaCom?

23      A.    September 2000.

24      Q.    2000.  Several months after the

25  bankruptcy proceeding?

1    A.    Yeah.  I think there were two waves or

2  maybe three waves.  Finance left in September,

3  so--

4    Q.    And after that, where--  After you left

5  InaCom, where did you become employed?

6    A.    I joined a small now nonexistent venture

7  capital firm in Omaha by the name of the Dream

8  Field Partners.

9    Q.    What was the nature of the business for

10  that entity?

11    A.    It was a beginning venture capital firm

12  to--or private investment firm.  I think I was

13  there maybe nine months.

14    Q.    Okay.  And after that, where did you go?

15    A.    I was unemployed for six months, spending

16  time with my then four-year-old boy, and then

17  joined the state Government of Iowa where I became

18  policy director for Governor Vilsack.

19    Q.    Is that your position right now?

20    A.    No.  A year and a half ago or so I left

21  the Governor's office to go to work for the--it is

22  called the Democratic Senate Caucus Staff.  I work

23  for the Democrats in the Iowa State Senate.

24    Q.    And is that the position you hold today,

25  sir?

1          A.    Yes.   Senior research analyst there.

2               MS. STREUSAND:  Just a brief break for

3     five minutes.

4               (Short recess.)

5               MS. STREUSAND:  Let's go back on the

6     record.

7               Mr. Oshlo, thank you for your time.  I'm

8     going to pass the witness.  I believe Mr. Halliday

9     has some questions.

10                     EXAMINATION

11    BY MR. HALLIDAY:

12        Q.    Mr. Oshlo, good afternoon.  The

13    examination will not be lengthy, but if you want

14    to take a break at any time--I know we've had

15    lunch, and the afternoon is lengthening--please

16    just let me know, but I do not expect to take too

17    long with my examination.

18               Mr. Oshlo, InaCom Corporation has brought

19    separate actions against Tech Data Corporation,

20    Dell Computer Corporation, Lexmark International

21    Inc., Resilien, Inc., and Ingram Entertainment,

22    Inc.  I am here today because I am representing

23    one of those defendants, Lexmark International,

24    Inc.

25               Your deposition is being taken for

1  purposes of all of those actions, but I'm here

2  today for Lexmark International, Inc.

3          The actions have all been brought by

4  InaCom Corporation to recover allegedly

5  preferential payments made by InaCom Corporation

6  to those defendants.  A defense that has been

7  alleged by each of those defendants to InaCom

8  Corporations's claim is the ordinary course of

9  payment defense, that the payments were not

10  preferential because they were made in the

11  ordinary course, and an important fact for the

12  court in determining the validity of the defense

13  down the road may well be they held checks, which

14  is why I'm going to ask you some questions about

15  that.

16          I'm not trying to be tedious, but try to

17  make sure that we put as fine a point on those

18  facts as you recall them over four years later,

19  and I do appreciate that, as we can.

20          You and counsel this morning have

21  referred to held checks.  Am I correct, sir?

22      A.    Yes.

23      Q.    And it is my understanding, sir, and

24  correct me, I just want to make sure I have the

25  correct understanding, that you, when you were

134

1    referring to held checks, meant checks that had

2    actually been written on InaCom's account, had

3    been signed but had not been sent in payment to

4    vendors; correct?

5        A.    And that were in my office.

6        Q.    Literally in your office, sir?

7        A.    Yes.

8        Q.    In other words, literally in your

9    physical possession?

10       A.    Yes.

11       Q.    And control?

12       A.    Yes.

13       Q.    And it was your decision, sir, to send

14   those held checks, am I correct?

15       A.    Yes.  Sometimes in discussions with other

16   individuals, but yes.

17       Q.    Let me ask it this way, then:  It was

18   your responsibility to make the ultimate decision

19   whether to send those checks, sir?

20       A.    Yeah.  A couple times it was shared with

21   Tom Fitzpatrick, but yes.

22       Q.    I understand, sir.  Sir, as I recall, and

23   again I'm just trying to make sure my recollection

24   is right, you began your employment with InaCom

25   Corporation in January of 1997?

1       A.    Yes.

2       Q.    And your employment continued

3   uninterrupted until September of 2000; is that

4   correct, sir?

5       A.    Yes.

6       Q.    And I believe, sir, that you had two

7   titles while you were employed by InaCom

8   Corporation.  First, assistant treasurer, and then

9   treasurer.  Is that correct, sir?

10      A.    Technically, one was assistant treasurer

11  and then I think I became treasurer and then I

12  became vice-president and treasurer.  I don't know

13  what the distinction was.

14      Q.    And I believe you were hired initially as

15  assistant treasurer; is that correct, sir?

16      A.    Yes.

17      Q.    And you acted as assistant treasurer

18  until about January of 1998 when you were made

19  treasurer; is that correct?

20      A.    Something like that.  I forget the date

21  of promotion, but yes.

22      Q.    Do you recall when your title changed

23  again to vice-president for treasury?

24      A.    No, I don't.  No, I don't.

25      Q.    Let me ask you, sir:  Was the scope of

1    your responsibilities and your duties

2    substantially the same during your entire

3    employment with InaCom Corporation?

4        A.    Yes.   As, you know, treasurer, I probably

5    had a higher signing authority because I became an

6    executive officer, but other than that, no.

7        Q.    And as I understand it, while you were

8    assistant treasurer, there was no treasurer?

9        A.    Yes.

10       Q.    Sir, is it your recollection that InaCom

11   Corporation filed a voluntary bankruptcy petition

12   on or about June 16 of 2000?

13       A.    Somewhere around there.   I don't recall

14   the date specifically, but somewhere around there.

15       Q.    Between the time approximately, sir, of

16   the filing of its voluntary bankruptcy petition

17   and the time you left InaCom Corporation's

18   employment, did it hold any checks?

19           MR. NOLAN:   Can you read that back for

20   me?

21           (Question read by the reporter.)

22       A.    I don't recall.   Things were melting

23   down, obviously, very, very rapidly at that point

24   in time.   We were moving--our functioning was

25   dictated by the banks because of the bankruptcy

1    filing.

2    BY MR. HALLIDAY:

3        Q.    So as I understand, sir, then you do not

4    recall a check being held from the period--during

5    the period from the filing of InaCom's bankruptcy

6    petition on or about June 16th, 2000, and the time

7    you left InaCom Corporation's employment in

8    September of 2000; is that correct?

9        A.    I assume there were checks being held.  I

10    don't have any clear specific recollection of

11    details except the company was ceasing to exist in

12    terms of a functioning business.

13        Q.    I understand.  But you assume without

14    recalling specifically that checks were held

15    during that period of time?

16        A.    Yes.

17        Q.    Okay.  Do you recall, sir, whether InaCom

18    Corporation held checks during the month of May

19    2000?

20        A.    I think it did, but absent other

21    documentation or information, you know, I don't

22    recall which checks were held at that time.

23        Q.    And I understand, sir, and I just want to

24    make sure.  I'm going to ask a follow-up question.

25    I want to make sure I understand what you are

1    telling me.

2         You do not recall specifically what

3    checks may have been held, but you believe that

4    checks were held during the month of May 2000?

5        A.    But what I don't know, and I'm a little

6    fuzzy with the dates because things were changing

7    so dramatically, whether or not we were actually

8    cutting checks then or we were moving to wire

9    transfers because of the reasons I mentioned

10   earlier.  Everything was being dictated by the

11   bank group, because we'd gone from a work-out to a

12   wind-down.

13       Q.    Well, I understand, and again I'm not

14   trying to belabor this.  I just want to make sure

15   I get each month clearly.

16        Do you believe, sir, that during the

17   month of May, 2000, InaCom Corporation held

18   checks?

19        MR. NOLAN:  I'll object to the question

20   to the extent it has been asked and answered.

21        MR. FORTE:  I'll join.

22       A.    I assume so.

23   BY MR. HALLIDAY:

24       Q.    You assume so, sir?

25       A.    Yes.

1      Q.    Sir, do you believe, based on your best

2  recollection, obviously, today, sir, that in April

3  2000, InaCom Corporation held checks?

4      A.    I assume it was.

5      Q.    Sir, do you believe today, based on your

6  best recollection, that in March 2000, InaCom

7  Corporation held checks?

8      A.    Yes.

9      Q.    Sir, do you believe today, based on your

10  best recollection, that in February 2000, InaCom

11  Corporation held checks?

12      A.    Yes.

13      Q.    Sir, do you believe, as you sit here

14  today, based on your best recollection, that

15  InaCom Corporation held checks in January of 2000?

16      A.    Yes.

17      Q.    Sir, do you believe as you sit here

18  today, based on your best recollection, that

19  InaCom Corporation held checks in December of

20  1999?

21      A.    Yes.

22      Q.    Sir, as you sit here today, based on your

23  best recollection, do you believe that InaCom

24  Corporation held checks in November of 1999?

25      A.    That's where I'm fuzzy, because as I