1  indicated earlier, starting in late '99, and

2  whether it was December 1 or December 10th or, you

3  know, November 30th, at this point in time I just

4  don't recall.

5      Q.    And again, sir, just because I believe

6  your answer will probably be pretty much the same

7  as we continue backwards in time, I want to make

8  sure as I understand the November 1999 month.  You

9  do not assume that it was the case then in

10 November 1999 that InaCom Corporation was holding

11 checks?

12     A.    Other than as I have just previously

13 qualified, that could have started November 30th

14 rather than, you know, December 5.

15     Q.    I understand.

16     A.    You know, it was four years ago.  I don't

17 know.

18     Q.    So it could possibly have been the case

19 in late November 2000 that InaCom Corporation was

20 holding checks?

21     A.    Yes.

22           MR. NOLAN:  I'll object to the question

23 to the extent it misstates prior testimony.

24           MR. FORTE:  I'll join.

25     A.    Yes, to the extent that AR securitization--

1  and the AR securitization is kind of the way those

2  individuals design it and it becomes kind of a

3  leading indicator, my term, anyway obviously went

4  belly up in January, so somewhere out there, you

5  know, whether it was four weeks or two weeks or

6  five weeks in advance of that, it would be

7  somewhat logical that there were some cash flow

8  problems, but I can't sit here today and say

9  specifically it was, you know, December 5 as

10 opposed to November 25th or something like that.

11 BY MR. HALLIDAY:

12     Q.   I understand.  But it may have been--so

13 it may have been the case, then, however, that

14 InaCom Corporation held checks in November of

15 1999?

16          MR. NOLAN:  I'll object to the question.

17 It misstates prior testimony.

18     A.   Possibly.

19 BY MR. HALLIDAY: *stop*

20     Q.   Is it possible, sir, that in October

21 1999, InaCom Corporation held checks?

22     A.   I don't think so.

23     Q.   But you do believe it is possible as you

24 sit here today, based on your best recollection,

25 sir?

1      A.    I doubt it.

2      Q.    But it is possible, sir?

3           MR. NOLAN:  Object to the question.  It

4  misstates prior testimony.

5      A.    I doubt it was.

6  BY MR. HALLIDAY:

7      Q.    And again, sir, I don't have a whole lot

8  of questions, but this is a topic I care about

9  confirming.  If you doubt it, are you telling me

10 that it is possible that in the month of October

11 1999, InaCom Corp. was holding checks?

12          MR. NOLAN:  I'm going to object to the

13 question again.  It has been asked and answered

14 to the best of his recollection.  I think it is

15 harassing to continue the questioning.

16     A.    I assume we weren't holding checks.

17 BY MR. HALLIDAY:

18     Q.    Holding checks in October of 1999?

19     A.    Yes sir.

20     Q.    I'm sorry?

21     A.    I assume we weren't.

22     Q.    Thank you, sir.  I'm sorry.  I'm just

23 trying to be clear.

24          Sir, do you assume that InaCom Corp. was

25 holding checks in September of 1999?

1        MR. NOLAN:  I object to the question.  It

2   misstates prior testimony.

3        A.    And I'm going to respond a certain way to

4   that question.

5   BY MR. HALLIDAY:

6        Q.    Certainly.

7        A.    When I joined InaCom, we weren't holding

8   checks.  "We" being the treasury department.

9   Sometime in late '99 we had to begin holding

10  checks.  It was not routine for InaCom treasury

11  department to hold checks.

12        Now, particularly with IBM Credit,

13  because of the floor planning, and even with

14  Deutsche Financial Services, over on some part of

15  InaCom there were always disagreements between,

16  you know, vendor receivables and billings and

17  everything else, and I don't know what was going

18  on over in accounts payable, where a check would

19  have been cut and then, you know, a dispute worked

20  out or what.

21        At some point in time in '99, late '99,

22  because of this constant problem, we began--the

23  treasurer began holding checks.  Now, there was

24  possibly a financing sometime, when we removed IBM

25  Credit or whatever, to create some static for two

1    days, I just said, "We've got--we can't borrow up,

2    we're going to pay off X amount, let's just freeze

3    things."  I don't know if we did that, but it

4    could have been '97 or whatever.

5            But I think at the end--you know, the end

6    of the year, as I said, whether it is November

7    30th or December 5, that's when we began holding

8    checks.

9        Q.   So if checks were being held prior to

10   October of 1999 by InaCom Corp., it wouldn't have

11   been by the treasury department for InaCom

12   Corporation?

13       A.   Other than as I said maybe I put--I

14   didn't have it in my office, but we kind of freeze

15   things to do a refinancing, because we had to

16   drive a stake in the--we're actually paying off

17   $450 million or $350 million of IBM Credit

18   tomorrow, you know, something like that, or if we

19   were going to change--at one point in time we

20   started to change our cash management system from

21   one bank to another, you know, but actually taking

22   those checks and having them moved to the treasury

23   department, that would have started at the end of

24   the year.

25       Q.   Is it possible, sir, as best you know,

1  sitting here today, that prior to October 1999,

2  checks were being held by InaCom Corporation other

3  than by the treasury department?

4         MR. NOLAN:  I'll object to the question.

5  Lacks foundation.

6     A.  I don't think so.

7  BY MR. HALLIDAY:

8     Q.  Who do you believe, sir, would know the

9  most about InaCom Corporation's holding of checks

10 in calendar year 2000?

11    A.  When you say "the most," what do you mean

12 by that?

13    Q.  Just the ordinary regular meaning of it.

14 Who is the most knowledgeable person?

15    A.  I don't know.

16    Q.  Can you think of someone, sir, who would

17 be more knowledgeable than you?

18    A.  Well, the accounts payable person.

19    Q.  Except in 2000, weren't you the one

20 physically holding the held checks?

21    A.  Yes.  I mean they were brought to me by

22 somebody.  I did not go through every individual

23 check, you know.  I just wasn't interested in that

24 process.  I had other things to worry about it.

25    Q.  Is it your belief, sir, that you were not

1    the most knowledgeable person during calendar year

2    2000 about InaCom Corporation's held checks?

3            MR. NOLAN:  I object to the question just

4    to the extent that you earlier defined held checks

5    as being the checks that he held in his office, so

6    the question is vague and ambiguous.

7        A.    I mean I knew, you know, that that's

8    what started the process of this tally of checks

9    in my office and when they were being released so

10   I could get some sense of what was going on, you

11   know.  I'm not sure who would have known more than

12   I did.

13   BY MR. HALLIDAY:

14       Q.    Okay.  Can you tell us if you think

15   anyone knew more or had more knowledge about the

16   holding of checks by InaCom Corporation in

17   calendar year 1999 than you?

18       A.    Well, there were a lot of conversations

19   between me and first Dave Guenthner and then Tom

20   Fitzpatrick about what was going on, you know,

21   some of which were the checks.  There were a lot

22   of conversations about the number of phone calls I

23   was getting from the vendors on the held checks.

24       Q.    If I could ask you to look at Exhibit No.

25   10, again, sir.  That's the, if I may--it's

 1    labeled at the top "Treasury Released Checks by

 2    Date."  Do you have that document, sir?

 3        A.    Yes.

 4        Q.    And is that document dated, sir?

 5        A.    Yes, 5-10-2000.

 6        Q.    I believe, sir, that you indicated that

 7    this was a document prepared on a regular basis by

 8    InaCom Corporation; is that correct?

 9        A.    This or, you know, a similar predecessor

10    document.

11        Q.    And would that regular basis be on a

12    daily business day basis?  Let's put it that way.

13        A.    Pretty much so.

14        Q.    And, sir, does this document list what we

15    are referring to as held checks?

16        A.    Yes.

17        Q.    Was this document prepared for you, sir?

18        A.    Yeah.  I mean initially it was prepared

19    for me, and then when the consultants started

20    coming in, several people used it.

21        Q.    And was this document prepared by

22    somebody in the treasury department?

23        A.    First the treasury department and then,

24    as I said earlier, by 5-10 there weren't many

25    people left at InaCom and it could have--may have

1    been someone in Dave Lemon's shop.  I just don't

2    know who on any given day was there.

3        Q.    Sir, would you have received this

4    document on an almost daily basis then during all

5    of calendar year 2000?

6            MR. NOLAN:  I'll object to the question.

7    It is overbroad, lacks foundation.

8        A.    Sometime in, you know--around the

9    bankruptcy filing or after it switched to the

10   wires, "it" being the information I got, and I may

11   or may not have seen this document at that time.

12   BY MR. HALLIDAY:

13       Q.    Okay.  And that was a badly asked

14   question by me.  I apologize.  Your answer was

15   helpful and made me realize I had asked an awkward

16   question.

17           Sir, did you receive this from January--

18   through and including January of 2000 through at

19   least May 10, 2000?

20       A.    This or something similar.

21       Q.    Would you have received it in 1999

22   beginning when the treasury department took over

23   the handling of held checks from accounts

24   receivable?

25       A.    I kind of doubt it, only because when the

1  whole process first started, the checks just came

2  over, and I quickly realized with the phone calls

3  that I did not know what was in the boxes, and so

4  I then asked for an accounting of what checks were

5  coming over.

6      Q.   So it's a refinement you added to the

7  process, sir?

8      A.   I'm not sure if I added to the

9  refinement, but somebody did.

10     Q.   It was something that you deemed

11 important after your department took over the

12 responsibility?

13     A.   Yes.

14     Q.   Sir, do you recall whether you received

15 or customarily received this type of report by

16 electronic transmittal or in hard copy form?

17     A.   I just don't recall.

18     Q.   Was this a type of report, sir, that you

19 would customarily retain in a file?

20     A.   Probably not.  I mean because it was done

21 on a regular basis and I used it certainly

22 initially to track what checks were in my office

23 and what was going out, a check was released, and

24 so after that was done, I mean I probably

25 discarded it.

1     Q.   Mr. Oshlo, do you have an understanding

2  whether this document, type of document, pardon

3  me, was more likely to have been retained by

4  InaCom Corporation in an electronic or hard copy

5  form?

6     A.   I don't know.

7     Q.   Do you recollect, sir, whether anyone in

8  the treasury department maintained a hard copy or

9  written file with this type of document stored in

10 it?

11    A.   I don't know.

12         MR. NOLAN:   You have to let him finish

13 the question.

14 BY MR. HALLIDAY:

15    Q.   Who would you think, sir, as you sit here

16 today, would be the person at InaCom Corporation

17 who would most likely be able to tell me where to

18 find other documents of this type?

19    A.   I don't know.  You know, I don't know

20 where the files are.  I mean I have no idea.

21    Q.   Do you know what individual, however,

22 might be best able to help me?

23    A.   Maybe Dave Lemon.  I just don't know who

24 was, you know, left over at some point in time.

25    Q.   Do you recall, sir-- Do you have an

1   idea, sir, let's put it that way, who most likely

2   was the person in the treasury department who

3   would have prepared this type of report?

4       A.   I'm not sure with the 5-10-2000 date that

5   this was actually prepared by somebody in the

6   treasury department.  I mean we were all--I don't

7   know how many people at that time were left.  I

8   assume this was--you know, our databases were all

9   being turned over to the accountants and

10  consultants at that time at 5-10-2000.  I don't

11  know if it was somebody in John Dugan's shop, Dave

12  Lemon, because every day they were trying to

13  figure out what our cash flow was on 5-10, so I

14  don't know who--who actually printed this document

15  out from their database on 5-10, I don't know.

16      Q.   Mr. Dugan and Mr. Lemon might be persons

17  who could tell me?

18      A.   Maybe.

19      Q.   Sir, could you refer to Exhibit 11,

20  please?

21      A.   Do you know what that is?

22      Q.   It's the one with the March--with the

23  July 1999, with the handwritten "Checks Held"

24  reference.  I just have a couple questions on this

25  one, sir.

1          Does this appear to you, sir, to be a

2    document that was created by InaCom Corporation?

3        A.    It was filled in by IBM Credit.

4        Q.    I'm sorry?

5        A.    It was filled in--the handwritten notes

6    were from IBM Credit.

7        Q.    And the handwritten notes filled in by

8    IBM Credit are on a paper that was created by

9    InaCom Corporation?

10       A.    Well, it would have been created--it

11   would have been as an attachment to the floor

12   planning document, IBM Credit, and then probably

13   just a copy of that was then filled in.

14       Q.    And it says--do you see where I'm

15   reading, sir, up at the top, 7-25-99?  Do you see

16   where I'm reading, sir?

17       A.    Yes.

18       Q.    And then down below it says, "Checks

19   Held, 37,227,000."

20       A.    Yes.

21       Q.    Now, if checks for 31,227,000 were being

22   held on that date, they would not have been being

23   held in July of 1999 by you in the treasury

24   department, would they?

25       A.    Right.  I think that's true.

1      Q.    Is it your understanding, sir, that if in

2   fact checks were being held in that amount in July

3   of 1999, they would have been being held then in

4   the--by accounts receivable?

5           MR. NOLAN:  Object to the question.  It

6   lacks foundation.

7           MR. FORTE:  Objection to form.  Accounts

8   payable.

9      A.    Accounts payable.

10  BY MR. HALLIDAY:

11     Q.    Thank you.  And at that time, July of

12  1999, who headed accounts payable if you can

13  recall, sir?

14     A.    I don't recall the name.

15     Q.    Sir, do you recall if during your tenure

16  at InaCom Corporation, that it held checks made

17  payable to the order of Tech Data Corporation?

18          MR. NOLAN:  Can you read that question

19  back, please.

20          (Question read by the reporter.)

21     A.    Yes, but only by referring to Exhibit 10.

22  BY MR. HALLIDAY:

23     Q.    Can you recall, sir, if during your

24  tenure at InaCom Corporation, it held checks made

25  payable to the order of Dell Computer Corporation?

1    A.    Yes.    Here again by referring to Exhibit

2    10.

3    Q.    Do you recall if during your tenure at

4    InaCom Corporation it held checks made payable to

5    the order of Lexmark International, Inc.?

6    A.    I assume so, but I don't know if they are

7    on the list.    I guess they are, yes.

8    Q.    Do you recall, sir, that during your

9    tenure at InaCom Corporation, it held checks made

10   payable to Resilien, Inc.?

11   A.    I don't know.

12   Q.    Do you recall, sir, if during your tenure

13   at InaCom Corporation, it held checks made payable

14   to the order of Logicare, Inc.?

15   A.    I wouldn't know unless I went through a

16   list.

17   Q.    Do you recall, sir, if during your tenure

18   at InaCom Corporation, it held checks made payable

19   to the order of Ingram Entertainment, Inc.?

20   A.    Yes, here again because just glancing at

21   Exhibit 10, I can see their name.

22        MR. HERSEY:    Culver, this is John Hersey.

23   If I could interrupt for a second.

24        MR. HALLIDAY:    Yes, sir.

25        MR. HERSEY:    Mr. Oshlo, on the Exhibit 10

1    you're referring to, do you see a reference to

2    Ingram Entertainment specifically?

3              THE WITNESS:  No.  I see just Ingram.

4              MR. HERSEY:  Do you see reference to

5    Nashville Computer Liquidators?

6              THE WITNESS:  I see a reference to

7    Nashville Computer.

8              MR. HERSEY:  That's it.  I'm sorry to

9    interrupt, Culver.  You can continue.

10   BY MR. HALLIDAY:

11       Q.    With reference, sir, to the Exhibit 10,

12   does it appear that during your tenure at InaCom

13   Corporation, it held checks made payable to the

14   order of Nashville Computer?

15       A.    Yes.

16       Q.    And does it also appear during your

17   tenure at InaCom Corporation that it held checks

18   made payable to the order of Logicare?

19       A.    Yes.

20       Q.    And you will agree with me, sir, that

21   with reference to Exhibit 10, that other companies

22   in addition to those I've specifically referred to

23   in this series of questions had their checks held

24   by InaCom Corporation while you were its employee?

25       A.    Yes.

1              MR. NOLAN:  I'll object to the question

2    to the extent that it is overbroad as to time.

3    BY MR. HALLIDAY:

4         Q.    Would you agree with me, sir, that during

5    your tenure at InaCom Corporation, the holding of

6    checks made payable to the order of vendors was in

7    the ordinary course of its business?

8              MR. FORTE:  Objection to the form.

9         A.    No.

10   BY MR. HALLIDAY:

11        Q.    It was not in the ordinary course of its

12   business to do so?

13        A.    I'm assuming by "held checks," you mean

14   the checks as we talked earlier about in the

15   treasury department?

16        Q.    Yes.

17        A.    No.

18        Q.    So it was extraordinary?

19        A.    Yes.

20        Q.    Yet you received a report on a daily

21   basis through all of 2000, beginning in late 1999,

22   referencing the checks that were being held,

23   correct?

24             MR. NOLAN:  Object to the question.  It

25   misstates prior testimony.

1      A.    For the vast majority of my time at

2    InaCom we did not--I never saw a check, and it was

3    only beginning in that period, the beginning of a

4    liquidity crisis, that it was first evidenced by

5    the AR securitization going under and continuing

6    on beyond that.

7      Q.    Well, I just want to make sure I

8    understand what you're saying on this point, then.

9    So while checks were held on an almost daily basis

10   beginning at least in late 1999 until May of 2000,

11   at least May of 2000, it was not in the ordinary

12   course of InaCom Corporation's business to hold

13   checks made payable to vendors?

14         MR. NOLAN:  Object to the question.  It

15   has been asked and answered, and it misstates

16   prior testimony in the statement of the question.

17         MR. FORTE:  I will join.

18     A.    I do not believe it was in the ordinary

19   business of InaCom.

20   BY MR. HALLIDAY:

21     Q.    Do you recall the asset purchase

22   agreement between Compaq and InaCom?

23     A.    Generally, yes.

24     Q.    And do you recall that it was dated as of

25   about February 16 of 2000?

1     A.     Yes.

2     Q.     Is it your recollection today that

3  proceeds of that transaction would be used by

4  InaCom Corporation to pay certain checks that were

5  being held by InaCom Corporation?

6     A.     The only agreement was to make payments

7  under the wiring instructions that, for the most

8  part, were evidenced in one of the earlier

9  exhibits.

10    Q.     Is it your understanding, however, that

11 proceeds from the transaction between Compaq and

12 InaCom were to be used by InaCom Corporation to

13 pay held checks?

14        MR. FORTE:   Objection; asked and

15 answered.

16    A.     Proceeds were to be used to make the

17 payments by wire as identified in one of the

18 earlier exhibits and to run the company.

19 BY MR. HALLIDAY:

20    Q.     Did those payments include payments for

21 held checks?

22    A.     Which payments?

23    Q.     The payments you just referred to.

24    A.     The wire transfers?

25    Q.     Let me start over again, then.   InaCom

1   Corporation was to receive payment from Compaq

2   Computer Company as part of the asset purchase

3   agreement; correct?

4        A.   Yes.

5        Q.   Was any portion of the proceeds of that

6   transaction used by InaCom Corporation to pay held

7   checks?

8             MR. NOLAN:  I'll object.  The question

9   has been asked and answered.

10            MR. FORTE:  I'll join in that.

11       A.   Other than the funds owed to IBM Credit

12   and Deutsche Financial Services.  Now, whether

13   that meant that checks were canceled out for them,

14   I don't know.

15   BY MR. HALLIDAY:

16       Q.   Do you know if there was an agreement

17   between Dell--pardon me--Compaq Computer

18   Corporation and InaCom Corporation regarding the

19   use to which the proceeds of that asset purchase

20   agreement transaction would be by InaCom

21   Corporation?

22       A.   Could you repeat that?

23       Q.   Sure.  Was there an agreement between

24   InaCom Corporation and Compaq Computer Corporation

25   with respect to what use InaCom Corporation would

160

1    make of the proceeds of the asset purchase

2    transaction?

3        A.    Not that I know of.

4        Q.    There was no specific agreement that you

5    have any knowledge of between InaCom Corporation

6    and Compaq Computer Corporation regarding the use

7    to which the proceeds of the asset purchase

8    agreement were to be put, correct?

9        A.    Correct.

10        Q.    Do you have any recollection as you sit

11    here today, sir, that representatives of InaCom

12    Corporation in the, let's say, 30-day period

13    preceding the asset purchase transaction between

14    InaCom Corporation and Compaq Computer Corporation

15    were telling InaCom Corporation's vendors that

16    proceeds of the sale--of the asset purchase

17    transaction, pardon me, would be used to pay their

18    held checks?

19            MR. NOLAN:   Madam court reporter, can you

20    read that question back for me, please?

21            (Question read by the reporter.)

22        A.    Not that I recall.

23            MR. HALLIDAY:   I'm going to hand this to

24    the court reporter to mark it, I believe, as

25    Exhibit 23.   It is a letter that all of the rest

```
 1   of us have seen about a hundred times.

 2                        (Exhibit No. 23 was

 3                        marked for identification.)

 4           MS. STREUSAND:  Off the record.

 5           (Discussion off the record.)

 6   BY MR. HALLIDAY:

 7      Q.   Mr. Oshlo, I don't want to rush you.

 8   Have you had an opportunity to examine that

 9   document that has been marked as Exhibit 23 to

10   your deposition?

11      A.   I've read it.

12      Q.   Thank you, sir.  If you will tell me,

13   sir, do you recall the name William A. Schuette?

14      A.   No disrespect to him.  No.

15      Q.   Do you recall this letter, sir?

16      A.   No.  It probably didn't get to me because

17   of my misspelled last name, sir.

18      Q.   Oh, if we could only be so lucky, I would

19   have missed quite a few.

20      A.   No, I don't recall.  I shouldn't be so

21   hilarious about this.

22      Q.   If you will read, sir, the--and just to

23   make this simple, quick, and easy, if I could just

24   ask you to read the first two sentences of the

25   second paragraph.
```

```
 1        A.    "It is my understanding from Leon

 2   Kerkman, whom I met with last week, that any

 3   invoices that have had checks written against them

 4   will be held until the sale is completed between

 5   InaCom and Compaq.  The proceeds from the sale

 6   will then cover those checks and they will be

 7   disbursed over a period of one to ten weeks."

 8        Q.    And as I understand your testimony, sir,

 9   you have no recollection of any understanding or

10   agreement whereby the proceeds of the sale between

11   InaCom Corporation and Compaq Computer Corporation

12   would be used to pay held checks, correct?

13        A.    Correct.

14        Q.    Do you know Leon Kerkman?

15        A.    Very well.

16        Q.    This letter, sir, is dated February 15,

17   2000.  Where would he have worked in InaCom

18   Corporation at that time if you recall?

19        A.    He was the former controller who was at

20   that time working for Mike Steffen in the group

21   that went over to Compaq, overseeing our

22   integration centers, and I forget what the name of

23   the group was called.

24        Q.    Sir, did you have any involvement in the

25   negotiation of the asset purchase agreement?
```

1    A.    No.    Like I say, I attended the first due

2  diligence meeting, maybe the second, supplied some

3  information, and that's one of the things that was

4  taken out of Omaha.    It was--this is terrible,

5  because he subsequently died of cancer, but the

6  gentleman who was at InaCom who was the point

7  person on that was the--I think was the senior

8  vice-president for, oh, corporate development.

9  His name I forget, but he's probably in some

10 documents, but he was kind of the point man along

11 with Fitzpatrick and Gagliardi for negotiating

12 that.

13    Q.    Sir, can you read the last sentence of

14 the paragraph you just read the two sentences

15 from?

16    A.    "Additionally, Compaq will assume the

17 liability of Lexmark invoices that have not had

18 checks written against them."  That sentence?

19    Q.    Yes, sir.  Thank you.  Do you recall

20 anything about any assumption by Compaq Computer

21 Corporation of liability for Lexmark invoices that

22 have not had checks written against them?

23    A.    No, I don't, unless that means, you know--

24 the new direct business going forward would have

25 been Compaq.  I don't know if that's what that

1  reference is.

2      Q.   Sir, do you have any recollection today

3  as to any understanding between InaCom Corporation

4  and Compaq Computer Corporation as to the payment

5  of held checks made payable to the order of

6  Lexmark International, Inc.?

7      A.   No, I don't.

8      Q.   As you sit here today, sir, do you have

9  any recollection of any understanding between

10  Compaq Computer Corporation and InaCom Corporation

11  as to the payment of held checks made payable to

12  the order of Tech Data Corporation, Dell Computer

13  Corp., Nashville Entertainment or Logicare?

14      A.   No, I don't.

15      Q.   And Logicare is now called Resilien,

16  Inc., and Nashville Computer is now called Ingram

17  Entertainment.  Would that change your answer,

18  sir?

19      A.   No.

20          MR. HALLIDAY:  Thank you.  Will you

21  indulge me with a five-minute break and I'm

22  hopeful I'm done or just about.

23          (Short recess.)

24          MR. HALLIDAY:  Go back on the record.

25

```
 1   BY MR. HALLIDAY:

 2      Q.    Mr. Oshlo, have you had experience in

 3   your business professional life with checks being

 4   held in the manner in which they were held by

 5   InaCom Corporation during your tenure there?

 6      A.    No.

 7      Q.    Do you have an understanding, sir, as to

 8   why InaCom Corporation held checks?

 9            MR. NOLAN:   I'll object to the question.

10   It has been asked and answered.

11      A.    Yes.

12   BY MR. HALLIDAY:

13      Q.    And what is your understanding, sir?

14      A.    I asked that they be brought over to my

15   office because we were having cash flow problems,

16   as I said, starting with the default under the

17   Nesbit Burns facility and I had to make sure--I

18   needed to know what was going out every day.  In

19   the past, AP just sent them out, basically.

20      Q.    Why, sir, was it necessary--let me

21   restate that, sir.  I was about to ask an awkward

22   question.

23            Why, sir, would a check be written to pay

24   a vendor if InaCom Corporation did not have

25   sufficient cash at the time the check was written
```

1    to honor the check upon presentment?

2           MR. FORTE:  Objection to form.

3           MR. NOLAN:  I'll join.

4      A.   I'm not an accounts payable person and

5    that was over on that side of the operation, and I

6    think it was just way they--it was almost

7    automatic, and that's why I asked that they be

8    sent over to my office to be put on hold.

9    Accounts payable didn't know what was going to be

10   sent out and when.

11   BY MR. HALLIDAY:

12     Q.   When the check was written, would

13   accounts payable remove it from its list of

14   accounts payable?

15          MS. GREENFIELD:  Objection as to form.

16     A.   I don't know.  I don't know.

17   BY MR. HALLIDAY:

18     Q.   Do you have an understanding as you sit

19   here today, sir, based on your business experience

20   and knowledge, as to whether invoices submitted by

21   vendors for which checks have been written but not

22   delivered should be reflected as having been paid

23   in accounts payables records and journals?

24          MS. GREENFIELD:  I'm sorry.  Could you

25   reread the question?

1          (Question read by the reporter.)

2          MR. NOLAN:  Object to the question.  It

3    is overbroad.

4          A.    I'm not sure it was--how it was reflected

5    in the accounts payable department.

6    BY MR. HALLIDAY:

7          Q.    Do you have an opinion, though, sir, as

8    to whether it should have been reflected, such

9    invoices, as having been paid if a check was

10    issued but not sent?

11          MR. FORTE:  Object to the form.  Asks for

12    opinion.

13          A.    I assume it should not be reflected as

14    having been paid.

15          MR. HALLIDAY:  Those are all the

16    questions I have today, Mr. Oshlo.  Again, thank

17    you for spending your Sunday with us.

18          MR. NOLAN:  Guys on the phone, it's your

19    stage if you want it.

20          MR. HERSEY:  This is John Hersey.  I

21    don't have any questions.

22          MR. HUNT:  This is Steve Hunt.  I have a

23    few questions.

24

25

168

1                    EXAMINATION

2   BY MR. HUNT:

3        Q.    Good afternoon, Mr. Oshlo.

4        A.    Hi.

5        Q.    My name is Stephen Hunt.  I'm from Adorno

6   and Yoss, a law firm in Florida.  I represent Tech

7   Data Corporation.  Thank you for your prior

8   testimony today.  Many of the questions that I had

9   have already been answered, and I therefore have a

10  few to pose to you now that won't take very long.

11            For starters, Mr. Oshlo, did there ever

12  come a time during the course of your employment

13  with InaCom where you ever refused to sign a

14  report or borrowing base certificate to one of

15  InaCom's lenders?

16       A.    Not that I recall.

17       Q.    Did there ever come a time during your

18  employment with InaCom where you became concerned

19  regarding signing one of these borrowing base

20  certificates or reports?

21       A.    I'm always concerned when I sign when

22  it's an official document, but not beyond that.

23       Q.    To your understanding, and given the fact

24  that you had prior experience in the banking

25  industry before joining InaCom, do you know

1    whether any of InaCom's covenants with its lenders

2    prohibited it from holding checks?

3        A.    No, I don't.

4        Q.    You don't know the answer?

5        A.    I don't know the answer.

6        Q.    Were you a member of a transition team on

7    the InaCom side with respect to the sale of the

8    hardware business of Compaq?

9        A.    I'm not sure if it was formally called a

10   transition team.  Well, yeah.  I mean I helped

11   transition, you know--I think I was.  I think

12   there may have been some designated transition

13   team.  I just don't recall.

14       Q.    Would you have an ability to recall

15   anyone else on the InaCom side who would have been

16   on such a transition team?

17       A.    Well, Jay Samuelson would have been one.

18   I think Scott Simmelink would have been one.

19   Obviously Tom Fitzpatrick, Laz, eventually; you

20   know, probably Dave Lemon.  I mean the whole

21   direct side would have--several senior people over

22   there would have been on the transition team.  I

23   think it would have included Dave Lemon who was a

24   controller for that division.

25       Q.    And of those names, are those all persons

1  who stayed on with InaCom after the sale?

2      A.    No.   Jay Samuelson did not.   Scott

3  Simmelink did.   John Dugan did.   I forget who

4  else.   And Dave Lemon did.

5      Q.    Do you recall whether you had discussions

6  with a gentleman named Bill Francis during 2000

7  and any time prior to or after the sale of the

8  hardware business to Compaq?

9      A.    Who is Bill Francis?

10     Q.    I think that the question has been

11 answered.

12          Do you recall, Mr. Oshlo, having any

13 discussions with anyone from Tech Data Corporation

14 during the first half of the 2000 calendar year?

15     A.    No, I don't.   Let me expand on that.   I

16 no doubt received calls from Tech Data and

17 probably every other vendor on this Exhibit 10,

18 and probably multiple calls, and at this point I

19 don't recall talking to them or just hearing the

20 messages they left on the voice mail.   It was a

21 pretty coordinated effort by each company to make

22 those contacts, and, you know, at this point I

23 just don't recall if I talked to someone or just

24 heard their messages.

25     Q.    Mr. Oshlo, did you have any role with the

1    preparation of the monthly operating reports that

2    were filed by InaCom with the bankruptcy court?

3        A.   I don't think with the preparation of

4    them.

5        Q.   Did you maintain any contact with Mr.

6    Guenthner after he left InaCom?

7        A.   Yes.

8        Q.   Are you still in contact with him today?

9        A.   You mean when he went to Compaq?

10        Q.   Yes.

11        A.   Well, he was--his office was right next

12    to mine, so even though he was working for Compaq

13    for part of that period, we talked regularly, and

14    then I have subsequently talked to him a couple

15    times.

16        Q.   Do you know an address that he may be

17    reached at now, work or personal?

18        A.   Not off the top of my head, and I'm not

19    sure-- I may have a phone number, but I can't--I

20    can't guarantee it.  He had come here to see me in

21    Des Moines when I was in the Governor's office

22    because he was thinking about starting up a

23    company here in Iowa, and he had just moved, my

24    recollection is, so I may have a phone number but

25    I can't guarantee it.