172

1       Q.    Do you know if Mr. Guenthner maintained

2   full-time employment after he left InaCom and

3   Compaq, or if something else happens that would

4   have prevented that?

5       A.    He may have been doing some consulting

6   work for a couple small clients, but he did not

7   have, you know--  I think he was--he didn't have a

8   regular full-time position to my understanding.

9       Q.    Mr. Oshlo, bear with me one moment.  I

10  want to just review some notes.  I think I have

11  most of them covered, but I could save us some

12  time by not asking them again.

13          (Pause.)

14      Q.    Mr. Oshlo, did you come to work with

15  anyone from Bridge Associates during the term of

16  the debtor's bankruptcy case while you remained

17  employed by InaCom?

18      A.    Could you repeat that again?

19      Q.    Yes.  Did you come to work with anyone

20  from a firm called Bridge Associates after the

21  commencement of InaCom's bankruptcy case and prior

22  to your separation from InaCom?

23      A.    I ask that you please answer this next

24  question just because it may clarify something.

25  Who is Bridge Associates?

```
 1        Q.    I'll take that as an answer to the
 2  question.
 3        A.    Well, we had several consultants, so--
 4              MR. HUNT:  All right.  Well, I'm going to
 5  pass this on, and thank you, Mr. Oshlo, for your
 6  patience in answering these questions.
 7              MR. NOLAN:  Is that everybody on the
 8  phone?
 9              MS. STREUSAND:  I think so, yes.
10              MR. NOLAN:  I have some questions to ask
11  the witness.  Would you mind if I came over there?
12              MS. STREUSAND:  Sure.
13              (Pause.)
14                      EXAMINATION
15  BY MR. NOLAN:
16        Q.    Mr. Oshlo, can you put in front of you
17  Exhibit 5?
18        A.    Bear with me for a moment.  What is that?
19        Q.    It's the Fourth Amendment and Waiver.
20        A.    Yes, I have it.
21        Q.    And I'm going to draw your attention to
22  the bottom of page 1, paragraph 2(c).
23        A.    Yes.
24        Q.    And at the beginning of the next page,
25  2(c) Roman numeral iii, where it states, "The
```

1   borrower is currently experiencing strained

2   relations with its vendors as a result of its

3   liquidity problems."  Do you see that statement?

4       A.    2(c) little i, or triple--

5       Q.    Triple i.

6       A.    iii.  Excuse me.  Yes.

7       Q.    As of February 15, 2000, and thereabout,

8   was it your understanding that the borrower was

9   experiencing strained relations with its vendors

10  as a result of liquidity problems?

11          MS. STREUSAND:  Objection; leading.

12      A.    Yes.

13  BY MR. NOLAN:

14      Q.    Okay.  And based on your position at

15  InaCom as the treasurer, what's the basis for your

16  understanding?

17      A.    Of that statement?

18      Q.    Yes.  In your understanding of that

19  statement.

20      A.    We weren't--we had cash flow problems

21  that were preventing us from paying our bills with

22  our vendors on a regular basis, and that was as a

23  result of, I think, the changes going on through

24  the company.  The industry was changing.  We

25  were--we defaulted on our AR securitization, had

1    trouble making payroll that day, we were in these

2    negotiations to sell the facilities to Compaq, and

3    we had cash flow problems.

4         Q.    And Exhibit 5 uses the reference of

5    vendors.  What's your understanding as to the

6    vendors that InaCom was experiencing strained

7    relations with?

8         A.    It would have been with our suppliers,

9    IBM down to, you know, the smallest vendor that we

10   dealt with.

11        Q.    Okay.  Did you have any interaction in

12   February of 2000 with any of the vendors that

13   InaCom was experiencing strained relations?

14        A.    I got repeated calls from probably every

15   vendor, asking where their check was.  That was

16   somewhat reflected in one of the earlier exhibits,

17   you know, and they escalated up.  I mean I think

18   it was a fairly coordinated effort.  It would

19   start from, you know, probably the credit manager

20   and go up to the treasurer, maybe the chief

21   financial officer or the senior vice-president,

22   something like that, wanting to know when they

23   were going to get paid and in some instances

24   demanding payment.

25        Q.    And at any time in your position as

1    assistant treasurer at InaCom, did you ever

2    experience a similar type of phone calls from

3    vendors?

4           MS. STREUSAND:  Objection; leading.

5       A.   No.

6    BY MR. NOLAN:

7       Q.   At any time prior to February 15th--

8    strike that.

9           At any time prior to 2000, do you have

10   any recollection as you sit here today of

11   receiving any calls directly from vendors with

12   respect to when they would be paid?

13      A.   Only beginning in that December late '99

14   period when it became apparent to me that we were

15   facing a serious cash flow problem and we started

16   putting checks on hold.

17      Q.   When you were treasurer at InaCom in this

18   time frame of January and February of 2000, did

19   you ever instruct anyone at InaCom to refer phone

20   calls from vendors who were inquiring about

21   receipt of payment?

22          MS. STREUSAND:  Objection to the form and

23   objection to leading.

24      A.   I believe I did, yes.

25

1  BY MR. NOLAN:

2      Q.    Let me restate the question.  Do you have

3  any understanding as you sit here today as to how

4  vendors knew to call you as opposed to anyone else

5  in February of 2000?

6      A.    Oh.  I had asked that the checks come to

7  my office and the accounts payable people at

8  InaCom were--you know, worked very closely with

9  whoever the vendors they were assigned, and they

10 immediately started referring those phone calls,

11 for the most part, to my office.

12     Q.    Did you ask them to refer the phone calls

13 to your office in February of 2000, or was that

14 just what actually in fact happened?

15         MS. STREUSAND:   Objection to the form.

16 Objection, leading.

17 BY MR. NOLAN:

18     Q.    Let me restate the question.  Did you

19 make any request of any individual in the accounts

20 payable department at InaCom in February 2000

21 concerning phone calls from vendors?

22     A.    At some point, and I don't recall when, I

23 suggested they start calling me.

24     Q.    We looked at an exhibit earlier today.

25 It was Exhibit 10.  Can you please pull that in

1    front of you, sir?

2        A.    What is it?

3        Q.    It's a document entitled "Treasury

4    Released Checks by Date."  It is approximately

5    four pages long.

6        A.    I have it.

7        Q.    Okay.  Have you ever seen that document

8    prior to today?

9        A.    Yes.

10       Q.    Can you please tell me in what respect

11   you've seen this document prior to today?

12       A.    I saw it at the deposition that I gave

13   for Aqua Systems, and then I saw it on almost a

14   daily basis, this or a predecessor document, when

15   I was at InaCom during 2000.

16       Q.    Do you know who at InaCom requested that

17   a document such as Exhibit 10 in the format that

18   it is in be prepared?

19       A.    I did.

20       Q.    And why did you request a document in the

21   form of Exhibit 10 be prepared?

22       A.    So I would know what checks were

23   available and when they got out in order to manage

24   the cash flow of the company.

25       Q.    And what was going on at the time Exhibit

1   10 was prepared that made you request to have a

2   document with this type of information?

3            MS. STREUSAND:  Objection to the form.

4   Objection, leading.

5       A.   We were going through a liquidity cash

6   flow problem and were having a hard time making

7   payments as the company was going through a series

8   of changes.

9   BY MR. NOLAN:

10      Q.   You referenced earlier in response to

11  some questions from other counsel that the checks

12  that were referenced--that there were checks,

13  physically checks that were delivered into your

14  office that were referenced in Exhibit 10.  Do you

15  recall that testimony?

16      A.   Yes.

17      Q.   How were those checks delivered to you?

18      A.   They were delivered in the same boxes,

19  multiple boxes that looked like the boxes that the

20  envelopes, you know, standard size mailing

21  envelope, was originally used to hold those

22  envelopes.

23      Q.   And was Exhibit 10 prepared and delivered

24  to you with the boxes of checks?

25      A.   Yes, and its predecessor, which was a

180

1    rougher form because I had to know--I was getting

2    all those calls from the vendors and they'd refer

3    to some--  Their way of tracking receivables,

4    their receivables, was different from our way and

5    I needed to know what actually was there so I

6    could ultimately control the release of the

7    checks.

8         Q.    Well, when you received a phone call from

9    a vendor, did you ever have an opportunity to pull

10   any of the checks that were in the box?

11        A.    Sometimes.

12        Q.    And why would you do that?  Why would you

13   pull a check out of a box?

14        A.    Just, number one, to see what was there.

15   It was early on when I was checking what we had on

16   the list and what was in the box.

17        Q.    And I think you testified previously

18   that--strike that.  I'm just ask you again.

19             Where were the checks stored at InaCom

20   that were referenced in Exhibit 10?

21        A.    In cabinets under lock and key in my

22   office, in my filing cabinets behind my desk.

23        Q.    And why were the checks under lock and

24   key?

25        A.    For safety reasons, and I just did not

1    want a check getting out without my authority, my

2    release.

3        Q.    And what was the basis for your concern

4    that checks might be issued out of InaCom without

5    your authority?

6        A.    I just didn't--you know, there was a lot

7    of heat being applied by the multiple vendors, and

8    I just wanted to make sure somebody didn't take

9    care of a vendor when I didn't know what was

10   happening.

11       Q.    At any of the times in January or

12   February of 2000, did you ever have an opportunity

13   to look at Exhibit 10 or a copy of Exhibit 10 when

14   you were talking with any of the vendors?

15           MS. STREUSAND:    Objection; lacks

16   foundation, and objection to the form.

17       A.    I tried not to talk to a vendor as I was

18   getting multiple calls and had to get other work

19   done.    To the extent I did talk to vendors, I

20   often would reference to make sure that, you know,

21   it was, you know, $608,330 owed to some vendor and

22   I knew where it was, or if it had been released

23   already, so I could know that and let them know.

24   BY MR. NOLAN:

25       Q.    Looking at Exhibit 10, can you tell me

1    what the left hand-column "CK Date" stands for?

2        A.    That's the check on the date--the day

3    that accounts payable cut the check.

4        Q.    Would that also--strike that.

5              Do you know whether or not that would be

6    the date that would be reflected on the check as

7    opposed to any other date?

8        A.    That would have been the check--or the

9    date on the check.

10        Q.    And the column that's next to it that

11    says "CK Number," do you know, Mr. Oshlo, what

12    that stands for?

13        A.    That would have been the actual number on

14    the check.

15        Q.    Okay.  The column for "Vender," can you

16    tell me what that column stands for?

17        A.    That would be the vendor to whom the

18    check was made out, was made payable.

19        Q.    Are you familiar with any of the names of

20    those companies that are listed underneath the

21    vendor?

22        A.    Yes.  Some more than others.  Some were

23    obviously major vendors of ours and major

24    corporations.

25        Q.    Do you have any independent knowledge as

1    you sit here today whether or not InaCom ever did

2    business with any of the vendors that are listed

3    underneath that column in Exhibit 10?

4        A.    If they hadn't done business, we wouldn't

5    have been paying them.  There wouldn't have been a

6    check cut for them.  And I would often see, you

7    know, these names on the list.  When we went to

8    the rating agencies, for instance, there was

9    always a question as to who we are doing business

10   with, and I knew some of the names from when we

11   took a tour of our integration systems or

12   facilities.

13       Q.    Okay.  There's a column to the right of

14   "Vender."  It is referenced as "Date Released."

15   Can you tell me, based on your position as the

16   treasurer, what that column refers to?

17       A.    That would have been the day that I

18   released the check and it was mailed.

19       Q.    And the column next to "Date Released" is

20   labeled "Amount Released."  Do you know what that

21   column refers to?

22       A.    That would have been the amount of that

23   check made payable to that company.

24       Q.    And what's the significance of including

25   a column that would record the information for

184

1    amount released in Exhibit 10?

2        A.    That's the number that was most relevant

3    to me because that was the total that we sent out

4    that day and was the figure that I used to help

5    manage the cash flow.

6        Q.    The last column to the right is marked

7    "Daily Totals Released."  Do you know what that

8    column refers to?

9        A.    That's--I misspoke.  I thought that was

10   the column you were asking about in the previous

11   question.  That is what was released that day, and

12   would have included certain figures in the Amount

13   Released column.

14       Q.    Why in February of--or strike that.

15             Why in January or February of 2000 would

16   it have been significant for you to record on

17   Exhibit 10 what the daily totals released were?

18       A.    Because that's when we were at--we were

19   in a liquidity crisis in January and February and

20   coming off the AR securitization default and lock-

21   down of our lock-boxes, so we had to know--I had

22   to know what was being released.

23             MR. NOLAN:  Would you read back the

24   question, please?

25             (Record read by the reporter.)

1      Q.    What was the AR securitization default

2   that you referred to in your prior response?

3      A.    Nesbit Burns was providing an AR

4   securitization facility, and because of the credit

5   quality of our accounts receivable, we defaulted

6   under it, and therefore was unable to use it to

7   continuously replenish as a cash for us.  I

8   couldn't borrow up under it anymore, and it had

9   been coming down lower and lower over a period of

10   time anyway.

11      Q.    For a layperson, though, what does it

12   mean, AR securitization?  What does that stand

13   for?

14      A.    It's accounts receivable.  In essence, we

15   pledge to them most of our direct or hardware

16   product receivables for those sales, and they in

17   return gave us so much money back, almost like a

18   lending agreement, and that fluctuated on a

19   monthly basis depending upon a fairly complex and

20   complicated system for determining the credit

21   quality of our accounts receivable.

22      Q.    When you're saying accounts receivable,

23   are you referring to InaCom's accounts receivable?

24      A.    Yes.

25      Q.    Okay.  And when you say lock-box, I mean

1  accounts receivable, again for a layperson, is

2  that the money coming into InaCom?

3      A.    That was based on our business with

4  certain of our clients and whether or not they

5  were getting--it was being paid according to our

6  terms or those payments were being delayed to

7  InaCom.

8      Q.    So this Nesbit Burns AR securitization

9  agreement, that gives Nesbit Burns entitlement to

10 what at InaCom?

11         MS. STREUSAND:   Objection to the form.

12 Objection, leading.

13 BY MR. NOLAN:

14     Q.    If anything.

15     A.    Well, their lending facility was secured

16 by that bulk accounts receivables, and when we

17 defaulted on the documents, they took over the

18 lock-boxes and controlled that revenue coming in

19 and immediately applied it to the balance

20 outstanding under that facility.

21     Q.    And what time frame was this as to,

22 Mr. Oshlo?

23     A.    That was in early to mid-January.

24     Q.    Prior to--I'm sorry.  January of what

25 year?

 1      A.    2000.

 2      Q.    Okay.  Prior to January of 2000, while

 3   you were at InaCom, did it ever occur that InaCom

 4   had defaulted on any other AR securitization

 5   instrument?

 6           MS. STREUSAND:  Objection as to form.

 7      A.    No.

 8   BY MR. NOLAN:

 9      Q.    And what were the practical effects to

10   InaCom as a result of a default under this AR

11   securitization agreement that you just mentioned?

12      A.    That we almost didn't make payroll a

13   certain Friday until Nesbit Burns and Deutsche

14   Bank gave us a waiver, number one.  Number two, it

15   meant that we were going to have to--we couldn't

16   rely on--we were no longer going to be able to

17   rely on that facility for additional borrowings.

18           Number three, since they were taking

19   control of those lock-boxes, we couldn't have the

20   flexibility of using those revenues coming into

21   InaCom.  They were being applied to pay down the

22   AR securitization.

23      Q.    At any time that you referenced Exhibit

24   10 in any of your phone calls in January or

25   February of 2000, or at any time you actually

1    pulled any of the held checks, did you ever notice

2    that any of the information between the held

3    checks in Exhibit 10 contradicted one another?

4            MS. STREUSAND:  Objection to the form.  I

5    believe Exhibit 10 is dated May 10, 2000, so I'm

6    not exactly sure how he can be referencing it in

7    February and January.

8    BY MR. NOLAN:

9        Q.    You can answer the question.

10       A.    Not that I know of.

11       Q.    I mean did you ever get a call from a

12   vendor about a held check and you pulled Exhibit

13   10 and there wasn't a held check on the exhibit?

14           MS. STREUSAND:  Objection to the form of

15   the question.  Objection, leading.

16       A.    No.

17   BY MR. NOLAN:

18       Q.    At any time did you have any conversation

19   that you can recall as you sit here today with any

20   vendor that would have--that gave you the

21   impression that any of the information you were

22   tracking in Exhibit 10 was inaccurate?

23           MS. STREUSAND:  Objection to the form of

24   the question.  Objection, leading.

25

1  BY MR. NOLAN:

2      A.   No.

3      Q.   In Exhibit 10, if a check was released on

4  a particular day, would that have been information

5  that you would have updated in Exhibit 10 or would

6  that be information that someone else at InaCom

7  would have included?

8          MS. STREUSAND:  Objection to the form.

9  Objection, leading.

10     A.   That would have been updated.  I didn't

11  personally update this form, so I would have

12  checked off what was going out and then the form

13  got updated.

14  BY MR. NOLAN:

15     Q.   How do you know the form got updated?

16     A.   I knew what was going out on a daily

17  basis, and then particularly as we got closer to

18  the bankruptcy filing, that information was given

19  to, you know, for instance--I'm not saying this

20  was the right date--but for instance, the 1.8

21  million, right-hand column, would have been given

22  to--it would have been logged in as an adjustment

23  because I know--in our daily release, and then it

24  would have been given to the numerous consultants

25  that we had at InaCom, bank consultants and our

1    consultants, closer to the bankruptcy filing.

2        Q.    When you decided to release a check, what

3    physically would happen to that check?

4        A.    It would be given back to accounts

5    payable and they would mail it.

6        Q.    And it would be given back to accounts

7    payable by who?

8        A.    By me.

9        Q.    And then what, if anything, would be done

10   to Exhibit 10?

11       A.    It would be updated, you know, sometime

12   that day for the next day.

13       Q.    And you may have already been asked this

14   question.  I apologize if I have to ask it again.

15   The format of this document, do you know how it

16   was maintained by you, what medium?

17       A.    I didn't maintain it, simply in my--  I

18   was the one that asked for the document, and the

19   original form went under several changes as

20   demanded by me, and then originally it was done in

21   my cash management department, and I'd get a

22   printout so that I knew what was being released

23   every day, and then ultimately that, as I said

24   earlier, I'm off the top of my head not sure who

25   was doing it because there were just fewer and

1  fewer of us at InaCom.

2      Q.  I'm sorry, when you say print out, does

3  that mean it came off of a certain type of a

4  medium?

5      A.  Yeah.  I'm not sure if it was a Word

6  document or, you know, what.

7      Q.  Are you talking about a computer

8  document?

9      A.  Yeah.

10     Q.  Okay.  Did you have a computer in your

11 office?

12     A.  Yeah.  It wasn't in my computer.  It

13 would have been in our cash management system, as

14 I said, ultimately somewhere else.

15     Q.  How many people were in the treasury

16 department at InaCom in February of 2000?

17     A.  Before the Compaq sale, we were

18 probably--well, there was probably four or five.

19     Q.  And who did those individuals report to?

20     A.  Well, they reported to me.  I think one

21 person may have reported to Gary Fitzgerald who

22 was doing--Gary Ferguson who was doing our real

23 estate issues, and everybody else reported to me.

24     Q.  Were you the most senior person in the

25 treasury department in January of 2000?

1    A.    Yes.

2    Q.    And would it be a fair statement to say

3    that you oversaw the operations of the treasury

4    department in January of 2000?

5    A.    Yes.

6    Q.    Is it a fair statement, Mr. Oshlo, that

7    you would have been aware as to what was going on

8    in the treasury department in January of 2000?

9    A.    Yes.

10   Q.    Can you look at Exhibit 10 and tell me

11   the latest date that you see for a check being--

12   strike that.  Poor question.

13          In the left-hand column under Check Date,

14   can you tell me what the earliest date is that you

15   notice on Exhibit 10?

16          MS. STREUSAND:  You're asking him just to

17   read Exhibit 10?

18          MR. NOLAN:  Yes.  I'm going to ask him to

19   look at Exhibit 10 and look at the left column of

20   the exhibit for check date.

21   A.    It looks like January 4th.  No.  It looks

22   like December 28 of 1999 is the earliest date.  On

23   the left-hand column?

24   Q.    Correct.  Do you have any independent

25   recollection as you sit here today of holding a

1    check in the InaCom treasury department that was

2    earlier than December 28, 1999?

3         MS. STREUSAND:  Objection as to form.

4       A.   No.

5    BY MR. NOLAN:

6       Q.   Was there any independent event, Mr.

7    Oshlo, that stands out in your mind that may have

8    occurred prior to December 28th, 1999, that would

9    give you some indication that you were holding

10   checks dated earlier than December 28th, 1999, in

11   the treasury department?

12        MS. STREUSAND:  Objection as to form of

13   the question.

14      A.   No.

15   BY MR. NOLAN:

16      Q.   Do you have any independent recollection

17   as you sit here today of InaCom defaulting on any

18   facility or bank loan in December of 1999?

19      A.   No.

20      Q.   You mentioned previously in your

21   testimony an anti cash-hoarding provision.  Do you

22   recall that testimony?

23      A.   Yes.

24      Q.   Can you tell me what that term is or what

25   that refers to?

1     A.    Deutsche Bank in one of the amendments--

2  and I'm not sure if it was the--I don't recall

3  which amendment; it was probably the January

4  amendment, although it may have been later--

5  decided to require InaCom to follow a covenant

6  that said that, and I think it was over--it was

7  over a period of time, maybe five days, we could

8  not have more than I believe it was $30 million in

9  our account, other than perhaps payroll, I think

10  it was designated, and if we did, we had to pay

11  down their facility.

12     Q.    And I'm sorry, how much money was that?

13     A.   I think it was $30 million.

14     Q.    And when you say "facility," are you

15  referring to their loan?

16     A.    Yes.  The syndicated loan agreement.

17     Q.   A facility is a syndicated loan

18  agreement?

19     A.    Yes.

20     MS. STREUSAND:  Can I interject here for

21  a minute?  Do you recall the amount that was

22  allowed for payroll?

23     THE WITNESS:  I don't.  There may have

24  been, you know, I don't know, if leases was in

25  there, or--you know.  I just don't recall.

1    BY MR. NOLAN:

2        Q.    Prior to January 2000, in your position

3    as assistant treasurer or treasurer at InaCom, are

4    you aware of any other facility or syndicated loan

5    agreement that InaCom entered into where there was

6    an anti cash-hoarding provision?

7        A.    No.

8        Q.    And do you have any understanding as you

9    sit here today as to why Deutsche Bank in January

10   of 2000 included this covenant within one of the

11   amendments to its loan?

12       A.    It was part of their tightening up of

13   their credit relationship with--the lending

14   relationship with InaCom.

15       Q.    And what do you mean by tightening?

16       A.    Well, they added--ultimately they added a

17   borrowing base which we did not have under the

18   predecessor document, made it more--there were

19   certain controls under which we could borrow money

20   and have less flexibility with our cash.

21       Q.    And so what would be the practical effect

22   to InaCom when you use this term constricting or

23   tightening the loan to InaCom?

24            MS. STREUSAND:   Objection to the form.

25       A.    It reduced our flexibility.

1  BY MR. NOLAN:

2      Q.    And again I'm trying to get you to

3  translate this because you obviously have

4  sophistication and I never took a finance course

5  in my life.

6      A.    You're smart.

7      Q.    What does that mean as far as InaCom's

8  ability to borrow money?

9      A.    Well, you know, for example, the

10  borrowing base, the predecessor document never had

11  a borrowing base so we didn't have to worry about,

12  you know, confirming accounts receivable or

13  inventory.  Assuming that the other financial

14  covenant--we were in compliance with the other

15  financial covenants, I could just go in and borrow

16  that.  With this document, it was put in there

17  because that way they could restrict our

18  capability to borrow.  It reduced their risk to

19  InaCom.

20      Q.    Does that make it any easier or any

21  harder for InaCom to borrow money?

22      A.    It makes it more difficult.

23      Q.    And the money that InaCom might have

24  borrowed in January 2000 under this syndicated

25  loan agreement from Deutsche Bank, what was it

1   being used for at InaCom?

2         MS. STREUSAND:   Objection to the form of

3   the question.   Are you asking hypothetically?

4         MR. NOLAN:   Good point.

5     Q.    Any money that was to be borrowed under

6   this modification of the loan agreement with

7   Deutsche Bank in January of 2000, what was--as far

8   as you being the treasurer, what would be the

9   purposes of borrowing money under that loan

10  agreement?

11    A.    Well, over its life, InaCom was a net

12  borrower.   I think it always probably had been.

13  And therefore, Bill Fairfield, the founder and

14  former CEO, once said that--I think the figure was

15  that for every dollar of revenue that we

16  generated, we had to borrow 25, 35 cents under our

17  facilities part because it was so fast growing.

18         And so we were relying on our credit

19  facilities on a daily basis, and that money would

20  have been used to, you know, survive, do whatever

21  a company needs to do to make its payroll, pay its

22  leases and health insurance policies.

23    Q.    In any of the subsequent amendments with

24  Deutsche Bank that you've been shown here today,

25  do you recall whether or not Deutsche Bank had any

1  other constrictions in their amendments to the

2  ability of InaCom to borrow money in the year

3  2000?

4          MS. STREUSAND:  Objection to the form of

5  the question.

6      A.    Well, the two major ones were the--well,

7  it was the addition of the borrowing base.  They

8  tightened up the covenants and then putting in the

9  cash hoarding--the anti cash-hoarding provision.

10 And then, you know, ultimately I think the last

11 one had the lock-boxes go into place, which would

12 have been an addition.

13 BY MR. NOLAN:

14     Q.    And what was that provision?

15     A.    Well, it gave them control over those

16 cash receipts that, you know--kind of direct

17 control that they didn't have beforehand.

18     Q.    It gave Deutsche Bank direct control over

19 what?

20     A.    Receipts coming into our company, and

21 then, you know, when we filed bankruptcy, they

22 basically had a major say in, you know, what we

23 did every day.

24     Q.    And Deutsche Bank's subsequent amendment

25 of the loan agreement which gave Deutsche Bank

1    control over InaCom's lock-boxes, did that inhibit

2    in any way your ability to control the cash flow

3    at InaCom?

4            MS. STREUSAND:  Objection to the form.

5    Objection, leading.

6        A.    Yes.  We were, in effect, almost like a

7    workout, you know.  We were headed--at some point

8    headed to bankruptcy and then became a liquidating

9    bankruptcy.  It was almost like a workout.

10   BY MR. NOLAN:

11       Q.    And at any time in 1998 or 1999, did

12   Deutsche Bank ever take control over any of

13   InaCom's lock-boxes?

14       A.    No.

15       Q.    At any time in 1998 or 1999, did Deutsche

16   Bank ever impose the restriction of a borrowing

17   base on any of the loan agreements to InaCom?

18       A.    No.

19       Q.    Is it a fair statement that these

20   restrictions that you have just referred to,

21   Mr. Oshlo, concerning the Deutsche Bank loan

22   agreements, all occurred in the year 2000?

23       A.    Yes.

24       Q.    At any time that you were the assistant

25   treasurer or the treasurer at InaCom, Mr. Oshlo,

1    did you become aware of any issues with the

2    collectibility of accounts receivable by InaCom?

3        A.    Would you restate that?

4        Q.    Sure.    At any time that you were the

5    assistant treasurer or treasurer at InaCom, did

6    you become aware that there were problems with

7    InaCom's collection of accounts receivable?

8            MS. STREUSAND:    Objection to the form of

9    the question.

10       A.    Yes.

11   BY MR. NOLAN:

12       Q.    When did you become aware of such an

13   issue?

14       A.    At the time of the Vanstar acquisition

15   and as we wrote their AR into InaCom's accounts

16   receivable base.

17       Q.    And in what year did that occur, or what

18   years did that occur?

19       A.    '99.

20       Q.    And what issue--strike that.

21           And the issue with the InaCom accounts

22   receivable, what did you witness as assistant

23   treasurer or treasurer?

24       A.    I had replaced Norwest, which originated

25   accounts receivable securitization at InaCom, with

1    one provided by JP Morgan, and having been a

2    Morgan banker previously, they have kind of a

3    unique perspective on credit, a lot tighter these

4    days than most other banks.

5            At the time of the AR securitization,

6    they came to us and said, we love--this isn't an

7    exact quote--we love the old InaCom AR and will

8    continue providing that, but as the sale goes

9    through, the merger goes through, we will not be

10   the provider of the securitization, we'll not, in

11   essence, be the manager of that under the

12   Vanstar/InaCom accounts receivable.

13       Q.   And what merger are you referring to?

14       A.   The merger with Vanstar.

15       Q.   The merger between Vanstar and who?

16       A.   InaCom.

17       Q.   When did that take place?

18       A.   In 1999.

19       Q.   Okay.  And what did you witness after the

20   Vanstar/InaCom merger with respect to the value of

21   the InaCom accounts receivable?

22       A.   That's when we had to take out JP Morgan

23   and replace them with Nesbit Burns which had done

24   the Vanstar AR, and it was still such of a low

25   quality that to get to the borrowing levels that I

1   used to be at and needed to be at because of the

2   larger company, under the AR securitization

3   facility, they had to go out at a cost to us and

4   get it insured by MBIA, otherwise we wouldn't have

5   been able to, you know, have those resources,

6   financial resources, available to accommodate the

7   larger company.

8        Q.    And the merger that you are referring to

9   and the subsequent accounts securitization

10  agreement, did you witness in the year 2000

11  whether or not that had any impact on the

12  operations of InaCom?

13       A.    From my perspective it did because

14  obviously from the start I think our bank

15  documents, bank loans, weren't--didn't provide us

16  with the resources that we had beforehand.

17  Because of the timing of the market and just

18  because of the InaCom credit, you know, the

19  Deutsche Bank facility for InaCom was much more

20  attractive pre the Vanstar merger than it was

21  after.

22            Based on conversations with the rating

23  agencies, I think we were moving to an improvement

24  in our credit rating before the Vanstar

25  acquisition, and we weren't after the Vanstar