1   acquisition, and with the AR securitization

2   specifically, that slowly started to decline in

3   terms of their credit quality of the combined

4   accounts receivable.

5       Q.    You mean the credit quality of the

6   accounts receivable?

7       A.    Yes.

8       Q.    Does that credit quality refer to the

9   collectionability of the accounts receivable?

10      A.    Collectionability, aging, how long, size

11  of the largest outstanding.  The aging of--I don't

12  have the specific figure in mind.  Scott Simmelink

13  would have that.  But the aging--the oldest

14  outstanding AR under Vanstar was much longer than

15  the oldest at InaCom.

16      Q.    So as treasurer in 2000, did you note any

17  change or any significance in the collection-

18  ability of accounts receivable at InaCom?

19          MS. STREUSAND:  Objection to the form of

20  the question.

21      A.    I could look at the AR securitization

22  report and, you know, the figures would show up

23  there, in terms of the aging of the accounts

24  receivable.

25

1    BY MR. NOLAN:

2        Q.    As treasurer you had access to those

3    reports?

4        A.    Yes.    That would go into the AR

5    securitization.

6        Q.    And do you have any recollection as you

7    sit here today of whether or not in 2000, InaCom's

8    collection on its outstanding accounts receivable

9    was any better or any worse than subsequent to the

10   merger with Vanstar?

11            MS. STREUSAND:    Objection to the form of

12   the question.

13       A.    It was worse than before the merger with

14   Vanstar.

15   BY MR. NOLAN:

16       Q.    Okay.  Do you have any way you can

17   indicate as to what degree worse it was?

18       A.    No.    I mean that's where the availability

19   under the AR securitization was slowly coming

20   down.    I just didn't have the flexibility to go

21   borrow under it as I did with JP Morgan.    But at

22   this point I just don't recall--I can't give you

23   any specific.

24       Q.    If you could, would you look at Exhibit

25   4.

1      A.    What document is that?

2      Q.    It's the borrowing base/non-default

3   certificate.

4          MS. STREUSAND:  The February 26, 2000?

5          MR. NOLAN:   Correct.  The one on page 2,

6   it says under the schedule, February 26, 2000.

7      A.    Yes.

8      Q.    Okay.  I believe you've already testified

9   that on the last page, that's your signature; is

10  that correct?

11     A.    Yes.

12     Q.    Okay.  And can you just read the top line

13  which includes the small parenthetical (a)?  You

14  can read it out loud, please, in the record.

15     A.    "The undersigned certifies to the agent,

16  on behalf of the borrower, that (a), the foregoing

17  borrowing base/non-default certificate is true and

18  correct in all aspects, is in accordance with the

19  books and records of the undersigned, and is

20  prepared in accordance with the terms of the

21  credit agreement."

22          Do you want me to continue?

23     Q.    No, that's good.  As part of executing

24  this document, would individuals at InaCom give

25  you figures based off the InaCom books and records

1    to incorporate within the report?

2        A.    Yes.

3        Q.    And those would be figures that would be

4    drafted in a department other than the treasury

5    department or where you were involved?

6        A.    Yes.

7        Q.    And if those figures were somehow

8    inaccurate in February of 2000, do you have any

9    ability to know whether or not the figures from

10   another department were accurate?

11           MS. STREUSAND:   Objection to the form of

12   the question.

13       A.    No

14   BY MR. NOLAN:

15       Q.    At any time when you were at InaCom, did

16   you become aware that the financials for InaCom

17   had to be restated?

18       A.    Yes.

19       Q.    And for what calendar or quarters are you

20   aware that the financials for InaCom had to be

21   restated?

22       A.    I can't remember which quarters, but it

23   had to do with vendor AR.   I think '99, but I

24   don't know if it was all of '99 or the fourth

25   quarter.

1      Q.    Are there any estimates contained within

2   Exhibit 4?

3            MS. STREUSAND:  Objection to the form of

4   the question.

5   BY MR. NOLAN:

6      Q.    Do you understand my question?  I can

7   restate it if you don't.

8      A.    Please restate.

9      Q.    In Exhibit 4, as part of Exhibit 4, are

10  any of the calculations in Exhibit 4 projections

11  or estimates as opposed to something being taken--

12  a figure specifically out of the books and records

13  of InaCom?

14     A.    Well, the interpretation becomes that of

15  what is, you know, inventory, for instance, based

16  on the exclusions in the Deutsche Bank lending

17  document or facility governing this borrowing base

18  calculation, is just that.  I mean it's an

19  interpretation of a point in time, so--

20     Q.    What are you referring to?  What area on

21  Exhibit 4, Mr. Oshlo?

22     A.    I'm just using that as an example.  For

23  instance, you know, let's say borrowing base

24  inventory, for instance.

25     Q.    Item number 2?

PETERSEN COURT REPORTERS
317 Sixth Avenue, Suite 606
Des Moines, IA 50309-4155
515/243-6596

1    A.    Yeah.   You know, what is collectible AR?

2  That's an inter--that ultimately becomes an

3  interpretation.

4    Q.    And what number is that you're referring

5  to?

6    A.    Well, you know, any--

7    Q.    I'm sorry, what number?

8    A.    Yeah.   I'm just, you know--  I was just

9  talking in broad terms.   It wasn't really--

10    Q.    All right.   I'm with you.   Is that page

11  2, Roman numeral IV?

12         MS. STREUSAND:   Objection to the form of

13  the question.

14  BY MR. NOLAN:

15    Q.    When you're talking, Mr. Oshlo, about

16  accounts--I thought you said you were talking

17  about the interpretation of collectible accounts

18  receivable.

19    A.    Right.

20    Q.    If I understood you correctly, you're

21  saying that's a matter of interpretation?

22    A.    Yes.   Well the footnotes, for instance, I

23  think pertain to that.   I don't know where that

24  footnote applies to--  Well, right there, the

25  vendor, 25.26 million.   And that's--ultimately

1   that interpretation of the vendor AR is what led

2   to the restatement.

3       Q.    Restatement of what?

4       A.    The earnings.  And in fact, subsequent to

5   this, either after the bank meeting on April 27th

6   or at the time of the bankruptcy, Deutsche Bank

7   came in and redid these--redid one of the

8   borrowing bases in terms of what they felt was

9   reasonable either AR or inventory.  I forget which

10  one.

11      Q.    So Deutsche Bank came back in and

12  restated the financials that had been set forth in

13  one of these borrowing certificates?

14          MS. STREUSAND:  Objection to the form.

15  Objection, leading.

16      A.    Yes.

17  BY MR. NOLAN:

18      Q.    Why don't you explain.  I didn't

19  understand.  You referenced that Deutsche Bank

20  came in and restated figures.  What are you

21  referring to?

22      A.    Well, they made an interpretation as to

23  the quality of either our inventory or our AR, I

24  forget which one, and reduced the amount of the

25  borrowing base.

1     Q.    And what's the practical effect to InaCom

2     and your ability to borrow as a treasurer?

3     A.    That reduces the ability to borrow.

4          MS. GREENFIELD:  Jeff, I hate to do this,

5     but I'm going to have to leave shortly.  Can I

6     step in for about five minutes?

7          MR. NOLAN:  Sure.  Go ahead.

8                    EXAMINATION

9     BY MS. GREENFIELD:

10     Q.    Mr. Oshlo, my name is Gail Greenfield.

11     We met a little earlier, but I represent Hewlett

12     Packard and Company as successor in interest to

13     Compaq Corporation.

14     A.    Uh-huh.

15     Q.    Hewlett Packard has been sued by several

16     of the vendors, Tech Data and Lexmark, to be made

17     whole in the event that InaCom is allowed to

18     recover these preferential payments.  So HP, as

19     I'll refer to it, is a third-party defendant in

20     this action.

21          I'd like to focus your attention for the

22     moment on the issue of whether or not held checks

23     are reflected on an accounts payable report.  I

24     believe you stated in your own words earlier that

25     you're not an AP person; is that correct?

1        A.    Yes.

2        Q.    Now, in your position as treasurer, is it

3   also correct to say that you did not prepare any

4   AP reports?

5        A.    Yes.

6        Q.    And in your position as treasurer, you

7   can't tell me whether or not held checks are, in

8   fact, reflected on any given AP report by InaCom;

9   is that correct?

10       A.    That is correct.

11       Q.    And you can't tell me whether or not it

12   is customary that once a check is cut, that

13   whether it is automatically removed from an AP

14   list?

15       A.    That's correct.

16       Q.    So any assumption as to whether or not

17   checks appear on an AP list is conjecture, would

18   that be fair?

19       A.    Yes.

20            MS. GREENFIELD:  Okay.  Thank you.  I

21   have no further questions.

22                    EXAMINATION (Resumed)

23   BY MR. NOLAN:

24       Q.    I'd like you to look at Exhibit 11, if

25   you could.

1      A.   What is Exhibit 11?  Which one is that?

2      Q.   That's the document that was prepared by

3  IBM, the Attachment E.

4           MR. HALLIDAY:  It has blanks filled in by

5  IBM?

6           MR. NOLAN:  Let me ask.

7           MR. HALLIDAY:  I'm not sure I'm going to

8  object, I don't object much, but it is an InaCom

9  Corporation form that's been filled in, I believe,

10  by IBM.  That's the testimony.

11          MR. NOLAN:  I don't think so, but let's

12  ask him.

13     Q.   I think your testimony, Mr. Oshlo, was

14  that Attachment F was prepared or--looks like

15  Attachment E--was prepared as another--as part of

16  a report, is that--

17     A.   Yes.

18     Q.   Do you recall for what type of report it

19  was prepared?

20     A.   It has to do with the floor planning

21  facility with IBM Credit for purchase of IBM

22  product.

23     Q.   Okay.  So you said floor plan agreement?

24     A.   Yes.

25     Q.   Okay.  Was attachment--I'm just going to

1  call it Attachment E because I can't tell if it is

2  Attachment E or Attachment F.

3         MS. STREUSAND:  Why don't we just refer

4  to it as Exhibit 11.

5         MR. NOLAN:  Okay.  Exhibit 11.  That's

6  better.

7     Q.   Was Exhibit 11 the standard form that was

8  prepared by IBM or was it something that might

9  have been--a form that was prepared by InaCom as

10  part of that document?

11    A.   Well, when we brought in Deutsche Bank,

12  we placed IBM credit as a, quote, bank, unquote,

13  they were kind of our lead provider under the

14  combined floor planning credit facility.  It

15  became a pure floor planning facility for the

16  purchase of IBM product after we brought Deutsche

17  Bank in, and this was the form that they required.

18    Q.   Okay.  So Exhibit 11, then, was a form

19  that was required to be filled out by IBM?

20    A.   No.  Required to be filled out by--

21  submitted by InaCom.

22         MS. STREUSAND:  To IBM.

23         THE WITNESS:  To IBM.

24  BY MR. NOLAN:

25    Q.   I guess the bottom line I'm trying to get

1    to is who dictated these different categories that

2    needed to be filled out?  Was it categories that

3    InaCom provided or categories that IBM requested

4    information on?

5         A.    IBM requested that information.

6         Q.    Okay.  Now, you said a floor plan

7    agreement.  Again, for a layperson, what's a floor

8    plan agreement mean?

9         A.    It's an agreement to provide credit to

10   kind of match up the differences between the

11   purchase of the inventory, and in this instance

12   IBM product, and the time we ultimately sold it

13   and got our cash back for it.

14        Q.    Okay.  So in 1999, is InaCom buying

15   product from IBM?

16        A.    Yes.

17        Q.    Okay.  And in 1999 in this time frame is

18   InaCom borrowing money from IBM?

19        A.    Yeah.  It's not a traditional credit

20   facility, and so, you know, some bankers wouldn't

21   agree with that terminology, but we didn't have

22   to--it gave us capacity, in essence, to purchase

23   product without coming up with, you know--just

24   picking a figure--$144 million today to buy that

25   product to sell sometime in the future, you know,

1  when our terms became--dictated payment.

2  Q.  So you would have--so is this product

3  then that's bought from IBM under this type of

4  agreement bought on credit?

5  A.  Yes.

6  Q.  At any time in 1999 were you aware of

7  there ever being disputes between InaCom and IBM

8  with respect to this floor plan agreement?

9  A.  I think there were fairly regular

10  disputes between IBM and InaCom as to what was in

11  transit, in addition to what the actual dispute

12  column says there.  I think that was normal in

13  terms of preparation of this document.

14  Q.  What was the basis that you were aware of

15  in 1999 for the dispute?

16  A.  I think it was just part of the

17  relationship with IBM and InaCom and how they

18  approached--how IBM Credit approached their

19  clients.

20      A case in point is under the old facility

21  that we have with IBM Credit, I think it was a

22  $400 million floor planning facility and a

23  traditional credit facility, and when I first

24  showed up at InaCom, if I went into--my books

25  showed that I had, hypothetically, $200 million

216

1    outstanding under it and therefore could borrow up

2    to another 200 million, and this actually happened

3    one time, for instance, and I went in to borrow.

4    One quickly realizes that I didn't have 200

5    million because IBM would look at it and say,

6    well, next month--they would look prospectively in

7    the future--we're going to ship $70 million more

8    of product and therefore that eats up your

9    availability, whether or not it was eaten up that

10   day that we wanted to borrow, and that's what

11   partially led to our replacing IBM Credit as,

12   quote, the lead bank and the manager of the credit

13   facility, just restricting them to the floor

14   planning facility.

15       Q.    And so you had disputes with IBM as to

16   what amount you could--or InaCom could borrow up

17   on the floor plan in 1999?

18          MS. STREUSAND:   Objection to the form of

19   the question.

20       A.    The floor planning, there was always

21   disputes, outside of my purview, over, you know,

22   what was being paid for or where it was, was in

23   transit, so forth.   I was referring to it as just

24   an example of what the disputes were between

25   InaCom and IBM Credit under the old facility, the

1    initial facility we had with them.  They had floor

2    planning and a bank credit document combined.

3    BY MR. NOLAN:

4        Q.    Okay.  There's a reference here, it says,

5    "Checks Held, 31,271,000.  Do you see that?

6        A.    Yes.

7        Q.    Is that your handwriting?

8        A.    No.

9        Q.    In 1999 were you ever holding $31,227,000

10   of held checks in the treasury department at

11   InaCom that were due to or payable to IBM?

12       A.    No.

13            MR. HALLIDAY:  I'm sorry, Jeff.  Your

14   question was limited to just the treasury

15   department?

16            MR. NOLAN:  Yes.

17       Q.    Did you ever become aware in 1999 that

18   the accounts payable department was holding $31

19   million in checks that were owed payable to IBM?

20       A.    Not that I recall.

21            MS. STREUSAND:  Jeff, can we take a quick

22   break?

23            MR. NOLAN:  Sure.

24            (Recess.)

25            MR. NOLAN:  Back on the record.

1      Q.    Can you look at Exhibit 10 again, Mr.

2   Oshlo?  I'd like you to look at Exhibit 10 and

3   tell me the latest date that you note that the

4   treasury department released a check as evidenced

5   from Exhibit 10.

6      A.    It looks like 4-20 of 2000.

7      Q.    Do you have any recollection as you sit

8   here today of InaCom holding--strike that.

9            Do you have any recollection as you sit

10  here today of holding in the treasury department

11  any checks later than April 20th, 2000, owed

12  payable to vendors?

13     A.    Not specifically.

14     Q.    Can you look at Exhibit 7 for me?

15     A.    What is that?

16     Q.    I think it's another one of these--I

17  think it's another borrowing base certificate.  Do

18  you have it?

19     A.    Yes.

20     Q.    If you could look at the last page again.

21  I believe it was your testimony that that was your

22  signature; is that correct?

23     A.    Yes.

24     Q.    And can you read for the record the first

25  sentence?

1    A.    "The undersigned certifies to the Agent,

2    on behalf of the Borrower, that (a), the foregoing

3    Borrowing Base/Non-Default Certificate is true and

4    correct in all respects, is in accordance with the

5    books and records of the undersigned, and is

6    prepared in accordance with the credit agreement."

7    Q.    And the books and records that are

8    referenced therein, are those the books and

9    records of InaCom?

10    A.    Yes.

11    Q.    And as part of putting together this

12    borrower certificate, would individuals, other

13    individuals at InaCom from other departments give

14    you information to be included or incorporated

15    within the borrowing base certificate?

16    A.    Yes.

17    Q.    And if that information that came from

18    any of the other departments was inaccurate in any

19    way, would you have any way in the treasury

20    department of being able to confirm that?

21    A.    No.

22    Q.    And is it accurate that if the books and

23    records of InaCom were not accurate, that this

24    borrowing base/non-default certificate would not

25    be accurate?

1            MS. STREUSAND:  Objection to the form,

2    objection to leading.

3        A.    Yes.

4    BY MR. NOLAN:

5        Q.    Are any of the categories that have

6    dollar amounts next to them on Exhibit 7,

7    categories that involve projections as opposed to

8    specific dollars that may have been recorded out

9    of a specific book and record at InaCom?

10            MS. STREUSAND:  Objection to the form of

11    the question.

12        A.    I assume, but I don't know specifically

13    now with respect to this--with this particular

14    document.

15    BY MR. NOLAN:

16        Q.    Do you see anywhere that the borrowing

17    base default certificate, which is Exhibit 7, is

18    based on a valuation of accounts receivables?

19        A.    Yes.

20        Q.    Do you see anywhere that the borrowing

21    base certificate that's Exhibit 7 is based upon an

22    approximation or valuation of inventory of InaCom?

23        A.    Yes.

24        Q.    Can you look at Exhibit 8, Mr. Oshlo, and

25    for the record, it's a borrowing base certificate.

1   This one is for the period ending April 22nd,

2   2000.

3        A.   Yes.

4        Q.   Can you read on the last--strike that.

5             On the last page, is that your signature?

6        A.   Yes.

7        Q.   Can you read the first sentence to the

8   end of parenthetical small (a)?

9        A.   "The undersigned certifies to the Agent,

10  on behalf of the borrower, that (a), the foregoing

11  Borrowing Base Certificate is true and correct in

12  all respects, is in accordance with the books and

13  records of the company, and is prepared in

14  accordance with the terms of the credit

15  agreement."

16       Q.   And as part of your duties of putting

17  together and executing this borrowing base

18  certificate, did you receive figures from other

19  departments than the treasury department?

20       A.   Yes.

21       Q.   And as treasurer, in putting together

22  this borrowing base certificate, would it be a

23  fair statement that those figures that were given

24  from others would be figures that the treasury

25  department would have no ability to know the

1    accurateness of those figures?

2         MS. STREUSAND:  Objection to the form and

3    misstates the prior testimony of the witness, and

4    objection, leading.

5    BY MR. NOLAN:

6         Q.   Let me ask it a different way, Mr. Oshlo,

7    because that was a long question to boot.

8         MS. STREUSAND:  And I think you stated

9    that it was inaccurate.

10         MR. NOLAN:  Yes.  It was a poor question.

11    I just gave myself and F, you're supposed to

12    correct me at that point and say it wasn't really

13    that bad.

14         (Discussion off the record.)

15    BY MR. NOLAN:

16         Q.   Mr. Oshlo, let me retry this and make it

17    hopefully a little simpler.

18         With respect to Exhibit 8, as far as

19    those calculations that were forwarded from a

20    department at InaCom other than the treasury

21    department, would there be any way that the

22    treasury department could corroborate the

23    accurateness of those figure?

24         A.   No.

25         Q.   And if any of the figures that were given

1  to the treasury department to incorporate within

2  the borrowing base certificate were inaccurate,

3  would that increase the probability that this

4  borrowing base certificate would be inaccurate?

5          MR. STREUSAND:  Objection to the form of

6  the question and objection, leading.

7      A.    Yes.

8  BY MR. NOLAN:

9      Q.    In Exhibit 8, do you see any of the

10  figures that would involve an estimate of the

11  value of a particular component of InaCom rather

12  than a recording of a figure out of the books and

13  records of the debtor?

14      A.    Yes.

15      Q.    And what categories would that be?

16      A.    I mean it's how you determine--how you

17  calculate the gross eligible inventory, and these

18  were discussions I would have with Dave Lemon,

19  probably gave me the inventory figure.

20      Q.    And would the figures with respect to a

21  valuation of accounts receivables, would those be

22  an estimate or would there be an actual document

23  that would give the exact dollar value of the

24  accounts receivable?

25      A.    I never saw the exact document, so, you

224

1    know, I don't know.  I don't recall what this was

2    being pulled off of.  It wouldn't have been in the

3    treasury department.

4        Q.    On the bottom of page 2 of Exhibit 8

5    there is a footnote (1).  Can you read that to

6    yourself?

7        A.    It says trade receivables?

8        Q.    Yes, sir.

9        A.    Yes.

10       Q.    Does footnote (1) appear to you to be an

11   approximation of the value of trade receivables or

12   the recordation of what the trade receivables were

13   at InaCom for that period of time?

14            MS. STREUSAND:  Objection to the form of

15   the question, and I think it actually misstates

16   footnote (1) which I believe relates to

17   international operations; is that correct?

18            MR. NOLAN:  That's correct.  That's

19   accounts receivable of InaCom.

20            MS. STREUSAND:  For international

21   operations.

22   BY MR. NOLAN:

23       Q.    Is international operations of InaCom a

24   part of InaCom?

25       A.    Yes.  Yes.

225

1          MS. STREUSAND:  I'm just trying to

2   specify what footnote (1) is actually referring

3   to.

4   BY MR. NOLAN:

5      Q.   Do you know how, for the purposes of

6   Exhibit 8, trade receivables were calculated for

7   the purposes of this report?

8      A.   No, not at this point in time.

9      Q.   At any time as treasurer of InaCom, did

10  you become aware that there was a dispute

11  concerning the valuation of trade receivables of

12  InaCom?

13     A.   No.

14     Q.   No, you didn't become aware or you don't

15  know?

16     A.   I don't know.

17     Q.   Do you know who the individual would be

18  at InaCom who would have performed in the year

19  2000 any approximation of the value of accounts

20  receivables?

21     A.   I think the vendor receivables, which I

22  do know was in dispute, would have come from,

23  first, Jay Samuelson and then I believe from Dave

24  Lemon.  Trade receivables would have come from

25  Scott Simmelink.

1       Q.    As you sit here today, Mr. Oshlo, are you

2   aware of Compaq--strike that.

3             As you sit here today, Mr. Oshlo, are you

4   aware of InaCom ever drawing on any credit

5   facility from Compaq post sale of the asset

6   distribution division to Compaq?

7       A.    I don't think we drew on that.

8       Q.    When you say you don't think we drew on

9   that, are you saying the loan was never made or it

10  was never drawn down on?

11      A.    I don't think the loan was ever made.

12      Q.    Mr. Oshlo, what did you receive your BA

13  in at Drake University?

14      A.    Political science.

15      Q.    And what year did you receive your

16  Bachelor of Arts?

17      A.    1971.

18      Q.    And what was the next schooling that

19  you--the next subsequent schooling you obtained

20  after your Bachelor of Arts from Drake?

21      A.    I went to the Maxwell Graduate School in

22  Public Administration and then transferred to

23  Pennsylvania where I earned a Master's Degree in

24  international affairs in '74, I think.  I forget.

25      Q.    So how many years did you attend the

1    Maxwell?

2        A.    Just one year.

3        Q.    What year was that?

4        A.    Let's see.  '71 to like '73.  That's too

5    long ago to remember.

6        Q.    And what was the area of your studies?

7        A.    Public administration.

8        Q.    And when did you attend the University of

9    Pennsylvania?

10       A.    '73-74.  I actually think I received my

11   degree in probably, you know, '75, but completed

12   course work in '73.

13       Q.    In what was the area that you received

14   your degree?

15       A.    Political science, international affairs.

16       Q.    And then what was the next subsequent

17   schooling after receiving your degree from the

18   University of Pennsylvania?

19       A.    I earned an MBA at Columbia and I was

20   there from '81 to '83.

21       Q.    And what was your MBA in at Columbia?

22       A.    Finance.

23       Q.    Was there any particular area of study in

24   the finance department?

25       A.    No.

1      Q.    Do you hold any other certificates or

2   degrees other than what you've told me?

3      A.    No.

4      Q.    Do you have any type of subsequent

5   accreditation?

6      A.    When I was at Morgan, I was a Series 7

7   for a while.

8          MS. STREUSAND:  Excuse me.  What is a

9   Series 7?

10          THE WITNESS:  I'm sorry.  As Morgan moved

11   from pure lending to an investment banking

12   operation, that's through the NSAD.  We never used

13   it because I never dealt with the public, but a

14   stockbroker would be a Series 7.

15   BY MR. NOLAN:

16      Q.    And you were with JP Morgan from 1983 to

17   1991?

18      A.    '90 or '91.  I should remember that, but

19   I don't.

20      Q.    And what department were you with at JP

21   Morgan?

22      A.    It was the investment banking department.

23   It had to do with tax exempt underwritings, and

24   then I was in a group, I forget the name of the

25   group, that's terrible, where we were doing

1    taxable placements and underwritings, bond issues.

2    Q.    Okay.  Would you be--in what respect?

3    Would you be writing those, funding them?

4    A.    I'd go out, bring the account in,

5    structure the transaction, be a bond, for

6    instance, and the bond desk would actually price

7    it, and then I'd work with the attorneys to get

8    the thing closed.

9    Q.    So that would be--in that respect you

10   would be structuring a bond for the lending of

11   money by JP Morgan to someone else?

12   A.    Yes.  Well, Morgan wouldn't lend the

13   money.  It would be either privately placed or

14   underwritten in the public markets, so, you know,

15   an institutional investor ultimately--would

16   ultimately buy it.

17   Q.    And who would the loans be--the bonds be

18   sold to?

19   A.    Some institutional investor.

20   Q.    Okay.

21   A.    Depending upon--Morgan at that time was

22   trying to create a niche in university finance

23   because it was kind of quasi tax exempt but also

24   quasi taxable, and they, you know, would be sold

25   to, you know, mutual funds and institutional

1    investors.

2         Q.    Would you prepare any type of financial

3    documents as part of your duties of being an

4    account officer?

5         A.    When you say "financial documents," what

6    do you mean?

7         Q.    Projections, statements with respect to

8    interest.

9         A.    No.  Principally it was documents for the

10   rating agencies as we took clients to the rating

11   agencies.  We had kind of a research department

12   that would--credit research that would help with

13   the projections.

14        Q.    Okay.  Two years after you said you were

15   a private consultant?

16        A.    Yeah.

17        Q.    That's from 1991 to 1993?

18        A.    Yes.

19        Q.    Were you performing the same type of work

20   as you were performing at JP Morgan?

21        A.    No.  I was more focusing on public

22   finance.  I was also trying to start a business

23   having nothing to do with finance.

24        Q.    And what years were you with GWR

25   Consulting?

1      A.    GWR Investments, and it was '93 to

2  sometime in '96.

3      Q.    Any part of your duties with GWR

4  Investments involve the creation of documents to

5  summarize financial information?

6      A.    It may have.  They were mostly real

7  estate transactions placed in the private market,

8  obviously much smaller transactions.  You know,

9  GWR had a small sales force, and I'm sure it is

10  something--we had official offering documents that

11  had some projections in them.

12          MR. NOLAN:  Okay.  I don't have any other

13  questions right now.  I reserve my questions

14  for--any that may occur after other counsel's

15  questions.

16          MS. STREUSAND:  I have a few questions,

17  sir, and then Mr. Halliday may have a few.

18          MR. NOLAN:  Do you want to switch spots

19  with me?

20          MR. FORTE:  I have a few questions.  Do

21  you want me to do them now?  Five minutes maybe.

22                    EXAMINATION

23  BY MR. FORTE:

24      Q.    Mr. Oshlo, my name is Earl Forte and my

25  law firm represents Executive Sounding Board

1    Associates, Inc., which is the liquidating agent

2    for the InaCom estate, and we're representing the

3    interests of InaCom in the preference action

4    against Dell, Ms. Streusand's client and Mr.

5    Landon's client.

6         During the preference period, March 17th

7    through June 16th of 2000, who was the person at

8    InaCom authorized to make wire transfer payments

9    to vendors such as Dell?

10    A.    It would have been myself and Tom

11    Fitzpatrick.

12    Q.    Anyone else?

13    A.    No.

14    Q.    Was anyone in the accounts payable

15    department authorized to make wire transfer

16    payments to vendors such as Dell during that time

17    frame?

18    A.    No.

19    Q.    And just to clarify, it is my

20    understanding of your testimony earlier today that

21    the accounts payable department was separate from

22    treasury?

23    A.    Yes.

24    Q.    All right.  Do you know if the typical

25    form of payment by InaCom to a vendor such as Dell

1   during, let's say, the two-year period before the

2   bankruptcy was by check or by wire?

3       A.    By check.

4       Q.    And who would typically issue a check to

5   a vendor such as Dell?

6       A.    Someone in accounts payable.

7       Q.    Now, if I told you that the payments that

8   InaCom made to Dell during the preference period

9   were all checks except for one, which was a wire,

10  based on your prior testimony today, would you

11  conclude that you were the person who had

12  authorized that single wire payment?

13          MS. STREUSAND:  Objection to form of the

14  question, and objection, leading.

15      A.    Yes.  I wouldn't have punched the button

16  for it, that would have been done by someone in

17  cash management, but I would have had to authorize

18  it.

19  BY MR. FORTE:

20      Q.    All right.  Who in cash management?

21      A.    It was probably Neil Goldsworth, although

22  I can't remember when he--he subsequently left

23  and, you know, it just depends on the time.

24      Q.    Do you recall who that person would have

25  been in the 90-day period before the bankruptcy

1  filing?

2      A.    I assume he was still there, or at least

3  most of that.

4      Q.    That was Neil Goadsworth?

5      A.    Goldsworth.

6      Q.    Spell that for the record.

7      A.    I think it's G-O-L-D-S-W-O-R-T-H,

8  something like that.

9      Q.    Thank you.  Now, you mentioned earlier

10 today that you received some collection calls from

11 vendors?

12     A.    Yes.

13     Q.    Do you recall receiving collection calls

14 from Dell?

15         MS. STREUSAND:  Asked and answered.

16     A.    Yes.

17 BY MR. FORTE:

18     Q.    Do you remember who specifically at Dell

19 made those calls to you?

20     A.    No.

21     Q.    Do you recall the title or level of the

22 person within Dell?

23     A.    Not specifically.  I do recall that

24 several vendors, including Dell, they escalated up

25 in terms of level of importance.

1      Q.    Did they escalate up as InaCom got closer

2    to its bankruptcy filing?

3      A.    I'm not--  Yes, but I'm not sure it was

4    related to that.

5      Q.    Now, after InaCom sold its hardware

6    business to Compaq, February 16th, 2000, do you

7    know whether InaCom continued to buy hardware

8    computer equipment from Dell?

9      A.    I assume they did not.

10      Q.    Are you familiar with the term pro forma

11    financial statement?

12      A.    Yes.

13      Q.    What is the difference between a pro

14    forma financial statement and a financial

15    statement that is not a pro forma?

16      A.    It is based on the assumption that

17    certain things are going to happen.

18      Q.    Is a pro forma financial statement an

19    actual financial statement of facts or is it based

20    on future events?

21      A.    Future events.

22      Q.    In your experience in the financial

23    world, have you ever known pro forma financial

24    statements to turn out to be wrong or inaccurate?

25            MR. STREUSAND:  Objection to the form of

1    the question; objection, leading.

2        A.    Yes, they have turned out to be wrong or

3    inaccurate.

4    BY MR. FORTE:

5        Q.    Do you ever know--excuse me.

6              Do you know of any pro forma financial

7    statements prepared with respect to InaCom during

8    2000 that were inaccurate?

9              MR. STREUSAND:  Objection to the form of

10   the question.  I believe the witness testified he

11   did not work on financial statements from this

12   morning's testimony.

13             MR. FORTE:  He can say that if that's his

14   answer.

15       A.    I think there were pro forma statements

16   that were done around the time of the Compaq sale.

17   I don't know what they--I don't recall what they

18   showed.

19       Q.    Okay.  Now, there was some testimony

20   today with respect to the $78 million Nesbit Burns

21   facility to the effect that it was paid early.  Do

22   you recall that?

23       A.    I'm confused, because I don't think it

24   was about that facility.

25       Q.    What facility, do you recall?

1      A.    I think it was IBM Credit.

2      Q.    Pardon me.  Do you recall if at the time

3  InaCom paid the IBM Credit facility, that facility

4  was in default?

5      A.    I don't recall.

6           MR. FORTE:  Give me a moment.  Mr. Nolan

7  covered several of the areas I was going to ask

8  you about, so he's shortened my questioning.

9           I have no further questions for the

10  witness.  Thank you, Mr. Oshlo.

11                    EXAMINATION

12  BY MS. STREUSAND:

13     Q.    Mr. Oshlo, Sabrina Streusand on behalf of

14  Dell.

15           Referring back to the borrowing base

16  certificates, did anyone at InaCom ever refuse to

17  give you information that would go into the

18  borrowing base certificates?

19     A.    Not that I know of, no.

20     Q.    And did you satisfy yourself that the

21  information contained on the borrowing base

22  certificates was true and correct as of the date

23  that you certified it was true and correct?

24           MR. NOLAN:  Objection to the question.

25  It lacks foundation and calls for speculation.

1      A.      I don't--I treated the figures as what

2    they were when they were given to me.

3    BY MS. STREUSAND:

4      Q.      Did you have any reason to believe at the

5    time that you were certifying to the banks that

6    these were true and correct statements that they

7    were incorrect?

8      A.      No.

9      Q.      And did you believe at any time you were

10   lying to the banks when they were advancing you

11   money based on these borrowing base certificates?

12          MR. NOLAN:  I'll object to the question

13   to the extent it misstates prior testimony and it

14   calls for speculation.

15     A.      No.

16   BY MS. STREUSAND:

17     Q.      And did you understand that these were

18   federally insured institutions, sir?

19     A.      Yes.

20          MR. NOLAN:  Object to the question.  It's

21   irrelevant.

22     A.      Yes.

23   BY MS. STREUSAND:

24     Q.      Well, do you understand the relevance of

25   my question with respect to the institutions being

239

```
 1    federally insured?

 2        A.    Yes.

 3             MR. FORTE:   Objection to the form.

 4    BY MS. STREUSAND:

 5        Q.    And what is the relevance?

 6             MR. FORTE:   Objection to the form.  How

 7    can you ask the witness what the relevance of the

 8    question is?

 9             MS. STREUSAND:   No, I'm not asking that.

10        Q.    I asked you--okay.  The institutions that

11    were lending, I think it's a $450 million

12    revolving credit facility to InaCom; correct?

13        A.    Yes.

14        Q.    Do you recall those?

15        A.    Yes.

16        Q.    And there's the list of banks if you want

17    to see them.

18        A.    Yes.

19        Q.    You know those?

20        A.    Yes.  I brought several of them in.

21        Q.    And you are a finance person with a great

22    deal of acumen in the finance area.  I'm sorry.

23    That's just--you don't have to agree with that.

24        A.    You give me more credit than I deserve.

25             MR. NOLAN:   We will take that admission.
```

```
 1          MS. STREUSAND:  That's fine.
 2      Q.   With respect to the certifications that
 3  you were giving on the borrowing base
 4  certificates, you understood that the banks were
 5  basically relying on their certifications with
 6  respect to their lending facilities?
 7      A.   Yes.
 8      Q.   And I asked you if you understood that
 9  those banks were federally insured and you said
10  yes, correct?
11      A.   Yes.
12          MR. NOLAN:  Same objection.
13  BY MS. STREUSAND:
14      Q.   When I say they are federally insured
15  institutions and you understood the relevance of
16  that, explain to me what you meant by that.
17      A.   Not only that they are federally insured,
18  but they may be public corporations too, and
19  there's fiduciary responsibilities that they have.
20      Q.   And you understood you were, as a
21  fiduciary, signing these certificates that they
22  were true and correct at the time, correct?
23      A.   Correct.
24          MR. FORTE:  Objection to the question.
25  It's  overbroad.
```

```
 1        A.    Yes.
 2   BY MS. STREUSAND:
 3        Q.    Did the treasury department ever order
 4   product from Dell?
 5        A.    The treasury department?
 6        Q.    Yes, sir.
 7        A.    No.
 8        Q.    And when you answered Mr. Forte's
 9   question that you assumed after the Compaq
10   transaction that Dell product was not ordered, do
11   you have personal knowledge as to what was ordered
12   and what was not ordered from Dell?
13        A.    No personal knowledge other than the fact
14   that we were getting out of the hardware business.
15   BY MS. STREUSAND:
16        Q.    I understand.  That was part of the
17   transition to the service business, therefore
18   there wouldn't be additional vendor supplies
19   ordered after the sale to Compaq?
20        A.    Yes.
21        Q.    And did I understand your testimony
22   correctly this morning that you did not work on
23   the balance sheets or the financial statements for
24   InaCom?
25        A.    Yes, that's true.
```

1    Q.    You did not do that?

2    A.    Did not.

3    Q.    That was not your department?

4    A.    No.

5          MS. STREUSAND:  Pass the witness.

6          MR. HALLIDAY:  I think I have five

7    questions.

8          MR. FORTE:  We're going to count.

9          (Discussion off the record.)

10          MR. HALLIDAY:  I think I have five areas.

11                    EXAMINATION

12   BY MR. HALLIDAY:

13    Q.    Again, thank you for your patience.  And

14   this is just to make sure I understand.

15          Isn't it true that you know InaCom held

16   checks after a date late in 1999 because you and

17   the treasury department then began actually

18   holding the checks?

19          MR. FORTE:  Objection to form.

20          MR. NOLAN:  Same objection.

21    A.    I'm not smart enough to figure that

22   question out.  Could you repeat that?

23    Q.    Okay.  But don't charge me it as one of

24   the five.

25          MR. FORTE:  This is two.

1  BY MR. HALLIDAY:

2      Q.    Is it correct that you know that as of a

3  date late in 1999, InaCom was holding checks

4  because you and the treasury department became, as

5  of that date late in 1999, the person and

6  department actually holding the checks?

7          MR. NOLAN:  I'll object to the form of

8  the question.  It's vague and ambiguous as to

9  time.

10     A.    I was the one who asked that the checks

11  be sent to my office.

12  BY MR. HALLIDAY:

13     Q.    As of late in 1999, your words, correct?

14     A.    Yes.

15         MR. NOLAN:  Objection.  Misstates prior

16  testimony.

17  BY MR. HALLIDAY:

18     Q.    Let's get absolutely sure on that.  Late

19  in 1999 is your testimony, correct, sir?

20     A.    Yes.

21         MR. NOLAN:  Same objection.

22  BY MR. HALLIDAY:

23     Q.    Thank you.  And is it not also true that

24  you do not today, sir, intend your testimony to be

25  understood by the Court as ruling out the

1  possibility that that date late in 1999 could have

2  been a date in October?

3        MR. FORTE:  I'll object to the form of

4  the question.

5        MR. NOLAN:  It misstates prior testimony.

6    A.   I assume it was not in October.  I assume

7  it was in, you know, the latest--earliest, December.

8  BY MR. HALLIDAY:

9    Q.   Your deposition is likely going to be

10  read in trial.  Do you wish to tell the Court that

11  you are ruling out the possibility that the date

12  late in 1999 could have been in October?

13        MR. NOLAN:  Culver, you're badgering the

14  witness.

15        MR. HALLIDAY:  No, I want an answer to

16  that.

17        MR. FORTE:  Culver, you have an

18  obligation to treat the witness with courtesy.

19        MS. STREUSAND:  He is treating the

20  witness with courtesy.

21        MR. FORTE:  No, you're trying to create a

22  record called unring the bell.  You're trying to

23  make him look like a liar on the record.  It's

24  totally improper.

25        MR. HALLIDAY:  Mr. Oshlo, I want you to

1   know--

2        MR. NOLAN:  We're all just trying to make

3   a record here because all we have different

4   interpretations of what your testimony is.

5        THE WITNESS:  But I'm not going to be

6   accused of lying.

7   BY MR. HALLIDAY:

8        Q.   Mr. Oshlo, I want--

9        A.   With all due respect.

10       Q.   The statement by Mr. Forte that I am

11  accusing you of lying is absolutely outrageous.

12  You have not lied today, in my opinion.

13       A.   But you're trying to set me up as though

14  I might appear to be a liar down the future.  Now,

15  I think it started in December.  I can't say

16  whether it was December 15th, December 20th this

17  stuff starts, only in hindsight, you know.  You're

18  in a liquidity crisis that isn't going away

19  tomorrow.

20       Q.   Here's all I want to know, sir.  Do you

21  mean to rule out that that date late in 1999 was

22  in October?

23       A.   I find it hard to believe it would be in

24  October.

25       Q.   Mr. Oshlo, with all due respect, I'm just

1    trying to make sure I understand.  You cannot

2    today, based on recollection of things four years

3    ago, rule out the possibility that it might have

4    been in October 1999 that you and the treasury

5    department began actually holding the checks?

6                    MR. FORTE:  Objection; asked and

7    answered.

8                    MR. NOLAN:  I'll object to the question.

9    It's asked and answered.

10        A.     I cannot rule that out with a hundred

11   percent certainty.

12   BY MR. HALLIDAY:

13        Q.     That's all I was looking for.  I thank

14   you sir.  Now, I have one more--two more

15   questions.

16                    Sir, Exhibit 11 reflects checks held of

17   $31,227,000--that's what it says--in July of 1999.

18        A.     Is that the IBM facility?

19        Q.     Yes, sir.  Exhibit 11.

20        A.     It was the last one.  It's the bottom of

21   the stack.

22        Q.     Yes, sir.  And, sir, that date, July of

23   1999, was some months prior to you and the

24   treasury department actually beginning to hold the

25   held checks, correct?

1          MR. NOLAN:  I'll object to the question.

2     It's intentionally misleading, it's vague and

3     ambiguous as to time, and you're trying to

4     misstate the witness's prior testimony.

5          A.    Yes, that was some months before.

6     BY MR. HALLIDAY:

7          Q.    So I assume you would agree with me that

8     you can't tell us today whether or not checks were

9     being held in that amount in July of 1999?

10          MR. NOLAN:  I'll object to the term

11    quote-unquote, checks held.  You can answer the

12    question.

13    BY MR. HALLIDAY:

14          Q.    You don't know--

15          A.    I don't know what that referred to.

16          Q.    --whether it's true or not?

17          A.    These figures come from IBM Credit.  This

18    was a running, whatever, figure.  Whatever we

19    originally put down in this document, we zipped

20    off to IBM Credit and they disagreed with it.

21    There are figures in here that were blind to

22    InaCom.  Only IBM Credit knew what they were.

23          Q.    And all I'm saying is--

24          A.    So, you know, that's why--

25          Q.    Excuse me.  Let me--

1       A.    --I know nobody at InaCom filled these

2   figures out because I specifically recall how

3   ridiculous this document was, that we're asked to

4   submit it, but half the figures on here or some

5   percent of it only IBM Credit knew.  And if you

6   match up--it's pretty clear, match up the

7   handwriting with whatever this was, and so--

8   Particularly  four years later.

9       Q.    I understand.

10      A.    And I'm not sure I knew exactly what all

11  those figures, nor did many people in InaCom, what

12  they referred to when it was done.

13      Q.    Do you think, sir, that you signed this

14  after the figures were written into this document,

15  onto this document, pardon me?

16      A.    I assume I did.

17      Q.    That's all I have.

18      A.    I just know there was a running battle

19  between us and IBM Credit, and it goes back to my

20  testimony earlier about my inability to borrow up,

21  which led to our replacing IBM Credit as, quote,

22  the lead bank with Deutsche Bank, because we never

23  knew what our availability was on that line, let

24  alone what the floor planning figures were.

25           MR. HALLIDAY:  Thank you very much, Mr.

1  Oshlo.

2         MR. NOLAN:  Do you have any other

3  questions on the phone, guys?  Sorry we skipped

4  over you.

5         MR. HUNT:  That's okay.  Steve Hunt.  I

6  just have two follow-up questions very briefly.

7                    EXAMINATION

8  BY MR. HUNT:

9     Q.   Mr. Oshlo, are you ready?

10    A.   I suppose so.

11    Q.   Mr. Oshlo, I asked you earlier if you had

12  everybody--

13         MR. NOLAN:  You cut off, counsel.

14         (Discussion off the record.)

15         MR. HUNT:  All right.  Thank you.  I've

16  moved my beach chair closer.

17    Q.   Mr. Oshlo, again I had asked you earlier

18  if you had ever refused to sign a borrowing base

19  certificate and whether you were concerned when

20  you signed them, and I don't want to put words in

21  your mouth, but you said you never did refuse and

22  you were always concerned.  Is that a fair summary

23  of what you said?

24    A.   Yes.

25    Q.   I want to ask you, were you concerned

 1    because you knew you were putting your name on

 2    something and that held a position of trust on

 3    behalf of the company as an executive officer?

 4         A.    Yes, and also just from a practical

 5    perspective, you never know--there are no

 6    absolutes in this stuff, you know, and so--  Did

 7    I--yeah.  I mean I always get concerned when I

 8    sign things like that.  It is not something to be

 9    taken lightly.

10              MR. HUNT:  Very good.  That's all I

11    needed from you.  Thank you, Mr. Oshlo, for your

12    patience for a long deposition under weekend

13    conditions.  No questions further.

14              MS. STREUSAND:  Thank you, Mr. Oshlo.

15              MR. NOLAN:  Thank you.

16              Do you have a standard stip for the

17    depositions?

18              MR. STREUSAND:  Yes.  What that means is

19    you'll get a copy of the transcript and you'll be

20    able to read it and make any changes, and I assume

21    you'll send it back to Mr. Nolan or Mr. Forte,

22    whoever you want to.

23              MR. FORTE:  To Jeff.

24              (Proceedings concluded at 5:45 p.m.)

25

```
 1                    C E R T I F I C A T E

 2        I, the undersigned, a Certified Shorthand

 3   Reporter of the State of Iowa, do hereby certify

 4   that there came before me at the time, date and

 5   place hereinbefore indicated the witness named on

 6   the caption sheet hereof, who was by me duly sworn

 7   to testify to the truth of said witness'

 8   knowledge; that the witness was thereupon examined

 9   under oath, the examination taken down by me in

10   shorthand and later reduced to typewriting through

11   the use of a computer-aided transcription device

12   under my supervision and direction, and that the

13   deposition is a true record of the testimony given

14   and of all objections interposed.

15        I further certify that I am neither attorney

16   nor counsel for, nor related to nor employed by

17   any of the parties to the action in which this

18   deposition is taken, and further that I am not a

19   relative or employee of any attorney or counsel

20   employed by the parties hereto, or financially

21   interested in the action.

22        Dated at Des Moines, Iowa, this 28th day of

23   March, 2005.

24                    _____
                      CERTIFIED SHORTHAND REPORTER
25
```

0

REPORTER'S NOTE:  After the conclusion of the deposition, it was decided that after the witness reads the transcript, he will return it to the court reporter's office.  The court reporter will notify all attorneys of any corrections the witness has made, and then the original transcript will be sent to Ms. Streusand.