1    the second half of that previous question, or --

2    did you, sir, assist Custom Edge, Inc. in

3    implementing the asset purchase agreement?

4         A.  My involvement in -- I did not

5    work with the agreement, my -- when --

6    where I'm confused here is with the word

7    "implementation."  My job was to run the

8    operations.  Clearly, the agreement was an

9    asset sale, so implementation of the agreement,

10   to me, means I did my job and ran the operations.

11        Q.  Actually, that was a very clear

12   response.

13             Sir, have you been deposed before?

14        A.  Yes.

15        Q.  How many times?

16        A.  Once.

17        Q.  In what matter?

18        A.  An accounts payable suit, Inacom

19   versus somebody; a long time ago.

20        Q.  Was this when you were controller?

21        A.  Yeah -- yes.

22        Q.  Am I correct that neither Custom

23   Edge, Inc. or Compaq Computer Corporation or

24   Hewlett-Packard were parties to that suit?

25        A.  You're correct.

**BARNES REPORTING SERVICE, INC.**
**COURT REPORTERS**

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

1        Q.   Was it a collection suit brought by

2    Inacom Corporation?

3        A.   I don't recall.

4        Q.   Let me just ask one more question.

5    Was it a suit brought to collect money from

6    Inacom Corporation?

7        A.   No, Inacom was suing whoever it was.

8        Q.   To collect money owed?

9        A.   Collect money.

10        Q.   And that's the only time, sir, you've

11    been deposed?

12        A.   Correct.

13            MR. HALLIDAY:  Sir, those are all

14    the questions I have for you.  I'm going to pass

15    you to the next attorney and I thank you for

16    your time this morning.

17            THE WITNESS:  Thank you.

18            CROSS-EXAMINATION

19    BY MR. LANDON:

20        Q.   Sir, I introduced myself before, but I

21    will again for the record.  My name is James

22    Landon and I'm from the law firm of Hughes and

23    Luce in Austin, Texas and I represent Dell, Inc.

24            Let me back up a little bit and

25    just get a little bit of background, just sort

KERKMAN - CROSS (Landon)

1    of the process.  You said you've been deposed

2    before so you've probably heard this, but bear

3    with me.  You understand that today we're going

4    to ask you questions on the record and they're

5    going to be recorded, verbatim, by the court

6    reporter?

7         A.  Yes, I understand that.

8         Q.  And so you understand that it's

9    important that you answer the questions orally

10   rather than just nodding your head?

11        A.  I do.

12        Q.  And I will do my best to respond in

13   the same way?

14        A.  Yes.

15        Q.  And you understand that you are under

16   oath just as if you were in a court testifying?

17        A.  I do understand that.

18        Q.  There may be some objections made

19   today as the questioning continues.  Many times

20   those are simply questions -- objections to the

21   form of the question to preserve the record.

22   You may still answer the question unless your

23   counsel specifically instructs you otherwise.

24        A.  I understand.

25        Q.  And we just took a break, so it may

KERKMAN - CROSS (Landon)

1    not be necessary for a few minutes and I don't

2    think I'm going to go very long, but if at any

3    time you would like to take a break, please let

4    us know --

5        A.  Thank you.

6        Q.  -- we're all free to come and go.

7            And if you remember something as

8    we're visiting today that you forgot to say,

9    it's okay, later on, if you remember something,

10   to add to an earlier response that would help

11   clarify it or make it more correct, please feel

12   free to bring that up at a later time in the

13   deposition so that we can talk about it; is that

14   okay?

15       A.  Yes.

16       Q.  And if you remember any documents that

17   may assist you in remembering any of the issues

18   that we talk about today, please let me know so

19   that I might -- maybe I have them, maybe we can

20   talk about them or try to get them; is that

21   okay?

22       A.  Yes.

23       Q.  And, finally, what did you do to

24   prepare for your deposition this morning?

25       A.   I actually talked to Cecily earlier in

1     the week, she showed me three exhibits; other

2     than that, nothing.

3          Q.  Okay.  Did -- and I don't want to get

4     into the -- well, did you meet with anybody else

5     in preparation for your deposition?

6          A.  No.

7          Q.  And other than your attorneys, the

8     only individuals you spoke to -- or the only

9     people that you spoke to in preparation for the

10    deposition was your attorneys?

11         A.  That's correct.

12         Q.  And did you review any documents in

13    preparation for the deposition?

14         A.  There were three exhibits that Cecily

15    forwarded me, I think three letters, I believe.

16         Q.  Okay.  Do you recall what those were?

17         A.  There was a letter from Lexmark, a

18    letter from Tech Data, and I think there was

19    another one, but I don't recall which it was.

20         Q.  And what was just the general

21    substance of those letters?

22         A.  They were letters from Lexmark and

23    from Tech Data that -- confirming collection of

24    some -- some liabilities, if you will, I believe

25    from -- from Inacom.

1         Q.   Okay.   Do you recall seeing any

2    similar letters from Dell?

3         A.   No.

4         Q.   And do you recall seeing any

5    letters -- similar letters directed to Dell?

6         A.   No.

7         Q.   Okay.   And did you bring any documents

8    with you today in response -- I know the

9    deposition notice had some categories -- did you

10   bring any documents in response to those?

11        A.   No.

12        Q.   Thank you, sir.   I appreciate just

13   getting that background out of the way.  So

14   that you know where I'm going, I'm going to

15   just ask you some questions, trying to, and I

16   think the right word is going to be probe areas

17   that you may have knowledge of.  If you don't

18   have knowledge, then that's fine, I'm sure

19   your lawyer already told you don't make stuff

20   up, and then we can move on.  So I may ask you

21   questions and you may think it makes no sense

22   why I'm doing that, but it's really just to sort

23   of test where we need to go; is that okay?

24        A.   Yes, it is.

25        Q.   One thing I want to get is you

**BARNES REPORTING SERVICE, INC.**
**COURT REPORTERS**

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

KERKMAN - CROSS (Landon)

1    indicated that you were, from 1995 until

2    January of 2000, vice president of operations

3    for Inacom.  Can you describe for me a little

4    bit more what the vice president of operations

5    does?

6        A.  I was responsible for the purchasing

7    organization, so that -- buying of products

8    from our vendors.  I was responsible for the

9    manufacture or the customization of products

10   for our customers, and then shipping those and

11   deploying those products to our customers.

12       Q.  And when you say you were responsible

13   for it, you were -- does that mean you were the,

14   in a formal term, the head of the department

15   that did those things?

16       A.  That's correct.

17       Q.  And about how many individuals were

18   under your direct supervision?

19       A.  Direct supervision?

20       Q.  And that's -- let me strike that,

21   that's a bad term because I know -- how

22   many individuals would you say were in the

23   departments over which you were responsible?

24       A.  Approximately, a thousand.

25       Q.  In this position as vice president of

KERKMAN - CROSS (Landon)

1    operations, how would you describe your role as

2    it relates to financial reporting of the company

3    of Inacom?

4            A.   No interaction at all.

5            Q.   And how would you describe the --

6    and I know you said no interaction with the

7    financial reporting.  What type of interaction,

8    if any, did you have in your position as

9    vice president of operations with the finance

10   group, so to speak?

11           A.   If there was possible payment or a

12   question on a payment, or something where the

13   vendor organizations that we worked with had --

14   would bring it to me, then I would pass it along

15   to the finance organization.

16           Q.   Okay.  And, other than that, any

17   other -- you know, interaction is not a defined

18   term, but do you understand what I mean by

19   interaction there?

20           A.   You can define it better, please.

21           Q.   I mean, did you, in your position,

22   sort of the dealings in connection with

23   implementing your job responsibilities, what

24   type of dealings in that capacity did you have

25   with any other dealings in implementing your job

**BARNES REPORTING SERVICE, INC.**
COURT REPORTERS

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

1    responsibilities with the finance department?

2         A.   Your question is not clear.

3         Q.   That question was even worse than the

4    first, wasn't it?

5              I'm trying to think of --

6    I know what I'm trying to ask, but I've

7    got to think how to ask it in a way you'll

8    understand.  In your position as vice president

9    of operations, you indicated that you may

10   interact with the finance department in terms

11   of specific payments.  Is there any other type

12   of -- strike that, let me ask this.

13             Did you, as vice president of

14   operations, provide any information to the

15   finance department that they then used in

16   preparing financial books and records for

17   Inacom?

18        A.   No.

19        Q.   Okay.

20             MS. DUMAS:  Excellent question.

21             MR. LANDON:  Thank you.  It took me

22   awhile, but eventually perseverance.

23   BY MR. LANDON:

24        Q.   Sir, did you -- are you aware of

25   the -- and, again, let's define the time, end of

**BARNES REPORTING SERVICE, INC.**
COURT REPORTERS

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

1    1999 -- let's say mid-1999 through January 2000

2    as the time period here, were you aware of

3    Inacom's lending relationships with its banks?

4         A.   No.

5         Q.   And did you provide any information

6    to Inacom in connection with its lending

7    relationships with its banks?

8         A.   No.

9         Q.   And was -- and that was -- and

10   providing such information was not a part

11   of the departments over which you were head

12   as vice president of operations?

13        A.   No, they were not.

14        Q.   Do you know who Inacom's lenders were

15   from, let's say, April 1999 through 2000?

16        A.   No.

17        Q.   Okay.  Were you, or anyone within the

18   departments over which you were responsible,

19   requested to provide information in connection

20   with the obtaining of any credit?

21        A.   I personally do not know of any.

22        Q.   As you sit here today, you don't

23   recall providing such information?

24        A.   That's correct.

25        Q.   And do you recall being requested to

KERKMAN - CROSS (Landon)

1  provide such information?

2       A.  No.

3       Q.  At any time in 1999 or 2000, did

4  you assist in the preparation of any financial

5  projections for Inacom?

6       A.  No.

7       Q.  At any time during 1999 or 2000,

8  did you assist in providing any projections

9  concerning Ebitda for Inacom?

10      A.  No.

11      Q.  And are you aware of any projections

12  prepared by Inacom projecting future financial

13  performance that were prepared during 1999 or

14  2000?

15      A.  No.

16      Q.  You may have answered this, so

17  forgive me:  Did you assist or provide any

18  information in connection with the preparation

19  of an officer's certificate -- let me get it --

20  prepared by Thomas Fitzpatrick at the end of

21  1999 or early 2000?

22      A.  No.

23      Q.  Do you recall seeing such an officer's

24  certificate?

25      A.  No.

**BARNES REPORTING SERVICE, INC.**
COURT REPORTERS

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

1           Q.   Do you know what I'm talking about?

2           A.   No.

3           Q.   Okay.

4                MR. HALLIDAY:   One of your good

5      questions there.

6                MR. LANDON:   I'm cutting to the

7      chase.

8      BY MR. LANDON:

9           Q.   Sir -- and, again, these may be

10     repetitive, but I'm just trying to go down my

11     list here -- did you assist in the preparation

12     of a March 25th, 2000 preliminary balance sheet?

13          A.   No.

14          Q.   Did you or anyone within the

15     departments over which you were responsible

16     provide information in connection with the

17     preparation of a March 25th, 2000 preliminary

18     balance sheet?

19          A.   Not to the best of my knowledge.

20          Q.   And do you recall seeing a March 25th,

21     2000 preliminary balance sheet?

22          A.   No.

23          Q.   Sir, did you or anyone within your

24     department assist with the preparation of a

25     simple balance sheet dated March 31st, 2000?

KERKMAN - CROSS (Landon)

1        A.   No.

2        Q.   Are you aware of anyone within

3   your department assisting with or providing

4   information in connection with the preparation

5   of a simple balance sheet dated March 31st,

6   2000?

7        A.   I am not aware of that.

8        Q.   Sir, did you provide any information

9   in connection with the preparation of an

10  April 22nd, 2000 balance sheet?

11       A.   No.

12       Q.   And, again, all of these questions

13  have been on behalf of Inacom -- Inacom balance

14  sheet?

15       A.   I understand.

16       Q.   Did you or anyone within your

17  department assist with or provide information in

18  connection with the preparation of an April

19  22nd, 2000 balance sheet for Inacom?

20       A.   Not that I'm aware of.

21       Q.   Sir, do you know who a company called

22  Houlihan, Lokey, Howard and Zukin is?

23       A.   No.

24       Q.   Do you recall seeing a solvency

25  opinion by a company called Houlihan, Lokey,

KERKMAN - CROSS (Landon)

1   Howard and Zukin?

2       A.   No.

3       Q.   So I take it that you did not

4   assist in the preparation or provision of any

5   information in connection with the solvency

6   opinion issued by Houlihan, Lokey, Howard and

7   Zukin in early 2000?

8       A.   That's correct, I did not.

9       Q.   Do you have any knowledge concerning a

10  $55.5 million credit facility between Compaq and

11  Inacom?

12      A.   No.

13      Q.   And did you assist in or provide any

14  information to Inacom in connection with the

15  negotiation of a $55.5 million credit facility

16  with Compaq?

17      A.   No.

18      Q.   Same question, but did you provide

19  any information to Compaq in connection with

20  the credit facility?

21      A.   No.

22      Q.   And since it was such a good question

23  the last time, do you know what I'm talking

24  about?

25      A.   No.

1        Q.   Sir --

2                MR. HALLIDAY:   Still a good

3    question.

4                MR. LANDON:   I love it.

5    BY MR. LANDON:

6        Q.   Sir, did you assist in the preparation

7    of -- strike that and start over.

8                Sir, did you assist in the

9    preparation of an 8K file on behalf of Inacom in

10   March of 2000?

11       A.   No.

12       Q.   Did you, or anyone within your

13   department over which you were responsible,

14   provide information in connection with the

15   preparation of an 8K for March 2000 on behalf

16   of Inacom?

17       A.   Not to my knowledge.

18       Q.   Do you recall seeing Inacom's 8K for

19   March 2000?

20       A.   No.

21       Q.   Sir, did you assist in the

22   preparation -- well, let me ask you this

23   question:  Do you know what a borrowing base is?

24       A.   I'm vaguely familiar with the term.

25       Q.   Do you know what a borrowing base

KERKMAN - CROSS (Landon)

1    certificate is?

2          A.  No.

3          Q.  Did you assist in the preparation of a

4    borrowing base certificate for Inacom at any

5    time in 2000?

6          A.  No.

7          Q.  Did you or anyone within the

8    department over which you were responsible

9    assist with or provide information in connection

10   with a borrowing base certificate for Inacom in

11   2000?

12         A.  Not to the best of my knowledge.

13         Q.  As you sit here today, do you have any

14   knowledge concerning the financial condition of

15   Inacom during the year 2000?

16         A.  No.

17         Q.  As you sit here today, do you have any

18   knowledge concerning Inacom's payment of any

19   amounts to either vendors or its lenders during

20   the year 2000?

21         A.  Could you repeat the question?

22         Q.  Let me break it up.  As you sit here

23   today, do you have any knowledge concerning

24   Inacom's payments to its lenders during the year

25   2000?

**BARNES REPORTING SERVICE, INC.**
**COURT REPORTERS**

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

1            MS. DUMAS:  Objection, overbroad.

2    You can answer.

3            THE WITNESS:  Lenders?

4            MR. LANDON:  Lenders, yes, sir.

5            THE WITNESS:  No.

6    BY MR. LANDON:

7        Q.  As you sit here today, do you have any

8    knowledge concerning payments by Inacom to its

9    vendors in the year 2000?

10           MS. DUMAS:  Objection, overbroad.

11   You can answer.

12           THE WITNESS:  Can you clarify the

13   question a little?

14   BY MR. LANDON:

15       Q.  You know, did -- prior to your leaving

16   Inacom in January of 2000, did you have any

17   connection with Inacom's payments to its

18   vendors?

19           MS. DUMAS:  Objection, vague,

20   overbroad.  You can answer.

21           THE WITNESS:  If there would be a

22   vendor who would have a question about, you

23   know, getting paid through my relationship from

24   procuring product from them, I would -- if I

25   would -- they would come to me, I would funnel

1    them -- tell them to go talk to the finance

2    guys.

3    BY MR. LANDON:

4         Q.   After January 2000, did you deal with

5    anyone at Inacom in connection with payments by

6    Inacom to its vendors?

7         A.   No.

8         Q.   After January 2000 -- strike that.

9              After January 2000, did you have

10   any involvement with Inacom in connection with

11   any payments Inacom owed to its vendors?

12              MS. DUMAS:   Objection, overbroad.

13              MR. FORTE:   I'll join in the

14   objection.

15              MS. DUMAS:   Gave it your best shot.

16              THE WITNESS:   After the -- after

17   2000, with Compaq, no.

18   BY MR. LANDON:

19        Q.   And is your -- is it fair to say

20   that your only involvement with the payment

21   of vendors concerns what you mentioned before,

22   attempting to obtain -- well, let's strike that.

23              You mentioned earlier and I didn't

24   write it down, but you mentioned earlier that if

25   somebody came to you and they wanted a payment

1    made to a vendor, you would assist with that; is

2    that correct?

3              MS. DUMAS:  Objection, misstates

4    his prior testimony.

5    BY MR. LANDON:

6         Q.  Why don't you tell me what your prior

7    testimony was so she doesn't have to read it

8    back to us?

9         A.  Okay.  So if -- if -- as part of

10   overseeing the procurement organization, I

11   had dealings with -- with suppliers, and my

12   responsibility for the company was to make sure

13   that they continued to supply us product.  If

14   they had an issue with getting paid, you know,

15   say that they thought there was a discrepancy or

16   something with their receivables versus what we

17   were buying, and if they would bring that to my

18   attention, I would have them discuss that with

19   the finance organization in an attempt to

20   just -- because what's important to me is the

21   product continues to come to us.

22        Q.  And after January 2000, did you

23   continue, in any way, to do that for Inacom?

24        A.  For Inacom, no.

25        Q.  Okay.  And did you continue to do that

1    for Custom Edge?

2        A.   Yes.

3        Q.   Other than that, did you have any

4    involvement with the payment of vendors of

5    Inacom?

6        A.   No.

7        Q.   And then, other than that, did you

8    have any involvement with the payment of vendors

9    by Custom Edge?

10       A.   No.

11       Q.   Prior to January 2000, were you

12   responsible for accounts payable at Inacom?

13            MS. DUMAS:   Objection, vague as to

14   time frame.

15   BY MR. LANDON:

16       Q.   From 1995 through January 2000, were

17   you responsible for accounts payable at Inacom?

18       A.   No.

19       Q.   Who was the head of that, and

20   we'll use the term "department"?  And let's

21   cut the time period, I don't want to ask you

22   to go back to '95.  Let's say from '99 to

23   January -- January '99 to January 2000, do you

24   know, who was the head of the accounts payable

25   department?

1          A.   I think it was Jay Samuelson.

2          Q.   Are you aware of a dispute that

3     developed in 2000 between Custom Edge/Compaq on

4     the one hand and Inacom on the other concerning

5     accounts receivable?

6          A.   No.

7              MR. LANDON:   Go off the record for

8     just a couple of minutes and let me flip through

9     here.  (Counsel reviewing.)

10             (Whereupon, a short recess was had.)

11             MR. LANDON:   Back on the record.

12    BY MR. LANDON:

13         Q.   Sir, were you aware of the existence

14    of a services supply and sales agreement dated

15    February 16th, 2000 by and between Compaq

16    Computer Corporation, ITY Corp. and Inacom

17    Corp.?

18         A.   Yes.

19             MR. LANDON:   I'd ask that you mark

20    this, please.

21             (Whereupon, Exhibit Number 1 was

22             marked for identification.)

23    BY MR. LANDON:

24         Q.   Sir, if you would just take a look at

25    that, if you could, and take as much time as you

**BARNES REPORTING SERVICE, INC.**
COURT REPORTERS

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

1    need.

2        A.    (Witness reviewing.)   Okay.

3        Q.    Have you had a chance to take a look

4    at what's been marked as Exhibit 1?

5        A.    Yes.

6        Q.    What is it?

7            MS. DUMAS:   Objection, lack of

8    foundation.

9    BY MR. LANDON:

10        Q.    Do you recognize it?

11        A.    No.

12        Q.    Have you seen this document before?

13        A.    No.

14        Q.    Do you understand -- and you mentioned

15    that you understood there was a Services, Supply

16    and Sales Agreement?   Go ahead.

17        A.    I believe you asked me if I was aware

18    of an agreement.   I was aware there was an

19    agreement where Custom Edge was going to provide

20    services to Compaq.

21        Q.    Okay.   Do you understand -- or let me

22    ask you this:   What was your understanding of

23    the services that Custom Edge was going to --

24    did you say Inacom (sic) was going to provide to

25    Compaq?

1      A.   I'm sorry, it's Custom -- we were

2  going to provide computer services to Inacom.

3      Q.   Okay.  And so what is your

4  understanding of the services that Custom Edge

5  was going to provide to Inacom?

6      A.   Ship computers to their company -- or

7  their customers.

8      Q.   And do you have any specific knowledge

9  of the terms of the agreement?

10     A.   No.

11     Q.   And did the -- did Custom Edge begin

12  shipping -- did Custom Edge ship computers to

13  Inacom's customers?

14     A.   I believe so.

15     Q.   And when did that start?

16     A.   At the time of the asset sale.

17     Q.   Okay.  Did you have any understanding

18  about how long or the duration of which

19  Custom Edge was going to be shipping computers

20  to Inacom's customers?

21     A.   No.

22     Q.   Did you have any understanding of any

23  requirements concerning the amount or the volume

24  of computers that Custom Edge would ship to

25  Inacom's customers?

KERKMAN - CROSS (Landon)

1        A.  No.

2        Q.  Is it fair to say -- and I don't

3    want to put words in your mouth, so if it's

4    not fair to say, tell me, I just want to

5    pin this down -- is it fair to say that your

6    understanding of the services and supply

7    agreement, as you understood, generally, there

8    was some agreement in which Custom Edge was

9    going to ship computers to Inacom's customers?

10       A.  My understanding was that -- from my

11   perspective, we were going to service their

12   customers with -- you know, we would get orders

13   and we would ship orders.

14       Q.  Was there ever a time, that you are

15   aware of, in which Compaq no longer was shipping

16   computer materials to Inacom's customers?

17       A.  No.

18       Q.  And is there any time in which -- so

19   we don't draw too fine a line -- is there any

20   time, that you are aware of, that Custom Edge

21   no longer was shipping computers to Inacom's

22   customers?

23       A.  No.

24       Q.  Thank you.  Sir, are you -- let's say

25   from January '99 until you left in January --