1    until you left Inacom in January 2000, were you

2    aware of a practice at Inacom of cutting checks

3    on one date, but not actually sending them until

4    later dates?

5        A.   Yes.

6        Q.   When did that practice start?

7        A.   I think it went for -- I can't --

8    I do not know a specific date, but it was at

9    least a full year.

10            MR. LANDON:   Just a couple more

11   areas.  I appreciate it.

12   BY MR. LANDON:

13       Q.   Sir, from January '99 until you left

14   Inacom in January 2000, were you responsible for

15   the accounts receivable department?

16       A.   No.

17       Q.   And did you ever have any occasion

18   to -- or who was the person who would be in

19   charge of or the head of the accounts receivable

20   department from January '99 to January of 2000?

21       A.   I'm not sure.

22       Q.   In your position as vice president of

23   operations, and, again, we'll just limit the

24   time from January of '99 to January of 2000, did

25   you ever have occasion to speak to anyone in the

KERKMAN - CROSS (Landon)

1    accounts receivable department in fulfilling

2    your job responsibilities?

3        A.   Accounts receivable, no.

4        Q.   Sir, in your position as

5    vice president of operations, and, again,

6    the time period we'll be talking about is

7    January of '99 to January 2000, when you left,

8    did you have any role or responsibility in

9    valuing Inacom's inventory?

10       A.   No.

11       Q.   Did you, as vice president of

12   operations for Inacom, from January '99

13   to January 2000, did you have any role or

14   responsibility in monitoring the level of

15   Inacom's inventory?

16       A.   No.

17       Q.   Do you know what department was

18   responsible for valuing Inacom's inventory

19   during that time period?

20       A.   No.

21       Q.   And do you know what response --

22   what department at Inacom was responsible for

23   monitoring the levels of Inacom's inventory

24   during that time period?

25       A.   No.

**BARNES REPORTING SERVICE, INC.**
**COURT REPORTERS**

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

KERKMAN - CROSS (Landon)

1    Q.   And if we now broaden the time

2    period to after you left in January of 2000,

3    do you know who was responsible, at Inacom,

4    for calculating or measuring the value of

5    Inacom's inventory?

6    A.   No.

7    Q.   And do you know who was responsible --

8    or did you have any role -- strike that.

9         Do you know who was responsible,

10   after January 2000, for monitoring the level of

11   Inacom's inventory?

12   A.   No.

13   Q.   From January 2000 -- or from January

14   1999 through January 2000, do you know who was

15   responsible for monitoring and calculating the

16   amount of accounts receivable owed to Inacom?

17   A.   Did you say 1999?

18   Q.   Yes, January '99 through January

19   2000.

20   A.   No.

21   Q.   Okay.  And do you know what department

22   was responsible for monitoring the accounts

23   receivable of Inacom during that time?

24   A.   No.

25        MR. LANDON:  If we could just have

1    a two-minute break, I want to visit and run down

2    my list to make sure.

3                    THE WITNESS:  Can we take five

4    minutes?

5                    (Whereupon, a short recess was had.)

6                    MR. LANDON:  Sir, we're back on the

7    record.

8                    I appreciate your time.  That's all

9    the questions I have at this time.  I may have

10   some after some other people have some, but

11   thank you very much, and we appreciate you

12   coming today.

13                   THE WITNESS:  You're welcome.

14                   MR. HERSEY:  Mr. Kerkman, I have no

15   questions for you at this time.

16                   THE WITNESS:  That's good.

17                   MR. HUNT:  Mr. Kerkman, I do have a

18   couple of questions.

19                   (Whereupon, an off-the-record

20                    discussion was held.)

21                        CROSS-EXAMINATION

22   BY MR. HUNT:

23       Q.  Good morning, Mr. Kerkman.  As I

24   indicated at the outset of the deposition, my

25   name is Steve Hunt and I represent Tech Data

1    Corporation.  Are you familiar with Tech Data

2    Corporation from your time in the operations

3    side of Inacom's business?

4            A.  Yes.

5            Q.  And how are you familiar with Tech

6    Data, sir?

7            A.  We purchased products from Tech Data.

8            Q.  Would you have considered, during your

9    final year with Inacom, Tech Data to have been a

10    significant supplier of product to Inacom?

11            A.  No.

12            Q.  Who would you have considered to be

13    the most significant supplier?

14            A.  Compaq, IBM and Hewlett-Packard.

15            Q.  After the time that you left KPMG Peat

16    Marwick, did anyone on the audit team for KPMG

17    stay on the Inacom account, say, through the

18    time you left Inacom?

19            A.  Can you elaborate a little more?

20            Q.  Yes.  I presume that other persons at

21    KPMG worked with you on the audit team for

22    Inacom?

23            A.  Yes.

24            Q.  How many other persons do you recall,

25    at the time that you left KPMG, were involved on

1   the audit team?

2        A.  Probably three.

3        Q.  Did you maintain contact with those

4   persons after you left KPMG?

5        A.  Yes.

6        Q.  Through 1995, say?

7        A.  Yes.

8        Q.  After you switched to operations,

9   would you have had any need to stay in

10  communication with them?

11       A.  Only on a social basis.

12       Q.  Would you explain to me the

13  decision-making process that entered your

14  mind when you were presented with the

15  opportunity to leave Inacom to join the

16  new Custom Edge venture?

17       A.  There wasn't a choice; I was part of

18  the asset sale, part of the organization that I

19  ran was sold to Compaq.

20       Q.  In operations, did you have any

21  involvement with the services side of Inacom's

22  business?

23       A.  No.

24       Q.  So would it be a fair statement that,

25  as head of operations, you were pretty much

1    solely concerned with the hardware side of the

2    business of Inacom?

3        A.   That's correct.

4        Q.   At the time that you left Inacom, did

5    you have any stock options or other monies that

6    were owed to you by Inacom?

7        A.   Yes.

8        Q.   At the time of the bankruptcy case in

9    June of 2000, were you similarly still owed

10   stock options or other monies?

11       A.   No.

12       Q.   With the new Custom Edge company at

13   the time that you started, was there any value

14   to Custom Edge for maintaining existing supply

15   lines from Inacom's vendors?

16       A.   Yes.

17       Q.   After the implementation of the asset

18   purchase in February of -- mid-February of 2000,

19   did Custom Edge start doing business with any

20   significant new vendors in terms of volume?

21       A.   Not significantly new, no, I do not

22   believe so.

23       Q.   Were you consulted with prior to the

24   implementation of the asset purchase agreement

25   regarding methods by which existing supply lines

**BARNES REPORTING SERVICE, INC.**
COURT REPORTERS

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

1    could be maintained from old Inacom vendors

2    over to the new Inacom -- the new Custom Edge

3    division?

4        A.   No.

5        Q.   Did you have an understanding

6    regarding any provisions that would be made by

7    Custom Edge for maintaining existing supply

8    lines from old Inacom vendors to the new

9    company?

10       A.   I -- yes.

11       Q.   Could you identify or explain to me

12   what that understanding was?

13       A.   Some -- obviously, the -- a number of

14   the vendors that we were doing business with we

15   wanted to continue to do business with after the

16   asset purchase or sale, whichever side you were

17   on, and we just wanted to continue to maintain

18   those relationships with those vendors, and

19   continue to procure product from them.

20       Q.   Did you have any understanding as to

21   whether Custom Edge sought to maintain the same

22   old accounts, if you will, from certain of its

23   vendors?

24       A.   No, we did not want to maintain the

25   same old accounts.

1      Q.   Who had the ultimate decision-making

2  authority regarding whether old account

3  relationships would be maintained with Inacom

4  vendors or not?

5      A.   I do not recall who had -- who drove

6  the decision process around that, but I know

7  that I recall having discussions on, you know,

8  these vendors we will, you know, set up a new

9  payable with and, you know, we're the new

10  company and we'll continue buying from them.

11     Q.   Is there any typical delay in setting

12  up a new account with a vendor in terms of

13  coding or links for products that would be

14  purchased going forward?

15     A.   There probably was not much of a

16  delay there because we were continuing to use,

17  I think, some of the same systems that we had

18  before, as a matter of, like, you know, changing

19  the digit on an account, on a new account versus

20  an old account, I believe.

21     Q.   Can you explain what you mean by

22  "systems"?

23     A.   The accounts payable system, for

24  instance, that Custom Edge used was the same

25  accounts payable, the -- the system was the

1    same.  I think the assets of the system were

2    purchased by Compaq as well, if my memory serves

3    me correctly.

4          Q.   Would you have knowledge as to whether

5    there would be any delays on the vendor side in

6    terms of delays for setting up new product lines

7    or new accounts?

8          A.   I wouldn't have that knowledge.

9          Q.   Did you work with Mr. Frasca?

10         A.   Yes.

11         Q.   Both before and after the asset

12   purchase?

13         A.   Yes.

14         Q.   How about Mr. Wells?

15         A.   No.

16         Q.   Do you still work with Mr. Frasca?

17         A.   We work for the same company.  He does

18   not work in my organization.

19         Q.   Did you ever work in the same division

20   of a company?

21         A.   With Mr. Frasca?

22         Q.   With Mr. Frasca.

23         A.   Yes.

24         Q.   So, starting on the outside and

25   working in, you worked both in operations?

**BARNES REPORTING SERVICE, INC.**
COURT REPORTERS

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

1        A.  Yes.

2        Q.  Did you both work in procurement?

3        A.  That was one of the areas I was

4    responsible for.

5        Q.  And would he have been under your

6    responsibility?

7        A.  Yes.

8        Q.  Once you hit the vice president level

9    at Inacom, were you considered an executive

10   officer of the company?

11       A.  For a period of time, yes.  I do not

12   believe I was an executive officer at least for

13   the last six months of 1999.

14       Q.  Could you explain why that is, sir?

15       A.  I'm using the term "executive officer"

16   with respect to being a public company.  I --

17   I -- as the new management changed from Bill

18   Fairfield to Jerry Gagliardi, there was some

19   shifting around at the time that Gagliardi came

20   in, he changed the makeup of the management

21   team.

22       Q.  Okay.  Are you aware of the pendency

23   of any litigation by the Securities and Exchange

24   Commission with respect to former Inacom

25   officers?

1          A.   I have knowledge of that, yes.

2          Q.   Were you interviewed by any parties

3     with respect to that SEC litigation?

4          A.   No, I was not.

5          Q.   Did you acquire any of the knowledge

6     regarding that litigation subject matter

7     firsthand, or just collaterally from people

8     you talked to?

9          A.   Collaterally, from people and

10    newspapers.

11         Q.   During the time that you were with

12    Inacom, did you ever review SEC public filings

13    after they were filed?

14         A.   Can -- what's the time frame?

15         Q.   Say your last two years with the

16    company.

17         A.   No.

18         Q.   How about after you left the company?

19         A.   No.

20         Q.   Would it pretty much have been

21    restricted to the time that you were in the

22    finance arm of Inacom?

23         A.   That's correct.

24         Q.   As a person responsible for

25    procurement at Custom Edge, was it important

1    to your mission to maintain an uninterrupted

2    supply of product to Custom Edge?

3        A.   Yes.

4        Q.   Do your responsibilities extend to the

5    fabrication of product by Custom Edge at the

6    time that you were working for Custom Edge?

7        A.   Fabrication, what --

8        Q.   Assembly of any product.

9        A.   We would build -- we would buy things

10   from people and manufacture them, yes.

11       Q.   Have you ever heard the term

12   "aggregator" used in connection with Inacom?

13       A.   Yes.

14       Q.   Would you be able to explain what that

15   term means in connection with Inacom?

16       A.   Probably a number of different

17   definitions.  My definition of an aggregator is

18   you're purchasing parts or systems from a number

19   of different people, aggregating them together

20   and then sending them to a customer.

21       Q.   While at Custom Edge, did you have

22   any further need for services that might have

23   been provided by Inacom for Custom Edge?

24       A.   No.

25       Q.   Did you have any knowledge regarding a

KERKMAN - CROSS (Hunt)

1    possible acquisition of the services business

2    side of Inacom by any entities?

3         A.  No.

4         Q.  Have you spoken to Mr. Frasca

5    recently, sir?

6         A.  Yes.

7         Q.  Have you spoken regarding the subject

8    matter of this litigation?

9         A.  No.

10        Q.  Did he know you were going to be

11   deposed?

12        A.  Yes.

13        Q.  Do you know that he's going to be

14   deposed next week?

15        A.  Yes.

16        Q.  Would you have considered yourself, to

17   speak colloquially, at the top of the food chain

18   in the procurement side of Custom Edge at the

19   time that you were there?

20        A.  As it related to the division I was

21   working in, yes.

22        Q.  Would it be possible, again,

23   colloquially --

24             MR. HUNT:  Sorry, Cecily.

25             MS. DUMAS:  That's okay.

1    BY MR. HUNT:

2         Q.  -- to figure out where Mr. Frasca

3    would have fit in that food triangle?

4         A.  John reported to me.

5         Q.  Were there persons between yourself

6    and Mr. Frasca in that chain of authority?

7         A.  Not at that time, no.

8         Q.  Did Mr. Frasca report directly to you

9    at Inacom as well?

10        A.  Yes.

11        Q.  Did you both migrate from Inacom to

12   Custom Edge at the same time?

13        A.  Yes.

14        Q.  Did Mr. Frasca have authority to make

15   decisions regarding methods by which old vendors

16   would be compensated by Custom Edge?

17             MR. FORTE:  Objection to form; "old

18   vendors."

19             MR. HUNT:  You can answer.

20             THE WITNESS:  I don't believe

21   that -- that he had that responsibility, no.

22   BY MR. HUNT:

23        Q.  Would you have had that responsibility?

24        A.  No.

25        Q.  Do you recall Mr. Frasca's title when

KERKMAN - CROSS (Hunt)

1    he joined Custom Edge?

2         A.   Vice president of something.   I

3    don't -- I know he was a vice president, but I

4    don't recall the exact title.

5         Q.   Did you use the existing computer

6    systems of Inacom when Custom Edge started up

7    operations?

8         A.   Yes, those were purchased assets of my

9    company.

10        Q.   So, to sum up, there was some accounts

11   receivable, accounts payable systems that were

12   maintained going forward --

13        A.   Yes.

14        Q.   -- for example?

15        A.   Yes.

16        Q.   Was there an electronic mail

17   communications system that was also used from

18   the old company to the new?

19        A.   Yes, we used the same one for awhile.

20        Q.   Where did you and Mr. Frasca sit in

21   relation to each other while you worked during

22   your last six months at Inacom?

23        A.   Right next door to each other.

24        Q.   How about after you started with

25   Custom Edge?

1          A.   Right next door to each other.

2              MR. HUNT:  Thank you, Mr. Kerkman.

3              THE WITNESS:  Thank you.

4              MR. HUNT:  Pass the witness.

5              MR. FORTE:  I'm Earl Forte.  I have

6    no questions for the witness.

7              MR. NOLAN:  I have no questions.

8              MS. DUMAS:  We'll -- off the

9    record.

10          (Whereupon, an off-the-record

11              discussion was held.)

12              MR. HUNT:  I'll be happy to ask,

13   just to keep the record clear.

14              MS. DUMAS:  That'd be great,

15   Steve.  Thanks.

16   BY MR. HUNT:

17          Q.   Mr. Kerkman, we took a short break and

18   I just wanted to ask you a final one or two for

19   clarification.

20              Can you be more specific in terms

21   of testifying as to the time frame by which you

22   left Inacom and joined Custom Edge?

23          A.   Certainly.  The actual transaction

24   date, I believe, was in mid-February, so I

25   worked as an employee of Inacom right to the

**BARNES REPORTING SERVICE, INC.**
**COURT REPORTERS**

POST OFFICE BOX 144
BOYSTOWN, NEBRASKA 68010

402-330-7796
FAX 402-330-3227

KERKMAN - CROSS (Hunt)

1    date of the closing of -- of the asset purchase

2    and then started immediately at Custom Edge.

3         Q.  Would I be correct in assuming that

4    there were pass-through responsibilities that

5    existed that you handled prior to the closing

6    date, and they continued, uninterrupted, after

7    the closing date?

8         A.  That is correct.

9         Q.  So you had essentially performed the

10   same job function, it just changed the brand

11   name as of the closing date?

12        A.  That is correct.

13             MR. HUNT:  Thank you.

14             MR. HALLIDAY:  We are done, sir.

15   Thank you for your time.

16             THE WITNESS:  I appreciate it.

17             MR. CHAVES:  Mr. Kerkman, you

18   understand that your testimony today will be

19   typed up by the court reporter, put in a booklet

20   form, that transcript is going to be sent to

21   my office and we'll, in turn, send it to you.

22   You're going to have the opportunity to review

23   that transcript, make any changes if you see

24   anything inaccurate in the booklet.  Just so

25   you know that if you do make any changes, any

1    of the attorneys here today can use that to

2    comment on your credibility at any proceeding

3    in the future, any hearing or trial.

4                    You'll sign the booklet, send it

5    back to my office and then Mr. Halliday will

6    retain the original for use at the time of

7    trial.

8                    THE WITNESS:  I understand.

9                    MR. HALLIDAY:  Thank you very

10   much.

11                   (Whereupon, this deposition was

12                    concluded at the hour of 11:04 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                 <u>SIGNATURE PAGE</u>

4

5

6

7          _____
8                    LEON KERKMAN

9

10    STATE OF NEBRASKA   )
                          ) ss.
11    COUNTY OF_____)

12

13

14         Subscribed and sworn to before me this
      _____ day of_____, 2005.

15

16

17         _____
                  GENERAL NOTARY PUBLIC

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4


5

     STATE OF NEBRASKA  )
6                      ) ss.
     COUNTY OF DOUGLAS  )

7


8          I, Denise J. Lukasiewicz, Court
     Reporter and General Notary Public in and
9    for the State of Nebraska, do hereby certify
     that LEON KERKMAN was by me duly sworn to
10   testify the truth, the whole truth, and nothing
     but the truth, and that the deposition by him
11   as above set forth was reduced to print under
     my direction by means of computer-assisted
12   transcription.

13         That the within and foregoing deposition
     was taken by me at the time and place herein
14   specified and in accordance with the within
     stipulations; the reading and signing of the
15   witness to his deposition having not been
     waived.

16
           That I am not counsel, attorney, or
17   relative of any of the parties involved, or
     otherwise interested in the event of this suit.

18
           IN TESTIMONY WHEREOF, I have placed my
19   hand and notarial seal this 27th day of April,
     2005.

20

21

22         _____
           DENISE J. LUKASIEWICZ
23         COURT REPORTER AND
           GENERAL NOTARY PUBLIC

24

25


**BARNES REPORTING SERVICE, INC.**
**COURT REPORTERS**

POST OFFICE BOX 144                                402-330-7796
BOYSTOWN, NEBRASKA 68010                           FAX 402-330-3227

April 27, 2005

Mr. Leon Kerkman
c/o Mr. Brandon C. Chaves
Attorney at Law
FRIEDMAN, DUMAS & SPRINGWATER, L.L.P.
One Maritime Plaza, Suite 2475
San Francisco, CA  94111

Dear Mr. Kerkman:

        As you will recall, your deposition
was taken on March 25, 2005, at the HILTON
HOTEL OMAHA, Prague Room, 1001 Cass Street,
Omaha, Nebraska.  You reserved your right to
read and sign your deposition.

        Please read your enclosed deposition.  If
you have any corrections, please list them on
the enclosed errata sheet.  Note the page, the
line number, the correction, and the reason for
the correction.

            DO NOT WRITE ON THE TRANSCRIPT.

        Please sign the Signature Page (Page 68)
before a Notary Public and return these to me in
the enclosed, self-addressed, stamped envelope
within 30 days of its receipt.

                        Sincerely,



                        Denise J. Lukasiewicz
                        Court Reporter

Enclosures

**BARNES REPORTING SERVICE, INC.**
**COURT REPORTERS**

POST OFFICE BOX 144                                    402-330-7796
BOYSTOWN, NEBRASKA 68010                        FAX 402-330-3227

```
1    CAPTION: Inacom vs. Tech Data, et al.
     DEPOSITION OF: Leon Kerkman
2    TAKEN ON: March 25, 2005

3    _____ NO CORRECTIONS

4

5    PAGE   LINE          CORRECTION          REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

**BARNES REPORTING SERVICE, INC.**
**COURT REPORTERS**

POST OFFICE BOX 144                              402-330-7796
BOYSTOWN, NEBRASKA 68010                         FAX 402-330-3227



EXHIBIT

Kerkman 1
3-25-05    DD

## SERVICES, SUPPLY AND SALES AGREEMENT

SERVICES, SUPPLY AND SALES AGREEMENT (the "Agreement"), dated as of February 16, 2000, by and between Compaq Computer Corporation, a Delaware corporation ("Compaq"), ITY Corp., a Delaware corporation and a wholly-owned subsidiary of Compaq ("Compaq Sub"), and InaCom Corp., a Delaware corporation ("Inacom").

### RECITALS

WHEREAS, Compaq Sub, Compaq and Inacom have entered into an Asset Purchase Agreement dated as of January 4, 2000, as amended (the "Asset Purchase Agreement");

WHEREAS, the execution of this Agreement is a condition to Compaq Sub acquiring, and Inacom disposing of, the Purchased Assets (as defined in the Asset Purchase Agreement) in connection with the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereto hereby agree as follows:

### ARTICLE I.

### AGREEMENT TO COOPERATE

SECTION 1.1. Services Agreement. Compaq agrees to assist Inacom in the generation of incremental revenues for InaCom's service business as provided in the Service Level Agreement dated as of February 16, 2000 between Compaq and Inacom (the "Service Level Agreement"), and the terms of the Service Level Agreement are incorporated by reference herein.

SECTION 1.2. Supply. In connection with Inacom's computer services business, Compaq Sub and Inacom agree as follows:

The parties agree that when Inacom places an order with Compaq Sub for hardware and Procurement Services, as defined below, Compaq Sub will invoice the amount directed by Inacom and collect from the customer for the invoiced amount; provided that Inacom, acting as an agent of Compaq Sub, shall have entered into an agreement with the customer relating to the acquisition of such hardware and Procurement Services, in form and substance reasonably acceptable to Compaq Sub. Such agreement shall include a grant of a purchase money security interest in favor of Compaq or Compaq Sub, as appropriate, on all hardware and related software licenses supplied by Compaq Sub. From these collected amounts, Compaq Sub will retain its sales price for hardware and Procurement Services, and pay the remaining proceeds to Inacom as an agency fee. As used herein, "sales price" shall mean, (i) with respect to hardware, Compaq's actual cost (excluding the impact of volume incentive rebates) with respect to third party hardware and US1 or TOSS price, whichever is applicable, with respect to Compaq's hardware, and (ii) with respect to Procurement Services, the fees as per the Fee Schedule. In the event that the invoiced amounts are insufficient to cover the sales price of the hardware and Procurement

Defendants Ex. 54