1               UNITED STATES DISTRICT COURT
                   DISTRICT OF DELAWARE
2                CASE NO. 04-CV-583

3   ------------------------------------------------------

           **DEPOSITION OF WILLIAM A. SCHUETTE**

4

5   ------------------------------------------------------

   INACOM CORP. on behalf of all         PLAINTIFF
6   affiliated debtors

7   v.

8   LEXMARK INTERNATIONAL, INC.        DEFENDANT

9   LEXMARK INTERNATIONAL, INC.       THIRD-PARTY
                                  PLAINTIFF
10  v.

11  COMPAQ COMPUTER CORP., ITY CORP.,    THIRD-PARTY
    and CUSTOM EDGE, INC.          DEFENDANTS
12  ------------------------------------------------------

13       The deposition of **WILLIAM A. SCHUETTE** was

14  taken on behalf of the plaintiff, Inacom Corporation,

15  before Ann Hutchison, Registered Professional Reporter

16  and Notary Public in and for the State of Kentucky at

17  Large, at the law office of Stoll, Keenon & Park, 300

18  West Vine Street, Suite 2100, Lexington, Kentucky, on

19  Tuesday, February 8, 2005, beginning at the hour of 1:55

20  p.m.  Said deposition was taken pursuant to Rule 30 of

21  the Federal Rules of Procedure and Rule 7030 of the

22  Federal Bankruptcy Procedure.

23  ------------------------------------------------------

24            **ACTION COURT REPORTERS**
             184 North Mill Street
25          Lexington, Kentucky 40507
               (859) 252-4004

1                       APPEARANCES

2

3    COUNSEL FOR PLAINTIFF INACOM CORPORATION:

4         Jeffrey P. Nolan
          Pachulski, Stang, Ziehl, Young & Jones
5         10100 Santa Monica Boulevard, 11th Floor
          Los Angeles, California 90067-4100

6

7    COUNSEL FOR THIRD-PARTY DEFENDANT COMPAQ:

8         Cecily A. Dumas
          Friedman, Dumas & Springwater, LLP
9         One Maritime Plaza, Suite 2475
          San Francisco, California 94111

10

11   COUNSEL FOR DEFENDANT AND THIRD-PARTY PLAINTIFF
     LEXMARK INTERNATIONAL, INC.:
12
          Culver V. Halliday
13        Stoll, Keenon & Park, LLP
          2650 Aegon Center
14        400 West Market Street
          Louisville, Kentucky 40202-3377
15

16   ALSO PRESENT:

17        Kevin Sarkisian

18

19

20

21

22

23

24

25

1                          **INDEX**

2

3   DEPONENT:  **WILLIAM A. SCHUETTE**                    PAGE

    EXAMINATION BY:

4        Mr. Nolan .................................    4
         Ms. Dumas .................................   65

5        Mr. Nolan .................................   97

6   REPORTER'S CERTIFICATE ..........................   99
    SIGNATURE PAGE ..................................  100

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **WILLIAM A. SCHUETTE**

2    having been first duly placed under oath, was examined

3    and testified as follows:

4                       **EXAMINATION**

5    BY MR. NOLAN:

6         Q.    Can you please state your full name for

7    the record.

8         A.    William A. Schuette.

9         Q.    Mr. Schuette, have you ever had your

10   deposition taken before?

11        A.    Once before.

12        Q.    How long ago was that?

13        A.    Thirty some years ago.

14        Q.    Okay.

15              MS. DUMAS:  When you were 12?

16              THE WITNESS:  Yeah, I wish.

17        Q.    Let me just go through a little bit of the

18   ground rules quick for you --

19        A.    Okay.

20        Q.    -- so you understand.  I want you to

21   appreciate what's going on today.  This is an informal

22   setting.  You can take a break any time you want.  If

23   you want to stretch your legs, run to the rest room, get

24   something to eat, simply ask me to take a break, I'd be

25   more than happy to do that.  Is that fair?

1        A.       Yeah.

2        Q.       Everything that's being said in this room

3   today is going to be taken down by the court reporter

4   and placed in a booklet form at a later date for you to

5   review.  It's very important, then, that your responses

6   be audible.  Kind of minimize the hand gestures, if you

7   can.  And try to say, you know, yes and no, as opposed

8   to uh-huh and huh-uh, shakes, nods of the head and such.

9   Do you understand that?

10       A.       Yes.

11       Q.       Okay.  You will also have an opportunity

12  at a later date to make any modifications to your

13  deposition testimony given here today.  I'd like to just

14  caution you, though, if you make any changes of a

15  substantive nature, then any lawyer who's present at

16  time of trial can comment upon that change to, you know,

17  reflect, you know, your inability to recall a fact

18  accurately or to impeach your testimony.  Are you aware

19  of that?

20       A.       I am now.

21       Q.       Okay.  Is there any reason you can't give

22  me your best testimony today?  Are you under the

23  influence of any of type of medication --

24       A.       No.

25       Q.       -- anything that might inhibit your

1   ability to testify?

2        A.    No.

3        Q.    Also, you're going to be able to

4   anticipate my question before I'm actually finishing the

5   question, and in a lot of cases I'll probably be able to

6   anticipate your answer before you even finish answering.

7   But for the purposes of having a nice, clean transcript,

8   give me a second after I finish my question before you

9   answer, and I'll similarly try to do that as well.  Is

10  that fair?

11       A.    Yes.

12       Q.    Okay.  We're going to be asking you some

13  things today that have to do with events that occurred a

14  number of years ago.  I don't want you to guess.

15  However, if you have a recollection or an impression or

16  an understanding, or you have a recall of it personally

17  or someone telling you something, I'm entitled to get

18  your best recollection or estimate of what occurred.  Is

19  that fair?

20       A.    That's fair.

21       Q.    If I ask you something you just don't

22  know, just tell me you don't know.  That's a fair

23  response as well.

24       A.    Okay.

25       Q.    Can you tell me when you were employed

1    with Lexmark?

2          A.      I originally started with IBM in September

3    of 1976, and I just retired from the company last Friday

4    so it was about 29 and a half years, close to that.

5          Q.      Okay.  So you started in September 1976

6    with IBM?

7          A.      Right.

8          Q.      What was your position?

9          A.      At that time I was a salesman.

10         Q.      And what was the next title you held with

11   IBM?

12         A.      Probably -- well, I started off as a sales

13   rep; then I became marketing rep; then I became an

14   account rep; then I went to Boca Raton in a staff

15   position with the PC group.  I then became a senior

16   staff person in Boca Raton.  Then I went to Ft.

17   Lauderdale, Florida to be a marketing manager; then I

18   went to Detroit, Michigan to be an account exec; then I

19   went with the new company when the division was sold to

20   Clayton Dubilier, I think that was '91.  I think that

21   was the year, I'm not -- '90 or '91.  And I was a

22   district sales manager in Atlanta, and then I became --

23   an opening opened up out in the west, and I became a

24   district sales manager in Phoenix.

25         Q.      So let's just see if we can pin this down

1  chronologically.  1976 you start with IBM.

2      A.    Right.

3      Q.    You started as a salesman and you became a

4  marketing representative?

5      A.    Right.

6      Q.    What year did you become a marketing

7  representative?

8      A.    I don't know, a year later maybe.

9      Q.    1977?

10     A.    Yeah.

11     Q.    And when did you become an account

12  representative?

13     A.    About the following year.

14     Q.    1978.

15     A.    Yeah.

16     Q.    Then you say you took a staff position

17  with the PC group?

18     A.    Right.

19     Q.    What year was that?

20     A.    September of '83.  I had been in the

21  products center before that for about -- as a rep for

22  about -- an account rep for about, I don't know, nine

23  months, nine months to a year.

24     Q.    Okay.  So from 1978 to about 1982 you're

25  an account representative?

1          A.      In the field, selling for the office

2     products division.

3          Q.      And how long were you with the staff

4     position with the PC group?

5          A.      September of '83, and I think it was

6     January 1st of '87 that I became a marketing manager.    I

7     should have brought my resume with me, then we could

8     just...

9          Q.      We'd fly through it.

10          You mention then you took off as senior

11     staff in Boca Raton, senior staff person?

12          A.      Yeah, and that was probably '85 maybe,

13     January '85.  I don't recall exactly when I became a

14     senior staff -- I mean, there's just kind of a --

15     there's a higher pay scale.  I just moved to a higher

16     pay scale, basically.  I mean, I did the same function.

17     It was just based on performance.  I went from like a

18     regular staff guy to a senior staff guy.

19          Q.      Okay.  And what do you do as a marketing

20     manager?

21          A.      Well, you have anywhere from four to six

22     people who work for you who are sales people, and you're

23     responsible to oversee their activities.

24          Q.      And what were you selling?

25          A.      At that time, typewriters and supplies.

1          Q.      Okay.  And then the next position was a

2    marketing manager in Ft. Lauderdale, I think you said?

3          A.      Wait a minute.  I thought you just asked

4    me about being a marketing manager.

5          Q.      I said senior staff in Boca Raton.  I

6    thought there was another --

7          A.      Okay.  Senior staff when I was -- what I

8    just explained to you was what you do as a marketing

9    manager, you have four to six people.

10         Q.      Right.

11         A.      And as a senior staff person, I was

12   involved with gray market activity, which meant people

13   who were selling illegally to other places where they

14   shouldn't, and so we would go out and do audits, things

15   of that nature.

16         Q.      And that's what you did?

17         A.      That's as a senior staff person.  I had

18   other responsibilities.  I did business shows, stuff

19   like that.

20         Q.      What year were you in the gray market

21   oversight, auditing gray market matters?

22         A.      Probably '84, '85 time frame.

23         Q.      What's the next position or change in

24   title that you had at IBM after senior staff person?

25         A.      That was when I was made a marketing

1    manager in Ft. Lauderdale.

2          Q.      And when were you -- for what time period

3    were you a marketing manager?

4          A.      '87 until -- let's see.  It was two years,

5    so I was there '86 through '87, I believe.  And then I

6    went to Detroit as an account exec for '88, '89 and '90.

7          Q.      And what were your job duties as a

8    marketing manager?

9          A.      That was the four to six people, four to

10   six people that worked for me.

11         Q.      As an account executive, is that correct,

12   account executive in Detroit?

13         A.      Right.

14         Q.      What were your job duties and

15   responsibilities as an account executive?

16         A.      I was responsible for the executive

17   relationships with the company called Inacomp --

18   c-o-m-p, not Inacom but Inacomp -- and I had one

19   marketing manager that worked for me, and he had about,

20   gosh, I can't remember exactly, eight or nine people

21   that worked for him.  We had reps across the country.

22         Q.      And when you dealt with Inacomp, where

23   were they out of?

24         A.      Detroit, Michigan.  That's where I was.

25         Q.      And as an account executive, was that all

1   in the sales end?

2        A.     Yeah.

3        Q.     So you were basically selling product to

4   these folks, and they are customers or resellers?

5        A.     They were resellers.

6        Q.     And what type of product were you selling?

7        A.     Personal computers, printers, displays,

8   some software.

9        Q.     And the next position you held, I think

10  1990 when you said you were a district sales manager?

11       A.     1991; I believe that's the year I moved to

12  Atlanta as a district sales manager for Lexmark,

13  correct.

14       Q.     And were your job duties any different?

15       A.     I didn't have a marketing manager working

16  for me.  It was more like first line level manager job.

17  And it was still -- obviously, we didn't sell PCs

18  anymore because we're the printer division, so I had

19  gone back, then, selling typewriters, supplies and

20  printers, and primary selling to resellers.

21       Q.     How long were you district sales manager

22  down in Atlanta?

23       A.     Until January of '97.  That's when I moved

24  to Phoenix.  Same job, different set of resellers but

25  the same job.

1      Q.      Same specialty as well, printers,

2  typewriters?

3      A.      No.  No typewriters at that point.  We --

4  I quit being involved with typewriters probably '94

5  maybe, '95.  I don't recall exactly when we quit selling

6  them, but we moved all of the responsibilities to

7  Lexington.  I think it was in the '94, '95 time frame,

8  and then we started specializing in printers.  I don't

9  remember the exact year.  It was either '94 or '95 that

10  that happened.

11      Q.      Okay.  Same job duties and

12  responsibilities in Phoenix, just different customers?

13      A.      Right.  A different set of customers,

14  right.

15      Q.      How many folks working underneath you in

16  Phoenix, if anybody?

17      A.      It varied.  Anywhere from four to five.

18      Q.      And how long were you a district sales

19  manager in Phoenix?

20      A.      Until January of 2001.  And for about

21  three months I was then a district sales manager in the

22  end user community, which is selling to customers, and

23  my district was dissolved about -- because of -- we

24  didn't want to have a developmental district anymore and

25  at that point in time I went to work with the Alliance

1    Group, and that's where I've worked since that time

2    frame.

3         Q.    So when you were district sales manager in

4    Phoenix are you employed by IBM?

5         A.    No, Lexmark.

6         Q.    By Lexmark.

7         A.    When I came to Atlanta, that's when I

8    became Lexmark.

9         Q.    Okay.

10         A.    The division was sold to a company by the

11    name of Clayton Dubilier, who then changed the name to

12    Lexmark.

13         Q.    And how do you spell Dubilier?

14         A.    I have no idea.  D-u-b -- it's French.  I

15    used to know, but I don't anymore.

16         Q.    Okay.  So from 1991 until your time of

17    retirement you worked for Lexmark?

18         A.    Yes.

19         Q.    And now who is the Alliance Group?

20         A.    Alliance, that means I was working with

21    IBM and Dell, and they are people who buy our printers

22    and we put their logo on our printers and they resell

23    them.  During that time I had responsibility for both

24    Dell and IBM for the western half of the country.

25         Q.    And this position was from January 2001

1  until when?

2          A.      Till I retired last Friday.

3          Q.      Last Friday.

4          A.      Yeah.

5          Q.      Okay.  We'll give you the whole month of

6  January.

7          A.      All right.  I wish they'd do that for my

8  pay.

9          Q.      Are you currently employed with anyone

10  else?

11          A.      Yes.

12          Q.      Who are you employed with?

13          A.      A company by the name of MMI.

14          Q.      And what does MMI stand for, if anything?

15          A.      Motorcycle Mechanics Institute.  It's a

16  division of a company by the name of UTI, which is

17  United Technology Institute.

18          Q.      And what's your position at Motorcycle

19  Mechanics Institute?

20          A.      I am the national accounts sales director

21  for motorcycle and marine OEMs.

22          Q.      And what would be your job duties and

23  responsibilities holding that position?

24          A.      Well, I'm not sure of all the

25  responsibilities because I haven't gotten there, but

1    it's basically to interface with the manufacturers,

2    Harley Davidson, Suzuki, Evinrude, people like that, to

3    make sure that the curriculum that we've got set up for

4    the training meets their requirements, as well as they

5    provide free motorcycles and equipment for the students

6    to work on, so I have to keep that flow going and try to

7    develop more business.

8         Q.    Okay.  Have you started yet?

9         A.    Tomorrow.

10        Q.    Tomorrow.

11        A.    I think I'm on the payroll with them, but

12   I haven't actually started.

13        Q.    Did Lexmark have offices out of Phoenix

14   when you worked as a district sales manager?

15        A.    Yes.

16        Q.    I'm going to focus now on you being the

17   district sales manager in Phoenix.  That's the title you

18   held the entire time you were in Phoenix?

19        A.    Well, other than when I went to the

20   Alliance Group, you know, in 2001.

21        Q.    Okay.  Who did you report to as district

22   sales manager in the Phoenix location?

23        A.    Bob Kendrick.

24        Q.    Anybody else?

25        A.    No.

1          Q.      And who was below you as far as who

2   reported to you when you were the district sales

3   manager?

4          A.      You want all their names?  People who left

5   and...

6          Q.      Well, let's limit it to the 1999 time

7   frame.

8          A.      To the 1999 time frame.

9          Q.      Yeah.

10         A.      Let me think.  I think Greg Weeking, I

11   believe worked for me at that time, Susan Bandy.

12         Q.      Let me ask you this.  This might simplify

13   things.

14         A.      Sales reps worked for me.

15         Q.      Okay.  That's the next question.  And

16   approximately how many sales reps did you have

17   underneath you in the 1999 time frame?

18         A.      I'm not sure.  I'd have to go back and

19   look, but probably four to five people.

20         Q.      At any given time, four to five people?

21         A.      Right.

22         Q.      And what was your job with respect to the

23   sales reps?

24         A.      Supervisor.  Assist them on sales calls

25   when necessary, any coaching that would be required.

1    You know, basically a sales and marketing job.

2          Q.     And they are selling to who?

3          A.     Resellers.

4          Q.     Anybody below the sales reps, or you hit

5    the client at that point, the reseller?

6          A.     In 1999?

7          Q.     Yeah.

8          A.     No.

9          Q.     Do you know who the sales rep was in the

10   1999 time frame with Inacom?

11         A.     I think it was a guy, but he did not work

12   for me -- wait a minute.  I'm trying to think here.  I

13   took Inacom over in the January time frame of 2000, and

14   I believe the rep that had that account was the same guy

15   who came to report to me, and that would have been Brad

16   Funk, but he didn't work for me in 1999.

17         Q.     Okay.  So Brad Funk is the sales rep with

18   Inacom so -- and he's not underneath you in 1999.

19   Right?

20         A.     Correct.

21         Q.     So did you have any oversight, or did you

22   have anybody working with Inacom in 1999?

23         A.     No.

24         Q.     So they're completely removed from you in

25   the 1999 time frame?

1          A.      Correct.

2                  THE WITNESS:  I should have brought my

3     resume with me or a profile sheet.

4          Q.      Do you have an understanding why Brad Funk

5     was transferred underneath your oversight?

6          A.      Julian Gorman, the district manager,

7     retired, and so I took his place.

8          Q.      And where was Mr. Gorman located out of?

9          A.      Chicago.

10          Q.      So they don't move you to Chicago.  They

11     keep you in Phoenix and they send --

12          A.      And fly me to Omaha.

13          Q.      And they keep the rep who's with Inacom,

14     and they just -- Mr. Funk, and they just transferred him

15     under your control?

16          A.      Correct.

17          Q.      Had you ever worked with Mr. Funk before

18     that time?

19          A.      No.

20          Q.      Don't know him from anybody prior to that

21     time?  Didn't know who he was?

22          A.      No, I knew who he was because I had seen

23     him in meetings.  But no, he had never worked for me.

24          Q.      Okay.  Did Mr. Funk come to Phoenix as

25     well?

1        A.      No.  He worked out of Chicago.

2        Q.      Prior to Mr. Funk coming over, did you

3   ever have any sales calls, any work at all, with Inacom?

4        A.      No.

5        Q.      Did you oversee anybody else who dealt

6   with Inacom prior to January 1, 2000?

7        A.      No, not with Inacom.  Now, just as a means

8   of explanation, Inacomp was bought by a company I

9   believe called -- it was a merger between Inacomp and

10  Valcom, and I think that happened in about 1997.  But

11  there was nobody that I called on at Inacomp in 1996

12  and -- rather, earlier, when I was in Detroit that was

13  still there.  So deep in the roots of the company was

14  Inacomp, but there was a merger.

15       Q.      Right.  Did you have any dealings in 1999

16  with Vanstar?

17       A.      With Vanstar.  When did I -- I had them, I

18  believe, when they went out of -- I don't think so.  I

19  think they went out of business before.  I don't recall.

20  I had Vanstar for a period of about nine or ten months

21  at the beginning -- I think it was '97.  But I could be

22  wrong about that.  I'd have to go back and...

23       Q.      When you took over Inacom in January 2000,

24  did you have an individual at Inacom that you dealt

25  with?  Was there persons that you were assigned to, or

1  you were assigned with?

2        A.      Well, nobody that we ever were assigned

3  to.  There was a product guy by the name of Don Huber,

4  and then he was replaced by Bill, and I don't remember

5  his last name, and Bill had somebody by the name of Kurt

6  who worked for him, and Kurt was the buyer.  Bill was

7  sort of the manager of the buyers.  And then I also had

8  been introduced to Leon Kerkman, and a couple of other

9  people who I don't recall their names.

10        Q.      And when do you think you were introduced

11  to Leon Kerkman?

12        A.      Either the -- probably the second or the

13  third week of January.  I believe that's about when I

14  made my first call.

15        Q.      How was it set up between you and Mr. Funk

16  with Inacom?  Would he primarily have the connection

17  with Inacom and you would supervise him, or would, you

18  know, you both correspond and connect with Inacom at the

19  same time or...

20        A.      He had primary responsibility for selling

21  product and all the day-to-day transactions.  And then I

22  would make calls to try and establish more executive

23  relationships and also to coach him, to help him on

24  sales calls to see, you know, how he's doing, what kind

25  of questions he asked, stuff like that.

1          Q.       Now, at this time frame when Mr. Funk

2    comes over underneath your supervision, Inacom comes

3    with it, would Inacom have been your largest account at

4    that time, or would you have had larger accounts?

5          A.       Let me think.  See, I had a lot of

6    different accounts.  Yeah, they probably were the

7    largest account in terms of revenue the prior year,

8    yeah.

9          Q.       Did you have any other accounts that were

10   similar to Inacom in January 2000 as far as size?

11         A.       Synnex.  I believe at that time I still

12   had Merisel.  I had Comark, and I had the remnants -- it

13   wasn't much left -- of Pinacor.  I believe they had --

14   Pinacor was clearly the biggest, but they had gone

15   bankrupt the year before, I believe.

16         Q.       And you're selling them, those entities,

17   all printers and peripherals?

18         A.       Right.  Primarily printers.

19         Q.       As far as the payment terms that would be

20   mandated by Lexmark, who at Lexmark would set those

21   terms?

22         A.       Kevin and his group, Kevin Sarkisian.

23         Q.       And based on your position and job duties,

24   did they have one set of terms or did they have multiple

25   different terms depending upon, I don't know, different

1  circumstances such as the size of the reseller, other

2  factors?

3         A.    I believe the way it worked was the larger

4  resellers could pay early and get a discount.  I don't

5  recall what that discount was.  There were a group of

6  distributors that could do that.  And then they could

7  pay half the invoice in 30 days and the remaining half

8  in the next 30 days, so it worked out to be about

9  45 days.  That's my recollection.

10        Q.    So would they actually get 60 days?

11        A.    No, 40 -- it would work out to be about

12  45 days because you pay half the invoice in 30 days and

13  you pay the other half the next 30 days so it melded

14  into about a 45-day term.

15        Q.    Okay.  But would part of the debt be

16  actually paid in 60 days, and you're just averaging?

17        A.    Well, I guess it could be, yeah.  Yeah.

18  If I understand what you're asking in terms of an

19  average, yeah.

20        Q.    Well, I'm just trying to get an

21  understanding as -- I think you said half should be paid

22  in 30 days.  That would be net 30 days?

23        A.    No, it didn't have to be paid in 30 days.

24  The terms were set up so that they could pay half the

25  invoice in the first 30 days and if they wanted to wait

1    until the second half, they could pay the rest of it in

2    the next 30 days. Okay? So if you looked at those two

3    things together, it would give them about 45 days. It

4    may not work out to be exactly 45 days, but if the guy

5    paid on the 30th day and he paid on the 60th day, then

6    it probably would work out pretty close to being

7    45 days.

8         Q.    Okay.

9         A.    And there were never any invoices that

10   were designated as having to be paid in the first 30

11   days or the last 30 days of the 60 days.

12        Q.    Do you know what would appear on invoices?

13        A.    No. I can't even remember seeing an

14   invoice.

15        Q.    How would it be if you went to -- as far

16   as your job duties and responsibilities in 1999, if

17   product was sold by Lexmark to Inacom from your sales

18   reps and such, they would make the sale to Lexmark -- I

19   mean, they would make the sale to Inacom. Correct?

20        A.    They would, but I didn't have Inacom in

21   1999.

22        Q.    Okay. I'm sorry. Let's say another

23   company, then. Let's use --

24        A.    Any company.

25        Q.    Let's use Synnex.

1      A.      Right.

2      Q.      So in 1999 your folks would make -- your

3  folks, that being the folks underneath you, would make

4  the sale to Synnex?

5      A.      Right.

6      Q.      And would they generate any type of

7  paperwork as a result of the sale?

8      A.      My reps?  No.

9      Q.      Who would generate the paperwork?

10      A.      Come from our accounts receivable in

11  Lexington.

12      Q.      Okay.  And what would they generate?

13      A.      An invoice that would just say this is

14  what you bought, this is how much is owed.

15      Q.      Do you know whether or not they would wait

16  for a purchase order before they generated the invoice?

17      A.      I believe they would.  I believe what

18  would happen would be a lot of the customers were on a

19  system which is called EDI, Electronic -- I'm not sure

20  what EDI stands for, Electronic Data something, I don't

21  know.  But they would enter the order through EDI,

22  giving a PO, and then the product would be shipped and

23  invoiced off that PO.

24      Q.      When would the invoice be generated by

25  Lexmark, if you know?

1      A.     I don't know specifically.  Probably that
2   same day or next, but I don't know.
3      Q.     And when the invoice was generated by
4   Lexmark, would it be sent to you folks --
5      A.     No.
6      Q.     -- as the sales representative or would it
7   be sent directly to the company?
8      A.     It would be sent to their accounts payable
9   people, I believe.
10     Q.     In January of 2000 would this same type of
11  system have been followed with Inacom?
12     A.     Yes.
13     Q.     So as a normal practice as a district
14  sales manager in January of 2000, would it be fair to
15  say you would not see the invoices that reflect the
16  business that you generated?
17     A.     Yes.
18     Q.     Would you ever see the purchase orders?
19     A.     I never saw an EDI order.  No, I wouldn't
20  see the purchase orders.  The only way I would see it is
21  if it was handed to me and I was instructed by the
22  customer to send it in, and I don't ever remember that
23  happening.
24     Q.     In 1999 would you have any interaction
25  with the credit department at Lexmark?

1    A.    In 1999?  Yes.

2    Q.    And what type of interaction would you

3 typically have as the district sales manager?

4    A.    Well, if a payment or if an account was

5 not paying on a timely basis, I would either get a call

6 from our accounts receivable, somebody who worked for

7 Kevin Sarkisian, or I'd get a call from Kevin.

8    Q.    And what would the call be with -- I mean,

9 what would the credit department or that person from the

10 credit department usually have you do?

11    A.    We're having issues getting paid, could

12 you go talk to somebody and see when we're going to get

13 paid or what the problem is, you know.

14    Q.    So if I understand it correctly, the '99

15 time frame the credit department would operate through

16 the sales force trying to find out why there's been a

17 slow pay or outstanding amounts?

18    A.    We had direct responsibility for the

19 exec -- you know, for the management of the resellers,

20 so yeah, they would contact us.

21    Q.    That was the normal course of operations

22 at Lexmark?

23    A.    Yes.  At least it was for me.  I can't

24 speak for all of Lexmark but...

25    Q.    Okay.  In 1999 were you aware for any of

1    your accounts that the credit department was contacting

2    your client, I mean the folks that were assigned -- the

3    resellers that were assigned to you, that the credit

4    department was contacting them directly?

5         A.    I believe they were contacting Pinacor at

6    that time because of the bankruptcy filing.

7         Q.    So other than something as extreme as a

8    bankruptcy filing, would it be normal in 1999 that the

9    credit department would be contacting your client as

10   opposed to going through you?

11        A.    Well, our accounts receivable personnel

12   would contact the customer's accounts payable people who

13   worked in that department.  So there were conversations

14   that were going on between that level.  But when that

15   level of communication wasn't bearing fruit, so to

16   speak, then we would get involved.

17        Q.    Now, on those occasions where the credit

18   department would contact you and would ask you to

19   contact a reseller, it was usually in regards to slow

20   pay, is that --

21        A.    Yeah.

22        Q.    And after you got those phone calls from

23   the credit department and contacted the actual reseller,

24   was it normal that you would have any type of

25   responsibility to report back to the credit department?

1         A.    Well, normal behavior would be to say I

2    had a conversation with so-and-so, and they said we

3    would be paid by such and such a date, if you could get

4    that from the customer.  Or these are the reasons you're

5    not being paid at this time, you know, that kind of a

6    thing.

7         Q.    Would you fill any type of form out and

8    send it to the credit or treasury department, or is it

9    just kind of a verbal call?

10        A.    Well, you could send an e-mail or you

11   could just pick up the phone, you could do either one.

12        Q.    All right.  Where was Mr. Kendrick at this

13   time?  Is he in Phoenix as well?

14        A.    No.  Atlanta, Georgia.

15        Q.    Do you know how long Brad Funk had been

16   the rep with Inacom before he came underneath your

17   department?

18        A.    I'm not certain.

19        Q.    I'm sorry.  Go ahead.

20        A.    No, I just was going to say, maybe two

21   years, I'm not certain.  I think it was two years, but

22   I'm not certain.  Could have been three.  So if you're

23   looking for a specific answer, two to three years.

24        Q.    When Mr. Funk came on board in January of

25   2000, did you have a meeting with him concerning any of

1    the accounts that he was overseeing?

2         A.      We met and discussed -- yeah.  He had at

3    that time Comark, some very small resellers in Chicago,

4    and then he had Inacom.  And we just tried to set up

5    times that I could go out and meet with the accounts, to

6    introduce myself and try to get to know some of the

7    people.

8         Q.      Was Inacom his largest client, do you

9    know, at the time?

10        A.      Yes.

11        Q.      When he came underneath you would Inacom

12   have been your -- the largest account of any of the reps

13   underneath you?

14        A.      I think I said that earlier.  Yes.

15        Q.      Was there any pending issues at the time

16   Mr. Funk came on board with Inacom that he brought you

17   up to speed on?

18        A.      Yes.

19        Q.      What was that?

20        A.      Well, I was made aware that they were

21   behind in payments.

22        Q.      Who made you aware of that?

23        A.      I think the person who actually made me

24   aware of that was Bob Kendrick.

25        Q.      What did Mr. Kendrick tell you about that,

1    if you recall?

2         A.    Best I recall, that there were some

3    invoices that were outstanding and they were past due

4    for an extended period, and one of the responsibilities,

5    immediate responsibilities in taking over the account

6    was that I should start chasing that.

7         Q.    And when you said chase that, I take it --

8         A.    Well, that's my term.

9         Q.    I know.  I'm just going to clarify for the

10   record, though, because there's plenty of terms I'm sure

11   that you have in your industry that I'm not familiar

12   with.

13        A.    Right.

14        Q.    Chase; that means collect on the

15   outstanding accounts receivable?

16        A.    Right.

17        Q.    Does it mean to collect on any of the

18   older accounts receivable or is it just all accounts

19   receivable?

20        A.    It's anything that's aged, let's get it

21   cleaned up.

22        Q.    And what would be -- what would fall

23   underneath the heading of aged?

24        A.    I would say anything that was over 45 days

25   old.

1     Q.    And after you talked to Mr. Kendrick and

2    he filled you in on that responsibility with Inacom,

3    what was your -- did you have any new tact that you took

4    as far as trying to collect these outstanding accounts

5    receivable from Inacom?

6     A.    Well, when I met with Inacom the first

7    time, I asked about it, and at that point in time I

8    believe there was a -- I'm not sure, I'm trying to think

9    of the term -- I believe Compaq had announced their

10   intent to buy them, and they were going through like an

11   investigation period.  I can't recall what that's

12   called.

13    Q.    Due diligence?

14    A.    Due diligence.  There you go.  They were

15   going through that at the time that I took them over.

16    Q.    And I think you said you had -- let me ask

17   you again.  When do you think you had your first meeting

18   with the representatives from Inacom?

19    A.    It was probably the second or third week

20   of January.

21    Q.    And who was it at Inacom you met with?

22    A.    I met Don Huber; I met Kurt, whose last

23   name escapes me; and the guy who was going to be

24   replacing Don; and I also had a brief meeting with Leon

25   just to introduce myself to him.

1          Q.      Did you raise the issue of -- or strike

2     that.

3               Do you have a recollection of how big the

4     aged accounts receivable were that was owed by Inacom to

5     Lexmark at the time of that meeting?

6          A.      I knew it was over 3 million, but I don't

7     recall the exact amount at that point in time.

8          Q.      As far as the dollar terms, 3 million, was

9     that the largest account that was underneath your or

10    your representatives' direct control that was

11    outstanding in that amount?

12         A.      I honestly don't recall.

13         Q.      Okay.

14         A.      I don't recall.

15         Q.      When you were at that first meeting, did

16    you make any demands of Inacom with regards to the

17    outstanding amount of 3 million or whatever that amount

18    was?

19         A.      I don't recall the exact conversation that

20    I had with Leon at that time.  There were subsequent

21    conversations that I had with him, but I don't recall my

22    exact words with him the first time I met him about the

23    A/R.  I know I made a statement that I understand

24    they're behind in payments.  But in terms of specifics,

25    I don't recall anything else.

1       Q.      Did you mention that to Mr. Kerkman or was

2   that to someone else at the first meeting?

3       A.      No, that would have been with Leon.

4       Q.      Because I thought the first meeting you

5   had with Mr. Kerkman, was kind of --

6       A.      It was a brief meeting.

7       Q.      -- introduction.  Oh, it was more than

8   that.

9       A.      Well, we sat in a room for probably -- a

10  conference room about half the size of this room for

11  probably ten minutes, 15 minutes.  So that's a brief

12  meeting.

13      Q.      And the outstanding accounts receivable

14  came up during that meeting?

15      A.      It did.

16      Q.      What do you recall Mr. Kerkman saying?

17      A.      Well, generally what I was always told by

18  him was don't worry, you're going to get paid.

19      Q.      But I'm just -- I want to focus on this

20  first meeting.  Do you recall what Mr. Kerkman told you?

21      A.      I don't recall the exact thing that he

22  said at that point in time.

23      Q.      Do you recall the substance, not the exact

24  words, but do you recall the substance of what

25  Mr. Kerkman relayed to you at that first meeting

1      Q.      In preparation for your deposition today

2   have you reviewed any documents?

3      A.      I looked at the letter that I had sent,

4   and I still had a copy of the letter from Bill Francis,

5   but I didn't look at any other documents other than

6   that.  And I had a letter from, you know, the legal

7   group basically summarizing that I was supposed to come

8   and stuff like that.

9      Q.      Summarizing that you were supposed to come

10  to the deposition today?

11     A.      Yeah.

12     Q.      Okay.  So besides that letter, the only

13  other two documents you reviewed was the letter that you

14  wrote --

15                  THE WITNESS:  Do you want to hand me

16  my briefcase?

17     Q.      -- and the Compaq letter?

18     A.      It was just a Compaq letter.

19     Q.      Did you review any e-mails in preparation

20  for your deposition?

21     A.      I think I saw one e-mail.

22     Q.      Was it authored by you?

23     A.      No.

24     Q.      Was it authored to you?

25     A.      No.  I was copied on it.

1        Q.      Any other documents other than the two

2    letters and the e-mail?

3        A.      No.

4        Q.      With respect to those two letters and that

5    e-mail, did you have those in your custody and control,

6    or were those letters given to you in preparation for

7    this deposition?

8        A.      I had the letter that I had sent, and I

9    had a copy of a letter from Bill Francis, but those were

10   the only two things that I had in my own possession.

11       Q.      Okay.  So you had those two letters

12   somewhere at home in a file or on your database or

13   something?

14       A.      It was on my hard file on my PC.  I didn't

15   have it in any file or anything.  When -- called, I went

16   through everything I had.

17       Q.      So you had the letter that you authored

18   to -- the letter that you authored to Mr. Oshlo was on

19   your hard drive?

20       A.      Right.

21       Q.      Okay.  And the letter from Compaq --

22       A.      I had a copy of it.

23       Q.      You had a physical copy of that letter?

24       A.      Right.  You know, that may have been sent

25   to me by those guys.  I remember I had it when it was

1    sent to me originally, when we originally received it,

2    but I don't think I still had that.  But I did still

3    have the letter on my hard file that I sent to Oslo.

4         Q.    So as far as the documents that you had in

5    your possession, you know, years past --

6         A.    Oslo.

7         Q.    Just Oshlo's letter?

8         A.    Yeah.  And I had to go back to an old

9    system that I wasn't even using anymore.  I went through

10   everything on that hard file.

11        Q.    Okay.  And as far as the other documents

12   that you reviewed in preparation of your deposition,

13   those documents were given to you to review?

14        A.    Right.  Right.  Yeah.

15        Q.    Anything else that you reviewed in

16   preparation for your deposition today?

17        A.    No.

18        Q.    Other than your lawyer, any conversations

19   that you've had with anyone in preparation for your

20   deposition today?

21        A.    No.

22        Q.    You didn't talk to --

23        A.    Wait a minute.  I talked to Bob yesterday,

24   our inside rep, Bob Patton.

25             MR. HALLIDAY:  The in-house counsel.

1          A.     In-house counsel.

2          Q.     And anybody besides Mr. Patton, anybody

3    else you talked to?

4          A.     No.

5          Q.     Did you talk to Mr. Sarkisian in

6    preparation for your deposition?

7          A.     Oh, yeah.  Excuse me, he was there.  Well,

8    I didn't really talk to him.  He was in the room.

9    Right.

10         Q.     Who was in the room for the meeting?

11         A.     Me -- us three, Bob Patton and Bob

12   Kendrick.

13         Q.     Okay.  Misty Atchison also there?

14         A.     No.

15         Q.     How long was the meeting?

16         A.     My meeting was about half-hour,

17   40 minutes.

18         Q.     Can you tell me when you first became

19   aware of that there was a lawsuit pending concerning the

20   Inacom bankruptcy and sums that were paid to Lexmark?

21         A.     Originally probably a year ago or

22   something like that.

23         Q.     And how did you become aware of that?

24         A.     Bob Patton called me up.

25                MR. NOLAN:  Okay.  I have no further

1    questions at this time.  I reserve my right to step

2    aside and let another lawyer question you.

3                    MR. HALLIDAY:  Can we take a break?

4                    MS. DUMAS:  I was going to suggest a

5    five-minute break if that's okay.

6                    (3:35 BREAK 3:41)

7                    MS. DUMAS:  Back on the record.

8                    - - - - - - - - - - -

9                         **EXAMINATION**

10   **BY MS. DUMAS:**

11       Q.     Mr. Schuette, we'll try to keep this as

12   short as possible for the rest of the afternoon.

13       A.     Thank you.

14       Q.     Let me introduce myself.  My name is

15   Cecily Dumas, and I represent Hewlett-Packard Company,

16   who was sued by Lexmark when Inacom sued it to recover

17   the preference.

18       A.     Okay.

19       Q.     Okay?  And I represent Hewlett-Packard as

20   a result of the merger in 2001 between Compaq Computer

21   Corporation and Hewlett-Packard Company.

22       A.     Right.

23       Q.     For purposes of the deposition, because we

24   were talking about Compaq in the time frame of these

25   events, I'm going to refer to my client as Compaq.  Is