1    concerning outstanding accounts receivable owed by

2    Inacom to Lexmark?

3           A.    No.

4           Q.    You don't have any recollection as you sit

5    here today if he gave you an explanation or he just

6    nodded his head or anything at the first meeting?

7           A.    The only thing I recall was that for me to

8    relax, that we would get paid.  But other than that, I

9    don't recall anything else that he said.

10          Q.    Besides Mr. Kerkman at that first meeting,

11   did Mr. Huber or anyone else give you any type of an

12   explanation or a rationale as to when Lexmark would get

13   paid?

14          A.    I asked those guys, but I determined

15   based -- I didn't think they were involved.  They had no

16   influence, I didn't think.  So I never really pursued it

17   with them other than:  Have you heard anything about the

18   payments?

19          Q.    Okay.  When you come back from the first

20   meeting with the Inacom representatives, did you report

21   to Mr. Kendrick?

22          A.    I'm sure I did, but I don't remember

23   anything about it.

24          Q.    No recollection of your conversation with

25   Mr. Kendrick?

1          A.      No.

2          Q.      Any recollection of anyone else at Lexmark

3    that you talked with following your first meeting from

4    Inacom?

5          A.      No, not really.  No.

6          Q.      Do you recall whether or not you wrote any

7    e-mails upon returning from the first meeting with

8    Inacom?

9          A.      I don't recall that, no.  Don't think I

10   did.

11         Q.      What's the next contact that you recall

12   after the first meeting of -- having with Inacom

13   representatives?

14         A.      Well, I had at least one more meeting.  I

15   went in and talked briefly with Don Huber and also with

16   Kurt and Bill, and then I met with Leon, and that was

17   probably the -- I don't have a date for this, I don't

18   have any kind of a log that shows me when I travelled in

19   there, but I had a conversation with him, and again, the

20   conversation was that they're in the process of being

21   purchased and, you know, we probably wouldn't get paid

22   anything until the end, and for me to relax, that -- you

23   know, that we would get paid for the money that was owed

24   us.

25         Q.      When you had the first meeting with

1    Mr. Kendrick and he talked to you about taking over the

2    Inacom account and the fact that they were -- they had

3    aged accounts receivable, did he inform you to do

4    anything, or to restrict you from selling any amounts to

5    Inacom, or to allow them or restrict them on running up

6    any credit?

7         A.    He did not.

8         Q.    Did anybody else at Lexmark tell you when

9    the Inacom account first came over under your

10   supervision that due to the outstanding accounts

11   receivable to limit or to restrict credit to Inacom?

12        A.    Well, it seems to me that I had a

13   conversation with Kevin Sarkisian, but it was more along

14   the lines of the fact that with the new name and

15   everything -- with it being a new company, in order to

16   go forward and sell product to them we had to establish

17   some kind of a line of credit with Custom Edge or

18   Compaq.  And so in terms of being able to go forward, I

19   had a request in to try to get some kind of a statement

20   of, you know, obligation from somebody, either at Compaq

21   or Custom Edge, as to who would be responsible for

22   future invoices.

23        Q.    Okay.  Is it a fair statement that when

24   you took over the Inacom account you were under the

25   impression that you could sell as much product -- strike

1    that.

2                    From a credit perspective, is it a fair

3    statement that at the time you took over the Inacom

4    account or took over supervision of it, Lexmark was

5    willing to sell Inacom as much product as it wanted?

6         A.    That's not a fair statement.  I don't

7    think I could have sold them an unlimited amount, just

8    because of the past due amounts that were owed.  I mean,

9    it was being monitored by accounts receivable; I knew

10   that.  But in the January time frame it's my opinion

11   that when -- we're at a point where we were going to

12   stop doing business with them.  So that's, you know --

13   but I couldn't have sold them an unlimited amount of

14   product.

15        Q.    Did you ever become aware in January of

16   2000 that Lexmark had made the decision to put a

17   shipping hold or stop shipment on the Inacom accounts?

18        A.    I don't -- I don't recall.

19        Q.    You don't recall one way or the other?

20        A.    I've had accounts -- because of the number

21   of accounts I've had over the years, I've had accounts

22   where we've stopped payments.

23        Q.    Stopped shipments?

24        A.    Stopped shipments, rather, stopped

25   shipments.  But I don't think we did with Inacom when I

1    was there.  I just don't remember.  We did it pretty

2    regularly with another account, Merisel, because of slow

3    payments, but I just don't recall.

4        Q.    And based on your position and your prior

5    job duties, what's a slow payment?

6        A.    I'd say any time it got over 45 to 60 days

7    that was considered slow.  That would be a sales

8    definition.

9        Q.    Anything over 45 to 60 days, you said?

10       A.    Right.

11       Q.    And would that be 45 to 60 days from the

12   date of the issuance of the invoice?

13       A.    Yes.

14       Q.    And what was the name of the account, was

15   Merisel?

16       A.    Merisel.

17       Q.    And in the Merisel occasion, Lexmark

18   stopped shipments because of slow payment?

19       A.    Correct.

20       Q.    The subsequent conversation, subsequent to

21   the first meeting that you had with Inacom, can you give

22   me an idea of when that may have occurred?  Was it maybe

23   a number of days after --

24       A.    It was towards the end of January.

25       Q.    The end of January of 2000?

1          A.     Right.  Probably that last week.

2          Q.     And that next conversation, was it a phone

3     conversation or a conversation --

4          A.     No.

5          Q.     -- in person?

6          A.     It was face-to-face, as I recall.

7          Q.     You got to let me finish my question to

8     make it nice and clean.

9          A.     Okay.

10         Q.     So the next conversation is face-to-face?

11         A.     Right.

12         Q.     Is it in Omaha?

13         A.     Yes.

14         Q.     And who did you meet with?

15         A.     Leon Kerkman.

16         Q.     Anybody else?

17         A.     Kurt and Bill probably were in the room.

18    They usually were always in the room when I talked with

19    Leon.

20         Q.     Kurt who?

21         A.     I can't remember Kurt's last name.  I

22    can't remember Bill's last name, either.  I'm bad with

23    names.

24                  MR. NOLAN:  Want to take a break?  You

25    okay?

1                    THE WITNESS:   No.   I'm fine.

2          Q.      And how long did that next meeting last

3    with the Inacom folks?

4          A.      I can't recall the exact time, but at

5    least an hour.

6          Q.      Okay.  And what was the substance -- what

7    was the reason for that meeting?

8          A.      Well, we're trying to put together some

9    marketing programs for that year, and then the subject

10   of the accounts, their accounts payable, our accounts

11   receivable came up as well.

12         Q.      Was the outstanding accounts payable the

13   catalyst for the meeting?

14         A.      It wasn't the first thing discussed, no.

15         Q.      So it was just -- was it, I mean, how do

16   you want to characterize it?  Was it on the agenda of

17   things to be discussed?

18         A.      It was on the agenda.  It was on my agenda

19   to discuss while I was there.

20         Q.      Do you have a -- I know it's been some

21   time, but do you have an impression of how much the

22   outstanding accounts receivable was at that time?

23         A.      Precisely, no.  But in a range, I would

24   say at that point it was probably about three and a half

25   million dollars.

1      Q.      So it had gone up since the first meeting?

2      A.      Yeah.   Or -- yeah, probably.

3      Q.      And what was Inacom's response to your

4  inquiries about the outstanding accounts receivable?

5      A.      Basically the same as what it had been in

6  the past, that they were going to -- this period of time

7  where Compaq was still doing their due diligence and,

8  you know, that we would get paid.   And I believe it was

9  at that meeting that I was told about the, you know,

10  checks that had been written and would be issued as soon

11  as the transaction became final.

12      Q.      So this event was the first time you heard

13  about this issue of held checks?

14      A.      Yes.

15      Q.      That's what the -- I'm going to refer to

16  them as held checks.   Is that what you were referring

17  to, checks that had been issued?

18      A.      Right.   But not sent or given to us.

19      Q.      What did they tell you that was the reason

20  that they had issued checks but not issued -- they had

21  issued checks but were actually holding them?

22      A.      I think it had -- I don't know the

23  specifics, but I think it had to do with the purchase of

24  the company, and who was going to assume what, I guess.

25  I don't know.

1      Q.      You're not sure?

2      A.      No, I'm not sure.

3      Q.      Okay.  Did anyone tell you directly or did

4  you have any opportunity to learn whether or not Inacom

5  was having liquidity problems at that time?

6      A.      No one told me about that, and I -- you

7  know, the only indication that I would have that there

8  would be liquidity problems would be the fact that we

9  weren't being paid so...  But I had not heard anything

10  that they weren't paying their people or anything along

11  those lines.

12      Q.      Is that something, though, as a sales

13  executive for your accounts you would kind of want to be

14  in tune with is whether or not the folks you're selling

15  to are, you know, in good business standing or whether

16  or not they're having problems or whether or not they're

17  growing or shrinking?

18      A.      Yeah, it would be.  But I, again, had only

19  been on the account for about two or three weeks, and I

20  was just getting into it.

21      Q.      All right.  So you're not told anything

22  other than the fact that they are cutting checks and

23  they're holding these checks.  And did they tell you

24  when they were going to release the checks?

25      A.      Well, I sent that -- I sent a letter,

1    which you probably have a copy of.  It was my

2    understanding that once the sale was completed that they

3    would then begin issuing the checks, and it would take I

4    think it was one to ten weeks or something like that to

5    get all the disbursements done.

6         Q.    Okay.  Did they tell you --

7         A.    I don't recall him saying one to ten weeks

8    in that meeting.  I mean, I recall being told -- I

9    learned that in some other meeting with Leon later on.

10   I think a little bit later.

11        Q.    But the source of your information on this

12   next conversation the end of January is primarily Leon

13   Kerkman?

14        A.    Right.

15        Q.    Anybody else from Inacom giving you the

16   information?

17        A.    No.

18        Q.    And nobody at Inacom mentions to you at

19   that meeting that they're having problems with liquidity

20   or a cash crunch?

21        A.    No.

22        Q.    And from your other business dealings had

23   you heard any word on the street that Inacom was having

24   any cash problems?

25        A.    No.

1      Q.    Anything else that you can recall being

2 discussed with Mr. Kerkman at this meeting at the end of

3 January 2000?

4      A.    No, just marketing programs, what we're

5 going to try to set up to try to, you know, get sales

6 moving.

7      Q.    Did Mr. Kerkman give you any idea how

8 many -- or what dollar amount of checks had been cut but

9 were being held?

10      A.    I don't recall that being discussed.  No.

11 No.

12      Q.    So when you left that meeting, you didn't

13 know if he was talking about $500,000 or $1.5 million in

14 held checks?

15      A.    My belief was that we were talking about

16 all the outstanding checks that -- all the outstanding

17 invoices that were past due.  That was my impression of

18 what he was talking about.  Whether or not that was 15

19 invoices or 18 invoices or 30 invoices, I didn't know

20 the detail in terms of how many invoices it was.  But my

21 belief was that it was about three to three and a half

22 million dollars at that point in time.

23      Q.    And I think you testified that he didn't

24 give you any idea as to when those checks would be

25 released?

1      A.      At that point, no.

2      Q.      Did he instruct you to contact any

3  particular person at Inacom about the released checks?

4      A.      I don't recall if it was that

5  conversation, but he was the person who told me to

6  contact Dick Oslo, and I don't recall if that occurred

7  in that meeting or it occurred in a telephone call later

8  on.  I don't remember exactly when I got Dick's name,

9  but Leon gave me his name and I started to try to

10  contact him.

11     Q.      Okay.  You're not sure if that happened on

12  that occasion or a different one?

13     A.      I'm not sure if it happened in that

14  particular meeting or it happened in a phone

15  conversation or -- you know, I just don't recall if it

16  was that meeting that Dick's name came up.

17     Q.      Did Mr. Funk attend that meeting with you?

18     A.      Yes.

19     Q.      So he was there in person as well?

20     A.      I believe so, yeah.

21     Q.      When you returned back to -- strike that.

22             After that meeting was completed, did you

23  report back to Mr. Kendrick?

24     A.      I'm sure I did.  Yeah.

25     Q.      Do you have a recollection of your

1    conversation you had with Mr. Kendrick following that

2    meeting?

3          A.     I think I told him that the checks were

4    being held and that they were going to be released when

5    the transaction was completed.

6          Q.     And what was Mr. Kendrick's response?

7          A.     Not good enough.  Try to find out a

8    specific time and date.

9          Q.     And did you do that?

10         A.     I believe that's when I began trying to

11   contact Dick Oslo, and I tried to contact him at least

12   for a week.  I had no success getting to him, and so I

13   sent him a letter and overnighted it to him, either

14   overnighted it or registered, I don't know which I did,

15   may have been both, copied Leon and also my boss.

16         Q.     I'm sorry.  Go ahead and finish.

17         A.     No.  And also copied Kendrick on the

18   letter.

19         Q.     And why were you trying to call Dick

20   Oshlo?

21         A.     Because it was my impression from talking

22   to Leon that he was the guy who was disbursing the

23   checks.  He was the man that was responsible for putting

24   stuff out.

25         Q.     Okay.  And what was your purpose of

1   contacting -- I mean, what did you want to tell Mr.

2   Oshlo?

3        A.    I wanted to confirm what I had been told

4   by Leon.

5        Q.    That he was -- that being that Mr. Oshlo

6   was holding checks?

7        A.    That checks had been written and that they

8   were being held until the transaction took place.

9        Q.    And I think you said Mr. Oshlo didn't

10  return phone calls?

11       A.    I called him for at least a week and left

12  voice mails and never got a return call.

13       Q.    Did you call multiple occasions per day?

14       A.    Yes.   I don't know how many per day, but

15  yes.

16       Q.    Did anyone else return Mr. Oshlo's

17  messages?   Did anybody call you back?

18       A.    I don't think anybody ever called me back,

19  but I do believe I talked to his assistant once or twice

20  and left messages to have him call me.

21       Q.    At the time you were calling Mr. Oshlo,

22  did you ever become aware of the fact that Inacom was

23  having liquidity problems?

24       A.    No.

25       Q.    Did you ever become aware that they had

```
 1    been in default on numerous loans?
 2          A.     No.
 3          Q.     Did you report back to Mr. Kendrick that
 4    you couldn't get ahold of Mr. Oshlo?
 5          A.     Yes.
 6          Q.     What was Mr. Kendrick's response?
 7          A.     Let's write a letter.  And that's why the
 8    letter was generated.
 9          Q.     And the letter was to Mr. Oshlo?
10          A.     Oslo.
11          Q.     Oslo.
12          A.     Right.
13          Q.     Okay.  And what did the letter, what was
14    the purpose of the letter?
15          A.     To confirm our understanding of how they
16    were going to be paying us for the back invoices.
17          Q.     Okay.  So the letter was written -- the
18    letter didn't memorialize a conversation you had with
19    Mr. Oslo, did it?
20          A.     Well, do you have a copy of the letter?  I
21    have a copy of the letter.  I mean, I could show you the
22    letter if you want to see it.
23          Q.     Okay.
24          A.     Basically, I started off in the letter and
25    I said:  Been trying to get you, I haven't been able to
```

1   get you, you have serious past due invoices.  My

2   understanding from Leon was that invoices had been cut,

3   that we were going to be paid as -- once the completion

4   of the sale took place, and that all invoices wouldn't

5   be paid immediately, that it would be over a one-to-

6   ten-week time period.  And I was trying to confirm if

7   that is in fact what was going to happen.

8        Q.     Okay.  So the letter you wrote was to

9   memorialize a conversation you had -- or the

10  understanding you inferred from Mr. Kerkman.  Right?

11       A.     Correct.

12       Q.     And it wasn't a letter that was

13  memorializing any conversation you had with Mr. Oshlo

14  because you hadn't got ahold of him yet?

15       A.     Right.

16       Q.     Okay.  Did you ever get a hold of

17  Mr. Oshlo?

18       A.     He called me back after having received

19  the letter and confirmed that that was going to be the

20  process and apologized for not calling me back.

21       Q.     Did you learn on that conversation with

22  Mr. Oshlo that Inacom was having liquidity problems?

23       A.     No.

24       Q.     Did you learn at that occasion either

25  through Mr. Oshlo or through anyone else that Inacom had

1    defaulted on loans?

2        A.      No.

3        Q.      Was that the only conversation you had

4    ever had with Mr. Oshlo?

5        A.      I believe so.  I might have had one other

6    telephone conversation, but I think that was the only

7    one.

8        Q.      Anything else you can recall from the

9    conversation with Mr. Oshlo?

10       A.      No.  I mean -- no.

11       Q.      Did Mr. Oshlo tell you when he was going

12   to release the checks?

13       A.      Not a specific date.  I don't think

14   anything had been formalized yet.

15       Q.      Did you ask him if he could give you

16   specific dates when the checks would be released when

17   you talked to him on the phone?

18       A.      I'm sure I did, but I don't -- I don't

19   recall specifically saying it.  I can be fairly

20   persistent, and I'm reasonably certain I asked him that,

21   but I just don't remember any specific terminology or

22   conversation there.

23       Q.      Any expletive?

24       A.      No, wouldn't have been that.

25       Q.      Do you know at this time, this being the

1    time you talked to Mr. Oshlo, whether or not Lexmark was

2    extending any further credit to Inacom?

3        A.    Any further credit.  We were still doing

4    business with them.  I'm not sure that it was under the

5    Inacom name or the -- I mean, I just can't remember if

6    it was under the -- because I didn't get involved from

7    an operations standpoint.  We were still selling them

8    product so...  Yeah, we were still giving them credit.

9        Q.    Do you recall when the first of the held

10   checks was released, or does that kind of just blend in

11   with everything else?

12       A.    Seems to me it was sometime in March.

13   Middle of March or something like that was when the

14   first checks started coming out.

15       Q.    The first held checks?

16       A.    Right.  Or invoice numbers, the past due

17   stuff.

18       Q.    Okay.  Did you have access -- as part of

19   your job duties and responsibilities in February 2000,

20   did you receive a daily or weekly outstanding aging

21   report on accounts receivable?

22       A.    No.  I would have talked with Kevin, but

23   not on a daily basis, no.

24       Q.    During this time frame when you're trying

25   to get ahold of Mr. Oshlo and you're just leaving

1    messages and such, were you interacting with your credit

2    department at Lexmark?

3              A.      I don't recall any specific -- I mean, I'm

4    sure I was, but I just don't recall any specific

5    conversations.

6              Q.      When I say credit department, is that the

7    same as the treasury department at Lexmark?

8              A.      No.   That would be -- credit department to

9    me would be Kevin Sarkisian and anyone who worked for

10   him.

11             Q.      Did the credit department or any other

12   department give you any type of an operating plan as far

13   as trying to collect the outstanding accounts receivable

14   or the aged accounts receivable from Inacom?

15             A.      No.   No plan other than just get it as

16   soon as you can get it.

17             Q.      Do you know who the accounts payable

18   person was at Lexmark who was contacting Inacom?

19             A.      I believe it was Misty.  I'm not sure of

20   the girl's name.  I think it was Misty.

21             Q.      Misty Atchison?

22             A.      Yeah.

23             Q.      As you sit here today, do you have a

24   recollection that when you were talking about held

25   checks at Inacom you were talking about checks that were

 1   actually issued by Inacom made payable to Lexmark?

 2        A.    That was my impression, yes.

 3        Q.    When was the next meeting that you can

 4   recall having with anyone at Inacom, including

 5   Mr. Kerkman, following the meeting at the end of

 6   January 2000?

 7        A.    I don't have -- I can't remember when I

 8   met with him.  Like I say, I don't have any record of

 9   when I travelled out there.  I'm sure I was there in

10   February, but I don't recall the specific time or date

11   that I was there, because I had other accounts that I

12   was calling on as well.

13        Q.    At the next time that you went out to

14   Inacom or met with Mr. Kerkman, do you have any

15   appreciation of whether or not it was before or after

16   the sell of the Inacom distribution/asset division or

17   assets to Compaq?

18        A.    I honestly don't recall if it was before

19   or after.  I really don't.

20        Q.    And what's the -- do you recall the

21   substance of the next meeting that you had -- or strike

22   that.

23              Was the next meeting with Mr. Kerkman in

24   person?

25        A.    I didn't meet with him every time I went

1    out there.  I don't remember if I met with him the next

2    time.  There were times I would go there and I would

3    just meet with the buyer and work with them on any

4    promotions that we had going on.  So, you know, I don't

5    remember any -- I really don't.  I don't remember

6    specifics about that.

7        Q.    Okay.  Do you recall if the next meeting

8    whether or not the issue of outstanding or aged accounts

9    receivable came up?

10       A.    It would depend -- I recall Misty got sent

11   a letter that was sent from Compaq saying that they were

12   going to assume the liabilities, and I don't remember if

13   it was before that letter or after that letter, so no, I

14   don't remember.  I wish I had my log, but I don't.

15       Q.    Well, is it fair to say that you can't

16   recall after that January -- end of January 2000

17   meeting, you don't recall as you sit here today another

18   meeting where you met in person with the Inacom folks to

19   talk about aged or outstanding accounts payable -- or

20   accounts receivable?  I'm sorry.

21       A.    I can't remember a specific meeting, no.

22   I can't tell you what dates it occurred or anything like

23   that.  I know I had conversations -- I continued to have

24   conversations with people until we got paid, but in

25   terms of being able to tell you who specifically I met

1  with and what the specific conversations were, I don't

2  recall.

3      Q.    Okay.  But you recall -- you do recall the

4  fact that you continued to try to collect the account

5  that was owed by Inacom to Lexmark?

6      A.    Well, yeah.  Yeah.

7      Q.    That still was a duty?

8      A.    That still was a duty until the check came

9  in.  I was on the hook to keep after it to try to get us

10  paid.

11      Q.    Okay.  And what about Mr. Funk?  Was he

12  doing the same thing?

13      A.    I don't -- no.  Huh-uh.  No, I was

14  basically told to get that.  I mean, I would ask him

15  when you're out there, you know, see if you can find out

16  anything.  But in terms of him -- he really didn't have,

17  in my opinion, any good contacts on the finance side of

18  the business, and that seemed to be where all the

19  control was being held at.

20      Q.    Okay.  You mentioned previously that a

21  slow payment was anything over 45 to 60 days?

22      A.    Uh-huh.

23      Q.    Was there any terminology you would use to

24  refer to invoices that were in excess of 60 days in age?

25      A.    I'd say they were aged or old or way past

1  due, you know.

2        Q.      Nothing else, no other term?

3        A.      No.  None that I used.

4        Q.      When did you become aware that Inacom

5  filed for bankruptcy?

6        A.      I think it was -- I think I saw it on

7  Yahoo, either Yahoo or Wall Street Journal, it was one

8  of the periodicals, and it was in the June -- I want to

9  say it was in June.  I think it was the June time frame.

10       Q.      Had you been continuing to do business

11  with Inacom following the sale of the asset or

12  distribution division to Custom Edge or Compaq?

13       A.      Yes.

14       Q.      Do you know what division of Inacom you

15  continued to do business with?

16       A.      Well, at that point it was Custom Edge.

17  So we called on the same people we did before, so it was

18  the same group of people.  I mean, some people left

19  because of consolidation, but we continued to call on

20  Kurt and Bill.

21       Q.      Did you do business with Inacom out of

22  Alpharetta, Georgia?

23       A.      No.

24       Q.      Did you ever do any business with --

25       A.      Well, now, wait a minute.  Alpharetta,

1    Georgia.  I lived in Alpharetta, Georgia in 19 -- when I

2    worked for IBM, and I did do business with Inacomp, but

3    not Inacom in Alpharetta, Georgia.  But I did no

4    business with Inacom in -- well, they had a location in

5    there.  But in terms of my going out and making a call

6    there, no.  I strictly made calls at headquarters.

7        Q.    In February of 2000 were you aware that

8    after Inacom sold its asset or distribution division --

9    assets and distribution division to Compaq that it

10   continued to operate as Inacom in a service sector

11   business?

12       A.    I don't actually -- I know that they

13   continued to have branch offices for a period of time, I

14   recall that, but from a services standpoint that's

15   probably true, yeah.

16       Q.    So the question back to you again is do

17   you recall whether or not you did any business after the

18   sale of the distribution business of Inacom to Compaq

19   Custom Edge, did you do any business with the Custom --

20   or with the Inacom customer services business which was

21   operated out of Alpharetta, Georgia?

22       A.    No.  I don't ever remember doing that.

23       Q.    Do you know or do you recall at the time

24   Inacom filed for bankruptcy whether or not Inacom owed

25   any outstanding sums to Lexmark?

1       A.      I don't think Inacom did.  I mean, we

2  probably had some outstanding invoices with Custom edge,

3  but I thought all the invoices had been paid by Inacom

4  to us when they filed.

5       Q.      Did anybody ever ask you to compile any

6  outstanding invoices as part of a proof of claim in the

7  Inacom bankruptcy?

8       A.      No.

9       Q.      Other than the testimony you've given me

10  with respect to trying to contact Mr. Oshlo, did you

11  ever contact anybody in the Inacom accounting

12  department?

13      A.      I think -- I can't recall the guy's name.

14  But it was after I had the conversations with Mr. Oslo,

15  and it may have been somebody that worked for him, and I

16  think it was around the time frame of when the invoices

17  started being paid.  But I can't remember the guy's

18  name.  I think -- that's all I can recall.

19      Q.      Do you remember his title?

20      A.      No, I really don't.

21      Q.      You do remember he was in the accounting

22  department?

23      A.      He was in the accounting or the finance

24  side, but I don't remember the guy's name.  I met him on

25  a visit with Brad, but I don't remember exactly when.

1      Q.      For any of your other accounts up to the

2   time of February 2000, had you ever run across a client

3   who had cut checks payable to Lexmark but actually held

4   them?

5      A.      No.

6      Q.      This was the first occasion, that being --

7      A.      The first one I can recall, yeah.

8      Q.      This occasion with Inacom was the first

9   occasion of you ever being exposed to this issue of held

10  checks?

11     A.      Yeah.

12     Q.      As far as your business practices, did you

13  consider that to be out of the ordinary?

14     A.      Yes.  Out of the ordinary in the sense

15  that people don't normally do that, but they were also

16  going through an acquisition so I thought it could make

17  sense.

18     Q.      Well, I was looking at it from out of the

19  ordinary from one of your -- as opposed to one of your

20  other accounts as far as doing business with another

21  reseller, this instance of sums being owed to Lexmark,

22  someone telling you that yes the sums had been approved,

23  a check had been cut, but they're not going to send you

24  the check.  Was that out of the ordinary?

25     A.      That would be out of the ordinary.