1    that acceptable to you?

2         A.    Sure.

3         Q.    Okay.  I just want to make sure we don't

4    get in any misunderstanding here because Hewlett-Packard

5    was also involved with Inacom as a totally separate

6    relationship.

7         A.    As a vendor.

8         Q.    That's correct.  But I will be referring

9    to Compaq as the entity that's being sued and the entity

10   that acquired the Inacom assets.

11        A.    Okay.

12        Q.    Okay?  You ready?  You want a minute?

13        A.    Let's go.

14        Q.    Okay.  My first question is just going to

15   ask you, is this your handwriting?

16              (Document handed to witness.)

17        A.    No.

18        Q.    You can return that to me.  Save yourself

19   some time.

20              MR. HALLIDAY:  Go off the record.

21              (Off-the-record discussion.)

22        Q.    I'll try not to repeat what Mr. Nolan

23   asked you about earlier.  He was skirting around some

24   areas of questions that I think you were trying to hint

25   to him that he should get to the meat of the coconut,

1    and he was doing that on purpose because those questions

2    relate more to Compaq's part of the case than Inacom's.

3            A.      Okay.

4            Q.      So he was deferring.  And let me get to

5    some of that stuff.

6            A.      Okay.

7            Q.      I'm going to hand you what we marked in

8    Mr. Kendrick's deposition as Exhibit 2.  Are you

9    familiar with this letter, sir?

10           A.      Yes.

11           Q.      Is that your signature that appears on it?

12           A.      Yes.

13           Q.      Okay.  And did you send this letter to

14   Mr. Oshlo on or about February 15, 2000?

15           A.      Yes.

16           Q.      And as you testified a little while ago,

17   you copied it to Mr. Leon Kerkman at Inacom --

18           A.      Right.

19           Q.      -- and also to Mr. Kendrick, who was then

20   your boss?

21           A.      Right.

22           Q.      Did you show this letter in draft to

23   Mr. Kendrick before it was sent?

24           A.      We kind of worked together on it.

25           Q.      So it was a product of a mutual effort?

1        A.      Right.

2        Q.      Between you and Mr. Kendrick?

3        A.      Correct.

4        Q.      But the substance of the letter reflects

5   communications that you had with Inacom, not that

6   Mr. Kendrick had with Inacom; is that right?

7        A.      That's correct.

8        Q.      So you're the one with the personal

9   knowledge --

10       A.      Right.

11       Q.      -- of the statements reflected in the

12  letter?

13       A.      Correct.

14       Q.      Okay.  The second paragraph, and I'll read

15  it for the record, says, "It is my understanding from

16  Leon Kerkman, with whom I met last week, that any

17  invoices that have had checks written against them will

18  be held until the sale is completed between Inacom and

19  Compaq.  The proceeds from the sale would then cover

20  these checks, and they will be disbursed over a period

21  of one to ten weeks.  Additionally, Compaq will assume

22  the liability of Lexmark invoices that have had not

23  checks written against them."

24              Was your understanding that Compaq was

25  going to assume the liabilities of what Inacom owed to

1    Lexmark other than the held checks?

2           A.     Yes.

3           Q.     Who did you have that understanding from?

4           A.     Leon.

5           Q.     Anybody else at Inacom?

6           A.     Well, at that time, no.

7           Q.     I just have to --

8           A.     Right.

9           Q.     I always have to pin down if there's any

10   other source of your information.

11          A.     Right.  No.

12          Q.     And Inacom was going to go ahead and

13   release the checks that it was holding in the treasury

14   department and the held checks would be satisfied,

15   obviously, by Lexmark negotiating those checks.  Right?

16          A.     I don't know what you mean by us

17   negotiating.

18          Q.     Them clearing your bank account?

19          A.     Oh, okay.  Yeah, we would -- once they

20   cleared, then we would consider the stuff paid, right.

21          Q.     Did you have any understanding about

22   whether Compaq was also assuming the liability to make

23   good on the held checks after they had been released and

24   paid?

25          A.     Well, my assumption always was that Compaq

1   would make good the payments, but I don't think at the
2   time I knew whether or not the checks were going to be
3   written from Inacom.   I mean, I don't think I knew the
4   source of the money, who was actually going to be paying
5   for the checks, if it was going to be coming out of an
6   Inacom account or it was going to be coming out of a
7   Compaq account.   I don't think I knew the source of the
8   money, but I felt like Compaq would cover the invoices.
9        Q.     All invoices?
10       A.     All of them, yeah.
11       Q.     So any invoice that was outstanding?
12       A.     Right.
13       Q.     Okay.   Then why does it say here Compaq
14  will assume the liability of Lexmark invoices that have
15  not had checks written against them?   Did you write an
16  incorrect statement in that letter?
17       A.     No.   No.   Maybe I'm not saying it right.
18  I believed that the checks that were being held -- I
19  don't know who was the ultimate source of the funds.   I
20  don't know if it was coming from Inacom or it was coming
21  from Compaq, but I believed that we would be paid
22  that -- those checks and that they would clear and that
23  we would be paid for it.   And anything that was not --
24  had not had a check written on it previously, that
25  Compaq would assume that liability.   That was my

```
 1   understanding.  I don't think I ever asked Leon who was
 2   really paying -- you know, what billfold it was coming
 3   out of.  My assumption was that we would be paid when
 4   the transaction was completed off the proceeds of the
 5   sale.  So whether or not it was -- I never asked that
 6   question.
 7        Q.    So from your point of view, if Inacom was
 8   going to use the money that it got from Compaq for the
 9   sale to pay Lexmark, that didn't matter to you.  It
10   didn't matter where it was coming from as long as
11   Lexmark got paid?
12        A.    From my perspective, I would say that's
13   true.
14        Q.    Was it your expectation that these held
15   checks would be -- strike that.
16              Was it your expectation that the checks
17   they were holding in Treasury would eventually be paid
18   through the proceeds that -- of the Compaq --
19        A.    I think I put that in there, didn't they?
20              (Witness reviews document.)
21        A.    "Proceeds from the sale will then cover
22   those checks, and they will be disbursed over a
23   period...."
24        Q.    Okay.  So it was your understanding
25   that --
```

```
 1          A.    I didn't know where the funds were coming
 2   from, but -- I didn't know if Compaq would be paying the
 3   funds or Inacom would be paying the funds, but it was my
 4   expectation that the checks that were being held,
 5   whether or not Compaq gave Inacom the money or Inacom
 6   gave Compaq, those checks that were being held were
 7   going to paid, and then anything else that was
 8   outstanding Compaq would assume the liability.  That was
 9   my understanding.
10          Q.    Okay.  Did you know how much Compaq was
11   paying Inacom for its distribution business?
12          A.    No.
13          Q.    Did Leon tell you?
14          A.    I don't remember him telling me, no.  How
15   much they were paying them?
16          Q.    Yeah.
17          A.    No.  I don't ever remember him telling me
18   how much they were paying them.  He may have, but I
19   don't remember that.  I would think that would be
20   confidential.  I don't know.
21          Q.    So he never mentioned to you -- well,
22   let's put a framework and some dates.  Do you know when
23   the sale closed?
24          A.    I think in March, sometime in March,
25   middle of March.
```

```
 1          Q.     Okay.  With your counsel's permission, I'm
 2    going to state for you that the sale actually -- the
 3    records reflect that the sale closed on February 16,
 4    2000.
 5          A.     Okay.
 6          Q.     And so this letter would have been written
 7    the day before the closing, February 15, 2000.
 8          A.     Okay.
 9          Q.     I'm not asking you to assume that that's
10    correct, but I'm trying to place it in time.
11          A.     Thank you.
12          Q.     So I guess, then, rather than peg it by
13    the closing date, because you don't have personal
14    knowledge of that, let me peg my questions by the date
15    of your letter.  As of the day you sent this letter,
16    February 15, 2000, Leon Kerkman hadn't mentioned to you
17    the purchase price for the transaction that Inacom was
18    receiving?
19          A.     No.
20          Q.     So you had no idea whether it was
21    $50 million or $350 million?
22          A.     Well, I'm sure there was something in the
23    rags, but I don't remember the dollar amount.  I don't
24    remember Leon saying anything to me about it.
25          Q.     Okay.  Did he tell you how Inacom was
```

1  going to use the sale proceeds?

2      A.    No.

3      Q.    So he didn't describe to you that Inacom

4  would take the sale proceeds and pay off a factoring

5  company with which it had factored some receivables and

6  pay off some of its bank debt and pay vendors like

7  Lexmark and others that had past due payables?

8      A.    No.   I don't remember him saying anything

9  like that to me.

10      Q.    Okay.   So he didn't say more to you -- he

11  didn't give you any more detail than the proceeds of the

12  sale will cover the checks and they will be disbursed

13  over a period of one to ten weeks?

14      A.    I don't remember him saying anything more

15  than that.   I think if he would have said anything more

16  than that, I would have put it in a letter.

17      Q.    Was it your understanding that -- from

18  Mr. Kerkman that there was any money flowing from Inacom

19  to Compaq as part of this acquisition transaction?

20      A.    That Inacom was paying Compaq?

21      Q.    Yeah.

22      A.    No.   I never had that belief.

23      Q.    So it was your understanding that -- well,

24  did you know -- first of all, let me see if I can jar

25  your memory at all about whether he did tell you --

1        A.      Right.

2        Q.      -- specifics of the transaction.  Did he

3   advise you that it was a purchase of assets as opposed

4   to a stock purchase?

5        A.      Gosh, I don't remember him taking me

6   through anything like that.  You know, as I recall,

7   everybody was pretty secretive until the due diligence

8   was over.  And, you know, I just don't recall having any

9   conversations with anybody about we're going to take

10  this and put it here.  I don't recall that at all.  I

11  don't think -- I don't think I ever had a conversation

12  about that because that just doesn't ring anything.

13       Q.      But he advised you that the money was

14  going from Inacom to Compaq.  Right?

15       A.      No, not from Inacom, Compaq.

16       Q.      I'm sorry, I said that backwards.  He

17  advised you that money was going from Compaq to Inacom?

18       A.      Right.  I mean, there was going to be --

19  the sale was going to be completed, and my assumption

20  would be, then, that if -- see, I don't know on the back

21  end the stack of invoices or checks or whatever you want

22  to say, I wasn't sure if Inacom was going to be paying

23  those or Compaq was going to be paying those, and I

24  didn't know the source.  My assumption was that they're

25  waiting to be paid by Compaq to pay the invoices.  But

1   that's an assumption.  No one specifically said -- I

2   can't remember him saying, well, we're waiting for

3   Compaq to pay us so we can pay you.  I don't remember

4   that.  It was -- money was going to be released, but I

5   don't remember delving into the details.  I was more

6   concerned with just are we going to get paid, you know,

7   that kind of thing.

8          Q.     Were the checks that were eventually

9   released by Inacom -- well, strike that.

10         Who notified you when -- that Inacom held

11  checks were eventually released in late March?

12         A.     I think I got that from our accounts

13  receivable people.  It was either Misty or Kevin.  I

14  don't think -- I don't remember Inacom calling me up and

15  telling me that they were being released.  I think I got

16  it from -- and I'm not even sure we received -- I don't

17  know.  They could have wired the money.  I don't know.

18         Q.     So you don't know if it was wire transfers

19  or checks?

20         A.     I don't recall.  No.

21         Q.     Mr. Sarkisian would be more knowledgeable

22  about that than you?

23         A.     He would be, yeah, because none of that

24  flowed through us.

25         Q.     I'm still trying to make sure I understand

1   your understanding of the transaction, so I apologize

2   for repeating myself.

3        A.     I apologize for not explaining myself.

4        Q.     I understand that so long as Lexmark got

5   paid, it wasn't really of particular concern to you how

6   Lexmark got paid --

7        A.     Right.

8        Q.     -- between Inacom and Compaq.  But I am

9   trying to get your -- the most concrete testimony I can

10  about what you did think at the time was going to

11  happen.

12             You understood that some money was going

13  to flow from Compaq to Inacom at the sale closing.

14  Right?

15       A.     Yeah.  That would be a safe assumption,

16  yes.

17       Q.     And that therefore Inacom's bank account

18  would have sufficient funds for those checks that were

19  being held in the treasury department to be good so that

20  they could be sent to Lexmark --

21       A.     Correct.

22       Q.     -- to be paid?

23       A.     Correct.

24       Q.     And how is it that Compaq in your

25  understanding was involved in that process other than

1  funding the money for the purchase of these assets?

2          A.      I think that -- I don't have any -- I

3  mean, the extent of -- you just said it.  I mean, I

4  think Compaq was the provider of the funds for Inacom.

5  I don't -- you know.

6          Q.      Okay.  But it wasn't a gift and it wasn't

7  lending funds.

8          A.      No.

9          Q.      It was buying something --

10         A.      Okay.

11         Q.      -- so that Inacom then had money in its

12  bank account?

13                 MR. HALLIDAY:  Let her finish the

14  question, and then when you answer, let's just tell her

15  what we know.  Okay?

16                 THE WITNESS:  Yeah.

17         A.      You want to ask the question one more

18  time?

19         Q.      Sure.  You said that Compaq was providing

20  the funds.

21         A.      I think they were providing the funds.

22         Q.      Okay.

23         A.      I don't know that for sure, but I think

24  they probably were, yeah.

25         Q.      But Inacom owed you the money.

```
1        A.      Right.

2        Q.      And Compaq bought some of Inacom's assets

3   and paid a purchase price.

4        A.      Right.

5        Q.      So the reason that Compaq was providing

6   the funds is just because it was paying a contractual

7   obligation in exchange for which it got assets.

8        A.      Correct.

9                MR. HALLIDAY:  Wait.  We need to get a

10  question.  I don't think she was finished.  There wasn't

11  a question mark at the end of that.  It was a

12  declarative statement.

13               THE WITNESS:  Okay.

14               MR. HALLIDAY:  Cecily, I've been quiet

15  all day.  This area, we're just getting a little bit --

16  and it's kind of like okay, okay, okay.  So I don't

17  think he knows what the transaction was about.  I think

18  that's pretty darn clear.

19               MS. DUMAS:  I understand.

20               MR. HALLIDAY:  I'm not trying to --

21               MS. DUMAS:  No, no, no, no, no.

22       Q.      And the reason that I'm doing this is

23  because this letter really -- well, this letter says

24  that the proceeds from the sale will cover the checks

25  and they will be disbursed over a period of one to ten
```

1    weeks.  And I'm reading that as the checks will be

2    disbursed by Inacom over a period of one to ten weeks.

3    Is that your understanding as well?

4         A.    I'm kind of asking for a declaration of

5    what its going to be in this letter.  I'm trying to get

6    a confirmation.  I'm not trying to say this is the way

7    it's going to -- I'm trying to go to Dick and say, okay,

8    my understanding from Leon is that this is what's going

9    to happen.  Is that true?  And that's why I sent him a

10   letter to just get a confirmation, that is this the way

11   it's going to happen?  I mean, I was just looking for a

12   confirmation.  I'm not -- I don't know all the specifics

13   of the transaction that occurred between Inacom and

14   Compaq.  I'm just trying to understand -- Leon said we

15   were going to be paid, we're going to be paid when the

16   disbursement happened.  Is this the way it's going to

17   happen.  That's what I was trying to understand.

18        Q.    I appreciate that explanation.  Thank you.

19              Does this letter accurately reflect what

20   your understanding was from what Leon Kerkman told you?

21        A.    Yes.

22        Q.    And when Dick Oshlo called you back after

23   you got this letter, did he confirm to you that the

24   understanding reflected in this letter was correct?

25        A.    Yes.

1        Q.     So when the letter says Compaq will assume

2   the liability of Lexmark invoices that have not had

3   checks written against them, weren't you confirming that

4   Compaq was only assuming open payables and Inacom was

5   going to pay the held checks?

6        A.     No, I don't think I was confirming that.

7   Again, I wasn't sure who was paying the -- I mean, I

8   didn't know the source of the funds that were paying

9   for -- you could say that I -- my assumption is that

10  Compaq was paying for assets, but I'm not sure that the

11  exact money that they paid was the money that was used

12  to pay the invoice.  You know, I didn't have any of the

13  inside information on it.

14       Q.     What did you mean when you wrote this

15  sentence:  Compaq will assume the liability of Lexmark

16  invoices that have not had checks written against them?

17       A.     That means any invoices that were still

18  outstanding, Compaq would assume the responsibility of

19  paying for them.  In other words, any checks -- if we

20  had any invoices that they didn't have written, that

21  Compaq would still pay for those as well, if Inacom

22  didn't pay.  Now, I didn't write this letter by myself,

23  but that's what I believe was the intent of this letter.

24       Q.     And what is your understanding, as

25  reflected in this letter, of who would pay invoices that

1   did have checks written against them?

2       A.      If -- I don't know who would be the

3   signer, but the Inacom checks would -- the checks that

4   we had sent to Inacom with the name Inacom would be

5   paid.  But again, I don't know if it would be coming out

6   of an Inacom checking account or a Compaq checking

7   account.  I don't think I was concerned about that at

8   the time.  I just wanted to make sure that we're going

9   to get paid.  I mean, you know.

10      Q.      Okay.  Let's start again.

11              MR. HALLIDAY:  No.  We've started

12  through it six or seven times.  I know you're

13  frustrated, Cecily.  You've asked him that same question

14  six or seven times.

15              MS. DUMAS:  No, I haven't.

16              MR. HALLIDAY:  No, no.  You have.  And

17  asked and answered.  Let's move on, please.  Please.

18      Q.      From whose -- all right.  Let's go back to

19  this notion of holding checks.  In the second or third

20  week of January Leon Kerkman advised you that this

21  treasury department of Inacom had written checks but

22  they were being held in a drawer.  Right?

23      A.      I don't know if they were -- they were

24  being held, right.

25      Q.      They were being held.

1          A.      Right.

2          Q.      By Inacom.

3          A.      Yes.

4          Q.      Before the sale closing.

5          A.      It was before the transaction went final,

6    correct.

7          Q.      Before they had Compaq's money, they had

8    written checks off their bank account.

9          A.      I don't know what the check looked like,

10   so I don't know how the check was written.  But it was

11   my understanding that the checks had been written, but

12   they had not been released, and they were waiting for

13   funds to hit the account.  That's...

14         Q.      And those funds could be from any source?

15         A.      They could be from any source.

16         Q.      Inacom was waiting for funds to hit its

17   operating account so that it had sufficient money?

18         A.      Let's backtrack one more time here.  I

19   don't know if because of the transaction that was going

20   on that -- I don't know the details of the Inacom/Compaq

21   transaction.  All I know is that I don't believe any

22   invoices were being paid in this interim time period,

23   and I don't know what was causing it.  I don't know if

24   they were waiting on Compaq funds or they were just

25   waiting on the sale to be completed before they paid the

1   funds.  So I'm not sure that I want to go on record as

2   saying that we're waiting on Compaq funds because I

3   don't know if we were waiting on Compaq funds or we were

4   just waiting on the transaction to be completed.  Okay?

5   Because I don't know where -- I mean, for all I know,

6   Inacom could have had the money sitting in the bank but

7   they were waiting on the transaction to close before

8   they paid it.  I don't know.

9       Q.      And Inacom eventually released the checks

10  it was holding.  Right?

11      A.      That's right.

12      Q.      And Lexmark eventually got paid everything

13  that Inacom owed it.  Right?

14      A.      I believe so.  I think we got it all.

15      Q.      Is it your understanding that Compaq paid

16  the accounts payable that it assumed under the

17  transaction?

18      A.      I don't think I have that knowledge as to

19  who actually paid it.  I mean, I would have had to have

20  seen the check or the wire to see who it came from, and

21  I have no idea.

22      Q.      Who would be more knowledgeable than you

23  about that subject?

24      A.      Kevin Sarkisian.

25      Q.      I think maybe -- I'm trying to understand

1    where the disconnect is between us, because I don't

2    understand your answers, and I think you're getting

3    frustrated with my questions.  Are you drawing a

4    distinction between the phrase:  Compaq will assume the

5    liability of invoices versus Compaq will make funds

6    available to fund checks that have already been written?

7    Is that the distinction?

8         A.    No.  I'm making the assumption --

9              MR. HALLIDAY:  Wait.  Let her ask

10   another question.

11             THE WITNESS:  Okay.

12             MR. HALLIDAY:  You just answer.

13             MS. DUMAS:  No, I've asked the

14   question.  And it's another question.

15             MR. HALLIDAY:  And he said no.  Now

16   it's another question.

17             MS. DUMAS:  Well, he can explain his

18   no.

19             MR. HALLIDAY:  Well, I'm telling him

20   not to explain it.  I'm telling him to answer your

21   questions.

22        Q.    What did you mean when you wrote the

23   sentence:  Additionally, Compaq will assume the

24   liability of Lexmark invoices that have not had checks

25   written against them?

1      A.      That all back debt would be -- would be

2  paid and that Compaq would assume any liability that was

3  left over.

4      Q.      Thank you.  All back debt would be paid by

5  whom?

6      A.      By Compaq.

7      Q.      If that's your -- and that's your

8  testimony:  All back debt would be paid by Compaq?

9      A.      Anything that was not in that stack, yeah.

10 I mean, that's what I recall the statement being.

11     Q.      Okay.  So anything that was not in the

12 stack of held checks, Compaq would assume that debt; is

13 that what you're saying?

14     A.      Yes.

15     Q.      Okay.

16     A.      I mean, I'm not making that a statement of

17 fact.  I'm looking for confirmation.

18     Q.      Right.  That's what you were being told?

19     A.      Yeah, that's what I'm being told.  I'm

20 looking for confirmation.

21     Q.      I understand that.

22     A.      I'm getting a lot of different -- tell me

23 what the deal is going to be.  That's what I'm looking

24 for in this letter.

25     Q.      Okay.  And the confirmation you got is

1    that Compaq would assume liability for everything except

2    the checks that were sitting in treasury?

3         A.    Well, there was another letter that came

4    from Compaq that was dated the 16th that I believe said

5    that, that they would assume all liabilities.

6         Q.    With or without the held checks?

7         A.    I think it said that they would take it

8    all.  I mean, I don't have that letter here in front of

9    me, but there was a letter that came out that said that

10   they would assume all liabilities that were outstanding

11   to Lexmark.  And I don't have the exact verbiage.  I'm

12   sure you guys got a copy of it some place but that's...

13        Q.    I understand what you're saying, and I'd

14   be happy to show you that letter.  I will show you that

15   letter.  Do you understand that to modify your

16   understanding that Compaq from this letter, from this

17   communication from Inacom, as reflected by your

18   conversation with Mr. Kerkman and the subsequent

19   conversation with Mr. Oshlo, that Compaq would assume

20   everything other than what was sitting in a drawer in

21   held checks?

22        A.    My assumption would be that Compaq would

23   assume all the liability, not just what was not in a

24   drawer or anything.  My assumption is that they would

25   pay for everything.

1      Q.     Then your sentence is incorrect when you
2  say Compaq will assume the liability of Lexmark invoices
3  that have not had checks written against them?
4               MR. HALLIDAY:  Objection.  That
5  mischaracterizes his repeated testimony.  That what he's
6  doing here is reflecting what he was told by Leon
7  Kerkman.  That's all he did in that letter.  Go ahead
8  and answer the question if you can.
9      A.     All I'm saying is that if there are any
10  other outstanding debts that the -- that are not sitting
11  in this hypothetical drawer of checks -- it's not
12  hypothetical, but this drawer of checks that we've been
13  referring to, if there are additional, you know,
14  invoices, that Compaq will assume it.
15              And I've said before, I don't know if
16  Compaq is funding the payment of those invoices that are
17  in there or Inacom is funding those.  My understanding
18  from talking to Leon was that those checks would clear
19  when the transaction took place.  I did not ask Leon is
20  the money coming from Compaq or is it coming from
21  Inacom.  I never asked that question.  I never made any
22  assumption as to who was paying for that.
23              But my statement in here is I'm trying to
24  understand, you're going to pay those, and then Compaq
25  is going to assume the rest of any outstanding invoices.