UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In Re:  INACOM CORP, et al.<br>    Debtors | Chapter 11<br>Bankruptcy Case No.<br>00-2426 (PJW) |
| _____ | |
| INACOM CORP., et al.<br>        Plaintiffs<br>    v.<br>TECH DATA CORPORATION<br>        Defendant | Civil Action No.<br>04-CV-148 (GMS) |
| _____ | |
| INACOM CORP., et al.<br>        Plaintiffs<br>    v.<br>DELL COMPUTER CORP.<br>        Defendant | Civil Action No.<br>04-CV-582 (GMS) |
| _____ | |
| INACOM CORP., et al.<br>        Plaintiffs<br>    v.<br>LEXMARK INTERNATIONAL, INC.<br>        Defendant | Civil Action No.<br>04-CV-583 (GMS) |
| _____ | |
| INACOM CORP., et al.<br>        Plaintiffs<br>    v.<br>RESILIEN, INC.<br>        Defendant | Civil Action No.<br>04-CV-584 (GMS) |
| _____ | |
| INACOM CORP., et al.<br>        Plaintiffs<br>    v.<br>INGRAM ENTERTAINMENT INC.<br>        Defendant | Civil Action No.<br>04-CV-593 (GMS) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ORAL DEPOSITION OF**

**BEN K. WELLS**

**MARCH 30, 2005**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL DEPOSITION OF BEN K. WELLS, produced as a

witness at the instance of the Defendants, and duly

sworn, was taken in the above-styled and numbered cause

on the 30th day of March, 2005, from 12:35 p.m. to 2:59

p.m., before Debbie Leonard, CSR, RMR, CRR, a Certified

Shorthand Reporter in and for the State of Texas,

reported by machine shorthand, at the offices of

Hewlett-Packard, 20555 State Highway 249, Building

CC-A6, Conference Room 6801, Houston, Texas, pursuant

to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

```
 1                    A P P E A R A N C E S

 2  FOR THE PLAINTIFF:
         Mr. Andrew W. Caine
 3       (via telephone)
         PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB
 4       10100 Santa Monica Boulevard
         11th Floor
 5       Los Angeles, California 90067
         FAX:  (310) 201-0760
 6       PHONE:  (310) 277-6910

 7  FOR THE DEFENDANT, TECH DATA CORPORATION:
         Mr. Stephen C. Hunt
 8       ADORNO & YOSS
         350 East Las Olas Boulevard
 9       Suite 1700
         Fort Lauderdale, Florida 33301
10       FAX:  (954) 766-7800
         PHONE:  (954) 763-1200
11
    FOR THE DEFENDANT, DELL COMPUTER CORP.:
12       Mr. G. James Landon
         HUGHES LUCE, LLP
13       111 Congress Avenue
         Suite 900
14       Austin, Texas 78701
         FAX:  (512) 482-6859
15       PHONE:  (512) 482-6880

16  FOR THE DEFENDANT, LEXMARK INTERNATIONAL, INC.:
         Mr. Culver V. Halliday
17       STOLL, KEENON & PARK, LLP
         2650 Aegon Center
18       400 West Market Street
         Louisville, Kentucky 40202-3377
19       FAX:  (502) 568-5700
         PHONE:  (502) 568-9100
20
    FOR THE DEFENDANT, INGRAM ENTERTAINMENT:
21       Mr. Jonathan P. Hersey
         (via telephone)
22       BINGHAM McCUTCHEN, LLP
         600 Anton Boulevard
23       18th Floor
         Costa Mesa, California 92626
24       FAX:  (714) 830-0719
         PHONE:  (714) 830-0619
25
```

```
 1              A P P E A R A N C E S
                    (Continued)
 2
    FOR EXECUTIVE SOUNDING BOARD, INC., LIQUIDATING AGENTS
 3  OF DEBTOR, INACOM CORP.:

 4       Mr. Earl M. Forte
         BLANK ROME, LLP
 5       One Logan Square
         18th & Cherry Streets
 6       Philadelphia, Pennsylvania 19103
         FAX:  (215) 832-5618
 7       PHONE:  (215) 569-5618

 8  FOR THE WITNESS AND THIRD-PARTY DEFENDANT, COMPAQ
    COMPUTER CORPORATION:
 9
         Ms. Cecily A. Dumas
10       FRIEDMAN, DUMAS & SPRINGWATER, LLP
         One Maritime Plaza
11       Suite 2475
         San Francisco, California 94111
12       FAX:  (415) 834-1044
         PHONE:  (415) 834-3800
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                                                  PAGE

 3   Appearances..................................    2

 4   BEN K. WELLS

 5

 6        Examination by Mr. Hunt...................   7

 7        Examination by Mr. Landon................  58

 8        Examination by Mr. Hersey................  71

 9        Examination by Mr. Caine.................  77

10        Further Examination by Mr. Hunt..........  76

11

12

     Changes and Signature.........................  79
13
     Reporter's Certificate........................  81
14

15

16

17

18

19

20

21

22

23

24

25
```

1                     E X H I B I T S

2    NUMBER           DESCRIPTION                          PAGE

3    Wells-1          Defendant's First notice of            18
                      Deposition of Ben Wells
4
     Wells-2          notice of Rule 30(b)(6)                 31
5                     Deposition

6    Wells-3          Forwarding E-mail                       47
                      From:  Ward, Michael
7                     Sent:  February 03, 2000
                      To:  Zava Mike et al.
8
     Wells-4          Fax Transmittal                         51
9                     To:  Mr. Mike Zafa
                      From:  Bill Francis
10                    Dated:  02/16/00

11   Wells-5          Letter to Ms. Misty Atchinson           51
                      from Bill Francis, dated
12                    February 16, 2000

13   Wells-6          Letter to Logicare, Inc.                51
                      from Bill Francis, dated
14                    February 17, 2000

15   Wells-7          Letter to The Board of                  55
                      Directors of Inacom
16                    Corporation and Compaq
                      Computer Corporation from
17                    Houlihan Lokey Howard & Zukin,
                      dated February 16, 2000
18
     Wells-8          Services, Supply and Sales              59
19                    Agreement

20   Wells-9          Document titled:  8K Mar 00             64
                      Bates stamped 00134 -00204
21
     Wells-10         Letter to Inacom Corp from Ben          67
22                    K. Wells, dated February 15,
                      2000
23

24

25

1                          **BEN K. WELLS,**

2    having been first duly sworn, testified as follows:

3                          **EXAMINATION**

4    **BY MR. HUNT:**

12:35  5        Q.   Good afternoon, Mr. Wells.  My name is

6    Stephen Hunt, and I'm from the law firm of Adorno &

7    Yoss, and I represent Tech Data Corporation.

8                    Tech Data is a defendant in a lawsuit

9    brought by Inacom for recovery of avoidable

12:35 10    preferential transfers.  And in turn, Tech Data is a

11    third-party plaintiff as to Hewlett-Packard.

12                    Have you ever had your deposition taken

13    before?

14        A.   Yes.

12:35 15        Q.   How many times, sir?

16        A.   Twice.

17        Q.   I ask because I want to ensure that you're

18    familiar with the method of stenographic recording of

19    your answers.  I would ask you to please wait until my

12:35 20    answers [sic] have been completed before you answer.

21                    I would also ask you to ensure that you

22    verbally respond to my questions so that the reporter

23    can take down your answers.  A shake or nod of your

24    head is not readily transcribable.

12:36 25                    Accordingly, I would ask you to pay

1  attention to those rules.  Do you understand?

2      A.    Yes.

3      Q.    Thank you.  Prior to going on the record, I

4  heard the reporter ask you your full name, and you said

12:36  5  Ben K. Wells.

6      A.    Correct.

7      Q.    What does the middle initial stand for?

8      A.    Kent.

9      Q.    Where do you reside, sir?

12:36  10      A.    23103 Holly Hollow, Tomball, Texas.

11      Q.    Would you mind spelling the name of that town

12  for me, sir?

13      A.    T-O-M-B-A-L-L.

14      Q.    Thank you.  Do I understand correctly that

12:37  15  you are no longer employed by Hewlett-Packard?

16      A.    That's correct.

17      Q.    What was your separation date, sir?

18      A.    June 29th, 2002.

19      Q.    What was your title or position when you

12:37  20  departed the company?

21      A.    Vice president, corporate treasurer.

22      Q.    Am I correct that that was vice president and

23  corporate treasurer of Hewlett-Packard?

24      A.    No.  That would be Compaq.

12:37  25      Q.    Compaq Computer Corporation?

1    A.    Correct.

2    Q.    When is the most recent time that you had

3  your deposition taken, sir?  Month and year would be

4  sufficient.

12:37  5    A.    I -- I can't recall the month.  I'm not even

6  sure I can recall the year.  It would have been maybe

7  two years, perhaps, before the sale.

8    Q.    And by "the sale" --

9    A.    The merger of Compaq and HP.

12:38  10    Q.    Okay.  In what context was your deposition

11  sought?  Was it pertaining to a lawsuit?

12    A.    Yes.

13    Q.    Do you recall who the parties were?

14    A.    It was Compaq Computer Corporation versus, I

12:38  15  believe, the bank group of Inacom.

16    Q.    I believe you indicated that you had been

17  deposed one prior occasion, sir.

18    A.    Yes.

19    Q.    Was that a long time prior to --

12:38  20    A.    Yes.

21    Q.    -- the bank group deposition?

22    A.    Yes.

23    Q.    Was that in the context of your employment

24  duties with Compaq Computer?

12:38  25    A.    Yes.

```
 1        Q.    Do you recall the parties to that lawsuit,
 2   sir?
 3        A.    Frankly, I don't.  Obviously Compaq was.  It
 4   was a class action lawsuit that was filed in '88, '89.
 5        Q.    Mr. Wells, how long had you been employed by
 6   Compaq?
 7        A.    I was employed just a little over 15 years.
 8        Q.    In what position did you start with Compaq
 9   when you joined, sir?
10        A.    Manager of foreign exchange.
11        Q.    Was there a particular department within the
12   corporate structure of Compaq that that position
13   reported in?
14        A.    Treasury department.
15        Q.    After that position, sir, how long did you
16   serve as manager of foreign exchange?
17        A.    I can't recall a specific, but perhaps 18
18   months.
19        Q.    And I presume you had an elevation of some
20   type to another position, sir?
21        A.    I did.
22        Q.    And what was that position?
23        A.    Director of foreign exchange.
24        Q.    Did you have any other positions prior to
25   being elevated to vice president and corporate
```

12:39  5
12:40 10
12:40 15
12:41 20
12:41 25

1  treasurer?

2       A.   I was the assistant treasurer.

3       Q.   At the time of the sale of the hardware

4  assets by Inacom to Compaq, what was your position with

12:41  5  Compaq?

6       A.   I was acting chief financial officer and vice

7  president, corporate treasurer.

8       Q.   Whom did you succeed as CFO, even in the

9  acting capacity?

12:42 10       A.   Earl Mason.

11       Q.   And at what time did you commence serving as

12  acting CFO?

13       A.   Beginning of April 1999.

14            MR. HALLIDAY:  I'm sorry.  Did you

12:42 15  say '89?

16            THE WITNESS:  '99.

17            MR. HALLIDAY:  Thank you.

18       Q.   (By Mr. Hunt)  Sir, I presume at some point

19  you ceased acting as acting CFO.  When would that have

12:42 20  been?

21       A.   April of 2000.

22       Q.   Was the position as acting CFO in addition to

23  your other responsibilities as corporate treasurer?

24       A.   Yes.

12:43 25       Q.   And as of April of 2000, did you resume your

1  original duties solely as corporate treasurer?

2      A.    Yes.

3      Q.    Mr. Wells, would you explain what your

4  responsibilities were as corporate treasurer for Compaq

12:43  5  Computer Corporation?

6      A.    They were -- essentially fell into four or

7  five distinct areas.

8               First was cash management.

9               Second was capital markets, which

12:43  10  included debt management.

11               The third was foreign exchange.

12               The fourth was tax.

13               And the fifth was risk management, which

14  is another phrase for insurance.

12:44  15               And now I have one other one, which was

16  mergers and acquisition -- mergers and acquisitions.

17      Q.    Well, thank you, Mr. Wells.   I appreciate

18  what was a very comprehensive and short description of

19  responsibilities for treasurer.

12:44  20               As acting CFO, what additional

21  responsibilities were you undertaking on behalf of

22  Compaq?

23      A.    The activities that generally go with a chief

24  financial officer position.   That included filing of

12:44  25  financial statements with the SEC, which then, in turn,

```
 1  obviously included ensuring the proper close of the
 2  books of the corporation; forecasts, financial
 3  forecasts.  I also picked up some mundane -- I became
 4  corporate compliance officer, admin -- facilities,
 5  whether the lights were on.  There were a number of
 6  different areas.
 7       Q.   Mr. Wells, are you presently employed?
 8       A.   I have a sole proprietorship.
 9       Q.   In what business do you operate, sir?
10       A.   Financial and treasurer advisory.
11       Q.   Is that the only position you've had since
12  you separated from Hewlett-Packard?
13       A.   That's correct.
14       Q.   Is Hewlett-Packard presently a customer of
15  your business?
16       A.   No.
17       Q.   Is Tech Data Corporation presently one of
18  your customers?
19       A.   No.
20       Q.   I have a few more along the same lines.  Are
21  Lexmark or Dell Computer presently among your clients?
22       A.   No.
23       Q.   Mr. Wells, did you have any involvement with
24  the negotiation of the Asset Purchase Agreement for the
25  acquisition of the hardware assets from Inacom?
```

(time markers in left margin: 12:45 at line 5, 12:45 at line 10, 12:46 at line 15, 12:46 at line 20, 12:46 at line 25)

1     A.    Yes.

2     Q.    Was there a core group of Compaq personnel

3 that were involved with the negotiation of the Asset

4 Purchase Agreement?

12:47  5     A.    Yes.

6     Q.    Would you count yourself among that core

7 group?

8     A.    Yes.

9     Q.    Would you tell me whom else might have been a

12:47 10 member of that group?

11     A.    It changed over time, but names -- core group

12 included but was not restricted to Mike Winkler, Bill

13 Wavro, Chris Anderson, Mike Baker.  We had legal

14 support.  I honestly cannot recall the lawyer that was

12:48 15 assigned to the transaction.

16           MR. HALLIDAY:  How do you spell the

17 second name, please, sir?

18           MR. HUNT:  Wavro?

19           MR. HALLIDAY:  How do you spell that?

12:48 20           THE WITNESS:  W-A-V-R-O.

21           MR. HALLIDAY:  Thank you, sir.  Excuse

22 me.

23           THE WITNESS:  Wendy Caswell, Jeff Clark.

24 And then there were a series of names that escape me

12:48 25 that were from what we called supply chain.

1        Q.    (By Mr. Hunt)  Mr. Wells, would you consider

2    procurement to be a similar function as supply chain in

3    the context of Compaq's operations at the time?

4        A.    It was a part of supply chain.

12:49  5        Q.    Okay.  Supply chain being a broader concept

6    than procurement?

7        A.    That's correct.

8        Q.    Mr. Wells, I would like to discuss the

9    responsibilities in very, very broad categories of the

12:49 10   personnel who participated as part of this core group.

11              For yourself, were you acting primarily

12   in the capacity as treasurer, or were there additional

13   duties that befell you as acting CFO at the time of

14   this acquisition?

12:49 15              MS. DUMAS:  As they relate to the

16   acquisition?

17              MR. HUNT:  Yes.  I'm sorry.

18        Q.    (By Mr. Hunt)  That was a bit attenuated.

19   Let me rephrase the question.

12:49 20              In relation to the acquisition of the

21   hardware assets from Inacom, were you handling duties

22   on behalf of the treasury department of Compaq as it

23   pertained to that deal?

24        A.    Sure.  Yes.

12:50 25        Q.    Did you have other duties of a financial

1  nature by virtue of your service as acting CFO at the

2  time?

3      A.   I believe I did, yes.

4      Q.   In what capacity did Mr. Winkler participate

12:50  5  in the group?

6      A.   Mr. Winkler would be the -- would be viewed

7  as the owner of the transaction, as it was ultimately

8  going to reside in his organization.

9      Q.   And would his organization mean his

12:50  10 department or the entity that was going to be created,

11 Custom Edge?

12     A.   I'm meaning it in the context of reporting to

13 him.

14     Q.   Okay.  In what discipline did Mr. Winkler

12:51  15 serve at Compaq?

16     A.   Oh, gosh.  He was -- this may not be

17 accurate, but he was an executive vice president in

18 charge of what I used to refer to as the PC division.

19 I'm not really sure what they called it.

12:51  20     Q.   Similarly, Mr. Wells, for Mr. Wavro.  What

21 aspect of Compaq did he represent?

22     A.   He was Mr. Winkler's head finance guy, his

23 controller.

24     Q.   And was it Ms. Anderson?

12:51  25     A.   Mr.

1    Q.    Mr. Anderson.  In what aspect did

2  Mr. Anderson participate?

3    A.    He was Mr. Wavro's direct report; second, if

4  you will.

12:52  5    Q.    The guy behind the guy.

6    A.    (Moving head up and down.)

7    Q.    And Mr. Baker's participation?

8    A.    Mr. Baker was a corporate controller.

9    Q.    Corporate controller.  Ms. Caswell's

12:52  10  participation?

11    A.    Ms. Caswell was an adjunct loaned to the

12  project from the strategy department, I believe.

13    Q.    What was the function of the strategy

14  department at Compaq, Mr. Wells?

12:53  15    A.    They were a resource that was used by the

16  various divisions to evaluate strategic options

17  available to the corporation.

18    Q.    I believe we also have on our list Mr. Jeff

19  Clark.  In what capacity did he participate, sir?

12:53  20    A.    He negotiated elements of the first agreement

21  with Inacom.

22    Q.    Mr. Wells, who would have been parties to the

23  first agreement?

24    A.    I would say a relatively -- I would say a

12:54  25  relatively large number of people.  Michael Capellas's

```
 1  staff would have been aware of it.  And probably
 2  limited to that.  It didn't survive.
 3       Q.   And I think that might be a new name for my
 4  list, sir.  Michael Capellas's?
```
12:54  5     A.   He was the chief executive officer, president
```
 6  and CEO.
 7       Q.   Thank you.
 8            MR. HUNT:  Madam Reporter, would you
 9  mark this as Exhibit 1, please?
```
12:54 10          (Exhibit Wells-1 marked for
```
11            identification.)
12       Q.   (By Mr. Hunt)  Mr. Wells, do you recall what
13  the subject of the dispute in the lawsuit that you were
14  deposed in by the bank group pertained to?
```
12:55 15     A.   Broadly.
```
16       Q.   Would you please enlighten me?
17       A.   The -- at the -- I don't know exactly the
18  timing, but the allegation that Compaq Computer made
19  was that when Deutsche, Deutsche Bank, closed out the
```
12:55 20 bank accounts, if you will, or cleared out the bank
```
21  accounts of Inacom, there were certain monies in those
22  accounts that belonged to Compaq Computer Corporation.
23       Q.   Do you know how that lawsuit was ultimately
24  resolved, sir?
```
12:56 25     A.   I don't.

```
        1        Q.   Mr. Wells, I would like to hand you a
        2   document that's been marked as Exhibit 1.  And I'll
        3   represent for those present on the phone that it is a
        4   deposition notice for your appearance here today.
 12:56  5        A.   Okay.
        6        Q.   And I would ask you if you would be kind
        7   enough to look at the first two or three pages.  The
        8   remainder of it being merely names and addresses of
        9   attorneys who were mailed to.
 12:57 10             MS. DUMAS:  Off the record for a minute.
       11             (Off-the-record discussion.)
       12        Q.   (By Mr. Hunt)  Mr. Wells, I'll circle back to
       13   this exhibit a bit later.  We took a short break, and
       14   we were discussing production of some additional
 13:01 15   documents.  So without further ado, let me please
       16   continue.
       17             Mr. Wells, can you think of any person or
       18   persons or department within Compaq from which the idea
       19   of acquiring the hardware assets from Inacom
 13:01 20   originated?
       21        A.   The concept occurred in a meeting of Michael
       22   Capellas's staff.
       23        Q.   Do you recall roughly the time frame of when
       24   that meeting would have transpired?
 13:02 25        A.   It was either late December, January.
```

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | Q.   Of what year, sir?                                |
|       | 2  | A.   Oh, December '99 or January 2000.                 |
|       | 3  | Q.   To your knowledge, was Inacom a trading           |
|       | 4  | partner of Compaq Computer during 1999?                |
| 13:02 | 5  | A.   What do you mean by, "trading partner"?           |
|       | 6  | Q.   Did Compaq do business with Inacom?               |
|       | 7  | A.   Yes.                                               |
|       | 8  | Q.   In what manner did Compaq do business?            |
|       | 9  | A.   We used Inacom to configure computer hardware      |
| 13:03 | 10 | for further shipment to our customers.                 |
|       | 11 | Q.   Have you heard the term "aggregator" used in      |
|       | 12 | connection with Inacom's business operations?          |
|       | 13 | A.   I have heard that.                                 |
|       | 14 | Q.   To your understanding of that term, did it go     |
| 13:03 | 15 | beyond the configuration of hardware to include        |
|       | 16 | anything else?                                          |
|       | 17 | A.   I can't recall.                                    |
|       | 18 | Q.   Do you recall if Compaq did business with         |
|       | 19 | Inacom in a manner other than the hardware side of the |
| 13:03 | 20 | business?                                               |
|       | 21 | A.   I don't know.                                      |
|       | 22 | Q.   In particular, were you aware that Inacom had     |
|       | 23 | a services industry?                                    |
|       | 24 | A.   Yes.                                               |
| 13:03 | 25 | Q.   Did that knowledge come in connection with        |

1    Compaq doing business with Inacom or in some other

2    manner?

3        A.    I was first made aware of it during the

4    course of the transaction.

13:04  5        Q.    Okay.  Mr. Wells, as part of what we've

6    colloquially termed the core group dealing with the

7    Inacom hardware acquisition, were you exclusively

8    handling financial issues for the deal on the Compaq

9    side?

13:04 10              MS. DUMAS:  Objection.  Assumes facts

11   not in evidence.  Lacks foundation.

12              You can answer.

13              THE WITNESS:  Largely it was financial.

14       Q.    (By Mr. Hunt)  Were there other categories of

13:04 15   information about the deal that were also within your

16   responsibility?

17       A.    Well, as lead finance person, there were the

18   coordinating, the meetings, the making sure that people

19   showed up when they were supposed to show up,

13:05 20   negotiations.

21       Q.    Were you present during the Capellas staff

22   meeting when the acquisition of Inacom was first

23   discussed?

24              MS. DUMAS:  Objection.  Misstates his

13:05 25   testimony.

1        Q.    (By Mr. Hunt)   Did you understand my

2   question, Mr. Wells?

3        A.    I did, but it wasn't a staff meeting.   It was

4   a meeting of Capellas's staff to discuss the

13:05   5   transaction.

6        Q.    Were you present at the meeting of Capellas's

7   staff to discuss the transaction?

8               MS. DUMAS:   Objection.   Ambiguous.   I'm

9   really doing this to try to help.

13:06  10               MR. HUNT:   Okay.

11               MS. DUMAS:   There were a series of

12   different iterations to what you're calling "the

13   transaction."   And I think the witness's testimony

14   might be more clear and you might have a better

13:06  15   communication with him if you --

16               MR. HUNT:   I will attempt to elucidate.

17               MS. DUMAS:   -- break that down.

18        Q.    (By Mr. Hunt)   At the time that the

19   acquisition of certain assets of Inacom was discussed,

13:06  20   was there an initial consensus reached by Compaq as to

21   which assets would be purchased?

22        A.    I don't recall that.   I don't recall.

23        Q.    Was there ever a consensus reached regarding

24   acquiring Inacom in its entirety?

13:07  25        A.    No.

```
 1      Q.    So there was always -- at the point by which
 2 a decision had been made to acquire a part of Inacom's
 3 assets, it had always been the intention of Compaq to
 4 not acquire the entirety of Inacom --
13:07  5      A.    No.
 6      Q.    -- just a portion of it?
 7      A.    No.
 8      Q.    Did the portion of the assets of Inacom that
 9 was to be acquired ever change in scope from that which
13:07 10 was initially discussed?
11                  MS. DUMAS:  Objection.  Ambiguous.
12                  Off the record.
13                  (Off-the-record discussion.)
14      Q.    (By Mr. Hunt)  Mr. Wells, we're rejoining
13:08 15 after a short -- very short recess.  Did Compaq ever
16 make an initial decision to attempt to purchase stock
17 of Inacom?
18      A.    We did not reach a decision.  We agreed to
19 evaluate the stock acquisition of Inacom.
13:08 20      Q.    Was that evaluation geared towards acquiring
21 a majority of the shares of the company that were
22 outstanding?
23      A.    Yes.
24      Q.    Do you recall for what period of time that
13:09 25 evaluation continued after it was first discussed, in
```

1  general terms?

2      A.   I would say that we evaluated Inacom and

3  several other companies for a period of perhaps two,

4  three, or so months.

13:09  5      Q.   And do you recall when that evaluation

6  commenced?

7      A.   No, I don't.  It would have been mid-fall.

8      Q.   Of 1999?

9      A.   Of 1999.

13:09  10      Q.   I believe you indicated that certain other

11  companies than Inacom were also included in this

12  evaluation; is that correct?

13      A.   That's correct.

14      Q.   Do you recall which other entities were in

13:10  15  consideration for this acquisition or stock purchase?

16      A.   We looked at -- I cannot recall the complete

17  list, but we looked at Micron Technologies in Boise,

18  Idaho.  We looked at CDW.  I'm sure there were others,

19  but I can't recall.  Those were the ones that come to

13:10  20  mind.

21      Q.   Mr. Wells, were these other entities also in

22  the business of configuring computer hardware for

23  Compaq?

24      A.   No.  Let me correct that.  Not every one was.

13:10  25      Q.   Was the purpose of the evaluation, though, to

1 locate a company that configured hardware to join the

2 umbrella of Compaq entities?

3     A.    I'm not sure I would agree with that.  The

4 objective was to cause Compaq to begin to get into what

13:11  5 is commonly referred to as the direct sale model.

6     Q.    Thank you.  Now, I believe I'm correct in

7 stating that there was a meeting of Capellas's staff in

8 late 1999 by which time the evaluation had been

9 completed and a decision had been made to acquire

13:12 10 assets from Inacom as opposed to stock; is that

11 correct?

12     A.    No, that would not be correct.

13     Q.    At what time period was Compaq of a mind to

14 purchase assets from Inacom as opposed to a stock

13:12 15 purchase?

16     A.    We -- in the meeting that you referred to, we

17 agreed that we would not do an equity transaction,

18 buying all or largely all of the corporation, Inacom

19 Corporation.  And we agreed to begin the evaluation of

13:12 20 an asset purchase at that time, but there was no

21 decision unequivocally.

22            We didn't even know, frankly, how they

23 would react, although we had -- obviously, it was a

24 calculated guess on our part, but we decided at that

13:13 25 point we would see if they would be interested in an

1  asset transaction.

2      Q.   Was one or more persons delegated by Compaq

3  to serve as the contact person for Inacom to discuss

4  the possibility of acquiring certain of its assets?

13:13  5      A.   Compaq employees?

6      Q.   Yes.

7      A.   Mike Winkler was the person that approached

8  Inacom with regards to the asset transaction.

9      Q.   Do you recall when that would have taken

13:13 10  place?

11      A.   It would have occurred shortly after the

12  Capellas meeting of his -- key members of his staff.

13  As to when that took place, again, my timeline is a

14  little vague, or recollection.  It would have been

13:14 15  either late December 1999 or early January 2000.

16      Q.   Do you recall what the response was from

17  Inacom after this initial communication?

18      A.   It was favorable.

19      Q.   After receiving the favorable response, was

13:14 20  there to be further negotiation between Inacom and

21  Compaq as to exactly which assets or operating units

22  would be acquired?

23      A.   Yes.

24      Q.   By this point, had a consensus been reached

13:14 25  by Compaq regarding exactly what it wanted to buy?

1    A.    No.

2    Q.    What was involved in further evaluating that

3  which was to be acquired?

4    A.    Once the Inacom organization had indicated

13:15  5  their willingness to explore an asset sale, we had to

6  then convert or bring in technical expertise to

7  evaluate the assets.  We had to -- as a result of the

8  technical acquisition, we also had to ascertain what

9  other assets would be needed to run those assets and so

13:15 10  on and so forth.

11    Q.    Am I correct that the closing on the Asset

12  Purchase Agreement that was ultimately negotiated took

13  place in mid-February of 2000?

14    A.    I believe that's correct, yes.

13:16 15    Q.    How much time was involved in the technical

16  evaluation that you testified about?

17    A.    I don't have a specific time to give you, but

18  my recollection is that it was weeks of work went into

19  it.  There were multiple visits by multiple people to

13:16 20  the various sites, and they had to come back, and we

21  had to collate the data and see if it was worth buying.

22    Q.    Once Inacom had given an initial favorable

23  decision to Compaq to sell part of its assets, was the

24  negotiation of the nuts and bolts of the asset sale

13:17 25  taking place at the same time as this technical

1  evaluation?

2       A.   I can't really recall.  I'm sure the answer

3  is yes.  I believe, for example, Inacom -- the big

4  issue was, which assets.  And each asset, if you will,

13:17  5  had a value placed to it.

6              And there was some debate as to whether

7  or not the call centers would be part of the

8  acquisition, whether the data center would be part of

9  the acquisition.

13:18  10             There, I believe, was a ballpark number.

11  I think it was largely viewed by our side as

12  gamesmanship on the part of Inacom as to what the value

13  of that business was.

14       Q.   Do you know how much time elapsed from the

13:18  15  conclusion of this technical evaluation until the

16  closing?

17       A.   No, I don't.

18       Q.   Would you agree that this transaction

19  proceeded fairly quickly from the time a favorable

13:18  20  decision to sell was given to the actual closing data?

21              MS. DUMAS:  Objection.  Ambiguous.

22              You can answer.

23              THE WITNESS:  I think I would answer it

24  as that we -- knowing that we had transacted business

13:18  25  with Inacom, we were aware that the configuration