1    centers were there.  We had data links with -- we were

2    able -- not data links.  I guess they were.  We were

3    able to shoot them configuration codes and things like

4    that.

13:19   5              So the evaluation went out -- as the

6    engineers went out into plants that they probably

7    already visited, but now they had access to more data,

8    so on and so forth.  And the amount of time of hours

9    spent was actually quite large, especially in the area

13:19  10    of the data center, to my recollection.

11         Q.    (By Mr. Hunt)  Did there come a point at

12    which Compaq needed to engage in financial due

13    diligence regarding Inacom for purposes of the sale of

14    the hardware assets?

13:19  15         A.    I believe we felt like we had done that

16    during the due diligence that was concluded during the

17    equity transaction.  And what was left was the

18    technical due diligence as to whether or not we could

19    really plug these configuration centers into Compaq in

13:20  20    a manner which would allow us to realize our direct

21    sale goals.

22         Q.    I suppose that's probably what I was not

23    exactly clear on, Mr. Wells.  Just my understanding of

24    your answers.

13:20  25              During what time period did the

1  evaluation of the equity transaction take place?

2      A.    Well, again, we -- we entered some

3  substantive negotiations with one of the other

4  organizations.

13:20  5            When that transaction fell apart, we had

6  already had caused bankers and counsel to be retained

7  that would allow us to begin doing due diligence on

8  publicly available information.

9            That might have taken place as early --

13:21  10  and this could be incorrect, but I would say maybe even

11  as early as August/September time frame of 1999.

12      Q.    And are you able to indicate roughly the

13  conclusion point for this due diligence for the equity

14  transaction?

13:21  15      A.    I'm sorry.  Could you --

16            MR. FORTE:  Could you speak up a little

17  bit?  It was hard to hear that question.

18            MR. HUNT:  Yes.  I will try to face the

19  telephone a little bit more.

13:21  20            (Off-the-record discussion.)

21      Q.    (By Mr. Hunt)  Would you agree that the due

22  diligence pertaining to the possibility of an equity

23  transaction ended at some point?

24      A.    Yes.

13:22  25      Q.    When did it end?

         1          A.    At that Capellas meeting of key members of

         2    his staff in mid to late December of 1999.

         3                     MR. HUNT:  Madam Reporter, would you

         4    mark this as our second exhibit, please?

13:23    5                     (Exhibit Wells-2 marked for

         6                     identification.)

         7          Q.    (By Mr. Hunt)  Mr. Wells, would you please

         8    inform me of your educational background, starting with

         9    college?

13:23   10          A.    I have a bachelor of arts degree in economics

        11    from the University of Missouri, Columbia.  I have a

        12    master of science degree in economics from Texas A&M

        13    University.  I have an MBA from Canisius College.

        14          Q.    Thank you.  And in what degrees were these --

13:24   15    what years were these various degrees awarded?

        16          A.    The Missouri degree, the BA was 1975.  A&M

        17    degree was 1976.  And the MBA was 1982.

        18          Q.    Thank you, sir.  Do you hold any professional

        19    certifications?

13:24   20          A.    No.

        21          Q.    Thank you.  Mr. Wells, I would now like to

        22    ask you to refer to what's been marked as Exhibit 1,

        23    and that's the paper that's in front of you that is a

        24    notice for your appearance personally for today's

13:25   25    deposition.

1      A.    All right.

2      Q.    I would like to ask you if you've seen this

3   document before today.

4      A.    No.

13:25   5      Q.    Would you please read the first paragraph of

6   the document, which I believe appears on page -- the

7   second paragraph on Page 3, it begins.

8      A.    "The deponent, Mr. Wells, is requested to

9   bring with him to the deposition all documents in his

13:25   10   possession, custody or control discussing, concerning,

11   regarding, or relating to (1) the solvency of Plaintiff

12   Inacom Corp. ('InaCom') during the 90-day period

13   immediately preceding its filing of a voluntary

14   bankruptcy petition on June 16, 2000, (2) the February

13:26   15   16, 2000 asset purchase agreement between Inacom and

16   Compaq Computer Corporation ('Compaq'), and (3) the

17   agreed upon and actual use of the monies paid pursuant

18   to February 16, 2000 asset purchase agreement between

19   Inacom and Compaq."

13:26   20      Q.    Thank you, sir.  Are you presently in

21   possession of any documents that would be responsive to

22   those categories?

23      A.    No.

24      Q.    Thank you.  Mr. Wells, I'm now handing you

13:26   25   what's been marked as Exhibit 2, which is a deposition

1  notice seeking the most knowledgeable person from

2  Compaq as to certain categories of information, those

3  categories being listed on Exhibit A.

4      A.    All right.

13:27  5              MS. DUMAS:  I think you're still in the

6  definitions.

7              THE WITNESS:  I'm in definitions?  I'm

8  reading definitions.  Okay.

9      Q.    (By Mr. Hunt)  Lawyers used to be paid by the

13:27 10  word.

11              MS. DUMAS:  Keep going.  There you go.

12      Q.    (By Mr. Hunt)  And staying on that Exhibit A

13  is probably a good place.  And I may need Ms. Dumas's

14  involvement here to designate the categories of

13:27 15  information that you're to be testifying about as the

16  most knowledgeable person.

17              MR. HUNT:  Ms. Dumas, do we need to go

18  off the record, or are you able to --

19              MS. DUMAS:  No.  Sure, I can -- of the

13:27 20  six categories listed, we have designated Mr. Wells as

21  a person most knowledgeable with respect to 1, 2, 4,

22  and 5.   And that is not to say that he may not have

23  information relative to category numbers 2 [sic] and 6.

24              And having made the designation, HP

13:28 25  continues the assertion of its prior objection as to

```
 1  the breadth of the categories and will also note that
 2  the extent to which we find, after completion of this
 3  deposition, that Mr. Wells is able to identify other HP
 4  personnel who may be more knowledgeable than him, we
 5  have agreed to work with the defendants to attempt to
 6  make those individuals available.
 7                   MR. HUNT:  Thank you, Ms. Dumas.
 8       Q.  (By Mr. Hunt)  So Mr. Wells, with respect to
 9  Exhibit A to Exhibit 2, there is a representation that
10  you may be someone who knows the most about some of
11  these things, or at least as much as anyone else who's
12  left.
13                   MS. DUMAS:  The emphasis being on the
14  latter part of that statement.
15       Q.  (By Mr. Hunt)  Would you please indicate to
16  me, with respect to the first numbered item, whether
17  you believe you hold substantial knowledge about that
18  category of information?
19                   MS. DUMAS:  Objection.  Vague with
20  respect to "substantial."
21                   For the benefit of the witness, the
22  Rules of Civil Procedure require HP to attempt to
23  designate someone who's knowledgeable about the subject
24  matter.  Since you're no longer at HP, I mean, we
25  attempted to locate a former employee.  That isn't to
```

13:29  5
13:29 10
13:29 15
13:29 20
13:30 25

1  say, being designated, you possess the entirety of the

2  knowledge of the corporation.

3              THE WITNESS:  Okay.  With that, I feel

4  like I have knowledge of the asset purchase -- or the

13:30  5  due diligence that was made prior to the Asset Purchase

6  Agreement, and I have very little knowledge, if any, on

7  the Services Supplies Sale Agreement.

8       Q.   (By Mr. Hunt)  Sitting here today, can you

9  think of anyone else who was with Compaq at the time

13:30  10  that might have knowledge regarding the first category?

11      A.   I would have to say that Bill Wavro would

12  have been involved in due diligence prior to the Asset

13  Purchase Agreement or was aware of it going on.

14              As far as the Services Supplies Sales

13:31  15  Agreement, I honestly don't know who in Mike Winkler's

16  organization executed that document.

17              MS. DUMAS:  Before you ask your next

18  question, may I?

19              (Witness conferred with counsel.)

13:31  20              MR. HUNT:  Do you want to take a

21  bio break?  Why don't we just take a short break.

22              MS. DUMAS:  That's fine.

23              (Break taken from 1:31 p.m. to 1:38 p.m.)

24              MR. HUNT:  We're going back on the

13:38  25  record after a short recess.

1          MS. DUMAS:  I guess the genesis of the

2   break was my request to confer with the witness during

3   Mr. Hunt's examination.  And Steve, I do appreciate

4   your tolerating that.  The reason for my question was

13:38  5   not in any sense confidential.

6          As counsel are aware, one of HP's

7   difficulties in construing the 30(b)(6) notice is that

8   it's broad, and I wanted to communicate with the

9   witness with respect to his interpretation of certain

13:39  10   very general terms used in the notice, such as "due

11   diligence."

12          And in the course of that conference, I

13   learned, for example, that Mr. Wells apparently

14   interpreted due diligence with respect to a -- for

13:39  15   example, the topic of the final number of components of

16   inventory that were being acquired.

17          Since defendants have declined our

18   request to further clarify the scope, we don't know

19   whether it relates to due diligence with respect to

13:39  20   Inacom's financial conditions, due diligence with

21   respect to the number of widgets actually acquired, or

22   other aspects of the due diligence.

23          So my only goal is to, if there are

24   additional witnesses to be identified, that those

13:40  25   individuals be someone whose knowledge base is germane

1    to the subject of the litigation.

2                    And Mr. Hunt, I thank you for giving me

3    the opportunity to make that speech during your

4    examination.

13:40  5                    MR. HUNT:  Thank you, Ms. Dumas.

6        Q.    (By Mr. Hunt)  Mr. Wells, we were sort of

7    running down the list on the exhibit attached to the

8    deposition notice.  And we had gotten through the first

9    point regarding whether you were knowledgeable about

13:40 10    the information listed.

11                    And based upon Ms. Dumas's comments, I

12    would ask you whether there's a need to clarify that

13    your knowledge pertaining to due diligence is more

14    appropriately focused upon the financial condition of

13:40 15    Inacom or something else.

16        A.    Yes, my knowledge is on the financial

17    condition of the -- of Inacom and going into the

18    transaction.  And as I pointed out to my attorney,

19    Mr. Wavro and Co. were sent in after to evaluate the

13:41 20    actual -- I believe the agreement had a true-up, and

21    they were there to ascertain the nuts and bolts of what

22    was going to be trued up and place a value on certain

23    assets essentially after the fact.

24                    But my role was that of doing the -- or

13:41 25    managing the primary due diligence of the -- financial

1    due diligence of the transaction.

2        Q.    To use your terminology, was Mr. Wavro

3    essentially the controller of the owning section of

4    Compaq for the Inacom assets?

13:42  5        A.    That's correct, he was.

6        Q.    Is there anyone else that you can think of

7    that we should add to the list of people that might be

8    knowledgeable about this category, as broadly as it

9    might be written?

13:42  10       A.    The -- I was the primary finance person.

11   There were others that would kind of come in and come

12   out.  But I was the primary finance person on the team.

13   And I was supported by outside counsel and my financial

14   advisors, both accounting and investment bankers.

13:42  15       Q.    Let me back up a second.

16            Mr. Wells, you indicated, I believe, that

17   you were primarily responsible for investigating the

18   financial condition of Inacom as part of this asset

19   sale.

13:43  20       A.    That's correct.

21       Q.    Why was it important to ascertain the

22   financial condition of Inacom?

23       A.    We were, as I believe I stated earlier,

24   initially evaluating an asset -- an equity transaction,

13:43  25   in which case I would have to have caused their

1  statement to be consolidated into Compaq statements.

2  Ergo, I would have to do the appropriate due diligence

3  before I brought them into our P&L and balance sheet.

4      Q.  Once Compaq had decided they didn't wish to

13:43  5  pursue an equity transaction, was there a need for

6  further financial due diligence on your part in order

7  to complete the asset purchase?

8      A.  Very little.

9      Q.  Mr. Wells, I think we can probably move more

13:44  10  quickly through the list, having established some of

11  the basic parameters between counsel.  In looking at

12  the second numbered category --

13      A.  Number 2?

14      Q.  Yes, sir.  Would you be able to tell me if

13:44  15  you understand and have knowledge about the information

16  that's listed in Point Number 2 on Exhibit A to the

17  deposition notice?

18      A.  Well, it reads, "Due diligence with respect

19  to Inacom Corporation's solvency before and after the

13:44  20  February 2000 sale."

21      We performed due diligence around the

22  acquisition of the entity, and that is what we did.

23      Q.  Why did Compaq do it, sir?

24      A.  Again, we were evaluating an equity purchase

13:45  25  or acquisition of the entire asset -- the entire

1  corporation.  And we had to evaluate whether or not we

2  were going to do that, and then all of the parts and

3  pieces that went with it.

4      Q.    Other than yourself, are there other

13:45  5  knowledgeable persons from Compaq that participated in

6  this category?

7      A.    I had people working for me as we began to

8  formulate our opinions and thoughts as to whether or

9  not we were going to begin to -- either going to do an

13:45 10  equity deal or not do an equity deal.

11      Q.    Did Inacom provide substantial access to its

12  non-public financial information in order to assist

13  Compaq in conducting this financial condition

14  evaluation?

13:46 15      A.    I believe they did, yes.

16      Q.    Was there a primary contact that you had at

17  Inacom on the financial side?

18      A.    That would have been the CFO of Inacom.  The

19  name --

13:46 20      Q.    Was it Mr. Fitzpatrick?

21      A.    Yes.  Thank you.

22      Q.    Yes, sir.  Did you have communications

23  directly with Mr. Fitzpatrick?

24      A.    I did, yes.

13:46 25      Q.    Did you also communicate through your

```
 1  subordinates?

 2      A.    To Mr. Fitzpatrick?

 3      Q.    Yes, sir.

 4      A.    I'm sure the answer is yes.

 5      Q.    With respect to that second category of

 6  information, did there come a point at which Compaq

 7  made a -- formulated an opinion as to the financial

 8  condition of Inacom immediately prior to the asset

 9  sale?

10              MS. DUMAS:  Objection.  Lacks

11  foundation.

12              You can go ahead and answer.

13              MR. FORTE:  I didn't hear that

14  objection.

15              MR. HUNT:  There was an objection, lacks

16  foundation.

17              MR. FORTE:  I'll object to the form.

18              THE WITNESS:  I'm sorry.  I don't have a

19  clue what's going on.

20      Q.    (By Mr. Hunt)  That's okay.

21      A.    I do not believe that we made a solvency

22  determination, no.

23      Q.    Do you recall which professionals were

24  retained on behalf of Compaq to assist with the asset

25  purchase?
```

| | 1 | A.   We retained Greenhill & Company, and the lead |
|---|---|---|

A.   We retained Greenhill & Company, and the lead
banker there was Jeff Buckalew.  We also retained
Salomon Smith Barney.  And I'm sorry.  I cannot
remember the name there.  We also had on retainer at
13:48  5  this time PricewaterhouseCoopers, and we retained Davis
Polk & Wardell for legal counsel.

MR. HUNT:  I believe I'm correct,
Ms. Dumas, that the witness has not been designated as
knowledgeable about Category Number 3?

13:48  10  MS. DUMAS:  Let's test that, however.
If you want to ask him to go back into the definitions
so that he can see what the solvency opinion is, you're
free to ask him what he knows about that category.

Q.   (By Mr. Hunt)  Mr. Wells, a few pages earlier
13:48  15  on in that deposition notice, there are some
definitions listed.  I'm going to be asking you to
juxtapose the definition of the terms listed on that
third numbered point of Exhibit A with the definitions
in the notice, the last page versus the definition.

13:49  20  A.   I'm sorry.  I didn't follow what you asked
me.

Q.   If you look at Number 3 on --

A.   Yes.  I've got Number 3.  And Item Number 21,
it says, "Solvency Opinion."  Am I good there?

13:49  25  Q.   Yes, sir.  You are.

1      A.    Okay.

2      Q.    Do you have knowledge regarding the solvency

3   opinion identified in that Bullet Point Number 3?

4      A.    No.

13:49  5      Q.    Are you able to apprise me of anyone at

6   Compaq at the time who would have had knowledge about

7   that?

8      A.    Honestly, no.

9      Q.    Okay.

13:49  10      A.    I don't remember retaining Houlihan Lokey,

11   so -- and I would have been the guy doing it, so I

12   don't know.

13      Q.    Moving on to Point Number 4, I would ask you,

14   sir, if you --

13:50  15      A.    Okay.

16      Q.    If you believe you have knowledge pertaining

17   to that category of information.

18      A.    I believe I do.

19      Q.    And you've previously testified that you

13:50  20   certainly had persons working for you, but aside from

21   those, are there other persons at Compaq who were

22   knowledgeable about that category as well?

23      A.    I believe there's people that were aware of

24   it.  I believe I was the person that had the most

13:50  25   knowledge of it, other than my staff.

1      Q.    And finally, moving on to the last point,

2   Point Number 5, I would ask you, sir, if you believe

3   that you had knowledge regarding that category.

4      A.    I had knowledge.

13:50  5      Q.    Okay.  Do you still have knowledge?

6      A.    I believe I do.

7      Q.    Can you think of other persons at Compaq who

8   would?

9      A.    Well, I mean, clearly there was legal staff

13:51 10   that assisted me in the actual Asset Purchase

11   Agreement.  There were, as I pointed out, people that

12   went in and tested the true-up and things of that

13   nature.

14            So, you know, I mean, I clearly don't

13:51 15   have all knowledge of the Asset Purchase Agreement, but

16   I am clearly aware of it.

17      Q.    Okay.  During your tenure at Compaq, had you

18   been involved with equity transactions for other

19   companies that might or might not have been acquired?

13:51 20      A.    If you're asking me did I have knowledge of

21   other equity transactions that Compaq Computer entered

22   into in which we actually purchased the stock of that

23   entity, yes.

24      Q.    I think you worded it much better than I did,

13:52 25   so thank you.

1                During your tenure with Compaq, would you

2      be able to put a number on approximately how many such

3      transactions transpired?

4            A.    In a major sense, in excess of 200 million, I

13:52  5      would say there were probably anywhere from 4 to 6,

6      maybe 7, and there were an indeterminate number of

7      smaller transactions.

8            Q.    Had the Inacom equity transaction taken

9      place, would you have characterized it as a major

13:52  10     transaction?

11           A.    It would have been -- it would have started

12     meeting the lower end of that threshold.

13           Q.    Similarly, sir, on the asset purchase side,

14     had you been involved in other transactions at Compaq

13:53  15     where assets of entities were acquired?

16           A.    I hesitate to say no, but I believe the

17     answer is no.

18           Q.    As part of the evaluation of the financial

19     condition of Inacom, did Compaq investigate the

13:54  20     timeliness of payments of accounts payable by Inacom to

21     its vendors?

22           A.    I don't know.  I don't recall.

23           Q.    Did you have interactions with the treasury

24     department or the treasurer of Inacom as part of your

13:54  25     financial evaluation?

1    A.    I was in one meeting in which he gave a

2  presentation.  That was the extent of my interaction.

3  He gave a presentation.

4    Q.    Am I correct in assuming that gentleman would

13:54  5  have been Mr. Dick Oshlo?

6    A.    I believe that's right.  Don't hold me to it,

7  but I believe that's correct.

8    Q.    Are you able to recall when that presentation

9  took place, sir?

13:54 10    A.    It was during the equity phase of the

11  transaction, and timing is indeterminate from my

12  perspective, but during the equity phase.

13    Q.    Do you recall what the substance of the

14  presentation generally was?

13:55 15    A.    Not in its entirety.  I can -- I vaguely

16  recall him focusing primarily on his credit revolver.

17    Q.    Mr. Wells, would your ongoing evaluation of

18  the financial condition of Inacom after December of

19  1999 have included reviewing SEC public filing

13:56 20  statements by Inacom?

21    A.    Yes.  We would have maintained a -- I would

22  have delegated that evaluation, but yes.

23    Q.    Do you have a recollection of reporting by

24  Inacom of its intention to proceed with the asset sale

13:56 25  to Compaq?

1      A.    I'm sorry.  Could you --

2      Q.    Yes.  Do you have recollection sitting here

3  today of public filings by Inacom which indicated its

4  intention of consummating the asset sale to Compaq?

13:56  5      A.    I'm sorry.  I don't.

6              MR. HUNT:  Madam Reporter, would you

7  mark this as Exhibit 3, please?  We'll be jointly

8  marking some of the exhibits from Mr. Frasca's

9  deposition.

13:57  10             (Exhibit Wells-3 marked for

11                   identification.)

12     Q.    (By Mr. Hunt)  Prior to the evaluation of

13  Inacom's financial condition in relation to a possible

14  equity transaction, how many years prior had been the

13:57  15  next most recent evaluation of a company for an equity

16  transaction?

17     A.    We probably concluded one in an

18  August/September time frame of 1999.

19     Q.    In relation to the acquisition of Inacom's

13:58  20  hardware business and due in part to what I believe

21  your testimony was that there hadn't been prior asset

22  purchases that you participated in, was this

23  essentially the first Asset Purchase Agreement that you

24  participated in the negotiation of?

13:58  25     A.    Oh, wow.  Definitely the first, as a

1 principle.  I believe -- again, I don't want to say no,

2 but it could be no.  I'm trying to go back 25 years,

3 so --

4      Q.   I appreciate that.  Mr. Wells, I'm going to

13:59  5 hand you an exhibit, part of which is a form 8K report

6 dated January 4th of 2000.

7      A.   Okay.

8      Q.   And it's a lengthy document.  And while

9 you're welcome to read it if you'd like, I really am

13:59 10 just interested in focusing your attention on the first

11 page of the 8K so you can identify what it is.

12      A.   Okay.

13      Q.   And then if you would, please, look at

14 Pages 53 through 56.  They're numbered on the top right

13:59 15 corner.

16      A.   What did you say?  Fifty --

17      Q.   53 through 56.

18      A.   Okay.

19           (Pause)

14:00 20           I scanned it.

21      Q.   Thank you, sir.  Did you see a reference to

22 Tech Data Corporation in those pages?

23      A.   Okay.  I'll look more closely for it.

24      Q.   I'll also be asking about Lexmark, sir.

14:01 25      A.   I thought I saw Lexmark.  I don't see it.  If

```
 1  it is in here, I am not -- again, I'm going quickly
 2  through it.  I don't see it.
 3       Q.   All right, sir.  Was there, to the best of
 4  your recollection, a section in the Asset Purchase
 5  Agreement pertaining to the payment of certain vendors
 6  by Compaq after the transaction as assumed liabilities?
 7       A.   I don't specifically recall, to be perfectly
 8  honest with you.
 9       Q.   Do you have any recollection of whether
10  provisions were made for the payment of Tech Data or
11  Lexmark by Compaq for outstanding accounts payable
12  after the conclusion of the asset purchase?
13       A.   Them specifically, no.
14       Q.   Okay.
15                 MR. HUNT:  Can we go off the record a
16  moment?
17                 (Off-the-record discussion.)
18       Q.   (By Mr. Hunt)  Mr. Wells, did you know
19  Mr. Bill Francis?
20       A.   I did.
21       Q.   Do you know in what capacity he served at
22  Compaq?
23       A.   He was a manager of accounts payable.
24       Q.   Do you know what function, if any, he had as
25  part of the implementation of the asset purchase by
```

Timestamps in left margin: 14:02 (line 5), 14:02 (line 10), 14:02 (line 15), 14:03 (line 20), 14:03 (line 25)

1    Compaq?

2        A.    You know, given his title, I believe that he

3    would have coordinated the accounts payable that came

4    with the asset purchase that ultimately would have gone

14:03  5    on to Compaq's books.

6        Q.    I asked you earlier if you recalled

7    specifically as to Tech Data and Lexmark assumption of

8    liabilities of accounts payable, and I believe you were

9    unable to recall it.    I want to ask you something

14:04 10    slightly different.

11            Do you recall that Compaq agreed to

12    assume the liabilities of certain accounts payable just

13    as a category of the Asset Purchase Agreement?

14        A.    Narrowly speaking, we were concerned that, as

14:04 15    the acquisition transpired, that the configuration

16    centers were -- continued to be filled with the

17    componentry that is necessary as you configure the

18    machine and move it on.

19            And we endeavored to assure the component

14:04 20    suppliers that, in fact, we were going to be in the

21    configuration business on a go-forward basis.    "We"

22    being Compaq Computer Corporation under the name of --

23    it was a hokey name -- Custom Edge.    Custom Edge.

24        Q.    Do you recall how long the Custom Edge

14:05 25    business continued before it was absorbed by Compaq

1  entirely?

2      A.    Well, I was under the impression that once

3  the asset purchase was consummated, Custom Edge was, in

4  fact, Compaq.

14:05  5      Q.    Okay.

6              MR. HUNT:  Madam Reporter, three more

7  exhibits to mark, please.  4, 5, and 6.  They'll be the

8  same numbers from the Frasca deposition.

9              (Exhibits Wells-4 through Wells-6 marked

14:06 10              for identification.)

11      Q.    (By Mr. Hunt)  Mr. Wells, I'm handing you a

12  document that's been marked as Exhibit 4.  It's a

13  one-page letter from Bill Francis to Tech Data

14  Corporation.  And I would ask you just to quickly

14:06 15  familiarize yourself with it.

16      A.    Okay.

17      Q.    Is this the first time that you're seeing

18  this letter, sir?

19      A.    This specific one?

14:06 20      Q.    Yes.

21      A.    Yes.

22      Q.    How about not specifically?  In other words,

23  have you seen a letter containing substantially the

24  same concept before?

14:07 25      A.    Yes.

```
 1       Q.   Was that in relation to the Inacom asset
 2  purchase?
 3       A.   Yes.
 4       Q.   Is the letter that you're testifying that you
 5  saw before one that was actually addressed to a party
 6  or one that was just a blank form letter?
 7       A.   No.  I believe it was probably addressed to a
 8  party.
 9       Q.   Can you recall which party it would have
10  been, sir?
11       A.   I'm sorry.  I can't.
12       Q.   Okay.  At your level of the negotiation of
13  the asset purchase, were you aware that this type of
14  letter was being sent to certain vendors?
15       A.   Yes.
16       Q.   Had that been authorized by yourself?
17       A.   Yes.
18       Q.   I would like to show you what's been marked
19  as Exhibit 5, sir.
20       A.   The same letter to Lexmark?
21       Q.   Yes, sir.
22       A.   Okay.
23       Q.   And before you lose your glasses, Exhibit 6.
24       A.   Okay.  Same letter to Logicare, I believe.
25  Yes.  Same letter.
```

1      Q.    Sir, do you recall from whence the idea came

2   to issue these letters to certain vendors?

3      A.    No, I don't.  No.

4      Q.    Are you able to recall the extent to which

14:08   5   this type of letter was to be sent to Inacom's

6   pre-transaction vendors?  And by that I mean, was this

7   to be a widely distributed type of letter or one more

8   narrowly focused?

9      A.    My understanding was, is it was only supposed

14:09  10   to go to those entities in which were going to provide

11   componentry to the assets that were purchased by Compaq

12   that were focused on Compaq product going through the

13   door on the other end.

14              The -- broadly speaking, the concern here

14:09  15   was that there was some confusion.  My recollection is

16   a little vague, but my recollection of the announcement

17   is, is that Compaq Computer Corporation had bought --

18   and we used the phrase "specific" in one release --

19   assets.

14:10  20              There were some suppliers that wondered

21   if there was going to be a configuration and where

22   their business was going.  And to clarify that

23   uncertainty such that the Compaq business -- we were

24   really focusing on customer satisfaction.  Out of the

14:10  25   field -- and this came out of the field, that it was

| | |
|---|---|
| 1 | prudent for us to focus on that grouping inasmuch as it |
| 2 | affected Compaq equipment. |
| 3 | Q.   Thank you, sir. |
| 4 | A.   Going through the configuration center. |
| 14:10 5 | Q.   I can represent that other witnesses have |
| 6 | indicated there was a transition team or multiple |
| 7 | transition teams for bringing Custom Edge within the |
| 8 | Compaq fold, so to speak. |
| 9 | My question to you is, were there |
| 14:11 10 | transition teams set up on the Compaq, Inacom, and |
| 11 | Custom Edge sides to fold the purchased assets into |
| 12 | Compaq? |
| 13 | A.   I believe there was, yes. |
| 14 | Q.   Do you know if Mr. Francis was one of the |
| 14:11 15 | members of the Compaq transition team? |
| 16 | A.   As I stated before, I believe his involvement |
| 17 | would have been covering the accounts payable, although |
| 18 | I am not sure how far into the transition team he went. |
| 19 | He was really acting more in the context of a Compaq |
| 14:11 20 | Computer Corporation person with a very narrow -- |
| 21 | Q.   Mr. Francis -- to your mind, did Mr. Francis |
| 22 | send out the letters that are marked as Exhibit 4 and 5 |
| 23 | on his own, or did he obtain approval from someone else |
| 24 | before he sent them? |
| 14:12 25 | A.   No, I -- I'm absolutely positive he didn't. |

1  I actually authorized, I believe -- let's see.  Let

2  me -- Mr. Baker to authorize -- and I'm sure Mr. Baker

3  went to his direct report, who then went to Mr. Francis

4  and said it's okay to do this.

14:12  5       Q.   Would you have seen the form of this letter

6  before it was sent out, sir?

7       A.   I'm sure I would have, but I don't recall.

8       Q.   In looking at Exhibit 4, for example, sir,

9  would you please tell me --

14:13  10      A.   Okay.  This one is the one to Tech Data.

11      Q.   Yes, sir.

12      A.   Okay.

13      Q.   What did that letter mean to you, or what did

14  you mean by that letter being sent out?

14:13  15      A.   Well, the context in which it was supposed to

16  have meant is, again, as I stated earlier, that if they

17  were supplying componentry to the configuration

18  centers, then Compaq -- that was being used in the

19  configuration of Compaq computers, then we would assume

14:14  20  that liability and pay them.

21           MR. HUNT:  Madam Reporter, would you

22  mark that as Exhibit 7, please?  It's the same exhibit

23  from the Frasca deposition, Frasca-7.  It's the

24  Houlihan Lokey solvency opinion.

14:14  25           (Exhibit Wells-7 marked for

1              identification.)

2      Q.    (By Mr. Hunt)  Mr. Wells, I'm handing you

3  Exhibit 7, which purports to be a solvency opinion

4  prepared by the Houlihan Lokey firm.  And I'm going to

14:15  5  be asking you if you recall ever seeing it before.

6      A.    I do not recall seeing this.

7      Q.    Okay.  Mr. Wells, would one of the final

8  components of your financial evaluation of Inacom have

9  included an examination of its accounts payable to

14:15 10  vendors who would be supplying products for Compaq

11  configurations post-closing?

12      A.    I'm sure we did look at that.  I can't recall

13  instructing someone to do it.  That would have been

14  delegated down to a subteam; involved, as I alluded to

14:16 15  earlier, evaluating the assets that were on the books

16  that we had agreed to take the baskets, if you will,

17  and that would have delegated down.

18              But as far as me instructing someone to

19  do it, I did not.  But that probably would have been

14:16 20  picked up by a team.

21      Q.    Would that team have been comprised entirely

22  by full-time Compaq employees, or could it have been

23  outside professionals?

24      A.    If there were outside professionals, it would

14:16 25  have been a member of our auditing independent