accountants, PricewaterhouseCoopers.  But for the most

        part, I would have anticipated it would have been

        internal Compaq.

                    MR. HUNT:  With your permission, I would

14:17   just like to confer with my other counsel for a moment.

                    MS. DUMAS:  Sure.  Before you do that, I

        might as well say for the record that, since we

        received the 30(b)(6) notice, HP has ascertained that

        it currently believes that Mr. Chris Anderson, who the

14:17   witness identified, is the individual who was primarily

        involved in the accounts payable analysis by Compaq.

                    The last time I spoke with Mr. Anderson,

        which was a couple of months ago, he was an HP

        employee.  I recently learned, after we received this,

14:17   that he's no longer with Hewlett-Packard.  And thus

        far, we've been unable to reach him.  But that is who

        we are attempting to locate on that topic.

                    MR. HUNT:  Okay.  Thank you, Ms. Dumas.

                    (Break taken from 2:18 p.m. to 2:21 p.m.)

14:21               MR. HUNT:  Mr. Wells, I took a brief

        recess with my colleagues to try to see if I can winnow

        down as much as possible my list of questions.

                    I think, in the interest of expediency,

        I'm going to go ahead and pass you along to the next

14:22   attorney.  And I want to thank you for your time and

1  attention.

2          THE WITNESS:  Thank you.

3          MR. HALLIDAY:  Mr. Wells, my name is

4  Culver Halliday.  I represent Lexmark International

14:22  5  Inc., and I have no questions for you.  Thank you.

6          THE WITNESS:  Okay.

7                      **EXAMINATION**

8  **BY MR. LANDON:**

9      Q.   Good afternoon.  I'm James Landon.  I'm an

14:23  10  attorney from the law firm of Hughes and Luce out of

11  Austin, Texas, and I represent Dell Inc. in this

12  matter.

13          I have a couple of areas I want to talk

14  to you about.  I don't think it will take very long,

14:23  15  hopefully.  But I'll try not to be redundant on areas

16  that we have already touched upon today.

17          One thing I ask before we start is, if I

18  ask a question that is not clear to you, please feel

19  free to stop me and ask me to clarify.  I'm happy to do

14:23  20  that.  So please just feel free to stop me if you don't

21  understand it, and I'll try to clarify the question.

22  Okay?

23      A.   Okay.

24      Q.   If you don't do that, I'm going to assume you

14:23  25  understood the question.

```
 1        A.   Okay.

 2        Q.   We talked a little bit about what we've

 3   called the sale of assets or sale of Inacom's hardware

 4   assets to Compaq in February of 2000.  And for the sake

 5   of convenience, I will refer to that as asset sale.  Do

 6   you understand what we'll be talking about when I

 7   reference that term?

 8        A.   Yes.

 9        Q.   Okay.  At the time that the asset sale was --

10   let's say in February of 2000 --

11             MR. LANDON:  I'll ask the court reporter

12   to mark this as Exhibit Number 8, please.

13             (Exhibit Wells-8 marked for

14             identification.)

15             MR. LANDON:  Gentlemen on the phone, we

16   have marked as Deposition Exhibit 8 the Services,

17   Supply and Sales Agreement between Compaq Computer

18   Corporation, ITY Corp., and Inacom dated February 16th,

19   2000.

20        Q.   (By Mr. Landon)  Sir, if you will just take a

21   few minutes to look over that for me.  I'm just going

22   to have a few questions dealing with that.

23             (Pause)

24        A.   I have not read it all, but I have broadly

25   looked through it.
```

1      Q.    Okay.  Do you recognize what's been marked as

2   Deposition Exhibit 8?

3      A.    I recognize it, yes.  It's a Service, Supply

4   and Sales Agreement between Compaq Computer Corporation

14:26  5   and Inacom.

6      Q.    And do you recall having seen that document

7   prior to today?

8      A.    A long time ago.

9      Q.    And were you involved with the negotiation of

14:26 10   the Services, Supply and Sales Agreement?

11      A.    No, I was not.

12      Q.    Who was?  For Compaq, who was involved in the

13   negotiation of Exhibit 8?

14      A.    I honestly don't know.  I note that this

14:26 15   document was signed by Mike Winkler, but I honestly

16   don't know who he instructed to negotiate this

17   document.

18      Q.    Now --

19      A.    It does make mention, however, of Mike Pocock

14:26 20   on Page 4 of the document.  It's entirely possibly that

21   Mike Pocock would have been the person which negotiated

22   it.

23      Q.    Who is Mr. Pocock?

24      A.    At the time of the transaction, Mr. Pocock

14:27 25   was head of North American sales, I believe.

```
 1       Q.   And do you recall what the -- well, was the
 2  negotiation of the Services, Supply and Sales
 3  Agreement, was it negotiated in connection with the
 4  Asset Purchase Agreement?
 5       A.   I'm sorry.  Could you repeat that again?
 6       Q.   Yeah.  Was this negotiated in connection with
 7  the Asset Purchase Agreement?
 8       A.   Broadly speaking, yes.
 9       Q.   And do you have any understanding of what the
10  relationship was going to be between the Asset Purchase
11  Agreement and the Services, Supply and Sales Agreement,
12  if any?
13       A.   I did not view them as tied to one another.
14       Q.   Okay.  What did you view the purpose of the
15  Services, Supply and Sales Agreement to be?
16       A.   Deal sweetener.
17       Q.   What do you mean by that?
18       A.   Mr. Gagliardi and Mr. Fitzpatrick had,
19  throughout the course of the transaction, attempted to
20  increase the price on numerous occasions or negotiate
21  various aspects that would be in their benefit, and I
22  viewed this as one of those attempts.
23       Q.   So what was the purpose then, technically
24  speaking, of the Services, Supply and Sales Agreement?
25  Let me rephrase that.
```

14:27  5
14:27 10
14:27 15
14:28 20
14:28 25

```
 1              What was the Services, Supply and Sales
 2    Agreement meant to accomplish with respect to Inacom?
 3         A.   I can't answer that.
 4         Q.   Well, let me rephrase that a different way.
14:28  5              What was Compaq obligating itself to do
 6    under the Services, Supply and Sales Agreement?
 7         A.   Well, I think it was listed -- again, just
 8    quick perusal of it is that Exhibit 1 listed the things
 9    that we were going to take from them and pay for.
14:29 10              And these were things that somebody in
11    the organization -- and I'm sure it was in North
12    America -- thought that we needed.  So there would be
13    value-adds.
14              For example, identification and
14:29 15    cataloging of existing images, things of that nature,
16    and delivering.  This is all about life-cycle
17    management and break-fix.
18         Q.   What do you mean by that, "life cycle
19    management"?
14:29 20         A.   Life cycle management -- I'm not a student of
21    life cycle management, but life cycle management is,
22    essentially, you buy a machine and you want certain
23    services, upgrades to it, over the life of the machine.
24    And they -- it's specifically focused on the machine,
14:29 25    keeping it alive.  And the -- so that's life cycle
```

```
 1   management.
 2        Q.   And what's "break-fix"?
 3        A.   When it breaks, you're supposed to fix it.
 4        Q.   So is it fair to say that under this
 5   agreement, Compaq was agreeing to continue to utilize
 6   some services of Inacom on a going-forward basis?
 7        A.   That's correct, yes.
 8        Q.   And do you have any knowledge about -- of the
 9   time frame, so to speak, of how long Compaq was
10   obligating itself to continue to utilize certain
11   services of Inacom on a going-forward basis?
12        A.   It was a number of years.  It covered years.
13   I don't know.
14        Q.   Do you have any recollection of the -- well,
15   do you have any recollection of the services or service
16   level commitments that Compaq was agreeing to in
17   connection with the Services, Supply and Sales
18   Agreement?
19        A.   No.
20        Q.   If you will flip to -- we've already marked
21   it as an exhibit.  I believe it was Exhibit Number 3,
22   the 8K.
23        A.   Okay.  Let me find the 8K.
24             MR. HUNT:  I believe that's it, sir.
25             THE WITNESS:  Yeah.  Okay.
```

          1      Q.    (By Mr. Landon)    May I just peek at that real

          2    quick?   Because on my copy --

          3      A.    (Handing.)

          4      Q.    It might be easier if I can find the page I'm

14:31     5    talking about, because mine has Bates numbers.   Bear

          6    with me one second.

          7                  MR. HUNT:   Could we go off the record a

          8    second?

          9                  (Off-the-record discussion.)

14:31    10      Q.    (By Mr. Landon)   At this point I'm going to

         11    just show you this.   I'm not going to mark it.   I just

         12    want to see if this refreshes your recollection.   If it

         13    doesn't, that's fair enough.   Just tell me.

         14                  MR. LANDON:   Why don't we go ahead and

14:32    15    mark this as Deposition Exhibit Number 9.

         16                  Gentlemen on the telephone, this is the

         17    8K March 2000.   It's been previously used as exhibits

         18    in various depositions of last week.

         19                  MR. HUNT:   Dated February 16, 2000.

14:32    20                  MR. LANDON:   Yes.

         21                  (Exhibit Wells-9 marked for

         22                  identification.)

         23                  THE WITNESS:   Do you want me to read it

         24    all?

14:32    25      Q.    (By Mr. Landon)   You're more than welcome to

1  if you want to, but I promise I'm going to have a few

2  discrete questions for you.  There's numbers at the

3  bottom right corner.  Do you see that?  If you will

4  flip to Page 00149.

14:33  5      A.   Okay.

6      Q.   And if you just look briefly at that

7  Section 1.1.  It continues over to Page 00150.

8      A.   To where do you want me to read?

9      Q.   Just through the very top -- it looks like

14:33  10  Paragraph C on the top of 00150.

11               (Pause)

12      A.   I browsed through it.

13      Q.   You see there that it talks about, you know,

14  1.1(a), "During the one year period commencing on April

14:34  15  1, 2000, Compaq will assist Inacom in the generation of

16  revenues for Inacom's service business derived from the

17  five service categories specified in Section 2.1

18  through 2.5 below in an aggregate amount of 85

19  million."

14:34  20               Do you see that?

21      A.   Yes.

22      Q.   Does that refresh your recollection as to

23  whether there were certain minimum covenants under the

24  services and supply agreement?

14:34  25      A.   Unfortunately, no.

1    Q.    Okay.  Is it your understanding that there

2  were certain covenants concerning the level of --

3    A.    I'm not -- I'm not familiar with the service

4  agreement, as I pointed out earlier.  I mean, I was

14:35  5  aware of it, but as far as being intimate with the

6  document, no.

7    Q.    And that would be either Mr. Pocock or Mr. --

8  who was the other individual you named?  Wavro?  Who

9  would be most knowledgeable concerning --

14:35  10    A.    That's supposition on my part, but since

11  Mr. Pocock's name was in the agreement, I made that

12  assumption.

13    Q.    Fair enough.  We'll move on then.  Thank you,

14  sir.

14:36  15         You referenced that it was your

16  understanding, though, that this services and supply

17  agreement was projected to continue for a few years

18  following the asset purchase -- the consummation of the

19  Asset Purchase Agreement?

14:36  20    A.    That was my understanding.

21    Q.    So was it also your understanding that, from

22  Compaq's perspective, Inacom -- Compaq then necessarily

23  expected Inacom to survive as a viable business going

24  forward in the future after the Asset Purchase

14:36  25  Agreement was consummated?

1          A.    That's correct.

2                    MR. FORTE:   Objection to the form.   Earl

3    Forte.

4                    MR. CAINE:   Join.

14:36  5     Q.    (By Mr. Landon)   I'll show you another --

6                    MR. LANDON:    We could mark this as

7    Deposition Exhibit Number 10.

8                    Gentlemen on the phone, this is the

9    February 15, 2000, letter of intent.   The re line is

14:37 10   "Revolving Credit Facility Commitment Letter."   The

11   Bates number is 01067 through 01802 -- 082.   Excuse me.

12                   (Exhibit Wells-10 mark for

13                   identification.)

14         Q.    (By Mr. Landon)   Sir, after she has that

14:37 15   marked, if you would take a few minutes to look at

16   that.

17                   (Pause)

18                   Sir, do you generally recognize what's

19   been marked as Exhibit 10?

14:39 20        A.    I signed it.

21         Q.    And what is it?

22         A.    It is a revolving credit facility commitment

23   letter.   It's a letter that I sent to Inacom.   It's

24   dated February 15th, in which I am extending to them a

14:39 25   $55 million line of credit.   Not me.   Compaq Computer

1  Corporation is.

2      Q.    That's a good clarification.  And do you

3  recall -- was this extension of credit provided in

4  connection with the Asset Purchase Agreement?

14:39  5      A.    Broadly.

6      Q.    And what do you mean, "broadly"?

7      A.    Again, I viewed this as another attempt on

8  the part of Inacom to sweeten the deal.

9      Q.    Okay.  And what do you mean by that in this

14:39 10  context?

11      A.    They kept adding on requirements.  I believe

12  that they knew that Compaq senior management wanted

13  these assets.  They knew that others in the computer

14  industry were doing much better at the direct sale

14:40 15  model than we were, and there was some degree of

16  anxiousness on Compaq's part to get this deal

17  transacted, finalized, settled so that we could get

18  ahold of the assets.

19              And this is another example, in my

14:40 20  opinion -- admittedly, it is only my opinion -- of

21  Inacom knowing that and extracting something out of

22  Compaq Computer Corporation.

23      Q.    And so the purpose of this 55 million --

24  $55.5 million credit facility was to, I guess in

14:40 25  layman's terms, to make funds available to the

1  remaining Inacom business?

2      A.   That's correct.

3      Q.   And do you know when this -- or did this

4  $55.5 million credit facility close or --

14:41  5      A.   In here it is signed by Inacom.  So

6  technically, it was in force the moment that

7  Mr. Gagliardi on Page 1070 signed the document.

8      Q.   Okay.

9      A.   It had certain conditions to it, but the

14:41 10  document was in force.

11      Q.   Okay.  Do you know if -- strike that.

12              MR. LANDON:  If you'll bear with me one

13  second.  We'll take a quick break.  I'm just going to

14  go down my outline and see if there's anything else.

14:41 15              (Break taken from 2:41 p.m. to 2:45 p.m.)

16      Q.   (By Mr. Landon)  I just have just a couple

17  more quick questions I want to run down.  I should

18  never say a couple.  No doubt it's more than two.

19              You discussed the letters, and they were

14:45 20  marked as Exhibits 4, 5, and 6.

21      A.   Okay.  I've got them.

22      Q.   Do you recall seeing a letter in the form of

23  either Exhibits 4, 5, and 6 directed to Dell?

24      A.   I do not.

14:45 25      Q.   Do you know whether a similar letter to the

```
 1   form of Exhibits 4, 5, and 6 was, in fact, sent to
 2   Dell?
 3        A.   I do not.
 4        Q.   You mentioned earlier Greenhill & Company.
14:45  5   What is that?
 6        A.   Investment bankers.
 7        Q.   And what was their role?
 8        A.   They advised on mergers and acquisition --
 9   they advised on mergers and acquisitions, and we
14:46 10   employed them in this transaction to assist us in
11   the -- evaluating the various transactions that we
12   looked at.  That's not coming out right.
13             Of all of the transactions -- we retained
14   them to look at the various opportunities that we
14:46 15   perceived existed in the marketplace to allow Compaq
16   into the direct sales business.
17        Q.   We had shown you earlier, and it was Exhibit
18   Number 7 there, and I apologize if this question has
19   been asked.  Did you -- do you recall having seen that
14:46 20   letter before?
21        A.   No, I do not recall having seen it before.
22        Q.   And do you know who -- or do you know why --
23   strike that.  You said you haven't seen Exhibit 7.
24   I'll move on.
14:47 25             In connection with the $55.5 million
```

1  credit facility, which I believe we looked at the

2  letter as Exhibit 10, who for Inacom did you deal with

3  in negotiating that?

4      A.    Primarily Mr. Fitzpatrick.

14:47  5          MR. LANDON:  Sir, I'll pass the witness.

6  Reserving to redirect any questions.  But thank you

7  very much.  I appreciate it.

8              THE WITNESS:  Okay.

9              MR. HUNT:  Mr. Hersey?

14:48  10          MR. HERSEY:  Yes.  If you can give me

11  just ten seconds to glance over my notes.

12              (Pause)

13                  **EXAMINATION**

14  **BY MR. HERSEY:**

14:48  15      Q.    Mr. Wells, my name is John Hersey.  I am an

16  attorney with the law firm of Bingham McCutchen.  We

17  represent Ingram Entertainment, which is a successor in

18  interest to Nashville Computer Liquidators.  I have a

19  few questions for you.

14:48  20          You had testified earlier, I believe --

21  .feel free to correct me if I'm wrong -- that Compaq at

22  one point had agreed to pay some invoices that had been

23  sent to Inacom for products provided to Inacom by

24  certain vendors; is that correct?

14:49  25          MS. DUMAS:  Objection.  Misstates the

```
 1  testimony.
 2              You can go ahead and answer.
 3              THE WITNESS:  I think -- I think what I
 4  was -- how I referred to that is that we had bought
 5  certain assets and liabilities in the transaction and
 6  that we agreed to pay those liabilities that were
 7  picked up as a result of the asset purchase.
 8       Q.   (By Mr. Hersey)  Did some of those
 9  liabilities include invoices that had been sent to
10  Inacom by some of its vendors?
11              MS. DUMAS:  Objection.  Vague.
12              You can answer if you understand it.
13              THE WITNESS:  I mean, clearly some of
14  the -- keep in mind, when you do an asset purchase, you
15  are stepping into a stream, and that clearly some are
16  going to be on their books and some are in the process
17  of happening as the deal is being closed.  So frankly,
18  I guess the answer to your question is a qualified yes.
19       Q.   (By Mr. Hersey)  In what way is it qualified?
20       A.   Well, again, it -- the -- the payable would
21  have been -- had to have been identified as part of the
22  transaction.  And if it wasn't, then obviously it was
23  excluded.  And if it was, it was picked up as part of
24  the transaction.
25              And clearly there were commitments for
```

14:49 5
14:49 10
14:50 15
14:50 20
14:51 25

1  componentry that had been made perhaps even the day of

2  the signing of the deal that we would have felt

3  obligated to pay.

4             Otherwise, again, as I noted in my

14:51  5  earlier testimony, the flow of Compaq product --

6  configured Compaq product coming out the back door of

7  this configuration center or centers would have been

8  disrupted as we had suppliers that were no longer

9  happy.

14:51  10     Q.    How did Compaq determine which of Inacom's

11  payables it was going to pay?

12                 MR. CAINE:   Objection.   No foundation.

13                 MS. DUMAS:   Same objection.

14                 MR. FORTE:   Join.   Earl Forte.

14:51  15                 MS. DUMAS:   You can answer if you can.

16                 THE WITNESS:   I don't know.   I'm sure

17  that was delegated to a subteam as to evaluating which

18  payable was going to be included and which wasn't.   I

19  did not participate in the actual subteams.

14:52  20     Q.    (By Mr. Hersey)   Could you tell me who was on

21  the subteam that would have made that decision?

22     A.    Well, as I -- I think I alluded to earlier,

23  Chris Anderson probably was on that team.   There would

24  have been others, but I don't know who they would have

14:52  25  been.

1       Q.    Did you give any guidance to that subteam as

2    to which payables Compaq would agree to pay or to

3    assume the liability for?

4       A.    I don't recall ever doing that.

14:52    5       Q.    Have you ever heard of Nashville Computer

6    Liquidators before?

7       A.    I have not.

8       Q.    Was there ever an instance that you're aware

9    of where Compaq assumed -- agreed to assume Inacom's

14:53   10    liability to a vendor where the vendor's components

11    weren't going to be used in the configuration of a

12    Compaq product?

13                   MR. HUNT:  Objection to form.  Vague.

14                   MS. DUMAS:  Same objection.

14:53   15                   THE WITNESS:  I don't believe we would

16    have done that, but I -- I can't recall.  Again, the

17    whole concept of this transaction was to identify the

18    assets that were needed to take Compaq in a go-direct

19    model and ensure that that stream continued through the

14:54   20    transition mode and got us into the direct business to

21    compete with your (indicating) client.

22       Q.    (By Mr. Hersey)  As you sit here today, if

23    you could take a look at Exhibits 4, 5, and 6, do you

24    have a sense as to how many vendors those letters were

14:54   25    sent to?

1      A.    I do not.

2      Q.    Do you know whether they would have been sent

3  to any vendor whose parts would have been used in the

4  configuration of a Compaq product?

14:54  5            MR. FORTE:   Objection to form.  Earl

6  Forte.

7            MS. DUMAS:  Same objection.

8            THE WITNESS:  I can't recall.

9      Q.    (By Mr. Hersey)  You testified earlier that

14:55 10  you authorized the sending of this letter; is that

11  correct?

12      A.    Yes.

13      Q.    And by, "this letter," I mean the letter in

14  the form of Exhibits 4, 5, and 6.

14:55 15      A.    That's correct.

16      Q.    Who at Compaq made the decision as to which

17  vendors would be receiving that letter?

18      A.    I wouldn't know.

19      Q.    Would it have been someone -- if you'll

14:56 20  excuse my colloquialism -- lower in the food chain than

21  you?

22            MR. FORTE:   Objection to form.  Earl

23  Forte.

24            MS. DUMAS:  Don't speculate.

14:56 25            THE WITNESS:  I don't know.

Q.    (By Mr. Hersey)  So your testimony is that you approved the form of the letter, but you don't know who the letters were sent to?

A.    Correct.

14:56    Q.    And the reason for the letter was to ensure the continued flow of products from these vendors that would be necessary to configure Compaq products at Custom Edge?

A.    That's correct.

14:57    MR. HERSEY:  Okay, Mr. Wells.  Those are all the questions I have.  I appreciate your time.

THE WITNESS:  Okay.  Thank you.

**FURTHER EXAMINATION**

**BY MR. HUNT:**

14:57    Q.    One follow-up question, Mr. Wells.  With respect to the letters that are Exhibits 4, 5, and 6, on the financial side for Compaq, did the buck stop with you as to whether those letters would get sent out or not?

14:57    A.    Yes.  Ultimately, delegation of authority for this type of thing -- well, there were -- I believe delegation authority were two people, and I were one. And so it couldn't have gone out unless either I or the other authorized by the delegation authority had said

14:57    okay.

1    Q.   I apologize.  That answer invites a further

2    question.  Who was the other party?

3    A.   Michael Capellas.

4              MR. HUNT:  Thank you, Mr. Wells.  No

14:58  5    further questions.

6              MS. DUMAS:  Andy or Earl?

7              MR. FORTE:  This is Earl Forte.  I have

8    no questions for the witness.

9              MR. CAINE:  This is Andy Caine.  I have

14:58  10   a couple.

11                     **EXAMINATION**

12   **BY MR. CAINE:**

13   Q.   Mr. Wells, I represent Inacom.  Is it your

14   understanding that the Asset Purchase Agreement

14:58  15   included schedules that identified certain invoices

16   that would be assumed by Compaq?

17             MR. HUNT:  Objection.  Misstates the

18   prior testimony.

19             MS. DUMAS:  Same objection.

14:58  20            THE WITNESS:  I'm not sure I understood

21   the question, so --

22   Q.   (By Mr. Caine)  Is it your understanding that

23   there were schedules in connection with the Asset

24   Purchase Agreement that identified the specific

14:59  25   invoices to be assumed by Compaq?

         1        A.    I don't know that there weren't.  I don't
         2   recall ever having seen those schedules.
         3        Q.    But you were not on the team that would
         4   have -- might have put those together?
14:59    5        A.    Oh, I definitely was not on the team.
         6        Q.    By these letters, Exhibits 4, 5, and 6, did
         7   you intend to commit Compaq to any obligations that
         8   weren't contained in the Asset Purchase Agreement?
         9        A.    No.
14:59   10                  MR. CAINE:  I have nothing further.
        11                  MS. DUMAS:  I have no questions.
        12                  MR. HUNT:  Thank you, Mr. Wells.
        13                  THE WITNESS:  Okay.
        14                  (Off the record at 2:59 p.m.)
        15
        16
        17
        18
        19
        20
        21
        22
        23
        24
        25

```
 1                    CHANGES AND SIGNATURE

 2  PAGE    LINE   CHANGE                              REASON

 3  _____   _____  _____  _____

 4  _____   _____  _____  _____

 5  _____   _____  _____  _____

 6  _____   _____  _____  _____

 7  _____   _____  _____  _____

 8  _____   _____  _____  _____

 9  _____   _____  _____  _____

10  _____   _____  _____  _____

11  _____   _____  _____  _____

12  _____   _____  _____  _____

13  _____   _____  _____  _____

14  _____   _____  _____  _____

15  _____   _____  _____  _____

16  _____   _____  _____  _____

17  _____   _____  _____  _____

18  _____   _____  _____  _____

19  _____   _____  _____  _____

20  _____   _____  _____  _____

21  _____   _____  _____  _____

22  _____   _____  _____  _____

23  _____   _____  _____  _____

24  _____   _____  _____  _____

25  _____   _____  _____  _____
```

```
 1                  CHANGES AND SIGNATURE

 2   PAGE    LINE   CHANGE                          REASON

 3   _____   _____  _____   _____

 4   _____   _____  _____   _____

 5   _____   _____  _____   _____

 6   _____   _____  _____   _____

 7   _____   _____  _____   _____

 8   _____   _____  _____   _____

 9   _____   _____  _____   _____

10        I, BEN K. WELLS, have read the foregoing
     deposition and hereby affix my signature that same is
11   true and correct, except as noted above.

12

13        _____
          BEN K. WELLS
14
     THE STATE OF_____:
15   COUNTY OF_____:

16        BEFORE ME, _____, on this day
     personally appeared BEN K. WELLS, known to me (or
17   proved to me under oath or through _____)
     (description of identity card or other document) to be
18   the person whose name is subscribed to the foregoing
     instrument and acknowledged to me that they executed
19   the same for purposes and consideration therein
     expressed.
20
          Given under my hand and seal of office this _____
21   day of _____, 2005.

22

23        _____
          Notary Public in and for the
          State of _____
24        My commission expires: _____

25
```

1  THE STATE OF TEXAS :

2  COUNTY  OF  HARRIS :

3      I, Debbie Leonard, a Certified Shorthand Reporter

4  in and for the State of Texas, do hereby certify that

5  the matters set forth in the caption to the foregoing

6  deposition are true and correct; that the witness

7  appeared before me at the time and place set forth;

8  that said witness was first duly sworn to tell the

9  truth, and thereupon proceeded to testify in said

10  cause; that the questions of counsel and the answers of

11  the said witness were taken down in shorthand by me and

12  thereafter reduced to typewriting under my direction;

13  and that the foregoing pages comprise a true, correct,

14  and complete transcript of the testimony given and the

15  proceedings had during the taking of said deposition.

16      I further certify that I am not counsel, attorney

17  or relative of either party, or otherwise interested in

18  the event of this suit.

19      GIVEN UNDER MY HAND AND SEAL OF OFFICE on this 7th

20  day of April, 2005.

21

22      _Debbie Leonard_____

23      Debbie Leonard, CSR, RMR, CRR
        Houston Reporting Service
        Firm Registration No. 306

24      1010 Lamar, Suite 1400
        Houston, Texas 77002

25      Phone:  (713) 739-1400

L A W Y E R ' S   N O T E S

| Page | Line | |
|------|------|---|
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |
|      |      | |

**HOUSTON REPORTING SERVICE**
Registered Professional Reporters
**1010 Lamar, Suite 1400**
**Houston, Texas 77002**
**(713) 739-1400**

FORM 003

L A W Y E R ' S   N O T E S

| Page | Line | |
|------|------|---|
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |

**HOUSTON REPORTING SERVICE**
Registered Professional Reporters
**1010 Lamar, Suite 1400
Houston, Texas 77002
(713) 739-1400**

FORM 003