Taxes shall do so, and the other party shall cooperate with respect thereto as necessary.

      (d) Apportioned Obligations and Transfer Taxes described in Section 8.03(b) or 8.03(c) shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law. The paying party shall be entitled to reimbursement from the non-paying party in accordance with Section 8.03(b) or (c), as the case may be. Upon receipt of any bill for, or payment of, any such Apportioned Obligation or Transfer Tax, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under Section 8.03(b) or (c), as the case may be,

&lt;PAGE&gt;

together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying party shall make such reimbursement promptly but no event later than 10 days after the presentation of such statement. Any payment not made within such time shall bear interest at a rate set forth in Section 2.09(b) for each day until paid.

ARTICLE 9

Employee Benefits

      Section 9.01. Employee Benefits Representations. Seller hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date, that:

      (a) Schedule 9.01(a) lists each material "employee benefit plan", as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), each material employment, severance or similar contract, plan, arrangement or policy and each other material plan or arrangement (written or oral) providing for compensation, bonuses, profit-sharing, stock option or other stock related rights or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangements), health or medical benefits, employee assistance program, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, severance benefits and post-employment or retirement benefits (including compensation, pension, health, medical or life insurance benefits) which is maintained, administered or contributed to by Seller or any ERISA Affiliate and covers any person who is a Business Employee, as defined in Section 9.02 (any such plan, arrangement or policy, an "Employee Plan"). Copies of each Seller 401(k) Plan (as defined in Section 9.01(b)) and each other Employee Plan that provides for severance, vacation, sick leave or deferred compensation and all amendments thereto and written interpretations thereof have been furnished to Buyer. For purposes of this Agreement, "ERISA Affiliate" of Seller shall mean any other entity which, together with Seller, would be treated as a single employer under Section 414 of the Code. Since December 31, 1998, except as set forth in Schedule 9.01(a), no employee benefit plan or arrangement, including without limitation any Employee Plan, or modification thereto, has been adopted that would, individually or in the aggregate, increase materially the operating cost of the Business.

      (b) No Employee Plan is a multiemployer plan, as defined in Section 3(37) of ERISA, and no Employee Plan is subject to Title IV of ERISA. Neither Seller nor any of Seller's ERISA Affiliates has incurred any liability under Title IV of ERISA arising in connection with the termination of any plan covered or

<PAGE>

previously covered by Title IV of ERISA that could become, after the Closing Date, an obligation of Buyer or any of its affiliates. The InaCom Employees Retirement Savings Plan and Trust, the Vanstar Corporation 401(k) Plan, the Office Products of Minnesota Inc. 401(k) Plan, the National Technology Group 401(k) Plan, the Computerland 401(k) Plan and the Mentor Technologies Ltd. 401(k) Plan (the "Seller 401(k) Plans") have been determined to be qualified under Section 401(a) of the Code and nothing has occurred with respect to such plans since such determination that could reasonably be expected to result in the loss of such qualification or exemption from tax. Each plan loan outstanding under the Seller 401(k) Plans is fully secured by the vested Plan account balance of the applicable participant, and each such loan has been extended on such terms and administered in such a manner as to avoid treatment as a distribution under Section 72(p) of the Code.

(c) Neither Seller nor any of its subsidiaries is a party to or subject to, or is currently negotiating in connection with entering into, any collective bargaining agreement or other contract or understanding with a labor union or labor organization.

(d) Neither Seller nor any of its subsidiaries has, in connection with the Business, engaged any individual as an independent contractor or made payments for services to be performed by any individual as an independent contractor who should be considered, under applicable law, an employee of (rather than an independent contractor to) Seller or any of its subsidiaries.

Section 9.02. Employees and Offers of Employment. For purposes of this Agreement, "Business Employees" shall mean the individuals described in Schedule 9.02. As soon as practicable after the date hereof, Seller shall provide Buyer with a list containing the names of all of the Business Employees, and through the Closing Date Seller shall periodically revise such list to include each Business Employee newly hired by Seller or its affiliate, and to reflect termination of employment or similar personnel changes. At Closing, Buyer or its affiliate shall offer employment, in a comparable position and at the same rate of salary (or, if applicable, base hourly rate), to each Business Employee who is actively employed as of the Closing Date, and each inactive Business Employee who is on approved leave on the Closing Date because of jury duty, family or medical leave, sick leave, short-term disability, vacation or military duty; provided, however, that nothing contained herein is intended to confer upon any Business Employee any right to continued employment after the Closing Date. Each Business Employee who accepts (or is deemed to accept) employment with Buyer on the Closing Date is referred to herein as a "Transferred Employee". Seller hereby agrees that neither Seller nor any affiliate shall (i) rehire or continue to employ any Business Employee at any time prior to the first anniversary of the Closing Date; or (ii)

<PAGE>

offer any Business Employee any severance or similar benefits payable on termination of such Employees' employment by Seller or its affiliate; provided, that this clause (ii) shall not apply with respect to any Business Employee unless Buyer offers such Employee employment in accordance with this Article 9, at a location no greater than 50 miles from that in effect at the Closing Date.

Section 9.03. Seller's Employee Benefit Plans. (a) Seller shall retain all obligations and liabilities under the Employee Plans and any other benefit plan or arrangement of Seller or its affiliate in respect of each employee or former employee (including any beneficiary thereof) who is not a Transferred Employee. Except as expressly set forth herein, Seller or its designated

2391

affiliate shall retain all liabilities and obligations in respect of benefits accrued by Transferred Employees under the Employee Plans and any other benefit plan or arrangement of Seller or its affiliate, and neither Buyer nor any of its affiliates shall have any liability with respect thereto. Except as expressly set forth herein, no assets of any Employee Plan shall be transferred to Buyer or any of its affiliates or to any plan of Buyer or any of its affiliates. Seller shall take all actions necessary (including any necessary plan amendments) to cause accrued benefits or account balances of Transferred Employees under the Seller 401(k) Plans to be fully vested as of the Closing Date, and to provide that Transferred Employees shall be entitled to the full benefit of any matching contribution under the Seller 401(k) Plans for the plan year that includes the Closing Date (the "Closing Plan Year") attributable to amounts actually deferred prior to the Closing Date by Transferred Employees under the Seller 401(k) Plans during the Closing Plan Year, to the extent consistent with the governing plan documents and the past practice of Seller, excluding:

        (i) any discretionary matching contribution determined after the Closing Date; and

        (ii) any nondiscretionary matching contribution the allocation of which to a participant's account is conditioned on such participant's being employed at the end of the Closing Plan Year.

        (b) In the event that Seller reasonably determines that the transactions contemplated by this Agreement constitute an event described in Section 401(k)(10)(A)(ii) of the Code, Seller shall take all actions necessary: (i) to permit Transferred Employees to elect to take distributions (subject to applicable law) of their accounts thereunder in accordance with the terms of such plans; and (ii) to the extent Transferred Employees so elect, to roll over the amounts received from the Seller 401(k) Plans (including, to the extent permissible under applicable law, any outstanding loans) to an individual retirement account or to one or more defined contribution retirement plans qualified under Section 401(a) of the Code

<PAGE>

and maintained by Buyer or one of its affiliates (the "Buyer 401(k) Plans"). Buyer shall cause the Buyer 401(k) Plans to accept such rollovers, provided Buyer receives evidence reasonably acceptable to it that the Seller 401(k) Plans are qualified under the applicable provisions of the Code. In the event that Buyer and Seller reasonably determine that the transactions contemplated by this Agreement do not constitute an event described in Section 401(k)(10)(A)(ii) of the Code, then as soon as practical following receipt by Buyer and Seller of favorable determination letters or Buyer's certification to Seller, and Seller's certification to Buyer, in a manner reasonably acceptable to both Seller and Buyer, that Buyer's 401(k) Plans and Seller's 401(k) Plans are qualified under the applicable provisions of the Code, Seller shall cause the trustee of Seller's 401(k) Plans to transfer, solely in the form of cash or notes representing outstanding participant loans, assets representing the full account balances of the Transferred Employees, together with the appropriate net investment return (including unrealized appreciation or depreciation) thereon, reduced by any necessary benefit or withdrawal payments made in respect of Transferred Employees prior to the actual date of transfer, to the trustee of Buyer's 401(k) Plans.

        (c) With respect to the Transferred Employees (including any beneficiary or dependent thereof), Seller shall retain (i) all liabilities and obligations arising under any group life, accident, medical, dental or similar arrangement (whether or not insured) to the extent that such liability or

obligation relates to claims that are covered by such arrangements and incurred (whether or not reported), prior to the Closing Date, and (ii) all liabilities and obligations arising under any worker's compensation arrangement to the extent such liability or obligation relates to claims incurred prior to the Closing Date, including liability for any retroactive worker's compensation premiums attributable to such period. With respect to Transferred Employees (including beneficiaries or dependents thereof), Buyer or its affiliate shall be responsible, in accordance with the terms of its benefit plans and arrangements, for (I) all liabilities and obligations arising under any group life, accident, medical, dental or similar arrangement (whether or not insured) to the extent that such liability or obligation relates to claims that are covered by such arrangements and incurred (whether or not reported) on or after the Closing Date, and (II) all liabilities and obligations arising under any worker's compensation arrangement to the extent such liability or obligation relates to claims incurred on or after the Closing Date, including liability for any retroactive workers' compensation premiums attributable to such period. Buyer shall assume all liabilities and obligations of Seller under any vacation or sick leave plan or arrangement with respect to Transferred Employees, to the extent such liabilities are reflected on the Closing Statement. Buyer shall assume all liabilities of Seller under any nonqualified deferred compensation plan or arrangement with respect to Transferred Employees, but only to the extent such liabilities are funded by means of a rabbi trust; and Seller shall, as soon as

<PAGE>

practicable after the Closing Date, pay to Buyer, by wire transfer in a cash lump sum, the full amount of such funding.

For purposes of this Section 9.03(c), claims shall be deemed to have been incurred:

(A) with respect to all death or dismemberment claims, on the actual date of death or dismemberment;

(B) with respect to all disability claims on the date the claimant became unable to (x) perform his or her regular duties of employment, in the case of an employee claimant, or (y) perform the normal day-to-day responsibilities that would reasonably be expected of someone of similar age and lifestyle, in the case of a dependent claimant;

(C) with respect to sick leave claims, on each day for which sick leave benefits are payable to the claimant;

(D) with respect to all medical, drug or dental claims, on the date the service was received or the supply was purchased by the claimant; provided, however, a medical claim relating to a claimant's hospitalization shall be deemed to be incurred on the date the claimant was first hospitalized; and

(E) with respect to workers' compensation claims, on the date the incident occurred.

Section 9.04. Buyer Benefit Plans. As of the Closing Date, each Transferred Employee shall become a participant in all employee benefit plans of Buyer (or comparable employee benefit plans of its affiliate) on the same terms and conditions as similarly situated employees of Buyer, to the extent such Transferred Employee satisfies the applicable eligibility requirements under such plans. Transferred Employees shall participate under Buyer's "welfare

plans" (within the meaning of Section 3(1) of ERISA) as of the Closing Date without any waiting periods, evidence of insurability, or the application of any preexisting physical or mental condition restrictions (except, in each case, to the extent applicable and unsatisfied under Seller's welfare plans, and except to the extent otherwise required for coverage by Buyer's long-term disability insurance carrier); and, to the extent relevant, Buyer shall provide credit for claims incurred during 2000 and prior to the Closing Date for purposes of applying deductibles, co-payments, out-of-pocket maximums, and benefit maximums. Buyer or one of its affiliates will recognize all service of the Transferred Employees with Seller or any of its affiliates, only for purposes of: (i) eligibility to participate and vesting,

<PAGE>

under those employee benefit plans (within the meaning of Section 3(3) of ERISA) in which the Transferred Employees are eligible to participate, and are in fact participating, on and after the Closing Date; and (ii) level of benefits, under any vacation or sick leave plan in which the Transferred Employees are eligible to participate, and are in fact participating, on and after the Closing Date. With respect to any Transferred Employee who participates in an Employee Plan which is a "flexible spending arrangement," within the meaning of Proposed Treasury Regulation ss. 1.125-2 (a "Seller FSA"), Buyer or its affiliate shall permit such Transferred Employee to continue to participate after the Closing Date in a flexible spending account maintained by Buyer, and shall credit such Transferred Employee with an account balance equivalent to that which applied, as of the Closing Date, to the Transferred Employee under the applicable Seller FSA. As soon as practicable after the Closing Date, either Seller shall pay to Buyer the amount described in "X" below, or Buyer shall pay to Seller the amount described in "Y" below, whichever is applicable, in either case by wire transfer in a cash lump sum. For this purpose, "X" shall mean the amount, if any, by which the aggregate amount deferred through such date by Transferred Employees under the Seller FSAs during the plan year in which the Closing Date occurs exceeds aggregate claims paid for such year on behalf of such Transferred Employees under the Seller FSAs; and "Y" shall mean the amount, if any, by which aggregate claims paid for such year on behalf of Transferred Employees under the Seller FSAs exceeds the aggregate amount deferred through the Closing Date by Transferred Employees under the Seller FSAs during such year.

Section 9.05. Inactive Employees. Seller shall retain all liability with respect to Business Employees who are absent from active employment on the Closing Date other than for the reasons expressly stated in the third sentence of Section 9.02 (any such employee, an "Inactive Business Employee"). Subject to applicable law, if any Inactive Business Employee returns directly from such leave of absence to active employment, then from and after the date of such return such Inactive Business Employee shall be treated as a Transferred Employee under this Article 9, applying this Article with respect to such Inactive Business Employee by substituting the date of his or return to active employment for the Closing Date, where applicable hereunder.

Section 9.06. Severance Benefits. Buyer agrees that, in the event any Transferred Employee is terminated by Buyer during the one-year period immediately following the Closing Date, Buyer shall provide such Transferred Employee with a severance benefit which is not less than the cash separation payment that would have been provided for by Seller's severance pay policy and the severance agreements between Seller and certain Transferred Employees as listed in Schedule 9.06, had such Transferred Employee been terminated under the same circumstances by the Seller immediately prior to the Closing Date, but only

<PAGE>

to the extent the terms of such severance pay policy and severance agreements have been fully disclosed to Buyer prior to the date hereof.

Section 9.07. COBRA. Seller shall retain all obligations and liabilities arising under Section 601 of ERISA or Section 4980B of the Code which result from the termination of employment of any employee of Seller or its affiliate, including without limitation any such obligations or liabilities which result from the termination of employment of any Business Employee on or prior to the Closing. Buyer shall have sole responsibility for all obligations and liabilities arising under Section 601 of ERISA or Section 4980B of the Code with respect to all Transferred Employees, and "qualified beneficiaries" of Transferred Employees, for whom a "qualifying event" has occurred after the Closing Date. The terms "qualified beneficiaries" and "qualifying event" shall have the meaning ascribed to them under Section 4980B of the Code and Sections 601-608 of ERISA.

Section 9.08. Continuation of Certain Administrative Services and Insurance Coverage. To the extent (i) requested by Buyer in writing prior to the Closing Date and (ii) the Closing occurs within 30 days (or, if the Seller fails to comply with its obligations under the last sentence of this Section 9.08, 60 days) after the date of this Agreement (such 30- or 60-day period, the "Post-Signing Period"), Seller agrees to (A) continue to provide certain administrative services in respect of the Transferred Employees as reasonably necessary for Buyer to conduct the Business, which shall be limited to payroll services, record keeping services and claims processing services and (B) to cover Transferred Employees under the Employee Plans which constitute "welfare plans" within the meaning of Section 3(1) of ERISA and which provide for insurance coverage, to the extent such coverage is permitted under the terms of such plans and the applicable insurance contracts, and to provide claims processing services in respect of the Transferred Employees in both cases for the duration of the Post-Signing Period or, in either case, until such earlier time as Buyer or its designated affiliate can assume responsibility for such insurance and administrative services in an orderly manner. Buyer agrees to reimburse Seller, within seven business days after its receipt from Seller of an invoice with respect to such services, for any and all of Seller's costs and all other expenses reasonably incurred in continuing to provide such insurance and administrative services, including, without limitation, insurance premiums, cost of direct claims reimbursement under any self-insured plans and a reasonable share of all other related administrative and other costs and expenses of any nature whatsoever. Such continuation of insurance and administrative services shall not affect the allocation of liabilities and obligations as set forth in this Article 9. Buyer shall use all reasonable efforts to arrange for such insurance and administrative services as promptly as possible in order to avoid using Seller's services under this Section; and Seller shall use all reasonable

<PAGE>

efforts to provide Buyer, as promptly as possible, with computer tapes, data or other payroll or other information necessary for Buyer to assume responsibility for such insurance and administrative services.

Section 9.09. Short Term Disability. Notwithstanding anything to the contrary in this Article 9, the following provisions shall apply with respect to any Business Employee who is absent from work on the Closing Date by reason of short-term disability, within the meaning of the applicable Employee Plan covering such Business Employee (an "STD Employee"): At Closing, Buyer or its affiliate shall offer employment, contingent on returning to work, to each STD Employee in accordance with the third sentence of Section 9.02, and Seller shall comply with the requirements set forth in the last sentence of Section 9.02 with respect to such STD Employee (substituting such STD Employee's Return Date, as

defined below, for the Closing Date). The date on which any STD Employee returns directly from disability leave of absence to active employment shall be referred to hereunder as such STD Employee's "Return Date". Any STD Employee who accepts Buyer's or its affiliate's offer of employment as of his or her Return Date shall be treated as a Transferred Employee under this Article 9, applying this Article with respect to such STD Employee by substituting his or her Return Date for the Closing Date where applicable hereunder. Until his or her Return Date, each STD Employee shall continue to be employed by Seller or its affiliate and covered under the Employee Plans and other benefit arrangements of Seller and its affiliates in accordance with their terms. Until each STD Employee's Return Date, Buyer or its affiliate shall reimburse Seller or its affiliate for one-half of the cost of any employee benefit incurred on or after the Closing Date with respect to such STD Employee which is: (i) incurred in the ordinary course of business under an Employee Plan; and (ii) not provided through the purchase of insurance. For this purpose, medical and dental benefits shall be treated as provided through the purchase of insurance. Seller shall not take any action that would impair or diminish the coverage of any STD Employee under any applicable plan or policy of insurance.

Section 9.10. Foreign Benefit Plans. Buyer and Seller agree to cooperate and to take all actions reasonably necessary to effectuate the transfer, where (i) permissible and consistent with common practice or (ii) required by law, from Seller or one of its affiliates to Buyer or one of its affiliates (or from a plan or trust maintained by Seller or one of its affiliates to a plan or trust maintained by Buyer or one of its affiliates) of assets (and corresponding liabilities) attributable to Transferred Employees under any Employee Plan maintained primarily for the benefit of employees resident outside the United States ("Non-U.S. Business Employees"). Any liability that Buyer or its affiliate is required by law to assume with respect to Non-U.S. Business Employees by virtue of the transactions contemplated by this Agreement which is not fully offset

<PAGE>

by a transfer of assets pursuant to the preceding sentence shall be reflected as a liability on the Closing Statement; provided, that if such liability (determined without reduction for any such transfer of assets) as reasonably computed by the parties no later than seven days prior to the Closing Date exceeds $500,000 in the aggregate, Buyer may elect, on notice given no later than five days before the Closing Date, to assume such excess or cause all such Non-U.S. Business Employees not to be treated as Business Employees (in which case such Non-U.S. Business Employees shall be made available by Seller for secondment to Buyer after the Closing Date, at Buyer's election, the post-closing employment-related costs of such seconded employees to be borne by Buyer); provided, that Seller may nevertheless cause such employees to be treated as Business Employees if it, upon notice given to Buyer on or before the Closing Date, pays such excess to Buyer. Seller shall promptly (and in any event no later than 10 days after the date hereof) furnish Buyer with full and complete information concerning the identities and locations of the Non-U.S. Business Employees (nothing in this sentence being deemed to limit Seller's ability to hire employees in the ordinary course of its business); benefit, compensation, severance and similar plans, commitments or obligations with respect thereto; and workers councils or similar organizations applicable to the Non-U.S. Business Employees.

Section 9.11. Cooperation. Seller and Buyer agree to cooperate with each other in good faith in effectuating the provisions of this Article 9, and to furnish each other promptly with such information concerning employees and employee benefit plans, arrangements or policies as is necessary and appropriate to carry out the terms hereof. Without limiting the foregoing, Seller agrees to

provide Buyer with a reasonable opportunity to communicate with Business Employees prior to the Closing Date.

Section 9.12. No Third Party Beneficiaries. No provision of this Article 9 shall create any third party beneficiary or other rights in any employee or former employee (including any beneficiary or dependent thereof) of Seller or of any of its subsidiaries in respect of continued employment (or resumed employment) with either Buyer or any of its affiliates and no provision of this Article 9 shall create any such rights in any such persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or any plan or arrangement which may be established by Buyer or any of its affiliates. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of Buyer or any of its affiliates.

<PAGE>

ARTICLE 10

Conditions to Closing

Section 10.01. Conditions to Obligations of each Party. The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a) Any applicable waiting period under the HSR Act relating to the transactions contemplated hereby shall have expired or been terminated.

(b) No provision of any applicable law or regulation and no judgment, injunction, order or decree of a court of competent jurisdiction shall prohibit or enjoin the consummation of the Closing.

(c) Buyer and the Board of Directors of Seller shall have received a customary opinion of a nationally recognized investment banking or appraisal firm, in form and substance reasonably satisfactory to Buyer and such Board , regarding the solvency of Seller after the Closing, including that the fair value of Seller's assets would exceed Seller's liabilities, Seller would be able to pay its debts as they become due and Seller's remaining capital would not be unreasonably small for its business.

Section 10.02. Conditions to Obligation of Buyer. The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

(a) (i) Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date and (ii) the representations and warranties of Seller contained in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, shall be true at and as of the Closing Date, as if made at and as of such date with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect.

(b) There shall not be any injunction, judgment, order or decree of a court of competent jurisdiction entered, or any law, rule or regulation enacted, adopted, amended or deemed applicable that prohibits the Closing or is reasonably likely to have a Material Adverse Effect, or a material adverse effect on Buyer and its affiliates , taken as a whole, or the ability of Buyer to own and exercise control over the Business after the Closing;

2397

<PAGE>

(c) The Amendment and Waiver shall have become effective (assuming the Closing hereunder shall have occurred), or Seller shall have at Closing available funds sufficient (i) to effect all necessary refinancing of all outstanding indebtedness under the Credit Agreement that is required as a result of the transactions contemplated by this Agreement and to pay all related fees and expenses and (ii) to provide reasonable working capital to Seller's business after the Closing.

(d) Execution and delivery by Seller of the Services, Supply and Sales Agreement in the form and substance set forth as Exhibit C hereto (the "Services, Supply and Sales Agreement");

(e) (i) Seller shall have received all Required Consents, in each case in form and substance reasonably satisfactory to Buyer and without imposing any incremental costs on Buyer, and no such consent, authorization or approval shall have been revoked or be subject to revocation and (ii) material terms of any lease of Real Property not subject to a Required Consent shall not have been changed to impose any incremental costs to Buyer.

(f) Buyer shall have (i) obtained at its sole cost an ALTA extended coverage form of leasehold owner's title insurance policies, or binders to issue the same, dated the Closing Date and in amounts satisfactory to Buyer insuring or committing to insure, at ordinary premium rates without any requirement for additional premiums, title to the Real Property as indicated by an asterisk in Schedule 3.12(a), free and clear of any Liens, except for Permitted Liens and Liens disclosed on Schedule 3.12(b); provided that the condition in this clause (i) will be deemed satisfied without regard to any Liens that may exist on landlord's interest and (ii) received evidence reasonably satisfactory to it that all Liens on any of the Purchased Assets arising under any of Seller's indebtedness for borrowed money that is not an Assumed Liability shall have been released, including without limitation duly executed partial releases under all applicable UCC financing statements.

(g) Buyer shall have received on or before the Closing Date an opinion of Willkie Farr & Gallagher and an opinion of Richards Layton & Finger, in each case in the form provided to Buyer prior to the date hereof.

Section 10.03. Conditions to Obligation of Seller. The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a) (i) Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing

<PAGE>

Date and (ii) the representations and warranties of Buyer contained in this Agreement shall be true in all material respects at and as of the Closing Date, as if made at and as of such date.

(b) The Amendment and Waiver shall have become effective (assuming the Closing hereunder shall have occurred), or Seller shall have refinanced all outstanding indebtedness under the Credit Agreement on terms that in the aggregate are not, in Seller's reasonable judgment, materially more adverse to Seller than the terms under the Amendment and Waiver.

(c) Execution and delivery by Buyer of the Services, Supply and Sales Agreement in the form and substance set forth as Exhibit C hereto.

ARTICLE 11

Survival; Indemnification

Section 11.01. Survival. The representations and warranties of the parties hereto contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall not survive the Closing; provided that the representations and warranties contained in Section 3.13 shall survive indefinitely.

Section 11.02. Indemnification. (a) Seller hereby indemnifies Buyer and its affiliates and their respective directors, officers, employees and agents against and agrees to hold each of them harmless from any and all damage, loss, liability and expense (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding) ("Damages") incurred or suffered by any such person arising out of:

(i) any misrepresentation or breach of warranty made by Seller contained in Section 3.13;

(ii) any breach of covenant or agreement made or to be performed by Seller pursuant to this Agreement; or

(iii) any Excluded Liability.

(b) Buyer hereby indemnifies Seller and its affiliates and their respective directors, officers, employees and agents against and agrees to hold each of them harmless from any and all Damages incurred or suffered by any such person arising out of:

<PAGE>

(i) any breach of covenant or agreement made or to be performed by Buyer pursuant to his Agreement; or

(ii) any Assumed Liability.

Section 11.03. Procedures. The party seeking indemnification under Section 11.02 (the "Indemnified Party") agrees to give prompt notice to the party against whom indemnity is sought (the "Indemnifying Party") of the assertion of any claim, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought under such Section. The Indemnifying Party may at the request of the Indemnified Party participate in and control the defense of any such suit, action or proceeding at its own expense. The Indemnifying Party shall not be liable under Section 11.02 for any settlement effected without its consent of any claim, litigation or proceeding in respect of which indemnity may be sought hereunder.

ARTICLE 12

Termination

Section 12.01. Grounds for Termination. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Seller and Buyer; or

(b) by either Seller or Buyer,

(i) if the Closing shall not have been consummated on or before March 31, 2000; provided that the right to terminate this Agreement pursuant to this Section 12.01(b)(i) shall not be available to any party whose breach of any provision of this Agreement results in the failure of the Closing to be consummated by such time; or

(ii) if there shall be any law or regulation that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or if consummation of the transactions contemplated hereby would violate any nonappealable final judgment, injunction, order or decree of any court of competent jurisdiction.

The party desiring to terminate this Agreement pursuant to clause 12.01(b) shall give notice of such termination to the other party.

<PAGE>

Section 12.02. Effect of Termination. If this Agreement is terminated pursuant to Section 12.01, this Agreement shall become void and of no effect with no liability on the part of any party hereto; provided that no such termination shall relieve any party of any liability or damages resulting from (i) any action taken by such party that, to such party's knowledge after reasonable inquiry, would, or would likely result in a, breach of any covenant hereunder or (ii) any inaccuracy in the representations and warranties of such party as of the date hereof that would constitute a failure to satisfy the conditions in Section 10.02(a)(ii) or 10.03(a)(ii), as applicable, if at the date hereof such party had or would have had, after reasonable inquiry, knowledge of such inaccuracy. The provisions of Section 13.03, 13.05, 13.06 and 13.07 shall survive any termination hereof pursuant to Section 12.01.

ARTICLE 13

Miscellaneous

Section 13.01. Notices. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given, if to Parent or Buyer, to:

Compaq Computer Corporation

20555 S.H. 249 MS110701
Houston, Texas 77070-2698
Attention: Wendy Caswell
Fax: (281) 518-8642

with copies to:

Compaq Computer Corporation

20555 S.H. 249 MS110701
Houston, Texas 77070-2698
Attention: Thomas C. Siekman
Fax: (281) 518-8209

<PAGE>

and

Davis Polk & Wardwell
450 Lexington Avenue

New York, New York  10017

Attention: Christopher Mayer, Esq.
Fax: (212) 450-4800

if to Seller, to:

InaCom Corp.
10810 Farnam, Suite 200
Omaha, Nebraska 68154

Attention: Chief Financial Officer
Fax: (402) 758-3602

with a copy to:

Willkie Farr & Gallagher
787 Seventh Avenue
New York, New York 10019
Attention: Jack H. Nusbaum, Esq.
Fax: (212) 728-8111

All such notices, requests and other communications shall be deemed received on
the date of receipt by the recipient thereof if received prior to 5 p.m. in the
place of receipt and such day is a business day in the place of receipt.
Otherwise, any such notice, request or communication shall be deemed not to have
been received until the next succeeding business day in the place of receipt.

Section 13.02. Amendments and Waivers. (a) Any provision of this
Agreement may be amended or waived if, but only if, such amendment or waiver is
in writing and is signed, in the case of an amendment, by each party to this
Agreement, or in the case of a waiver, by the party against whom the waiver is
to be effective.

(b) No failure or delay by any party in exercising any right, power or
privilege hereunder shall operate as a waiver thereof nor shall any single or
partial exercise thereof preclude any other or further exercise thereof or the
exercise of any other right, power or privilege. The rights and remedies herein
provided shall be cumulative and not exclusive of any rights or remedies
provided by law.

<PAGE>

Section 13.03. Fees and Expenses. Except as otherwise provided in this
Agreement, all costs and expenses incurred in connection with this Agreement
shall be paid by the party incurring such cost or expense. If the Closing
occurs, Buyer and Seller shall share equally the cost of obtaining the opinion
referenced in Section 10.01(c).

Section 13.04. Successors and Assigns. The provisions of this Agreement
shall be binding upon and inure to the benefit of the parties hereto and their
respective successors and assigns; provided that no party may assign, delegate
or otherwise transfer any of its rights or obligations under this Agreement
without the consent of each other party hereto, except that Buyer may transfer
or assign, in whole or from time to time in part, to one or more of its
affiliates, the right to purchase all or a portion of the Purchased Assets, but
no such transfer or assignment will relieve Buyer of its obligations hereunder.

Section 13.05. Governing Law. This Agreement shall be governed by and
construed in accordance with the law of the State of New York without regard to

2401

the conflicts of law rules of such state.

Section 13.06. Jurisdiction. Except as otherwise expressly provided in this Agreement, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, so long as such courts shall have subject matter jurisdiction over such suit, action or proceeding, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 13.01 shall be deemed effective service of process on such party.

Section 13.07. WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

<PAGE>

Section 13.08. Counterparts; Third Party Beneficiaries. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

Section 13.09. Entire Agreement. This Agreement, the Fulfillment Agreement, the Services, Supply and Sales Agreement, the agreements contemplated by Section 7.07 and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

Section 13.10. Bulk Sales Laws. Buyer and Seller each hereby waive compliance by Seller with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state.

Section 13.11. Parent Guarantee. Parent hereby agrees to guarantee Buyer's obligations to Seller, in accordance with the terms of this Agreement, for payment of the Purchase Price under Article 2 and any indemnification amounts under Section 11.02(b).

Section 13.12. Schedules. Reference to any Schedule in Article 3 shall be deemed a reference to the applicable section of the disclosure schedule provided by Seller to Buyer on or prior to the date hereof.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be

2402

duly executed by their respective authorized officers as of the day and year first above written.

INACOM CORP.

By:   /s/ Gerald A. Gagliardi
      --------------------------------
      Gerald A. Gagliardi
      President and Chief Executive Officer

COMPAQ COMPUTER
   CORPORATION

By:   /s/ Michael J. Winkler
      --------------------------------
      Michael J. Winkler
      Senior Vice President and
      Group Manager

ITY CORP.

By:   /s/ Michael J. Winkler
      --------------------------------
      Michael J. Winkler
      President

<PAGE>

EXHIBIT A

ASSIGNMENT AND ASSUMPTION AGREEMENT

      ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of _____ __, 2000, between InaCom Corp., a Delaware corporation ("Seller"), and ITY Corp., a Delaware corporation ("Buyer").

                    W I T N E S S E T H :

      WHEREAS, Buyer and Seller have concurrently herewith consummated the purchase by Buyer of the Purchased Assets pursuant to the terms and conditions of the Asset Purchase Agreement dated as of January __, 2000 (the "Asset Purchase Agreement"; terms defined in the Asset Purchase Agreement and not otherwise defined herein being used herein as therein defined);

      WHEREAS, pursuant to the Asset Purchase Agreement, Buyer has agreed to assume certain liabilities and obligations of Seller;

      NOW, THEREFORE, in consideration of the sale of the Purchased Assets and in accordance with the terms of the Asset Purchase Agreement, Buyer and Seller agree as follows:

      1. (a) Seller does hereby sell, transfer, assign and deliver to Buyer all of the right, title and interest of Seller in, to and under the Purchased Assets; provided that no sale, transfer, assignment or delivery shall be made of any or any material portion of any of the agreements or Permits if an attempted sale, assignment, transfer or delivery, without the consent of a third party,

would constitute a breach or other contravention thereof or in any way adversely affect the rights of Buyer or Seller thereunder. The foregoing sale, transfer, assignment and delivery is made without representation, warranty or recourse of any kind, except as set forth in the Asset Purchase Agreement.

(b) Buyer does hereby accept all the right, title and interest of Seller in, to and under all of the Purchased Assets (except as aforesaid) and Buyer assumes and agrees to pay, perform and discharge promptly and fully when due all of the Assumed Liabilities.

<PAGE>

2. This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

3. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

INACOM CORP.

By:_____
    Name:
    Title:


ITY CORP.

By:_____
    Name:
    Title:

<PAGE>

EXHIBIT B

January 4, 2000

Gerald Gagliardi

President and Chief Executive Officer
Inacom Corporation
10810 Farnam Drive

Omaha, NE 68514

Dear Gerry:

This letter of understanding sets forth the understanding between Compaq Computer Corporation, a Delaware corporation ("Compaq"), and Inacom Corporation, a Delaware corporation ("Inacom"), regarding Compaq's desire that Inacom provide, and Inacom's desire to provide, certain configuration and distribution services ("Services") with respect to certain Compaq products and

services for major and small and medium business accounts in North America. Compaq and Inacom agree to cooperate and use their reasonable commercial efforts to negotiate in good faith a definitive fulfillment agreement ("Fulfillment Agreement") governing the Services, on terms mutually-agreeable to Compaq and Inacom.

1. Inacom agrees that, from and after the date of this letter until the Expiration Date (as defined below), it will not execute any agreement or arrangement regarding the provision of configuration or distribution services to any person or entity that could reasonably be expected to, either individually or in the aggregate, following the Expiration Date require utilization of more than 7.5% of Inacom's potential configuration or distribution capacity.

2. Each of Compaq and Inacom agree that it will bear its own expenses and costs with regard to the transactions contemplated by this letter including without limitation the fees and expenses of its legal counsel.

3. This letter of understanding shall expire on the earlier to occur of (a) the closing of the Asset Purchase Agreement dated of even date herewith between Compaq and Inacom; and (b) February 6, 2000 (the earlier to occur of such dates, the "Expiration Date") unless the Fulfillment Agreement shall have been executed and delivered prior to such date, in the case of which execution and delivery the Fulfillment Agreement shall supersede this letter.

4. This letter of understanding shall be subject to that certain Confidentiality Agreement dated November 9, 1999, between Compaq and Inacom.

5. If the foregoing accurately summarizes our understanding with respect to the proposed Fulfillment Agreement, please date and execute the enclosed duplicate original of this letter and return the same to the undersigned not later than January 4, 2000. This letter of understanding may be executed in multiple counterparts, but all of which together shall constitute but one and the same instrument.

Very truly yours,

COMPAQ COMPUTER CORPORATION

By: _____
    Name: Michael J. Winkler
    Title: Senior Vice President and Group
    Manager, Commercial Personal
    Computing Group

AGREED TO AND ACCEPTED
AS OF January 4, 2000

INACOM CORPORATION

By: _____
Name:    Gerald A. Gagliardi
Title:   President and Chief Executive Officer

&lt;PAGE&gt;

EXHIBIT C

2405

SERVICES, SUPPLY AND SALES AGREEMENT

SERVICES, SUPPLY AND SALES AGREEMENT (THE "AGREEMENT"), dated as of _____ __, 2000, by and between COMPAQ COMPUTER CORPORATION, A DELAWARE CORPORATION ("COMPAQ"), ITY Corp., a Delaware corporation and a WHOLLY-OWNED SUBSIDIARY OF COMPAQ ("COMPAQ SUB"), AND INACOM CORPORATION, A DELAWARE CORPORATION ("INACOM").

RECITALS

WHEREAS, Compaq Sub and Inacom have entered into an Asset Purchase Agreement dated as of January __, 2000 (THE "ASSET PURCHASE AGREEMENT");

WHEREAS, the execution of this Agreement is a condition to Compaq Sub acquiring, and Inacom disposing of, the Purchased Assets (as defined in the Asset Purchase Agreement) in connection with the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereto hereby agree as follows:

ARTICLE I.

AGREEMENT TO COOPERATE

SECTION 1.1. Services Agreement. Compaq agrees to assist Inacom in the generation of incremental revenues from its service business during the three-year period following the closing of the Asset Purchase Agreement. The revenue will be derived from the following (as summarized on Exhibit 1):

1. Compaq shall outsource an additional $10 million, $20 million and $25 million in 2000, 2001 and 2002 respectively over the 1999 levels for on-site warranty work, subject to the provisions of Section 7 below. Compaq's intent is to move as much on-site warranty work to Inacom as possible. It is understood that any business above the committed amount will depend on the percentage of Compaq's business that is direct to end-user.

2. Compaq shall provide $50 million, $75 million and $100 million of service revenue to Inacom in 2000, 2001 and 2002 respectively over the 1999 levels for the ongoing delivery and management of the service obligation sold with Compaq hardware to customers, subject to the provisions of Section 7 below. Compaq's intent is to build a service revenue stream for Inacom from the sale of desktop, laptop and workstation products from Compaq to all customers. In all cases, the volume of service revenue above the Compaq commitment will depend on the sale of Compaq branded services with the product sale, which will be influenced in turn by the percentage of Compaq's business that is direct to end user and the value of the Compaq brand for service sold by other resellers.
<PAGE>

3. Compaq shall outsource to Inacom an additional $5 million, $10 million and $20 million in 2000, 2001 and 2002 respectively over the 1999 levels for call handling and off-site support, subject to the provisions of Section 7 below.

4. Compaq shall provide $15 million, $25 million and $35 million of service revenue to Inacom in 2000, 2001 and 2002 respectively over 1999 levels for the delivery and ongoing management of service obligations from the sale of Inacom services, such as asset management services by Compaq, subject to the provisions of Section 7 below. Compaq's intent is to expand Compaq's service portfolio by adding Inacom's asset management service offerings and direct delivery of that business to Inacom.

5. Compaq commits to designate Inacom as a "Premier Service Partner for Distributed Infrastructure Services". Compaq also commits to provide $5 million, $10 million and $15 million of professional services subcontracting to Inacom in 2000, 2001 and 2002 respectively over 1999 levels, subject to the provisions of Section 7 below. Compaq's intent is to refer and recommend personal computer integration opportunities to Inacom and utilize Inacom capabilities, such as MCSE resources, to support Compaq Professional Service projects.

6. FOR PURPOSES OF THIS SECTION 1.1, "COMPAQ'S INTENT" shall mean that Compaq will use commercially reasonable efforts to direct revenue to Inacom above Compaq's revenue commitment.

7. The obligations set forth in this Section 1.1 shall be subject to Inacom's ability to competitively price its services (which for these purposes shall not require Inacom to be the lowest-priced service provider) and to satisfy Service Level Agreements for service capabilities and performance, as mutually agreed to by the parties. In addition, it is agreed that Inacom will offer Compaq its most favored customer fees, i.e. the lowest fees which it charges any of its customers, for the services described in this Section 1.1 , except in the instance where lower pricing is offered to "meet competition" in response to a documented lower bid, as such term is commonly used in the relevant industry.

SECTION 1.2. Supply. In connection with Inacom's computer services business, Compaq Sub and Inacom agree as follows:

The parties agree that when Inacom places an order with Compaq Sub for hardware and Procurement Services, as defined below, Compaq Sub will invoice the amount directed by Inacom and collect from the customer for the invoiced amount; provided that Inacom, acting as an agent of Compaq Sub, shall have entered into an agreement with the customer relating to the acquisition of such hardware and Procurement Services, in form and substance reasonably acceptable to Compaq Sub. Such agreement shall include a grant of a purchase money security interest in favor of Compaq or Compaq Sub, as appropriate, on all hardware and related software licenses supplied by Compaq Sub. From these collected amounts, Compaq Sub will retain its sales price for hardware and Procurement Services, and pay the remaining proceeds to Inacom as an agency fee. As used herein, "sales price" shall mean, (i) with respect to hardware, Compaq's actual cost (excluding the impact of volume incentive rebates) with respect to third party hardware and US1 or TOSS price, whichever is applicable, with respect to Compaq's hardware, and (ii) with respect to Procurement Services, the fees as per the Fee Schedule. In the event that the invoiced amounts are insufficient to cover the sales price of the hardware and Procurement Services as per the Fee Schedule (defined below), Inacom agrees to pay the difference to Compaq Sub. The scope of Inacom's agency is as set forth in Exhibit 2.
<PAGE>

1. Inacom agrees to make Compaq Sub its preferred provider of the procurement services listed in Exhibit 3 ("Procurement Services"), meaning only that Inacom shall direct at least 75% of its requirements for such services to Compaq Sub. The obligations set forth in this Section 1.2(1) shall be subject to Compaq Sub's ability to competitively price its services (which for these purposes shall not require Compaq Sub to be the lowest-priced service provider) and to satisfy Service Level Agreements for service capabilities and performance, as mutually agreed to by the parties.

2. Inacom will pay a fee to Compaq Sub for the Procurement Services based on the fee schedule, attached hereto as Exhibit 4 (the "Fee Schedule").

Compaq Sub agrees to provide Inacom with a fixed rate structure for the Procurement Services, which does not depend on rebates for volume attainment. In any event, Compaq Sub will offer Inacom the most favored procurement service customer fees of Compaq Sub or any of its affiliates, i.e. the lowest fees which it charges any of its customers for the Procurement Services except in the instance where lower pricing is offered to "meet competition" in response to a documented lower bid, as such term is commonly used in the relevant industry. Upon reasonable notice, Compaq Sub will give Inacom's independent third party auditor access, on a quarterly basis, to Compaq and multi-vendor sales price information at the SKU level, including but not limited to product cost and freight information, for the sole purpose of verifying Compaq Sub's pricing of the Procurement Services. All such information shall be subject to the terms of the Confidentiality and Non-disclosure Agreement executed by the parties.

3. In the event that Compaq Sub must go outside of the normal distribution agreements with third party vendors in order to obtain third party products, it will absorb commercially reasonable increases in product costs associated with such procurement. If Compaq Sub determines that such costs are not commercially reasonable, Compaq Sub will offer Inacom the right to procure such products from its own channels. Inacom shall be responsible for product sourcing cost increases resulting from instances where Compaq has a distribution agreement with a particular vendor, but product is unavailable, provided Inacom has agreed to incur such additional costs.

4. Compaq and Compaq Sub agree that any marketing funds or other vendor funding (including rebates) provided to Compaq by third party vendors for sales of product to customers where Inacom acted as agent, shall be paid to Inacom within a reasonable time following receipt by Compaq, provided that Inacom agrees to independently satisfy any vendor requirements for such funding.

5. Inacom will provide Compaq Sub with a list of current and potential accounts and Compaq Sub will determine a credit limit and any other appropriate limitations or requirements for each such account. To the extent that Inacom sells products within each customer's credit limit, Compaq Sub will assume the credit risk. However, to the extent that Inacom sells products in excess of any customer's credit limit, Inacom must bear the credit risk. Inacom agrees that all payment terms for its customer invoices shall be net 30 days from receipt of invoice by customer.

6. As part of its Procurement Services, Compaq Sub will provide invoice and collection services for accounts receivable on product procured by customers through Inacom from Compaq Sub under the name of Compaq Sub or Inacom (as agent for Compaq Sub), whichever Inacom prefers. These invoice and collection services will only be available for hardware and/or Procurement Services. Inacom agrees to pay agreed upon fees for customer invoices that are not paid when due in accordance with the Fee Schedule, to the extent the payment period is in excess of the payment period calculated into the assumptions for the Fee Schedule. Compaq's obligation for collections of accounts receivables in this provision is only effective for hardware and Procurement Services delivered by Compaq and sold by Inacom after the close of the Asset Purchase Agreement.
<PAGE>

7. Inacom will not bear any inventory price protection risk. If Inacom or a customer requires Compaq Sub to hold inventory beyond the normal stocking period, then Inacom agrees to pay to Compaq Sub a price protection risk fee in accordance with the Fee Schedule to the extent the inventory holding period is in excess of the inventory price protection element calculated into the assumptions for the Fee Schedule.

SECTION 1.3.  Sales Agreement.

2408

1. Compaq and Inacom will jointly develop Compaq-branded service offerings for end users ("Services"). These services will be performed by Inacom and will be sold through the Compaq sales force.

2. Compaq and Inacom will jointly develop and agree on rules of engagement, which will include, among other things, Relationship Management and Joint Account Planning. Compaq and Compaq Sub agree (and agree to cause their affiliates) not to directly solicit, the Inacom customers with contracts that include the purchase of Compaq hardware or a demonstrated run-rate of the purchase of Compaq hardware, as set forth in Exhibit 5, where Compaq's direct product sales and services offerings are competitive with those offered by Inacom as of the date hereof, for a period of one year from the date hereof, provided the customer continues to purchase Compaq product from Inacom.

ARTICLE II.

MISCELLANEOUS

SECTION 2.1. Definitive Agreements; Binding Effect. The parties agree to use their reasonable best efforts to complete definitive agreements with respect to the matters described in Article 1 within 30 days of the date hereof. Until superseded by such definitive agreements, this Agreement shall be binding on the parties.

SECTION 2.2. Notices. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

        If to Inacom, to:

                Inacom Corporation
                Attention: Dick Anderson
                2001 Westside Parkway

                Suite 260
                Alpharetta, GA  30004

        If to Compaq or Compaq Sub, to:

                Compaq Computer Corporation

                20555 SH 249
                Houston, TX 77070
                Attention: Mike Pocock
                Facsimile:

<PAGE>

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

SECTION 2.3. Amendments and Waivers. (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 2.4.  Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

SECTION 2.5. Entire Agreement. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 2.6.  Governing Law. This Agreement shall be governed by and construed in accordance with the law of the State of New York without regard to the conflicts of law rules of such state.

SECTION 2.7.  Counterparts; Third Party Beneficiaries.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.  No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

SECTION 2.8. Term. The term of this Agreement shall be for a period of three (3) years from the date of execution. Following the first anniversary of the date of execution of the Asset Purchase Agreement, the parties agree to renegotiate pricing for Procurement Services for pricing periods to be mutually agreed to by the parties to the extent necessary to ensure that pricing for Procurement Services remains competitively priced in the marketplace for each of the parties.

<PAGE>

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

                        Inacom Corporation

                        By: _____
                              Name:
                              Title:
                              Date:

                        Compaq Computer Corporation

                        By: _____
                              Name:
                              Title:
                              Date:


                        ITY Corp.

By: _____
     Name:
     Title:
     Date:

<PAGE>

SERVICES, SUPPLY & SALES AGREEMENT

<PAGE>

EXHIBIT 1

REVENUE COMMITMENTS

Compaq agrees that it shall purchase the following aggregate service revenues over 1999 levels from Inacom over the course of the next three years. In addition, Compaq shall be obligated to satisfy the individual services categories within plus or minus twenty-five percent (25%) of the revenue targets outlined below, provided that Compaq shall be required to achieve revenue commitments in the aggregate. Compaq estimates that it will achieve the aggregate revenue commitment for 2000 on the following basis: $10M in 1Q00; $20M in 2Q00; $25M in 3Q00; $30M in 4Q00, provided that Compaq shall be required to achieve the 2000 revenue commitment in the aggregate.

<TABLE>

| INCREMENTAL REVENUE SOURCE | 2000 | 2001 | 2002 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 1. Outsourcing of on-site warranty work | $10 million | $20 million | $25 |
| 2. Ongoing delivery and management of service obligations sold with Compaq hardware | $50 million | $75 million | $100 |
| 3. Outsourcing of call handling and off-site support | $5 million | $10 million | $20 |
| 4. Delivery and ongoing management of service obligations | $15 million | $25 million | $35 |
| 5. Designation as "Premier Service Partner for Distributed Infrastructure Services and subcontracting for professional services | $5 million | $10 million | $15 |

2411

```
- ------------------------------------------ ------------------- ----------------- --
- ------------------------------------------ ------------------- ----------------- --

Aggregate Revenue Commitment        $85 million        $140 million        $195
- ------------------------------------------ ------------------- ----------------- --
</TABLE>
```

<PAGE>

EXHIBIT 2

SCOPE OF AGENCY

<PAGE>

EXHIBIT 3

PROCUREMENT SERVICES

Compaq Sub agrees to offer the following Procurement Services pursuant to this Agreement:

PROGRAM DEVELOPMENT & MANAGEMENT PROGRAM DESIGN Scope of Work Statement of Work Process Alignment Transition & Implementation

TECHNOLOGY SELECTION

Provide evaluation hardware Establish hardware standards Identification and cataloging of existing images Create and implement design process Design software images Create software images Create proof-of-concept system Test and validate proof-of-concept system GLOBAL PROJECT MANAGEMENT Single point of accountability International standards ORDER FULFILLMENT ACCOUNT SETUP Create account(s) Implement financing methods & processes PRICING AND AVAILABILITY 90-Day forecast Client-specific purchasing Client-owned inventory Pre-customized inventory Special bid pricing Create and maintain client-specific pricing profiles Assign and maintain client-specific SKUs Create and maintain convenience bundles PRE-SALES CONSULTING Create & provide client-specific web-based catalog Provide configuration manual Provide live pre-sales support (standards only) Provide live pre-sales support (any products) Provide on-site pre-sales support ORDER CREATION Create adhoc system order Create adhoc order for upgrade/peripheral/supplies Create refresh plan Obtain Client internal approval Generate purchase order ORDER ENTRY, CONFIRMATION, ETAS Provide web-based order entry tool Provide centralized order entry contact Provide on-site order entry contact Provide X.12 EDI connection to client system Review order for completeness Review order for technical correctness Review order for credit availability Release order on fulfillment system Verbally confirm order and ETA to client contact Electronically confirm order and ETA to client contact ORDER MANAGEMENT Ensure product acquisition and allocation Answer order status inquires Escalate issues Advance ship notification (ASN) Returns and DOAs Track and review SLA compliance Measure and report client satisfaction MANUFACTURING AND CUSTOMIZATION Manage image and instructions Assemble system (JMAS) Customize hardware Third-party component setup Partition/format fixed disk drives Asset tagging and recording

Custom labeling or bar-coding Install software Operating System
Shrink-wrapped applications Proprietary applications Image load
Personalized system settings IP address  Workgroup name Other
Perform dial-out and/or leased line connectivity  testing Apply
client-specific  data  via  dial-out  or  leased  line  Burn-in
Troubleshoot  and repair image issues  Perform  client-specific
quality check LOGISTICS Pick and pack/repack  products  Special
overpack  Design  packing  per  client  specifications  Acquire
packaging Pack orders per client specifications Ensure shipment
integrity   Ship/Deliver  products  Standard  ground  Three-day
Two-day Next-day Crisis  transport  service  Carrier-specific
delivery  Time/place  specific delivery INVOICING AND REPORTING
Customized  packing  list  Provide  proof-of-delivery  (POD)
confirmation  Standard  invoice  Summary  invoice  EDI  invoice
Invoice  acceptance  Payment  generation  (standard)  Payment
generation  (EFT) REPORTS  Product  Purchase  Purchase  history
Standard vs.  non-standard  By  manufacturer  By business  unit
Standards  price  list Order  Management  Daily  Status  Report
Backorder  report - open  orders  Proof-of-delivery  (POD)
Notification  SLA Performance  order  turnaround SLA attainment
Invoices  Invoices billed  Invoices paid Asset  Management feed
Client Satisfaction

<PAGE>

EXHIBIT 4

FEE SCHEDULE

<PAGE>

EXHIBIT 5

SPECIFIED CUSTOMERS

<PAGE>

Schedule 1.01
Definition of the Business

    The Business means the  following  businesses  currently  conducted by
Seller and its subsidiaries:

        o       Configuration and distribution operations, including:
                o       Distribution center and distribution services
                o       Configuration and configuration support
                o       Central sales
                o       Project and technology project management
                o       Purchasing
                o       Quality assurance
                o       Traffic
                o       Memphis distribution and configuration activities
                o       Microsoft project
                o       Asset recovery
                o       Bid desk
                o       Client services
                o       Operations - International
                o       Loss prevention
        o       Reseller  business,  other  than  (1)  obligations  under  franchise

2413