EXHIBIT 6

Received at: 3:16PM, 2/8/2002

Feb-08-02 15:05   Resilian                    631 420 1980          P.02

February 17, 2000


Logicare, Inc
85A Marcus Drive
Melville NY 11747



RE:   Account Payable # 018647 of Inacom Corporation

Dear Chris and Bill,

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of
Compaq Computer Corporation purchased certain assets of Inacom Corporation. The Compaq
subsidiary will operate under the name of Custom Edge, Inc., and its' A/P accounts will be funded
by Compaq.

In connection with such purchase, Custom Edge, Inc, also assumed the obligation to pay all of
the outstanding amount on the referenced account, subject to the terms and conditions of such
account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to Noni Vitols at
402.758.3678.

Thank you for your consideration in this matter.

Sincerely,



Bill Francis
Director, Corporate Finance
Telephone:  281.514.1223
Email:  bill.francis@compaq.com



EXHIBIT 7



# HOULIHAN LOKEY HOWARD & ZUKIN

### FINANCIAL ADVISORS





February 16, 2000

The Board of Directors
Inacom Corporation
10810 Farnam Drive, Suite 200
Omaha, NE 68154

The Board of Directors
Compaq Computer Corporation
20555 State Highway #249, MS110701
Houston, TX 77070-2698

Dear Directors

We understand that Inacom Corporation (the "Company") has entered into a transaction with Compaq Computer Corporation ("Compaq") whereby the Company will be selling certain assets and facilities of its product distribution and configuration business to Compaq for approximately $369 5 million We further understand that Compaq will be providing a $55 5 million revolving credit facility to the Company and that the existing lenders to the Company under the Credit Agreement (as herein defined) will make available a $225 million revolving credit facility to the Company The sale and related transactions are referred to collectively herein as the "Transaction"

You have requested our written opinion (the "Opinion") as to the matters set forth below This Opinion values the Company as a going-concern (including goodwill), on a pro forma basis, immediately after and giving effect to the Transaction and the associated indebtedness For purposes of this Opinion, "fair value" shall be defined as the amount at which the Company would change hands between a willing buyer and a willing seller, each having reasonable knowledge of the relevant facts, neither being under any compulsion to act, with equity to both, and "present fair saleable value" shall be defined as the amount that may be realized if the Company's aggregate assets (including goodwill) are sold as an entirety with reasonable promptness in an arm's length transaction under present conditions for the sale of comparable business enterprises, as such conditions can be reasonably evaluated by Houlihan Lokey Howard & Zukin Financial Advisors, Inc ("Houlihan Lokey") We have used the same valuation methodologies in determining fair value and present fair saleable value for purposes of rendering this Opinion The term "identified contingent liabilities" shall mean the stated amount of contingent liabilities identified to us and valued by responsible officers of the Company, upon whom we have relied upon without independent verification, no other contingent liabilities will be considered Being "able to pay its debts as they become absolute and mature" shall mean that, assuming the Transaction has been consummated as proposed, the Company's financial forecasts for the period 2000 to 2003 indicate positive cash flow for such period, including (and after giving effect to) the payment of installments due under loans made pursuant to the indebtedness to be outstanding immediately after the consummation of the Transaction, as such installments are scheduled at the close of the Transaction It is Houlihan Lokey's

**Los Angeles**

1930 Century Park West
Los Angeles California 90067 6802
Tel 310 553 8871  Fax 310 553 2173

Investment advisory services through Houlihan Lokey Howard & Zukin Financial Advisors

Board of Director,
Inacom Corporation

The Board of Directors
Compaq Computer Corporation
February 16, 2000

-2-

understanding, upon which it is relying, that the Company's Board of Directors and any other recipient of the Opinion will consult with and rely solely upon their own legal counsel with respect to said definitions No representation is made herein, or directly or indirectly by the Opinion, as to any legal matter or as to the sufficiency of said definitions for any purpose other than setting forth the scope of Houlihan Lokey's Opinion hereunder

Notwithstanding the use of the defined terms "fair value" and "present fair saleable value," we have not been engaged to identify prospective purchasers or to ascertain the actual prices at which and terms on which the Company can currently be sold, and we know of no such efforts by others  Because the sale of any business enterprise involves numerous assumptions and uncertainties, not all of which can be quantified or ascertained prior to engaging in an actual selling effort, we express no opinion as to whether the Company would actually be sold for the amount we believe to be its fair value and present fair saleable value

In connection with this Opinion, we have made such reviews, analyses and inquiries as we have deemed necessary and appropriate under the circumstances  Among other things, we have

1    reviewed the Company's annual reports to shareholders and on Form 10-K for the five fiscal years ended 1998 and quarterly reports on Form 10-Q for the three quarters ended September 25, 1999, and Company-prepared interim balance sheets and income statements for the four months ended January 31, 2000 and Company-prepared estimates for the period February 1, 2000 to February 14, 2000, which the Company's management has identified as the most current information available.

2    reviewed copies of the following agreements
    ♦ Credit Agreement among Inacom Corp , Various Lending Institutions, IBM Credit Corporation as Documentation Agent, Banque Nationale De Paris as Syndication Agent and Deutsche Bank AG as Administrative Agent dated April 9, 1999 (the "Credit Agreement"),
    ♦ Third Amendment and Waiver Document among Inacom Corp , the Banks party to the Credit Agreement, IBM Credit Corporation as Documentation Agent, Banque Nationale De Paris as Syndication Agent and Deutsche Bank AG as Administrative Agent dated January 4, 2000,
    ♦ Fourth Amendment and Waiver, dated as of February 15, 2000, among Inacom Corp , the Banks party to the Credit Agreement, IBM Credit Corporation, as Documentation Agent, Banque Nationale De Paris, as Syndication Agent and Deutsche Bank AG, New York Branch, as Administrative Agent,
    ♦ Asset Purchase Agreement dated as of January 4, 2000 between Compaq Computer Corporation, ITY Corp , and Inacom Corp ,
    ♦ February 10, 2000 draft of the First Amendment to Asset Purchase Agreement dated as of February __, 2000, among Compaq Computer Corporation, ITY Corp , and InaCom Corp ,
    ♦ February 15, 2000 draft of the Fifth Amendment and Waiver to Agreement for Inventory Financing made as of February 15, 2000 by and between InaCom Corp , Vanstar Corporation, InaCom Government Systems, Inc , and IBM Credit Corporation,
    ♦ Revolving Credit Facility Commitment Letter dated February 15, 2000 between Compaq Computer Corporation and Inacom Corp , and
    ♦ Subordinated Debenture Agreement between Vanstar Corp and Wilmington Trust Company dated October 2, 1996,

Board of Directors
Inacom Corporation

The Board of Directors
Compaq Computer Corporation
February 16, 2000                                                                              -3-

3    spoken with certain members of the senior management of the Company to discuss the
     operations, financial condition, future prospects and projected operations and performance of
     the Company,

4    visited certain facilities and business offices of the Company,

5    reviewed forecasts and projections prepared by the Company's management with respect to the
     Company for the four quarters ended December 31, 2000 and the three years ended December
     31, 2000 through 2003,

6    reviewed the historical market prices and trading volume for the Company's publicly traded
     securities,

7    reviewed other publicly available financial data for the Company and certain companies that we
     deem comparable to the Company,

8    reviewed drafts of certain documents to be delivered at the closing of the Transaction,
     including, but not limited to, the reports of the Company's chief financial officer, and

9    conducted such other studies, analyses and investigations as we have deemed appropriate

We have relied upon and assumed, without independent verification but based on representations from the
Company, that the financial forecasts and projections provided to us have been reasonably prepared and
reflect the best currently available estimates of the future financial results and condition of the Company,
and that there has been no material adverse change in the assets, financial condition, business or prospects
of the Company since the date of the most recent financial statements made available to us

We have not independently verified the accuracy and completeness of the information supplied to us with
respect to the Company and do not assume any responsibility with respect to it. We have not made any
physical inspection or independent appraisal of any of the properties or assets of the Company. Our
opinion is necessarily based on business, economic, market and other conditions as they exist and can be
evaluated by us at the date of this letter

Based upon the foregoing, and in reliance thereon, it is our opinion as of the date of this letter that,
assuming the Transaction had been consummated as proposed, immediately after and giving effect to the
Transaction

(a)   on a pro forma basis, the fair value and present fair saleable value of the Company's assets
      would exceed the Company's stated liabilities and identified contingent liabilities,

(b)   the Company should be able to pay its debts as they become absolute and mature, and

(c)   the capital remaining in the Company after the Transaction would not be unreasonably small
      for the business in which the Company is engaged, as management has indicated it is now
      conducted and is proposed to be conducted following the consummation of the Transaction

Board of Directors
Inacom Corporation

The Board of Directors
Compaq Computer Corporation
February 16, 2000                                                                                  -4-

The Company, like other companies and any business entities analyzed by Houlihan Lokey or which are
otherwise involved in any manner in connection with this Opinion, could be materially affected by
complications that may occur, or may be anticipated to occur, in computer-related applications as a result
of the year change from 1999 to 2000 (the "Y2K Issue") In accordance with long-standing practice and
procedure, Houlihan Lokey's services are not designed to detect the likelihood and extent of the effect of
the Y2K Issue, directly or indirectly, on the financial condition and/or operations of a business Further,
Houlihan Lokey has no responsibility with regard to the Company's efforts to make its systems, or any
other systems (including its vendors and service providers), Year 2000 compliant on a timely basis
Accordingly, Houlihan Lokey shall not be responsible for any effect of the Y2K Issue on the matters set
forth in this Opinion

This Opinion is furnished solely for your benefit and may not be relied upon by any other person without
our express, prior written consent  This Opinion is delivered to each recipient subject to the conditions,
scope of engagement, limitations and understandings set forth in this Opinion and our engagement letter
dated December 29, 1999, and subject to the understanding that the obligations of Houlihan Lokey in the
Transaction are solely corporate obligations, and no officer, director, employee, agent, shareholder or
controlling person of Houlihan Lokey shall be subjected to any personal liability whatsoever to any
person, nor will any such claim be asserted by or on behalf of you or your affiliates

HOULIHAN LOKEY HOWARD & ZUKIN FINANCIAL ADVISORS, INC

*Houlihan Lokey Howard & Zukin Financial Advisors, Inc.*

SR2 /B3R9

EXHIBIT 8

## SERVICES, SUPPLY AND SALES AGREEMENT

SERVICES, SUPPLY AND SALES AGREEMENT (the "Agreement"), dated as of February 16, 2000, by and between Compaq Computer Corporation, a Delaware corporation ("Compaq"), ITY Corp., a Delaware corporation and a wholly-owned subsidiary of Compaq ("Compaq Sub"), and InaCom Corp., a Delaware corporation ("Inacom").

## RECITALS

WHEREAS, Compaq Sub, Compaq and Inacom have entered into an Asset Purchase Agreement dated as of January 4, 2000, as amended (the "Asset Purchase Agreement");

WHEREAS, the execution of this Agreement is a condition to Compaq Sub acquiring, and Inacom disposing of, the Purchased Assets (as defined in the Asset Purchase Agreement) in connection with the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereto hereby agree as follows:

## ARTICLE I.

## AGREEMENT TO COOPERATE

SECTION 1.1. Services Agreement. Compaq agrees to assist Inacom in the generation of incremental revenues for InaCom's service business as provided in the Service Level Agreement dated as of February 16, 2000 between Compaq and Inacom (the "Service Level Agreement"), and the terms of the Service Level Agreement are incorporated by reference herein.

SECTION 1.2. Supply. In connection with Inacom's computer services business, Compaq Sub and Inacom agree as follows:

The parties agree that when Inacom places an order with Compaq Sub for hardware and Procurement Services, as defined below, Compaq Sub will invoice the amount directed by Inacom and collect from the customer for the invoiced amount; provided that Inacom, acting as an agent of Compaq Sub, shall have entered into an agreement with the customer relating to the acquisition of such hardware and Procurement Services, in form and substance reasonably acceptable to Compaq Sub. Such agreement shall include a grant of a purchase money security interest in favor of Compaq or Compaq Sub, as appropriate, on all hardware and related software licenses supplied by Compaq Sub. From these collected amounts, Compaq Sub will retain its sales price for hardware and Procurement Services, and pay the remaining proceeds to Inacom as an agency fee. As used herein, "sales price" shall mean, (i) with respect to hardware, Compaq's actual cost (excluding the impact of volume incentive rebates) with respect to third party hardware and US1 or TOSS price, whichever is applicable, with respect to Compaq's hardware, and (ii) with respect to Procurement Services, the fees as per the Fee Schedule. In the event that the invoiced amounts are insufficient to cover the sales price of the hardware and Procurement



EXHIBIT

Wells-8

DL    3/30/05

SS&S.AGT

Services as per the Fee Schedule (defined below). Inacom agrees to pay the difference to Compaq Sub.

1. Inacom agrees to make Compaq Sub its preferred provider of the procurement services listed in Exhibit 1 ("Procurement Services"), meaning only that Inacom shall direct at least 75% of its requirements for such services to Compaq Sub. The obligations set forth in this Section 1.2(1) shall be subject to Compaq Sub's ability to competitively price its services (which for these purposes shall not require Compaq Sub to be the lowest-priced service provider) and to satisfy Service Level Agreements for service capabilities and performance, as mutually agreed to by the parties.

2. Inacom will pay a fee to Compaq Sub for the Procurement Services based on the fee schedule, attached hereto as Exhibit 2 (the "Fee Schedule"). Compaq Sub agrees to provide Inacom with a fixed rate structure for the Procurement Services, which does not depend on rebates for volume attainment. In any event, Compaq Sub will offer Inacom the most favored procurement service customer fees of Compaq Sub or any of its affiliates, i.e. the lowest fees which it charges any of its customers for the Procurement Services except in the instance where lower pricing is offered to "meet competition" in response to a documented lower bid, as such term is commonly used in the relevant industry. Upon reasonable notice, Compaq Sub will give Inacom's independent third party auditor access, on a quarterly basis, to Compaq and multi-vendor sales price information at the SKU level, including but not limited to product cost and freight information, for the sole purpose of verifying Compaq Sub's pricing of the Procurement Services. All such information shall be subject to the terms of the Confidentiality and Non-disclosure Agreement executed by the parties.

3. In the event that Compaq Sub must go outside of the normal distribution agreements with third party vendors in order to obtain third party products, it will absorb commercially reasonable increases in product costs associated with such procurement. If Compaq Sub determines that such costs are not commercially reasonable, Compaq Sub will offer Inacom the right to procure such products from its own channels. Inacom shall be responsible for product sourcing cost increases resulting from instances where Compaq has a distribution agreement with a particular vendor, but product is unavailable, provided Inacom has agreed to incur such additional costs.

4. Compaq and Compaq Sub agree that any marketing funds or other vendor funding (including rebates) provided to Compaq by third party vendors for sales of product to customers where Inacom acted as agent, shall be paid to Inacom within a reasonable time following receipt by Compaq, provided that Inacom agrees to independently satisfy any vendor requirements for such funding.

5. Inacom has provided Compaq Sub with a list of current and potential accounts, attached hereto as an appendix to Exhibit 3, and Compaq Sub will determine a credit limit and any other appropriate limitations or requirements for each such account. To the extent that Inacom sells products within each customer's credit limit, Compaq Sub will assume the credit risk. However, to the extent that Inacom sells products in excess of any customer's credit limit,

2

SS&S.AGT

Inacom must bear the credit risk. Inacom agrees that all payment terms for its customer invoices shall be net 30 days from receipt of invoice by customer.

6. As part of its Procurement Services, Compaq Sub will provide invoice and collection services for accounts receivable on product procured by customers through Inacom from Compaq Sub under the name of Compaq Sub or Inacom (as agent for Compaq Sub), whichever Inacom prefers. These invoice and collection services will only be available for hardware and/or Procurement Services. Inacom agrees to pay agreed upon fees for customer invoices that are not paid when due in accordance with the Fee Schedule, to the extent the payment period is in excess of the payment period calculated into the assumptions for the Fee Schedule. Compaq's obligation for collections of accounts receivables in this provision is only effective for hardware and Procurement Services delivered by Compaq and sold by Inacom after the close of the Asset Purchase Agreement.

7. Inacom will not bear any inventory price protection risk. If Inacom or a customer requires Compaq Sub to hold inventory beyond the normal stocking period, then Inacom agrees to pay to Compaq Sub a price protection risk fee in accordance with the Fee Schedule to the extent the inventory holding period is in excess of the inventory price protection element calculated into the assumptions for the Fee Schedule.

SECTION 1.3. Sales Agreement.

1. Compaq and Inacom will jointly develop Compaq-branded service offerings for end users ("Services"). These services will be performed by Inacom and will be sold through the Compaq sales force.

2. Compaq and Inacom have jointly developed and agreed on Rules of Engagement, attached hereto as Exhibit 3, which include, among other things, Relationship Management and Joint Account Planning. Compaq and Compaq Sub agree (and agree to cause their affiliates) not to directly solicit, the Inacom customers with contracts that include the purchase of Compaq hardware or a demonstrated run-rate of the purchase of Compaq hardware, as set forth in Exhibit 3, where Compaq's direct product sales and services offerings are competitive with those offered by Inacom as of the date hereof, for a period of one year from the date hereof, provided the customer continues to purchase Compaq product from Inacom.

ARTICLE II.

MISCELLANEOUS

SECTION 2.1. Definitive Agreements; Binding Effect. The parties agree to use their reasonable best efforts to complete definitive agreements with respect to the matters described in Section 1.2 and Section 1.3 within 30 days of the date hereof. Until superseded by such definitive agreements, this Agreement shall be binding on the parties.

SECTION 2.2. Notices. All notices, requests and other communications to any party

3

SS&S_AGT

hereunder shall be in writing (including facsimile transmission) and shall be given,

If to Inacom, to:

> Inacom Corporation
> Attention: Dick Anderson
> 2001 Westside Parkway
> Suite 260
> Alpharetta, GA 30004
> Facsimile: (770) 619-6082

If to Compaq or Compaq Sub, to:

> Compaq Computer Corporation
> 20555 SH 249
> Houston, TX 77070
> Attention: Mike Pocock
> Facsimile: (281) 514-0851

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

SECTION 2.3. Amendments and Waivers. (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 2.4. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

SECTION 2.5. Entire Agreement. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SS&S.AGT

SECTION 2.6. Governing Law. This Agreement shall be governed by and construed in accordance with the law of the State of New York without regard to the conflicts of law rules of such state.

SECTION 2.7. Counterparts; Third Party Beneficiaries. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

SECTION 2.8. Term. This Agreement shall terminate upon termination of the Service Level Agreement in accordance with Section 5.7(a) or (b) thereof. Following the first anniversary of the date of execution of the Asset Purchase Agreement, the parties agree to renegotiate pricing for Procurement Services for pricing periods to be mutually agreed to by the parties to the extent necessary to ensure that pricing for Procurement Services remains competitively priced in the marketplace for each of the parties.

SECTION 2.9. Single Agreement. This Agreement and the agreements identified on Exhibit 4 hereto (this Agreement and such other agreements, collectively, the "Operating Agreements") were entered into pursuant to the Asset Purchase Agreement. The undertakings of each party hereunder and thereunder constitute consideration for the undertakings of the other parties under all of the Operating Agreements, and all of the Operating Agreements shall constitute a single agreement. The material performance of the obligations of each party under each Operating Agreement shall be a condition to the performance of the obligations of each other party under each Operating Agreement   The rightful rejection of any Operating Agreement (which shall not include an expiration or termination thereof) requires the rejection of all Operating Agreements.

(NY) 05862.066/AGT/SS&S.AGT.doc

SERVICES, SUPPLY & SALES AGREEMENT

    IN WITNESS WHEREOF, the parties have duly executed this
Agreement as of the date first above written.

Inacom Corporation

By: _____
    Gerald A. Gagliardi
    President and Chief Executive
    Officer

Compaq Computer Corporation

By: _____
    Michael J. Winkler
    Senior Vice President and Group
    Manager

ITY Corp.

By: _____
    Michael J. Winkler
    President

SERVICES, SUPPLY & SALES AGREEMENT

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

Inacom Corporation

By: _____
    Gerald A. Gagliardi
    President and Chief Executive
    Officer

Compaq Computer Corporation

By: _____
    Michael J. Winkler
    Senior Vice President and Group
    Manager

ITY Corp.

By: _____
    Michael J. Winkler
    President

SS&S.AGT

## Exhibit 1

## PROCUREMENT SERVICES

Compaq Sub agrees to offer the following Procurement Services pursuant to this Agreement:

      **Program Development & Management**
      **Program Design**
      Scope of Work
      Statement of Work
      Process Alignment
      Transition & Implementation
      **Technology Selection**
      Provide evaluation hardware
      Establish hardware standards
      Identification and cataloging of existing images
      Create and implement design process
      Design software images
      Create software images
      Create proof-of-concept system
      Test and validate proof-of-concept system
      **Global Project Management**
      Single point of accountability
      International standards
      **Order Fulfillment**
      **Account Setup**
      Create account(s)
      Implement financing methods & processes
      **Pricing and Availability**
      90-Day forecast
      Client-specific purchasing
      Client-owned inventory
      Pre-customized inventory
      Special bid pricing
      Create and maintain client-specific pricing profiles
      Assign and maintain client-specific SKUs
      Create and maintain convenience bundles
      **Pre-sales Consulting**

7

SS&S.AGT

Create & provide client-specific web-based catalog
Provide configuration manual
Provide live pre-sales support (standards only)
Provide live pre-sales support (any products)
Provide on-site pre-sales support
**Order Creation**
Create adhoc system order
Create adhoc order for upgrade/peripheral/supplies
Create refresh plan
Obtain Client internal approval
Generate purchase order
**Order Entry, Confirmation, ETAs**
Provide web-based order entry tool
Provide centralized order entry contact
Provide on-site order entry contact
Provide X.12 EDI connection to client system
Review order for completeness
Review order for technical correctness
Review order for credit availability
Release order on fulfillment system
Verbally confirm order and ETA to client contact
Electronically confirm order and ETA to client contact
**Order Management**
Ensure product acquisition and allocation
Answer order status inquires
Escalate issues
Advance ship notification (ASN)
Returns and DOAs
Track and review SLA compliance
Measure and report client satisfaction
**Manufacturing and Customization**
Manage image and instructions
Assemble system (JMAS)
Customize hardware
Third-party component setup
Partition/format fixed disk drives
Asset tagging and recording
Custom labeling or bar-coding

8

SS&S.AGT

Install software
 Operating System
 Shrink-wrapped applications
 Proprietary applications
 Image load
 Personalized system settings
IP address
Workgroup name
Other
Perform dial-out and/or leased line connectivity testing
Apply client-specific data via dial-out or leased line
Burn-in
Troubleshoot and repair image issues
Perform client-specific quality check
Logistics
Pick and pack/repack products
Special overpack
Design packing per client specifications
Acquire packaging
Pack orders per client specifications
Ensure shipment integrity
Ship/Deliver products
Standard ground
Three-day
Two-day
Next-day
Crisis transport service
Carrier-specific delivery
Time/place specific delivery
**Invoicing and Reporting**
Customized packing list
Provide proof-of-delivery (POD) confirmation
Standard invoice
Summary invoice
EDI invoice
Invoice acceptance
Payment generation (standard)
Payment generation (EFT)
**Reports**
Product Purchase

9

SS&S.AGT

Purchase history
Standard vs. non-standard
By manufacturer
By business unit
Standards price list
Order Management
Daily Status Report
Backorder report - open orders
Proof-of-delivery (POD) Notification
SLA Performance

order turnaround

SLA attainment

Invoices

Invoices billed

Invoices paid

Asset Management feed

Client Satisfaction

10

SS&S.AGT

## Exhibit 2

## FEE SCHEDULE

In addition to payment owed for hardware purchases as set forth in Section 1.2 of this Agreement, Compaq agrees that it will charge Inacom the following fees for Procurement Services performed under this Agreement:

| | |
|---|---|
| **Procurement Services Base Fee** | 2.6% of invoice price per customer invoice |
| **Additional Fees** | (Fees for special procurement and configuration services) |

---

| | |
|---|---|
| **Total Compensation for Services** | 3.5% of invoice price per customer invoice |

Compaq will retain 3.5% of the invoice price per customer order as total compensation for services performed. The total services fee of 3.5% will be used in calculating any agency fee payment owed to Inacom. The agency fee will be calculated and paid monthly by Compaq Sub and adjusted quarterly to 3.5%. The parties agree to negotiate appropriate SLA metric standards during 2000 to be used to further adjust the quarterly fee rate to recognize changes in Inacom's business and Compaq Sub's cost model.

### SLA METRICS

The parties agree that the above fee structure (3.5%) will be adjusted using the following SLA metrics to be agreed between the parties:

1.  The percentage of Customization Fees charged to Inacom as compared to the total revenue Compaq Sub invoiced for Inacom customers is TBD, as based on Q399 numbers. The method to be used for this calculation will be the Commission Cost Basis (CCB).

2.  The percentage of Restock Fees charged Inacom as compared to the total revenue Compaq Sub invoiced for Inacom customers customer is TBD, based on Q399 numbers.

3.  The percentage of Expedite Fees charged Inacom as compared to the total revenue Compaq Sub invoiced for Inacom customers is TBD, based on Q399 numbers.

4.  The percentage of Cancellation Fees charged Inacom as compared to the total revenue Compaq Sub invoiced for Inacom customers is TBD, based on Q399 numbers.

### QUARTERLY ADJUSTMENT CALCULATION

Following the end of each calendar quarter, if the aggregate of the above amounts are within plus or minus 10% of the baseline assumptions set forth above, there will be no adjustment. If any of the above

11

SS&S.AGT

aggregate amounts are greater than plus or minus 10% of the baseline assumptions, then an adjustment will be made by Compaq Sub for the difference. This adjustment will be made at the end of the Compaq Sub fiscal quarter and added or deducted from the agency fee payment to Inacom. For example (these figures used in this example are for illustrative purposes only):

| Fee Type | Q399 Baseline | Current Quarter |
|----------|---------------|-----------------|
| Customization Fees | TBD | .70% |
| Restock Fees | TBD | .08% |
| Expedite Fees | TBD | .05% |
| Cancellation Fees | TBD | .12% |
| Total | 1.10% | .95% |

1) The adjustment baseline is +/-.11%  (10% * 1.10%)
2) Current quarter deviation is -.15% (.95% - 1.10%)
3) Total fee adjustment -.04% (.11% - .15%)
4) This .04% is a rebate (added to agency fee payment) to Inacom since the current quarter is lower than the Q399 baseline

The quarterly adjustment will be made following the end of the third month of the applicable Compaq fiscal quarter. The adjustment will include any adjustment accrued during the first two months of the quarter.

Compaq Sub reserves the right to pay agency fees when invoices are collected from Inacom customers, as indicated in Section 1.2 of the Agreement.

12

SS&S.AGT

## Exhibit 3

### Rules of Engagement for Field Purpose

Working proactively with Inacom to create a consistent engagement process when a current Inacom/Compaq customer is at risk. Designed to facilitate communication needed to best serve customers and to facilitate customer choice, where each party will act unilaterally.

### Guiding Principles

Allow customer choice for manufacturer or reseller (Direct or Indirect) in an end customer's decision making process.

While remaining competitors, Compaq will operate in a consistent, predictable & fair manner with Inacom.

As required by Asset Purchase transaction, Compaq will not directly solicit listed accounts for one year. If customer requests Compaq to sell directly to the account, Compaq will follow agreed upon escalation path.

Through proactive planning and review activities, Compaq and Inacom will work together to grow market share for Compaq, and proactively put plans in place to effectively compete against Compaq product competitors in existing and identified partnership accounts.

All special product pricing from Compaq will be managed by Compaq Field Team exclusively (each party sets its own pricing independently).

It is very important we follow the rules of engagement. They are designed to ensure consistency of approach to Compaq/Inacom joint customers.

### Rules of Engagement (ROE)

The companies will continue to operate as separate entities until the acquisition is complete (expected during 1Q00) and continue to compete aggressively.

Post acquisition, Compaq and Inacom will work together to communicate the joint value proposition in the new partnership.

Compaq and Inacom will publish a list of existing and identified partnership accounts for their field sales organizations.

Upon completion of the acquisition, Compaq will proactively engage in account planning sessions with Inacom for existing and identified partnership accounts to determine the current account state, opportunities to partner, and agreed upon strategy to partner. Pricing, margins, and profitability shall not be discussed.

13

(NY) 05862.066/AGT/SS&S.AGT.doc