SS&S.AGT

An escalation path will be communicated between the companies to process customer requests to move to a direct model in existing and identified partnership accounts.

A post acquisition Program Office will be established to be the final point of escalation for any issues and to answer questions. The goal of the Program Office will be to ensure customer satisfaction, communicate changes to current incumbency, and to do due diligence around issue resolution for the Customer Engagement Process. Due diligence includes making sure that the ROE have been followed, and communication occurred between Inacom and Compaq, but each party shall unilaterally.

## Next Steps

Develop a Communication Plan with timeline for internal and joint communications.

Identify and communicate a framework for the Account Planning Process. Output to include a one page document designed to review current account state, opportunities to partner, and agreed upon strategy to partner.

Create and communicate a joint value proposition to be used by field teams for customer communication.

Post acquisition, communicate the defined Escalation Path. (see below)

- Compaq Area Director/Inacom District Director of Sales (48 hours Response)
- Compaq Regional Vice President/Inacom Area Vice President (48 hours Response)
- Program Office (Don Weatherson/Dick Andersen/Steve Ramsland)

Finalize dates to manage a quarterly review of account status by the Program Office for existing and identified partnership accounts.

14

SS&S.AGT

# Appendix – List of Accounts

| Compaq Sales Region | Inacom Group Name | Inacom Group Number | Location | Division / Department |
|---|---|---|---|---|
| Central | Ameritrade Holding Corp | 10041368 | VA | |
| Great Lakes | Andersen Consulting SC | 10114744 | Chicago, IL | |
| Central | Anheuser-Busch | 10036554 | St. Louis, MO | |
| Southeast | Bellsouth Telecomm | 10079708 | | |
| Southeast | Bellsouth Telecomm | 10078022 | | |
| Northeast | Bloomberg LP-Non Taxable | 10106544 | | |
| Northeast | Blue Cross/Blue Shield MA, Inc | 10112125 | | |
| Southeast | Capital One Services | 10042463 | Richardson, VA | |
| West | Charles Schwab & Co. | 10110820 | San Francisco, CA | . |
| Northeast | Chase Manhattan | 10095177 | | . |
| West | Clorox | 10111300 | Oakland & Pleasanton, California, + 35 plants in North America | |
| Northeast | Commercial Union Insurance Co | 42006340 | MA | |
| | Crowley | 10112186 | | Crowley Maritime, Crowley American Transport |
| Southeast | CSX Technology | 02JCSX00 | | |
| West/Southeast | Disney Vacation Club | 10079081 | Vacation Club is a business unit of Walt Disney, So Carolina & Florida | |
| West/Southeast | Walt Disney Company | 10093459 | | Walt Disney World (Orlando) |
| Northeast | E_I_Dupont/Dana Credit Corporation | 10104098 | Wilmington, DE | |
| Southeast | Edison Mission Energy | 10113235 | N. VA, DC | |
| Northeast | Ernst & Young | 10113114 | | |
| Southeast | First Union National Bank | 10008159 | Atlanta, GA | |
| West | Freightliner Corporation | 10114443 | Portland, OR | |
| Northeast | GE Power Systems | 10113859 | | |
| Northeast | Harvard Pilgrm Health Care | 10008902 | | |
| Great Lakes | ITT Technical Institute | 10102476 | | |
| Northeast | Johnson & Johnson Corporation | 20N00466 | | |
| West | Kaiser Permanente Nor-Cal | 10111303 | 80% in California, also Colorado Oregon & Hawaii | |
| Northeast | Massachusetts General Hospital | 10050399 | | |
| Central | MCI Worldcom | 10080003 | Atlanta, GA, Washington, DC, Colorado Springs, CO, Dallas / Richardson, TX, Tampa, FL, Chicago, IL | Business Markets, Consumer Markets, UUNET, International, Conferencing, SkyTel, Mobile Solutions |
| Northeast | McKinsey/Compaq Capital Corporation | 10116449 | | |
| Northeast | Merck & Co | 20N00510 | | |
| West | Microsoft | 10111335 | | |
| Great Lakes | Motorola | 10115518 | Florida, Chicago, Phoenix, Austin, Ft. Worth and Plantation, FL | Motorola Engineering Div... SPS, Automotive, Communications Enterprise (CE) - the IT and business divisions within these sectors – Compaq ProLiant product only |
| West | Norwest Corporation/Wells Fargo | 7000320 | | IT department responsible for the entire organization, and Investment Management Group |
| West | Peoplesoft | 10110769 | | |
| Northeast | Praxair | 10017589 | | |
| Great Lakes | Proctor & Gamble | 10113052 | Cincinnati, OH | Global Computing Team – Compaq ProLiant product only |
| SI | SAIC (Science Applications) | 10112161 | San Diego, CA, N. VA | |
| Northeast | SmithKline Beecham R&D | 10115739 | Collegeville, PA (Philadelphia) | R&D and Powerline (Sales Organization) |
| Central | St. Paul First & Marine Insurance | 10103700 | | |
| Southeast | Suntrust/STSC Leasing - Branch Deployment | 10097496 | Atlanta, GA | |

15

SS&S.AGT

| Great Lakes | The Scotts/Compaq Financial Services | 10117681 | | |
|---|---|---|---|---|
| Central | Trammel Crow/Compaq Capital Corporation | 10116925 | Dallas, TX | |
| Southeast | US Internetworking, Inc. | 10104980 | | |
| West | Weyerhaeuser Company | 42004488 | | |
| Northeast | Xerox Corp | 42005266 | | |
| Great Lakes | Zurich-American/MC Leasing | 10114950 | Schaumberg, IL | |

16

SS&S.AGT

## Exhibit 4

### Operating Agreements

Separation and Sharing Agreement

InaCom Services Service Level Agreement with Compaq Computer Corporation and the other agreements referred to therein

17

EXHIBIT 9

8K Mar 00
UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported)
February 16, 2000

InaCom Corp.
(Exact name of registrant as specified in its charter)

| Delaware | 0-16114 | 47-0681813 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

10810 Farnam Drive, Suite 200, Omaha Nebraska          68154
(Address of principal executive offices)               (Zip Code)

Registrant's telephone number, including area code
(402) 758-3900

<PAGE>

This report contains certain forward-looking statements and information relating to Inacom Corp. ("Inacom" or the "Company") that are based on the beliefs of Inacom management as well as assumptions made by and information currently available to Inacom management. Such statements reflect the current view of InaCom with respect to future events and are subject to certain risks, uncertainties, and assumptions, including the risk factors and uncertainties described in Inacom's 1998 Form 10-K annual report. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those described herein as believed, estimated or expected.

Item 2. Acquisition or Disposition of Assets.

On February 16, 2000, Inacom completed the sale of certain net assets of its product customization and logistics operations (collectively referred to as "Distribution Net Assets") to Compaq Computer Corporation ("Compaq") for $369.5 million in cash, subject to certain post-closing adjustments as provided in the Asset Purchase Agreement dated January 4, 2000, as amended. These Distribution Net Assets sold by the Company included five configuration and distribution centers. A copy of the Asset Purchase Agreement was previously filed with the Company's Current Report on Form 8-K dated January 4, 2000 and is incorporated by this reference; First Amendment thereto is attached as an exhibit and is incorporated by this reference.

In connection with the sale of the Distribution Net Assets, the Company and Compaq entered into a three-year Services, Supply and Sales Agreement and a related Service Level Agreement (collectively the "Services Agreement"). The Services Agreement will give the Company access to the product customization and logistics capabilities that were sold to Compaq and also provides, subject to

Page 2



EXHIBIT

00134

certain conditions, for Compaq's use of the Company's lifecycle and professional service offerings over the same three-year period. Copies of these agreements are attached as exhibits and are incorporated by this reference.

Item 5. Other Events.

### Liquidity

On December 25, 1999, the Company's primary sources of liquidity were provided through a $450.0 million revolving credit and amortizing term loan facility with Deutsche Bank, as agent, and a $350.0 million asset securitization program with Nesbitt Burns Securities, Inc., as agent. The Company's capital resources also included $201.3 million in Company-obligated mandatorily redeemable convertible preferred securities (the "Trust Preferred Securities") of a subsidiary trust holding solely convertible subordinated debt securities of the Company. The Company also maintained a floor planning facility for IBM product purchases with IBM Credit Corp. ("IBMCC") and a floor planning facility for Compaq product purchases with Deutsche Financial Services Corporation.

In April 1999, the Company entered into a $450.0 million revolving credit and amortizing term loan facility with Deutsche Bank, as agent. This facility is a combined senior secured $250.0 million revolving credit facility and $200.0 million amortizing term loan. On December 25, 1999, $407.5 million was outstanding under the facility ($245.0 million under the revolving credit portion and $162.5 million under the amortizing term loan portion) at an interest rate of 8.2%.

In December 1996, the Company established an asset securitization facility, which was amended in May 1999 to provide the Company with up to $300.0 million in available credit. This amount was increased to $350.0 million in July 1999. Pursuant to this asset securitization facility, the Company sells, on a revolving basis, certain pooled trade accounts receivable to a separate non-consolidated wholly-owned special purpose corporation, which in turn sells a percentage ownership interest in the pooled trade accounts receivable to a commercial paper conduit sponsored by an unrelated financial institution. As of December 25, 1999, the gross proceeds resulting from the sale of the percentage ownership interests in the pooled trade accounts receivable totaled $312.0 million. On December 25, 1999, the implicit interest rate on the asset securitization transaction was 6.6%. On February 4, 2000, the Company agreed to wind down the asset securitization facility due to an undercollateralization of the pooled trade accounts receivable. In connection with this winding down, the Company agreed to direct all cash receipts from its direct product trade accounts receivables to the paydown of the facility. Although the final payoff of all obligations under the asset securitization facility depends on the timing of collections for the accounts receivable involved in the program, the Company anticipates that all amounts owing in connection with this program will be repaid by March 31, 2000.

In October 1996, the Company's subsidiary trust issued the Trust Preferred Securities, raising gross proceeds of $201.3 million. The holders of the Trust Preferred Securities are entitled to cumulative cash distributions at an annual rate of 6 3/4% of the liquidation amount of $50 per security. The distributions are payable quarterly in arrears in the aggregate amount of approximately $3.5 million per quarter, unless the Company has elected to defer such interest payments in accordance with the provisions governing such distributions. The aggregate net proceeds to the Company from this offering totaled $194.4 million after selling expenses, discounts, and commissions. The Trust Preferred Securities are convertible at the option of the holder into Inacom common stock at a conversion rate of 1.113 shares of Inacom common stock for each Trust Preferred Security (equivalent to a conversion price of $44.92 per share).

In connection with the sale of the Distribution Net Assets to Compaq, the Company amended its $450.0 million revolving credit and amortizing term loan

Page 3

8K Mar 00

facility with Deutsche Bank, as agent, to a $225.0 million revolving credit facility. As part of the amendment to this facility, the Company agreed to defer, until at least January 1, 2001, the quarterly cash distributions payable on the Trust Preferred Securities. As a result of the sale of the Distribution Net Assets to Compaq, the Company suspended floor planning advances under the IBMCC facility and agreed to repay all advances outstanding thereunder by May 15, 2000. In connection with the Compaq transaction, Compaq assumed all the Company's obligations owed to Deutsche Financial Services Corporation relating to the Company's floor planning facility for Compaq product.

On February 16, 2000, the Company received a written commitment from Compaq (the "Commitment") for a new $55.5 million revolving credit facility with funding available beginning in the second quarter of 2000. The new credit facility with Compaq will contain various conditions to funding, including satisfaction of certain financial covenants and the absence of defaults. A copy of the Commitment is attached as an exhibit and is incorporated by this reference.

The Company's credit facilities contain certain restrictive covenants, including the maintenance of minimum levels of working capital, net worth and EBITDA, limitations on the amount of funded debt and interest expense, limitations on incurring additional indebtedness, and restrictions on the amount of dividends the Company can pay to stockholders. As of December 25, 1999, the Company was in compliance with the covenants contained in these agreements or has received written waivers to the covenants contained in these agreements.

Board of Directors

The Board of Directors of the Company consists of eight members as of February 28, 2000. The Board of Directors has determined that there will be two committees of the Board for fiscal year 2000. Effective February 28, 2000, the Audit Committee members are Gary Schwendiman (Chairman), John Oltman and Linda Wilson; and the Compensation Committee members are William Janeway (Chairman), James Crowe and Linda Wilson. The remaining members of the Board of Directors are G. A. Gagliardi (Chairman), Joseph Auerbach and William Tauscher. The following directors have resigned since the Company's 1999 annual stockholders meeting: Richard Bard, Mogens Bay, Bill Fairfield, Grant Gregory, Joseph Inatome and Rick Inatome.

Legal Proceedings

On February 25, 2000, a class action lawsuit was filed against Inacom and certain of its former directors and current and former officers. The lawsuit alleges violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 through, among other things, false and misleading statements made by Inacom and the other defendants. The complaint alleges, among other things, that Inacom issued materially false and misleading statements regarding its ability to recognize growth and remain profitable in light of significant changes in manufacturers' distribution of computers, and as a result of the materially false and misleading statements, the price of Inacom common stock was artificially inflated during the class period. The action is brought on behalf of a purported class of persons who allegedly purchased Inacom common stock between October 9, 1998 and January 4, 2000. The plaintiff seeks compensatory damages in an unspecified amount, together with other relief. The suit was filed in the United States District Court for Nebraska and is entitled Softest, Inc. Pension and Profit Sharing Plan v. Inacom Corporation, et. al. Case No. 8100CV120  Inacom believes the lawsuit is without merit and plans to vigorously defend the action.

Item 7.  Financial Statements and Exhibits.

(b)      Pro forma financial information.

The Pro Forma Consolidated Financial Statements taking into account the
Page 4

8K Mar 00

transaction described in Item 2 will be filed pursuant to an amendment to this Report.

<PAGE>

The following exhibits are filed with this Form 8-K:

2.1    First Amendment dated February 16, 2000 to the Asset Purchase Agreement dated January 4, 2000 by and between Inacom Corp. and Compaq Computer Corporation.

2.2    Services, Supply and Sales Agreement dated as of February 16, 2000, by and between Inacom Corp. and Compaq Computer Corporation.*

2.3    Service Level Agreement dated February 16, 2000 by and between Inacom Corp. and Compaq Computer Corporation.

2.4    Revolving Credit Facility Commitment Letter dated as of February 16, 2000, by and between Inacom Corp. and Compaq Computer Corporation.

2.5    Third Amendment dated January 4, 2000 to the Senior Secured Revolving Credit Agreement dated April 9, 1999 between Inacom Corp. and Deutsche Bank, as agent.

2.6    Fourth Amendment dated February 15, 2000 to the Senior Secured Revolving Credit Agreement dated April 9, 1999 between Inacom Corp. and Deutsche Bank, as agent.

* Concurrently with the filing of this Form 8-K, the Company has filed with the Securities and Exchange Commission a Confidential Request Letter pursuant to Rule 24b-2 requesting confidential treatment of certain portions of Exhibit 2.2, which exhibit has been redacted accordingly in this filing.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Inacom Corp.

March 2, 2000                    By: /s/ Thomas J. Fitzpatrick
                                     ---------------------------
                                     Thomas J. Fitzpatrick
                                     Executive Vice President and
                                     Chief Financial Officer

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.1
<SEQUENCE>2
<DESCRIPTION>FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT
<TEXT>

FIRST AMENDMENT TO

ASSET PURCHASE AGREEMENT

FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Amendment") dated as of February 16, 2000 among Compaq Computer Corporation, a Delaware corporation

Page 5

00137

8K Mar 00

("Parent"), ITY Corp., a Delaware corporation ("Buyer") and wholly-owned subsidiary of Parent, and InaCom Corp. a Delaware corporation ("Seller").

W I T N E S S E T H :

WHEREAS, Compaq Sub and InaCom (the "Parties") have entered into an Asset Purchase Agreement dated as of January 4, 2000 (the "Asset Purchase Agreement") whereby Compaq Sub will purchase from InaCom the Purchased Assets and will assume the Assumed Liabilities;

WHEREAS, the Parties hereto wish to amend the Asset Purchase Agreement as set forth below:

NOT, THEREFORE, it is agreed:

1. Adjustment of Purchase Price. Section 2.09 of the Asset Purchase Agreement is hereby amended by deleting subsection 2.09(a)(ii) in its entirety and substituting in lieu thereof the following:

"(ii) If Final Net Worth is less than $275 million, Seller shall pay to Buyer, in the manner and with interest as provided in 2.09(b), an amount equal to the excess, if any, of $275 million over Final Net Worth (the "Make-Up Payment").

2. Grounds for Termination. Section 12.01 of the Asset Purchase Agreement is hereby amended by deleting the section in its entirety and substituting in lieu thereof the following:

"SECTION 12.01. Grounds for Termination. This Agreement shall terminate prior to Closing if:

(a) the Closing shall not have been consummated on or before March 31, 2000 unless the parties otherwise agree; provided that any party whose breach of any provision of this Agreement has resulted in the failure of the Closing to be consummated by such time shall be deemed to have consented to any extension approved by the other party.

(b) Seller and Buyer shall agree;

(c) there shall be any law or regulation that makes consummation of the transaction contemplated hereby illegal or otherwise prohibited or consummation of the transactions contemplated hereby would violate any nonappealable final judgment, injunction, order or decree of any court of competent jurisdiction.

3. Defined Terms. Defined terms used herein but not otherwise defined herein shall have the meanings specified in the Asset Purchase Agreement.

4. Captions. The captions in this Amendment are included for convenience of reference only and shall be ignored in the construction or interpretation of the provisions of this Amendment.

5. Counterparts; Effectiveness. This Amendment may be signed in any number of counterparts; each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Amendment shall become effective when each party to this Amendment shall have received a counterpart hereof signed by the other party hereto.

6. Governing Law. This Amendment shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of law rules of such state.

Page 6

00138

8K Mar 00

7. Agreement as Amended. From and after the effective date hereof, all references to the Asset Purchase Agreement shall be deemed references to the Asset Purchase Agreement as amended and supplemented hereby.

IN WITNESS WHEREOF, the parties have caused this Amendment to be duly executed in their respective corporate names by their respective officers, each of whom is duly and validly authorized and empowered, all as of the day and year first written above.

INACOM CORP.

By: /s/ Gerald A. Gagliardi
Name: Gerald A. Gagliardi
Title: President and Chief Executive Officer

COMPAQ COMPUTER CORPORATION

By: /s/ Ben K. Wells
Name: Ben K. Wells
Title: Vice President and
       Corporate Treasurer, Acting CFO

ITY CORP.

By: /s/ Ben K. Wells
Name: Ben K. Wells
Title: Vice President and Treasurer

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.2
<SEQUENCE>3
<DESCRIPTION>SERVICES, SUPPLY AND SALES AGREEMENT
<TEXT>
```

Note: Certain material, indicated by three asterisks (***), has been omitted from this document, pursuant to a request for confidential treatment filed with the Securities and Exchange Commission. The omitted material has been filed separately with the Securities and Exchange Commission.

SERVICES, SUPPLY AND SALES AGREEMENT

SERVICES, SUPPLY AND SALES AGREEMENT (the "Agreement"), dated as of February 16, 2000, by and between Compaq Computer Corporation, a Delaware corporation ("Compaq"), ITY Corp., a Delaware corporation and a wholly-owned subsidiary of Compaq ("Compaq Sub"), and InaCom Corp., a Delaware corporation ("Inacom").

RECITALS

WHEREAS, Compaq Sub, Compaq and Inacom have entered into an Asset Purchase Agreement dated as of January 4, 2000, as amended (the "Asset Purchase Agreement");

WHEREAS, the execution of this Agreement is a condition to Compaq Sub acquiring, and Inacom disposing of, the Purchased Assets (as defined in the Asset Purchase Agreement) in connection with the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements
Page 7

00130

8K Mar 00
set forth herein, the parties hereto hereby agree as follows:

ARTICLE I.

AGREEMENT TO COOPERATE

SECTION 1.1. Services Agreement. Compaq agrees to assist Inacom in the generation of incremental revenues for InaCom's service business as provided in the Service Level Agreement dated as of February 16, 2000 between Compaq and Inacom (the "Service Level Agreement"), and the terms of the Service Level Agreement are incorporated by reference herein.

SECTION 1.2. Supply. In connection with Inacom's computer services business, Compaq Sub and Inacom agree as follows:

The parties agree that when Inacom places an order with Compaq Sub for hardware and Procurement Services, as defined below, Compaq Sub will invoice the amount directed by Inacom and collect from the customer for the invoiced amount; provided that Inacom, acting as an agent of Compaq Sub, shall have entered into an agreement with the customer relating to the acquisition of such hardware and Procurement Services, in form and substance reasonably acceptable to Compaq Sub. Such agreement shall include a grant of a purchase money security interest in favor of Compaq or Compaq Sub, as appropriate, on all hardware and related software licenses supplied by Compaq Sub. From these collected amounts, Compaq Sub will retain its sales price for hardware and Procurement Services, and pay the remaining proceeds to Inacom as an agency fee. As used herein, "sales price" shall mean, (i) with respect to hardware, Compaq's actual cost (excluding the impact of volume incentive rebates) with respect to third party hardware and USl or TOSS price, whichever is applicable, with respect to Compaq's hardware, and (ii) with respect to Procurement Services, the fees as per the Fee Schedule. In the event that the invoiced amounts are insufficient to cover the sales price of the hardware and Procurement Services as per the Fee Schedule (defined below), Inacom agrees to pay the difference to Compaq Sub.

1. Inacom agrees to make Compaq Sub its preferred provider of the procurement services listed in Exhibit 1 ("Procurement Services"), meaning only that Inacom shall direct at least 75% of its requirements for such services to Compaq Sub. The obligations set forth in this Section 1.2(1) shall be subject to Compaq Sub's ability to competitively price its services (which for these purposes shall not require Compaq Sub to be the lowest-priced service provider) and to satisfy Service Level Agreements for service capabilities and performance, as mutually agreed to by the parties.

2. Inacom will pay a fee to Compaq Sub for the Procurement Services based on the fee schedule, attached hereto as Exhibit 2 (the "Fee Schedule"). Compaq Sub agrees to provide Inacom with a fixed rate structure for the Procurement Services, which does not depend on rebates for volume attainment. In any event, Compaq Sub will offer Inacom the most favored procurement service customer fees of Compaq Sub or any of its affiliates, i.e. the lowest fees which it charges any of its customers for the Procurement Services except in the instance where lower pricing is offered to "meet competition" in response to a documented lower bid, as such term is commonly used in the relevant industry. Upon reasonable notice, Compaq Sub will give Inacom's independent third party auditor access, on a quarterly basis, to Compaq and multi-vendor sales price information at the SKU level, including but not limited to product cost and freight information, for the sole purpose of verifying Compaq Sub's pricing of the Procurement Services. All such information shall be subject to the terms of the Confidentiality and Non-disclosure Agreement executed by the parties.

3. In the event that Compaq Sub must go outside of the normal distribution agreements with third party vendors in order to obtain third party products, it will absorb commercially reasonable increases in product costs associated with such procurement. If Compaq Sub determines that such costs are

Page 8

8K Mar 00

not commercially reasonable, Compaq Sub will offer Inacom the right to procure such products from its own channels. Inacom shall be responsible for product sourcing cost increases resulting from instances where Compaq has a distribution agreement with a particular vendor, but product is unavailable, provided Inacom has agreed to incur such additional costs.

4. Compaq and Compaq Sub agree that any marketing funds or other vendor funding (including rebates) provided to Compaq by third party vendors for sales of product to customers where Inacom acted as agent, shall be paid to Inacom within a reasonable time following receipt by Compaq, provided that Inacom agrees to independently satisfy any vendor requirements for such funding.

5. Inacom has provided Compaq Sub with a list of current and potential accounts, attached hereto as an appendix to Exhibit 3, and Compaq Sub will determine a credit limit and any other appropriate limitations or requirements for each such account. To the extent that Inacom sells products within each customer's credit limit, Compaq Sub will assume the credit risk. However, to the extent that Inacom sells products in excess of any customer's credit limit, Inacom must bear the credit risk. Inacom agrees that all payment terms for its customer invoices shall be net 30 days from receipt of invoice by customer.

6. As part of its Procurement Services, Compaq Sub will provide invoice and collection services for accounts receivable on product procured by customers through Inacom from Compaq Sub under the name of Compaq Sub or Inacom (as agent for Compaq Sub), whichever Inacom prefers. These invoice and collection services will only be available for hardware and/or Procurement Services. Inacom agrees to pay agreed upon fees for customer invoices that are not paid when due in accordance with the Fee Schedule, to the extent the payment period is in excess of the payment period calculated into the assumptions for the Fee Schedule. Compaq's obligation for collections of accounts receivables in this provision is only effective for hardware and Procurement Services delivered by Compaq and sold by Inacom after the close of the Asset Purchase Agreement.

7. Inacom will not bear any inventory price protection risk. If Inacom or a customer requires Compaq Sub to hold inventory beyond the normal stocking period, then Inacom agrees to pay to Compaq Sub a price protection risk fee in accordance with the Fee Schedule to the extent the inventory holding period is in excess of the inventory price protection element calculated into the assumptions for the Fee Schedule.

SECTION 1.3. Sales Agreement.

1. Compaq and Inacom will jointly develop Compaq-branded service offerings for end users ("Services"). These services will be performed by Inacom and will be sold through the Compaq sales force.

2. Compaq and Inacom have jointly developed and agreed on Rules of Engagement, attached hereto as Exhibit 3, which include, among other things, Relationship Management and Joint Account Planning. Compaq and Compaq Sub agree (and agree to cause their affiliates) not to directly solicit, the Inacom customers with contracts that include the purchase of Compaq hardware or a demonstrated run-rate of the purchase of Compaq hardware, as set forth in Exhibit 3, where Compaq's direct product sales and services offerings are competitive with those offered by Inacom as of the date hereof, for a period of one year from the date hereof, provided the customer continues to purchase Compaq product from Inacom.

ARTICLE II.

MISCELLANEOUS

SECTION 2.1. Definitive Agreements; Binding Effect. The parties agree to use their reasonable best efforts to complete definitive agreements with

Page 9

00141

8K Mar 00

respect to the matters described in Section 1.2 and Section 1.3 within 30 days of the date hereof. Until superseded by such definitive agreements, this Agreement shall be binding on the parties.

SECTION 2.2. Notices. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

If to Inacom, to:

Inacom Corporation
Attention: Dick Anderson
2001 Westside Parkway
Suite 260
Alpharetta, GA 30004
Facsimile: (770) 619-6082

If to Compaq or Compaq Sub, to:

Compaq Computer Corporation
20555 SH 249
Houston, TX 77070
Attention: Mike Pocock
Facsimile: (281) 514-0851

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

SECTION 2.3. Amendments and Waivers. (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement. or in the case of a waiver, by the party against whom the waiver is to be effective.

(a)(b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 2.4. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

SECTION 2.5. Entire Agreement. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 2.6. Governing Law. This Agreement shall be governed by and construed in accordance with the law of the State of New York without regard to the conflicts of law rules of such state.

SECTION 2.7. Counterparts; Third Party Beneficiaries. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall

Page 10

00142

8K Mar 00

have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

SECTION 2.8. Term. This Agreement shall terminate upon termination of the Service Level Agreement in accordance with Section 5.7(a) or (b) thereof. Following the first anniversary of the date of execution of the Asset Purchase Agreement, the parties agree to renegotiate pricing for Procurement Services for pricing periods to be mutually agreed to by the parties to the extent necessary to ensure that pricing for Procurement Services remains competitively priced in the marketplace for each of the parties.

SECTION 2.9. Single Agreement. This Agreement and the agreements identified on Exhibit 4 hereto (this Agreement and such other agreements, collectively, the "Operating Agreements") were entered into pursuant to the Asset Purchase Agreement. The undertakings of each party hereunder and thereunder constitute consideration for the undertakings of the other parties under all of the Operating Agreements, and all of the Operating Agreements shall constitute a single agreement. The material performance of the obligations of each party under each Operating Agreement shall be a condition to the performance of the obligations of each other party under each Operating Agreement The rightful rejection of any Operating Agreement (which shall not include an expiration or termination thereof) requires the rejection of all Operating Agreements.

<PAGE>


IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

Inacom Corporation

By: /s/ Gerald A. Gagliardi
    -----------------------
Name: Gerald A. Gagliardi
Title:   President and Chief Executive Officer
Date:    February 16, 2000

Compaq Computer Corporation

By: /s/ Michael J. Winkler
    -----------------------
Name: Michael J. Winkler
Title:   Senior Vice President and Group Manager
Date:    February 16, 2000

ITY Corp.

By: /s/ Michael J. Winkler
    -----------------------
Name: Michael J. Winkler
Title:   President
Date:    February 16, 2000

<PAGE>


Exhibit 1

Page 11

8K Mar 00
PROCUREMENT SERVICES

Compaq Sub agrees to offer the following Procurement Services pursuant to this Agreement:

Program Development & Management
Program Design
Scope of work
Statement of Work
Process Alignment
Transition & Implementation
Technology Selection
Provide evaluation hardware
Establish hardware standards
Identification and cataloging of existing images
Create and implement design process
Design software images
Create software images
Create proof-of-concept system
Test and validate proof-of-concept system
Global Project Management
Single point of accountability
International standards
Order Fulfillment
Account Setup
Create account(s)
Implement financing methods & processes
Pricing and Availability
90-Day forecast
Client-specific purchasing
Client-owned inventory
Pre-customized inventory
Special bid pricing
Create and maintain client-specific pricing profiles
Assign and maintain client-specific SKUs
Create and maintain convenience bundles
Pre-sales Consulting
Create & provide client-specific web-based catalog
Provide configuration manual
Provide live pre-sales support (standards only)
Provide live pre-sales support (any products)
Provide on-site pre-sales support
Order Creation
Create adhoc system order
Create adhoc order for upgrade/peripheral/supplies
Create refresh plan
Obtain Client internal approval
Generate purchase order
Order Entry, Confirmation, ETAS
Provide web-based order entry tool
Provide centralized order entry contact
Provide on-site order entry contact
Provide X.12 EDI connection to client system
Review order for completeness
Review order for technical correctness
Review order for credit availability
Release order on fulfillment system
Verbally confirm order and ETA to client contact
Electronically confirm order and ETA to client contact
Order Management
Ensure product acquisition and allocation
Answer order status inquires
Escalate issues

Page 12

8K Mar 00

Advance ship notification  (ASN)
Returns and DOAs
Track and review SLA compliance
Measure and report client  satisfaction
Manufacturing and Customization
Manage image and instructions
Assemble system (JMAS)
Customize hardware
Third-party  component setup
Partition/format  fixed disk drives
Asset tagging and recording
Custom labeling or bar-coding
Install software
Operating System
Shrink-wrapped   applications
Proprietary   applications
Image load
Personalized  system settings
IP address
Workgroup name
Other
Perform  dial-out and/or leased line connectivity testing
Apply  client-specific data via dial-out or  leased  line
Burn-in
Troubleshoot   and  repair   image issues
Perform client-specific  quality check
Logistics
Pick and pack/repack  products
Special overpack
Design packing per client specifications
Acquire packaging
Pack orders per  client  specifications
Ensure  shipment  integrity
Ship/Deliver  products
Standard   ground
Three-day
Two-day
Next-day
Crisis   transport   service
Carrier-specific  delivery
Time/place specific delivery
Invoicing and Reporting
Customized packing list
Provide  proof-of-delivery  (POD) confirmation
Standard invoice
Summary  invoice
EDI invoice
Invoice  acceptance
Payment  generation (standard)
Payment  generation (EFT)
Reports
Product Purchase
Purchase history
Standard vs.  non-standard
By manufacturer
By business unit
Standards price list
Order  Management
Daily  Status Report
Backorder  report  -  open  orders
Proof-of-delivery  (POD)  Notification
SLA  Performance
order  turnaround

Page 13

00145

8K Mar 00

SLA attainment
Invoices
Invoices billed
Invoices paid
Asset Management feed
Client Satisfaction

<PAGE>

Exhibit 2

FEE SCHEDULE

In addition to payment owed for hardware purchases as set forth in Section 1.2 of this Agreement, Compaq agrees that it will charge Inacom the following fees for Procurement Services performed under this Agreement:

Procurement Services Base Fee            ***% of invoice price per customer invoice

Additional Fees            (Fees for special procurement and configuration services)

Total Compensation for Services            ***% of invoice price per customer invoice

Compaq will retain ***% of the invoice price per customer order as total compensation for services performed. The total services fee of ***% will be used in calculating any agency fee payment owed to Inacom. The agency fee will be calculated and paid monthly by Compaq Sub and adjusted quarterly to ***%. The parties agree to negotiate appropriate SLA metric standards during 2000 to be used to further adjust the quarterly fee rate to recognize changes in Inacom's business and Compaq Sub's cost model.

SLA METRICS

The parties agree that the above fee structure (***%) will be adjusted using the following SLA metrics to be agreed between the parties:

1.      The percentage of Customization Fees charged to Inacom as compared to the total revenue Compaq Sub invoiced for Inacom customers is TBD, as based on Q399 numbers. The method to be used for this calculation will be the Commission Cost Basis (CCB).

2.      The percentage of Restock Fees charged Inacom as compared to the total revenue Compaq Sub invoiced for Inacom customers customer is TBD, based on Q399 numbers.

3.      The percentage of Expedite Fees charged Inacom as compared to the total revenue Compaq Sub invoiced for Inacom customers is TBD, based on Q399 numbers.

4.      The percentage of Cancellation Fees charged Inacom as compared to the total revenue Compaq Sub invoiced for Inacom customers is TBD, based on Q399 numbers.

QUARTERLY ADJUSTMENT CALCULATION

Following the end of each calendar quarter, if the aggregate of the above amounts are within plus or minus ***%of the baseline assumptions set forth above, there will be no adjustment. If any of the above aggregate amounts are greater than plus or minus ***% of the baseline assumptions, then an adjustment will be made by Compaq Sub for the difference. This adjustment will be made at

Page 14

8K Mar 00

the end of the Compaq Sub fiscal quarter and added or deducted from the agency fee payment to Inacom. For example (these figures used in this example are for illustrative purposes only):

| Fee Type | Q399 Baseline | Current Quarter |
| --- | --- | --- |
| Customization Fees | TBD | ***% |
| Restock Fees | TBD | ***% |
| Expedite Fees | TBD | ***% |
| Cancellation Fees | TBD | ***% |
| Total | ***% | ***% |

1)   The adjustment baseline is +/-***% (***% - ***%)
2)   Current quarter deviation is -***% (***% - ***%)
3)   Total fee adjustment -.04% (***% - ***%)
4)   This .04% is a rebate (added to agency fee payment) to Inacom since the current quarter is lower than the Q399 baseline

The quarterly adjustment will be made following the end of the third month of the applicable Compaq Sub fiscal quarter. The adjustment will include any adjustment accrued during the first two months of the quarter.

Compaq Sub reserves the right to pay agency fees when invoices are collected from Inacom customers, as indicated in Section 1.2 of the Agreement.

<PAGE>

Exhibit 3

Rules of Engagement for Field Purpose

Working proactively with Inacom to create a consistent engagement process when a current Inacom/Compaq customer is at risk. Designed to facilitate communication needed to best serve customers and to facilitate customer choice, where each party will act unilaterally.

Guiding Principles

Allow customer choice for manufacturer or reseller (Direct or Indirect) in an end customer's decision making process.

While remaining competitors, Compaq will operate in a consistent, predictable & fair manner with Inacom.

As required by Asset Purchase transaction, Compaq will not directly solicit listed accounts for one year. If customer requests Compaq to sell directly to the account, Compaq will follow agreed upon escalation path.

Through proactive planning and review activities, Compaq and Inacom will work together to grow market share for Compaq, and proactively put plans in place to effectively compete against Compaq product competitors in existing and identified partnership accounts.

All special product pricing from Compaq will be managed by Compaq Field Team exclusively (each party sets its own pricing independently).

It is very important we follow the rules of engagement. They are designed to ensure consistency of approach to Compaq/Inacom joint customers.

Rules of Engagement (ROE)
Page 15

00147

8K Mar 00

The companies will continue to operate as separate entities until the acquisition is complete (expected during 1Q00) and continue to compete aggressively.

Post acquisition, Compaq and Inacom will work together to communicate the joint value proposition in the new partnership.

Compaq and Inacom will publish a list of existing and identified partnership accounts for their field sales organizations.

Upon completion of the acquisition, Compaq will proactively engage in account planning sessions with Inacom for existing and identified partnership accounts to determine the current account state, opportunities to partner, and agreed upon strategy to partner. Pricing, margins, and profitability shall not be discussed.

An escalation path will be communicated between the companies to process customer requests to move to a direct model in existing and identified partnership accounts.

A post acquisition Program Office will be established to be the final point of escalation for any issues and to answer questions. The goal of the Program Office will be to ensure customer satisfaction, communicate changes to current incumbency, and to do due diligence around issue resolution for the Customer Engagement Process. Due diligence includes making sure that the ROE have been followed, and communication occurred between Inacom and Compaq, but each party shall act unilaterally.

Next Steps

Develop a Communication Plan with timeline for internal and joint communications.

Identify and communicate a framework for the Account Planning Process. Output to include a one page document designed to review current account state, opportunities to partner, and agreed upon strategy to partner.

Create and communicate a joint value proposition to be used by field teams for customer communication.

Post acquisition, communicate the defined Escalation Path. (see below)
o  Compaq Area Director/Inacom District Director of Sales (48 hours Response)
o  Compaq Regional Vice President/Inacom Area Vice President (48 hours Response)
o  Program Office (Don Weatherson/Dick Andersen/Steve Ramsland)

Finalize dates to manage a quarterly review of account status by the Program Office for existing and identified partnership accounts.

<PAGE>

Appendix - List of Accounts ***

<PAGE>

EXHIBIT 4

OPERATING AGREEMENTS

Separation and Sharing Agreement
                    Page 16

8K Mar 00

InaCom Services Service Level Agreement with Compaq Computer Corporation and the
other agreements referred to therein

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.3
<SEQUENCE>4
<DESCRIPTION>SERVICE LEVEL AGREEMENT
<TEXT>
```

CONFORMED COPY

INACOM SERVICES

SERVICE LEVEL AGREEMENT

WITH

COMPAQ COMPUTER CORPORATION

Service Level Agreement (the "Agreement"), dated as of February 16,
2000, by and between Compaq Computer Corporation, a Delaware corporation, on
behalf of itself and its wholly owned subsidiaries ("Compaq"), and Inacom Corp.,
a Delaware corporation ("Inacom"). In the event of any inconsistency between
this Agreement and the Services, Supply and Sales Agreement between the parties
dated as of February 16, 2000 (the "Services, Supply and Sales Agreement") as to
the subject matter hereof, this Agreement shall control.

WHEREAS, Compaq, ITY Corp., a newly formed subsidiary of Compaq
("Compaq Sub") and Inacom have entered into an Asset Purchase Agreement dated as
of January 4, 2000, as amended (the "Asset Purchase Agreement");

WHEREAS, the execution of this Agreement is a condition to Compaq Sub
acquiring. and Inacom disposing of, the Purchased Assets (as defined in the
Asset Purchase Agreement) in connection with the Asset Purchase Agreement;

WHEREAS, Compaq has agreed to assist Inacom in the generation of
incremental revenue for Inacom's service business during the three one-year
periods following the closing of the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements
set forth herein, the parties hereto hereby agree as follows:

SECTION 1. SERVICES CATEGORIES AND REVENUE TARGETS, APPLICATION AND
           ----------------------------------------------------------------
RECONCILIATION.
- ---------------

1.1 Compaq agrees to assist Inacom in the generation of incremental
revenues for InaCom's service business as follows:

(a) During the one year period commencing on April 1, 2000
(the "year 2000 period"), Compaq will assist Inacom in the generation of
revenues for Inacom's service business derived from the five service categories
("Service Categories") specified in Section 2.1 through 2.5 below in an
aggregate amount of $85 million (as summarized in Exhibit 1).

(b) If Inacom shall have satisfied in all material respects
the conditions to Compaq's obligations as set forth in the last paragraph of
this Section 1.1 for the year 2000 period, this Agreement shall be extended

Page 17

00149

8K Mar 00

automatically, except as otherwise terminated pursuant to Section 5.7, for an additional one year period commencing immediately after the termination of the year 2000 period (the "year 2001 period"). During the year 2001 period, Compaq will assist Inacom in the generation of revenues for Inacom's service business derived from the Service Categories in an aggregate amount of $140 million (as summarized in Exhibit 1).

(c) If Inacom shall have satisfied in all material respects the conditions to Compaq's obligations as set forth in the last paragraph of this Section 1.1 for the year 2001 period, this Agreement shall be extended automatically, except as otherwise terminated pursuant to Section 5.7, for an additional one year period commencing immediately after the termination of the year 2001 period (the "year 2002 period"). During the year 2002 period, Compaq will assist Inacom in the generation of revenues for Inacom's service business derived from the Service Categories in an aggregate amount of $195 million (as summarized in Exhibit 1).

Compaq shall provide to Inacom for planning purposes at each quarterly business review a rolling four-quarter forecast of estimated revenue for each Services Category for each year. Compaq's first forecast is attached as Exhibit 1. Compaq's intent is to use commercially reasonable efforts to direct revenue to Inacom above Compaq's annual revenue targets. It is understood that any business above the targeted amounts will depend on the percentage of Compaq's business that is direct to end-user.

Compaq's obligations set forth in this Section 1 shall be subject to Inacom's ability to reasonably competitively price its services (which for these purposes shall not require Inacom to be the lowest-priced service provider) and to fulfill its service level obligations set forth in this Agreement and in the associated services agreements referenced herein. If Compaq believes Inacom has not satisfied in any material respect the foregoing conditions at any time, Compaq shall, to the extent permitted by law, deliver a written notice to Inacom to such effect indicating its intention to enforce its rights under this paragraph, and Inacom shall have 90 days after the date of such notice to cure the matters referenced in such notice. The provisions of this paragraph will not limit the termination provisions of Section 5.7(c).

1.2 Application of Revenue. Qualifying revenue (i.e., that Inacom service revenue that qualifies for application against Compaq's annual revenue targets) shall be applied when paid by Compaq or when due from a party other than Compaq.

1.3 Reconciliation of Revenue.

(a) Within sixty days of the end of each of the three annual periods specified in Subsection 1.1 above, Compaq and Inacom will confirm whether or not Compaq met its annual revenue target for the preceding year. If it is determined that Compaq did not meet its revenue target for the preceding year, Compaq shall pay to Inacom an amount equal to fifty percent (50%) of the revenue target shortfall for that year.

(b) If Compaq had a shortfall to its revenue target for the year 2000 period and/or year 2001 period, but meets its three-year aggregate revenue target as set forth in Exhibit 1, as amended from time to time, before the end of the year 2002 period, Inacom shall credit to Compaq's account an amount equal to the total shortfall payments made by Compaq to Inacom for the years 2000 and 2001. Such credit shall be applied against subsequent purchases of services by Compaq from Inacom as specified by Compaq.

SECTION 2.  SERVICES CATEGORIES.
            --------------------

2.1    On-Site/Off-Site Compaq Warranty Services.
                    Page 18

8K Mar 00
--------------------------------------------

(a) Definition of Work. On-site and off-site warranty services for Compaq products as those services are more fully described in the Compaq Guaranteed Service Provider Program "Maintainer Agreement - United States Warranty Service" dated May 19, 1998, as from time to time may be amended by mutual agreement of the parties ("GSP Maintainer Agreement") and in any successor agreement.

(b) Service Capabilities. Inacom shall maintain throughout the term of this Agreement all service capabilities, and associated training, certification, logistics, communications and other capabilities as described in the "GSP Maintainer Agreement".

(c) Performance Criteria. Inacom shall maintain throughout the term of this Agreement a level of service performance which meets or exceeds the level of satisfaction generally considered by end-users to be acceptable within the industry. It is agreed that Compaq shall have the sole right using reasonable and prudent judgment to determine if Inacom is providing such level of performance.

(d) Fee Schedule. Subject to the labor rates specified in the GSP Maintainer Agreement.

2.2 Multi-Vendor Services, Non-Warranty Compaq Product Services and Other
      -------------------------------------------------------------------
Services.
- ---------

(a) Definition of Work. The services described in and contemplated by the Master Subcontract Agreement for Warranty and Remedial Maintenance Services between Compaq and Inacom dated August 5, 1999, as from time to time may be amended by mutual agreement of the parties (the "Master Subcontract Agreement"), and those installation, migration, system deployment and other project based services as specified in the applicable project agreement and/or statement of work; including but not limited to the following:

o        Maintenance of existing Multi-vendor Contracts
o        Maintenance of Warranty on new Multi-Vendor Service Contracts e.g.
         Dell, HP, IBM, Apple o Off site repair for selected Compaq/Non Compaq
         products
o        Remedial support services for Compaq Sold Carepaq's
o        Installation support services for Compaq Sold Carepaq's
o        Project based work such as, installation, migration & system deployment
         services
o    .   New service offers to be jointly developed by Compaq and Inacom with
         the express intent of tailoring such offers for delivery by Inacom
o        Other services which are not specifically designated to one of the
         other Services Categories

(b) Service Capabilities. Inacom shall maintain throughout the term of this Agreement all service capabilities, and associated training, certification, logistics, communications and other capabilities as described in the Master Subcontract Agreement. In addition, Inacom shall maintain for the term of any installation, migration, system deployment or other project based services engagement all service capabilities specified in the applicable project agreement and/or statement of work.

(c) Performance Criteria. Inacom shall maintain throughout the term of this Agreement a level of service performance which meets or exceeds the level of satisfaction generally considered by end-users to be acceptable within the industry. It is agreed that Compaq shall have the sole right using reasonable and prudent judgment to determine if Inacom is providing such level

Page 19

8K Mar 00

of performance.

       (d)      Fee Schedule.

o    The maintenance and repair services fee schedule shall be as specified in the Master Subcontract Agreement.

o    Prices and fees for installation, migration, system deployment and other project based services shall be as specified in an amended version of the Master Subcontract Agreement or in the applicable purchase order, project agreement and/or statement of work.

    2.3      Call Handling Services.
             -----------------------

       (a)      Definition of Work.

o    Remedial Call Center Support. Inacom will take calls that are redirected from Compaq's Customer Support Centers (CSCs), and on an as needed basis will take overflow calls from the CSCs. A fuller description of the services will be contained in a definitive Call Handling Services Agreement to be entered into by the parties subsequent to the execution of this Agreement. Such Call Handling Services Agreement shall be substantially in the form of the Call Handling Services Agreement, including its Service Capabilities attachment, attached hereto as Exhibit 2.

o    Customer Help Desk. Inacom will take calls from Client end users in support of hardware and software problems. Inacom will maintain call records, provide multi-tier support, escalations and diagnosis before dispatch. Inacom will manage these calls in Inacom's call handling system utilizing knowledge-based tools. Standard reports will be provided monthly. A fuller description of the services contemplated by this paragraph will be contained in the executed Call Handling Services Agreement.

       (b) Service Capabilities. Inacom shall maintain throughout the term of this Agreement all service capabilities, and associated training, certifications, communications and other capabilities as described in a definitive Call Handling Services Agreement, including its Service Capabilities attachment, to be entered into by the parties subsequent to the execution of this Agreement, substantially in the form and content of the Compaq Call Handling Services Agreement, including its Service Capabilities attachment attached hereto as Exhibit 2.

       (c) Performance Criteria. Inacom shall maintain throughout the term of this Agreement a level of service performance that meets or exceeds the level of satisfaction generally considered by end-users to be acceptable within the industry. It is agreed that Compaq shall have the sole right using reasonable and prudent judgment to determine if Inacom is providing such level of performance.

       (d) Fee Schedule. Subject to the fee schedule specified in the Call Handling Services Agreement.

    2.4      Inacom Branded Services.
             -----------------------
       (a) Definition of Work. Compaq's sale of Inacom branded services.

       (b) Service Capabilities.

o    Compaq shall professionally represent Inacom's branded service

Page 20

00152