8K Mar 00

Compaq Computer Corporation

By: /s/ Ben K. Wells
Name:   Ben K. Wells
Title:  Chief Financial Officer (Acting),
        Vice President and Corporate Treasurer

Agreed and accepted as of the date first above written:

Inacom Corp.


By: /s/ Gerald A. Gagliardi
    Name: Gerald A. Gagliardi
    Title: President and Chief Executive Officer


<PAGE>


SCHEDULE 1

        Capitalized terms used but not defined in this Schedule are used as
defined in the Commitment Letter (the "Commitment Letter") to which this
Schedule is attached and into which it is incorporated.

        The Company agrees to indemnify, defend and hold harmless each
Indemnified Person from and against any and all losses, claims, demands,
damages, liabilities and other expenses of any kind (collectively, "Losses") to
which any Indemnified Person may become subject, insofar as such Losses (or
actions or other proceedings commenced or threatened in relation thereto) relate
to or in any way arise from the Facility or any proposed or actual use of the
proceeds of the Facility, and to reimburse each Indemnified Person for any legal
or other expenses incurred in connection with investigating, preparing to defend
or defending against any such Loss or action or other proceeding (whether or not
such Indemnified Person is a party to any action or proceeding out of which any
such Loss arises), it being understood that the indemnification provided for
herein shall not apply to any losses, claims, demands, damages, liabilities and
other expenses arising from the Asset Purchase Agreement or the performance, or
failure to perform, thereunder by any party thereto, any such indemnification to
be provided, if at all, under the Asset Purchase Agreement and the other
instruments, agreements and documents entered into pursuant thereto or in
connection therewith. The Company will not be responsible, however, for any such
Losses of any Indemnified Person that are determined by final and nonappealable
judgment of a court of competent jurisdiction to have resulted primarily from
actions taken or omitted to be taken by such Indemnified Person in bad faith or
from such Indemnified Person's gross negligence or willful misconduct. No
Indemnified Person shall be liable to any other person, firm, corporation or
other legal entity for consequential damages which may be alleged as a result of
the Commitment Letter or the Facility.

        The Company shall not be liable for any settlement of any proceeding
effected without its prior written consent (which shall not be unreasonably
withheld), but if settled with such consent or if there is a final judgment for
the plaintiff, the Company agrees to indemnify each Indemnified Person from and
against any Loss (other than Losses determined by final and nonappealable
judgement of a court of competent jurisdiction to have resulted primarily from
actions taken or omitted to be taken by such Indemnified Person in bad faith or
from such Indemnified Person's gross negligence or willful misconduct) by reason
of such settlement or judgment. The Company shall not, without the prior written
consent of each Indemnified Person, effect any settlement of any pending or
threatened proceeding in respect of which such Indemnified Person is or could
Page 45

00177

8K Mar 00

have been a party and indemnity could have been sought hereunder by such
Indemnified Person, unless such settlement includes an unconditional release of
such Indemnified Person from all liability or claims that are the subject matter
of such proceeding.

<PAGE>

EXHIBIT A

SUMMARY OF TERMS AND CONDITIONS

Borrower:          Inacom Corp., a Delaware corporation.

Facility:          $55,500,000 revolving credit facility (the "Facility").

Purpose:           Proceeds will be used for general corporate purposes,
                   including working capital.

Lender:            Compaq Computer Corporation ("Compaq" or the "Lender").

Security:          The Company's obligations under the Facility will be secured
                   by perfected "silent" second lien on all of the assets
                   securing the Company's obligations under the Credit
                   Agreement dated as of April 9, 1999 among the Company, the
                   lenders party thereto, IBM Credit Corporation, as
                   Documentation Agent, Banque Nationale de Paris, as
                   Syndication Agent, and Deutsche Bank AG, New York Branch,
                   as Administrative Agent (as amended through the closing date
                   of the Asset Sale, the "DB Credit Agreement"). The
                   Guarantees described below will be secured by perfected
                   "silent" second liens on all of the assets of the Guarantors
                   (as defined below) securing such Guarantors' obligations
                   under their guarantees of the DB Credit Agreement.

Guarantees:        Each of the Company's subsidiaries that shall have
                   guaranteed the DB Credit Agreement (the "Guarantors") will
                   guarantee the Company's obligations under the Facility, up
                   to the maximum amount possible without violating applicable
                   fraudulent conveyance laws.

Borrowing Options and
Interest Periods:  LIBOR and Base Rate. LIBOR and Base Rate will be determined
                   on a basis substantially similar to the basis used under the
                   DB Credit Agreement, except that the Company may only elect
                   interest periods for LIBOR loans of 1 month.

Interest Rates:    Margins over adjusted LIBOR and margins over Base Rate will
                   be 2% above the corresponding margins set forth in the DB
                   Credit Agreement.

<PAGE>

                   Interest in respect of Base Rate loans shall be payable
                   quarterly in arrears on the last business day of each
                   quarter. Interest in respect of LIBOR loans shall be payable
                   in arrears at the end of the applicable interest period.
                   Interest will also be payable at the time of conversion or
                   repayment of any loans and at maturity. All interest and fee

Page 46

00178

8K Mar 00

calculations shall be based on a 360-day year and actual days elapsed or, in the case of interest on Base Rate Loans based on the prime rate, a 365/366-day year and actual days elapsed.

Upon any default in the payment of principal or interest, all overdue amounts shall bear interest at a rate per annum equal to the rate which is 2% in excess of the rate otherwise applicable to Base Rate loans from time to time or, in the case of LIBOR loans prior to the end of the then pending interest period, at the rate which is 2% in excess of the rate otherwise then borne by such loans. Such interest shall be payable on demand.

| | | |
|---|---|---|
| Commitment: | From the Asset Sale Closing Date through the 90th day following the Asset Sale Closing Date: | $0 |
| | From the 91st day following the Asset Sale Closing Date through the 120th day following the Asset Sale Closing Date: | $25,000,000 |
| | From the 121st day following the Asset Sale Closing Date and thereafter (subject to reduction pursuant to "Amortization" below): | $55,500,000 |
| Maturity Date: | September 30, 2001. | |

Amortization: The Commitment shall be reduced in nine equal monthly installments beginning on January 31, 2001. Any loans outstanding in excess of the amount of the Commitment as reduced from time to time shall be repaid.

Voluntary
Prepayments: Permitted at any time with one business day's notice for Base Rate loans and three business days' notice for LIBOR loans. The Company will compensate the Lender for any break-funding losses if it prepays LIBOR loans at any time other than the end of an Interest Period.

<PAGE>

Conditions
to Effectiveness: The Facility shall become effective on the date (the "Effective Date") upon which all of the following conditions precedent shall have been satisfied:

1. Completion of the Credit Agreement containing the terms and conditions set forth in the Commitment Letter and this Term Sheet and otherwise in form and substance reasonably satisfactory to the Lender, and completion of other customary documentation relating to the Facility in form

Page 47

00179

8K Mar 00

and substance reasonably satisfactory to the Lender, including receipt by the Lender of reasonably satisfactory opinions of counsel to the Company as to the transactions contemplated thereby, together with customary closing documentation.

2. The Asset Sale shall have been consummated in accordance with the Asset Purchase Agreement.

3. Absence of any pending or threatened actions, suits or proceedings against the Company or any of its subsidiaries or otherwise relating to the Facility, that could reasonably be expected to have a material adverse effect on the rights or remedies of the Lender or the ability of the Company or any Guarantor to perform its obligations under the Credit Agreement, the guarantees thereof by the Guarantors or any of the other financing documents or a Material Adverse Effect (defined in a manner substantially similar to the definition thereof in the DB Credit Agreement).

Conditions to Initial
Borrowing:                The obligations of the Lender to make the initial borrowing under the Facility shall be subject to the following conditions (in addition to the "Conditions to Each Borrowing" set forth below):

1. The Effective Date shall have occurred.

2. Creation and perfection of security arrangements referred to under "Security" above to the satisfaction of the Lender, all in form and substance reasonably satisfactory to the Lender.

3. The DB Credit Facility shall have been amended by an amendment in the form of Exhibit A hereto or otherwise in form and substance satisfactory to the Lender.

<PAGE>

4. The Agreement for Inventory Financing, dated April 27, 1998, between IBM Credit Corporation and the Company, as amended, shall have been amended by an amendment in the form of Exhibit B hereto or otherwise in form and substance satisfactory to the Lender so as to permit the Asset Sale, the Facility and the security therefor.

4. The Lender shall have received consolidated statements of income and cash flows for the Company and its subsidiaries for the month of April 2000, certified by the chief financial officer of the Company as fairly presenting the consolidated income and cash flows of the Company and its subsidiaries for such month in accordance with GAAP (the "April Financial Statements").

5. (i) EBITDA (as defined in the DB Credit Agreement) for the month of April 2000 (as set forth in the April Financial Statements) shall not have been less than $(14,000,000) or (ii) EBITDA (as so defined) for the two month period of April and May 2000 (as set forth in the April Financial Statements and the May Financial Statements (as defined

Page 48

00180

8K Mar 00

below)) shall not have been less than $(23,000,000) or (iii) the Company shall have been in compliance as of June 30, 2000 with all of the financial covenants set forth in the Credit Agreement and shall have delivered consolidated financial statements of the Company and its subsidiaries as at such date and for the periods then ended and a compliance certificate setting forth the calculations necessary to demonstrate such compliance.

Conditions to the
First Borrowing that
Results in Outstanding
Loans Exceeding
$25,000,000:          The obligations of the Lender to make the initial borrowing under the Facility that results in there being outstanding loans in an aggregate principal amount exceeding $25,000,000 shall be subject to the following conditions (in addition to the "Conditions to Each Borrowing" set forth below):

1. The Lender shall have received consolidated statements of income and cash flows for the Company and its subsidiaries for the month of May 2000, certified by the chief financial officer of the Company as fairly presenting the consolidated income and cash flows of the Company and its subsidiaries for such month in accordance with GAAP (the "May Financial Statements")

<PAGE>

2. (i) EBITDA (as defined in the DB Credit Agreement) for the two month period of April and May 2000 (as set forth in the April Financial Statements and the May Financial Statements) shall not have been less than $(23,000,000) or (ii) the Company shall have been in compliance as of June 30, 2000 with all of the financial covenants set forth in the Credit Agreement and shall have delivered consolidated financial statements of the Company and its subsidiaries as at such date and for the periods then ended and a compliance certificate setting forth the calculations necessary to demonstrate such compliance.

Conditions to
Each Borrowing:       Each borrowing under the Facility will be subject to satisfaction of the following conditions:

1. The Effective Date shall have occurred.
2. Absence of Default.
3. Accuracy of representations and warranties in all material respects.
4. Loans in the full amount of the then available borrowing base under the DB Credit Agreement are outstanding under the DB Credit Agreement.
5. The cash and cash equivalent investments of the Company and its subsidiaries, before giving effect to such borrowing, shall not exceed $10,000,000 on the date of borrowing.

6. There shall exist no default under the DB Credit Agreement that has not been cured or waived.

Representations
and Warranties: The representations and warranties will be substantially similar
Page 49

00181

8K Mar 00

to those contained in the DB Credit Agreement.

Covenants:     The covenants will be substantially similar to those contained
               in the DB Credit Agreement, except that the financial covenant
               levels set forth in the DB Credit Agreement shall be modified as
               set forth in Annex I hereto.

Events
of Default:    The events of default will be substantially similar to those
               contained in the DB Credit Agreement, except that the cross-
               default provision will not apply to the DB Credit Agreement,
               which will instead be subject to cross-acceleration and cross-
               payment-default provisions.

Increased Costs/
Change of
Circumstances: The Credit Agreement will contain customary provisions
               protecting the Lender in the event of unavailability of funding,
               illegality, increased costs and funding losses.

Assignments and
Participations: The Lender will be able to assign all or a pro rata portion of
               its outstanding loans and Commitment with the consent of the
               Borrower (such consent not to be unreasonably withheld or
               delayed).

<PAGE>

Indemnification: The Company will indemnify the Lender against all losses,
               liabilities, claims, damages or expenses relating to the loans,
               the Facility and the Company's use of the loan proceeds, or the
               commitments, including but not limited to attorneys' fees and
               settlement costs, except for losses, liabilities, claims,
               damages or expenses caused by such indemnitee's gross
               negligence or willful misconduct, it being understood that the
               indemnification provided for herein shall not apply to any
               losses, liabilities, claims, damages or expenses relating to
               the Asset Purchase Agreement or the performance, or failure to
               perform, thereunder by any party thereto, any such
               indemnification to be provided if at all, under the Asset
               Purchase Agreement and the other instruments, agreements and
               documents entered into pursuant thereto or in connection
               therewith.

Waiver
of Set-Off:    The Borrower will provide customary waivers of set off rights.
               The Lender will waive its rights to set off amounts owed by the
               Lender to the Company against amounts owed by the Company to the
               Lender under the Facility.

Governing Law
and Forum:     State of New York.

Expenses:      The Company will pay all reasonable legal and other out-of
               -pocket expenses of Compaq, including the fees and expenses of
               counsel to Compaq, in connection with collection under or
               enforcement of, or any default under, or amendment or waiver of,
               the definitive financing agreements.

Jurisdiction:  The parties will submit to the jurisdiction of the federal and
               state courts of the State of New York.
               Page 50

00182

8K Mar 00

<PAGE>

ANNEX I

RELATIONSHIP BETWEEN DB CREDIT AGREEMENT AND COMPAQ FACILITY
FINANCIAL COVENANTS

|  | | DB Credit Agreement | Compaq Facility | |
|---|---|---|---|---|
| MINIMUM EBITDA | | ($20) | ($30) | 6/30/00 |
| | | ($6) | ($16) | 9/30/00 |
| | | $7 | ($3) | 12/31/00 |
| | | $15 | $5 | 3/31/00 |
| MINIMUM NET WORTH | | $185 | $178.5 | |
| MAXIMUM LEVERAGE RATIO | Funded Senior | 2.15x | 2.55x | Q1'01 |
| | | 1.95x | 2.3x | Thereafter |
| | Funded Debt | 5.2x | 6.05x | Q1'01 |
| | | 4.65x | 5.35x | Thereafter |
| MINIMUM EBITDA TO INTEREST EXPENSE RATIO | | 5.5x | 4.9x | Q1'01 |
| | | 6.0x | 5.3x | Thereafter |
| MINIMUM CURRENT RATIO | | 0.95x | 0.85x | |

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.5
<SEQUENCE>6
<DESCRIPTION>THIRD AMENDMENT AND WAIVER
<TEXT>

### THIRD AMENDMENT AND WAIVER

THIRD AMENDMENT AND WAIVER (the "Amendment"), dated as of January 4, 2000, among INACOM CORP., a Delaware corporation (the "Borrower"), the Banks party to the Credit Agreement referred to below, IBM CREDIT CORPORATION, as Documentation Agent, BANQUE NATIONALE DE PARIS, as Syndication Agent and DEUTSCHE BANK AG, NEW YORK BRANCH, as Administrative Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to them in the Credit Agreement referred to below.

### RECITALS

WHEREAS, the Borrower, the Banks, the Documentation Agent, the Syndication Agent and Administrative Agent are parties to a certain Credit Agreement, dated as of April 9, 1999 (as amended, modified or supplemented through, but not including, the date hereof, the "Credit Agreement") pursuant to which the Banks have agreed to extend credit to the Borrower; and

WHEREAS, the Borrower has requested that the undersigned Banks

00183

8K Mar 00

provide certain waivers, and the parties hereto have agreed to amend the Credit Agreement. in each case on the terms and subject to the conditions set forth herein:

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Waivers.
      -------

The Banks hereby waive compliance with the covenants contained in Sections 8.09, 8.11 and 8.12 of the Credit Agreement at all times during the fiscal quarter ended on December 25, 1999, or for the Test Period ended on December 25, 1999, as the case may be.

2.    Amendments.
      ----------

(a) Section 2.01(b) of the Credit Agreement is hereby amended by deleting the amount "$40,000,000" contained therein and inserting the amount "$10,000,000" in lieu thereof.

(b) Section 3.03 of the Credit Agreement is hereby amended by (i) redesignating clause (d) thereof as clause (e), and (ii) inserting therein the following new clause (d):

"(d) On each date set forth below, the Total Revolving Loan Commitment shall be automatically and permanently reduced by the amount set forth opposite such date below:

| Date | Amount of Reduction |
|------|---------------------|
| January 1, 2001 | $25,000,000 |
| July 1, 2001 | $25,000,000 |
| January 1, 2002 | $25,000,000" |

(c) Section 7.01(e) of the Credit Agreement is hereby amended by deleting the phrase "Sections 8.09, through and including 8.13," contained therein and inserting in lieu thereof the phrase "Sections 8.09, 8.10, 8.11, 8.12. 8 24, 8.25 and 8.26".

(d) Section 7.01 of the Credit Agreement is hereby further amended by (i) redesignating clause (m) thereof as clause (n), and (ii) inserting therein the following new clause (m) immediately following clause (l) thereof:

"(l) Borrowing Base Certificate. Within 15 days after the end of each fiscal month of the Borrower, a certificate of the chief financial officer or other Authorized Officer of the Borrower setting forth the Borrowing Base as of the last day of such fiscal month, which certificate shall be in a form, and with an amount of detail, reasonably satisfactory to the Administrative Agent."

(e) Section 7.12 of the Credit Agreement is hereby amended by (i) deleting the phrase "two years" contained therein and inserting the phrase "one year" in lieu thereof, and (ii) deleting the amount "$200,000,000" contained therein and inserting the amount "$75,000,000" in lieu thereof.

(f) Section 8.02(a) of the Credit Agreement is hereby amended

Page 52

00184

8K Mar 00

by (1) deleting the amount "$10,000,000" contained in subclause (v) thereof and inserting the amount "$5,000,000" in lieu thereof, and (ii) deleting the phrase "Sections 8.09, 8.10, 8.11, 8.12 and 8.13" contained in subclause (v) thereof and inserting the phrase "Sections 8.09, 8.10, 8.11, 8.12, 8.24, 8.25 and 8.26" in lieu thereof.

(g) Section 8.02 of the Credit Agreement is hereby further amended by (i) deleting the word "and" contained at the end of clause (k) thereof, (ii) deleting the period appearing at the end of clause (l) thereof and inserting "; and" in lieu thereof, and (iii) inserting therein immediately following clause (l) thereof the following new clause (m):

"(m) the Borrower may convey, sell or otherwise dispose of certain of its assets to Compaq Computer Corporation and/or one of its Subsidiaries in accordance with the terms of the Compaq Asset Purchase Agreement; provided, however, that (i) the cash proceeds from such conveyance, sale or disposition shall be applied (x) first, to repay the outstanding Term Loans in full and (y) second, to repay outstanding Revolving Loans, and (ii) concurrently with the consummation of such conveyance, sale, or disposition, the Total Revolving Loan Commitment shall be reduced by $25,000,000 (which reduction shall be in addition to any subsequent reduction of the Total Revolving Loan Commitment pursuant to Section 3.03(d), and which reduction shall apply proportionately to reduce the Revolving Loan Commitment of each Bank with such a Commitment)."

(h) Section 8.03(e) of the Credit Agreement is hereby amended by deleting the amount "$5,000,000" contained therein and inserting the amount "$2,500,000" in lieu thereof.

(i) Section 8.04(f) of the Credit Agreement is hereby amended by deleting the amount "$25,000,000" contained therein and inserting the amount "$10,000,000" in lieu thereof.

(j) Section 8.05(a) of the Credit Agreement is hereby amended by inserting the following phrase immediately following the phrase "Foreign Cash Equivalents" contained therein:

", provided that during any time when Revolving Loans are outstanding, the aggregate amount of cash, Cash Equivalents and Foreign Cash Equivalents held by the Borrower and its Subsidiaries shall not exceed $30,000,000 for any period of four or more consecutive Business Days".

(k) Section 8.05(n) of the Credit Agreement is hereby amended by deleting the amount "$25,000,000" contained therein and inserting the amount "$10,000,000" in lieu thereof.

(l) Section 8.06(iii) of the Credit Agreement is hereby amended by deleting the reference to "March 27, 1999" contained therein and by inserting in lieu thereof a reference to "December 25, 1999".

(m) Section 8.09 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.09 Net Worth. The Borrower shall not permit Net Worth at any time to be less than the sum of (i) 75% of Net Worth as of December 25, 1999 plus (ii) 75% of net income, if positive for the period from and after December 25, 1999 to the last day of the then most recently ended fiscal quarter, plus (iii) 100% of the aggregate Net Issuance Proceeds
Page 53

00185

8K Mar 00

received by the Borrower from the issuance or sale of its Capital stock (including any preferred stock) from and after the Third Amendment Effective Date, plus (iv) 100% of the principal amount of any Indebtedness( including, without limitation, any Subordinated Debt and the Trust Preferred Related Subordinated Debt), which is converted into equity after the Third Amendment Effective Date (in each case on and after the date of such conversion); such covenant to be calculated as of the end of each fiscal quarter."

(n) Section 8.11 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.11 Leverage Ratios. (a) The Borrower shall not permit the ratio of (a) the aggregate principal amount of Funded Senior Debt outstanding at any time of the Borrower and its Subsidiaries to (b) EBITDA for the Test Period then most recently ended to exceed (i) at any time on and after the last day of the Borrower's fiscal quarter ending on or about March 31, 2001 to but excluding the last day of the Borrower's fiscal quarter ending on or about June 30, 2001, 1.10:1.00, and (ii) at any time thereafter, 1.00:1.00.

(b) The Borrower shall not permit the ratio of (a) the aggregate principal amount of Funded Debt outstanding at any time of the Borrower and its Subsidiaries to (b) EBITDA for the Test Period then most recently ended to exceed (i) at any time on and after the last day of the Borrower's fiscal quarter ending on or about March 31, 2001 to but excluding the last day of the Borrower's fiscal quarter ending on or about June 30, 2001, 4.20:1.00, and (ii) at any time thereafter, 3.95:1.00."

(o) Section 8.12 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.12 EBITDA to Interest Expense Ratio. The Borrower shall not permit the ratio of EBITDA for any Test Period set forth below to Interest Expense for such Test Period to be less than the ratio set forth opposite such Test Period below:

| Test Period ending on or about | Ratio |
| --- | --- |
| March 31, 2001 | 5.00:1.00 |
| Thereafter | 5.50:1.00 |

(p) Section 8.13 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.13 Intentionally Omitted."

(q) Section 8.20(d) of the Credit Agreement is hereby amended by deleting the reference to "$15,000,000" contained therein and inserting "$10,000,000" in lieu thereof.

(r) Section 8.23(a) of the Credit Agreement is hereby amended by deleting the amount "$90,000,000" contained therein and inserting the amount "$35,000,000" in lieu thereof. The amendment effected pursuant to this clause (r) shall be effective for the fiscal year ending on or about December 31, 2000 and each subsequent fiscal year, and no Capital Expenditure carryforwards shall be permitted pursuant to Section 8.23(b) of the Credit Agreement until the

Page 54

8K Mar 00
fiscal year ending on or about December 31, 2001.

(s) Section 8 of the Credit Agreement is hereby further amended by inserting therein the following new Section 8.24:

<PAGE>

"8.24 Minimum EBITDA. The Borrower will not permit EBITDA for the fiscal quarter ending on or about each date set forth below to be less than the amount set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending on or about | Amount |
|-----------------------------------|--------|
| June 30, 2000 | ($12,000,000) |
| September 30, 2000 | ($ 2,000,000) |
| December 31, 2000 | $10,000,000 |
| March 31, 2001 | $20,000,000 |

(t) Section 8 of the Credit Agreement is hereby further amended by inserting therein the following new Section 8.25:

"8.25 Borrowing Base. The Borrower will not permit (a) the sum of the Effective Amount of all Loans and the Effective Amount of all Letter of Credit Outstandings at any time (commencing with the 15th day following the last day of the fiscal month ending on or about February 29, 2000) to exceed (b) the Borrowing Base in effect at such time."

(u) Section 8 of the Credit Agreement is hereby further amended by inserting therein the following new Section 8.26:

"8.26 Maximum Funded Debt. The Borrower will not permit the aggregate principal amount of Funded Debt of the Borrower and its Subsidiaries outstanding at any time during any fiscal quarter ending on or about a date set forth below to exceed the amount set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending on or about | Amount |
|-----------------------------------|--------|
| March 31, 2000 | $960,000,000 |
| June 30, 2000 | $725,000,000 |
| September 30, 2000 | $575,000,000 |
| December 31, 2000 | $475,000,000 |
| March 31, 2001 | $400,000,000 |

(v) The definition of the term "Annual Cash Investment Limit" contained in Section 10 of the Credit Agreement is hereby amended to read in its entirety as follows:

"Annual Cash Investment Limit" shall mean, for any fiscal year of the Borrower, (i) $50,000,000 for the fiscal year ending on December 25, 1999 and (ii) $30,000,000 for each fiscal year thereafter."

(w) The definition of the term "EBITDA" contained in Section 10 of the Credit Agreement is hereby amended to read in its entirety as follows:

Page 55

00187

8K Mar 00

"EBITDA" shall mean, with respect to the Borrower and its Subsidiaries for any applicable period, Net Income for such period, plus, to the extent deducted in determining Net Income for such period, the aggregate amount of (i) Interest Expense, (ii) federal, state, local and foreign income taxes (but without reducing Net Income for the effect of any income tax benefits), (iii) depletion, depreciation and amortization of tangible and intangible assets, (iv) non-recurring non-cash charges taken in such period and (v) non-recurring cash charges in an aggregate amount (for all periods) not greater than $20,000,000.

(x) The definition of the term "Test Period" contained in Section 10 of the Credit Agreement is hereby amended to read in its entirety as follows:

"Test Period" shall mean each period of four consecutive fiscal quarters of the Borrower (or, if shorter, the period beginning on the first day of the fiscal quarter ending on or about March 31, 2001 and ending on the last day of the then most recently ended fiscal quarter of the Borrower), in each case taken as one accounting period; provided that (A) for the purposes of calculating compliance with Section 8.11, (i) for the Test Period ending on or about March 31, 2001, EBITDA shall be EBITDA as calculated for the fiscal quarter of the Borrower ending on or about such date multiplied by 4.00, (ii) for the Test Period ending on or about June 30, 2001, EBITDA shall be EBITDA as calculated for the two fiscal quarter period of the Borrower ending on or about such date multiplied by 2.00 and (iii) for the Test Period ending on or about September 30, 2001, EBITDA shall be EBITDA as calculated for the three fiscal quarter period of the Borrower ending on or about such date multiplied by 1.33; and (B) for the purposes of calculating compliance with Section 8.12, (i) for the Test Period ending on or about March 31, 2001, each of EBITDA and Interest Expense shall be EBITDA and Interest Expense as calculated for the fiscal quarter of the Borrower ending on or about such date, (ii) for the Test Period ending on or about June 30, 2001, each of EBITDA and Interest Expense shall be EBITDA and Interest Expense calculated for the two fiscal quarter period of the Borrower ending on or about such date, and (iii) for the Test Period ending on or about September 30, 2001, each of EBITDA and Interest Expense as calculated for the three fiscal quarter period of the Borrower ending on or about such date.

(y) Section 10 of the Credit Agreement is hereby further amended by inserting therein the following new defined terms in appropriate alphabetical order:

"Borrowing Base" shall mean, as at any date on which the amount thereof is being determined, an amount equal to the sum of (i) 60% of Eligible Inventory, (ii) 85% of Eligible Receivables plus (iii) 50% of the outstanding principal amount of the Nesbitt Burns Residual Notes, each as determined from the Borrowing Base Certificate most recently delivered pursuant to Section 7.01(l)."

"Borrowing Base Certificate" shall have the meaning specified in Section 7.01(l).

Page 56

8K Mar 00

"Compaq Asset Purchase Agreement" shall mean the Asset Purchase Agreement to be entered into by and among Compaq Computer Corporation, one of its Subsidiaries and the Borrower, substantially on the same terms and conditions set forth in the 12/30/99 draft thereof delivered to the Administrative Agent.

"Eligible Inventory" shall mean the gross dollar value (valued at the lower of cost or market value) of the finished goods inventory of the Borrower and the Subsidiary Guarantors located in any state of the United States or the District of Columbia and which is readily marketable and is then currently being held for sale in the ordinary course of business and conforms in all material respects to the representations and warranties contained in the Security Agreement, except (i) any supplies (not including services parts), goods returned or rejected (except to the extent that such returned or rejected goods continue to conform in all material respects to the other requirements of this definition) by customers and goods to be returned to suppliers, (ii) any inventory held on consignment, (iii) any inventory which has been shipped to a customer, even if on a consignment or "sale or return" basis, (iv) any inventory to the extent that the Borrower or a Subsidiary Guarantor has taken a reserve, but only to the extent of such reserve, including any reserves required by the Administrative Agent in its reasonable judgment, (v) any inventory not subject to a valid and perfected first-priority Lien in favor of the Collateral Agent under the Security Agreement, subject to no prior or equal Lien, (vi) any inventory not produced in compliance with the applicable requirements of the Fair Labor Standards Act and (vii) other inventory which is not acceptable to the Administrative Agent in its reasonable judgment.

"Eligible Receivables" shall mean the total face amount of all trade and vendor receivables of the Borrower and the Subsidiary Guarantors which conform in all material respects to the representations and warranties in the Security Agreement and at all times continue to be acceptable to the Administrative Agent in its reasonable judgment, except (i) receivables relating to sales to account debtors outside the United States, Latin America and Canada, (ii) any receivable that does not comply in all material respects with all applicable legal requirements, including, without limitation, all laws, rules, regulations and orders of any governmental or judicial authority, (iii) any receivable payable more than 60 days after the date of the original invoice therefor, (iv) any receivable that remains unpaid for more than 120 days from the time of the original issuance of the invoice therefor, (v) any unbilled receivable and any receivable in respect of goods not yet shipped, (vi) any receivable arising outside the ordinary course of business of the Borrower or any Subsidiary Guarantor, (vii) any receivable due from an account debtor that is the subject of a case or proceeding of the type described in Section 9.05, (viii) any receivable due from an account debtor at any time, to the extent that the aggregate outstanding amount of receivables due from such account debtor and its Affiliates at such time exceeds 25% of the aggregate amount of all receivables due to the Borrower and the Subsidiary Guarantors at such time, but only to the extent of such excess, (ix) any receivable not subject to a valid and perfected first-priority Lien in favor of the Collateral Agent

Page 57

8K Mar 00

under the Security Agreement, subject to no prior or equal Lien, (x) contracts or sales to any Affiliate of the Borrower or any of its Subsidiaries.

"Nesbitt Burns Residual Notes" shall mean the "Company Notes" (issued to the Borrower and Vanstar Corporation) under and as defined in the Amended and Restated Nesbitt Burns Receivables Purchase Facility.

"Third Amendment Effective Date" shall mean the Amendment Effective Date under and as defined in the Third Amendment and Waiver to this Agreement, dated as of January 4, 2000.

3.    Representations and Warranties. The Borrower hereby represents and warrants to the Administrative Agent and the Banks that:

(a) After the effectiveness of this Amendment, no Default or Event of Default has occurred and is continuing.

(b) The execution, delivery and performance by the Borrower of this Amendment has been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, notice to or action by, any Person in order to be effective and enforceable. The Credit Agreement as amended by this Amendment constitutes the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its respective terms.

(c) All representations and warranties of the Borrower contained in the Credit Agreement or in the other Credit Documents are true and correct as of the date hereof and as of the Amendment Effective Date with the same effect as though made on the date hereof or thereof and as though applied to the Credit Agreement as herein amended.

(d) The Borrower is entering into this Amendment on the basis of its own investigation and for its own reasons, without reliance upon the Administrative Agent and the Banks or any other Person.

4.    Amendment Effective Date. This Amendment shall become effective as of the date (the "Amendment Effective Date") when (i) counterparts (or if elected by the Administrative Agent, an executed facsimile copy) of this Amendment have been executed and delivered to the Administrative Agent by the Borrower and the Required Banks, and each Subsidiary Guarantor shall have executed and delivered to the Administrative Agent a Guarantor Acknowledgment and Consent (the "Acknowledgment") in the form attached hereto, and (ii) the asset sale contemplated by the Compaq Asset Purchase Agreement (as defined above) shall have been consummated substantially on the terms set forth in the 12/30/99 draft of such Agreement delivered to the Administrative Agent. Notwithstanding the foregoing, the waivers set forth in Section 1 of this Amendment shall become effective when the condition precedent contained in clause (i) of the preceding sentence shall be satisfied.

5.    Reservation of Rights. The Borrower acknowledges and agrees that the execution and delivery by the Administrative Agent and the Banks of this Amendment shall not be deemed (i) to create a course of dealing or otherwise obligate the Administrative Agent or the Banks to forebear or execute similar amendments under the same or similar circumstances in the future, or (ii) to amend, relinquish or impair any right of the Administrative Agent or the Banks to receive any indemnity or similar payment from any Person or entity as a result of any matter arising from or relating to this Amendment.

6.    Miscellaneous.
----------------

8K Mar 00

(a) Except as herein expressly amended, all terms, covenants and provisions of the Credit Agreement are and shall remain in full force and effect and all references therein to such Credit Agreement shall henceforth refer to the Credit Agreement as amended by this Amendment. This Amendment shall be deemed incorporated into, and a part of, the Credit Agreement.

(b) This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. No third party beneficiaries are intended in connection with this Amendment.

(c) This Amendment shall be governed by and construed in accordance with the law of the State of New York.

(d) This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Each of the parties hereto understands and agrees that this document (and any other documents required herein) may be delivered by any party thereto either in the form of an executed original or an executed original sent by facsimile transmission to be followed promptly by mailing of a hard copy original, and that receipt by the Administrative Agent of a facsimile transmitted document purportedly bearing the signature of a Bank or the Borrower shall bind such Bank or the Borrower, respectively, with the same force and effect as the delivery of a hard copy original. Any failure by the Administrative Agent to receive the hard copy executed original of such document shall not diminish the binding effect of receipt of the facsimile transmitted executed original of such document of the party whose hard copy page was not received by the Administrative Agent.

(e) This Amendment, together with the Credit Agreement and the Credit Documents, contains the entire and exclusive agreement of the parties hereto with reference to the matters discussed herein and therein. This Amendment supersedes all prior drafts and communications with respect thereto. This Amendment may not be amended except in accordance with the provisions of Section 12.12 of the Credit Agreement.

(f) If any term or provision of this Amendment shall be deemed prohibited by or invalid under any applicable law, such provision shall be invalidated without affecting the remaining provisions of this Amendment or the Credit Agreement, respectively.

(g) The Borrower covenants to pay to or reimburse the Administrative Agent, upon demand, for all reasonable costs and expenses (including allocated costs of in-house counsel) actually incurred by the Administrative Agent in connection with the development, preparation, negotiation, execution and delivery of this Amendment.

(h) The Borrower hereby agrees to pay each Bank which delivers an executed copy of this Amendment (by hard copy or facsimile) to the Administrative Agent by no later than 12:00 (Noon) (New York time) on January 4, 2000, a fee (the "Amendment Fee") in an amount equal to 0.75% of such Bank's Revolving Loan Commitment (as such Revolving Loan Commitment will be in effect immediately following the consummation of the Compaq Asset Purchase Agreement as provided herein), which Amendment Fee shall be due and payable on the first Business Day following the date on which the Required Banks shall have executed and delivered this Amendment.

(i) The Borrower (and each Guarantor by execution of the Acknowledgment) confirms that the Security Documents secure the Obligations under the Credit Agreement as amended hereby. Each Guarantor by execution of the Acknowledgment confirms that the Subsidiary Guaranty applies to all Obligations under the Credit Agreement as amended hereby.

Page 59

8K Mar 00

☆ ☆ ☆

<PAGE>

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amendment as of the date first above written.

INACOM CORP.

By: /s/ Richard C. Oshlo
Title: Vice President and Treasurer


DEUTSCHE BANK AG, NEW YORK
BRANCH, as Administrative Agent

By: /s/ Robert Wood
Title: Director

By: /s/ Ira Lubinsky
Title: Vice President


DEUTSCHE BANK AG, NEW YORK
BRANCH AND/OR CAYMAN ISLAND BRANCH

By: /s/ Robert Wood
Title: Director

By: /s/ Ira Lubinsky
Title: Vice President


IBM CREDIT CORPORATION, Individually and as
Documentation Agent

By: /s/ Ronald J. Bachner
Title: Manager, Commercial Financing
       Solutions Americas


BANQUE NATIONALE DE PARIS,
Individually and as Syndication Agent

By: /s/ Jennifer Y. Cho
Title: Vice President

By: /s/ Stuart Darby
Title: Assistant Vice President


COMERICA BANK

By: /s/ Timothy O'Rourke
Title: Vice President


CREDIT LYONNAIS
  Page 60

8K Mar 00
CHICAGO BRANCH

By: /s/ Joseph A. Philbin
Title: Vice President

THE BANK OF NOVA SCOTIA

By: /s/ F. C. H. Ashby
Title: Senior Manager Loan Operations

U.S. BANK NATIONAL ASSOCIATION

By: Merryll M. Hales
Title: Vice President

FLEET NATIONAL BANK

By: /s/ Michael S. Barclay
Title: Vice President

MERCANTILE BANK, N.A.

By: /s/ Joseph L. Sooter, Jr.
Title: Vice President

ABN AMRO BANK, N.V.

By:
Title:

By:
Title:

TRANSAMERICA COMMERCIAL
FINANCE CORPORATION

By:
Title:

STERLING ASSET MANAGEMENT, LLC

By:
Title:

FINOVA CAPITAL CORP.

By: /s/ Patrick Smith
Title: Vice President Credit Manager

FIRST NATIONAL BANK OF OMAHA

By: /s/ Mark Barata
Title: Vice President

   Page 61

8K Mar 00

<PAGE>

GUARANTOR ACKNOWLEDGMENT AND CONSENT

The undersigned, each a guarantor or third party pledgor with respect to the Borrower's obligations to the Administrative Agent and the Banks under the Credit Agreement, each hereby (i) acknowledge and consent to the execution, delivery and performance by the Borrower of the foregoing Third Amendment and Waiver to Credit Agreement (the "Amendment"), and (ii) reaffirm and agree that the respective guaranty, third party pledge or security agreement to which the undersigned is party and all other documents and agreements executed and delivered by the undersigned to the Administrative Agent and the Banks in connection with the Credit Agreement are in full force and effect, without defense, offset or counterclaim. (Capitalized terms used herein have the meanings specified in the Amendment).

GUARANTORS

INACOM TENNESSEE, INC.
INACOM COMMUNICATIONS, INC.
INACOMP FINANCIAL SERVICES, INC.
INACOM INTERNATIONAL, INC.
INACOM SOLUTIONS, INC.
PERIGEE COMMUNICATIONS, INC.
GORHAM CLARK, INC.
KURE ASSOCIATES, INC.
NETWORKS, INC.
BOSTON COMPUTER EXCHANGE
CORPORATION
PC TECHNICAL SERVICES, INC.
INACOM PROFESSIONAL SERVICES, INC.
INACOM FINANCE CORP.
OFFICE PRODUCTS OF MINNESOTA, INC.
VANSTAR CORPORATION
INACOM LATIN AMERICA
COMPUTERLAND INTERNATIONAL DEVELOPMENT, INC.
COMPUTER PORT WORLD TRADE, INC.
VANSTAR INTERNATIONAL CORPORATION
VST WEST, INC.
VST ILLINOIS, INC.
VSTNC, INC.
CIAND TEX, INC.
INACOM GOVERNMENT SYSTEMS, INC.
CONTRACT DATA, INC.
COMPUTER PROFESSIONALS, INC.
VANSTAR PROFESSIONAL TECHNICAL RESOURCES, INC.

Dated as of:  January 4, 2000          By:
                                       Title:


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.6
<SEQUENCE>7

Page 62

8K Mar 00
<DESCRIPTION>FOURTH AMENDMENT AND WAIVER
<TEXT>

FOURTH AMENDMENT AND WAIVER

FOURTH AMENDMENT AND WAIVER (the "Amendment"), dated as of February 15, 2000, among INACOM CORP., a Delaware corporation (the "Borrower"), the Banks party to the Credit Agreement referred to below, IBM CREDIT CORPORATION, as Documentation Agent, BANQUE NATIONALE DE PARIS, as Syndication Agent and DEUTSCHE BANK AG, NEW YORK BRANCH, as Administrative Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to them in the Credit Agreement referred to below.

RECITALS

WHEREAS, the Borrower, the Banks, the Documentation Agent, the Syndication Agent and Administrative Agent are parties to a certain Credit Agreement, dated as of April 9, 1999 (as amended, modified or supplemented through, but not including, the date hereof, the "Credit Agreement") pursuant to which the Banks have agreed to extend credit to the Borrower; and

WHEREAS, the Borrower has requested that the undersigned Banks provide certain waivers, and the parties hereto have agreed to amend the Credit Agreement, in each case on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Waiver.
        ------

(a) The Banks hereby waive any Event of Default pursuant to Section 9.04 of the Credit Agreement that has occurred as a result of any termination, liquidation, unwind or similar event under the Amended and Restated Nesbitt Burns Receivables Purchase Facility.

(b) The Banks hereby waive compliance with the covenant contained in Section 8.14(ii) of the Credit Agreement to the extent that there is an increase in the collateralization under the IBM Inventory Finance Facility pursuant to Section 8.03(r) of the Credit Agreement.

2.      Amendments.
        ----------

(a) Section 6.10(c) of the Credit Agreement is hereby amended to read in its entirety at follows:

"(c) Since November 27, 1999, nothing has occurred that has had or could reasonably be expected to have a Material Adverse Effect (it being understood that the Banks acknowledge having been informed by the Borrower that (i) the Borrower incurred an EBITDA loss during January, 2000 of approximately $23,000,000, (ii) the Borrower intends to take two charges in the fourth quarter of fiscal year 1999, one of which is expected to be a $100-150 million special charge which will be primarily non-cash, and the other of which is expected to relate to a $80-100 million write-off of accounts receivable, and (iii) the Borrower is currently experiencing strained relations with its vendors as a result of its liquidity problems)."

(b) Section 7 of the Credit Agreement is hereby amended by
Page 63

00195

8K Mar 00

inserting at the end thereof the following new Section 7.15:

"7.15  Lock-Box Arrangement.  Within 60 days following the Fourth Amendment Effective Date, (i) the Borrower and its Subsidiaries shall enter into a lock-box arrangement with one or more lock-box banks relating to all of their receivables subject to the Security Documents, which arrangement (and the documentation governing such arrangement) shall be reasonably satisfactory in form and substance to the Collateral Agent and (ii) all lock-box banks shall enter into agreements with the Collateral Agent relating to all amounts deposited into the respective lock-box account on terms and conditions reasonably satisfactory to the Collateral Agent."

(c) Section 8.03 of the Credit Agreement is hereby amended by (i) deleting the word "and" contained at the end of clause (p) thereof, (ii) deleting the period appearing at the end of clause (q) thereof and inserting "; and" in lieu thereof and (iii) inserting therein immediately following clause (q) thereof the following clause (r):

"(r) (i) Liens on the assets subject to the Security Documents in favor of the lenders under the Compaq Credit Facility, provided that such Liens shall be subordinated (on a passive or "silent" basis) to the Liens on such assets in favor of the Secured Creditors and (ii) Liens on the assets subject to the Security Documents in favor of the lenders under the IBM Inventory Finance Facility, provided that such Liens shall be subordinated (on a passive or "silent" basis) to the Liens on such assets in favor of the Secured Creditors and the lenders under the Compaq Credit Facility (to the extent there are outstanding loans under such Facility) (it being understood and agreed that the Liens permitted under this clause (r) may be created pursuant to the Security Documents (as a result of amendments thereto or amendments and restatements thereof) or other security agreements and related intercreditor agreements, in each case in form and substance reasonably satisfactory to the Collateral Agent)."

(d) Section 8.04 of the Credit Agreement is hereby amended by (i) deleting the word "and" contained at the end of clause (l) thereof, (ii) deleting the period appearing at the end of clause (m) thereof and inserting "; and" in lieu thereof and (iii) inserting therein immediately following clause (m) thereof the following new clause (n):

"(n)  Indebtedness incurred pursuant to the Compaq Credit Facility in an aggregate principal amount not to exceed $55,500,000."

(e) Section 8.06(iv) of the Credit Agreement is hereby amended by inserting therein, immediately following the phrase "in an amount" appearing therein, the phrase "(net of income taxes)".

(f) Section 8.09 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.09 Net Worth.  The Borrower shall not permit Net Worth at any time to be less than the sum of (i) $185,000,000 plus (ii) 75% of net income, if positive for the period from and after December 25, 1999 to the last day of the then most recently ended fiscal quarter, plus (iii) 100% of the aggregate Net Issuance Proceeds received by the Borrower from the issuance or sale of its capital stock (including any preferred stock) from and after the Fourth Amendment Effective Date, plus (iv) 100% of the principal amount of any

Page 64

8K Mar 00

Indebtedness (including, without limitation, any Subordinated Debt and the Trust Preferred Related Subordinated Debt), which is converted into equity after the Fourth Amendment Effective Date (in each case on and after the date of such conversion); such covenant to be calculated as of the end of each fiscal quarter."

(g) Section 8.11 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.11 Leverage Ratios. (a) The Borrower shall not permit the ratio of (a) the aggregate principal amount of Funded Senior Debt outstanding at any time of the Borrower and its Subsidiaries to (b) EBITDA for the Test Period then most recently ended to exceed (i) at any time on and after the last day of the Borrower's fiscal quarter ending on or about March 31, 2001 to but excluding the last day of the Borrower's fiscal quarter ending on or about June 30, 2001, 2.15:1.00, and (ii) at any time thereafter, 1.95:1.00.

(b) The Borrower shall not permit the ratio of (a) the aggregate principal amount of Funded Debt outstanding at any time of the Borrower and its Subsidiaries to (b) EBITDA for the Test Period then most recently ended to exceed (i) at any time on and after the last day of the Borrower's fiscal quarter ending on or about March 31, 2001 to but excluding the last day of the Borrower's fiscal quarter ending on or about June 30, 2001, 5.20:1.00, and (ii) at any time thereafter, 4.65:1.00."

<PAGE>

(h) Section 8.12 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.12 EBITDA to Interest Expense Ratio. The Borrower shall not permit the ratio of EBITDA for any Test Period set forth below to Interest Expense for such Test Period to be less than the ratio set forth opposite such Test Period below:

| Test Period ending on or about | Ratio |
| --- | --- |
| March 31, 2001 | 5.50:1.00 |
| Thereafter | 6.00:1.00 |

(i) Section 8.10 of the Credit Agreement is hereby amended by deleting the ratio "1.00:1.00" appearing therein and by inserting in lieu thereof the ratio "0.95:1.00".

(j) Section 8.14 of the Credit Agreement is hereby amended by (i) deleting the word "or" appearing at the end of clause (iii) thereof, (ii) deleting the period appearing at the end of clause (iv) thereof and inserting "; or" in lieu thereof and (iii) inserting therein the following new clause (v) immediately following clause (iv) thereof:

"(v) amend, modify, or permit the amendment or modification of, any provision of the Compaq Credit Facility."

Page 65

8K Mar 00

    (k) Section 8.24 of the Credit Agreement is hereby amended to read in its entirety as follows:

    "8.24 Minimum EBITDA. The Borrower will not permit EBITDA for the fiscal quarter ending on or about each date set forth below to be less than the amount set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending on or about | Amount |
| --- | --- |
| June 30, 2000 | ($20,000,000) |
| September 30, 2000 | ($ 6,000,000) |
| December 31, 2000 | $ 7,000,000 |
| March 31, 2001 | $15,000,000" |

    (l) Section 8.26 of the Credit Agreement is hereby amended to read in its entirety as follows:

<PAGE>

    "8.26 Maximum Funded Debt. The Borrower will not permit the aggregate principal amount of Funded Debt of the Borrower and its Subsidiaries outstanding at any time during any fiscal quarter ending on or about a date set forth below to exceed the amount set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending on or about | Amount |
| --- | --- |
| March 31, 2000 | $600,000,000 |
| June 30, 2000 | $575,000,000 |
| September 30, 2000 | $525,000,000 |
| December 31, 2000 | $500,000,000 |
| March 31, 2001 | $450,000,000" |

    (m) Section 8 of the Credit Agreement is hereby further amended by inserting at the end thereof the following new Section 8.27:

    "8.27 Trust Preferred Securities. Notwithstanding anything to the contrary contained in this Agreement (including, without limitation, in Section 8.06 hereof), the Borrower will not, and will not permit any of its Subsidiaries (including, without limitation, Vanstar Corporation) to make any interest payments on any Trust Preferred Related Subordinated Debt in cash, and the Borrower will take or cause its Subsidiaries to take all action necessary under Section 312 of the indenture governing the Trust Preferred Related Subordinated Debt to defer the obligation to pay such cash interest; provided that the Borrower or its respective Subsidiaries may make such cash interest payments any time after January 1, 2001, if at the time of such payment (i) all commitments under the Compaq Credit Facility have been terminated and all outstanding amounts thereunder have been paid in full, (ii) no Default or Event of Default shall exist or result therefrom, (iii) the Borrower shall be in compliance with Section 8.25 of this Agreement (determined for this purpose only without giving effect to clause (iv) of the definition of Borrowing Base) and (iv) for the most recently ended four consecutive quarter period ending prior to such payment, (A) EBITDA less (B) Interest Expense less (C) the

Page 66

8K Mar 00

proposed cash interest payment to be made on the Trust Preferred Related Subordinated Debt (determined as if such payment was made during such period) is greater than 0."

(n) Section 9 of the Credit Agreement is hereby amended by (i) inserting the word "or" at the end of Section 9.12 thereof and (ii) inserting therein immediately following Section 9.12 thereof the following new Section 9.13:

"9.13 Compaq Agreements." (a) Compaq shall default in the observance or performance of or deny or disaffirm its obligations under the Compaq Commitment Letter and Term Sheet or, after the execution thereof, the Compaq Credit Facility or (b) the Compaq Commitment Letter and Term Sheet shall expire or terminate other than as a result of the execution of the Compaq Credit Facility;".

(o) The definition of the term "Applicable Margin" contained in Section 10 of the Credit Agreement is hereby amended by inserting the following phrase immediately following the phrase "then in effect," appearing therein:

", provided that on and after January 1, 2001 each of the percentages set forth below (other than the Commitment Fee percentage) shall be increased by 0.25%".

(p) The definition of the term "Borrowing Base" contained in Section 10 of the Credit Agreement is hereby amended to read in its entirety as follows:

"Borrowing Base" shall mean, as at any date on which the amount thereof is being determined, an amount equal to the sum of (i) 60% of Eligible Inventory, plus (ii) 85% of Eligible Receivables plus (iii) 50% of the outstanding principal amount of the Nesbitt Burns Residual Notes, each as determined from the Borrowing Base Certificate most recently delivered pursuant to Section 7.01(l) plus (iv) for the period (and only for the period) from the Fourth Amendment Effective Date to and including September 30, 2001, $25,000,000."

(q) Section 10 of the Credit Agreement is hereby further amended by inserting therein the following new defined terms in appropriate alphabetical order:

"Compaq" shall mean Compaq Computer Corporation, a corporation organized under the laws of the State of Delaware.

"Compaq Commitment Letter and Term Sheet" shall mean the Commitment Letter, dated February 15, 2000, between the Borrower and Compaq, together with the Summary of Terms and Conditions attached thereto.

"Compaq Credit Facility" shall mean that credit agreement and related guaranties and ancillary documents entered into by the Borrower, the Subsidiary Guarantors and Compaq, having terms and conditions substantially the same as those set forth in the Compaq Commitment Letter and Term Sheet (and as to matters not covered by the Compaq Commitment Letter and Term Sheet, having terms and conditions that are reasonably satisfactory to the Administrative Agent), as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof and hereof.

Page 67

8K Mar 00

"Fourth Amendment Effective Date" shall mean the Amendment Effective Date under, and as defined in, the Fourth Amendment and Waiver, dated as of February 15, 2000, to this Agreement.

3.    Representations and Warranties. The Borrower hereby represents and warrants to the Administrative Agent and the Banks that:

(a) After the effectiveness of this Amendment, no Default or Event of Default has occurred and is continuing.

(b) The execution, delivery and performance by the Borrower of this Amendment has been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, notice to or action by, any Person in order to be effective and enforceable. The Credit Agreement as amended by this Amendment constitutes the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its respective terms.

(c) All representations and warranties of the Borrower contained in the Credit Agreement or in the other Credit Documents are true and correct as of the date hereof and as of the Amendment Effective Date with the same effect as though made on the date hereof or thereof and as though applied to the Credit Agreement as herein amended.

(d) The Borrower is entering into this Amendment on the basis of its own investigation and for its own reasons, without reliance upon the Administrative Agent and the Banks or any other Person.

4.    Amendment Effective Date. This Amendment shall become effective as of the date (the "Amendment Effective Date") when (i) counterparts (or if elected by the Administrative Agent, an executed facsimile copy) of this Amendment have been executed and delivered to the Administrative Agent by the Borrower and the Required Banks, and each Subsidiary Guarantor shall have executed and delivered to the Administrative Agent a Guarantor Acknowledgment and Consent (the "Acknowledgment") in the form attached hereto, (ii) the Commitment Letter from Compaq to the Borrower, substantially in the form of the 2/15/00 draft distributed to the Banks, shall have been executed by the Borrower and Compaq and shall be in full force and effect, (iii) the asset sale contemplated by the Compaq Asset Purchase Agreement (as defined in the Third Amendment and Waiver) shall have been consummated substantially on the same terms set forth in the 12/30/99 draft of such Agreement delivered to the Administrative Agent (as amended by the first amendment thereto substantially in the form of the 2/10/00 draft of such amendment delivered to the Administrative Agent) and (iv) all accrued but unpaid fees, costs and disbursements of White & Case LLP, counsel to the Administrative Agent, incurred in connection with the Credit Agreement shall have been paid in full.

5.    Reservation of Rights. The Borrower acknowledges and agrees that the execution and delivery by the Administrative Agent and the Banks of this Amendment shall not be deemed (i) to create a course of dealing or otherwise obligate the Administrative Agent or the Banks to forebear or execute similar amendments under the same or similar circumstances in the future, or (ii) to amend, relinquish or impair any right of the Administrative Agent or the Banks to receive any indemnity or similar payment from any Person or entity as a result of any matter arising from or relating to this Amendment.

6.    Miscellaneous.

(a) Except as herein expressly amended, all terms, covenants and provisions of the Credit Agreement are and shall remain in full force and

Page 68