8K Mar 00

effect and all references therein to such Credit Agreement shall henceforth refer to the Credit Agreement as amended by this Amendment. This Amendment shall be deemed incorporated into, and a part of, the Credit Agreement.

(b) This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. No third party beneficiaries are intended in connection with this Amendment.

(c) This Amendment shall be governed by and construed in accordance with the law of the State of New York.

(d) This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Each of the parties hereto understands and agrees that this document (and any other documents required herein) may be delivered by any party thereto either in the form of an executed original or an executed original sent by facsimile transmission to be followed promptly by mailing of a hard copy original, and that receipt by the Administrative Agent of a facsimile transmitted document purportedly bearing the signature of a Bank or the Borrower shall bind such Bank or the Borrower, respectively, with the same force and effect as the delivery of a hard copy original. Any failure by the Administrative Agent to receive the hard copy executed original of such document shall not diminish the binding effect of receipt of the facsimile transmitted executed original of such document of the party whose hard copy page was not received by the Administrative Agent.

(e) This Amendment, together with the Credit Agreement and the Credit Documents, contains the entire and exclusive agreement of the parties hereto with reference to the matters discussed herein and therein. This Amendment supersedes all prior drafts and communications with respect thereto. This Amendment may not be amended except in accordance with the provisions of Section 12.12 of the Credit Agreement.

(f) If any term or provision of this Amendment shall be deemed prohibited by or invalid under any applicable law, such provision shall be invalidated without affecting the remaining provisions of this Amendment or the Credit Agreement, respectively.

(g) The Borrower covenants to pay to or reimburse the Administrative Agent, upon demand, for all reasonable costs and expenses (including allocated costs of in-house counsel) actually incurred by the Administrative Agent in connection with the development, preparation, negotiation, execution and delivery of this Amendment.

(h) The Borrower (and each Guarantor by execution of the Acknowledgment) confirms that the Security Documents secure the Obligations under the Credit Agreement as amended hereby. Each Guarantor by execution of the Acknowledgment confirms that the Subsidiary Guaranty applies to all Obligations under the Credit Agreement as amended hereby.

(i) The undersigned Banks each hereby consent to the amendment and/or modification to the Security Documents and/or the execution of any other security agreements and intercreditor agreements to incorporate terms and conditions of the Credit Agreement as amended by this Amendment, in each case on such terms and conditions as shall be satisfactory to the Collateral Agent.

* * *

<PAGE>

Page 69

00201

8K Mar 00

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Amendment as of the date first above written.

INACOM CORP.

By: /s/ Thomas Fitzpatrick
Title: Executive Vice President and
        Chief Financial Officer


DEUTSCHE BANK AG, NEW YORK
BRANCH, as Administrative Agent

By: /s/ Robert Wood
Title: Director

By: /s/ Ira Lubinsky
Title: Vice President


DEUTSCHE BANK AG, NEW YORK
BRANCH AND/OR CAYMAN ISLAND BRANCH

By: /s/ Robert Wood
Title: Director

By: /s/ Ira Lubinsky
Title: Vice President


IBM CREDIT CORPORATION, Individually and as
Documentation Agent

By: /s/ Sal Grasso
Title: Manager of Credit Operations


BANQUE NATIONALE DE PARIS,
Individually and as Syndication Agent


By:
Title:

By:
Title:


COMERICA BANK

By: /s/ Timothy O'Rourke
Title: Vice President


CREDIT LYONNAIS
CHICAGO BRANCH

By:
Title:


THE BANK OF NOVA SCOTIA
        Page 70

8K Mar 00

By: /s/ F. C. B. Ashby
Title: Senior Manager Loan Operations

U.S. BANK NATIONAL ASSOCIATION

By: /s/ Merryll M. Hales
Title: Vice President

FLEET NATIONAL BANK

By:
Title:

MERCANTILE BANK, N.A.

By: /s/ Joseph L. Sooter, Jr.
Title: Vice President

ABN AMRO BANK, N.V.

By: /s/ Lee-Lee Miao
Title: Group Vice President

By: /s/ Paul S. Faust
Title: Vice President

TRANSAMERICA COMMERCIAL
FINANCE CORPORATION

By:
Title:

ML CLO XIX STERLING (CAYMAN) LTD.

By:
Sterling Asset Manager, L.L.C.,
as its Investment Advisor
Title:

FINOVA CAPITAL CORP.

By:
Title:

FIRST NATIONAL BANK OF OMAHA

By: /s/ Charles H. Fries, Jr.
Title: Senior Vice President

<PAGE>

Page 71

00203

8K Mar 00

GUARANTOR ACKNOWLEDGMENT AND CONSENT

        The undersigned, each a guarantor or third party pledgor with respect
to the Borrower's obligations to the Administrative Agent and the Banks under
the Credit Agreement, each hereby (i) acknowledge and consent to the execution,
delivery and performance by the Borrower of the foregoing Fourth Amendment and
Waiver to Credit Agreement (the "Amendment"), and (ii) reaffirm and agree that
the respective guaranty, third party pledge or security agreement to which the
undersigned is party and all other documents and agreements executed and
delivered by the undersigned to the Administrative Agent and the Banks in
connection with the Credit Agreement are in full force and effect, without
defense, offset or counterclaim. (Capitalized terms used herein have the
meanings specified in the Amendment).

                              GUARANTORS

                        INACOM TENNESSEE, INC.
                        INACOM COMMUNICATIONS, INC.
                        INACOMP FINANCIAL SERVICES, INC.
                        INACOM INTERNATIONAL, INC.
                        INACOM SOLUTIONS, INC.
                        PERIGEE COMMUNICATIONS, INC.
                        GORHAM CLARK, INC.
                        KURE ASSOCIATES, INC.
                        NETWORKS, INC.
                        BOSTON COMPUTER EXCHANGE
                        CORPORATION
                        PC TECHNICAL SERVICES, INC.
                        INACOM PROFESSIONAL SERVICES, INC.
                        INACOM FINANCE CORP.
                        OFFICE PRODUCTS OF MINNESOTA, INC.
                        VANSTAR CORPORATION
                        INACOM LATIN AMERICA
                        COMPUTERLAND INTERNATIONAL DEVELOPMENT, INC.
                        COMPUTER PORT WORLD TRADE, INC.
                        VANSTAR INTERNATIONAL CORPORATION
                        VST WEST, INC.
                        VST ILLINOIS, INC.
                        VSTNC, INC.
                        CIAND TEX, INC.
                        INACOM GOVERNMENT SYSTEMS, INC.
                        CONTRACT DATA, INC.
                        COMPUTER PROFESSIONALS, INC.
                        VANSTAR PROFESSIONAL TECHNICAL RESOURCES, INC.

Dated as of: February 15, 2000    By:
                                  Title:

</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

Page 72

00204

EXHIBIT 10

February 15, 2000

Inacom Corp
10310 Forman, Suite 200
Omaha, Nebraska 68154
Attention: Chief Financial Officer

Re: Revolving Credit Facility Commitment Letter

Ladies and Gentlemen:

Compaq Computer Corporation ("**Compaq**" or the "**Lender**") understands that Inacom Corp ("Inacom" or the "**Company**") is proposing to sell (the "Asset Sale") to ITY Corp., a wholly-owned subsidiary of Compaq (the "**Buyer**"), certain assets pursuant to an Asset Purchase Agreement dated as of January 4, 2000 among Inacom, Compaq and the Buyer, as amended by the First Amendment to Asset Purchase Agreement dated as of the date hereof (as so amended, the "**Asset Purchase Agreement**") You have asked Compaq to commit to provide up to $55.5 million of financing to Inacom following the consummation of the Asset Sale pursuant to the secured credit facility (the "**Facility**") described below.

Compaq is willing to provide the Facility upon the terms and conditions specified herein. Compaq's commitment hereunder shall become effective when the Company signs copies of this Commitment Letter and returns it to Compaq

Full Disclosure

You represent, warrant and covenant that (i) the pro forma financial statements of the Company and its subsidiaries furnished by you did not contain, as of the time they were furnished, any material misstatement of fact or omit, as of such time, to state any material fact necessary to make the statements therein taken as a whole not misleading, in the light of the circumstances under which they were made, and (ii) the projections regarding the future performance of the Company and its subsidiaries furnished by you have been prepared in good faith based on assumptions believed to be reasonable at the time of preparation thereof.

Certain Conditions

Certain of the terms of the Facility are set forth in the Summary of Terms and Conditions attached hereto (the "Term Sheet"). The Term Sheet is intended as an outline only but does summarize all of the material terms, conditions, covenants, representations, warranties and other provisions which will be contained in definitive financing agreements for the Facility. Compaq's commitment is subject to the satisfaction of the conditions set forth in the Term Sheet and (i) the negotiation, execution and delivery of a credit agreement (the "**Credit Agreement**") and other definitive financing agreements, prepared by Davis Polk & Wardwell, special counsel to Compaq, containing terms and conditions

(NY) 05862/066/LOAN TS/commit.ltr wpd

1

EXHIBIT

Jells-10

DL 3/30/05

13

consistent with the Term Sheet and otherwise reasonably satisfactory to Compaq, by not later than May 1, 2000 and (ii) the consummation of the Asset Sale in accordance with the Asset Purchase Agreement

## Costs and Expenses

By your acceptance of this Commitment Letter, you agree that all costs and expenses (including the reasonable fees and expenses of Davis Polk & Wardwell, counsel for Compaq) incurred by Compaq in connection with the collection or enforcement of this Commitment Letter and the definitive financing agreements or any default under, or amendment or waiver of, the definitive financing agreements shall be for your account.

## Indemnification

By your acceptance of this Commitment Letter, the Company agrees to indemnify and hold harmless Compaq and each of its affiliates (including, without limitation, any controlling person) and the directors, officers, employees and agents of each of the foregoing parties (each, an "**Indemnified Person**") in accordance with the provisions of Schedule 1 hereto, which is incorporated herein and made a part of this Commitment Letter

## Miscellaneous

This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer, and shall not be deemed to confer, any benefits upon, or create any rights in or in favor of, any Person other than the parties hereto, except as provided above with respect to Indemnified Persons

The offer by Compaq set forth in this Commitment Letter will terminate at 5:00 p m , New York time, on the closing date of the Asset Sale (the "Asset Sale Closing Date"), unless on or before that date and time it has received a copy of this Commitment Letter signed by you. The provisions set forth above under "Costs and Expenses" and "Indemnification" shall survive any such termination of the offer under this Commitment Letter, and shall be binding regardless of whether a Credit Agreement or other definitive documentation is signed

01068

This Commitment Letter shall be governed by and construed in accordance with the laws of the State of New York. Each of you and Compaq hereby submits to the jurisdiction of the United States District Court for the Southern District of New York and of any New York State court sitting in New York City for purposes of all legal proceedings arising out of or relating to this Commitment Letter or the transactions contemplated hereby. Each of you and Compaq hereby irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum and to the right to have a trial by jury. All payments under this Commitment Letter shall be paid in U.S. Dollars to the relevant payee in New York City, without set-off or counterclaim and free and clear of any withholding or other taxes.

Very truly yours,

Compaq Computer Corporation

By: _____

Name:  Ben K. Wells
Title:   Chief Financial Officer (Acting),
          Vice President and Corporate Treasurer

Agreed and accepted as of the
date first above written:

Inacom Corp.

By: _____
    Name:
    Title:

01069

This Commitment Letter shall be governed by and construed in accordance with the laws of the State of New York. Each of you and Compaq hereby submits to the jurisdiction of the United States District Court for the Southern District of New York and of any New York State court sitting in New York City for purposes of all legal proceedings arising out of or relating to this Commitment Letter or the transactions contemplated hereby. Each of you and Compaq hereby irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum and to the right to have a trial by jury. All payments under this Commitment Letter shall be paid in U.S. Dollars to the relevant payee in New York City, without set-off or counterclaim and free and clear of any withholding or other taxes.

Very truly yours,

Compaq Computer Corporation

By   _____
     Name    Ben K. Wells
     Title·    Chief Financial Officer (Acting),
                Vice President and Corporate Treasurer

Agreed and accepted as of the
date first above written:

Inacom Corp.

By   _____
     Name     Gerald A. Gagliardi
     Title     President and Chief Executive Officer

01070

### SCHEDULE 1

Capitalized terms used but not defined in this Schedule are used as defined in the Commitment Letter (the "**Commitment Letter**") to which this Schedule is attached and into which it is incorporated.

The Company agrees to indemnify, defend and hold harmless each Indemnified Person from and against any and all losses, claims, demands, damages, liabilities and other expenses of any kind (collectively, "**Losses**") to which any Indemnified Person may become subject, insofar as such Losses (or actions or other proceedings commenced or threatened in relation thereto) relate to or in any way arise from the Facility or any proposed or actual use of the proceeds of the Facility, and to reimburse each Indemnified Person for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against any such Loss or action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding out of which any such Loss arises), it being understood that the indemnification provided for herein shall not apply to any losses, claims, demands, damages, liabilities and other expenses arising from the Asset Purchase Agreement or the performance, or failure to perform, thereunder by any party thereto, any such indemnification to be provided, if at all, under the Asset Purchase Agreement and the other instruments, agreements and documents entered into pursuant thereto or in connection therewith. The Company will not be responsible, however, for any such Losses of any Indemnified Person that are determined by final and nonappealable judgment of a court of competent jurisdiction to have resulted primarily from actions taken or omitted to be taken by such Indemnified Person in bad faith or from such Indemnified Person's gross negligence or willful misconduct. No Indemnified Person shall be liable to any other person, firm, corporation or other legal entity for consequential damages which may be alleged as a result of the Commitment Letter or the Facility.

The Company shall not be liable for any settlement of any proceeding effected without its prior written consent (which shall not be unreasonably withheld), but if settled with such consent or if there is a final judgment for the plaintiff, the Company agrees to indemnify each Indemnified Person from and against any Loss (other than Losses determined by final and nonappealable judgement of a court of competent jurisdiction to have resulted primarily from actions taken or omitted to be taken by such Indemnified Person in bad faith or from such Indemnified Person's gross negligence or willful misconduct) by reason of such settlement or judgment. The Company shall not, without the prior written consent of each Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding

01071

EXHIBIT A

## SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Borrower:** | Inacom Corp., a Delaware corporation. |
| **Facility:** | $55,500,000 revolving credit facility (the "**Facility**") |
| **Purpose:** | Proceeds will be used for general corporate purposes, including working capital. |
| **Lender:** | Compaq Computer Corporation ("**Compaq**" or the "**Lender**"). |
| **Security:** | The Company's obligations under the Facility will be secured by perfected "silent" second lien on all of the assets securing the Company's obligations under the Credit Agreement dated as of April 9, 1999 among the Company, the lenders party thereto, IBM Credit Corporation, as Documentation Agent, Banque Nationale de Paris. as Syndication Agent, and Deutsche Bank AG, New York Branch, as Administrative Agent (as amended through the closing date of the Asset Sale, the "**DB Credit Agreement**")  The Guarantees described below will be secured by perfected "silent" second liens on all of the assets of the Guarantors (as defined below) securing such Guarantors' obligations under their guarantees of the DB Credit Agreement |
| **Guarantees:** | Each of the Company's subsidiaries that shall have guaranteed the DB Credit Agreement (the "**Guarantors**") will guarantee the Company's obligations under the Facility, up to the maximum amount possible without violating applicable fraudulent conveyance laws. |
| **Borrowing Options and Interest Periods:** | LIBOR and Base Rate   LIBOR and Base Rate will be determined on a basis substantially similar to the basis used under the DB Credit Agreement, except that the Company may only elect interest periods for LIBOR loans of 1 month |
| **Interest Rates:** | Margins over adjusted LIBOR and margins over Base Rate will be 2% above the corresponding margins set forth in the DB Credit Agreement |
| | Interest in respect of Base Rate loans shall be payable quarterly in arrears on the last business day of each quarter.  Interest in respect of |

(NY) 05862/066/LOAN TS/commit ltr wpd

5

01072

LIBOR loans shall be payable in arrears at the end of the applicable interest period. Interest will also be payable at the time of conversion or repayment of any loans and at maturity. All interest and fee calculations shall be based on a 360-day year and actual days elapsed or, in the case of interest on Base Rate Loans based on the prime rate, a 365/366-day year and actual days elapsed.

Upon any default in the payment of principal or interest, all overdue amounts shall bear interest at a rate per annum equal to the rate which is 2% in excess of the rate otherwise applicable to Base Rate loans from time to time or, in the case of LIBOR loans prior to the end of the then pending interest period, at the rate which is 2% in excess of the rate otherwise then borne by such loans. Such interest shall be payable on demand.

| | | |
|---|---|---|
| Commitment: | From the Asset Sale Closing Date through the 90th day following the Asset Sale Closing Date: | $0 |
| | From the 91st day following the Asset Sale Closing Date through the 120th day following the Asset Sale Closing Date: | $25,000,000 |
| | From the 121st day following the Asset Sale Closing Date and thereafter (subject to reduction pursuant to "Amortization" below) | $55,500,000 |
| Maturity Date: | September 30, 2001. | |
| Amortization: | The Commitment shall be reduced in nine equal monthly installments beginning on January 31, 2001. Any loans outstanding in excess of the amount of the Commitment as reduced from time to time shall be repaid. | |
| Voluntary Prepayments: | Permitted at any time with one business day's notice for Base Rate loans and three business days' notice for LIBOR loans. The Company will compensate the Lender for any break-funding losses if it prepays LIBOR loans at any time other than the end of an Interest Period | |

01073

| | |
|---|---|
| **Conditions to Effectiveness:** | The Facility shall become effective on the date (the "**Effective Date**") upon which all of the following conditions precedent shall have been satisfied: |

    1.    Completion of the Credit Agreement containing the terms and conditions set forth in the Commitment Letter and this Term Sheet and otherwise in form and substance reasonably satisfactory to the Lender, and completion of other customary documentation relating to the Facility in form and substance reasonably satisfactory to the Lender, including receipt by the Lender of reasonably satisfactory opinions of counsel to the Company as to the transactions contemplated thereby, together with customary closing documentation

    2    The Asset Sale shall have been consummated in accordance with the Asset Purchase Agreement

    3.    Absence of any pending or threatened actions, suits or proceedings against the Company or any of its subsidiaries or otherwise relating to the Facility, that could reasonably be expected to have a material adverse effect on the rights or remedies of the Lender or the ability of the Company or any Guarantor to perform its obligations under the Credit Agreement, the guarantees thereof by the Guarantors or any of the other financing documents or a Material Adverse Effect (defined in a manner substantially similar to the definition thereof in the DB Credit Agreement)

| | |
|---|---|
| **Conditions to Initial Borrowing:** | The obligations of the Lender to make the initial borrowing under the Facility shall be subject to the following conditions (in addition to the "Conditions to Each Borrowing" set forth below) |

    1    The Effective Date shall have occurred

    2    Creation and perfection of security arrangements referred to under "Security" above to the satisfaction of the Lender, all in form and substance reasonably satisfactory to the Lender

    3    The DB Credit Facility shall have been amended by an amendment in the form of Exhibit A hereto or otherwise in form and substance satisfactory to the Lender

    4    The Agreement for Inventory Financing, dated April 27, 1998, between IBM Credit Corporation and the Company, as amended, shall have been amended by an amendment in the form of Exhibit B hereto or otherwise in form and substance

01074

satisfactory to the Lender so as to permit the Asset Sale, the Facility and the security therefor.

4.   The Lender shall have received consolidated statements of income and cash flows for the Company and its subsidiaries for the month of April 2000, certified by the chief financial officer of the Company as fairly presenting the consolidated income and cash flows of the Company and its subsidiaries for such month in accordance with GAAP (the "**April Financial Statements**").

5.   (i) EBITDA (as defined in the DB Credit Agreement) for the month of April 2000 (as set forth in the April Financial Statements) shall not have been less than $(14,000,000) or (ii) EBITDA (as so defined) for the two month period of April and May 2000 (as set forth in the April Financial Statements and the May Financial Statements (as defined below)) shall not have been less than $(23,000,000) or (iii) the Company shall have been in compliance as of June 30, 2000 with all of the financial covenants set forth in the Credit Agreement and shall have delivered consolidated financial statements of the Company and its subsidiaries as at such date and for the periods then ended and a compliance certificate setting forth the calculations necessary to demonstrate such compliance.

**Conditions to the First Borrowing that Results in Outstanding Loans Exceeding $25,000,000:**

The obligations of the Lender to make the initial borrowing under the Facility that results in there being outstanding loans in an aggregate principal amount exceeding $25,000,000 shall be subject to the following conditions (in addition to the "Conditions to Each Borrowing" set forth below):

1.   The Lender shall have received consolidated statements of income and cash flows for the Company and its subsidiaries for the month of May 2000, certified by the chief financial officer of the Company as fairly presenting the consolidated income and cash flows of the Company and its subsidiaries for such month in accordance with GAAP (the "**May Financial Statements**")

2.   (i) EBITDA (as defined in the DB Credit Agreement) for the two month period of April and May 2000 (as set forth in the April Financial Statements and the May Financial Statements) shall not have been less than $(23,000,000) or (ii) the Company shall have been in compliance as of June 30, 2000 with all of the financial covenants set forth in the Credit Agreement and shall have delivered consolidated financial statements of the Company and its subsidiaries as at such date and for the periods

01075

then ended and a compliance certificate setting forth the calculations necessary to demonstrate such compliance

**Conditions to Each Borrowing:**

Each borrowing under the Facility will be subject to satisfaction of the following conditions:

1. The Effective Date shall have occurred
2. Absence of Default.
3. Accuracy of representations and warranties in all material respects
4. Loans in the full amount of the then available borrowing base under the DB Credit Agreement are outstanding under the DB Credit Agreement.
5. The cash and cash equivalent investments of the Company and its subsidiaries, before giving effect to such borrowing, shall not exceed $10,000,000 on the date of borrowing
6. There shall exist no default under the DB Credit Agreement that has not been cured or waived

**Representations and Warranties:**

The representations and warranties will be substantially similar to those contained in the DB Credit Agreement

**Covenants:**

The covenants will be substantially similar to those contained in the DB Credit Agreement, except that the financial covenant levels set forth in the DB Credit Agreement shall be modified as set forth in Annex I hereto

**Events of Default:**

The events of default will be substantially similar to those contained in the DB Credit Agreement, except that the cross-default provision will not apply to the DB Credit Agreement, which will instead be subject to cross-acceleration and cross-payment-default provisions

**Increased Costs/Change of Circumstances:**

The Credit Agreement will contain customary provisions protecting the Lender in the event of unavailability of funding, illegality, increased costs and funding losses.

**Assignments and Participations:**

The Lender will be able to assign all or a pro rata portion of its outstanding loans and Commitment with the consent of the Borrower (such consent not to be unreasonably withheld or delayed)

**Indemnification:**

The Company will indemnify the Lender against all losses, liabilities, claims, damages or expenses relating to the loans, the Facility and the Company's use of the loan proceeds, or the commitments, including but not limited to attorneys' fees and

01076

settlement costs, except for losses, liabilities, claims, damages or expenses caused by such indemnitee's gross negligence or willful misconduct, it being understood that the indemnification provided for herein shall not apply to any losses, liabilities, claims, damages or expenses relating to the Asset Purchase Agreement or the performance, or failure to perform, thereunder by any party thereto, any such indemnification to be provided if at all, under the Asset Purchase Agreement and the other instruments, agreements and documents entered into pursuant thereto or in connection therewith

**Waiver of Set-Off:**  The Borrower will provide customary waivers of set off rights. The Lender will waive its rights to set off amounts owed by the Lender to the Company against amounts owed by the Company to the Lender under the Facility.

**Governing Law and Forum:**  State of New York.

**Expenses:**  The Company will pay all reasonable legal and other out-of-pocket expenses of Compaq, including the fees and expenses of counsel to Compaq, in connection with collection under or enforcement of, or any default under, or amendment or waiver of, the definitive financing agreements.

**Jurisdiction:**  The parties will submit to the jurisdiction of the federal and state courts of the State of New York.

(NY) 05862/066/LOAN TS/commit ltr wpd

10

01077

ANNEX I

# RELATIONSHIP BETWEEN DB CREDIT AGREEMENT AND COMPAQ FACILITY FINANCIAL COVENANTS

|  |  | DB Credit Agreement | Compaq Facility |  |
|---|---|---|---|---|
| MINIMUM EBITDA |  | ($20) | ($30) | 6/30/00 |
|  |  | ($6) | ($16) | 9/30/00 |
|  |  | $7 | ($3) | 12/31/00 |
|  |  | $15 | $5 | 3/31/00 |
| MINIMUM NET WORTH |  | $185 | $178 5 |  |
| MAXIMUM LEVERAGE RATIO | Funded Senior | 2.15x | 2.55x | Q1'01 |
|  |  | 1.95x | 2 3x | Thereafter |
|  | Funded Debt | 5 2x | 6 05x | Q1'01 |
|  |  | 4.65x | 5.35x | Thereafter |
| MINIMUM EBITDA TO INTEREST EXPENSE RATIO |  | 5 5x | 4.9x | Q1'01 |
|  |  | 6.0x | 5 3x | Thereafter |
| MINIMUM CURRENT RATIO |  | 0 95x | 0 85x |  |

(NY) 05862/066/LOAN TS/commit ltr wpd

01078

EXHIBIT A

FOURTH AMENDMENT AND WAIVER

FOURTH AMENDMENT AND WAIVER (the "Amendment"), dated as of February 15, 2000, among INACOM CORP., a Delaware corporation (the "Borrower"), the Banks party to the Credit Agreement referred to below, IBM CREDIT CORPORATION, as Documentation Agent, BANQUE NATIONALE DE PARIS, as Syndication Agent and DEUTSCHE BANK AG, NEW YORK BRANCH, as Administrative Agent. Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to them in the Credit Agreement referred to below.

RECITALS

WHEREAS, the Borrower, the Banks, the Documentation Agent, the Syndication Agent and Administrative Agent are parties to a certain Credit Agreement, dated as of April 9, 1999 (as amended, modified or supplemented through, but not including, the date hereof, the "Credit Agreement") pursuant to which the Banks have agreed to extend credit to the Borrower; and

WHEREAS, the Borrower has requested that the undersigned Banks provide certain waivers, and the parties hereto have agreed to amend the Credit Agreement, in each case on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Waiver.

(a)    The Banks hereby waive any Event of Default pursuant to Section 9.04 of the Credit Agreement that has occurred as a result of any termination, liquidation, unwind or similar event under the Amended and Restated Nesbitt Burns Receivables Purchase Facility.

(b)    The Banks hereby waive compliance with the covenant contained in Section 8.14(ii) of the Credit Agreement to the extent that there is an increase in the collateralization under the IBM Inventory Finance Facility pursuant to Section 8.03(r) of the Credit Agreement.

2.    Amendments.

(a)    Section 6.10(c) of the Credit Agreement is hereby amended to read in its entirety at follows·

"(c)  Since November 27, 1999, nothing has occurred that has had or could reasonably be expected to have a Material Adverse Effect (it being understood that the Banks acknowledge having been informed by the Borrower that (i) the Borrower incurred an EBITDA loss during January, 2000 of approximately $23,000,000, (ii) the Borrower intends to take two charges in the fourth quarter of fiscal year 1999, one of which is

01080

expected to be a $100-150 million special charge which will be primarily non-cash, and the other of which is expected to relate to a $80-100 million write-off of accounts receivable, and (iii) the Borrower is currently experiencing strained relations with its vendors as a result of its liquidity problems)."

(b)    Section 7 of the Credit Agreement is hereby amended by inserting at the end thereof the following new Section 7.15:

"7.15 Lock-Box Arrangement.  Within 60 days following the Fourth Amendment Effective Date, (i) the Borrower and its Subsidiaries shall enter into a lock-box arrangement with one or more lock-box banks relating to all of their receivables subject to the Security Documents, which arrangement (and the documentation governing such arrangement) shall be reasonably satisfactory in form and substance to the Collateral Agent and (ii) all lock-box banks shall enter into agreements with the Collateral Agent relating to all amounts deposited into the respective lock-box account on terms and conditions reasonably satisfactory to the Collateral Agent."

(c)    Section 8.03 of the Credit Agreement is hereby amended by (i) deleting the word "and" contained at the end of clause (p) thereof, (ii) deleting the period appearing at the end of clause (q) thereof and inserting "; and" in lieu thereof and (iii) inserting therein immediately following clause (q) thereof the following clause (r):

"(r) (i) Liens on the assets subject to the Security Documents in favor of the lenders under the Compaq Credit Facility, provided that such Liens shall be subordinated (on a passive or "silent" basis) to the Liens on such assets in favor of the Secured Creditors and (ii) Liens on the assets subject to the Security Documents in favor of the lenders under the IBM Inventory Finance Facility, provided that such Liens shall be subordinated (on a passive or "silent" basis) to the Liens on such assets in favor of the Secured Creditors and the lenders under the Compaq Credit Facility (to the extent there are outstanding loans under such Facility) (it being understood and agreed that the Liens permitted under this clause (r) may be created pursuant to the Security Documents (as a result of amendments thereto or amendments and restatements thereof) or other security agreements and related intercreditor agreements, in each case in form and substance reasonably satisfactory to the Collateral Agent)."

(d)    Section 8.04 of the Credit Agreement is hereby amended by (i) deleting the word "and" contained at the end of clause (l) thereof, (ii) deleting the period appearing at the end of clause (m) thereof and inserting "; and" in lieu thereof and (iii) inserting therein immediately following clause (m) thereof the following new clause (n):

"(n)  Indebtedness incurred pursuant to the Compaq Credit Facility in an aggregate principal amount not to exceed $55,500,000."

(TUE) 2.15'00 22:32/ST. 22:31/NO. 4860619342 P. 4    FROM WHITE & CASE FAX DEPARTMENT

01081

(e)    Section 8.06(iv) of the Credit Agreement is hereby amended by inserting therein, immediately following the phrase "in an amount" appearing therein, the phrase "(net of income taxes)".

(f)    Section 8.09 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.09  Net Worth.  The Borrower shall not permit Net Worth at any time to be less than the sum of (i) $185,000,000 plus (ii) 75% of net income, if positive for the period from and after December 25, 1999 to the last day of the then most recently ended fiscal quarter, plus (iii) 100% of the aggregate Net Issuance Proceeds received by the Borrower from the issuance or sale of its capital stock (including any preferred stock) from and after the Fourth Amendment Effective Date, plus (iv) 100% of the principal amount of any Indebtedness (including, without limitation, any Subordinated Debt and the Trust Preferred Related Subordinated Debt), which is converted into equity after the Fourth Amendment Effective Date (in each case on and after the date of such conversion); such covenant to be calculated as of the end of each fiscal quarter."

(g)    Section 8.11 of the Credit Agreement is hereby amended to read in its entirety as follows:

"8.11  Leverage Ratios  (a) The Borrower shall not permit the ratio of (a) the aggregate principal amount of Funded Senior Debt outstanding at any time of the Borrower and its Subsidiaries to (b) EBITDA for the Test Period then most recently ended to exceed (i) at any time on and after the last day of the Borrower's fiscal quarter ending on or about March 31, 2001 to but excluding the last day of the Borrower's fiscal quarter ending on or about June 30, 2001, 2.15:1.00, and (ii) at any time thereafter, 1.95:1.00.

(b) The Borrower shall not permit the ratio of (a) the aggregate principal amount of Funded Debt outstanding at any time of the Borrower and its Subsidiaries to (b) EBITDA for the Test Period then most recently ended to exceed (i) at any time on and after the last day of the Borrower's fiscal quarter ending on or about March 31, 2001 to but excluding the last day of the Borrower's fiscal quarter ending on or about June 30, 2001, 5.20:1.00, and (ii) at any time thereafter, 4.65:1.00."

01082

L A W Y E R ' S   N O T E S

| Page | Line | |
|------|------|--|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**HOUSTON REPORTING SERVICE**
Registered Professional Reporters
**1010 Lamar, Suite 1400
Houston, Texas 77002
(713) 739-1400**

FORM 003

L A W Y E R ' S   N O T E S

| Page | Line | |
|------|------|--|
| | | |

**HOUSTON REPORTING SERVICE**
Registered Professional Reporters
**1010 Lamar, Suite 1400**
**Houston, Texas 77002**
**(713) 739-1400**

FORM 003

## L A W Y E R ' S   N O T E S

| Page | Line | |
|------|------|---|
|      |      |   |

**HOUSTON REPORTING SERVICE**
Registered Professional Reporters
**1010 Lamar, Suite 1400
Houston, Texas 77002
(713) 739-1400**

FORM 003

L A W Y E R ' S   N O T E S

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**HOUSTON REPORTING SERVICE**
Registered Professional Reporters
**1010 Lamar, Suite 1400
Houston, Texas 77002
(713) 739-1400**

FORM 003