# 1. WILLIAM FRANCIS

William Francis

| PAGE:LINE | PAGE:LINE |
|---|---|
| 7:15-7:16 | 30:25-31:24 |
| 12:2-12:10 | 34:25-35:14 |
| 12:22-12:25 | 38:3-38:15 |
| 15:6-15:16 | 39:15-40:13 |
| 16:25-18:17 | 41:18-41:23 |
| 18:25-19:13 | 47:12-47:14 |
| 20:5-20:15 | 52:3-52:13 |
| 20:20-20:22 | 53:9-53:18 |
| 21:2-21:24 | 54:2-54:10 |
| 22:10-22:18 | 56:2-56:5 |
| 22:23-23:2 | 56:8-56:18 |
| 23:7-24:4 | 58:1-58:13 |
| 24:11-24:18 | 59:18-60:5 |
| 25:8-25:10 | 63:7-63:17 |
| 25:14-25:23 | 64:17-64:25 |
| 30:16-30:23 | 68:3-68:25 |
|  | 70:21-71:3 |

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF DELAWARE
 2

 3

 4   IN RE:   INACOM CORP., ET AL.,
                                        CHAPTER 11
 5                 DEBTORS              BANKRUPTCY CASE
                                       NO. 00-2426 (PJW)
 6   _____
 7   INACOM CORP., ET AL.,

 8          PLAINTIFFS

 9      -VS-                            CIVIL ACTION
                                       NO. 04-CV-148 (GMS)
10   TECH DATA CORPORATION,

11          DEFENDANT

12   _____

13   INACOM CORP., ET AL.,

            PLAINTIFFS
14
        -VS-                           CIVIL ACTION
15                                     NO. 04-CV-582 (GMS)
     DELL COMPUTER CORP.
16
            DEFENDANT
17   _____

18   INACOM CORP., ET AL.,

19          PLAINTIFFS

20      -VS-                           CIVIL ACTION
                                       NO. 04-CV-583 (GMS)
21   LEXMARK INTERNATIONAL, INC.

22          DEFENDANT

23   _____

24

25
```

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 2

```
 1

 2   INACOM CORP., ET AL.,

 3          PLAINTIFFS

 4      -VS-                          CIVIL ACTION
                                      NO. 04-CV-584  (GMS)
 5   RESILIEN, INC.,

 6          DEFENDANT

 7   ---------------------------------

 8   INACOM CORP., ET AL.,

          PLAINTIFFS
 9
        -VS-                          CIVIL ACTION
10                                    NO. 04-CV-593  (GMS)

11   INGRAM ENTERTAINMENT, INC.,

12          DEFENDANT

13   --------------------------------------------------

14

15                                    MARCH 2, 2005
                                      10:00 A.M.
16

17        THE DEPOSITION OF WILLIAM FRANCIS, TAKEN

18   PURSUANT TO NOTICE ON BEHALF OF THE DEFENDANT

19   AND THIRD-PARTY PLAINTIFF LEXMARK, AT THE

20   OFFICES OF DOWNTOWN REPORTING, 37 NORTH ORANGE

21   AVENUE, SUITE 500, ORLANDO, FLORIDA, BEFORE

22   CHRISTINE E. LE RETTE, REGISTERED PROFESSIONAL

23   REPORTER AND NOTARY PUBLIC, IN AND FOR THE

24   STATE OF FLORIDA AT LARGE.

25
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 3

```
 1   APPEARANCES:

 2

 3         ANDREW W. CAINE, ESQUIRE
           PACHULSKI, STANG, ZIEHL, YOUNG,
 4            JONES & WEINTRAUB
           10100 SANTA MONICA BOULEVARD
 5         11TH FLOOR
           LOS ANGELES, CALIFORNIA  90067-4100
 6         310-277-6910

 7              REPRESENTING THE PLAINTIFF INACOM
                    CORP.
 8

 9         CULVER V. HALLIDAY, ESQUIRE
           STOLL, KEENON & PARK, LLP
10         2650 AEGON CENTER
           400 WEST MARKET STREET
11         LOUISVILLE, KENTUCKY  40202-3377
           502-568-9100
12
                REPRESENTING THE DEFENDANT AND
13                  THIRD-PARTY PLAINTIFF LEXMARK.
14

15         STEPHEN C. HUNT, ESQUIRE
           ADORNO & YOSS, P.A.
16         350 EAST LAS OLAS BOULEVARD, 17TH FLOOR
           FORT LAUDERDALE, FLORIDA  33301
           954-766-7834
17
                REPRESENTING THE DEFENDANT TECH DATA.
18

19         CECILY A. DUMAS, ESQUIRE
           FRIEDMAN, DUMAS & SPRINGWATER, LLP
20         ONE MARITIME PLAZA, SUITE 2475
           SAN FRANCISCO, CALIFORNIA  94111
21         415-834-3800

22              REPRESENTING THE THIRD-PARTY DEFENDANT
                    COMPAQ COMPUTER/HEWLETT PACKARD
23

24

25
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 4

```
 1   APPEARANCES (CONT'D.):

 2

 3           PATRICK COLLINS, ESQUIRE    (VIA TELEPHONE)
             FARRELL FRITZ, P.C.
 4           EAB PLAZA
             UNIONDALE, NEW YORK  11556-0120
 5           516-227-0700

 6                 REPRESENTING THE DEFENDANT
                      RESILIEN, INC.
 7

 8           JAMES LANDON, ESQUIRE   (VIA TELEPHONE)
             HUGHES & LUCA, LLP
 9           111 CONGRESS AVENUE, SUITE 900
             AUSTIN, TEXAS  78701
10
                   REPRESENTING THE DEFENDANT DELL
11                    COMPUTER CORPORATION.

12
             EARL M. FORTE, ESQUIRE   (VIA TELEPHONE)
13           BLANK ROME, LLP
             ONE LOGAN SQUARE
14           18TH & CHERRY STREETS
             PHILADELPHIA, PENNSYLVANIA  19103-6998
15
                   COUNSEL FOR STATUTORY COMMITTEE OF
16                    UNSECURED CREDITORS OF INACOM CORP.

17

18

19

20

21

22

23

24

25
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 5

```
 1                    TABLE OF CONTENTS

 2

 3   DEPOSITION OF WILLIAM FRANCIS
     MARCH 2, 2005
 4

 5   APPEARANCES                                    3,4

 6   STIPULATIONS                                     6

 7

     TESTIMONY OF WILLIAM FRANCIS
 8
         DIRECT EXAMINATION BY MR. HALLIDAY          7
 9       CROSS EXAMINATION BY MR. HUNT              36
         CROSS EXAMINATION BY MR. COLLINS           49
10       CROSS EXAMINATION BY MR. LANDON            60
         CROSS EXAMINATION BY MR. FORTE             62
11       CROSS EXAMINATION BY MS. DUMAS             64
         RECROSS EXAMINATION BY MR. COLLINS         68
12       CROSS EXAMINATION BY MR. CAINE             69
         RECROSS EXAMINATION BY MR. HUNT            70
13

14   CERTIFICATE OF REPORTER                        73

15   SUBSCRIPTION OF DEPONENT                       74

16                    E X H I B I T S

17   FRANCIS EXHIBITS
     FOR IDENTIFICATION:
18
     NO. 1  2/16/00 LETTER, FRANCIS TO LEXMARK      17
19   NO. 2  2/17/00 LETTER, FRANCIS TO LOGICARE     27
     NO. 3  3/27/00 LETTER, VITOLS TO LOGICARE      28
20   NO. 4  2/16/00 LETTER, FRANCIS TO TECH DATA    39

21

22

23

24

25
```

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 6

1

2

3

4

5                    S T I P U L A T I O N S

6

7          IT IS HEREBY STIPULATED AND AGREED BY AND

8    BETWEEN COUNSEL PRESENT FOR THE RESPECTIVE

9    PARTIES AND THE DEPONENT THAT THE READING AND

10   SIGNING OF THE DEPOSITION BE EXPRESSLY RESERVED.

11

12                    *     *     *

13

14   KEY TO PUNCTUATION:

15

16

17   -- AT THE END OF QUESTION OR ANSWER DENOTES AN
         INTERRUPTION.

18   ... DENOTES A TRAILOFF BY WITNESS AND NOT AN

19       INTERRUPTION.

20   UH-HUH.  DENOTES AN AFFIRMATIVE SOUND.
     HUH-UH.  DENOTES A NEGATIVE SOUND.

21

22

23

24

25

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 7

```
 1              P R O C E E D I N G S
 2         MR. HUNT:  I'LL JUST SAY FOR EVERYONE
 3     AGAIN THAT WE'RE HERE WITH MR. FRANCIS, THE
 4     DEPONENT.  ALSO PRESENT BESIDES THE REPORTER
 5     ARE CULVER HALLIDAY, MYSELF, STEVE HUNT, CECILY
 6     DUMAS AND ANDY CAINE.
 7              CAN EVERYONE HEAR US OKAY?
 8              UNIDENTIFIED SPEAKERS ON TELEPHONE:  YEAH.
 9         MR. HUNT:  OKAY.
10                   WILLIAM FRANCIS,
11     HAVING FIRST BEEN DULY SWORN BY THE REPORTER,
12     THEREUPON, TESTIFIED AS FOLLOWS:
13                   DIRECT EXAMINATION
14  BY MR. HALLIDAY:
15         Q.   COULD YOU PLEASE STATE YOUR NAME, SIR.
16         A.   WILLIAM J. FRANCIS.
17         Q.   MR. FRANCIS, GOOD MORNING.  MY NAME IS
18  CULVER HALLIDAY AND I AM AN ATTORNEY REPRESENTING
19  LEXMARK INTERNATIONAL, INC., WHICH IS A PARTY TO THE
20  LAWSUIT IN WHICH YOU ARE BEING DEPOSED.
21              HAVE YOU EVER BEEN DEPOSED BEFORE, SIR?
22         A.   NO, I HAVE NOT.
23         Q.   IF AT ANY TIME YOU WANT TO TAKE A BREAK
24  FOR ANY REASON, PLEASE LET US KNOW.
25         A.   OKAY.
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 12

1    A.   YES, IT DID.

2    Q.   AFTER DIRECTOR OF CORPORATE FINANCE WHAT

3    POSITION DID YOU HAVE?

4    A.   WELL, I STAYED AS A DIRECTOR OF CORPORATE

5    FINANCE.  MY RESPONSIBILITIES CHANGED.

6    Q.   WHAT WERE YOUR RESPONSIBILITIES AS

7    DIRECTOR OF CORPORATE FINANCE?

8    A.   INITIALLY IT WAS NORTH AMERICAN ACCOUNTS

9    PAYABLE OPERATIONS, WORLDWIDE TRAVEL AND AMERICAN

10   EXPRESS IMPLEMENTATION AND PAYROLL FOR NORTH AMERICA.

11   MS. DUMAS:  OFF THE RECORD FOR A MINUTE.

12   (A DISCUSSION WAS HELD OFF THE RECORD.)

13   MR. COLLINS:  HI, THIS IS PAT COLLINS.  I

14   CAN HEAR CULVER'S QUESTIONS PRETTY WELL BUT I

15   CAN'T HEAR THE ANSWERS.  IS IT POSSIBLE TO MOVE

16   THE MICROPHONE CLOSER TO MR. FRANCIS?

17   MS. DUMAS:  YOU BET.  WE'VE GOT IT RIGHT

18   IN FRONT OF HIM, PAT.

19   MR. COLLINS:  THANK YOU.

20   MS. DUMAS:  YOU'RE WELCOME.

21   BY MR. HALLIDAY:

22   Q.   MR. FRANCIS, DURING THE PERIOD YOU WERE

23   EMPLOYED BY COMPAQ WERE YOU ALWAYS DIRECTOR OF

24   CORPORATE FINANCE?

25   A.   YES.

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 15

```
 1        Q.   AT THE TIME IT WAS ENTERED INTO DID YOU

 2   HAVE ANY UNDERSTANDING OF WHAT THE AGREEMENT WAS

 3   ABOUT?

 4        A.   WOULD YOU REPEAT THAT QUESTION AGAIN,

 5   PLEASE?

 6        Q.   I'LL TRY.  AT THE TIME THE AGREEMENT WAS

 7   ENTERED INTO, ABOUT FEBRUARY 2000, DID YOU HAVE ANY

 8   UNDERSTANDING AS TO WHAT IT WAS ABOUT?

 9        A.   YES.

10        Q.   WHAT WAS THAT UNDERSTANDING, SIR?

11        A.   MY UNDERSTANDING IS THAT COMPAQ PURCHASED

12   A PORTION OF INACOM, PRIMARILY THE PACKAGING AND

13   DISTRIBUTION PORTION OF THEIR BUSINESS.

14        Q.   WAS IT YOUR UNDERSTANDING AT THAT TIME

15   THAT COMPAQ WAS ALSO ACQUIRING LIABILITIES OF INACOM?

16        A.   SOME LIABILITIES, YES.

17        Q.   DID YOU UNDERSTAND AT THAT TIME WHAT THOSE

18   LIABILITIES IT WAS ACQUIRING WERE?

19        A.   NOT IN ANY GREAT DETAIL.

20        Q.   DID YOU HAVE ANY UNDERSTANDING AT THAT

21   TIME WHEN THE AGREEMENT WAS ENTERED INTO AS TO

22   WHETHER COMPAQ WAS ACQUIRING LIABILITY FOR ACCOUNTS

23   PAYABLE FROM ANY OF INACOM'S CUSTOMERS?

24        A.   BASICALLY ON -- MY UNDERSTANDING WAS --

25             MR. COLLINS:  COULD THE WITNESS BE LOUDER,
```

Inacom vs. Tech Data                 3/2/2005                    WILLIAM FRANCIS

Page 16

1      PLEASE?

2      **A.    BASICALLY MY UNDERSTANDING WAS THAT WE**

3  **PURCHASED SOME ASSETS AND FOR SOME CUSTOMERS IT**

4  **BECAME MORE SPECIFIC AS TO THE ASSETS; BUT IT WAS,**

5  **I'LL HAVE TO SAY, ON A GOING-FORWARD BASIS FROM THE**

6  **DATE OF OUR AGREEMENT.**

7      Q.    AND WAS THAT YOUR UNDERSTANDING AT THAT

8  TIME IN FEBRUARY OF 2000?

9      **A.    YES.**

10     Q.    WITH RESPONSIBILITY FOR ACCOUNTS PAYABLE

11 WHILE YOU WERE AT COMPAQ DID YOU COMMUNICATE WITH

12 SOME OF COMPAQ'S VENDORS AND CUSTOMERS?

13     **A.    ALL THE TIME.**

14     Q.    AND AT THE TIME OF THE ASSET PURCHASE

15 AGREEMENT WERE YOU HAVING ANY COMMUNICATION WITH

16 CUSTOMERS OF INACOM?

17     **A.    NOT AT THE TIME OF THE AGREEMENT, NO.**

18     Q.    LET ME ASK YOU TO LOOK AT --

19         MR. HALLIDAY:  SHOULD I CALL THIS FRANCIS

20     NO. 1?  IS THAT WHAT WE DECIDED TO DO LAST

21     TIME?

22         MS. DUMAS:  I THINK SO.  WE'RE JUST

23     STARTING OVER WITH 1, 2, 3, WITH EACH WITNESS.

24 BY MR. HALLIDAY:

25     Q.    -- WHAT I'LL ASK THE COURT REPORTER TO

Inacom vs. Tech Data                          3/2/2005                          WILLIAM FRANCIS

Page 17

```
 1   MARK AS FRANCIS NO. 1.
 2        (FRANCIS EXHIBIT NO. 1 WAS MARKED BY THE
 3   REPORTER.)
 4        (A DISCUSSION WAS HELD OFF THE RECORD.)
 5   BY MR. HALLIDAY:
 6        Q.   SIR, TAKE YOUR TIME TO LOOK AT THAT LETTER
 7   AND LET ME KNOW WHEN YOU'VE HAD A CHANCE TO.
 8        A.   YEAH, I HAVE.
 9        Q.   CAN YOU IDENTIFY THIS DOCUMENT, SIR?
10        A.   SURE.  IT'S A LETTER THAT I SIGNED THAT IN
11   THIS CASE WENT TO LEXMARK INTERNATIONAL TALKING
12   ABOUT -- IT'S WHAT WE CALL A COMFORT LETTER THAT WAS
13   SENT TO A SELECTED NUMBER OF SUPPLIERS.
14        Q.   YOU SAY IT'S WHAT YOU REFER TO AS A
15   COMFORT LETTER?
16        A.   THAT IS CORRECT.
17        Q.   WHAT DOES THAT MEAN?
18        A.   INACOM WAS HAVING SOME TROUBLE WITH THEIR
19   SUPPLIERS WHO WERE RELUCTANT TO SHIP MATERIAL OR
20   GOODS TO INACOM BECAUSE OF PAST ISSUES THEY HAD WITH
21   INACOM SO THEY KEPT ASKING ABOUT -- THEY WANTED SOME
22   MORE ASSURANCE, SO THIS LETTER WAS DEVELOPED TO GIVE
23   THEM SOME ASSURANCE THAT COMPAQ WAS BEHIND THE CUSTOM
24   EDGE PORTION OF INACOM AND THEY COULD BE ASSURED THAT
25   THEY WOULD BE PAID FOR THE GOODS AND SERVICES THAT
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 18

1    THEY SUPPLIED.

2         Q.    DID YOU SEND THIS COMFORT LETTER IN

3    CONNECTION WITH THE ASSET PURCHASE AGREEMENT?

4         A.    NO.

5         Q.    IT WASN'T PART OF THAT TRANSACTION?

6         A.    NO.

7         Q.    WERE COMFORT LETTERS SOMETHING THAT WERE

8    SENT ROUTINELY WHILE YOU WERE AN EMPLOYEE OF COMPAQ?

9         A.    NO.

10        Q.    DO YOU RECALL SENDING A LETTER LIKE THIS,

11   A COMFORT LETTER IN CONNECTION WITH ANY OTHER

12   TRANSACTION OR EVENT?

13        A.    NO.

14        Q.    DID YOU SEND MORE THAN ONE COMFORT LETTER

15   AT OR ABOUT THE TIME YOU SENT THIS COMFORT LETTER TO

16   LEXMARK?

17        A.    YES.

18        Q.    DO YOU RECALL WHO ELSE WOULD HAVE RECEIVED

19   ONE?

20        A.    NO, I DON'T HAVE ANY RECOLLECTION NOW OF

21   THAT.

22        Q.    DO YOU RECALL IF TECH DATA RECEIVED ONE?

23        A.    THEY MAY HAVE.  I CAN'T RECALL EXACTLY

24   EACH ONE I SIGNED FIVE YEARS AGO.

25        Q.    I UNDERSTAND, SIR.  BUT YOU DO RECALL

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 19

1  SIGNING AND SENDING THIS LETTER TO A MS. ATCHINSON AT

2  LEXMARK?

3       A.    I CAN'T SAY I RECALL IT.   I CAN IDENTIFY

4  THE LETTER.   I MEAN, IT'S MY SIGNATURE SO I KNOW I

5  SIGNED IT, I KNOW I SENT IT.

6       Q.    DO YOU RECALL WHY THIS LETTER IN SPECIFIC

7  WAS SENT?

8       A.    NO.   WHAT HAPPENED IS THAT JOHN FRASCA,

9  WHOSE NAME IS ON THE LETTER, GAVE US -- OR GAVE ME A

10 LIST OF THE CUSTOMERS -- THEIR CUSTOMERS OR

11 SUPPLIERS, I SHOULD SAY, WHO HE FELT NEEDED A COMFORT

12 LETTER.   THAT WAS THE BASIS FOR WHICH SUPPLIERS

13 RECEIVED ONE OF THESE LETTERS.

14      Q.    SO THIS LETTER WOULD HAVE GONE OR BEEN

15 SENT BY YOU AT THE REQUEST OF JOHN FRASCA?

16      A.    THAT'S CORRECT.

17      Q.    WHAT WAS MR. FRASCA'S POSITION AT THAT

18 TIME, IF YOU RECALL, SIR?

19      A.    I DON'T RECALL SPECIFICALLY.   I WANT TO

20 SAY HE WAS ON THE MARKETING SIDE OF THE HOUSE WITH

21 INACOM, SLASH, CUSTOM EDGE BUT I, I DON'T REMEMBER

22 EXACTLY.

23      Q.    HOW WOULD HE HAVE COMMUNICATED TO YOU A

24 REQUEST THAT THIS COMFORT LETTER BE SENT TO LEXMARK?

25      A.    PROBABLY VIA EITHER A PHONE CALL OR

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 20

```
 1   E-MAIL.

 2       Q.   DO YOU RECALL WHICH IT WAS ON THIS

 3   OCCASION?

 4       A.   NO.

 5       Q.   DID MR. FRASCA TELL YOU WHAT TO SAY IN THE

 6   LETTER?

 7       A.   HE DRAFTED THE LETTER, AS FAR AS I KNOW.

 8       Q.   DRAFTED IT FOR YOUR SIGNATURE AND FOR YOU

 9   TO SEND?

10       A.   THAT'S CORRECT.

11       Q.   THAT BEING THE CASE DO YOU RECALL NOW

12   WHETHER THIS LETTER MIGHT NOT HAVE BEEN SENT TO YOU

13   IN DRAFT FORM BY MR. FRASCA BY E-MAIL?

14       A.   I'M SURE HE DID SEND IT TO ME IN DRAFT

15   FORM BY E-MAIL.

16       Q.   WAS THIS PREPARING A LETTER FOR YOU TO

17   SIGN AND SEND SOMETHING THAT MR. FRASCA HAD DONE

18   BEFORE?

19       A.   NOT THAT I KNOW OF, NOT TO ME.

20       Q.   SO JUST SO I'M SURE THAT I UNDERSTAND,

21   SIR, WHILE THIS LETTER -- SIGNED BY YOU, CORRECT?

22       A.   UH-HUH, THAT'S CORRECT.

23       Q.   -- AND IS SENT BY YOU -- WAS SENT BY

24   YOU -- PARDON ME -- HOWEVER, THE TEXT OF THE LETTER

25   WAS PREPARED BY MR. FRASCA.
```

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 21

1    A.    THAT'S CORRECT.

2    Q.    BEFORE YOU SENT THE LETTER DID YOU NEED TO

3  OBTAIN APPROVAL OR HAVE THE LETTER REVIEWED BY ANYONE

4  ELSE AT COMPAQ?

5    A.    I DID HAVE IT REVIEWED AND OBTAIN

6  APPROVAL.  WHETHER OR NOT I NEEDED TO, BY POLICY, I

7  DON'T -- I DON'T KNOW, BUT I WOULD NOT HAVE SENT IT

8  OUT ON MY OWN.

9        I WOULD HAVE -- ALTHOUGH I CAN'T REMEMBER

10 SPECIFICALLY -- CERTAINLY WOULD HAVE REVIEWED IT WITH

11 OUR ATTORNEYS WHO WERE INVOLVED WITH THE TRANSACTION

12 AND WITH MY OWN MANAGEMENT.

13   Q.    AND AS BEST YOU RECALL TODAY, SIR, YOU DID

14 DO THAT.

15   A.    ABSOLUTELY.

16   Q.    DO YOU RECALL THE NAME OR NAMES OF ANY

17 ATTORNEYS WHO MIGHT HAVE BEEN THE ONES WHO REVIEWED

18 IT?

19   A.    I WOULD SAY GREG PHILLIPS.  I CAN'T TELL

20 YOU AT THIS MOMENT WHEN AND WHERE BUT HE WAS, AS I

21 RECALL, A MEMBER OF THE TRANSITION TEAM AND ONE I

22 WOULD HAVE WORKED WITH ON THIS PARTICULAR ISSUE.

23   Q.    I'M SORRY.  WAS HE AN IN-HOUSE ATTORNEY --

24   A.    HE WAS AN IN-HOUSE COMPAQ ATTORNEY.

25   Q.    AND THE TRANSITION THAT YOU'RE REFERRING

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 22

1  TO WAS?

2      A.    THERE WAS -- AFTER THE, I'LL SAY,

3  CONCLUSION OF THE AGREEMENT OR PERHAPS EVEN PRIOR TO

4  THAT A TRANSITION TEAM WAS ESTABLISHED TO INTEGRATE

5  TO THE EXTENT REQUIRED THE INACOM/CUSTOM EDGE WITH

6  COMPAQ.  I WAS ONE MEMBER OF THAT TEAM.

7          GREG, AS I RECALL, WAS A -- THE ATTORNEY

8  AND THERE WERE A NUMBER OF OTHER PEOPLE REPRESENTING

9  OTHER DISCIPLINES IN THE COMPANY.

10     Q.    AND CAN YOU RECALL ANYONE TODAY, SIR,

11 BESIDES MR. PHILLIPS WHO MIGHT HAVE REVIEWED THE

12 LETTER FOR YOU BEFORE IT WAS SENT, WHETHER AN

13 IN-HOUSE ATTORNEY OR MANAGEMENT?

14     A.    WELL, IT WOULD HAVE BEEN -- AGAIN,

15 ALTHOUGH I CAN'T -- I DON'T SPECIFICALLY REMEMBER

16 REVIEWING IT, IT WOULD HAVE BEEN EITHER MY DIRECT

17 MANAGER, MIKE BAKER, WHO WAS CONTROLLER, OR BEN

18 WELLS, WHO WAS THE C.F.O. AT THE TIME.

19         MR. HUNT:  JUST FOR THE RECORD'S CLARITY

20     WAS THAT MIKE BICKER OR BAKER?

21         THE WITNESS:  MIKE BAKER, B A K E R.

22 BY MR. HALLIDAY:

23     Q.    AND WHILE YOU DON'T SPECIFICALLY RECALL

24 IT, IT'S YOUR BELIEF THAT YOU MORE THAN LIKELY WOULD

25 HAVE HAD A LETTER LIKE THIS REVIEWED BEFORE YOU SENT

Case 1:04-cv-00583-GMS    Document 136-2    Filed 03/15/2006    Page 18 of 41

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 23

1  IT.

2      A.    OH, YES.

3      Q.    DO YOU KNOW WHETHER THIS LETTER WAS COPIED

4  TO ANYONE WITHIN COMPAQ AFTER IT WAS SENT BY YOU TO

5  MS. ATCHINSON?

6      A.    I DON'T KNOW.

7      Q.    DO YOU RECALL TALKING TO ANYONE AT ANY

8  TIME WHO WAS AN EMPLOYEE OF LEXMARK ABOUT THIS

9  LETTER?

10      A.    NO.

11      Q.    WHAT WAS YOUR UNDERSTANDING AS TO WHAT

12  YOUR RESPONSIBILITIES WERE GOING TO BE AFTER THE

13  TRANSITION WAS COMPLETED?

14      A.    WELL, LET ME BACK UP A MINUTE.  THE

15  TRANSITION TEAM WAS ESTABLISHED WITH -- AS I

16  MENTIONED, WITH THE INTENT TO INTEGRATE TO THE EXTENT

17  APPROPRIATE INACOM, SLASH, CUSTOM EDGE WITH COMPAQ.

18          AS IT TURNED OUT, THE DECISION WAS MADE

19  THAT THEY WOULD USE THEIR OWN ACCOUNTS PAYABLE

20  SYSTEMS, FOLLOW THEIR OWN PROCEDURES AND WHATNOT; SO

21  MY ROLE AT THAT POINT BECAME ONE OF SUPPORTING THEM

22  IF THEY HAD ANY POLICY, CORPORATE POLICY QUESTIONS,

23  ISSUES OF THAT NATURE.  SO I DIDN'T -- SO I HAD NO

24  DIRECT DAY-TO-DAY INVOLVEMENT IN THEIR OPERATIONS.

25          THEY CAME TO ME BECAUSE THEY HAD CONCERNS

1  WITH SOME OF THEIR SUPPLIERS, AS I SAID EARLIER, WHO

2  WERE RELUCTANT TO SHIP GOODS BECAUSE THEY WERE

3  CONCERNED ABOUT GETTING PAID, AND THAT'S WHAT

4  DEVELOPED INTO THIS COMFORT LETTER.

5       Q.   WHEN YOU SENT THIS LETTER TO MS. ATCHINSON

6  DID YOU HAVE AN UNDERSTANDING WHAT DISPUTE -- DISPUTE

7  MAY BE TOO STRONG OF A WORD -- WHAT CONVERSATIONS OR

8  DISCUSSIONS WERE GOING ON BETWEEN INACOM AND LEXMARK

9  THAT MIGHT REQUIRE THE LETTER?

10      A.   NO.

11      Q.   SO THE REASON THAT MAY HAVE EXISTED FOR A

12 COMFORT LETTER NEEDING TO BE SENT TO LEXMARK IS NOT

13 SOMETHING THAT YOU KNOW ABOUT.

14      A.   NO, NO.

15      Q.   BUT IT IS YOUR RECOLLECTION THAT JOHN

16 FRASCA PREPARED OR DRAFTED AND ASKED YOU TO SEND THIS

17 LETTER TO LEXMARK, CORRECT?

18      A.   THAT IS CORRECT.

19      Q.   AND, AS I THINK YOU SAID, YOU BELIEVE YOU

20 MAY HAVE SENT OTHERS.

21      A.   THAT'S CORRECT.

22      Q.   WHEN YOU SENT THIS LETTER, SIR, IN

23 FEBRUARY OF 2000, DID YOU REVIEW IT AND HAVE AN

24 UNDERSTANDING AS TO ITS IMPORT?

25           MS. DUMAS:   OBJECTION, VAGUE.

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 25

```
 1            MR. FORTE:  OBJECT TO THE FORM.

 2            THE COURT REPORTER:  I'M SORRY.  WHO WAS

 3       SPEAKING?

 4            MR. FORTE:  EARL FORTE.

 5            THE WITNESS:  REPEAT THAT QUESTION,

 6       PLEASE.

 7  BY MR. HALLIDAY:

 8       Q.   WHEN YOU SENT THIS LETTER IN FEBRUARY OF

 9  2000 TO MS. ATCHINSON AT LEXMARK, DID YOU HAVE AN

10  UNDERSTANDING PERSONALLY AS TO ITS IMPORT?

11            MS. DUMAS:  SAME OBJECTION.

12            YOU CAN ANSWER.

13            MR. FORTE:  SAME OBJECTION.  EARL FORTE.

14       A.   WELL, MY UNDERSTANDING WAS THAT, AGAIN,

15  THIS SUPPLIER WAS RELUCTANT TO SHIP GOODS TO CUSTOM

16  EDGE AND JOHN FRASCA AND THOSE FOLKS ASKED THAT WE

17  SEND THIS OUT TO THEM TO GIVE THIS SUPPLIER SOME

18  ASSURANCE OR ENOUGH ASSURANCE, SATISFACTION THAT

19  COMPAQ WAS BEHIND CUSTOM EDGE AND THEIR RECEIVABLES

20  WERE NOT AT RISK ENOUGH TO ALLOW THEM TO SHIP GOODS

21  AND SERVICES AND MATERIALS TO CUSTOM EDGE.

22            I, I DON'T KNOW ANYTHING ABOUT THE DETAILS

23  OF WHAT CAUSED JOHN TO MAKE THE REQUEST.

24       Q.   AND I THINK YOU'VE ALREADY ANSWERED THIS

25  BECAUSE YOU'VE ALREADY TOLD ME YOU HAVEN'T SPOKEN TO
```

Inacom vs. Tech Data    3/2/2005    WILLIAM FRANCIS

Page 30

1    A.    I DON'T THINK THE AGREEMENT DID THAT.

2  THIS WASN'T PART OF THE AGREEMENT.    IT WAS -- AS FAR

3  AS I KNOW, THERE WAS NOTHING IN THE AGREEMENT THAT

4  SAID SOMETHING LIKE THIS WOULD BE SENT OUT.

5    Q.    IF YOU WOULD, SIR, LOOK AT EXHIBIT 3.    I

6  CAN'T TELL IF THAT'S AN ASTERISK OR A LITTLE SQUARE

7  TO THE LEFT BUT IN THE LAST PARAGRAPH THAT BEGINS

8  ALL, QUOTE, HELD CHECKS, CLOSED QUOTES.

9    A.    UH-HUH.

10    Q.    DO YOU KNOW ANYTHING ABOUT -- WELL, DO YOU

11  KNOW WHAT THIS IS REFERRING TO?

12    A.    I DO NOW SINCE MISS DUMAS SHARED WITH ME

13  WHAT THAT'S ABOUT.

14    Q.    WELL, I'M NOT GOING TO ASK YOU WHAT MS.

15  DUMAS SAID OR WHAT Y'ALL TALKED ABOUT.

16    LET ME PUT IT THIS WAY, SIR:    BACK IN

17  FEBRUARY OF 2000 DID YOU HAVE AN UNDERSTANDING AS TO

18  WHAT THE HELD CHECKS REFERRED TO WERE?

19    A.    NO.

20    Q.    AFTER THE CLOSING OF THE TRANSACTION

21  REFERRED TO IN THE ASSET PURCHASE AGREEMENT IN

22  FEBRUARY OF 2000 DID YOU HAVE ANY INVOLVEMENT, SIR,

23  WITH ISSUES RELATING TO INACOM ACCOUNTS PAYABLE?

24    MR. CAINE:    OBJECTION, VAGUE.

25    A.    DID I HAVE ANY INVOLVEMENT WITH INACOM'S

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 31

1    **ACCOUNTS PAYABLE.**

2         Q.    YES, SIR.

3    **A.    NO.**

4         Q.    AFTER THE CLOSING OF THE ASSET PURCHASE

5    AGREEMENT IN FEBRUARY 2000 DID YOU HAVE ANY

6    INVOLVEMENT WITH INACOM ACCOUNTS PAYABLE ASSUMED BY

7    COMPAQ?

8         **A.    NO, I REALLY DIDN'T.**

9         Q.    AT ANY TIME PRIOR TO -- WELL, AT ANY TIME

10   FROM FEBRUARY 16, 2000, TILL YOUR LEAVING COMPAQ'S

11   EMPLOYMENT WERE YOU QUESTIONED BY ANYONE AT COMPAQ

12   REGARDING EXHIBIT NO. 1?

13        **A.    YES.**

14        Q.    BY WHOM, SIR?

15        **A.    I CAN RECALL A CONFERENCE CALL SOMETIME**

16   **AGO WHERE DARRELL RAIFORD AND SOME OTHER FOLKS WERE**

17   **ON THE PHONE ASKING ME ABOUT THIS LETTER.**

18        Q.    DARRELL --

19        **A.    DARRELL RAIFORD WAS THE NORTH AMERICAN**

20   **CONTROLLER AT COMPAQ WHEN I LEFT.**

21        **A.    BUT THIS IS OVER A YEAR AGO, MAYBE TWO**

22   **YEARS NOW.**

23        Q.    HOW DO YOU SPELL HIS LAST NAME, SIR?

24        **A.    R A I F O R D.**

25        MR. HUNT:  I WASN'T EVEN CLOSE.

Inacom vs. Tech Data                      3/2/2005                      WILLIAM FRANCIS

Page 34

```
 1          IT'S NOT CLEAR TO ME FROM THE RECORD

 2      THAT'S BEEN ESTABLISHED WHETHER HE GOT A CALL

 3      AFTER HE WASN'T WORKING AT COMPAQ ANYMORE, WHEN

 4      THE LAWSUIT WAS FILED.  I THINK HE SAID --

 5          MR. HALLIDAY:  I THINK I ASKED INITIALLY

 6      FROM FEBRUARY 16, 2000, TO THE END OF HIS

 7      EMPLOYMENT.

 8          MS. DUMAS:  RIGHT, AND I THINK HE SAID THE

 9      CALL MAY HAVE BEEN A YEAR AGO SO --

10  BY MR. HALLIDAY:

11      Q.   WAS THIS AFTER YOU LEFT?

12      A.   OH, YEAH, THE CALL THAT I'M TALKING ABOUT

13  WAS AFTER I LEFT.

14          MR. HALLIDAY:  THANK YOU.

15          MR. HUNT:  BECAUSE YOU LEFT IN APRIL 2001.

16          THE WITNESS:  RIGHT.  THAT'S WHY I SAID I

17      WAS SURPRISED TO GET A CALL.  I WASN'T AN

18      EMPLOYEE OF COMPAQ AT THE TIME.

19          MR. HALLIDAY:  THANK YOU.  I DID

20      MISUNDERSTAND.

21  BY MR. HALLIDAY:

22      Q.   LET ME JUST BACK UP AND BE SURE I'VE GOT

23  IT RIGHT NOW.

24      A.   OKAY.

25      Q.   DO YOU RECALL HAVING A CONVERSATION
```

Inacom vs. Tech Data                 3/2/2005                        WILLIAM FRANCIS

Page 35

1   BETWEEN FEBRUARY 16, 2000, AND THE DATE THAT YOUR

2   EMPLOYMENT WITH COMPAQ ENDED REGARDING THE FEBRUARY

3   16, 2000, LETTER, EXHIBIT 1?

4        A.   WITH ANYONE AT COMPAQ OR --

5        Q.   LET'S START THERE.  WITH ANYONE AT COMPAQ.

6        A.   NOT, NOT SPECIFICALLY OTHER THAN A CALL

7   FROM JOHN FRASCA WHO WANTED ONE FOR SOME SUPPLIER

8   OR -- YOU KNOW, ONLY IN THAT CONTEXT.

9             I MEAN, ONCE WE SENT OUT THE LETTERS TO

10  THE SUPPLIERS HE NOTED AND ON OCCASION HE WOULD CALL

11  BACK UP OR SEND ME AN E-MAIL AND SAY I HAVE ANOTHER

12  SUPPLIER WHO'S GOT THE SAME CONCERN, CAN YOU SEND HIM

13  A LETTER, THAT'S -- THOSE ARE THE ONLY CONVERSATIONS

14  I HAD.

15       Q.   SO AT THE TIME OF YOUR DEPARTURE FROM

16  COMPAQ YOU WERE NOT AWARE OF AN ISSUE --

17       A.   NO.

18       Q.   JUST A MINUTE -- RELATING TO THE MATTERS

19  DISCUSSED IN THE FEBRUARY 16, 2000, LETTER,

20  EXHIBIT 1.

21       A.   THAT'S CORRECT.

22            MR. HALLIDAY:  LET'S TAKE A FIVE-MINUTE

23       BREAK AND I WILL WRAP UP.

24            THE WITNESS:  OKAY.

25       (A RECESS WAS TAKEN FROM 10:49 A.M. TO 11:07

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 38

1  PAYABLE OPERATION THERE WERE PROBABLY A TOTAL OF 300

2  OR SO.

3       Q.    I BELIEVE I'M CORRECT IN STATING THAT YOU

4  PREVIOUSLY TESTIFIED THAT THERE WERE SEVERAL PEOPLE

5  FROM COMPAQ ON A TRANSITION TEAM FOR THE INACOM/

6  CUSTOM EDGE MERGER?

7       A.    THAT'S CORRECT.

8       Q.    WERE THERE ANY PERSONNEL FROM CUSTOM EDGE

9  ALSO ON THAT TRANSITION TEAM, IF YOU RECALL?

10      A.    I CAN'T RECALL VERY MANY SPECIFICS.  THERE

11 WERE SOME AND IT WOULD HAVE BEEN THE COUNTERPART OF

12 THE FUNCTIONAL COMPAQ PERSON.  JAY SAMUELSON COMES TO

13 MIND AS THE A.P. CONTACT FOR CUSTOM EDGE.

14           THE OTHER DISCIPLINES I WASN'T INVOLVED

15 WITH SO I DON'T KNOW WHO THEY WERE.

16      Q.    MR. FRANCIS, DID THE TRANSITION TEAM MEET

17 ON A REGULAR BASIS?

18      A.    YES.

19      Q.    WERE THESE PERIODIC MEETINGS ON A WEEKLY

20 BASIS, FOR EXAMPLE, OR SOME OTHER PERIODS OR AS

21 NEEDED?

22      A.    I WOULD HAVE TO SAY AS NEEDED, AS I

23 RECALL.

24      Q.    I SUPPOSE THIS QUESTION MAY BE JUST OUT OF

25 MY IGNORANCE, NOT HAVING REALLY BEEN A WORKING PERSON

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 39

1   IN THE BUSINESS WORLD BUT LET ME GIVE IT A TRY THIS

2   WAY:

3           DID THE TRANSITION TEAM MEET ON A FORMAL

4   BASIS WHERE THERE HAD TO BE A CERTAIN MINIMUM NUMBER

5   OF PEOPLE BEFORE A MEETING COULD CONVENE?

6       A.   NO, THERE WAS NO REQUIRED MINIMUM QUORUM-

7   TYPE SITUATION THAT I'M AWARE OF.

8       Q.   DID PEOPLE MEET AND HAVE MINUTES OF THEIR

9   MEETINGS TAKEN BY A SECRETARY OR SOME RECORDING

10  PERSON?

11      A.   I DO NOT RECALL ANY RECORDING PERSON.  THE

12  INDIVIDUALS TOOK THEIR OWN NOTES REGARDING THEIR

13  SPECIFIC AREAS OF RESPONSIBILITY BUT THAT'S THE

14  EXTENT THAT I CAN RECALL.

15          MR. HUNT:  I WOULD LIKE TO, MADAM

16          REPORTER, ASK THAT BE MARKED AS THE NEXT

17          EXHIBIT 4, PLEASE.

18          (FRANCIS EXHIBIT NO. 4 WAS MARKED BY THE

19  REPORTER.)

20  BY MR. HUNT:

21      Q.   WOULD YOU PLEASE LOOK AT EXHIBIT 4, MR.

22  FRANCIS.

23      A.   OKAY.

24      Q.   AND FOR THE BENEFIT OF THE ATTORNEYS ON

25  THE PHONE, I'LL SAY THAT EXHIBIT 4 IS A LETTER

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 40

1  FROM -- APPEARS TO BE A LETTER FROM MR. FRANCIS AT

2  COMPAQ TO TECH DATA CORPORATION DATED FEBRUARY -- IS

3  THAT 17, MR. FRANCIS?

4       A.   16.

5       Q.   FEBRUARY 16, 2000.

6       A.   RIGHT.

7       Q.   CAN YOU IDENTIFY WHETHER THAT'S YOUR

8  SIGNATURE ON THE LETTER, MR. FRANCIS?

9       A.   YES, IT IS.

10      Q.   DOES THE LETTER APPEAR TO BE SIMILAR TO

11 WHAT WAS MARKED AS EXHIBIT 1, THE LETTER DATED

12 FEBRUARY 16 FROM YOURSELF TO LEXMARK INTERNATIONAL?

13      A.   YES.

14      Q.   SO SOME OF THE QUESTIONS I MAY HAVE MAY

15 APPEAR TO BE REDUNDANT AND I APOLOGIZE IN ADVANCE FOR

16 THAT.

17           DID YOU RECEIVE THIS FORM OF LETTER AS

18 WELL FROM AND AT THE REQUEST OF MR. FRASCA?

19      A.   I DON'T RECALL.  I DON'T RECALL WHETHER HE

20 ACTUALLY SENT ME THE ENTIRE LETTER OR JUST GAVE ME

21 THE ADDRESS AND THE CONTACT THAT WE WOULD USE.

22      Q.   DO YOU RECALL WHETHER YOU WOULD THEN HAVE

23 DRAFTED THIS LETTER YOURSELF IF IT WASN'T GIVEN TO

24 YOU BY SOMEONE ELSE?

25      A.   NO.  THIS WAS -- AS I MENTIONED EARLIER,

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 41

1    THIS IS OUR STANDARD COMFORT LETTER THAT WE USED WITH

2    THE SUPPLIERS OF CUSTOM EDGE.

3        Q.    AND WHERE WOULD THE STANDARD BLANK FORM OF

4    THE LETTER THEN COME FROM?

5        A.    WELL, MY ADMIN JUST HAD IT IN THEIR WORD

6    PROCESSOR IN THEIR COMPUTER.

7        Q.    FOR EXHIBIT 4 DID YOU SIMILARLY OBTAIN

8    APPROVAL FROM ANYONE BEFORE YOU WOULD HAVE SENT THIS

9    LETTER OUT?

10       A.    NO.

11       Q.    SO YOU WOULD HAVE UNDERTAKEN TO SEND THIS

12   LETTER OUT YOURSELF?

13       A.    YES.

14       Q.    AND WOULD THIS LETTER HAVE BEEN A TOPIC OF

15   ANYTHING AT ONE OF THE TRANSITION TEAM MEETINGS?

16       A.    IT MIGHT HAVE BEEN.  I DON'T RECALL BUT IT

17   MIGHT HAVE BEEN.

18       Q.    WHY WOULD YOU HAVE OBTAINED APPROVAL FOR

19   THE LEXMARK LETTER AND NOT FOR THE TECH DATA LETTER?

20       A.    I DON'T RECALL THAT I OBTAINED APPROVAL

21   SPECIFICALLY FOR THE LEXMARK LETTER BUT I WOULD HAVE

22   OBTAINED APPROVAL FOR THE LETTER ITSELF, NOT KNOWING

23   NECESSARILY AT THAT TIME WHO IT WOULD HAVE GONE TO.

24       Q.    DO YOU RECALL WHETHER THE LETTER WAS

25   ALTERED OR CHANGED BY ANY OF THE PEOPLE WHO REVIEWED

Inacom vs. Tech Data                  3/2/2005                          WILLIAM FRANCIS

Page 47

1      A.   YES.

2      Q.   DID YOU HAVE ANY INVOLVEMENT ON BEHALF OF

3   HEWLETT PACKARD OR COMPAQ WITH INACOM'S BANKRUPTCY

4   CASE?

5      A.   NO.

6      Q.   HAVE YOU EVER BEEN INVOLVED IN ANY S.E.C.

7   INVESTIGATIONS?

8      A.   NO.

9      Q.   JUST BEAR WITH ME A MOMENT.  CAN YOU

10  IDENTIFY THE NAME DAVID GUENTHNER FOR ME?

11     A.   IT DOES NOT RING ANY BELLS AT ALL.

12     Q.   MR. FRANCIS, CAN YOU TELL ME WHETHER YOUR

13  OPERATION FROM COMPAQ WAS ON AMICABLE TERMS?

14     A.   YES, IT WAS.

15     Q.   DO YOU HAVE A RETENTION AGREEMENT WITH

16  MISS DUMAS OR HER FIRM FOR HER REPRESENTATION OF YOU

17  TODAY?  HAVE YOU SIGNED A LETTER?

18     A.   I HAVEN'T SIGNED ANY AGREEMENTS.

19     Q.   ARE THE SERVICES BEING PROVIDED FOR YOU

20  COMPLIMENTARY, AS FAR AS YOU KNOW?

21     A.   I NEVER HAD A CONVERSATION ABOUT IT SO I

22  DON'T -- I DON'T KNOW THAT EITHER.

23     Q.   MR. FRANCIS, YOU INDICATED THAT YOU LIVE

24  IN CLERMONT, FLORIDA?

25     A.   CLERMONT, RIGHT, THAT'S CORRECT.

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

1       A.    WELL, THEY WEREN'T, AS FAR AS I KNEW AT

2   THE TIME.

3       Q.    I BELIEVE YOU TESTIFIED EARLIER THAT THE

4   COMFORT LETTER TO LEXMARK, THE ONE THAT YOU

5   SPECIFICALLY REMEMBER, YOU PUT THAT IN THE MAIL

6   YOURSELF OR ARRANGED FOR IT TO BE MAILED YOURSELF.

7           DID YOU AUTHORIZE ANYBODY ELSE TO SEND THE

8   OTHER COMFORT LETTERS?

9       A.    NO.

10      Q.    SO TO YOUR KNOWLEDGE THE PERSON WHO SENT

11  ALL THE COMFORT LETTERS WAS YOU.

12      A.    I OR MY ADMIN, YES.  LET ME CLARIFY THAT.

13  THOSE THAT I SIGNED.

14      Q.    UNDERSTOOD.  DO YOU RECALL WHETHER YOU

15  EVER SIGNED A COMFORT LETTER ADDRESSED TO LOGICARE OR

16  RESILIEN?

17      A.    I, I DON'T RECALL.

18      Q.    YOU DON'T RECALL ONE WAY OR THE OTHER.

19      A.    THAT'S CORRECT.

20      Q.    THE EXHIBIT NO. 2 IS ADDRESSED TO -- OR IT

21  SAYS, "DEAR CHRIS AND BILL".  DO YOU HAVE ANY IDEA

22  WHO CHRIS AND BILL ARE?

23      A.    NO.

24      Q.    DID THE SIGNED COMFORT LETTERS THAT YOU

25  RECALL SENDING OUT GO ON CUSTOM EDGE LETTERHEAD?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 53

```
 1        A.    AS I RECALL, IT WAS COMPAQ LETTERHEAD.

 2        Q.    COMPAQ LETTERHEAD?

 3        A.    I BELIEVE SO.

 4        Q.    JUST BECAUSE I'M ON THE PHONE AND I CAN'T

 5   SEE EXHIBITS NO. 1 AND NO. 4, COULD YOU LOOK AT THOSE

 6   AND TELL ME WHETHER THEY'RE ON COMPAQ LETTERHEAD?

 7        A.    1 WAS ON COMPAQ LETTERHEAD AND 4 WAS ON

 8   COMPAQ LETTERHEAD.

 9        Q.    THANK YOU.  BEFORE, IN SPEAKING WITH MR.

10   HALLIDAY, YOU DISCUSSED WHAT YOUR UNDERSTANDING WAS

11   OF WHY THE COMFORT LETTERS WERE SENT.

12              COULD YOU ELABORATE ON THAT A LITTLE BIT?

13   I BELIEVE YOU STATED THAT YOU WERE INFORMED BY MR.

14   FRASCA THAT SOME SUPPLIERS WERE UNWILLING TO SHIP

15   GOODS TO CUSTOM EDGE.  IS THAT CORRECT?

16        A.    THAT IS CORRECT.

17        Q.    DID MR. FRASCA TELL YOU WHY THAT WAS THE

18   CASE?

19        A.    I REALLY DON'T RECALL ALL OF THE DETAILS

20   OF THE CONVERSATION.

21        Q.    DID YOU ASK HIM WHY THE SUPPLIERS WERE NOT

22   WILLING TO SHIP?

23        A.    I MAY HAVE.

24        Q.    AND YOU DON'T RECALL ASKING AND I GATHER

25   THAT YOU DON'T RECALL, IF YOU DID ASK, WHAT HIS
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 54

1  ANSWER WOULD HAVE BEEN?

2       **A.   NO, I REALLY -- I REALLY DON'T REMEMBER**

3  **THAT CONVERSATION.   THAT WAS FIVE YEARS AGO AND I**

4  **KNOW WE TALKED ABOUT IT, I KNOW THEIR SUPPLIERS WERE**

5  **UNWILLING TO SHIP, YOU KNOW.   BEYOND THAT, I DON'T**

6  **RECALL ANY DETAILS SPECIFIC TO ANY SUPPLIER AS TO WHY**

7  **THEY WOULDN'T SHIP.**

8       Q.   DO YOU KNOW ANYTHING ABOUT WHY CUSTOM EDGE

9  AGREED TO ASSUME OBLIGATIONS TO PAY OFF CERTAIN

10 ACCOUNTS OF INACOM?

11           MR. FORTE:  I'LL OBJECT TO THE FORM.

12           MS. DUMAS:  SAME OBJECTION.

13           THE COURT REPORTER:  I'M SORRY; WHO WAS

14      SPEAKING?

15           MR. FORTE:  EARL FORTE.

16           MS. DUMAS:  SAME OBJECTION.

17 BY MR. COLLINS:

18      Q.   IF YOU UNDERSTAND MY QUESTION, YOU CAN

19 ANSWER IT.

20      **A.   COULD YOU REPEAT IT, PLEASE, PAT?**

21      Q.   DO YOU KNOW WHAT THE REASONING WAS FOR WHY

22 CUSTOM EDGE DID WHAT -- REFERRING TO PARAGRAPH 2 OF

23 EXHIBIT NO. 2, WHY CUSTOM EDGE WOULD HAVE ASSUMED THE

24 OBLIGATION TO PAY OFF OUTSTANDING AMOUNTS TO

25 CREDITORS OF INACOM?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 56

```
 1          A.    YES, I DO.

 2          Q.    DO YOU HAVE ANY UNDERSTANDING AS TO WHY

 3   CUSTOM EDGE ASSUMED TO PAY -- ASSUMED THE OBLIGATION

 4   TO PAY ALL OF THE OUTSTANDING AMOUNTS OF THE

 5   REFERENCED ACCOUNT IN EXHIBIT NO. 1?

 6               MR. CAINE:  OBJECTION.  NO FOUNDATION.

 7               MS. DUMAS:  SAME OBJECTION.

 8          A.    AGAIN, MY UNDERSTANDING IS THAT WITHOUT

 9   HAVING THE ABILITY TO REFER TO THE ASSET AGREEMENT, I

10   CAN'T ANSWER YOUR QUESTION.

11               MY UNDERSTANDING IS THAT WE -- FOR SOME

12   SPECIFIC SUPPLIERS THERE WERE SPECIFIC ASSETS

13   PURCHASED AND THE LIABILITIES ASSOCIATED WITH THOSE

14   ASSETS, CUSTOM EDGE, SLASH, COMPAQ ASSUMED.

15               OTHER THAN THAT IT WAS ON A GOING-FORWARD

16   BASIS FROM THE DATE OF THE AGREEMENT.  NOW, THERE

17   WAS -- MAY HAVE BEEN A LITTLE FINE-TUNING IN THAT,

18   BUT ESSENTIALLY THAT WAS MY UNDERSTANDING.

19          Q.    AND WITH RESPECT TO THE FORMER, WITH

20   RESPECT TO THE CERTAIN ASSETS ASSUMED ALONG WITH

21   LIABILITIES DO YOU KNOW WHAT THE REASONING WAS FOR

22   THAT DECISION?

23          A.    NO.

24               MS. DUMAS:  OBJECTION.  LACKS FOUNDATION.

25          Q.    I'M SORRY.  DID YOU SAY NO?
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 58

```
 1        Q.    LOOKING AT THE THIRD BULLET POINT OF THE
 2   SECOND PARAGRAPH OF EXHIBIT NO. 3, IT STATES, "COMPAQ
 3   IS ASSUMING THE OPEN ACCOUNTS PAYABLE BUT NOT THE --"
 4   QUOTE, HELD CHECKS, UNQUOTE, PERIOD.
 5             DO YOU KNOW WHAT THE REFERENCE TO HELD
 6   CHECKS IS IN THAT SENTENCE?
 7        A.    ONLY SINCE YESTERDAY WHEN I WAS GIVEN SOME
 8   INFORMATION REGARDING WHAT THE HELD CHECKS SITUATION
 9   WAS.
10        Q.    DO YOU RECALL EVER HAVING ANY
11   CONVERSATIONS WITH JOHN FRASCA OR ANYONE AT INACOM
12   ABOUT HELD CHECKS?
13        A.    NO.
14        Q.    DID YOU EVER HAVE ANY CONVERSATIONS WITH
15   MR. OSHLO ABOUT HELD CHECKS?
16        A.    I DON'T RECALL EVER TALKING WITH HIM.  I
17   DON'T EVEN RECOGNIZE THE NAME.
18        Q.    I'M REFERRING TO THE NAME IN THE FOURTH
19   BULLET POINT OF PARAGRAPH 2, EXHIBIT NO. 3, MR.
20   RICHARD OSHLO.
21        A.    YEAH, CORRECT.  I DON'T RECALL EVER
22   TALKING WITH HIM.
23        Q.    HAVE YOU EVER SPOKEN WITH ANY
24   REPRESENTATIVE OF LOGICARE OR RESILIEN?
25        A.    NOT THAT I CAN RECALL.
```

Inacom vs. Tech Data                    3/2/2005                         WILLIAM FRANCIS

Page 59

1      Q.    HAVE YOU EVER COMMUNICATED IN ANY WAY

2    OTHER THAN ORAL CONVERSATION, CORRESPONDED WITH

3    ANYONE AT INACOM OR RESILIEN?

4      A.    AGAIN, NOT THAT I CAN RECALL.

5      Q.    WERE YOU INVOLVED OR DID YOU HAVE ANY

6    KNOWLEDGE WITH WHAT WAS DONE BY INACOM WITH THE

7    PROCEEDS OF THE PURCHASE PRICE PAID BY COMPAQ IN

8    CONNECTION WITH THE ASSET PURCHASE AGREEMENT?

9      A.    I HAVE NO IDEA.

10     Q.    YOU WERE NOT PART OF ANY CONVERSATIONS OR

11   DISCUSSIONS ON THAT TOPIC?

12     A.    NONE AT ALL.

13     Q.    OTHER THAN THE COMFORT LETTERS IN THE

14   FORMS OF EXHIBIT NO. 1 AND 4, ARE YOU AWARE OF ANY

15   OTHER TYPES OF LETTERS SENT TO INACOM SUPPLIERS IN

16   CONNECTION WITH THE ASSET PURCHASE AGREEMENT?

17     A.    NOT THAT I KNOW OF, NO.

18     Q.    SO THE ONLY CORRESPONDENCE THAT YOU'RE

19   AWARE OF GOING TO INACOM SUPPLIERS IN CONNECTION WITH

20   THE ASSET PURCHASE AGREEMENT WERE THE COMFORT

21   LETTERS?

22     A.    YES.  AGAIN, ONLY TO THOSE SELECTED

23   SUPPLIERS IDENTIFIED BY JOHN FRASCA.

24     Q.    DO YOU KNOW WHY JOHN SELECTED THOSE

25   SUPPLIERS?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 60

```
 1        A.     BECAUSE THOSE WERE THE, THE FOLKS WHO HAD

 2   A RELUCTANCE TO, TO SHIP PARTS AND MATERIAL.  THAT'S

 3   MY UNDERSTANDING.

 4        Q.    AND PARTS AND MATERIAL TO CUSTOM EDGE.

 5        A.    YES.

 6             MR. COLLINS:  I HAVE NO FURTHER QUESTIONS.

 7   THANK YOU, MR. FRANCIS.

 8             THE WITNESS:  YOU'RE WELCOME.

 9             MR. LANDON:  THIS IS JAMES LANDON FOR

10   DELL.  IF IT'S OKAY, I JUST HAVE A COUPLE

11   QUESTIONS.  IS THAT OKAY WITH EVERYBODY?

12             MR. FORTE:  YES.

13                    CROSS EXAMINATION

14   BY MR. LANDON:

15        Q.    MR. FRANCIS, MY NAME IS JAMES LANDON AND

16   I'M AN ATTORNEY FOR DELL, INC.  HOW ARE YOU?

17        A.    GOOD, THANK YOU.

18        Q.    I JUST HAVE A COUPLE QUESTIONS FOR YOU.

19             DO YOU RECALL ONE OF THESE SO-CALLED

20   COMFORT LETTERS BEING SENT TO DELL OR ANY AFFILIATE

21   OF DELL?

22        A.    NOT THAT I CAN RECALL.

23        Q.    DO YOU HAPPEN TO RECALL ANY CONVERSATIONS

24   CONCERNING DELL?

25        A.    NO.
```

Inacom vs. Tech Data                3/2/2005                    WILLIAM FRANCIS

Page 63

1   INACOM ON THE ONE HAND AND COMPAQ OR C.E.I. ON THE

2   OTHER WHEREBY FUNDS FROM THE SALE TO COMPAQ-C.E.I.

3   WOULD BE SEGREGATED OR SEPARATED BY INACOM TO PAY

4   OUTSTANDING BILLS TO DELL, ITS AFFILIATES OR ANY

5   OTHER SUPPLIERS OF INACOM?

6        A.   NO.

7        Q.   NOW, YOU USED A TERM IN RESPONSE TO ONE OF

8   MR. PATRICK'S (SIC) QUESTIONS; I THINK YOU SAID IT

9   WAS A STRICTLY GOING-FORWARD SITUATION.  DID I

10  REMEMBER IT CORRECTLY?

11       A.   YES.

12       Q.   WHAT DID YOU MEAN BY THAT?

13       A.   WELL, AS OF THE DATE OF THE AGREEMENT IN

14  AN IDEAL WORLD, ANY MATERIALS THAT HAD BEEN SHIPPED

15  WOULD HAVE BEEN PAID FOR BY INACOM AND ANY MATERIALS

16  SHIPPED AND RECEIVED AFTER THAT DATE USED BY CUSTOM

17  EDGE WOULD BE THE RESPONSIBILITY OF CUSTOM EDGE.

18       Q.   ALL RIGHT.

19       A.   SO THAT'S HOW I WOULD DESCRIBE THAT.

20            MR. FORTE:  OKAY.  I HAVE NO FURTHER

21       QUESTIONS OF THE WITNESS.  THANK YOU, MR.

22       FRANCIS.

23            THE WITNESS:  YOU'RE WELCOME.

24            MS. DUMAS:  MR. CAINE, DO YOU HAVE ANY

25       QUESTIONS FOR THE WITNESS?

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 64

```
 1              MR. CAINE:  NO.

 2              MS. DUMAS:  OKAY.  I WOULD LIKE TO TAKE A

 3         FEW MINUTES AND ASK SOME QUESTIONS.

 4                     CROSS EXAMINATION

 5    BY MS. DUMAS:

 6         Q.    MR. FRANCIS, AS YOU KNOW, I REPRESENT

 7    HEWLETT PACKARD COMPANY.  AS THE RESULT OF A MERGER

 8    THAT OCCURRED AFTER THE TIME PERIOD IN WHICH WE'VE

 9    BEEN DISCUSSING COMPAQ COMPUTER CORPORATION MERGED

10    WITH HEWLETT PACKARD COMPANY, SO ALTHOUGH I REPRESENT

11    H.P., I'M GOING TO REFER TO MY CLIENT AS COMPAQ

12    BECAUSE THAT WAS THE ENTITY INVOLVED IN THESE

13    TRANSACTIONS.  IS THAT A FAIR --

14         A.    YES.

15         Q.    -- UNDERSTANDING?

16         A.    YES.

17         Q.    THANK YOU.  MR. FRANCIS, I BELIEVE YOU

18    PREVIOUSLY TESTIFIED THAT WHEN MR. FRASCA ASKED YOU

19    TO DELIVER THESE COMFORT LETTERS YOU HAD NOT BEEN

20    AWARE OF THE SO-CALLED HELD CHECKS; IS THAT CORRECT?

21         A.    THAT'S CORRECT.

22         Q.    AND YOU DIDN'T BECOME AWARE OF EVEN THE

23    TERM "HELD CHECKS" UNTIL YOU AND I MET YESTERDAY; IS

24    THAT CORRECT?

25         A.    THAT'S CORRECT.
```

Inacom vs. Tech Data                3/2/2005                WILLIAM FRANCIS

Page 68

```
 1                RECROSS EXAMINATION

 2   BY MR. COLLINS:

 3        Q.    REFERRING TO THE SECOND PARAGRAPH OF

 4   EXHIBIT NO. 1, WERE YOU EVEN THINKING ABOUT HELD

 5   CHECKS AT ALL IN CONNECTION WITH THAT -- WHEN YOU

 6   WROTE THAT PARAGRAPH OR SENT OUT THAT LETTER?

 7        A.    FIRST, I DIDN'T WRITE IT.  IT WAS JOHN

 8   FRASCA; AND TO ANSWER YOUR QUESTION, I DIDN'T KNOW

 9   ANYTHING ABOUT HELD CHECKS AT THE TIME THESE LETTERS

10   WERE SENT.

11        Q.    SO WHEN MISS DUMAS ASKED YOU WHETHER YOU

12   INTENDED BY THAT PARAGRAPH TO OBLIGATE CUSTOM EDGE TO

13   PAY HELD CHECKS, YOU ANSWERED NO, THAT'S SOMETHING

14   YOU DIDN'T KNOW ABOUT ONE WAY OR ANOTHER.

15        A.    I DIDN'T HAVE ANY KNOWLEDGE ABOUT THE HELD

16   CHECK SITUATION AT ALL.

17        Q.    THANK YOU.  AND MISS DUMAS ALSO ASKED YOU

18   ABOUT WHETHER YOU INTENDED PARAGRAPH 2 OF THE COMFORT

19   LETTERS TO COVER SITUATIONS WHERE THE SUPPLIER MAY

20   HAVE BEEN PAID BUT THEN LATER ASKED TO RETURN THE

21   MONEY IN THE CONTEXT OF THE BANKRUPTCY CASE.

22             WAS THAT A SITUATION THAT YOU WERE EVEN

23   CONTEMPLATING WHEN THESE COMFORT LETTERS WERE SENT

24   OUT?

25        A.    NO.
```

Inacom vs. Tech Data                    3/2/2005                    WILLIAM FRANCIS

Page 70

```
 1          I THINK -- AND I HAVEN'T ASKED THE

 2     QUESTION YET -- THAT EITHER YOU HAD THE

 3     AUTHORITY TO SEND THEM AND SIGN THEM OR YOU

 4     DIDN'T, AND THAT'S WHY YOU EITHER GOT APPROVAL

 5     OR YOU DIDN'T, SO LET ME ASK YOU TO THINK ABOUT

 6     THAT FOR A MOMENT.

 7          MS. DUMAS:  THERE'S NO QUESTION PENDING --

 8          MR. CAINE:  THERE'S NO --

 9          MR. DUMAS:  -- MR. FRANCIS.

10          MR. CAINE:  -- QUESTION PENDING, AND I

11     COMPLETELY DISAGREE WITH --

12          MS. DUMAS:  AND I --

13          MR. CAINE:  -- COUNSEL'S CHARACTERIZATION.

14          MS. DUMAS:  OBJECTION TO THE BADGERING OF

15     THE WITNESS AND ANY IMPLICATION THAT THE

16     WITNESS' TESTIMONY HAS BEEN ANYTHING OTHER THAN

17     FULLY TRUTHFUL AND RESPONSIVE.

18          MR. CAINE:  AND CONSISTENT.

19               RECROSS EXAMINATION

20     BY MR. HUNT:

21     Q.   NOW, MR. FRANCIS, WOULD YOU HAVE SENT

22     EXHIBITS 1 AND 4 OUT IF YOU DIDN'T HAVE THE AUTHORITY

23     TO SIGN THEM?

24     A.   I HAD AUTHORITY TO SIGN THESE LETTERS.

25     THE QUESTION WAS DID I HAVE THE AUTHORITY TO COMMIT
```

Inacom vs. Tech Data                 3/2/2005                    WILLIAM FRANCIS

Page 71

```
 1  COMPAQ TO ASSUME OTHER LIABILITIES AND MY ANSWER WAS

 2  NO, I DID NOT HAVE THAT LEVEL OF AUTHORITY.  THAT'S

 3  NOT WHAT THIS LETTER WAS INTENDED TO DO.

 4           MR. HUNT:  WE CAN READ BACK MR. CAINE'S

 5       QUESTION BUT IT WAS GROUNDED IN THE TERMS OF

 6       THE LETTER AND THAT'S WHY I'M POSING THIS

 7       FOLLOW-UP QUESTION.  I'LL LIMIT MY QUESTION TO

 8       WHAT WAS ASKED AND ANSWERED THEN, AND I HAVE

 9       NOTHING FURTHER.  THANK YOU.

10           MS. DUMAS:  ANYBODY ON THE PHONE?  I THINK

11       WE'RE DONE.

12           MR. FORTE:  NO QUESTIONS MORE FROM ME,

13       EARL FORTE.

14           MR. LANDON:  NONE FROM JAMES LANDON.

15           MR. HUNT:  NO QUESTIONS FURTHER FROM THE

16       PHONE?

17           MR. COLLINS:  NO.

18           MR. FORTE:  NO.

19           MR. HALLIDAY:  I THINK WE'RE DONE.  THANK

20       YOU, MR. FRANCIS.

21           THE WITNESS:  THANK YOU.

22           MR. FORTE:  THIS IS EARL FORTE.  I'D JUST

23       LIKE TO TELL THE COURT REPORTER WHAT KIND OF

24       TRANSCRIPT I WANT.  A MINISCRIPT AND AN ASCII

25       DISK AND HARD COPIES OF THE EXHIBITS.
```