## 2. JOHN T. FRASCA

| PAGE:LINE | PAGE:LINE |
|-----------|-----------|
| 8:9-8:11 | 39:24-40:4 |
| 8:19-8:23 | 41:20-41:23 |
| 10:19-10:21 | 42:10-43:6 |
| 11:17-11:25 | 43:10-44:15 |
| 12:4-12:10 | 44:21-44:25 |
| 12:22-13:1 | 59:19-59:20 |
| 14:12-14:14 | 59:23-60:4 |
| 15:2-15:4 | 66:20-67:8 |
| 22:13-22:18 | 68:13-68:17 |
| 29:22-30:2 | 69:5-70:5 |
| 32:10-32:14 | 70:10-70:22 |
| 35:9-35:16 | 70:25-71:6 |
| 36:20-37:1 | 71:8-71:10 |
| 37:10 | 71:12-71:17 |
| 38:16-38:20 | 72:1-72:4 |
| 39:5-39:18 | 79:14-79:19 |

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

In Re:  INACOM CORP, et al.        Chapter 11
    Debtors                        Bankruptcy Case No.
                                   00-2426 (PJW)
_____

INACOM CORP., et al.
        Plaintiffs
    v.
TECH DATA CORPORATION              Civil Action No.
        Defendant                  04-CV-148 (GMS)
_____

INACOM CORP., et al.
        Plaintiffs
    v.
DELL COMPUTER CORP.                Civil Action No.
        Defendant                  04-CV-582 (GMS)
_____

INACOM CORP., et al.
        Plaintiffs
    v.
LEXMARK INTERNATIONAL, INC.        Civil Action No.
        Defendant                  04-CV-583 (GMS)
_____

INACOM CORP., et al.
        Plaintiffs
    v.
RESILIEN, INC.                     Civil Action No.
        Defendant                  04-CV-584 (GMS)
_____

INACOM CORP., et al.
        Plaintiffs
    v.                             Civil Action No.
INGRAM ENTERTAINMENT INC.          04-CV-593 (GMS)
        Defendant


*************************************************************

ORAL DEPOSITION OF

JOHN T. FRASCA

MARCH 30, 2005

*************************************************************

ORAL DEPOSITION OF JOHN T. FRASCA, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 30th day of March, 2005, from 9:26 a.m. to 11:43 a.m., before Debbie Leonard, CSR, RMR, CRR, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Hewlett-Packard, 20555 State Highway 249, Building CC-A6, Conference Room 6801, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
1                      A P P E A R A N C E S

2   FOR THE PLAINTIFF:
        Mr. Andrew W. Caine
3       (via telephone)
        PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB
4       10100 Santa Monica Boulevard
        11th Floor
5       Los Angeles, California 90067
        FAX:  (310) 201-0760
6       PHONE:  (310) 277-6910

7   FOR THE DEFENDANT, TECH DATA CORPORATION:
        Mr. Stephen C. Hunt
8       ADORNO & YOSS
        350 East Las Olas Boulevard
9       Suite 1700
        Fort Lauderdale, Florida 33301
10      FAX:  (954) 766-7800
        PHONE:  (954) 763-1200
11
    FOR THE DEFENDANT, DELL COMPUTER CORP.:
12      Mr. G. James Landon
        HUGHES LUCE, LLP
13      111 Congress Avenue
        Suite 900
14      Austin, Texas 78701
        FAX:  (512) 482-6859
15      PHONE:  (512) 482-6880

16  FOR THE DEFENDANT, LEXMARK INTERNATIONAL, INC.:
        Mr. Culver V. Halliday
17      STOLL, KEENON & PARK, LLP
        2650 Aegon Center
18      400 West Market Street
        Louisville, Kentucky 40202-3377
19      FAX:  (502) 568-5700
        PHONE:  (502) 568-9100
20
    FOR THE DEFENDANT, INGRAM ENTERTAINMENT:
21      Mr. Jonathan P. Hersey
        (via telephone)
22      BINGHAM McCUTCHEN, LLP
        600 Anton Boulevard
23      18th Floor
        Costa Mesa, California 92626
24      FAX:  (714) 830-0719
        PHONE:  (714) 830-0619
25
```

```
 1              A P P E A R A N C E S
                    (Continued)
 2
    FOR EXECUTIVE SOUNDING BOARD, INC., LIQUIDATING AGENTS
 3  OF DEBTOR, INACOM CORP.:

 4       Mr. Earl M. Forte
         (via telephone)
 5       BLANK ROME, LLP
         One Logan Square
 6       18th & Cherry Streets
         Philadelphia, Pennsylvania 19103
 7       FAX:  (215) 832-5618
         PHONE:  (215) 569-5618
 8
    FOR THE WITNESS AND THIRD-PARTY DEFENDANT, COMPAQ
 9  COMPUTER CORPORATION:

10       Ms. Cecily A. Dumas
         FRIEDMAN, DUMAS & SPRINGWATER, LLP
11       One Maritime Plaza
         Suite 2475
12       San Francisco, California 94111
         FAX:  (415) 834-1044
13       PHONE:  (415) 834-3800

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                                                   PAGE

 3   Appearances..................................     2

 4
     JOHN T. FRASCA
 5

 6
         Examination by Mr. Hunt...................    7
 7
         Examination by Mr. Halliday..............    66
 8
         Examination by Mr. Landon................    72
 9
         Examination by Mr. Hersey................    73
10
         Examination by Mr. Forte.................    76
11
         Further Examination by Mr. Hunt..........    77
12

13

14   Changes and Signature........................    81

15   Reporter's Certificate.......................    83

16

17

18

19

20

21

22

23

24

25
```

```
 1                      E X H I B I T S

 2   NUMBER          DESCRIPTION                    PAGE

 3   Frasca-1        Defendants' First Notice of       7
                     Deposition of John Frasca, six
 4                   pages

 5   Frasca-2        Forwarding E-mail                32
                     From: Ward, Michael
 6                   Sent:  February 03, 2000
                     To:  Zava Mike et al.
 7                   Subject:  Copy of the 8K

 8   Frasca-3        Letter to Mr. David Guenthner     36
                     from Michael J. Ward
 9                   dated February 9, 2000

10   Frasca-4        Fax Transmittal                  38
                     To:  Mr. Mike Zafa
11                   From:  Bill Francis
                     Dated:  02/16/00
12
     Frasca-5        Letter to Ms. Misty Atchinson    45
13                   from Bill Francis
                     dated February 16, 2000
14
     Frasca-6        Letter to Logicare, Inc.         45
15                   from Bill Francis, dated
                     February 17, 2000
16
     Frasca-7        Letter to The Board of           61
17                   Directors of Inacom
                     Corporation and Compaq
18                   Computer Corporation from
                     Houlihan Lokey Howard & Zukin,
19                   dated February 16, 2000

20   Frasca-8        Résumé of John T. Frasca         63

21

22

23

24

25
```

1  objection interposed by any of the counsel, please be

2  guided by one of the counsel here as to your next

3  course of action.  You may be instructed by your

4  attorney not to answer a question.  So you should bear

09:27  5  those instructions in mind accordingly.

6          Do you have any questions regarding this

7  procedure?

8      A.   No.

9      Q.   Mr. Frasca, would you state your full legal

09:27  10  name, please?

11      A.   John Thomas Frasca.

12          MR. HUNT:  Can everyone on the phone

13  hear the witness?

14          MR. FORTE:  Yes.

09:27  15      Q.   (By Mr. Hunt)  Mr. Frasca, what is your

16  address, please?

17      A.   12407 Mossy, M-O-S-S-Y, Woods Drive, Tomball,

18  T-O-M-B-A-L-L, Texas 77377.

19      Q.   Thank you.  What is your current position?

09:27  20  And am I correct in assuming that you're at

21  Hewlett-Packard?

22      A.   Yes.  I'm the director of global logistics

23  procurement.

24      Q.   How long have you been employed by

09:28  25  Hewlett-Packard, as Hewlett-Packard?

1  you that that's the deposition notice for today's

2  deposition.

3                    (Pause)

4        A.    Okay.

09:30  5        Q.    You can --

6        A.    Oh.

7        Q.    -- keep it handy in case you want to refer

8  back to it, sir.

9        A.    Okay.

09:30  10        Q.    Mr. Frasca, did you review Page 3 whereon

11  there is a request for any documentation you might have

12  regarding certain topics?

13        A.    I did.

14        Q.    Do you have any documents with you today?

09:30  15        A.    I do not.

16        Q.    Okay.  Have you seen this deposition notice

17  before?

18        A.    I have not.

19        Q.    Prior to joining Hewlett-Packard, were you

09:31  20  with Compaq Computer Corporation?

21        A.    Yes.

22        Q.    What was your title at Compaq?

23        A.    It was director of global logistics.

24        Q.    Were your responsibilities different from

09:31  25  your present responsibilities at Hewlett-Packard?

1       A.    It was the same but included all of the

2   freight costs management, all of the security, and all

3   of the claims associated with movement of product.

4       Q.    So your responsibilities have narrowed since

09:31  5   you joined Hewlett-Packard?

6       A.    It has --

7       Q.    Categorically?

8       A.    Categorically, yes.

9       Q.    Do you hold a position as an officer of

09:31  10  Hewlett-Packard?

11      A.    No.

12      Q.    Did you hold a position as an officer of

13  Compaq?

14      A.    No.

09:31  15      Q.    Do you recall when you joined Compaq?

16      A.    Through acquisition, February of 2000.

17      Q.    Other than through acquisition, do you recall

18  when you actually began working for Compaq per se?

19      A.    It was upon close of Compaq purchasing the

09:32  20  assets of Inacom.   I don't know the exact date.

21      Q.    Did you have a title with Custom Edge

22  Corporation?

23      A.    Yes.

24      Q.    What was your title with Custom Edge?

09:32  25      A.    Vice president of supply chain management.

1    Q.    Do you recall how long you were in that

2    position?

3    A.    As Custom Edge, three months, approximately.

4    Q.    Would you explain the circumstances by which

09:33  5    you were no longer working as a Custom Edge employee

6    and became a Compaq employee?

7    A.    Sure.  When Compaq purchased the assets of

8    Inacom, the strategy that was communicated by the

9    executives was to not call it Compaq but rather call it

09:34  10    Custom Edge.

11          The strategy was to offer the customer a

12    multi-vendor solution, which means offering them a Dell

13    computer, a Lexmark printer, a Compaq desktop, and an

14    HP server.  Really offering the customer a suite of

09:34  15    products, not just a Compaq product.

16          That did not go well because IBM decided

17    not to sell Custom Edge product.  So then Compaq

18    decided to change it from Custom Edge to Compaq Direct.

19    Compaq Direct was considered the direct model to the

09:34  20    customers.  So it was more of a marketing strategy

21    title of Custom Edge.

22    Q.    With that transition from Custom Edge to

23    Compaq, did you become a direct employee of Compaq

24    Computer?

09:35  25    A.    I was a direct employee of Compaq when it was

1  called Custom Edge.

2      Q.    Okay.  And after that three-month period of

3  time where you transitioned marketing of the company --

4      A.    It was more of a business card change only.

09:35  5  I don't know from a legal subsidiary or any of that how

6  that worked.  I was not privy to that.  The only

7  fundamental change in my life was a business card

8  change.

9      Q.    I heard you use the name of an entity, unless

09:35  10  I'm mistaken, Compaq Direct?

11      A.    Uh-huh.

12      Q.    Was that a separate entity that you might

13  have been employed by?

14      A.    It was Compaq.

09:35  15      Q.    Okay.  Was that more in the nature of a

16  "doing business as" or trade name?

17      A.    I don't know how it was set up.  You know,

18  from our perspective, it was more of a marketing.

19      Q.    Okay.  Before the acquisition of the Inacom

09:36  20  hardware division by Compaq -- and when I refer to

21  Compaq, perhaps Ms. Dumas would prefer I refer to it as

22  Hewlett-Packard, just for the sake of consistency.

23          MS. DUMAS:  Whatever is a communication

24  where the witness understands you, it makes no

09:36  25  difference to me whether you refer to it as

1  Hewlett-Packard or Compaq.

2           MR. HUNT:  Okay.

3      Q.   (By Mr. Hunt)  Prior to the acquisition of

4  the hardware division of Inacom by Hewlett-Packard --

09:36  5           MS. DUMAS:  Objection.  Assumes facts

6  not in evidence.

7           You can go ahead and answer.

8           MR. HUNT:  Actually, I was still framing

9  the question.

09:36 10           MS. DUMAS:  I'm sorry, Steve.  I'm

11  sorry.

12      Q.   (By Mr. Hunt)  Prior to the sale of Inacom's

13  hardware division, were you employed by Inacom?

14      A.   Yes.

09:37 15           MS. DUMAS:  Objection.  Assumes facts

16  not in evidence.

17           You should wait until I render an

18  objection.

19           THE WITNESS:  Okay.

09:37 20           MS. DUMAS:  He referred to an

21  acquisition of a division instead of assets, so I've

22  got to state my objection.  I think he's saying

23  something that wasn't the case, so --

24           THE WITNESS:  Okay.

09:37 25      Q.   (By Mr. Hunt)  Let me rephrase it then,

15

1  Mr. Frasca.

2           Prior to the sale of Inacom's hardware

3  assets, were you employed by Inacom?

4       A.   Yes.

09:37  5       Q.   What was your position at the time that you

6  left Inacom?

7       A.   Vice president of supply chain management.

8       Q.   Who was your immediate supervisor?

9       A.   Leon Kerkman.

09:37  10       Q.   Was Mr. Kerkman your immediate supervisor at

11  Custom Edge as well?

12       A.   Yes.

13       Q.   Was he your immediate supervisor at Compaq?

14       A.   No.

09:38  15       Q.   Who was your immediate supervisor there?

16       A.   Robert Gifford.

17       Q.   Was Mr. Kerkman in the chain of command, so

18  to speak, over you at Compaq?

19       A.   Until I moved from Omaha.

09:38  20       Q.   Okay.  Is Mr. Kerkman in a supervisory

21  capacity of you now?

22       A.   No.

23       Q.   Okay.  When did you begin working with

24  Inacom?

09:38  25       A.   1998, July.

1  financing arm of Inacom?

2      A.   No.

3      Q.   Did you participate in any way with

4  negotiations with lenders?

09:48  5      A.   No.

6      Q.   Were you called upon to produce data that

7  might be used in the compilation of financial

8  projections by the company?

9      A.   No.

09:48  10      Q.   In a sense, you were just handling the nuts

11  and bolts of procurement, correct?

12      A.   Correct.

13      Q.   Do you recall when you actually left Inacom's

14  employ?

09:48  15      A.   I do not recall the exact date.

16      Q.   Was it contemporaneous with the sale of the

17  hardware assets to HP?

18      A.   Yes.

19      Q.   How far in advance of the actual closing date

09:49  20  of that sale were you aware that it would be taking

21  place?

22      A.   I actually read about it in the Wall Street

23  Journal, so whenever that article was.  The

24  communication was not that good.

09:49  25      Q.   Did at some point you verify the information

1  naming their name.

2              We talked about their order cycle time

3  and other certain metrics defined as, when an order was

4  placed, how long did it take them to deliver it to the

10:04  5  destination.

6              We talked about claims data, how often

7  that product was lost, damaged, short, over, when

8  compared to the order.

9              We talked about future opportunities and

10:04 10  where the vendor was actually going from a strategic

11  perspective.

12              That's about all the topics that we would

13  discuss.

14      Q.    Did those discussions include then a

10:04 15  reconciling function of disputed accounting issues

16  between Inacom and a third-party vendor?

17      A.    No.

18      Q.    On the Inacom side, who would have handled

19  the reconciliation of the account with a third-party

10:05 20  option vendor?

21      A.    Accounts payable function.

22      Q.    Was there a particular person that you might

23  have dealt with on the accounts payable side?

24      A.    Personally, no.

10:05 25  Q.    Do you recall who was in charge of that

```
 1  function while at Inacom?
 2       A.   Nancy Pearson.
 3       Q.   Okay.  Mr. Frasca, can you explain to me the
 4  circumstances by which you came to join the Inacom
 5  company?
 6       A.   I cold-called the executive vice president of
 7  HR.  I told him that, although he had no position open,
 8  that I could -- based upon looking at his annual
 9  report, financial data, that I can make significant
10  change at Inacom.  And I said I would take him to
11  lunch, and he would have a free lunch and perhaps I
12  would have a job.
13           The next day, I interviewed with Bill
14  Fairfield, the CEO; Dave Guenthner, the CFO; Leon
15  Kerkman; and Wayne Lallman.  The following day after
16  that, I received an offer.
17       Q.   Very good.  Thank you.  I note from the
18  résumé that you shared with me that you previously
19  worked at Coleman Powermate Company in Omaha, Nebraska.
20       A.   Correct.
21       Q.   And there as well you indicate director of
22  supply chain management.
23       A.   Correct.
24       Q.   Did you work alongside with any personnel at
25  Coleman Powermate who later joined Inacom?
```

1  assigned account manager, made phone calls.

2      Q.    Do you recall whether Mr. Mike Ward of Tech

3  Data might have communicated with you?

4      A.    I don't.

10:08  5      Q.    Do you recall whether you might have been on

6  a conference call as a participant with other personnel

7  from Inacom and personnel from Tech Data during that

8  January/February 2000 period?

9      A.    I don't.

10:09 10      Q.    Do you recall whether there were any concerns

11  voiced by Tech Data regarding what would happen to Tech

12  Data accounts payable by Inacom as part of the sale of

13  the hardware assets to Compaq?

14      A.    I don't.

10:09 15      Q.    Did you ever communicate, if you recall, by

16  electronic mail with Tech Data personnel separate and

17  apart from the EDI system?

18      A.    I don't recall any specific e-mail, but most

19  of my communication was done via that form of

10:10 20  communication.

21          MR. HUNT:  Madam Reporter, would you

22  mark this as Frasca-2, please?

23          (Exhibit Frasca-2 marked for

24          identification.)

10:10 25      Q.    (By Mr. Hunt)  Mr. Frasca, I'm handing you a

```
 1        A.    It does not.
 2        Q.    Okay.  Did you normally receive SEC public
 3   filings from the company in your capacity as vice
 4   president of supply chain management?
10:16 5   A.    No.
 6        Q.    Do you know how you might have come in
 7   possession of this 8K?
 8        A.    I don't.
 9        Q.    Would you have any reason to dispute that
10:16 10  this e-mail was sent by you on February 3rd of 2000?
11        A.    No.
12        Q.    I'm going to read the first paragraph of the
13   e-mail.  "I have attached the 8K for your review.  I
14   encourage you to read page 54 thru 56 which indicates
10:16 15  that 100% of the payables for Tech Data will be assumed
16   by Compaq."
17                   Was that your understanding -- let me
18   back up.
19                   Did you have an understanding that
10:17 20  100 percent of the payables for Tech Data would be
21   assumed by Compaq as part of this 8K, if you recall?
22        A.    I don't recall.
23        Q.    The e-mail continues.  "I would like to
24   discuss the opportunity to increase the credit limit
10:17 25  based on this contract."
```

1          Do you recall whether you ever had a

2    discussion with Tech Data after sending this e-mail

3    regarding increasing the credit limit based on this

4    contract?

10:17  5          A.    I don't.

6                    MR. HUNT:  Madam Reporter, I would like

7    to mark these two pages as Exhibit 3, please.

8                    (Exhibit Frasca-3 marked for

9                     identification.)

10:18  10                 MR. HUNT:  Bear with me, Cecily.  I'm

11   getting there.

12                   MS. DUMAS:  Take your time.

13        Q.    (By Mr. Hunt)  Begging counsel's indulgence,

14   I'll show you what we've all looked at before in this

10:19  15   case that's been marked as Exhibit 3, and it's a letter

16   from Tech Data to Inacom.

17                   THE WITNESS:  Is this the same?

18                   MS. DUMAS:  It's actually two different

19   copies of the same letter.  Go ahead.  Take your time.

10:19  20        Q.    (By Mr. Hunt)  I will apologize to the

21   witness.  The exhibit is two pages.  The one,

22   hopefully, is a better copy of at least part of the

23   letter.  It's a letter dated February -- it appears to

24   be February 9th, 2000, from Mr. Michael J. Ward of Tech

10:20  25   Data to Mr. David Guenthner, G-U-E-N-T-H-N-E-R, of

1  Inacom:

2                    MR. HUNT:  Do you need a copy, Cecily?

3                    MS. DUMAS:  No.  I'm familiar with it.

4  If you've got an extra, I'll take it, but if you don't

10:20  5  have an extra --

6                    MR. HUNT:  I'll give it to you when I'm

7  done, if you don't mind.

8                    MS. DUMAS:  That's fine.

9                    (Pause)

10:21  10      A.    Okay.  (Handing.)

11      Q.    You can retain it for now, Mr. Frasca.

12      A.    Okay.

13      Q.    I'll represent to you, reading from

14  Exhibit 3, that the first paragraph appears to read as

10:21  15  follows:

16                    "This letter is to summarize our

17  conference call yesterday which included the following

18  Inacom senior managers:  Leon Kerkman, John Frasca, and

19  Dick Oshlo.  Mike Zafa and Donna Platt were also

10:21  20  present on this call."

21                    I've omitted titles from the first

22  paragraph.

23                    Do you recall being on a call with these

24  folks, including Mr. Guenthner and Mr. Michael Ward, I

10:21  25  suppose on or about February 8th of 2000?

1   A.   I do not.

2   Q.   And having reviewed the letter, does that

3   refresh your recollection at all about the call?

4   A.   No.

10:22  5   Q.   Okay.  Thank you.

6        MR. HUNT:  Ms. Dumas, here are extra

7   copies for you (handing).

8        Madam Reporter, Exhibit 4, please.

9        (Exhibit Frasca-4 marked for

10:22 10        identification.)

11   Q.   (By Mr. Hunt)  Mr. Frasca, do you recall

12   hearing of a separation and sharing agreement between

13   Compaq and Inacom pertaining to the sale and

14   acquisition of the hardware assets?

10:22 15   A.   No.

16   Q.   Okay.  Isn't it true that, after the sale of

17   the hardware assets, you basically had a business card

18   change and still stayed in the same physical space,

19   performing essentially the same job?

10:23 20   A.   Correct.

21   Q.   Do you recall whether a transition team was

22   created to assist with the facilitation of the transfer

23   of the Inacom hardware asset operations to that of

24   Compaq and Custom Edge?

10:23 25   A.   I -- I would assume so, but I have no -- I

1  did not participate in any transition team.

2      Q.    Okay.  So as far as you recall, you weren't a

3  member of a transition team?

4      A.    Correct.

10:23  5      Q.    Okay.  Can you identify an individual named

6  William Francis?

7      A.    Yes.

8      Q.    Would you tell me who he is, please?

9      A.    He is a Compaq employee that had provided a

10:24 10  letter to us -- "us" being Inacom -- to send out to

11  vendors, explaining the -- explaining the transaction.

12      Q.    I would like to show you, Mr. Frasca, what's

13  been marked as Exhibit 4.  I'll represent, for the sake

14  of counsel on the phone, that it is a letter signed --

10:25 15  appears to be signed by Bill Francis to Tech Data

16  Corporation dated February 16th of 2000.  The first

17  page being a fax cover sheet.  And I'm going to locate

18  an extra copy for Ms. Dumas.

19          I would ask you to just generally

10:25 20  familiarize yourself with that letter, if you would,

21  sir.

22          (Pause)

23      A.    Okay.

24      Q.    Have you seen that document before, sir?  Let

10:25 25  me rephrase that question.

```
 1              Have you seen the second page of
 2    Exhibit 4 before?  I don't expect you would have seen
 3    the first page.
 4         A.   Yes.
 5         Q.   Do you recall when the first time you saw
 6    that document was?
 7         A.   The first time I saw it was at the previous
 8    deposition.  Let me correct that.
 9         Q.   Yes, sir.
10         A.   The substance -- this particular letter I did
11    not see at the last deposition, because this particular
12    letter has Tech Data Corporation referenced.
13         Q.   Okay.  Do you recall when the first time you
14    saw that letter was?
15         A.   The first time that I recall seeing the
16    letter was at the last deposition.
17         Q.   Okay.
18         A.   I did not recall seeing it back in February
19    of 2000.
20         Q.   Okay.  Now, you indicated at the outset of
21    the deposition that you had been deposed before.
22         A.   Uh-huh.
23         Q.   How many times previously, sir?
24         A.   Two.
25         Q.   Do you recall roughly when those depositions
```

1    took place, month and date -- month and year?

2        A.    The last deposition was three months ago.  I

3    don't have the exact month.  I'm going based on memory.

4    Three months ago.  And the first deposition was for me

10:27  5    winning custody of my kids during a divorce proceeding.

6        Q.    I can promise you we'll confine our questions

7    to the second deposition.

8        A.    I figured.

9        Q.    Do you recall in which I assume litigation

10:27  10    that second deposition was given?

11        A.    Restate your question, please.

12        Q.    Who took your deposition the second time,

13    sir?

14        A.    Origin Micro.

10:28  15        Q.    Okay.  And you indicated that, while you had

16    not seen Exhibit 4 per se -- please correct me if I'm

17    misstating what you said -- the substance of it was

18    familiar to you from that prior deposition?

19        A.    Correct.

10:28  20        Q.    Did you have communications with Mr. William

21    Francis prior to the sale of the Inacom hardware assets

22    on February 16th of 2000, if you recall?

23        A.    Yes.

24        Q.    Were you instructed to communicate with him

10:28  25    by anyone?

1      A.    Yes.

2      Q.    Who instructed you, sir?

3      A.    Leon Kerkman.

4      Q.    Do you recall what Mr. Kerkman told you to

10:28  5  do?

6      A.    I don't recall.

7      Q.    Do you know when the first time you spoke to

8  Mr. Francis was?

9      A.    I don't.

10:29  10     Q.    Do you recall the substance of the

11  conversations that you had with Mr. Francis in any

12  detail?

13     A.    The only detail was that, you know, we,

14  Inacom, wanted a letter from Compaq to provide to the

10:29  15  suppliers on the substance of the sale to clear up any

16  confusion of the sale.

17     Q.    And by saying "Inacom," is there a particular

18  person that you can say wanted this letter?

19     A.    It was -- I don't.  But if you recall, there

10:30  20  was 600 vendors that I had, and a good number of them

21  was confused about the transaction.

22     Q.    And how did you reach the conclusion that a

23  good number of them were confused, sir?  And I'll

24  continue with a compound question, with your

10:30  25  counsel's -- subject to your counsel's blessing.

1          Was it because of direct communications

2   by you or information being relayed to you by your

3   subordinates?

4       A.    It was information being relayed to me.

10:30  5       Q.    Okay.   So I assume you contacted Mr. Francis?

6       A.    Yes.

7       Q.    Do you recall whether that was by telephone

8   or some other method of communication?

9       A.    I don't.

10:31 10       Q.    Do you recall what Mr. Francis's response was

11   to the request for a letter?

12       A.    I don't recall his -- any words around it,

13   but I do recall him providing us a form letter to use.

14       Q.    Did you request this letter for -- you

10:31 15   indicated a good number of your vendors were confused

16   about the sale.   Did you request this letter for a good

17   number of your vendors?

18       A.    We actually assembled the names and addresses

19   of all of our vendors.   If you recall, I talked about a

10:31 20   lot of the small vendors.

21       Q.    Yes.

22       A.    There was a lot of confusion between the

23   company called Inacom, the company called Custom Edge,

24   and the company called Compaq and who was ultimately

10:32 25   going to be paying their bills and when, based upon the

1   close of the date.  And so the intent was to clear up

2   any confusion that may be out there.

3       Q.    So Mr. Francis, you're indicating, provided a

4   form letter to you?

10:32   5   A.    Yes.

6       Q.    Was it a signed letter or just a letter in

7   blank?

8       A.    I don't recall how -- his name was not signed

9   on it, and I don't recall how that -- you know, whether

10:32  10  we sent everything down to him and then he signed it or

11  whether he stamped it, but certainly the questions --

12  because of the relationships that Inacom had directly

13  with the vendors, it was determined that phone calls

14  would come to my attention versus somebody who did not

10:33  15  have relationships with those vendors.

16      Q.    Was there more than one version of this

17  letter that was shared with you by Mr. Francis?

18      A.    I don't recall.

19              MR. HUNT:  Madam Reporter, would you

10:33  20  mark this Exhibit 5, please, and Exhibit 6.

21              Exhibit 5 will be a February 16th, 2000,

22  letter from Bill Francis to Lexmark International.

23              And Exhibit 6 will be a February 17th,

24  2000, unsigned letter from Bill Francis to Logicare

10:34  25  Inc.

1    Q.   Did you ever have any discussions that were

2    more substantial than water-cooler discussions prior to

3    the sale of the hardware assets?

4              MR. CAINE:   Same objection to form.

10:56  5         THE WITNESS:   When we had vendors -- I

6    call them squeaky-wheel vendors -- that were

7    complaining about checks or -- I'm sorry.   Let me

8    rephrase.

9              When we had vendors that were

10:56  10  complaining about aged receivables, I would communicate

11   to Dick Oshlo to the point where, you know, I would

12   communicate, "Here is who are complaining the most."

13   And I would communicate those to Dick, and Dick would

14   turn and tell me how much monies that he would be

10:57  15  committing to paying these vendors.

16   Q.   (By Mr. Hunt)  Am I correct that you used the

17   term "squeaky-wheel vendors"?

18   A.   You're correct.

19   Q.   Was Tech Data at that time period what you

10:57  20  would call a squeaky-wheel vendor?

21              MR. CAINE:   Same objection to form.

22              MS. DUMAS:   Same objection.

23              THE WITNESS:   If you're asking me

24   whether or not Tech Data was one of the people that

10:58  25  frequently called, the answer is yes.

1    Q.    (By Mr. Hunt)  Thank you.  Would you know

2  whether Lexmark was one of the vendors that would

3  frequently call as well?

4    A.    I don't.

10:58  5    Q.    Would you know whether Logicare was one of

6  the vendors that would frequently call as well?

7    A.    I don't.

8    Q.    Was Origin Micro one of the vendors who would

9  frequently call?

10:58 10    A.    No.

11    Q.    Was Nashville Computer one of the vendors

12  that would frequently call?

13    A.    No.

14    Q.    How about the Ingram entities?  Were any of

10:58 15  the Ingram companies vendors that would frequently call

16  to complain as well?

17    A.    Yes.

18    Q.    Do you recall which ones?

19    A.    Ingram Micro.

10:59 20    Q.    Thank you.  Were you privy, during your time

21  at Inacom, to any internal reports that were generated

22  listing checks that were currently being held by the

23  treasury department?

24    A.    No.

10:59 25    Q.    Did you have any participation in the

**EXAMINATION**

**BY MR. HALLIDAY:**

Q.    Mr. Frasca, good morning again.  My name is Culver Halliday.  I am representing Lexmark International Inc.  I have some questions for you.

I believe that Exhibits 4, 5, and 6 are each letters dated February 16, 2000; is that correct?

A.    I have 5 and 6 in front of me.  Here we go. Got it.

Q.    Is that correct, sir?

A.    Correct.

Q.    Do you recall, sir, if on that day you were still an employee of Inacom Corporation?

A.    I do not know when that date was that I transitioned from Inacom to Compaq.

Q.    So you might have been an employee of Inacom Corporation, but you don't recall today, on that date, February 16th, 2000?

A.    Correct.

Q.    Sir, you have spoken, I believe, today or referred, I believe, today to tiers vendors.  Am I correct?

A.    Correct.

Q.    And these were tiers established by Inacom Corporation to assist it in managing its vendor

1  relationships; is that correct?

2      A.   Correct.

3      Q.   How many such tiers were there, sir?

4      A.   You had Tier 1, which was HP, Compaq, IBM.

11:20  5           You had Tier 2, which I do not recall the

6  number of, but those that were included in there were

7  Xerox, Lexmark, Dell, Gateway, Toshiba, Targus,

8  Kingston, and some others that I don't recall.

9           And then the third tier, which was my

11:21  10  group, was called the third-party options.  Those were

11  all of the widgets, the smaller parts, the smaller

12  vendors, which then also included the distributor

13  vendors which Tech Data and Ingram Micro were part of.

14      Q.   And you did not say, sir, but am I correct in

11:21  15  assuming that the first-tier vendors were the vendors

16  who, in dollar terms, supplied the most product to

17  Inacom Corporation?

18      A.   Correct.

19      Q.   And again I have assumed, but would I be

11:22  20  correct in having done so and assumed that the

21  second-tier vendors were the vendors who assumed -- who

22  delivered the most product to Inacom Corporation after

23  the vendors in Tier 1?

24      A.   Correct.

11:22  25      Q.   And is it correct, then, that the third-party

1  options, those vendors listed in Tier 3, delivered less

2  product to Inacom Corporation than the vendors listed

3  in Tier 1 and Tier 2?

4       A.   Less dollars amount but more units.

11:23  5       Q.   Okay.  Thank you.  I tried to ask it that

6  way.  I forgot by the time I got to the third tier.

7       A.   That's okay.

8       Q.   Thank you.  Your responsibility, sir, was for

9  the vendors in the third tier?

11:23  10       A.   Correct.

11       Q.   And you reported to Mr. Kerkman?

12       A.   Correct.

13       Q.   And I believe you said that Mr. Cullen was

14  responsible for the vendors in the second tier?

11:23  15       A.   Correct.

16       Q.   And he also reported to Mr. Kerkman?

17       A.   Correct.

18       Q.   And you may have said this.  I apologize if

19  I've already forgotten.  Who was responsible for the

11:23  20  first tier?

21       A.   IBM was Mike Bjornstad.  Compaq was James

22  Stapleton.  And HP, I don't recall.  If you give me an

23  hour, I'll remember that one.

24       Q.   I think we'll be okay.

11:24  25       A.   Okay.

1    Q.   Did the persons who were responsible for the

2  third -- the first-tier vendors also report to

3  Mr. Kerkman?

4    A.   Yes.

11:24  5    Q.   Sir, if I could ask you to refer or to look

6  at the February 16, 2000, letter from Mr. Francis to

7  Lexmark, which has been marked as Exhibit 5.  I have

8  just a question or two about that letter.

9             In the third paragraph, sir, it says,

11:25  10  "Inquiries to Custom Edge Inc. regarding your account

11  should be directed to John Frasca."  And it gives a

12  telephone number, which is 402-758-3822.  Do you see

13  where I was reading, sir?

14    A.   Yes, sir.

11:25  15    Q.   Do you recall that telephone number?

16    A.   Yes, sir.

17    Q.   Is that the telephone number you had while

18  you were an employee of Custom Edge Inc.?

19    A.   Correct.

11:25  20    Q.   And did you have that same number while you

21  were also an employee of Inacom Corporation?

22    A.   Correct.

23    Q.   Was that your personal extension?

24    A.   Yes.

11:25  25    Q.   I believe, sir, that you've testified that

1  this was a -- that this letter was based on a form; is

2  that correct?

3      A.    Correct.

4      Q.    Where it says your name on Exhibit 5, should

11:26  5  it have said Mr. Cullen instead?

6              MS. DUMAS:  Objection.  Calls for

7  speculation.

8              MR. FORTE:  Objection to form.  Earl

9  Forte.

11:26 10             THE WITNESS:  It would make sense that

11  the person responsible for that particular vendor would

12  have their name associated with it.

13     Q.    (By Mr. Halliday)  As you sit here today --

14  and I know this is many years past the event -- is it

11:26 15  your recollection that the form was to be used to be

16  sent to vendors, correct?

17     A.    Correct.

18     Q.    And is it also your recollection as you sit

19  here today that, in the third paragraph of the form,

11:27 20  the employee responsible for the particular vendor or

21  specific vendor to whom the letter was sent was to be

22  identified?

23             MS. DUMAS:  Objection.  Assumes facts

24  not in evidence.  Lack of foundation.

11:27 25             THE WITNESS:  Can you restate your

1  question, please?

2      Q.   (By Mr. Halliday)  Yes.  If this form -- I

3  will restate it a different way.

4          If the form was sent to a Tier 2 vendor,

11:27  5  should it have had Mr. Frasca's name in the third

6  paragraph?

7          MS. DUMAS:  Same objections.

8          THE WITNESS:  No.

9      Q.   (By Mr. Halliday)  Should it have had

11:28  10  Mr. Cullen's name?

11          MS. DUMAS:  Same objections.

12          THE WITNESS:  I would assume so.

13      Q.   (By Mr. Halliday)  Do you recall, sir, ever

14  having any conversation, in person or by telephone,

11:28  15  with anyone at Lexmark International Inc. concerning

16  the matters which are addressed in Exhibit 5?

17      A.   No.

18      Q.   Did you ever have a conversation while you

19  were an employee of Inacom Corporation and Custom Edge

11:29  20  Inc. with anyone who was an employee of Lexmark

21  International Inc. --

22      A.   I don't recall.

23      Q.   -- about anything?  You don't recall any such

24  conversation?

11:29  25      A.   I don't remember any.

1    Q.   Do you recall sending any communication by

2  any means to anyone at Lexmark International Inc.

3  regarding the matters raised or concerned in Exhibit 5?

4    A.   No, I don't recall.

11:30  5             MR. HALLIDAY:  Those are all the

6  questions I have.  I thank you for your time this

7  morning.

8             THE WITNESS:  You're welcome.

9                    **EXAMINATION**

10 **BY MR. LANDON:**

11   Q.   I introduced myself briefly a few minutes

12 ago.  I'm James Landon from the law firm of Hughes and

13 Luce in Austin representing Dell Inc., and I just have

14 a few short questions for you.

11:30 15            Do you recall having seen a letter in the

16 form of either Exhibits 4, 5, or 6 directed to Dell?

17   A.   No.

18   Q.   And in your role as -- I believe it was vice

19 president of supply chain management for Inacom, do you

11:30 20 recall any conversations with any employee or

21 representative of Dell?

22   A.   No.

23   Q.   Following the asset sale to HP or Compaq in

24 February 2000, do you recall having any conversations

11:31 25 with an employee or representative of Dell?

1  response to that request?

2      A.    There was no records at all.

3      Q.    And just to clarify that, that date preceding

4  which none were available, what was that date again?

11:41  5      A.    It was dating back to January of 19 -- it was

6  January of 1999 to present, all the way to January of

7  2004.

8      Q.    Okay.  Thank you.

9      A.    You're welcome.

11:41 10      Q.    Did the other gentlemen who served as your

11  procurement peers at Inacom also transition to Custom

12  Edge or Compaq?

13      A.    100 percent of them did.

14      Q.    And are any of those personnel still with

11:41 15  Hewlett-Packard?

16      A.    John Cullen is.  Jim Stapleton is.  Leon

17  Kerkman is.  Kevin Rose, Noni Vitols.  Mike Bjornstad

18  is not.  Those were the names that we had mentioned

19  during this deposition.

11:42 20      Q.    Yes, sir.  They are.  And may I ask you, to

21  whom did Mr. Kerkman report when he was at Inacom

22  during those final three months?

23      A.    He reported to Mike Steffan.

24      Q.    And do you recall what Mr. Steffan's title

11:42 25  would have been?