## 4. RICHARD C. OSHLO

| PAGE:LINE | PAGE:LINE |
|---|---|
| 6:15-6:17 | 161:7-161:17 |
| 40:22-40:25 | 161:22-162:13 |
| 133:20-134:16 | 163:13-164:7 |
| 146:24-147:16 | 166:12-166:14 |
| 151:19-153:4 | 166:16 |
| 153:9 | 166:18-166:23 |
| 154:3-154:7 | 167:4-167:5 |
| 157:21-158:13 | 167:7-167:10 |
| 158:16-158:18 | 167:13-167:14 |
| 158:20-159:7 | 170:5-170:11 |
| 159:11-159:14 | 211:6-211:19 |
| 160:4-160:18 | |
| 160:22-161:1 | |

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


In re
INACOM CORP., et al.        Bankruptcy Case No. 00-2426 PJW

| | |
|---|---|
| INACOM CORP., on behalf | : |
| of all affiliated Debtors, | : Civil Action No. 04-148 GMS |
| | : (Original filed in this Action) |
| Plaintiff, | : Adversary Case No. 02-03496 PJW |
| v. | : |
| | : |
| TECH DATA CORP., | : |
| | : |
| Defendant. | : |



INACOM CORP., on behalf of
all affiliated Debtors,

         Plaintiff,          : Civil Action No. 04-582 GMS
                             :
         v.                  : Adversary Case No. 02-03499 PJW
                             :
DELL COMPUTER CORPORATION,   :
                             :
         Defendant.          :


INACOM CORP., on behalf of
all affiliated Debtors,

         Plaintiff,          : Civil Action No. 04-583 GMS
                             :
         v.                  : Adversary Case No. 02-03500 PJW
                             :
LEXMARK INTERNATIONAL, INC.,:
                             :
         Defendant.          :


DEPOSITION OF RICHARD CHARLES OSHLO, JR.,
March 20, 2005


KATHRYN POWERS- CERTIFIED SHORTHAND REPORTER


PETERSEN COURT REPORTERS
515/243-6596

```
_____
                              :
INACOM CORP., on behalf of    :
all affiliated Debtors,       :
                              :
              Plaintiff,      :   Civil Action No. 04-584 GMS
                              :
          v.                  :   Adversary Case No. 02-03501 PJW
                              :
RESILIEN, INC., et al.,       :
                              :
              Defendant.      :
_____
                              :
INACOM CORP., on behalf of    :
all affiliated Debtors,       :
                              :
              Plaintiff,      :   Civil Action No. 04-593-GMS
                              :
          v.                  :   Adversary Case No. 02-03960 PJW
                              :
INGRAM ENTERTAINMENT, INC.,   :
Successor in interest to      :
NASHVILLE COMPUTER            :
LIQUIDATORS,                  :
                              :
              Defendant.      :
_____
                              :
INACOM CORP., on behalf of    :
all affiliated Debtors,       :   Civil Action No. 04-601 GMS
                              :
              Plaintiff,      :   Adversary Case No. 02-04441 PJW
                              :
          v.                  :
                              :
SIGMA DATA, INC,              :
                              :
              Defendant.      :
_____
```

### DEPOSITION OF RICHARD CHARLES OSHLO, JR.,

taken by the Defendants before Kathryn Powers, Certified
Shorthand Reporter of the State of Iowa, at the Renaissance
Savery Hotel, Room 210, Des Moines, Iowa, commencing at
9:45 a.m., Sunday, March 20, 2005.

3

```
1   APPEARANCES:

2   For InaCom Corp.:        JEFFREY P. NOLAN, ESQ.
                             Pachulski, Stang, Ziehl,
3                             Young, Jones & Weintraub, P.C.
                             10100 Santa Monica Blvd.
4                            Eleventh Floor
                             Los Angeles, California 90067-4100
5
    For Executive Sounding   EARL M. FORTE, ESQ.
6   Board Associates, Inc.,  Blank & Rome, LLP
    Liquidating Agent of     One Logan Square
7   InaCom Corp.:            18th and Cherry Streets
                             Philadelphia, Pennsylvania  19103-6998
8
    For Defendant Dell:      SABRINA L. STREUSAND, ESQ.
9                            G. JAMES LANDON, ESQ.
                             Hughes & Luce, LLP
10                           111 Congress Avenue, Suite 900
                             Austin, Texas  78701
11
    For Defendant Tech       STEPHEN C. HUNT, ESQ.
12  Data:                    Adorno & Yoss
    (by telephone)           350 East Las Olas Blvd.
13                           Seventh Floor
                             Fort Lauderdale, Florida  23301
14
    For Defendant Lexmark:   CULVER V. HALLIDAY, ESQ.
15                           Stoll, Keenon & Park, LLP
                             2650 Aegon Center
16                           400 West Market St.
                             Louisville, Kentucky 40202-3377
17
    For Defendant Ingram:    JONATHAN P. HERSEY, ESQ.
18  (by telephone)           Bingham McCutchen, LLP
                             600 Anton Road, 18th Floor
19                           Costa Mesa, California  92626

20  For Third-Party          GAIL S. GREENWOOD, ESQ.
    Defendant Hewlett        Friedman, Dumas & Springwater, LLP
21  Packard, Successor in    One Maritime Plaza
    Interest to Compaq       Suite 2475
22  Computer:                San Francisco, California  94111

23
    Also Present:            Jason Fensterstock
24  (by telephone)           Duff & Phelps

25
```

```
 1                    I  N  D  E  X

 2  WITNESS                                        PAGE

 3  Richard Charles Oshlo, Jr.

 4           Examination  By Ms. Streusand          6

 5           Examination by Mr. Halliday          132

 6           Examination by Mr. Hunt              168

 7           Examination By Mr. Nolan             173

 8           Examination by Ms. Greenwood         210

 9           Examination by Mr. Nolan             211

10           Examination by Mr. Forte            231

11           Examination by Ms. Streusand        237

12           Examination by Mr. Halliday         242

13           Examination by Mr. Hunt             249

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    E X H I B I T S

2   EXHIBITS                                          MARKED

3    1 - InaCom Corp. Officer's Certificate            37
     2 - Third Amendment and Waiver                    41
4    3 - 8-K March 2000                                44
     4 - Borrowing Base/Non-Default Certificate        51
5          February 26, 2000
     5 - Fourth Amendment and Waiver                   56
6    6 - 2/16/00 Memo from Davis Polk                  65
     7 - Borrowing Base/Non-DeFault Certificate        68
7          March 25, 2000
     8 - Borrowing Base Certificate 4/22/00            70
8    9 - Summary of Impact of disposed Assets          72
           and Operations
9   10 - Treasury Released Checks by Date              78
    11 - Attachment E, Collateral Mang. Report         80
10  12 - (This number was skipped in marking)
    13 - 3/29/00 Ltr. to Bachner                       90
11  14 - 4/4/00 Memo to Tom from Dick                  93
    15 - 3/24/00 Memo to Tom rom Dick                 102
12  16 - Board of Directors Minutes                   104
    17 - Intercreditor Agreement                      104
13  18 - Separation and Sharing Agreement             108
    19 - Fifth Amendment and Waiver                   110
14  20 - Sixth Amendment and Waiver                   112
    21 - Form Notice of Borrowing                      115
15  22 - March 2000 - Wires                           127
    23 - 2/15/00 Ltr. to Oslo from Schuette            161
16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              MS. STREUSAND:  Would you please swear

3    the witness.

4                    ROBERT CHARLES OSHLO, JR.,

5    called as a witness by the Defendants, being first

6    duly sworn by the Certified Shorthand Reporter,

7    was examined and testified as follows:

8                    EXAMINATION

9    BY MS. STREUSAND:

10       Q.    Good morning, Mr. Oshlo.  We met just

11   briefly a moment ago.  Let me reintroduce myself.

12   I'm Sabrina Streusand.  Along with James Landon,

13   we represent Dell, Inc., in an adversary

14   proceeding brought by InaCom.

15            Can you please state your full name for

16   the record.

17       A.    Richard Charles Oshlo, Jr.

18       Q.    And your address, sir, please?

19       A.    3818 Lincoln Place Drive, Des Moines,

20   Iowa, 50312.

21       Q.    And have you had your deposition taken

22   before, sir?

23       A.    Yes.

24       Q.    How many times?

25       A.    Probably about five times.

1    2000.

2            MR. NOLAN:  Do you have a copy of that

3    document for me, Sabrina?

4            MS. STREUSAND:  Yes.

5            MR. NOLAN:  Thanks.

6    BY MS. STREUSAND:

7        Q.    In terms of the information on the

8    balance sheets, you would not have been providing,

9    for example, the inventory analysis, correct, sir?

10       A.    That is correct.

11       Q.    And you did not work on what I would call

12   the reconciliation of accounts receivable for

13   those balance sheets; correct?

14       A.    That is correct.

15       Q.    Perhaps the part that you would have

16   worked on was the cash balances?

17       A.    That would have been submitted.  I

18   wouldn't have provided that.

19       Q.    Okay.

20       A.    That would have been pulled off of our

21   systems, off of the accounting systems.

22       Q.    Did you work with the bank group in 1999

23   with respect to the proposal to sell the

24   distribution business to Compaq?

25       A.    Yes.

1  purposes of all of those actions, but I'm here

2  today for Lexmark International, Inc.

3          The actions have all been brought by

4  InaCom Corporation to recover allegedly

5  preferential payments made by InaCom Corporation

6  to those defendants.  A defense that has been

7  alleged by each of those defendants to InaCom

8  Corporations's claim is the ordinary course of

9  payment defense, that the payments were not

10  preferential because they were made in the

11  ordinary course, and an important fact for the

12  court in determining the validity of the defense

13  down the road may well be they held checks, which

14  is why I'm going to ask you some questions about

15  that.

16          I'm not trying to be tedious, but try to

17  make sure that we put as fine a point on those

18  facts as you recall them over four years later,

19  and I do appreciate that, as we can.

20          You and counsel this morning have

21  referred to held checks.  Am I correct, sir?

22      A.    Yes.

23      Q.    And it is my understanding, sir, and

24  correct me, I just want to make sure I have the

25  correct understanding, that you, when you were

```
 1   referring to held checks, meant checks that had
 2   actually been written on InaCom's account, had
 3   been signed but had not been sent in payment to
 4   vendors; correct?
 5       A.    And that were in my office.
 6       Q.    Literally in your office, sir?
 7       A.    Yes.
 8       Q.    In other words, literally in your
 9   physical possession?
10       A.    Yes.
11       Q.    And control?
12       A.    Yes.
13       Q.    And it was your decision, sir, to send
14   those held checks, am I correct?
15       A.    Yes.  Sometimes in discussions with other
16   individuals, but yes.
17       Q.    Let me ask it this way, then:  It was
18   your responsibility to make the ultimate decision
19   whether to send those checks, sir?
20       A.    Yeah.  A couple times it was shared with
21   Tom Fitzpatrick, but yes.
22       Q.    I understand, sir.  Sir, as I recall, and
23   again I'm just trying to make sure my recollection
24   is right, you began your employment with InaCom
25   Corporation in January of 1997?
```

1  the most knowledgeable person during calendar year

2  2000 about InaCom Corporation's held checks?

3          MR. NOLAN:  I object to the question just

4  to the extent that you earlier defined held checks

5  as being the checks that he held in his office, so

6  the question is vague and ambiguous.

7      A.    I mean I knew, you know, that that's

8  what started the process of this tally of checks

9  in my office and when they were being released so

10  I could get some sense of what was going on, you

11  know.  I'm not sure who would have known more than

12  I did.

13  BY MR. HALLIDAY:

14      Q.    Okay.  Can you tell us if you think

15  anyone knew more or had more knowledge about the

16  holding of checks by InaCom Corporation in

17  calendar year 1999 than you?

18      A.    Well, there were a lot of conversations

19  between me and first Dave Guenthner and then Tom

20  Fitzpatrick about what was going on, you know,

21  some of which were the checks.  There were a lot

22  of conversations about the number of phone calls I

23  was getting from the vendors on the held checks.

24      Q.    If I could ask you to look at Exhibit No.

25  10, again, sir.  That's the, if I may--it's

1  labeled at the top "Treasury Released Checks by

2  Date."  Do you have that document, sir?

3      A.   Yes.

4      Q.   And is that document dated, sir?

5      A.   Yes, 5-10-2000.

6      Q.   I believe, sir, that you indicated that

7  this was a document prepared on a regular basis by

8  InaCom Corporation; is that correct?

9      A.   This or, you know, a similar predecessor

10 document.

11     Q.   And would that regular basis be on a

12 daily business day basis?  Let's put it that way.

13     A.   Pretty much so.

14     Q.   And, sir, does this document list what we

15 are referring to as held checks?

16     A.   Yes.

17     Q.   Was this document prepared for you, sir?

18     A.   Yeah.  I mean initially it was prepared

19 for me, and then when the consultants started

20 coming in, several people used it.

21     Q.   And was this document prepared by

22 somebody in the treasury department?

23     A.   First the treasury department and then,

24 as I said earlier, by 5-10 there weren't many

25 people left at InaCom and it could have--may have

1  idea, sir, let's put it that way, who most likely

2  was the person in the treasury department who

3  would have prepared this type of report?

4      A.   I'm not sure with the 5-10-2000 date that

5  this was actually prepared by somebody in the

6  treasury department.  I mean we were all--I don't

7  know how many people at that time were left.  I

8  assume this was--you know, our databases were all

9  being turned over to the accountants and

10 consultants at that time at 5-10-2000.  I don't

11 know if it was somebody in John Dugan's shop, Dave

12 Lemon, because every day they were trying to

13 figure out what our cash flow was on 5-10, so I

14 don't know who--who actually printed this document

15 out from their database on 5-10, I don't know.

16     Q.   Mr. Dugan and Mr. Lemon might be persons

17 who could tell me?

18     A.   Maybe.

19     Q.   Sir, could you refer to Exhibit 11,

20 please?

21     A.   Do you know what that is?

22     Q.   It's the one with the March--with the

23 July 1999, with the handwritten "Checks Held"

24 reference.  I just have a couple questions on this

25 one, sir.

1          Does this appear to you, sir, to be a

2    document that was created by InaCom Corporation?

3         A.    It was filled in by IBM Credit.

4         Q.    I'm sorry?

5         A.    It was filled in--the handwritten notes

6    were from IBM Credit.

7         Q.    And the handwritten notes filled in by

8    IBM Credit are on a paper that was created by

9    InaCom Corporation?

10        A.    Well, it would have been created--it

11   would have been as an attachment to the floor

12   planning document, IBM Credit, and then probably

13   just a copy of that was then filled in.

14        Q.    And it says--do you see where I'm

15   reading, sir, up at the top, 7-25-99?  Do you see

16   where I'm reading, sir?

17        A.    Yes.

18        Q.    And then down below it says, "Checks

19   Held, 37,227,000."

20        A.    Yes.

21        Q.    Now, if checks for 31,227,000 were being

22   held on that date, they would not have been being

23   held in July of 1999 by you in the treasury

24   department, would they?

25        A.    Right.  I think that's true.

153

1    Q.    Is it your understanding, sir, that if in

2  fact checks were being held in that amount in July

3  of 1999, they would have been being held then in

4  the--by accounts receivable?

5           MR. NOLAN:  Object to the question.  It

6  lacks foundation.

7           MR. FORTE:  Objection to form.  Accounts

8  payable.

9    A.    Accounts payable.

10  BY MR. HALLIDAY:

11   Q.    Thank you.  And at that time, July of

12  1999, who headed accounts payable if you can

13  recall, sir?

14   A.    I don't recall the name.

15   Q.    Sir, do you recall if during your tenure

16  at InaCom Corporation, that it held checks made

17  payable to the order of Tech Data Corporation?

18           MR. NOLAN:  Can you read that question

19  back, please.

20           (Question read by the reporter.)

21   A.    Yes, but only by referring to Exhibit 10.

22  BY MR. HALLIDAY:

23   Q.    Can you recall, sir, if during your

24  tenure at InaCom Corporation, it held checks made

25  payable to the order of Dell Computer Corporation?

1      A.    Yes.  Here again by referring to Exhibit

2  10.

3      Q.    Do you recall if during your tenure at

4  InaCom Corporation it held checks made payable to

5  the order of Lexmark International, Inc.?

6      A.    I assume so, but I don't know if they are

7  on the list.  I guess they are, yes.

8      Q.    Do you recall, sir, that during your

9  tenure at InaCom Corporation, it held checks made

10  payable to Resilien, Inc.?

11      A.    I don't know.

12      Q.    Do you recall, sir, if during your tenure

13  at InaCom Corporation, it held checks made payable

14  to the order of Logicare, Inc.?

15      A.    I wouldn't know unless I went through a

16  list.

17      Q.    Do you recall, sir, if during your tenure

18  at InaCom Corporation, it held checks made payable

19  to the order of Ingram Entertainment, Inc.?

20      A.    Yes, here again because just glancing at

21  Exhibit 10, I can see their name.

22          MR. HERSEY:  Culver, this is John Hersey.

23  If I could interrupt for a second.

24          MR. HALLIDAY:  Yes, sir.

25          MR. HERSEY:  Mr. Oshlo, on the Exhibit 10

1    A.    For the vast majority of my time at

2    InaCom we did not--I never saw a check, and it was

3    only beginning in that period, the beginning of a

4    liquidity crisis, that it was first evidenced by

5    the AR securitization going under and continuing

6    on beyond that.

7    Q.    Well, I just want to make sure I

8    understand what you're saying on this point, then.

9    So while checks were held on an almost daily basis

10   beginning at least in late 1999 until May of 2000,

11   at least May of 2000, it was not in the ordinary

12   course of InaCom Corporation's business to hold

13   checks made payable to vendors?

14        MR. NOLAN:  Object to the question.  It

15   has been asked and answered, and it misstates

16   prior testimony in the statement of the question.

17        MR. FORTE:  I will join.

18   A.    I do not believe it was in the ordinary

19   business of InaCom.

20   BY MR. HALLIDAY:

21   Q.    Do you recall the asset purchase

22   agreement between Compaq and InaCom?

23   A.    Generally, yes.

24   Q.    And do you recall that it was dated as of

25   about February 16 of 2000?

1    A.    Yes.

2    Q.    Is it your recollection today that

3  proceeds of that transaction would be used by

4  InaCom Corporation to pay certain checks that were

5  being held by InaCom Corporation?

6    A.    The only agreement was to make payments

7  under the wiring instructions that, for the most

8  part, were evidenced in one of the earlier

9  exhibits.

10    Q.    Is it your understanding, however, that

11  proceeds from the transaction between Compaq and

12  InaCom were to be used by InaCom Corporation to

13  pay held checks?

14        MR. FORTE:  Objection; asked and

15  answered.

16    A.    Proceeds were to be used to make the

17  payments by wire as identified in one of the

18  earlier exhibits and to run the company.

19  BY MR. HALLIDAY:

20    Q.    Did those payments include payments for

21  held checks?

22    A.    Which payments?

23    Q.    The payments you just referred to.

24    A.    The wire transfers?

25    Q.    Let me start over again, then.  InaCom

1   Corporation was to receive payment from Compaq

2   Computer Company as part of the asset purchase

3   agreement; correct?

4       A.   Yes.

5       Q.   Was any portion of the proceeds of that

6   transaction used by InaCom Corporation to pay held

7   checks?

8           MR. NOLAN:  I'll object.  The question

9   has been asked and answered.

10          MR. FORTE:  I'll join in that.

11      A.   Other than the funds owed to IBM Credit

12  and Deutsche Financial Services.  Now, whether

13  that meant that checks were canceled out for them,

14  I don't know.

15  BY MR. HALLIDAY:

16      Q.   Do you know if there was an agreement

17  between Dell--pardon me--Compaq Computer

18  Corporation and InaCom Corporation regarding the

19  use to which the proceeds of that asset purchase

20  agreement transaction would be by InaCom

21  Corporation?

22      A.   Could you repeat that?

23      Q.   Sure.  Was there an agreement between

24  InaCom Corporation and Compaq Computer Corporation

25  with respect to what use InaCom Corporation would

1  make of the proceeds of the asset purchase

2  transaction?

3      A.    Not that I know of.

4      Q.    There was no specific agreement that you

5  have any knowledge of between InaCom Corporation

6  and Compaq Computer Corporation regarding the use

7  to which the proceeds of the asset purchase

8  agreement were to be put, correct?

9      A.    Correct.

10      Q.    Do you have any recollection as you sit

11  here today, sir, that representatives of InaCom

12  Corporation in the, let's say, 30-day period

13  preceding the asset purchase transaction between

14  InaCom Corporation and Compaq Computer Corporation

15  were telling InaCom Corporation's vendors that

16  proceeds of the sale--of the asset purchase

17  transaction, pardon me, would be used to pay their

18  held checks?

19          MR. NOLAN:  Madam court reporter, can you

20  read that question back for me, please?

21          (Question read by the reporter.)

22      A.    Not that I recall.

23          MR. HALLIDAY:  I'm going to hand this to

24  the court reporter to mark it, I believe, as

25  Exhibit 23.  It is a letter that all of the rest

1    of us have seen about a hundred times.

2                              (Exhibit No. 23 was

3                          marked for identification.)

4          MS. STREUSAND:  Off the record.

5          (Discussion off the record.)

6    BY MR. HALLIDAY:

7        Q.   Mr. Oshlo, I don't want to rush you.

8    Have you had an opportunity to examine that

9    document that has been marked as Exhibit 23 to

10   your deposition?

11       A.   I've read it.

12       Q.   Thank you, sir.  If you will tell me,

13   sir, do you recall the name William A. Schuette?

14       A.   No disrespect to him.  No.

15       Q.   Do you recall this letter, sir?

16       A.   No.  It probably didn't get to me because

17   of my misspelled last name, sir.

18       Q.   Oh, if we could only be so lucky, I would

19   have missed quite a few.

20       A.   No, I don't recall.  I shouldn't be so

21   hilarious about this.

22       Q.   If you will read, sir, the--and just to

23   make this simple, quick, and easy, if I could just

24   ask you to read the first two sentences of the

25   second paragraph.

162

1      A.    "It is my understanding from Leon

2  Kerkman, whom I met with last week, that any

3  invoices that have had checks written against them

4  will be held until the sale is completed between

5  InaCom and Compaq.  The proceeds from the sale

6  will then cover those checks and they will be

7  disbursed over a period of one to ten weeks."

8      Q.    And as I understand your testimony, sir,

9  you have no recollection of any understanding or

10  agreement whereby the proceeds of the sale between

11  InaCom Corporation and Compaq Computer Corporation

12  would be used to pay held checks, correct?

13      A.    Correct.

14      Q.    Do you know Leon Kerkman?

15      A.    Very well.

16      Q.    This letter, sir, is dated February 15,

17  2000.  Where would he have worked in InaCom

18  Corporation at that time if you recall?

19      A.    He was the former controller who was at

20  that time working for Mike Steffen in the group

21  that went over to Compaq, overseeing our

22  integration centers, and I forget what the name of

23  the group was called.

24      Q.    Sir, did you have any involvement in the

25  negotiation of the asset purchase agreement?

1    A.    No.   Like I say, I attended the first due

2    diligence meeting, maybe the second, supplied some

3    information, and that's one of the things that was

4    taken out of Omaha.   It was--this is terrible,

5    because he subsequently died of cancer, but the

6    gentleman who was at InaCom who was the point

7    person on that was the--I think was the senior

8    vice-president for, oh, corporate development.

9    His name I forget, but he's probably in some

10   documents, but he was kind of the point man along

11   with Fitzpatrick and Gagliardi for negotiating

12   that.

13        Q.    Sir, can you read the last sentence of

14   the paragraph you just read the two sentences

15   from?

16        A.    "Additionally, Compaq will assume the

17   liability of Lexmark invoices that have not had

18   checks written against them."   That sentence?

19        Q.    Yes, sir.   Thank you.   Do you recall

20   anything about any assumption by Compaq Computer

21   Corporation of liability for Lexmark invoices that

22   have not had checks written against them?

23        A.    No, I don't, unless that means, you know--

24   the new direct business going forward would have

25   been Compaq.   I don't know if that's what that

164

1    reference is.

2        Q.   Sir, do you have any recollection today

3    as to any understanding between InaCom Corporation

4    and Compaq Computer Corporation as to the payment

5    of held checks made payable to the order of

6    Lexmark International, Inc.?

7        A.   No, I don't.

8        Q.   As you sit here today, sir, do you have

9    any recollection of any understanding between

10   Compaq Computer Corporation and InaCom Corporation

11   as to the payment of held checks made payable to

12   the order of Tech Data Corporation, Dell Computer

13   Corp., Nashville Entertainment or Logicare?

14       A.   No, I don't.

15       Q.   And Logicare is now called Resilien,

16   Inc., and Nashville Computer is now called Ingram

17   Entertainment.  Would that change your answer,

18   sir?

19       A.   No.

20           MR. HALLIDAY:  Thank you.  Will you

21   indulge me with a five-minute break and I'm

22   hopeful I'm done or just about.

23           (Short recess.)

24           MR. HALLIDAY:  Go back on the record.

25

1      to honor the check upon presentment?

2              MR. FORTE:  Objection to form.

3              MR. NOLAN:  I'll join.

4      A.   I'm not an accounts payable person and

5      that was over on that side of the operation, and I

6      think it was just way they--it was almost

7      automatic, and that's why I asked that they be

8      sent over to my office to be put on hold.

9      Accounts payable didn't know what was going to be

10     sent out and when.

11     BY MR. HALLIDAY:

12     Q.   When the check was written, would

13     accounts payable remove it from its list of

14     accounts payable?

15             MS. GREENFIELD:  Objection as to form.

16     A.   I don't know.  I don't know.

17     BY MR. HALLIDAY:

18     Q.   Do you have an understanding as you sit

19     here today, sir, based on your business experience

20     and knowledge, as to whether invoices submitted by

21     vendors for which checks have been written but not

22     delivered should be reflected as having been paid

23     in accounts payables records and journals?

24             MS. GREENFIELD:  I'm sorry.  Could you

25     reread the question?

1          (Question read by the reporter.)

2          MR. NOLAN:  Object to the question.  It

3  is overbroad.

4      A.    I'm not sure it was--how it was reflected

5  in the accounts payable department.

6  BY MR. HALLIDAY:

7      Q.    Do you have an opinion, though, sir, as

8  to whether it should have been reflected, such

9  invoices, as having been paid if a check was

10  issued but not sent?

11      MR. FORTE:  Object to the form.  Asks for

12  opinion.

13      A.    I assume it should not be reflected as

14  having been paid.

15          MR. HALLIDAY:  Those are all the

16  questions I have today, Mr. Oshlo.  Again, thank

17  you for spending your Sunday with us.

18          MR. NOLAN:  Guys on the phone, it's your

19  stage if you want it.

20          MR. HERSEY:  This is John Hersey.  I

21  don't have any questions.

22          MR. HUNT:  This is Steve Hunt.  I have a

23  few questions.

24

25

1    who stayed on with InaCom after the sale?

2        A.    No.   Jay Samuelson did not.   Scott

3    Simmelink did.   John Dugan did.   I forget who

4    else.   And Dave Lemon did.

5        Q.    Do you recall whether you had discussions

6    with a gentleman named Bill Francis during 2000

7    and any time prior to or after the sale of the

8    hardware business to Compaq?

9        A.    Who is Bill Francis?

10        Q.    I think that the question has been

11    answered.

12            Do you recall, Mr. Oshlo, having any

13    discussions with anyone from Tech Data Corporation

14    during the first half of the 2000 calendar year?

15        A.    No, I don't.   Let me expand on that.   I

16    no doubt received calls from Tech Data and

17    probably every other vendor on this Exhibit 10,

18    and probably multiple calls, and at this point I

19    don't recall talking to them or just hearing the

20    messages they left on the voice mail.   It was a

21    pretty coordinated effort by each company to make

22    those contacts, and, you know, at this point I

23    just don't recall if I talked to someone or just

24    heard their messages.

25        Q.    Mr. Oshlo, did you have any role with the

211

1    A.    Yes.

2    Q.    Now, in your position as treasurer, is it

3   also correct to say that you did not prepare any

4   AP reports?

5    A.    Yes.

6    Q.    And in your position as treasurer, you

7   can't tell me whether or not held checks are, in

8   fact, reflected on any given AP report by InaCom;

9   is that correct?

10    A.    That is correct.

11    Q.    And you can't tell me whether or not it

12   is customary that once a check is cut, that

13   whether it is automatically removed from an AP

14   list?

15    A.    That's correct.

16    Q.    So any assumption as to whether or not

17   checks appear on an AP list is conjecture, would

18   that be fair?

19    A.    Yes.

20         MS. GREENFIELD:  Okay.  Thank you.  I

21   have no further questions.

22              EXAMINATION (Resumed)

23   BY MR. NOLAN:

24    Q.    I'd like you to look at Exhibit 11, if

25   you could.