## 5. WILLIAM SCHUETTE

| PAGE:LINE | PAGE:LINE |
|---|---|
| 4:6-4:8 | 49:13-50:11 |
| 14:16-14:18 | 69:21-70:12 |
| 37:8-37:22 | 83:7-84:8 |
| 43:12-44:5 | 87:13-89:10 |
| 47:25-48:8 | |

```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF DELAWARE
2                       CASE NO. 04-CV-583

3    ------------------------------------------------------

              DEPOSITION OF WILLIAM A. SCHUETTE
4

5    ------------------------------------------------------

6    INACOM CORP. on behalf of all              PLAINTIFF
     affiliated debtors

7    v.

8    LEXMARK INTERNATIONAL, INC.                DEFENDANT

9    LEXMARK INTERNATIONAL, INC.                THIRD-PARTY
                                                PLAINTIFF
10   v.

11   COMPAQ COMPUTER CORP., ITY CORP.,          THIRD-PARTY
     and CUSTOM EDGE, INC.                      DEFENDANTS
12
     ------------------------------------------------------
13         The deposition of WILLIAM A. SCHUETTE was

14   taken on behalf of the plaintiff, Inacom Corporation,

15   before Ann Hutchison, Registered Professional Reporter

16   and Notary Public in and for the State of Kentucky at

17   Large, at the law office of Stoll, Keenon & Park, 300

18   West Vine Street, Suite 2100, Lexington, Kentucky, on

19   Tuesday, February 8, 2005, beginning at the hour of 1:55

20   p.m.  Said deposition was taken pursuant to Rule 30 of

21   the Federal Rules of Procedure and Rule 7030 of the

22   Federal Bankruptcy Procedure.

23   ------------------------------------------------------

24                    ACTION COURT REPORTERS
                       184 North Mill Street
25                  Lexington, Kentucky 40507
                         (859) 252-4004
```

```
 1                      APPEARANCES

 2


 3    COUNSEL FOR PLAINTIFF INACOM CORPORATION:

 4        Jeffrey P. Nolan
          Pachulski, Stang, Ziehl, Young & Jones
 5        10100 Santa Monica Boulevard, 11th Floor
          Los Angeles, California 90067-4100
 6


 7    COUNSEL FOR THIRD-PARTY DEFENDANT COMPAQ:

 8        Cecily A. Dumas
          Friedman, Dumas & Springwater, LLP
 9        One Maritime Plaza, Suite 2475
          San Francisco, California 94111
10


11    COUNSEL FOR DEFENDANT AND THIRD-PARTY PLAINTIFF
      LEXMARK INTERNATIONAL, INC.:
12
          Culver V. Halliday
13        Stoll, Keenon & Park, LLP
          2650 Aegon Center
14        400 West Market Street
          Louisville, Kentucky 40202-3377
15


16    ALSO PRESENT:

17        Kevin Sarkisian

18

19

20

21

22

23

24

25
```

INDEX

DEPONENT:  WILLIAM A. SCHUETTE                                    PAGE

EXAMINATION BY:
    Mr. Nolan ............................................   4
    Ms. Dumas ............................................  65
    Mr. Nolan ............................................  97

REPORTER'S CERTIFICATE ..................................  99
SIGNATURE PAGE ..........................................  100

```
 1                    WILLIAM A. SCHUETTE
 2   having been first duly placed under oath, was examined
 3   and testified as follows:
 4                         EXAMINATION
 5   BY MR. NOLAN:
 6        Q.    Can you please state your full name for
 7   the record.
 8        A.    William A. Schuette.
 9        Q.    Mr. Schuette, have you ever had your
10   deposition taken before?
11        A.    Once before.
12        Q.    How long ago was that?
13        A.    Thirty some years ago.
14        Q.    Okay.
15              MS. DUMAS:  When you were 12?
16              THE WITNESS:  Yeah, I wish.
17        Q.    Let me just go through a little bit of the
18   ground rules quick for you --
19        A.    Okay.
20        Q.    -- so you understand.  I want you to
21   appreciate what's going on today.  This is an informal
22   setting.  You can take a break any time you want.  If
23   you want to stretch your legs, run to the rest room, get
24   something to eat, simply ask me to take a break, I'd be
25   more than happy to do that.  Is that fair?
```

```
 1  Group, and that's where I've worked since that time
 2  frame.
 3       Q.   So when you were district sales manager in
 4  Phoenix are you employed by IBM?
 5       A.   No, Lexmark.
 6       Q.   By Lexmark.
 7       A.   When I came to Atlanta, that's when I
 8  became Lexmark.
 9       Q.   Okay.
10       A.   The division was sold to a company by the
11  name of Clayton Dubilier, who then changed the name to
12  Lexmark.
13       Q.   And how do you spell Dubilier?
14       A.   I have no idea.  D-u-b -- it's French.  I
15  used to know, but I don't anymore.
16       Q.   Okay.  So from 1991 until your time of
17  retirement you worked for Lexmark?
18       A.   Yes.
19       Q.   And now who is the Alliance Group?
20       A.   Alliance, that means I was working with
21  IBM and Dell, and they are people who buy our printers
22  and we put their logo on our printers and they resell
23  them.  During that time I had responsibility for both
24  Dell and IBM for the western half of the country.
25       Q.   And this position was from January 2001
```

```
 1   Mr. Kendrick and he talked to you about taking over the
 2   Inacom account and the fact that they were -- they had
 3   aged accounts receivable, did he inform you to do
 4   anything, or to restrict you from selling any amounts to
 5   Inacom, or to allow them or restrict them on running up
 6   any credit?
 7        A.    He did not.
 8        Q.    Did anybody else at Lexmark tell you when
 9   the Inacom account first came over under your
10   supervision that due to the outstanding accounts
11   receivable to limit or to restrict credit to Inacom?
12        A.    Well, it seems to me that I had a
13   conversation with Kevin Sarkisian, but it was more along
14   the lines of the fact that with the new name and
15   everything -- with it being a new company, in order to
16   go forward and sell product to them we had to establish
17   some kind of a line of credit with Custom Edge or
18   Compaq. And so in terms of being able to go forward, I
19   had a request in to try to get some kind of a statement
20   of, you know, obligation from somebody, either at Compaq
21   or Custom Edge, as to who would be responsible for
22   future invoices.
23        Q.    Okay. Is it a fair statement that when
24   you took over the Inacom account you were under the
25   impression that you could sell as much product -- strike
```

1    Q.    You're not sure?

2    A.    No, I'm not sure.

3    Q.    Okay. Did anyone tell you directly or did
4 you have any opportunity to learn whether or not Inacom
5 was having liquidity problems at that time?

6    A.    No one told me about that, and I -- you
7 know, the only indication that I would have that there
8 would be liquidity problems would be the fact that we
9 weren't being paid so... But I had not heard anything
10 that they weren't paying their people or anything along
11 those lines.

12    Q.    Is that something, though, as a sales
13 executive for your accounts you would kind of want to be
14 in tune with is whether or not the folks you're selling
15 to are, you know, in good business standing or whether
16 or not they're having problems or whether or not they're
17 growing or shrinking?

18    A.    Yeah, it would be. But I, again, had only
19 been on the account for about two or three weeks, and I
20 was just getting into it.

21    Q.    All right. So you're not told anything
22 other than the fact that they are cutting checks and
23 they're holding these checks. And did they tell you
24 when they were going to release the checks?

25    A.    Well, I sent that -- I sent a letter,

```
 1  which you probably have a copy of.  It was my
 2  understanding that once the sale was completed that they
 3  would then begin issuing the checks, and it would take I
 4  think it was one to ten weeks or something like that to
 5  get all the disbursements done.
 6          Q.      Okay.  Did they tell you --
 7          A.      I don't recall him saying one to ten weeks
 8  in that meeting.  I mean, I recall being told -- I
 9  learned that in some other meeting with Leon later on.
10  I think a little bit later.
11          Q.      But the source of your information on this
12  next conversation the end of January is primarily Leon
13  Kerkman?
14          A.      Right.
15          Q.      Anybody else from Inacom giving you the
16  information?
17          A.      No.
18          Q.      And nobody at Inacom mentions to you at
19  that meeting that they're having problems with liquidity
20  or a cash crunch?
21          A.      No.
22          Q.      And from your other business dealings had
23  you heard any word on the street that Inacom was having
24  any cash problems?
25          A.      No.
```

```
 1   conversation you had with Mr. Kendrick following that
 2   meeting?
 3        A.   I think I told him that the checks were
 4   being held and that they were going to be released when
 5   the transaction was completed.
 6        Q.   And what was Mr. Kendrick's response?
 7        A.   Not good enough.  Try to find out a
 8   specific time and date.
 9        Q.   And did you do that?
10        A.   I believe that's when I began trying to
11   contact Dick Oslo, and I tried to contact him at least
12   for a week.  I had no success getting to him, and so I
13   sent him a letter and overnighted it to him, either
14   overnighted it or registered, I don't know which I did,
15   may have been both, copied Leon and also my boss.
16        Q.   I'm sorry.  Go ahead and finish.
17        A.   No.  And also copied Kendrick on the
18   letter.
19        Q.   And why were you trying to call Dick
20   Oshlo?
21        A.   Because it was my impression from talking
22   to Leon that he was the guy who was disbursing the
23   checks.  He was the man that was responsible for putting
24   stuff out.
25        Q.   Okay.  And what was your purpose of
```

```
 1  contacting -- I mean, what did you want to tell Mr.
 2  Oshlo?
 3       A.    I wanted to confirm what I had been told
 4  by Leon.
 5       Q.    That he was -- that being that Mr. Oshlo
 6  was holding checks?
 7       A.    That checks had been written and that they
 8  were being held until the transaction took place.
 9       Q.    And I think you said Mr. Oshlo didn't
10  return phone calls?
11       A.    I called him for at least a week and left
12  voice mails and never got a return call.
13       Q.    Did you call multiple occasions per day?
14       A.    Yes.  I don't know how many per day, but
15  yes.
16       Q.    Did anyone else return Mr. Oshlo's
17  messages?  Did anybody call you back?
18       A.    I don't think anybody ever called me back,
19  but I do believe I talked to his assistant once or twice
20  and left messages to have him call me.
21       Q.    At the time you were calling Mr. Oshlo,
22  did you ever become aware of the fact that Inacom was
23  having liquidity problems?
24       A.    No.
25       Q.    Did you ever become aware that they had
```

```
 1    been in default on numerous loans?
 2           A.     No.
 3           Q.     Did you report back to Mr. Kendrick that
 4    you couldn't get ahold of Mr. Oshlo?
 5           A.     Yes.
 6           Q.     What was Mr. Kendrick's response?
 7           A.     Let's write a letter.  And that's why the
 8    letter was generated.
 9           Q.     And the letter was to Mr. Oshlo?
10           A.     Oslo.
11           Q.     Oslo.
12           A.     Right.
13           Q.     Okay.  And what did the letter, what was
14    the purpose of the letter?
15           A.     To confirm our understanding of how they
16    were going to be paying us for the back invoices.
17           Q.     Okay.  So the letter was written -- the
18    letter didn't memorialize a conversation you had with
19    Mr. Oslo, did it?
20           A.     Well, do you have a copy of the letter?  I
21    have a copy of the letter.  I mean, I could show you the
22    letter if you want to see it.
23           Q.     Okay.
24           A.     Basically, I started off in the letter and
25    I said:  Been trying to get you, I haven't been able to
```

```
 1   get you, you have serious past due invoices.  My
 2   understanding from Leon was that invoices had been cut,
 3   that we were going to be paid as -- once the completion
 4   of the sale took place, and that all invoices wouldn't
 5   be paid immediately, that it would be over a one-to-
 6   ten-week time period.  And I was trying to confirm if
 7   that is in fact what was going to happen.
 8         Q.     Okay.  So the letter you wrote was to
 9   memorialize a conversation you had -- or the
10   understanding you inferred from Mr. Kerkman.  Right?
11         A.     Correct.
12         Q.     And it wasn't a letter that was
13   memorializing any conversation you had with Mr. Oshlo
14   because you hadn't got ahold of him yet?
15         A.     Right.
16         Q.     Okay.  Did you ever get a hold of
17   Mr. Oshlo?
18         A.     He called me back after having received
19   the letter and confirmed that that was going to be the
20   process and apologized for not calling me back.
21         Q.     Did you learn on that conversation with
22   Mr. Oshlo that Inacom was having liquidity problems?
23         A.     No.
24         Q.     Did you learn at that occasion either
25   through Mr. Oshlo or through anyone else that Inacom had
```

```
 1   Lexmark other than the held checks?
 2        A.   Yes.
 3        Q.   Who did you have that understanding from?
 4        A.   Leon.
 5        Q.   Anybody else at Inacom?
 6        A.   Well, at that time, no.
 7        Q.   I just have to --
 8        A.   Right.
 9        Q.   I always have to pin down if there's any
10   other source of your information.
11        A.   Right.  No.
12        Q.   And Inacom was going to go ahead and
13   release the checks that it was holding in the treasury
14   department and the held checks would be satisfied,
15   obviously, by Lexmark negotiating those checks.  Right?
16        A.   I don't know what you mean by us
17   negotiating.
18        Q.   Them clearing your bank account?
19        A.   Oh, okay.  Yeah, we would -- once they
20   cleared, then we would consider the stuff paid, right.
21        Q.   Did you have any understanding about
22   whether Compaq was also assuming the liability to make
23   good on the held checks after they had been released and
24   paid?
25        A.   Well, my assumption always was that Compaq
```

```
 1   would make good the payments, but I don't think at the
 2   time I knew whether or not the checks were going to be
 3   written from Inacom.  I mean, I don't think I knew the
 4   source of the money, who was actually going to be paying
 5   for the checks, if it was going to be coming out of an
 6   Inacom account or it was going to be coming out of a
 7   Compaq account.  I don't think I knew the source of the
 8   money, but I felt like Compaq would cover the invoices.
 9        Q.    All invoices?
10        A.    All of them, yeah.
11        Q.    So any invoice that was outstanding?
12        A.    Right.
13        Q.    Okay.  Then why does it say here Compaq
14   will assume the liability of Lexmark invoices that have
15   not had checks written against them?  Did you write an
16   incorrect statement in that letter?
17        A.    No.  No.  Maybe I'm not saying it right.
18   I believed that the checks that were being held -- I
19   don't know who was the ultimate source of the funds.  I
20   don't know if it was coming from Inacom or it was coming
21   from Compaq, but I believed that we would be paid
22   that -- those checks and that they would clear and that
23   we would be paid for it.  And anything that was not --
24   had not had a check written on it previously, that
25   Compaq would assume that liability.  That was my
```

```
 1        A.      Right.
 2        Q.      By Inacom.
 3        A.      Yes.
 4        Q.      Before the sale closing.
 5        A.      It was before the transaction went final,
 6   correct.
 7        Q.      Before they had Compaq's money, they had
 8   written checks off their bank account.
 9        A.      I don't know what the check looked like,
10   so I don't know how the check was written.  But it was
11   my understanding that the checks had been written, but
12   they had not been released, and they were waiting for
13   funds to hit the account.  That's...
14        Q.      And those funds could be from any source?
15        A.      They could be from any source.
16        Q.      Inacom was waiting for funds to hit its
17   operating account so that it had sufficient money?
18        A.      Let's backtrack one more time here.  I
19   don't know if because of the transaction that was going
20   on that -- I don't know the details of the Inacom/Compaq
21   transaction.  All I know is that I don't believe any
22   invoices were being paid in this interim time period,
23   and I don't know what was causing it.  I don't know if
24   they were waiting on Compaq funds or they were just
25   waiting on the sale to be completed before they paid the
```

```
 1   funds.  So I'm not sure that I want to go on record as
 2   saying that we're waiting on Compaq funds because I
 3   don't know if we were waiting on Compaq funds or we were
 4   just waiting on the transaction to be completed.  Okay?
 5   Because I don't know where -- I mean, for all I know,
 6   Inacom could have had the money sitting in the bank but
 7   they were waiting on the transaction to close before
 8   they paid it.  I don't know.
 9           Q.    And Inacom eventually released the checks
10   it was holding.  Right?
11           A.    That's right.
12           Q.    And Lexmark eventually got paid everything
13   that Inacom owed it.  Right?
14           A.    I believe so.  I think we got it all.
15           Q.    Is it your understanding that Compaq paid
16   the accounts payable that it assumed under the
17   transaction?
18           A.    I don't think I have that knowledge as to
19   who actually paid it.  I mean, I would have had to have
20   seen the check or the wire to see who it came from, and
21   I have no idea.
22           Q.    Who would be more knowledgeable than you
23   about that subject?
24           A.    Kevin Sarkisian.
25           Q.    I think maybe -- I'm trying to understand
```

```
 1   that Compaq would assume liability for everything except
 2   the checks that were sitting in treasury?
 3           A.      Well, there was another letter that came
 4   from Compaq that was dated the 16th that I believe said
 5   that, that they would assume all liabilities.
 6           Q.      With or without the held checks?
 7           A.      I think it said that they would take it
 8   all.  I mean, I don't have that letter here in front of
 9   me, but there was a letter that came out that said that
10   they would assume all liabilities that were outstanding
11   to Lexmark.  And I don't have the exact verbiage.  I'm
12   sure you guys got a copy of it some place but that's...
13           Q.      I understand what you're saying, and I'd
14   be happy to show you that letter.  I will show you that
15   letter.  Do you understand that to modify your
16   understanding that Compaq from this letter, from this
17   communication from Inacom, as reflected by your
18   conversation with Mr. Kerkman and the subsequent
19   conversation with Mr. Oshlo, that Compaq would assume
20   everything other than what was sitting in a drawer in
21   held checks?
22           A.      My assumption would be that Compaq would
23   assume all the liability, not just what was not in a
24   drawer or anything.  My assumption is that they would
25   pay for everything.
```

```
 1       Q.      Then your sentence is incorrect when you
 2  say Compaq will assume the liability of Lexmark invoices
 3  that have not had checks written against them?
 4              MR. HALLIDAY: Objection. That
 5  mischaracterizes his repeated testimony. That what he's
 6  doing here is reflecting what he was told by Leon
 7  Kerkman. That's all he did in that letter. Go ahead
 8  and answer the question if you can.
 9       A.      All I'm saying is that if there are any
10  other outstanding debts that the -- that are not sitting
11  in this hypothetical drawer of checks -- it's not
12  hypothetical, but this drawer of checks that we've been
13  referring to, if there are additional, you know,
14  invoices, that Compaq will assume it.
15              And I've said before, I don't know if
16  Compaq is funding the payment of those invoices that are
17  in there or Inacom is funding those. My understanding
18  from talking to Leon was that those checks would clear
19  when the transaction took place. I did not ask Leon is
20  the money coming from Compaq or is it coming from
21  Inacom. I never asked that question. I never made any
22  assumption as to who was paying for that.
23              But my statement in here is I'm trying to
24  understand, you're going to pay those, and then Compaq
25  is going to assume the rest of any outstanding invoices.
```

```
 1   That's what I'm trying to say in that paragraph.  Now, I
 2   may not have done a good job explaining myself or
 3   perhaps writing the letter, but that's my understanding.
 4              I'm trying to make sure that I understand
 5   that we're going to be paid for the invoices that are
 6   outstanding, and anything else that might be out there
 7   Compaq will then assume, because that was my
 8   understanding.  Nothing else.  That's all I'm trying to
 9   do in this particular paragraph.  And then, by the way,
10   we need to be paid as quickly as you can pay us.
11        Q.     When you wrote this letter, at any time
12   before you wrote this letter, had you had any
13   communication directly with anybody from Compaq?
14        A.     No.
15        Q.     So you don't know whether or not Compaq
16   had any idea that Inacom's treasury department was
17   sitting on checks to vendors?
18        A.     Well, I don't know who was sitting on the
19   checks.  I don't know if Inacom was sitting on the
20   checks or Compaq was sitting on the checks.
21        Q.     But what I'm saying is you don't
22   personally know if Compaq knew about Inacom's held
23   checks?
24        A.     I personally don't know whether or not --
25   that's true.
```