# 7. MICHAEL WARD

| PAGE:LINE | PAGE:LINE |
|-----------|-----------|
| 5:9-5:11 | 51:21-51:23 |
| 7:16-7:22 | 55:17-56:2 |
| 14:11-14:25 | 56:9-56:14 |
| 15:22-15:25 | 56:16-56:20 |
| 30:3-30:14 | 58:9-58:23 |
| 30:20-31:10 | 59:7-59:12 |
| 31:16-32:1 | 59:18-59:24 |
| 34:14-35:4 | 62:11-63:1 |
| 35:21-36:3 | 65:4-66:11 |
| 37:22-38:8 | 66:17-67:1 |
| 39:9-39:15 | 69:22-70:6 |
| 39:21-40:1 | 84:23-84:25 |
| 46:22 | 85:3-85:15 |
| 46:25-47:5 | 99:14-99:20 |
| 47:19-48:25 | 104:1-104:12 |
| 51:11-51:16 | 124:21-125:17 |

Inacom vs. Tech Data                3/4/2005                          MIKE WARD

Page 1

```
 1              United States District Court
                    District of Delaware
 2

 3

 4    In re: Inacom Corp. et al.,

 5                  Debtors             Chapter 11
                                        Bankruptcy Case
 6                                      No. 00-2426(PJW)

 7    Inacom Corp., et al,

 8                      Plaintiffs

 9         -vs-                         Civil Action
                                        No.:  04-CV-148(GMS)
10    Tech Data Corporation,

11                  Defendant

12

13    Inacom Corp., et al.,
                        Plaintiffs
14         -vs-                         Civil Action
                                        No. 04-CV-582(GMS)
15    Dell Computer Corp.,

16                  Defendant

17

18    Inacom Corp., et al.,
                        Plaintiffs
19
              -vs-                      Civil Action
20                                      No. 04-CV-583(GMS)
21    Lexmark International, Inc.,
                        Defendant
22

23

24

25
```

Inacom vs. Tech Data                3/4/2005                          MIKE WARD

Page 2

```
 1   Inacom Corp., et al.,

 2                    Plaintiffs

 3           -vs-                    Civil Action
                                     No. 04-CV-584(GMS)
 4   Resilien, Inc.,

 5                    Defendant

 6

 7   Inacom Corp., et al.,

 8                    Plaintiffs

 9           -vs-                    Civil Action
                                     No. 04-CV-593(GMS)
10   Ingram Entertainment, Inc.,
                     Defendant
11

12

13                              March 4, 2005
14                              9:20 a.m.

15

16

17        The deposition of Mike Ward, taken on

18     behalf of the Defendant Compaq, pursuant to

19     Notice of Taking Deposition, at the offices of

20     Downtown Reporting, 37 North Orange Avenue,

21     Suite 400, Orlando, Florida, before Lois H.

22     Simonds, Registered Professional Reporter and

23     Notary Public, in and for the State of Florida

24     at Large.

25
```

Inacom vs. Tech Data                         3/4/2005                              MIKE WARD

                                                                                        Page 3

```
 1        APPEARANCES:

 2

 3            Andrew W. Caine, Esquire
              Pachulski, Stang, Ziehl, Young,
 4            Jones & Weintraub, P.C.
              10100 Santa Monica Boulevard
 5            11th Floor
              Los Angeles, California 90067
 6
                  Representing Inacom Corp.
 7

 8

 9            Stephen C. Hunt, Esquire
              Charles M. Tatelbaum, Esquire
10            Adorno & Yoss
              350 East Las Olas Boulevard
11            Suite 1700
              Fort Lauderdale, Florida  33301
12                Representing Tech Data Corporation.

13

14            Cecily Dumas, Esquire
              Friedman Dumas & Springwater, LLP
15            One Maritime Plaza, Suite 2475
              San Francisco, California  94111
16
                  Representing Compaq Computer
17            Corporation.

18                        *    *    *

19

20

21

22

23

24

25
```

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 4

```
 1                      TABLE OF CONTENTS
 2   Michael Ward
     March 4, 2005
 3
     Appearances                                          2
 4
     TESTIMONY OF Michael Ward
 5
          DIRECT EXAMINATION by Ms. Dumas              5
 6
          AFTERNOON SESSION                            84
 7
          CROSS EXAMINATION by Mr. Caine              118
 8
          REDIRECT EXAMINATION by Ms. Dumas           124
 9
     SUBSCRIPTION OF DEPONENT                          129
10
     CERTIFICATE OF REPORTER                           130
11
12                           EXHIBITS
13   Ward Exhibits
     For Identification:
14
     No.  1   telephone log                            85
15
16
17            S T I P U L A T I O N S
              It is hereby stipulated and agreed by
     and between counsel present for the
18   respective parties and the deponent that the
     reading and signing of the deposition is
19   expressly reserved.  (end of stipulation)
                        *   *   *
20   Reporter's Key To Punctuation:
     --  At end of question or answer references
21       an interruption.
22   ... References a trail-off by the speaker.
         No testimony omitted.
23
     "Uh-huh"  references an affirmative sound.
24   "Unh-unh" references a negative sound.
25
```

Inacom vs. Tech Data                      3/4/2005                      MIKE WARD

Page 5

```
 1                  P R O C E E D I N G S
 2                    Michael Ward,
 3      having been first duly sworn by the reporter,
 4      thereupon testified upon his oath as follows:
 5                  DIRECT EXAMINATION
 6  by Ms. Dumas:
 7        Q.   Morning, sir.
 8        A.   Morning.
 9        Q.   Would you state your name for the record,
10  please?
11        A.   My name is Michael Joseph Ward.
12        Q.   What's your address?
13        A.   10128 Paradise Boulevard, Treasure Island,
14  Florida, 33706.
15        Q.   Thank you.  Mr. Ward, my name is Cecily
16  Dumas.  I'll be starting with the questions this
17  morning.  I represent Hewlett Packard Company.  And
18  for ease of reference, because my client Hewlett
19  Packard Company is the successor in interest to
20  Compaq, I'm going to refer to my client as Compaq in
21  the course of my questioning because that was the
22  company that was involved in the transactions we'll
23  be talking about; is that acceptable to you?
24        A.   Sure.
25        Q.   Have you ever had your deposition taken
```

Inacom vs. Tech Data                3/4/2005                        MIKE WARD

Page 7

```
 1   sign and certify it.  You're allowed to make changes
 2   to the transcript as you see fit, but I should
 3   caution you that any changes you make to the
 4   substance of the testimony could be commented on by
 5   my client or other parties to the litigation.  Do
 6   you understand that?
 7        A.    I understand.
 8        Q.    Lastly, if at any point you want to a
 9   break for any reason, want to talk to your counsel,
10   please just let me know.  This is -- you're in the
11   driver's seat here.
12        A.    I understand.
13        Q.    Are you represented here by Mr. Tatelbaum
14   and Mr. Hunt?
15        A.    Yes, I am.
16        Q.    Where are you currently employed, sir?
17        A.    At Tech Data Corporation.
18        Q.    And how long have you been employed by
19   Tech Data?
20        A.    Almost nine years.
21        Q.    So about 1995, '96?
22        A.    I started April 15, 1996.
23        Q.    What position did you start at at Tech
24   Data in 1996?
25        A.    I started as a senior credit manager.
```

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 14

1        **A.**    **He reported to Patrick Connelly.**

2        Q.    What's Mr. Connelly's position at Tech

3    Data, or was at that time?

4        **A.**    **His position was Vice President of**

5    **worldwide credit operations.**

6        Q.    When I asked you a few minutes ago to

7    describe generally what a credit manager does, was

8    that description you gave me consistent with what

9    you actually did at Tech Data as a credit manager?

10       **A.**    **Yes.**

11       Q.    Do you consider yourself to have

12   sufficient training to be generally familiar with

13   accounting principles?

14       **A.**    **Yes, I do.**

15       Q.    What's your understanding of what an

16   account payable is?

17       **A.**    **An account payable, from my understanding,**

18   **is what a company owes to another business or**

19   **individual in the normal course of business for**

20   **purchasing services or products.**

21       Q.    And is the account payable reflected in

22   the books and records of the company that owes the

23   money?

24       **A.**    **Generally, the accounts payable is on the**

25   **balance sheet of the company.**

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 15

1       Q.    I'm going to ask you now to focus on the

2  time frame of late 1999, early 2000, and in

3  particular on the events surrounding Tech Data's

4  customer Inacom and the acquisition of certain

5  assets of Inacom by Compaq computer corporation.

6           First, let me ask you were you, in the end

7  of 1999, say December 1999, were you still a senior

8  credit manager with Tech Data?

9       **A.    Yes, I was.**

10      Q.    And were you responsible for supervising

11 personnel in connection with the Inacom account at

12 Tech Data?

13      **A.    Yes, I was.**

14      Q.    Who reported to you, who had direct

15 responsibility for monitoring credit for the Inacom

16 account?

17      **A.    I don't remember the individual's name**

18 **anymore, but it would be a financial analyst.  And**

19 **generally, we had financial analysts and an account**

20 **reconciler that would have responsibility specific**

21 **to Inacom and other accounts as assigned to them.**

22      Q.    At this time frame, late 1999, was Inacom

23 a major customer of Tech Data?

24      **A.    It was one of our larger customers, as I**

25 **handled the larger customer accounts.**

Inacom vs. Tech Data                3/4/2005                MIKE WARD

Page 30

1          Q.    Well, it was a bad question, too, so let

2    me see if I can ask you a better one.

3          Was -- when Tech Data first learned about

4    this proposed transaction between Inacom and Compaq,

5    was there an outstanding account receivable due Tech

6    Data from Inacom?

7          **A.    In other words, did Tech Data have an**

8    **accounts receivable on its books from Inacom?**

9          Q.    Yes.

10         **A.    Yes.**

11         Q.    Do you recall how much was that?

12         **A.    It would have been several million**

13   **dollars, I mean, but may not all have been due based**

14   **on the terms of the account.**

15         Q.    Did you give any special instructions to

16   your staff with respect to collecting that account

17   receivable when you learned about the proposed

18   transaction?

19         **A.    I don't recall any special instructions.**

20         Q.    What was your understanding as to how the

21   Tech Data account was going to be handled within

22   Inacom and Compaq in connection with that

23   transaction?

24         **A.    At that time we were trying to gather**

25   **information to see if we needed to do anything**

Inacom vs. Tech Data                3/4/2005                MIKE WARD

Page 31

```
 1   special.
 2       Q.   Did you arrive at any conclusion?
 3       A.   Not until we were instructed by Compaq
 4   what it is they wanted us to do.
 5       Q.   And what instructions did you receive from
 6   Compaq?
 7       A.   That they would assume all the debt of
 8   Inacom and that they wanted to maintain the same
 9   accounts receivable account that Inacom had been
10   using.
11       Q.   Is that -- when you say they wanted to use
12   the same account receivable account that Inacom had
13   been using, is that the same account number?
14       A.   It's the same account number, the same
15   account setup.
16       Q.   Is it fair to say it was your
17   understanding that that was going to be one account
18   simply transitioned from one customer to another
19   customer?
20       A.   Yes.  We would, we would change the name
21   of the account and we would change whatever other
22   information that Compaq deemed necessary as far as
23   shipping and billing would go.
24       Q.   But other than that, terms would remain
25   the same?
```

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 32

```
 1      A.    Yes.

 2      Q.    Was a new credit limit established for

 3 Compaq?

 4      A.    Compaq, I believe, already had a credit

 5 limit established since there was a separate -- we

 6 were doing business with them separately.  I think

 7 we may have looked at the credit limit to make sure

 8 that it was sufficient enough for the volume of

 9 business that was proposed to come through.

10      Q.    Do you have any recollection of whether

11 the credit limit was increased?

12      A.    I don't recall that we had to do anything

13 drastic.  It was pretty much -- the business volume

14 was pretty much going to stabilize.

15      Q.    I need to clarify some terminology.  I've

16 been referring to the acquiring entity as Compaq.

17 Do you -- have you ever heard of Custom Edge?

18      A.    Yes.

19      Q.    Who is Custom Edge?

20      A.    Custom Edge was the name given to the

21 Inacom configuration business that was purchased by

22 Compaq.

23      Q.    And did you understand Custom Edge to be a

24 wholly owned subsidiary or a division of Compaq?

25      A.    Yes.
```

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 34

```
 1  at Mr. Zava's deposition as Exhibit No. 5.  And I
 2  will give you what time you need to review this
 3  two-page exhibit.  It's marked as two pages, but it
 4  appears to be two different copies of the same
 5  letter or portions of the same letter.
 6          Let me know when you're --
 7     A.   Okay.
 8     Q.   Okay.  The first page of Exhibit 5, which
 9  has a Bates stamp 390 doesn't bear a signature so
10  I'm going to turn your attention to the second page
11  which appears to be another copy of this letter.
12  Does that version bear your signature?
13     A.   The second page, yes, that's my signature.
14     Q.   What is this letter?
15     A.   This letter is a summary of a telephone
16  conversation that we had and the parties involved in
17  the first paragraph.
18     Q.   I'll read the first paragraph aloud for
19  the record.  Correct me if I say anything wrong.
20  "This letter is to summarize our conference call
21  yesterday which included the following Inacom senior
22  managers Leon Kirkman," next word is obscured,
23  "purchasing John Frasca," must be "Senior V.P.
24  Purchasing, John Frasca, V.P. Purchasing and Dick
25  Oshlo V.P. Treasury, Mike Zava Tech Data V.P. of
```

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 35

```
 1   U.S. Credit Services and Donna Platt, Tech Data
 2   Territory Sales Manager were also present on this
 3   call."  Did I read anything wrong?
 4       A.   No, that's a good reading.
 5           Mr. Hunt:  Actually, I'm just going to
 6       object to the form because the letter says what
 7       it says.  I can't read it.  I don't have a
 8       copy.
 9           Ms. Dumas:  Do you want to take a break so
10       we can make you a copy?
11           Mr. Hunt:  I think the letter says what it
12       says.  I don't -- I mean, if it all --
13           Ms. Dumas:  Steve, I'm just trying to find
14       out if I read the names right because I'm
15       reading a typewritten copy.
16           Mr. Hunt:  Okay.
17   By Ms. Dumas:
18       Q.   Did I read the names right, Mr. Ward?
19       A.   Yes, I believe you pronounced the names
20   correctly.
21       Q.   Thank you.  Was there a conference call
22   the day before this letter, which is dated February
23   9, 2000?
24       A.   From the letter, yes, that would be
25   correct.  That would stand.
```

Inacom vs. Tech Data                    3/4/2005                              MIKE WARD

Page 36

```
 1        Q.    And do you recall having participated in
 2   the conference call as you sit here today?
 3        A.    Yes, I do.
 4        Q.    How long did the call last?
 5        A.    I would have to say less than an hour.
 6        Q.    More than a half hour?
 7        A.    Maybe, maybe a little bit more closer to
 8   half an hour.
 9        Q.    Who is Mr. Kirkman?
10        A.    I have to say that I really don't know.  I
11   never personally met him other than he was sitting
12   in the back room on a call.
13        Q.    And Mr. Frasca?
14        A.    Mr. Frasca was an individual that I
15   communicated with from time to time during this time
16   period.
17        Q.    Had you communicated with Mr. Frasca prior
18   to this time period?
19        A.    I don't recall.
20        Q.    What was his -- what was your
21   understanding of his position at Inacom?
22        A.    At that time my understanding was that he
23   was in some sort of management capacity for
24   purchasing for Inacom.
25        Q.    And how about Mr. Oshlo?
```

Inacom vs. Tech Data                3/4/2005                    MIKE WARD

Page 37

1      A.    As it states here in the letter, it was my

2  understanding that he was a V.P. of Treasury for

3  Inacom.

4      Q.    Before the conference call that's referred

5  to in this letter, had you ever had any

6  communication with Mr. Oshlo?

7      A.    I believe there was some times prior to

8  that that I did at least attempt to talk to him for

9  check information.

10     Q.    And what about Ms. Platt, who was she?

11     A.    She was the Tech Data outside sales

12 representative for Inacom.

13     Q.    Did she work for Tech Data?

14     A.    Yes.

15     Q.    What were her responsibilities?

16     A.    In a sales capacity she was responsible

17 for the territory that Inacom was in and would call

18 on the customer to make sure that relationships were

19 appropriate, and pricing, and whatever questions

20 would come up in the normal course of business

21 between two companies like ourselves.

22     Q.    On this call do you recall whether

23 somebody took the lead from the Inacom side and

24 somebody took the lead from the Tech Data side, or

25 was it a general discussion.  How did it go?

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 38

1    A.   Well, the call began with the usual

2  ritualistic formalities and exchanges of weather and

3  things of that nature.   Then from that point on it

4  was pretty much David Guenthner who did most of

5  communicating.

6    Q.   Who is Mr. Guenthner?

7    A.   At that time I believe he was the V.P. of

8  Finance for Inacom.

9    Q.   Had you ever spoken to Mr. Guenthner

10  before this?

11    A.   Maybe, just maybe just once or twice

12  before this teleconference or conference call.

13    Q.   Between you and Mr. Zava at Tech Data, who

14  had more direct communication with Inacom in this

15  time frame about this subject?

16    A.   That would have been me.

17    Q.   So, I interrupted your train of thought.

18  Mr. Guenthner took the lead on the call for Inacom;

19  is that correct?

20    A.   That's correct.

21    Q.   Did anyone take the lead in the call on

22  behalf of Tech Data?

23    A.   It was our purpose at that time to just

24  get an understanding of what was to transpire.

25    Q.   So you were more on the receiving end?

Inacom vs. Tech Data                    3/4/2005                              MIKE WARD

Page 39

```
 1        A.    Yes.

 2        Q.    Did you write this letter?

 3        A.    I wrote the letter that's in the, in the

 4   printed text.

 5        Q.    Without the handwritten interlineations;

 6   is that correct?

 7        A.    No handwritten lineations, I believe you

 8   said, was my signature on the bottom.

 9        Q.    What was your purpose in writing this

10   letter?

11        A.    David had provided us quite a bit of

12   information within what I think was about a half an

13   hour time period.  And the only sole purpose of that

14   was to make sure that we understood his

15   communication to us correctly.

16        Q.    Do you believe that this letter accurately

17   summarized his communication to you in that call?

18        A.    Based on all the changes he made to it I

19   assume that I did not make all the right

20   understandings as I thought I had.

21        Q.    Okay.  Take a look at the page 391 which

22   is the second version of this.  Do you know whose

23   handwriting is opposite your signature on the

24   right-hand side of the bottom of the page?

25        A.    I have to understand that is Dave
```

Inacom vs. Tech Data                    3/4/2005                              MIKE WARD

Page 40

1  **Guenthner's handwriting.**

2       Q.    Another caution for the deposition.  I

3  don't want you to speculate.  As a matter of fact,

4  I'm not entitled to your speculation.

5       **A.    Uh-huh.**

6       Q.    If you know that to be his handwriting

7  certainly tell me.  If you don't know it to be his

8  handwriting, then it's a hundred percent okay for

9  you to say I simply don't know.

10      **A.    Well, I thank you for that, because I had**

11 **never seen his handwriting before or after or since.**

12      Q.    I figured that might be the case.  Let me

13 see if I can -- let me see if I can --

14            So you sent the letter in just the typed

15 form signed by you to Mr. Guenthner; is that

16 correct?

17      **A.    Yes.  I sent this in a typed form with my**

18 **signature to David Guenthner.**

19      Q.    And then at some point later did you get

20 it back with these interlineations and this note in

21 the bottom?

22      **A.    I believe the next day or two days later**

23 **he sent this back to me -- I assume it's from him**

24 **again -- with these corrections on it.**

25      Q.    Let me show you what I marked in

Inacom vs. Tech Data                3/4/2005                MIKE WARD

Page 46

1           **The witness:  Okay.**

2           **(A recess was taken from 10:32 to 10:50 a.m.)**

3    By Ms. Dumas:

4           Q.   Mr. Ward, before the break we were talking

5    about this call that happened on February 8, 2000.

6    Did you say anything in this conversation?

7           **A.   I might have just asked questions for**

8    **clarity sake, understand what I thought I heard as**

9    **it came across the telephone lines.**

10          Q.   Did Mr. Zava say anything of the

11   conversation that you recall?

12          **A.   Not anything more than one would expect in**

13   **a normal conversation.  Again, mostly we were in a**

14   **listening mode.**

15          Q.   And how about Ms. Platt?

16          **A.   I recall she stayed in the background.**

17          Q.   Is Donna Platt still employed by Tech

18   Data?

19          **A.   Yes, she is.**

20          Q.   In Clearwater?

21          **A.   No.  I believe she's in Chicago.**

22          Q.   The third paragraph of the letter --

23               Ms. Dumas:  I'll try to read it correctly,

24   Mr. Hunt.

25          Q.   Says:  "In the meantime, all checks

Inacom vs. Tech Data                3/4/2005                MIKE WARD

Page 47

1    payable to all Inacom vendors at this time are being

2    held in Inacom's treasury department."  Do you

3    recall Mr. Guenthner describing that information?

4        A.   Not in any more detail than what I have

5    here in this letter.

6        Q.   Do you remember whether or not he said

7    that they were holding all checks pending the

8    closing or the reason, did he describe a reason for

9    holding checks payable to Inacom's vendors?

10       A.   I don't recall that he gave a reason.

11       Q.   It goes on to read:  "This includes five

12   checks totaling 4.9 million today payable to Tech

13   Data.  No checks will be released by Inacom until at

14   least six weeks after the closing.  Inacom's total

15   payables" --

16       A.   I'm sorry to interrupt.

17            Mr. Tatelbaum:  It says a week?

18       A.   I think that's "at least a week."

19       Q.   I'm sorry.  I should be reading the

20   smaller version.  Let me read that again.

21            "No checks will be released by Inacom

22   until at least a week after the closing.  Inacom's

23   total payables to Tech Data are approximately 15

24   million as of this letter."

25            My first question is, simply, does that

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 48

1  last sentence refresh your recollection as to what

2  was the outstanding payable from Inacom as of

3  February 2000 for 15 million?

4        A.    Yeah.    As I stated earlier, I would have

5  thought at that time Inacom would have owed us

6  several million dollars.    Again, based on the agings

7  it probably would not have all been due.

8        Q.    And in the first sentence where it says --

9  or excuse me, the second sentence where it says:

10  "This includes five checks totaling 4.9 million

11  today," he's referring to checks that are being held

12  in Inacom's treasury department.    Is that consistent

13  with what you testified to earlier of Inacom's

14  practice of holding checks before they release them?

15        A.    Yes.

16        Q.    Did your personnel monitor the status of

17  checks in Inacom's treasury department prior to the

18  date of that letter?

19        A.    As we did in the normal course of business

20  with Inacom, yes.

21        Q.    The next paragraph reads:    "An important

22  item of note as discussed is that Compaq will assume

23  all vendor liabilities on account at closing unless

24  Inacom is holding a check in its treasury to pay

25  such liabilities."

1  **about 15 days after closing.**

2      Q.    Was that your understanding of what that

3  interlineation was at the time?

4      **A.    As I just read it, it would have been.**

5      Q.    But was it at the time?

6      **A.    Yes.**

7      Q.    Did you contact Mr. Guenthner after you

8  received his interlineation of the letter?

9      **A.    I don't recall contacting him again after**

10 **this letter.**

11     Q.    Do you remember him saying in the

12 discussion that Compaq will assume all vendor

13 payables on account at closing unless Inacom is

14 holding a check in its treasury to pay such

15 liabilities?

16     **A.    Yes, I do recall that.**

17     Q.    Did you or Mr. Zava say anything in

18 response to that statement?

19     **A.    I don't believe there was any response to**

20 **that of any substance.**

21     Q.    You didn't disagree with it?

22     **A.    I don't believe we disagreed.  We just,**

23 **just accepted it for what he said.**

24     Q.    Did you say that that's not acceptable to

25 Tech Data?

Inacom vs. Tech Data                    3/4/2005                    MIKE WARI

Page 5:

1  **Inacom's actions what we would then do going**
2  **forward.  Wait and see.**
3      Q.    Did you, in this call did you -- strike
4  that.
5          As of the date of this call, February 8,
6  had you had any communication at that point with
7  anyone from Compaq about this transaction?
8      **A.    On this specific day did you say?**
9      Q.    No.  Any time before this day?
10     **A.    I can't say for sure.  I can't recall.**
11     Q.    Did you have -- I'm trying to -- just
12 trying to pin things down on dates.  The sale
13 closed, if I'm not mistaken, on February 16, 2000.
14 And you don't have to accept that representation as
15 true if you remember a different day, but I'm simply
16 trying to pin down a time frame.
17         Do you recall whether you had any
18 conversations directly with Compaq as opposed to
19 Inacom personnel before the closing about this
20 transaction?
21     **A.    I can't recall if it was before the**
22 **closing or if it was in the process of the closing**
23 **or subsequent to the closing.**
24     Q.    Okay.  What communication did you have
25 with Compaq?

Inacom vs. Tech Data                    3/4/2005                              MIKE WARD

Page 56

1     A.    I had a communication with an individual

2   from Compaq by the name of Mr. Bill Francis.

3     Q.    What was the -- in what form was that

4   communication?

5     A.    The initial contact with Mr. Francis was

6   on telephone.

7     Q.    Who initiated the call?

8     A.    I don't recall.

9     Q.    What was the substance of the discussion

10  as best as you can recall?

11    A.    The substance of the discussion was to --

12  for Compaq to provide to Tech Data some form of

13  comfort that Tech Data's liabilities, trade

14  receivables from Inacom would be assumed by Compaq.

15    Q.    Did you ask Inacom to -- strike that.

16          Was it at Tech Data's request that Compaq

17  provide some form of comfort that Inacom's trade

18  receivables would be assumed by Compaq?

19    A.    I don't recall that anyone in credit

20  initiated that call.

21    Q.    Do you recall whether anyone from Tech

22  Data initiated that call?

23    A.    There were other departments that had

24  interest in this action and there could have been

25  others outside of the credit department acting

1    Q.    Who did you get the letter from?

2    A.    I don't recall exactly if I received it

3 directly from Bill Francis or if Mike Zava received

4 it and gave it to me.

5    Q.    Referring back to the questions that I was

6 asking you a few minutes ago, this letter is dated

7 February 16, 2000.

8    A.    Yes.

9    Q.    Does looking at this letter refresh your

10 memory about whether your phone call with

11 Mr. Francis was before you saw this letter from him

12 or after you saw this letter from him?

13    A.    Well, in that context, my phone call was

14 before this letter.

15    Q.    And did you view this letter as in

16 response to your request that Compaq provide some

17 form of comfort to Tech Data?

18    A.    Again, I'm not sure that I asked for that

19 comfort from Compaq.  Again, I'm not sure who

20 initiated the phone conversation that I had with

21 Bill Francis, but there was a phone conversation,

22 whether I answered the phone or whether I actively

23 called him, but there was a phone conversation.

24    Q.    How long did that call last?

25    A.    I don't think it lasted more than ten

Inacom vs. Tech Data                3/4/2005                MIKE WARD

Page 59

1   minutes.

2       Q.   Who did you understand Mr. Francis to be

3   when this call was placed?

4       A.   I understood Mr. Francis to be the person

5   that he identifies himself as, Director of Corporate

6   Finance for Compaq.

7       Q.   To the best of your recollection, what did

8   he say to you in this call?

9       A.   To the best of my recollection, in summary

10  he said that he was going to send the letter from

11  Compaq to Tech Data saying that Compaq was assuming

12  all the liabilities of Inacom.

13      Q.   And did you say anything to him other than

14  thank you?

15      A.   I probably gave -- you know, thanked him

16  for doing so and directed him where that information

17  should be sent to.

18      Q.   Did you have any communication with

19  Mr. Francis after you got this letter?

20      A.   Yes.

21      Q.   What was the next communication?

22      A.   There was some communication subsequent to

23  this letter regarding a cross corporate guarantee

24  from Compaq on behalf of Custom Edge to Tech Data.

25      Q.   Turning your direction to the text of this

Inacom vs. Tech Data                3/4/2005                                MIKE WARD

Page 62

```
 1   in the March 2000 time frame we requested that
 2   Compaq provide us a cross corporate guarantee on the
 3   Custom Edge purchases from Tech Data.
 4        Q.   The form of this letter, the text that's
 5   in it, did you provide that to Mr. Francis?
 6        A.   No, I did not.
 7        Q.   Did anybody from Tech Data provide that to
 8   Mr. Francis?
 9        A.   I'm not aware that anybody from Tech Data
10   would have provided this to Mr. Francis.
11        Q.   The second paragraph reads:  "In
12   connection with such purchase Custom Edge, Inc. also
13   assumed the obligation to pay all of the outstanding
14   amount on the referenced account subject to the
15   terms and conditions of such account."
16        My question is:  What did you understand
17   that sentence to mean?
18        A.   I understood that sentence to mean that in
19   any and all circumstances Compaq would pay any of
20   the debts owed by Inacom to Tech Data.
21        Q.   Did you have any conversations with
22   Mr. Francis, or did you have any communications with
23   Mr. Francis other than his statement that's set
24   forth in this letter about that understanding?
25        A.   I don't believe I did.  I believe that the
```

Inacom vs. Tech Data                3/4/2005                                    MIKE WARD

Page 63

1  **letter spoke for itself as it was written.**

2      Q.    The next paragraph reads:   "Inquiries to

3  Custom Edge, Inc. regarding your account should be

4  directed to John Frasca."   And then it provides a

5  telephone number.

6          Did you make any inquiries or communicate

7  with Mr. Frasca after you received this letter --

8      A.    Yes.

9      Q.    -- about the subject of this letter?

10     A.    Yes.

11     Q.    Tell me about that communication.

12     A.    **There would have been calls from me**

13  **regarding, again, the process of payments to Tech**

14  **Data for trade payables owed.**

15     Q.    More than one?

16     A.    Yes.

17     Q.    Do you recall any specific conversations

18  with Mr. Frasca?

19     A.    **I recall one conversation on the phone**

20  **with Mr. Frasca that he said, you know, Compaq is**

21  **going to take care of all the debts, so you should**

22  **have no concerns, something to that effect.**

23     Q.    Do you remember when you had this

24  conversation with him?

25     A.    **That would have been in the late February,**

Inacom vs. Tech Data                3/4/2005                              MIKE WARD

Page 65

1    we understand that now at this time and -- you know,

2    because at that time we were working with Frasca to

3    continue the smooth transition of the business.

4        Q.    Did you understand Mr. Frasca's statement

5    to you to be something different than what was

6    expressed by Mr. Guenthner in the February 9th

7    letter with regard to Compaq assuming the

8    liabilities other than liabilities that Inacom was

9    holding checks for?

10       A.    I understood that conversation with

11   Mr. Frasca on his part to be an affirmation of the

12   Compaq letter.  He also referred me to the Inacom 8K

13   filing that stated that as well in that public

14   information.

15       Q.    Okay.  I appreciate that.  That wasn't

16   exactly my question.  My question was: Did you

17   understand it to be different from what

18   Mr. Guenthner's letter said, which was that, quote,

19   Compaq will assume all vendor liabilities on account

20   at closing unless Inacom is holding a check in its

21   treasury to pay such liabilities?

22       A.    At that time I understood that this

23   February 16, 2000 letter from Mr. Bill Francis

24   superseded that summarization of a conversation that

25   was unilateral from Mr. Guenthner.

Inacom vs. Tech Data                    3/4/2005                              MIKE WARD

Page 66

1      Q.   So you understood the February 16 letter

2  to state something different than was stated in the

3  February 9 letter; the difference being that Compaq

4  was going to assume all liabilities, not just the

5  liabilities that were not reflected by a check that

6  was held in treasury; is that right?

7      **A.   I understood that we would -- that Compaq**

8  **had assumed all the debts and from that point**

9  **forward our conversations and -- I'm sorry, our**

10 **payables would be assumed by the Compaq**

11 **Corporation.**

12         **Ms. Dumas:  Would you read the last answer**

13     **back?**

14     **(The answer appearing on page 65, line 9**

15 **through line 13 was read by the reporter.)**

16 **By Ms. Dumas:**

17     Q.   So at that point after the February 16

18 letter you were no longer looking to Inacom to pay a

19 portion of the debt through the held checks; is that

20 right?

21     **A.   We were not relying on Inacom to pay any**

22 **of its debts to Tech Data.**

23     Q.   Was that perceived as good news by Tech

24 Data?

25     **A.   In a sense it was since Compaq was such a**

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 67

1  **large vendor of Tech Data's.**

2      Q.    Let me go back to the first exhibit that I

3  showed you, this Exhibit No. 4.  And if you'll just

4  let me take a moment to find what I want to ask you

5  about.

6          I guess the first thing I want to ask you,

7  it's just on the first page under the top words

8  that's "AR note management" ANM notes I guess is the

9  abbreviation, it says customer number 953001 HP

10 Direct, this particular printout of the ANM notes

11 appears to have been printed on July 7, 2004 and I'm

12 drawing that conclusion from the upper right-hand

13 corner where it says date 07/07/04.  Am I reading

14 that correctly?

15      **A.    Yes.**

16      Q.    So that, at that point, what had

17 previously been Custom Edge or Compaq, name had been

18 changed to HP to reflect the subsequent merger

19 between Compaq and Hewlett Packard; am I reading

20 that correctly?

21      **A.    Yes.  We can change the names here in the**

22 **customer information center.  Actually, this was**

23 **Inacom -- this account number was Inacom, then it**

24 **was Custom Edge, and then it became HP Direct as**

25 **directed by HP.**

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 69

1  still do not have cross corporate however. Compaq

2  is holding it because we have not formalized our

3  cross corporate to them." Have I read that

4  correctly?

5      **A.    Yes.**

6      Q.    Is this a reference to the cross corporate

7  guarantee that you testified to earlier?

8      **A.    This is the cross corporate that I**

9  **testified earlier between Compaq and Custom Edge to**

10 **Tech Data.   There is another cross corporate**

11 **guarantee being referred to here.**

12     Q.    Okay.   What cross corporate is that?

13     **A.    That would be us as a customer to Compaq**

14 **as our vendor on another division or subsidiary of**

15 **Tech Data Corporation.**

16     Q.    So Tech Data was guaranteeing the

17 liabilities of Tech Data's subsidiary in favor of

18 Compaq, and Compaq was guaranteeing the liabilities

19 of Custom Edge on Custom Edge's liabilities to Tech

20 Data; is that correct?

21     **A.    That's the general idea, yes.**

22     Q.    Okay.   And did Tech Data receive a

23 corporate guarantee of Compaq from -- guaranteeing

24 the obligations of Custom Edge?

25     **A.    I'm going to repeat that question.   Did**

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 70

```
 1    Tech Data receive a cross corporate guarantee from

 2    Compaq on Custom Edge?

 3         Q.    Right.

 4         A.    No, we did not.

 5         Q.    Never at any point?

 6         A.    I don't recall that we ever did.

 7         Q.    Was that a requirement of establishing a

 8    credit line for Custom Edge?

 9         A.    It didn't turn out to be a requirement.

10    It was a formal request, a routine request if you

11    will.

12         Q.    But as it turned out Tech Data was willing

13    to sell product to Custom Edge without a Compaq

14    guarantee?

15         A.    That's correct.

16         Q.    And why was that?

17         A.    Because of our relationship with Compaq as

18    a vendor.

19         Q.    The top of the next page, which is bates

20    numbered 2345, it's dated 3/16/00, 11:07 a.m., and

21    employee number and then the entry:  "We have

22    received a tax copy of the CCG" -- Does "CCG" stand

23    for cross corporate guarantee?

24         A.    Yes, it does.

25         Q.    -- "signed by Bill Francis, Compaq
```

Inacom vs. Tech Data                3/4/2005                          MIKE WARD

Page 84

```
 1                    AFTERNOON   SESSION
 2         (The deposition was resumed at 12:52 p.m.)
 3               CONTINUED DIRECT EXAMINATION
 4    by Ms. Dumas:
 5         Q.    Mr. Ward, would you pick up Exhibit 4
 6    again which is the big pack?  You got it.  And I've
 7    just got one or two questions for you back on this.
 8    And that is, in it there is a reference to Tech Data
 9    requesting a corporate resolution from Compaq that
10    Mr. Francis was authorized to execute a corporate
11    guarantee back on that page 2345 that we were --
12         A.    Yes.
13         Q.    -- reviewing.  Are you with me on that?
14         A.    Yes.
15         Q.    All right.  My question is:  When
16    Mr. Francis sent you the February 16 letter did you
17    request a confirmation, corporate authorization that
18    Mr. Francis was authorized to deliver this letter?
19         A.    No, I did not.
20         Q.    And why not?
21         A.    Because of the letterhead and the title on
22    the letter I had assumed that that was sufficient.
23         Q.    Isn't the reason that you didn't ask for a
24    corporate authorization because this was a comfort
25    letter not a guarantee?
```

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 85

```
 1            Mr. Tatelbaum:  Objection.  You can
 2       answer.
 3       A.    We saw that as an assumption of the debts
 4  of Inacom.
 5       Q.    So you did not see it as a guarantee?
 6       A.    We saw it as an assumption.
 7       Q.    In your usage of the words is an
 8  assumption of the liabilities different than a
 9  guarantee of the liabilities?
10       A.    Yes, there's a slight difference.
11       Q.    What is that difference?
12       A.    In this instance here they had assumed
13  taking over the debts for them as opposed to
14  guaranteeing yet remaining separate from the entity
15  that they would be guaranteeing for.
16       Q.    All right.  You can put that aside.
17            Ms. Dumas:  I'm going to ask the reporter
18       to mark Exhibit 1 to Mr. Ward's deposition.
19       (The document was marked for identification as
20  Ward Exhibit No. 1.)
21  By Ms. Dumas:
22       Q.    Would you take whatever time you need
23  to --
24       A.    Back on the record?
25       Q.    We're back on the record.
```

Inacom vs. Tech Data                          3/4/2005                          MIKE WARD

Page 99

1   conversations with Mr. Samuelson?

2       **A.     I believe I spoke to him about some**

3   **invoices that needed to be reconciled.**

4       Q.     Do you recall whether they were Inacom

5   invoices?

6       **A.     Yes, I believe they were Inacom invoices.**

7       Q.     What does this mean:  Dick recommended Jay

8   Samuelson as contact for funds due from Compaq for

9   pre-closing?

10      **A.     Essentially, what that means is Dick Oshlo**

11  **didn't really want me calling him anymore.**

12      Q.     Is it your recollection that there was --

13  strike that.

14             It was your testimony this morning that

15  Compaq had assumed the liabilities of Inacom to Tech

16  Data, correct?

17      **A.     Yes.**

18      Q.     Including invoices that had been submitted

19  by Tech Data before the closing, correct?

20      **A.     Yes.**

21      Q.     Is that what this is in reference to when

22  you say the status of the 2.2 million of pre-closing

23  invoices?

24      **A.     Yes.**

25      Q.     Do you know why you referenced the amount

```
 1        Q.   But isn't what I'm saying to you
 2   consistent with your letter to Mr. Guenthner wherein
 3   he expressed that Compaq was going to pay the
 4   payables other than payables that had a check
 5   written against them?
 6        A.   Well, again, I'm going to say that the
 7   Compaq letter from Bill Francis superseded that
 8   one-way conversation that Dick Guenthner had with
 9   Tech Data per the telephone call.
10        Q.   All right.  And that letter you received
11   on February 16, 2000, correct?
12        A.   The one from Bill Francis.
13        Q.   Yet here in March 2000 after you got that
14   letter you were asking to follow-up on payment on --
15   you say it in a number of different ways, the 2.2
16   million portion of Compaq's funds still due, the
17   Compaq side of the receivable, the 2.2 million of
18   pre-invoices still open that Compaq had claimed
19   responsibility of; how do you explain that
20   distinction?
21        Mr. Hunt:  Objection, argumentative, asked
22     and answered.  Answer if you can.
23        Mr. Tatelbaum:  You can answer, or if you
24     want to ask the reporter read it back again you
25     can.
```

Inacom vs. Tech Data                    3/4/2005                    MIKE WARD

Page 124

1      Q.    As of February 2000 had Inacom reached the

2  upper end of its credit limit with Tech Data?

3      A.    It's a possibility that it could have,

4  yes.

5            Mr. Caine:  I have nothing further.

6            Ms. Dumas:  I just have a -- Can I speak

7      in --

8            Mr. Tatelbaum:  Sure.

9                    *    *    *    *

10                Redirect Examination

11 By Ms. Dumas:

12     Q.    Mr. Ward, earlier when I was asking you

13 questions this morning I asked you how you defined

14 the term account payable; do you remember that?

15     A.    Yes, I do.

16     Q.    You have a -- you hold a CPA, right,

17 you're a Certified Public Accountant?

18     A.    That's correct.

19     Q.    And were you in 2000?

20     A.    Yes, I was.

21     Q.    Using your definition as you understand

22 account payable used in connection with the accounts

23 of a company, when a check is written against that

24 payable, isn't it true that it no longer becomes an

25 open payable on the books of the paying company?

Inacom vs. Tech Data                3/4/2005                                MIKE WARD

Page 125

```
 1        A.    In my experience as an auditor before my

 2   association with Tech Data, I can say that different

 3   companies have different processes for making

 4   payments or relieving payables from their books.

 5        Q.    What might some of those be that you were

 6   familiar with?

 7        A.    Some of those would be that when the, when

 8   the check is cut it could relieve the payables from

 9   the accounts payable ledger, others may maintain

10   them on the accounts payable ledger until the check

11   clears the bank.  I mean, there's everything in

12   between.  So there is no one standard format for how

13   there is an accounts payable cycle, if you will, per

14   se.

15        Q.    Do you know how Inacom's accounts payable

16   ledger was maintained?

17        A.    I definitely do not.

18        Ms. Dumas:  Thank you.  No further

19   questions.

20        Mr. Tatelbaum:  Okay.  He will read and

21   sign.

22        The Reporter:  And you will handle the

23   reading and signing?

24        Mr. Tatelbaum:  Yes.

25        Mr. Hunt:  I'll just mention that I
```