## 8. BEN K. WELLS

| | |
|---|---|
| 8:3-8:6 | 52:12-52:22 |
| 11:3-11:7 | 53:4-54:2 |
| 11:11-11:13 | 54:21-55:7 |
| 11:18-11:21 | 55:13-55:20 |
| 38:16-38:20 | 57:6-57:17 |
| 45:18-45:22 | 71:20-71:24 |
| 48:4-48:6 | 72:3-72:10 |
| 49:9-49:13 | 72:13-73:11 |
| 49:18-50:5 | 73:16-73:19 |
| 50:11-51:4 | 75:9-75:15 |
| 51:6-51:8 | 76:1-76:9 |
| 51:11-51:16 | 76:15-77:3 |

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

In Re:  INACOM CORP, et al.          Chapter 11
    Debtors                          Bankruptcy Case No.
                                     00-2426 (PJW)
_____

INACOM CORP., et al.
        Plaintiffs
    v.
TECH DATA CORPORATION                Civil Action No.
        Defendant                    04-CV-148 (GMS)

_____

INACOM CORP., et al.
        Plaintiffs
    v.
DELL COMPUTER CORP.                  Civil Action No.
        Defendant                    04-CV-582 (GMS)

_____

INACOM CORP., et al.
        Plaintiffs
    v.
LEXMARK INTERNATIONAL, INC.          Civil Action No.
        Defendant                    04-CV-583 (GMS)

_____

INACOM CORP., et al.
        Plaintiffs
    v.
RESILIEN, INC.                       Civil Action No.
        Defendant                    04-CV-584 (GMS)

_____

INACOM CORP., et al.
        Plaintiffs
    v.                               Civil Action No.
INGRAM ENTERTAINMENT INC.            04-CV-593 (GMS)
        Defendant


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

BEN K. WELLS

MARCH 30, 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF BEN K. WELLS, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 30th day of March, 2005, from 12:35 p.m. to 2:59 p.m., before Debbie Leonard, CSR, RMR, CRR, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Hewlett-Packard, 20555 State Highway 249, Building CC-A6, Conference Room 6801, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

1                    A P P E A R A N C E S

2    **FOR THE PLAINTIFF:**
          Mr. Andrew W. Caine
3         (via telephone)
          PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB
4         10100 Santa Monica Boulevard
          11th Floor
5         Los Angeles, California 90067
          FAX:  (310) 201-0760
6         PHONE:  (310) 277-6910

7    **FOR THE DEFENDANT, TECH DATA CORPORATION:**
          Mr. Stephen C. Hunt
8         ADORNO & YOSS
          350 East Las Olas Boulevard
9         Suite 1700
          Fort Lauderdale, Florida 33301
10        FAX:  (954) 766-7800
          PHONE:  (954) 763-1200

11   **FOR THE DEFENDANT, DELL COMPUTER CORP.:**
12        Mr. G. James Landon
          HUGHES LUCE, LLP
13        111 Congress Avenue
          Suite 900
14        Austin, Texas 78701
          FAX:  (512) 482-6859
15        PHONE:  (512) 482-6880

16   **FOR THE DEFENDANT, LEXMARK INTERNATIONAL, INC.:**
          Mr. Culver V. Halliday
17        STOLL, KEENON & PARK, LLP
          2650 Aegon Center
18        400 West Market Street
          Louisville, Kentucky 40202-3377
19        FAX:  (502) 568-5700
          PHONE:  (502) 568-9100

20   **FOR THE DEFENDANT, INGRAM ENTERTAINMENT:**
21        Mr. Jonathan P. Hersey
          (via telephone)
22        BINGHAM McCUTCHEN, LLP
          600 Anton Boulevard
23        18th Floor
          Costa Mesa, California 92626
24        FAX:  (714) 830-0719
          PHONE:  (714) 830-0619
25

1                    A P P E A R A N C E S
                        (Continued)
2

FOR EXECUTIVE SOUNDING BOARD, INC., LIQUIDATING AGENTS
3 OF DEBTOR, INACOM CORP.:

4        Mr. Earl M. Forte
         BLANK ROME, LLP
5        One Logan Square
         18th & Cherry Streets
6        Philadelphia, Pennsylvania 19103
         FAX:  (215) 832-5618
7        PHONE:  (215) 569-5618

8 FOR THE WITNESS AND THIRD-PARTY DEFENDANT, COMPAQ
  COMPUTER CORPORATION:
9

         Ms. Cecily A. Dumas
10       FRIEDMAN, DUMAS & SPRINGWATER, LLP
         One Maritime Plaza
11       Suite 2475
         San Francisco, California 94111
12       FAX:  (415) 834-1044
         PHONE:  (415) 834-3800
13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1                  I N D E X

 2                                                PAGE

 3  Appearances....................................    2

 4
    BEN K. WELLS
 5

 6       Examination by Mr. Hunt...................    7

 7       Examination by Mr. Landon................   58

 8       Examination by Mr. Hersey................   71

 9       Examination by Mr. Caine.................   77

10       Further Examination by Mr. Hunt..........   76

11

12
    Changes and Signature.........................   79
13
    Reporter's Certificate........................   81
14

15

16

17

18

19

20

21

22

23

24

25
```

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Wells-1 | Defendant's First notice of Deposition of Ben Wells | 18 |
| Wells-2 | notice of Rule 30(b)(6) Deposition | 31 |
| Wells-3 | Forwarding E-mail From: Ward, Michael Sent: February 03, 2000 To: Zava Mike et al. | 47 |
| Wells-4 | Fax Transmittal To: Mr. Mike Zafa From: Bill Francis Dated: 02/16/00 | 51 |
| Wells-5 | Letter to Ms. Misty Atchinson from Bill Francis, dated February 16, 2000 | 51 |
| Wells-6 | Letter to Logicare, Inc. from Bill Francis, dated February 17, 2000 | 51 |
| Wells-7 | Letter to The Board of Directors of Inacom Corporation and Compaq Computer Corporation from Houlihan Lokey Howard & Zukin, dated February 16, 2000 | 55 |
| Wells-8 | Services, Supply and Sales Agreement | 59 |
| Wells-9 | Document titled: 8K Mar 00 Bates stamped 00134 -00204 | 64 |
| Wells-10 | Letter to Inacom Corp from Ben K. Wells, dated February 15, 2000 | 67 |

         1   attention to those rules.  Do you understand?

         2        A.   Yes.

         3        Q.   Thank you.  Prior to going on the record, I

         4   heard the reporter ask you your full name, and you said

12:36    5   Ben K. Wells.

         6        A.   Correct.

         7        Q.   What does the middle initial stand for?

         8        A.   Kent.

         9        Q.   Where do you reside, sir?

12:36   10        A.   23103 Holly Hollow, Tomball, Texas.

        11        Q.   Would you mind spelling the name of that town

        12   for me, sir?

        13        A.   T-O-M-B-A-L-L.

        14        Q.   Thank you.  Do I understand correctly that

12:37   15   you are no longer employed by Hewlett-Packard?

        16        A.   That's correct.

        17        Q.   What was your separation date, sir?

        18        A.   June 29th, 2002.

        19        Q.   What was your title or position when you

12:37   20   departed the company?

        21        A.   Vice president, corporate treasurer.

        22        Q.   Am I correct that that was vice president and

        23   corporate treasurer of Hewlett-Packard?

        24        A.   No.  That would be Compaq.

12:37   25        Q.   Compaq Computer Corporation?

1    treasurer?

2        A.    I was the assistant treasurer.

3        Q.    At the time of the sale of the hardware

4    assets by Inacom to Compaq, what was your position with

12:41  5    Compaq?

6        A.    I was acting chief financial officer and vice

7    president, corporate treasurer.

8        Q.    Whom did you succeed as CFO, even in the

9    acting capacity?

12:42  10        A.    Earl Mason.

11        Q.    And at what time did you commence serving as

12    acting CFO?

13        A.    Beginning of April 1999.

14            MR. HALLIDAY:    I'm sorry.    Did you

12:42  15    say '89?

16            THE WITNESS:    '99.

17            MR. HALLIDAY:    Thank you.

18        Q.    (By Mr. Hunt)    Sir, I presume at some point

19    you ceased acting as acting CFO.    When would that have

12:42  20    been?

21        A.    April of 2000.

22        Q.    Was the position as acting CFO in addition to

23    your other responsibilities as corporate treasurer?

24        A.    Yes.

12:43  25        Q.    And as of April of 2000, did you resume your

1  due diligence of the transaction.

2      Q.    To use your terminology, was Mr. Wavro

3  essentially the controller of the owning section of

4  Compaq for the Inacom assets?

13:42  5      A.    That's correct, he was.

6      Q.    Is there anyone else that you can think of

7  that we should add to the list of people that might be

8  knowledgeable about this category, as broadly as it

9  might be written?

13:42  10      A.    The -- I was the primary finance person.

11  There were others that would kind of come in and come

12  out.  But I was the primary finance person on the team.

13  And I was supported by outside counsel and my financial

14  advisors, both accounting and investment bankers.

13:42  15      Q.    Let me back up a second.

16          Mr. Wells, you indicated, I believe, that

17  you were primarily responsible for investigating the

18  financial condition of Inacom as part of this asset

19  sale.

13:43  20      A.    That's correct.

21      Q.    Why was it important to ascertain the

22  financial condition of Inacom?

23      A.    We were, as I believe I stated earlier,

24  initially evaluating an asset -- an equity transaction,

13:43  25  in which case I would have to have caused their

1          During your tenure with Compaq, would you

2    be able to put a number on approximately how many such

3    transactions transpired?

4          A.    In a major sense, in excess of 200 million, I

13:52   5    would say there were probably anywhere from 4 to 6,

6    maybe 7, and there were an indeterminate number of

7    smaller transactions.

8          Q.    Had the Inacom equity transaction taken

9    place, would you have characterized it as a major

13:52  10    transaction?

11          A.    It would have been -- it would have started

12    meeting the lower end of that threshold.

13          Q.    Similarly, sir, on the asset purchase side,

14    had you been involved in other transactions at Compaq

13:53  15    where assets of entities were acquired?

16          A.    I hesitate to say no, but I believe the

17    answer is no.

18          Q.    As part of the evaluation of the financial

19    condition of Inacom, did Compaq investigate the

13:54  20    timeliness of payments of accounts payable by Inacom to

21    its vendors?

22          A.    I don't know.  I don't recall.

23          Q.    Did you have interactions with the treasury

24    department or the treasurer of Inacom as part of your

13:54  25    financial evaluation?

1    principle.  I believe -- again, I don't want to say no,

2    but it could be no.  I'm trying to go back 25 years,

3    so --

4        Q.   I appreciate that.  Mr. Wells, I'm going to

13:59  5  hand you an exhibit, part of which is a form 8K report

6    dated January 4th of 2000.

7        A.   Okay.

8        Q.   And it's a lengthy document.  And while

9    you're welcome to read it if you'd like, I really am

13:59  10  just interested in focusing your attention on the first

11   page of the 8K so you can identify what it is.

12       A.   Okay.

13       Q.   And then if you would, please, look at

14   Pages 53 through 56.  They're numbered on the top right

13:59  15  corner.

16       A.   What did you say?  Fifty --

17       Q.   53 through 56.

18       A.   Okay.

19           (Pause)

14:00  20          I scanned it.

21       Q.   Thank you, sir.  Did you see a reference to

22   Tech Data Corporation in those pages?

23       A.   Okay.  I'll look more closely for it.

24       Q.   I'll also be asking about Lexmark, sir.

14:01  25   A.   I thought I saw Lexmark.  I don't see it.  If

1  it is in here, I am not -- again, I'm going quickly

2  through it.  I don't see it.

3      Q.   All right, sir.  Was there, to the best of

4  your recollection, a section in the Asset Purchase

14:02  5  Agreement pertaining to the payment of certain vendors

6  by Compaq after the transaction as assumed liabilities?

7      A.   I don't specifically recall, to be perfectly

8  honest with you.

9      Q.   Do you have any recollection of whether

14:02  10  provisions were made for the payment of Tech Data or

11  Lexmark by Compaq for outstanding accounts payable

12  after the conclusion of the asset purchase?

13      A.   Them specifically, no.

14      Q.   Okay.

14:02  15          MR. HUNT:  Can we go off the record a

16  moment?

17          (Off-the-record discussion.)

18      Q.   (By Mr. Hunt)  Mr. Wells, did you know

19  Mr. Bill Francis?

14:03  20      A.   I did.

21      Q.   Do you know in what capacity he served at

22  Compaq?

23      A.   He was a manager of accounts payable.

24      Q.   Do you know what function, if any, he had as

14:03  25  part of the implementation of the asset purchase by

1  Compaq?

2      A.    You know, given his title, I believe that he

3  would have coordinated the accounts payable that came

4  with the asset purchase that ultimately would have gone

14:03  5  on to Compaq's books.

6      Q.    I asked you earlier if you recalled

7  specifically as to Tech Data and Lexmark assumption of

8  liabilities of accounts payable, and I believe you were

9  unable to recall it.  I want to ask you something

14:04  10  slightly different.

11          Do you recall that Compaq agreed to

12  assume the liabilities of certain accounts payable just

13  as a category of the Asset Purchase Agreement?

14      A.    Narrowly speaking, we were concerned that, as

14:04  15  the acquisition transpired, that the configuration

16  centers were -- continued to be filled with the

17  componentry that is necessary as you configure the

18  machine and move it on.

19          And we endeavored to assure the component

14:04  20  suppliers that, in fact, we were going to be in the

21  configuration business on a go-forward basis.  "We"

22  being Compaq Computer Corporation under the name of --

23  it was a hokey name -- Custom Edge.  Custom Edge.

24      Q.    Do you recall how long the Custom Edge

14:05  25  business continued before it was absorbed by Compaq

1  entirely?

2      A.    Well, I was under the impression that once

3  the asset purchase was consummated, Custom Edge was, in

4  fact, Compaq.

14:05  5      Q.    Okay.

6              MR. HUNT:    Madam Reporter, three more

7  exhibits to mark, please.    4, 5, and 6.    They'll be the

8  same numbers from the Frasca deposition.

9              (Exhibits Wells-4 through Wells-6 marked

14:06  10             for identification.)

11     Q.    (By Mr. Hunt)    Mr. Wells, I'm handing you a

12  document that's been marked as Exhibit 4.    It's a

13  one-page letter from Bill Francis to Tech Data

14  Corporation.    And I would ask you just to quickly

14:06  15  familiarize yourself with it.

16     A.    Okay.

17     Q.    Is this the first time that you're seeing

18  this letter, sir?

19     A.    This specific one?

14:06  20     Q.    Yes.

21     A.    Yes.

22     Q.    How about not specifically?    In other words,

23  have you seen a letter containing substantially the

24  same concept before?

14:07  25     A.    Yes.

1    Q.    Was that in relation to the Inacom asset
2  purchase?

3    A.    Yes.

4    Q.    Is the letter that you're testifying that you
5  saw before one that was actually addressed to a party
6  or one that was just a blank form letter?

7    A.    No.  I believe it was probably addressed to a
8  party.

9    Q.    Can you recall which party it would have
10  been, sir?

11    A.    I'm sorry.  I can't.

12    Q.    Okay.  At your level of the negotiation of
13  the asset purchase, were you aware that this type of
14  letter was being sent to certain vendors?

15    A.    Yes.

16    Q.    Had that been authorized by yourself?

17    A.    Yes.

18    Q.    I would like to show you what's been marked
19  as Exhibit 5, sir.

20    A.    The same letter to Lexmark?

21    Q.    Yes, sir.

22    A.    Okay.

23    Q.    And before you lose your glasses, Exhibit 6.

24    A.    Okay.  Same letter to Logicare, I believe.

25  Yes.  Same letter.

1      Q.    Sir, do you recall from whence the idea came

2  to issue these letters to certain vendors?

3      A.    No, I don't.  No.

4      Q.    Are you able to recall the extent to which

14:08  5  this type of letter was to be sent to Inacom's

6  pre-transaction vendors?  And by that I mean, was this

7  to be a widely distributed type of letter or one more

8  narrowly focused?

9      A.    My understanding was, is it was only supposed

14:09 10  to go to those entities in which were going to provide

11  componentry to the assets that were purchased by Compaq

12  that were focused on Compaq product going through the

13  door on the other end.

14          The -- broadly speaking, the concern here

14:09 15  was that there was some confusion.  My recollection is

16  a little vague, but my recollection of the announcement

17  is, is that Compaq Computer Corporation had bought --

18  and we used the phrase "specific" in one release --

19  assets.

14:10 20          There were some suppliers that wondered

21  if there was going to be a configuration and where

22  their business was going.  And to clarify that

23  uncertainty such that the Compaq business -- we were

24  really focusing on customer satisfaction.  Out of the

14:10 25  field -- and this came out of the field, that it was

1    prudent for us to focus on that grouping inasmuch as it

2    affected Compaq equipment.

3        Q.    Thank you, sir.

4        A.    Going through the configuration center.

14:10  5        Q.    I can represent that other witnesses have

6    indicated there was a transition team or multiple

7    transition teams for bringing Custom Edge within the

8    Compaq fold, so to speak.

9            My question to you is, were there

14:11 10    transition teams set up on the Compaq, Inacom, and

11    Custom Edge sides to fold the purchased assets into

12    Compaq?

13        A.    I believe there was, yes.

14        Q.    Do you know if Mr. Francis was one of the

14:11 15    members of the Compaq transition team?

16        A.    As I stated before, I believe his involvement

17    would have been covering the accounts payable, although

18    I am not sure how far into the transition team he went.

19    He was really acting more in the context of a Compaq

14:11 20    Computer Corporation person with a very narrow --

21        Q.    Mr. Francis -- to your mind, did Mr. Francis

22    send out the letters that are marked as Exhibit 4 and 5

23    on his own, or did he obtain approval from someone else

24    before he sent them?

14:12 25        A.    No, I -- I'm absolutely positive he didn't.

1  I actually authorized, I believe -- let's see.  Let

2  me -- Mr. Baker to authorize -- and I'm sure Mr. Baker

3  went to his direct report, who then went to Mr. Francis

4  and said it's okay to do this.

14:12  5      Q.   Would you have seen the form of this letter

6  before it was sent out, sir?

7      A.   I'm sure I would have, but I don't recall.

8      Q.   In looking at Exhibit 4, for example, sir,

9  would you please tell me --

14:13  10     A.   Okay.  This one is the one to Tech Data.

11     Q.   Yes, sir.

12     A.   Okay.

13     Q.   What did that letter mean to you, or what did

14  you mean by that letter being sent out?

14:13  15     A.   Well, the context in which it was supposed to

16  have meant is, again, as I stated earlier, that if they

17  were supplying componentry to the configuration

18  centers, then Compaq -- that was being used in the

19  configuration of Compaq computers, then we would assume

14:14  20  that liability and pay them.

21          MR. HUNT:  Madam Reporter, would you

22  mark that as Exhibit 7, please?  It's the same exhibit

23  from the Frasca deposition, Frasca-7.  It's the

24  Houlihan Lokey solvency opinion.

14:14  25          (Exhibit Wells-7 marked for

1  accountants, PricewaterhouseCoopers.  But for the most

2  part, I would have anticipated it would have been

3  internal Compaq.

4            MR. HUNT:  With your permission, I would

14:17  5  just like to confer with my other counsel for a moment.

6            MS. DUMAS:  Sure.  Before you do that, I

7  might as well say for the record that, since we

8  received the 30(b)(6) notice, HP has ascertained that

9  it currently believes that Mr. Chris Anderson, who the

14:17  10  witness identified, is the individual who was primarily

11  involved in the accounts payable analysis by Compaq.

12            The last time I spoke with Mr. Anderson,

13  which was a couple of months ago, he was an HP

14  employee.  I recently learned, after we received this,

14:17  15  that he's no longer with Hewlett-Packard.  And thus

16  far, we've been unable to reach him.  But that is who

17  we are attempting to locate on that topic.

18            MR. HUNT:  Okay.  Thank you, Ms. Dumas.

19            (Break taken from 2:18 p.m. to 2:21 p.m.)

14:21  20            MR. HUNT:  Mr. Wells, I took a brief

21  recess with my colleagues to try to see if I can winnow

22  down as much as possible my list of questions.

23            I think, in the interest of expediency,

24  I'm going to go ahead and pass you along to the next

14:22  25  attorney.  And I want to thank you for your time and

1   credit facility, which I believe we looked at the

2   letter as Exhibit 10, who for Inacom did you deal with

3   in negotiating that?

4        A.    Primarily Mr. Fitzpatrick.

14:47   5              MR. LANDON:  Sir, I'll pass the witness.

6   Reserving to redirect any questions.  But thank you

7   very much.  I appreciate it.

8              THE WITNESS:  Okay.

9              MR. HUNT:  Mr. Hersey?

14:48   10              MR. HERSEY:  Yes.  If you can give me

11   just ten seconds to glance over my notes.

12              (Pause)

13                   **EXAMINATION**

14   **BY MR. HERSEY:**

14:48   15        Q.    Mr. Wells, my name is John Hersey.  I am an

16   attorney with the law firm of Bingham McCutchen.  We

17   represent Ingram Entertainment, which is a successor in

18   interest to Nashville Computer Liquidators.  I have a

19   few questions for you.

14:48   20              You had testified earlier, I believe --

21   feel free to correct me if I'm wrong -- that Compaq at

22   one point had agreed to pay some invoices that had been

23   sent to Inacom for products provided to Inacom by

24   certain vendors; is that correct?

14:49   25              MS. DUMAS:  Objection.  Misstates the

1    testimony.

2                You can go ahead and answer.

3                THE WITNESS:  I think -- I think what I

4    was -- how I referred to that is that we had bought

14:49  5    certain assets and liabilities in the transaction and

6    that we agreed to pay those liabilities that were

7    picked up as a result of the asset purchase.

8        Q.    (By Mr. Hersey)  Did some of those

9    liabilities include invoices that had been sent to

14:49 10    Inacom by some of its vendors?

11                MS. DUMAS:  Objection.  Vague.

12                You can answer if you understand it.

13                THE WITNESS:  I mean, clearly some of

14    the -- keep in mind, when you do an asset purchase, you

14:50 15    are stepping into a stream, and that clearly some are

16    going to be on their books and some are in the process

17    of happening as the deal is being closed.  So frankly,

18    I guess the answer to your question is a qualified yes.

19        Q.    (By Mr. Hersey)  In what way is it qualified?

14:50 20        A.    Well, again, it -- the -- the payable would

21    have been -- had to have been identified as part of the

22    transaction.  And if it wasn't, then obviously it was

23    excluded.  And if it was, it was picked up as part of

24    the transaction.

14:51 25                And clearly there were commitments for

1    componentry that had been made perhaps even the day of

2    the signing of the deal that we would have felt

3    obligated to pay.

4               Otherwise, again, as I noted in my

14:51  5    earlier testimony, the flow of Compaq product --

6    configured Compaq product coming out the back door of

7    this configuration center or centers would have been

8    disrupted as we had suppliers that were no longer

9    happy.

14:51  10       Q.    How did Compaq determine which of Inacom's

11   payables it was going to pay?

12               MR. CAINE:  Objection.  No foundation.

13               MS. DUMAS:  Same objection.

14               MR. FORTE:  Join.  Earl Forte.

14:51  15               MS. DUMAS:  You can answer if you can.

16               THE WITNESS:  I don't know.  I'm sure

17   that was delegated to a subteam as to evaluating which

18   payable was going to be included and which wasn't.  I

19   did not participate in the actual subteams.

14:52  20       Q.    (By Mr. Hersey)  Could you tell me who was on

21   the subteam that would have made that decision?

22       A.    Well, as I -- I think I alluded to earlier,

23   Chris Anderson probably was on that team.  There would

24   have been others, but I don't know who they would have

14:52  25   been.

1    A.    I do not.

2    Q.    Do you know whether they would have been sent

3 to any vendor whose parts would have been used in the

4 configuration of a Compaq product?

14:54  5              MR. FORTE:    Objection to form.    Earl

6 Forte.

7              MS. DUMAS:    Same objection.

8              THE WITNESS:    I can't recall.

9    Q.    (By Mr. Hersey)    You testified earlier that

14:55 10 you authorized the sending of this letter; is that

11 correct?

12    A.    Yes.

13    Q.    And by, "this letter," I mean the letter in

14 the form of Exhibits 4, 5, and 6.

14:55 15    A.    That's correct.

16    Q.    Who at Compaq made the decision as to which

17 vendors would be receiving that letter?

18    A.    I wouldn't know.

19    Q.    Would it have been someone -- if you'll

14:56 20 excuse my colloquialism -- lower in the food chain than

21 you?

22              MR. FORTE:    Objection to form.    Earl

23 Forte.

24              MS. DUMAS:    Don't speculate.

14:56 25              THE WITNESS:    I don't know.

1    Q.    (By Mr. Hersey)  So your testimony is that

2  you approved the form of the letter, but you don't know

3  who the letters were sent to?

4    A.    Correct.

14:56  5    Q.    And the reason for the letter was to ensure

6  the continued flow of products from these vendors that

7  would be necessary to configure Compaq products at

8  Custom Edge?

9    A.    That's correct.

14:57  10          MR. HERSEY:  Okay, Mr. Wells.  Those are

11  all the questions I have.  I appreciate your time.

12          THE WITNESS:  Okay.  Thank you.

13                **FURTHER EXAMINATION**

14  **BY MR. HUNT:**

14:57  15    Q.    One follow-up question, Mr. Wells.  With

16  respect to the letters that are Exhibits 4, 5, and 6,

17  on the financial side for Compaq, did the buck stop

18  with you as to whether those letters would get sent out

19  or not?

14:57  20    A.    Yes.  Ultimately, delegation of authority for

21  this type of thing -- well, there were -- I believe

22  delegation authority were two people, and I were one.

23  And so it couldn't have gone out unless either I or the

24  other authorized by the delegation authority had said

14:57  25  okay.

1    Q.    I apologize.  That answer invites a further

2  question.  Who was the other party?

3    A.    Michael Capellas.

4              MR. HUNT:  Thank you, Mr. Wells.  No

14:58  5  further questions.

6              MS. DUMAS:  Andy or Earl?

7              MR. FORTE:  This is Earl Forte.  I have

8  no questions for the witness.

9              MR. CAINE:  This is Andy Caine.  I have

14:58  10  a couple.

11                    **EXAMINATION**

12  **BY MR. CAINE:**

13    Q.    Mr. Wells, I represent Inacom.  Is it your

14  understanding that the Asset Purchase Agreement

14:58  15  included schedules that identified certain invoices

16  that would be assumed by Compaq?

17              MR. HUNT:  Objection.  Misstates the

18  prior testimony.

19              MS. DUMAS:  Same objection.

14:58  20              THE WITNESS:  I'm not sure I understood

21  the question, so --

22    Q.    (By Mr. Caine)  Is it your understanding that

23  there were schedules in connection with the Asset

24  Purchase Agreement that identified the specific

14:59  25  invoices to be assumed by Compaq?

Schedule 2.03
Assumed Liabilities

<TABLE>

| Item | Assumed Liabilities |
|------|---------------------|
| <S> | <C> |
| Accounts Payable | o All accounts payable related to the following vendors and businesses: Compaq, Microsoft, Ingram, Tech Data, 3Com, Lexmark, other 3rd party product vendors, reseller business, and Boston Computer Exchange business.<br>o Liabilities under the Agreement for Wholesale Financing with Deutsche Financial Services Corp. dated as of December 24, 1998, as amended on May 25, 1999 and December 23, 1999.<br>o Government payables. |
| Notes Payable | None. |
| Other Current Liabilities | |
| o Accrued liabilities | o See Article 9 relating to compensation and benefits. |
| o Taxes payable. | o None. |
| o Accrued other | o See Article 9 relating to compensation and benefits. |
| Long Term Debt | o None. |
| Preferred Stock | o None. |

</TABLE>

<PAGE>

Schedule 2.04
Excluded Liabilities

<TABLE>

| Item | Excluded Liabilities |
|------|----------------------|
| <S> | <C> |
| Accounts Payable | o All accounts payable related to the following vendors and businesses: IBM, Hewlett-Packard, Dell, Toshiba, Lucent, rental business, international businesses, Inacom Latin America, Oracle A/P (administrative payables).<br>o Liabilities under Agreement for Inventory Financing with IBM Credit Corporation dated as of April 27, 1998.<br>o Accounts payable to Compaq or its affiliates for which checks have been written, but not yet |

FEB-16-00 WED 06:49 PM                    FAX:                    PAGE 2

Compaq Computer Corporation          20555 SH 249
P.O. Box 692000                      Houston, TX 77070-2698
Houston, TX 77269-2000               Tel 713-370-0670

# COMPAQ

February 16, 2000

Lexmark International, Inc.
Ms. Misty Atchinson
Fax 800.732.9539

RE:     Account Payable # 117403 of Inacom Corporation

Dear Ms. Atchinson:

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of
Compaq Computer Corporation purchased certain assets of Inacom Corporation. The Compaq
subsidiary will operate under the name of Custom Edge, Inc., and its' A/P accounts will be funded
by Compaq.

In connection with such purchase, Custom Edge, Inc, also assumed the obligation to pay all of
the outstanding amount on the referenced account, subject to the terms and conditions of such
account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to John Frasca at
402.758.3822.

Thank you for your consideration in this matter.

Sincerely,

Bill Francis
Director, Corporate Finance
Telephone: 281.514.1223
Email: bill.francis@compaq.com

EXHIBIT
Wells-5
DL 3/30/05

EXHIBIT
Frasca-5
DL 3/30/05