Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 124

1  **was responsible in my mind for the payout.  So I**

2  **would not have, I don't recall hearing it that way,**

3  **but I had mentioned before I did have a very faint**

4  **recollection of some checks being cut but I didn't**

5  **really understand quite what they meant by that.**

6      Q.    Did you have an understanding from this

7  initial discussion with Mr. Ward about what

8  structure the acquisition would take, and by that I

9  mean, companies are bought and sold in a number of

10  different ways.

11      **A.    Right.**

12      Q.    Sometimes the stock is purchased,

13  sometimes the acquirer just buys assets and not the

14  stock of the company.  Are you generally familiar

15  with those distinctions?

16      **A.    Generally.  We were made aware that it was**

17  **a purchase of assets of this particular part of the**

18  **organization, it was around 80 percent of the**

19  **organization and liabilities were being assumed as**

20  **well, at least our liability was being assumed, that**

21  **was our understanding.**

22      Q.    And you got that understanding from Mr.

23  Ward, is that right?

24      **A.    Yes, subsequently confirmed by a letter**

25  **from Compaq.**

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 125

1      Q.   Did you ask anybody at Inacom to send you

2   any kind of confirmation of what the terms of the

3   transaction between Compaq and Inacom were?

4      **A.   It would be normal procedure for us to ask**

5   **that.  As to whether we get that or not, that's not**

6   **necessarily normal.  It's difficult.**

7      Q.   Do you know whether or not Inacom ever

8   provided you with a written description of the terms

9   of the transaction with Compaq?

10     **A.   Other than the conversations relayed to me**

11  **by Mr. Ward and the letter subsequently from Compaq,**

12  **no, I don't recall receiving that.**

13     Q.   If such a letter had been received, where

14  would it be placed in Tech Data's filing system?

15     **A.   In the customer file.**

16     Q.   So your understanding of the transaction,

17  if I can paraphrase, and tell me if I am

18  paraphrasing wrongly, is that Inacom advised Tech

19  Data that Tech Data was an account that Compaq was

20  assuming under the purchase?

21     **A.   Yes.**

22     Q.   And you had no recollection that a

23  distinction was drawn between checks that Inacom had

24  already cut to pay certain of the accounts payable

25  and other accounts payable that Compaq was going to

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 126

1  assume liability to pay?

2      A.   No.

3      Q.   Mr. Ward never told you that that was the

4  understanding between Inacom and Compaq?

5      A.   That what was the understanding?

6      Q.   That Inacom would pay, Inacom had already

7  written checks for certain of its accounts payable

8  to Tech Data and those would be paid by Inacom

9  because the checks had been written and then with

10 respect to payables that the checks had not yet been

11 written, Compaq would assume the liability to pay

12 those open payables.

13     A.   I don't know that, I was never advised

14 that by Mike Ward, nor would I have assumed that

15 based upon what we were hearing or how we were

16 hearing the transaction would occur and the

17 subsequent letter that we received from Compaq.

18     Q.   I guess what I'm trying to get at is, who

19 were you hearing about how the transaction would

20 occur other than from Mr. Ward and in this

21 conference call?

22     A.   That's generally the people involved and

23 at that juncture, once we became aware, I guess the

24 news reports, but that would be correct.

25     Q.   Other than what's memorialized in this

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 128

1    specific details.

2          I do recall having a conversation or two

3    with Guenthner and they would have been normal.  I

4    would have it with any organization in which there

5    was such a transaction occurring.

6          Q.    But you don't remember what specifically

7    was discussed?

8          A.    When will it close, when was this going to

9    happen, when will this line be needed here, that

10   kind of thing.

11         Q.    This letter also in the fourth paragraph,

12   I will read for the record says,  "An important item

13   of note as discussed is that Compaq will assume all

14   vendor liabilities on account at closing unless

15   Inacom is holding a check in its treasury to pay

16   such liabilities.  Such checks from Inacom will then

17   be released over several days to its vendors," the

18   next word is crossed out, "no sooner than," and this

19   part is also crossed out but you can read, "at least

20   a week after the closing."

21         My question to you is do you recall that

22   being discussed, that Compaq will assume all vendor

23   liabilities unless Inacom is holding a check in its

24   treasury to pay such liabilities?

25         A.    Actually I don't remember that being

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 129

1    **discussed.  I know this is a confirmation of a**

2    **conference call but I don't remember that specific**

3    **item being discussed.**

4        Q.   Take a look at the next to the last

5    paragraph, and I'll read it out loud.  "Our

6    conference call ended with all parties acknowledging

7    and understanding that until the closing is indeed

8    consummated, there will be no further forwarding of

9    funds to Tech Data Corporation nor any resumption of

10   product shipping."

11           Does that refresh your recollection that

12   Tech Data was not shipping to Inacom at the time of

13   this letter, February 9, 2000?

14       **A.   Well, it refreshes my understanding that**

15   **due to the transaction and somewhat ambiguity of the**

16   **transaction, that would be normal for us to stop**

17   **shipping until we know exactly where it stands.**

18   **This was coming from Inacom getting purchased by**

19   **Compaq.**

20       Q.   So it doesn't trigger any memory for you

21   that Inacom had already been placed on shipping hold

22   by Tech Data for delinquent payment?

23       **A.   Could have been placed on shipping hold**

24   **but my assumption here would be the causes of this**

25   **transaction are unclear in our understanding at that**

Inacom vs. Tech Data                           1/26/2005                           MICHAEL ZAVA

Page 133

```
 1            Do you have any recollection of whether or

 2   not you saw that confirmation from Mr. Guenthner of

 3   Mr. Ward's recitation in his February 9th letter?

 4       A.   No.

 5       Q.   You can put Exhibit 6 aside and Exhibit 5

 6   aside.

 7            This letter from Mr. Francis is dated

 8   February 16, 2000.  Do you recall having received

 9   this letter on or shortly after February 16, 2000?

10       A.   Yes.

11       Q.   At the time you received this letter, did

12   you already know who Mr. Francis was?

13       A.   I did not know Mr. Francis at the time.  I

14   had heard his name.

15       Q.   When had you heard his name?

16       A.   In conversations with Mr. Ward, apparently

17   this was the name that was given as our Compaq

18   contact.

19       Q.   Before you got this letter from Mr.

20   Francis, you never communicated with Mr. Francis

21   personally in any other way, right?

22       A.   I do not recall that.  I can't swear to

23   it.  Again, my memory is a little light.

24       Q.   Do you know why he sent you this letter?

25       A.   Obviously we would be concerned about the
```

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 134

1  liabilities owed to us and we would be wanting

2  confirmation from Compaq.

3      Q.   Did you request that this letter be sent

4  to Tech Data?

5      A.   Possibly, but do I remember specifically

6  requesting the letter, no.  I remember requesting

7  something from Compaq as we had only been

8  communicating with Inacom.

9      Q.   As far as you know, was this the first

10 communication Tech Data had directly with Compaq

11 about the transaction?

12     A.   Written.

13     Q.   This was the first written communication?

14     A.   Yes.

15     Q.   Were there other verbal communications

16 before this letter?

17     A.   I'm not certain.  I was not privy to them

18 or I do not recall them, but I do recall a reference

19 to conversations in which Mike or someone within his

20 organization had spoken to someone at Compaq.

21     Q.   After you received this letter, did you

22 have any conversations with Mr. Francis?

23     A.   I don't recall that, no.

24     Q.   Did you have any conversations with Mr.

25 Ward after you received this letter about the

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 135

1  substance of this letter?

2      **A.    Likely, yes.**

3      Q.    What's your best recollection?

4      **A.    Again, this would be confirmation to us of**

5  **what we believed how the transaction would**

6  **transpire.**

7      Q.    So when you got this letter from Mr.

8  Francis, is it fair to say it was consistent with

9  what you had already thought the transaction would

10 involve?

11     **A.    Yes.**

12     Q.    And your understanding was formed by your

13 discussions with Mr. Ward in the conference call you

14 had had with Inacom representatives and other people

15 at Tech Data?

16     **A.    Yes.**

17     Q.    You see where it says in the first

18 paragraph, second sentence,  "The Compaq subsidiary

19 will operate under the name of Custom Edge Inc. and

20 its AP accounts will be funded by Compaq"?

21     **A.    Yes.**

22     Q.    Is that consistent with your recollection

23 of what we talked about earlier in the deposition

24 about Custom Edge being the subsidiary of Compaq

25 that was going to run the business that had been

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 136

1  formerly operated by Inacom?

2     **A.    Yes.**

3     Q.   And at the end where it says, "its AP

4  accounts will be funded by Compaq," I think you told

5  me earlier that Tech Data felt assured about

6  receiving payment because of Compaq being a

7  creditworthy customer?

8     **A.    Yes, in the relationship.**

9     Q.   It says in the third paragraph,

10 "Inquiries to Custom Edge Inc. regarding your

11 account should be directed to John Frasca at", and

12 then it gives a telephone number.  Did you contact

13 Mr. Frasca?

14    **A.    No.**

15    Q.   Have you ever spoken to Mr. Frasca?

16    **A.    According to Exhibit 6, he was on the**

17 **conference call, purchasing and at that time he was**

18 **an Inacom employee.**

19    Q.   Any other time you have talked to Mr.

20 Frasca that you recall?

21    **A.    I don't recall.**

22    Q.   You have no recollection of having called

23 Mr. Frasca with any inquiries regarding your

24 account?

25    **A.    No.**

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

Page 137

1    Q.    Have you directed Mr. Ward to contact Mr.

2  Frasca?

3    **A.    Likely.**

4    Q.    Do you have any specific recollection of

5  asking Mr. Ward to follow up with John Frasca?

6    **A.    I can only speak to what would be normal**

7  **behavior and procedure.**

8    Q.    The paragraph number two which seems to be

9  the meat of the coconut says,  "In connection with

10  such purchase, Custom Edge Inc. also assumed the

11  obligation to pay all of the outstanding amount on

12  the referenced account subject to the terms and

13  conditions of such account."

14        When you stated earlier your understanding

15  that Compaq was going to assume the liabilities,

16  were you referring to that statement that I have

17  just read in the letter?

18    **A.    Yes.**

19    Q.    When he says, "Custom Edge also assumed

20  the obligation to pay all of the outstanding amount

21  on the referenced account", did you take that to

22  mean, everything that was owing to Tech Data at that

23  point in time?

24    **A.    Yes.**

25    Q.    So when you got this letter, was it your

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 138

1  understanding that as of the point in time Tech

2  Data -- strike that.

3           When you got this letter shortly after

4  February 16, 2000, was it your understanding that

5  everything that was then owing Tech Data by Inacom

6  would henceforth be paid by Compaq?

7      A.   Yes.

8      Q.   Do you have a recollection as you sit here

9  today of how much in accounts receivable Tech Data

10 had on its books for Inacom as of this February 16,

11 2000?

12     A.   I don't know.

13     Q.   When you got this letter, is it correct to

14 state that you considered Inacom to be a regular

15 performing customer, performing according to payment

16 terms?

17     A.   Yes.

18     Q.   I should break it up into two pieces.

19     A.   Sorry.

20     Q.   And this letter was simply advising you

21 that due to this acquisition Compaq through Custom

22 Edge would start to pay the accounts?

23     A.   Yes.

24     Q.   So your understanding in this time frame

25 was -- strike that.

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 139

1          You didn't have any understanding in this

2    time frame of Inacom being in financial distress of

3    any sort?

4         A.    No.

5         Q.    Let me focus on this phrase in the second

6    paragraph, the outstanding amount on the referenced

7    account.    Is it your understanding that when he is

8    using the term, the outstanding amount on the

9    referenced account, he is referring to everything

10   that Inacom owed Tech Data at that point in time?

11        A.    Yes.

12        Q.    And it is not your understanding on the

13   other hand that what he was referring to was the

14   outstanding accounts payable reflected on Inacom's

15   books as to what Inacom owed Tech Data?  Do you

16   understand the difference?

17        A.    I understand what you are saying.  No, my

18   understanding was the obligation to pay all the

19   outstanding amount on the referenced account, that

20   was what was owed to us.

21        Q.    And you had no basis for understanding in

22   February 2000 that the outstanding amount owed to

23   you might be different from what was reflected on

24   Inacom's books as its outstanding account payable

25   balance?

Inacom vs. Tech Data                           1/26/2005                              MICHAEL ZAVA

Page 140

1      **A.    No, no reason to believe there was a**

2  **difference.**

3      Q.    When I use the term accounts payable, do

4  you have an understanding of what that term means in

5  business?

6      **A.    Yes.**

7      Q.    Would you explain what it means in your

8  understanding?

9      **A.    It's what we owe H-P at a given point in**

10  **time, what's a receivable on your books for Tech**

11  **Data or vice versa, what you owe us at a given point**

12  **in time, yes.   A product shipped and invoiced.**

13      Q.    As part of your job responsibilities, do

14  you have any direct responsibility with regard to

15  Tech Data's accounts payable?

16      **A.    Thankfully, no.**

17      Q.    Do you have a general understanding of how

18  accounts payable reporting works within a company?

19      **A.    Yes.**

20      Q.    Let me give you a hypothetical and let me

21  know if you agree or disagree with what I'm

22  describing based on your understanding of how

23  accounts payable reporting works.   When an invoice

24  is submitted by a vendor to a company, the amount

25  stated in that invoice would be then placed on an

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 141

```
 1  accounts payable report within the company, right?
 2       A.   (Indicating.)
 3            MR. TATELBAUM:  You have to say yes
 4       or no.
 5       A.   Yes, sorry.
 6       Q.   When that amount, when that invoice is
 7  paid, then that amount comes off the accounts
 8  payable report, correct?
 9       A.   Correct.
10       Q.   So if a company, say if Tech Data were to
11  write a check in satisfaction of an invoice, then
12  that invoice after that check is written, would that
13  invoice still show up on an accounts payable report
14  or would that invoice be removed from an accounts
15  payable report?
16            MR. TATELBAUM:  I am going to object
17       on the grounds that he said he has no
18       knowledge of it and this is beyond the
19       hypothetical.  Now you are asking him
20       something on Tech Data processing.
21            MS. DUMAS:  I will go back to the
22       hypothetical.
23       A.   You want to repeat that?
24       Q.   Sure.  Once a check is cut to pay the
25  invoice, the amount reflected by that invoice is
```

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 142

1   removed from the accounts payable report, isn't that

2   correct?

3       A.   Yes.

4       Q.   So if Compaq asked Inacom to produce a

5   report, an accounts payable aging report advising

6   Compaq of what the payables were at closing, amounts

7   that Inacom had already written checks on wouldn't

8   be reflected in an accounts payable report, correct?

9            MR. TATELBAUM:   Objection.

10           You can answer.

11      A.   Sounds like we are talking about a Sarping

12  Zocksly issue.

13           MR. TATELBAUM:   Mr. Zava, just look

14      at the question if you would and answer

15      it the best you can.  And I maintain an

16      objection to the form of that question.

17           (Pause.)

18      A.   I can not answer that question.  I don't

19  know the answer to that question.

20      Q.   What I'm driving at is when Mr. Francis is

21  preparing his letter on the closing date -- let me

22  see if there's a better way I can put this.

23           When Mr. Francis is referring to the

24  outstanding amount on the referenced account,

25  wouldn't that ordinarily be reflected in an accounts

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 144

```
 1          Q.    What would Tech Data's normal policy be.

 2          A.    The check would be immediately mailed and

 3     the items would be removed, yes.

 4          Q.    So do you know whether or not Tech Data

 5     knew before February 16 of Inacom's practice of

 6     cutting checks and holding them before they were

 7     mailed?

 8          A.    No.

 9          Q.    Do you know if Mr. Ward knew of Inacom's

10     practice of holding checks for a period of time

11     before they were mailed?

12          A.    No, I don't know how we would know that

13     that was the normal practice of Inacom if it was.

14          Q.    Unless somebody told Mr. Ward.

15          A.    I am unaware.

16          Q.    Do you know whether or not when Mr.

17     Francis wrote this letter, he knew of Inacom's

18     practice of holding checks before mailing them?

19               MR. TATELBAUM:   Objection.

20               Go ahead.

21          A.    No.

22          Q.    So it is entirely possible that when Mr.

23     Francis wrote this letter, he also had in his mind

24     normal accounting practices where outstanding amount

25     would refer to what's on the accounts payable
```

Inacom vs. Tech Data                     1/26/2005                    MICHAEL ZAVA

Page 145

```
 1  report, isn't that true?
 2          MR. TATELBAUM:  I am going to object
 3      and instruct him not to answer because it
 4      would call for at best mind reading as to
 5      what Mr. Francis knew or didn't know and
 6      any answer could be misinterpreted
 7      because that's a question that doesn't
 8      have an answer because he doesn't know
 9      what's in his mind based upon the prior
10      questions.
11          MS. DUMAS:  He could have told him.
12          MR. TATELBAUM:  He said he didn't
13      know so I am going to instruct him not to
14      answer the question because it could be
15      misconstrued.
16  BY MS. DUMAS:
17      Q.   Did you ever have a conversation with Mr.
18  Francis in which he told you that he knew about
19  these held checks by Inacom?
20      A.   I don't have any recollection of any
21  conversation with Mr. Francis.
22      Q.   Do you have any knowledge from any source
23  about whether Compaq was even aware of this practice
24  that Inacom held checks?
25          MR. TATELBAUM:  Objection on the
```

Inacom vs. Tech Data                     1/26/2005                     MICHAEL ZAVA

Page 146

```
 1        grounds that it hasn't been proved that

 2        they held checks.

 3            But you can answer that question

 4        without accepting the fact that the

 5        premise is held true.

 6        A.   Would you repeat it?

 7        Q.   Sure.  Are you aware from any source at

 8   all, anybody telling you that Compaq was aware that

 9   Inacom had a practice of holding checks?

10        A.   No.

11        Q.   Isn't it possible that between Compaq and

12   Tech Data there was a misunderstanding evidenced by

13   this second paragraph as to what the outstanding

14   amount was at the time he wrote this letter?

15            MR. TATELBAUM:  Objection.

16            You can answer it.

17        A.   A misunderstanding?

18        Q.   As to what the dollar amount of the

19   outstanding amount was.

20        A.   Anything is possible but commentary states

21   all the outstanding amount.  Anything is possible.

22   I can't speak for that.

23        Q.   After Mr. Francis delivered this letter,

24   February 16, 2000, did -- excuse me, let me start

25   again.
```

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 156

1 assumed liabilities paid?

2     **A.     That's not the picture I see, no.**

3     Q.     That's not the picture you saw at the

4 time?

5     **A.     Right.**

6     Q.     So if Tech Data's customer profile

7 revealed otherwise, you would be surprised?

8     **A.     It might indicate calls were made to**

9 **someone at Inacom or Custom Edge, whatever.  In our**

10 **minds we were talking Custom Edge or Compaq.**

11     Q.     In your mind or Mr. Ward's mind or Tech

12 Data's mind?

13     **A.     Possibly all.**

14     Q.     But you can only refer to what was in your

15 mind.

16     **A.     Correct.**

17     Q.     Had Mr. Francis not delivered the letter

18 that you understood to indicate that Custom Edge was

19 assuming all the payables owing to Tech Data, what

20 would you have done as the credit manager?

21         MR. TATELBAUM:   Objection, if you

22         speculate.  But don't speculate; if you

23         know.

24     **A.     We would have reacted differently.  As to**

25 **what exactly we would have done, I can not say, but**

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 157

1  **we would have reacted quite differently to the**

2  **entire situation.**

3      Q.    I may have asked you this and if I did, I

4  apologize:  Do you know what the outstanding

5  receivable was from Inacom as of this closing,

6  February 16, 2000?

7      **A.    I don't.**

8      Q.    Do you know if it was less than a million

9  dollars or more than $10 million?

10     **A.    It was several million, I know that much.**

11     Q.    Was it less than 10 million?

12     **A.    I can't say without going back and**

13 **looking.**

14     Q.    Did whatever the number was, the several

15 million, did everything eventually get paid?

16     **A.    No.**

17     Q.    Do you recall how much didn't get paid?

18     **A.    Eight or 900,000, something of that**

19 **nature.**

20     Q.    So all but eight or 900,000 got paid?

21     **A.    Yes.**

22     Q.    Have you attempted to collect that eight

23 or 900,000 from H-P?

24     **A.    No.**

25     Q.    Why not?

Inacom vs. Tech Data                    1/26/2005                         MICHAEL ZAVA

Page 160

1      Q.    Do you know whether Tech Data accepted

2   payment from Inacom after February 16, 2000 with

3   respect to invoices delivered in connection with the

4   distribution and the hardware side of the business?

5      **A.    I'm sorry, say that again, please.**

6      Q.    Do you know whether Tech Data accepted

7   payment from Inacom, not Custom Edge, after February

8   16, 2000 with respect to invoices submitted to

9   Inacom's distribution and configuration business?

10     **A.    So what you are saying is did Inacom, the**

11  **new entity of services, make payment against the**

12  **other distribution piece assumed by Compaq?**

13     Q.    Right.

14     **A.    I don't know the answer to that.   I would**

15  **assume not but I don't know the answer to that.**

16     Q.    Do you know if Tech Data accepted payments

17  from Inacom with respect to invoices that had been

18  submitted to Inacom before the acquisition by

19  Compaq?

20          MR. HUNT:   Objection, for what

21     period?

22     **A.    No, I don't.**

23     Q.    <u>So you are unaware of the fact that Tech</u>

24  <u>Data accepted payments of almost $5 million from</u>

25  <u>Inacom after the merger, a month after the merger?</u>

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 161

1        A.    We were paid X amount of dollars after

2   such time as Compaq/Custom Edge told us that they

3   were responsible for that debt.   Now, how Compaq

4   arranged the payment through any arrangement or

5   agreement with Inacom or checks or whatever was not

6   important to us at that juncture as long as we got

7   paid per their agreement to pay those liabilities.

8        Q.    Again, you have no knowledge whatsoever

9   regarding whether or not Compaq knew about Inacom's

10   held checks?

11        A.    I actually don't understand that question

12   quite, you know.

13        Q.    I can restate it.

14        A.    I understand what you are saying but I

15   guess I'm not getting the point.

16        Q.    I can explain it.

17        MR. TATELBAUM:   I am going to object

18        again because the question presupposes he

19        knows what's in the mind of somebody at

20        Compaq and he has not been qualified as a

21        soothsayer.

22        Q.    You keep saying in a half a dozen answers

23   to my questions that Compaq must have directed

24   Inacom to do something and all I'm trying to

25   ascertain is what's the basis for your having made

Inacom vs. Tech Data                     1/26/2005                     MICHAEL ZAVA

Page 168

```
1      A.     Would you repeat that?

2      Q.     Sure.  So you didn't know that what Mr.

3   Ward was doing in trying to get Inacom to mail held

4   checks, checks that were being held in its treasury

5   was to get Inacom to pay invoices that Compaq had

6   not assumed?

7              MR. TATELBAUM:  Objection as to

8         form.

9              THE WITNESS:  Can I answer that or

10        not?

11             MR. TATELBAUM:  You can answer, if

12        you can.

13     A.     Absolutely not.

14     Q.     So was he acting without your

15   authorization?

16             MR. TATELBAUM:  Objection.

17     A.     No.  He was not acting without my

18   instructions or authority.  He was making contact

19   with whomever he had to make contact with after this

20   purchase in order to get checks from whomever they

21   might be.  The liability was assumed by Compaq and

22   however they orchestrated the checks back to us was

23   their problem.

24     Q.     When he says in this letter,  "An

25   important item of note as discussed is that Compaq
```

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 169

 1  will assume all vendor liabilities on accounts at

 2  closing unless Inacom is holding a check in its

 3  treasury to pay such liabilities," that sentence is

 4  not consistent with the testimony you have given

 5  that it was Tech Data's understanding that Compaq

 6  would assume all liabilities.  That has an exception

 7  and that's checks that Inacom is holding in its

 8  treasury.

 9       A.    You are right, that is not consistent.

10       Q.    What I am asking you is, did that not

11  occur in this discussion, that information being

12  disclosed on February 9th?

13       A.    I honestly do not recall that being

14  discussed, but even if I had seen this letter or as

15  I had seen this letter back then, this would have

16  overridden that comment.

17            MR. TATELBAUM:  This being?

18            THE WITNESS:  This letter, the

19  February 16th letter from Bill Francis.

20       Q.    Why?

21       A.    Why, in connection with such purchase,

22  Custom Edge Inc. also assumed the obligation to pay

23  all of the outstanding amount on the referenced

24  account.  That would be the way I looked at it.

25       Q.    Because it's later in time?

1    **A.**   **Yes.**

2    Q.   So when you got Mr. Francis' letter, it

3 didn't occur to you that Compaq might not be privy

4 to this agreement between Tech Data and Inacom that

5 Tech Data would get held checks after the closing?

6    MR. TATELBAUM:  Objection as to

7    form, not in evidence, no guarantee of an

8    agreement.

9    You can answer it if you can.

10   **A.**   **Can you state that again?**

11   Q.   Sure.  I'll try to say it a little bit

12 better.

13    So you don't know whether or not Mr.

14 Francis was aware of this, the understanding that's

15 memorialized in this letter which is an

16 understanding directly between Tech Data and Inacom

17 that Compaq will assume all vendor liabilities at

18 closing unless Inacom is holding a check in its

19 treasury to pay such liabilities?

20    MR. TATELBAUM:  Objection as to

21    form.

22    You want to read the question?

23    THE WITNESS:  Yes.

24    (Pause.)

25   **A.**   **No, I don't.**

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 171

1      Q.    You have no information from any source as

2  to whether or not Mr. Francis even knew about these

3  holding checks in treasury prior to the closing?

4      **A.    I personally don't know.**

5      Q.    But Tech Data knew about Inacom holding

6  these checks in treasury prior to the closing?

7      **A.    Well, according to this letter, yes.**

8      Q.    I have no more questions.  I apologize for

9  the time, Mr. Zava.

10         MR. NOLAN:  Just a couple of

11     followup, though.

12 REDIRECT EXAMINATION

13 BY MR. NOLAN:

14     Q.    Could you look at Exhibit 7 again.

15         MR. TATELBAUM:  February 16th

16     letter.

17         MR. NOLAN:  Yes, the one signed by

18     Mr. Francis.

19     Q.    Before you received this letter, had you

20 ever talked to Mr. Francis before?

21     **A.    No.**

22     Q.    Did that name ring a bell at all prior to

23 February 16, 2000?

24     **A.    No.**

25     Q.    When you received this February 16, 2000

Inacom vs. Tech Data                1/26/2005                MICHAEL ZAVA

Page 172

1    letter from Mr. Francis, did you believe it related

2    to the earlier conference call you had with Mr.

3    Guenthner and the other individuals?

4         A.    I do recall that we were at this juncture,

5    we were looking for confirmation of feedback from

6    the purchaser, who do we speak to.

7         Q.    But at the time you received Exhibit 7,

8    the February 16, 2000 letter, did you think that

9    letter was in followup to the conference call that

10   you had on or about February 9, 2000 with Mr.

11   Guenthner and those other individuals?

12        A.    Could have been, yes.

13        Q.    Any other conference call that you were

14   aware of between February 9, 2000 and receiving this

15   letter dated February 16, 2000?

16        A.    I don't recall.

17        Q.    I'd like to just show you briefly, we'll

18   mark it as Exhibit 8, it is a copy of the first

19   amended complaint.  It is actually the pleading.

20   You can give it to the court reporter afterwards.

21   It is a first amended complaint for avoidance and

22   recovery of preferential transfers.

23             I don't need you to read the whole thing.

24   I would like you to look at Exhibit A which is

25   attached to the complaint.  It is kind of in a graph