# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

INACOM CORP., et al.

    **Plaintiffs**

v.

LEXMARK INTERNATIONAL, INC.        Civil Action No. 04-CV-583 (GMS)

    **Defendant and Third-Party Plaintiff**

v.

COMPAQ COMPUTER CORP., et al.

    **Third-Party Defendants**

## LEXMARK'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

STEVENS & LEE, P.C.

Thomas G. Whalen Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Tel:   (302) 425-3304
Fax:   (302) 654-5181
E-mail: tgw@stevenslee.com

STOLL KEENON OGDEN PLLC

Culver V. Halliday
Emily L. Pagorski
2650 AEGON Center
400 West Market Street
Louisville, Kentucky 40202-3377
Tel: (502) 568-9100
Fax: (502) 568-5700
E-mail:  culver.halliday@skofirm.com
E-mail:  emily.pagorski@skofirm.com

Dated:  March 31, 2006

*Attorney's for Third-Party Plaintiff*
*Lexmark International, Inc.*

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................ 1

II.  PROCEDURAL HISTORY ....................................................................... 4

III.  PROPOSED FINDINGS OF FACT ........................................................ 6

(a)  The Parties ............................................................................................... 6

(b)  The Asset Purchase Agreement ............................................................... 7

(c)  The Assumed Liabilities ........................................................................... 7

(d)  InaCom's Accounts Payable with Lexmark ........................................... 9

(e)  Lexmark's Efforts to Collect Payment from InaCom ............................ 9

(f)  Bill Francis's February 15, 2000 Letter to Lexmark ........................... 12

(g)  Other Vendors Received a Letter from Mr. Francis ............................ 15

(h)  Tech Data Was Given the Same Promise as Lexmark .......................... 16

(i)  Compaq's Efforts to Rescind the Francis Letter ................................. 17

(j)  Mr. Wells's February 5, 2001 Letter to Lexmark ................................ 17

IV.  PROPOSED CONCLUSIONS OF LAW ............................................... 18

(a)  Second and Fourth Claims for Relief
     Lexmark's Breach of Contract Claims Based on
     the Francis Letter ................................................................................. 19

     (1)  The Francis Letter Does Not Present a Choice of Law Issue
          Because HP has Conceded that Kentucky Law Governs ................ 19

     (2)  HP is Bound by the Terms of the Francis Letter ......................... 20

     (3)  The Failure to Remit Payment to Lexmark is a Breach of the Francis Letter ... 22

(b) Fifth and Sixth Claims for Relief
    *Lexmark's Indemnity Claims Based on the Francis Letter*
    *and the Guaranty Letter* ................................................................. 23

(c) Seventh and Eighth Claims for Relief
    *Lexmark's Promissory Estoppel Claims Based on the Francis Letter* ..................... 25

(d) Ninth Claim for Relief
    *Lexmark's Breach of Contract Claim Based on the Guaranty Letter* ....................... 28

    *(1) Delaware Law Governs the Guaranty Letter* ....................................... 29

    *(2) The Guaranty Letter Requires HP to Reimburse Lexmark for Any and All*
        *Indebtedness Arising from Transactions Between*
        *Custom Edge and Lexmark* ..................................................... 29

    *(3) By Failing to Reimburse Lexmark for the Amount Paid to InaCom in Settlement*
        *of the Preference Action, HP has Breached the*
        *Terms of the Guaranty Letter* ................................................ 32

(e) Claim for Attorney Fees and Costs and Expenses
    *Lexmark's Claim for Attorney Fees and Litigation Costs and Expenses*
    *Based on the Guaranty Letter* .................................................... 32

V.  CONCLUSION……………………………………………………………………..33

## TABLE OF AUTHORITIES

### CASES

*Ajax Rubber Company, Inc. v. Gam*, 151 A. 831 (Del. Super. Ct. 1924) ........................ 30

*APL, Inc. v. Ohio Valley Aluminum, Inc.*, 839 S.W.2d 571 (Ky. Ct. App. 1992) ....... 21, 22

*Autochanel, Inc. v. Speedvision Network, LLC,* 144 F.Supp.2d 784 (W.D. Ky. 2001) .... 26

*Baxter State Bank v. Bernhardt*, 985 F. Supp. 1259 (D. Kan. 1997) ............................... 28

*Bryant v. Food Machinery and Chemical Corporation Niagara Division*,
130 So. 2d 132 (Fla. Dist. Ct. App. 1961) ......................................................... 28

*Degener v. Hall Contracting Corp.*, 27 S.W.3d 775 (Ky. 2000) ..................................... 24

*Falco v. Alpha Affiliates, Inc.*, 1997 U.S. Dist. LEXIS 20122 (Dist. Del. 1997) ....... 29, 30

*Fanin v. Commercial Credit Corp.*, 249 S.W.2d 826 (Ky. 1952) ................................... 22

*Gabriel Ride Control Products, Inc. v Wolverine Auto Supply, Inc.*,
35 Fed. Appx. 397 (6th Cir. 2002) .................................................................... 22

*In re Art Shirt Ltd., Inc.*, 34 B.R. 918 (E.D. Pa. 1983) ........................................ 23, 27, 32

*In re Herman Cantor Corp.*, 15 B.R. 747 (E.D. Va. 1981) ........................................ 23, 32

*Intercargo Insurance Co. v. B.W. Farrell*, 89 S.W.3d 422 (Ky. Ct. App. 2002) ............. 20

*Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513 (Del. Super. Ct. 2005) .......... 32

*International Harvester Credit Corp. v. Bowman*, 316 S.E.2d 619
(N.C. Ct. App. 1984) ........................................................................................ 22

*Johnson's Diary, Inc. v. Western Reserve Life Assurance Company of Ohio*,
107 F.3d 400 (6th Cir. 1997) ....................................................................... 23, 24

*Liberty Bank v. Shimokawa*, 632 P.2d 289 (Haw. Ct. App. 1981) .................................. 22

*Martin-Senour Paints v. Delmarva Venture Corporation*,
1988 Del. Super. LEXIS 93 (Del. Super. 1988) .................................... 26, 27, 28

*Material Partnerships, Inc. v. Lopez*, 102 S.W.3d 252 (Tex. Ct. App. 2003) ................. 21

*McCarthy v. Louisville Cartage Company, Inc.,* 796 S.W.2d 10 (Ky. App. 1990).......... 26

*Pascagoula-Moss Point Bank v. Citizens Fidelity Bank & Trust Co.,*
563 S.W.2d 727 (Ky. 1977) ............................................................................... 28

*The Excello Press, Inc., et al. v. Maxwell Holdings, Inc., et al.,*
 1991 U.S. Dist. LEXIS 7406 (N.D. Ill. 1991) ................................................... 28

*Trader v. Wilson*, 2002 Del. Super. LEXIS 92 (Del. Super. 2002) ................................ 30

*Warner v. First National Bank of Waco, Texas*, 369 S.W.2d 651
(Tex. Civ. App. 1963) ...................................................................................... 28

*Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024 (Del. Ch. 2005) ................................ 29

*Wheeler & Clevenger Oil Company, Inc. v. Washburn*, 127 S.W.3d 609
(Ky. 2004) ........................................................................................................ 21

*Wilmington & Northern Railroad Co. v. Delaware Valley Railway Co.,*
1999 Del. Super. LEXIS 220 (Del. Super. Ct. 1999) ......................................... 31

*Wilmington Trust Co. v. Keith*, 2002 Del. Super. LEXIS 445 (Del. Super. Ct. 2002).....31

**STATUTES**

Del. Code Ann. Tit. 6, § 2714(a) ...................................................................... 30

KRS 371.065(1) .......................................................................................... 20, 21

**RULES**

Fed. R. Civ. P. 54 ...................................................................................... 3, 33

A trial by the Court without a jury of the third-party complaint filed by Third-Party Plaintiff Lexmark International, Inc. ("Lexmark") against Third-Party Defendants Compaq Computer Corporation ("Compaq") and Custom Edge, Inc. ("Custom Edge") was held on February 16, 2006. Lexmark, pursuant to the Agreed Scheduling Order entered on March 9, 2006, tenders these proposed findings of fact and conclusions of law. Tendered with the proposed findings of fact and conclusions of law is an appendix. The appendix includes the testimony and exhibits, and also the cases, statutes and other authority, referred to herein.

## I. INTRODUCTION

InaCom Corp. ("InaCom") filed an adversary proceeding against Lexmark, in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), to avoid $2,928,090 in allegedly preferential transfers. Lexmark filed an answer denying any liability to InaCom. With leave of the Bankruptcy Court, Lexmark also filed a third-party complaint against Compaq and Custom Edge. Lexmark alleged in the third-party complaint that Compaq and Custom Edge would be liable to Lexmark for whatever amount it might be found liable to InaCom. Hewlett-Packard Company ("HP"), as successor in interest to both Compaq and Custom Edge, has been mounting the defense of Compaq and Custom Edge to Lexmark's third-party complaint.[1]

The Court withdrew the reference to the Bankruptcy Court of the adversary proceedings brought by InaCom against Lexmark and others. After discovery was

---

[1]     As is discussed, *infra*, Custom Edge was a wholly owned subsidiary of Compaq that was merged into Compaq, with Compaq the surviving entity. Compaq then merged with HP, with HP the surviving entity. There is no dispute but that Compaq is liable for whatever liability Custom Edge may have, and HP is liable for whatever liability Compaq may have, for the claims alleged by Lexmark in its third-party complaint.

completed, the Court consolidated for trial the adversary proceedings brought by InaCom against Lexmark and four other defendants, Tech Data Corp. ("Tech Data"), Dell Computer Corp. ("Dell"), Resilien Inc. ("Resilien") and Ingram Entertainment Inc. ("Ingram").[2]  One of the four other defendants, Tech Data, had also filed a third-party complaint against Compaq and Custom Edge.  Soon after the order for consolidation was entered, the Court entered an order granting HP's motion for a separate trial of Lexmark and Tech Data's third-party complaints against Compaq and Custom Edge after the trial of InaCom's adversary proceedings.

Sitting without a jury, the Court commenced the trial of InaCom's adversary proceedings against Lexmark and Tech Data, on October 19, 2005.[3]  Before the trial was concluded, InaCom reached separate agreements with Lexmark and Tech Data compromising and disposing of the claims underlying InaCom's adversary proceedings against them.

The terms of the agreement between InaCom and Lexmark were recited to the Court by the attorneys representing InaCom and Lexmark.  Pursuant to the agreement, InaCom released the claims alleged against Lexmark in the adversary proceeding in exchange for $990,000.  The agreement expressly provided that the dismissal of InaCom's adversary proceeding complaint against Lexmark was without prejudice to Lexmark's third-party complaint against Compaq and Custom Edge.

---

[2]    *InaCom Corp., et al. v. Tech Data Corp.*, Civil Action No. 04-CV-148 (GMS), *InaCom Corp., et al. v. Dell Computer Corp.*, Civil Action No. 04-CV-582 (GMS), *InaCom Corp., et al. v. Resilien Inc.*, Civil Action No. 04-CV-584 (GMS), and *InaCom Corp., et al. v. Ingram Entertainment Inc.*, Civil Action No. 04-CV-593 (GMS).

[3]    The other three defendants, Dell, Resilien and Ingram, had previously reached agreements with InaCom compromising and disposing of its claims against them.

SL1 624012v1/004907.00003

The trial by the Court without a jury of Lexmark's third-party complaint against Compaq and Custom Edge began and ended on February 16, 2006.  The complaint is the result of the failure of Compaq and Custom Edge, and HP as the successor in interest to both, to honor the promises made to Lexmark contained in the (1) letter from Bill Francis, director of corporate finance for Compaq, to Lexmark dated February 16, 2000, and (2) letter from Ben K. Wells, acting chief financial officer, vice president and corporate treasurer of Compaq, to Lexmark dated February 5, 2001.  The gravamen of the complaint is that Compaq and Custom Edge, and HP as the successor in interest to both, based on the promises made to Lexmark in the letters from Messrs. Francis and Wells, are liable to Lexmark for the $990,000 it paid InaCom for a release of its claims.

At the conclusion of the trial of Lexmark's third-party complaint against HP, the Court ordered the parties to tender proposed findings of fact and conclusions of law. These are Lexmark's proposed findings of fact and conclusions of law.  Lexmark respectfully submits that, for the reasons set out herein, a judgment should be entered in its favor against Compaq and Custom Edge, and HP as the successor in interest to both, for $990,000, the amount Lexmark paid InaCom, plus the costs allowed as a matter of course to the prevailing party, reasonable attorney fees, litigation costs and expenses, and judgment interest.[4]  Custom Edge and Compaq made unambiguous and unequivocal promises to Lexmark, the responsibility for which has been assumed by HP, and those promises should be honored.

---

[4]     Mr. Wells's February 5, 2001 to Lexmark provides that Compaq "agrees to pay all reasonable attorneys' fees, the allotted cost of Lexmark's internal counsel, and all other costs and expenses that may be incurred by Lexmark in the enforcement of this Guaranty."  As is discussed, *infra*, following the entry of a judgment in its favor, Lexmark will make a motion for "attorney fees and nontaxable expenses" pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

3

## II.  PROCEDURAL HISTORY

InaCom filed a voluntary petition under Chapter 11 of the Bankruptcy Code on June 16, 2000.[5]

InaCom filed an adversary proceeding complaint against Lexmark, on May 16, 2002.  (Docket Item ("D.I.") 2).  In the complaint, InaCom alleged it was entitled to recover as preferential transfers payments totaling $2,928,090 made to Lexmark within the ninety days immediately preceding the filing of its petition.[6]  Lexmark filed an answer denying liability on June 21, 2002.  (D.I. 2).

Leave having been granted by the Bankruptcy Court, Lexmark filed a third-party complaint against Compaq and Custom Edge to recover as damages any amount for which it might be found liable to InaCom on December 12, 2002.  (D.I. 2).  Compaq and Custom Edge filed an answer denying liability on January 8, 2003.  (D.I. 2).

The Court entered an order, on June 25, 2004, withdrawing the reference to the Bankruptcy Court of a number of adversary proceedings brought by InaCom.  (D.I. 1).  The Court held a telephonic scheduling conference in eight of the adversary proceedings.  Included were the adversary proceedings against Lexmark, Tech Data, Dell, Resilien and Ingram (collectively "Preference Defendants").  Following the conference, on October 4, 2004, the Court entered an order setting the adversary proceedings brought by InaCom against the Preference Defendants for trial on October 17, 2005.

---

[5]     *In re InaCom Corp., et al.*, Bankr. Case No. 00-2426 (PJW).

[6]     In their proposed pretrial order, InaCom and Lexmark stipulated that "[a]ll of the transfers were made in payment for Lexmark products previously sold, delivered, and accepted by InaCom."  (D.I. 73, ¶ 15).

4

As had been anticipated by the parties, by order entered September 1, 2005, the Court consolidated for trial InaCom's adversary proceedings against the Preference Defendants. (D.I. 98). The Court on the same date ordered that the third-party complaints filed by Lexmark and Tech Data against Compaq and Custom Edge be consolidated for a separate trial after the trial of the adversary proceedings against the Preference Defendants. (D.I. 98).

The trial of InaCom's adversary proceeding against Lexmark and Tech Data began on October 17, 2005.[7] (D.I. Minute Entry). The trial of InaCom's adversary proceeding against Lexmark ended on October 19, 2005, when the attorneys representing InaCom and Lexmark advised the Court that they had agreed to a settlement.[8] (D.I. Minute Entry). The attorneys informed the Court that pursuant to the agreement, Lexmark would pay InaCom $990,000 for a release of its claims against Lexmark. A notice and stipulation of dismissal with prejudice of InaCom's adversary proceeding complaint against Lexmark was filed with the Court on November 30, 2005. (D.I. 116).

Lexmark's third-party complaint against Compaq and Custom Edge was tried by the Court without a jury on February 16, 2006. (D.I. Minute Entry). At the conclusion of the trial, the Court discussed with the attorneys for the parties how the matter would be submitted to the Court for a ruling. The parties prepared and tendered to the Court the Agreed Scheduling Order setting out the procedure to be followed. The Agreed

---

[7] Prior to the start of the consolidated trial of the four adversary proceedings brought by InaCom against the Preference Defendants, two of the defendants, Dell and Ingram, reached agreements with InaCom disposing of its claims against them.

[8] HP has not raised an issue as to the amount paid by Lexmark for a release of InaCom's claims. However, in the event that an issue is raised by HP for the first time in its proposed findings of fact and conclusions of law, Lexmark tenders to the Court the documents evidencing that HP was given an opportunity to object and to assume the defense of the adversary proceeding but declined to do so. (Appendix ("Apx.") pg. 568).

Scheduling Order was entered on March 9, 2006. (D.I. 126). Pursuant to the Agreed Scheduling Order, Lexmark tenders these proposed findings of fact and conclusions of law.

### III. PROPOSED FINDINGS OF FACT

Based on the evidence at trial, including the transcript of the testimony of the witnesses who testified at the trial, the transcripts of those witnesses who testified by deposition, and the exhibits introduced through the persons who testified at the trial and by deposition, the Court makes the following findings of fact:

#### (a) The Parties

1.    InaCom was in two basic lines of business: (1) a computer hardware and peripherals distribution business, and (2) a technology service and configuration business. (D.I. 121, Trial Transcript ("T.T.") 65:20-66:3, Apx. pg. 59).

2.    Lexmark supplied printers and peripherals to InaCom beginning in approximately 1991 and continuing until its bankruptcy. (D.I. 121, T.T. 4:21-5:2, 5:14-5:16, 18:21-18:25, Apx. pgs. 31, 32, 41).

3.    During this period, Lexmark and Compaq had an original equipment manufacturer relationship ("OEM Relationship") whereby Lexmark made printers that were sold to Compaq and branded with the Compaq name. (D.I. 121, T.T. 16:9-16:23, Apx. pg. 39). Because of the OEM Relationship, Compaq was Lexmark's largest domestic customer, making the relationship a very important one for Lexmark. (D.I. 121,

T.T. 16:9-16:23, Apx. pg. 39).  Compaq ceased doing business with Lexmark upon its acquisition by HP, Lexmark's competitor.  (D.I. 121, T.T. 55:19-56:4, Apx. pg. 57).

### (b)  The Asset Purchase Agreement

4.     InaCom entered into negotiations with Compaq, one of its largest distribution vendors, for the sale of InaCom's distribution business to Compaq in late 1999.  (D.I. 121, T.T. 65:3-65:12, Apx. pg. 59).

5.     The asset purchase agreement ("Asset Purchase Agreement"), dated January 4, 2000, was signed by InaCom with Compaq and its acquisition subsidiary ITY Corp. ("ITY").  (Apx. pg. 136).  ITY was a wholly owned subsidiary of Compaq.  (D.I. 81, Tab 1 ¶ 3).  ITY changed its name to Custom Edge and was then merged into Compaq, which was then acquired by and merged into HP.  (D.I. 81, Tab 1 ¶ 3).  The parties have stipulated that HP has assumed all liabilities of Compaq and Custom Edge. (D.I. 81, Tab 1 ¶ 3).

6.     The Asset Purchase Agreement closed on February 16, 2000 when ITY acquired InaCom's distribution business for approximately $369,500,000.  (D.I. 81, Tab 1 ¶ 1).

### (c)  The Assumed Liabilities

7.     Pursuant to Section 2.03 and Schedule 2.03 of the Asset Purchase Agreement, ITY assumed, among others, InaCom's liabilities to Lexmark:

> Section 2.03.  *Assumed Liabilities* . . . Buyer [ITY] agrees, effective as of Closing, to assume all liabilities or obligations of Seller [InaCom] and its subsidiaries of any kind, character or description (whether known or unknown, accrued, absolute, contingent or otherwise)

7

     (a)    primarily relating to or arising out of the conduct of the business or the ownership or use of the Purchased Assets, or

     (b)    described on Schedule 2.03 or to be assumed by Buyer [ITY Corp.] in Article 8 or Article 9 (the items in clause (a) and (b) collectively, the "Assumed Liabilities").

(Apx. pgs. 144, 195).  Schedule 2.03, titled "Assumed Liabilities," identifies the InaCom accounts payables for which ITY assumed liability under the Asset Purchase Agreement. (Apx. pg. 195).  Lexmark is one of several companies identified by name for which the accounts payable liability of InaCom was assumed by ITY.  (Apx. pg. 195).

     8.    Section 2.04 of the Asset Purchase Agreement identifies liabilities excluded under the Asset Purchase Agreement:

> Section 2.04.  *Excluded Liabilities* . . . Buyer [ITY] is not assuming any liability or obligation of Seller [InaCom] or any of its subsidiaries . . . of whatever nature, whether presently in existence or arising hereafter, known or unknown, accrued, absolute, contingent or otherwise, other than the Assumed Liabilities, and in any event Buyer [ITY] is not assuming any of the following . . .

     (d)    any liability or obligation described in Schedule 2.04 . . .

(Apx. pgs. 144).  Schedule 2.04, titled "Excluded Liabilities," identifies by name companies for which the accounts payables liability of InaCom was not assumed by ITY.[9]  (Apx. pg. 196).  Schedule 2.04 also excludes liability for "[a]ccounts payable to Compaq or its affiliates for which checks had been written, but not yet released to Buyer by Seller (provided such checks will be delivered in the ordinary course)."[10]  (Apx. pg. 196).

---

    [9]    Among the companies listed was HP.  At the time, HP was a competitor of Compaq, ITY's parent corporation.

    [10]    HP has never argued that Lexmark is a Compaq affiliate.

9.     The Form 8-K filed by InaCom with the Securities and Exchange Commission dated January 4, 2000, incorporates the Asset Purchase Agreement and the representations made therein, including the representation that the accounts payable liability of InaCom to Lexmark is being assumed by ITY.  (Apx. pg. 201).

### (d)  InaCom's Accounts Payable with Lexmark

10.     Before the execution of the Asset Purchase Agreement, InaCom became delinquent on its account with Lexmark.  (D.I. 121, T.T. 7:1-7:5, 7:15-7:17, Apx. pg. 33). Lexmark began contacting InaCom regarding the delinquency in late 1999, and was informed that it should not worry about being paid because there was a sale pending between InaCom and another large corporation.  (D.I. 121, T.T. 17:7-17:12, 35:6-35:13, Apx. pgs. 40, 48).

11.     As InaCom's "delinquency" continued to grow, discussions were held at Lexmark throughout January 1999, on almost a daily basis, as to whether InaCom should be placed on a shipping hold.  (D.I. 121, T.T. 7:15-9:5, Apx. pg. 33).

### (e)  Lexmark's Efforts to Collect Payment from InaCom

12.     Kevin Sarkisian, Lexmark's U.S. Credit Manager, first learned of InaCom's delinquency in December 1999 when Lexmark's order entry system automatically began placing orders for InaCom on shipping hold.  (D.I. 121, T.T. 7:15-8:21, Apx. pg. 33).  Lexmark's order entry system automatically stops orders from being shipped to a customer if twenty-five percent or more of the customer's outstanding balance is delinquent.  (D.I. 121, T.T. 7:15-8:21, Apx. pg. 33).  When a shipment is

placed on hold by the order entry system, it remains on hold until the credit department makes an affirmative decision to release it. (D.I. 121, T.T. 9:14-10:4, Apx. pg. 35). As head of the credit department, Mr. Sarkisian had the "ultimate responsibility" for determining whether to continue to ship goods to InaCom. (D.I. 121, T.T. 18:21-19:17, Apx. pg. 41).

13.     Lexmark's corporate philosophy is that the sales team owns the customer relationship because it has the "best contacts" with the customer providing the team with "insider knowledge." (D.I. 121, T.T. 12:2-12:21, Apx. pg. 37). As he considered whether to place shipments to InaCom on hold, Mr. Sarkisian contacted two members of Lexmark's sales department, William Schuette and Bob Kendrick, and requested that they contact InaCom to determine the reason for the delinquency. (D.I. 121, T.T. 12:2-12:21, Apx. pg. 37).

14.     As of February 15, 2000, InaCom's account with Lexmark was past due in the amount of $4,694,000. (D.I. 121, T.T. 32:18-33:5, Apx. pg. 46). On that date, Mr. Schuette wrote a letter addressed to Dick Oshlo, InaCom's treasurer ("Schuette Letter").[11] (Apx. pg. 264).

15.     The purpose of the Schuette Letter was to confirm what Mr. Schuette had been told by Leon Kerkman, vice-president of operations for InaCom. (D.I. 121, T.T. 15:2-15:11, Apx. pg. 38, Schuette Deposition ("Depo."), 47:25-48:8, Apx. 101, Kerkman Depo., 11:7-11:18, 12:13-13:10, Apx. pgs. 86, 87). The Schuette Letter recited that InaCom had written checks payable to Lexmark for the past due amounts and these

---

[11]     Mr. Oshlo's name is misspelled "Oslo" in the Schuette Letter. Mr. Sarkisian did not review the Schuette Letter before it was mailed to Mr. Oshlo. (D.I. 121, T.T. 33:14-33:20, Apx. pg. 47).

checks would be disbursed within one to ten weeks after the sale of InaCom's assets. (Apx. pg. 264).

16.     When the Schuette Letter was sent, Mr. Schuette did not have an understanding as to the source of the funds backing the checks that Mr. Kerkman had told him Inacom was holding. (Schuette Depo. at 83:7-84:8, Apx. pg. 105).  Mr. Schuette believed, however, that at the end of the day Compaq would see that Lexmark was paid what it was owed by InaCom:

> Q:     Did you have any understanding about whether Compaq was also assuming the liability to make good on the held checks after they had been released and paid?
>
> A:     Well, my assumption always was that Compaq would make good the payments, but I don't think at the time I knew whether or not the checks were going to be written from Inacom.  I mean, I don't think I knew the source of the money, who was actually paying for the checks, if it was going to be coming out of an Inacom account or it was going to be coming out of a Compaq account.  I don't think that I knew the source of the money, but I felt like Compaq would cover the invoices.
>
> Q:     All invoices?
>
> A:     All of them, yeah.
>
> Q:     So any invoice that was outstanding?
>
> A:     Right.

(Schuette Depo., 69:21-70:12, Apx. pg. 103).

17.     When asked at his deposition if there was an agreement between InaCom and Compaq providing that the proceeds of the asset sale would be used to pay held checks, Mr. Oshlo, InaCom's treasurer, testified that there was not:

> Q:     And as I understand your testimony, sir, you have no recollection of any understanding or agreement whereby

11

proceeds of the sale between InaCom Corporation and Compaq Computer Corporation would be used to pay held checks, correct?

A:      Correct.

(Oshlo Depo., 162:8-162:13, 164:2-164:7, Apx. pgs. 96, 97).

### (f)  Bill Francis's February 15, 2000 Letter to Lexmark

18.      Mr. Sarkisian was responsible for deciding whether to place InaCom on shipping hold.  (D.I. 121, T.T. 19:3-19:17, Apx. pg. 42).   Mr. Sarkisian viewed the Schuette Letter as an effort on Mr. Schuette's part to confirm what he had been told by InaCom was its plan for paying Lexmark the money it was owed.  (D.I. 121, T.T. 15:2-15:11, 40:23-41:8, Apx. pgs. 38, 50).  Mr. Sarkisian did not place much confidence in the Schuette Letter because while "[t]he letter in whole was more information than [he] had the day before" it was not enough to make him comfortable that Lexmark was going to be paid.  (D.I. 121, T.T. 39:5-39:11, Apx. pg. 49).

19.      The following day, however, February 16, 2000, Bill Francis, the director of corporate finance for Compaq, telecopied a letter ("Francis Letter") to Misty Atchinson of Lexmark regarding "Account Payable #117403 of InaCom Corporation." (Apx. pg. 265).   The Francis Letter states that certain assets of InaCom had been purchased by Compaq and would be operated as Custom Edge — with accounts payable to be funded by Compaq.  (Apx. pg. 265).  The Francis Letter states that Custom Edge "also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account."  (Apx. pg. 265).

12

20.    Consistent with the Asset Purchase Agreement, the Francis Letter obligated Custom Edge to pay all the outstanding amount owing from InaCom to Lexmark, including invoices against which InaCom had cut checks and which checks were held by InaCom's Treasury Department until after the close of the Compaq Sale. (D.I. 121, T.T. 41:22-42:9, Apx. pg. 51).

21.    Mr. Francis obtained approval before sending the Francis Letter to Lexmark and other InaCom vendors.  (Francis Depo., 21:2-21:24, 22:23-23:2 Apx. pgs. 70, 71).  Ben Wells, Compaq's acting chief financial officer and vice president, corporate treasurer, authorized the sending of the Francis Letter. ( Wells Depo., 11:3-11:7, 11:11-11:13, 52:12-52:17, 54:21-55:4, 75:9-75:15, 76:15-77:3, Apx. pgs. 128, 128, 129, 131, 133, 134).  Mr. Wells said that the purpose of the Francis Letter was to ensure the continued flow of products that would be necessary to configure Compaq products at Custom Edge:

> Q:    And the reason for the letter was to ensure the continued flow of products from these vendors that would be necessary to configure Compaq products at Custom Edge?
>
> A:    That's correct.

(Wells Depo., 76:1-76:9, 53:4-54:2, Apx. pgs. 134, 130, Kerkman Depo., 60:24-61:13, Apx. pg. 89).

22.    The Francis Letter was everything that Lexmark had been looking for. Not only did the Francis Letter confirm that Compaq would be responsible for amounts owed by Custom Edge going forward but it also provided that Custom Edge would pay anything that was due on the InaCom's accounts payable with Lexmark, whether past due or current.  (D.I. 121 T.T., 41:22-42:9, Apx. pg. 51).

23.    As far as Mr. Sarkisian was concerned, after receipt of the Francis Letter, the Schuette Letter was of no further relevance:

> Q:    Were you concerned that these two letters, which were one day apart, expressed two different concepts in your mind as to how Lexmark was going to be paid?
>
> A:    No.   The reason is, the first letter is written by my salesperson trying to confirm a plan to someone at Inacom that apparently is not willing to talk to him.   And the second letter is from Compaq, one of my biggest — the biggest customer in the United States for Lexmark, and its saying that they are assuming all the obligation to pay the accounts payable of Lexmark.   That is something that I could rely on.
>
> Q:    Because you knew, from the preexisting relationship, you knew Compaq well?
>
> A:    Yes.
>
> Q:    Did you think that there might be a misunderstanding in the expression of two different concepts between the two letters?
>
> A:    As I recall, essentially, the February 15th letter was no longer in my thoughts.   When I got this letter from Compaq, everything was, in my mind, going to be taken care of.   If it weren't going to be taken care of, I could go back to Compaq and ask them to.   The February 15 letter didn't have any bearing after I received the February 16th letter on my thoughts.

(D.I. 121, T.T. 40:23-41:21, Apx. pg. 50).   Indeed, Mr. Sarkisian "continued to ship because [he] got a letter from Compaq saying that they would be responsible."  (D.I. 121, T.T. 47:3-47:12, Apx. pg. 55).

24.    During cross-examination at trial, when asked why Lexmark did not seek immediate payment of the past due delinquency on or about February 16, 2000, Mr. Sarkisian testified as follows:

14

A:    As I recall, since we received the letter from Compaq, it gave us a great deal of comfort knowing that they were going to be responsible for that payment – for those amounts due from Inacom.  And it essentially took the pressure out of the situation.  As I recall, Inacom, you know, continued to make promises to pay.  And we felt that if they didn't pay us, then we could go back and ask Compaq to pay based on this letter.

(D.I. 121, T.T. 45:25-46:10, Apx. pg. 53).

\* \* \* \* \*

Q:    So you saw the February 16th letter as a catchall, whatever happens to you, Compaq will make you whole?  That's how you read the letter?

A:    Yes, certainly.

(D.I. 121, T.T. 48:21-48:24, Apx. pg. 56).

### (g)  Other Vendors Received a Letter from Mr. Francis

25.    Prior to the close of the sale of InaCom assets to Compaq, other of InaCom's vendors besides Lexmark were becoming reluctant to ship goods and seeking assurances that they would be paid.  (Francis Depo., 16:25-18:17, Apx. pg. 67, Frasca Depo., 42:10-42:16, Apx. pg. 80).  Accordingly, the Francis Letter was sent to other InaCom vendors, including Tech Data and Logicare, on or about February 16, 2000.[12] (Wells Depo., 75:9-75:16, Apx. pg. 133).  In each, the representation was made that Custom Edge "assumed the obligation to pay all the outstanding amount on the referenced account, subject to the terms and conditions of such account."  (Apx. pgs. 266, 267).

---

[12]    At his deposition Mr. Francis confirmed that he had sent the letter to other vendors in addition to Lexmark.  (Francis Depo., 18:14-18:17, Apx. pg. 69).

SL1 624012v1/004907.00003

### *(h)  Tech Data Was Given the Same Promise as Lexmark*

26.     Like Lexmark, Tech Data had engaged in communications with InaCom regarding its outstanding account payable prior to receiving a Francis Letter.  (D.I. 81, Tab 1 ¶ 7).  As stipulated by the parties, on February 3, 2000, John Frasca, vice president of supply chain management at InaCom, sent an e-mail to Michael Ward, Tech Data's senior credit manager, attaching InaCom's Form 8-K dated January 4, 2000.  (D.I. 81, Tab 1 ¶ 7).  In his e-mail, Mr. Frasca advised Mr. Ward that the Form 8-K indicated "that 100% of the payables for Tech Data will be assumed by Compaq."  (Apx. pg. 263).  "[B]ased on this contract," Mr. Frasca requested Tech Data increase InaCom's credit line.  (Apx. pg. 263).

27.     On or about February 16, 2000, Michael Zava, Tech Data's vice president of credit and customer services for the Americas, received a letter from Mr. Francis regarding "Account Payable # 102598 of InaCom Corporation."  (Zava Depo., 6:22-7:3, 133:7-133:10, Apx. pgs. 574, 576).  Like Mr. Francis's letter to Lexmark, the letter to Mr. Zava recited that certain assets of InaCom had been purchased by Compaq and would be operated as Custom Edge — with accounts payable to be funded by Compaq.  (Apx. pg. 266).  The letter further stated that Custom Edge "also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account."  (Apx. pg. 266).

28.     Like Mr. Sarkisian, Mr. Zava understood the letter from Mr. Francis to mean that Compaq would be liable for everything that was owing to Tech Data by InaCom.  (Zava Depo., 138:3-138:7, 137:8-137:24, Apx. pgs. 578, 577).  When asked at his deposition what Tech Data would have done had it not received this letter from Mr.

SL1 624012v1/004907.00003

Francis, Mr. Zava testified that "we would have reacted quite differently to the entire situation."  (Zava Depo., 156:17-156:20, 156:24-157:2, Apx. pg. 579).

### (i)  Compaq's Efforts to Rescind the Francis Letter

29.    On or about February 17, 2000, Nondas Vitols, a product manager for Custom Edge, sent a letter to a number of vendors announcing that certain assets of InaCom had been purchased by Compaq and would be operated as Custom Edge ("Announcement Letter").  (Vitols Depo. at 8:2-8:12, Apx. pg. 112).   In contrast to the Francis Letter, the Announcement Letter provided that "Compaq is assuming the open accounts payable but NOT the held checks." (Emphasis in original).  (Apx. pg. 268).  The vendors identified in Schedule 2.03 of the Asset Purchase Agreement, including Lexmark and Tech Data, were not sent an Announcement Letter.[13]

### (j)  Ben Wells's February 5, 2001 Letter to Lexmark

30.    After the closing of the InaCom asset sale to Compaq, in keeping with the Lexmark credit department's standard procedure, Mr. Sarkisian requested that Mr. Schuette obtain a letter from Compaq guaranteeing any debts that Custom Edge had to Lexmark because Lexmark was "extending credit to a subsidiary based on the parent's financial statements."  (D.I. 121, T.T. 21:8-22:3, Apx. pg. 43).[14]

---

[13]    Lexmark has sought without success to discover whether the Announcement Letter was intended also for Lexmark and Tech Data and, if so, why it was not sent to them.  Remarkably, despite its obvious importance, HP chose not to call a witness to testify at the trial of the matter regarding the issue.

[14]    Prior to filing its bankruptcy petition, InaCom paid Lexmark everything that was owed it. (D.I. 121, T.T. 23:7-23:11, Apx. pg. 45).

SL1 624012v1/004907.00003

31.    Mr. Schuette received from Mr. Wells a letter dated February 5, 2001 ("Guaranty Letter").  (Apx. pg. 269).  This was the letter sought by Mr. Sarkisian.  The Guaranty Letter stated, in pertinent part, that:

> For valuable consideration, Compaq Computer Corporation, a Delaware Corporation (the "Guarantor"), hereby unconditionally guarantees and promises to pay to Lexmark International Inc. (Lexmark) on demand, any and all indebtedness from time to time outstanding under or in respect to transactions between Custom Edge, Inc. (CEI) and Lexmark.

(Apx. pg. 269).  As guarantor, Compaq also agreed "to pay all reasonable attorneys' fees, the allocated of Lexmark's internal counsel, and all other costs and expenses that may be incurred by Lexmark in the enforcement of this Guaranty."  (Apx. pg. 269).


## IV.  PROPOSED CONCLUSIONS OF LAW

Lexmark alleges nine claims for relief in its third-party complaint against Compaq and Custom Edge.  The claims for relief are as follows:

**First Claim:**  Breach of contract claim against Custom Edge

**Second Claim:**  Breach of contract claim against Custom Edge

**Third Claim:**    Breach of contract claim against Compaq

**Fourth Claim:**  Breach of contract claim against Compaq

**Fifth Claim:**  Indemnity claim against Custom Edge

**Sixth Claim:**  Indemnity claim against Compaq

**Seventh Claim:**  Promissory estoppel claim against Custom Edge

**Eighth Claim:**  Promissory estoppel claim against Compaq

**Ninth Claim:**  Breach of guaranty claim against Compaq

(D.I. 2, Apx. pg. 1).

18

The first and third claims for relief alleged in the third-party complaint are based on a third-party beneficiary theory of liability. Lexmark has determined it will not pursue and waives the first and third claims.[15] The remaining claims for relief are discussed seriatim as they appear in Lexmark's third-party complaint. Lexmark is entitled to relief under each of these claims.

### (a)  Second and Fourth Claims for Relief

*Lexmark's Breach of Contract Claims*
*Based on the Francis Letter*

At its second and fourth claims for relief, Lexmark alleges that Compaq and Custom Edge are liable to it for breach of contract. The breach is the result of the failure of Compaq and Custom Edge, and ultimately HP, to keep the promise reflected in the Francis Letter, the promise to pay the amounts owed by InaCom to Lexmark. The Francis Letter constitutes a valid and binding contract of guaranty. By failing to remit the amount of the accounts payable ultimately owing to Lexmark from InaCom, Compaq and Custom Edge, and HP as their successor in interest, are liable to Lexmark for breach of contract in the amount of $990,000.

### (1)  *The Francis Letter Does Not Present a Choice of Law Issue Because HP has Conceded that Kentucky Law Governs*

Both Lexmark and HP are Delaware corporations. Compaq sent the Francis Letter from its headquarters in Houston, Texas to Lexmark at its headquarters in Lexington, Kentucky. All of the actions taken by Lexmark in reliance on the Francis

---

[15]    By letter telecopied March 28, 2006, Lexmark's attorneys advised HP's attorneys that Lexmark would not pursue and waives the first and third claims for relief alleged in its third-party complaint. (Apx. pg. 570).

Letter occurred in Kentucky.  Accordingly, it might appear that, as a preliminary matter, the Court must decide whether the state law of Delaware, Texas or Kentucky governs its consideration of the Francis Letter.  However, there is no issue.  The law of Kentucky applies.

In its motion for a separate trial of the third-party complaints brought by Lexmark and Tech Data against Compaq and Custom Edge, HP conceded that Kentucky law properly controls Lexmark's claims relating to the Francis Letter.  (D.I. 46, Apx. pg. 13). HP stated as follows:

> Lexmark and Tech Data also claim a letter sent by Compaq to certain vendors of InaCom constituted an independent contractual obligation to assume or guarantee all of Inacom's payment obligations to them.  They have asserted common counts of breach of contract, indemnity, promissory estoppel, and breach of guaranty.  The merits of these claims will be determined by Florida law in Tech Data's case, and Kentucky law in Lexmark's case – not bankruptcy law.

D.I. 46, Apx. pg. 24).  Because HP has conceded that Kentucky law governs Lexmark's claims based on the Francis Letter, the Court does not need to engage in a choice of law analysis.

### (2)  *HP is Bound by the Terms of the Francis Letter*

A guaranty agreement is defined as "one in which the promisor protects his promisee from liability for a debt resulting from the failure of a third party to honor an obligation to that promisee – thus creating a secondary liability."  *Intercargo Insurance Co. v. B.W. Farrell*, 89 S.W.3d 422, 426 (Ky. Ct. App. 2002).  (Apx. pg. 351).  KRS 371.065(1) provides that:

> No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be

> valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates . . . .

(Apx. pg. 567). A guaranty agreement "which either is . . . written on, or . . . expressly refer[s] to, the instrument or instruments being guaranteed" is not required to specify the guarantor's maximum liability or the guaranty's termination date. *Wheeler & Clevenger Oil Company, Inc. v. Washburn*, 127 S.W.3d 609, 614-615 (Ky. 2004). (Apx. pg. 550). Because the Francis Letter expressly refers to InaCom's account payable owing Lexmark, it need not specify the maximum liability being guaranteed by Custom Edge and Compaq nor provide a termination date.

Kentucky law defines an absolute guaranty as a contract by which "the guarantor promises that if the debtor does not perform his obligation or obligations, the guarantor will perform some act (such as the payment of money) to or for the benefit of the creditor, irrespective of any additional contingencies." *APL, Inc. v. Ohio Valley Aluminum, Inc.*, 839 S.W.2d 571, 573 (Ky. Ct. App. 1992). (Apx. pg. 276). "When the circumstances surrounding the issuance of an absolute guaranty and the terms of the writing itself evidence no indication that the guarantor anticipated notification of acceptance from the creditor, the guarantor will be liable on the instrument from the time the creditor acts in reliance on it." *Id*.

Consideration for a guaranty agreement is usually either the sufferance of a detriment by the creditor or a benefit conferred on the primary debtor. *Material Partnerships, Inc. v. Lopez*, 102 S.W.3d 252, 262 (Tex. Ct. App. 2003). (Apx. pg. 456). As such, consideration need not pass to the guarantor. *Id*. Courts have held that an agreement to continue doing business with a party confers a benefit on that party. *Id*.;

*see, also, Gabriel Ride Control Products, Inc. v Wolverine Auto Supply, Inc.*, 35 Fed. Appx. 397, 399 (6th Cir. 2002) (Apx. pg. 341); *International Harvester Credit Corp. v. Bowman*, 316 S.E.2d 619, 621 (N.C. Ct. App. 1984) (Apx. pg. 440); *Liberty Bank v. Shimokawa*, 632 P.2d 289, 292 (Haw. Ct. App. 1981) (Apx. pg. 448).

The Francis Letter constitutes a contract of guaranty that is absolute because Custom Edge "assumed the obligation to pay all of the outstanding amount on the referenced [InaCom] account," while Compaq in turn promised to fund Custom Edge's accounts payable.  (Apx. pg. 265).  Prior to the close of the sale of InaCom assets to Compaq, Lexmark and other of InaCom's vendors were becoming reluctant to ship goods and requested assurances that they would be paid for the goods they provided.  (Francis Depo., 17:9-18:17, Apx. pg. 68, Frasca Depo., 42:10-42:16, Apx. pg. 80).  The stated purpose of the Francis Letter was to ensure the continued flow of products that would be necessary to configure Compaq products at Custom Edge.  (Wells Depo., 76:1-76:9, Apx. pg. 134).  Viewing the promises to pay against this background, it is obvious that the Francis Letter constituted an offer that Lexmark accepted by continuing to ship goods to InaCom and then Custom Edge after it acquired InaCom's distribution business.[16]

### (3) *The Failure to Remit Payment to Lexmark Is a Breach of the Francis Letter*

To state a cause of action ex contractu under Kentucky law the plaintiff must state the contract, the breach and the facts which show the loss or damage by reason of the breach.  *Fanin v. Commercial Credit Corp.*, 249 S.W.2d 826, 827 (Ky. 1952).  (Apx. pg.

---

[16]    Lexmark did not need to notify Compaq and Custom Edge of its acceptance in writing because neither the language of the Francis Letter nor the circumstances surrounding its issuance evidenced a desire on the part of Compaq and Custom Edge to receive notification of acceptance from Lexmark. *APL, Inc. v. Ohio Valley Aluminum, Inc.*, 839 S.W.2d 571, 574 (Ky. Ct. App. 1992).  (Apx. pg. 276).

339).  Existing law deems a preferential payment to be no payment at all.  *In re Art Shirt Ltd., Inc.*, 34 B.R. 918, 921 (E.D. Pa. 1983); *In re Herman Cantor Corp.*, 15 B.R. 747, 750 (E.D. Va. 1981).  (Apx. pgs. 343, 348).  Consequently, Compaq and Custom Edge breached their obligations under the Francis Letter by failing to remit to Lexmark the $990,000 it was required to pay InaCom for a release of its preference claims against Lexmark.  Therefore, the Court must find that Compaq and Custom Edge, and HP as successor in interest to Compaq and Custom Edge, are liable to Lexmark for breach of contract in the amount of $990,000.

### (b)  Fifth and Sixth Claims for Relief

#### *Lexmark's Indemnity Claims Based on the*
#### *Francis Letter and the Guaranty Letter*

In its fifth and sixth claims for relief, Lexmark alleges that Compaq and Custom Edge must indemnify it for the $990,000 paid to InaCom in settlement of its preference claims because had Compaq and Custom Edge not breached the terms of the Francis Letter, and had Compaq not breached the Guaranty Letter, Lexmark would not have been have been required to remit payment to InaCom.

Kentucky follows the Restatement of Restitution which provides that:

A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct.

*Johnson's Dairy, Inc. v. Western Reserve Life Assurance Company of Ohio*, 107 F.3d 400, 401 (6th Cir. 1997).  (Apx. pg. 444).  Thus, a claim for indemnity is not a claim in which the claimant seeks damages for his or her own personal injuries, but is one in

which the claimant seeks restitution for damages he or she was required to pay for injuries sustained by another. *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 781-782 (Ky. 2000). (Apx. pg. 311).

The case of *Johnson's Dairy* is highly instructive. Johnson's Dairy, Inc. ("Dairy") hired Western Reserve Life ("Western Reserve") to manage its pension funds. *Johnson's Dairy* at 401. David Lambert ("Lambert"), an agent of Western Reserve, was assigned to the account. *Id.* While managing the account, Lambert embezzled most of Dairy's pension funds but repaid $243,201.73 to Dairy in 1986. *Id.* at 401. Lambert subsequently declared bankruptcy and his payment to Dairy was determined to have been preferential. *Id.* In 1994, the bankruptcy court ordered Dairy to repay the money to the trustee. The Dairy sought reimbursement from Western Reserve. *Id.* at 401-402. The Sixth Circuit found that:

> But for the embezzlement of Western Reserve's agent, there would have been no loss and no preferential payment in Bankruptcy, and the Dairy, an innocent party, would not have been required to make the repayment. Since the Dairy did not know that it would have to refund the payment to the Trustee until 1994, it did not know that it had a cause of action until that time. Since the Dairy was repaid $243,000 of the embezzled money by Lambert in 1986, it had no claim at that time against the employer because the injury had been cured by Lambert's repayment of the embezzled funds.

*Id.* Accordingly, the Sixth Circuit held that in light of Western Reserve's legal obligation to reimburse Dairy for the loss of its pension funds due to the embezzlement by Lambert, Western Reserve's employee, Western Reserve was required to compensate Dairy for its payment of the bankruptcy preference. *Id.* at 402. The court opined that to require the loss to lie with Dairy would be unjust and enrich the insurance company at the expense of the Dairy and its pensioners. *Id.*

24

Lexmark's indemnification claims satisfy the requirements articulated by existing case law.  In settlement of InaCom's preference claims, Lexmark repaid $990,000 to InaCom's bankruptcy estate.  Like Dairy, Lexmark's claims against Compaq and Custom Edge did not arise until Lexmark made payment to InaCom's bankruptcy estate.  Prior to the payment, Lexmark's claims against Compaq and Custom Edge were contingent because Lexmark had received payment from InaCom for the amounts owed to Lexmark on InaCom's accounts payable.  Because Compaq and Custom Edge guarantied InaCom's payments to Lexmark through the Francis Letter, and Compaq guarantied InaCom's payments to Lexmark through the Guaranty Letter, they, and HP as their successor in interest, must now indemnify Lexmark in the amount of $990,000.

### (c) Seventh and Eighth Claims for Relief

#### *Lexmark's Promissory Estoppel Claims Based on the Francis Letter*

In its seventh and eighth claims for relief, Lexmark asserts that it reasonably relied upon the promises contained in the Francis Letter to its detriment by continuing to provide goods on credit to InaCom, and by delaying collection efforts for amounts owing. Because Lexmark detrimentally relied upon Compaq's promise to fund Custom Edge's accounts payable, and Custom Edge's promise "to pay all the outstanding amount" owing Lexmark on the InaCom accounts payable, they and HP, as successor in interest to Compaq and Custom Edge, are liable to Lexmark for the $990,000 it paid for a release of InaCom's preference claims.

In its motion for a separate trial of the third-party claims brought by Lexmark and Tech Data, HP conceded that Kentucky law controls Lexmark's promissory estoppel

claims.  (D.I. 46, Apx. pg. 24).  Kentucky case law, in keeping with the Restatement

(Second) of Contracts § 90 (1965), defines the doctrine of promissory estoppel as

> A promise which the promisor should reasonably expect to induce action
> or forebearance on the part of the promisee or a third person and which
> does induce such action or forebearance is binding if injustice can be
> avoided only be enforcement of the promise.

*McCarthy v. Louisville Cartage Company, Inc.,* 796 S.W.2d 10, 11 (Ky. App. 1990).

(Apx. pg. 468).  A plaintiff, in order to prevail on a claim of promissory estoppel, must

show (1) a promise, and (2) that the plaintiff in reliance on the promise took action to his

or her detriment.  *Martin-Senour Paints v. Delmarva Venture Corporation,* 1988 Del.

Super. LEXIS 93, *4 (Del. Super. 1988) (Apx. pg. 452); *Autochanel, Inc. v. Speedvision

Network, LLC,* 144 F.Supp.2d 784, 792 (W.D. Ky. 2001) (Apx. pg. 282).

In the present case the elements for promissory estoppel are unquestionably

satisfied.  Custom Edge clearly promised in the Francis Letter that it would pay all of the

outstanding amounts due to Lexmark by InaCom:

> In connection with such purchase, Custom Edge, Inc. **also assumed the
> obligation to pay all of the outstanding amount on the referenced
> account**, subject to the terms and conditions of such account. (emphasis
> added).

(Apx. pg. 265).  Custom Edge's promise to pay "all of the outstanding amount" of

InaCom's obligations to Lexmark is clear and unequivocal as is Compaq's promise to

fund Custom Edge's accounts payable.  (Apx. pg. 265).

Lexmark also took action to its detriment in reasonable reliance upon Compaq's

and Custom Edge's promises.  As set out in the proposed findings of fact, Lexmark was

concerned about InaCom's past due account and had been in contact with InaCom

regarding the matter.  (Schuette Depo., 47:25-48:8, Apx. pg. 101).  On February 15,

2000, Lexmark wrote to InaCom demanding information as to how it would be paid.

(Apx. pg. 264).  On February 16, 2000, Lexmark got its answer in the Francis Letter and considered the matter resolved.  (D.I. 121, 41:22-42:9, Apx. pg. 51).  Lexmark knew that Compaq, a most important customer, could pay the amounts due.  (D.I. 121, 41:22-42:9, Apx. pg. 51).  In reliance upon Compaq's promise to pay, Lexmark forbore from taking any further action on the account and continued to ship supplies to InaCom.  Therefore, because Lexmark detrimentally relied on Compaq's unequivocal promise to pay, Compaq and Custom Edge, and HP as their successor in interest, are liable to Lexmark for the $990,000 that Lexmark paid InaCom in settlement of its preference claims.  *See In re Art Shirt, Ltd, Inc.,* 34 B.R. 918, 921 (E.D. Pa. 1983) ("A preferential payment is deemed to be no payment at all.").  (Apx. pg. 345).

The case of *Martin-Senour Paints v. Delmarva Venture Corp.,* 1988 Del. Super. LEXIS 93 (Del. Super. 1988) is on point.  (Apx. pg. 452).  In that case, Martin-Senour Paints ("Martin") sold $21,443.72 of paint supplies and materials to Delmarva Hardware Building and Supply Corporation ("Delmarva").  *Id*. at *1.  Delmarva was a wholly owned subsidiary of Delmarva Venture Corporation ("DVC").  *Id*. at *2.  Delmarva became delinquent on its account with Martin.  On November 8, 1984, DVC sent a letter to Martin in which it stated that Delmarva's debt to Martin would soon be "satisfactorily discharged."  Delmarva subsequently filed for bankruptcy without paying the debt.  *Id*. at *5.

Martin sued DVC for, among other things, promissory estoppel.  *Id*. at *2.  Martin asserted that DVC was liable for the debt because, in reliance upon the promise contained in the November 8, 1984 letter, Martin forbore from taking further action on the account and extended new credit.  *Id*. at *8.  The court agreed and held that DVC was liable for

27

the debt. *Id.* at *9-10. *See also The Excello Press, Inc., et al. v. Maxwell Holdings, Inc.,*

*et al.,* 1991 U.S. Dist. LEXIS 7406, *82-86 (N.D. Ill. 1991) (where a potential purchaser

of a corporation decided not to buy the corporation, it was liable for amounts due certain

trade creditors because the potential purchaser had promised that they would be paid out

of the sale proceeds, and they continued to extend credit to the corporation in reliance on

the promise). (Apx. pg. 483).

There is no significant factual distinction between *Martin-Senour Paints* and the

present case. Compaq and Custom Edge, and HP as successor in interest to both, are

liable to Lexmark for $990,000 under its promissory estoppel claims because of

Lexmark's reasonable reliance on the promises contained in the Francis Letter.

### (d) <u>Ninth Claim for Relief</u>

### *Lexmark's Breach of Contract Claim*
### *Based on the Guaranty Letter*

In its ninth claim for relief, Lexmark asserts that the Guaranty Letter created a

binding contract between it and Compaq. The Guaranty Letter is an independent and

distinct contract of guaranty, and was prepared and delivered by Compaq to Lexmark at

its request.[17] The Guaranty Letter clearly states that Compaq will pay to Lexmark any

---

[17]    The Guaranty Letter had no effect on the Francis Letter, as the execution of a subsequent contract of guaranty does not extinguish a prior contract of guaranty unless it is shown that the parties so intended. *Pascagoula-Moss Point Bank v. Citizens Fidelity Bank & Trust Co.,* 563 S.W.2d 727, 729 (Ky. 1977) (Apx. pg. 480); *see, also Baxter State Bank v. Bernhardt,* 985 F. Supp. 1259, 1266-1267 (D. Kan. 1997) (Apx. pg. 294); *Warner v. First National Bank of Waco, Texas,* 369 S.W.2d 651, 652-653 (Tex. Civ. App. 1963) (noting that "the fact alone that an additional guaranties are provided does not prove that the original continuing guaranty was destroyed") (Apx. pg. 524); *Bryant v. Food Machinery and Chemical Corporation Niagara Division,* 130 So. 2d 132, 134 (Fla. Dist. Ct. App. 1961) ("In the absence of evidence to show that the new contract of guaranty was designed to destroy one outstanding, it has not been deemed to have been in renewal thereof, or a substitute therefore, and is regarded as an independent and distinct agreement.") (Apx. pg. 308).

and all indebtedness outstanding in respect to "transactions between Custom Edge, Inc. and Lexmark."  (Apx. pg. 269).  The Francis Letter constitutes a "transaction" between Custom Edge and Lexmark obligating Custom Edge to pay to Lexmark the amounts owing it by InaCom.

### (1)  Delaware Law Governs the Guaranty Letter

The Guaranty Letter was sent by Compaq from its headquarters in Houston, Texas to a Lexmark office in Scottsdale, Arizona.  The Guaranty Letter provides that it is to be construed in accordance with the laws of the state of Delaware:  "THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE."  (Emphasis in original).  (Apx. pg. 269).  Because Delaware case law enforces choice of law provisions, the Guaranty Letter must be construed in accordance with Delaware law.  *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1032 (Del. Ch. 2005) (holding that a choice of law provision must be respected so long as the law selected bears some material relationship to the transaction).  (Apx. pg. 526).

### (2)  The Guaranty Letter Requires HP to Reimburse Lexmark for Any and All Indebtedness Arising from Transactions Between Custom Edge and Lexmark

Under Delaware law, "a contract of guaranty is the promise to answer for the payment of some debt or for the performance of some obligation by another on the default of that third person who is liable in the first instance."  *Falco v. Alpha Affiliates, Inc.*, 1997 U.S. Dist. LEXIS 20122, * 15 (Dist. Del. 1997).  (Apx. pg. 329).  In order for

a guaranty to be enforceable, it must, with reasonable clearness, evidence an intent on the part of a party to become liable on an obligation in the event of default by the primary obligor. *Id*. at *16. Under an absolute and unconditional guaranty there is no express condition annexed to the contract itself, nor is any condition implied by law requiring the plaintiff to notify the guarantor of the default of the principal or of the amount due at the close of the plaintiff's transactions with the debtor. *Ajax Rubber Company, Inc. v. Gam*, 151 A. 831, 832 (Del. Super. Ct. 1924). (Apx. pg. 270).

Delaware's statute of frauds provides that an agreement to answer for the debts of another must be reduced to writing to be enforceable. *Trader v. Wilson*, 2002 Del. Super. LEXIS 92, *16 (Del. Super. 2002) (Apx. pg. 516); *see, also,* Del. Code Ann. Tit. 6, § 2714(a) (Apx. pg. 565). In determining whether any particular writing satisfies the statute of frauds, Delaware relies on the Restatement (Second) of Contracts § 131 (1981). *Falco v. Alpha Affiliates, Inc.*, 1997 U.S. Dist. LEXIS 20122, *21 (D. Del. 1997). (Apx. pg. 329). Section 131 requires that at least one of the writings be (1) signed by the party to be charged and that (2) all the writings taken together:

> (a) reasonably identify the subject matter of the contract, (b) [are] sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and (c) state[] with reasonable certainty the essential terms of the unperformed promises in the contract.

*Id.* at *21-*22, *citing to* Restatement (Second) of Contracts § 131 (1981). The Guaranty Letter satisfies these requirements: first, the Guaranty Letter is signed by Mr. Wells for Compaq, the entity to be charged; second, the Guaranty Letter reasonably identifies the "indebtedness from time to time outstanding under or in respect to transactions between Custom Edge, Inc. (CEI) and Lexmark" as the subject matter of the contract; third, the

Guaranty Letter indicates that a contract has been made and consideration received; and fourth, the Guaranty Letter states with reasonable certainty the essential terms of the unperformed promises.

In Delaware, guaranty contracts should be governed by the basic consideration that the intention of the parties must prevail. *Wilmington & Northern Railroad Co. v. Delaware Valley Railway Co.*, 1999 Del. Super. LEXIS 220, *17 (Del. Super. Ct. 1999) (Apx. pg. 550); *see, also, Wilmington Trust Co. v. Keith*, 2002 Del. Super. LEXIS 445, *11 (Del. Super. Ct. 2002) (Apx. pg. 559). "Where the intent is reasonably clear, there is no room for construction." *Id*. at *18. The Guaranty Letter states:

> For valuable consideration, Compaq Computer Corporation, a Delaware Corporation (the "Guarantor"), hereby unconditionally guarantees and promises to pay to Lexmark International Inc. (Lexmark) on demand, any and all indebtedness from time to time outstanding under or in respect to transactions between Custom Edge, Inc. (CEI) and Lexmark.

(Apx. pg. 269). Compaq's intent to be bound to pay to Lexmark "any and all indebtedness from time to time outstanding or in respect to transactions between Custom Edge, Inc. (CEI) and Lexmark" is clear. The Francis Letter constitutes a "transaction" between Lexmark and Custom Edge.[18] Therefore, under the Guaranty Letter, Compaq is obligated to pay to Lexmark $990,000, the amount for which Lexmark settled the adversary proceeding brought against it by InaCom.

---

[18] Black's Law Dictionary defines a "transaction" as "the act or an instance of conducting business or other dealings." Black Law Dictionary 1503 (7th ed. 1999).

*(3)  By Failing to Reimburse Lexmark for the Amount Paid to
InaCom in Settlement of the Preference Action, HP has
Breached the Terms of the Guaranty Letter*

The elements of a breach of contract claim under Delaware law are:  the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages to the plaintiff.  *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005).  (Apx. pg. 356).   A preferential payment is deemed by law to be no payment at all.  *In re Art Shirt Ltd., Inc.*, 34 B.R. 918, 921 (E.D. Pa. 1983) (Apx. pg. 343); *In re Herman Cantor Corp.*, 15 B.R. 747, 750 (E.D. Va. 1981) (Apx. pg. 348). Consequently, Compaq breached its obligation to pay "all of the outstanding amount" owing Lexmark by failing to remit to Lexmark the $990,000 owing Lexmark upon it settlement of the Preference Action with InaCom.   Therefore, the Court must find that Compaq breached the Guaranty Letter and enter judgment in favor of Lexmark against Compaq, and HP as its successor in interest, in the amount of $990,000.

### (e)  Claim for Attorney Fees and Costs and Expenses

*Lexmark's Claim for Attorney Fees and Litigation Costs
and Expenses Based on the Guaranty Letter*

The Guaranty Letter provides that Compaq "agrees to pay all reasonable attorneys' fees, the allotted cost of Lexmark's internal counsel, and all other costs and expenses that may be incurred by Lexmark in the enforcement of this Guaranty."  (Apx. pg. 269).   Therefore, if Lexmark prevails on its claims brought to enforce the promise made to it by Compaq in the Guaranty Letter, the claims alleged in Lexmark's ninth claim for relief, Lexmark will be entitled to recover attorney fees and litigation costs and expenses.

32

Fed. R. Civ. P. 54(d)(2)(A) provides that "[c]laims for attorneys' fees and related nontaxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial." A claim by Lexmark for attorney fees and litigation costs and expenses based on the Guaranty Letter is not a claim under the "substantive law governing the action," required to be proved as an element of damages at trial.[19]  Accordingly, if the Court grants Lexmark judgment on its claims arising under the Guaranty Letter, Lexmark will after judgment is entered file a motion for attorney fees, and litigation costs and expenses, pursuant to Fed. R. Civ. P. 54(d)(2)(A) and the rules of the Court.


## V.  CONCLUSION

Lexmark submits that, based on the evidence at trial and the applicable law, it is entitled to judgment against Compaq, Custom Edge and HP, as successor in interest to Compaq and Custom Edge, for (1) the breach by Compaq and Custom Edge of the Francis Letter, and (2) the breach by Compaq of the Guaranty Letter, in the amount of $990,000, plus the costs allowed as of course to the prevailing party and judgment interest.  Lexmark also submits that, as it is entitled to judgment for the breach by Compaq of the Guaranty Letter, it is also entitled to an award of attorney fees and litigation costs and expenses, in an amount to be determined by the Court, upon motion by Lexmark pursuant to Fed. R. Civ. P. 54(d)(2)(A) and the rules of the Court.

---

[19]        By letter telecopied March 28, 2006, Lexmark's attorneys advised HP's attorneys that Lexmark would not seek and waived any claim to attorney fees as an element of damages under the substantive law governing the action.  (Apx. pg. 570).

SL1 624012v1/004907.00003

Dated:  March 31, 2005

Respectfully submitted,

Culver V. Halliday
Emily L. Pagorski
Stoll Keenon Ogden PLLC
2650 AEGON Center
400 West Market Street
Louisville, Kentucky 40202-3377
Tel:  (502) 568-9100
Fax:  (502) 568-5700
E-mail:  culver.halliday@skofirm.com
E-mail:  emily.pagorski@skofirm.com


and


_____
Thomas G. Whalen Jr. (No. 4034)
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Tel:  (302) 425-3304
Fax:  (302) 654-5181
e-mail:  tgw@stevenslee.com


*Attorneys for Third-Party Plaintiff,*
*Lexmark International, Inc.*

SL1 624012v1/004907.00003