1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              -   -   -

4    INACOM CORP. on behalf of        :       Civil Action
     all affiliated debtors,          :
5                                      :
                  Plaintiff,           :
6                                      :
7        v.                            :
                                       :
     LEXMARK INTERNATIONAL, INC.,      :
8                                      :
                  Defendant.           :
9                                      :

10
     LEXMARK INTERNATIONAL, INC.,      :
11                                     :
                  Third-Party          :
12                Plaintiff,           :
                                       :
13       v.                            :
                                       :
14   COMPAQ COMPUTER CORP., ITY        :
     CORP., and CUSTOM EDGE, INC.,     :
15                                     :
                  Third-Party          :
16                Defendants.          :       No. 04-583 (GMS)

17                              -   -   -

18                    Wilmington, Delaware
                 Thursday, February 16, 2006
19                       9:30 a.m.

20                              -   -   -

21   BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.

22

23

24

25

```
 1   APPEARANCES:

 2              DEREK C. ABBOTT, ESQ.
               Morris, Nichols, Arsht & Tunnell
 3                          -and-
               CECILY A. DUMAS, ESQ.
 4             Friedman, Dumas & Springwater, LLP
               (San Francisco, California)
 5
                            Counsel for Compaq
 6
               THOMAS G. WHALEN, JR., ESQ.
 7             Stevens & Lee, P.C.
                         -and-
 8             CULVER V. HALLIDAY, ESQ., and
               EMILY L. PAGORSKI, ESQ.
 9             Stoll, Keenon & Park, LLP
               (Lexington, Kentucky)
10
                            Counsel for Lexmark
11
                       -   -   -
12             THE COURT:  Good morning.

13             (Counsel respond "Good morning.")

14             THE COURT:  We should reintroduce for the

15   record, starting with Mr. Halliday and his team.

16             MR. HALLIDAY:  Good morning, Your Honor.  Culver

17   Halliday.  Emily Pagorski, Stoll, Keenon & Park, Tom Whalen,

18   Stevens & Lee.  Bob Patton, in-house counsel for Lexmark.

19   Then, Your Honor, we have Steve Negerian (phonetic), who is

20   our tech person, then Kevin Sarkisian, who is our one live

21   witness, Your Honor.

22             THE COURT:  Ms. Dumas.

23             MS. DUMAS:  Good morning, Your Honor.  Cecily

24   Dumas, here with Derek Abbott, our Hewlett-Packard

25   representative, Ms. Anne Kennelly, is here.
```

Sarkisian - direct

1    A.    Since June of 1992.

2    Q.    In what business is Lexmark engaged?

3    A.    We manufacture printers and associated supplies.

4    Q.    Are those computer printers?

5    A.    Yes, they are.

6    Q.    They manufacture computer printers?

7    A.    That's correct.

8    Q.    What position did you hold at Lexmark in the period

9    late 1999-early 2000?

10    A.    I was the U.S. credit manager.

11    Q.    What were your responsibilities as the U.S. credit

12    manager?

13    A.    To establish and maintain credit limits for all of our

14    U.S. customers, as well as oversee collections for all of

15    our U.S. customers.

16    Q.    Are you familiar with a company called Inacom

17    Corporation?

18    A.    Yes, I am.

19    Q.    Was Inacom a customer of Lexmark during that period?

20    A.    Yes, they were.

21    Q.    What kind of company is it your understanding that

22    Inacom was?  In what business was it engaged?

23    A.    They were a distributor of computer products.

24    Q.    Did they buy such products from Lexmark?

25    A.    Yes, they did.

5

Sarkisian - direct

1   Q.   And what kind of products did they buy from Lexmark?

2   A.   Computer printers and associated supplies.

3   Q.   Was Inacom a large customer or a small customer or

4   somewhere in between of Lexmark?

5   A.   They were a large customer.

6   Q.   Sir, I would suspect -- you tell me -- that Lexmark

7   has many thousands of customers?

8   A.   Yes, we do.

9   Q.   At that period of time, and I mean late 1999-early

10   2000, was Inacom one of the top customers of Lexmark?

11   A.   Yes, they were.

12   Q.   Did Inacom purchase products from Lexmark on credit?

13   A.   Yes, they did.

14   Q.   Do you know, sir, when Inacom first became a customer

15   of Lexmark?

16   A.   It would have been when Lexmark was created in 1991.

17   Q.   Do you know, sir, when Inacom began purchasing

18   products from Lexmark on credit?

19   A.   It would have been at the same time.

20   Q.   Now, were you involved in the initial decision by

21   Lexmark to extend credit to Inacom?

22   A.   Not initially, as I wasn't at Lexmark until June of

23   '92.

24   Q.   Were you involved in subsequent decisions, if there

25   were any, regarding the extension of credit to Inacom?

Sarkisian - direct

1    Q.    Did there come a point in time where Inacom failed to

2    promptly pay its invoices?

3    A.    Yes.   In late 1999, Inacom started becoming

4    delinquent, in other words, beyond the 45 days payment for

5    most of their invoices.

6    Q.    Is Inacom presently a customer of Lexmark?

7    A.    No, they are not.

8    Q.    Do you have an understanding, sir, as you sit here

9    today, as to why they are not a customer at Lexmark at

10   present?

11   A.    Yes.   They went into bankruptcy.

12   Q.    Do you recall, sir, when that may have taken place,

13   approximately?

14   A.    I believe it was June of 2000.

15   Q.    Sir, when did you first, personally, first learn that

16   Inacom was not making timely payments on its account?

17   A.    As I recall, it was in December of 1999.

18   Q.    How, sir, did that come to your attention?

19   A.    One of the functions of the credit department is to

20   review orders for any customers that have 25 percent or more

21   delinquency on their outstanding balance.   Those new orders

22   from any customer that meets that status have to be reviewed

23   by the credit department and the credit department has to

24   determine whether they are going to ship orders on credit to

25   any of those types of customers.

Sarkisian - direct

1    Q.    How is that issue -- you said a 25-percent

2    delinquency.  What does that mean exactly, in lay terms?

3    A.    That means that if, for example, a customer has a

4    million-dollar balance, total balance, with Lexmark, all

5    their invoices that we have sent to the customer, if

6    $250,000 worth of those invoices are past their terms, in

7    this case Inacom had 45-day terms, so if $250,000 or more of

8    that million dollars is past the 45-day term, our order

9    entry system will automatically stop orders for that

10   customer.

11   Q.    Your order entry system will automatically stop orders

12   for that customer.  Is that what you just said?

13   A.    Yes.

14   Q.    Does that mean that orders will no longer be shipped

15   on credit?

16   A.    That's correct, unless -- the credit department has to

17   review any of those orders, and makes a determination

18   whether they are going to continue to ship orders.

19   Q.    When does the credit department decide to review those

20   orders?

21   A.    They are reviewed on a daily basis.

22   Q.    Did there come a point in time, then, where Inacom's

23   delinquency met or exceeded that 25 percent that you were

24   just discussing?

25   A.    Yes.

Sarkisian - direct

1   Q.    And again, that would have been in December of 1999?

2   A.    Yes, as I recall.

3   Q.    And at that point in time, then, were you involved in

4   decisions regarding that credit?

5   A.    Yes, I was.

6   Q.    You say that you received a report?

7   A.    Yes, a report is generated for any customers that meet

8   that -- that are in that status.

9   Q.    And who does that report go to?

10  A.    It is given to the credit department.

11  Q.    And in 1999, late 1999-early 2000, who credited that

12  area?  Who headed that area?

13  A.    I did.

14  Q.    And what does that report tell you about that

15  customer's account?

16  A.    It shows me all the new orders that customer has

17  placed.  It shows me their total outstanding balance.  And

18  it shows me any delinquent balance.

19  Q.    Does it tell you whether or not they are seeking to

20  purchase additional products?

21  A.    Yes.  And that would be indicated by the new orders.

22  Q.    Is that why you get the report?

23  A.    Yes, because the credit department has to make a

24  determination, if we decide that orders aren't going to be

25  shipped, then they aren't shipped.  If we decide we can

Sarkisian - direct

1    ship, then we allow release of those orders.

2    Q.    Will the order go out without your saying it can be

3    shipped?

4    A.    No.

5    Q.    What happened when it first came to your attention

6    that the 25-percent delinquency threshold had been met with

7    respect to Inacom?

8    A.    As I recall, my first step was to inquire from our

9    accounts receivable team why there was delinquency and when

10   it was going to be paid.

11   Q.    Is that the way such delinquent accounts are usually

12   handled?

13   A.    Yes.

14   Q.    Did you make such an inquiry of your accounts

15   receivable?

16   A.    Yes, I did.

17   Q.    Was there a particular person that you spoke to?

18   A.    Yes.  As I recall, it was a young lady named Misty

19   Atchinson.

20   Q.    And she is in accounts receivable at Lexmark?

21   A.    That's correct.

22   Q.    And what would your inquiry have been?

23   A.    I would ask Misty when the past due invoices were

24   going to be paid, and if they weren't going to be paid, why.

25   Q.    Do you recall making such an inquiry?

Sarkisian - direct

1    A.    Yes, that is what I am saying.

2    Q.    Was there a further step that was taken at that time?

3    A.    Yes.   I contacted our sales department, our sales team

4    that worked on the Inacom account.  And I asked them to go

5    to Inacom to get the answers.

6    Q.    Is this the normal step to take if a satisfactory

7    answer isn't given by accounts receivable?

8    A.    Yes, it is.

9    Q.    Why go to the sales team?

10   A.    Because at Lexmark we rely on the sales team to

11   provide that kind of information because they have the best

12   contacts with the customer.  They have inside knowledge with

13   the customer.  They also have a vested interest in seeing

14   that shipments continue to the customer.

15              So I am telling the sales team, I need

16   information, I need answers, or we are considering stopping

17   shipments to your customer.

18   Q.    Was there a particular salesperson or persons that you

19   spoke to at that time regarding this issue?

20   A.    Yes.   That would have been Bill Schuette and Bob

21   Kendrick.

22              MR. HALLIDAY:  Your Honor, should I approach and

23   hand this to the Bench or your docket clerk?

24              THE COURT:  Ms. Walker.

25              MR. HALLIDAY:  Thank you.  We only have a few

Sarkisian - direct

1    orders nearly on a daily basis.

2    Q.    Did this letter, which I believe you said you recalled

3    receiving at or about this time, provide information to you

4    that would have been used in that process of deciding

5    whether to extend additional credit?

6    A.    Yes, it did provide information.

7    Q.    What information did it give to you?  What was your

8    understanding?

9    A.    I saw this as an effort on Mr. Schutte's part to

10   confirm a plan to pay Lexmark that he had been told by

11   someone at Inacom, a Mr. Kerkman.

12   Q.    Did you get a substantial check with that letter?

13   A.    No, sir.

14   Q.    Mr. Sarkisian, I am going to hand you what has been

15   marked as No. 1, ask you if you could -- can you identify

16   that document, sir?

17   A.    Yes.  It's a letter dated February 16th, 2000 from a

18   Bill Francis at Compaq to Misty Atchinson at Lexmark.

19   Q.    Is that the same person you referred to earlier who

20   worked in accounts receivable?

21   A.    She is.

22   Q.    Do you recall seeing this letter at or about February

23   16, 2000?

24   A.    Yes, I do.

25   Q.    Do you recall who provided you with a copy of the

Sarkisian - direct

1    letter?

2    A.    Yes.  Misty Atchinson.

3    Q.    Why would Ms. Atchinson have given you a copy of that

4    letter?

5    A.    She would want -- as the accounts receivable rep for

6    the Inacom account, she would want to inform me of anything

7    regarding payment on the Inacom past due balance, any

8    information.

9    Q.    At or about February 16, 2000, did Lexmark have a

10   relationship of any sort with Compaq?

11   A.    Yes, we did have a relationship with Compaq.

12   Q.    What was your understanding of that relationship?

13   A.    We were making printers for Compaq in what is known as

14   an OEM relationship.

15   Q.    What does that mean?

16   A.    An original equipment manufacturer relationship.  We

17   would make the printer and put Compaq's name on it.  And

18   Compaq, as I recall at that time, was our largest U.S.

19   customer.

20   Q.    Lexmark's largest U.S. customer?

21   A.    Correct.

22   Q.    Was it an important relationship then for Lexmark?

23   A.    Yes, it was very important.

24   Q.    There is reference here to a wholly-owned subsidary

25   of Compaq.  Do you see where I am reading, sir?

Sarkisian - direct

1    A.    Yes.

2    Q.    That will operate under the name of Custom Edge?

3    A.    Yes.

4    Q.    And is purchasing certain assets for Inacom

5    Corporation?

6    A.    Correct.

7    Q.    Do you recall whether at that time you had any

8    understanding of that transaction?

9    A.    It is certainly the information that our sales team

10   had been relaying to us, as well as, there was information

11   in the press regarding the fact that Compaq was going to be

12   buying the distribution business of Inacom.

13   Q.    So you had heard something of this transaction before

14   you received this letter?

15   A.    Yes, I had.

16   Q.    Before you were given a copy of this letter?

17   A.    Correct.

18   Q.    In the second paragraph, there is a representation,

19   "In connection with such purpose," do you see where I am

20   reading?

21   A.    Yes.

22   Q.    Custom Edge, Inc. also assumed the obligation to pay

23   all of the outstanding amount on the referenced account

24   subject to the terms and conditions of such account?

25   A.    Yes.

Sarkisian - direct

1   Q.    Now, on February 16, 2000, at or about that date, was,

2   as best you can recall today, sir, Inacom delinquent?

3   A.    Yes, they were.

4   Q.    In payment on its account with Lexmark?

5   A.    That's correct.

6   Q.    And delinquent at at least the 25-percent level?

7   A.    Yes.

8   Q.    And I believe you said that you don't recall any other

9   Lexmark customer being as delinquent or delinquent in

10  payment of as large an amount as that owed by Inacom.  Is

11  that correct?

12  A.    That's correct.

13  Q.    Was this an issue, the issue of Inacom's account with

14  Lexmark, a large issue at that time?

15  A.    It was huge.

16  Q.    And it was one that you were addressing frequently?

17  A.    Every day.

18  Q.    Ms. Atchinson in accounts receivable, you say,

19  provided you with a copy of this letter?

20  A.    That's correct.

21  Q.    After February 16, 2000, did Lexmark continue to ship

22  product to Inacom?

23  A.    Yes, we did.

24  Q.    Did it continue to ship product to Inacom on credit?

25  A.    Yes, we did.

Sarkisian - direct

1    Q.    Was this letter considered in making that decision?

2    A.    Very much so.

3    Q.    Could product have been shipped by Lexmark to Inacom

4    after it became delinquent in payment without an affirmative

5    decision being made to allow product to be shipped?

6    A.    An affirmative decision of the credit department, no,

7    it could not have.

8    Q.    And in that period of time, who headed the credit

9    department?

10   A.    I did.

11   Q.    Who had the ultimate responsibility for making that

12   decision?

13   A.    I did.

14   Q.    Did the sales team at Lexmark have the authority to

15   make a decision as to whether or not to ship additional

16   product to a customer on credit?

17   A.    No, they did not.

18   Q.    Did Lexmark ever, as best you recall, cut off Inacom's

19   credit?

20   A.    We did not, as best I can recall.

21   Q.    If -- let me ask you this, sir:  Since in the period

22   of time that you headed credit -- and you still do?

23   A.    Yes.  I am now the corporate credit manager for

24   Lexmark.

25   Q.    -- has Lexmark cut off a customer's credit because of

Sarkisian - direct

1    A.    Yes, they are.

2    Q.    Is Custom Edge at this period of time, as best you

3    recall, a customer of Lexmark's?

4    A.    Yes, they are.

5    Q.    Is Custom Edge the subsidiary that was referred to in

6    the February 16 letter of 2000?

7    A.    Yes, they are.

8    Q.    Do you recall seeing this letter, sir, at or about

9    February 5, 2001?  Do you recall it?

10   A.    Yes, I do.

11   Q.    How did you -- did you see the letter then?

12   A.    Yes.  Mr. Schuette sent me a copy of it.

13   Q.    Is this the same Mr. Schuette who wrote the letter of

14   February 15, 2000?

15   A.    It is.

16   Q.    Do you have an understanding as to why Mr. Schuette

17   would have brought you this letter?

18   A.    Yes.  I was asking him to obtain it.

19   Q.    Why?

20   A.    Because we wanted to -- we were selling product to

21   Custom Edge, a wholly owned subsidiary of Compaq.  Since we

22   were relying on Compaq's balance sheet for the

23   creditworthiness of Custom Edge, we wanted to have Compaq

24   guarantee any debts that Custom Edge had to Lexmark.

25   Q.    You solicited this letter?

Sarkisian - direct

1    A.    Yes.    It would be a standard procedure in the credit

2    department when we are extending credit to a subsidiary,

3    based on the parent's financial statements.

4    Q.    And once again, was it Mr. Schuette then who

5    communicated with Compaq?

6    A.    Yes, it was.

7    Q.    So he relayed your request for this letter?

8    A.    That's correct.

9    Q.    Just as Mr. Schuette had previously relayed request

10   for payment?

11   A.    Yes.

12   Q.    Did you, sir, or anybody in your credit team that you

13   know of communicate with Inacom in late 1999 or early 2000

14   regarding the status of its account with Lexmark?

15   A.    No.

16   Q.    Did you or anyone in your team that you know of in

17   late 1999 or early 2000 communicate with Custom Edge about

18   the status of Inacom's accounts payable?

19   A.    No.

20   Q.    In late 199-early 2000, did you or to your knowledge

21   anyone in your credit team communicate with Compaq regarding

22   Inacom's accounts payable?

23   A.    No.

24   Q.    Sir, when you received a copy of this letter from Mr.

25   Schuette in February of 2001, at that time, as best you can

Sarkisian - direct

1    recall, did Inacom owe Lexmark any money?

2    A.    No, they did not.

3    Q.    At that time, February 2001, when you received a copy

4    of this letter, as best you can recall, did Custom Edge owe

5    Lexmark any money?

6    A.    Yes, they did.

7    Q.    At this point in time in February 2001, was there any

8    issue internally at Lexmark regarding Inacom's accounts

9    payable?

10   A.    No.    Inacom had paid everything they owed Lexmark,

11   even before they filed bankruptcy.

12   Q.    I am going to hand you, sir, what have been marked as

13   Exhibits 46 and 47, and ask if you can identify those?

14   A.    These are invoices from Stole Keenan and Stevens & Lee

15   to Lexmark in the Inacom litigation, regarding the Inacom

16   litigation.

17   Q.    Do you recall, sir, whether these have been paid by

18   Lexmark?

19   A.    They have.

20   Q.    Sir, do you recall Lexmark being in litigation with

21   Inacom Corporation?

22   A.    Yes, I do.

23   Q.    And do you recall what the outcome of that litigation

24   was?

25   A.    Yes.    Lexmark paid Inacom $990,000 to settle a

32

Sarkisian - cross

1    A.    I own the credit limit establishment.  If I decide

2    that the customer is not creditworthy, then we don't give

3    them a credit limit.

4    Q.    And the credit department was part of the order

5    fulfillment group at Lexmark?

6    A.    That's correct.

7    Q.    In 2000.

8              So the specific action that you or your group

9    could take relative to a customer would be to stop shipping

10   new product to that customer?

11   A.    Yes, as well as we could remove credit limits, which

12   in effect is the same result.

13   Q.    So just to make sure I got that right, then, neither

14   Mr. Kendrick or Mr. Schuette or Mr. Pinkston or Ms.

15   Atchinson had any reporting relationship with you or the

16   people in your group?

17   A.    That's correct.

18   Q.    In early February 2000, what was the amount Inacom

19   owed Lexmark?

20   A.    I don't recall specifically.  Given the letter of the

21   15th, it was in the 4-million-dollar range.  That was the

22   amount that was past due.  The amount owed was probably

23   larger, as that wouldn't have included invoices that weren't

24   past due.

25   Q.    That were not past this 45-day payment term?

Sarkisian - cross

1    A.    Correct.

2    Q.    Did that letter that Mr. Halliday showed you refresh

3    your memory as to how much that amount was?  Or are you

4    going off what it says in the letter in your answer?

5    A.    It refreshed my memory.

6    Q.    Do you know, of that 4.6, roughly 4.6 million that is

7    referred to in that letter, how much of that amount was in

8    checks held in Inacom's treasury department?

9    A.    No.

10   Q.    And at the time did you have any idea of the 4.6, how

11   much of that was in checks held in Inacom's treasury

12   department?

13   A.    I have no idea.

14   Q.    That February 15 letter, by the way, Mr. Halliday

15   asked you if you got it at or about February 15th, I think

16   he said.  Did you get it after it was sent or before it was

17   sent?  Did you review it in draft?  In what context did you

18   get it?

19   A.    I got it after it was sent.  I did not review it

20   beforehand, before it went out.

21   Q.    Did you discuss with Mr. Schuette before he sent it

22   the fact that he was preparing it or going to send it?

23   A.    No.

24   Q.    So it's fair to say you were copied on the letter?

25   A.    Yes.

Sarkisian - cross

1  Q.    And is the reason for that because in an asset

2  acquisition, as opposed to when one company buys the stock

3  of another company, it is not automatic that all the

4  liabilities of the seller get assumed by the buyer?

5  A.    Yes, as I understand it.

6  Q.    Was that the first time you had heard of an asset

7  acquisition, this Inacom-Compaq acquisition?

8  A.    As I recall it, you know, there was certainly

9  information floating around regarding the fact that Inacom

10 was trying to sell their distribution business.  We didn't

11 know specifically who they were selling it to.  And we

12 didn't know it was an asset acquisition before the official

13 press release that I believe was sometime in January.

14 Q.    Mr. Sarkisian, I asked you a bad question.  I see by

15 your answer that you didn't understand.

16       Were you familiar in this January 2000 time

17 frame with one company buying the assets of another company

18 as a general matter?

19 A.    Yes.

20 Q.    Had you seen prior to this time a situation in which

21 one of Lexmark's customers sold its assets to another entity

22 or vice versa?

23 A.    Yes, I had.

24 Q.    So at that time you knew the difference between an

25 asset purchase and a stock purchase?

Sarkisian - cross

1    the liability of invoices that have not had checks written

2    against them?

3    A.    I don't recall having a specific conversation with

4    Bill regarding that matter.

5    Q.    Did you, when you read this letter, as the U.S. credit

6    manager of Lexmark, when you read this letter, did you have

7    a reaction to that paragraph?

8    A.    I don't recall specifically.  The letter in whole was

9    more information than I had the day before.  But it

10   certainly wasn't enough to make me totally comfortable that

11   we were going to get paid.

12   Q.    When you read this letter, did you think there was a

13   risk associated with taking the payments of held checks from

14   Inacom and the payments of open invoices, if you will, from

15   Compaq?

16   A.    I don't recall focusing on that point.  I saw that, it

17   stated that we were going to be paid in a period of one to

18   ten weeks.  I know I wasn't happy about that.  But I was

19   also encouraged that Mr. Schuette was still trying to make

20   contact with the treasurer of Inacom and that he wanted to

21   get this confirmed.

22   Q.    I think you said in your deposition -- thank you for

23   reminding me -- that Mr. Kendrick, who was Mr. Schuette's

24   supervisor, you had great confidence in as a salesperson in

25   his willingness and ability to get customers to pay on their

Sarkisian - cross

1    accounts.  Is that correct?

2    A.    Yes, I did.

3    Q.    And you were aware that Mr. Kendrick had delegated

4    this responsibility to Mr. Schuette to communicate with

5    Inacom and confirm how it was going to be paid.  Is that

6    right?

7    A.    Yes, I did.

8    Q.    Switching gears to the other letter I have asked you

9    to look at, the Bill Francis letter, the middle paragraph

10   says, "In connection with such purchase, Custom Edge, Inc.

11   also assumed the obligation to pay all of the outstanding

12   amount on the referenced account subject to the terms and

13   conditions of such account."

14         Do you see where I am reading?

15   A.    Yes, I do.

16   Q.    Do you see an inconsistency between the middle

17   paragraph in the February 15th letter and the middle

18   paragraph in the February 16th letter?

19   A.    Yes, I see inconsistency.

20   Q.    What inconsistency do you see?

21   A.    One is talking about held checks and the other one

22   isn't.

23   Q.    Were you concerned that these two letters, which were

24   dated one day apart, expressed two different concepts in

25   your mind as to how Lexmark was going to be paid?

Sarkisian - cross

1    A.    No.  The reason is, the first letter is written by my

2    salesperson trying to confirm a plan to someone at Inacom

3    that apparently is not willing to talk to him.  And the

4    second letter is from Compaq, one of my biggest -- the

5    biggest customer in the United States for Lexmark, and it's

6    saying that they are assuming all the obligation to pay the

7    accounts payable of Lexmark.  That is something that I could

8    rely on.

9    Q.    Because you knew, from the preexisting relationship,

10   you knew Compaq well?

11   A.    Yes.

12   Q.    Did you think that there might be a misunderstanding

13   in the expression of two different concepts between the two

14   letters?

15   A.    As I recall, essentially, the February 15th letter was

16   no longer in my thoughts.  When I got this letter from

17   Compaq, everything was, in my mind, going to be taken care

18   of.  If it weren't going to be taken care of, I could go

19   back to Compaq and ask them to.  The February 15 letter

20   didn't have any bearing after I received the February 16th

21   letter on my thoughts.

22   Q.    And when he is talking about the obligation to pay all

23   of the outstanding amount on the referenced account subject

24   to the terms and conditions of such account, and he is

25   saying it in the context of having bought the company the

Sarkisian - cross

1    day before, did you make any connection, or did a question

2    arise in your mind that he may have been referring to the

3    accounts payable stated on Inacom's books as of the closing

4    date?

5    A.    No.    That wasn't my concern.    I had a letter from

6    Compaq saying they were going to pay me everything Inacom

7    owed me.    I didn't know how much Inacom had in held checks

8    and I didn't care.    Compaq was signing off to pay me.

9    That's what I relied on.

10   Q.    Did you ask Mr. Schuette to go back to the Inacom

11   people and say words to the effect of, no, we don't want

12   your held checks, we want everything to be paid by Compaq?

13   We want to make sure we are paid by Compaq?

14   A.    No.

15   Q.    Do you know if he made any such statement to Inacom?

16   A.    I do not know.

17   Q.    Do you know if, in fact, after the closing date of

18   February 16th Inacom released those checks that were held in

19   its treasury department and mailed them to Lexmark's

20   lockbox?

21   A.    The only thing I know is that we got paid.

22   Q.    So you don't know whether or not Inacom mailed checks

23   to Lexmark's lockbox in Chicago and Lexmark applied the

24   proceeds of those checks that were dated in early February

25   2000 in payment of Inacom's invoices.    Is that your

Sarkisian - cross

1    Q.    So aside from any minor business that the remaining

2    services side of the Inacom business was doing, that big

3    delinquent receivable wasn't getting any worse.  Right?

4    A.    I don't recall.

5    Q.    Why did Lexmark wait for a period of several months

6    before -- why did it wait for Inacom to eventually pay those

7    over a period of several months?

8    A.    I don't recall why we waited.  I am not sure that I

9    understand your question.

10    Q.    Well, you indicated that you got this letter of

11    February 16th from Mr. Francis, but no check accompanied it,

12    and Lexmark was interested in getting paid.  So what I am

13    having trouble understanding is why is it that Lexmark

14    agreed to wait for a period of several months unless it's a

15    fact that Lexmark was in fact waiting for these held checks

16    to be released by Inacom, which is consistent with the

17    February 15th letter?

18              THE COURT:  Is that a question you want him to

19    answer, really?

20              MS. DUMAS:  Yes.

21              THE COURT:  I think you should rephrase.  It is

22    rather argumentative.  It is vague.  Rephrase.

23              MS. DUMAS:  Thank you, Your Honor.  Withdrawn.

24    BY MS. DUMAS:

25    Q.    Do you have an understanding as to why Lexmark didn't

Sarkisian - cross

1  demand immediate payment of the past due delinquency on or

2  about February 16th?

3  A.    As I recall, since we received the letter from Compaq,

4  it gave us a great deal of comfort knowing that they were

5  going to be responsible for that payment -- for those

6  amounts due from Inacom.  And it essentially took the

7  pressure out of the situation.  As I recall, Inacom, you

8  know, continued to make promises to pay.  And we felt if

9  they didn't pay us, then we could go back and ask Compaq to

10  pay based on this letter.

11  Q.    And your accounts receivable department in fact

12  continued to follow up with Inacom to get these held checks

13  released.  Is that correct?

14  A.    I don't recall specifically.

15  Q.    The fact that Mr. Francis' letter wasn't accompanied

16  by payment, together with the statement just a day earlier

17  in Mr. Schuette's letter that the understanding was there

18  were two different buckets from which Lexmark would receive

19  payment on Inacom's payable, held checks would be released

20  by Inacom, and invoices that had not had held checks written

21  against them would be paid by Compaq, was there any concern

22  that you had in continuing to wait for Inacom to pay its

23  portion?

24  A.    Not when I got the February 16th letter.

25  Q.    And it was Mr. Schuette's role in this transaction to

47

Sarkisian - cross

1    deal with Inacom.  Correct?

2    A.    Correct.

3    Q.    So if there was an understanding -- and I am not

4    asking you to assume that there was -- but if there was an

5    understanding formed between Inacom and Lexmark relative to

6    there being two buckets of payment, that understanding would

7    have been formed by Mr. Schuette and the Inacom

8    representatives.  Correct?

9    A.    I don't know that I can answer that.  I know I am the

10   person that decided to continue to ship.  I continued to

11   ship because I got a letter from Compaq saying that they

12   would be responsible.

13   Q.    And why would you have not shipped to Compaq after

14   February 16th?

15   A.    If I didn't get paid from Inacom, then I would say

16   Compaq/Custom Edge is not getting any more product until

17   Compaq or Custom Edge owns up to their promise.

18   Q.    You think that you would really be authorized to

19   refuse to ship product to Compaq Computer Corporation at

20   this time?

21   A.    Yes.

22   Q.    And how would that have reduced the Inacom account

23   receivable?  Wouldn't it only eliminate potential new

24   revenues to Lexmark?

25            MR. HALLIDAY:  I am going to object.  Vague.

Sarkisian - cross

1    Ambiguous.

2                THE COURT:   Sustained.

3    BY MS. DUMAS:

4    Q.    Was Compaq paying on a timely basis for new product

5    that it ordered from Lexmark?

6    A.    As I recall, they were.

7    Q.    So the reason that you would have stopped shipping to

8    Compaq was because of this outstanding Inacom delinquency.

9    Correct?

10   A.    Correct.

11   Q.    And, in fact, Lexmark didn't stop shipping to Compaq

12   even though that delinquency wasn't taken care of for, in

13   your words, several months.  So why was it that you didn't

14   stop shipments to Compaq?

15   A.    Because we got paid.

16   Q.    But this was already past due in January 2000.  So we

17   are talking about several months after February 16th, 2000?

18   A.    We ultimately got paid.  And if we didn't, I had the

19   February 16th letter to make sure we did.  So I felt

20   comfortable with the situation.

21   Q.    So you saw the February 16th letter as a catchall,

22   whatever happens to you, Compaq will make you whole?  That's

23   how you read that letter?

24   A.    Yes, certainly.

25   Q.    And that, you would agree with me, is inconsistent

55

Sarkisian - redirect

1    A.    Correct.

2    Q.    Not from Inacom, not from Compaq, not from Custom

3    Edge, not from Hewlett-Packard.  Just this.  This is the

4    only reference that you are aware of?

5    A.    That I am aware of, yes.

6    Q.    This February 15, 2000 letter?

7    A.    Correct.

8    Q.    And then you received a letter dated February 16, 2000

9    from Compaq.  Correct?

10   A.    That's correct.

11   Q.    And there is no reference in that letter to held

12   checks, is there?

13   A.    There is not.

14   Q.    And that letter is from Compaq to Lexmark.  Correct?

15   A.    That's correct.

16   Q.    Sir, I believe you said that Compaq at that period of

17   time was a good customer of Lexmark's?

18   A.    They were.

19   Q.    Is Compaq still a customer of Lexmark's?

20   A.    They are not.

21   Q.    Why are they no longer a customer of Lexmark's, if you

22   have an understanding?

23   A.    When they merged with Hewlett-Packard, being our

24   biggest competitor, we no longer did business with them.

25   Q.    Hewlett-Packard is your biggest competitor.  Is that

56

Sarkisian - redirect

1    what you just said?

2    A.    That's correct.

3    Q.    And they acquired Compaq.  That is your understanding?

4    A.    Yes.

5         MR. HALLIDAY:  Thank you, Mr. Sarkisian.  Those

6    are all the questions I have.

7         THE COURT:  Do you have anything further, Ms.

8    Dumas?

9         MS. DUMAS:  Just two questions, Your Honor.

10                    RECROSS-EXAMINATION

11   BY MS. DUMAS:

12   Q.    That letter that just went off the screen, the

13   February 16 letter, when you got a copy of it, did you ask

14   Ms. Atchinson to call Mr. Francis and ask him to clarify

15   whether that was including the held checks?

16   A.    No, I did not.

17   Q.    And did you call Mr. Francis and ask him to clarify

18   whether that included the held checks?

19   A.    I did not.

20        MS. DUMAS:  Thank you.

21        THE COURT:  I will give you the last word, Mr.

22   Halliday.

23        MR. HALLIDAY:  I just want to move for the

24   admission of Exhibits 1, 7, 8, 46 and 47.

25        THE COURT:  They are already in the record.

Samuelson - direct

1   Q.    Who reported to you?

2   A.    That is correct.

3   Q.    I am going to ask you a few questions about the

4   acquisition of assets of Inacom Corporation by Compaq

5   Computer Corporation in late 1999-early 2000.  Were you

6   aware in that time frame of efforts by Inacom to market

7   itself for sale?

8   A.    Yes, I was.

9   Q.    What was your understanding at that time?

10  A.    My understanding at that time was that Inacom was

11  trying to sell the distribution operations division of

12  Inacom to Compaq.

13  Q.    And what are you referring to when you use the term

14  distribution operations business?

15  A.    The distribution operations division of Inacom was

16  primarily its distribution centers, its warehouse, the

17  ability to ship inventory to various customers.  Really more

18  the operations area, instead of the selling or the services

19  area.

20  Q.    And what was the other business area or areas that

21  Inacom had in late 1999?

22  A.    In 1999, at that time the company really perceived

23  itself as having two major divisions.  One was the

24  distribution operations, which handled most of the computer

25  products and kind of tangible items.  Then also the other

66

Samuelson - direct

1    division would have been something more services oriented,

2    where they handled more the breadbox, consulting services,

3    things like that.

4    Q.    From whom did you learn about the proposed acquisition

5    of Inacom's distribution business by a Compaq firm?

6    A.    Initially, I was informed by Dave Gunther and also Tom

7    Fitzpatrick.  Tom Fitzpatrick was the CFO of Inacom at that

8    time.

9    Q.    And were you assigned any responsibilities in

10   connection with this proposed transaction?

11   A.    Yes, I was.  My responsibilities were to work in the

12   initial due diligence in creating the finance supporting

13   schedules that were part of -- to support the agreement.

14   Q.    Was any part of the responsibilities that were

15   delegated to you related to Inacom's accounts payable?

16   A.    Yes, they were.

17   Q.    Could you describe what your responsibilities were

18   with regard to Inacom's accounts payable?

19   A.    The agreement between Compaq and Inacom was that

20   Compaq was going to purchase certain assets and certain

21   liabilities from Inacom that were primarily related to the

22   distribution operations division.  From an accounts payable

23   standpoint, my responsibility was to obtain that specific

24   list of liabilities that was going to be acquired by Compaq

25   and provide them supporting schedules for that.