may in its sole discretion deem proper in order to assert or enforce any right, title or interest in, to or under the Purchased Assets, and to defend or compromise any and all actions, suits or proceedings in respect of the Purchased Assets. Buyer shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof.

SECTION 7.02. *Certain Filings*. Seller and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any governmental body, agency, official or authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

SECTION 7.03. *Public Announcements*. The parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except as may be required by applicable law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

SECTION 7.04. *Trademarks; Tradenames*. (a) Except as set forth otherwise in this Section 7.04, after the Closing, (i) Seller and its subsidiaries shall not use any of the marks or names used primarily in the Business as set forth on Schedule 7.04(a) the "**Business Trademarks and Tradenames**") and (ii) Buyer and its subsidiaries shall not use any of the marks or names set forth on Schedule 7.04(b) (the "**Seller Trademarks and Tradenames**").

(b)    After the Closing, Buyer shall have the right to sell existing inventory and to use existing packaging, labeling, containers, supplies, advertising materials, technical data sheets and any similar materials bearing any Seller Trademarks and Tradenames until the earlier of (i) six months after the Closing Date and (ii) the date existing stocks are exhausted. Buyer shall have the right to use the Seller Trademarks and Tradenames in advertising that cannot be changed by Buyer using reasonable efforts for a period not to exceed 90 days after the Closing Date. Buyer shall comply with all applicable laws or regulations in any use of packaging or labeling containing the Seller Trademarks and Tradenames.

(c)   ·Buyer shall not be obligated to change the Seller Trademarks and Tradenames on goods in the hands of dealers, distributors and customers at the time of the expiration of a time period set forth in subsection 7.04(b) above. The

(NY) 05862/066/APA/asset.agt.wpd

obliteration of the Seller Trademarks and Tradenames shall be deemed compliance with the covenant not to use the Seller Trademarks and Tradenames pursuant to this Section 7.04 with respect to the property to which such Seller Trademarks and Tradenames were not affixed.

(d)  Buyer agrees to cease using the Seller Trademarks and Tradenames on buildings, cars, trucks and other fixed assets as soon as possible within a period not to exceed six months after the Closing Date.

(e)  Seller agrees that its consent to the amendment or extension of this Section will not be unreasonably withheld if Buyer cannot exhaust existing inventory within six months of the Closing Date.

SECTION 7.05. *Warn Act.* The parties agree to cooperate in good faith to determine whether any notification may be required under the Worker Adjustment and Retraining Notification Act (the "WARN Act") as a result of the transactions contemplated by this Agreement. Buyer will be responsible for providing any notification that may be required under the WARN Act with respect to any Transferred Employees. Seller will be responsible for providing any notification that may be required under the WARN Act with respect to any employees of the Business that are not Transferred Employees.

SECTION 7.06. *Notices of Certain Events.* Buyer and Seller shall promptly notify each other of:

(a)  any notice or other communication from any person alleging that the consent of such person is or may be required in connection with the transactions contemplated by this Agreement; and

(b)  any notice or other communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement.

SECTION 7.07. *Operating Agreements.* On the date hereof, the parties entered into the Fulfillment Agreement in the form set forth as Exhibit B. At Closing, the parties will enter into definitive agreements on the terms set forth in Schedule 7.07 relating to the sharing of (1) Tech Center, (2) Gateway Building, (3) Corporate Headquarters and (4) Corporate IT Function.

27

## ARTICLE 8

### TAX MATTERS

SECTION 8.01. *Tax Definitions.* The following terms, as used herein, have the following meanings:

"Code" means the Internal Revenue Code of 1986.

"Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including, without limitation, withholding on amounts paid to or by any person, together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "**Taxing Authority**") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other person.

SECTION 8.02. *Tax Matters.* Seller hereby represents and warrants to Buyer that

(a)   Seller has timely paid all Taxes which will have been required to be paid on or prior to the date hereof, the non-payment of which would result in a Lien on any Purchased Asset, would otherwise adversely affect the Business or would constitute an Assumed Liability.

(b)   Seller has established, in accordance with generally accepted accounting principles applied on a basis consistent with that of preceding periods, adequate reserves for the payment of, and will timely pay, all Taxes, which arise from or with respect to the Purchased Assets or the operation of the Business and are incurred in or attributable to the Pre-Closing Tax Period, the non-payment of which would result in a Lien on any Purchased Asset, would otherwise adversely affect the Business or would constitute an Assumed Liability. ..

SECTION 8.03. *Tax Cooperation; Allocation of Taxes.* (a) Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets or Assumed Liabilities (including, without limitation, access to books and records) as is reasonably necessary for the filing of all Tax

(NY) 05862/066/APA/asset.agt.wpd

returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets and Assumed Liabilities for a period of at least six years following the Closing Date. At the end of such period, each party shall provide the other with at least 10 days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records. Seller and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or Assumed Liabilities or the Business.

(b)    All real property taxes, personal property taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Seller and Buyer based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period after the Closing Date (with respect to any such taxable period, the "**Post-Closing Tax Period**"), *provided, however,* that Seller shall not be responsible for any increased assessments resulting from the transactions contemplated hereby. Seller shall be liable for the proportionate amount of such taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such taxes that is attributable to the Post-Closing Tax Period.

(c)    All excise, sales, use, value added, registration stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and fees (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne equally by Seller and Buyer. Buyer and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation. The party that is required by applicable law to make the filings, reports, or returns with respect to any applicable Transfer Taxes shall do so, and the other party shall cooperate with respect thereto as necessary.

(d)    Apportioned Obligations and Transfer Taxes described in Section 8.03(b) or 8.03(c) shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable law. The paying party shall be entitled to reimbursement from the non-paying party in accordance with Section 8.03(b) or (c), as the case may be. Upon receipt of any bill for, or payment of, any such Apportioned Obligation or Transfer Tax, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under Section 8.03(b) or (c), as the case may be,

together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying party shall make such reimbursement promptly but no event later than 10 days after the presentation of such statement. Any payment not made within such time shall bear interest at a rate set forth in Section 2.09(b) for each day until paid.

## ARTICLE 9

### EMPLOYEE BENEFITS

SECTION 9.01.  *Employee Benefits Representations.*  Seller hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date, that:

(a)   Schedule 9.01(a) lists each material "employee benefit plan", as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), each material employment, severance or similar contract, plan, arrangement or policy and each other material plan or arrangement (written or oral) providing for compensation, bonuses, profit-sharing, stock option or other stock related rights or other forms of incentive or deferred compensation, vacation benefits, insurance (including any self-insured arrangements), health or medical benefits, employee assistance program, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, severance benefits and post-employment or retirement benefits (including compensation, pension, health, medical or life insurance benefits) which is maintained, administered or contributed to by Seller or any ERISA Affiliate and covers any person who is a Business Employee, as defined in Section 9.02 (any such plan, arrangement or policy, an "Employee Plan"). Copies of each Seller 401(k) Plan (as defined in Section 9.01(b)) and each other Employee Plan that provides for severance, vacation, sick leave or deferred compensation and all amendments thereto and written interpretations thereof have been furnished to Buyer. For purposes of this Agreement, "ERISA Affiliate" of Seller shall mean any other entity which, together with Seller, would be treated as a single employer under Section 414 of the Code. Since December 31, 1998, except as set forth in Schedule 9.01(a), no employee benefit plan or arrangement, including without limitation any Employee Plan, or modification thereto, has been adopted that would, individually or in the aggregate, increase materially the operating cost of the Business.

(b)   No Employee Plan is a multiemployer plan, as defined in Section 3(37) of ERISA, and no Employee Plan is subject to Title IV of ERISA. Neither Seller nor any of Seller's ERISA Affiliates has incurred any liability under Title IV of ERISA arising in connection with the termination of any plan covered or

previously covered by Title IV of ERISA that could become, after the Closing Date, an obligation of Buyer or any of its affiliates. The InaCom Employees Retirement Savings Plan and Trust, the Vanstar Corporation 401(k) Plan, the Office Products of Minnesota Inc. 401(k) Plan, the National Technology Group 401(k) Plan, the Computerland 401(k) Plan and the Mentor Technologies Ltd. 401(k) Plan (the "Seller 401(k) Plans") have been determined to be qualified under Section 401(a) of the Code and nothing has occurred with respect to such plans since such determination that could reasonably be expected to result in the loss of such qualification or exemption from tax. Each plan loan outstanding under the Seller 401(k) Plans is fully secured by the vested Plan account balance of the applicable participant, and each such loan has been extended on such terms and administered in such a manner as to avoid treatment as a distribution under Section 72(p) of the Code.

(c)   Neither Seller nor any of its subsidiaries is a party to or subject to, or is currently negotiating in connection with entering into, any collective bargaining agreement or other contract or understanding with a labor union or labor organization.

(d)   Neither Seller nor any of its subsidiaries has, in connection with the Business, engaged any individual as an independent contractor or made payments for services to be performed by any individual as an independent contractor who should be considered, under applicable law, an employee of (rather than an independent contractor to) Seller or any of its subsidiaries.

SECTION 9.02. *Employees and Offers of Employment.* For purposes of this Agreement, "Business Employees" shall mean the individuals described in Schedule 9.02. As soon as practicable after the date hereof, Seller shall provide Buyer with a list containing the names of all of the Business Employees, and through the Closing Date Seller shall periodically revise such list to include each Business Employee newly hired by Seller or its affiliate, and to reflect termination of employment or similar personnel changes. At Closing, Buyer or its affiliate shall offer employment, in a comparable position and at the same rate of salary (or, if applicable, base hourly rate), to each Business Employee who is actively employed as of the Closing Date, and each inactive Business Employee who is on approved leave on the Closing Date because of jury duty, family or medical leave, sick leave, short-term disability, vacation or military duty; *provided, however,* that nothing contained herein is intended to confer upon any Business Employee any right to continued employment after the Closing Date. Each Business Employee who accepts (or is deemed to accept) employment with Buyer on the Closing Date is referred to herein as a "Transferred Employee". Seller hereby agrees that neither Seller nor any affiliate shall (i) rehire or continue to employ any Business Employee at any time prior to the first anniversary of the Closing Date; or (ii)

offer any Business Employee any severance or similar benefits payable on termination of such Employees' employment by Seller or its affiliate; *provided*, that this clause (ii) shall not apply with respect to any Business Employee unless Buyer offers such Employee employment in accordance with this Article 9, at a location no greater than 50 miles from that in effect at the Closing Date.

SECTION 9.03. *Seller's Employee Benefit Plans*. (a) Seller shall retain all obligations and liabilities under the Employee Plans and any other benefit plan or arrangement of Seller or its affiliate in respect of each employee or former employee (including any beneficiary thereof) who is not a Transferred Employee. Except as expressly set forth herein, Seller or its designated affiliate shall retain all liabilities and obligations in respect of benefits accrued by Transferred Employees under the Employee Plans and any other benefit plan or arrangement of Seller or its affiliate, and neither Buyer nor any of its affiliates shall have any liability with respect thereto. Except as expressly set forth herein, no assets of any Employee Plan shall be transferred to Buyer or any of its affiliates or to any plan of Buyer or any of its affiliates. Seller shall take all actions necessary (including any necessary plan amendments) to cause accrued benefits or account balances of Transferred Employees under the Seller 401(k) Plans to be fully vested as of the Closing Date, and to provide that Transferred Employees shall be entitled to the full benefit of any matching contribution under the Seller 401(k) Plans for the plan year that includes the Closing Date (the "Closing Plan Year") attributable to amounts actually deferred prior to the Closing Date by Transferred Employees under the Seller 401(k) Plans during the Closing Plan Year, to the extent consistent with the governing plan documents and the past practice of Seller, excluding:

(i) any discretionary matching contribution determined after the Closing Date; and

(ii) any nondiscretionary matching contribution the allocation of which to a participant's account is conditioned on such participant's being employed at the end of the Closing Plan Year.

(b) In the event that Seller reasonably determines that the transactions contemplated by this Agreement constitute an event described in Section 401(k)(10)(A)(ii) of the Code, Seller shall take all actions necessary: (i) to permit Transferred Employees to elect to take distributions (subject to applicable law) of their accounts thereunder in accordance with the terms of such plans; and (ii) to the extent Transferred Employees so elect, to roll over the amounts received from the Seller 401(k) Plans (including, to the extent permissible under applicable law, any outstanding loans) to an individual retirement account or to one or more defined contribution retirement plans qualified under Section 401(a) of the Code

(NY) 05862/066/APA/asset.agt.wpd

32

and maintained by Buyer or one of its affiliates (the "**Buyer 401(k) Plans**"). Buyer shall cause the Buyer 401(k) Plans to accept such rollovers, *provided* Buyer receives evidence reasonably acceptable to it that the Seller 401(k) Plans are qualified under the applicable provisions of the Code. In the event that Buyer and Seller reasonably determine that the transactions contemplated by this Agreement do not constitute an event described in Section 401(k)(10)(A)(ii) of the Code, then as soon as practical following receipt by Buyer and Seller of favorable determination letters or Buyer's certification to Seller, and Seller's certification to Buyer, in a manner reasonably acceptable to both Seller and Buyer, that Buyer's 401(k) Plans and Seller's 401(k) Plans are qualified under the applicable provisions of the Code, Seller shall cause the trustee of Seller's 401(k) Plans to transfer, solely in the form of cash or notes representing outstanding participant loans, assets representing the full account balances of the Transferred Employees, together with the appropriate net investment return (including unrealized appreciation or depreciation) thereon, reduced by any necessary benefit or withdrawal payments made in respect of Transferred Employees prior to the actual date of transfer, to the trustee of Buyer's 401(k) Plans.

(c) With respect to the Transferred Employees (including any beneficiary or dependent thereof), Seller shall retain (i) all liabilities and obligations arising under any group life, accident, medical, dental or similar arrangement (whether or not insured) to the extent that such liability or obligation relates to claims that are covered by such arrangements and incurred (whether or not reported), prior to the Closing Date, and (ii) all liabilities and obligations arising under any worker's compensation arrangement to the extent such liability or obligation relates to claims incurred prior to the Closing Date, including liability for any retroactive worker's compensation premiums attributable to such period. With respect to Transferred Employees (including beneficiaries or dependents thereof), Buyer or its affiliate shall be responsible, in accordance with the terms of its benefit plans and arrangements, for (I) all liabilities and obligations arising under any group life, accident, medical, dental or similar arrangement (whether or not insured) to the extent that such liability or obligation relates to claims that are covered by such arrangements and incurred (whether or not reported) on or after the Closing Date, and (II) all liabilities and obligations arising under any worker's compensation arrangement to the extent such liability or obligation relates to claims incurred on or after the Closing Date, including liability for any retroactive workers' compensation premiums attributable to such period. Buyer shall assume all liabilities and obligations of Seller under any vacation or sick leave plan or arrangement with respect to Transferred Employees, to the extent such liabilities are reflected on the Closing Statement. Buyer shall assume all liabilities of Seller under any nonqualified deferred compensation plan or arrangement with respect to Transferred Employees, but only to the extent such liabilities are funded by means of a rabbi trust; and Seller shall, as soon as

practicable after the Closing Date, pay to Buyer, by wire transfer in a cash lump sum, the full amount of such funding.

For purposes of this Section 9.03(c), claims shall be deemed to have been incurred:

      (A)   with respect to all death or dismemberment claims, on the actual date of death or dismemberment;

      (B)   with respect to all disability claims on the date the claimant became unable to (x) perform his or her regular duties of employment, in the case of an employee claimant, or (y) perform the normal day-to-day responsibilities that would reasonably be expected of someone of similar age and lifestyle, in the case of a dependent claimant;

      (C)   with respect to sick leave claims, on each day for which sick leave benefits are payable to the claimant;

      (D)   with respect to all medical, drug or dental claims, on the date the service was received or the supply was purchased by the claimant; provided, however, a medical claim relating to a claimant's hospitalization shall be deemed to be incurred on the date the claimant was first hospitalized; and

      (E)   with respect to workers' compensation claims, on the date the incident occurred.

SECTION 9.04. *Buyer Benefit Plans.* As of the Closing Date, each Transferred Employee shall become a participant in all employee benefit plans of Buyer (or comparable employee benefit plans of its affiliate) on the same terms and conditions as similarly situated employees of Buyer, to the extent such Transferred Employee satisfies the applicable eligibility requirements under such plans. Transferred Employees shall participate under Buyer's "welfare plans" (within the meaning of Section 3(1) of ERISA) as of the Closing Date without any waiting periods, evidence of insurability, or the application of any preexisting physical or mental condition restrictions (except, in each case, to the extent applicable and unsatisfied under Seller's welfare plans, and except to the extent otherwise required for coverage by Buyer's long-term disability insurance carrier); and, to the extent relevant, Buyer shall provide credit for claims incurred during 2000 and prior to the Closing Date for purposes of applying deductibles, co-payments, out-of-pocket maximums, and benefit maximums. Buyer or one of its affiliates will recognize all service of the Transferred Employees with Seller or any of its affiliates, only for purposes of: (i) eligibility to participate and vesting,

under those employee benefit plans (within the meaning of Section 3(3) of ERISA) in which the Transferred Employees are eligible to participate, and are in fact participating, on and after the Closing Date; and (ii) level of benefits, under any vacation or sick leave plan in which the Transferred Employees are eligible to participate, and are in fact participating, on and after the Closing Date. With respect to any Transferred Employee who participates in an Employee Plan which is a "flexible spending arrangement," within the meaning of Proposed Treasury Regulation § 1.125-2 (a "Seller FSA"), Buyer or its affiliate shall permit such Transferred Employee to continue to participate after the Closing Date in a flexible spending account maintained by Buyer, and shall credit such Transferred Employee with an account balance equivalent to that which applied, as of the Closing Date, to the Transferred Employee under the applicable Seller FSA. As soon as practicable after the Closing Date, either Seller shall pay to Buyer the amount described in "X" below, or Buyer shall pay to Seller the amount described in "Y" below, whichever is applicable, in either case by wire transfer in a cash lump sum. For this purpose, "X" shall mean the amount, if any, by which the aggregate amount deferred through such date by Transferred Employees under the Seller FSAs during the plan year in which the Closing Date occurs exceeds aggregate claims paid for such year on behalf of such Transferred Employees under the Seller FSAs; and "Y" shall mean the amount, if any, by which aggregate claims paid for such year on behalf of Transferred Employees under the Seller FSAs exceeds the aggregate amount deferred through the Closing Date by Transferred Employees under the Seller FSAs during such year.

SECTION 9.05. *Inactive Employees.* Seller shall retain all liability with respect to Business Employees who are absent from active employment on the Closing Date other than for the reasons expressly stated in the third sentence of Section 9.02 (any such employee, an "Inactive Business Employee"). Subject to applicable law, if any Inactive Business Employee returns directly from such leave of absence to active employment, then from and after the date of such return such Inactive Business Employee shall be treated as a Transferred Employee under this Article 9, applying this Article with respect to such Inactive Business Employee by substituting the date of his or return to active employment for the Closing Date, where applicable hereunder.

SECTION 9.06. *Severance Benefits.* Buyer agrees that, in the event any Transferred Employee is terminated by Buyer during the one-year period immediately following the Closing Date, Buyer shall provide such Transferred Employee with a severance benefit which is not less than the cash separation payment that would have been provided for by Seller's severance pay policy and the severance agreements between Seller and certain Transferred Employees as listed in Schedule 9.06, had such Transferred Employee been terminated under the same circumstances by the Seller immediately prior to the Closing Date, but only

to the extent the terms of such severance pay policy and severance agreements have been fully disclosed to Buyer prior to the date hereof.

SECTION 9.07. *COBRA.* Seller shall retain all obligations and liabilities arising under Section 601 of ERISA or Section 4980B of the Code which result from the termination of employment of any employee of Seller or its affiliate, including without limitation any such obligations or liabilities which result from the termination of employment of any Business Employee on or prior to the Closing. Buyer shall have sole responsibility for all obligations and liabilities arising under Section 601 of ERISA or Section 4980B of the Code with respect to all Transferred Employees, and "qualified beneficiaries" of Transferred Employees, for whom a "qualifying event" has occurred after the Closing Date. The terms "qualified beneficiaries" and "qualifying event" shall have the meaning ascribed to them under Section 4980B of the Code and Sections 601-608 of ERISA.

SECTION 9.08. *Continuation of Certain Administrative Services and Insurance Coverage.* To the extent (i) requested by Buyer in writing prior to the Closing Date and (ii) the Closing occurs within 30 days (or, if the Seller fails to comply with its obligations under the last sentence of this Section 9.08, 60 days) after the date of this Agreement (such 30- or 60-day period, the "Post-Signing Period"), Seller agrees to (A) continue to provide certain administrative services in respect of the Transferred Employees as reasonably necessary for Buyer to conduct the Business, which shall be limited to payroll services, record keeping services and claims processing services and (B) to cover Transferred Employees under the Employee Plans which constitute "welfare plans" within the meaning of Section 3(1) of ERISA and which provide for insurance coverage, to the extent such coverage is permitted under the terms of such plans and the applicable insurance contracts, and to provide claims processing services in respect of the Transferred Employees in both cases for the duration of the Post-Signing Period or, in either case, until such earlier time as Buyer or its designated affiliate can assume responsibility for such insurance and administrative services in an orderly manner. Buyer agrees to reimburse Seller, within seven business days after its receipt from Seller of an invoice with respect to such services, for any and all of Seller's costs and all other expenses reasonably incurred in continuing to provide such insurance and administrative services, including, without limitation, insurance premiums, cost of direct claims reimbursement under any self-insured plans and a reasonable share of all other related administrative and other costs and expenses of any nature whatsoever. Such continuation of insurance and administrative services shall not affect the allocation of liabilities and obligations as set forth in this Article 9. Buyer shall use all reasonable efforts to arrange for such insurance and administrative services as promptly as possible in order to avoid using Seller's services under this Section; and Seller shall use all reasonable

efforts to provide Buyer, as promptly as possible, with computer tapes, data or other payroll or other information necessary for Buyer to assume responsibility for such insurance and administrative services.

SECTION 9.09. *Short Term Disability.* Notwithstanding anything to the contrary in this Article 9, the following provisions shall apply with respect to any Business Employee who is absent from work on the Closing Date by reason of short-term disability, within the meaning of the applicable Employee Plan covering such Business Employee (an "**STD Employee**"): At Closing, Buyer or its affiliate shall offer employment, contingent on returning to work, to each STD Employee in accordance with the third sentence of Section 9.02, and Seller shall comply with the requirements set forth in the last sentence of Section 9.02 with respect to such STD Employee (substituting such STD Employee's Return Date, as defined below, for the Closing Date). The date on which any STD Employee returns directly from disability leave of absence to active employment shall be referred to hereunder as such STD Employee's "**Return Date**". Any STD Employee who accepts Buyer's or its affiliate's offer of employment as of his or her Return Date shall be treated as a Transferred Employee under this Article 9, applying this Article with respect to such STD Employee by substituting his or her Return Date for the Closing Date where applicable hereunder. Until his or her Return Date, each STD Employee shall continue to be employed by Seller or its affiliate and covered under the Employee Plans and other benefit arrangements of Seller and its affiliates in accordance with their terms. Until each STD Employee's Return Date, Buyer or its affiliate shall reimburse Seller or its affiliate for one-half of the cost of any employee benefit incurred on or after the Closing Date with respect to such STD Employee which is: (i) incurred in the ordinary course of business under an Employee Plan; and (ii) not provided through the purchase of insurance. For this purpose, medical and dental benefits shall be treated as provided through the purchase of insurance. Seller shall not take any action that would impair or diminish the coverage of any STD Employee under any applicable plan or policy of insurance.

SECTION 9.10. *Foreign Benefit Plans.* Buyer and Seller agree to cooperate and to take all actions reasonably necessary to effectuate the transfer, where (i) permissible and consistent with common practice or (ii) required by law, from Seller or one of its affiliates to Buyer or one of its affiliates (or from a plan or trust maintained by Seller or one of its affiliates to a plan or trust maintained by Buyer or one of its affiliates) of assets (and corresponding liabilities) attributable to Transferred Employees under any Employee Plan maintained primarily for the benefit of employees resident outside the United States ("**Non-U.S. Business Employees**"). Any liability that Buyer or its affiliate is required by law to assume with respect to Non-U.S. Business Employees by virtue of the transactions contemplated by this Agreement which is not fully offset

(NY) 05862/066/APA/asset.agt.wpd

Apx. 177

by a transfer of assets pursuant to the preceding sentence shall be reflected as a liability on the Closing Statement; *provided*, that if such liability (determined without reduction for any such transfer of assets) as reasonably computed by the parties no later than seven days prior to the Closing Date exceeds $500,000 in the aggregate, Buyer may elect, on notice given no later than five days before the Closing Date, to assume such excess or cause all such Non-U.S. Business Employees not to be treated as Business Employees (in which case such Non-U.S. Business Employees shall be made available by Seller for secondment to Buyer after the Closing Date, at Buyer's election, the post-closing employment-related costs of such seconded employees to be borne by Buyer); *provided*, that Seller may nevertheless cause such employees to be treated as Business Employees if it, upon notice given to Buyer on or before the Closing Date, pays such excess to Buyer. Seller shall promptly (and in any event no later than 10 days after the date hereof) furnish Buyer with full and complete information concerning the identities and locations of the Non-U.S. Business Employees (nothing in this sentence being deemed to limit Seller's ability to hire employees in the ordinary course of its business); benefit, compensation, severance and similar plans, commitments or obligations with respect thereto; and workers councils or similar organizations applicable to the Non-U.S. Business Employees.

SECTION 9.11. *Cooperation.* Seller and Buyer agree to cooperate with each other in good faith in effectuating the provisions of this Article 9, and to furnish each other promptly with such information concerning employees and employee benefit plans, arrangements or policies as is necessary and appropriate to carry out the terms hereof. Without limiting the foregoing, Seller agrees to provide Buyer with a reasonable opportunity to communicate with Business Employees prior to the Closing Date.

SECTION 9.12. *No Third Party Beneficiaries.* No provision of this Article 9 shall create any third party beneficiary or other rights in any employee or former employee (including any beneficiary or dependent thereof) of Seller or of any of its subsidiaries in respect of continued employment (or resumed employment) with either Buyer or any of its affiliates and no provision of this Article 9 shall create any such rights in any such persons in respect of any benefits that may be provided, directly or indirectly, under any Employee Plan or any plan or arrangement which may be established by Buyer or any of its affiliates. No provision of this Agreement shall constitute a limitation on rights to amend, modify or terminate after the Closing Date any such plans or arrangements of Buyer or any of its affiliates.

## ARTICLE 10
### CONDITIONS TO CLOSING

SECTION 10.01. *Conditions to Obligations of each Party*. The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)   Any applicable waiting period under the HSR Act relating to the transactions contemplated hereby shall have expired or been terminated.

(b)   No provision of any applicable law or regulation and no judgment, injunction, order or decree of a court of competent jurisdiction shall prohibit or enjoin the consummation of the Closing.

(c)   Buyer and the Board of Directors of Seller shall have received a customary opinion of a nationally recognized investment banking or appraisal firm, in form and substance reasonably satisfactory to Buyer and such Board , regarding the solvency of Seller after the Closing, including that the fair value of Seller's assets would exceed Seller's liabilities, Seller would be able to pay its debts as they become due and Seller's remaining capital would not be unreasonably small for its business.

SECTION 10.02. *Conditions to Obligation of Buyer*. The obligation of Buyer to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)   (i) Seller shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date and (ii) the representations and warranties of Seller contained in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, shall be true at and as of the Closing Date, as if made at and as of such date with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect.

(b)   There shall not be any injunction, judgment, order or decree of a court of competent jurisdiction entered, or any law, rule or regulation enacted, adopted, amended or deemed applicable that prohibits the Closing or is reasonably likely to have a Material Adverse Effect, or a material adverse effect on Buyer and its affiliates , taken as a whole, or the ability of Buyer to own and exercise control over the Business after the Closing;

(c)   The Amendment and Waiver shall have become effective (assuming the Closing hereunder shall have occurred), or Seller shall have at Closing available funds sufficient (i) to effect all necessary refinancing of all outstanding indebtedness under the Credit Agreement that is required as a result of the transactions contemplated by this Agreement and to pay all related fees and expenses and (ii) to provide reasonable working capital to Seller's business after the Closing.

(d)   Execution and delivery by Seller of the Services, Supply and Sales Agreement in the form and substance set forth as Exhibit C hereto (the "**Services, Supply and Sales Agreement**");

(e)   (i) Seller shall have received all Required Consents, in each case in form and substance reasonably satisfactory to Buyer and without imposing any incremental costs on Buyer, and no such consent, authorization or approval shall have been revoked or be subject to revocation and (ii) material terms of any lease of Real Property not subject to a Required Consent shall not have been changed to impose any incremental costs to Buyer.

(f)   Buyer shall have (i) obtained at its sole cost an ALTA extended coverage form of leasehold owner's title insurance policies, or binders to issue the same, dated the Closing Date and in amounts satisfactory to Buyer insuring or committing to insure, at ordinary premium rates without any requirement for additional premiums, title to the Real Property as indicated by an asterisk in Schedule 3.12(a), free and clear of any Liens, except for Permitted Liens and Liens disclosed on Schedule 3.12(b); *provided* that the condition in this clause (i) will be deemed satisfied without regard to any Liens that may exist on landlord's interest and (ii) received evidence reasonably satisfactory to it that all Liens on any of the Purchased Assets arising under any of Seller's indebtedness for borrowed money that is not an Assumed Liability shall have been released, including without limitation duly executed partial releases under all applicable UCC financing statements.

(g)   Buyer shall have received on or before the Closing Date an opinion of Willkie Farr & Gallagher and an opinion of Richards Layton & Finger, in each case in the form provided to Buyer prior to the date hereof.

SECTION 10.03. *Conditions to Obligation of Seller.* The obligation of Seller to consummate the Closing is subject to the satisfaction of the following further conditions:

(a)   (i) Buyer shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing

Apx. 180

Date and (ii) the representations and warranties of Buyer contained in this Agreement shall be true in all material respects at and as of the Closing Date, as if made at and as of such date.

(b)   The Amendment and Waiver shall have become effective (assuming the Closing hereunder shall have occurred), or Seller shall have refinanced all outstanding indebtedness under the Credit Agreement on terms that in the aggregate are not, in Seller's reasonable judgment, materially more adverse to Seller than the terms under the Amendment and Waiver.

(c)   Execution and delivery by Buyer of the Services, Supply and Sales Agreement in the form and substance set forth as Exhibit C hereto.

## ARTICLE 11

### SURVIVAL; INDEMNIFICATION

SECTION 11.01. *Survival.* The representations and warranties of the parties hereto contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall not survive the Closing; *provided* that the representations and warranties contained in Section 3.13 shall survive indefinitely.

SECTION 11.02. *Indemnification.* (a) Seller hereby indemnifies Buyer and its affiliates and their respective directors, officers, employees and agents against and agrees to hold each of them harmless from any and all damage, loss, liability and expense (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding) ("Damages") incurred or suffered by any such person arising out of:

(i)   any misrepresentation or breach of warranty made by Seller contained in Section 3.13;

(ii)   any breach of covenant or agreement made or to be performed by Seller pursuant to this Agreement; or

(iii)   any Excluded Liability.

(b)   Buyer hereby indemnifies Seller and its affiliates and their respective directors, officers, employees and agents against and agrees to hold each of them harmless from any and all Damages incurred or suffered by any such person arising out of:

(NY) 05862/066/APA/asset.agt.wpd

41

**Apx. 181**

    (i)    any breach of covenant or agreement made or to be performed by Buyer pursuant to his Agreement; or

    (ii)    any Assumed Liability.

SECTION 11.03. *Procedures.* The party seeking indemnification under Section 11.02 (the "**Indemnified Party**") agrees to give prompt notice to the party against whom indemnity is sought (the "**Indemnifying Party**") of the assertion of any claim, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought under such Section. The Indemnifying Party may at the request of the Indemnified Party participate in and control the defense of any such suit, action or proceeding at its own expense. The Indemnifying Party shall not be liable under Section 11.02 for any settlement effected without its consent of any claim, litigation or proceeding in respect of which indemnity may be sought.hereunder.

## ARTICLE 12
### TERMINATION

SECTION 12.01. *Grounds for Termination.* This Agreement may be terminated at any time prior to the Closing:

    (a)    by mutual written agreement of Seller and Buyer; or

    (b)    by either Seller or Buyer,

    (i)    if the Closing shall not have been consummated on or before March 31, 2000; *provided* that the right to terminate this Agreement pursuant to this Section 12.01(b)(i) shall not be available to any party whose breach of any provision of this Agreement results in the failure of the Closing to be consummated by such time; or

    (ii)    if there shall be any law or regulation that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or if consummation of the transactions contemplated hereby would violate any nonappealable final judgment, injunction, order or decree of any court of competent jurisdiction.

The party desiring to terminate this Agreement pursuant to clause 12.01(b) shall give notice of such termination to the other party.

(NY) 05162/066/APA/asset.agt.wpd

42

Apx. 182

SECTION 12.02. *Effect of Termination.* If this Agreement is terminated pursuant to Section 12.01, this Agreement shall become void and of no effect with no liability on the part of any party hereto; *provided* that no such termination shall relieve any party of any liability or damages resulting from (i) any action taken by such party that, to such party's knowledge after reasonable inquiry, would, or would likely result in a, breach of any covenant hereunder or (ii) any inaccuracy in the representations and warranties of such party as of the date hereof that would constitute a failure to satisfy the conditions in Section 10.02(a)(ii) or 10.03(a)(ii), as applicable, if at the date hereof such party had or would have had, after reasonable inquiry, knowledge of such inaccuracy. The provisions of Section 13.03, 13.05, 13.06 and 13.07 shall survive any termination hereof pursuant to Section 12.01.

## ARTICLE 13

### MISCELLANEOUS

SECTION 13.01. *Notices.* All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Parent or Buyer, to:

Compaq Computer Corporation
20555 S.H. 249 MS110701
Houston, Texas 77070-2698
Attention: Wendy Caswell
Fax: (281) 518-8642

with copies to:

Compaq Computer Corporation
20555 S.H. 249 MS110701
Houston, Texas 77070-2698
Attention: Thomas C. Siekman
Fax: (281) 518-8209

Apx. 183

and

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
Attention: Christopher Mayer, Esq.
Fax: (212) 450-4800

If to Seller, to:

InaCom Corp.
10810 Farnam, Suite 200
Omaha, Nebraska 68154
Attention: Chief Financial Officer
Fax: (402) 758-3602

with a copy to:

Willkie Farr & Gallagher
787 Seventh Avenue
New York, New York 10019
Attention: Jack H. Nusbaum, Esq.
Fax: (212) 728-8111

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

SECTION 13.02.. *Amendments and Waivers.* (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)    No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 13.03.  *Fees and Expenses*. Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.  If the Closing occurs, Buyer and Seller shall share equally the cost of obtaining the opinion referenced in Section 10.01(c).

SECTION 13.04.  *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, except that Buyer may transfer or assign, in whole or from time to time in part, to one or more of its affiliates, the right to purchase all or a portion of the Purchased Assets; but no such transfer or assignment will relieve Buyer of its obligations hereunder.

SECTION 13.05.  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the law of the State of New York without regard to the conflicts of law rules of such state.

SECTION 13.06.  *Jurisdiction*.  Except as otherwise expressly provided in this Agreement, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Southern District of New York or any New York State court sitting in New York City, so long as such courts shall have subject matter jurisdiction over such suit, action or proceeding, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 13.01 shall be deemed effective service of process on such party.

SECTION 13.07.  *WAIVER OF JURY TRIAL*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(NY) 05862/066/APA/asset.agt.wpd

Apx. 185

SECTION 13.08. *Counterparts; Third Party Beneficiaries.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

SECTION 13.09. *Entire Agreement.* This Agreement, the Fulfillment Agreement, the Services, Supply and Sales Agreement, the agreements contemplated by Section 7.07 and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 13.10. *Bulk Sales Laws.* Buyer and Seller each hereby waive compliance by Seller with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state.

SECTION 13.11. *Parent Guarantee.* Parent hereby agrees to guarantee Buyer's obligations to Seller, in accordance with the terms of this Agreement, for payment of the Purchase Price under Article 2 and any indemnification amounts under Section 11.02(b).

SECTION 13.12. *Schedules.* Reference to any Schedule in Article 3 shall be deemed a reference to the applicable section of the disclosure schedule provided by Seller to Buyer on or prior to the date hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

INACOM CORP.

By: _____
    Gerald A. Gagliardi
    President and Chief Executive Officer

COMPAQ COMPUTER CORPORATION

By: _____
    Michael J. Winkler
    Senior Vice President and
    Group Manager

ITY CORP.

By: _____
    Michael J. Winkler
    President

Apx. 187

# EXHIBIT A
# (PART TWO)

## Schedule 1.01
### Definition of the Business

The Business means the following businesses currently conducted by Seller and its subsidiaries:

- Configuration and distribution operations, including:
  - Distribution center and distribution services
  - Configuration and configuration support
  - Central sales
  - Project and technology project management
  - Purchasing
  - Quality assurance
  - Traffic
  - Memphis distribution and configuration activities
  - Microsoft project
  - Asset recovery
  - Bid desk
  - Client services
  - Operations -- International
  - Loss prevention
- Reseller business, other than (1) obligations under franchise and TMS franchise agreements and (2) in Latin America
- Tangible assets and liabilities of Government services unit, but not including Sysorex goodwill.[1]
- Information technology systems and applications, but only to the extent allocated to Buyer under Section 7.07.
- International Operations as follows:
  - Project management activities located in Omaha, Nebraska and, if any, in Luxembourg
  - Canadian operations (solely through Buyer's purchase of Seller's 19% interest in InaCom Information Systems, Ltd., a Canadian entity).[2]
- Boston Computer Exchange

The Business does not include the following (the "Excluded Business"):

- Services organization, excluding procurement.

---

[1] Buyer has an option within three weeks of the date hereof to delete this item from the definition of "Business" if Buyer reasonably concludes after review and upon notice to Seller on or prior to the end of such three-week period that contracts representing a substantial portion of the Government business are not assignable without consent and not likely to be consented to within a customary period of time needed for obtaining such consents, including novations if necessary.

[2] Buyer has an option within two weeks of the date hereof to delete this item from the definition of the "Business".

(NY) 05862/066/APA/asset.agt.wpd

**Apx. 189**

**Schedule 2.01**
**Purchased Assets**

| Item | Purchased Assets |
|---|---|
| <u>Cash and Cash Equivalents</u> | •None |
| <u>Accounts Receivable</u><br>•Trade<br><br><br><br>•Vendor<br>•Securitization | •All non-direct product accounts receivable, other than those arising out of (1) Communications group, (2) Latin America and (3) Europe<br>•Government receivables<br>•Boston Computer Exchange receivables.<br>•All accounts receivable due from Compaq.<br>•None. |
| <u>Inventory</u> | •All product inventory, other than non-committed inventory related to the following vendors and businesses: IBM, HP, Dell, Toshiba and the Excluded Business (as defined on Schedule 1.01)<br>•All HP printer inventory.<br>•All committed product inventory.<br>•Boston Computer Exchange inventory. |
| <u>Other Current Assets</u><br>•Prepaids<br>•Deferred Taxes<br>•Other | •None.<br>•None.<br>•None. |

| Item | Purchased Assets |
|------|-----------------|
| Fixed Assets | •All assets primarily used by the Business or the Transferred Employees.<br>•Leasehold interests and all fixed assets and equipment associated with the following:<br>　　•Distribution and configuration centers and central sales call centers in (1) Omaha, Nebraska, (2) Indianapolis, Indiana, (3) Swedesboro, New Jersey and (4) Ontario, California.<br>　　•Tech center in Omaha, Nebraska, excluding personnel and assets not associated with information technology or distribution. See Section 7.07 for allocation of use of this facility.[3]<br>　　•Gateway building in Omaha, Nebraska. See Section 7.07 for allocation of use of this facility.<br>　　•Corporate headquarters in Omaha, Nebraska. See Section 7.07 for allocation of use of this facility.<br>　　•Livermore, California facility.<br>　　•Memphis, Tennessee facility.<br>　　•Boston Computer Exchange.<br>　　•Distribution center in Singapore. |
| Intangibles | •None. |
| Other Assets<br>•Other<br><br>•Deferred Taxes | •19% interest in InaCom Information Systems, Ltd., a Canadian entity, and option to purchase remainder.[4]<br>•None. |

---

[3] If landlord consent to transfer of the Tech Center has not been received by Closing, the Tech Center shall become an Excluded Asset and Seller shall sublease it to Buyer.

[4] Buyer has option within two weeks of the date hereof to delete this item from the definition of "Purchased Assets" and to add it to the definition of "Excluded Assets". If this item is to be included, Buyer will purchase Seller's 19% equity interest in InaCom Information Systems, Ltd., and not the underlying assets.

(NY) 05862/066/APA/asset.agt.wpd

Apx. 192

|  | Employees.<br>•Any receivables from Seller. |
|---|---|
| •Deferred Taxes | •All. |
| •Other | •Monies or other properties received by Seller as a result of affirmative claims made by Seller against third parties for the matters set forth in Schedule 3.10.<br>•Authorizations to do business.<br>•If Buyer elects not to acquire the Canadian interest or the Government unit, those items will become Excluded Assets. |

Apx. 194

### Schedule 2.03
### Assumed Liabilities

| Item | Assumed Liabilities |
|---|---|
| Accounts Payable | •All accounts payable related to the following vendors and businesses: Compaq, Microsoft, Ingram, Tech Data, 3Com, Lexmark, other 3rd party product vendors, reseller business, and Boston Computer Exchange business.<br>•Liabilities under the Agreement for Wholesale Financing with Deutsche Financial Services Corp. dated as of December 24, 1998, as amended on May 25, 1999 and December 23, 1999.<br>•Government payables. |
| Notes Payable | None. |
| Other Current Liabilities<br>•Accrued liabilities<br>•Taxes payable.<br>•Accrued other | •See Article 9 relating to compensation and benefits.<br>•None.<br>•See Article 9 relating to compensation and benefits. |
| Long Term Debt | •None. |
| Preferred Stock | •None. |

{NY} 05862/066/APA/asset.agt.wpd

5

Apx. 195

Schedule 2.04
Excluded Liabilities

| Item | Excluded Liabilities |
|------|----------------------|
| Accounts Payable | •All accounts payable related to the following vendors and businesses: IBM, Hewlett-Packard, Dell, Toshiba, Lucent, rental business, international businesses, Inacom Latin America, Oracle A/P (administrative payables).<br>•Liabilities under Agreement for Inventory Financing with IBM Credit Corporation dated as of April 27, 1998.<br>•Accounts payable to Compaq or its affiliates for which checks have been written, but not yet released to Buyer by Seller (provided such checks will be delivered in the ordinary course). |
| Notes Payable | All. |
| Other Current Liabilities<br>•Accrued liabilities<br><br><br>•Taxes payable.<br>•Accrued other | <br>•All, other than as provided in Article 9 relating to compensation and benefits.<br>•All intangibles or liabilities associated with Sysorex.<br>•All.<br>•All, other than as provided in Article 9 relating to compensation and benefits. |
| Long Term Debt | •All. |
| Preferred Stock | •All. |
| Other | •Any liabilities relating to any Vanstar litigation.<br>•Any liabilities relating to earn out or contingent payment obligations arising from pre-closing acquisitions.<br>•Any liabilities relating to litigation (whether pending, threatened or settled) disclosed in Schedule 3.10.<br>•Computer Associates software license obligations.<br>•Any payable to Seller. |

## Schedule 7.07

### Information Technology
### Physical Separation and Sharing of Common Costs

Both Inacom and Compaq (the "**Parties**") recognize that while the Information Technology infrastructure is being physically separated, both Parties will be required to share the cost of certain personnel and assets. All cost sharing will be based on actual direct costs, with no markup or loading of indirect costs of any sort.

During the period beginning on the signing date and ending on the Closing Date, the Parties undertake to initiate and complete a classification of all Information Technology personnel and assets as either (a) dedicated solely to the Business (the "**Business Personnel and the Business Assets**"), (b) dedicated solely to the Excluded Business (the "**Excluded Business Personnel and the Excluded Business Assets**"), or (c) jointly supporting both the Business and the Excluded Business (the "**Joint Personnel and Joint Assets**").

Excluded Business Personnel remain employees of Inacom and Excluded Business Assets become Excluded Assets at the Closing Date. Each Party will bear the cost of their respective personnel and assets.

With respect to Joint Personnel and Joint Assets (a) the Parties agree to jointly prepare a time schedule within which to achieve physical separation, and (b) share the costs of such personnel and assets, using a percentage to be determined monthly, during the period that such personnel and assets are jointly employed. As Joint Personnel or Joint Assets are no longer required, each Party will share equally in the termination cost of the Joint Personnel or the disposal cost of the Joint Asset. If either party elects to assume complete responsibility for a Joint Personnel or Joint Asset, such party will settle up with the other based on the original classification or accounting at the Closing Date.

In any event, both Parties agree that time is of the essence in achieving separation and that in any event, all separation activities will be completed no later than 12 months after the Closing Date.

(NY) 05862/066/AP/Vasset.agt.wpd

7

Apx. 197

Administrative Services
Jointly Provided Services

The Parties recognize that subsequent to closing, the temporary services of administrative support personnel will be required until such time as complete physical separation can be achieved. The Parties agree to share the cost of such personnel based on periodic estimates of the amount of time devoted to each. All cost sharing will be based on actual direct salary, benefit and insurance costs, with no markup or loading of indirect costs of any sort.

During the period beginning on the signing date and ending on the Closing Date, Inacom and Compaq (the "**Parties**") undertake to initiate and complete a classification of all Administrative Support personnel as either (a) dedicated solely to the Business (the "**Business Personnel**"), (b) dedicated solely to the Excluded Business (the "**Excluded Business Personnel**"), or (c) jointly supporting both the Business and the Excluded Business (the "**Joint Personnel**").

Excluded Business Personnel and Joint Personnel remain employees of Inacom at the Closing Date. Each Party will bear the cost of their respective personnel and assets.

With respect to Joint Personnel (a) the Parties agree to jointly prepare a time schedule within which to achieve physical separation, and (b) share the costs of such personnel, using a percentage to be determined quarterly, during the period that such personnel are jointly employed. As Joint Personnel are no longer required, each Party will share equally in the termination cost of the Joint Personnel. If either party elects to assume complete responsibility for Joint Personnel, such party will settle up with the other based on the original classification or accounting at the Closing Date.

In any event, both Parties agree that time is of the essence in achieving separation and that in any event, all separation activities will be completed no later than 12 months after the Closing Date.

Shared Space Arrangements

In all matters related to leased space in the Corporate Headquarters and Gateway Buildings, each Party shall take reasonable steps to help reduce the costs to be borne by the other Party.

(NY) 05862/066/APA/asset.agt.wpd

· 8

With respect to the Gateway building, each Party will bear the cost of leased space attributable to the space occupied by the Business or the Excluded Business, as applicable, at the date hereof. Subtenant rentals will directly offset the cost of the leased space for the Party to which the space was attributed at the date hereof.

With respect to the Corporate Headquarters, Seller will reimburse Buyer for its pro rata portion of the building occupied by Excluded Business Personnel and its share of Joint Personnel at the date hereof. The pro rata portion is to be based on a fraction, the numerator of which is the sum of Excluded Business Personnel plus Seller's share of Joint Personnel occupying the building at the date hereof and the denominator of which is the total number of Seller Employees occupying the building at the date hereof. The resulting fraction will be used to allocate the net cost of the building until the lease term expires. The net cost of the building is defined as the total lease cost less subtenant lease payments.

With respect to the Tech Center in Chalco Hills:

- With respect to the portion of the building not occupied by Information Technology personnel and assets at the date hereof, Seller will reimburse Buyer it pro rata portion of the building occupied by Excluded Business Personnel. The pro rata portion is be based on a fraction, the numerator of which is the square footage of such space occupied by Excluded Business Personnel at the date hereof and the denominator of which is the total square footage of the building (excluding the square footage occupied by Information Technology personnel and assets) at the date hereof. The resulting fraction will be used to allocate the net cost of the building until the lease term expires. Buyer agrees to use reasonable best efforts to take over space vacated by Seller and to the extent it does so utilize the vacated space, adjust the fraction downward.

- With respect to the space occupied by Information Technology personnel and assets, Seller will reimburse Buyer its pro rata portion of the building occupied by Excluded Business Personnel and its share of Joint Personnel. The pro rata portion is to be based on a fraction, the numerator of which is the sum of Excluded Personnel plus Seller's share of Joint Personnel and the denominator of which is the sum of Excluded Business Personnel plus Business Personnel plus Joint Personnel.

**Schedule 9.02**
**Business Employees**

The term "Business Employees" means any person primarily employed in connection with the Business, including:

1. Order management/central sales (approximately 806 employees, including 160 employees resident in branch offices);

2. Procurement services (approximately 780 employees);

3. Configuration centers (Indianapolis; Omaha; Ontario, CA; and Swedesboro, NJ (approximately 450 employees in total);

4. Boston computer exchange (approximately 10 employees);

5. Bid desk unit (approximately 10 employees);

6. Reseller group (approximately 40 employees);

7. IT systems and applications to the extent provided in Schedule 1.01 (approximately 150 employees);

8. Memphis center exclusively devoted to Federal Express (approximately 30 employees);

9. Government unit (approximately 130 employees); and

10. Human resource, finance and marketing communications functions, but only those employees directly and exclusively involved in support of the categories listed above (approximately 30 employees).

11. Configuration and Logistics Project Management resources in US, Europe, Singapore and Hong Kong.