---

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

---

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the

Securities Exchange Act of 1934

January 4, 2000
Date of Report (Date of earliest event reported)

InaCom Corp.

(Exact name of registrant as specified in its charter)

| Delaware (State or other jurisdiction of incorporation) | 0-16114 (Commission File Number | 47-0681813 (IRS Employer Identification No.) |
|---|---|---|

| 10810 Farnam Drive, Suite 200, Omaha, Nebraska (Address of principal executive offices) | 68154 (Zip Code) |
|---|---|

Registrant's telephone number, including area code
(402) 758-3900

---

<PAGE>

ITEM 5. OTHER EVENTS.

On January 4, 2000, InaCom Corp. issued a press release announcing that it had entered into an agreement for the sale of certain assets to, and the assumption of certain liabilities by, Compaq Computer Corporation. InaCom and Compaq also agreed to enter into a supply and services agreement (attached to the purchase agreement as Exhibit C) which will provide InaCom access to the product customization and logistics capabilities of the assets sold to Compaq and provide for Compaq's use of InaCom's lifecycle and professional services offerings. Copies of the purchase agreement and the press release are attached as exhibits and are incorporated herein by reference.

ITEM 7: FINANCIAL STATEMENTS, PRO FORMA FINANCIAL INFORMATION AND EXHIBITS.

(c) Exhibits.

The following exhibits are filed with this Form 8-K:

2.1 Asset Purchase Agreement, dated as of January 4, 2000 by and between InaCom Corp. and Compaq Computer Corporation.

99.1 Press Release dated January 4, 2000.

<PAGE>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

INACOM CORP.

January 6, 2000

/s/ Thomas Fitzpatrick

Thomas Fitzpatrick
Executive Vice President and
Chief Finance Officer

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.1
<SEQUENCE>2
<DESCRIPTION>ASSET PURCHASE AGREEMENT
<TEXT>

EXHIBIT 2.1

ASSET PURCHASE AGREEMENT

dated as of

January 4, 2000

between

COMPAQ COMPUTER CORPORATION,

ITY CORP.

and

INACOM CORP.

<PAGE>

TABLE OF CONTENTS

Page

ARTICLE 1

Definitions

Section 1.01. Definitions..............................................1

ARTICLE 2

Purchase and Sale

Section 2.01. Purchased Assets.........................................4
Section 2.02. Excluded Assets..........................................4
Section 2.03. Assumed Liabilities......................................4
Section 2.04. Excluded Liabilities.....................................4
Section 2.05. Assignment of Contracts and Rights.......................5
Section 2.06. Purchase Price; Allocation of Purchase Price.............6
Section 2.07. Closing..................................................6
Section 2.08. Closing Statement........................................7
Section 2.09. Adjustment of Purchase Price.............................9

ARTICLE 3

Representations and Warranties of Seller

Section 3.01. Corporate Existence and Power...........................11
Section 3.02. Corporate Authorization.................................11
Section 3.03. Governmental Authorization..............................11
Section 3.04. Noncontravention........................................12
Section 3.05. Required and Other Consents.............................12
Section 3.06. Financial Statements....................................12
Section 3.07. Absence of Certain Changes..............................12
Section 3.08. No Undisclosed Material Liabilities.....................14
Section 3.09. Material Contracts......................................14
Section 3.10. Litigation..............................................15
Section 3.11. Compliance with Laws and Court Orders...................16
Section 3.12. Properties..............................................16
Section 3.13. Sufficiency of and Title to the Purchased Assets........17
Section 3.14. Intellectual Property...................................17
Section 3.15. Licenses and Permits....................................18
Section 3.16. Finders' Fees...........................................18
Section 3.17. Environmental Compliance................................19
Section 3.18. Year 2000 Compliance ...................................20

<PAGE>

Page

Section 3.19. No Transfer of Substantially All of Seller's Assets...........20
Section 3.20. Financing.....................................................21

ARTICLE 4

Representations and Warranties of Buyer

Section 4.01. Corporate Existence and Power...............................21
Section 4.02. Corporate Authorization.....................................21
Section 4.03. Governmental Authorization..................................21
Section 4.04. Noncontravention............................................22

Section 4.05. Finders' Fees....................................................22

ARTICLE 5

Covenants of Seller

Section 5.01. Conduct of the Business...........................................22
Section 5.02. Access to Information; Confidentiality.............................23
Section 5.03. Seller's Sales Personnel...........................................24
Section 5.04. ICG Alliance.......................................................24
Section 5.05. Leasehold Defaults.................................................24
Section 5.06. Use of Proceeds....................................................24

ARTICLE 6

Covenants of Buyer

Section 6.01. Access............................................................25
Section 6.02. Products for Seller's Franchisees..................................25

ARTICLE 7

Covenants of Buyer and Seller

Section 7.01. Further Assurances.................................................25
Section 7.02. Certain Filings.....................................................26
Section 7.03. Public Announcements................................................26
Section 7.04. Trademarks; Tradenames..............................................26
Section 7.05. Warn Act............................................................27
Section 7.06. Notices of Certain Events...........................................27
Section 7.07. Operating Agreements................................................27

<PAGE>

Page

ARTICLE 8

Tax Matters

Section 8.01. Tax Definitions....................................................28
Section 8.02. Tax Matters........................................................28
Section 8.03. Tax Cooperation; Allocation of Taxes...............................28

ARTICLE 9

Employee Benefits

Section 9.01. Employee Benefits Representations..................................30
Section 9.02. Employees and Offers of Employment.................................31
Section 9.03. Seller's Employee Benefit Plans....................................32
Section 9.04. Buyer Benefit Plans................................................34
Section 9.05. Inactive Employees.................................................35
Section 9.06. Severance Benefits.................................................35
Section 9.07. COBRA..............................................................36
Section 9.08. Continuation of Certain Administrative Services and
Insurance Coverage...............................................36
Section 9.09. Short Term Disability..............................................37
Section 9.10. Foreign Benefit Plans..............................................37
Section 9.11. Cooperation........................................................38

Section 9.12. No Third Party Beneficiaries....................................38

ARTICLE 10

Conditions to Closing

Section 10.01. Conditions to Obligations of each Party......................39
Section 10.02. Conditions to Obligation of Buyer............................39
Section 10.03. Conditions to Obligation of Seller...........................40

ARTICLE 11

Survival; Indemnification

Section 11.01. Survival....................................................41
Section 11.02. Indemnification.............................................41
Section 11.03. Procedures..................................................42

<PAGE>

Page

ARTICLE 12

Termination

Section 12.01. Grounds for Termination.....................................42
Section 12.02. Effect of Termination.......................................43

ARTICLE 13

Miscellaneous

Section 13.01. Notices.....................................................43
Section 13.02. Amendments and Waivers......................................44
Section 13.03. Fees and Expenses...........................................45
Section 13.04. Successors and Assigns......................................45
Section 13.05. Governing Law...............................................45
Section 13.06. Jurisdiction................................................45
Section 13.07. WAIVER OF JURY TRIAL........................................45
Section 13.08. Counterparts; Third Party Beneficiaries.....................46
Section 13.09. Entire Agreement............................................46
Section 13.10. Bulk Sales Laws.............................................46
Section 13.11. Parent Guarantee............................................46
Section 13.12. Schedules...................................................46

<PAGE>

ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (the "Agreement") dated as of January 4, 2000 among Compaq Computer Corporation, a Delaware corporation ("Parent") (solely for purposes of Section 13.11), ITY Corp., a Delaware corporation ("Buyer") and wholly-owned subsidiary of Parent, and InaCom Corp., a Delaware corporation ("Seller").

The parties hereto agree as follows:

ARTICLE 1

Definitions

Section 1.01. Definitions.

(a) The following terms, as used herein, have the following meanings:

"affiliate" means, with respect to any person, any other person directly or indirectly controlling, controlled by, or under common control with such other person.

"Business" has the meaning set forth in Schedule 1.01.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, encumbrance or other adverse claim of any kind in respect of such property or asset.

"knowledge" means (i) with respect to Seller (A) for purposes of Section 5.01, the actual knowledge of Gerald Gagliardi, Jon Wellman, Thomas Fitzpatrick, Bill Fairfield, William Janeway or Dick Anderson and (B) for all other purposes, the actual knowledge of Gerald Gagliardi, Jon Wellman, Thomas Fitzpatrick, Bill Fairfield, William Janeway, David Guenthner, Mike Steffan, Dick Oshlo or Dick Anderson; and (ii) with respect to any other person, the actual knowledge of such person.

"Material Adverse Effect" means a material adverse effect on the condition (financial or otherwise), business, assets or results of operations of the Business or the Purchased Assets and Assumed Liabilities, except any such effect resulting from or arising in connection with (i) changes in economic conditions in the United States generally, (ii) changes or conditions affecting the computer products or services industry generally or (iii) changes resulting from any adverse

<PAGE>

action taken by any customer or supplier of the Business as a result of the announcement of this Agreement or the transactions contemplated hereby, provided that Seller has used reasonable best efforts to maintain its relationship with such customer or supplier, and has notified Buyer about such adverse action.

"person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"subsidiary" means, with respect to any person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such person.

(b) A reference in this Agreement to any statute shall be to such statute as amended from time to time and to the rules and regulations promulgated thereunder.

(c) Each of the following terms is defined in the Section set forth opposite such term:

Term                                                                Section

| - ---- | ------- |
|---|---|
| Accounting Referee | 2.06 |
| Agreement | preamble |
| Apportioned Obligations | 8.03 |
| Assumed Liabilities | 2.03 |
| Balance Sheet | 2.08 |
| Balance Sheet Date | 3.07 |
| Base Net Worth | 2.09 |
| Business Employees | 9.02 |
| Business Intellectual | 3.14 |
| Business Trademarks and Tradenames | 7.04 |
| Buyer | preamble |
| Buyer 401(k) Plans | 9.03 |
| Closing | 2.07 |
| Closing Date | 2.07 |
| Closing Net Worth | 2.08 |
| Closing Plan Year | 9.03 |
| Closing Statement | 2.08 |
| Code | 8.01 |
| Confidentiality Agreement | 5.02 |
| Configuration Employee | 9.02 |
| Contracts | 2.01 |

<PAGE>

| Term | Section |
|---|---|
| - ---- | ------- |
| Damages | 11.02 |
| Employee Plan | 9.01 |
| ERISA | 9.01 |
| ERISA Affiliate | 9.01 |
| Excess Payment | 2.09 |
| Exchange Agreement | 3.03 |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.04 |
| Final Net Worth | 2.09 |
| HSR Act | 3.03 |
| Inactive Business Employee | 9.05 |
| Indemnified Party | 11.03 |
| Indemnifying Party | 11.03 |
| Intellectual Property Rights | 3.14 |
| IT Employee | 9.02 |
| Make-Up Payment | 2.09 |
| Marketing Employee | 9.02 |
| Other Consents | 3.05 |
| Parent | preamble |
| Permits | 3.15 |
| Permitted Liens | 3.12 |
| Post-Closing Tax Period | 8.03 |
| Pre-Closing Tax Period | 8.01 |
| Property Rights | 3.14 |
| Purchased Assets | 2.01 |
| Purchase Price | 2.06 |
| Real Property | 3.12 |
| Required Consents | 3.05 |
| Seller | preamble |

| | |
|---|---|
| Seller 401(k) Plans | 9.01 |
| Seller FSA | 9.04 |
| Seller Indebtedness | 3.20 |
| Tax | 8.01 |
| Tax Allocation Statement | 2.06 |
| Taxing Authority | 8.01 |
| Transfer Taxes | 8.03 |
| Transferred Employee | 9.02 |
| WARN Act | 7.05 |

<PAGE>

ARTICLE 2

Purchase and Sale

Section 2.01. Purchased Assets. Except as otherwise provided in Sections 2.02 and 2.05 and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller and Seller agrees to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered, to Buyer at the Closing, all right, title and interest of Seller and its subsidiaries in, to and under

(a) the assets, properties and business, of every kind and description, held or used primarily in connection with the Business as the same shall exist on the Closing Date, and

(b) the assets, properties and businesses described on Schedule 2.01 (the items in clauses (a) and (b) collectively, the "Purchased Assets"),

in the case of tangible Purchased Assets, free and clear of all Liens, other than Permitted Liens and Liens disclosed on Schedule 3.12(b).

Section 2.02. Excluded Assets. Notwithstanding anything else contained in this Agreement, the Purchased Assets shall not include all right, title and interest of Seller and its subsidiaries in, to and under the assets, properties and businesses described on Schedule 2.02 (such excluded assets, properties and businesses being referred to as the "Excluded Assets").

Section 2.03. Assumed Liabilities. Except as otherwise provided in Section 2.04 and subject to the terms and conditions of this Agreement, Buyer agrees, effective as of Closing, to assume all liabilities or obligations of Seller and its subsidiaries of any kind, character or description (whether known or unknown, accrued, absolute, contingent or otherwise)

(a) primarily relating to or arising out of the conduct of the Business or the ownership or use of the Purchased Assets, or

(b) described on Schedule 2.03 or to be assumed by Buyer in Article 8 or Article 9 (the items in clauses (a) and (b) collectively, the "Assumed Liabilities").

Section 2.04. Excluded Liabilities. Notwithstanding anything else contained in this Agreement, Buyer is not assuming any liability or obligation of Seller or any of its subsidiaries (or any predecessor thereof or any prior owner of all or part of any of their businesses, properties and assets) of

whatever nature,

<PAGE>

whether presently in existence or arising hereafter, known or unknown, accrued, absolute, contingent or otherwise, other than the Assumed Liabilities and, in any event, Buyer is not assuming any of the following:

(a) except as provided in Article 8 with respect Apportioned Obligations and transfer taxes, any liability or obligation for Taxes of Seller or any of its subsidiaries or any member of any consolidated, affiliated, combined or unitary group of which Seller or any of its subsidiaries is or has been a member, arising on or prior to the Closing Date;

(b) except to the extent provided in Article 9, all liabilities or obligations relating to employees or their compensation or benefits;

(c) any liability or obligation under any indebtedness for borrowed money (other than in respect of the Agreement for Wholesale Financing with Deutsche Financial Services Corp. dated as of December 24, 1998, as amended on May 25, 1999 and December 23, 1999);

(d) any liability or obligation described on Schedule 2.04;

(e) any liability or obligation relating to Excluded Assets; and

(f) any liability or obligation arising under or relating to any Environmental Law which does not primarily relate to or arise out of the conduct of the Business or the ownership or use of the Purchased Assets.

All such liabilities and obligations not being assumed by Buyer shall be retained by and remain liabilities and obligations of Seller and its subsidiaries (the "Excluded Liabilities").

Section 2.05. Assignment of Contracts and Rights. Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right or benefit arising thereunder or resulting therefrom if an attempted assignment, without the consent of a third party thereto, would constitute a breach or other contravention thereof or in any way adversely affect the rights of Buyer or Seller or their affiliates thereunder. Buyer and Seller will use reasonable efforts (but without any payment of money) to obtain any required consents to the assignment of the Purchased Assets to Buyer as Buyer may reasonably request. If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement under which Buyer

<PAGE>

would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.

Section 2.06. Purchase Price; Allocation of Purchase Price. (a) The purchase price for the Purchased Assets (the "Purchase Price") is $369.5 million in cash. The Purchase Price shall be paid as provided in Section 2.07 and shall be subject to adjustment as provided in Section 2.09.

(b) As soon as practicable after the determination of the Final Net Worth, the Buyer shall deliver to the Seller a statement (the "Tax Allocation

Statement"), allocating the Purchase Price, as adjusted pursuant to Section 2.09 (plus Assumed Liabilities, to the extent properly taken into account under Section 1060 of the Code) among the Purchased Assets in accordance with Section 1060 of the Code. If within 30 days after the delivery of the Tax Allocation Statement the Seller notifies the Buyer in writing that the Seller objects to the allocation set forth in the Tax Allocation Statement, the Buyer and the Seller shall use commercially reasonable efforts to resolve such dispute within 30 days. In the event that the Buyer and the Seller are unable to resolve such dispute within 30 days, the Buyer and the Seller shall jointly retain a nationally recognized accounting firm (the "Accounting Referee") to resolve the disputed items. Upon resolution of the disputed items, the allocation reflected on the Tax Allocation Statement shall be adjusted to reflect such resolution. The costs, fees and expenses of the Accounting Referee shall be borne equally by Buyer and Seller.

(c) Seller and Buyer agree to (i) be bound by the Tax Allocation Statement and (ii) act in accordance with the Tax Allocation Statement in the preparation, filing and audit of any Tax return.

(d) Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, each party shall deliver to the other party a copy of its Form 8594.

Section 2.07. Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place at the offices of Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York, as soon as possible, but in no event later than 10 business days, after satisfaction of the conditions set forth in Article 10, or at such other time or place as Buyer and Seller may agree. "Closing Date" means the date of the Closing. At the Closing:

(a) Buyer shall deliver to Seller the Purchase Price in immediately available funds by wire transfer to an account of Seller with a bank in New York

<PAGE>

City designated by Seller, by notice to Buyer, not later than three days prior to the Closing Date,

(b) Seller and Buyer shall enter into an Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit A, and

(c) Seller shall deliver to Buyer such deeds, bills of sale, assignments and other good and sufficient instruments of conveyance and assignment as the parties and their respective counsel shall deem reasonably necessary to vest in Buyer all right, title and interest of Seller and its subsidiaries in, to and under the Purchased Assets. Such instruments of conveyance and assignment shall not contain any representation or warranty or covenant in addition to those contained herein; nor shall the parties' rights or obligations thereunder be different from those contained herein.

Section 2.08. Closing Statement. (a) As promptly as practicable but in no event later than 30 days after the Closing Date, Seller will close its books and records relating to the Purchased Assets and Assumed Liabilities in order to permit Buyer to prepare the Closing Statement. As promptly as practicable thereafter but no later than 60 days after the closing of such books and records, Buyer will cause to be prepared and delivered to Seller a closing statement of Purchased Assets and Assumed Liabilities (the "Closing Statement") together with a report of Buyer's independent accountant thereon, and a certificate based on such Closing Statement setting forth Buyer's calculation of

Closing Net Worth. The Closing Statement shall (x) fairly present the Purchased Assets and Assumed Liabilities as at the close of business on the Closing Date in accordance with U.S. generally accepted accounting principles applied on a basis consistent with those used in the preparation of the audited balance sheet of Seller included in Seller's Supplemental Consolidated Financial Statements included in Seller's report on Form 8-K/A dated March 3, 1999 (the "Seller 8-K"), (y) be prepared in accordance with accounting policies and practices consistent with those used in the preparation of such financial statements and (z) include line items substantially consistent with those in the statement of Purchased Assets and Assumed Liabilities as of November 27, 1999 referred to in Section 3.06 (the "Balance Sheet"). "Closing Net Worth" means the excess of the book value of the Purchased Assets over the book value of the Assumed Liabilities as reflected on the Closing Statement. The Closing Statement shall exclude: (i) all assets that in accordance with generally accepted accounting principles would be classified as intangible assets, including, without limitation, goodwill, patents, trademarks, deferred expenses and unamortized debt discount; (ii) all liabilities for which Buyer is indemnified pursuant to this Agreement and the receivable arising from such indemnification obligation; and (iii) the effect (including the Tax effect) of any act, event or transaction occurring after the Closing (but prior to the close of

<PAGE>

business on the Closing Date) and not in the ordinary course of business of the Business. For purposes of the Closing Statement, the amount of any accounts payable due to, or any accounts receivable due from, Buyer or its affiliates will be determined by agreement between Buyer and Seller, or absent such agreement, through arbitration. In auditing the Closing Statement, Buyer's independent accountant will follow generally accepted auditing standards and such other procedures as are customary including, as appropriate, conducting a physical inventory and verifying third party receivables and payables.

(b) If Seller disagrees with Buyer's calculation of Closing Net Worth delivered pursuant to Section 2.08(a), Seller may, within 30 days after delivery of the documents referred to in Section 2.08(a), deliver a notice to Buyer disagreeing with such calculation and setting forth Seller's calculation of such amount. Any such notice of disagreement shall specify those items or amounts as to which Seller disagrees, and Seller shall be deemed to have agreed with all other items and amounts contained in the Closing Statement and the calculation of Closing Net Worth delivered pursuant to Section 2.08(a).

(c) If a notice of disagreement shall be duly delivered pursuant to Section 2.08(b), Buyer and Seller shall, during the 15 days following such delivery, use their reasonable commercial efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Closing Net Worth, which amount shall not be less than the amount thereof shown in Buyer's calculations delivered pursuant to Section 2.08(a) nor more than the amount thereof shown in Seller's calculation delivered pursuant to Section 2.08(b). If during such period, Buyer and Seller are unable to reach such agreement, they shall promptly thereafter cause the Accounting Referee promptly to review this Agreement and the disputed items or amounts for the purpose of calculating Closing Net Worth. In making such calculation, the Accounting Referee shall consider only those items or amounts in the Closing Statement or Buyer's calculation of Closing Net Worth as to which Seller has disagreed. The Accounting Referee shall deliver to Buyer and Seller, as promptly as practicable, a report setting forth such calculation. Such report shall be final and binding upon Buyer and Seller. The cost of such review and report shall be borne (i) by Buyer if the difference between Final Net Worth and Closing Net Worth as set forth in Buyer's calculation of Closing Net Worth delivered pursuant to Section 2.08(a) is greater than the difference between

Final Net Worth and Closing Net Worth as set forth in Seller's calculation of Closing Net Worth delivered pursuant to Section 2.08(b), (ii) by Seller if the first such difference is less than the second such difference and (iii) otherwise equally by Buyer and Seller. "Final Net Worth" means Closing Net Worth (x) as shown in Buyer's calculation delivered pursuant to Section 2.08(a) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 2.08(b); or (y) if such a notice of disagreement is

<PAGE>

delivered, (A) as agreed by Buyer and Seller pursuant to Section 2.08(c) or (B) in the absence of such agreement, as shown in the Accounting Referee's calculation delivered pursuant to Section 2.08(c); provided that in no event shall Final Net Worth be less than Buyer's calculation of Closing Net Worth delivered pursuant to Section 2.08(a) or more than Seller's calculation of Closing Net Worth delivered pursuant to Section 2.08(b).

(d) Buyer and Seller agree that they will, and agree to cause their respective independent accountants to, cooperate and assist in the preparation of the Closing Statement and the calculation of Closing Net Worth and in the conduct of the audits and reviews referred to in this Section 2.08, including without limitation, the making available to the extent necessary of books, records, work papers and personnel.

Section 2.09. Adjustment of Purchase Price. (a) The parties will make payments as follows:

(i) If Final Net Worth exceeds $335.9 million, Buyer shall pay to Seller, in the manner and with interest as provided in 2.09(b), an amount equal to such excess (the "Excess Payment").

(ii) If Final Net Worth is less than $335.9 million, Seller shall pay to Buyer, in the manner and with interest as provided in Section 2.09(b), an amount equal to the sum of

(A) the lesser of (x) $19.5 million and (y) 110% of the excess of $335.9 million over Final Net Worth, and

(B) the excess, if any, of $275 million over Final Net Worth (the "Make-Up Payment").

(b) Any payment pursuant to Section 2.09(a) shall be made within 10 days after determination of Final Net Worth (the "Final Payment Date") by the paying party causing such payment to be credited to such account of the receiving party as may be designated by such receiving party. The amount of any payment to be made pursuant to this Section 2.09 shall bear interest from and including the Closing Date to but excluding the date of payment at a rate per annum equal to LIBOR plus 1.0%. For these purposes, "LIBOR" means "USD-LIBOR-ISDA" (as defined in the 1991 ISDA Definitions published by the International Swaps and Derivatives Association) with a "Designated Maturity" of one month under such definition and reset every month. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of 365 days and the actual number of days elapsed.

<PAGE>

Notwithstanding anything herein to the contrary, the parties agree that:

(i) All payments pursuant Section 2.09(a) shall be made in cash or other immediately available funds except as provided in clause (ii) or (iii) below.

(ii) The Excess Payment shall, at the option of Buyer, be paid in (A) accounts receivable that are, as of the Final Payment Date, not in dispute and not aged over 60 days and are valued on a basis consistent with the Closing Statement or inventory that has been received from the original manufacturer no longer than three weeks prior to the Final Payment Date and valued at the lower of cost or market (including any purchase price protection received thereon), in each case that would have otherwise constituted Purchased Assets or otherwise arises in connection with the Business after the Closing, (B) cash or (C) any combination thereof. To the extent that any such items are transferred to Seller, they shall be treated as Excluded Assets.

(iii) The Make-Up Payment shall, at the option of Seller, be paid in Specified Current Assets, cash or any combination thereof. "Specified Current Assets" means, in each case free and clear of all Liens,

(x) accounts receivable that (A) are, as of the Final Payment Date, not in dispute and not aged over 60 days, (B) are not accounts receivable due from IBM, Hewlett Packard, Dell or Toshiba and (C) are valued on a basis consistent with the Closing Statement, or

(y) product inventory that (A) has been received by Seller from the original manufacturer no longer than three weeks prior to the Final Payment Date, (B) is not IBM, Hewlett Packard, Dell or Toshiba inventory and (C) is valued at the lower of cost or market (including any purchase price protection received thereon).

During the 60-day period after the Final Payment Date, Buyer will use reasonable and customary efforts to collect such receivables and sell such inventory in the ordinary course of business. At the end of such period, Seller will pay to Buyer in cash the excess, if any, of the Make-Up Payment (less the amount of such payment made in cash) over the amounts actually realized by Buyer from such accounts receivable and inventory not to exceed the value used in making the Make-Up Payment. Buyer shall assign such unsold inventory and uncollected accounts

<PAGE>

receivable to Seller. Buyer shall not waive any rights against the account debtor in respect of any accounts receivable so assigned.

## ARTICLE 3

### Representations and Warranties of Seller

Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date that:

Section 3.01. Corporate Existence and Power. Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted. Seller is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction where such

qualification is necessary, except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect. Seller has heretofore delivered to Buyer true and complete copies of the certificate of incorporation and bylaws of Seller as currently in effect.

Section 3.02. Corporate Authorization. The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby are within Seller's corporate powers and have been duly authorized by all necessary corporate action on the part of Seller. This Agreement constitutes a valid and binding agreement of Seller. In connection with the authorization of this Agreement, the Seller's Board of Directors has received an opinion of Goldman, Sachs & Co. to the effect that the consideration to be paid pursuant to this Agreement is fair to Seller from a financial point of view.

Section 3.03. Governmental Authorization. Except as set forth in Schedule 3.03, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby require no action by or in respect of, or filing with, any governmental body, agency or official other than (i) compliance with any applicable requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"); (ii) any actions or filings which, if not taken or made, would not have a Material Adverse Effect or materially adversely affect the ability of Seller to consummate on the transactions contemplated hereby; and (iii) any filings or notices not required to be made or given until after the Closing Date.

<PAGE>

Section 3.04. Noncontravention. Except as set forth in Schedule 3.04, the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) violate the certificate of incorporation or bylaws of Seller, (ii) assuming compliance with the matters referred to in Section 3.03, violate any law, rule, regulation, judgment, injunction, order or decree, (iii) assuming the obtaining of all Required and Other Consents, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to the Business or the Purchased Assets or Assumed Liabilities to which Seller or any of its subsidiaries is entitled under any agreement or other instrument or (iv) result in the creation or imposition of any Lien on any Purchased Asset, except, in the case of clauses (ii), (iii) and (iv), for such matters as would not have a Material Adverse Effect.

Section 3.05. Required and Other Consents. (a) Schedule 3.05(a) sets forth each agreement or other instrument binding upon Seller or any of its subsidiaries or any Permit requiring a consent or other action by any person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date (the "Required Consents").

(b) Schedule 3.05(b) sets forth each other consent or action by any person (the "Other Consents") under such agreements or other instruments or Permits that is necessary with respect to the execution, delivery and performance of this Agreement.

Section 3.06. Financial Statements. The November 27, 1999 statement of Purchased Assets and Assumed Liabilities attached hereto as Schedule 3.06 fairly presents the Purchased Assets and Assumed Liabilities as at such date in accordance with U.S. generally accepted accounting principles applied on a basis

consistent with those used in the preparation of the audited balance sheet of Seller included in the Seller 8-K. The revenues, gross margins, pre-coop selling, general and administrative expenses and earnings before taxes for Company 42/Distribution-Operations business for each month in the nine months ended September 25, 1999 fairly present such items in all material respects on a consistent basis.

Section 3.07. Absence of Certain Changes. Except as disclosed on Schedule 3.07, since November 30, 1999 (the "Balance Sheet Date") or, after the date hereof, in respect of transactions required by this Agreement, the Business has been conducted in the ordinary course consistent with past practices and there has not been:

<PAGE>

(a) any event, occurrence, development or state of circumstances or facts which has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b) any declaration, setting aside or payment of any dividend or other distribution with respect to any shares of capital stock of Seller, or any repurchase, redemption or other acquisition by Seller or any of its subsidiaries of any outstanding shares of capital stock or other equity securities of, or other ownership interests in, Seller or any of its subsidiaries;

(c) any incurrence, assumption or guarantee by Seller or any of its subsidiaries of any indebtedness for borrowed money that will constitute an Assumed Liability;

(d) any creation or other incurrence of any Lien on any Purchased Asset other than in the ordinary course of business consistent with past practices;

(e) any damage, destruction or other casualty loss (whether or not covered by insurance) affecting the Business or any Purchased Asset which, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect;

(f) any transaction or commitment made, or any contract or agreement entered into, by Seller or any of its subsidiaries relating to the Business or any Purchased Asset (including the acquisition or disposition of any assets) or any relinquishment by Seller or any of its subsidiaries of any contract or other right, in either case, material to the Business or Purchased Assets and Assumed Liabilities, other than transactions and commitments in the ordinary course of business consistent with past practices and those contemplated by this Agreement;

(g) any change in any method of accounting or accounting practice by Seller with respect to the Business, except for any such change required by reason of a concurrent change in generally accepted accounting principles;

(h) any increase in compensation payable to any Business Employee, other than in the ordinary course of business consistent with past practices; or

(i) any material labor dispute, other than routine individual grievances, or any activity or proceeding by a labor union or representative thereof to organize any Business Employees, which Business Employees were not subject to a collective bargaining agreement at the Balance Sheet Date, or any material lockouts, strikes, slowdowns, work stoppages or threats thereof by or with respect to Business Employees.

<PAGE>

Section 3.08. No Undisclosed Material Liabilities. There are no liabilities or obligations of the Business of any kind (whether known or unknown, accrued, contingent, absolute or otherwise) that will constitute an Assumed Liability and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than:

(a) liabilities or obligations provided for in the Balance Sheet or disclosed in the notes thereto;

(b) liabilities disclosed on Schedule 3.08; and

(c) liabilities or obligations incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date, which in the aggregate are not material to the Business.

Section 3.09. Material Contracts. (a) Except as disclosed in Schedules 3.09, 3.12, 3.14, 3.15 or 9.01, neither Seller nor any of its subsidiaries is a party to or bound by any of the following agreements that will constitute a Purchased Asset or an Assumed Liability:

(i) any lease of personal property (other than forklifts and related equipment) providing for annual rentals of $50,000 or more or any lease of real property;

(ii) any agreement committing Seller to purchase materials, supplies, goods, services, equipment or other assets providing for either (A) annual payments by Seller of $100 million or more or (B) aggregate payments by Seller of $200 million or more;

(iii) any agreement committing Seller to sell materials, supplies, goods, services, equipment or other assets providing for either (A) annual payments to Seller of $50 million or more or (B) aggregate payments to Seller of $100 million or more;

(iv) any partnership, joint venture or other similar agreement or arrangement;

(v) any agreement relating to the prospective acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise);

<PAGE>

(vi) any agreement relating to indebtedness for borrowed money or the deferred purchase price of property (in either case, whether incurred, assumed, guaranteed or secured by any asset), except any such agreement (A) with an aggregate outstanding principal amount not exceeding $10 million and which may be prepaid on not more than 30 days notice without the payment of any penalty and (B) entered into subsequent to the date of this Agreement as permitted by Section 3.07(c);

(vii) any option, license, franchise or similar agreement;

(viii) any sales agency, dealer, sales representative, marketing or other similar agreement that, in the aggregate, accounted for at

least 80% of Seller's revenues from resellers for the nine months ended September 25, 1999;

(ix) any agreement that limits the freedom of Seller or any of its subsidiaries to compete in any line of business or with any person or in any area or to own, operate, sell, transfer, pledge or otherwise dispose of or encumber any Purchased Asset or which would so limit the freedom of Buyer after the Closing Date;

(x) any agreement with or for the benefit of any officer, director, 5% or more shareholder or affiliate of Seller; or

(xi) any other agreement, commitment, arrangement or plan not made in the ordinary course of business that is material to the Business.

(b) Each agreement disclosed in any Schedule to this Agreement or required to be disclosed pursuant to this Section is a valid and binding agreement of Seller and is in full force and effect, and none of Seller or any of its subsidiaries or, to the knowledge of Seller, any other party thereto is in default or breach in any material respect under the terms of any such agreement, and, to the knowledge of Seller, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute any event of default thereunder, except for such matters as would not have a Material Adverse Effect. True and complete copies of each such agreement, including all amendments and modifications thereto, have been delivered to Buyer.

Section 3.10. Litigation. Except as set forth in Schedule 3.10, there is no action, suit, investigation or proceeding pending against, or to the knowledge of Seller, threatened against or affecting, the Business or any Purchased Asset before any court or arbitrator or any governmental body, agency or official which would

<PAGE>

reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.11. Compliance with Laws and Court Orders. Except as set forth in Schedule 3.11, neither Seller nor any of its subsidiaries is in violation of, or has violated, any applicable law, rule, regulation, judgment, injunction, order or decree applicable to the Purchased Assets or the conduct of the Business, except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.12. Properties. (a) Schedule 3.12(a) correctly lists all real property used or held primarily in connection with the Business, including leasehold interests (the "Real Property"), and any Liens thereon (other than Permitted Liens or Liens disclosed on Schedule 3.12(b)), specifying in the case of leases or subleases, the name of the lessor or sublessor.

(b) Seller has good and marketable, indefeasible, fee simple title to, or in the case of leased property, valid leasehold interests in, all tangible Purchased Assets (whether real, personal or otherwise) reflected on the Balance Sheet or acquired after the Balance Sheet Date, except for properties and assets sold since the Balance Sheet Date in the ordinary course of business consistent with past practices. No tangible Purchased Asset is subject to any Lien, except:

(i)   Liens disclosed on Schedule 3.12(b);

(ii)  Liens securing Assumed Liabilities; or

(iii) Liens that do not materially detract from the value of such Purchased Asset, or materially interfere with any present or intended use of such Purchased Asset (clauses (ii) - (iii) of this Section 3.12(b) are, collectively, the "Permitted Liens").

(c) There are no developments affecting any of the Purchased Assets pending or, to the knowledge of Seller threatened, which are reasonably likely to materially detract from the value, materially interfere with any present or intended use or materially adversely affect the marketability of such Purchased Assets.

(d) Except for the Excluded Assets, the Real Property includes all real property as is used or held primarily in connection with the conduct of the business and operations of the Business as heretofore conducted.

(e) Except as disclosed in Schedule 3.12 and except as would not have a Material Adverse Effect, (i) the plants, buildings, structures and equipment

<PAGE>

included in the Purchased Assets have no defects, are in good operating condition and repair and have been reasonably maintained consistent with standards generally followed in the industry (giving due account to the age and length of use of same, ordinary wear and tear excepted), are adequate and suitable for their present and intended uses and, in the case of plants, buildings and other structures (including, without limitation, the roofs thereof), are structurally sound; (ii) none of the structures on the Real Property encroaches upon real property of another person, and no structure of any other person encroaches upon any Real Property; (iii) the Real Property, and its continued use, occupancy and operation as currently used, occupied and operated, does not constitute a nonconforming use under all applicable building, zoning, subdivision and other land use and similar laws, regulations and ordinances; and (iv) there has been no actual or, to Seller's knowledge, threatened taking of all or any portion of the Real Property by eminent domain or similar governmental power, and no condemnation proceedings are currently pending or, to Seller's knowledge, threatened with respect to the Real Property.

Section 3.13. Sufficiency of and Title to the Purchased Assets. (a) Except for the Excluded Assets, the Purchased Assets constitute all of the property and assets used or held primarily in connection with the Business and are adequate to conduct the Business as currently conducted.

(b) Upon consummation of the transactions contemplated hereby, Buyer will have acquired good and marketable title in and to, or a valid leasehold interest (on the terms of the existing agreement as in effect on the date hereof assuming that the subject asset is used in the same manner as it is currently used by Seller) in, each of the tangible Purchased Assets, free and clear of all Liens, except for Permitted Liens and Liens disclosed in Schedule 3.12(b), and all of the right, title and interest of Seller and its subsidiaries in and to any intangible Purchased Assets.

Section 3.14. Intellectual Property. Except for the Excluded Assets, Seller and its subsidiaries have sufficient rights to use, whether through ownership, licensing or otherwise, all patents, trademarks, service marks, trade names, copyrights, trade secrets, processes and other proprietary rights that are necessary for the Business as now conducted (collectively the "Intellectual Property Rights"). Except as set forth on Schedule 3.14, none of Seller or any of its subsidiaries has assigned, hypothecated or otherwise transferred or encumbered any of the Intellectual Property Rights and none of the Intellectual

Property Rights purport to grant sole or exclusive licenses or other rights to any other person, including, without limitation sole or exclusive licenses limited to specific fields of use. To the best of Seller's knowledge, the patents owned by Seller or its subsidiaries relating to the Business are valid and enforceable and any patent

<PAGE>

issuing from patent applications of Seller or its subsidiaries will be valid and enforceable. Except as disclosed in Schedule 3.14, (i) to the best of the Seller's knowledge, there is no infringement by any other person of any of the Intellectual Property Rights, and (ii) neither Seller nor any of its subsidiaries has entered into any agreement to indemnify any person against any charge of infringement of any of the Intellectual Property Rights except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect. To the best of Seller's knowledge, neither Seller nor any of its subsidiaries has violated or infringed in connection with the Business any intellectual property right of any other person, and neither Seller nor any of its subsidiaries has received any communication alleging that it violates or infringes the intellectual property right of any other person. Except as set forth on Schedule 3.14, neither Seller nor any of its subsidiaries has been sued or is being sued or has reason to believe that it may be sued for infringing in connection with the Business any intellectual property right of another person. None of the processes, techniques and formulae, research and development results or other know-how or show-how relating to the Business, the value of which to the Business is contingent upon maintenance of the confidentiality thereof, has been disclosed by Seller or any affiliate thereof to any person other than those persons who have a need to know thereof and who are bound to hold such information in confidence pursuant to confidentiality agreements or by operation of law.

Section 3.15. Licenses and Permits. Schedule 3.15 correctly describes each material governmental license, authorization, consent and approval to the extent relating to the Business (the "Permits") together with the name of the government agency or entity issuing such Permit. Except as set forth on the Schedule 3.15, (i) the Permits are valid and in full force and effect, (ii) Seller is not in default, and no condition exists that with notice or lapse of time or both would constitute a default, under the Permits and (iii) none of the Permits will, assuming the related Required Consents have been obtained prior to the Closing Date, be terminated or impaired or become terminable, in whole or in part, as a result of the transactions contemplated hereby. Upon consummation of such transactions, Buyer will, assuming the related Required Consents or Other Consents, as the case may be, have been obtained prior to the Closing Date, have all of the right, title and interest in all Permits primarily relating to the Business (other than Excluded Assets).

Section 3.16. Finders' Fees. Except for Goldman Sachs & Co., whose fees will be paid by Seller, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

<PAGE>

Section 3.17. Environmental Compliance. (a) Except for such matters as would not reasonably be expected to have a Material Adverse Effect or as disclosed in Schedule 3.17:

(i) no written notice of violation or liability, demand, request

for information, citations, summons or order has been received, no complaint has been filed, no penalty has been assessed and no investigation, action, claim, suit, proceeding or review is pending, or to the knowledge of Seller or any of its subsidiaries, threatened by any governmental entity or other person with respect to any matters relating to the Business or the Purchased Assets or Assumed Liabilities and relating to or arising out of any Environmental Law;

(ii) no Hazardous Substance has been discharged, disposed of, dumped, injected, pumped, deposited, spilled, leaked, emitted or released at any of the Purchased Assets or Real Property or any property now or previously owned, leased or operated by Seller or any of its subsidiaries and used in connection with the Business, except in compliance with applicable Environmental Laws or where such would not reasonably be expected to result in liability under any Environmental Law; and

(iii) Seller and each of its subsidiaries have all environmental permits necessary for the Business and the Purchased Assets to comply with applicable Environmental Laws and are in compliance with the terms of such permits and all applicable Environmental Laws, and there are no Environmental Liabilities.

(b) There has been no environmental investigation, study, audit, test, review or other analysis conducted of which Seller or any of its subsidiaries has knowledge and possession in relation to the Business or the Purchased Assets which has not been delivered to Parent at least two days prior to the date hereof.

(c) Except as disclosed to Buyer in writing on or prior to the date hereof, neither Seller nor any of its subsidiaries owns, leases or operates any real property in respect of the Business or the Purchased Assets in New Jersey or Connecticut.

(d) For purposes of this Section, the following terms shall have the meanings set forth below:

"Seller" and "subsidiary" shall include any entity which is, in whole or in part, a predecessor of Seller or any of its subsidiaries;

<PAGE>

"Environmental Laws" means any federal, state, local or foreign law (including, without limitation, common law), treaty, judicial decision, regulation, rule, judgment, order, decree, injunction, permit or governmental regulation, or any binding agreement with any governmental authority, relating to the environment or the effect of the environment on human health, or regulating the discharge, release, disposal or emission to the environment of pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substances, wastes or materials;

"Environmental Liabilities" means any and all liabilities or obligations of the Business or the Purchased Assets or Assumed Liabilities, whether accrued, contingent, absolute, determined, determinable or otherwise, arising under any Environmental Law;

"Hazardous Substances" means any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or any substance, waste or material