duly  executed  by their  respective  authorized  officers  as of the day and year
first above written.

INACOM CORP.

By:  /s/ Gerald A. Gagliardi

--------------------------------
Gerald A. Gagliardi
President and Chief Executive Officer


COMPAQ COMPUTER
CORPORATION

By:  /s/ Michael J. Winkler
--------------------------------
Michael J. Winkler
Senior Vice President and
Group Manager


ITY CORP.

By:  /s/ Michael J. Winkler

--------------------------------
Michael J. Winkler
President


<PAGE>

EXHIBIT A

ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT  AND  ASSUMPTION  AGREEMENT,  dated as of _____ __, 2000,
between  InaCom Corp., a Delaware  corporation  ("Seller"),  and ITY Corp.,  a
Delaware corporation ("Buyer").

W I T N E S S E T H :

WHEREAS,  Buyer and Seller have concurrently  herewith  consummated the
purchase by Buyer of the Purchased  Assets  pursuant to the terms and conditions
of the Asset  Purchase  Agreement  dated as of  January __,  2000  (the "Asset
Purchase  Agreement";  terms defined in the Asset  Purchase  Agreement  and not
otherwise  defined herein being used herein as therein defined);

WHEREAS,  pursuant to the Asset Purchase Agreement,  Buyer has agreed to
assume certain liabilities and obligations of Seller;

NOW,  THEREFORE,  in consideration of the sale of the Purchased Assets
and in  accordance  with the terms of the Asset  Purchase  Agreement,  Buyer and
Seller agree as follows:

1. (a) Seller does hereby sell, transfer, assign and deliver to Buyer
all of the right,  title and  interest of Seller in, to and under the  Purchased
Assets; provided that no sale, transfer, assignment or delivery shall be made of
any or any material  portion of any of the agreements or Permits if an attempted
sale, assignment,  transfer or delivery,  without the consent of a third party,

2403

**Apx. 241**

would constitute a breach or other contravention thereof or in any way adversely affect the rights of Buyer or Seller thereunder. The foregoing sale, transfer, assignment and delivery is made without representation, warranty or recourse of any kind, except as set forth in the Asset Purchase Agreement.

(b) Buyer does hereby accept all the right, title and interest of Seller in, to and under all of the Purchased Assets (except as aforesaid) and Buyer assumes and agrees to pay, perform and discharge promptly and fully when due all of the Assumed Liabilities.

<PAGE>

2. This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

3. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

INACOM CORP.

By:_____
        Name:
        Title:


ITY CORP.

By:_____
        Name:
        Title:

<PAGE>

EXHIBIT B

January 4, 2000


Gerald Gagliardi

President and Chief Executive Officer
Inacom Corporation
10810 Farnam Drive

Omaha, NE  68514

Dear Gerry:                                                    **Apx. 242**

This letter of understanding sets forth the understanding between Compaq Computer Corporation, a Delaware corporation ("Compaq"), and Inacom Corporation, a Delaware corporation ("Inacom"), regarding Compaq's desire that Inacom provide, and Inacom's desire to provide, certain configuration and distribution services ("Services") with respect to certain Compaq products and

services for major and small and medium business accounts in North America. Compaq and Inacom agree to cooperate and use their reasonable commercial efforts to negotiate in good faith a definitive fulfillment agreement ("Fulfillment Agreement") governing the Services, on terms mutually-agreeable to Compaq and Inacom.

1. Inacom agrees that, from and after the date of this letter until the Expiration Date (as defined below), it will not execute any agreement or arrangement regarding the provision of configuration or distribution services to any person or entity that could reasonably be expected to, either individually or in the aggregate, following the Expiration Date require utilization of more than 7.5% of Inacom's potential configuration or distribution capacity.

2. Each of Compaq and Inacom agree that it will bear its own expenses and costs with regard to the transactions contemplated by this letter including without limitation the fees and expenses of its legal counsel.

3. This letter of understanding shall expire on the earlier to occur of (a) the closing of the Asset Purchase Agreement dated of even date herewith between Compaq and Inacom; and (b) February 6, 2000 (the earlier to occur of such dates, the "Expiration Date") unless the Fulfillment Agreement shall have been executed and delivered prior to such date, in the case of which execution and delivery the Fulfillment Agreement shall supersede this letter.

4. This letter of understanding shall be subject to that certain Confidentiality Agreement dated November 9, 1999, between Compaq and Inacom.

5. If the foregoing accurately summarizes our understanding with respect to the proposed Fulfillment Agreement, please date and execute the enclosed duplicate original of this letter and return the same to the undersigned not later than January 4, 2000. This letter of understanding may be executed in multiple counterparts, but all of which together shall constitute but one and the same instrument.

Very truly yours,

COMPAQ COMPUTER CORPORATION

By: _____
    Name: Michael J. Winkler
    Title: Senior Vice President and Group
    Manager, Commercial Personal
    Computing Group

AGREED TO AND ACCEPTED
AS OF January 4, 2000

INACOM CORPORATION

By: _____
Name:   Gerald A. Gagliardi
Title:  President and Chief Executive Officer

<PAGE>

EXHIBIT C

2405

SERVICES, SUPPLY AND SALES AGREEMENT

SERVICES, SUPPLY AND SALES AGREEMENT (THE "AGREEMENT"), dated as of
_____ __, 2000, by and between COMPAQ COMPUTER CORPORATION, A DELAWARE
CORPORATION ("COMPAQ"), ITY Corp., a Delaware corporation and a WHOLLY-OWNED
SUBSIDIARY OF COMPAQ ("COMPAQ SUB"), AND INACOM CORPORATION, A DELAWARE
CORPORATION ("INACOM").

RECITALS

WHEREAS, Compaq Sub and Inacom have entered into an Asset Purchase
Agreement dated as of January __, 2000 (THE "ASSET PURCHASE AGREEMENT");

WHEREAS, the execution of this Agreement is a condition to Compaq Sub
acquiring, and Inacom disposing of, the Purchased Assets (as defined in the
Asset Purchase Agreement) in connection with the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements
set forth herein, the parties hereto hereby agree as follows:

ARTICLE I.

AGREEMENT TO COOPERATE

SECTION 1.1. Services Agreement. Compaq agrees to assist Inacom in the
generation of incremental revenues from its service business during the
three-year period following the closing of the Asset Purchase Agreement. The
revenue will be derived from the following (as summarized on Exhibit 1):

1. Compaq shall outsource an additional $10 million, $20 million and
$25 million in 2000, 2001 and 2002 respectively over the 1999 levels for on-site
warranty work, subject to the provisions of Section 7 below. Compaq's intent is
to move as much on-site warranty work to Inacom as possible. It is understood
that any business above the committed amount will depend on the percentage of
Compaq's business that is direct to end-user.

2. Compaq shall provide $50 million, $75 million and $100 million of
service revenue to Inacom in 2000, 2001 and 2002 respectively over the 1999
levels for the ongoing delivery and management of the service obligation sold
with Compaq hardware to customers, subject to the provisions of Section 7 below.
Compaq's intent is to build a service revenue stream for Inacom from the sale of
desktop, laptop and workstation products from Compaq to all customers. In all
cases, the volume of service revenue above the Compaq commitment will depend on
the sale of Compaq branded services with the product sale, which will be
influenced in turn by the percentage of Compaq's business that is direct to end
user and the value of the Compaq brand for service sold by other resellers.
<PAGE>

3. Compaq shall outsource to Inacom an additional $5 million, $10
million and $20 million in 2000, 2001 and 2002 respectively over the 1999 levels
for call handling and off-site support, subject to the provisions of Section 7
below.

4. Compaq shall provide $15 million, $25 million and $35 million of
service revenue to Inacom in 2000, 2001 and 2002 respectively over 1999 levels
for the delivery and ongoing management of service obligations from the sale of
Inacom services, such as asset management services by Compaq, subject to the
provisions of Section 7 below. Compaq's intent is to expand Compaq's service
portfolio by adding Inacom's asset management service offerings and direct
delivery of that business to Inacom.

2406

5. Compaq commits to designate Inacom as a "Premier Service Partner for Distributed Infrastructure Services". Compaq also commits to provide $5 million, $10 million and $15 million of professional services subcontracting to Inacom in 2000, 2001 and 2002 respectively over 1999 levels, subject to the provisions of Section 7 below. Compaq's intent is to refer and recommend personal computer integration opportunities to Inacom and utilize Inacom capabilities, such as MCSE resources, to support Compaq Professional Service projects.

6. FOR PURPOSES OF THIS SECTION 1.1, "COMPAQ'S INTENT" shall mean that Compaq will use commercially reasonable efforts to direct revenue to Inacom above Compaq's revenue commitment.

7. The obligations set forth in this Section 1.1 shall be subject to Inacom's ability to competitively price its services (which for these purposes shall not require Inacom to be the lowest-priced service provider) and to satisfy Service Level Agreements for service capabilities and performance, as mutually agreed to by the parties. In addition, it is agreed that Inacom will offer Compaq its most favored customer fees, i.e. the lowest fees which it charges any of its customers, for the services described in this Section 1.1 , except in the instance where lower pricing is offered to "meet competition" in response to a documented lower bid, as such term is commonly used in the relevant industry.

SECTION 1.2.  Supply.  In connection with Inacom's computer services business, Compaq Sub and Inacom agree as follows:

The parties agree that when Inacom places an order with Compaq Sub for hardware and Procurement Services, as defined below, Compaq Sub will invoice the amount directed by Inacom and collect from the customer for the invoiced amount; provided that Inacom, acting as an agent of Compaq Sub, shall have entered into an agreement with the customer relating to the acquisition of such hardware and Procurement Services, in form and substance reasonably acceptable to Compaq Sub. Such agreement shall include a grant of a purchase money security interest in favor of Compaq or Compaq Sub, as appropriate, on all hardware and related software licenses supplied by Compaq Sub. From these collected amounts, Compaq Sub will retain its sales price for hardware and Procurement Services, and pay the remaining proceeds to Inacom as an agency fee. As used herein, "sales price" shall mean, (i) with respect to hardware, Compaq's actual cost (excluding the impact of volume incentive rebates) with respect to third party hardware and US1 or TOSS price, whichever is applicable, with respect to Compaq's hardware, and (ii) with respect to Procurement Services, the fees as per the Fee Schedule. In the event that the invoiced amounts are insufficient to cover the sales price of the hardware and Procurement Services as per the Fee Schedule (defined below), Inacom agrees to pay the difference to Compaq Sub. The scope of Inacom's agency is as set forth in Exhibit 2.
<PAGE>

1. Inacom agrees to make Compaq Sub its preferred provider of the procurement services listed in Exhibit 3 ("Procurement Services"), meaning only that Inacom shall direct at least 75% of its requirements for such services to Compaq Sub. The obligations set forth in this Section 1.2(1) shall be subject to Compaq Sub's ability to competitively price its services (which for these purposes shall not require Compaq Sub to be the lowest-priced service provider) and to satisfy Service Level Agreements for service capabilities and performance, as mutually agreed to by the parties.

2. Inacom will pay a fee to Compaq Sub for the Procurement Services based on the fee schedule, attached hereto as Exhibit 4 (the "Fee Schedule").

Compaq Sub agrees to provide Inacom with a fixed rate structure for the Procurement Services, which does not depend on rebates for volume attainment. In any event, Compaq Sub will offer Inacom the most favored procurement service customer fees of Compaq Sub or any of its affiliates, i.e. the lowest fees which it charges any of its customers for the Procurement Services except in the instance where lower pricing is offered to "meet competition" in response to a documented lower bid, as such term is commonly used in the relevant industry. Upon reasonable notice, Compaq Sub will give Inacom's independent third party auditor access, on a quarterly basis, to Compaq and multi-vendor sales price information at the SKU level, including but not limited to product cost and freight information, for the sole purpose of verifying Compaq Sub's pricing of the Procurement Services. All such information shall be subject to the terms of the Confidentiality and Non-disclosure Agreement executed by the parties.

3. In the event that Compaq Sub must go outside of the normal distribution agreements with third party vendors in order to obtain third party products, it will absorb commercially reasonable increases in product costs associated with such procurement. If Compaq Sub determines that such costs are not commercially reasonable, Compaq Sub will offer Inacom the right to procure such products from its own channels. Inacom shall be responsible for product sourcing cost increases resulting from instances where Compaq has a distribution agreement with a particular vendor, but product is unavailable, provided Inacom has agreed to incur such additional costs.

4. Compaq and Compaq Sub agree that any marketing funds or other vendor funding (including rebates) provided to Compaq by third party vendors for sales of product to customers where Inacom acted as agent, shall be paid to Inacom within a reasonable time following receipt by Compaq, provided that Inacom agrees to independently satisfy any vendor requirements for such funding.

5. Inacom will provide Compaq Sub with a list of current and potential accounts and Compaq Sub will determine a credit limit and any other appropriate limitations or requirements for each such account. To the extent that Inacom sells products within each customer's credit limit, Compaq Sub will assume the credit risk. However, to the extent that Inacom sells products in excess of any customer's credit limit, Inacom must bear the credit risk. Inacom agrees that all payment terms for its customer invoices shall be net 30 days from receipt of invoice by customer.

6. As part of its Procurement Services, Compaq Sub will provide invoice and collection services for accounts receivable on product provided by customers through Inacom from Compaq Sub under the name of Compaq Sub or Inacom (as agent for Compaq Sub), whichever Inacom prefers. These invoice and collection services will only be available for hardware and/or Procurement Services. Inacom agrees to pay agreed upon fees for customer invoices that are not paid when due in accordance with the Fee Schedule, to the extent the payment period is in excess of the payment period calculated into the assumptions for the Fee Schedule. Compaq's obligation for collections of accounts receivables in this provision is only effective for hardware and Procurement Services delivered by Compaq and sold by Inacom after the close of the Asset Purchase Agreement.
<PAGE>

7. Inacom will not bear any inventory price protection risk. If Inacom or a customer requires Compaq Sub to hold inventory beyond the normal stocking period, then Inacom agrees to pay to Compaq Sub a price protection risk fee in accordance with the Fee Schedule to the extent the inventory holding period is in excess of the inventory price protection element calculated into the assumptions for the Fee Schedule.

SECTION 1.3. Sales Agreement.

**Apx. 246**

1. Compaq and Inacom will jointly develop Compaq-branded service offerings for end users ("Services"). These services will be performed by Inacom and will be sold through the Compaq sales force.

2. Compaq and Inacom will jointly develop and agree on rules of engagement, which will include, among other things, Relationship Management and Joint Account Planning. Compaq and Compaq Sub agree (and agree to cause their affiliates) not to directly solicit, the Inacom customers with contracts that include the purchase of Compaq hardware or a demonstrated run-rate of the purchase of Compaq hardware, as set forth in Exhibit 5, where Compaq's direct product sales and services offerings are competitive with those offered by Inacom as of the date hereof, for a period of one year from the date hereof, provided the customer continues to purchase Compaq product from Inacom.

ARTICLE II.

MISCELLANEOUS

SECTION 2.1. Definitive Agreements; Binding Effect. The parties agree to use their reasonable best efforts to complete definitive agreements with respect to the matters described in Article 1 within 30 days of the date hereof. Until superseded by such definitive agreements, this Agreement shall be binding on the parties.

SECTION 2.2. Notices. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

  If to Inacom, to:

    Inacom Corporation
    Attention: Dick Anderson
    2001 Westside Parkway

    Suite 260
    Alpharetta, GA  30004

  If to Compaq or Compaq Sub, to:

    Compaq Computer Corporation

    20555 SH 249
    Houston, TX 77070
    Attention: Mike Pocock
    Facsimile:

<PAGE>

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

SECTION 2.3. Amendments and Waivers. (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

2409

Apx. 247

(b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 2.4. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

SECTION 2.5. Entire Agreement. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 2.6. Governing Law. This Agreement shall be governed by and construed in accordance with the law of the State of New York without regard to the conflicts of law rules of such state.

SECTION 2.7. Counterparts; Third Party Beneficiaries. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

SECTION 2.8. Term. The term of this Agreement shall be for a period of three (3) years from the date of execution. Following the first anniversary of the date of execution of the Asset Purchase Agreement, the parties agree to renegotiate pricing for Procurement Services for pricing periods to be mutually agreed to by the parties to the extent necessary to ensure that pricing for Procurement Services remains competitively priced in the marketplace for each of the parties.

<PAGE>

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

Inacom Corporation

By: _____
      Name:
      Title:
      Date:

Compaq Computer Corporation

By: _____
      Name:
      Title:
      Date:

ITY Corp.

```
By:  _____
     Name:
     Title:
     Date:
```

<PAGE>

SERVICES, SUPPLY & SALES AGREEMENT

<PAGE>

## EXHIBIT 1

### REVENUE COMMITMENTS

Compaq agrees that it shall purchase the following aggregate service revenues over 1999 levels from Inacom over the course of the next three years. In addition, Compaq shall be obligated to satisfy the individual services categories within plus or minus twenty-five percent (25%) of the revenue targets outlined below, provided that Compaq shall be required to achieve revenue commitments in the aggregate. Compaq estimates that it will achieve the aggregate revenue commitment for 2000 on the following basis: $10M in 1Q00; $20M in 2Q00; $25M in 3Q00; $30M in 4Q00, provided that Compaq shall be required to achieve the 2000 revenue commitment in the aggregate.

<TABLE>

| INCREMENTAL REVENUE SOURCE | 2000 | 2001 | 2002 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 1. Outsourcing of on-site warranty work | $10 million | $20 million | $25 |
| 2. Ongoing delivery and management of service obligations sold with Compaq hardware | $50 million | $75 million | $100 |
| 3. Outsourcing of call handling and off-site support | $5 million | $10 million | $20 |
| 4. Delivery and ongoing management of service obligations | $15 million | $25 million | $35 |
| 5. Designation as "Premier Service Partner for Distributed Infrastructure Services and subcontracting for professional services | $5 million | $10 million | $15 |

2411

**Apx. 249**

```
-- ------------------------------------   -----------------   -----------------  --
-- ------------------------------------   -----------------   -----------------  --
```

Aggregate Revenue Commitment            $85 million          $140 million       $195
-- ------------------------------------   -----------------   -----------------  --
</TABLE>

<PAGE>

EXHIBIT 2

SCOPE OF AGENCY

<PAGE>

EXHIBIT 3

PROCUREMENT SERVICES

Compaq Sub agrees to offer the following Procurement Services pursuant to this Agreement:

PROGRAM DEVELOPMENT & MANAGEMENT PROGRAM DESIGN Scope of Work Statement of Work Process Alignment Transition & Implementation

TECHNOLOGY SELECTION

Provide evaluation hardware Establish hardware standards Identification and cataloging of existing images Create and implement design process Design software images Create software images Create proof-of-concept system Test and validate proof-of-concept system GLOBAL PROJECT MANAGEMENT Single point of accountability International standards ORDER FULFILLMENT ACCOUNT SETUP Create account(s) Implement financing methods & processes PRICING AND AVAILABILITY 90-Day forecast Client-specific purchasing Client-owned inventory Pre-customized inventory Special bid pricing Create and maintain client-specific pricing profiles Assign and maintain client-specific SKUs Create and maintain convenience bundles PRE-SALES CONSULTING Create & provide client-specific web-based catalog Provide configuration manual Provide live pre-sales support (standards only) Provide live pre-sales support (any products) Provide on-site pre-sales support ORDER CREATION Create adhoc system order Create adhoc order for upgrade/peripheral/supplies Create refresh plan Obtain Client internal approval Generate purchase order ORDER ENTRY, CONFIRMATION, ETAS Provide web-based order entry tool Provide centralized order entry contact Provide on-site order entry contact Provide X.12 EDI connection to client system Review order for completeness Review order for technical correctness Review order for credit availability Release order on fulfillment system Verbally confirm order and ETA to client contact Electronically confirm order and ETA to client contact ORDER MANAGEMENT Ensure product acquisition and allocation Answer order status inquires Escalate issues Advance ship notification (ASN) Returns and DOAs Track and review SLA compliance Measure and report client satisfaction MANUFACTURING AND CUSTOMIZATION Manage image and instructions Assemble system (JMAS) Customize hardware Third-party component setup Partition/format fixed disk drives Asset tagging and recording

2412

Custom labeling or bar-coding Install software Operating System Shrink-wrapped applications Proprietary applications Image load Personalized system settings IP address Workgroup name Other Perform dial-out and/or leased line connectivity testing Apply client-specific data via dial-out or leased line Burn-in Troubleshoot and repair image issues Perform client-specific quality check LOGISTICS Pick and pack/repack products Special overpack Design packing per client specifications Acquire packaging Pack orders per client specifications Ensure shipment integrity Ship/Deliver products Standard ground Three-day Two-day Next-day Crisis transport service Carrier-specific delivery Time/place specific delivery INVOICING AND REPORTING Customized packing list Provide proof-of-delivery (POD) confirmation Standard invoice Summary invoice EDI invoice Invoice acceptance Payment generation (standard) Payment generation (EFT) REPORTS Product Purchase Purchase history Standard vs. non-standard By manufacturer By business unit Standards price list Order Management Daily Status Report Backorder report - open orders Proof-of-delivery (POD) Notification SLA Performance order turnaround SLA attainment Invoices Invoices billed Invoices paid Asset Management feed Client Satisfaction

<PAGE>

## EXHIBIT 4

### FEE SCHEDULE

<PAGE>

## EXHIBIT 5

### SPECIFIED CUSTOMERS

<PAGE>

## Schedule 1.01
### Definition of the Business

The Business means the following businesses currently conducted by Seller and its subsidiaries:

o    Configuration and distribution operations, including:
- o    Distribution center and distribution services
- o    Configuration and configuration support
- o    Central sales
- o    Project and technology project management
- o    Purchasing
- o    Quality assurance
- o    Traffic
- o    Memphis distribution and configuration activities
- o    Microsoft project
- o    Asset recovery
- o    Bid desk
- o    Client services
- o    Operations - International
- o    Loss prevention

o    Reseller business, other than (1) obligations under franchise

2413

and TMS franchise agreements and (2) in Latin America

o    Tangible assets and liabilities of Government services unit, but not including Sysorex goodwill.1

o    Information technology systems and applications, but only to the extent allocated to Buyer under Section 7.07.

o    International Operations as follows:

    o    Project management activities located in Omaha, Nebraska and, if any, in Luxembourg

    o    Canadian operations (solely through Buyer's purchase of Seller's 19% interest in InaCom Information Systems, Ltd., a Canadian entity).2

o    Boston Computer Exchange

The Business does not include the following (the "Excluded Business"):

o    Services organization, excluding procurement.

- --------

1 Buyer has an option within three weeks of the date hereof to delete this item from the definition of "Business" if Buyer reasonably concludes after review and upon notice to Seller on or prior to the end of such three-week period that contracts representing a substantial portion of the Government business are not assignable without consent and not likely to be consented to within a customary period of time needed for obtaining such consents, including novations if necessary.

2 Buyer has an option within two weeks of the date hereof to delete this item from the definition of the "Business".

<PAGE>

o    Product and service field sales force.
o    Communications group.

o    Franchisees (including TMS) business, including sales offices and equity investments in or loans or advances to franchisees.

o    Latin American reseller business.
o    Rentals business.

o    Europe business.

<PAGE>

Schedule 2.01
Purchased Assets

<TABLE>

| Item | Purchased Assets |
| --- | --- |
| <S> | <C> |
| Cash and Cash | o None |

2414

Apx. 252

```
Equivalents
- -----------
- ------------------------------------------------------------------------
Accounts Receivable
- ------------------
o Trade                        o All   non-direct   product   accounts
                                 receivable,  other than  those  arising  out of (1)
                                 Communications   group,   (2) Latin  America and (3)
                                 Europe
                               o Government receivables
                               o Boston Computer Exchange receivables.
o Vendor                       o All accounts receivable due from Compaq.
o Securitization               o None.
- ------------------------------------------------------------------------
Inventory
- ---------
                               o All product  inventory,  other than  non-committed
                                 inventory  related to the   following  vendors  and
                                 businesses:   IBM,  HP,  Dell,   Toshiba   and  the
                                 Excluded Business (as defined on Schedule 1.01)
                               o All HP printer inventory.
                               o All committed product inventory.
                               o Boston Computer Exchange inventory.
- ------------------------------------------------------------------------
Other Current Assets
- --------------------
o Prepaids                     o None.
o Deferred Taxes               o None.
o Other                        o None.
- ------------------------------------------------------------------------
</TABLE>

<PAGE>

<TABLE>
- ------------------------------------------------------------------------
          Item                              Purchased Assets
- ------------------------------------------------------------------------
<S>                            <C>
Fixed Assets                   o All assets primarily used by the Business or the
- ------------                    Transferred Employees.
                               o Leasehold  interests  and  all  fixed  assets  and
                                 equipment associated with the following:

                                     o Distribution and configuration  centers and
                                       central  sales  call  centers in (1) Omaha,
                                       Nebraska,  (2) Indianapolis,  Indiana,  (3)
                                       Swedesboro,  New  Jersey  and (4)  Ontario,
                                       California.

                                     o Tech center in Omaha,  Nebraska,  excluding
                                       personnel and assets  not  associated  with
                                       information technology or distribution. See
                                       Section 7.07 for  allocation of use of this
                                       facility.3

                                     o Gateway  building in Omaha,  Nebraska.  See
                                       Section 7.07 for  allocation of use of this
                                       facility.
```

  o Corporate headquarters in Omaha, Nebraska.
   See Section 7.07 for allocation of use of
   this facility.

  o Livermore, California facility.

  o Memphis, Tennessee facility.

  o Boston Computer Exchange.

  o Distribution center in Singapore.

| Item | |
|---|---|
| Intangibles | o None. |
| Other Assets | |
| o Other | o 19% interest in InaCom Information Systems, Ltd., a Canadian entity, and option to purchase remainder.4 |
| o Deferred Taxes | o None. |

</TABLE>

   3 If landlord consent to transfer of the Tech Center has not been received by Closing, the Tech Center shall become an Excluded Asset and Seller shall sublease it to Buyer.

   4 Buyer has option within two weeks of the date hereof to delete this item from the definition of "Purchased Assets" and to add it to the definition of "Excluded Assets". If this item is to be included, Buyer will purchase Seller's 19% equity interest in InaCom Information Systems, Ltd., and not the underlying assets.

<PAGE>

<div align="center">

Schedule 2.02
Excluded Assets

</div>

<TABLE>

| Item | Excluded Assets |
|---|---|
| <S> | <C> |
| Cash and cash equivalents | o All. |
| Accounts Receivable | |
| o Trade | o All direct product accounts receivable (other than Government receivables and Boston Computer Exchange receivables). |
| | o All accounts receivable arising out of (1) Communications group, (2) Latin America and (3) Europe. |
| o Vendor | o All accounts receivable other than those due from |

Apx. 254

|  | Compaq. |
| o Securitization | o All. |

**Inventory**

|  | o All non-committed product inventory related to the following vendors and businesses: IBM, HP, Dell, Toshiba and the Excluded Business. |

**Other Current Assets**

| o Prepaids | o All. |
| o Deferred Taxes | o All. |
| o Other | o All. |

**Fixed Assets**

|  | o All assets primarily used by the Excluded Business.<br>o Leasehold interests and all fixed assets and equipment associated with the following:<br>    o Services call centers in (1) Tempe, Arizona, (2) Atlanta, Georgia and (3) Omaha, Nebraska.<br>    o Branch offices.<br>    o Wharton repair facility.<br>    o South Building in Omaha, Nebraska.<br>    o Atlanta Facilities.<br>o Corporate airplane. |

**Intangibles**

|  | o All intangibles (including goodwill and InaCom name and logo). |

<PAGE>

**Other Assets**

| o Other | o All losses, loss carryforwards and rights to receive refunds, credits and loss carryforwards with respect to any and all Taxes of Seller that constitute Excluded Liabilities, including any interest receivable with respect thereto.<br>o Stock in any subsidiary of Seller, other than pursuant to Buyer's option on the Canadian entity.<br>o Desktops for all employees other than Transferred Employees.<br>o Any receivables from Seller. |
| o Deferred Taxes | o All. |

| o Other | o Monies or other properties received by Seller as a result of affirmative claims made by Seller against third parties for the matters set forth in Schedule 3.10.<br>o Authorizations to do business.<br>o If Buyer elects not to acquire the Canadian interest or the Government unit, those items will become Excluded Assets. |

</TABLE>

<PAGE>

Schedule 2.03
Assumed Liabilities

&lt;TABLE&gt;

| Item | Assumed Liabilities |
|------|---------------------|
| &lt;S&gt; | &lt;C&gt; |
| Accounts Payable | o All accounts payable related to the following vendors and businesses: Compaq, Microsoft, Ingram, Tech Data, 3Com, Lexmark, other 3rd party product vendors, reseller business, and Boston Computer Exchange business.<br>o Liabilities under the Agreement for Wholesale Financing with Deutsche Financial Services Corp. dated as of December 24, 1998, as amended on May 25, 1999 and December 23, 1999.<br>o Government payables. |
| Notes Payable | None. |
| Other Current Liabilities | |
| o Accrued liabilities | o See Article 9 relating to compensation and benefits. |
| o Taxes payable. | o None. |
| o Accrued other | o See Article 9 relating to compensation and benefits. |
| Long Term Debt | o None. |
| Preferred Stock | o None. |

&lt;/TABLE&gt;

&lt;PAGE&gt;

Schedule 2.04
Excluded Liabilities

&lt;TABLE&gt;

| Item | Excluded Liabilities |
|------|----------------------|
| &lt;S&gt; | &lt;C&gt; |
| Accounts Payable | o All accounts payable related to the following vendors and businesses: IBM, Hewlett-Packard, Dell, Toshiba, Lucent, rental business, international businesses, Inacom Latin America, Oracle A/P (administrative payables).<br>o Liabilities under Agreement for Inventory Financing with IBM Credit Corporation dated as of April 27, 1998.<br>o Accounts payable to Compaq or its affiliates for which checks have been written, but not yet |

&lt;/TABLE&gt;

2418

|  | released to Buyer by Seller (provided such checks will be delivered in the ordinary course). |
| Notes Payable | All. |
| Other Current Liabilities | |
| o Accrued liabilities | o All, other than as provided in Article 9 relating to compensation and benefits. |
| | o All intangibles or liabilities associated with Sysorex. |
| o Taxes payable. | o All. |
| o Accrued other | o All, other than as provided in Article 9 relating to compensation and benefits. |
| Long Term Debt | o All. |
| Preferred Stock | o All. |
| Other | |
| | o Any liabilities relating to any Vanstar litigation. |
| | o Any liabilities relating to earn out or contingent payment obligations arising from pre-closing acquisitions. |
| | o Any liabilities relating to litigation (whether pending, threatened or settled) disclosed in Schedule 3.10. |
| | o Computer Associates software license obligations. |
| | o Any payable to Seller. |

&lt;/TABLE&gt;

&lt;PAGE&gt;

Schedule 5.01(d)

Conduct of the Business.
- - - - - - - - - - - - - - - - - - - - - -

         None.

Schedule 7.04

Trademarks; Trade Names.
- - - - - - - - - - - - - - - - - - - - -

         (a)    None.

         (b)    Any and all trademarks and trade names of the Seller and its affiliates, including, but not limited to, InaCom and derivatives thereof, INACOMP, VALCOM, and VANSTAR.

&lt;PAGE&gt;

Schedule 7.07

Information Technology
Physical Separation and Sharing of Common Costs

Apx. 257

2419

Both Inacom and Compaq (the "Parties") recognize that while the Information Technology infrastructure is being physically separated, both Parties will be required to share the cost of certain personnel and assets. All cost sharing will be based on actual direct costs, with no markup or loading of indirect costs of any sort.

During the period beginning on the signing date and ending on the Closing Date, the Parties undertake to initiate and complete a classification of all Information Technology personnel and assets as either (a) dedicated solely to the Business (the "Business Personnel and the Business Assets"), (b) dedicated solely to the Excluded Business (the "Excluded Business Personnel and the Excluded Business Assets"), or (c) jointly supporting both the Business and the Excluded Business (the "Joint Personnel and Joint Assets").

Excluded Business Personnel remain employees of Inacom and Excluded Business Assets become Excluded Assets at the Closing Date. Each Party will bear the cost of their respective personnel and assets.

With respect to Joint Personnel and Joint Assets (a) the Parties agree to jointly prepare a time schedule within which to achieve physical separation, and (b) share the costs of such personnel and assets, using a percentage to be determined monthly, during the period that such personnel and assets are jointly employed. As Joint Personnel or Joint Assets are no longer required, each Party will share equally in the termination cost of the Joint Personnel or the disposal cost of the Joint Asset. If either party elects to assume complete responsibility for a Joint Personnel or Joint Asset, such party will settle up with the other based on the original classification or accounting at the Closing Date.

In any event, both Parties agree that time is of the essence in achieving separation and that in any event, all separation activities will be completed no later than 12 months after the Closing Date.

<PAGE>

## Administrative Services
## Jointly Provided Services

The Parties recognize that subsequent to closing, the temporary services of administrative support personnel will be required until such time as complete physical separation can be achieved. The Parties agree to share the cost of such personnel based on periodic estimates of the amount of time devoted to each. All cost sharing will be based on actual direct salary, benefit and insurance costs, with no markup or loading of indirect costs of any sort.

During the period beginning on the signing date and ending on the Closing Date, Inacom and Compaq (the "Parties") undertake to initiate and complete a classification of all Administrative Support personnel as either (a) dedicated solely to the Business (the "Business Personnel"), (b) dedicated solely to the Excluded Business (the "Excluded Business Personnel"), or (c) jointly supporting both the Business and the Excluded Business (the "Joint Personnel").

Excluded Business Personnel and Joint Personnel remain employees of Inacom at the Closing Date. Each Party will bear the cost of their respective personnel and assets.

With respect to Joint Personnel (a) the Parties agree to jointly prepare a time schedule within which to achieve physical separation, and (b)

2420

Apx. 258

share the costs of such personnel, using a percentage to be determined quarterly, during the period that such personnel are jointly employed. As Joint Personnel are no longer required, each Party will share equally in the termination cost of the Joint Personnel. If either party elects to assume complete responsibility for Joint Personnel, such party will settle up with the other based on the original classification or accounting at the Closing Date.

In any event, both Parties agree that time is of the essence in achieving separation and that in any event, all separation activities will be completed no later than 12 months after the Closing Date.

### Shared Space Arrangements

In all matters related to leased space in the Corporate Headquarters and Gateway Buildings, each Party shall take reasonable steps to help reduce the costs to be borne by the other Party.

<PAGE>

With respect to the Gateway building, each Party will bear the cost of leased space attributable to the space occupied by the Business or the Excluded Business, as applicable, at the date hereof. Subtenant rentals will directly offset the cost of the leased space for the Party to which the space was attributed at the date hereof.

With respect to the Corporate Headquarters, Seller will reimburse Buyer for its pro rata portion of the building occupied by Excluded Business Personnel and its share of Joint Personnel at the date hereof. The pro rata portion is to be based on a fraction, the numerator of which is the sum of Excluded Business Personnel plus Seller's share of Joint Personnel occupying the building at the date hereof and the denominator of which is the total number of Seller Employees occupying the building at the date hereof. The resulting fraction will be used to allocate the net cost of the building until the lease term expires. The net cost of the building is defined as the total lease cost less subtenant lease payments.

With respect to the Tech Center in Chalco Hills:

o    With respect to the portion of the building not occupied by Information Technology personnel and assets at the date hereof, Seller will reimburse Buyer it pro rata portion of the building occupied by Excluded Business Personnel. The pro rata portion is be based on a fraction, the numerator of which is the square footage of such space occupied by Excluded Business Personnel at the date hereof and the denominator of which is the total square footage of the building (excluding the square footage occupied by Information Technology personnel and assets) at the date hereof. The resulting fraction will be used to allocate the net cost of the building until the lease term expires. Buyer agrees to use reasonable best efforts to take over space vacated by Seller and to the extent it does so utilize the vacated space, adjust the fraction downward.

o    With respect to the space occupied by Information Technology personnel and assets, Seller will reimburse Buyer its pro rata portion of the building occupied by Excluded Business Personnel and its share of Joint Personnel. The pro rata portion is to be based on a fraction, the numerator of which is the sum of Excluded Personnel plus Seller's share of Joint Personnel and the denominator of which is the sum of Excluded Business Personnel

plus Business Personnel plus Joint Personnel.


<PAGE>
Schedule 9.01(a)

Employee Benefits.

InaCom Employees Retirement Savings Plan and Trust

InaCom Medical, Dental, Short-Term Disability and Employee Assistance Plan

InaCom Managed Care Plan

InaCom Life, A D & D & Long Term Disability Plan

InaCom Crop Dependent Care Reimbursement Plan

InaCom Health Care Reimbursement Plan

InaCom Before-Tax Premium Payment Plan

Office Products of Minnesota Inc. 401(k) Plan

InaCom Executive Deferred Compensation Plan

InaCom Corp. 1997 Stock Plan

InaCom Severance Pay Policy

InaCom 1994 Stock Plan

InaCom Corp 1990 Stock Plan

Valcom, Inc. 1987 Stock Option Plan

Group Insurance Plan for Employees of Vanstar Corporation

Vanstar Corporation Section 401(k) Plan

National Technology Group 401(k) Plan

Computerland 401(k) Plan

Mentor Technologies Ltd. 401(k) Plan

InaCom Paid Time Off Policy

See Section 3.07(3).

<PAGE>
Schedule 9.02
Business Employees

**Apx. 260**

The term "Business Employees" means any person primarily employed in connection with the Business, including:

      1.      Order management/central sales (approximately 806 employees, including 160 employees resident in branch offices);

2. Procurement services (approximately 780 employees);

3. Configuration centers (Indianapolis; Omaha; Ontario, CA; and Swedesboro, NJ (approximately 450 employees in total);

4. Boston computer exchange (approximately 10 employees);

5. Bid desk unit (approximately 10 employees);

6. Reseller group (approximately 40 employees);

7. IT systems and applications to the extent provided in Schedule 1.01 (approximately 150 employees);

8. Memphis center exclusively devoted to Federal Express (approximately 30 employees);

9. Government unit (approximately 130 employees); and

10. Human resource, finance and marketing communications functions, but only those employees directly and exclusively involved in support of the categories listed above (approximately 30 employees).

11. Configuration and Logistics Project Management resources in US, Europe, Singapore and Hong Kong.

<PAGE>

1

Schedule 9.06

Severance Benefits.
- ------------------

 See InaCom Severance Pay Policy applicable to all of Seller's employees attached hereto as Exhibit 9.06.


<PAGE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>3
<DESCRIPTION>PRESS RELEASE
<TEXT>


Tuesday January 4, 4:05 pm Eastern Time

Inacom Sells Product Customization and Logistics Operations to Compaq Computer Corporation

Sale Accelerates InaCom's eBusiness Infrastructure Solutions Focus

Additional Long-Term Services Agreement Ensures Inacom Access To Multi-Vendor Product Customization and Logistics and Provides For Compaq Utilization of Inacom Services

OMAHA, NEB--JAN. 4, 2000-- INACOM CORP. (NYSE:ICO - NEWS) announced today that it has entered into a definitive agreement with Compaq Computer Corporation (NYSE:CPQ - news) to sell certain operations and assets principally related to InaCom's product customization and logistics capabilities. Under the agreement, Compaq will pay $370 million in cash for these operations.

Inacom and Compaq also agreed to enter into a three-year Services, Supply and Sales Agreement. This agreement will give Inacom full access to the product customization and logistics capabilities that are being sold to Compaq. The agreement will also provide for Compaq's use of InaCom's lifecycle and professional services offerings over the same three-year period. This arrangement is expected to provide substantial incremental services revenues to Inacom.

"The sale of these operations is perfectly aligned with InaCom's strategic position as the multi-vendor eBusiness infrastructure expert," said G.A. Gagliardi, Inacom President and Chief Executive Officer (CEO). "This transaction allows us to retain our entry-point to the client - our sales force, technical professionals and the multi-vendor procurement and customization capability while eliminating the significant working capital requirements of the product business. Both Inacom and Compaq stand to benefit from achieving critical mass as Compaq moves increased volumes through the facilities."

"Following this transaction, Inacom will have the optimal business model to design and manage reliable, secure eBusiness infrastructures for corporations," Gagliardi added. "Specifically, Inacom will continue to benefit from having relationships with more than 35% of Fortune 500 corporations; more than 800,000 seats under management; and more than 30 long-term, full outsource accounts as well as 6,000 technical professionals. All of these elements will be maximized within the framework of an attractive economic and operational structure."

"This purchase makes great strategic sense for Compaq because it gives us the right capabilities quickly and cost-effectively," said Michael Cappellas, President and Chief Executive Officer (CEO), Compaq Computer Corporation. "We'll be better equipped to meet the diverse and changing needs of our U.S. customers - - particularly our major accounts which clearly want to go direct - increasing our potential for profitable growth."

About Inacom

INACOM CORP. (NYSE:ICO - NEWS) is an eBusiness Infrastructure Management expert. The company architects, builds and manages solutions that optimize corporations' return on IT investments. InaCom's client portfolio includes more than 35% of Fortune 500 corporations.

Forward Looking Statement

This press release contains certain forward-looking statements based on certain assumptions and information currently available to management. Such statements are subject to various risks and uncertainties, including those described in the Company's 1998 10-K Report that could cause actual results to differ materially from the results discussed herein.

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```