**Blackmore, Mary Ann**

| | |
|---|---|
| From: | Ward, Michael |
| Sent: | Thursday, February 03, 2000 12:14 PM |
| To: | Zava, Mike; Richter, Roger; Malone, Leslie; Shinnick, Suzanne; Platt, Donna |
| Subject: | FW: Copy of the 8K |

This is 60 page long....please refer to pages 53 and 54 for what John is referring to.

Thanks.

-Original Message-----
From: John Frasca [mailto:jfrasca@inacom.com]
Sent: Thursday, February 03, 2000 11:11 AM
To: mward@techdata.com
Cc: Leon Kerkman; Richard Oshlo; Dave Guenthner
Subject: Copy of the 8K


I have attached the 8K for your review.  I encourage you to read page 54 thru 56 which indicates that 100% of the payables for Tech Data will be assumed by Compaq.

I would like to discuss the opportunity to increase the credit limit based on this contract.  I do understand the risk involved in Tech Data doing this if the Compaq/Inacom falls thru but we are 99.99% that it will close between feb 15 thru feb 21.

John

http://www.sec.gov/Archives/edgar/data/818815/0000900440-00-000003.txt



EXHIBIT LX 4

EXHIBIT Wells-3  DL 3/30/05

EXHIBIT Frasca-2  DL 3/30/05

2361

1

FEB 15 2000 13:05 FR LEXMARK-SCOTTSDALE   602 367 8222 TO 16062327003   P.03/03

# LEXMARK

Lexmark International, Inc.
8700 East Via De Ventura
Suite 102
Scottsdale, Arizona 85258
USA

February 15, 2000

Mr. Dick Oslo
Treasurer
Inacom
10810 Farnam Drive
Omaha, NE 68154

Dear Dick,

During the last week I have left several messages in your voice mail and with your assistant requesting to talk with you concerning Inacom's serious past due amount of $4,694,000 with Lexmark, International.

It is my understanding from Leon Kerkman, whom I met with last week, that any invoices that have had checks written against them, will be held until the sale is completed between Inacom and Compaq. The proceeds from the sale will then cover those checks and they will be disbursed over a period of 1-10 weeks. Additionally, Compaq will assume the liability of Lexmark invoices that have not had checks written against them.

It is requested that upon the successful completion of the Inacom and Compaq sale, that Lexmark be notified immediately the timing of the payments for our now seriously past due invoices. It is critical that these checks that have been written, and are now being held by Inacom, be released immediately upon the completion of your sale.

I would like to discuss this further with you, and can be reached at 480-367-0120.

Sincerely,

William A. Schuette
U.S. West Sales Manager


cc:   Mr. Leon Kerkman, Senior V.P. of Distribution and Operations
      Mr. Robert S. Kendrick, Lexmark V.P. of U.S. Channel Sales and Marketing

EXHIBIT
LX 7

Apx. 264

P.O. Box 692000
Houston, TX 77269-2000

[...] SH 249
Houston, TX 77070-2698
Tel 713-370-0670



February 16, 2000

Lexmark International, Inc.
Ms. Misty Atchinson
Fax 800.732.9539

RE:    Account Payable # 117403 of Inacom Corporation

Dear Ms. Atchinson:

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of Compaq Computer Corporation purchased certain assets of Inacom Corporation. The Compaq subsidiary will operate under the name of Custom Edge, Inc., and its' A/P accounts will be funded by Compaq.

In connection with such purchase, Custom Edge, Inc, also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to John Frasca at 402.758.3822.

Thank you for your consideration in this matter.

Sincerely,

Bill Francis
Director, Corporate Finance
Telephone: 281.514.1223
Email: bill.francis@compaq.com

EXHIBIT
LX 1

HP/LEX 0001

Compaq Computer Corporation    20555 SH 249
P.O. Box 692000               Houston, TX 77070-2698
Houston, TX 77269-2000        Tel 713-370 0670



# COMPAQ

February 16, 2000

Tech Data Corporation
Mr. Mike Zafa
Fax 727.532.8018

RE:   Account Payable # 102598 of Inacom Corporation

Dear Mr. Zafa:

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of Compaq Computer Corporation purchased certain assets of Inacom Corporation. The Compaq subsidiary will operate under the name of Custom Edge, Inc., and its' A/P accounts will be funded by Compaq.

In connection with such purchase, Custom Edge, Inc, also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to John Frasca at 402.758.3822.

Thank you for your consideration in this matter.

Sincerely,

Bill Francis
Director, Corporate Finance
Telephone: 281.514.1223
Email: bill.francis@compaq.com

EXHIBIT
LX 9

HP/LEX 0002

Compaq Computer Corporation      20555 SH 249
P.O. Box 692000                  Houston, TX 77070-2698
Houston, TX 77269-2000           Tel 713-370 0670



# COMPAQ

February 16, 2000

Tech Data Corporation
Mr. Mike Zafa
Fax  727.532.8018

RE:   Account Payable # 102598 of Inacom Corporation

Dear Mr. Zafa:

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of Compaq Computer Corporation purchased certain assets of Inacom Corporation. The Compaq subsidiary will operate under the name of Custom Edge, Inc., and its' A/P accounts will be funded by Compaq.

In connection with such purchase, Custom Edge, Inc. also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to John Frasca at 402.758.3822.

Thank you for your consideration in this matter.

Sincerely,

*[signature: Bill Francis]*

Bill Francis
Director, Corporate Finance
Telephone:  281.514.1223
Email:  bill.francis@compaq.com

EXHIBIT
LX 9

HP/LEX 0002

Received at: 3:16PM, 2/8/2002

Feb-08-02 15:05   Resilien                          631 420 1980            P.02

February 17, 2000

Logicare, Inc
85A Marcus Drive
Melville NY 11747

RE:   Account Payable # 018647 of Inacom Corporation

Dear Chris and Bill,

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of Compaq Computer Corporation purchased certain assets of Inacom Corporation. The Compaq subsidiary will operate under the name of Custom Edge, Inc., and its' A/P accounts will be funded by Compaq.

In connection with such purchase, Custom Edge, Inc. also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to Noni Vitols at 402.758.3678.

Thank you for your consideration in this matter.

Sincerely,

Bill Francis
Director, Corporate Finance
Telephone:  281.514.1223
Email:  bill.francis@compaq.com



EXHIBIT
LX 6

EXHIBIT
Wells-6
DL   3/30/05



EXHIBIT
Frasca-6
DL   3/30/05

Received at: 3:16PM, 2/8/2002

Feb-08-02 15:06  Resilien                                   631 420 1980      P.03

## CUSTOM EDGE
*THERE ARE NO LIMITS TO WHAT WE CAN DO TOGETHER*

February 17, 2000

Logicare, Inc
85A Marcus Blvd
Melville NY 11747

Dear Chris and Bill,

On February 16, 2000, Compaq Computer Corporation completed the purchase of key assets of Inacom Corporation. With this purchase, we are proud to announce the formation of a new, wholly owned, and separately managed Compaq subsidiary named Custom Edge Incorporated.

In preparation for the go-forward business model, please note the following:
- Compaq Corp will be sending a letter notifying you that Compaq will be behind and fund the purchases by Custom Edge Inc;
- The account payable process will continue to operate in Omaha, Nebraska. Please continue to use your established Account Payable contacts. For any immediate issues please free to contact me at 402-758-3169. Kindly do not contact Mr. Bill Francis, Accounting Manager at Compaq, as he will have no information available.
- Compaq is assuming the open accounts payable but NOT the "Held Checks".
- All "Held Checks" are the responsibility of Inacom Corp not Compaq or Custom Edge. Any and all inquiries on the "Held Checks" should be presented to Mr. Richard Oshlo at 402-758-4380.

On behalf of Custom Edge Inc, we look forward to our partnership in the year 2000 and beyond.

Sincerely,

Noni Vitols
Product Manager



EXHIBIT LX 17

HP/LEX 0010

OCT-25-2002  10:50    S and L Wilmington

P.02

Compaq Computer Corporation
PO Box 669000
Houston, TX 77269-2000

20555 SH 249
Houston, TX 77070-2698
Tel 281-370-0670

# COMPAQ

February 5, 2001

Lexmark International Inc.
8700 East Via De Ventura, Suite 102
Scottsdale, Az  85258

Attn: Bill Schuette-Western District Sales Manager

For valuable consideration, Compaq Computer Corporation, a Delaware Corporation (the "Guarantor"), hereby unconditionally guarantees and promises to pay to Lexmark International Inc. (Lexmark) on demand, any and all indebtedness from time to time outstanding under or in respect to transactions between Custom Edge, Inc. (CEI) and Lexmark.

Guarantor's obligations hereunder are independent of the obligations of CEI and may be enforced by action against Guarantor, whether or not action is brought against CEI. Guarantor hereby authorizes Lexmark, from time to time, to renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the indebtedness, and hereby waives any and all rights and defenses that would otherwise release or exonerate a guarantor.

Guarantor further agrees to pay all reasonable attorneys' fees, the allocated cost of Lexmark's internal counsel, and all other costs and expenses that may be incurred by Lexmark in the enforcement of this Guaranty.  THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.

Very truly yours,

COMPAQ COMPUTER CORPORATION

By: Ben K. Wells
Title: Vice President, Corporate Treasurer



EXHIBIT C

EXHIBIT LX 8

TOTAL P.0

LEXSEE 151 A. 831

AJAX RUBBER COMPANY, INC., a corporation of the State of Delaware, v. EMMA S. GAM.

[NO NUMBER IN ORIGINAL]

SUPERIOR COURT OF DELAWARE, NEW CASTLE COUNTY

34 Del. 264; 151 A. 831; 1924 Del. LEXIS 34; 4 W.W. Harr. 264

May 7, 1924

**PRIOR HISTORY:** [***1] Superior Court for New Castle County; action of Covenant, No. 40, March Term, 1923.

Case heard on demurrer to defendant's eighth plea.

The declaration set out the following instrument of guaranty, alleged to have been duly executed by the defendant, offered to the plaintiff and accepted by it, with notice to such defendant:

"In consideration of the sum of One Dollar and other valuable considerations, the receipt whereof is hereby acknowledged, the undersigned hereby guarantees the prompt payment of all purchases heretofore made, and that may hereafter be made by A. B. Rothacker Rubber Co., Inc., from the Ajax Rubber Company, Inc., up to the amount of $ 25,000.00, it being understood that this guaranty shall be a continuing guaranty and shall remain valid and cover all purchases, until receipt by the Ajax Rubber Company, Inc., of a written notice from the undersigned that this guaranty is terminated.

"The undersigned hereby further consents to and waives notice of any extension or extensions of payment that may be hereafter granted by the Ajax Rubber Company, Inc., to the said principal debtor by the acceptance of notes or otherwise, for the payment of the indebtedness [***2] which is secured by this guaranty."

It further alleged that the plaintiff did

"afterwards, to-wit:--on sundry days between the first day of April, A. D. 1917 and the second day of October, A. D. 1917--sell and deliver to the said A. B. Rothacker Rubber Company, Inc., on certain credit then and there agreed upon between the said Ajax Rubber Company, Inc., and the said A. B. Rothacker Rubber Company, Inc., certain goods of great value--amounting in the whole to a large sum of money, to-wit:--the sum of Twenty Thousand ($ 20,000.00) Dollars, and that although the said credit and time for payment of the price of the said goods by the said A. B. Rothacker Rubber Company, Inc.--hath long since elapsed, yet the said A. B. Rothacker Rubber Company, Inc., hath not, although it was afterwards, to-wit:--on the eleventh day of September, A. D. 1917--requested by the said Ajax Rubber Company, Inc., so to do, as yet paid the sum of Twenty Thousand ($ 20,000.00) Dollars, or any part thereof, but hath hitherto wholly neglected and refused so to do-- of all of which said premises the said

34 Del. 264, *; 151 A. 831, **;
1924 Del. LEXIS 34, ***; 4 W.W. Harr. 264

Emma S. Gam, afterwards, to-wit:-- on the sixth day of October, A. D. 1917 there had notice."

The [***3] eighth plea alleged that "notice was not given to her (the defendant) by the said plaintiff within a reasonable time after the last sale of goods had been made by it to the said A. B. Rothacker Rubber Company, Inc., under said guaranty of the total amount then due said plaintiff from the said A. B. Rothacker Rubber Company, Inc., for the goods purchased by it from the said plaintiff and of the default of the said A. B. Rothacker Rubber Company, Inc., in the payment thereof, which notice of said demand and the default of the said A. B. Rothacker Rubber Company, Inc., the said plaintiff was bound in law to give in order to hold this defendant responsible therefor under said guaranty."

The plaintiff demurred to this plea specially, alleging that the defendant was not entitled to the notice relied on in said plea.

**DISPOSITION:** The demurrer to the defendant's eighth plea is sustained.

**HEADNOTES:** 1. GUARANTY.
"Guaranty" is promise to answer for payment of debt or performance of duty in case of failure of another person liable in first instance.

2. GUARANTY.
Continuing absolute guaranty neither expresses nor implies condition to notify guarantor of principal's default or amount due guarantee at close of transactions with principal.

3. GUARANTY.
Liability of guarantor under absolute guaranty is governed by rules determining liability for breach of ordinary contract.

4. GUARANTY.
Generally, in case of conditional continuing guaranty, law implies necessity for demand on principal and notice to guarantor of close of transactions and amount due.

5. COURTS.
Court *held* bound by same court's prior construction of same continuing guaranty as absolute guaranty though it might have construed it otherwise.

6. NOTICE.
It is unnecessary to prove and allege notice to defendant of matters equally within knowledge of both parties.

**COUNSEL:** Herbert H. Ward, Jr. (of Ward, Gray and Neary) for plaintiff.

Harry Emmons for defendant.

**JUDGES:** HARRINGTON and RICHARDS, J. J., sitting.

**OPINIONBY:** HARRINGTON

**OPINION:**

[*266] [**832] HARRINGTON, J., delivering the opinion of the court:

The instrument sued on guarantees the "prompt payment of all purchases [***4] heretofore made and that may hereafter be made" by A. B. Rothacker Rubber Company, Inc., from the plaintiff "up to the amount of Twenty-five Thousand ($ 25,000.00) Dollars, it being understood that this guaranty shall be a continuing guaranty and shall cover all purchases until written notice from the undersigned that this guaranty is terminated." It also expressly waived notice of any extensions of payment that might be granted by the Ajax Rubber Company to the principal debtor by the acceptance of notes or otherwise.

While most continuing contracts of guaranty may not be so construed, this court has already held that this particular instrument, by its express

terms, constituted an absolute and unconditional agreement on the part of the guarantor to pay the debts then due and thereafter to be contracted by the principal debtor in its transactions with the plaintiff. *Ajax Rubber Co. v. Gam, 4 W. W. Harr. (34 Del.) 260, 151 A. 828.*

The sole question before us, therefore, is whether, under such a guaranty, the guarantor is entitled to notice within a reasonable time after the close of the transactions between the plaintiff and the principal debtor of the [***5] amount due the plaintiff from such debtor and of his default in payment.

The defendant contends that a guarantor is always entitled to such notice under a continuing guaranty, in order that he may protect himself in his dealings with the principal debtor.

Among other cases, in support of this contention, she cites *Douglass v. Reynolds, 7 Pet. 126, 8 L. Ed. 626; Id., 12 Pet. 497, 9 L. Ed. 1171; Gardner v. Lloyd, 110 Pa. 278, 2 A. 562; Wildes v. Savage, Fed. Cas. No. 17653, 1 Story 22; Allen v. Pike, 3 Cush. (Mass.) 238;* Brandt on Suretyship and Guaranty, § 211; 28 C. J., § 113, p. 963.

As a general proposition this contention is correct, but whether it is applicable to a case where the contract has already been held [*267] to be absolute and unconditional is another question. As a matter of fact, the case above referred to ( *Ajax Rubber Co. v. Gam, 4 W. W. Harr. [34 Del.] 260, 151 A. 828)* though apparently not seriously questioned by the defendant, would seem to be conclusive as to her rights in this case.

A guaranty is usually [***6] defined as "a promise to answer for the payment of some debt or the performance of some duty in case of the failure of another person, who is liable in the first instance." 2 Daniels on Negotiable Instruments, § 768; 2 Randolph on Commercial Paper, § 849.

Such contracts, though always to some extent conditional, because their binding effect depends upon the failure of some person, other than the guarantor, to perform his obligation (*Chitty on Contracts, page* 499) are so far as this case is concerned divided by law into two classes, namely: Absolute guaranties and conditional guaranties.

In *Ajax Rubber Co. v. Gam, 4 W. W. Harr. (34 Del.) 260, 151 A. 828, supra,* this court, in holding that the guaranty sued on in this case was an absolute and unconditional agreement, said

"the contract of guaranty, forming the basis for this action, is an absolute contract of payment. * * * The liability of the guarantor appears to be fixed upon the failure of the principal debtor to pay the indebtedness incurred within the terms of the guaranty."

It, also, held that under such a contract it was not necessary for the declaration to allege any effort to [***7] collect from the principal debtor before proceeding against the guarantor. It defined an absolute guaranty as "an unconditional undertaking on the part of the guarantor that the debtor will pay the debt or perform the obligation" guaranteed.

In defining a conditional guaranty, it further stated that such a guaranty "imports the happening of some contingency other than the default of the principal debtor."

Under an absolute and unconditional guaranty there is, therefore, no express condition annexed to the contract itself, nor is any condition implied by law requiring the plaintiff to notify the guarantor of the default of the principal or of the amount due

Apx. 272

[*268] the plaintiff at the close of his transactions with the principal debtor. By reason of that fact, the liability of the guarantor in such a case is governed by the same rules of law by which the liability of one who has broken an ordinary contract is determined. *Heyman v. Dooley, et al., 77 Md. 162, 26 A. 117, 20 L.R.A. 257; Clay, et al., v. Edgerton, 19 Ohio St. 549, 2 Am. Rep. 422; Welch v. Walsh, 177 Mass. 555, 59 N.E. 440, 52 L. R. A. 782, 83 Am. St. Rep. 302;* [***8] *Lowe & Co. v. Beckwith, 14 B. Mon. 184, 58 Am. Dec. 659; Donley v. Camp, 22 Ala. 659, 58 Am. Dec. 274; Pingrey on Guaranty and Suretyship,* § *348, page 364; 3 Kent. Com. 123; 105 Am. St. Rep. 516; Elliott* [**833] *on Contracts,* § *3934; 28 C. J.,* § *137, page 980,* § *139, page 982.* See, also, *Brandt on Suretyship & Guaranty,* § 220.

The general rule as to collateral and conditional guaranties is, however, otherwise, and the necessity for demand and notice, though not expressly provided for, is usually implied by law. *Mayberry, et al., v. Bainton, et al., 2 Harr. 24; 28 C. J.,* § *136, page 979, and* § *138, page 981; Pingrey on Guaranty & Suretyship,* § *352.*

It is true that statements repeatedly appear in the textbooks to the effect that the authorities are in conflict as to the necessity for notice of non-payment by the principal debtor, but there seems to be little or no support, in the cases, for this statement where the particular guaranty involved is expressly held to be absolute and unconditional.

There are, however, many cases of guaranties of payment [***9] where demand and notice are required, where the courts do not state whether the particular guaranty is absolute and unconditional or otherwise, but where because of the general conditional character of any contract of guaranty, or otherwise, they are apparently treated as collateral and conditional. *Brooks v. Morgan, 1 Harr. 123, and Erwin v. Lamborn, 1 Harr. 125, hereinafter referred to, are perfectly consistent with this statement.*

*The real difficulty in deciding whether demand and notice are necessary, therefore, lies in reaching a conclusion as to the proper construction of the guaranty sued on in the particular case. Beebe v. Dudley, 26 N.H. 249, 1159 Am. Dec. 341.*

[*269] The fact that the guaranty in this case is a continuing one was, doubtless, considered by this court in deciding whether it was absolute or conditional, but that question having already been passed on, we are bound by it even though we might have otherwise construed it and the contract having been construed the usual rules as to demand and notice applicable to absolute and unconditional guaranties must be applied.

The conclusion that notice was not [***10] necessary when a continuing guaranty was held to be absolute and unconditional was reached in *Lowe & Co. v. Beckwith, 14 B. Mon. 184, 58 Am. Dec. 659,* though the responsibility of the guarantor was not even limited to a maximum amount.

None of the cases cited by the defendant are inconsistent with this conclusion, as none of them were clearly held to be absolute guaranties.

In fact the court in *Douglass v. Reynolds, 7 Pet. 126, 8 L. Ed. 626,* while holding that notice of default of the principal debtor was necessary in a continuing guaranty, expressly distinguished *Allen v. Rightmere, 20 Johns. (N.Y.) 365, 11 Am. Dec. 288,* from the case before it because the court in that case had held that the contract was absolute.

While the cases reported in the early Harrington Reports in this state

were not cited by the defendant, it would seem that they should be considered by us.

Both *Brooks v. Morgan,* 1 Harr. 123, and *Erwin v. Lamborn,* 1 Harr. 125, were guaranties of payment written on notes before their maturity, and, therefore, involved agreements with respect to the payment of definite [***11] sums at definite times. The argument was made in both cases that the contract was absolute and that notice to the guarantor was, therefore, unnecessary.

The court, however, held that generally speaking a guarantor was entitled to notice of the maker's default in payment unless such maker was insolvent at the maturity of the notes.

While the reasons for the court's conclusions are not specifically stated the necessary inference from the argument of counsel is that [*270] the particular guaranties sued on were held to be conditional and not absolute.

In *Mayberry, et al., v. Bainton,* 2 Harr. 24, the suit was on a letter of guaranty addressed to the plaintiffs, stating among other things,

"We hereby engage to see you paid in due course, for the bill of goods bought by R----- from you on the 27th instant, for the sum of about $ 624.00."

A note for the purchase price of the goods in question was given by the principal debtor to the plaintiff, which note was not paid at its maturity.

The court, with respect to the above guaranty, said:

"It was not an original undertaking to pay the debt of R-----, but only to see that R----- paid. In an undertaking of this [***12] character, the guarantor is entitled to prompt information of the default of his principal, in order that he may secure himself by withholding funds or otherwise providing against loss."

It is perfectly clear from this case that the court fully appreciated the distinction between absolute and conditional guaranties and the conclusion that the contracts in *Brooks v. Morgan* and *Erwin v. Lamborn,* supra, were construed as conditional contracts, therefore, seems unanswerable.

As further sustaining this conclusion, *Erwin v. Lamborn* is quoted as involving a conditional contract in *Pingrey on Guaranty and Suretyship,* § 349.

In view, however, of the construction already placed on the particular guaranty before us, whether the court's conclusions in [**834] these cases were based on the general conditional character of all guaranties, on the language used in the particular contract, or otherwise, need not be considered by us; but the fact that notice to the guarantor was held necessary is explained by the fact that they were held to be conditional contracts.

The conclusion that the guarantor is not entitled to notice of the default of the principal debtor in absolute guaranties [***13] is perfectly consistent with the common-law rule as to alleging and proving notice to the defendant in other cases.

[*271] It is unnecessary to allege and prove notice to the defendant of matters equally within the knowledge of both plaintiff and defendant. *Lent v. Padelford,* 10 Mass. 230, 6 Am. Dec. 119. See, also, 1 *Chitty on Pleading,* 328.

In *Vyse v. Wakefield,* 6 M. & W. 452, the law as to notice is summed up by the court in the following language:

"The rule to be collected from the cases seems to be this, that where a

party stipulated to do a certain thing in a certain specific event, which may become known to him, or with which he may make himself acquainted, he is not entitled to any notice, unless he stipulates for it; but when it is to do a thing, which lies within the peculiar knowledge of the opposite party, then notice ought to be given," and Park B. added that "when a specific act is to be done by a third party named no notice is necessary."

In *Heyman v. Dooley, et al.*, 77 Md. 162, 166, 26 A. 117, 118, 20 L. R. A. 257, the court said:

"The guarantee must know, it is true, of the default of the [***14] principal, and this default may be unknown to the guarantor; but it is not a fact which lies within the exclusive or peculiar knowledge of the guarantor. On the contrary, it is a fact in regard to which the guarantor had the easy and accessible means of information, either by inquiry of the guarantee, or of the principal himself."

On page 167 of 77 Md. 162, 26 A. 117, 118, the same court said:

"In all the standard authorities, the rule is stated that if an act is to be done by a third person, who is known, notice of his default is unnecessary."

See, also, *Hammond v. Gilmore's Adm'r*, 14 Conn. 479.

Neither *Ajax Rubber Co. v. Gam*, 7 Boyce 479, 108 A. 276 nor *Ajax Rubber Co. v. Gam*, 1 W. W. Harr. (31 Del.) 376, 114 A. 610, control this case. While both involved the same guaranty sued on here they were decided before any question as to the absolute and unconditional character of this guaranty had ever been raised or considered. Whatever may have been done by the court in those cases was, therefore, with the ordinary continuing conditional guaranty in mind.

For the reasons above given, the demurrer [***15] to the defendant's eighth plea is sustained.

LEXSEE 839 SW.2D 571

**APL, INC.; ATEC INDUSTRIES, INC.; and ATEC ALUMINUM EXTRUSIONS, INC. APPELLANTS V. OHIO VALLEY ALUMINUM, INC. APPELLEE**

NO. 91-CA-002532-MR

COURT OF APPEALS OF KENTUCKY

*839 S.W.2d 571; 1992 Ky. App. LEXIS 212*

October 23, 1992, Rendered

**SUBSEQUENT HISTORY:** [**1]

Released for Publication December 3, 1992.

**PRIOR HISTORY:**

APPEAL FROM SHELBY CIRCUIT COURT. HONORABLE HAROLD Y. SAUNDERS, JUDGE. CIVIL ACTION NO. 90-CI-000195.

**DISPOSITION:**

AFFIRMING

**COUNSEL:**

ATTORNEYS FOR APPELLANTS: W. Craig Aulenbach, Aulenbach & Shapero, Louisville, Kentucky. Sidney N. Freeman, Robert McNamara, McNamara & Freeman, Uniontown, OH.

ATTORNEYS FOR APPELLEE: C. Lewis Mathis, Jr., Mark D. Dean, Mathis, Riggs, Prather & Dean, P.S.C., Shelbyville, Kentucky. Larry L. Adair, Sunrise, Florida.

**JUDGES:** BEFORE: HAYES, HUDDLESTON and SCHRODER, Judges.

**OPINIONBY:** HUDDLESTON

**OPINION:**

[*572]

HUDDLESTON, JUDGE. APL, Inc., and it's subsidiaries, appeal from a summary judgment finding APL liable on a guaranty of payment extended to Ohio Valley Aluminum, Inc. Because we agree that Ohio Valley was entitled to judgment as a matter of law, we affirm.

APL Corporation is a holding company that owns APL Shelter Products Corporation. APL Shelter Products owns ATEC Industries, Inc. (ATEC), which in turn owns ATEC South, Inc. (ASI). APL may therefore be considered the parent company of the other corporate defendants in this case.

Ohio valley Aluminum, Inc. (OVACO), is a manufacturer of aluminum [**2] extrusion billet, the material used in the production of aluminum commercial products. OVACO did business with ATEC and ASI from June 1985 through March 1990, during which time it sold the two companies some 18,467,029 pounds of billet for the total sum of $ 7,670,837.03. At issue in this case is the last $ 139,237.91 worth of goods purchased on this account.

In 1987, ATEC/ASI's n1 account with OVACO came to be constantly sixty to ninety days in arrears. OVACO notified ATEC that it would discontinue its extension of credit to ATEC unless the company obtained some sufficient security for payment of the account.

In response, one of APL's holdings provided OVACO with a standby letter of credit, which expired in September 1989. ATEC/ASI's account continued to be in arrears even after the standby letter was secured.

> n1 See the discussion below regarding the APL-ATEC-ASI interlocking management structure.

In the summer of 1989, as the standby letter's expiration date drew near, OVACO continued to be concerned about ATEC/ASI's [**3] ability to timely pay its account. OVACO in fact terminated shipments on the account until some additional security could be obtained, so there would be no outstanding balance on the account at the standby letter's expiration.

ATEC proposed that APL guaranty its account with OVACO so that OVACO would continue to extend credit. In September 1989, APL drafted a Guaranty of Payment which ATEC forwarded to OVACO. ATEC/ASI placed its next order with OVACO in February 1990.

The last shipment from OVACO to ATEC/ASI was made on March 13, 1990. No payment was made on the $139,237.91 due on this shipment. On May 14, 1990, OVACO demanded payment from APL pursuant to the guaranty. When payment was not forthcoming, OVACO filed the present action in June 1990.

APL answered in July, asserting inter alia that the goods represented by the account were nonconforming, that the documents attached to the complaint failed to make out a case in account, and that OVACO was estopped from asserting recovery by its own actions or failures to act.

In December 1990, OVACO filed its first amended complaint. APL and ATEC answered in January 1991, offering essentially the defenses outlined above, but including [**4] [*573] an allegation that OVACO was not in compliance with the terms of the guaranty.

Pursuant to an agreed order of June 1991, OVACO and APL filed competing motions for summary judgment. In August 1991, Shelby Circuit Court entered judgment in favor of OVACO and against all corporate defendants on the respective summary judgment motions, in the amount of $139,237.91, plus interest. This judgment was supplemented by a September 1991 order granting OVACO attorneys' fees.

The trial judge found that the guaranty in question was an absolute guaranty, requiring no notification of acceptance. The judge found that the instrument was not required to conform to KRS 371.065, since that statute at the time of the guaranty's execution had application solely to guaranties of commercial paper. He finally found that defendants ATEC and ASI were essentially one entity. This appeal followed.

A guaranty is generally classified as either absolute or conditional. n2 An absolute guaranty is a contrast by which the guarantor promises that if the debtor does not perform his obligation or obligations, the guarantor will perform some act (such as the payment of money) to or for the benefit of the creditor, [**5] irrespective of any additional contingencies. Pulaski Stave Co. v. Miller's Creek Lumber Co., 138 Ky. 372, 128 S.W. 96, 102 (1910); see 38 Am. Jur. 2d Guaranty § 21 (1968).

> n2 The terms "absolute guaranty" and "unconditional guaranty" are often used interchangeably. See citations accompanying 38 Am. Jur. 2d Guaranty § 21 (1968).

A conditional guaranty, on the other hand, contemplates as a condi-

tion to the guarantor's liability the happening of some contingent event other than the default of the principal debtor, or the performance of some act on the part of the creditor. The promise issued by the potential guarantor at the inception of a conditional guaranty is therefore generally construed to be only an offer to guarantee, acceptance of which must be communicated by the potential creditor to the offeror to be effective. *McGowan v. Wells' Trustee*, 184 Ky. 772, 213 S.W. 573, 577 (1919); 38 Am. Jur. 2d at § 21.

When the [**6] circumstances surrounding the issuance of an absolute guaranty and the terms of the writing itself evidence no indication that the guarantor anticipated notification of acceptance from the creditor, the guarantor will be liable on the instrument from the time the creditor acts in reliance on it. *Pittsburgh Plate Glass Co. v. Cassidy*, 194 Ky. 81, 238 S.W. 172, 173-174 (1922); *McGowan v. Wells' Trustee*, 184 Ky. 772, 213 S.W. 573, 577-578 (1919); *J. R. Watkins Medical Co. v. Brand*, 143 Ky. 468, 136 S.W. 867, 868 (1911); *White Sewing Machine Co. v. Powell*, Ky., 25 Ky. L. Rptr. 94, 74 S.W. 746 (1903); *Hall's Executor v. Farmers' Bank of Kentucky*, Ky., 23 Ky. L. Rptr. 1450, 65 S.W. 365, 366-367 (1901); *Thompson v. Glover*, 78 Ky. 193, 195 (1879).

The guaranty APL provided to OVACO stated the following:

GUARANTY OF PAYMENT

TO: OHIO VALLEY ALUMINUM

FOR AND IN CONSIDERATION of financial accommodations and the extension of credit by Ohio Valley Aluminum (Valley) to Atec Industries, Inc., its affiliates [**7] and subsidiaries (Atec), which financial accommodations and extensions of credit have been and are of benefit to the undersigned corporation, which corporation is affiliated with Atec, the undersigned unconditionally guarantees prompt payment of all of Atec's obligation to Ohio Valley Aluminum, of whatsoever kind and nature, now existing or hereafter incurred or created.

The undersigned agrees that Valley need not institute any action or proceeding at law or in equity against Atec or anyone else or exhaust any remedies against Atec or anyone else or any security for any debt, as a condition precedent to bringing an action against the undersigned upon this Guaranty. The undersigned consents to the jurisdiction of and service of process by the State of [*574] Kentucky; and in the event action is brought to enforce this Guaranty, the undersigned agrees that venue of any such action may be laid in Shelby County, Kentucky. In any action concerning this Guaranty, the undersigned agrees to pay to the holder of any indebtedness guaranteed hereby such sum as the court may adjudge reasonable as attorney's fees. This guaranty will expire on December 31, 1991.

The individual signing this Guaranty [**8] represents and warrants that he holds the office designated and is authorized to sign this Guaranty on behalf of APL corporation.

DATED: September 6, 1989

APL CORPORATION

We discern nothing in this document indicating that it is anything but an absolute guaranty, payable on the default of the debtor regardless of any other contingency. We note no language in the document evidencing a desire on APL's part to receive a notification of acceptance from OVACO. The document by its terms purports to be nothing but a guaranty of debt, absolute and unconditional.

Similarly, the circumstances surrounding the issuance of the guaranty in no way evidenced that APL intended or expected to receive a notice of ac-

ceptance from OVACO. APL (through its subsidiaries) n3 and OVACO had carried on a continuing business relationship for some four years prior to the issuance of the guaranty. During that time OVACO had supplied APL with over $ 7,000,000.00 worth of aluminum extrusion billet. As noted above, the guaranty of payment APL issued to OVACO was intended to replace an expiring standby letter of credit. With the guaranty in place, all attendant circumstances indicate that both parties intended [**9] the business relationship to continue as usual. There is no indication that any sort of renegotiation of the account was in order, requiring that OVACO somehow change its relationship with APL before the guaranty would become effective. Indeed, in a letter accompanying the guaranty APL's Vice President and Controller, Stephen A. Hurwitz, stated:

n3 See discussion below.

Please find enclosed our letter of guaranty with respect to your company. We look forward to a continuing relationship between Ohio Valley and Atec and would like you to give consideration to an increase in our line of credit.

As evidenced by this letter, not only did APL expect the relationship to continue apace, but it actually hoped to increase its credit with OVACO. n4

n4 We also note that nothing in the record suggests, and indeed APL does not contend, that the guaranty was to be effective on the condition that OVACO increase APL's credit.

[**10]

We further note that it was five months after the issuance of the guaranty that ATEC/ASI placed its next order with OVACO. We believe this provided ample time for APL to make some representation to OVACO in some way indicating that APL required a formal acceptance of the guaranty, if this had in fact been the case. Again, we see nothing in the record indicating that such was the case.

Prior to its 1990 amendment, *KRS 371.065* provided:

No guaranty which is not written on the instrument involved shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates, provided that such termination shall not affect the liability of the guarantor with respect to:

(1) Obligations created or incurred prior to such date, or

(2) Extensions or renewals of, interest accruing on, or fees, costs or expenses incurred with respect to, such obligations on or after such date.

APL contends that *KRS 371.065* has applied to all guaranties from the time of its enactment. It therefore submits that APL was entitled to summary judgment in the [**11] proceedings below, because the guaranty in [*575] question did not contain a stated maximum amount as required by the statute, thus rendering it unenforceable.

The trial court ruled that *KRS 371.065* only applies to guaranties of commercial paper, due to the fact that the House Bill introducing the statute (HB 286) was titled "AN ACT relating to commercial paper." The trial court therefore necessarily ruled that the reference to "instrument" in *KRS 371.065* refers to only commercial paper.

Apx. 279

HB 286 was originally intended to be codified in the Kentucky Revised Statutes' chapter relating to commercial paper as an amendment to KRS 355.3-416, the "Contract of guarantor" statute. When the bill reached the Senate, the statute was transferred to KRS Chapter 371, the chapter relating to the law of contracts. The bill's title, however -- "AN ACT relating to commercial paper" -- was not changed, and remained the operative title when the bill became law in 1986.

Kentucky Constitution § 51 requires that:

No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred [**12] by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be re-enacted and published at length.

This constitutional mandate considered, we hold that Kentucky's legislature did not intend to render KRS 371.065 unconstitutional by placing it in the KRS contract law chapter. And we hold that the statute retained its exclusive applicability to guaranties of commercial paper irrespective of its particular situs in Kentucky's Revised Statutes.

APL makes much of the fact that when KRS 371.065 was amended in 1990, the title of the act was changed to "AN ACT relating to guaranties." APL contends that the legislature thus explicitly revealed in 1990 that it had intended all along for the statute to apply to all guaranties.

APL's guaranty to OVACO was signed in 1989. We have held that in 1989 KRS 371.065 had applicability solely to guaranties relating to commercial paper, pursuant to the statute's 1986 enactment. APL's guaranty to OVACO did not guaranty a transaction involving commercial paper. The fact that KRS 371.065 was amended in 1990 to be given broader applicability is irrelevant for purposes of the present appeal.

We further note that [**13] the United States Constitution provides at Article I, Section 10:

No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . . (Emphasis supplied.)

Were we to embrace APL's position and hold that KRS 371.065's 1990 amendment operated to annul the 1989 guaranty contract between APL and OVACO, we would place our state legislature in direct violation of the federal constitution. This would require that KRS 371.065 itself be annulled. APL's position is accordingly without merit.

The trial court ruled that:

The parties have agreed that the amount in question is $ 139,237.91, and for the purpose of disposing of this action, the Court finds that Apec [sic] Industries, Inc. and Apec [sic] South, Inc. is one and the same.

APL contends that the trial court erred by not distinguishing between ATEC and ASI. APL's guaranty, however, by its terms provided:

FOR AND IN CONSIDERATION of financial accommodations and the extension of credit by Ohio Valley Aluminum (Valley) to Atec Industries, Inc., its affiliates and subsidiaries (Atec), which financial accommodations and extensions of credit have been and are of benefit to the undersigned corporation, which corporation [**14] is affiliated with Atec, the undersigned unconditionally guarantees prompt payment of all of Atec's obligation to Ohio Valley Aluminum, of whatsoever kind and nature, now existing or hereafter incurred or created. [*576]

We note, again, that APL is the holding company that owns APL Shelter Products, Inc. APL Shelter Products in turn owns ATEC Industries, Inc., which in turn owns ASI. The ATEC/ASI purchase orders with OVACO were made on forms headed "APL/ATEC."

We note again the language in the APL letter to OVACO accompanying the guaranty:

Please find enclosed our letter of guaranty with respect to your company. We look forward to a continuing relationship between Ohio valley and Atec and would like you to give consideration to an increase in our line of credit.

Clearly, APL considered any credit extended to its subsidiaries to be the equivalent of credit extended to APL itself, as parent company.

Stephen Hurwitz, the individual who prepared and signed the guaranty in question, is Vice President and Controller of APL, Vice President of ATEC, and Vice President of ASI. Hurwitz was charged with managerial responsibilities in relation to all the named corporations. Jack Colonna, [**15] who reported directly to Hurwitz and requested that Hurwitz obtain the guaranty, is Executive Vice President and Chief Operating Officer of both ATEC and ASI. Colonna approved payment of the OVACO delinquent account in question. We note that ATEC and ASI have presently terminated their business operations, while APL remains operative.

The foregoing considered, we see no reversible error in the trial judge's ruling. APL is responsible for the debts of both ATEC and ASI, and that debt totals $ 139,237.91.

Having considered the record as a whole, we agree with the trial court that no issue of material fact exists, and consequently that OVACO was entitled to judgment as a matter of law.

The judgment is affirmed.

ALL CONCUR.