provides. However, the claim of the releasing person against the other persons shall be reduced by the amount of the released persons' quitable share of the obligation, determined in accordance with the provisions of this section. n15

n15 *KRS 411.182* (emphasis added.)

The writers of one of the best-known treatises on tort law suggested that the adoption of such comparative fault schemes may lead to a paradigmatic shift in the manner in which courts approach indemnity issues:

> Changes in the law of contribution and comparative fault may [**30] materially alter the context and the equities, thus causing courts to reconsider rules of indemnity. In the past, courts often viewed their choice as one between allocating the whole loss to one of two tortfeasors or dividing it equally between them. Adoption of comparative fault may be seen as creating another option--- allocating loss according to percentages. In some contexts, this outcome may appear more equitable than either of the first two. Recognition of this option of percentage allocation has already caused some modification of the law of indemnity, and further modification may be expected. n16

In fact, some jurisdictions which have faced this issue have found that comparative negligence and comparative fault statutes have abrogated the common law remedy of equitable implied indemnity between "passive" and "active" joint tortfeasors n17 while others have modified their common law to allow only for partial indemnity in proportion to comparative fault. n18 In holding that their legislatures had modified the common law, these courts recognized equitable implied indemnity as "a blunt instrument for reallocating responsibility to damages [which] shifts the entire loss [**31] from one culpable wrongdoer to another" n19 and took note of the malleability of the distinction between "active" and "passive" negligence:

> With a little ingenuity in phrasing, negligence can be made to be either "active" or "passive" as suits the writer. For example, "driving an automobile with bad brakes" or "running through the stop sign" or "using a defective crane" might be said to be "active" negligence, while "omitting maintenance of brake fluid level" or "neglecting to apply the brakes" or "failing to inspect the crane in order to discover its defectiveness" might be "passive" negligence---these are the same acts or omissions, but the outcome depends not upon the facts, but upon how someone chooses to characterize them. n20

While labels such as "active" or "passive" are themselves largely indeterminate, questions such as whether one party's negligence is secondary because it arose from the negligence of the other party and [*786] would not have arisen but for it and whether the parties were or were not in pari

delicto are proper factors to be weighed by the jury in determining the degree of fault apportioned to each party. n21

n16 Prosser and Keeton on Torts, [5]th Edition, § 51 (West Publishing Co. 1984).

[**32]

n17 See, e.g., *Tolbert v. Gerber Industries, Inc.*, 255 N.W.2d 362 (Minn. 1977); *Cypress Creek Utility Service Company. Inc. v. Muller*, 640 S.W.2d 860 (Tex. 1982).

n18 Woods, Comparative Fault, [2]nd Edition, § 13:11 Indemnity (Lawyers Cooperative Publishing Co. 1987); See also *Schneider National Inc. v. Holland Hitch Co.*, 843 P.2d 561 (Wyo. 1992).

n19 Tolbert note 15 *255 N.W.2d at 367.*

n20 Schneider National, Inc. supra note 16 at 574 (citing *Missouri Pac. R. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466, 471 (Mo. 1978)).

n21 See, e.g., Schneider National, Inc. supra note 16 at 578-9 ("The distinctions of "active" and "passive" negligence, while no longer determinative of the ability to seek indemnity, are factors to be weighed by the jury in assessing the percentage of fault of the parties." Id.).

The same principles of fundamental fairness that compelled the discarding of contributory negligence in favor of comparative negligence also compels the elimination [**33] of indemnity between joint tortfeasors who shoulder unequal fault. The Supreme Court of Minnesota addressed this issue and reasoned that an equitable concept such as implied indemnity exists only to correct unjust enrichment which cannot exist in a comparative fault jurisdiction which has abandoned joint and several liability:

> In the related area of contributory negligence, our legislature has abandoned the all-or-nothing approach of the common law by adopting a comparative negligence statute. ... Tortfeasors must now accept responsibility for damages commensurate with their own relative culpability. Because indemnity in [these] situations is an equitable doctrine, we are at liberty to ameliorate the rigid common-law rules in keeping with legislative philosophy without an express statutory mandate.
>
> By limiting the reallocation of loss between joint tortfeasors to contribution based upon relative fault, the more culpable tortfeasor will continue to bear a greater share of the loss, but at the same time his joint tortfeasor will not continue to escape all liability as in the past...
>
> The jury found that both [the defendants] were negligent and that the negligence of each was [**34] a direct cause of plaintiffs injury. Consequently, as between them, each will bear the cost of compensating plaintiff in proportion to its relative culpability. n22

n22 Tolbert, note 15 *255 N.W.2d at 367-68.*

To hold otherwise effectively eviscerates the bedrock upon which KRS 411.182 was built and overrules Hilen v. Hayes and its progeny. This Court held that "liability should be assessed in relation to fault and. . . the extent of liability should be determined by the extent of the fault" n23 because of its faith that juries can properly assess relative degrees of fault and, when appropriate, place the lion's share of liability on the principal wrongdoer. Today's majority withdraws that faith and holds that, even when a jury has determined that a defendant has engaged in tortious conduct and should be responsible for a proportional share of the plaintiffs damages, a tortfeasor may bring an equitable implied indemnity action against a more culpable joint tortfeasor who is "really" responsible for the plaintiffs [**35] damages. This holding is plainly inconsistent with KRS 411.182.

n23 Dix & Associates v. Key, supra note 8 at 27.

Other jurisdictions have chosen to allow plaintiffs to recover only when their own negligence is less than, or equal to, that of a defendant, but under Kentucky's system of fault allocation, a plaintiff may recover even when his responsibility for his damages exceeds that of the defendant or defendants. In other words, a plaintiff who is ninety percent (90%) responsible for his own damages may still recover against a defendant found to be ten percent (10%) liable for those damages. In striking the balance in favor of pure comparative fault, the General Assembly has clearly signaled that the legislature in this state wishes to hold wrongdoers responsible in proportion to their respective percentages of fault. n24 Today's majority opinion not only ignores the General Assembly's plain intent with respect to the comparative fault of joint tortfeasor defendants, but also potentially [**36] [*787] reinstates contributory negligence by, at least theoretically, allowing a "passively negligent" defendant to bring an action for equitable implied indemnity against an "actively negligent" plaintiff. n25

n24 KRS 411.182.

n25 The language of Brown Hotel, after all, does not distinguish between plaintiffs and defendants, but rather refers to the joint negligence of "parties."

Today's majority polishes up a relic from days gone by which the courts created to address inequities which arose in the context of a harsh law of tort which held multiple jointly negligent tortfeasors entirely responsible for a single indivisible injury because it was thought that the injury could not be divided into parts to determine the responsibility of each negligent actor. Contribution, while provided for by statute as discussed in the majority opinion, was pro rata only, which was "fundamentally unfair" n26 when the relative liabilities of joint tortfeasors were disproportionate. In this century, Kentucky tort law requires [**37] tortious parties to pay for their share of the plaintiffs damages, and only their share of the plaintiffs damages. Equitable implied indemnity is very much an anachronism, and KRS 411.182 properly rendered it extinct.

n26 See Dix & Associates Pipeline Contractors, Inc., 799 S.W.2d at 27-28, note 8.

INDEMNITY IN CIVIL RIGHTS ACTIONS

Although I have expressed above that I feel that the General Assembly, by adopting *KRS 411.182*, intended to eliminate the common law action for equitable implied indemnity, I specifically disagree with the majority's holding that an employer against whom an employee has brought a claim of sex-based, hostile workplace employment discrimination may have a Brown Hotel equitable implied indemnity claim against an individual sexual harasser. In my opinion, this holding misconstrues the cause of action created by *KRS 344.040* and *KRS 344.450* and ignores the policy decisions made by the General Assembly which assign direct liability to an employer for acts of employment [**38] discrimination.

*KRS 344.040* makes it an unlawful practice for an employer:

> (1) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, sex, age forty (40) and over, because the person is a qualified person with a disability, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking. (2) To limit, segregate, or classify employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect status as an employee, because of the individual's race, color, religion, national origin, sex or age forty (40) and over, because the person is a qualified individual with a disability, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking. n27

*KRS 344.450* provides a private right of action for employment discrimination:

> Any person injured by any act in violation of the provisions [**39] of this chapter shall have a civil cause of action in Circuit Court to enjoin further violations, and to recover the actual damages sustained, together with the costs of the law suit. The court's order or judgment shall include a reasonable fee for the plaintiffs attorney of record and any other remedies contained in this chapter. n28

[*788] In Meyers v. Chapman Printing Co., Inc., n29 this Court followed the United States Supreme Court's opinion in Meritor Sav. Bank v. Vinson n30 and held that sexual harassment creating a hostile or abusive work environment could give rise to a claim under *KRS 344.010*.

n27 *KRS 344.040*.

n28 *KRS 344.450*; see also *Meyers v. Chapman Printing Co., Inc.*, Ky., 840 S.W.2d 814, 819 (1992).

n29 See supra note 26, *840 S.W.2d at 820-821*.

n30 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986).

KRS 344.030(2) defines "employer" as:

> [A] person who has eight (8) or more employees within the state in each of twenty (20) or more calendar [**40] weeks in the current or preceding calendar year and an agent of such person, except for purposes of determining discrimination based on disability, employer means a person engaged in an industry affecting commerce who has fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and any agent of that person... n31

In Palmer v. International Association of Machinists and Aerospace Workers, n32 this Court acknowledged and agreed with the weight of federal authority n33 narrowly interpreting the term "employer" in Title VII of the 1964 Civil Rights Act to preclude liability on the part of individuals and entities who did not strictly meet the definition of employer. n34 While some observers have criticized legislature's decisions to hold employers and not individual perpetrators liable, n35 both Title VII of the Civil Rights Act of 1964 and Kentucky's statutory civil rights provisions hold employers, and only employers, directly liable for sexual discrimination in the workplace. n36 While some jurisdictions have [*789] held that individual perpetrators of sexual harassment may still be liable for [**41] their actions under the common law of tort or contract, n37 their liability does not stem from a violation of statutory laws against workplace discrimination.

n31 KRS 344.030(2).

n32 Ky., 882 S.W.2d 117 (1994).

n33 See, e.g. Grant v. Lone Star Co., 21 F.3d 649 (5th Cir. 1994), cert. denied, 513 U.S. 1015, 115 S. Ct. 574, 130 L. Ed. 2d 491 (1994); Sauers v. Salt Lake County, 1 F.3d 1122 (10th Cir. 1993); Miller v. Maxwell's International, Inc., 991 F.2d 583 [(9]th Cir. 1993), cert denied 510 U.S. 1109, 114 S. Ct. 1049, 127 L. Ed. 2d 372 (1994); Busby v. City of Orlando, 931 F.2d 764 (11th Cir. 1991).

n34 Palmer, supra note 30 at 119; see also Effinger v. Philip Morris, Inc., 984 F. Supp. 1043 (W.D.Ky. 1997).

n35 See, e.g. Hager, 30 Conn. Law R. 375 (1998):

> During Jim Crow, many whites viewed physical abuse of blacks as wrong, but found their exclusion from lunch counters excusable. Antidiscrimination law stripped away the prerogative to exclude and soon induced many to condemn what they had once excused. Antidiscrimination law can carry this kind of positive force. It has its proper uses where an entire culture condones a certain kind of group mistreatment. Its vice, however, is to displace moral blame from individuals to cultures. It should not

be overused. Anti-discrimination law was needed to dismantle Jim Crow in part because lunch counter exclusion did not invade personhood in a tortious sense and hence was non-actionable, absent anti-discrimination law. But a discrimination model can be superfluous and distracting in explaining the wrongfulness of invading fundamental personal rights. It should be avoided where a paradigm of individualized culpability for recognized moral wrongs already holds sway. A paradigm of the wrongfulness of personal invasion does hold sway and we should assume that it applies to sexual harassment. Its name is tort. One further problem with the discrimination paradigm for harassment bears highlighting. Lay people I speak with are generally astounded that Title VII harassment liability visits no legal sanction on the actual perpetrator. Though the circuits are split, the majority rule and the sounder reading of congressional intent is that liability lies exclusively against the employer. This outcome, so anomalous to common moral sense, flows naturally from conceptualizing harassment as employment discrimination. The strained and contrived nature of that conceptualization loosens the mooring between harassment law and common sense morals. Id.

[\*\*42]

n36 See, e.g., *30 U.S.F. L. Rev. 825, 826-827 (1996)*:

Statutory schemes provide that the employer is directly liable for certain instances of sexual harassment. The doctrine of respondeat superior is known also as vicarious liability, indicating that the employer is liable not because of its own conduct but because of its relationship to the employee committing the wrongful acts. Vicarious liability, then, is secondary liability. Thus, an employee who is the victim of sexual harassment need not prove her employer vicariously liable for the harasser-employee's acts, if the statutory requirements for direct liability are met. Id. (emphasis added).

n37 See, e.g., *Id. at 834* and surrounding notes ("Contract theories under which a plaintiff may sue include breach of the implied covenant of good faith and fair dealing. Available tort causes of action include battery, assault... and intentional infliction of emotional distress. Id.)

I find it impossible to find room to pigeonhole Korp II's claim against Dr. Salazar within the concept of Brown Hotel [\*\*43] equitable implied indemnity. The plaintiff in this action brought a claim against Korp II for sexual discrimination by allowing a hostile or abusive workplace to de-

Apx. 327

velop. Although the Oklahoma Court of Appeals case cited in the majority addresses the question of indemnity in the context of the employer's vicarious liability, the doctrine of respondeat superior is not implicated by the facts of this case because Dr. Salazar was not an employee of Korp II, and Korp II could not be held vicariously liable for Dr. Salazar's torts. Here, Korp II settled with the plaintiff a claim which alleged that Korp II had committed employment discrimination---a claim of action separate, distinct, and not derivative from any common law tort which Dr. Salazar may have committed. Implied equitable indemnity exists to prevent unjust enrichment. When "two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of his liability." n38 Here, if the plaintiffs allegations are taken at face value, both Dr. Salazar and Korp II's actions [**44] gave rise to claims for damages, but the claims and damages were distinct, and the plaintiff chose to pursue only the claim against Korp II for employment discrimination under a hostile workplace theory. The fact that Dr. Salazar might have committed a tort against the plaintiff which resulted in a claim for damages does not implicate Korp II's own liability, and does not give rise to a claim for indemnity.

n38 41 Am.Jur.2d 348 (Indemnity) § 2.

I would also note that strong public policy considerations hesitate against finding that an employer who has settled a claim of, or who has been found liable for, employment discrimination under a hostile workplace theory might have a claim for equitable implied indemnity against an individual perpetrator of sexual harassment. The General Assembly has made the policy decision to create workplace discrimination liability only for employers, and today's majority guts that policy by removing any financial incentive for employers to take any proactive measures aimed at [**45] preventing sexual harassment in the workplace such as screening potential employees and supervisors, promptly responding to employee complaints, or adopting policies which clarify the employer's procedures for eliminating sexual harassment. Under the majority's logic, any employer itself found liable for hostile workplace discrimination need only bring an action against the "real" source of sexual harassment. This holding flies in the face of the statute, which places the onus for addressing sexual harassment issues on the employer. The majority opinion poorly serves the public interest by allowing employer wrongdoers to completely shift accountability to others. The General Assembly has made the decision to focus its statutory efforts to reduce employment discrimination on the actions of employers, and today's majority reverses that decision by judicial fiat.

[*790] For the reasons outlined above, I would reverse the decision of the Court of Appeals in each case and reinstate the summary judgments entered by the respective trial courts.

Johnstone, J., joins this dissent.

LEXSEE 1997 US DIST. LEXIS 20122

FALCO, a Delaware partnership, Plaintiff, v. ALPHA
AFFILIATES, INC., a Delaware corporation, WILLIAM J. McGRATH
and THOMAS J. ELLIOTT, Defendants.

Civil Action No. 97-494 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1997 U.S. Dist. LEXIS 20122

November 20, 1997, Argued, Wilmington, Delaware
December 10, 1997, Decided

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Elliott's motion to dismiss denied.

**COUNSEL:** For plaintiff: Janet Z. Charlton, Esq., Young, Conaway, Stargatt & Taylor, Wilmington, Delaware.

For Elliott, defendant: Mark A. Kearney, Esq., Elliott Reihner Siedzikowski & Egan, P.C., Blue Bell, Pennsylvania.

For Elliott, defendant: Kathleen M. Miller, Esq., Smith Katzenstein & Furlow LLP, Wilmington, Delaware.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINIONBY:** Murray M. Schwartz

**OPINION:**

   MEMORANDUM OPINION

ARGUED: November 20, 1997
DATED: December 10, 1997
Wilmington, Delaware

**Schwartz, Senior District Judge**

   I. Introduction

Falco, a Delaware partnership, brought this breach of contract action initially in the Superior Court of the State of Delaware, New Castle County against Alpha Affiliates ("Alpha"), a Delaware corporation, and against William J. McGrath ("McGrath") n1 and Thomas J. Elliott ("Elliott"), the two shareholders of Alpha. Both Elliott and McGrath are citizens of the Commonwealth of Pennsylvania. Falco alleges that defendants defaulted in the payment of rent and other amounts accruing under a lease into which defendants had entered. In addition, Falco [*2] asserted that both Elliott and McGrath guaranteed all amounts due under the lease.

   n1 McGrath has not answered this complaint. Elliott has signaled his intentions to bring a cross-claim against him.

Elliott filed a notice of removal on August 28, 1997 and removed the case to this Court, with diversity jurisdiction premised on *28 U.S.C. § 1332*. Now pending before the Court is Elliott's motion to dismiss the complaint against him for failure to state a claim upon which relief may be granted pursuant to *Fed.R.Civ.P.*

Case 1:04-cv-00583-GMS    Document 139-15    Filed 03/31/2006    Page 9 of 17

Page 2
1997 U.S. Dist. LEXIS 20122, *

12(b)(6) or alternatively, for transfer to the United States District Court for the Eastern District of Pennsylvania pursuant to *28 U.S.C. § 1404*.

For the following reasons, Elliott's motion to dismiss or transfer will be denied.

## II. Factual Background

Falco is the owner of a commercial building and lot at 196 Quigley Boulevard, New Castle, Delaware. By lease dated July 14, 1994, and signed on August 4, 1994, Falco leased the premises to Alpha. Elliott and McGrath signed the lease in both [*3] their representative corporate capacity for Alpha and in their individual capacities as "guarantors," and "individually," with their personal social security numbers listed below.

Alpha defaulted in the payment of rent shortly after the lease was signed. On April 19, 1995, Falco filed an action in the Superior Court for the State of Delaware, New Castle County, for amounts that were accruing under the lease. The rent was not accelerated by Falco. Because neither Elliott nor McGrath answered the complaint, a default judgment was entered against them on July 11, 1995, for the rent that had accrued through July 1995. This judgment was subsequently transferred to Montgomery County, Pennsylvania, so that Elliott's deposition could be taken in aid of execution of the July 1995 judgment.

Alpha discontinued business and dissolved in mid-1995. On September 19, 1995, three creditors of Alpha placed Alpha in an involuntary Chapter 7 proceeding in the United States Bankruptcy Court. On February 2, 1996, the United States Trustee reported that Alpha had no assets and the Bankruptcy Court closed the Chapter 7 case.

Falco brought this present complaint in Superior Court on August 19, 1997 against [*4] defendants to collect amounts that have accrued on the lease from July 1995 through the end of the lease term, which expired on July 31, 1997. n2 On August 28, 1997, Elliott removed the state court action to this Court.

> n2 Although the lease was initially set to expire on July 31, 1999, as of July 31, 1997, Falco completely mitigated any further damages by finding a permanent tenant to occupy the premises for the remainder of the lease term. Any mitigation that took place before July 31, 1997, through temporary tenants, has been allegedly deducted from the relief that Falco now seeks from defendants.

## III. Discussion

The Court will first address the transfer motion and then turn its attention to the motion to dismiss.

### A. Motion To Transfer

The Court will consider Elliott's motion to transfer under the transfer statute applicable to the facts of this case, *28 U.S.C. § 1404*. n3 This section provides "for the convenience of parties and witnesses, in the interest of justice, a district court may [*5] transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a)* (1993). As a preliminary matter, there is no reason this action could not have been brought in the Eastern District of Pennsylvania. *See 28 U.S.C. § 1391(a)*.

> n3 In his reply brief, Elliott's counsel asserted that Elliott was moving for transfer to the Eastern District of Pennsylvania based upon the doctrine of *forum non conveniens*, not im-

proper venue. However, since the transfer statute, 28 U.S.C. § 1404(a), was enacted, *forum non conveniens* has continuing application only in cases in which the alternative forum is abroad. *See American Dredging Co. v. Miller, 510 U.S. 443, 114 S. Ct. 981, 986 n.2, 127 L. Ed. 2d 285 (1994).* Recognizing this point of law at oral argument, Elliott's counsel withdrew his *forum non conveniens* argument.

That being said, the text of § 1404(a) directs the Court to examine (1) the convenience of the parties, (2) the convenience of the witnesses, and [*6] (3) the interests of justice, in determining whether transfer is proper. The Court of Appeals for the Third Circuit has said that a district court must examine "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995).* The *Jumara* Court identified both private and public interests that the district court should consider.

The private interests include: (1) plaintiff's forum preference as manifested in the original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties as indicated by their relative physical and financial condition, (5) the convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, (6) the location of books and records (similarly to the extent that the files could not be produced in the alternative forum). *See id.* (citations omitted).

Among the public interests are: (1) the enforceability of the judgment, (2) practical considerations that could [*7] make the trial easy, expeditious, or inexpensive, (3) the relative administrative difficulty in the two fora resulting from court congestion, (4) the local interest in deciding local controversies at home, and (5) the public policies of the fora. *See id.* (citations omitted).

Although the factors listed by the *Jumara* Court are merely illustrative and by no means exhaustive, the Court will address the *Jumara* factors which are applicable to the facts of this case as they represent a good jumping off point to consider Elliott's motion to transfer.

### 1. Private Interests

#### a. Plaintiff's Forum Preference

The plaintiff's choice of forum is entitled to substantial deference and "should not be lightly disturbed". *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970), cert. denied, 401 U.S. 910, 27 L. Ed. 2d 808, 91 S. Ct. 871 (1971).* The party seeking the transfer bears the heavy burden of establishing that transfer would be appropriate in this case. *See id.* Although this factor weighs against transfer, the Court must now turn to other factors to see if Elliott can overcome this "heavy burden" against transfer.

#### b. Convenience of the Parties [*8]

Elliott argues that it would be more convenient for him to litigate this claim in Pennsylvania because he will be forced to incur considerable expense in trying this matter in this Court. Elliott also asserts he will have to take time out from his daily practice of law and will suffer an income loss to attend to this matter. In addition, Elliott contends that he is a stranger to Delaware and has no contacts with the State. Lastly, Elliott maintains Pennsylvania is a convenient forum for Falco because Falco has entered judgment in Montgomery County,

Case 1:04-cv-00583-GMS    Document 139-15    Filed 03/31/2006    Page 11 of 17

Page 4
1997 U.S. Dist. LEXIS 20122, *

Pennsylvania and has deposed Elliott there. Falco points out, on the other hand, that Wilmington, Delaware, where this Court sits, is only 30 miles away from Philadelphia, Pennsylvania, where the Eastern District is located. Falco also contends that the July 1995 judgment was only transferred to Montgomery County, Pennsylvania and Elliott deposed there so that they could execute their previous judgment against him.

Elliott has not met his heavy burden to demonstrate the convenience of the parties favors transfer to the Eastern District of Pennsylvania. Simply put, the difference between litigating this case in Philadelphia versus Wilmington [*9] is minimal, perhaps an hour car ride at best. Moreover, for Elliott to aver that he is a stranger to Delaware is disingenuous since until 1995 he was one of two shareholders in a business in New Castle, Delaware. And even though Elliott is an individual, while Falco is a partnership, it is unclear to the Court why having the litigation in Wilmington would increase the economic burden on Elliott since he would most likely have to take time off from his profession in order to attend trial. Lastly, the Court does not think that entering judgment in Pennsylvania or deposing witness there in any way proves that the forum is convenient for a party. Moreover, if Elliott's position were adapted it would be nothing more than substituting defendant's convenience for plaintiff's convenience. Therefore, the convenience of the parties does not militate in favor of transfer.

c. **Convenience of Witnesses and Access to Documents**

Elliott asserts that since McGrath, himself, other witnesses to Alpha's obligations, and associated discovery, are all located in Pennsylvania, the Pennsylvania forum would be the more convenient venue. Falco contends that all of their witnesses are located in Delaware [*10] and that the records to establish what aspects of the rent are due and owing are also located in Delaware. The convenience of witnesses and access to documents factors are a wash and cannot be said to favor transfer.

d. **Where the Claim Arose**

Because this claim arose in the state of Delaware, this fact weighs against transfer.

2. **Public Interests**

a. **Local Interest in Deciding Local Controversies at Home**

Falco has alleged a breach of Delaware state contract law. While entitled to only slight weight, "it is preferable for the court of the state whose substantive law controls to hear the case." *In re ML-Lee Acquisition Fund II, L.P.*, 816 F. Supp. 973, 979 (D.Del. 1993). This factor therefore militates against transfer.

b. **Practical Considerations Concerning Trial**

At oral argument, defense counsel stated defendant would require the attendance of a witness employed by a Philadelphia financial institution and its records pertaining to the defunct Alpha venture. No consideration will be given to this factor because of the absence of affidavit support. *See, e.g., Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 475 (D.Del. 1995).

The Court notes that defendant's [*11] counsel, Mark Kearney, Esq. ("Kearney"), although primarily practicing in Pennsylvania, is a member of the Delaware Bar. Moreover, Kearney and Elliott practice law in Blue Bell, Pennsylvania. If this case were tried in the Eastern District of Pennsylvania, Kearney and Elliott would have to take a twenty minute automobile ride, while to Wilmington, Delaware, they would have an approximate hour ride. The differential in travel time

seemingly weighs slightly in favor of transfer.

### c. Public Policies of the Fora

Delaware has an interest in this case because it involves an alleged breach of a real estate lease written, signed, performed and defaulted upon in Delaware. Delaware has an interest in providing its citizens with laws which will vindicate their interests when a valid, binding contract into which they have entered is breached. Again, this factor does not favor transfer.

### 3. Conclusion

The Court comes to the inescapable conclusion that Elliott has not carried his onerous burden of establishing that transfer would be in the interests of justice; to the contrary, all but one factor favor Delaware as the proper venue. As a result, Elliott's motion to transfer will be [*12] denied.

## B. Motion to Dismiss For Failure to State A Claim

Elliott asserts three reasons why Falco has failed to state a claim upon which relief may be granted. First, Elliott asserts the Complaint does not, and cannot, state any basis for imposing guaranty liability, as the lease agreement between Falco and defendants is silent on any guaranty terms. Second, Elliott maintains Falco's claim for guaranty liability does not satisfy the Statute of Frauds. Third, Elliott contends that Falco is barred by principles of *res judicata* from bringing this suit. Each of these arguments will be considered seriatim.

### 1. Standard of Review

Elliott has moved to dismiss the Complaint pursuant to *Fed.R.Civ.P. 12(b)(6)*. The purpose of a motion to dismiss is not to resolve disputed facts or to decide the merits of the case, but instead to test the sufficiency of a complaint. *See Panhandle Eastern Pipe Line Co. v. Utilicorp United Inc., 928 F. Supp. 466, 469-70 (D.Del. 1996)* (citing *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993))*; see also *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)* (purpose of 12(b)(6) [*13] "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"). When considering a 12(b)(6) motion, the Court should "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)*. Only if the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, should the Court dismiss the complaint. *See Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994)*. Not surprisingly, the moving party has the burden of persuasion under this standard. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

### 2. Elliott's Suggested Grounds For Dismissal

#### a. Complaint Does Not State Any Basis For Guarantor Liability

Elliott contends that Falco's sole basis for liability against him is based upon a theory of guarantor liability; that is, Elliott is alleged to have guaranteed the lease between Falco and Alpha. Elliott [*14] asserts that there is no guaranty clause in the lease and there is no evidence in the language of the lease itself which supports the contention that he ever intended to act as a guarantor for this lease. Falco responds that Elliott did guarantee the lease and, therefore, is liable because of Al-

1997 U.S. Dist. LEXIS 20122, *

pha's default. Specifically, Falco brings to the Court's attention the signatory portion of the lease where Elliott has signed both for Alpha in his corporate capacity and individually as a guarantor, with his personal social security number stated as well. n4 Falco asserts that this is proof of Elliott's intent to sign the lease in his individual capacity as a guarantor. n5

> n4 The signatory portion of the lease reads, in pertinent part, as follows:
>
> Alpha Affiliates, Inc.
>
> Tenant
>
> By: /s/ Thomas J. Elliott 8/4/94
>
> Thomas J. Elliott (Date)
>
> /s/ Thomas J. Elliott 8/4/94
>
> Guarantor (Date)
>
> Thomas J. Elliott - Individually
>
> S.S. # 175 40 6878
>
> n5 It was pointed out at oral argument that Elliott is a commercial lawyer. This can cut both ways in that Elliott should have known what he was signing and either intended to be a guarantor or believed the lease would not subject him to guarantor liability.

[*15]

The Supreme Court of Delaware has not yet had the opportunity to pass on this specific question of guaranty liability, i.e., could the word "guarantor" standing alone impose guaranty liability? Therefore, as a federal court sitting in diversity, the Court must predict what the Delaware Supreme Court would do if faced with this same issue. In making this determination, the Court gives proper regard to the opinions of Delaware's lower courts. *See City of Erie, Pennsylvania v. Guaranty Nat'l Ins. Co.*, 109 F.3d 156, 159-60 (3rd Cir. 1997). The policies underlying applicable legal doctrine, current trends in the law and decisions of other courts also inform the Court's decision. *See id.* at 160 (citing *Wassall v. DeCaro*, 91 F.3d 443, 445 (3d Cir. 1996)).

Under Delaware law, a contract of guaranty is the promise to answer for the payment of some debt or for the performance of some obligation by another on the default of that third person who is liable in the first instance. *See Jones Motor Co., Inc. v. Teledyne, Inc.*, 690 F. Supp. 310, 313 (D.Del. 1988) (citing *Financeamerica Private Brands, Inc. v. Harvey E. Hall, Inc.*, 380 A.2d 1377, 1379 (Del.Super. 1977)). The guaranty [*16] is a separate contract involving duties and responsibilities which are different from the basic contract to which it is collateral. 690 F. Supp. at 313 n.4. In addition, "in order for a guaranty to be enforceable it must, with reasonable clearness, evidence an intent on the part of a party to become liable on an obligation in the event of default by the primary obligor." *Texas Commerce Bank Nat'l Assoc. v. Capital Bancshares et. al.*, 907 F.2d 1571, 1574 (5th Cir. 1990).

In its interpretation of this lease's "guarantor" language, the Court is guided by the recently issued *Restatement (Third) of Suretyship and Guaranty* § 15 (1996). n6 In relevant part, § 15 reads:

> **§ 15. Interpretation of the Secondary Obligation - Use of Particular Terms**
>
> Unless indicated to the contrary by applicable law, the language employed by the parties, agreement of the parties, or the context:

Case 1:04-cv-00583-GMS    Document 139-15    Filed 03/31/2006    Page 14 of 17

Page 7
1997 U.S. Dist. LEXIS 20122, *

> (a) if the parties to a contract identify one party as a "guarantor" or the contract as a "guaranty," the party so identified is a secondary obligor and the secondary obligation is, upon default of the principal obligor of the underlying obligation, to satisfy the obligee's claim with respect to [*17] the underlying obligation . . . .

*Id.* The Restatement also lends some helpful illustrations to this type of scenario:

> 2. P and O enter into an agreement whereby P is to construct a building for O. The agreement is also signed by S, who is described as "surety" with respect to P's duty. S is a secondary obligor and P is a principal obligor. The underlying obligation is the agreement of P to construct the building. In the absence of language or circumstance to the contrary, the secondary obligation is the agreement of S to be jointly and severally liable to construct the building.

*Restatement (Third) of Suretyship and Guaranty,* § 15, Illustration 2. Although the illustration above refers to a "surety" rather than a "guarantor," the only difference between the two terms is that a "surety" is jointly and severally liable with the principal obligor to perform the obligation set forth in the contract, *see Restatement (Third) of Suretyship and Guaranty,* § 15(c), while a "guarantor", upon default of the principal obligor on the underlying obligation, satisfies the obligee's claim with respect to the underlying obligation. *See id.* at § 15(a).

> n6 The Court predicts that the Delaware Supreme Court would adopt the views found in the Restatement (Third) of Suretyship and Guaranty. Previously, the Court of Chancery of Delaware quoted approvingly *Restatement (First) of Security* § 88, *see Kent County Levy Ct. v. Int'l Underwriters, Inc.,* 1985 Del. Ch. LEXIS 480, 1985 WL 149635, at *3 (Del.Ch. July 31, 1985), which has now been superseded in part by the *Restatement (Third) of Suretyship and Guaranty* § 15.

[*18]

Analogizing to the Restatement illustration, and keeping in mind the distinction between a guarantor and a surety, it is quite possible, under a given set of facts, that Elliott and McGrath could be found to have signed the agreement between Falco and Alpha as "guarantors". Because there is no language or circumstance to the contrary, the secondary obligation, under this scenario, could be the agreement of Elliott and McGrath to satisfy Falco's claim with respect to the lease upon default of Alpha. Although there is no express guarantee contract or clause with terms and responsibilities spelled out, Section 15 takes the position that a separate writing was not required in order to impose guarantor liability.

Case 1:04-cv-00583-GMS   Document 139-15   Filed 03/31/2006   Page 15 of 17

Page 8
1997 U.S. Dist. LEXIS 20122, *

That leaves the issue of for what exactly are Elliott and McGrath guarantors. The Restatement counsels that, "Even if the satisfaction of the principal obligor's duty to the obligee pursuant to the underlying obligation is limited to a particular . . . property, the secondary obligation is to the pay the full amount of the obligee's claim." *Restatement (Third) of Suretyship and Guarantee* § 15, cmt. c. Therefore, based upon the contract signature, Falco should not be foreclosed [*19] from seeking to have Elliott held liable for the full amount owing to Falco under the lease.

There is authority consistent with the Restatement that the use of certain language on a document can act to serve as a guarantee contract, absent any guarantee language in the body of the contract. See *Franklin Commercial Discount Co. v. Goodman*, 12 N.J. Misc. 70, 169 A. 534 (N.J. Supr. 1933). In *Franklin*, the Court held that the language, "I hereby guarantee this account" on the back of a credit application, sufficient to set up a guaranty and survive defendant's motion to nonsuit. See *id.* at 72. In a more recent case, Judge Pollak held that even though, "the word 'guaranty' need not appear in the writing for it be construed as one of guaranty, still the language of the instrument should first be considered, and 'must indicate, with at least reasonable clearness, an intention to enter into a contract of guaranty . . . .'" *Crestar Mortgage Corp. v. Peoples Mortgage Co., Inc.*, 818 F. Supp. 816, 819, fn.4 (E.D.Pa. 1993) (quoting in part 38 C.J.S. Guaranty § 18, at 1155 (1943)).

The fact that Elliott signed the lease as a guarantor in his individual capacity, and with his social [*20] security number included, could signal Elliott's intent to be held liable as a guarantor in the event that Alpha was unable to meet the terms of the lease. This conclusion is consistent with the outcome that would result upon a strict application of the Restatement language to the facts of this case. In summary, the procedural posture of a motion to dismiss dictates the Court consider the possibility that Falco may be able to hold Elliott liable as a guarantor because Falco has put forward a set of facts in support of its claim which would entitle it to relief. Elliott's motion to dismiss must be denied on this first asserted ground.

**b. Plaintiff's Claim Does Not Satisfy The Statute of Frauds**

Elliott maintains his signature on the lease as a guarantor does not satisfy the Statute of Frauds, DEL. CODE ANN. tit. 6, § 2714(a) (1993). n7 Because the lease on its face does not contain terms defining guaranty liability, Elliott avers that the Statute of Frauds has not been satisfied and Falco has not stated a claim to impose guaranty liability upon him. Falco answers Elliott's contention by asserting that the memorialization of a guaranty does not have to be in the form of a written [*21] contract as long as there is some memorandum or notes signed by the party to be charged. Therefore, Falco contends that Elliott's signing of the lease in his individual capacity as guarantor satisfies the Statute of Frauds.

n7 In pertinent part, the Statute of Frauds reads:

> No action shall be brought to charge any person upon any agreement made . . . to charge any person to answer for the debt, default, or miscarriage, of another . . . unless the contract is reduced to writing, or some memorandum, or

notes thereof, are signed by the party to be charged therewith . . . .

DEL. CODE ANN. tit. 6, § 2714(a).

In determining whether any particular writing satisfies the Statute of Frauds, Delaware relies on the *Restatement (Second) of Contracts* § 131 (1981). *See Lindsey v. M.A. Zeccola & Sons, Inc.*, 26 F.3d 1236, 1239 (3d Cir. 1994) (citing *Kirschling v. Lake Forest Sch. Dist.*, 687 F. Supp. 927, 931 (D.Del. 1988)). § 131 requires that at least one of the writings be (1) signed by the party to be [*22] charged and that (2) all the writings taken together:

> (a) reasonably identify the subject matter of the contract, (b) [are] sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and (c) state[] with reasonable certainty the essential terms of the unperformed promises in the contract.

*Lindsey*, 26 F.3d at 1239 (quoting *Restatement (Second) of Contracts* § 131). In this case, all the requirements are met: first, the lease has been signed by Elliott, the person to be charged; second, the lease reasonably identifies the subject matter of the contract; third, the lease is sufficient to indicate that a contract has been entered into by the parties; and fourth, the lease states with reasonable certainty the essential terms of the unperformed promises of the contract. *See Kirschling*, 687 F. Supp. at 930-32 (applying the Restatement factors to an employment contract case and finding Statute of Frauds met, for among other reasons, minutes were signed by the person to be charged).

The *Restatement (Third) of Suretyship and Guaranty,* § 11 (1996), is in accord with this conclusion. § [*23] 11 states: "Pursuant to the Statute of Frauds, a contract creating a secondary obligation is unenforceable as a contract to answer for the duty of another unless there is a written memorandum satisfying the Statute of Frauds or an exception applies." *See id.* at § 11(1). It is clear from the text of the Restatement, and its commentary, that a signature appended to a written contract satisfies the written memorandum requirement. *See id.* at § 11, cmt. b (using the words 'writing' and 'signature' interchangeably). Therefore, the Court is unpersuaded by Elliott's argument that there must be a separate guarantee contract, with its own essential terms and subject matter, which is written and signed. Further, under Delaware law, as construed by the Court of Appeals for the Third Circuit, there is no reason to believe such a separate guaranty contract is necessary as long as some guarantee language is written on the contract and signed by the person to be charged. n8 *See Lindsey*, 26 F.3d at 1239; cf. *Kirschling*, 687 F. Supp. at 931-32. In this case, the Court finds the words "guarantor", "individually" and the personal social security numbers of Elliott and McGrath sufficient [*24] as guarantee-type language in the written contract. The Court therefore finds that the lease meets the requirements of the Statute of Frauds and is not unenforceable on these grounds.

> n8 Elliott points to *Abramson v. Delrose*, 132 F. Supp. 440 (D.Del. 1955), to support his position that there must be a separate guaranty contract with sepa-

rate contract essentials for the Statue of Frauds to be met. However, *Abramson* stands for the proposition that where the original contract was oral, and therefore not signed, other memoranda might be sufficient to meet the Statute if at least one of those writings is signed by the party to be charged. In the present case, the lease was signed in writing by the party to be charged and therefore, *Abramson* is inapplicable.

**c. Res Judicata Bars the Bringing of this Complaint**

Elliott's last argument need not detain one. Elliott asserts that Falco is barred from bringing this second claim for the same damages, on the same claims, and against the same defendants, after **[*25]** already obtaining a judgment for this claim. Falco urges principles of *res judicata* are inapplicable.

Under the doctrine of *res judicata*, a claim may not be asserted if: 1) there was a final judgment on the merits in a prior suit; 2) the prior suit involved the same parties or their privies; and 3) any subsequent suit was based on the same cause of action. *See Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 963 (3d Cir. 1991)*. Although Falco's previous default judgment against Elliott and the other defendant satisfies the first two factors of the *res judicata* test, the third factor is not met. From what is before the court, it appears the previous law suit was for damages up to July of 1995. This complaint represents a different cause of action for amounts owed under the lease that were not due as of July 1995. Therefore, Falco's cause of action is separate and different from the previous cause of action brought in July of 1995 and is not precluded under principles of *res judicata*.

For the foregoing reasons, Falco has stated a claim upon which relief may be **[*26]** granted and Elliott's motion to dismiss will be denied.

An appropriate order will issue.