LEXSEE 884 A.2D 513

**INTERIM HEALTHCARE, INC, CATAMARAN ACQUISITION CORP. and
CORNERSTONE EQUITY INVESTORS, IV, L.P., Plaintiffs, v.
SPHERION CORPORATION, Defendant.**

**C.A.No. 00C-09-180-JRS (consolidated)**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*884 A.2d 513; 2005 Del. Super. LEXIS 32*

**July 20, 2004 Submitted
February 4, 2005, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *Interim Healthcare, Inc. v. Spherion Corp., 2005 Del. LEXIS 416 (Del., Oct. 31, 2005)*

**PRIOR HISTORY:** [**1] Decision After Non-Jury Trial. Judgment for Plaintiffs. *Interim Healthcare, Inc. v. Spherion Corp., 2003 Del. Ch. LEXIS 130 (Del. Ch., Nov. 19, 2003)*

**DISPOSITION:** Judgment for plaintiffs in part and for defendant in part.

**COUNSEL:** Attorneys for Plaintiffs: Sean J. Bellew, Esquire, COZEN O'CONNOR, Wilmington, Delaware; Robert W. Hayes, Esquire, Sarah E. Davies, Esquire and Mary Craine Lombardo, Esquire, COZEN O'CONNOR, Philadelphia, Pennsylvania.

Attorneys for Defendant: Allen M. Terrell, Jr., Esquire and Alyssa M. Schwartz, Esquire, RICHARDS, LAYTON & FINGER, Wilmington, Delaware.

**JUDGES:** SLIGHTS, Judge.

**OPINIONBY:** SLIGHTS

**OPINION:**

SLIGHTS, Judge [*516]

---

TABLE OF CONTENTS*

| | |
|---|---:|
| I. | 2 |
| A. The Parties | 2 |
| B. The Medicare Cost Reimbursement Program | 4 |
| C. Cost Reports | 8 |
| 1. The Regulation of Cost Reports | 10 |
| 2. Interim's Cost Reports | 12 |
| a. The Three Component A&G Methodology | 13 |
| b. The Allocation of Capital Costs | 18 |
| c. Regional Vice President and Branch Manager Salaries | 20 |

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

## TABLE OF CONTENTS*

D. Interim's Pre-Sale Discussions With Its Fiscal Intermediaries          21

E. Catamaran Acquires Interim at Auction                                  28
1. The Timing of the Sale                                                 28
2. The Financial Statements                                              29
a. The Audited Historical Financial Statements                           29
b. The Pro Forma Financial Statements                                    31
c. The Medicare Reserves                                                 33
d. The Descriptive Memorandum                                            34
3. Cornerstone's Due Diligence                                           36
4. Cornerstone's Final Bid                                               39
5. The Restated Stock Purchase Agreement                                 40
a. The Medicare Provisions                                               43
b. The Financial Statements Provision                                    45
c. The Pending or Threatened Litigation or Liabilities
Provisions                                                               46
d. The Indemnification Provisions                                        47

F. Interim's Pre-Sale Liabilities                                        49
1. The Medicare Adjustments                                              50
2. The Black and Burns Franchise Loans                                   53
3. The Huff Litigation                                                   57
4. The Williams Litigation                                               60
5. The Therapy Student Claims                                            61

II.                                                                      64

A. Preliminary Findings of Fact and Conclusions of Law                   64
1. The Burden of Proof                                                   64
2. The Parol Evidence Rule                                               65
3. There is No Evidence of Fraud or Intentional
Misrepresentation                                                        67
4. The Elements of a Breach of Contract Claim                            69
5. Catamaran Has Standing to Allege a Breach of
the Agreement                                                            70
6. The Contractual Allocation of Risk and Expectancy Damages             71

B. The Medicare Adjustments                                              79
1. The Parties' Contentions                                              79
2. The Interpretation of the Applicable Provisions of
the Agreement                                                            83
a. Section 3.16                                                          83
b. Section 3.17                                                          90
3. The Medicare Experts                                                  93
4. The Audit Conclusions of HCFA and the FI are
Not Dispositive                                                          98
5. Cross-Subsidization                                                   99
6. The Three Component A&G Methodology                                  101
7. The Allocation of Capital Costs                                      109
8. The Allowance of Regional Vice-President
and Branch Manager Cost                                                 115
9. The Failure to Adjust Visits to the Provider's Statistical and

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

## TABLE OF CONTENTS*

Reimbursement Report                                              119
10. The Miscellaneous Violations of Law                          120
11. Causation and Damages                                        121

C. The Interim Financial Statements                              124
1. The Parties' Contentions                                      124
2. The Adequacy of Interim's Reserves                            126

D. The Remaining Section 10.1 Indemnification Claims             135
1. The Burns and Black Franchise Loans                           136
2. The Huff Litigation                                           138
3. The Williams Litigation                                       142
4. Plaintiffs Are Not Entitled To Indemnification For Any
Damages Indemnifiable Under Section 10.1                         145

E. The Therapy Student Claims                                    145
1. The Definition of Therapy Student In the Agreement            147
2. The Therapy Student Reserve                                   149
3. Notice of Therapy Student Claims                              151
4. Indemnification for the Therapy Student Claims                155

F. Plaintiffs Are Not Entitled to Expectancy Damages            156
III.                                                             157
The following table of contents
is included solely for the purpose
of aiding the reader
and is not part of the Court's
official opinion.
Therefore, all publishers
should feel comfortable
repaginating this table
for any subsequent publication.

---

**[**2]**

**[*517]** This lawsuit involves claims arising from alleged breaches of an intensely negotiated stock purchase agreement for the sale of Interim Healthcare, Inc. ("Interim") by defendant, Spherion Corporation ("Spherion"), to plaintiffs, Catamaran Acquisition Corp. ("Catamaran") and Cornerstone Equity Investors, IV L.P. ("Cornerstone") (the transaction will be referred to hereinafter as "the Sale"). The plaintiffs, Interim (as acquired), n1 Catamaran and Cornerstone, allege that Spherion breached several representations and warranties in the Agreement by failing adequately to disclose numerous pre-Sale liabilities of Interim and by misrepresenting the financial condition of Interim in the financial statements supplied to the plaintiffs during due diligence. Plaintiffs seek damages under the indemnification provisions of the Agreement and also seek expectancy/benefit-of-the-bargain damages for the difference between what they paid for Interim **[*518]** and the actual value of Interim at the time of the Sale.

n1 References to "Interim" prior to the Sale shall be to the division of Spherion that provided healthcare services; refer-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

ences to "Interim" after the sale shall be to the entity acquired by Catamaran. Where necessary, the Court will indicate parenthetically to which Interim entity it is referring. The Court's reference to "plaintiffs" shall be to all plaintiffs unless otherwise indicated.

[**3]

After a three week bench trial and post-trial submissions by the parties, this is the Court's findings of fact and conclusion of law. In short, the Court has found in favor of the plaintiffs on Counts I and II of their Amended Complaint and awards damages to plaintiffs in the amount of $ 1,070,719.47. The Court has found in favor of Spherion on Counts III of the Amended Complaint, Count I of the Court of Chancery Complaint (previously transferred to this Court), and on plaintiffs' claim for expectancy damages.

This Opinion, necessarily lengthy given the size of the trial record and the complexity of the claims, is organized as follows: Part One describes the parties, the background facts and the Court's findings of fact where the parties disagree. Part Two summarizes the claims and defenses and sets forth the Court's analyses and conclusions of law. Finally, Part Three summarizes the Court's conclusions and directions for the entry of the appropriate verdict and judgment on the docket.

I.

A. The Parties

Prior to September 26, 1997, Spherion (formerly known as Interim Services, Inc.), a Delaware corporation, operated two principal divisions, a commercial staffing division [**4] and a healthcare division. The healthcare division initially focused on providing temporary nurses to hospitals. n2 Eventually, the healthcare segment of Spherion's business grew with its entry into the home healthcare, physical therapy, and other health-related markets. n3 By the time Spherion sold its healthcare business in 1997, Interim had become the second largest independent home healthcare company in the United States. n4 As of December 27, 1996, Interim "operated a network of 391 home care offices in 45 states and 4 Canadian provinces." n5

n2 D.I. 109, at 3-5; D.I. 100, at PP 33-36. ("D.I    " shall refer to the applicable docket item in the Superior Court docket; "PX " shall refer to the applicable plaintiffs' exhibit; and "DX    " shall refer to the applicable defense exhibit. All references to the parties' Pretrial Stipulation, D.I. 1.00, shall be to the paragraphs of the stipulated statement of facts contained therein unless otherwise indicated.)

n3 D.I. 109, at 3-5; D.I. 100, at PP 33-36.

n4 PX 123, at Sph 012139.

n5 Id.

[**5]

Of Interim's 391 home care offices, 285 of them were operated by Interim franchisees. n6 The remaining home care offices were owned by Spherion and operated by Interim directly. The majority of Interim's revenues (approximately 75%) were derived from reimbursements for services from private payers (individual patients and private health insurers). The remaining approximately 25% of Interim's revenues were derived from Medicare program reimbursements. n7

n6 D.I. 100, at P 37.

n7 DX 29.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Cornerstone is a private equity firm based in New York. n8 Over its twenty year history, Cornerstone has focused its investment activities in four basic areas: technology, retail, consumer business services and healthcare. n9 Cornerstone's investors (approximately 30 in number) are primarily state pension funds and large corporate pension funds. n10 Cornerstone [*519] formed Catamaran in 1997 as the vehicle through which it would acquire Interim. n11

n8 D.I. 114, at 30.

[**6]

n9 *Id*. at 36.

n10 *Id*. at 37.

n11 D.I. 100, at P 91.

**B. The Medicare Cost Reimbursement Program**

As indicated, a significant percentage of Interim's revenues were derived from Medicare reimbursements. It is not surprising, then, that this segment of Interim's operation was a focal point of the parties' discussion prior to the Sale. Given the intense regulatory environment in which the Medicare program operates, it is also not surprising that the Medicare aspects of Interim's operations has become a focal point of the parties' dispute after the Sale and a key aspect of this litigation. The Medicare program, and Interim's interaction with it, both are quite complicated. The Court will address the background of this aspect of the case in detail in light of its importance to the plaintiffs' summital claim for relief

Medicare is a federally funded program created in 1966 by the Social Security Act, *42 U.S.C.* § 1395 (the

"Medicare statute"), to provide healthcare coverage for a designated population, including the elderly and disabled. n12 At the time [**7] of the events giving rise to this controversy, the Medicare program was administered by the Health Care Financing Administration of the Department of Health and Human Services ("HCFA"). n13 The Medicare program is comprised of two parts: "Part A" provides coverage for in-patient hospital andpost-hospital care, home health services and hospice care; "Part B" is a voluntary supplemental health insurance program that provides coverage for services rendered by physicians and other out-patient healthcare providers. n14 Skilled-intermittent nursing, physical therapy and home health aid services rendered by a home health provider to Medicare program beneficiaries are recognized by Medicare in Part A as "covered services." n15 Other services, such as regular "private duty" nursing care, are not covered by Medicare. n16

n12 *Id*. at P 1.

n13 *Id*. at PP 2-3. HCFA is now known as the Centers for Medicare and Medicaid Services ("CMS"). *Id*. at P 3.

n14 *Id*. at P 4. *See also 42 U.S.C.* §§ 1395c, 1395j.

n15 *Id*. at PP 6-7; DX 87, at 6.

n16 D.I. 100, at PP 6-7.

[**8]

Prior to a restructuring of Medicare reimbursement in October, 2000, home healthcare providers were reimbursed for covered services on a per-visit, retroactive cost basis. n17 Under this system, Medicare reimburses providers only for the allowable costs of providing the covered services they render to Medicare beneficiaries. n18

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Providers are not entitled to make a profit on billings to Medicare by inflating costs or by improperly shifting non-Medicare costs to the Medicare program. n19 In determining reimbursable costs, Medicare takes into account both the provider's direct and indirect costs to provide services to Medicare beneficiaries. n20 The intent of the reimbursement scheme is to ensure [*520] that the cost of delivering covered services to Medicare beneficiaries is not born by the provider's non-Medicare patients and, likewise, that the cost of providing services to the provider's non-Medicare patients is not born by Medicare beneficiaries. n21

n17 DX 87, at 6. On October 1, 2000, Medicare began to reimburse Part A providers through a "prospective payment system" which reimburses provider costs "based on a predetermined rate" rather than a "retrospective" calculation "based on [previously-filed] cost reports." FARROW, ET AL., *HEALTH LAW* ⸹ 13-10 (West 1995). *See also* D.I. 119, at 35-37.
[**9]

n18 D.I. 100, at P 7. *See 42 U.S.C.* ⸹ 1395f(b)(1)(A).

n19 D.I. 100, at PP 6-7.

n20    42    U.S.C.    ⸹ 1395x(v)(1)(A)(i);  42  C.F.R.  ⸹ 413.9(b).

n21 D.I. 100, at P 8. *See also 42    U.S.C.    ⸹ 1395x(v)(1)(A)* (defining "reasonable cost" of services as the "cost actually incurred" and stating that the cost "shall be determined in accordance with regulations establishing the method or methods to be used. . . .").

Under the retroactive cost reimbursement system, the provider bills the Medicare program as it delivers services to program beneficiaries. Medicare, in turn, pays the provider either on a "claim-by-claim" basis or on the basis of estimated lump-sum, bi-weekly payments known as periodic interim payments ("PIP"). n22 Such payments are estimates of the costs of delivering services and supplies to program beneficiaries based on past performance. At the end of the program year (usually the provider's fiscal year), the provider prepares and submits to Medicare a year-end "cost report" in which [**10] it calculates the costs it incurred to provide services to Medicare beneficiaries during the fiscal year for which the cost report is being submitted. n23 To the extent the actual costs vary from the estimated costs for which the provider already received PIPs, an adjustment occurs and the provider either pays back to Medicare any excess reimbursement or receives from Medicare any reimbursement to which it is owed. n24

n22 DX 87, at 7.

n23    *See    42    C.F.R.* ⸹ 413.24(f). The provider also submits interim cost reports during the course of the year in order to receive its PIP. The year-end cost reports are reconciled with the interim cost reports and a determination is made as to whether the provider requested too much or too little reimbursement during the course of the year. D.I. 100, at P 23.

n24 *Id.* at PP 23-27. Upon review of the cost report, the FI furnishes to the provider a Notice of Program Reimbursement ("NPR") in which the FI gives notice to the provider of the total amount of reimbursement due, including any adjustments that have been made (with explanations and

Case 1:04-cv-00583-GMS    Document 139-17    Filed 03/31/2006    Page 7 of 25

Page 7

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

citations to applicable author-ity). *See* 42 C.F.R. § 405.1983(a)(1)(b).

**[**11]**

The Medicare statute authorizes HCFA to delegate to insurance companies and other private parties the responsibility for processing billings from healthcare providers and for verifying that such requests for reimbursement are consistent with the Medicare statute and the rules and regulations interpreting the statute. These entities, known as "Fiscal Intermediaries" ("FI"), are assigned to the healthcare providers by HCFA and are the first point of contact for the providers when interacting with the Medicare program. n25 With respect to home healthcare companies, the FI specifically is charged with responsibility for enforcing the Medicare principles of retroactive costs by, among other measures, scrutinizing requests for PIP and scrutinizing the year-end cost reports submitted by the providers. n26

> n25 *42 U.S.C. § 1395h.*
>
> n26 *Id.*

**C. Cost Reports**

The process by which a provider seeks reimbursement from Medicare Part A, at first glance, appears quite simple. First, the provider **[**12]** must identify the costs, both direct and indirect, associated with providing reimbursable services to all of its patients, both Medicare beneficiaries and non-Medicare beneficiaries alike. n27 Once **[*521]** the provider has identified the costs associated with providing reimbursable services, the provider must then divide that number by the number of covered services provided during the fiscal year. This process yields a "cost per visit" or "cost per service." n28 That number is

then multiplied by the number of services rendered to Medicare beneficiaries during the fiscal year. This number yields the total Medicare reimbursement for that year. n29

> n27 A "direct cost" would include such items as the salary of the care provider and the cost of medical equipment used in the provision of care. "Indirect costs" would include such items as office overhead and other administrative expenses that are supportive of, but not directly related to, patient care. D.I. 100, at PP 16-17.
>
> n28 As indicated, not all medical services are reimbursed by Medicare. For instance, Medicare will not reimburse for home nursing services provided on a sustained, "private duty" basis. For reimbursement purposes, then, such services must be segregated from the reimbursable intermittent nursing services in order to reach an "average cost per visit." *Id.*

**[**13]**

> n29 *Id.* at P 22.

The allocation of the provider's direct costs is relatively straightforward. By way of example, if a nurse is providing both reimbursable intermittent nursing care, and non-reimbursable long-term "private duty" care, the direct cost of her salary would be allocated to Medicare by determining the extent to which she provided reimbursable services, and allocating that portion of her salary as a direct cost to be reimbursed by Medicare. n30 Indirect costs in the "chain provider" n31 context, on the other hand, present a range of more complicated issues, from identifying reim-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

bursable indirect costs, n32 to determining in what manner they may be allocated as between healthcare and non-healthcare businesses, and as between Medicare and non-Medicare services. n33 It is this aspect of Interim's cost reports that is primarily at issue here.

n30 *See generally Id.* at P 18.

n31 A "chain provider" is a provider with multiple facilities in multiple locations. *Id.* at P 16.

n32 Certain "indirect" costs may not be submitted to Medicare for reimbursement For instance, Medicare will not reimburse providers for costs associated with "marketing," defined generally as activities intended to increase utilization of the provider's Medicare services. *Id.* at PP 17-18.

[**14]

n33 Interim's cost allocation was made more complex by the nature of its operations. Not only did Interim operate multiple locations, it also offered a wide spectrum of services, some of which were reimbursable by Medicare and others of which were not. Moreover, Interim treated both private-pay patients as well as Medicare beneficiaries. Finally, Interim was a division of a company that offered both healthcare services and non-healthcare temporary staffing services. This dynamic created a particularly complicated regulatory environment in which Spherion was expected to allocate its costs for purposes of seeking Medicare reimbursement.

**1. The Regulation of Cost Reports**

The regulation of the home health industry's participation in Medicare and, particularly, the submission of cost reports, is executed through a complex scheme that begins with the Medicare statute itself. From there, the provider looks to regulations promulgated by HCFA, a provider manual published by HCFA (the Provider Reimbursement Manual or "PRM"), regular bulletins from HCFA called "Transmittals" that attempt to clarify [**15] or update the regulations or the PRM, and more informal communications or directives from the FI. n34 Unfortunately, these links of authority from which the provider may seek guidance do not always make a perfect chain. In some instances, the links offer vague [*522] guidance, n35 and at other times contradict one another, leaving the provider to make its best guess as to proper procedure. n36

n34 D.I. 106, at 207-08; DX 119, at 48-49.

n35 *See e.g.* PX 334 at 2150.2A ("Home office costs directly related to those services performed for individual providers which relate to patient care, plus *an appropriate* share of indirect costs . . . are allowable *to the extent they are reasonable*.") (emphasis supplied).

n36 *Compare* PX 69 (Transmittal 2), PX 70 (Transmittal 3) with DX 263 (Transmittal 4). *See also* DX 65 (FI acknowledges "inconsistencies in written and verbal direction from HCFA."); D.I. 118, at 68-69, 72 ("We were getting conflicting information from the [FI] . . .; ". . . talking directly to HCFA [we were] hearing one thing, but then in writing it says another. So we just felt it was -- we were getting conflicting information. So we were sticking with what we felt was right.").

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

[**16]

With respect to cost reports spe-
cifically, the Medicare statute offers
little, if any, direct guidance. It
simply directs that the provider shall
be entitled to the payment of the
lesser of its reasonable and customary
charges, the costs it incurred to pro-
vide the service, or established cost
limits. n37 The Medicare statute also
generally prohibits cost reimbursement
methodologies that will result in
"cross-subsidization" -- any process
that would enable the provider improp-
erly to recoup from Medicare its non-
Medicare related costs. n38 Beyond
this, the provider must turn to secon-
dary authorities for direction.

n37  *See   42   U.S.C.  §*
*1395f(b)(1)(A).*

n38 *Id.*

HCFA's regulations offer slightly
more definitive guidance, but are by
no means step-by-step instructions.
n39 The PRM and, occasionally, HCFA's
Transmittals address in some more de-
tail the manner in which a provider
should allocate costs for purposes of
preparing cost reports and seeking re-
imbursement. n40 And finally,  [**17]
the FIs themselves frequently offer
their own interpretation of the appli-
cable authority, which interpretations
may vary from year to year and from FI
to FI. n41

n39 *See e.g., 42 C.F.R.  §*
*413.24 (d)(1)* (generally describ-
ing the "step-down method" of
cost allocation).

n40 *See* D.I. 100, at P 20.

n41 D.I. 119, at 31-34.

Providers submit their cost reports
to their FI on forms supplied by HCFA.

n42 The FI reviews the cost reports
and notifies the provider if it owes
the Medicare program for overpayments
it received during the year or if
Medicare owes the provider because the
provider was not paid enough in the
PIPs. n43 If the provider disagrees
with the adjustments made by the FI,
the provider may appeal the findings
to HCFA's Provider Reimbursement Re-
view Board ("PRRB") and, if appropri-
ate, to an Administrative Law Judge
and up the appellate chain from there.
n44

n42 PX 739, at 3; DX 87, at 9.
[**18]

n43 D.I. 119, at 50-53; D.I.
100, at PP 26-28.

n44 *See generally* DX 87, at 7,
12-14.

## 2. Interim's Cost Reports

Like all chain providers, Interim
was required to file two types of cost
reports with HCFA: (1) separate cost
reports on behalf of the providers at
each branch location from which it
provided services; and (2) a single
cost report on behalf of the Spherion
home office where the operations of
each branch provider were coordinated.
With respect to the home office cost
reports, Interim was required to allo-
cate corporate overhead first as be-
tween the healthcare business and the
non-healthcare business of Spherion,
and then as among its various provid-
ers. HCFA requires the provider equi-
tably to allocate corporate costs be-
tween healthcare and non-healthcare
[*523] businesses to ensure that the
Medicare program does not subsidize
the non-healthcare business by provid-
ing reimbursement for non-healthcare
costs. n45 Once the home office costs
were allocated properly to the provid-
ers, Interim then could report such

Case 1:04-cv-00583-GMS    Document 139-17    Filed 03/31/2006    Page 10 of 25

Page 10

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

costs in the individual provider cost reports and at that level seek reimbursement **[**19]** for all reimbursable costs. n46

n45 D.I. 100, at P 19.

n46 *Id.* at P 16. Stated differently, in order to pass operational costs on to Medicare, Interim would move its home office costs down to each provider. The provider, in turn, would add the home office costs to its own costs to reach its total reimbursable costs. *See* D.I. 121, at 6.

**a. The Three Component A&G Methodology**

To allocate costs properly at the provider level, Interim, like all chain providers, had to devise an appropriate methodology to allocate operational costs in a manner that reflected those costs that were reimbursable and those that were not. The distinction between reimbursable and non-reimbursable costs at the home office level was made for the chain providers on Interim's home office cost report. All home healthcare providers are required by regulation to undertake this process, known as "cost finding," by employing a "step down cost finding methodology." n47

n47 *See* 42 *C.F.R.* § 413.24(d). "Under the cost finding process, data from the accounts ordinarily maintained by a provider is recast in order to ascertain the costs of the type of services rendered. This is done by allocating direct costs and prorating indirect costs." DX 117, at 7 (citing *42 C.F.R.* § 413.24(b)(1)).

**[**20]**

In 1991, Interim began to utilize a "step down" cost allocation methodology referred to as "the three component administrative and general ("three component A&G") methodology." n48 Under the three component A&G methodology, Interim first had to identify its "cost centers," i.e., organizational units within Interim that were operated for the benefit of the institution as a whole. n49 Interim then allocated its costs using a three-step process. First, Interim would allocate the costs of its "servicing center"(home office) down to "operating centers" that were located off site from the home office and included Medicare Billing, Medicare Compliance and a Processing Center (payroll, etc.) at one location, Quality Assurance, Commercial Operational Support and Franchise Operational Support at another location, and Regional Field Offices at various locations. The combined servicing center and operational center costs would then be allocated from the operating centers down to the providers using the three component A&G methodology. n50

n48 D.I. 100, at PP 20-21, 44. "A&G" stands for administrative and general costs incurred at both the home office and provider levels.

**[**21]**

n49 D.I. 100, at P 20. "Cost centers" would include such "organizational units" as the accounting, legal, billing and human resource departments within Spherion. *See* PX 733.

n50 D.I. 110, at 91-108. *See also* PX 733.

In the second step of its cost allocation, Interim identified three "A&G components" to which it could al-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

locate its home office costs: (1) reimbursable or intermittent A&G (A&G related to Medicare-type services); (2) non-reimbursable A&G (A&G related to non-Medicare activities); and (3) shared A&G (A&G that benefitted all cost centers). n51 "Shared A&G" included any A&G generated as a result of activities that supported both intermittent and non-intermittent services. Interim interpreted the guidance from HCFA as directing that it allocate A&G **[*524]** to shared A&G whenever it arose even "slightly" from both intermittent and non-intermittent activities. n52 By regulation, the costs of non-revenue producing centers must be allocated to the cost centers they serve by using an "allocation statistic" designed fairly to reflect the extent to which each cost center uses the services **[**22]** rendered by the cost center being allocated. n53

n51 D.I. 100, at PP 44-46.

n52 *See* PX 689, at 8; D.I. 101, at 26-28.

n53 *42 C.F.R. § 413.24.* Prior to adopting the three component A&G methodology, Spherion utilized an allocation statistic for indirect costs that was the product of the ratio between the direct costs incurred by the departments providing "Medicare-like services" and those providing "non-Medicare-like services." For example, if each division generated fifty percent of the total direct costs the provider incurred, fifty percent of the apportioned home office and provider indirect costs would be allocated to each department. In essence, then, all costs were allocated to a "shared bucket" from which only some of the costs were reimbursable. D.I. 101, at 16-17. Under the three component A&G methodology, however, the allocated home office costs would be

segregated into three components (or "buckets"), as outlined above, including a 100% reimbursable "bucket." There appears to be no dispute that the three component A&G methodology, given Spherion's particular circumstances, yielded a greater level of reimbursement from Medicare than its prior methodology.

**[**23]**

In the final step of the process, Interim "closed out" or apportioned its three component A&G cost centers on the cost report. n54 By regulation, all costs of the non-revenue producing centers are allocated to the centers that receive their services, regardless of whether these centers themselves produce revenues. n55 And, by regulation, "the cost of the non-revenue-producing center serving the greatest number of other centers, while receiving benefit from the least number of centers, is apportioned first." n56 Once a center's costs are apportioned, the center is "closed" and no further costs are apportioned to it. n57 When Interim first began to employ the three component A&G methodology, it allocated (or "sequenced") its shared A&G first using a "net accumulated cost" statistic. Under this methodology, Interim allocated shared costs to all relevant cost centers, including the other componentized A&G cost centers. n58 The 100% reimbursable costs were allocated directly to intermittent operational costs for which full reimbursement was sought; the 100% non reimbursable costs were allocated **[*525]** to non-intermittent operational costs for which no reimbursement was sought. n59

n54 D.I. 101, at 16-17.
**[**24]**

n55 *42 C.F.R. § 413.24(d)(1).*

Case 1:04-cv-00583-GMS    Document 139-17    Filed 03/31/2006    Page 12 of 25

Page 12

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n56 *Id.*

n57 *Id.*

n58 PX 733; DX 177, at 4. The following example illustrates the use of the "net cost" statistic in the three component A&G methodology: if 50% of the Medicare certified provider's total direct costs were intermittent (reimbursable) operational costs and 50% were non-intermittent (non-reimbursable) operational costs, then shared A&G would be split 50/50 between reimbursable and non-reimbursable operational costs, i.e., 50% of shared A&G would be included in the amount sought from HCFA for reimbursement. D.I. 101, at 20. The "net cost" statistic is typically distinguished from the "total accumulated costs" statistic, which is a percentage of reimbursable operational costs including 100% reimbursable A&G. *Id.* at 21. As a general rule, shared A&G would allocate at a higher rate to reimbursable costs using a "total accumulated costs" statistic because Medicare-like services tended to consume more resources (including indirect costs) than non-Medicare like services, a phenomenon not adequately captured by a comparison of direct costs for intermittent and non-intermittent services. *Id.* at 22. By using a "net cost" statistic, and allocating shared A&G first, Interim could allocate a portion of the shared A&G to the 100% reimbursable A&G before allocating it separately to the provider, along with direct costs, for reimbursement. *Id.* at 23-24.

[**25]

n59 *See* PX 733.

The Medicare regulations require a provider to obtain the approval of the FI before implementing a sophisticated allocation methodology (such as the three component A&G methodology), and Interim believed it had obtained such approval for its allocation methodology, including the sequencing and the allocation statistic, beginning in 1992. n60 As discussed below, Interim adjusted its sequencing and allocation statistic in 1996 after its FI expressed concern that Interim's sequencing was leading to inequitable reimbursement results.

n60 *See* D.I. 101, at 70; D.I. 100, at P 47; PX 675. The FI and the provider typically negotiate the use of a particular methodology of cost allocation because each chain provider presents its own unique corporate or operational structure that must be taken into consideration when devising an appropriate reimbursement scheme. *See* DX 87, at 18; DX 264; DX 265; D.I. 110, at 115.

[**26]

### b. The Allocation of Capital Costs

Among the indirect costs allocated from the home office to the chain providers are capital costs, e.g., moveable equipment depreciation, building depreciation, etc. Generally, the allowable capital costs of the chain organization's home office are allocated among the chain's facilities, first by allocating all costs directly attributable to particular facilities in the chain to those facilities; then, by allocating costs on a functional basis where possible; and, finally, by allocating all "pooled" or residual costs among healthcare facilities in the chain on the basis of either relative inpatient days or total costs if the chain consists only of healthcare facilities, or among healthcare facilities and the organization's other en-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

tities on an approved basis if the chain contains other than healthcare facilities. n61

> n61 See PX 334 -- PRM, Part I, at § 2150.3; 42 C.F.R. § 413.53 (a)(3).

Interim elected to allocate its home office capital [**27] costs on a "functional basis" utilizing the square footage of its various facilities as its allocation statistic. n62 Although HCFA did not direct providers to utilize a particular statistic for allocating capital costs, it did suggest that a functional allocation statistic (such as square footage) should be utilized only if it was reasonably related to the "services received by the entities in the chain." n63 To the extent a functional statistic could not be identified, the provider was directed to allocate capital costs on the basis of total costs. n64

> n62 Specifically, Interim created a square footage allocation statistic for the following "operating centers": the Medicare operations (maintained in a separate building across the street from the home office), the Quality Assurance Operations, and the Commercial and Franchise Support Operations. It did not create a square footage allocation statistic for the Processing Center or the Regional Field Offices. D.I. 101, at 30-31.

> n63 PX 334, at § 2150.3 C.

> n64 See PX 334, at § 2150.3C, D.

[**28]

It appears from the record that for the time relevant to this inquiry (1994-96), Interim allocated its capital costs as follows: (1) it allocated

the costs of the capital equipment physically located within each cost center directly to that cost center; (2) it then reallocated the costs of the home office Medicare operational cost centers back up to the home office administrative departments; (3) it then allocated the capital costs of the administrative departments along with the reallocated Medicare operational indirect costs back down to some, but not all, of the home office departments [*526] ; and (5) finally, it allocated these to the provider based on a square footage statistic. n65

> n65 D.I. 101, at 29-42. Interim allocated capital costs from the home office servicing center down to the five operating centers identified above based on the percentage the square footage of each operating center occupied in relation to the total square footage of all five operating centers. Id. at 31. The net result of its capital cost allocation was that approximately 4% of Medicare 1 servicing center salaries were allocated to the medicare operating center while 40% of the capital costs were allocated to the same operating center. Id. at 38. See also Id. at 43-51 & PX 677 (According to Interim's FI, 7% of pooled costs allocated to Medicare/reimbursable versus 42% of capital costs.).

[**29]

c. Regional Vice President and Branch Manager Salaries

Among the "field office" costs allocated to the providers were the salaries and related costs for regional vice presidents (four in number) and regional branch managers (more than 100 in number). n66 In order properly to allocate these costs

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

to the providers so that reimbursement could be sought from Medicare, Interim first had to determine whether the costs were allowable. Medicare will not pay for costs related to marketing or advertising. It will, however, pay for costs associated with "apprising [physicians, hospitals, public health agencies, nurse associations, etc.,] of the availability of the provider's covered services. . . ." n67 Interim sought reimbursement from Medicare for the costs associated with its regional vice presidents and branch managers to the extent it determined they were not engaged in non-allowable marketing activities. n68

n66 D.I. 119, at 117, 128.

n67 DX 87, at 42-43.

n68 D.I. 123, at 56-62.

**D. Interim's [**30] Pre-Sale Discussions With Its Fiscal Intermediaries**

Interim's cost allocation methodologies changed as the nature and extent of its Medicare operations changed. In the early part of 1991, Interim sought and received from its FI, Aetna Life Insurance Company ("Aetna"), approval to implement a three component A&G methodology. n69 Interim utilized the three component A&G methodology in its costs reports for fiscal years 1992 and 1993. n70 Interim's 1992 cost reports were fully audited by Aetna and no major issues were detected. n71

n69 DX 264; DX 265.

n70 DX 110.

n71 Id.

In early 1994, Interim sought to confirm that Aetna continued to approve of Interim's three component A&G

methodology. n72 Aetna responded: "You requested a letter authorizing approval of a three component A&G allocation method. We have reviewed this allocation method at the agency level and did not have any problems or exceptions with it." n73

n72 Id.
[**31]

n73 DX 31.

In early 1995, Aetna expressed concerns regarding the manner in which Interim sequenced its three component A&G components. Representatives from Interim met with Aetna in March, 1995 to discuss the issue. n74 Although it is unclear whether Aetna's concerns arose from its inability to process the sequencing methodology utilized by Interim with Aetna's then current software system, or from some other more substantive problem, it is [*527] clear that concerns were expressed and directions were given to Interim at the March, 1995 meeting. n75 Specifically, Aetna directed Interim to close out "shared A&G" last. Aetna also advised Interim that one A&G could not be allocated to another A&G. n76 Aetna reiterated this direction by letter dated June 7, 1995. n77

n74 DX 19; PX 20; D.I. 101, at 72-73; DX 169, Ex. G.

n75 PX 20.

n76 Id. at 4.

n77 PX 21.

Later in 1995, Aetna advised Interim that the 1994 home office [**32] cost report had been selected for a field audit. n78 On November 7, 1995, Interim attended a meeting with Aetna to address Aetna's concerns prior to

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

the commencement of the field audit. n79 Shortly after this meeting, Aetna provided Interim with a memorandum from HCFA which confirmed that providers utilizing a three component A&G cost allocation methodology should close out shared A&G last in the sequence. n80

n78 PX 47; D.I. 100, at P 56.

n79 *Id.* at P 57.

n80 *Id.* at P 58.

The field audit of the 1994 home office cost report ultimately was cancelled by Aetna because it lacked the resources to conduct the audit. n81 Aetna advised Interim that the audit probably would not be rescheduled, but that Interim should expect a field audit of its 1995 home office cost report. n82 A desk review of the 1994 home office cost report resulted in Aetna issuing NPR's to Interim reflecting downward adjustments of reimbursement totaling $ 821,475. n83 Interim timely appealed the adjustments to the PRRB shortly [**33] thereafter. n84

n81 PX 62.

n82 *Id.* Curiously, Interim's 1995 cost report, utilizing a slightly different methodology with the same net result, was never formally challenged by the FI. *See* DX 87, at 37 (Interim sequenced its shared A&G last but utilized a "total accumulated cost" statistic).

n83 D.I. 100, P 61. A "field audit" is an intensive audit conducted by the FI at the provider's offices and in the field. D.I. 100, at P 29. A "desk review" is a less intensive review of the provider's cost report

conducted by the FI at its own office. D.I. 119, at 50-51.

n84 D.I. 100, at P 62.

In August, 1995, in the midst of its discussions with Aetna regarding the sequencing of A&G and other issues, Interim made a formal request to the Regional Administrator of HCFA to remove Aetna as Interim's FI. n85 HCFA rejected Interim's request and supported Aetna's conclusions regarding the impropriety of Interim's cost finding methodologies. n86 Throughout this time frame, Interim continued to receive advice [**34] from its outside legal counsel encouraging Interim to stay the course and make its case for its three component A&G methodology. n87

n85 PX 41. While Spherion acknowledges that the request to change FI was made as Interim was contesting Aetna's position regarding Interim's three component A&G methodology, Spherion contends that the request also was motivated by Aetna's lack of experience in dealing with chain providers. D.I. 141, at 12; DX 69 ("Our method of cost reporting appears to be the same as . . . other chains. By moving to [another FI] we would be measured against what is normal and customary' with other chains rather than the random stream of consciousness from our current FI."). It seems likely that both factors motivated Spherion to seek a change in FI.

n86 PX 51.

n87 *See, e.g.*, DX 9, Attach. A, at 2; DX 215.

HCFA formally weighed in on the sequencing question when it issued Transmittal [*528] 2 on May 1, 1996.

Case 1:04-cv-00583-GMS    Document 139-17    Filed 03/31/2006    Page 16 of 25

Page 16

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n88 Transmittal2 was effective for cost reporting periods ending on or after September 30, 1996, and [**35] expressly stated that providers utilizing the three component A&G methodology must allocate shared A&G last in the sequence. n89 Interim complied with Transmittal 2 but changed its allocation statistic to "total accumulated cost." By utilizing this allocation statistic, Interim was able to maintain the same level of reimbursement it was receiving when it allocated its shared A&G first. n90

n88 PX 69.

n89 *Id.*

n90 D.I. 101, at 21-24.

Aetna responded in July, 1996 by admonishing Interim for using an improper allocation statistic and warning that if Interim did not comply with "published guidelines," Aetna may not allow Interim to continue to utilize the three component A&G methodology. n91 If Interim's three component A&G methodology was disallowed, then Aetna would "collapse" the A&G -- a process that would result in an allocation of operational costs on the basis of Interim's old method, i.e., on the basis of the relationship between the direct costs of Medicare and non-Medicare operations. n92 The [**36] practical effect of a collapse of A&G is that all A&G is placed in the "shared bucket." n93 Interim estimated that a collapse of its A&G would decrease its Medicare reimbursement for home office costs by $ 3.4 million per year. n94 Throughout this time frame, Interim continued its direct communications with HCFA, through counsel, in an effort to convince HCFA to revisit the sequencing issue. n95

n91 PX 81.

n92 *See* D.I. 106, at 47.

n93 D.I. 101, at 80.

n94 *See* PX 22.

n95 *See e.g.* DX 210.

In January, 1997, HCFA issued Transmittal 3 which mandated that providers utilize net cost, rather than net accumulated cost, as the allocation statistic when allocating costs under the three component A&G methodology. n96 Transmittal 3 also provided: "[FI's should] not make adjustments for alternative A&G fragmentation methodologies employed for cost reporting periods beginning prior to January 1, 1997, which may have been allowed for those periods." n97 Interim took some comfort in Transmittal [**37] 3. Even though HCFA was now directing providers to utilize a net cost statistic, it appeared to be offering grandfather grace to providers that were utilizing a methodology that had been approved by the FI prior to January, 1997. n98 Interim; believed that its three component A&G methodology fell into this category. n99

n96 PX 70.

n97 *Id.* at 2.

n98 DX 117, at 5.

n99 DX 31.

Finally, on November 1, 1997, in a tacit admission that it had been sending conflicting messages to providers in Transmittals 2 and 3, HCFA issued Transmittal 4 in which it attempted to offer definitive guidance to providers by reconciling its conflicting instructions with the applicable regulations. n100 In Transmittal 4, HCFA clarified its position on sequencing and specified that shared A&G should be [*529] sequenced first and allocated to the other componentized A&G cost centers, i.e., providers should utilize a net accumulated cost statis-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

tic. n101 HCFA declined, however, to give Transmittal 4 retroactive application; according [**38] to HCFA, it applied only to cost reports filed in 1997 or thereafter. n102

n100 DX 87, Ex. 5 (stating that Transmittal 4 was intended to clarify "longstanding HCFA policy contained in *42 C.F.R.* § *413.24 (d)(1)*. . . ."). *See also* D.I. 119, at 63-64, 73-74.

n101 DX 87, at Ex. 5.

n102 D.I. 101, at 92-95.

In late October 1996, Interim learned that Aetna would no longer serve as its FI. n103 Interim's new FI, Palmetto Government Benefits Administrators ("PGBA"), assumed Aetna's responsibilities sometime between April and June, 1997. n104 PGBA made it clear that it intended to maintain as much of Aetna's audit/reimbursement staff as possible, and that it did not intend to implement many changes in "the way things operate." n105 The change in FI occurred during Interim's 1996 fiscal year. Interim knew, therefore, that it would be submitting its 1996 year-end cost reports to PGBA for review.

n103 D.I. 100, at P 69.
[**39]

n104 PX 91.

n105 *Id.*

## E. Catamaran Acquires Interim at Auction

### 1. The Timing of the Sale

Spherion first considered the possibility of selling its healthcare division in the Fall of 1995. n106 Plaintiffs contend that the decision

to sell Interim was motivated by Interim's ongoing difficulties with Aetna. n107 The preponderance of the evidence, however, establishes that Spherion was motivated to sell Interim for reasons separate and apart from the reimbursement issues it was discussing with the FI. Specifically, Spherion determined that its expanded healthcare business was no longer readily compatible with its commercial staffing business and that Interim required more resources than Spherion was willing to dedicate to it, particularly given the intense regulatory environment in which it was required to operate. n108

n106 D.I. 109, at 19-20.

n107 D.I. 136, at 13-14.

n108 *See* D.I. 109, at 19-21. *See also* D.I. 137, Evans Dep., at 51-52 ("the [Spherion] board [decided] to divest itself of healthcare so it could focus, the company could focus, on what we felt were its core competencies which was the commercial staffing business."). The Court has found no direct evidence to support plaintiffs' contention that Spherion decided to sell Interim as a way out of its regulatory battle with Aetna (and later PGBA).

[**40]

Although Spherion first contemplated a sale of Interim in 1995, the Sale was not consummated until two years later. In the meantime, Spherion completed a major acquisition in connection with its commercial staffing business, and completed a second public stock offering in late August of 1996. Spherion decided a month or two later to go forward with the Sale of Interim. n109

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n109 *See* D.I. 109, at 20-21, 226-27; D.I. 137, Evans Dep., at 54.

## 2. The Financial Statements

### a. The Audited Historical Financial Statements

After Spherion decided to sell the Interim healthcare division, it began the process of preparing historical financial statements to reflect the operations of Interim as a stand-alone business. n110 While Spherion did maintain "divisional profit and loss [*530] statements" for Interim, these statements were incomplete in that they did not reflect certain home office expenses, interest income or allocated overhead, all of which a potential buyer would expect to see in the mix of information [**41] needed properly to evaluate Interim as a stand-alone company. n111 Accordingly, Spherion tasked Paul Haggard, Spherion's Vice President for Financial Affairs and Controller, with the responsibility of preparing a set of historical financial statements for Interim that could be supplied to potential buyers. n112

n110 D.I. 116, at 92-94.

n111 *Id.* at 90-91.

n112 D.I. 109, at 228-29.

Haggard prepared the historical financial statements by taking "the total company, Spherion, and dividing it into the two divisions, the commercial division and the healthcare division, so that the sum of the two divisions equaled the total. It was a bifurcation of the company on a historical basis." n113 The historical financial statements were intended to "reflect the results of operations, financial position, changes in [Spherion] investment and cash flows of the businesses [that will comprise Interim

when sold] . . . as if [Interim] were [sic] a separate entity for all periods presented." n114

n113 *Id.*

[**42]

n114 DX 9, at 7.

Once completed, Spherion submitted Interim's historical financial statements to its outside accountants for a complete audit. Deloitte and Touche ("D&T") had been acting as Spherion's auditor since at least 1994. n115 During the audit process, D&T "looked at every account, every balance sheet and profit and loss account and reanalyzed them." n116 It also reviewed Interim's cost reports, including the 1996 cost report. n117 The D&T audit team consisted of as many as nine people, some of whom were intimately familiar with Interim because they would spend upwards of three quarters of the year resident at Spherion reviewing information relevant to the annual audits and/or meeting with Interim management. n118 As part of its audit team, D&T included an in-house "Medicare specialist" to review the cost reports and cost reporting methodologies. n119 Although the audit was complete, given the nature of the estimates and allocations that were utilized to reflect the newly bifurcated healthcare business, D&T cautioned the consumer of the financial statements that the information contained [**43] therein may not provide a valid basis to measure future performance. n120

n115 D.I. 137, Gordon Dep. at 26.

n116 *Id.* at 34.

n117 *Id.* at 37.

n118 *Id.* at 138-39.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n119 *Id.* at 39, 43, 136-37.

n120 *See* D.I. 109, at 229-31. *See also* DX 9, at 5 ("Principally due to the use of estimates and allocations, the financial information included herein may not necessarily reflect the financial position and results of operations of the Company [Interim] in the future or what the financial position and results of operation of the Company would have been had it been a separate stand-alone entity during the periods presented. Management does not consider it practicable to estimate what the results of operation would have been had the Company operated as a separate, stand-alone entity.").

**b. The *Pro Forma* Financial Statements**

In addition to the historical financial statements, Haggard also prepared *pro forma* historical and projected financial statements by taking the **[\*\*44]** historical financial statements and adjusting them to account for expenses that would be created **[\*531]** as a result of the bifurcation of the company. n121 The purpose of the *pro forma* financial statements was to provide an estimate of what Interim would look like going forward as a stand-alone company. n122 While the historical financial statements were audited by D&T, the *pro forma* historical and projected financial statements were not audited. n123 As explained by Spherion's then Chief Financial Officer, Roy Krause:

Q. And why would they [the *pro forma* financial statements] not be audited by Deloitte and Touche?

A. There was no attempt to estimate every particular

revenue or expense account that could be adjusted under the new leadership or the new ownership. We did not know who would buy the company, whether it was a hospital, a home-health agency, or an individual venture capital company. So, we disclosed the items that we believed on an expense-account basis that they [potential acquirers] need to understand and, then, we also disclosed that we didn't affect revenue or any of the other items, because it was impossible to determine the impact of operations. **[\*\*45]** We didn't know who was going to buy it.

So we could audit the historical because that was a bifurcation of the company and the sum of the parts had to equal the total. But to try to adjust it further was -- -- we considered to be impractical, and we disclosed that it was impractical. n124

Indeed, the *pro forma* financial statements themselves provided the following disclaimer:

The *pro forma* financial statements show the adjustments to the historical financial statements to reflect the operating expenses of the company as if it was a stand alone organization. This presentation does not reflect the actual performance of the Company as a stand alone organization, since management may have run the company differently if it was not a division of

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

[Spherion]. The basis for this presentation is the audited financial statements inclusive of incremental operating expenses. Therefore, sales, revenues and direct costs remain unchanged from the audited historical statements. n125

n121 D.I. 109, at 229.

n122 *Id.* at 229-31.

n123 *Id.*

n124 *Id.* at 231.

n125 PX 123, at 51.

[**46]

### c. The Medicare Reserves

Spherion's financial statements included reserves for Medicare cost report adjustments. n126 Spherion historically maintained reserves for cost report adjustments in the range of $ 600,000 per year. n127 In 1996, it appeared that Interim would set its reserves in a range consistent with its past practice. n128 In November, 1996, however, Haggard directed that reserves be reduced by $ 300,000. n129 In December, 1996, Medicare reserves were reduced by another $ 250,000. n130 These adjustments (or "reversals") and others left Medicare reserves as reflected on Interim's 1996 income statement at $ 15,000. n131

n126 *See e.g.* PX 740, at 17.

n127 *Id.*

n128 PX 102.

n129 PX 98; D.I. 137, Haggard Dep., at 156.

n130 PX 98; D.I. 137, Haggard Dep., at 160.

n131 PX 101; PX 102; DX 39; D.I. 109, at 192-193; D.I. 118, at 10.

[*532] The reserves reflected on the balance sheet -- -- the cumulative reserves -- -- showed a different picture by year-end 1996. As of December 27, 1996, Spherion [**47] carried $ 707,795 in Medicare reserves on its balance sheet. n132 As of the time of the Sale in 1997, Interim's Medicare reserves were set at $ 3,088,129. n133 The significant jump in Medicare reserves from year-end 1996 to September 26, 1997 was the product, *inter alia,* of Interim's determination at the time it filed its 1996 year-end cost report that its interim cost reports had understated Medicare costs by approximately $ 3,000,000. n134

n132 DX 39; DX 56. Interim's balance sheet reflects the cumulative financial condition of all of the company's operations, while the income statement reflects adjustments made on a monthly basis and, for Spherion, only certain expenses were booked on the Medicare reserve "expense account." D.I. 109, at 191-92. Stated differently, on the income statement, Interim treated Medicare reserves as "an expense item that [Interim] hadn't paid yet." *Id.* The "expense" item would be reflected as an increase in the cumulative Medicare reserve carried on the balance sheet. *See e.g.* DX 39; DX 56.

n133 DX 57; DX 122, at 40; D.I. 109, at 202-08.

n134 D.I. 118, at 26-27, 32-33.

[**48]

### d. The Descriptive Memorandum

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Spherion engaged Alex.Brown to serve as the investment banker for the Sale. n135 After considering various options, Alex.Brown recommended that Spherion sell Interim at auction. n136 Spherion did not ask Alex.Brown to value Interim; it was content to allow the auction process to set the price. n137

n135 D.I. 109, at 22.

n136 *Id.* at 24.

n137 D.I. 116, at 4.

Spherion and Alex.Brown prepared a Descriptive Memorandum in April, 1997 for circulation to prospective bidders. n138 Alex.Brown had selected a range of potential bidders (approximately 20), including private equity firms (like Cornerstone), home health competitors, hospitals and nursing homes. n139 In the introduction to the Descriptive Memorandum, Alex.Brown explained that the purpose of the document was "to assist [potential bidders] in deciding whether to proceed further in the investigation of a possible acquisition." n140 Alex.Brown made it clear that the Descriptive Memorandum did "not purport to [**49] contain all of the information that a potential acquirer may desire." n141 Among the information contained as schedules to the Descriptive Memorandum were Interim's actual historical financial statements for the fiscal years 1994-96, a summary of *pro forma* adjustments, and the *pro forma* historical and projected financial statements for the fiscal years 1994-2001. n142

n138 DX 72; D.I. 109, at 25-26.

n139 D.I. 109, at 26.

n140 DX 72, at SPH 012134.

n141 *Id.*

n142 *Id.* at SPH 012136.

### 3. Cornerstone's Due Diligence

Cornerstone first expressed interest in bidding for Interim in April, 1997. n143 Cornerstone proposed "an aggregate all-cash purchase price to acquire Interim in the range of $ 120-$ 150 million." n144 The expression [*533] of interest was conditioned upon "further due diligence and the receipt of additional information," including "meeting with management, . . . comprehensive legal due diligence (including regulatory and environmental due diligence to the degree necessary), [**50] a thorough review of the Company's historic, current and projected financial performance, . . . [and] reference calls with customers *and payers.*" n145

n143 DX 71.

n144 *Id.* The parties dispute the means or methodology by which Cornerstone calculated its bid for Interim. Plaintiffs maintain that Cornerstone employed a straight-forward valuation based upon a fixed multiple of income before interest, taxes, depreciation and amortization ("EBITDA"). PX 613; D.I. 114, at 72-75, 144-47. Spherion will not admit that Cornerstone employed this methodology and, in any event, Spherion maintains that it certainly was never advised by Cornerstone of what methodology, if any, it was utilizing to set its bids for Interim. D.I. 116, at 4-5. According to Spherion, this was a pure auction; there was no floor or ceiling set by the seller. It was up to the marketplace to set the final price for Interim. *Id.* To the extent a final resolution of this dispute is required to resolve any of plaintiffs' claims - - -- unlikely given the Court's

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

other factual conclusions -- -- the Court concludes that both parties' contentions can be reconciled quite easily with the facts. It is likely that Cornerstone did utilize a multiple of EBITDA to determine what it was willing to pay for Interim. It is also likely that Spherion did not know or even care by what means the bidders set their bids, particularly given the wide range of potential bidders that might surface for Interim. D.I. 109, at 231.
[**51]

n145 *Id.* (emphasis supplied). It does not appear from the record that Cornerstone ever placed a "reference call" to Aetna, HCFA or any other "payer" affiliated with the Medicare program.

Cornerstone's due diligence was extensive and continued over a period of several months. n146 While the due diligence covered a number of issues, n147 the primary focus was on Interim's financial performance and its Medicare operations. n148 With respect to Medicare operations, and particularly reimbursement issues, Cornerstone involved one of its partners with healthcare experience, Martha Robinson, in the due diligence process. n149 Cornerstone also engaged outside experts. First, it engaged Ernst & Young ("E&Y") as a consultant to review Interim's financial statements. n150 E&Y was selected because of its particular expertise in the healthcare industry. n151 Cornerstone also engaged Judy Bishop of Bishop Consulting ("Judy Bishop") to review Interim's Medicare reimbursements and cost reporting methodology. n152

n146 D.I. 114, at 51; D.I. 120, at 76; PX 136, at SPH032501.

[**52]

n147 *See e.g.* DX 71.

n148 D.I. 117, at 34-38.

n149 D.I. 114, at 92-93, 112; D.I. 120, at 83-84, 94-95.

n150 D.I. 120, at 49-50.

n151 *Id.*

n152 PX 134; D.I. 114, at 111; D.I. 123, at 24-25.

Spherion developed a "data room" in which it maintained extensive documentary information regarding Interim's operations. n153 Included among the information contained in the data room were Interim's last three finalized cost reports, NPRs for 1994 and 1995 (including adjustments made by the FI with explanations), and related material correspondence with the FI. n154 Spherion provided members of the Interim management team to "chaperone" the Cornerstone representatives while in the data room and to answer any questions they might have. n155 Robert Getz, a principal of Cornerstone, explained the process as follows: the Cornerstone representatives would "submit a request for a specific [*534] document or documents and, then, they would be brought to [the Cornerstone representatives] to the extent that they were available." n156

n153 *See* PX 125; D.I. 114, at 92.
[**53]

n154 D.I. 118, at 42-44. *See also* D.I. 109, at 33; PX 125 (cost reports, NPRs and correspondence in the data room).

n155 D.I. 114, at 93-94.

n156 *Id.* at 93.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Cornerstone's expert consultants provided positive feedback on Interim. For its part, E&Y concluded that "there were very few significant audit adjustments made by the FIs [with respect to Interim's cost reports]." n157 Mr. Getz summarized his impression of the E&Y report as follows:

> Overall, the report represented a net positive, because, again, it indicated that the company was relatively doing things in a conservative fashion, particularly when it came to Medicare. So while there might have been specific issues raised here in terms of number of visits that seemed a little off kilter, overall the perception was, based on this two-page summary, that we were getting positive feedback from E&Y from their brief review. n158

n157 DX 75.

n158 D.I. 114, at 137.

**[**54]**

Judy Bishop likewise was both "impressed" with the opportunity an Interim acquisition would present for Cornerstone and satisfied that "there should not be any major changes required in Interim's current cost reporting." n159 Significantly, it appears that both E&Y and Judy Bishop were aware of Interim's ongoing discussions with Aetna regarding the three component A&G methodology and Aetna's challenges to the 1994 cost report. n160

n159 DX 76. *See also* DX 75 (the E&Y report also suggested

that Interim was a good deal: "In general, the cost reports appear conservative, given that the percentage of reimbursed Medicare costs to total expenses is typically lower than Medicare utilization based on visits. This indicates there may be opportunity *to increase* reimbursement by refining the cost allocation methodologies used.")(emphasis supplied).

n160 PX 125, at SPH 011901-02.

**4. Cornerstone's Final Bid**

Cornerstone communicated its offer to acquire Interim by letter dated June 24, 1997. In its letter, **[**55]** Cornerstone stated:

> [Cornerstone] has performed extensive business due diligence on [Interim] during the last 55 days, having met with the management team on five separate occasions and we are comfortable with the information that we have learned. In addition to our own examination, [Cornerstone] has had the benefit of examination of [Interim] by its attorney and consultants. At this point, we have completed substantially all of our due diligence and we are prepared to move swiftly to a definitive agreement. [Cornerstone] has been waiting to review Interim's audited financial statements, which we received yesterday (previous financials were marked "Draft.") Our accountants at E&Y can quickly perform confirmatory due diligence on the audit work papers and year-to-date financials. n161

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Cornerstone's final bid was $ 134 million, n162 and the auction gavel fell at this price. n163

n161 PX 136.

n162 PX 136. The initial "final bid" was $ 128 million, but Cornerstone increased the bid to $ 134 million to secure the right to negotiate exclusively with Spherion. D.I. 100, at PP 86-88.

[**56]

n163 D.I. 109, at 41-42.

5. **The Restated Stock Purchase Agreement**

The parties negotiated the terms of a definitive agreement for the sale of Interim [*535] from June 24, 1997 through September 26, 1997. n164 The first Stock Purchase Agreement was dated June 29, 1997. n165 Prior to closing, however, Interim discovered a potential Medicare fraud and abuse issue at its El Paso, Texas and Hollywood, Florida branches. n166 The closing was delayed and additional provisions were added to the Stock Purchase Agreement to address the newly discovered potential liability, and also to "firm up" the provisions of the parties' agreement relating to fraud and abuse liability. n167

n164 *See* PX 136; PX 172. Plaintiffs assert that "Spherion insisted . . . that [the] negotiations be completed on an expedited basis." D.I. 136, at 15. *See also* D.I. 114, at 162-63 (Mr. Getz suggests that negotiations were hurried). To the extent plaintiffs are attempting to suggest that they were rushed into the deal, the suggestion is at odds with Cornerstone's offer

letter in which it states: "we are prepared to move swiftly to a definitive agreement." PX 136, at SPH 032501.

[**57]

n165 D.I. 100, at P 90.

n166 *Id.* at P 92.

n167 PX 172, at § 3.16 (added after the El Paso investigation); D.I. 109, at 50-56, 73; D.I. 114, at 204-05; D.I. 117, at 94-96.

The Restated Stock Purchase Agreement By and Among Interim Services, Inc., Catamaran Acquisition Corp., and Cornerstone Equity Investors, IV, L.P. ("the Agreement") comprises 51 pages. n168 As indicated by its title, the parties to the Agreement are Interim Services, Inc. (now known as Spherion) listed as "Seller," Catamaran listed as "Buyer," and Cornerstone. n169 According to its terms, Cornerstone was a party to the Agreement solely for the purpose of allowing Spherion to recover liquidated damages from Cornerstone in the event of a Buyer's default. n170

n168 PX 172.

n169 *Id.* As will become apparent below, the identity of the parties to the Agreement is particularly important given Spherion's argument that Cornerstone lacks contractual standing to raise claims for damages under the Agreement.

n170 *Id.* at § 11.5.

[**58]

As to be expected, the parties exchanged numerous representations and warranties in connection with the transaction. They also provided for indemnification in the event of

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

breach. The parties negotiated five separate "Representations and Warranties of Seller" that address specifically Medicare issues and Medicare-related liabilities. n171 And each of these representations and warranties is tied to an indemnification obligation which, subject to certain limitations, provides the Buyer with indemnity protection in the event it is later required to pay "any damages that are caused by or arise out of . . . any breach by Seller of any of its covenants or agreements under [the] Agreement. . . ." n172

> n171 *Id.* at §§ § 3.14-3.18.
>
> n172 *Id.* at § 10.1 (a).

In addition to Medicare issues, plaintiffs sought and obtained representations and warranties that the historical consolidated financial statements for Interim supplied to Cornerstone were prepared in accordance with generally accepted accounting principles [**59] ("GAAP"), and that they "presented fairly in all material respects the consolidated financial position and results of operations of [Interim] . . . as of and for the periods indicated . . . and are consistent with the books and records of [Interim] for such periods." n173 Plaintiffs also obtained representations and warranties that Spherion had disclosed all pending and threatened litigation involving Interim [*536] , n174 and that Interim did not have any liability ("accrued, absolute, contingent or otherwise") that would have a "material adverse effect" on Interim that was not either disclosed in the Agreement, or the schedules to the Agreement, or adequately reflected and reserved against in the financial statements. n175

> n173 *Id.* at § 3.7.

> n174 *Id.* at § 3.20.
>
> n175 *Id.* at § 3.29.

Based on developments that occurred after the Sale, plaintiffs now allege that Spherion has breached numerous representations and warranties regarding Medicare operations and liabilities, the accuracy of the financial [**60] statements and pending or threatened litigation and/or liabilities. The specific provisions of the Agreement implicated by plaintiffs' claims are set forth below.

**a. The Medicare Provisions**

Spherion represented and warranted that it had not received "Notice" of any problems with its cost reports, that it had not intentionally filed cost reports without a reasonable basis and that its cost reports were filed in compliance with applicable laws. The specific provisions of the Agreement governing Medicare filings provide, in pertinent part, as follows:

> **3.16 Medicare/Medicaid Notices.**
>
> (a) Except as set forth in Schedule 3.16(a), n176 (i) [Interim] is [not] appealing any notices of program reimbursement, and no notices have been issued regarding any disputes related to [Interim] cost reports from Governmental Entities n177 responsible for administering the Medicare program for Seller's three (3) most recent fiscal years. n178
>
> (b) Except as set forth on Schedule 3.16(b), with respect to [Interim], no member of the Seller Group, current or former employees of any member of the Seller