884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Group, or entities or individuals (other than Franchisees) with [**61] whom a member of the Seller Group has contracted to provide services have intentionally filed a false claim, or filed a claim without a reasonable basis therefore, with HCFA, its fiscal intermediaries or any state agency, or other third-party payer, or violated the so-called "Medicare Fraud and Abuse" Laws contained in *Section 1128 (B) of the Social Security Act* or any similar laws addressing fraud and abuse in government healthcare programs. n179

n176 Schedule 3.16(a) disclosed the appeal of the NPR's issued after the desk review of the 1994 cost report. PX 174, at SPH 030337.

n177 "Governmental Entity" is defined in the Agreement to include "instrumentalities of any country or political subdivision thereof." PX 172, § 1.35. The parties do not appear to contest that HCFA would fall within the definition of "Governmental Entities." *See* D.I. 136, at 31; D.I. 141, at 51-53. They do, however, dispute whether a FI is a "Governmental Entity" for purposes of this provision of the Agreement.

n178 PX 172, at § 3.16(a)(i).

n179 *Id.* at § 3.16(b).

[**62]

Section 3.17 addresses Spherion's compliance with applicable "Laws" in the filing of its cost reports and provides, in pertinent part:

**3.17 Government Filings.**

Except as set forth in Schedule 3.17, [all] cost reports and other filings are complete and in compliance in all material respects with applicable Laws. n180

n180 *Id.* at § 3.17. "Laws" is defined at Section 1.62 to mean "any federal, state, local or foreign law, statute, ordinance, rule, regulation, permit, order, judgment or decree."

[*537] **b. The Financial Statements Provision**

The Agreement provides with respect to the audited historical financial statements that they are accurate and have been prepared in accordance with GAAP:

**3.7 Financial Statements.**

Schedule 3.7 sets forth: (i) The audited consolidated financial statements for the fiscal years of [Interim] ended on December 30, 1994, December 29, 1995 and December 27, 1996 and (ii) The unaudited consolidated balance sheet, income statement, [**63] and statement of cash flows, as of and for the period ended March 28, 1997 (collectively, the Healthcare Financial Statements"). The Healthcare Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby and present fairly in all material re-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

spects the consolidated financial position and results of operations of [Interim] operated by the Seller Group as of and for the periods indicated (subject, in the case of unaudited statements to normal year-end audit adjustments, matters that would be disclosed in the notes thereto and to any other adjustments described therein) and are consistent with the books and records of [Interim] for such periods. The Healthcare Financial Statements have been prepared from the separate records maintained by [Interim] and may not necessarily be indicative of the conditions that would have existed or the results of operations if [Interim] had been operated as an unaffiliated company. Portions of certain income and expenses represent allocations made from corporate headquarters items applicable to [Interim] as a whole. n181

n181 *Id.* at § 3.7. The "Seller Group" is defined at Section 1.85 to mean "seller, its wholly-owned subsidiaries other than the transferred entities and, prior to the respective Closings, the Transferred Entities." The "Transferred Entities" include Interim, an affiliate of Interim, and all subsidiaries of Interim. *Id.* at § § 1.100, 1.101 and 1.103.

[**64]

**c. The Pending or Threatened Litigation or Liabilities Provisions**

The Agreement provides that Spherion has disclosed threatened or pending litigation and all pending or contingent liabilities:

**3.20 Litigation**

Except as set forth in Schedule 3.20, there is no claim, action, suit, litigation, proceeding, or arbitration, at Law or in equity (collectively, "Actions"), pending, or to the Knowledge of the Seller Executives, after consultation with the Healthcare Executives, threatened against Seller related to the Healthcare Business, any of the Transferred Entities or arising from any actions by current or former employees of any member of the Seller Group directly related to the matters described in Section 3.16(b) regarding Medicare and Medicaid fraud or abuse that would have a Material Adverse Effect, and to the Knowledge of the Seller Executives, after consultation with the Healthcare Executives, there are no facts presently existing that would lead to any such Action. n182

**3.29   Undisclosed Liabilities.**

The Transferred Entities do not have any liability, whether accrued, absolute, contingent or otherwise, that would have a Material [**65] Adverse Effect, other than liabilities (a) reflected or reserved against in [Interim's] financial statements (or in the notes thereto), (b) disclosed in this Agreement, including the [*538]

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Schedules, (c) that are fully covered by enforceable insurance, indemnification, contribution or comparable arrangements, (d) under this Agreement or any other Transaction Document or (e) liabilities incurred or arising in the ordinary course of business of the Transferred Entities since December 27, 1996. n183

n182 *Id.* at § 3.20.

n183 *Id.* at § 3.29. "Material Adverse Change" or "Material Adverse Effect" is defined in the Agreement to mean "any change or effect that, individually or in aggregate, is materially adverse to the financial condition, business or results of operations of [Interim] taken as a whole." *Id.* at § 1.67.

#### d. The Indemnification Provisions

The parties addressed the Seller's indemnification obligation by including a general indemnification commitment at Section 10.1 and a more [**66] specific indemnification commitment at Section 10.4. The parties also negotiated certain limitations to their respective indemnification obligations including deductibles, caps, notice requirements and time limitations. The general Seller's indemnification provision provides, in pertinent part:

#### 10.1    Indemnification    by Seller

(a) Subject to the terms and limitations of this Section 10, Seller shall indemnify Buyer Indemnitees against any Damages that are caused by or arise out of (i) any breach by Seller of any of

its covenants or agreements under this Agreement or any of the other Transaction Documents (ii) any inaccuracy in any representation or breach of any warranty of Seller set forth in Section 3, except to the extent provided in Section 10.3 (c) or, (iii) any of the Excluded Liabilities.

(b) The representations and warranties of Seller set forth in Section 3 shall survive the Closing. The representations and warranties set forth in Section 3.3, 3.4, 3.5, 3.7 and subsequent Sections of Section 3 shall expire and be of no further force and effect eighteen months after the Closing Date, except . . . (ii) claims that Buyer has previously asserted against [**67] Seller in writing, setting forth with reasonable specificity the nature of such claims. n184

n184 *Id.* at § 10.1.

The general indemnification obligation set forth in Section 10.1 is subject to the limitations set forth in Section 10.3:

#### 10.3 Limitations.

(a) Buyer Indemnitees may not assert any claim for indemnification under Section 10.1(a)(ii)            or 10.1(a)(iii)(a    "Buyer's claim") unless and until: (i) such Buyer's Claim (or a series of related Buyer's Claims) gives rise to Damages (excluding Litigation

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Expenses for purposes of this threshold only) in excess of $ 10,000 and (ii) the aggregate amount of such Buyer's Claims shall exceed $ 2,000,000 and then only with respect to the excess of such aggregate Buyer's Claims over $ 2,000,000. Notwithstanding the foregoing, in no event shall Seller's liability under and with respect to this Agreement, the Other Transaction Documents, the Transactions or any claims associated herewith arising under Section 10.1 (a)(ii) or 10.1 (a)(iii) (whether [**68] in contract, tort or otherwise, but not including any claim for willful misconduct or willful fraud) exceed an aggregate amount equal to $ 25,000,000. The limitations set forth in this Section 10.3(a) shall not apply to . . . any Section 3.16 damages . . . which shall be governed by Section 10.4 below. n185

n185 *Id.* at ⅜ 10.3.

[*539]  The Agreement's special indemnification provision provides as follows:

**10.4 Special Indemnity.**

The limitations and thresholds set forth in Section 10.3 shall not apply to the following Special Indemnity matters:

(a) Seller shall indemnify Buyer Group with respect to damages resulting from (i) the failure to collect all

notes receivable from the Therapy Students, n186 to the extent that such failure to collect exceeds the amount specifically reserved therefore as of the Closing Date on the books and records of the Healthcare Business, as set forth on Schedule 10.4(a); (ii) claims by Therapy Students against the Seller Group with respect to obligations [**69] of Seller or the Transferred Entities under those certain contract concerning the education of the Therapy Students . . . (collectively, the "Specified Damages"). Seller and Buyer shall each pay 50% of all Specified Damages; provided, however, (I) Buyer shall pay the first $ 100,000 of Specified Damages and (II) Seller's liability for Specified Damages shall not exceed $ 2,000,000. Any payments made by Buyer pursuant to this Section 10.4(a) shall be included for purposes of determining the threshold set forth in Section 10.3(a)(ii). Any payments made by Seller pursuant to this Section 10.4(a) shall be included for purposes of calculating the $ 25,000,000 maximum set forth in Section 10.3(a).

(b) Notwithstanding any provision contained herein to the contrary, Seller shall indemnify Buyer Group with respect to Section 3.16 Damages . . .; provided, however, that Buyer shall pay 50% of any such Section 3.16 Damages . . . up to an aggregate maximum of $ 500,000, and, provided further that Buyer shall not be

Case 1:04-cv-00583-GMS    Document 139-18    Filed 03/31/2006    Page 5 of 27

Page 30

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

liable for Section 3.16 Damages . . . in excess of $ 250,000. . . . Any payments made by Seller pursuant to this Section 10.4(b) shall not be included for purposes of calculating [**70] the $ 25,000,000 maximum set forth in Section 10.3(a) and such $ 25,000,000 maximum shall not be applicable to any Section 3.16 damages. . . . n187

n186 As explained in detail below, the reference to "Therapy Students" is to a failed foreign exchange program for physical therapy students sponsored by Interim before the Sale that resulted in substantial losses to Interim.

n187 *Id.* at § 10.4.

### F. Interim's Pre-Sale Liabilities

Shortly after the closing, plaintiffs discovered that Interim was exposed to potential or actual liabilities that they believed were covered by the Seller's representations and warranties and the corresponding indemnity obligations in the Agreement. Some of the liabilities were unanticipated; some, plaintiffs argued, should have been anticipated and disclosed in the Agreement; and others were anticipated and specifically addressed in the Agreement.

### 1. The Medicare Adjustments

Within months after the Sale, HCFA, through PGBA, initiated an audit of Interim's 1996 [**71] home office cost report. n188 The [*540] audit was expanded to include certain provider cost reports in the summer of 1998, and expanded even further to include additional provider cost reports in September, 1998. n189 The first adjustments proposed by PGBA disallowed

all of the expenses of numerous Interim employees on the ground that their job descriptions included non-allowable marketing activities. PGBA then issued NPRs that proposed to collapse the three A&G components utilized by the providers. PGBA also proposed to reallocate home office capital costs on the basis of "total cost," as opposed to the "square footage" statistic utilized by Interim. n190

n188 D.I. 100, at P 99. It appears that the PGBA audit may have been initiated at the direction of HCFA as part of a nationwide effort "to conduct comprehensive audits of the cost reports submitted by a sample number of home health agencies whose cost reporting periods ended on or after October 1, 1996 through September 30, 1997 (the federal government's fiscal year) . . . to serve as the primary data source in developing the cost basis for a new prospective pay system for home health agencies." DX 87, at 22. *See also* F.N. 17, *infra*. HCFA did not provide any advance notice to the home health industry that it intended to initiate this nationwide audit. *Id.* [**72]

n189 D.I. 100, at PP 100-01.

n190 *Id.* at PP 102-06.

PGBA immediately began to withhold payments to Interim in order to recoup the amounts specified in the NPRs. n191 PGBA also expanded the audit to include Interim's 1997 cost reports and thereafter began to propose adjustments similar to those made to the 1996 cost reports. n192 If all of the adjustments proposed by PGBA for the 1996 and 1997 cost report years were

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

applied to all Interim providers, Interim would have faced a Medicare liability of approximately $ 38-40 million. n193

> n191 *Id.* at P 118.
>
> n192 *Id.* at P 114.
>
> n193 D.I. 115, at 23.

Interim immediately tendered the defense of the claims to Spherion pursuant to the Agreement, but Spherion elected, as it was entitled to do under the Agreement, to allow Interim to defend the claims since Spherion no longer possessed the expertise in Medicare reimbursement to address the adjustments effectively. [**73] n194 Interim engaged its long-time healthcare attorneys, Pyles, Powers, Sutter and Verville, P.C., as well as healthcare consultants, Thomas Curtis, CPA, and Eric Yospe, to assist in its audit defense. n195

> n194 *See PX* 172, at ⅝ 1.97.
>
> n195 D.I. 100, at PP 109, 110.

Over the course of the next two years, Interim, with the assistance of its attorneys and consultants, submitted several position papers to PGBA, n196 had numerous telephone conferences with PGBA's auditors, and met directly with HCFA representatives. n197 At Interim's request, PGBA conducted field audits at Interim's provider locations in order to review personnel files and interview employees to determine whether certain employees were involved in non-allowable marketing activities. n198 As a result of these meetings, Interim persuaded PGBA to reverse several of the proposed adjustments relating to disallowed salaries and benefits. n199 PGBA held firm, however, with respect to its disallowance of all of the re-

gional vice president's salaries [**74] and twenty-five percent of the branch manager's salaries. n200 PGBA also refused to reverse its adjustments regarding the three component A&G methodology for the 1996 and 1997 cost reports or the adjustments relating to the allocation of capital costs. n201

> n196 *See e.g.* DX 260.
>
> n197 D.I. 100, at P 111.
>
> n198 *Id.* at P 113.
>
> n199 *Id.* at P 115.
>
> n200 *Id.* at P 116.
>
> n201 *Id.*

After receiving PGBA's final position, Interim began to present its case directly to HCFA. n202 Ultimately, HCFA reversed [*541] PGBA's decision to collapse the three component A&G for the 1996 and 1997 cost reports. n203 HCFA did not, however, reverse the adjustments regarding the sequencing of A&G or the capital cost allocation. Nor did HCFA reverse the adjustments to disallow regional vice president and branch manager salaries. n204

> n202 *Id.* at P 117.
>
> n203 *Id.*
>
> n204 *Id.* at P 116.

[**75]

After receiving HCFA's final position, Interim filed multiple appeals to the PRRB regarding all issues implicated by the NPRs issued by PGBA. n205 The settlement discussions with HCFA continued, however, and on July 27, 2001, Interim entered into a global settlement agreement with HCFA's successor, CMS, pursuant to which Interim paid CMS an additional $

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

42 million (over and above the approximately $ 1 million already withheld by PGBA) in settlement of all outstanding NPR's and/or adjustments to its cost reports for fiscal years 1994 through 1999. n206 Spherion consented to the settlement by letter dated October 9, 2001. n207

n205 *Id.* at P 119.

n206 *Id.* at PP 120-21.

n207 *Id.* at P 122.

## 2. The Black and Burns Franchise Loans

Interim maintained a variety of franchise loan programs to provide funding to franchisees either to create or expand their franchises. n208 The franchise loans generally were secured by the franchisee's accounts receivable and other franchise assets, including **[**76]** Interim's ability, in the event of a default, to reassume territorial rights to the market area contractually held by the franchisee. n209 The loans also were collateralized in most instances by a personal guarantee of the franchise owner. n210 Interim monitored the loans and required franchisees periodically to provide their financial statements so that Interim could compare the loan to the franchisee's financial performance. n211 Interim also monitored the value of collateral that it received from franchisees. n212 At the time of the Sale, Interim's financial statements reflected loans receivable due from franchisees of approximately $ 14,750,000. n213 These loans were transferred by Spherion to Interim (as acquired) as part of the Sale. n214

n208 *Id.* at P 157.

n209 *Id.* at P 158.

n210 D.I. 137, Livonius Dep., at 125.

n211 D.I. 100, at P 159.

n212 *Id.* at P 160.

n213 *Id.* at P 161.

n214 PX 174, at Sch. 1.38.

Among the loans in Interim's franchise loan portfolio were **[**77]** loans to the franchise owned by Mary Black (the "Black franchise") and loans to the franchise owned by Jean and David Burns (the "Burns franchise"). The Black franchise entered into a revolving loan agreement with Interim in July, 1995 for a total loan amount of $ 120,000. n215 By August 31, 1997, however, the Black franchise owed Interim $ 281,650 on its loan. It paid Interim $ 90,850 on the loan in 1997. Throughout 1997, the attorney for the Black franchise advised Spherion that the Black franchise was having financial difficulties. n216 After the Sale, when the Black franchise continued to default on its loan payments, Interim **[*542]** sued Mary Black and the Black franchise seeking to recover the principal amount of the loan and all accrued interest. n217 Ultimately, Interim obtained a default judgment for the total uncollectible debt for the Black franchise in the amount of $ 268,400. n218 The Black franchise filed for bankruptcy protection shortly thereafter. n219

n215 PX 34; PX 35; PX 36; PX 37; PX 38. *See also D.I.* 100, at P 163.

n216 *Id.* at PP 164-67.

n217 *Id.* at P 168.

n218 *Id.* at P 169-71.
**[**78]**

n219 *Id.* at P 170.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

The Burns franchise had an out-standing loan balance of $ 230,000 as of December 27, 1996. n220 This amount was the product of two loans extended to the Burns franchise, the first in October, 1994, and the second in October, 1996. n221 In July, 1997, Spherion negotiated a payment plan with the Burns franchise for overdue accounts receivable. n222 This agreement was renegotiated in September, 1997 after the outstanding accounts receivable still had not been paid in full. n223 The renegotiated agreement was prompted by the Burns franchise advising Spherion that it "was having difficulty with a cash flow shortage." n224 On September 22, 1997, the Burns franchise provided further information regarding its financial situation and advised Spherion that it was losing $ 40,000 each month. n225

n220 *Id.* at P 173.

n221 PX 84; D.I.100, at PP 173-74.

n222 PX 152.

n223 PX 166.

n224 PX 731.

n225 PX 171; D.I. 100, at P 175.

**[**79]**

After the Sale, Interim commenced collection actions to recover the out-standing Burns franchise loan balance. n226 In response, the Burns franchise declared bankruptcy in February, 1998. n227 At the time of the bankruptcy, the Burns franchise owed Interim $ 230,000. n228 Interim then pursued Jean and David Burns personally on their financial guarantees and ulti-mately settled that claim with Spherion's consent. n229 Interim in-curred $ 28,788.47 in legal expenses and costs in its effort to collect the outstanding Burns franchise loan bal-ances. n230

n226 *Id.* at P 176.

n227 *Id.* at P 177.

n228 *Id.* at P 178.

n229 PX 719; PX 721.

n230 D.I. 100, at P 176.

### 3. The Huff Litigation

In June, 1996, Interim was sued by the parents of Joseph Huff, an infant treated by a nurse employed by an In-terim franchise in Portsmith, Ohio, who alleged that the nurse's medical negligence caused significant brain damage to their infant son ("Huff I"). n231 The defendants in Huff I were, *inter* **[**80]** *alia*, Interim and In-terim Home Solutions ("IHS"), an Illi-nois general partnership in which Interim was a general partner. n232 Spherion's insurance carrier assumed the defense of the case. n233

n231 *Id.* at PP 122, 136-37.

n232 PX 77; D.I. 100, at P 138.

n233 *Id.* at P 139.

In late 1996, prior to the Sale, the parties in Huff I began settlement negotiations that culminated in the settlement and voluntary dismissal of Huff I in 1998. n234 A full and final release was not executed **[*543]** un-til June, 2000. n235 In exchange for the payment of $ 50,000 by Spherion's insurance carrier, Mr. and Mrs. Huff released Interim, its franchisee, Ap-palachian Healthcare, Inc., and their agents and employees (including the nurse who rendered the care to Joseph Huff). n236 They did not, however, re-lease claims against IHS. n237

n234 DX 297; D.I. 100, at P 141.

Case 1:04-cv-00583-GMS    Document 139-18    Filed 03/31/2006    Page 9 of 27

Page 34

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n235 DX 295; D.I. 100, at P 141.

n236 DX 295.

n237 D.I. 100, at PP 141-44.

[**81]

In the midst of the discussions regarding the release language in connection with the settlement of Huff I, Mr. and Mrs. Huff initiated a second lawsuit in federal court against several defendants, including IHS ("Huff II"). n238 In Huff II, plaintiffs alleged that pharmacists were negligent in their preparation of intravenous medication for Joseph Huff, thereby causing the neurological deficits that were at issue in Huff I. n239 Plaintiffs alleged that IHS was jointly and severally liable with the other named defendants for Joseph Huff's brain injury and claimed more than $ 15 million in compensatory damages and $ 25 million in punitive damages. n240 IHS forwarded the complaint in Huff II to Spherion which, in turn, referred the matter to its insurance carrier to defend. n241 The carrier, AIG, denied coverage. n242

n238 PX 219.

n239 Id.

n240 Id.; D.I. 100, at P 145.

n241 D.I. 100, at P 147.

n242 PX 276.

As indicated, Interim, along with Home Solutions Systems, [**82] Corporation ("HSSC"), were the general partners of IHS. n243 The primary defendant in Huff II was Home Solutions Equity Corporation ("HSEC"), an affiliate of HSSC. n244 According to a management agreement between IHS and HSSC, liability insurance related to the preparation of intravenous solutions was to be procured by HSSC. n245 Shortly after Huff II was commenced,

however, Spherion learned that HSSC had not obtained such coverage. n246

n243 D.I. 100, at P 138.

n244 Id. at P 143; PX 219.

n245 D.I. 109, at 92-93.

n246 Id.

By letter dated July 21, 2000, Interim requested that Spherion pursue insurance coverage for Huff II. n247 Spherion declined on the grounds that no "Interim entity" was a party to the litigation, and that Spherion was not obligated to provide insurance coverage for IHS. n248 Spherion allowed that Interim could undertake an action against AIG for coverage "at [its] own risk and expense." n249 Interim did just that and, after incurring $ 91,180.26 in legal [**83] fees, Interim successfully prevailed upon AIG to provide coverage for Huff II. n250 As part of the settlement with AIG, Interim was reimbursed some of its legal fees, but $ 41,180.26 remained unreimbursed. n251 AIG ultimately funded the settlement of Huff II. n252

n247 D.I. 115, at 80; DX 99.

n248 DX 99.

n249 Id.

n250 D.I. 100, at PP 150-51; D.I. 115, at 79-81.

n251 D.I. 115, at 78-80; PX 330.

n252 D.I. 115, at 78; D.I. 100, at P 151.

Spherion did not disclose Huff I to the plaintiffs prior to the Sale because it believed that the lawsuit represented an "Excluded [*544] Liability" under the Agreement (it was a claim against Interim for which it maintained liability insurance). n253

Case 1:04-cv-00583-GMS    Document 139-18    Filed 03/31/2006    Page 10 of 27

Page 35

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

When Interim made a demand for indemnification under the Agreement for the expenses related to securing coverage in Huff II, Spherion rejected that claim on the ground that Huff II was post-closing litigation that did not involve a "Transferred Entity" under the Agreement against which an indemnification [**84] claim could be made. n254

n253 D.I. 109, at 90-91; PX 172, at § 1.30.

n254 D.I. 109, at 91-93; PX 172, at § 1.101.

### 4. The Williams Litigation

Nancy Williams owned an Interim franchise in a territory immediately adjacent to an Interim company-owned branch office. n255 Spherion's Chief Operating Officer, Robert Livonius, testified that Ms. Williams threatened to sue Spherion "many times" prior to the Sale for alleged "territorial infringement." n256 It is undisputed that Spherion never disclosed these threats to plaintiffs. After the Sale, Interim terminated Williams' franchise for failure to payroyalties. n257 Williams' franchise then sued Interim claiming, *inter alia*, that Interim had interfered with the franchise's prospective economic advantage by engaging in territorial infringement. n258

n255 D.I. 100, at P 152.

n256 D.I. 137, Livonius Dep., at 115. *See also* PX 142; PX 144.

n257 D.I. 100, at P 153; PX 220; D.I. 115, at 74. [**85]

n258 PX 223; D.I. 115, at 74-75, 76.

Interim prevailed on several of the claims raised by the Williams franchise on summary judgment. n259 The summary judgment was upheld on appeal. n260 Interim then settled the remaining claims with Ms. Williams for $ 100,000. n261 The parties have stipulated that the fees and costs incurred by Interim (as required) to defend the Williams litigation were $ 290,717.25. n262

n259 PX 690.

n260 PX 691; D.I. 115, at 76.

n261 PX 312; D.I. 115, at 77.

n262 PX 335.

### 5. The Therapy Student Claims

Prior to the Sale, Spherion disclosed to plaintiffs that Interim faced potential liability arising from a failed foreign exchange program it had sponsored on behalf of American students who wished to study physical therapy abroad (the "Therapy Student program"). n263 Interim had recruited these students to participate in a joint program it formed with several physical therapy schools [**86] in the Netherlands and had agreed to fund a portion of the tuition in exchange for the student's commitment to work a minimum of two years for Interim after graduation. n264 The Therapy Student program ended abruptly when the students learned that the schools in the Netherlands were not properly accredited making it difficult, if not impossible, for the Therapy Students to be licensed in most American jurisdictions. n265 Many of the Therapy Students asserted claims against Interim alleging that Interim had misled them about the accreditation of the Netherlands schools and had breached express [*545] contractual provisions regarding the Therapy Student program. n266

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n263 In 1994, Interim acquired certain assets known as Therapy Staff Services ("TSS"). PX 735; D.I. 115, at 38, 40. Among the assets purchased was the Therapy Student program initiated by TSS to train American physical therapy students abroad. *Id.* at 39-40.

n264 D.I. 100, at PP 123-124; PX 704; PX 705.

n265 D.I. 100, at P 125.

n266 *Id.* at PP 126-128.

[**87]

In addition to tuition assistance, Interim also provided low interest loans to many of the Therapy Students to cover incidental expenses while they participated in the program. When the students realized that the program was a failure, many of them defaulted on the loans. n267 Consequently, in addition to facing potential damages for the legal claims brought by the Therapy Students, Interim also received several requests for forgiveness of the Therapy Student loans. n268

n267 *Id.* at P 129.

n268 *Id.* at P 130.

Interim had begun the process of settling certain Therapy Student claims prior to the Sale. It also had agreed to forgive certain Therapy Student loan obligations in exchange for a release of claims. n269 Because it was clear that Interim would not resolve all of these claims prior to the closing, the parties agreed specifically to address the claims in the Agreement at § 10.4. n270 At the time of closing, Spherion carried reserves of $ 578,463 to address Therapy Student loans. In addition, [**88] Spherion disclosed two separate Therapy Student lawsuits (one of which was a multi-plaintiff lawsuit) on the Schedules to the Agreement. n271

n269 *Id* at P 131.

n270 *Id.* at P 132; PX 172, at § 10.4.

n271 D.I. 100, at PP 133-34; PX 174, at Sch. 3.20.

After the Closing, Interim provided notice to Spherion regarding additional Therapy Student claims and demanded indemnification under the Agreement. Spherion rejected many of these claims on the grounds that certain of the claimants were not "Therapy Students" as defined in the Agreement, Interim had not provided adequate notice of the claims, or the claims were otherwise barred by the limitations set forth in the Agreement. n272

n272 D.I. 115, at 55-58.

II.

A. Preliminary Findings of Fact and Conclusions of Law

Before the Court addresses specifically each of [**89] the plaintiffs' claims, it is appropriate first to identify certain legal principals and predicate factual determinations that will guide the Court's analysis throughout the balance of this opinion. They will be stated in general terms here and reiterated, when necessary, in the Court's discussion of the specific claims.

1. The Burden of Proof

The Court begins with the fundamental observation that plaintiffs bear the burden of proving their claims by a preponderance of the evidence. In this regard, the Court must be mindful that if the evidence presented by the parties during trial is inconsistent,

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

and the opposing weight of the evidence is evenly balanced, then "the party seeking to present a preponderance of the evidence has failed to meet its burden." n273 When balancing the evidence, the Court has applied "the customary Delaware standard to the trial testimony:"

I must judge the believability of each witness and determine the weight to be given to all trial testimony. I considered each witness's means of knowledge; strength of memory and opportunity [*546] for observation; the reasonableness or unreasonableness of the testimony, the motives actuating the witness; the fact, [**90] if it was a fact, the testimony was contradicted; any bias, prejudice or interest, manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the believability of the testimony. After finding some testimony conflicting by reason of inconsistencies, I have reconciled the testimony, as reasonably as possible, so as to make one harmonious story of it all. To the extent I could not do this, I gave credit to that portion of testimony which, in my judgment, was most worthy of credit and disregarded any portion of the testimony which, in my judgment, was unworthy of credit. n274

n273 *Eskridge v. Voshell*, 593 A.2d 589 (Del. 1991)(ORDER), cit-

ing *Guthridge v. Pen-Mod, Inc.*, 239 A.2d 709, 713 (Del. 1967).

n274 *Dionisi v. DeCampli*, 1995 Del. Ch. LEXIS 88, at *2-3.

## 2. The Parol Evidence Rule

The Court next takes this opportunity to restate a legal conclusion it reached prior to trial and reaffirmed [**91] during the trial: the Agreement at issue here is clear and unambiguous; the Court will not consider parol evidence when construing it. n275 In this regard, the Court notes that, at various times in this litigation, the parties have concurred with the Court's characterization of the Agreement as "unambiguous." n276 At other times during the litigation, however, when it suited them, the parties have suggested that the Agreement was ambiguous and that parol evidence was needed to interpret it. n277 Suffice it to say, a contract is either ambiguous or it is not ambiguous. The proper interpretation of a contract does not depend upon the parties' perceived need to present parol evidence when the contract, as written, does not support their position.

n275 *See Interim Healthcare, Inc. v. Spherion, Corp.*, C.A. No. 00C-09-180, Slights, J. (Del. Super. Nov. 21, 2003)(Mem. Op. at 20-21); D.I. 101, at 2-7.

n276 *See e.g.* D.I. 75, at 24 (Plaintiffs' Opening Brief in Support of Their Motion for Partial Summary Judgment: "the proper construction of an unambiguous contract is purely a question of law' and may be resolved on summary judgment."); D.I. 85, at 28 (Spherion's Opening Brief in Support of Its Motion for Partial Summary Judgment: "notwithstanding the clear language of the parties' Agreement. . . .").
[**92]

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n277 *See e.g.* D.I. 120, at 13 (plaintiffs' counsel argues that portions of the Agreement are ambiguous and acknowledges that plaintiffs have changed their position on this issue); D.I. 109, at 51-52 (defense counsel asks witness to interpret the Agreement).

The parol evidence rule provides that "when two parties have made a contract and have expressed it in a writing to which they have both assented as to the complete and accurate integration of that contract, evidence . . . of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." n278 To ensure compliance with the parol evidence rule, the Court first must determine whether the terms of the contract it has been asked to construe clearly state the parties' agreement. n279 In this regard, the Court must be mindful that the contract is not rendered ambiguous simply because the parties disagree as to the meaning of its terms. n280 [*547] "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have [**93] two or more different meanings." n281 Upon concluding that the contract clearly and unambiguously reflects the parties' intent, the Court's interpretation of the contract must be confined to the document's "four corners." n282 The Court will interpret the contract's terms according to the meaning that would be ascribed to them by a reasonable third party. n283

n278 26 CORBIN ON CONTRACTS § 573 (1960).

n279 *Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 13 (Del. Ch. 2003)(citing *In Re. Explorer Pipeline Co.,* 781 A.2d 705, 713 (Del. Ch. 2001)).

n280 *See Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992)("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

n281 *Id.* (citation omitted).

n282 *See O'Brien v. Progressive Nothern, Ins. Co.,* 785 A.2d 281, 288-89 (Del. 2001).

n283 *Comrie,* 837 A.2d at 13 (citations omitted).

[**94]

Having concluded that the Agreement is clear and unambiguous, the Court will not consider extrinsic evidence to construe it.

### 3. There is No Evidence of Fraud or Intentional Misrepresentation

The Court feels obliged at this point to state its view of what this case is *not* about. Throughout the pretrial proceedings, at times during the trial, and again in the post-trial briefing, plaintiffs repeatedly have attempted to characterize Spherion's alleged wrongful conduct as either intentional or fraudulent. Here again, plaintiffs' position has evolved as this litigation has progressed. When plaintiffs sought to amend their complaint to include the equitable claims of reformation and rescission, they claimed they were without a legal remedy because the facts did not support a claim for fraud. n284 Plaintiffs now apparently perceive some advantage to characterizing Spherion's conduct as intentional and/or fraudulent. They have suggested that Spherion intentionally withheld information from Cornerstone during due diligence, in-

Case 1:04-cv-00583-GMS    Document 139-18    Filed 03/31/2006    Page 14 of 27

Page 39

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

tentionally misled HCFA in the cost reports submitted on behalf of Interim, and intentionally misled Spherion's own auditor during the preparation of Interim's [**95] audited financial statements. They also suggest that Spherion executives intentionally destroyed damaging financial information "in a show of corporate arrogance which recent events have shown to be all too common." n285

n284 See D.I. 13, at 15-16; D.I. 14, at 3, n.5. Indeed, plaintiffs withdrew their fraud claim in this Court as a predicate to their argument that the entire case should be transferred to the Court of Chancery. Accord E.I. duPont De Nemours & Co. v. HEM Research, Inc., 1989 Del. Ch. LEXIS 132, at * 14 n.12 ("It should be noted that in cases involving a prayer for rescission based upon a claim of innocent misrepresentation, the equity court has exclusive jurisdiction.").

n285 D.I. 136, at 2.

Notwithstanding their hyperbolic declarations, the fact remains that plaintiffs have not pled fraud or intentional misconduct and, instead, have maintained in this litigation when it suited them that they were aware of no facts upon which such a claim could be based. n286 Their strategy [**96] apparently changed as the case moved closer to trial. Nevertheless, despite apparent best efforts, plaintiffs failed to present any facts at trial that would support a claim for fraud or intentional misconduct. Consequently, the Court will not consider a claim of fraud, nor will it consider plaintiffs' breach of warranty claims (or any other claim) in the context of, or against the backdrop of, fraud. The evidence simply [*548] does not support the

fraud-related "conspiracy theories" peppered throughout plaintiffs' trial presentation and post-trial arguments. This is a breach of warranty case and nothing more or less than that.

n286 See Interim Healthcare Inc. v. Spherion, 2003 Del. Ch. LEXIS 130, at * 30-31 (discussing the procedural history of the case as it relates to plaintiffs' position regarding Spherion's alleged fraud and explaining why the Court would not consider the claim).

4. The Elements of a Breach of Contract Claim

Under Delaware law, the elements of a breach of contract claim [**97] are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages. n287 "Reliance is not an element of [a] claim for indemnification [arising from a breach of contract]." n288 Having concluded that this is a breach of warranty case, the Court will consider the evidence of record to determine whether the plaintiffs have met their burden of proof on each of the foregoing elements. The Court will not, however, require the plaintiffs to prove that they were justified in relying upon Spherion's representations and warranties as set forth in the Agreement. No such reasonable reliance is required to make a prima facie claim for breach. It follows, then, that the extent or quality of plaintiffs' due diligence is not relevant to the determination of whether Spherion breach edits representations and warranties in the Agreement. To the extent Spherion warranted a fact or circumstance to be true in the Agreement, plaintiffs were entitled to rely upon the accuracy of the representation irregardless of what their due diligence may have or should have revealed. In this regard, Spherion accepted the risk of loss to

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

the full extent of its indemnification commitments [**98] in the event its covenants were breached.

> n287 *H-M Wexford, LLC v. En-corp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003).

> n288 *Gloucester Holding Corp. v. U.S. Tape & Sticky Products, LLC*, 832 A.2d 116, 127 (Del Ch. 2003).

## 5. Catamaran Has Standing to Allege a Breach of the Agreement

Spherion contends that Cornerstone may not seek damages because Corner-stone is a party to the Agreement only for the purpose of allowing Spherion to recover liquidated damages against Cornerstone if the Buyer breaches certain provisions of the Agreement. n289 Spherion points to the fact that Cata-maran is the only "Buyer" identified in the Agreement. n290 And, Spherion continues, the Seller's warranties set forth in Section 3 of the Agreement are given only to the "Buyer." n291 Thus, concludes Spherion, "Cornerstone cannot independently recover for any breach based on representations and warranties in a contract to which it is not a party." n292

> n289 PX 172, at § 11.5.

[**99]

> n290 *Id.* at § 1.6.

> n291 D.I. 141, at 94.

> n292 *Id.*

The plaintiffs acknowledge that they are not seeking to recover breach damages on behalf of Cornerstone. n293 Their references to "Cornerstone" in the briefing were intended to include both Cornerstone and Catamaran collec-tively, as explained at the outset of their Opening Brief. n294 Catamaran, as a named party to this lawsuit and a party to the Agreement to whom repre-sentations and warranties were made, has standing to plead a breach of war-ranty claim and any other claims that may properly arise from a breach of the Agreement, including expectancy or benefit-of-the-bargain damages, if ap-propriate.

> n293 D.I. 145, at 27.

> n294 D.I. 136, at 1.

## [*549] 6. The Contractual Alloca-tion of Risk and Expectancy Damages

Plaintiffs' showcase claim is that they were denied the benefit of their bargain with Spherion: they purchased a company that Spherion represented [**100] was worth approximately $ 134 million when, in fact, it was worth only $ 90 million. n295 Based on these facts, plaintiffs seek to invoke what is perhaps the most basic tenet of contract law: a party that breaches a contract must place the non-breaching party back to the position he would have enjoyed had there been no breach. n296 Thus, according to the plain-tiffs, Spherion must fulfill the plaintiffs' expectancy by making up the approximately $ 26 million short-fall. While the plaintiffs' expectancy argument has curb appeal, it does not withstand closer inspection.

> n295 Plaintiffs presented a more "conservative" claim for ex-pectancy damages at trial based on an analysis of *Interim's pro forma* financial statements with adjustments to account for proper cost reporting methodologies. *See* D.I. 121, at 55-60; PX 739. Ac-cording to this damages model, plaintiffs were denied the bene-fit-of-their-bargain in the

Case 1:04-cv-00583-GMS    Document 139-18    Filed 03/31/2006    Page 16 of 27

Page 41

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

amount of $ 25,485,600. *See* D.I. 136, at 79.

n296 *Duncan v. Theratx, Inc., 775 A.2d 1019, 1022 (Del. 2001).*

[**101]

The Court first considers whether the plaintiffs' expectancy damages claim is legally viable in the context of this highly negotiated contract between two sophisticated parties. Clearly, the Agreement does not expressly contemplate expectancy damages; they are nowhere mentioned or even insinuated in the contract. The sole remedy for breach identified in the Agreement is indemnification, both for the Seller (in the event of a Buyer's breach) and the Buyer (in the event of a Seller's breach). The indemnification provisions are quite specific in both their scope and application. According to Spherion, they provide the parties with their exclusive remedy in the event of a breach of the Agreement. The Court disagrees.

"Although the parties may, in their contract, specify a remedy for a breach, that specification does not exclude other legally recognized remedies. An agreement to limit remedies must be clearly expressed in the contract." n297 Here, although the Agreement does not specifically provide for expectancy damages, it also does not specifically exclude them. Accordingly, if other remedies (including expectancy damages) are factually viable, then they are legally viable as well. [**102] n298

n297 *17A AM. JUR. 2d Contracts* § 709 (2004). *See also Oliver B. Cannon &Sons, Inc. v. Dorr-Oliver, Inc., 336 A.2d 211, 214 (Del. 1975)*("The contractual remedy cannot be read as exclusive of all other remedies since it lacks the requisite expression of

exclusivity.") (citations omitted).

n298 This does not necessarily hold true for the equitable remedies plaintiffs have sought in the companion Court of Chancery litigation. *See Elysian Fed. Savings Bank v. Sullivan, 1990 Del. Ch. LEXIS 30* (holding that plaintiffs must elect between breach damages and rescission).

Turning, then, to the factual *bona fides* of expectancy damages in this case, as a fact finder, the Court must admit to some knee-jerk reluctance to embrace the claim given the generous pre-Sale due diligence afforded to the plaintiffs and the purity of the auction process leading up to the Sale. The Court's first impression has only been reinforced by further consideration [**103] of the claim.

At its essence, plaintiffs' claim appears to rest on the circular proposition that Interim was worth $ 134 million because that is what the plaintiffs paid for it. While that logic may apply to a commodity the total value of which can be realized [*550] immediately through use or sale -- a barrel of oil, for example -- it does not hold true in the sale of a going concern. In a free market economy, all businesses operate under the constant risk of declining profits caused by an infinite panoply of market factors. The emergence of a superior competing product, an adverse regulatory ruling, and the unexpected insolvency of a major customer are but a few examples. Market risks also work in the opposite direction; the insolvency of, or a regulatory ruling against a major competitor, for example, may provide windfall profits. The presence of these market factors -- more prevalent in some industries (like healthcare) than others -- must be taken into consideration when attempting to measure a firm's value.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Even then, the process is by no means an "exact science." n299

n299 *See Cooper v. Pabst Brewing Co., 1993 Del. Ch. LEXIS 91, at * 23* ("Ordinarily, the value of any commodity in a competitive market is what a willing buyer would pay a willing seller for that commodity. . . ."); *Northern Trust Co. v. C.I.R., 87 T.C. 349, 380 (1986)* ("[A] sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgments and reasonableness must enter into the process of weighing those facts and determining their aggregate significance. Indeed, we have repeatedly recognized that stock valuation is not an exact science, but rather is inherently imprecise and capable of resolution only by a Solomon-like pronouncement."); *Messing v. Commissioner, 48 T.C. 502, 512 (1967)* ("Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations -- a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement.").

[**104]

In this case, the occurrence of a foreseeable risk factor, an adverse regulatory ruling, soon after the plaintiffs acquired Interim does not necessarily mean that the plaintiffs received less than what they paid for. If Spherion could have in some way entirely eliminated the risk of an adverse audit, the parties' Agreement would reflect this protection and the price for Interim most certainly would have been higher. The representations and warranties in the Agreement, however, reflect that the parties were fully aware that a Medicare audit could occur and that Spherion would bear the risk of that loss only in certain circumstances, e.g., if Spherion failed to file its cost reports in a manner consistent with its Medicare representations and warranties. n300 The expectations of both parties, therefore, were shaped by the risks of which they were aware, and the allocation of those risks as expressed in their Agreement. n301

n300 PX 172, at ※ 3.17.

n301 Although not relevant to the breach of warranty claim, plaintiffs' due diligence, including their discovery of information regarding past audits of Interim cost reports, Interim's current cost reporting methodologies, and the FI's expressed concerns regarding those methodologies, all are relevant in determining the scope of plaintiffs' reasonable expectations.

[**105]

Professor Williston exposes the factual weakness in plaintiffs' expectancy argument in his explanation of the theoretical basis of the remedy:

The theory underlying [expectancy damages] is as simple as it is significant: A promissee enters into a particular outcome and believes that the best possible outcome, under the circumstances, will be achieved by

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

contracting with this par-
ticular promisor. When the
promisor *fails to perform as
promised*, the promissee
[*551] becomes entitled to
damages designed to compen-
sate him or her for the harm
caused by the breach. That
harm, in turn, is the loss
suffered by the promissee
when the *promisor failed to
perform his or her promise* -
- in other words, the value
to the promissee of the
promise that was broken.
n302

n302 24 WILLISTON ON
CONTRACTS, § 64:2, at 23-34
(2002)(emphasis supplied). *See
also* Holmes, *The Common Law &
Other Writings*, at 297-303 (Legal
Classics Library 1982)(Justice
Holmes discusses the nature of
contractual promises generally,
and notes that he views the con-
tract "as the taking of a risk"
tied to the specific nature and
extent of the promises contained
in the agreement).

**[**106]**

Although plaintiffs purport to link
their claim for expectancy damages to
alleged breaches of the Agreement,
n303 much of their argument suggests
that Spherion in all instances must
bear the risk of loss in this transac-
tion. n304 All things being equal, if
the Agreement did not contain a con-
tractual allocation of risk, the
plaintiffs' argument might be received
more favorably. But, in the shadow of
the parties' highly negotiated Agree-
ment, after thorough due diligence,
the plaintiffs sound much like an ex-
perienced gambler asking the pit boss
to allow him to take his losing bet
off the table after the roulette wheel
has stopped spinning. Plaintiffs had
ample opportunity to negotiate for a

specific representation and warranty
regarding the value of the company
they were acquiring. No such warranty
was given, however. To the contrary,
Spherion constructed the Sale of In-
terim as an auction, prepared *pro
forma* financial statements peppered
with disclaimers, and opened Interim's
doors to Cornerstone for due dili-
gence. Under these circumstances,
plaintiffs' reasonable expectancy must
be tied to and limited by the express
promises made to them in the Agree-
ment. n305

n303 D.I. 136, at 59 (refer-
ring to alleged breaches of Sec-
tions 3.7, 3.16 and 3.17 of the
Agreement).

**[**107]**

n304 *See Id.* at 60-61.

n305 Even assuming *arguendo*
that the plaintiffs miscalculated
and improperly discounted the
regulatory risks when formulating
their $ 134 million offer, absent
some type of fraud not present
here, the miscalculation is their
own fault. This was not a cloak-
and-dagger transaction presented
in a rushed take-it-or-leave-it
fashion; it was a multi-party
auction that incorporated a sub-
stantial due diligence process.
Delaware courts do not rescue
disappointed buyers from circum-
stances that could have been
guarded against through normal
due diligence and negotiated con-
tractual protections. *See VGS,
Inc. v. Castiel*, 2004 WL 876032
at * 6 (Del. Ch. Apr. 22, 2004)
(finding that a sophisticated in-
vestor's failure to recognize the
importance of a contract that was
made available during due dili-
gence diminished the plaintiffs'
fraud and breach of contract
claim); *Debakey Corp. v. Raytheon*

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

*Service Co.*, 2000 WL 1273317 at * 26-28 (Del. Ch. Aug. 25, 2000)(finding that a sophisticated party's failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction made it impossible to prove justifiable reliance. Instead, this behavior indicated that the sophisticated party made a business decision it was willing to accept in order to complete the deal quickly and cheaply, a decision the Court would not second-guess.). Put another way, if plaintiffs failed properly to account for risks ascertainable through due diligence, and to protect against them in the Agreement, then their $ 134 expectation was not reasonable and, therefore, it is not compensable.

**[**108]**

The cases that the parties belabor involve either the pure economic loss doctrine or estimating stock price in an appraisal action and, as such, are off point. n306 More relevant is the long line of cases in which buyers, like the plaintiffs here, seek to escape written warranties and disclaimers in favor of common law remedies that **[*552]** assume the absence of bargained for allocations of risk. Most common among these are disputes over the sale of goods involving the Uniform Commercial Code. For example, in upholding a contractual allocation of risk *in Employers Ins. Of Wausau v. Suwannee River Spa Lines, Inc.*, n307 the Fifth Circuit noted,

We will not disturb the agreed upon allocation of risks simply because the worst of those risks has materialized. While this result may seem harsh, it is

clear that two sophisticated commercial actors such as [plaintiff] and [defendant] could have allocated the risk of damage stemming from a guarantee deficiency differently . . . [Defendant] and [plaintiff] are "commercial giants" of equal bargaining power. Their lengthy negotiations produced a detailed contract of nearly 100 pages in length. We will not rewrite this contract **[**109]** to substantially alter the allocation of risks to which the parties have consented.

n306 *See e.g. Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194 (Del. 1992); *Duncan v. Theratx, Inc.*, 775 A.2d 1019 (Del. 2001).

n307 866 F.2d 752, 780 (5th Cir. 1989). *See also Progressive International Corp. V. E.I. DuPont De Nemours & Co.*, 2002 WL 1558382 at * 8 (Del. Ch. Jul. 9, 2002)(finding that even strict confidentiality requirements that considerably impede due diligence do not make a deal between sophisticated parties unconscionable because they are fully capable of making the business decision to continue the deal or walk away).

Here, plaintiffs made a business decision to allocate the risk of loss as between Buyer and Seller by including highly negotiated representation and warranty provisions in the Agreement. These representations and warranties were integral to the transaction and were reflected in the purchase price paid for Interim. The **[**110]** contractual allocation of risk was etched in stone when the par-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

ties included an integration clause, in which they acknowledged that the Agreement, including the express warranties, represented the sole and complete understanding of the parties. n308 The plaintiffs' calculated risk did not pan out, and now they seek to escape the express language of the Agreement infavor of more liberal common law platitudes. The Court is not persuaded. In the absence of proof by a preponderance of the evidence that Spherion breached a promise expressed in the Agreement in a manner that materially affected the value of Interim at the time of the Sale, the Court will not award expectancy damages. As discussed below, no such breach occurred here.

n308 PX 172, at ※ 15.4.

## B. The Medicare Adjustments

### 1. The Parties' Contentions

The plaintiffs contend that the post-Sale audit of Interim's cost reports uncovered numerous problems which, individually or in total, constitute breaches of Spherion's representations and warranties [**111] in the Agreement. Specifically, the plaintiffs have identified two provisions of the Agreement implicated by Spherion's alleged improper cost reporting methodologies: Section 3.16 and Section 3.17. As to Section 3.16(a), plaintiffs point to Spherion's representation that "no notices have been issued regarding any disputes related to [Interim] cost reports from Governmental Entities responsible for administering the Medicare program . . .," and argue that Spherion's failure to disclose Aetna's frequent pre-Sale communications with Interim regarding the deficiencies in their cost reporting methodologies constitutes a breach of this provision. n309 Plaintiffs contend that these communications were "notices" as

contemplated in this provision of the Agreement.

n309    Id.    at    ※
3.16(a)(emphasis supplied).

With respect to Section 3.16(b), plaintiffs argue that Spherion breached its representation [*553] that "[Interim has not] intentionally filed a false claim, or filed a claim without a reasonable basis therefore, [**112] with HCFA [or] its fiscal intermediaries. . . ." n310 Plaintiffs contend that Interim lacked any reasonable basis to support its implementation of the three component A&G methodology, its allocation for capital costs on the basis of a square footage statistic, its allowance of Regional Vice President and Branch Managers salaries and costs, as well as other allegedly improper claims for reimbursement identified during the course of the PGBA audit.

n310 Id. at ※ 3.16(b).

As to Section 3.17, plaintiffs contend that Interim's cost reports did not comply with "applicable Laws" because the overall reimbursement impact of the cost reports caused "cross-subsidization," a situation where Interim's non-Medicare costs were reimbursed by the Medicare program in violation of the Medicare statute. n311 According to the plaintiffs, Spherion's breach of Section 3.17 is further evidenced by its failure to comply with applicable HCFA regulations, the PRM provisions relating to cost reports, and HCFA's Transmittals 2, 3 [**113] and 4.

n311 Id. at ※ 3.17.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Spherion denies that it has breached any of the representations and warranties by its Medicare filings. As an initial matter, Spherion disagrees with Interim's interpretation of the relevant provisions of the Agreement. As to 3.16 (a), Spherion argues that "notices" in that provision refers specifically to formal "notices of program reimbursement." Spherion alleges that it complied with Section 3.16(a) when it disclosed to plaintiffs all NPRs that it had received from the Medicare program in Schedule 3.16(a) to the Agreement. Spherion also contends that communications from its FI could not form the basis of a claim of breach since its FI is not a "governmental entity" as contemplated by the Agreement. Thus, according to Spherion, it was not required to disclose any communications from the FI regarding the FI's concerns with its cost reporting methodologies because such communications were neither "notices," nor communications from a "government entity."

Spherion also takes issue [**114] with plaintiffs' interpretation of Section 3.16(b). Specifically, Spherion contends that to prove a violation of Section 3.16(b), plaintiffs must prove that Spherion "intentionally . . . filed a claim without a reasonable basis therefore with HCFA [or] its fiscal intermediaries. . . ." n312 Since the evidence does not support a claim that Spherion intentionally attempted to mislead HCFA or seek reimbursement to which it was not entitled in its cost reports, Spherion contends that plaintiffs cannot prove a violation of Section 3.16(b). Moreover, even if plaintiffs were not required to prove intentional conduct to prove a violation of Section 3.16(b), Spherion argues that it had a "reasonable basis" for all of its cost reporting methodologies.

n312 *Id.* at § 3.16(b).

Turning to Section 3.17, Spherion contends that its cost reports were filed in compliance with applicable "Laws." According to Spherion, "Laws" includes only Medicare statutes and regulations. It does not include the PRM or HCFA Transmittals. [**115] In any event, even if the Court construes "Laws" to mean statutes, regulations, the PRM and Transmittals, Spherion contends that its cost reports complied "in all material respects" with each of these various authorities. Spherion received approval from Aetna of its cost reporting methodologies in 1994 and [*554] continued to believe that its position with respect to its cost allocation methodologies was correct up to the time it filed its 1996 cost reports. Spherion also contends that plaintiffs' lone Medicare reimbursement expert has not made a credible case that any of Interim's cost reporting methodologies "materially" violated any Law. On the other hand, Spherion's expert forcefully and credibly endorsed the propriety of the cost reports. According to Spherion, this view is corroborated by the experts on both sides of the transaction who reviewed the cost reports prior to the Sale. Simply stated, according to Spherion, plaintiffs have failed to carry their burden of proof on this issue.

**2. The Interpretation of the Applicable Provisions of the Agreement**

**a. Section 3.16**

As indicated, the parties disagree as to whether the reference to "Governmental Entities" in Section [**116] 3.16(a) includes FIs or is limited to HCFA. n313 "Governmental Entity" is defined in the Agreement as "any court, tribunal, administrative agency or commission or other governmental or regulatory authority . . . including but not limited to agencies, departments, boards, commissions or *other instrumentalities* of any country or

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

any political subdivision thereof." n314 Spherion contends that a FI is not a "regulatory authority" as that term is used in Section 1.3 5. According to Spherion, "an FI is merely a private organization with which [HCFA] enters into an agreement to communicate with providers and to conduct audits." n315 Plaintiffs counter that FIs have "responsibility (by statute) for administering the Medicare program and, as such, the FI is an "instrumentality" of the government. n316 The Court agrees.

n313 Again, Section 3.16(a) provides, in pertinent part: "no notices have been issued . . . from Governmental Entities. . . ."

n314 PX 172, at § 1.35 (emphasis supplied).

n315 D.I. 141, at 53, *citing* 42 *U.S.C.* § 1395(h); 42 *C.F.R.* § 421 *et. seq.* (establishing FIs and defining their roles).
[**117]

n316 *See* 42 *U.S.C.* § 1395(h).

Aetna communicated with Interim on HCFA letterhead. n317 The FI was vested with authority to process bills and approve PIPs. And it was vested with authority to audit cost reports in the first instance. n318 Under these circumstances, the Court is satisfied that Aetna (and later PGBA) were "instrumentalities" of the government/HCFA.

n317 *See e.g.* PX 282; PX 283.

n318 42 *U.S.C.* § 1395(h); 42 C.F.R. § 421.

The parties also dispute the appropriate interpretation of "notices" as used in Section 3.16(a). Spherion contends that "notices" refers only to NPRs; plaintiffs contend that "notices" would include any communication from HCFA or the FI in which the provider is notified of a problem. It is a maxim of contract interpretation that, where no contrary intention is apparent, "general words used after specific terms are to be confined [**118] to things *'ejusdem generis'* -- of the same kind or class as the things previously specified." n319 *Ejusdem generis* captures the general notion that if parties intended a contractual term to be interpreted in accordance with its general definition, they would not have employed the term in the first instance in the context of a specific usage or term of art. n320

n319 17A *AM. JUR. 2d Contracts* § 364 (2d Ed. 2004).

n320 *See New Castle County v. National Union Fire Ins. Co. of Pittsburgh*, 243 F.3d 744, 751 (3d Cir. 2001)(quoting *Donaghy v. State*, 29 Del. 467, 6 Boyce 467, 100 A. 696, 707 (Del. 1917)).

[*555] Applying *ejusdem generis* to Section 3.16(a), the Court concludes that "notices" refers to the prior phrase "notices of program reimbursement." n321 The parties first used "notices" in connection with the term of art -- "notices of program reimbursement" -- and then referred to "notices" generally. This is precisely when *ejusdem generis* applies. Moreover, [**119] the language ". . . and no notices have been *issued* . . ." contemplates a formal process whereby a "Governmental Entity" "issues" a formal notice. NPR's are "issued" by the FI after the FI completes its review of the cost report. Interim disclosed all of the NPR's it had received from Aetna in the Schedules to the Agreement. n322 In doing so, it

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

complied with its obligations under Section 3.16(a). n323

> n321 Again, Section 3.16(a) provides in pertinent part: "[Interim is not] appealing any notices of program reimbursement and no notices have been issued regarding any disputes related to [Interim's] cost reports. . . ."

> n322 PX 174, at Sch. 3.16(a).

> n323 The Court also notes that it appears that Interim disclosed at least some of its correspondences with Aetna regarding the NPRs by supplying these documents to plaintiffs in the data room during due diligence. *See* PX 125.

With respect to Section 3.16(b), the Court's task in interpreting this provision is to determine whether the term "intentionally" **[**120]** modifies only "filed a false claim" or also modifies "filed a claim without a reasonable basis therefore." n324 Not surprisingly, plaintiffs endorse the former construction -- one that would not require them to prove intentional misconduct to prove a breach. Spherion endorses the latter construction -- one that would require proof that Interim intentionally filed improper cost reports. The Court is persuaded that Spherion's interpretation is most consistent with the Agreement's overall structure and plan, and most reflective of the parties' intent as expressed in the Agreement.

> n324 Again, Section 3.16(b) provides in pertinent part: "[Interim has not] intentionally filed a false claim, or filed a claim without a reasonable basis therefore, with HCFA [or] its fiscal intermediaries. . . ."

The Court begins its analysis by reiterating the general rule that "the standard of interpretation of a written instrument, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definitive **[**121]** meaning, is the meaning that would be attached to such instrument by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the instrument, other than oral statements by the parties of what they intended it to mean." n325 When construing the meaning of contractual terms, the Court will not allow sloppy "grammatical arrangement of the clauses" or "mistakes in punctuation" "to vitiate the manifest intent of the parties as gathered from the language of the contract." n326

> n325 *17A AM. JUR. 2d, Contracts* § 337 (2d. Ed. 2004).

> n326 *Id.* at §§ 365, 366.

At first glance, one readily could interpret Section 3.16(b) as representing that Interim has neither intentionally filed a false claim, nor filed any claim without a reasonable basis therefore. The placement of the adverb "intentionally" only before the phrase "filed a false claim," and the placement of the comma after "false **[**122]** claim," might be read to support this construction. Certainly this is how plaintiffs have read the provision. Yet the Court **[*556]** will not allow the imprecise placement of adverbs and commas to alter the otherwise plain meaning of a contractual provision or to frustrate the overall plan or scheme memorialized in the parties' contract. After a careful review of the Agreement, the Court is convinced that Section 3.16(b) was drafted to address conduct that either could give rise to liability arising

-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

from fraud and abuse or the intentional submission of improper claims for reimbursement. This conclusion is consistent with the Court's reading of the provision during trial. n327

> n327 *See* D.I. 114, at 192 (the Court observed during trial: "I believe that 3.16 is really meant to address issues that could give rise to a fraud and abuse liability and, therefore, there were particular indemnity provisions that were required because of the nature of that liability to address specifically those sorts of claims that might arise down the road, as opposed to 3.17, which was a more general government filing provision that could apply to any number of submissions that would be made on behalf of Interim.").

[**123]

When interpreting a contract, the Court must view the document as a whole, giving effect to all of its provisions. n328 "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's scheme or plan." n329 Section 3.16(b)'s place in the overall scheme or plan of the Agreement can perhaps best be gleaned from the schedule of liabilities listed in Schedule 3.16(b), specifically incorporated by reference in Section 3.16(b). There, Spherion disclosed only the fraud and abuse investigations in which it might be exposed to Medicare fraud and abuse liability, including the El Paso investigation. n330 Conspicuously absent from this schedule is any reference to the 1994 desk review pursuant to which Aetna alleged, in essence, that Interim had submitted its 1994 cost report without a "reasonable basis" for certain cost

allocations. n331 This potential liability was listed in Schedule 3.16(a) and Schedule 3.17. n332

> n328 *See E.I. duPont de Nemours & Co. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985)("In upholding the intentions of the parties, a court must construe the agreement as a whole giving effect to all provisions therein.")(citations omitted).
[**124]

> n329 *Id.* (citations omitted).
>
> n330 PX 174, at SPH 030339.
>
> n331 *Id.*
>
> n332 *Id.* at Sch. 3.16(a) and Sch. 3.17.

The structure of the indemnification provisions in Section 10 of the Agreement also support the Court's interpretation of Section 3.16(b). These provisions specifically carve out "Section 3.16 Damages" and exclude them from the limitations that are otherwise in place for indemnification claims arising from improperly filed cost reports. n333 The provisions reflect the parties' recognition after the El Paso and Hollywood, Florida investigations that damages and civil penalties relating to intentional misconduct and fraud and abuse liabilities should not be capped. n334

> n333 *See* PX 172, at §§ 10.1, 10.3(a), 10.4(b).
>
> n334 As indicated previously, the parties renegotiated the initial purchase agreement after the El Paso and Hollywood, Florida fraud and abuse investigations and agreed to add Section 3.16(b) and the corresponding indemnification provisions. D.I. 100, at

Case 1:04-cv-00583-GMS    Document 139-18    Filed 03/31/2006    Page 25 of 27

Page 50

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

PP 92-93. *See also* D.I. 109, at 73; D.I. 117, at 94-96.

**[**125]**

Finally, it cannot escape observation that the plaintiffs' interpretation of Section 3.16(b) would allow it to recover unlimited damages based on a lower threshold of proof -- "without a reasonable basis" -- than the limited damages it would be entitled to **[*557]** recover upon meeting a higher threshold of proof -- "violation of applicable Law" -- as established in Section 3.17. This result would also be contrary to the "Agreement's overall scheme or plan." n335

n335    *E.I. duPont de Nemours, 498 A.2d at 1113.*

Having concluded that Section 3.16(b) relates to intentional misconduct or matters that could give rise to "fraud and abuse" liability, it should come as no surprise that the Court has concluded that plaintiffs have not proven a breach of Section 3.16(b). As the Court already has determined, plaintiffs have not pled or proven that Spherion engaged in fraudulent or intentional misconduct. Moreover, no fraud and abuse investigation was ever initiated against Interim in connection with any of the cost **[**126]** reports at issue in this case. n336 Plaintiffs' remedy for the Medicare adjustments, therefore, if any, must arise from its claim that Spherion breached Section 3.17.

n336 D.I.: 121, at 69.

**b. Section 3.17**

The parties' disagreement with respect to the proper interpretation of Section 3.17 centers on the definition of "Law" as set forth in the Agreement. Spherion represented that it

submitted its cost reports in compliance with applicable Laws. The Agreement defines "Laws" at Section 1.62: "Laws' means any federal, state, local or foreign law, statute, ordinance, rule, regulation, permit, order, judgment or decree." n337 Plaintiffs argue that "Laws" includes provisions in the PRM and HCFA Transmittals. Spherion contends that "Laws" includes only statutes and regulations.

n337 PX 172, at § 1.62.

Spherion correctly notes that there **[**127]** is ample authority for the proposition that the PRM and Transmittals interpret, but do not supercede, the HCFA regulations. n338 "The PRM has been described as not binding like law or regulation. Rather, it guides the application of the laws and regulations.'" n339 The FI's duty is to "consult and assist providers in interpreting and applying the principles of Medicare reimbursement to generate claims for reimbursable costs." n340 The PRM and Transmittals assist the FI to this end.

n338 *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99, 131 L. Ed. 2d 106, 115 S. Ct. 1232 (1995)(characterizing the provisions of the PRM as "interpretive rules" and stating that "interpretive rules do not require notice and comment, although . . . they also do not have the force and effect of law and are not accorded that weight in the adjudicatory process."); *Ashtabula County Medical Center v. Thompson*, 352 F.3d 1090, 1093 n. 1 (6th Cir. 2003)("The PRM contains the interpretive rules regarding Medicare reimbursement."); *St. Mary Hosp. of Troy v. Blue Cross & Blue Shield Assoc.*, 788 F.2d 888, 890 (2d. Cir. 1986)("We rec-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

ognize that we deal here, not with either a statute or with formally promulgated regulations, but with a Manual explicating those regulations. While such interpretive guides are without the force of law, they are entitled to be given weight.")(citations omitted).

[**128]

n339 *GCI Health Centers, Inc. v. Thompson, 209 F. Supp. 2d 63, 69 (D. D.C. 2002)*(quoting *Wilmot Psychiatric v. Shalala, 11 F.3d 1505, 1507 (9th Cir. 1993)*).

n340 *Shalala, 514 U.S. at 94* (citing *42 C.F.R. § 413.20 (b)*).

Thus, there is a recognized distinction between the Medicare statute and regulations on the one hand, and the PRM and Transmittals on the other. Clearly, the statute and regulations have the force of law and the manual and transmittals do not. It is equally clear, however, that the PRM and Transmittals are considered "interpretive [*558] rules" in Medicare parlance. n341 And "rules" are encompassed within the Agreement's definition of "Laws." n342

n341 *See    In Re Cardiac Devices Qui Tam Litigation, 221 F.R.D. 318, 352 (D. Conn. 2004)*.

n342 PX 172, at § 1.62.

Spherion contends that the distinction between interpretive [**129] and substantive rules is important because interpretive rules cannot supercede the Medicare regulations and are not perceived among the courts or the providers of Medicare services as "laws." Substantive rules, such as regulations, on the other hand, are controlling. While this distinction may have

meaning in other contexts, it has no meaning in the operative language chosen by the parties to define their obligations. The Agreement expressly provides that "Laws" includes both "regulations" *and* "rules;" the Agreement is silent as to whether those "rules" must be interpretive or substantive.

Clearly, the parties were sophisticated scribners and knowledgeable of the healthcare field. They were familiar with the range of written authorities that regulate the healthcare industry. If they had intended to exclude the PRM or Transmittals from "Laws," they could have drafted the Agreement in a manner that it clearly did so. The Agreement as drafted, however, encompasses the PRM and Transmittals. Thus, when determining whether Spherion breached Section 3.17, the Court must consider whether Interim's cost reports as submitted complied "in all material respects" with applicable Medicare statutes, [**130] Medicare regulations, provisions of the PRM, and HCFA Transmittals. n343

n343 Of course, when reviewing an agency's decision regarding a provider's compliance with the applicable law, the courts first look to the applicable statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1986)*. Only if the intent of Congress is not clearly expressed in the statute will the Court consider the agency's construction of the statute. *Id.*

### 3. The Medicare Experts

Apparently recognizing the remarkable complexity of the Medicare-related issues, both parties engaged Medicare "reimbursement" experts to

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

address the propriety of Interim's cost reporting methodologies. Not surprisingly, there was little upon which the experts could agree. Given that the plaintiffs' claims regarding the Medicare adjustments, in large part, rise or fall on the testimony of the experts, it is appropriate for the Court to share its observations regarding the credibility of the experts' testimony [**131] before addressing the substance of the Medicare-related claims.

Plaintiffs presented the testimony of Thomas Curtis, a certified public accountant with extensive experience as an auditor with Medicare FIs. Mr. Curtis eventually rose to the position of "Audit Manager," in which capacity he supervised approximately thirty field auditors. n344 In 1987, Mr. Curtis started his own consulting company where he continues to provide services to healthcare providers regarding Medicare compliance issues, particularly reimbursement issues. n345 In this capacity, Mr. Curtis has represented several Medicare providers before the PRRB in connection with appeals of cost report adjustments. n346

n344 D.I. 106, at 188-91.

n345 Id. at 191-92.

n346 Id. at 194-95.

In late 1998, Interim's outside legal counsel retained Mr. Curtis on Interim's behalf to assist Interim in its efforts to reverse PGBA's audit adjustments of Interim's [*559] 1996 and 1997 cost reports. n347 Mr. Curtis served as Interim's principal "outside expert" [**132] in all of its subsequent dealings with PBGA and later with HCFA. n348 As Mr. Curtis himself described his role: "My job was to help [Interim] fight through [the audit] adjustments." n349

n347 Id. at 213-15.

n348 Id.

n349 Id. at 216.

Mr. Curtis' first impression upon reviewing the PGBA audit findings was that the audit was "not properly performed. . . ." n350 He characterized PGBA's approach to the three component A&G methodology as "troubling," its collapse of the three component A&G as "flawed," and the audit adjustments as "incorrect on several grounds." n351 During the audit process, Mr. Curtis assisted Interim in preparing for meetings with the FI, the purpose of which was either to obtain a reversal of audit adjustments or, at the very least, a new audit. n352 Position papers were prepared in advance of the meetings setting forth points that Interim or its consultants intended to communicate to the FI during the course of the meeting. n353 The position papers included such statements [**133] as: "we acted in good faith with reasonable assurances from Aetna that how we handled Interim Health Care cost reports was appropriate and permissible;" n354 and "our goal today is to show you that we have filed our cost reports based on supportable approved methods." n355 Later, when asked at his deposition in this litigation whether he believed in the positions Interim was taking with the FI and later with HCFA during the audit adjustment meetings, Mr. Curtis acknowledged that he "[couldn't] imagine . . . advocating a position that [he] didn't think was correct." n356

n350 DX 5.

n351 Id.

n352 D.I. 121, at 85-86.

n353 Id. at 82.

n354 DX 169, at 9.

n355 DX 171, at 4.