Case 1:04-cv-00583-GMS    Document 139-19    Filed 03/31/2006    Page 1 of 32

Page 53

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n356 D.I. 111, at 16.

At trial, however, Mr. Curtis' views regarding the propriety of Interim's cost reports appeared to change dramatically. Of course, Mr. Curtis' role had changed too. During the audit process, Mr. Curtis was engaged to support Interim in its efforts to secure reversals of the audit adjustments. [**134] At trial, Mr. Curtis was engaged by the plaintiffs to be critical of Interim's methodologies in support of the plaintiffs' claims of breach of the Agreement. Thus, when asked at trial, Mr. Curtis opined that Interim's 1996 and 1997 cost reports did not comply with Law and were not otherwise proper. n357 He concluded that Interim had improperly attempted to shift its costs to Medicare in an inequitable manner. n358

n357 D.I. 121, at 13.

n358 Id. at 14.

While Mr. Curtis' clients may be comforted by his willingness to advance their positions in accordance with their circumstance, the Court takes little comfort in this approach to forensic analysis as it searches for the truth. Mr. Curtis' conflicting roles, and the disconcerting evolution of his opinions, has limited his usefulness to the fact finder. n359

n359 The Court also considered the opinions of plaintiffs' other expert, John K. Dugan, as they related to the Medicare issues. See DX 8. While not affected by the same credibility issues, the Court found the opinions to be less persuasive than those offered by Spherion's expert.

[**135]

[*560] For its part, Spherion engaged William J. Simione, Jr., as its Medicare reimbursement expert. Mr. Simione is a certified public accountant who has been working in the healthcare industry for more than thirty-eight years. n360 His work as a healthcare consultant included work on several national committees that participated in the promulgation of national healthcare legislation. n361 Indeed, Mr. Simione was instrumental in working with HCFA to introduce the step-down cost allocation methodology to the home healthcare industry. n362 Mr. Simione spent between thirteen hundred and fourteen hundred hours reviewing the information relating to Interim's cost report submissions before reaching his opinions. n363 Although there were instances where Mr. Simione appeared to contradict himself, n364 his approach generally was measured, and his ultimate conclusions were not overreaching. In short, Mr. Simione made a credible expert presentation on behalf of Spherion and, in the Court's view, was the most persuasive witness on Medicare reimbursement issues.

n360 D.I. 119, at 23-24.

n361 Id.

n362 Id. at 26.
[**136]

n363 D.I. 130, at 77.

n364 See e.g. D.I. 130, at 6 (Interim probably should have filed 1996 cost report under protest); Id. at 73 (suggesting that Interim did not have to file its cost report under protest).

The Court's determination that Mr. Simione was the more credible Medicare reimbursement expert does not end the inquiry. As the Court considers each

Case 1:04-cv-00583-GMS     Document 139-19     Filed 03/31/2006     Page 2 of 32

Page 54

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

individual claim upon which the experts have opined, the Court must evaluate the experts' conclusions in the context of the entire evidentiary record. Accordingly, the Court will make reference to the competing expert opinions as appropriate when considering each of the individual claims.

### 4. The Audit Conclusions of HCFA and the FI are Not Dispositive

Finally, before addressing the specific Medicare claims, the Court must address a fundamental analytical flaw that flows throughout plaintiffs' arguments regarding the legality of Interim's cost reports. Plaintiffs appear to assume that the cost reports were prepared illegally because PGBA and, to a lesser extent, HCFA said they were prepared illegally during the audit and post-audit **[**137]** meetings. The statements and conclusions of the regulators, however, are not dispositive of the issue. They are, of course, evidence to be considered in the total mix of evidence regarding the propriety of Interim's cost reporting methodologies. At the end of the day, however, the Court must consider the legality of the cost reports as the issue has been presented in this case: the Agreement requires that Interim submit its cost reports "in all material respects in compliance with applicable Laws." This does not mean that Interim must submit its cost reports in a manner that is satisfactory to its FI and HCFA PGBA's and HCFA's interpretation of the applicable Laws is but one piece of evidence that must be considered along with the other evidence, including the opinions of the experts who have weighed in on the Medicare issues.

### 5. Cross-Subsidization

Plaintiffs allege that Interim's allocation of operational costs resulted in "cross-subsidization" in violation of the Medicare statute. n365 Plaintiffs offer the following example to illustrate the point with respect **[*561]** to the allocation of capital costs: even though the President of the company would spend only 7% of his time running **[**138]** the Medicare operations from his desk, Interim would allocate its capital costs in a manner that would indicate that 40% of the President's desk, computer, etc., were used in connection with the Medicare operations. n366

n365 *See 42 U.S.C. § 1395X(v)(1)(A)* ("The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the methods or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies and services. . . .").

n366 D.I. 136, at 23; D.I. 130, at 46-48. Plaintiffs also allege that "of the $ 19.4 million in A&G allocated to Interim in 1996, $ 19 million, or over 99%, was deemed reimbursable even though Medicare only accounted for about 25% of Interim's healthcare revenues." D.I. 136, at 20. As to this example, Spherion disputes plaintiffs' characterization of the costs allocated to Medicare, and with good reason. A review of the evidence reveals that Medicare was actually asked to pay only 34% of Interim's allowable Medicare costs of $ 19.4 million. *See* DX 270, at Sch. G.

**[**139]**

Plaintiffs' cross-subsidization analysis appears persuasive as far as it goes. The apparent imbalance in the allocation of capital versus other

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

costs certainly merits a closer look. But the criticism ultimately fails because it does not contemplate the fact that the Medicare component of Spherion's business, by its nature, drained more of Spherion's resources than the other two components of the business (non-intermittent healthcare and commercial staffing). As Mr. Simione explained, the skilled intermittent services Interim provided had to be billed on a per visit basis. The manner in which a Medicare bill must be generated is much more highly regulated than the billings related to Spherion's other business segments. A skilled intermittent care provider likely will have several patient encounters and make several Medicare visits during an eight hour shift. The resources needed to generate separate bills for these encounters and visits will far exceed the resources needed to administer the other components of Spherion's business.

In the commercial staffing realm, for instance, an individual likely would be assigned to one client for a full shift and, therefore, only one bill would [**140] be required. n367 In the non-intermittent nursing realm, fewer patient encounters and fewer visits generally will occur in a nurse's shift. n368 Under these circumstances, the fact that the allocation of capital costs did not match the allocation of related costs (such as salaries), or did not match the percentage of Medicare revenues to Spherion's total revenue, is not surprising and not necessarily indicative of improper cost reporting. Moreover, given the Court's conclusion that plaintiffs have not proven that Interim's methodologies violated any Law, as discussed below, it follows that they have not proven that Interim failed to allocate the "reasonable cost . . . of services . . . in accordance with regulations. . . ." n369

n367 D.I. 130, at 102-05.

n368 *Id*. In addition to the added resources required to generate a bill, the Medicare program also demands additional resources to support and/or justify the bill if later challenged, in the form of document retention and management protocols, regulatory experts and, as evidenced by the events in this case, outside experts and legal assistance. (D.I. 101, at 109-11, discussing documentation issues).

[**141]

n369 *See* 42 U.S.C. § 1395X(v)(1)(A) (the "cross-subsidization" statute).

**6. The Three Component A&G Methodology**

Plaintiffs allege that Interim's three component A&G cost allocation methodology [*562] violated "applicable Laws" because the methodology allowed Interim to pass on more of its operational costs to Medicare than was appropriate in violation of *Medicare Law*, including HCFA Transmittal 2, Transmittal 3 and, to a lesser extent, Transmittal 4. Having concluded that HCFA Transmittals are "Laws" as that term is used in the Agreement, the Court must consider whether any HCFA Transmittal or other law was violated by Interim's use of its three component A&G methodology.

According to the plaintiffs, Interim violated Transmittals 2 and 3 by sequencing the allocation of its A&G components improperly and by utilizing an improper allocation statistic. In this regard, the parties do not dispute that Transmittal 2 required providers to allocate shared A&G last. n370 Nor do they dispute that Interim complied with this directive in its 1996 cost report. n371 Interim negated

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

[**142]    the reimbursement impact of Transmittal 2, however, by utilizing a "total accumulated cost" statistic to allocate the A&G cost centers which, in essence, allowed it to readjust the allocation percentage each time it closed out an A&G cost center. n372 The parties appear to agree that the use of this allocation statistic was not contemplated by Transmittal 2.

n370 D.I. 100, at P 63.

n371 *Id.* at P 64.

n372 *Id.* at P 65.

Transmittal 3 made it clear that HCFA expected that a net cost, rather than a total accumulated cost statistic, would be used when allocating the three A&G components. n373 Transmittal 3, however, also stated:

[FIs] are **not** to make adjustments for alternative A&G fragmentation methodologies employed for cost reporting periods beginning prior to January 1, 1997, **which may have been allowed** for those periods. [Providers] opting to fragment A&G costs for cost reporting periods beginning on or after January 1, 1997, must seek [FI] approval or re-approval for [**143]   previously approved alternative A&G fragmentation methodologies . . . that do not comport with this Transmittal. n374

n373 PX 70.

n374 *Id.* (emphasis supplied).

Next in the line of HCFA pronouncements on step down cost allocation was Transmittal 4 which expressly super-ceded Transmirtals 2 and 3 and directed providers once again to close out shared A&G first in the allocation sequence. n375 HCFA explained that the allocation sequence prescribed in Transmittal 4 reflected the need "for greater accuracy when allocating componetized or fragmented A&G service costs," and was consistent with long-standing Medicare regulations. n376

n375 D.I. 100, at P 71; DX 87, at Ex. 5.

n376 *See* DX 87, at Ex. 5 (In Transmittal 4, HCFA states that it "clarifies long standing HCFA policy contained in *42 CFR 413.24 (d)(1)* which states, in part, that the cost of non revenue-producing cost centers serving the greatest number of other centers, while receiving benefits from the least number of centers, is apportioned first.'"). Needless to say, statutory and regulatory provisions trump manual provisions to the extent there is a conflict between the two. *See Shalala v. St. Paul-Ramsey Medical Center, 50 F.3d 522, 528 (8th Cir. 1995); Daviess County Hosp. v. Bowen, 811 F.2d 338, 338 (7th Cir. 1987).*

[**144]

Not surprisingly, Mr. Simione testified that HCFA's issuance of Transmittals 2, 3 and 4 caused great confusion in the home health care industry. n377 Even Aetna acknowledged [*563] that HCFA had been sending conflicting signals regarding the appropriate means by which to allocate costs under three component A&G methodology. n378

n377 D.I. 119, at 63-64 ("HCFA issued this Transmittal Letter [Transmittal 2] and put it as part of the manual instructions and stipulated that the sequence

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

would no longer be the sequence that most of the agencies were using and had approval for and, that is, with A&G share [sic] first, reimbursable second and non-reimbursable third. They were reversing their opinion and saying that 100% reimbursable should come first, 100% non-reimbursable should come second, and shared A&G should come last. . . . I mean we, in the industry, when this came out, and this was effective for cost reports . . . ending on or after September 30, 1996, I mean -- in the financial managers work group, we went kind of nuts over this whole situation, because here was HCFA coming into a middle of a fiscal year, and agencies had approval to file under a certain methodology from the fiscal intermediary, and HCFA comes in with this Transmittal saying, well we don't care if you're right in the middle of your fiscal year, this is in May, you have to now if you are a December year-end, you have to now change your methodology within the middle of the year. We took this up with HCFA and we said, you know, you just can't do this. And what happened was they recognized that they made an error.").

[**145]

n378 *See* DX 65.

While plaintiffs appear to acknowledge that Transmittal 4 superceded Transmittals 2 and 3, they contend that HCFA declined to give Transmittal 4 retroactive effect. Consequently, according to plaintiffs, Interim's 1995 and 1996 cost reports were subject to Transmittals 2 and 3. In addition, plaintiffs contend that Interim did not comply specifically with Transmittal 4 in any event. The Court rejects both arguments.

First, it is not at all clear that Interim was in violation of Transmittals 2 and 3. Transmittal 3 stated that providers could employ cost allocation methodologies for which they had approval prior to January 1, 1997. Interim had received approval for its three component A&G methodology from Aetna in 1994. n379 Plaintiffs concede that Aetna approved of the three component A&G methodology in concept, but dispute whether Aetna was actually aware of either the sequencing of the three component A&G, or the allocation statistic utilized by Interim, at the time it gave its approval in early 1994. Under these circumstances, plaintiffs contend that Transmittal 3's savings [**146] provision does not apply to Interim.

n379 DX 31.

In support of their contention that the allocation sequencing was not incorporated in Aetna's January, 1994 approval, plaintiffs cite to the testimony of one of Interim's Medicare managers who indicated that the first time the sequencing was clearly reflected on an Interim cost report was in the fourth quarter of 1994 (several months after Aetna confirmed its approval of the three component A&G methodology). n380 Spherion counters by noting that changes in Interim's computer system in 1994 caused the cost reports to be presented in a slightly different format, but the sequence for allocating A&G remained the same throughout 1991-94. According to Spherion, Aetna's field audit, or even a desk review of Interim's cost reports, would have revealed the details of its methodology. n381 The Court agrees.

Case 1:04-cv-00583-GMS    Document 139-19    Filed 03/31/2006    Page 6 of 32

Page 58

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n380 D.I. 136, at 11, *citing* D.I. 101, at 28 ("Q: When was the first time, if at all, the actual sequence that you utilized appeared on the cost report? A: I believe it was the December '94 cost report.").
[**147]

n381 DX 9, Attach. H, at 2; DX 218 ("FY 94 . . . was the first year that we [Interim] were able to update our year-end cost report software to actually show the three lines of A&G as separate items. . . . Having been unable to have the software updated, we did an off-line allocation of our intermittent A&G to the disciplines.").

[*564]    The preponderance of the evidence demonstrates that Aetna was aware of, or should have been aware of, the allocation sequence and statistic utilized by Interim in its 1992 and 1993 cost reports. While the information was more readily discernible in the last interim (periodic) cost report filed by Interim in 1994, it was clearly available to Aetna if it had reviewed the schedules to the cost reports in the course of the desk review (or audit) process in 1992 or 1993. There is absolutely no evidence to support the suggestion that Interim was attempting to hide its sequencing or allocation statistic from Aetna prior to 1994, or the contention that Aetna was not aware of these practices prior to re-affirming its approval of Interim's three component A&G methodology in January, [**148] 1994. n382

n382 *See* DX 9, Attach. H, at 2; DX 62; DX 218.

In any event, even if Aetna's prior approval does not save Interim from a

violation of Transmittals 2 and 3, HCFA's promulgation of Transmittal 4 provided Interim with ample ammunition with which to defend its cost reports. In this regard, the Court notes that HCFA's refusal to apply Transmittal 4 retroactively has been held by the PRRB to be improper. n383 Moreover, the fact that HCFA acknowledged that Transmittal 4 simply reiterated long-standing HCFA policy as reflected in HCFA's regulations suggests quite clearly that Transmittals 2 and 3 are not, in fact, (and never were) "Laws" as that term is used in the Agreement.

n383 *In Home Health*, PRRB Case No. 95-2210 GE.

That HCFA's flawed perception of its own regulations happened to be prevailing at the time Interim submitted [**149] its 1995 and 1996 cost reports is of no moment when determining whether Interim properly represented and warranted that it had submitted its cost reports in compliance with applicable "Laws." The representation and warranty was accurate in so far as Interim, in fact, submitted its cost reports in a manner consistent with "long-standing HCFA policy." n384

n384 The Court also refuses to find a breach of Section 3.17 simply because Interim did not comply with the letter of Transmittal 4. The Court is satisfied that Interim complied "in all material respects" with Transmittal 4 as required by the Agreement. *See* D.I. 101, at 93-95; D.I. 106, at 141-42; DX 87, at 37-38.

In reaching the conclusion that Interim's three component A&G methodology did not violate applicable Laws, the Court has taken notice of the overwhelming weight of the expert evidence on this issue. Interim's outside

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

healthcare attorneys, the Pyle law firm, and the healthcare experts who reviewed Interim's cost reports during the due diligence leading [**150] up to the Sale, all were satisfied that the three component A&G methodology was appropriate. n385 Mr. Simione, Spherion's healthcare consultant in this litigation, and one of the architects of the step-down methodology for reimbursement of home healthcare providers, was unequivocal in his opinion that Interim's three component A&G methodology complied with applicable Laws. n386 Even Mr. Curtis, when he was paid to advocate Interim's position before the FI and HCFA, expressed his view that the FI was employing an unreasonable interpretation of HCFA's requirements relating to step-down methodologies. n387

n385 DX210; PX134; DX75.

n386 D.I. 119, at 26; D.I. 130, at 4, 17-19.

n387 DX 5.

Finally, the Court is satisfied that the concerns that caused PGBA to "collapse" the A&G into one cost center were [*565] unfounded. Indeed, HCFA agreed to reverse this adjustment prior to the settlement of all outstanding audit issues. n388 Moreover, no expert has opined that the collapse of the A&G was warranted and, given the [**151] Court's conclusion that the three component A&G methodology was proper, the Court can find no reason to disagree with the experts.

n388 Plaintiffs' argument that Interim's allocation methodology produced an inequitable result irregardless of whether it complied with Transmittal 4 is, in essence, a restatement of the "collapse" adjustment that was ultimately reversed by HCFA. See

PX 313. The Court cannot conclude on this record that plaintiffs have proven that "inequitable" reimbursement occurred as a result of Interim's cost allocation methodology.

In sum, the Court concludes that the plaintiffs have failed to prove by a preponderance of the evidence that Interim's three component A&G cost allocation methodology constituted a material violation of applicable Law.

## 7. The Allocation of Capital Costs

According to plaintiffs, the PRM requires that chain providers allocate home office costs in "a manner reasonably related to the services received by the entities in the chain." n389 With respect to capital [**152] costs, plaintiffs contend that such costs may be allocated on a functional basis only "if there is a correlation of a statistic and a specific function," i.e., a reasonable relationship between the allocation statistic and a department's use of the services provided by the cost center whose costs are being allocated. n390

n389 PX 334, at PRM ⅊ 2150.3.

n390 D.I. 121, at 20-21. HCFA's instruction to home offices is first to allocate those expenses that can be allocated directly and then, as a next step, allocate those costs that cannot be allocated directly on the basis of a functional statistic.

Spherion counters that the Medicare regulations are silent as to the use of "square outage" or any other specific statistic when allocating capital costs on a functional basis. n391 Spherion contends that the use of a square footage statistic in its case yielded a substantially more "equita-

Case 1:04-cv-00583-GMS    Document 139-19    Filed 03/31/2006    Page 8 of 32

Page 60

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

ble" allocation of costs than the "to-tal costs" statistic proffered by the plaintiffs (and endorsed by PBGA after the audit). **[**153]** n392 As "equit-ble" cost allocation is at the heart of Medicare's cost-based reimbursement scheme, Spherion contends that an al-location of capital costs that is "eq-uitable" is, per se, lawful. n393

n391 D.I. 119, at 98.

n392 *Id.* at 102-03.

n393 *Id. See generally* 42 C.F.R. § 413.130.

The parties appear to agree that neither the Medicare regulations nor the PRM prescribe the use of a par-ticular functional statistic for pur-poses of allocating home office capi-tal costs. Rather, the theme that sur-faces throughout the PRM is that capi-tal costs must be allocated on an "eq-uitable" basis. n394 To establish that Interim **[*566]** allocated its capital costs in a manner that was not "in compliance in all material respects with applicable Laws," plaintiffs must demonstrate that the use of a square footage statistic yielded an inequita-ble allocation of capital costs from the home office servicing center to the other components of the Interim chain. Plaintiffs have not carried their burden **[**154]** of proof on this issue.

n394 *See e.g.* PRM, § 3104C ("Cost of home office operations -- allocate among the providers the allowable costs not directly allocable on a basis designed to equitably allocate the costs over the chain components or activi-ties receiving the benefits of the costs and in a manner rea-sonably related to the services received by the entities in the chain."); PRM, § 2150.3 C

("Costs Allocable on a Functional Basis -- The allowable home of-fice costs that have not been di-rectly assigned to specific chained components must be allo-cated among the providers . . . on a basis designed to equitably allocate the costs over the chain components or the activities re-ceiving the benefits of the costs."); PRM § 2150.3 D ("Pooled Costs in Home Office -- [Pooled] costs may be allocated to the components in the chain on the basis of beds, bed days or other basis, provided the basis used equitably allocates such costs.").

Plaintiffs contend that square footage was not reasonably related to the costs **[**155]** Interim was at-tempting to allocate. They contend, therefore, that Interim was obliged to allocate costs on the basis of "total cost" Yet plaintiffs offered abso-lutely no evidence to suggest that this simplistic method of cost alloca-tion would have yielded a more "equi-table" result. In this regard, the Court notes that the PRM does not qualify its use of the term "equita-ble" -- it does not, for instance, state that the cost allocation method-ology must be "equitable" only in the eyes of HCFA and/or its FIs. Equity runs both ways; the allocation of costs must be equitable to both par-ties involved, the provider and the Medicare program.

On this notion of "equitable" cost allocation, the Court found Mr. Simione's testimony particularly per-suasive. Mr. Simione opined that allo-cating capital costs on the basis of square footage was a more "equitable" allocation methodology than allocating on the basis of total costs as sug-gested by PGBA. n395 Specifically, Mr. Simione testified:

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

What they're doing is . . . trying to mandate that you go from a more sophisticated approach to the least sophisticated approach, which is pooled cost and using the least sophisticated statistic for pooled [**156] cost being total cost.

Really what they are saying here is that, and that is the least, what pooled costs say when you have to allocate it on total costs is that because a component or a cost center costs more, it should take down more A&G costs to it, and there's no relationship between those . . . they force them into using a statistic that was really unequitable, extremely unequitable.

* * *

I'm not saying its [square footage] the most equitable way, but its a lot more equitable than throwing it into total costs. n396

n395 D.I. 119, at 102-03, 109.

n396 *Id.* at 102-03, 109.

While it may be true that there is no direct correlation between square footage and the capital costs of the servicing centers, there is likewise no correlation between the amount of time people spent at the home office (servicing center) to support the second-tier cost centers and the total cost statistic used to allocate home office salaries. n397 Nevertheless, Medicare requires salaries to be allocated on the [**157] basis of total costs. n398 Thus, Medicare in its own instructions, appears to recognize that there may not always be a corre-

lation between the costs to be allocated and the statistic used for the allocation.

n397 D.I. 130, at 80-82.

n398 *Id.*

Moreover, the Court notes that other FIs have recommended the use of square footage as an appropriate statistic to allocate capital costs. For instance, Mr. Simione persuasively relied upon a 1992 Case Study prepared by Blue Cross and Blue Shield Association, a HCFA FI, in which Blue Crossprovides examples where square footage has been utilized as [*567] a statistic to allocate capital costs. n399 Square footage is also recognized in the PRM as a legitimate basis to allocate capital-related costs in certain instances. n400 Given that square footage is a statistic that has been endorsed by HCFA and its FI as a means to allocate capital costs, the Court is hard-pressed to conclude that Interim's utilization of this statistic (even if ultimately determined by the FI and HCFA [**158] to be improper) violated "applicable Laws" in breach of the Agreement.

n399 DX 87, at Ex. 1.

n400 PRM § 1709; DX 87, at Ex. 10; D.I. 119, at 109-10 ("Capital-related costs, movable equipment, all expenses, i.e., interest, personal property taxes for movable equipment should be allocated to the appropriate cost centers on the basis of square feet of area occupied or dollar value.")

Finally, unlike Interim's three component A&G methodology, which plaintiffs contend was not clearly reflected in the Interim costs reports, the use of square footage as a statis-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

tic to allocate capital costs without question was reflected in Interim's cost reports going back to at least 1994. n401 The 1994 cost report was the subject of a "desk review" performed by Aetna which resulted in substantial adverse adjustments. Yet the use of square footage as a statistic to allocate capital costs -- clearly reflected in Schedule F of the cost report -- was not challenged. n402 These same cost reports were reviewed by plaintiffs own healthcare [**159] experts during due diligence, and the use of the square footage statistic again was not identified as an issue for concern. n403 Indeed, E&Y concluded that Interim's cost reports, in general, were "conservative" and that "there may be opportunity to increase reimbursement by refining the cost allocation methodologies used." n404 Thus, when the Court weighs the experts' respective views regarding the propriety of Interim's cost reporting methodologies, including the use of the square footage statistic, the Court cannot ignore the fact that three healthcare experts -- E&Y, Judy Bishop, and Mr. Simione -- have not taken issue with the square footage statistic. n405

n401 D.I. 130, at 32-33.

n402 Id.

n403 DX 75; DX 76.

n404 DX 75 (emphasis supplied).

n405 The Court notes that it did not hear from any representatives of PGBA or HCFA during trial. In any event, the fact that PGBA took issue with Interim's cost reporting methodologies, at the end of the day, carries little weight with the Court given that its initial adjustments, totaling nearly $ 40 million, were drastically reduced in the final global settlement (to

approximately $ 5 million). To reiterate, the fact that PGBA was prosecuting alleged improprieties in the cost reporting methodology through the civil administrative process by no means indicates that such improprieties actually occurred or that they rose to the level of a violation of Law.

[**160]

**8. The Allowance of Regional Vice-President and Branch Manager Costs**

Plaintiffs contend that Interim's allowance for regional vice-president and branch manager costs violated applicable Laws because these positions involved a certain level of non-allowable marketing activity. n406 HCFA distinguished between allowable education activities -- activities intended to advise providers regarding the availability of services -- and non-allowable marketing activities -- activities designed to [*568] increase utilization of services. n407 In addition to these PRM references, plaintiffs rely upon the testimony of Mr. Curtis who opined that FIs required providers to support their allocation of salary costs with documentation that demonstrated that the employee was engaged in allowable activities, and that the failure to maintain such documentation violates Medicare Law. n408

n406 D.I. 100, at P 13. After determining that regional vice presidents and branch managers were engaged in non allowable marketing activities, PGBA disallowed 25% of branch manager and 100% of regional vice president salaries. D.I. 106, at 168.

[**161]

n407 The PRM, at Section 2136.1, provides:

Costs of activities involving professional contacts with physicians, hospitals, public health agencies, nurses associations, state and county medical societies, and similar groups and institutions, to apprise them of the availability of the provider's covered services are allowable. Such contacts make known what facilities are available to persons who require such information and providing for patient care, and serve other purposes related to patient care, e.g., exchange of medical information on patients and the provider's facility, administrative and medical policy, utilization review, etc.

Section 2136.2, on the other hand, provides:

Costs of advertising to the general public which seeks to increase patient utilization of the provider's facilities are not allowable. Situations may occur where advertising which appears to be in the nature of the provider's public relations activity is, in fact, an effort to attract more patients.

n408 D.I. 106, at 220 (incorrectly referenced in the plaintiffs' opening brief (at p. 26-27) as an admission from Interim's Mary B. Sneed; actually testimony from plaintiffs' expert, Thomas Curtis). See also D.I. 136, at 26-27.

[**162]

To succeed on their claim that seeking reimbursement for branch manager and regional vice president salaries violated the Law, plaintiffs bore the burden of proving that these Interim employees engaged in improper, non reimbursable marketing activity. To sustain this burden, plaintiffs produced expense reports that indicated that a branch manager may have taken a dozen donuts along to a meeting at a medical provider's office. n409 Plaintiffs also introduced job descriptions for the regional vice-president and branch manager positions, both of which indicate that the positions involved some level of "marketing" and/or sales. n410 On the other hand, the Interim executives who testified at trial indicated that, in fact, neither the regional vice-presidents nor the branch managers actually engaged in significant marketing or sales activities. They simply did not have time to do so given their other responsibilities. n411

n409 PX 604.

n410 PX 602; PX 603.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n411 *See* D.I. 123, at 59-60; D.I. 101, at 105-10.

[**163]

Plaintiffs correctly observe that certain branch managers acknowledged during field interviews that they were engaged in some "small amount of marketing." n412 But Interim also "[self]-disallowed some regional sales managers" and did not seek reimbursement for these costs. n413 That is as far as the evidence will take the plaintiffs on this claim. The fact that a branch manager or regional vice-president may have brought donuts to a meeting is not competent proof that these employees were involved in disallowed marketing activity, and is certainly not proof that Interim violated the Law when it allocated a portion of these costs to Medicare.

n412 D.I. 118, at 53-54; D.I. 101, at 105-06.

n413 D.I. 101, at 105-06.

Finally, the Court cannot help but take notice once again that the Interim cost reports for 1992 and 1994 were reviewed by the FI and the allowance for regional vice-president and branch manager salaries was never questioned. Indeed, Aetna discouraged Interim from utilizing the very time studies [**164] that both PGBA and Aetna (and now Mr. Curtis) maintain [*569] should have been prepared in order to support the allocation of these executive-level costs. n414 The absence of these time studies was cited as a primary basis for the audit adjustments. n415 But, according to Mr. Simione, HCFA traditionally has not required time studies for senior executive positions within healthcare entities. n416

n414 "Time studies" are employee surveys that breakdown how the employee spends his/her time during the workday. *See* DX 87, Ex. 14 (Interim writes to Aetna: "You cautioned us on the use of time studies to allocate common salaries."). *See also* DX 4 (Agenda for 12/18/98 meeting indicating that "time study requirements is new"); DX 119 (Agenda for August 14, 2000 meeting noting "PGBA & Aetna have different opinions of time studies/time records"); DX 17 (notes from September 30, 1998 meeting: ". . . we were told by Aetna that time studies would not be accepted as documentation for the cost report. Now it's hard to be told that a time study is the only thing that would save us when Aetna originally told us that time studies would not be accepted.").

[**165]

n415 PX 739, at 11.

n416 D.I. 119, at 122 (no manual instruction and he has never seen a FI require time studies to support salaries of senior executives).

One can readily glean from the PRM's less than definitive guidance that providers walked a fine line between "education" and "marketing." Given this fine line, and the paucity of record evidence demonstrating that the Interim executives in question were engaged in significant nonallowable activities, the Court concludes that plaintiffs have not carried their burden of proving a material breach of Section 3.17 with respect to this issue.

**9. The Failure to Adjust Visits to the Provider's Statistical and Reimbursement Report**

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Interim's FI would process its requests for PIP throughout the course of a year and, from time to time, would reject requests that were improperly submitted for various reasons. n417 The FI would prepare a running tally of disallowed requests for reimbursement called the Provider Statistical and Reimbursement Report ("PS&R"). Needless to say, the provider is not entitled to be reimbursed for costs associated [**166] with rejected visits. n418 Plaintiffs allege that Interim failed to reconcile its year-end cost reports with the PS&R to ensure that it was not seeking reimbursement for costs associated with disallowed visits. According to the plaintiffs, this constituted a violation of Law. n419

n417 See D.I. 101, at 109-11 (Ms. Watson testified that reasons a bill might be rejected include "if they ask for documentation and we did not have it -- there was not documentation of a visit or if orders were not signed or if it wasn't reasonable and necessary."); PX 739, at 12.

n418 Id.

n419 D.I. 121, at 43 (According to Mr. Curtis, "[Interim wasn't] in compliance with law because they made a claim for visits that they knew were not paid or going to be paid by Medicare.").

Interim's own billing records reflected disallowed visits. n420 Yet plaintiffs have failed to identify any Law that would require Interim to compare its own records to a PS&R to ensure that its own records captured all disallowed visits. Nor [**167] have plaintiffs demonstrated that Interim's records were somehow deficient in capturing disallowed visits, or that Interim did not review its own records

prior to submitting its year-end cost reports. In any event, HCFA's own instructions to providers suggest that cost reports can be submitted without reconciling them to the PS&R. n421 [*570] Moreover, the fact that the detailed PS&R is available from the FI only "on request" belies the suggestion that HCFA, as a matter of law, requires the provider to reconcile its cost report with the PS&R. n422

n420 D.I. 109, at 212-13.

n421 See PRM Pub. 15-2 ¶ 1102-3 N; PRM Pub. 15-1 ¶ 2408.2.

n422 See Medicare Intermediary Manual CMS Pub. 13-2 ¶ ¶ 2242, 2243. To the extent that Medicare Law required the provider to reconcile to the PS&R, one would think that HCFA would regularly supply the required information to the provider to ensure compliance. As stated, under current practice, if the provider wants a PS&R, they have to ask for it.

In sum, while it may have [**168] been prudent for Interim to attempt some reconciliation of its cost report with a PS&R, plaintiffs have failed in their burden of proving that the failure to do so constituted a material violation of Law.

**10. The Miscellaneous Violations of Law**

Plaintiffs contend that Spherion did not contest plaintiffs' allegation that Interim's 1996 and 1997 cost reports violated applicable Law in several additional respects, including the failure to allocate costs associated with routine medical supplies between reimbursable skilled intermittent services and non-reimbursable services, and the attempt to classify Interim's special billing department as "benefitting both the skilled in-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

termittent and private duty nursing." n423 After reviewing these claims, the Court cannot conclude that plaintiffs have carried their burden of proving that the adjustments for medical equipment and billing department allowances constitute material violations of any Laws. As Mr. Curtis acknowledged, ninety percent of cost reports are adjusted by the FI in some manner or another. n424 When adjustments are made, the FI has determined that the cost report is "incorrect" in some respect. n425 The fact that a cost [**169] report contains "incorrect" information does not, however, equate to a violation of Law. n426

n423 D.I. 136, at 28.

n424 D.I. 121, at 106.

n425 *Id.*

n426 *Id.* at 106-07. Having found that Interim's cost reporting methodologies did not breach the Agreement, the Court need not address plaintiffs' argument that Interim improperly certified the accuracy of its cost reports or improperly failed to submit its cost reports under protest. *See* D.I. 136, at 33.

## 11. Causation and Damages

The Court has concluded that plaintiffs have not proven that any of Interim's cost reports were submitted to HCFA in violation of the Agreement's Medicare representations and warranties. Yet even if plaintiffs had proven a breach, they still could not recover under the indemnification provisions of the Agreement because they have not proven their damages with the requisite specificity. As Professor Williston has observed:

Damages which are considered too remote and speculative

are not recoverable. [**170] Where actual pecuniary damages are sought, there must be evidence of their existence and extent, and some data from which they may be computed: The amount of damages must be established with reasonable, not absolute, certainty. . . . It is sufficient if a reasonable basis for computation of damages is afforded, even though the result will only be approximate. n427

n427 24 WILLISTON ON CONTRACTS, § 64:8 (4th Ed. 2002).

In this case, Interim (as acquired) seeks indemnification for amounts paid to CMS in global settlement of all adjustments made to Interim cost reports from 1994 [*571] through 1999. The total settlement was approximately $ 5.2 million, and plaintiffs seek the entirety of this amount. n428

n428 D.I. 100, at P 121; D.I. 125, at 29-31; DX 276.

The claim for indemnification damages is flawed for two reasons. First, the representations [**171] and warranties to which the right to indemnification attaches are expressly limited to pre-Sale cost reports, and to liabilities not disclosed in the Schedules to the Agreement. n429 Yet the global settlement included post-Sale cost reports and the 1994 cost reports, the potential liability for which was disclosed in the Schedules. Plaintiffs made no effort to secure a breakdown or itemization of the specific claims that were part of the global settlement or the specific dollar amounts attributed to each claim.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n429 PX 172, at §§ §§  3.16(a) & (b), 3.17.

Plaintiffs were well aware of the limitations of Spherion's express warranties and should have been aware, therefore, of the need to specify those damages attributable to conduct that was not warranted. Plaintiffs elected not to do that, however, and have declined in this litigation to explain or justify the manner in which the Medicare claims were settled. Instead, they have proffered various reasons why the Court should award the entire settlement amount as Damages, [**172] or suggested various formulas the Court might employ to extract from the global settlement the parties' intent with respect to the settlement of claims subject to warranty. n430 As fact-finder, the Court declines to attempt the extraction. The damages are too speculative and are not subject to "a reasonable basis for computation." The Medicare indemnification claim fails for this reason as well.

n430 See D.I. 136, at 65-68.

C. The Interim Financial Statements

1. The Parties' Contentions

Plaintiffs contend that Interim maintained its financial records in a manner that violated Sections 3.7 and 3.29 of the Agreement. In Section 3.7, Spherion represents and warrants that Interim's financial statements were "prepared in accordance in GAAP" and that they "presented fairly in all materials respects the consolidated financial position and results of operations of [Interim] -- as of and for the periods indicated -- and are consistent with the books and records of [Interim] for such periods." n431 [**173]  In Section 3.29, Spherion represented and warranted "that the Transferred Entities do not have any accrued, absolute, contingent or other liability except as disclosed." n432 According to the plaintiffs, these representations were inaccurate because Spherion did not maintain adequate reserves for Medicare liability, did not account for the impact of "segment reporting," and did not adequately disclose the liability to Medicare created by Interim's improper cost shifting methodologies. n433 Spherion denies that Interim's financial statements were prepared improperly, were inaccurate, or otherwise breached any provision of the Agreement.

n431 PX 172, at §§  3.7.

n432 Id. at §§  3.29.

n433 The plaintiffs' criticism focuses on the adequacy of the reserves carried by Interim for Medicare accounts receivable. They contend that Interim's Medicare reserves were too low and that, consequently, the earnings attributed to Medicare receivables were too high. This, of course, skewed plaintiffs' valuation of Interim which was the product of a multiple of Interim's EBITDA.

[**174]

Neither party disputes that a healthcare provider participating in the Medicare program must set reserves to account for cost [*572] report adjustments. n434 Beyond acknowledging this basic notion of corporate responsibility, the parties take very different views regarding the adequacy of the reserves Interim carried on its books for cost report adjustments. Indeed, the parties cannot even agree on the actual amount of reserves that Interim carried at any given point in time or where in Interim's financial statements the Court should look to

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

find the actual reserves. Plaintiffs contend that as a result of inexplicable "reversals" in the reserve for cost report settlements made near the end of 1996 at the direction of Mr. Haggard, Interim closed 1996 with only $ 15,000 booked as reserves for Medicare losses as reflected in Interim's income statement. n435 According to the plaintiffs, this amount was as little as $ 585,000, and as much as $ 3.6 million short of the amount required to address probable Medicare losses identified (or identifiable) by Interim as of the end of 1996. n436

n434 D.I. 111, at 36-37; D.I. 130, at 125-28.
[**175]

n435 PX102; D.I. 111, at 51-52.

n436 D.I. 111, at 51.

Spherion's argument regarding the adequacy of the Medicare reserves focuses on Interim's balance sheet. According to Spherion, Interim's balance sheet reflects a 1996 year-end reserve for cost report settlements of $ 707,795. n437 This balance incorporates the $ 300,000 reversal authorized by Mr. Haggard in November, 1996, and the $ 250,000 reversal authorized by Mr. Haggard in December, 1996. n438 As of the time of the Sale in September, 1997, Spherion's balance sheet reflects that reserves for cost report settlements rose to $ 3,088,129. n439 Spherion contends that these reserves were more than adequate, were set in compliance with GAAP, and were accurately reflected in Interim's financial statements.

n437 DX 56.

n438 Id.

n439 DX 57; DX 122, at 40.

## 2. The Adequacy of Interim's Reserves

The balance sheet reflects a "snapshot" of a firm's financial [**176] state at a given time, and reveals a cumulative picture. n440 In this case, the Court finds that the cumulative picture depicted in Interim's balance sheet offers the most accurate and appropriate measure of the adequacy of Interim's reserves to address contingent liabilities. The income statement simply does not provide a complete and accurate image of the reserve picture. n441 The cumulative reserve on the balance sheet reflected Interim's ongoing assessment of its exposure to Medicare adjustments, not only for the current year but also for past years for which Interim may still be liable. n442 This was an appropriate means by which to account for reserves on receivables and contingent liabilities. n443

n440 D.I. 111, at 42; D.I. 130, at 125.

n441 Even plaintiffs' own accounting expert acknowledged that "the balance sheet reserve is going to be reflective of reserves throughout ownership of an organization, whereas the income statement is strictly looking at a reserve for a given point in time -- for that current year." D.I. 111, at 42.

n442 D.I. 109, at 197-200.

n443 D.I. 130, at 125-30.

[**177]

Having determined that the balance sheet is the appropriate source from which to determine whether Interim carried adequate reserves, the Court must determine whether Interim's reserves were sufficient to address

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

Medicare adjustments that Interim management knew its FI and/or HCFA probably would make to the as-filed cost report. Plaintiffs advance two arguments [*573] in support of their contention that the balance sheet reserves were inadequate. First, they challenge the *bona fides* of the reserve number reflected in the balance sheet. Second, they contend that Interim's own "Medicare group" advised Spherion senior management that Interim's likely liability to Medicare far exceeded its established cost report reserves. The Court will address these arguments in turn.

Plaintiffs contend that the increase in the amount of reimbursable costs reflected in the 1996 year-end cost report resulted from Spherion's allocation to Medicare of additional home office costs that were generated after Spherion acquired a commercial staffing business in 1996. n444 Plaintiffs note that this newly acquired business was not involved in providing covered services to Medicare beneficiaries. Nevertheless, Interim [**178] allocated some of these costs to Medicare in its 1996 year-end cost report. n445 Without any citation to the record, plaintiffs then summarily conclude that the allocation of such costs was improper because they were not reimbursable. n446 The Court has searched for testimony in the record, either from fact witnesses or expert witnesses, specifically addressing the impropriety of this allocation. The Court has found no such testimony. Moreover, contrary to plaintiffs' suggestion, Mr. Krause did not acknowledge that all of the increase in costs reflected in the 1996 year-end cost report arose from the newly acquired business. Instead, he testified: "Those were parts of it. I don't know if that was all or the primary cost, but the whole headquarters cost had increased in '96 as the company got substantially bigger." n447

n444 D.I. 136, at 36. The sharp increase in Interim's year-end reserves is explained, in substantial part, by the difference between the Medicare revenues Interim projected it would receive as a result of its PIPs and the final amount of Medicare reimbursement sought in the as-filed year-end cost reports. Rather than record the approximately $ 3 million difference as additional revenue, Interim chose not to make a journal entry for the additional revenue and to carry the amount as a Medicare cost report reserve. DX 57; D.I. 118, at 26-27, 33. This practice was consistent with GAAP, which requires that adjustments to the financial records occur at the time the new information justifying the adjustment is discovered (as opposed to going back to adjust previously prepared financial statements). *See* D.I. 131, at 17; D.I. 137, Ex. 3, Haggard Dep. at 327.

[**179]

n445 D.I. 119, at 108-10.

n446 D.I. 136, at 36.

n447 D.I. 119, at 108.

The Court cannot conclude that the increase in Interim's Medicare reimbursable costs, as reflected in the 1996 year-end costs report, and the resulting increase in reserves booked by Interim as a result of the increased reimbursable costs, amounted to the recognition of "baseless revenues," as plaintiffs contend. n448 The evidence simply does not support this conclusion.

n448 *See* D.I. 147, at 145-46 (Plaintiffs' counsel's characterization during oral argument).

Case 1:04-cv-00583-GMS    Document 139-19    Filed 03/31/2006    Page 18 of 32

Page 70

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

As to the contention that Interim's "Medicare Group" told Spherion management to increase the cost report reserves, plaintiffs rely principally upon three documents in the record. The first document, prepared by the Medicare group, considered potential issues that could lead to cost report adjustments, but did so in a format that was not preferred by Interim senior management. According **[\*\*180]** to Ms. Watson and Ms. Snead, they were directed to discard that document and to prepare new documents that separated the issues in one document on **[\*574]** the basis of adjustments likely to occur, and in another document on the basis of adjustments not likely to occur. n449 All of the information presented in the first document was included in the two later-prepared separate documents. n450 As Ms. Watson testified:

> I think I went in with here's all the issues, and some of them I felt really were ridiculous and should not need to be reserved for. But given the fact that the intermediary can do what they want to do, we put them all on.
>
> * * *
>
> Then they [senior management] would have made the determination of how much the reserve would be. Then we would go back and kind of fit it in to the two saying, well, these we're going to reserve for, and these weren't reserved for, but we didn't want to disregard the fact they were still an issue. n451

n449 *See* PX21; PX122; D.I. 106, at 55-57, 59.

n450 D.I. 106, at 56-57.

n451 D.I. 101, at 61, 67.

**[\*\*181]**

The two documents that were prepared to reflect potential issues for adjustment, although not expressly phrased in terms of "probability," presented the issues of concern in a manner that would allow senior management to assess the need for reserves. n452 The document entitled "Issues Most Likely to Occur Requiring Reserve," in essence, reflects the Medicare group's assessment that adjustments were "probable" (hence, the conclusion that reserves were appropriate.) n453 The corresponding document, "Issues Not Likely to Occur, therefore, Not Reserved," reflects the Medicare group's assessment that adjustments related to the issues identified therein were not "probable." n454 These documents were prepared in April, 1997. At that time, Interim carried a total reserve on its balance sheet of approximately $ 4,574,281. n455 The Medicare group recommended that reserves be set at $ 4,612,497. n456 According to the Medicare group, then, Interim was under-reserved by $ 38,216 as of April, 1997. n457 The difference is not significant in the context of the ongoing assessment of reserves and certainly not, in and of itself, evidence of a breach of Section 3.7. n458

> n452 Management must determine, on the basis of "probability," the "net realizable value" of the accounts receivable. D.I. 130, at 126, 129. In other words, the firm bills for an amount it believes that it is entitled to receive, but then assesses the amount it will probably receive. The difference represents the

Case 1:04-cv-00583-GMS    Document 139-19    Filed 03/31/2006    Page 19 of 32

Page 71

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

amount reserved against accounts receivable. *Id.* at 125-29. [**182]


n453 PX 121; D.I. 130, at 125 (Reserves against receivables reflect what will probably be realized in the judgment of management).

n454 PX 122.

n455 PX 121.

n456 *Id.*

n457 *Id.*

n458 *See* DX 122, at 44 (concluding that reserves were set in accordance with GAAP and were adequate to address potential cost report adjustments). Obviously, the Court's finding that Interim did not breach any of the Medicare representations and warranties has influenced its analysis of whether Interim management properly assessed the likelihood of adjustments to Interim's requests for reimbursement from Medicare.


The Court's factual consideration of this claim recognizes that the process of setting reserves requires management to perform a series of ongoing estimates using its best judgment. n459 Indeed, as Mr. Krause testified:


Q. Now, with respect to the reserve, whether on the profit and loss statement [*575] or on the balance sheet, to what extent does management's judgment or estimates come into play with regard to any of these reserve items?

A. Well, they're all estimates [**183] because, when you establish a reserve account, you're looking at the probability of something happening differently than what you have recorded on the general ledger. So, you are making an estimate and a judgment, and you need to consider it probable and accruable at that point in time, and you make an adjustment for that. n460


n459 D.I. 111, at 83 (Dugan); D.I. 130, at 125 (Wright); D.I. 109, at 193-94 (Krause).

n460 D.I. 109, at 194.


At times, Interim senior management would rely upon the information received from the Medicare group in evaluating the adequacy of Interim's reserves. At other times, however, senior management made the determination that the Medicare group was not being reasonable and would ask them to consider other factors in reassessing their conclusions. n461 This is precisely the process contemplated by GAAP, and there is no compelling evidence in the record that Interim management varied from this accepted practice. n462 The fact that Interim made significant year-end adjustments [**184] to its reserve account is not unusual given the fact that management had acquired more information upon which to base its estimates. n463


n461 D.I. 137, Ex. 3, Haggard Dep. at 42.

n462 D.I. 131, at 15, 17. It should be noted that D&T raised no concerns regarding the adequacy of Interim's reserves, an opinion implicitly echoed by E&Y when it later concluded that

Case 1:04-cv-00583-GMS     Document 139-19     Filed 03/31/2006     Page 20 of 32

Page 72

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

D&T's audit reflected "adequate" procedures and "consistent" application of "accounting principles." DX 147. *See also* DX 9 (D&T audit report).

n463 D.I. 131, at 11-12. *See also*, D.I. 130, at 127-28 ("The setting of reserves is -- is a process of estimate -- of making estimates. Information that a company . . . has access to constantly changes. And as such, it is -- it is imperative upon management to make the appropriate estimates as one passes through the course of the year" to re-evaluate what is expected to be collected as information becomes -- new information becomes available."). In this regard, it is important to note that Interim's audited historical financial statements are dated December 23, 1996. DX9, Attach. A, at 5. To the extent additional information was developed after these documents were prepared, the adjustments would be recorded in the cumulative balance sheet, not by making retroactive adjustments to the income statements. D.I. 131, at 17.

**[\*\*185]**

Finally, the Court addresses plaintiffs' argument that the financial statements violated the Agreement because they did not account for the impact of "segment reporting" -- a process whereby the financial statements would reflect the impact on Interim's revenue of separating the healthcare business from Spherion's other business segments. The Court must reject this argument for the simple reason that it ignores the very documents upon which it purports to be based. First, the audited historical financial statements themselves warn:

Principally due to the use of estimates in allocations, the financial information included herein may not reflect the financial position and results of operations [of Interim] in the future or what the financial position and results of operation [of Interim] would have been had it been a separate, stand-alone entity during the periods presented. Management does not consider it practical to estimate what the results of operation would have been had the Company operated as a separate stand-alone entity. n464

n464 DX 9, Attach. A, at 7. Alex.Brown also made it clear in the Offering Memorandum that "each recipient is responsible for conducting its own independent analysis of [Interim] in connection with any proposed acquisition and for independently verifying the information contained herein." DX72 at SPH012134.

**[\*\*186]**

**[\*576]**  Then, in the Agreement's provision relating specifically to financial statements, the parties agreed:

The Healthcare Financial statements have been prepared from the separate records maintained by [Interim] and may not necessarily be indicative of the conditions that would have existed or the results of operations if [Interim] had been operated as an unaffiliated company. Portions of certain income and ex-

Case 1:04-cv-00583-GMS    Document 139-19    Filed 03/31/2006    Page 21 of 32

Page 73

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

penses represent allegations from corporate headquarters items applicable to [Interim] as a whole. n465

n465 PX 172, ※ 3.7.

In view of these multiple disclaimers, which appear throughout the relevant documents, it is difficult to conceive how plaintiffs can suggest that Spherion violated the Agreement by failing to account for "segment reporting." Spherion did not account for the impact of "segment reporting" because it determined that it was not practical to do so under the circumstances. n466 It then advised all potential purchasers of the limitations of the financial statements in the [**187] documents themselves and in Alex.Brown's Descriptive Memorandum, and then reiterated this disclaimer specifically to the plaintiffs in Section 3.7 of the Agreement. If plaintiffs had wanted to analyze the impact of "segment reporting," they could have attempted to do so with the information supplied by Spherion during due diligence. n467 The fact that this analysis apparently was not undertaken by either party cannot now be manufactured into a claim of breach.

n466 DX 9, Attach. 5. Moreover, neither the audited historical financial statements nor the *pro forma* financial statements purport to analyze the effect or impact upon Interim's revenues of Interim's separation from Spherion. D.I. 109, at 229-30, 231. While certain adjustments were made in the *pro forma* financial statements, any adjustments to revenues appeared in the midst of multiple prominent disclaimers. *Id.* at 236.

n467 *See* D.I. 121, at 102-04.

## D. The Remaining Section 10.1 Indemnification Claims

The Agreement [**188] contains two indemnification provisions relevant to this dispute, a general Seller's indemnification provision and a "Special Indemnity" provision. n468 The general provision is subject to the "Limitations" provision; the Special Indemnity contains its own limitations. n469 The "Limitations" provision sets a$ 2 million aggregate deductible and a $ 25 million aggregate cap on recoverable indemnification damages. The Court will address the remaining claims that are subject to the indemnification Limitations first, and then will address the one remaining special indemnity claim. After addressing each of the remaining claims of breach, the Court will give its final word on the plaintiffs' expectancy damages claim.

n468 PX 172, at ※ ※ 10.1, 10.4.

n469 *Id.* at ※ 10.3.

## 1. The Burns and Black Franchise Loans

Plaintiffs allege that at the time of the Sale, the franchise loans extended to the Black Franchise and the Burns Franchise were impaired and should have been written down or reserved against in the [**189] amount of $ 230,000 for the Burns loan and $ 130,00 for the Black loan. n470 Spherion disagrees [*577] , noting that the Black loan, while delinquent, was adequately collateralized, and the Burns loan was only two months in arrears at the time of the Sale, with no portion of the principal being due. n471 Once again, the Court is called upon to determine whether Interim's management exercised appropriate judgment in setting reserves and account-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

ing for potential losses. And, once again, the parties' experts are diametrically opposed in their view on this issue.

> n470 D.I. 111, at 62-64, 72-73. The franchise loan portfolio was transferred from Spherion to Interim as part of the Sale. PX 174, at ¶ 1.38.

> n471 DX 122; DX 288.

To prove a breach of the Agreement, the plaintiffs must establish that Interim's accounting treatment of the Burns and Black franchise loans did not comply with GAAP, n472 or that the impaired loans represented a "liability" that should have been disclosed in the schedules to the Agreement. n473 [**190] They have not met their burden of proof on either front.

> n472 PX 172, at ¶ 3.7.

> n473 Id. at ¶ 3.29.

The Burns and Black franchise loans both were backed by the personal guarantees of the franchise owners and were collateralized by accounts receivable, tangible property and the franchise territories. n474 And, although both franchises were struggling in their start-up phases, this quite common phenomenon does not, in and of itself, indicate a probability of ultimate failure. n475 The financial condition of both franchises appear to have been improving in the months leading up to the sale. n476 The indications that the franchises were facing financial difficulties were not such that Interim should have concluded that it would not eventually collect all amounts due, including any interest accrued during the periods when payments were interrupted. n477 Indeed, Interim's success with franchise loans was quite impressive; it

had not written off a franchise note in any of the five years preceding the Sale. [**191] n478

> n474 PX 8-12; PX 87-89, PX 93-94.

> n475 D.I. 131, at 27-29.

> n476 DX 122; D.I. 100, at P 165.

> n477 See DX 122, at 52 (citing paragraph 8 of FASB Statement 114; "A loan is not impaired during a period of delay in payment if the creditor expects to collect all amounts due including interest accrued at the contractual interest rate for the period of delay. Thus, a demand loan or other loan with no stated maturity is not impaired if the creditor expects to collect all amounts due including interest accrued at the contractual interest rate during the period the loan is outstanding.").

> n478 D.I. 131 at 31; DX 122, at 51.

Interim's decision not to write-off or reserve for the Black and Burns franchise loans was supported by its auditor, D&T, who concluded:

> The Franchise notes are collateralized by the Franchise's receivables. Further, the amount to be borrowed cannot exceed 90% of the outstanding receivable balance. There are other covenants that must be met by the Franchisees, such [**192] as certain debt to equity ratios, timely financial statements, timely Medicare reimbursement cost reports, etc. . . . Based on the above, there does not

Case 1:04-cv-00583-GMS    Document 139-19    Filed 03/31/2006    Page 23 of 32

Page 75

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

appear to be a need for an allowance regarding the Franchise Notes Receivable. n479

n479 DX 134.

E & Y likewise raised no concerns regarding the viability of franchise loans in its review of Interim's operations. n480 Aside from the opinion of their accounting expert -- an opinion the Court has found to be **[*578]** less persuasive than Spherion's accounting expert's opinion -- plaintiffs have failed to offer any evidence to advance their claim that GAAP required Interim (pre-Sale) either to write-off or reserve against the Burns and/or Black franchise loans or that the loans qualified as liabilities that should have been disclosed under the Agreement Consequently, the claim fails.

n480 DX 75.

**[**193]**

### 2. The Huff Litigation

Spherion contends that it is not required to indemnify plaintiffs for the costs associated with the litigation initiated by Interim (post-Sale) to obtain insurance coverage for Huff II on three grounds: (1) because the liability in Huff I was covered by insurance, it was an "Excluded Liability" under the Agreement not subject to disclosure; n481 (2) Spherion reasonably determined that Interim was not liable for the claims made in Huff II; n482 and (3) the named defendant in Huff II, IHS, was not a "Transferred Entity" as defined in the Agreement. n483 The Court rejects each of these contentions, and finds in favor of the plaintiffs on this claim.

n481 PX 172, at § 1.30; PX 174, at Sch. 1.44.

n482 D.I. 109, at 91-92.

n483 *Id.* at 93.

In Section 3.20 of the Agreement, Spherion warranted: "except as set forth in Schedule 3.20, there is no claim, action, suit, litigation, proceeding, or arbitration . . . ("Actions") pending or. . . . threatened against **[**194]** Seller related to [Interim] [or] any of the Transferred Entities. . . ." n484 Unlike Section 3.29, which provides that any liability covered by liability insurance need not be disclosed, Section 3.20 makes no reference to the presence of insurance at all, and certainly does not excuse disclosure when the claims alleged in the "Actions" are covered by insurance. n485 Huff I, therefore, should have been disclosed to the plaintiffs in Schedule 3.20.

n484 PX 172, at § 3.20.

n485 *Id.*

Although negotiations to settle Huff I began prior to the Sale, the actual settlement agreement was not consummated until June 2, 2000. n486 The litigation was voluntarily dismissed without prejudice in February, 1998. n487 Six months later, Mr. and Mrs. Huff initiated Huff II in which they made claims nearly identical to those raised in Huff I, and sought in excess of $ 15 million dollars compensatory and $ 25 million dollars in punitive damages. n488 Mr. and Mrs. Huff named IHS, a general partnership in **[**195]** which Interim was a general partner, as a defendant in Huff II and claimed that IHS was jointly and severally liable for all damages along with the other defendants. n489 IHS forwarded the complaint in Huff II to Spherion so that Spherion could seek

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

coverage from its liability carrier. n490 The carrier denied coverage. n491 Spherion then rejected Interim's claim for indemnification, and further advised that it would not seek to compel coverage from its insurance carrier. n492

> n486 DX 295.
>
> n487 D.I. 100, at P 141.
>
> n488 *Id.* at PP 142-45.
>
> n489 *Id.*
>
> n490 *Id.* at P 146.
>
> n491 *Id.* at P 147.
>
> n492 *Id.* at P 147-48.

The settlement agreement reached in Huff I left Interim, as a general partner in IHS, exposed to further liability in Huff II. Spherion knew that the plaintiffs had [*579] not released IHS, n493 knew that its insurance coverage, if any, for further claims was limited to $ 5.5 million, n494 and knew that the $ 50,000 settlement proceeds paid to Mr. and [**196] Mrs. Huff in Huff I was hardly satisfactory compensation for the catastrophic brain injuries suffered by their son. n495 Under these circumstances, the Court is satisfied that plaintiffs have carried their burden of proving a breach of Section 3.20 of the Agreement, and have further carried their burden of establishing a right to indemnification under Section 10.1 of the Agreement. The Damages incurred by plaintiffs to coerce Spherion's carrier to provide coverage for Huff II "arose out of" Spherion's failure properly to disclose Huff I in the schedules to the Agreement. n496 The Court also is satisfied that Spherion received timely notice of the claim. n497

> n493 DX 295.

> n494 PX 276.
>
> n495 DX 295.
>
> n496 PX 172, at ⸹ 10.1.
>
> n497 *See* PX 692.

Interim incurred $ 91,180.26 in legal fees and expenses in its prosecution of the coverage action. n498 AIG paid $ 50,000 of these legal expenses as part of the settlement with Interim, leaving $ 41,180.26 to be indemnified by Spherion. n499 [**197] This claim is below the $ 2 million deductible, however, and is not compensable on its own. It will count towards plaintiffs' aggregate recoverable claim for indemnification under Sections 10.1 and 10.3. n500

> n498 D.I. 100, at P 151.
>
> n499 *Id.*
>
> n500 PX 172, at ⸹ ⸹ 10.1, 10.3.

### 3. The Williams Litigation

The Court already has determined on summary judgment that Spherion breached Section 3.20 of the Agreement by failing to disclose the persistent pre-Sale threats of litigation against Interim made by the Williams franchise. n501 Specifically, the Court determined that Section 3.20 required Spherion to identify all threats of litigation, whether or not the litigation would result in a "material" loss as defined in the Agreement. n502 The Court concluded that the undisputed evidence of record demonstrated that the Williams franchise had threatened to sue Spherion on several occasions for territorial infringement and other claims. These claims ultimately formed the bases of the litigation initiated [**198] by the Williams franchise against Interim after the Sale. n503 Nevertheless, the Court declined to grant summary judgment to plaintiffs

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

on their claim for indemnification upon concluding that the plaintiffs had not established causation as a matter of law. The causation issue, therefore, was the only remaining issue to be litigated at trial with respect to the Williams franchise litigation.

n501 D.I. 94, at 34.

n502 *Id.*

n503 D.I. 100, at P 153.

The Court finds that the plaintiffs carried their burden of proving causation at trial. A review of the schedules attached to the Agreement demonstrates that the parties were quite thorough in identifying potential liabilities and incorporating such liabilities within the detailed representations and warranties in the Agreement. n504 Had Spherion disclosed Ms. Williams' persistent threats of litigation to the plaintiffs, as well as the Williams' franchise regular defaults on its franchise responsibilities, it **[*580]** is probable that the plaintiffs would either have **[**199]** sought specific indemnification protection from the Williams franchise claims or, at least, demanded that appropriate reserves be set for the contingent liability. Moreover, there can be no reasonable question that Interim's (as acquired) exposure to the Williams litigation Damages "arose out of" the inaccuracy of Spherion's representation that it had disclosed all threatened litigation. n505

n504 PX 174.

n505 PX 172, at § 10.1(ii).

Contrary to Spherion's suggestion, the plaintiffs did not improperly prompt the Williams franchise to initiate litigation. Rather, to the ex-

tent Ms. Williams' motivation for filing suit can be gleaned from the record at all, it appears most likely that it was the plaintiffs' insistence that she comply with her franchise responsibilities (not routinely enforced by Spherion pre-Sale) that caused Ms. Williams to pull the litigation trigger. The litigation gun, however, had been pointed at Interim many times starting long before the Sale was even contemplated.

Based on the foregoing, **[**200]** the Court concludes that the Damages incurred by the plaintiffs in connection with the Williams litigation are indemnifiable. n506 The parties have stipulated that the fees and costs incurred by Interim to defend the Williams litigation were $ 290,717.25, and that these fees and costs were reasonable and necessary. n507 Interim paid the Williams franchise $ 100,000 to settle the claims that remained after dispositive motion practice. n508 Both the settlement proceeds and attorney's fees and costs are "Damages" as defined under Sections 1.19 and 1.65 of the Agreement. n509 Accordingly, the total Damages recoverable for the breach of Section 3.20 with respect to the Williams' litigation is $ 390,717.25, subject to the limitations provisions of Section 10.3 of the Agreement. n510

n506 PX 172, at § § 3.20, 10.1(a).

n507 PX 335.

n508 PX 312; D.I. 155.

n509 PX 172, at § § 1.9, 1.65.

n510 *Id.* at § 10.3.

**4. Plaintiffs Are Not Entitled To Indemnification For Any Damages Indemnifiable Under Section [**201]  10.1**

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

The aggregate of plaintiffs' Damages from Spherion's breaches of its Seller's representations and warranties that are indemnifiable under Section 10.1 is less than $ 2 million. Consequently, pursuant to Section 10.3, plaintiffs are not entitled to indemnification for these Damages.

### E. The Therapy Student Claims

The claim for indemnification arising from the Therapy Student liabilities is not subject to the limitation provisions of Section 10.3. The parties anticipated that Interim would face claims from Therapy Students and other liabilities arising from the failed Therapy Student program so they negotiated special indemnification provisions to address these liabilities. These provisions, and the plaintiffs' entitlement to indemnification Damages thereunder, will be discussed below.

At the time of the Agreement, several matters relating to the Therapy Student program were either already in litigation, or soon to be in litigation. n511 Spherion was in the process of addressing these various claims prior to the Sale and, accordingly, the claims became a subject of certain indemnification provisions in the Agreement. [*581] n512 The parties have stipulated regarding the universe [**202] of Therapy Student claims for which plaintiffs seek indemnification. n513 They have also stipulated regarding the amounts of claims paid by Interim in settlement of Therapy Student claims, and the amount of outstanding Therapy Student loans written off by Interim. n514 Finally, the parties have stipulated that plaintiffs are entitled to indemnification as to settlements paid to, or loans written off on behalf of, certain Therapy Students. n515

n511 See DX112; PX225; PX223; PX225; PX239; PX253. See also DX174, at §§ 3.20.

n512 PX172 at §§ §§ 1.96, 10.4.

n513 D.I. 96; D.I. 132.

n514 Id.; PX 336.

n515 D.I. 96, at PP 11-15; D.I. 100, at PP 130-35; 74; PX705.

As to the remaining Therapy Student claims or Therapy Student loan write-offs, Spherion contends that plaintiffs are not entitled to indemnification because: (1) the claims or loan write-offs identified by the plaintiffs do not relate to "Therapy Students" as that term is defined in the Agreement; and/or (2) any claims or loan write-offs [**203] for which plaintiffs seek indemnification are subject to a "bad debt reserve" provided for in the Agreement and, therefore, are not recoverable in this litigation; and/or (3) plaintiffs failed to provide timely notice of the claim(s) as required by the Agreement. The Court will address these arguments seriatim.

### 1. The Definition of Therapy Student In the Agreement

At Section 1.96, the Agreement defines "Therapy Students" as follows:

'Therapy Students' means those individuals who have signed an agreement with any of the Transferred Entities whereby they receive loans and partial advances of tuition from such Transferred Entity for their education in physical therapy in exchange for their agreement to remain employed by such Transferred Entity for a specified period following

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

licensure in the United
States. n516


n516 PX172, at ※ 1.96.


Spherion contends that to qualify
as a Therapy Student under the Agree-
ment, one actually must have received
a loan pursuant to a signed agreement.
Under [**204] plaintiffs likely view
of the Agreement, a participant in the
Therapy Student program qualifies as a
"Therapy Student" if the individual
signed an agreement that provided for
the individual to receive a loan, vel
non the individual actually received
it.

The parties have identified in
their stipulation those individuals
who did, and those who did not actu-
ally receive a Therapy Student loan.
n517 As to those students who received
loans from Interim or its affiliates,
the parties appear to agree that these
individuals are Therapy Students as
that term is defined in the Agreement.
The parties also have stipulated that,
as to those students who did not actu-
ally receive a loan, each of them
signed an employment agreement which
required them to work for Interim, or
its predecessor, TSS, "for a specified
period following licensure in the
United States." n518 Pursuant to the
TSS Employment Agreement, students re-
ceived a commitment that TSS would
contribute $ 7,500 toward the stu-
dent's "tuition" and would make a loan
available to [*582] the student for
incidental expenses. n519 Whether the
student accepted the loan was up to
the student.


n517 D.I. 132, at PP-2.
[**205]


n518 D.I. 96, at P 10 ("Each
student entered into an Employ-

ment Agreement in connection with
his or her physical therapy edu-
cation in the Netherlands identi-
cal to the Employment Agreements
marked as plaintiffs' exhibits
704 and/or 705"); PX 704; PX 705.

n519 See e.g. PX 354; PX 355;
PX 388; PX 392; PX 412; PX 451;
PX 466; PX 474; PX 491; and PX
501.


After a careful review of the op-
erative language, the Court concludes
that the only reasonable interpreta-
tion of the Agreement's definition of
Therapy Student must focus on whether
the individual signed an agreement
that provided for loans and tuition
assistance from either Interim or its
predecessor, not whether the student
actually received both a loan and tui-
tion assistance. The definition of
Therapy Student describes the requi-
site provisions of the employment
agreement but does not specify whether
the student must elect all of the
benefits of the employment agreement
to fall within the definition. More-
over, Spherion has failed to offer any
meaningful justification -- either in
the tenets of contract construction or
in the [**206] practical consequences
of the competing constructions -- for
an interpretation of the definition
that would allow Interim (as acquired)
to seek indemnification for claims
made by students who received loans,
but would prohibit indemnification for
claims made by those students who
elected not to accept a loan. Like
blue on black, the distinction makes
no difference when considered in the
context of the liability exposure to
Interim that the parties intended Sec-
tion 10.4 to address. n520


n520 The parties' course of
conduct prior to this litigation
supports the Court's interpreta-
tion of the clear language of the
Agreement. D.I. 115, at 68-69 ("-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

- at no time [prior to the litigation] did Spherion -- ever take the position that a Therapy Student without a loan was not a Therapy Student under the definition in the Stock Purchase Agreement.").

## 2. The Therapy Student Reserve

Section 10.4(a) of Agreement provides, in pertinent part:

Seller shall indemnify Buyer Group with respect to Damages resulting [**207] from (i) the failure to collect on notes receivable from the Therapy Students, to the extent that such failure to collect exceeds the amount specifically reserved therefore ["the Therapy Student Reserve"] as of the Closing Date on the books and records [of Interim], as set forth on Schedule 10.4(a), (ii) claims by Therapy Students against the Seller Group with respect to obligations to Seller or the transferred Entities under those certain contracts concerning the education of the Therapy Students, ("Specified Damages"). n521

n521 PX 172, § 10.4(a). "Seller Group" includes Interim (pre-sale) and Spherion. Id. at § 1.85. "Transferred Entities" includes Interim and its subsidiaries. Id. at § § 1.100, 1.101, 1.103.

Spherion contends that the Therapy Student Reserve must be applied to reduce its obligation to indemnify plaintiffs with respect to all Therapy Student loans that were written-off, even those that were subject to "claims by Therapy Students against the Seller Group" as referenced in [**208] Section 10.4(a)(ii). Plaintiffs counter that the Therapy Student Reserve is referenced only in Section 10.4(a)(i) and, therefore, it is not applicable to the claims that are the subject of Section 10.4(a)(ii), even if such claims include Therapy Student loans written-off by Interim. Stated differently, plaintiffs contend that the Therapy Student Reserve does not apply to settlements of litigation or threatened litigation, even if the consideration for the settlement includes, in whole or in part, a write-off of a Therapy Student loan.

The Court will follow the interpretation of the Agreement proffered by the plaintiffs. [*583] Section 10.4(a) contemplates separate bases for indemnification. First, in those instances where Interim has determined to write-off Therapy Student loans without the threat of litigation because the loans are uncollectible, the parties agreed to a designated reserve amount to address those situations and to reduce the Seller's indemnity liability. On the other hand, where Therapy Students have made claims, either in threatened or actual litigation, against Interim or its predecessors based on allegations, inter alia, of breach of contract, misrepresentation or [**209] fraud, the consideration offered by Interim to resolve those claims -- including, if appropriate, the forgiveness of outstanding loan obligations -- is not subject to the Therapy Student Reserve. The write-off of the loan, under these circumstances, is tantamount to, and an integral part of, a payment of "Damages resulting from [a] claim by [a] Therapy Student." n522 There is simply no cannon of contract construction reasonably applied to the text of the Agreement that would justify applying the Therapy Student Reserve to

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

payments made under such circumstances.

> n522 *Id.* at § 10.4(a)(ii). *See also Id.* at § 1.19 ("Damages" means claims, *losses*, penalties, fines, damages, *liabilities* and *expenses*. . . .")(emphasis supplied).

### 3. Notice of Therapy Student Claims

Spherion next contends that plaintiffs may not seek indemnification for any of the Therapy Student claims because plaintiffs did not submit their demand for indemnification in accordance with the notice provisions of the Agreement. [**210] In addition to the adequacy of plaintiffs' notice of the claims, the parties dispute whether loan write-offs constitute "Third Party Claims" as defined in the Agreement.

The first applicable provision of the Agreement is Section 10.1(b), which provides, in pertinent part:

> The representations and warranties of Seller set forth in Section 3 shall survive the Closing. The representations and warranties set forth in Sections 3.3, 3.4, 3.5, 3.7 and subsequent sections of Section 3 shall expire and be of no further force and effect eighteen months after the initial closing date, except with respect to -- (ii) claims that Buyer has previously asserted against Seller in writing, setting forth with reasonable specificity the nature of such claims. n523

> n523 *Id.* at § 10.1.

The second provision, at Section 10.4(f), specifies that the eighteen-month survival period set forth in Section 10.1 applies to Therapy Student claims. n524 At Section 10.5, the Agreement requires "prompt" and "reasonably detailed [**211] notice of Third Party Claims." n525 The Agreement defines "Third Party Claim" as "any and all claims, demands, suits, actions or proceedings by any person or entity, other than members of the Buyer Group or the Seller Group, that could give rise to a right of indemnification under Section 10." n526

> n524 *Id.* at § 10.4(f).

> n525 *Id.* at § 10.5.

> n526 *Id.* at § 1.97.

Spherion contends that plaintiffs failed to comply with the notice provisions because they either failed to deliver timely notice, failed to deliver the notice in writing, or failed to deliver notice that set forth the claim for indemnification with the requisite specificity contemplated by the Agreement. Plaintiffs challenge Spherion's interpretation of Section 10.1 and argue that their written notice of the Therapy Student claims complied with a [*584] reasonable interpretation of the Agreement's notice provisions.

The Agreement does not define "reasonable specificity," yet this appears to be the focus of the parties' dispute with respect [**212] to this issue. The parties agree that plaintiffs did provide written notice to Spherion regarding several of the Therapy Student claims within the prescribed time period. n527 They also appear to agree that the written notices to Spherion did not identify by name all of the Therapy Students for which plaintiffs demanded indemnification. n528

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

n527 D.I. 109, at 134-36; PX 225; PX 229; PX 235; PX 239.

n528 *See e.g.* PX 239 ("[Interim] and Buyer take the position that other Therapy Students making allegations in the future, similar to the allegations previously disclosed to you, would be covered by the Special Indemnity provision of Section 10.4(a) of the Agreement.").

Given that Spherion was well aware of the complete fiasco its Therapy Student program had become prior to the Sale, and knew well that most if not all of the Therapy Students had not received what they were promised (an ability to seek an education abroad and then licensure and employment in the United States), the Court is disinclined to **[\*\*213]** follow Spherion's narrow construction of the Agreement's notice provision with respect to the Therapy Student claims. n529 Spherion knew specifically the universe of students who participated in the Therapy Student program. Each of the students, in one form or another, signed an agreement with Interim (pre-Sale) or its predecessor. n530 And each of these Therapy Students possessed a potential claim against Interim from the moment the Therapy Student program failed to deliver what Interim or its predecessor had promised. Under these circumstances, the Court finds that plaintiffs' written notification regarding the future Therapy Student claims was sufficient to satisfy the "reasonable specificity" requirement of Section 10.1(b)(ii), and the "reasonably detailed" requirement of Section 10.5. n531 Spherion knew full well who these potential claimants were and what its likely exposure to such claims would be.

n529 *See* PX 112; PX 233; PX 234; PX 253; PX 174, SCH. 3.20.

n530 D.I. 96, at P 10.

n531 PX 172, at §§ §§ 10.1(b)(ii), 10.5.

**[\*\*214]**

The Court also shares plaintiffs' view that loan write-offs are not "Third Party Claims" as defined in the Agreement, at least to the extent that the write-off did not occur in consideration for the release of a Third Party Claim. Because the Therapy Student program was a total failure, Interim was forced to write-off several loans deemed uncollectible. The assessment of the viability of the loans, and the decision to write them off, had nothing to do with a "claim, demand, suit, action or proceeding." n532 The loan write-offs, therefore, were not subject to the notice requirements of Section 10.5. n533

n532 *See Id.* at § 1.97.

n533 *Id.* at § 10.5 ("any Indemnified Party that seeks indemnification with respect to a *third party claim* from the other party . . . must provide written notice to the Indemnifying Party. . . .") (emphasis supplied).

**4. Indemnification for the Therapy Student Claims**

The Agreement provides that the parties are to share the losses associated with the Therapy Student **[\*\*215]** program. Specifically, the Agreement provides that Interim would pay the first $ 100,000 without any contribution from Spherion. Thereafter, the parties agreed to pay 50% of "Specified **[\*585]** Damages." n534 As to the loan write-offs, Spherion was obliged to pay 50% of the amount written off over and above the Therapy Student Reserve ($ 578,463.00), plus the fees associated with collection. n535 Based on the parties' stipula-

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

tions, and the Court's factual and legal conclusions regarding the proper construction of the Agreement, the Court is satisfied that the plaintiffs are entitled to the full amount of indemnification they seek for losses associated with the Therapy Student program. Specifically, plaintiffs are entitled to:

n534 *Id.* at § 10.4(a)(iii).

n535 *Id.* at § 10.4(a)(i).

| | |
|---|---|
| Alford Action: | $ 467,722.88 |
| Abrajano Action: | $ 420,086.12 |
| Stecker Action: | $ 255,443.89 |
| Other asserted claims: | $ 444,700.54 |
| Loan write-offs in access Therapy Student reserve: | $ 322,051.31 |
| Probable additional loan write-offs: | $ 331,434.21 |
| Total: | $ 2,241,438.95 |
| Less: | $ 100,000.00 |

Interim share: $ 1,070,719.48
n536Spherion share: $ 1,070,719.47

n536 The following evidence relates to each element of the Therapy Student indemnification Damages: (1) Alford action -- PX 112; PX 329; PX336; D.I. 132, P 9. (2) Abrajano action -- PX 233; PX 329; PX 336; PX 716; D.I. 96, P 1; D.I. 132, at P 9. (3) Stecker action -- PX 253; PX 254; PX 336; D.I. 132, P 9. (4) Other asserted claims -- PX 239; PX 329; PX 336; D.I. 132, at P 9. (5) Loan write --offs -- PX 329; PX336; D.I. 132, at P 11; D.I. 96, at PP 6, 7, 8.

[**216]

### F. Plaintiffs Are Not Entitled to Expectancy Damages

The Court already has concluded that plaintiffs' recovery of expectancy damages must be tied to their ability to prove a breach of the express promises made to them in the Agreement. Thus, for instance, had plaintiffs proven a breach of the Medicare representations and warranties, or the financial statement representations and warranties, plaintiffs could reasonably argue that their valuation of Interim was skewed as a result of these breaches and that expectancy damages, therefore, are appropriate. Plaintiffs failed to meet their burden of proof on these breach claims, however, and the breaches that they have proven are not such that the Court can conclude that plaintiffs' reasonable expectations for this transaction have been frustrated. Indemnification, under the circumstances, is the appropriate (and exclusive) remedy.

884 A.2d 513, *; 2005 Del. Super. LEXIS 32, **

## III.

For the foregoing reasons, the Court has found in favor of the plaintiffs on Counts I and II of their Amended Complaint. The Court has found in favor of Spherion on Count III of the Superior Court Complaint and Count I of the Court of Chancery Complaint, which claim was transferred to this [**217] Court prior to trial. The Court also has found in favor of Spherion on plaintiffs' claim for expectancy damages.

Plaintiffs are awarded $ 1,070,719.47 with respect to Count II of the Superior Court Amended Complaint, plus pre and post judgment interest at the statutory rate, and reasonable attorney's fees and costs in accordance with Sections 1.19, 1.65 and 10.1 of the Agreement. Because the plaintiffs' Damages with respect to Count I of the Superior Court Amended Complaint, in the aggregate, do not meet the $ 2 million deductible set forth in Section 10.3 of the Agreement, plaintiffs are not awarded their otherwise recoverable Damages as to these claims.

[*586]   The parties shall present a stipulation to the Court within fourteen days of this Order setting forth the means and timing by which they propose to address the attorney's fees issues under Sections 1.9, 1.65 and 10.1 of the Agreement. Upon resolution of this issue, the Court will enter its final judgment and verdict on the docket.

**IT IS SO ORDERED.**

The Honorable Joseph R. Slights, III

Original to Prothonotary