LEXSEE 69 N.C. APP. 217

INTERNATIONAL HARVESTER CREDIT CORPORATION v. HAROLD ROSCOE BOWMAN and BARBARA J. BOWMAN

No. 8326SC856

COURT OF APPEALS OF NORTH CAROLINA

69 N.C. App. 217; 316 S.E.2d 619; 1984 N.C. App. LEXIS 3392

May 8, 1984, Heard in the Court of Appeals
June 19, 1984, Filed

**PRIOR HISTORY:** [***1]
Appeal by defendants from *Snepp, Judge*. Order entered 28 March 1983 in Superior Court, Mecklenburg County.

**DISPOSITION:**

Affirmed.

**HEADNOTES:** 1. Fraud § 5; Guaranty § 1 -- **unreasonable reliance on misrepresentations**

Defendant guarantors' reliance, if any, on alleged misrepresentations by plaintiff creditor's agent as to whether their guaranty extended to subsequent purchases was unreasonable as a matter of law since there was no fiduciary relationship between the creditor and guarantors, and since defendants were charged with knowledge of the contents of the written instrument which they signed. Furthermore, plaintiff's agent had no duty to "disclose" to defendants the clear terms of the guaranty.

2. Guaranty § 1 -- **guaranty of present and future indebtedness -- consideration**

A guaranty extending to all obligations for which a corporation "is now or may hereafter become liable" was supported by consideration although plaintiff had extended credit to the corporation prior to defendants' execution of the guaranty.

3. Guaranty § 2 -- **guarantors' obligation not in dispute**

The amount of defendant guarantors' obligation was not in dispute because of their [***2] allegations concerning the sale of the collateral for the debts which they guaranteed where the sale of the collateral was conducted pursuant to an order of a federal bankruptcy court, defendants have identified no specific flaw or defect in the manner in which the sales were carried out, and the actual deficiency yielded by the sale was more than twice the amount awarded by the bankruptcy court as a deficiency allowance.

4. Guaranty § 1 -- **waiver of notice of sale of collateral**

Defendant guarantors waived notice of the sale of collateral for the debts which they guaranteed by language in the guaranty agreement stating that they waived "all other notices of any kind whatsoever."

**SYLLABUS:**

This is a civil action wherein plaintiff seeks to recover $ 51,000.00 under a guaranty agreement executed by plaintiff and defendants on 3 October

Apx. 440

69 N.C. App. 217, *; 316 S.E.2d 619, **;
1984 N.C. App. LEXIS 3392, ***

1977. The record reveals the following:

Plaintiff, a North Carolina corporation, is a subsidiary of International Harvester Corporation. Defendant Harold Bowman is the former president and fifty-three percent stockholder in B & A Transport Company, Inc., a now bankrupt long-distance trucking company. Beginning in 1977 B & A Transport engaged [***3] in a series of transactions with plaintiff and its parent company, in which B & A purchased trucks from International Harvester Corporation and financed its acquisitions through plaintiff Credit Corporation by execution of numerous retail installment contracts. On 3 October 1977, defendants executed a guaranty in favor of plaintiff and its parent corporation, in which they guaranteed payment of all debts and obligations incurred by B & A Transport. On 23 January 1980 B & A Transport filed for bankruptcy, and has since that time failed to make regular payments to plaintiff as required by the installment contracts. The vehicles subject to the installment contracts were sold pursuant to order of the United States Bankruptcy Court, entered 8 May 1980. Sale of the vehicles produced a substantial deficiency, and on 20 October 1980 the bankruptcy judge entered an order declaring that plaintiff was entitled to a deficiency allowance of $ 51,000.00. On 1 March 1981 plaintiff filed this action, seeking to recover $ 51,000.00 from defendants pursuant to the guaranty. Defendants counterclaimed, asserting that their signatures on the guaranty were obtained by means of plaintiff's unfair and [***4] deceptive trade practices. On 28 March 1983 plaintiff's motion for summary judgment was granted, and defendants were ordered to pay plaintiff $ 51,000.00 plus costs and attorney's fees. The court did not rule on defendants' counterclaim. Defendants appealed.

**COUNSEL:**

C. Eugene McCartha for plaintiff, appellee.

White and Crumpler, by David R. Crawford, for defendants, appellants.

**JUDGES:**

R. A. Hedrick, Judge, wrote the opinion. Judges Gerald Arnold and Eugene H. Phillips concur.

**OPINIONBY:**

HEDRICK

**OPINION:**

[*219] [**620] We note at the outset that defendants' appeal is from an order "which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" and is thus premature. N.C. Gen. Stat. Sec. 1A-1, Rule 54(b), North Carolina Rules of Civil Procedure. Nevertheless, we choose to exercise our discretion to pass on the merits of defendants' appeal.

The thrust of defendants' argument on appeal is that summary judgment was inappropriate [**621] because of the existence of "multiple genuine issues of material fact" raised by the pleadings and supporting documents considered by the trial judge. We will examine each of these alleged "genuine [***5] issues" in turn.

Defendants first contend that a genuine issue exists as to whether their execution of the guaranty was procured by the fraudulent acts of plaintiff's agent, and whether "plaintiff breached a duty . . . to reveal the material terms of the guaranty." In support of this argument, defendants contend that their subjective understanding of the guaranty was that their obligations extended only to the purchase of one truck, and not to all subsequent purchases made by B & A

Transport. They further contend that they communicated this understanding to plaintiff's agent, who assured them that this was accurate. Finally, defendants point to the failure of plaintiff's agent to point out to them provisions of the guaranty directly contrary to this alleged misrepresentation.

We find defendants' argument in this regard entirely unpersuasive. The clear language of the guaranty, which defendants are [*220] presumed to have read and which defendants signed, in pertinent part provides:

The Undersigned, for a valuable consideration the receipt of which is hereby acknowledged, hereby guarantees payment, at maturity, of any and all indebtedness or obligations, whether primary [***6] or secondary, for which B & A Transport Co., Inc., of Mt. Airy, County of Surry and State of North Carolina, is now *or may hereafter* become liable or indebted to International Harvester Company or International Harvester Credit Corporation.

(Emphasis added.)

A person who executes a written instrument is ordinarily charged with knowledge of its contents, *Mills v. Lynch*, 259 N.C. 359, 130 S.E. 2d 541 (1963), and may not base an action for fraud on ignorance of the legal effect of its provisions, *Pierce v. Bierman*, 202 N.C. 275, 162 S.E. 566 (1932). While these rules do not apply to situations in which the person making the misrepresentations stands in a fiduciary relationship to the signing party, *Vail v. Vail*, 233 N.C. 109, 63 S.E. 2d 202 (1951), the relationship between a creditor and a guarantor is not such a relationship. In short, we hold that defendants' reliance, if any, on alleged misrepresentations made by plaintiff's agent was unreasonable as a matter of law. We further hold that plaintiff's agent had no duty to "disclose" to defendants the clear terms of the guaranty. The case relied on by defendants in support of their contention to the contrary [***7] involved a situation in which a creditor was allegedly aware of some fact that materially increased the guarantor's risk and which the creditor knew the guarantor probably would not discover. *See Trust Co. v. Akelaitis*, 25 N.C. App. 522, 214 S.E. 2d 281 (1975). The principles set out in this case have no application to the facts here presented.

Defendants next contend that a genuine issue is presented as to whether the guaranty was supported by valid consideration. In this regard defendants make much of the fact that plaintiff had extended credit to B & A Transport prior to their execution of the guaranty. Because plaintiff's extension of credit was independent of the guaranty, defendants argue, the guaranty was without consideration and was thus unenforceable.

[*221] It is true, as defendants assert, that a guaranty executed independently of the main debt must be supported by independent consideration. *Supply Co. v. Dudney*, 56 N.C. App. 622, 289 S.E. 2d 600 (1982). We do not agree, however, that the record discloses a genuine issue of material fact as to the existence of such independent consideration in the instant case. This Court has said that a guaranty of [***8] future as well as present indebtedness is supported by adequate consideration, *Gillespie v. DeWitt*, 53 N.C. App. 252, 280 S.E. 2d 736, disc. rev. denied, 304 N.C. 390, 285 S.E. 2d 832 (1981). We find *Gillespie* controlling on the facts before us, where the guaranty [**622] extends to all obligations for which B & A Transport "is now or may hereafter become liable." We note in further support of our ruling that plaintiff in fact extended credit to B & A Transport on several occasions after defendants' execution of the guaranty.

69 N.C. App. 217, *; 316 S.E.2d 619, **;
1984 N.C. App. LEXIS 3392, ***

Defendants also argue that summary judgment was improper because the amount of their obligation under the guaranty was in dispute. In support of this contention defendants set forth a number of allegations going to the sale of the collateral for the debts that they guaranteed. Specifically, defendants complain that they had no notice of the sale and that the sale was negligently conducted and was thus commercially unreasonable.

We find defendants' argument to be without merit for several reasons. First, we note that the sale of the collateral securing B & A Transport's debt was conducted pursuant to order of the United States Bankruptcy [***9] Court. Secondly, we note that defendants have, aside from general allegations, identified no specific flaw or defect in the manner in which the sales were carried out. Next, we note that the actual deficiency yielded by the sale was more than twice the amount awarded by the Bankruptcy Court as a deficiency allowance. Finally, we point out the language of the guaranty:

The Undersigned also agrees that the written acknowledgment of the debtor or the judgment of any court establishing the amount due from the debtor shall be conclusive and binding on the Undersigned. . . .

In regard to defendants' argument that they were entitled to notice of the sale, we point out that defendants have found neither case nor statute in this State that supports their position. [*222] Furthermore, we turn once again to the clear language of the contractual agreement entered into by the parties:

The Undersigned hereby waives notice of the acceptance of this guaranty, notice of any and all indebtedness or obligations now existing or which may hereafter exist, notice of default of payment, demand and diligence, *and all other notices of any kind whatsoever.*

(Emphasis added.)  [***10]

Our disposition of this case makes a discussion of defendants' remaining assignment of error unnecessary.

Affirmed.

LEXSEE 107 F.3D 400

**JOHNSON'S DAIRY, INC., and JAMES JOHNSON and JOHN JOHNSON, Successor Co-Trustees of Johnson's Dairy, Inc., Defined Benefit Pension Plan and Trust, Plaintiffs-Appellants, v. WESTERN RESERVE LIFE ASSURANCE COMPANY OF OHIO, Defendant-Appellee.**

No. 95-5984

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

107 F.3d 400; 1997 U.S. App. LEXIS 2860; 1997 FED App. 0069P (6th Cir.)

June 7, 1996, Argued
February 20, 1997, Decided
February 20, 1997, Filed

**PRIOR HISTORY:** [**1] ON APPEAL from the United States District Court for the Eastern District of Kentucky. 94-00267. Henry R. Wilhoit, Jr., District Judge.

**DISPOSITION:** Reversed and remanded.

**COUNSEL:** For JOHNSON'S DAIRY, INC., JAMES JOHNSON, Successor Co-Trustees of Johnson's Dairy, Inc., Defined Benefit Pension Plan and Trust, JOHN JOHNSON, Successor Co-Trustee of Johnson's Dairy, Inc., Defined Benefit Pension Plan and Trust, Plaintiffs - Appellants: Michael K. Lett, ARGUED, BRIEFED, Gray, Woods & Cooper, Ashland, KY.

For WESTERN RESERVE LIFE ASSURANCE COMPANY, of Ohio, Defendant - Appellee: Robert W. Griffith, ARGUED, Michael I. Kanovitz, BRIEFED, Stites & Harbison, Louisville, KY.

**JUDGES:** Before: MERRITT and COLE, Circuit Judges; DUGGAN, District Judge. * MERRITT, J., delivered the opinion of the court, in which COLE, J., joined. DUGGAN, D. J. (pp. 4-6), delivered a separate dissenting opinion.

    * The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

**OPINIONBY:** MERRITT

**OPINION:** [***2]

[*401] MERRITT, Circuit Judge. According to the complaint in this case, dismissed by the court below for failure to state a claim under Rule 12(b)(6), Johnson's Dairy hired Western Reserve Life to manage its pension funds. An agent of Western Reserve, one David Lambert, was the person assigned to the account. Lambert embezzled money, including most of Johnson's Dairy's pension funds. In 1986, Lambert paid back $ 243,201.73, which was a large portion of the embezzled money. After that payment, Lambert declared bankruptcy. The payment to Johnson's Dairy was determined to be a "preferential payment" by the Bankruptcy Court in 1994, and the Dairy was required to repay the embezzled money to the Trustee. The Dairy [**2]

is now seeking reimbursement for this payment from Western Reserve Life which was jointly liable with Lambert for Lambert's defalcation. It argues that it is entitled in restitution to repayment of the money paid to the Bankruptcy Trustee as indemnity.

The Restatement of Restitution provides: "A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct." RESTATEMENT OF RESTITUTION § 76 (1937) (General Rule). This indemnity principle clearly applies in the instant case. The Dairy, which was not at fault, paid the Bankruptcy Trustee the amount demanded because of the fault of the agent of Western Reserve, according to the complaint. It is elementary that under general agency and tort law, Western Reserve is liable to the Dairy for the torts of its agent, Lambert, in the scope of employment. But for embezzlement of Western Reserve's agent, there would have been no loss and no preferential [*402] payment in Bankruptcy, and the Dairy, an innocent party, would not [***3] have been required [**3] to make the repayment. Since the Dairy did not know that it would have to refund the payment to the Trustee until 1994, it did not know that it had a cause of action until that time. Since the Dairy was repaid $ 243,000 of the embezzled money by Lambert in 1986, it had no claim at that time against the employer because the injury had been cured by Lambert's repayment of the embezzled funds. The Dairy had possession of the money until 1994, when the Bankruptcy Court ordered the Dairy to repay the money to the Trustee.

The case law in Kentucky does not address the specific issue in this case, and there is no precedent from a Kentucky court which we find helpful on this issue. But we have no reason to believe that Kentucky would not apply well-established general principles of restitution in indemnity cases, as found in RESTATEMENT OF RESTITUTION § 76 (1937). The Dairy has discharged a duty cured in reality by Western Reserve. As between the Dairy and Western Reserve, in light of Western Reserve's legal obligation to reimburse the Dairy for the loss of its pension funds due to the embezzlement by Lambert, Western's employee, Western Reserve must compensate the Dairy for its payment [**4] of the bankruptcy preference, assuming that the facts are as set out in the complaint summarized above. To require the loss to lie with the Dairy is unjust and violates principles of indemnity declared in the law of restitution and unjustly enriches the insurance company at the expense of the Dairy and its pensioners.

The judgment of the District Court dismissing the complaint is reversed and the case remanded for trial on the merits. [***4]

**DISSENTBY:** PATRICK J. DUGGAN

**DISSENT:** PATRICK J. DUGGAN, District Judge, dissenting. I respectfully dissent. Plaintiffs claim that sometime in the mid-1980's, Lambert, acting as an agent for defendant, embezzled approximately 1.1 Million Dollars from plaintiffs. In December, 1986, Lambert paid plaintiffs the sum of $ 243,201.73. In March, 1987, Lambert filed a bankruptcy petition, and the bankruptcy court ultimately determined that the payment in December was a "preferential payment." On April 14, 1989, the trustee brought suit against plaintiffs seeking recovery of the money. Plaintiffs returned $ 212,744.45 n1 to the bankruptcy estate on or about July 1, 1994. In October, 1994, plaintiffs brought this action seeking indemnification from defendant

107 F.3d 400, *; 1997 U.S. App. LEXIS 2860, **;
1997 FED App. 0069P (6th Cir.), ***

for [**5] the money it was required to pay to the bankruptcy trustee.

> n1 It is unclear why plaintiffs returned only $ 212,744.45 to the bankruptcy estate.

Plaintiffs' complaint asserts that defendant is liable because its negligent supervision of Lambert in the 1970's and 1980's resulted in a loss to plaintiffs and caused plaintiffs to return $ 212,744.45 to the trustee on July 1, 1994.

Plaintiffs may well have had a cause of action against defendant for any loss it suffered in the mid-1980's as a result of the "negligent supervision" of Lambert by defendant, but such claim is not one for indemnification.

As the district court stated:

> at first glance it appears that the logical cause of action available to the Plaintiffs would be a straight tort action against Defendant for the embezzlement of funds by Defendant's employee Lambert based on a theory of respondeat superior. However, the Plaintiffs frame their Complaint as an action sounding in indemnity. The Court is left to conclude that this is [***5] because [**6] any direct cause of action against Defendant for Lambert's conduct is no longer available to the Plaintiffs under the applicable statute of limitations.

(Order of 3/31/95, J.A. at 56.)

In order for defendant to be obligated to plaintiffs on a theory of indemnification, plaintiffs must establish that plaintiffs discharged a duty to a third party that both plaintiffs and defendant owed to such third party, but, as between them, the obligation should have been discharged by defendant. *Harris Corp. v. Comair, Inc.*, 510 F. Supp. 1168, 1173-74 (E.D. Ky 1981), affirmed, 712 F.2d 1069 (6th Cir. 1983).

Moreover, "for indemnity to arise, the obligation discharged by the indemnitee must [*403] be coextensive or identical with that owed by the indemnitor." *Id.* 510 F. Supp. at 1174, see also *Id.* at n.26 on 1174 (cases cited); accord *American Mutual Liability Co. v. Reed Cleaners*, 265 Minn. 503, 508-09, 122 N.W.2d 178, 182 (Minn. 1963); 42 C.J.S. Indemnity § 3 at 75 (1991).

The majority, relying on the paragraph quoted from $S 76 of the Restatement of Restitution, concludes that plaintiff is entitled to indemnity.

However, the comment to § 76 states:

> b. *Situations to which the* [**7] *rule applies.* The rule stated in this Section applies where two or more persons are subject to a duty to a third person either as joint promissors or otherwise, under such circumstances that one or more of them, as between themselves, should perform it rather than the other.
>
> . . . .
>
> . . . There is no such duty of indemnity unless the payment discharges the primary obligor from an existing duty ( § 78) [***6] .
> . . .

*Restatement of Restitution* § 76 cmt. b (1937).

Indemnity is available only if the indemnitee discharges a duty owed by the indemnitor, *see Crab Orchard Improvement Co. v. Chesapeake & Ohio Ry. Co.*, 115 F.2d 277, 281, 282 (4th Cir. 1940), *cert. denied*, 312 U.S. 702, 61 S. Ct. 807, 85 L. Ed. 1135 (1941), and if a benefit was conferred upon the indemnitor. 115 F.2d at 282. The indemnity doctrine is grounded on the concept of unjust enrichment. *See* George E. Palmer, *The Law of Restitution* § 1.5(d) at 29-32 (1978); *see also Harris Corp.*, 510 F. Supp. at 1174; 42 C.J.S. Indemnity § 3 at 74.

Plaintiffs' complaint in this action says, in relevant part, "by virtue of . . . the primary negligence and/or malfeasance of the Defendant . [**8] . . [in] employing . . . Lambert . . . and [in] failing to properly supervise . . . Lambert . . . Western Reserve should be required and compelled to indemnify . . . Plaintiffs." (Compl. P 19, J.A. at 14.)

Plaintiffs' complaint does not allege that plaintiffs discharged any duty owed by defendant when they paid the sum of $ 212,744.45 to the bankruptcy estate (because, in fact, defendant owed no duty to the bankruptcy estate); nor do plaintiffs allege that defendant was "unjustly enriched" by such payment.

The majority opinion states that since plaintiffs were repaid the embezzled money in 1986, "it had no claim at that time against the employer because the injury had been cured by the employee's repayment of the embezzled funds." While this fact may affect whether any claim plaintiffs might have for breach of contract or tort is barred by the statute of limitations, it does not, in my opinion, create a cause of action for indemnity.

Plaintiffs have therefore failed to state a claim for indemnity under Kentucky law, and I would affirm the decision of the district court.

LEXSEE 632 P.2D 289

LIBERTY BANK, Plaintiff-Appellant, v. JAMES W. SHIMOKAWA,
Defendant, and ASAE SHIMOKAWA, Defendant-Appellee

No. 7189

Intermediate Court of Appeals of Hawaii

2 Haw. App. 280; 632 P.2d 289; 1981 Haw. App. LEXIS 219

July 9, 1981

**PRIOR HISTORY:** [***1]
Appeal from First Circuit Court; Honorable Yasutaka Fukushima, Judge; Civil No. 50806.

**DISPOSITION:**

Accordingly, the judgment is reversed.

**HEADNOTES:** GUARANTY.

The general rule is that the contract of guaranty is an enforceable undertaking or promise on the part of one person which is collateral to a principal obligation, e.g., a promissory note, on the part of another and which binds the guarantor to performance in the event of nonperformance by the principal debtor.
GUARANTY -- *continuing guaranty*.

A continuing guaranty is a kind of contract of guaranty that contemplates a future course of dealings between the principal debtor and the creditor over an indefinite period of time.
GUARANTY -- *continuing guaranty*.

In operation, the continuing guaranty is an offer from the guarantor whose acceptance is manifested by the creditor's performance of a specific act that results in the formation of a contract between the creditor and the guarantor. It remains in effect until revoked by the guarantor. Thus, a continuing guaranty does not guarantee a particular note or obligation but rather guarantees an overall indebtedness. The continuing guarantor is obliged to pay all [***2] the debts of the defaulting principals encompassed by the guaranty whether those debts are secured by other collateral or not.
GUARANTY -- *continuing guaranty -- nonapplicability of the Uniform Commercial Code*.

The continuing guaranty contract, even where negotiable instruments are drawn in reliance on it, is not a transaction governed by the provisions of the Uniform Commercial Code.
GUARANTY -- *continuing guaranty -- consideration*.

The present and future extensions of credit to the principal debtor are generally deemed sufficient consideration to support a contract of guaranty.
GUARANTY -- *continuing guaranty -- interpretation*.

The court cannot extend a continuing guaranty contract beyond its precise and undisputed terms.
GUARANTY -- *continuing guaranty -- absence of the limit on liability*.

The absence of a limit on liability in a continuing guaranty is not, standing alone, a sufficient basis to invalidate the entire contract of con-

tinuing guaranty where the guarantor has the power to set the limit on liability.

**COUNSEL:**

*Neil F. Hulbert* (*Hong* and *Iwai* of counsel) for plaintiff-appellant.

*Eichi Oki* for defendant-appellee.

**JUDGES:** [***3]

Hayashi, C.J., Padgett and Burns, JJ. Opinion of the Court by Hayashi, C.J.

**OPINIONBY:**

HAYASHI

**OPINION:**

[*281] [**290] Liberty Bank appeals from the lower court's decision invalidating the continuing guaranty given it by Appellee Asae Shomokawa and releasing her from liability on a [**291] promissory note executed after the execution of the guaranty.

The underlying issues which merit consideration are (1) whether the continuing guaranty as executed by appellee is a valid, enforceable contract of guaranty between the appellee and the bank and (2) whether there was adequate consideration given for subsequent loans made by the appellant-bank to the husband.

For the reasons stated herein, we reverse and find that under the circumstances in this case, the continuing guaranty was valid and enforceable at all times relevant herein.

This action was commenced by the appellant-bank to collect on a promissory note executed by James Shimokawa, ex-husband of the appellee.

James Shimokawa applied for a $10,000.00 loan from appellant in February 1972. Henry Murakami, the bank's loan officer and a friend of James Shimokawa, required him to obtain a continuing guaranty by his wife [***4] of his indebtedness to the bank as a condition of the bank's approval of the loan. Murakami gave the form to Shimokawa to obtain his wife's signature. The funds were disbursed to him on February 11, 1972; and the continuing guaranty form was returned, signed by appellee, on February 15, 1972. The space left for the limitation on liability was in blank. Prior to the trial in this action, appellee first denied having signed the guaranty. By the time of trial, however, the parties stipulated that the signature on the continuing guaranty was that of appellee. At trial, she testified she could not recall having signed the form; and if she had signed it, she hadn't intended to sign it, nor did she have knowledge of its content.

Between February 1972 and March 1975, a number of loans were extended to Mr. Shimokawa by Liberty Bank. The parties were divorced in July 1974, but the continuing guaranty was not revoked by the appellee. The appellant sued Mr. Shimokawa on a $15,718.42 note he executed in March 1975 and obtained a default judgment; and when that was not satisfied, this action was brought against appellee. The trial court ruled that the continuing guaranty was invalid [***5] at its inception for lack of consideration, and for lack of [*282] communication and mutual assent between Liberty Bank and appellee sufficient to form a contract of guaranty. In its findings of fact the court found that even though appellee had stipulated that the signature on the contract was hers, there was no intent to sign a continuing guaranty of the debts of her husband.

At the outset, we think it is appropriate to address ourselves to the nature of the continuing guaranty contract and the obligations and liabilities arising thereunder with particu-

lar attention to the guaranty that is the subject of this action.

The general rule is that the contract of guaranty is an enforceable undertaking or promise on the part of one person which is collateral to a principal obligation, e.g., a promissory note, on the part of another and which binds the guarantor to performance in the event of nonperformance by the principal debtor. 38 AM. JUR. 2d *Guaranty* § 1 (1968); *International Trust Co. v. Suzui*, 31 Haw. 34 (1929). The continuing guaranty is a kind of contract of guaranty that contemplates a future course of dealings between the principal debtor and the creditor [***6] over an indefinite period of time. In operation, the continuing guaranty is an offer from the guarantor whose acceptance is manifested by the creditor's performance of a specific act that results in the formation of a contract between the creditor and guarantor. It remains in effect until revoked by the guarantor. 38 AM. JUR. 2d *Guaranty* § 63 (1968). Thus, a continuing guaranty does not guarantee a particular note or obligation, but rather guarantees an overall indebtedness. The continuing guarantor is obliged to pay all the debts of the defaulting principal encompassed by the guaranty whether those debts are secured by other collateral or not (which they can be). *Union Planters National Bank of Memphis v. Markowitz*, 468 F. Supp. § 529 (1979). However, the continuing guaranty contract, even where negotiable instruments are drawn in reliance on it, is not a transaction governed by the provisions of the [**292] Uniform Commercial Code. *EAC Credit Corp. v. King*, 507 F.2d 1232 (5th Cir. 1975); *Union Planters Bank of Memphis v. Markowitz, supra*. The present and future extensions of credit to the principal debtor are generally deemed sufficient consideration [***7] to support the contract of guaranty. 38 AM. JUR. 2d *Guaranty* § 43 (1968); *Oakland Bank of Commerce v. Washington*, 6 Cal. App. 3d 793, 86 Cal. Rptr. 276 (1970); see also *United States v. Lowell*, 557 F.2d 70 (6th Cir. 1977).

In the case before us, the trial court found that the continuing [*283] guaranty contract was void because (1) the bank had failed to notify appellee of its acceptance of her guaranty, and (2) the bank failed to notify her of the execution of the note on which this action is predicated, as the bank knew or should have known the parties were divorced at the time of its making. However admirable and considerate it would have been to do so, the law does not impose such a requirement under the facts of this case. By the terms of the guaranty, the appellee specifically waived such notice; and we, accordingly, cannot extend this contract beyond its precise and uncontroverted terms. *EAC Credit Corp. v. King, supra; Bank of Naperville v. Halz, supra*.

The court also found that the continuing guaranty contract was void for lack of consideration at its inception because the initial loan funds were disbursed to Mr. Shimokawa on February 11, 1972, [***8] and the continuing guaranty bearing appellee's signature as requested by the bank was dated February 15, 1972. The trial court found that on these facts the loan was not made in reliance on the continuing guaranty. Such a finding is inconsistent with the law governing the formation of contracts. Some courts have held that where a contract of guaranty is executed reasonably subsequent to the principal contract with the understanding that the contract of guaranty is the inducement to the execution of the principal contract, no new consideration is required. *United States v. Lowell, supra*. However, as a practical matter, whether the loan of February 11, 1972 was made in reliance on the continuing guaranty returned on the 15th is irrelevant to the question of whether the continuing guaranty was

sufficient consideration for the March 1975 loan which is the subject matter of this action. See 38 AM. JUR. 2d Guaranty § 43, supra.

Appellant ascribes error to the court's finding that appellee, having admitted to signing the guaranty, lacked the intent to do so. Appellee testified that she did not remember ever signing the document in question; but that since her signature [***9] was there, she thought she was signing a loan document instead of a continuing guaranty. She said if she had signed it, she certainly would have revoked the guaranty when the parties were divorced in 1974. However, lapse of memory is not a valid basis on which to disprove intent sufficient to invalidate a contract. See Bank of Santa Ana v. Molina, 1 Cal. App. 3d 607, 81 Cal. Rptr. 885 (1969). Moreover, it is a fundamental rule of contract law that a competent party who signs a [*284] written instrument is bound by its terms; and in the absence of allegations of mistake, fraud, or duress, a failure to read or understand the contents of the instrument cannot relieve the signing party of the obligation imposed therein. Hayes v. Travelers Insurance Co., 93 F.2d 568 (1937); In Re Adoption of Baby Girl K, 26 Wash. App. 897, 615 P.2d 1310 (1980); Squires v. Woodbury, 621 P.2d 443 (Kan. App. 1980); Markell v. Sidney B. Pfeifer Foundation, 402 N.E.2d 76 (Mass. App. Ct. 1980).

The appellant also ascribes error to the trial court's conclusion of law that the absence of a limit on liability invalidated the contract. The failure of the appellee to limit her liability [***10] is, likewise, an insufficient basis to invalidate the contract. There is considerable authority for the view that the absence of a limit on liability in a continuing guaranty is not, standing alone, a sufficient basis to invalidate the entire contract of continuing guaranty where the guarantor has the power to set the limit on liability. See e.g. American Petrofina Co. of [**293] Texas v. Bryan, 519 S.W.2d 488 (Tex. Cr. App. 1975), wherein the continuing guaranty failed to specify an upper limit on the liability of the guarantor. The court stated:

> Assuming that there were blanks when the instrument was signed, no evidence was offered that the body of the instrument was filled in incorrectly, fraudulently or contrary to the understanding of the two Bryans. The authority to fill in the blanks was entrusted to the agents of the Appellant, and the instrument is as good as if executed in complete form.

American Petrofina Co. of Texas v. Bryan, supra, at 488.

While this failure to supply a limit on liability is a major source of contention for the parties because of the appellant's responsibility to supply the limit and her apparent failure to carefully [***11] read a document to which she affixed her signature and the bank's error in overlooking the omission, we think neither is a sufficient basis to invalidate the entire contract. Williston on Contracts, 3d. Ed. §§ 35 and 90A; see also North Carolina National Bank v. Corbett, 271 N.C. 458, 156 S.E.2d 835 (1967).

Because we are reversing the trial court's judgment, it is not necessary to address the other issues raised by the appellant.

Accordingly, the judgment is reversed.

LEXSEE 1988 DEL. SUPER. LEXIS 93

**Martin-Senour Paints Plaintiff v. Delmarva Venture Corporation, t/a Delaware Hardware and Building Supplies Defendant**

Civil Action No. 86C-JA11

Superior Court of Delaware, Sussex

1988 Del. Super. LEXIS 93

Dated Submitted: March 3, 1988
March 14, 1988, Decided

**COUNSEL:** [*1]

Robert C. Wolhar, Jr., Esquire, Wolhar & Gill, Georgetown, Delaware, Attorney for Plaintiff.

George F. Gardner III, Esquire, Parkowski, Noble & Guerke, Dover, Delaware, Attorney for Defendant.

**JUDGES:**

LEE, Judge

**OPINIONBY:**

LEE

**OPINION:**

LEE, Judge

Plaintiff Martin-Senour Paints seeks to recover from defendant Delmarva Venture Corporation (hereinafter "DVC") the amount of $ 21,443.72 for paint supplies and materials sold on account to Delmarva Hardware Building and Supply Corporation (hereinafter "Delmarva Hardware"), a subsidiary of DVC. This is the Court's decision after a trial held without a jury on May 18, 1987.

The parties do not dispute the existence or the amount of the debt owed by Delmarva Hardware to the plaintiff. However, in 1986 Delmarva Hardware filed a petition for bankruptcy and the plaintiff now wants to hold DVC liable for the debt. Accordingly, plaintiff has presented several theories of liability. It alleges: (1) that Delmarva Hardware was the agent, instrumentality or adjunct of DVC; (2) that Delmarva Hardware was the alter ego of DVC; (3) that DVC is liable for the obligations of its subsidiary because of "illegality, wrong doing, injustice, bad faith, dishonesty, violation of statute and [*2] public policy"; (4) that DVC is estopped from denying liability for the debt of Delmarva Hardware; and (5) that DVC represented that it would stand behind the debts of its subsidiary Delmarva Hardware.

Through discovery and at trial, plaintiff produced evidence that Delmarva Hardware is a wholly-owned subsidiary of DVC and part of a network of nine corporations owned by DVC. DVC is a wholly owned subsidiary of Middle States Financial Corporation, which in turn is owned by Middle States Holding Company, Inc. The sole shareholder of Middle State Holding Company, Inc. is Gerald S. Klein. Klein also is the ex-

ecutive vice president and a director of DVC and Delmarva Hardware.

DVC is a non-operating holding company that provided administrative and accounting services to its nine subsidiaries. DVC's former president, Adolph Miller, and former vice president of finance, Larry Johnson, testified by deposition and at trial that they were employed and paid by DVC, but were also officers of all the subsidiaries. Their services were apportioned among the various subsidiaries in the form of management fees paid to DVC. The subsidiaries were set up by function or business line. Delmarva Hardware [*3] was in the business of selling to contractors and the general public retail and wholesale building materials and supplies. It had three locations, but its main office was in a building in Selbyville that was owned by DVC and for which Delmarva Hardware had no lease and paid no rent.

DVC was incorporated in 1983. It was funded primarily by loans from Merritt Commercial Savings & Loan Association, another subsidiary of Middle States Financial Corporation. DVC used these borrowed funds to set up its subsidiaries. Thereafter, intercompany loans were frequently made among the subsidiaries and parent corporation to cure deficits in accounts. At year end the balance of these loans would be reduced to notes with an interest rate determined by management. However, in May, 1985, seven of the accounts of DVC and its subsidiaries were frozen after the Governor of Maryland appointed a conservator to Merritt. Eventually, in 1986 DVC ceased operations.

To hold the defendant liable for Delmarva Hardware's debt under either of plaintiff's first three theories would require this Court to disregard the separate corporate existences of DVC and Delmarva Hardware. The law is settled in Delaware, however, [*4] that the Court of Chancery has sole jurisdiction of cases which involve piercing the corporate veil. See *Park Oil, Inc. v. Getty Refining and Marketing Co.*, Del. Supr., 407 A.2d 533 (1979); *John Julian Construction Co. v. Monarch Builders, Inc.*, Del. Supr., 324 A.2d 208 (1974); *Sonne v. Sacks*, Del. Supr., 314 A.2d 194 (1973). Plaintiff's last contention, however, presents a legal issue over which this Court has jurisdiction.

The *Restatement (Second) of Contracts* § 90(1) (1979) sets forth the doctrine of promissory estoppel as follows:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

A cause of action based upon the doctrine of promissory estoppel has two elements. The plaintiff must prove that there actually was a promise and that the plaintiff in reliance upon that promise took action to his detriment. *Haveg Corp. v. Guyer*, Del. Supr., 226 A.2d 231 (1967) [*5] *Metropolitan Convoy Corp. v. Chrysler Corp.*, Del. Supr., 208 A.2d 519 (1965).

Plaintiff has introduced into evidence a letter which it claims constitutes a promise by DVC to stand behind the debts of Delmarva Hardware. It claims that as a result of receiving this letter, it forbore from taking any action to collect on the overdue amount then owed by Delmarva Hardware and extended more credit to Delmarva Hardware to its further detriment. The letter, dated Nov. 8, 1984, is addressed to plaintiff on stationary of the law offices of Gerald S. Klein, Chartered, and is signed by Gerald S.

Klein. The letter specifically refers to the account with Delaware (sic) Hardware and states in pertinent part:

This office represents Delmarva Venture Corporation and its various subsidiaries of Selbyville, Delaware. At least one of the Delmarva Venture Corporation companies has an account with your firm that is, at least partly, overdue. We, first, wish you to understand how this occurred and what steps are being taken to rectify it.

As of this date, DVC subsidiaries are owed approximately 2.5 million dollars by a developer in Ocean City . . . . The developer, in turn, has [*6] been unable to pay these charges . . . due to the failure of the construction lender to pay draws validly required. . . . The difficulties with your account are the direct result of this situation and not of any intrinsic weakness in DVC or, for that matter, in the developer.

We believe that the solution to these problems will be in hand within several days, that the developer's requirements will be funded by alternative financing and that the monies owed to DVC will be paid. Thereupon, we would expect to pay what is owed to your Company on a fully current basis.

We recognize that, notwithstanding these extenuating circumstances, it is Delmarva Venture Corporation's responsibility to rehabilitate its credit relationships, and we are optimistic that you will soon find that responsibility to have been satisfactorily discharged and that all concerned will progress into a mutually profitable, future relationship.

Defendant denies that it ever agreed to stand behind the debts of Delmarva Hardware and contends that the letter of Nov. 8, 1984 does not constitute such a promise or guaranty. It argues that the language of the letter expresses merely a hope that credit relationships could be [*7] rehabilitated and not a promise to pay a debt.

According to the Restatement § 2(1), "[a] promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." The phrase "manifestion of intention" implies an external or objective standard for interpreting conduct. Id. at Comment b. It is the Court's opinion that a reasonable person in plaintiff's circumstances, that is a commercial creditor, would interpret the language of the letter as evincing a promise by DVC to guarantee payment of the existing and future debts of its subsidiary Delmarva Hardware.

Defendant points out that the letter relied on by plaintiff was written on the law office stationary of Gerald S. Klein and not on the letterhead of DVC and was signed solely by Klein as an attorney and not as an officer of DVC. Although the defendant has not expounded on the significance of these facts, the Court surmises that defendant is arguing that plaintiff had notice by virtue of the different stationary that Klein was not representing the corporation and had no authority to bind the corporation by his promise. Defendant, [*8] however, does not argue that Klein lacked the actual authority as attorney for the corporation to make such a promise on behalf of DVC.

During the trial Randy Streicher, credit manager of Martin-Senour Paints, testified that in the beginning prior to extending any credit to Delmarva Hardware, he was in possession of a Dun & Bradstreet report indicating the inter-corporate relationships of DVC, Delmarva Hardware, the other subsidiaries and their officers, directors and shareholders. He knew that Klein was "chairman" of both DVC and Delmarva Hardware. As a result of

Apx. 454

Klein's letter, Streicher forbore from taking any further action on the overdue account which totaled $16,474.93. In January, 1985, plaintiff received two checks from Delmarva Hardware in the amounts of $1,216.22 and $400.00. The checks were co-signed by Klein and Miller. Plaintiff then extended further credit to Delmarva Hardware in the amount of $5,423.26 for materials subsequently invoiced.

Regardless of whether Klein represented himself in the letter as either attorney, executive vice president or director of DVC, all three positions consititute merely agents of the same principal, DVC, a corporation that cannot [*9] act except through its agents. In his letter of Nov. 8, 1984 Klein had the apparent authority to bind the corporation to the promise to pay the debts of Delmarva Hardware by virtue of the corporation knowingly permitting him to write the letter to the plaintiff. *3 Am. Jur. 2d, Agency* § 78 (1986). Streicher reasonably concluded that Klein was acting for DVC because of his knowledge that Klein controlled DVC. Therefore, Klein's letter of Nov. 8, 1984 is capable of binding DVC to pay the $21,443.72 owed by Delmarva Hardware. See *International Boiler Works Co. v. General Waterworks Corp.*, Del. Supr., 372 A.2d 176, 177 (1977) ("Ordinarily, an agent can bind the principal on an apparent authority basis only if the third person involved reasonably concludes that the agent is acting for the principal.").

The Court finds that plaintiff relied on defendant's promise to its detriment by forbearing from taking any action to collect on the overdue accounts and by extending further credit to Delmarva Hardware, for total damages of $21,443.72. Given the circumstances of a debt overdue to a supplier, DVC reasonably should have expected that its promise to stand behind the [*10] debts of its subsidiary, coupled with assurances of financial soundness and future business relations, would have induced plaintiff to forbear from taking any action to collect on the debt and to extend further credit to defendant's subsidiary. Since injustice can be avoided only by enforcement of defendant's promise, it is the decision of this Court to enter judgment in favor of the plaintiff.

IT IS SO ORDERED.