LEXSEE 1991 U.S. DIST. LEXIS 7406

THE EXCELLO PRESS, INC., an Illinois corporation; THE OFFICIAL UNSECURED CREDITORS COMMITTEE OF EXCELLO PRESS, INC.; DOROTHY FELDMAR and GARY FELDMAR, as executors of the estate of Milton Feldmar; MILDOR CO., a Delaware corporation; GARY FELDMAR, individually; BERNARD J. REISEN, as Trustee of G. F. 1982 Trust A under Agreement dated October 26, 1982 and as trustee of G. F. 1982 Trust B under Agreement dated October 26, 1982, and LOCAL 458 OF THE GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, AFL-CIO, Plaintiffs, v. MAXWELL HOLDINGS, INC., a Delaware corporation, BPCC (U.S.), INC., a Delaware corporation, THE BRITISH PRINTING & COMMUNICATIONS PLC, a corporation organized under the laws of the United Kingdom of Great Britain, and MAXWELL COMMUNICATIONS & INFORMATION CORPORATION, a corporation under the laws of the United Kingdom of Great Britain, Defendants

No. 88 C 3638

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1991 U.S. Dist. LEXIS 7406

May 30, 1991

JUDGES: [*1]

Hubert L. Will, United States District Judge.

OPINIONBY:

WILL

OPINION:

FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

The court, having heard the evidence and the closing arguments of counsel, having read the final pretrial order, including the stipulation of uncontested facts as well as the depositions and exhibits received in evidence and the briefs filed by the parties, makes the following Findings of Fact and Conclusions of Law and enters its Opinion. Any stipulated facts not specifically included are incorporated by reference as are any additional facts found narratively in the Opinion.

*FINDINGS OF FACT*

*A. THE PARTICIPANTS*

1. Plaintiff The Excello Press, Inc. ("Excello") is an Illinois corporation.

2. On October 11, 1985, Excello filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of Illinois (Case No. 85 B 13649). Excello is the Debtor and Debtor-in-possession and is presently

Case 1:04-cv-00583-GMS   Document 139-23   Filed 03/31/2006   Page 2 of 15

Page 2
1991 U.S. Dist. LEXIS 7406, *

exercising its duties pursuant to 11 U.S.C. § 1107.

3. Plaintiff the Official Unsecured Creditors' Committee of Excello ("Committee") is the committee of unsecured creditors which the United States [*2] Trustee for the Northern District of Illinois appointed on November 7, 1985 pursuant to 11 U.S.C. § 1102.

4. Plaintiffs Dorothy Feldmar, Gary Feldmar and Bernard J. Reisen are residents of Illinois. Plaintiff Mildor Co. is a Delaware corporation. Gary Feldmar, individually, Gary Feldmar, Dorothy Feldmar and Bernard J. Reisen as trustees, and Mildor Co. (collectively, the "Feldmars") hold title to all of the issued and outstanding preferred and common stock of Excello.

5. Plaintiff Local 458 (formerly 245) of the Graphic Communications International Union, AFL-CIO ("Union") is a labor organization engaged in representing employees in various bargaining units in the commercial printing industry in the metropolitan Chicago area. At all relevant times, the Union was the duly designated and recognized collective bargaining representative of the lithographic production employees of Excello working in Elk Grove Village, Illinois.

6. Defendant Maxwell Holdings, Inc. is a Delaware corporation and is a successor corporation to BPCC (U.S.), Inc. BPCC (U.S.) Inc. merged into BPCC Holdings, Inc. and BPCC Holdings, Inc. was subsequently renamed Maxwell Holdings, Inc. Maxwell Holdings, Inc. will [*3] be referred to herein as "BPCC." Defendant Maxwell Communications Corporation PLC is a corporation organized under the laws of the United Kingdom of Great Britain and is the parent corporation of Maxwell Holdings, Inc. Maxwell Communications Corporation PLC was formerly known as The British Printing and Communication Corporation PLC. Maxwell Communications Corporation PLC will be referred to herein as "British Printing."

7. At all relevant times, Roy B. Hodgson ("Hodgson") was the president of BPCC.

8. At all relevant times, John A. O'Hara ("O'Hara") was the Chairman of the Board of BPCC.

9. At all relevant times, Richard Baker ("Baker") was the Deputy Managing Director and a director of British Printing.

10. At all relevant times, I. Robert Maxwell ("Maxwell") was the Chairman of the Board and Chief Executive Officer of British Printing, publisher of Mirror Group Newspapers, and has substantial interests in and is Chairman and Chief Executive Officer of other companies including MacMillan, Inc., Thomas Cook, U.S.A., Official Airline Guides, Inc. and Pergamon Holdings.

11. At all relevant times, Ellis J. Freedman ("Freedman") was a New York attorney representing defendants.

12. At [*4] all relevant times, David Elia ("Elia") was an agent of defendants.

13. At all relevant times, Jeffrey Brown ("Brown") was an agent of defendants.

14. At all relevant times, Ronald L. Peterson ("Peterson") was an agent of defendants.

15. At all relevant times, Eugene Laster ("Laster") was Excello's Vice-President of Finance.

16. Prior to July 25, 1985, Gary Feldmar ("Feldmar") was the President of Excello.

17. At all relevant times, Katten, Muchin, Zavis, Pearl & Galler (now Katten, Muchin & Zavis) ("Katten, Muchin") acted as legal counsel for Excello and the selling shareholders.

Case 1:04-cv-00583-GMS    Document 139-23    Filed 03/31/2006    Page 3 of 15

Page 3
1991 U.S. Dist. LEXIS 7406, *

18. Allan Muchin, Steven Neumer ("Neumer"), Michael Moss ("Moss") and Cheryl Heisler ("Heisler") were the attorneys from Katten Muchin representing Excello and the Feldmars.

19. The law firm of Laner, Muchin, Donbrow and Becker, Ltd. represented Excello in its labor matters for many years. Arthur Muchin, a partner in the firm, took over responsibility for Excello's legal work relating to labor matters in the 1970s.

20. Coopers & Lybrand's Chicago office represented Excello and the selling shareholders as a consultant to help structure a sale of Excello's business. Coopers & Lybrand also were Excello's regular [*5] accountants and auditors.

21. In late 1984, defendants hired Coopers & Lybrand's New York office to assist BPCC in the investigation of companies which BPCC was looking to purchase and in April 1985 asked them to assist in the acquisition of Excello.

22. For many years prior to April 9, 1985, Coopers & Lybrand also provided accounting, auditing and other services to British Printing and other related companies. Coopers & Lybrand continues to provide accounting, auditing and other services to the defendants and other related companies.

23. At all relevant times, Norberto Ellemberger ("Ellemberger") was the New York Coopers & Lybrand partner responsible for managing Coopers & Lybrand's work for the defendants on the Excello acquisition. Ellemberger also is the partner currently in charge of all work performed by Coopers & Lybrand for the defendants' printing companies located in the United States.

24. The New York Coopers & Lybrand professionals who worked on behalf of defendants on the Excello acquisition included: Ellemberger, Stuart Mitchell ("Mitchell"), and Thomas Grudichek ("Grudichek"). Fred Montgomery ("Montgomery") also worked on behalf of defendants on the Excello acquisition [*6] at least up until August 14, 1985.

25. The Chicago Coopers & Lybrand professionals who worked on behalf of Excello and the selling shareholders on the sale included: Sherri Speakman ("Speakman") and Ted Sykes ("Sykes").

B. THE CONTRACT

26. From April 9, 1985 through July 25, 1985, Excello, the Feldmars and BPCC negotiated the terms of a purchase agreement for the purchase of the stock of Excello by BPCC.

27. Defendants instructed Coopers & Lybrand to begin an examination of Excello while the parties were still negotiating the terms of the purchase agreement.

28. Beginning on June 10, 1985 and continuing through September 10, 1985, Peterson, representing BPCC, was physically present at Excello's Elk Grove Village plant.

29. In June, 1985, Peterson and Laster prepared plaintiffs' Exhibit 24, a document entitled "Business Plan Excello Press June 17, 1985." Peterson gave the business plan to Hodgson and O'Hara.

30. During the week of June 17, 1985, Hodgson, Laster and Peterson met to review and discuss parts of plaintiffs' Exhibit 24.

31. Elia drafted plaintiffs' Exhibits 22, 23 and 26 and sent them to O'Hara and Hodgson on or about the dates stated in each of the exhibits.

32. [*7] On July 22, 1985, Brown, an agent of defendants, sent Joint Exhibit 3 to Laster.

33. Excello posted Joint Exhibit 4 on the bulletin board in its Elk Grove Village, Illinois plant.

34. On July 25, 1985, BPCC, Excello and the Feldmars entered into plaintiffs' Exhibit 51, the Stock Purchase Agreement ("Agreement"). After July 25, representatives of the parties worked on preparing the necessary documents for the closing.

35. On August 2, 1985, the board of directors of British Printing voted that British Printing would execute a guarantee for the benefit of the Feldmars of BPCC's obligations under the Stock Purchase Agreement.

36. On August 2, 1985, Maxwell and Baker executed plaintiffs' Exhibit 69 which is a guaranty issued by British Printing to the Feldmars in the form of Exhibit B to the Stock Purchase Agreement, guaranteeing BPCC's performance under the Stock Purchase Agreement.

37. On August 5, 1985, the Federal Trade Commission approved the acquisition of Excello by BPCC pursuant to the Hart-Scott-Rodino Act.

38. On August 7, 1985, Freedman sent defendants' Exhibit 46 to Katten, Muchin.

39. On August 21, 1985, the board of directors of British Printing voted to ratify the guarantee [*8] of British Printing to the Feldmars of BPCC's obligations under the Stock Purchase Agreement with Excello. Baker prepared and signed minutes of that meeting which are plaintiffs' Exhibit 85.

40. On August 23, 1985, Freedman sent defendants' Exhibit 63 to counsel for Excello and the selling shareholders.

41. On August 26, 1985, Edmund Galvin ("Galvin"), the Chicago Coopers & Lybrand partner in charge of the Excello account, sent plaintiffs' Exhibit 92 to Ellemberger, the New York Coopers & Lybrand partner in charge of the Maxwell account.

42. On August 28, 1985, Freedman sent defendants' Exhibit 76 to Katten, Muchin.

43. On August 30, 1985, O'Hara prepared, signed and transmitted plaintiffs' Exhibit 104, which is a memorandum entitled "Summary of Excello Situation," to Maxwell in London.

44. On August 30, 1985, the Feldmars and Excello sent Joint Exhibit 14 to defendants' counsel stating that they were "ready, willing and able to close on August 31, 1985."

45. The sale of Excello did not close on August 31, 1985.

46. On August 29, 1985 and September 3, 1985, Coopers & Lybrand issued plaintiffs' Exhibits 101 and 114 to defendants' counsel Freedman. Hodgson and O'Hara also received copies [*9] of plaintiffs' Exhibits 101 and 114.

47. On September 3, 1985, O'Hara signed the Peterson employment agreement that is part of plaintiffs' Exhibit 109 and transmitted plaintiffs' Exhibit 109 to Peterson.

48. On September 10, 1985, defendants notified Excello and the Feldmars in writing that defendants considered the Stock Purchase Agreement and guarantee terminated.

C. THE UNION'S ROLE

49. On or about May 1, 1983, Excello and the Union entered into plaintiffs' Exhibit 133, a collective bargaining agreement covering the time period of May 1, 1983 through April 30, 1987 ("Collective Bargaining Agreement").

50. On July 23, 1984, Excello's labor counsel, Arthur Muchin, sent plaintiffs' Exhibit 4A to Harry Conlon ("Conlon"), the Union's President, requesting that the Union and Excello meet as soon as possible to discuss Excello's obtaining temporary economic relief from the terms of the collective bargaining agreement.

51. On August 7, 1984, Arthur Muchin, Feldmar, Laster, Conlon, George Evert ("Evert"), the Union's Vice-President, and Rich Catalano ("Catalano"), the Union's shop steward, met to discuss whether the Union would consider negotiating with Excello about concessions [*10] to the Collective Bargaining Agreement.

52. On August 27, 1984, Conlon sent plaintiffs' Exhibit 5 to Feldmar in which Conlon notified Feldmar that the Union's Executive Board had decided not to renegotiate the terms of the Collective Bargaining Agreement.

53. In May 1985, defendants demanded that Excello's Union agree to concessions to its collective bargaining agreement. (Plaintiffs' Exhibits 11, 12 and 14) Some time in May, Hodgson told Arthur Muchin and Laster that, unless Excello obtained concessions from the Union which were acceptable to BPCC, no purchase would take place. Hodgson stated that BPCC's objective was to secure $ 650,000 in annual cost savings through changes in the Collective Bargaining Agreement.

54. Pursuant to those discussions, Laster and Arthur Muchin developed a list of possible concessions which, according to Laster, would result in the $ 650,000 annual savings required by BPCC. (Defendants' Exhibit 122) Laster and Arthur Muchin prepared the list of possible concessions only because of the condition which BPCC had placed on any purchase of Excello.

55. On May 24, 1985, Arthur Muchin met with Hodgson at Freedman's New York City office to discuss BPCC's specific [*11] priorities in any discussions with the Union. During the May 24, 1985 meeting, Arthur Muchin discussed the list of possible concessions with Hodgson item by item. Hodgson identified those items which were mandatory for BPCC, those which were important but not mandatory, and those which were "walk-aways" which BPCC was prepared to give away during negotiations.

56. While at Freedman's office on May 24, 1985, at Hodgson's directions, Arthur Muchin telephoned Conlon, President of the Union. During that telephone conversation, Arthur Muchin informed Conlon that Excello was "going under" within a month and that BPCC was the only potential purchaser. He stated that BPCC would accept the then-existing union contract, but that BPCC needed $ 650,000 in concessions from the Union in order to proceed with the transaction. He also stated that BPCC was willing to install new equipment at Excello and was not out to "bust" the union. Conlon stated that he was willing to meet and discuss the situation. Arthur Muchin arranged to telephone Conlon again on Memorial Day, which was May 27, 1985, to inform him what concessions BPCC would need and to discuss when he, Conlon and Hodgson could meet.

57. On [*12] May 27, 1985, Arthur Muchin again telephoned Conlon and told him that Excello had received a letter from The American National Bank ("ANB"), its principal secured lender, advising Excello that, absent a purchase, Excello's loan obligations would be declared to be in default. Arthur Muchin read the letter from ANB to Conlon. (Defendants' Exhibit 26) He reiterated to Conlon that BPCC was not prepared to proceed with the purchase of Excello without receiving concessions from the Union, and he listed the specific concessions BPCC wanted. At the conclusion of this telephone conversation, Conlon agreed to meet with Arthur Muchin and Hodgson for dinner on June 4, 1985. (Defendants' Exhibit 28)

58. On June 4, 1985, Messrs. Muchin, Hodgson, Conlon and Evert met for dinner at the Hamilton Hotel in Itasca, Illinois. During that meeting, Hodgson reiterated that BPCC would not purchase Excello unless the Union made

concessions in the areas of wages, hours and manning, which Hodgson described in general terms. Hodgson also generally explained the operations of BPCC and Excello's financial difficulties.

59. On June 7, 1985, Arthur Muchin met briefly with Conlon at the Union's office to schedule [*13] a formal meeting. At that time, he gave Conlon a written list of the proposed concessions, which he had prepared based on his May 24, 1985 meeting with Hodgson. The parties agreed to meet on June 19, 1985. (Plaintiffs' Exhibit 132)

60. On June 19, 1985, Arthur Muchin, Feldmar, Laster, Hodgson, Conlon, Evert and Rich Panella ("Panella"), one of Excello's shop stewards, met at Excello's offices to discuss BPCC's request for changes to the Collective Bargaining Agreement. At the outset of that meeting, Arthur Muchin reiterated that Excello "must have help" or it would fold "within weeks." Feldmar then reviewed the proposed concessions which the Union had rejected in 1984, and stated that the BPCC purchase was the only alternative to foreclosure on Excello's collateral by ANB. Shortly thereafter, Feldmar left the meeting. Arthur Muchin again read ANB's May 20, 1985 letter to Excello, and Laster stated that Excello had continued its downward trend in May, with customers beginning to "walk away" because of the company's financial condition. Arthur Muchin stated that, after the BPCC purchase, Feldmar would only be a salesman on commission for Excello.

61. Hodgson also addressed the Union [*14] representatives. He stated that British Printing was the largest printer in England and that it was listed on the London Stock Exchange, with 61 percent of its stock owned by Sir Robert Maxwell, the principal of the London Daily Mirror. Hodgson further stated that British Printing employed some 12,000 employees in England, and was "100 percent union." In addition, Hodgson stated that, if the purchase of Excello was consummated, there would be room for expansion, and that BPCC would "need everyone's help" to turn Excello around as soon as possible. Hodgson stated that the only thing that stood in the way of BPCC purchasing Excello was that the Union had to grant Excello the proposed concessions.

62. On June 21, 1985, Hodgson, Feldmar, Laster, Arthur Muchin, Conlon, and Evert met with Excello's employees who were members of the Union in the Excello press room. The Union distributed a written summary of the proposed concessions to the employees. (Plaintiffs' Exhibit 29) Feldmar began the meeting by introducing Hodgson to the employees as a representative of BPCC, the potential buyer of Excello. After his brief introduction, Feldmar turned the meeting over to Hodgson.

63. Hodgson again [*15] described British Printing as the largest printer in the United Kingdom and a highly successful company which dealt with many unions in the United Kingdom. He stated that BPCC was able to invest in new equipment, and that if the Union approved the proposed concessions, BPCC would proceed with its purchase of Excello, put new equipment in the plant, and bring in additional work. He also stated that the only remaining condition to BPCC's purchase of Excello was the approval of the proposed concessions by the Union's membership.

64. After Hodgson finished his address, Messrs. Muchin, Feldmar, Laster and Hodgson left the meeting. Conlon and Evert remained in the meeting and recommended to the membership that the concessions be approved, in light of BPCC's representation that it would purchase Excello if they were approved. Following a brief discussion, the concessions were overwhelmingly approved.

65. On June 25, 1985, Excello and the Union executed plaintiffs' Exhibit 31, entitled "Supplemental Agreement Between Excello Press Inc. and Local 458, Graphic Arts International Union" ("Supplemental Agreement"). The Supplemental Agreement went into effect on July 1, 1985. Between July 1, 1985 [*16] and September 10, 1985, members of the Union gave up $ 66,945.59 in wages as a result of the work week and overtime changes implemented under the Supplemental Agreement.

### D. THE TRADE CREDITORS' ROLE

66. At the time that Excello entered into the Stock Purchase Agreement with the defendants, Excello was suffering cash flow problems and did not always have the necessary cash to purchase inventory and supplies. Excello had fallen behind on the payment of its accounts payable, and some vendors had stopped supplying goods to Excello on credit.

67. During 1984 and continuing in 1985, Laster often negotiated with suppliers for credit sales by paying earlier bills in order to obtain new shipments on credit.

68. For example, during 1985, Excello became delinquent in paying its bills to Rickard Circular Folding ("Rickard Circular"). Rickard Circular is a trade bindery which takes printed press products and folds, cuts and stitches the printing into final product. Prior to 1983, Jack Rickard ("Rickard"), the President of Rickard Circular, never questioned Excello's ability to pay its bills in a timely fashion. After its move to Elk Grove Village in 1983, Excello started to fall behind [*17] in payment of its bills to Rickard Circular. By 1985, the problem had become serious. At least once a month during the first half of 1985, Rickard spoke with Laster and told him that Excello was delinquent. By the spring of 1985, Rickard accepted fewer and fewer orders from Excello.

69. By late spring 1985, the situation had so deteriorated that Rickard finally informed Excello that there would be no extensions of additional credit unless Rickard Circular was paid on existing extensions of credit.

70. Similarly, in July 1985, John Dean ("Dean"), the Vice-president of Whitaker-Carpenter-Marquette ("Whitaker-Carpenter"), a paper merchant, told Laster in a telephone call that his company would not extend any new credit to Excello.

71. In the spring of 1985, Forest-Atwood Paper Company ("Forest-Atwood"), another of Excello's paper suppliers, also began reviewing each order from Excello and limiting Excello's credit.

72. In the spring of 1985, Excello's largest paper supplier, Hobart/McIntosh Paper Company ("Hobart/McIntosh") also limited Excello's credit. Prior to the time that Excello moved to Elk Grove Village, Excello was a discounting customer of Hobart/McIntosh, which meant that [*18] Excello paid its bills early and received an early payment discount. After its move, Excello stopped discounting. During 1984, Excello brought its bills with Hobart/McIntosh current. However, beginning in the winter of 1985, Excello again stopped discounting. As Excello's time of payment increased, Hobart/McIntosh's Vice-President of Finance, Timothy Bondy ("Bondy"), became more concerned.

73. In the late spring of 1985, Bondy and Laster met at Bondy's offices at Hobart/McIntosh. At that meeting, Laster gave Bondy copies of Excello's financial statements for the first time. After reviewing the financial statements, Bondy determined that ceasing all credit was not a viable option because it would force a bankruptcy filing by Excello. Bondy determined instead that he had to closely

monitor the credit and limit the amount of Hobart/McIntosh's exposure.

74. Because of these problems with vendors, in late July, 1985, Laster spoke with Hodgson on several occasions regarding Excello's cash flow problems. Feldmar participated in some of the meetings. During those meetings, Hodgson stated that he was seriously concerned that Excello would not be able to continue to obtain goods from its vendors [*19] on credit between the date the contract was signed and the scheduled closing date of August 31, 1985. To solve this problem, Hodgson told Laster he was authorized to tell any Excello trade creditors who were concerned about extending additional credit to Excello that defendants would pay all trade debts within a few days after the closing. Hodgson also told Laster to tell any vendors who were critical of Excello's operations about Peterson's appointment as interim president. He also told Laster that defendants would invest approximately $ 4 million in Excello. At the time that he authorized Laster to make these statements, Hodgson apparently did not intend to pay all creditors in full after closing although he did not so advise Laster.

75. From July 25, 1985 throughout the month of August, 1985, Laster and other managers at Excello had a series of conversations with representatives of a number of suppliers including Hobart/McIntosh, Rickard Circular, Whitaker-Carpenter, and Forest-Atwood regarding payment of their bills after the closing of the Stock Purchase Agreement.

76. In late July 1985, Rickard had several conversations with middle-level managers at Excello. The middle-level [*20] managers, on instruction from Laster, told Rickard (a) that defendants were buying Excello, (b) that Peterson was the new president of Excello and that he was managing the company, (c) that defendants were going to pay all past due bills after the closing and (d) that Rickard Circular would be paid in September, 1985.

77. As a result of these representations, Rickard Circular increased its sales to Excello. Between July 25, 1985 and September 10, 1985, Rickard Circular extended the following credit to Excello:

RICKARD CIRCULAR FOLDING

| Invoice No. | Date | Ship Date n1 | Amount |
| --- | --- | --- | --- |
| 77739 | 08/19/85 | 08/13/85 | $ 4,678.34 |
| 77754 | 08/19/85 | 08/12/85 | $ 2,855.64 |
| 77770 | 08/22/85 | 08/09/85 | $ 924.96 |
| 77773 | 08/23/85 | 08/19/85 | $ 1,391.50 |
| 77738 | 08/30/85 | 08/16-29/85 | $ 26,330.74 |
| 77790 | 08/30/85 | 08/21/85 | $ 5,605.16 |

1991 U.S. Dist. LEXIS 7406, *

RICKARD CIRCULAR FOLDING

| | | | |
|---|---|---|---|
| 77828 | 08/30/85 | 08/29-30/85 | $ 4,188.02 |
| 77774 | 09/13/85 | 09/06/85 | $ 12,828.48 |
| TOTAL: | | | $ 58,802.84 |

[*21]

n1 The Ship Date refers to the dates upon which Rickard Circular shipped product to Excello.

78. Dean of Whitaker-Carpenter spoke with Laster twice in the beginning of August. During the first conversation, Laster told Dean that British Printing was going to acquire Excello and that the acquisition would take place within a month. Laster also told Dean that British Printing had its own person running Excello's operations and that British Printing would look favorably upon the fact that Whitaker-Carpenter was helping Excello through its rough period. Laster also said that British Printing was a discounting company and that it intended to discount with all of Excello's vendors once the sale closed. Laster told Dean that he had authority to tell suppliers that they would continue to use the same suppliers and that defendants would cause Excello to pay their bills.

79. As a result of Laster's statements, Whitaker-Carpenter began accepting new orders from Excello.

80. Between August 8, 1985 and September 10, 1985, Whitaker-Carpenter [*22] extended the following credit to Excello:

WHITAKER CARPENTER

| Invoice No. | Date | Amount |
|---|---|---|
| 278804 | 08/08/85 | $ 18,663.70 |
| 282230 | 08/24/85 | $ 48,158.82 |
| 1282230 | 08/26/85 | $ 35,291.42 |
| 285905 | 09/10/85 | $ 873.97 |
| 286191 | 09/10/85 | $ 2,056.40 |
| TOTAL: | | $ 105,044.31 |

1991 U.S. Dist. LEXIS 7406, *

81. In late July, 1985, Thomas O'Brien ("O'Brien") of Forest-Atwood met with Laster. Laster told O'Brien that defendants were purchasing Excello, that Feldmar had been relieved of all of his duties, and that British Printing's agent, Ron Peterson, had been appointed interim president and was already at work. Laster also told O'Brien that in early September, defendants would pay all of Excello's vendors and would begin discounting future orders.

82. As a result of that meeting, O'Brien was no longer concerned about being paid for his bills and wanted to show his support to defendants [*23] so that they would continue to buy paper from him after September, 1985.

83. Between July 31, 1985 and September 10, 1985, Forest-Atwood extended the following credit to Excello:

FOREST ATWOOD

| Invoice No. | Date | Ship Date n1 | Amount |
|---|---|---|---|
| 68968 | 07/31/85 | n2 | $ 21,038.52 |
| 69219 | 08/12/85 | 08/21/85 | $ 13,195.95 |
| 69524 | 08/19/85 | 08/10/85 | $ 5,387.13 |
| 69928 | 08/27/85 | 08/17 & 19/85 | $ 42,218.06 |
| 70405 | 08/30/85 | 08/27-28/85 | $ 102,751.11 |
| 70417 | 09/06/85 | 08/31/85 | $ 22,890.78 |
| 70418 | 09/06/85 | 08/31/85 | $ 20,805.40 |
| 70623 | 09/11/85 | 09/03/85 | $ 17,487.28 |
| 70808 | 09/17/85 | 09/10/85 | $ 17,395.27 |
| TOTAL: | | | $ 263,169.50 |

n1 The Ship Date refers to the dates upon which Forest-Atwood shipped product to Excello.
[*24]

n2 The Ship Date is unavailable.

84. On July 25, 1985, Bondy and Hobart/McIntosh's President, Edwin Curtis, attended a meeting with Laster and Feldmar. Bondy and Curtis learned that the Stock Purchase Agreement between Excello and BPCC had been signed that day.

85. On or about July 29, 1985, Bondy saw an announcement confirming that the Stock Purchase Agreement had been signed and that Ronald Peterson had been appointed acting president of Excello.

86. In early August 1985, Bondy met with Laster at Excello's offices. Laster told Bondy that Feldmar's participation in Excello would be limited to sales only, BPCC's new personnel would handle management, planning and administration, Laster would have increased responsibilities and that these changes had already taken place. Laster told Bondy that BPCC would guarantee Excello's debts and pay trade creditors' claims. Laster also told Bondy that the closing would be at the end of August 1985, because that is when Excello's fiscal year ended and that there were no unusual conditions that would cause difficulty in closing. Bondy asked Laster if Laster had [*25] authority to give him this information. Laster told him that BPCC was aware of everything that Laster was telling Bondy and other creditors and that he was acting on BPCC's behalf.

87. Throughout the month of August, Laster and Bondy had several conversations. Each time, Laster told Bondy that BPCC would pay creditors in full in September, 1985.

88. As a result of the information Laster gave to Bondy, Hobart/McIntosh relaxed its credit policy to Excello and no longer attempted to limit its credit exposure.

89. On August 30, 1985, Laster and Bondy met again. Laster again told Bondy that BPCC was guaranteeing Excello's debt, and that BPCC would infuse sufficient cash into Excello so that Excello could become current on its payments to its trade suppliers and continue purchasing from those trade suppliers as a discounting customer. Bondy also asked Laster whether there were any "odd ball" conditions which would prevent the closing and Laster stated that BPCC and Excello were merely tying down loose ends and that there were no issues that would prevent a closing.

90. Between July 25, 1985 and September 10, 1985, Hobart/McIntosh extended the following credit to Excello:

HOBART/MCINTOSH PAPER COMPANY

| Invoice No. | Date | Ship Date n1 | Amount |
| --- | --- | --- | --- |
| 68709 | 07/31/85 | 08/01/85 | $ 19,615.42 |
| 68654 | 07/31/85 | n2 | $ 76,041.95 |
| 68751 | 08/07/85 | 07/30/85 | $ 19,494.56 |
| 55901 n3 | 08/14/85 | 08/13/85 | $ 18,507.02 |
| 68883 | 08/15/85 | 08/12/85 | $ 19,270.13 |
| 68929 | 08/20/85 | 08/06/85 | $ 19,065.53 |

HOBART/MCINTOSH PAPER COMPANY

| Invoice No. | Date | Ship Date n1 | Amount |
|---|---|---|---|
| 68933 | 08/20/85 | 08/14/85 | $ 19,795.35 |
| 68893 | 08/20/85 | 08/09/85 | $ 37,187.34 |
| 68919 | 08/21/85 | 08/21/85 | $ 23,489.49 |
| 68917 | 08/23/85 | n2 | $ 6,974.75 |
| 68974 | 08/26/85 | 08/12/85 | $ 3,837.71 |
| 68727 | 09/10/85 | 07/31/85 08/15/85 08/19/85 | $ 10,732.74 |
| 69150 | 09/10/85 | 09/05/85 | $ 18,239.49 |
| 69174 | 09/10/85 | 09/06/85 | $ 4,587.54 |
| 69159 | 09/10/85 | 09/09/85 | $ 17,312.89 |
| 48662 | 09/10/85 | 09/06/85 | $ 155.23 |
| 69183 | 09/10/85 | n2 | $ 44,609.29 |
| TOTAL: | | | $ 358,916.43 |

[*26]

   n1 The Ship Date refers to the dates upon which Hobart/McIntosh shipped product to Excello.

   n2 The Ship Date is unavailable.

   n3 The invoice number represents Hobart/McIntosh's internal purchase order number.

91. Throughout the month of August, Hodgson would ask Laster how Excello's vendors were reacting to the news of the sale to BPCC. Laster reported that the trade creditors were again granting trade credit to Excello and that Excello was purchasing more inventory. Hodgson told Laster he was pleased with the vendors' responses.

92. Neither Hodgson nor anyone else acting on behalf of defendants ever told Laster that, in fact, defendants were considering not paying all trade creditors in full in September.

93. The trade debt incurred by Excello in July, August and early September 1985 was for paper and other supplies purchased in the ordinary course of business in order for Excello to fill its regular orders by customers.

E. THE SALES TAX BREACH ISSUE

94. Excello and the sellers represented and warranted [*27] in Section 3.1(F) of the Agreement that the financial statements annexed to the Agreement "are true, correct and complete and present fairly the financial

position and result of operations of Excello for the relevant periods."

95. Excello and the sellers represented and warranted in Section 3.1(I) of the Agreement that as of the date of the Agreement:

Excello does not have any liabilities, absolute or contingent (including, but not being limited to, liabilities for sales and use tax and liabilities for taxes based upon or measured by income or gross receipts), other than those (1) which are fully reflected in nature and amount on the annual financial statements and on the interim balance sheets; (2) arising from the leases, contracts and commitments described or referred to in the exhibits to this agreement; or (3) incurred in the ordinary course of business for the purpose of obtaining supplies, products, or services at prices not exceeding fair market value.

96. Excello and the sellers represented and warranted in Section 3.1(S) of the Agreement that:

Excello has no liability, either fixed or contingent, accrued or unaccrued, existing or threatened, for any federal, state or [*28] local income, property, sales, gross receipts or other taxes other than those set forth and reflected on the annual balance sheet as of August 31, 1984, except for such customary and normal tax liabilities as Excello may have incurred or accrued from August 31, 1984 to the date of execution hereof by reason of the normal operations of its business and the application of generally accepted tax accounting principles consistently applied.

97. The financial statements annexed to the Agreement included no provision for state sales tax liabilities in New York, Pennsylvania or Minnesota.

98. During fiscal years 1979 through 1984, Excello sold goods to customers located in the State of New York, but did not file sales tax returns with the State of New York.

99. On or about August 2, 1985, the State of New York sent plaintiffs' Exhibit 67 to Excello.

100. In § 3.1 of the agreement, Excello and the sellers disclosed that due to a change in the Illinois Department of Revenue's method of computing Illinois sales tax due from printers, Excello might have liability for additional Illinois sales tax.

101. Excello and the sellers also represented and warranted in Section 3.1(S) of the Agreement that:
[*29]
Excello has duly filed all federal, state and local tax returns and estimates required to have been filed by it at all times and has paid the tax shown to be due on any such returns or estimates filed and no waivers or extensions of the statutory period of limitation within which assessments may be made have been requested or granted with respect to any such returns. All such returns properly and fairly disclose all information required to be disclosed therein.

102. Excello and the sellers represented and warranted under Section 3.1(W) of the Agreement that:

Neither this agreement nor any of the documents required to be furnished pursuant hereto by Excello and Sellers or any of their representatives is false or misleading or contains any material misstatement of fact or omits to state any material fact required to be stated in order to make the statements herein or therein not misleading.

103. Under Section 4.4 of the Agreement, sellers covenanted that, upon becoming aware of any impending or threatened event which would cause any representations or warranties to be untrue, sellers would immediately

provide detailed written notice thereof to BPCC and use their best efforts to prevent [*30] or promptly remedy such breach.

104. New York State law requires a printer to collect and remit sales tax to New York on all material delivered to consumers located in New York or to obtain an "exemption certificate" excusing liability for such taxes, or if delivered to a mailer in New York, to obtain proof from the mailer that the material was delivered to consumers outside of New York. (Def. Ex. 168) Excello's management believed that Excello was not required to file sales tax returns with the State of New York because it delivered its goods in Illinois. Excello delivered the material which it printed for its customers to its customers at its dock in Elk Grove Village, Illinois. Title to the goods passed from Excello to its customers in Illinois.

105. New York has no statute of limitations on collection of sales taxes where sales tax returns have not been filed. New York is active in the collection of taxes from out-of-state firms which do taxable business in New York.

106. Excello opened a sales office in New York in 1979, which remained open until Excello went into bankruptcy. Excello made sales and delivered materials to customers in the State of New York in each of the fiscal [*31] years 1979 through 1984.

107. Prior to 1985, each year when Coopers & Lybrand audited Excello's financial statements, Coopers & Lybrand personnel would review the states where Excello was filing sales tax and other state tax returns. Coopers & Lybrand never instructed Excello to file sales tax returns with the State of New York even though Coopers & Lybrand personnel knew Excello had a sales office in New York.

108. Prior to 1985, Excello had received standardized Nexus questionnaires from the State of New York on a yearly basis. Excello returned the completed forms each year. Although the State of New York asked Excello to begin filing corporate franchise and New York City rent taxes, the State of New York never asked Excello to begin filing New York State sales tax returns or to begin collecting New York State sales tax.

109. As of July 25, 1985, Excello maintained sales personnel in New York, Minnesota and Pennsylvania but had not filed sales tax returns in those states. (Def. Ex. 41)

110. Defendants learned in the course of their due diligence examination, which took place prior to the date on which they signed the Stock Purchase Agreement, that Excello was not filing sales tax [*32] returns with the States of New York, Minnesota or Pennsylvania or collecting sales taxes for these states.

111. On July 15, 1985, Montgomery and Grudichek of New York Coopers & Lybrand went to Excello in connection with the due diligence investigation of Excello for BPCC. Montgomery and Grudichek went to investigate Excello's historical tax compliance and potential tax liabilities.

112. On July 26, 1985, Messrs. Montgomery and Grudichek sent a draft memorandum to Mitchell which reported what they had learned at Excello on July 15. (Pl. Ex. 55) The memo reported that, because of the unavailability of sales information by state, Montgomery did not know whether sales taxes were actually due New York, Minnesota, or Pennsylvania, and if due, what the amount of those taxes might be. The July 26, draft was sent to Mitchell as soon as it was completed. Montgomery was unaware as of July 26 that the Agreement had been executed on July 25.

113. On August 5, 1985, Excello received a letter from the New York State Department of Taxation calling to Excello's attention that it was filing New York State tax returns for other taxes, but not for sales tax. The letter enclosed a Nexus Questionnaire [*33] for Excello to fill out and return. (Pl. Ex. 67)

114. On or about August 5, 1985, Freedman learned from an accountant that Excello's sales office in New York might obligate Excello to file sales tax returns in and pay sales taxes to New York State. Freedman contacted Mitchell of Coopers & Lybrand to inquire whether Excello was required to file state tax returns in New York and whether Excello owed state taxes to New York. Mitchell reported to Freedman that Coopers & Lybrand was attempting to determine that information. Mitchell also told Freedman that Excello was filing returns other than sales tax and had just received the State of New York letter requesting Excello to fill out a Nexus Questionnaire to determine whether Excello should have been filing state sales tax returns in New York. (Def. Ex. 44)

115. On August 7, 1985, Freedman told Neumer, counsel for Excello, and the sellers both by telephone and by letter that BPCC would require certification by Coopers & Lybrand as to the maximum amount of exposure for state sales taxes and that this exposure might preclude closing. (Def. Ex. 46)

116. On the morning of August 14, 1985, Neumer of Katten, Muchin told Freedman in a telephone [*34] conversation that Coopers & Lybrand had seven people at the Excello plant working on the sales tax matter who would be finished by noon and able to report to Freedman at the end of the day. That afternoon, at the Excello plant, Laster informed Freedman that Coopers & Lybrand had done nothing on the sales tax matter and would be coming to Excello on Thursday to look at figures Laster had put together. Freedman and O'Hara called Ellemberger, the New York Coopers & Lybrand partner in charge of the BPCC account, to complain about Coopers & Lybrand not acting on the sales tax issue. They told Ellemberger that the Coopers & Lybrand draft memorandum of July 26, 1985 (Pl. Ex. 197) on state taxes was unclear and not what was needed and that they wanted a Coopers & Lybrand analysis and opinion on maximum exposure they could rely on, including a Coopers & Lybrand study to determine sales volume and type of transaction by state to determine exposure, as recommended in the Coopers & Lybrand July 26, 1985 draft memo. (Pl. Ex. 197, pg. 5) Ellemberger promised clear and satisfactory answers to the sales tax questions. (Def. Ex. 50)

117. The next day, August 15, 1985, Ellemberger called Montgomery [*35] to inform him that BPCC wanted a letter on all of Excello's state tax contingencies and assurances as to Excello's maximum potential state tax exposure. Ellemberger stated that he was coming to Chicago the next day and wanted to meet with Messrs. Montgomery and Grudichek and the Chicago Coopers & Lybrand partners responsible for Excello's tax and audit work.

118. On August 16, 1985, Messrs. Ellemberger, Montgomery and Grudichek met with Larry Freedman, Coopers' Excello tax partner, and Edmund Galvin, Coopers' Excello audit partner. At that meeting, Ellemberger reiterated British Printing's need for assurances with respect to the sales tax issue and stated that the issue could be a "deal breaker." It was decided at the meeting that Excello should be asked to gather more information and that Montgomery and Thomas McGonigle ("McGonigle"), a Coopers & Lybrand manager who had worked on Excello's audits, would return to Excello to re-