view this additional information as soon as possible.

119. After the meeting ended, Messrs. Galvin and Montgomery telephoned Messrs. Feldmar and Laster to explain the need for further information, specifically, records which would reflect Excello's sales on [*36] a state-by-state basis. During the conversation, it was agreed that Laster and others at Excello would gather the Excello information and notify Montgomery when the information was available for his review.

120. On August 20, 1985, Laster called Montgomery to tell him that the requested information was available. On August 21, 1985, Montgomery and McGonigle went to the offices of Excello to review the records. When they arrived at Excello, they were told by Laster and his staff that they were able to reconstruct on a state-by-state basis sales records for the years 1982 through 1985, but that records for years prior to 1982 did not exist. This was of importance to Montgomery because Excello had had a New York sales office since 1979 and sales taxes might be owed to the State of New York from that year forward.

121. Montgomery requested any exemption certificates provided to Excello by its mailers. Laster informed Montgomery that Excello had no exemption certificates.

122. While at Excello on August 21, 1985, Montgomery spoke with Mr. Robert Wood ("Wood"), a Coopers & Lybrand partner in New York, with regard to New York sales tax laws. Wood informed Montgomery that with respect to any [*37] sales that Excello made to mailers in the State of New York, Excello was obligated to collect and remit sales taxes on shipments made by those mailers outside of New York unless Excello obtained documentary proof of such out-of-state mailings from the mailers. After that call, Montgomery asked Laster for this documentation but Laster stated that Excello did not have such records. Montgomery explained to Laster why he needed the information, and Laster suggested that the two of them speak to Feldmar. In Feldmar's office, Montgomery explained the situation to Feldmar, who estimated that only 10 percent of Excello's shipments to New York mailers remained finally in New York state. Montgomery told Feldmar that he needed substantiation for that figure. Feldmar agreed to call some of Excello's New York mailers. Feldmar later told Montgomery that he had called the mailers. The New York mailers he called were Thomas McGee of Publishers Clearing House, Norman Dorff of Columbia Record Club and Alex Levy of North Shore Animal League. Each of them told Feldmar they would check on their distribution and reported to him that about 5 to 10 percent of their nationwide mailings went to New York residents [*38] and that these were conservative estimates. Montgomery was given this information.

123. Feldmar did not ask for his customers' mailing lists because these documents are considered highly confidential. Montgomery never asked Laster or Feldmar to obtain any written documentation from Excello's customers about their estimates.

124. By August 23, 1985, Montgomery had estimated that Excello's possible liability to the State of New York was only $ 120,000. Ellemberger reported this estimate to O'Hara. Based on Ellemberger's estimate that a sales tax audit would cost $ 80,000-100,000 and take several months, O'Hara and Ellemberger agreed that it was not cost effective to further analyze the potential liability. (Joint Ex. 7) On August 26, 1985, Coopers & Lybrand concluded that any potential state tax liability which Excello might have would "not have a material impact" on Coopers & Lybrand's previously issued audit reports. (Joint Ex. 9) On August 28, 1985, Feldmar told Galvin that

Publishers' Clearing House, one of Excello's largest New York customers, with $ 554,152 of the $ 2.7 million in sales shipped into New York, paid use tax directly to the State of New York pursuant to a direct [*39] pay permit and, accordingly, no sales tax was due.

125. On August 29, 1985, Coopers & Lybrand sent a letter to Freedman with copies to O'Hara and Hodgson describing their review of the sales tax "posture" of Excello and commenting on potential tax liabilities. The letter said that Coopers & Lybrand had "estimated . . . Excello's potential net unrecorded sales tax liabilities" based on certain assumptions, including Excello's summaries of sales volume in 1983-85 and other assumptions suggested by Excello. Based upon the information available to it and the noted assumptions, Coopers & Lybrand estimated that Excello might owe $ 140,000 in sales taxes in Illinois, New York and Minnesota. The letter gave no amount or estimate as to maximum or "worst case" exposure to state sales tax liability. (Joint Ex. 12) Also, on August 29, 1985, Freedman called Montgomery and told him that he wanted a more specific report based upon numbers developed by Coopers & Lybrand rather than a calculation based upon Excello's numbers and assumptions. Montgomery agreed to prepare a revised sales tax letter.

126. On September 3, 1985, Coopers & Lybrand sent a second state sales tax letter which adopted the same [*40] Excello information and assumptions which Coopers & Lybrand found to be "reasonable" or "not arbitrary," explained why they so believed and estimated the same tax figure as in the August 29 sales tax letter, which would be a deductible expense for federal income tax purposes and would be subject to indemnification by the selling shareholders. Hodgson accordingly believed a possible sales tax exposure of $ 140,000 to be immaterial in connection with the purchase of a company the size of Excello.

127. The States of New York, Minnesota and Pennsylvania have never made or threatened to make or assess any sales tax or other claims against Excello or its bankrupt estate.

F. OTHER ALLEGED BREACH ISSUES

128. As of July 25, 1985, there had been a claim asserted against Excello by L'Eggs Products, in a case entitled L'Eggs Products v. Excello Press, Inc., Case No. 79-L-22239, which was pending in the Circuit Court of Cook County, in the amount of approximately $ 16,000.

129. The L'Eggs lawsuit, which had been filed in 1979, inactive since 1982, which L'Eggs had offered to settle for $ 9,500 and which was ultimately dropped, is not identified in the Stock Purchase Agreement.

130. On [*41] July 25, 1985, Excello Syndicated Promotions' books did not reflect any liabilities due to Val Pak from Excello Syndicated Promotions. Excello Syndicated Promotions ("Promotions") was a joint venture in which a subsidiary of Excello had a 10 percent interest.

131. On July 30, 1985, after Promotions had asserted a claim of $ 46,000 against Val Pak, the latter sent defendants' Exhibit 59 to Feldmar, which is a letter alleging that Promotions owed Val-Pak $ 653,562.00.

132. On or about August 30, 1985, Promotions and Val Pak exchanged plaintiffs' Exhibit 106, which is a document entitled Mutual General Release dated August 19, 1985, under which Val Pak released any claims against Promotions in exchange for the release by Promotions of its "dubious" $ 46,000 claim against Val Pak. O'Hara and Hodgson were advised of the settlement.

G. TRANSACTIONAL FACTS

133. Prior to 1983, Excello had historically been a profitable firm. Between 1975 and 1982, Excello's net sales grew from $ 8,249,000 to $ 25,400,000. In 1983, Excello moved its printing plant from its long-time location in Chicago, Illinois to a new, larger plant in Elk Grove Village, Illinois. As a result, in part, of the higher overhead [*42] costs associated with operating a larger plant, in 1983 and 1984 Excello suffered operating losses. During this time period, however, Excello's net sales continued to grow, up to $ 30,232,000 for 1985. Notwithstanding, Excello's net operating loss for the 10 months ending June 30, 1985 was $ 981,030. For the fiscal year ended August 31, 1984, Excello's net loss was $ 1,213,864.

134. Excello's financial condition continued to decline in 1985 while Excello and its shareholders searched for a buyer. On February 14, 1985, Joseph Walker ("Walker") of American National Bank ("ANB"), which held a security interest in Excello's assets, sent a letter to Feldmar at Excello threatening to accelerate Excello's loans unless Excello obtained a new equity investor and new management. (Def. Ex. 17) On April 12, 1985, Walker again wrote to Feldmar, noting the continuing decline in Excello's financial condition and a "significant erosion" in the value of Excello's assets, and demanding additional security and guarantees on the loans. (Def. Ex. 23) On May 20, 1985, Walker again wrote to Feldmar about Excello's deteriorating financial condition, offered to cooperate with the possible sale of the company, [*43] but stated that the bank must explore further drastic action. (Def. Ex. 26)

135. At about the same time, defendants began looking for printing companies located in the United States of America which they could acquire.

136. Between mid-April and July 25, 1985, Coopers & Lybrand personnel spent substantial time at Excello investigating all aspects of Excello's business.

137. In late May, 1985, Ronald L. Peterson, a manager with Sun Chemical's General Printing Ink subsidiary, interviewed with Hodgson and O'Hara at Excello. Thereafter, Hodgson asked Peterson to come to Excello to work on a daily basis.

138. Prior to July 25, 1985, defendants decided to appoint Peterson as acting president of Excello with the appointment to take effect upon the execution of the Stock Purchase Agreement.

139. Joint Exhibit 3 was also a draft announcement to be distributed to Excello's employees announcing Peterson's appointment as acting president. Brown drafted Joint Exhibit 3 and O'Hara approved Joint Exhibit 3 before it was sent to Laster.

140. Laster had the announcement that is part of Joint Exhibit 3 retyped on Excello stationery. (Joint Exhibit 4)

141. Excello posted Joint Exhibit 4 in its Elk Grove [*44] Village, Illinois plant.

142. Joint Exhibit 4 was signed by Feldmar and stated in part:

It is with great pleasure that I announce a contract has been signed for the acquisition of Excello Press by British Printing & Communications Corporation subject to final government approvals and other conditions which we expect will be met.

Since its founding in 1934, our Company has had a rich heritage of producing high quality printing. Through your efforts and a commitment to pride and excellence, Excello has grown to become an industry leader. Our strong new partner will help immensely in assuring Excello's return to profitabil-

ity, growth and continuance as an outstanding place to work.

British Printing & Communications is Europe's largest printing concern and will bring added technology and resources to Excello. We are extremely fortunate that Mr. John O'Hara, former President and Chief Executive Officer of Reader's Digest Association, will become the new Chairman and Chief Executive Officer of Excello and Mr. Roy Hodgson, a Director of British Printing will become Vice Chairman. Effective with the signing of the contract, I turn over the responsibility for the operations of Excello [*45] to Mr. Ron Peterson, who will serve as acting President. I am confident that you will give Mr. Peterson your full support and cooperation. Mr. Gene Laster will continue in his present capacity and I will continue to be active in sales and will have the title of Vice Chairman/Sales. . . .

Joint Exhibit 4.

143. As found in Finding 34, on July 25, 1985, Excello, the Feldmars, and BPCC entered into the Stock Purchase Agreement ("Agreement"). (Pl. Ex. 51)

144. Under § 1.2(D) of the Agreement, BPCC was initially to pay $ 50,000.00 for the outstanding stock of Excello, plus additional amounts based upon a percentage of future years net profits of Excello in excess of specified amounts, up to a maximum of $ 1,325,000 (inclusive of the initial $ 50,000 payment).

145. The Agreement provided in § 2.1 that the closing, subject to the terms and conditions of the Agreement, would take place on August 31, 1985 or earlier if mutually convenient.

146. The Agreement, § 2.3(C), provided that, upon closing, Excello and Feldmar would enter into an Employment Agreement in the form annexed to the Agreement as Exhibit A.

147. The proposed Employment Agreement between Excello and Feldmar was for a term [*46] of two years at an annual fixed salary of $ 75,000, plus commissions. The Employment Agreement, Exhibit A paras. 3, 4, provided that Excello could terminate Feldmar's employment at some earlier time without cause and pay only the balance of Feldmar's filed salary for the remainder of the two-year term.

148. The Employment Agreement, Exhibit A para. 8, provided that if Excello's business was discontinued in good faith, Excello could terminate Feldmar's employment without further obligation.

149. Excello and defendants agreed to a closing date of August 31, 1985 because that was the end of Excello's fiscal year. Since the purchase price payments due under the Agreement were tied to year-end profits, defendants represented to Excello and the Feldmars that it would be cleaner to wait until August 31 to close the purchase.

150. On August 26, 1985, O'Hara and Feldmar had a telephone conversation. Freedman listened to the telephone conversation over a speaker telephone, but did not participate in the conversation. During the telephone conversation, O'Hara assured Feldmar that defendants seriously wanted to close and to do so as quickly as possible and that Hodgson and he had been exerting [*47] pressure to accelerate the closing.

151. O'Hara's August 30, 1985 memorandum to Maxwell, referred to in Finding of Fact No. 43, and entitled "Summary of Excello Situation," stated

As instructed, we are reporting that we are now just about ready to close the Excello deal subject to your approval. The problems that arose have now been resolved to the extent that they can be and we recommend going forward with closing.

Excello has all of the basic strengths and potential that we saw before and we believe that it can be turned into a highly profitable company.

The two principal breaches that we have discovered are a $ 645,000 claim against a partnership of which an Excello subsidiary was a general partner. This has been settled by giving up a dubious account receivable for $ 46,000.

The second breach is that, although they have had a New York office for many years, they have failed to collect and pay over New York sales taxes. C and L estimate that the probable liability in this regard should be something less than $ 125,000, although conceivably it could be many times that. These taxes are often ignored by out-of-state firms and it is the practice of the State to settle on some [*48] reasonable basis.

Any liability for the tax will be covered by the Sellers' warranty and indemnity agreement and can be recovered out of the monies that will become payable to the Sellers based on a share of our profit in years to come.

It is Ellis's opinion that under the provisions of the contract, we have the legal right to refuse to go forward with closing (although of course the Sellers' attorneys might assert a different view).

All in all, we think that the purchase remains an extremely attractive one for BPC.

Our business plan, which has been reviewed with C and L, is attached.

It is urgent to move quickly for many reasons, and we would therefore appreciate your authority to close this as soon as possible.

152. While the closing did not take place on August 31, between that date and September 10, 1985, Messrs. Hodgson, O'Hara and Freedman continued to represent that they expected the sale to close. They said that Maxwell was busy with labor troubles in the United Kingdom and that the sale could not close until he could review the final papers.

153. On September 3, 1985, O'Hara signed the employment agreement with Peterson that is part of Plaintiffs' Exhibit 109 and [*49] transmitted Plaintiffs' Exhibit 109 to Peterson.

154. Exhibit 109 is a letter agreement between BPCC and Peterson pursuant to which "The Excello Press Incorporated (Excello), a subsidiary of BPCC (U.S.) agreed to employ Mr. Peterson as the President and Chief Operating Officer of Excello."

155. Between August 31, 1985 and September 10, 1985, Peterson continued to serve as acting President of Excello.

156. On Saturday, September 8, O'Hara, Hodgson and Freedman were at the Cos Cob, Connecticut residence of Mr. Aboff, the Vice-Chairman of Pergamon Press, which is a Maxwell-owned company and publishes scientific journals. Also present was Ms. Jean Baddeley, Maxwell's personal assistant in London. Maxwell called her by phone and in O'Hara's words "It was an emotionally charged moment because Ms. Baddeley had been really taken to the cleaners for some dereliction. . . ." After the vigorous conversation with Ms. Baddeley, Maxwell apparently then talked with either O'Hara, Hodgson or Freedman. Although O'Hara, Hodgson and Freedman have different recollections, the latter two specifically do not recollect having had a conversation with Maxwell. Given the circumstances, it is unlikely that [*50] they would have forgotten a conversation with him and likely that they would have avoided it if possible. Freedman does

not recall any direct conversation with Maxwell during the entire period from June on. Apparently, Maxwell's subordinates do not frequently call him but wait for him to call them. In his conversation, presumably with O'Hara, Maxwell said that he was not approving the Excello purchase although it is not clear that, at the time, he had read O'Hara's August 30th memo strongly recommending it.

157. Maxwell believed that under the Agreement his personal approval was a condition precedent to closing.

158. Maxwell was unfamiliar with the identity of some of his U.S. representatives, the actions they had taken in connection with the Excello acquisition, the terms of the July 25, 1985 Agreement itself and many of the documents and other basic facts with respect to the proposed acquisition. When asked at his deposition in April 1989 if he (1) had ever previously seen the Agreement (2) had at any time received any reports or memos from Baker, Hodgson, Freedman or O'Hara re Excello (3) had received any written reports from Coopers & Lybrand (4) knew who Gary Feldmar, or Ronald [*51] Peterson who had been hired by O'Hara and Hodgson to be President of Excello, or Jeffrey L. Brown, a Maxwell Communications and Information officer in New York, were, or (5) had received copies of any of a number of relevant documents, his answer in each instance was "No."

159. Maxwell's recollection of whom, when and under what circumstances he informed his U.S. representatives that he had decided not to acquire Excello is inconsistent with that of O'Hara, Hodgson and Freedman. Maxwell testified at his deposition that either Freedman called him or he called Freedman or that he told Baker of his decision and Baker told either O'Hara, Hodgson or Freedman. O'Hara, Hodgson and Freedman all recall that the circumstances were as set forth in Finding 156. Maxwell's recollection also was that he had informed his U.S. representatives as early as September 4 that he was not going through with the deal. That is inconsistent with their recollections as well as actions O'Hara took after that date, such as his letter of September 5, 1985 to a representative of the Illinois Department of Commerce and Community Affairs which referred to finalizing the purchase of Excello and actions to be taken [*52] thereafter. Maxwell also erroneously believed that the $ 635,000 Val Pak claim against Promotions predated the signing of the Agreement on July 25, 1985 and had been concealed by Excello. In fact, it was first raised by Val Pak in a letter dated July 30, 1985, received by Excello on August 2, and Hodgson was notified shortly thereafter.

CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction and venue as well as personal jurisdiction over the defendants.

2. The Stock Purchase Agreement dated July 25, 1985 and the related Feldmar employment contract were, subject to their terms and conditions, valid and binding contracts.

3. Under Illinois law, to prevail on breach of contract claims, plaintiffs must prove: (1) a valid contract existed between Excello, the Feldmars and the defendants; (2) Excello and the Feldmars substantially performed the material terms and conditions of the contract; (3) defendants materially breached the contract; and (4) plaintiffs were damaged as a result of defendants' breach. *Costa v. Stephens-Adamson, Inc.*, 142 Ill. App. 3d 798, 799-800, 491 N.E.2d 490, 492 (2d Dist. 1986).

4. Defendants contend that they did not [*53] breach the two agreements by refusing to complete the acquisition of Excello because the sellers

Case 1:04-cv-00583-GMS    Document 139-24    Filed 03/31/2006    Page 7 of 18

Page 22
1991 U.S. Dist. LEXIS 7406, *

had failed substantially to perform the material terms and conditions under the contracts.

5. Under Illinois law, only a material breach of a contract by one party will justify nonperformance by the other party. *Sahadi v. Continental Ill. Nat. Bank & Trust Co.*, 706 F.2d 193, 196 (7th Cir. 1983) (summarizing Illinois law).

6. Under Illinois law, breaches by one party excusing performance of the other party's performance are not favored inasmuch as forfeitures are not favored. See *Markoff-Fitzgerald Assoc., Inc. v. Sable Corp.*, 1990 U.S. Dist. LEXIS 2875, *21 (N.D. Ill.) (No. 85 C 9184).

7. Materiality depends upon whether: (1) the breach operated to defeat the bargained-for-objective of the parties; (2) the breach caused disproportionate prejudice to the non-breaching party; (3) custom and usage considers such a breach to be material; and (4) allowance of reciprocal non-performance will result in the accrual of an unreasonable and unfair advantage. *Sahadi*, supra, 706 F.2d at 196. The courts also consider whether the behavior of [*54] the party failing to perform comports with standards of good faith and fair dealing. *J.E. Milligan Steel Erectors, Inc. v. Garbe Iron Works, Inc.*, 139 Ill. App. 3d 303, 310, 486 N.E.2d 945, 949 (3d Dist. 1985); Restatement (Second) of Contracts § 241.

8. Courts employ an objective test when determining whether a breach is material.

9. An agent's knowledge is imputed to his or her principle if the agent acquired that knowledge within the scope of the agency and the knowledge concerns a matter within the scope of his or her authority. *Kuska v. Folkes*, 73 Ill. App. 3d 540, 391 N.E. 2d 1082, 1085 (2d Dist. 1979).

10. Defendants now contend that plaintiffs committed five material breaches of the Agreement which excused their performance. Only two possible breaches by the sellers were ever discussed by the parties prior to August 31, 1985 and only two possible breaches were referred to in O'Hara's August 30, 1985 memorandum to Maxwell. Moreover, in his deposition, Maxwell gave only two alleged breaches as the basis for his decision not to perform under the Agreement. Those two were: (1) the Val Pak claim for $ 635,000 asserted [*55] against Promotions after the latter had asserted a $ 46,000 claim against Val Pak and (2) a possible New York State sales tax liability not reflected in Excello's financials.

11. Only the Val Pak claim and the possible New York tax liability are relevant in determining whether or not possible breaches by the plaintiffs were material and therefore justified Maxwell's decision not to perform. None of the other sellers' breaches now alleged and asserted by the defendants as grounds for their refusal to perform are relevant, and they may not properly be considered. They were not considered by the defendants themselves at the moment they reached their decision not to perform, and they may not be relied on as justifications for that decision now. In Illinois, a defendant in a contract action may not "mend" his "hold" by relying during litigation on afterthoughts, on post hoc justifications for a refusal to perform which were not considered and relied on at the time performance was actually withheld. *Gibson v. Brown*, 214 Ill. 330, 341, 73 N.E. 578, 582 (1905); *County of Schuyler v. Missouri Bridge & Iron Co.*, 356 Ill. 348, 353, 100 N.E. 239, 240 (1912). [*56] See also trial transcript at 1524 (Court: "Now, do you agree that I have to look not at what . . . breaches hindsight may have found, but on breaches that were known at the time?" Counsel for defendants:

"I do think that. I believe that that's the case."). See generally *Harbor Insurance Co. v. Continental Bank Corp., 922 F.2d 357, 362-65 (7th Cir. 1990)*. A party to a contract who has refused to perform may not change the ground on which he refused to perform after the fact. *Railway Co. v. McCarthy, 96 U.S. 258, 267-68 (1877)*.

Val Pak Claim

12. The $ 635,000 claim asserted by Val Pak was against Promotions, a partnership in which a subsidiary of Excello had a 10% interest. Accordingly, it was not a liability of Excello and had no material effect on Excello's financial condition. Similarly, the claim for $ 46,000 asserted by Promotions against Val Pak which O'Hara in his August 30, 1985 memo to Maxwell accurately characterized as "dubious" was not an asset of Excello. Its release in exchange for Val Pak's release of the $ 635,00 counterclaim which it had asserted only after Promotions notified it of the $ 46,000 claim and was equally [*57] "dubious" had no effect on Excello's financial condition.

13. Section 3.1(x) of the Agreement warrants that the accounts receivable of Promotions were sufficient to satisfy any debts owed to third parties and substantially more than the amounts owed to third parties were collected on the Promotions accounts receivable.

14. Maxwell, according to his deposition, knew that the Promotions-Val Pak cross claims had been disposed of by mutual releases prior to his decision not to perform under the Agreement.

15. The Promotions-Val Pak cross-claims were not material. Promotions was a partnership in which not Excello but a subsidiary of Excello had only a 10% interest, and the claims had been resolved at no cost to Excello, as Maxwell had been advised by O'Hara's August 30, 1985 memo. The Promotions-Val Pak cross-claims were not a material breach of any of the sellers' warranties and were not a justifiable basis for the defendants' refusal to perform under the Agreement.

Sales Tax

16. Although Coopers & Lybrand was aware that Excello had not filed sales tax returns in New York, Pennsylvania and Minnesota and expressed the opinion on August 26, 1985 that possible unreported sales tax liabilities [*58] of $ 119,000 would not have a material impact on Coopers & Lybrand's previously audited statements, defendants have not waived the right to assert these failures as material breaches of the Agreement, since Coopers & Lybrand was not solely defendants' agent but was an independent auditor employed by both plaintiffs and defendants.

17. The $ 140,000 estimate by Coopers & Lybrand in its August 29 and September 3, 1985 letters as to possible sales tax liability was conservative and was based on facts and reasonable assumptions though not a certified figure.

18. Since Excello's customers took title to their purchases in Chicago and directed the destinations to which they were to be shipped, and since none of the three states had or has asserted a claim for sales taxes, there was a legal question as to whether or not Excello owed state sales taxes to any of the three states.

19. Any claims for unpaid sales taxes were covered by the indemnification provisions of the Agreement.

20. Since Excello, although technically insolvent, had assets of some $ 14,000,000 and annual sales of approximately $ 30,000,000, the possible undisclosed New York sales tax liability was not material. The possible [*59] claims did not materially alter defendants' purchase and plaintiffs'

sale of a substantial going commercial printing concern.

21. For the same reasons, the possible sales tax claims did not cause disproportionate prejudice to defendants and were not therefore material breaches under Illinois law. Cf. *Sahadi, supra,* 706 F.2d at 196.

22. The possible sales tax claims and the failure to include them in Excello financial statements did not, as Coopers & Lybrand had opined on August 26, constitute a material breach of the representation that Excello's financial statements attached to the Agreement were true, correct and complete and fairly presented the financial position and results of the operations of Excello for the relevant periods.

23. The possible New York sales tax claims were not a material breach of any of the sellers' warranties and were not a justifiable basis for the defendants' refusal to complete the purchase of Excello under the Agreement.

24. Neither the already disposed of Val Pak claim nor the possible New York sales tax liability was a material breach by sellers and did not justify defendants' breach of the Agreement.

25. While not relevant, since [*60] not asserted by defendants at the time as a basis for refusing to perform under the Agreement, none of the other alleged breaches by sellers was material. The L'Eggs $ 16,000 claim was de minimis and was ultimately dismissed without any payment. The financials, as Coopers & Lybrand stated in their August 20 opinion, fairly represented Excello's financial condition. Since there was no closing because of defendants' refusal, the sellers' and their counsels' obligations to furnish certain certificates and opinions at the closing never became operative.

26. Maxwell's belief that his personal approval was a condition precedent to closing under the Agreement was erroneous.

27. The plaintiff sellers, the local union, Gary Feldmar and the Creditors Committee to the extent that it represents Rickard Circular, Whitaker-Carpenter, Forest-Atwood and Hobart/McIntosh, all of whom relied on representations of representatives of the defendants made either directly to them or authorized to be made to them indirectly are entitled to judgment on the issue of liability.

OPINION

This action arises out of a Stock Purchase Agreement ("Agreement") entered into on July 25, 1985 between Excello and its [*61] shareholders and BPCC under which the latter agreed to purchase Excello and British Printing, BPCC's parent, agreed to and subsequently did guarantee the payment of the purchase price. The Agreement also provided that upon the closing, an Employment Agreement would be entered into with Feldmar for a term of two years at an annual fixed salary of $ 75,000 plus commissions, subject to termination at any time with damages limited to any unpaid balance of the fixed salary for the remainder of the two-year term. Closing under the Agreement was to be on August 31, 1985. On August 31, BPCC and British Printing declined to close although indicating they were simply waiting on Maxwell's approval to do so. The delay, it was indicated, was caused by his being out of London attending a trade union conference. On September 10, plaintiffs were advised that there would be no closing and no purchase by BPCC and that BPCC and British Printing considered the Agreement and guarantee terminated.

Excello and its shareholders allege that BPCC and British Printing's refusals to close and pay the purchase price constituted a breach of the

Agreement which caused them substantial damage.

The plaintiff Union [*62] asserts that it was induced to make substantial concessions in its collective bargaining agreement with Excello by BPCC's agent's insistence that such concessions were the essential precondition to BPCC's purchase of Excello and the continued employment of the Union members. As a result of the defendants' refusal to complete the purchase, the Union members allege they suffered substantial financial loss.

Six trade suppliers of Excello (the "trade creditors") contend that they extended credit and sold materials and supplies to Excello in August and early September 1985, after the Agreement was signed on July 25, only because they were assured that BPCC was acquiring Excello, would pay their outstanding accounts and would continue to do business with them. As a result of the defendants' alleged breaches, the trade creditors assert they suffered substantial damage.

Feldmar asserts that the defendants' breach of the Agreement and guarantee and the concomitant breach of the agreement to enter into an employment contract with him as part of the acquisition caused him substantial damage.

The defendants respond that their action in not closing and acquiring Excello was justified by material [*63] breaches of the contract by the plaintiffs. They point to a number of alleged breaches any, some, or all of which they contend were material Those alleged breaches are:

1. Sales Taxes. The failure of Excello to file returns and pay sales taxes to Minnesota, New York and Pennsylvania was a material breach of § 3.1(S) of the contract. The failure to reflect any liability for such taxes on the Excello financials attached to the contract constituted a material breach of §§ 3.1(F), (I), (S) and (U) of the contract, and the failure promptly to remedy these breaches was a breach of § 4.4 of the contract.

2. The Val Pak Claim. The failure of Excello to disclose prior to August 14, 1985 that Val Pak had asserted a claim for $ 635,000 against Excello Syndicated Promotions ("ESP"), a partnership in which a wholly owned subsidiary of Excello named Excello Direct, Inc. ("Direct") had a 10 percent interest was a material breach of §§ 4.1(T), 4.2(A), (D) and (J) as well as § 4.4 of the contract. The settlement of Val Pak's claim against ESP by the latter's giving up a claim which it had asserted against Val Pak for $ 46,000 in exchange for Val Pak's giving up its $ 635,000 claim against [*64] ESP materially breached §§ 4.2(A), (D) and (J).

3. The L'Eggs Suit. The failure to disclose the suit L'Eggs Products v. Excello Press, Inc. filed in 1979 in the Circuit Court of Cook County in which L'Eggs sought $ 16,000 in damages and which was still pending in 1985 was a material breach of § 3.1(T) of the contract.

4. Sellers Certificate and Legal Opinion. The sellers' failure at or before the closing date to furnish BPCC with a certificate in form satisfactory to BPCC to the effect that to the best of their knowledge, information and belief all of the conditions precedent specified in § 5.1 of the contract had been satisfied was a material breach. Also, the failure at or before the closing date to furnish a written opinion of Katten, Muchin, Zavis, Pearl & Galler, dated the closing date, stating that counsel did not believe that any of the sellers' representations and warranties in the contract were contrary to fact was a material breach of § 5.1(G) of the contract.

Defendants' Breach

It is undisputed that the defendants' failure to consummate the purchase of Excello, unless justified by material breaches by the sellers constituted a material breach of the [*65] Agreement by defendants. The first issue in the case, therefore, is whether any or all of the alleged breaches by sellers was material. Obviously, we do not reach the claims asserted by the Union, the trade creditors or Feldmar until we have determined whether or not defendants unjustifiably breached the Agreement.

In this connection, defendants have asserted, as the foregoing indicates, a list of what they now contend constituted breaches by sellers, only two of which, however, were raised with, could have been considered by or were referred to by Maxwell in his deposition as the basis for his decision not to complete the Excello purchase. It is Illinois law that a party seeking to justify non-performance of a contract on the basis that the other party's breaches were material may not rely on alleged breaches which are afterthoughts and were not raised, considered or relied on by the non-performing party at the time. *Gibson v. Brown*, 214 Ill. 330, 341, 73 N.E. 578, 582 (1905); *County of Schuyler v. Missouri Bridge & Iron Co.*, 356 Ill. 348, 353, 100 N.E. 239, 240 (1912). Accordingly, we need and may consider only the two [*66] which Maxwell asserts were the basis of his decision not to complete the purchase.

The first of these is the so-called Val Pak claim. The facts with respect to this claim are as follows. Feldmar, in going over the books of a joint venture called Excello Syndicated Promotions ("Promotions") in which a wholly owned subsidiary of Excello, Excello Direct, Inc. ("Direct"), had a 10% interest, concluded that Promotions had not been paid $ 46,000 by Val Pak for services which it had performed for that company. Accordingly, he sent Val Pak a letter seeking payment of that amount. On July 30, 1985, some five days after the Agreement was signed, Val Pak sent Promotions a letter counterclaiming $ 635,000. Neither the original claim nor the counterclaim involved Excello. After some negotiations and with the knowledge and approval of Hodgson, an officer and agent of BPCC, the purchaser under the Agreement, the matter was settled by each party releasing its claim.

In his August 30, 1985 memo to Maxwell, O'Hara correctly called the Promotions $ 46,000 claim "dubious" as was Val Pak's retaliatory $ 635,000 counterclaim as evidenced by their willingness to abandon it in exchange for Promotions release [*67] of its claim.

So far as any default under the Agreement is concerned, it contains only two references to Direct and Promotions. The first appears in Article 3.1(D) and reads

Excello has no subsidiary corporations except for Excello Direct, Inc. Excello Direct, Inc. has no assets or liabilities other than its interest in Excello Syndicated Promotions which is not represented to be of any value."

(Emphasis added) Article 3.1(X) states that the operations of Promotions had been discontinued, that Direct had a 10% interest in Promotions and that Excello had made cash advances to Promotions. It concludes:

Sellers expressly warrant and represent that the accounts receivable of Excello Syndicated Promotions, all of which have been assigned to Excello on account of its indebtedness to Excello, will result in collections of at least a sufficient amount of money to pay all debts and liabilities of Excello Syndicated Promotions to third parties. Excello Direct, Inc. does not have any assets or liabilities except as disclosed in this paragraph (X).

It is undisputed that the collections on the Promotions accounts receivable far exceeded its liabilities of some $ 6,000. Notwithstanding that [*68] the Promotions-Val Pak claim and counterclaim were dubious at best, that they had been mutually released in August as O'Hara had advised Maxwell in his August 30 memo, and that they did not involve Excello in any event, defendants assert that they represented a material breach of the Agreement by the sellers. Obviously they constituted no breach, much less a material one.

The second alleged breach by sellers which defendants assert was material and justified their breach was the possible liability for New York sales taxes which did not appear on Excello's balance sheet. The facts with respect to this claim are as follows.

Excello printed and sold large quantities of direct mail advertising material to mass direct mail merchandisers such as Publishers Clearing House, Readers Digest and others. Some of them headquartered in New York State. Excello's New York sales were large enough that it opened a sales office in New York in 1979. During the years 1979-84 Excello had substantial sales to New York customers.

From time to time, Excello received from New York tax authorities standardized form Nexus questionnaires which it filled out and returned. As a result, the New York tax authorities [*69] requested and Excello filed returns for and paid New York City rent tax and New York State franchise tax. No request for sales tax information was made by New York prior to a letter dated August 2, 1985 and received August 5 (well after the Agreement was signed on July 25) from the New York State Department of Taxation and Finance (Plaintiffs Exh. 67) enclosing a new Nexus questionnaire and inquiring if the company was registered for filing New York State Sales, Franchise or Income taxes.

Coopers & Lybrand had been aware, in connection with their annual audits of Excello, that New York sales taxes were not being paid but had raised no question about the matter. Since all printed material sold by Excello was delivered to customers at the Excello dock in Elk Grove Village, Illinois, and title passed to the purchaser there who directed where the material was to be sent, Excello believed that it was not liable for other than Illinois sales tax. Given the fact that Excello had a sales office in New York, this was probably an erroneous conclusion although no one so advised the company. But to this date, neither New York nor any other state has filed a sales tax claim against Excello.

When [*70] the August 2 letter from the New York tax authorities was received, Excello immediately advised Coopers & Lybrand, the Chicago office of which was Excello's regular accountants and the New York office of which then handled and still handles the accounting work for all Maxwell affiliated companies in the United States and was performing the due diligence investigation of Excello on behalf of BPCC. This started an intensive investigation during the course of which it became important to determine Excello's sales to New York customers in the years 1979-1984 and the amount or percentage of the printed material sold to New York customers which was ultimately mailed to New York residents since the New York sales tax does not apply to material mailed to other states. It also became important to determine if any New York customers were either exempt from sales tax or as was the case with Publishers Clearing House, one of Excello's largest New York customers, paid use tax directly to the State of New York.

Laster made every effort to obtain all the necessary information on New York sales and told Coopers & Lybrand's New York office staff that while Excello had exact state by state sales figures [*71] for 1982-85, records for pre-1982 years did not exist but that they could make reasonably accurate estimates based on the later years' sales. They also advised that they possessed no New York exemption certificates and did not know what amount or percentage of New York purchases were mailed to New York residents although they estimated it to be about 10%.

The Coopers & Lybrand representatives asked for better information and Feldmar agreed to call three of the largest New York customers and attempt to obtain more accurate figures. Accordingly, he called Thomas McGee of Publishers Clearing House, Norman Dorff of the Columbia Record Club and Alex Levy of North Shore Animal League. Each agreed to check their mailing lists and reported back that between 5% and 10% of their mailings went to New York residents and that these were conservative figures. This information was given to Montgomery of Coopers & Lybrand.

By August 23, using the information he had obtained, Montgomery estimated that the Excello potential liability for New York Sales Tax was $ 120,000. He told Ellemberger, the Coopers & Lybrand New York partner responsible then and still responsible for Coopers & Lybrand's accounting [*72] work for Maxwell companies and Ellemberger reported the figure to O'Hara. They then discussed the possibility of Coopers & Lybrand doing a sales tax audit. Ellemberger estimated that such an audit would cost $ 80,000 to $ 100,000, take several months and, in his opinion, would not be cost effective. O'Hara agreed that the potential liability did not warrant such an audit. O'Hara's memo to the files reflecting his conversation with Ellemberger (Jt. Exh. 7) also points out that, if any back sales tax was owing, there would be no penalty since New York had declared an amnesty period from November 1, 1985 to February 1986.

In a memo dated August 26, 1985, Galvin, Coopers & Lybrand's Chicago partner in charge of the Excello account, advised Ellemberger, with carbon copies to other Coopers & Lybrand employees in New York and Chicago, including those working both with BPCC and Excello on the BPCC purchase, that possible unreported sales tax liability, which he estimated at $ 119,000, would not have a material impact on Coopers & Lybrand's previous audited statements, some of which were attached to the Agreement.

It is apparent from the record that Maxwell erroneously believed that under [*73] the Agreement his personal approval was a condition precedent to the defendants' obligation to purchase Excello, that he had an absolute veto power and no closing need or could take place unless he authorized it. The Agreement contains no such provision. When asked at his deposition to point one out, Maxwell acknowledged that he had not read the Agreement but asserted that all parties were aware of the condition.

It is unfortunate that Maxwell was unable to appear and testify at trial. Some of the ambiguities in his deposition might have been clarified. He stated in his deposition that the Val Pak and New York sales tax questions were the reasons he declined to close yet O'Hara's August 30 memo indicated that the former had been disposed of and the latter, for the reasons spelled out, was not a serious obstacle. It is not clear that Maxwell had read O'Hara's memo before deciding to veto the purchase, although he apparently had read it before his deposition.

The substance of his Saturday, September 8 telephone conversation with,

apparently O'Hara, after taking Ms. Baddeley to "the cleaners," is unclear. In his deposition, Maxwell recollected he had talked either to Freedman directly [*74] or to Baker, who had talked to Freedman, and that those conversations had taken place prior to September 4. Freedman has no recollection of having talked to Maxwell directly at any time about the Excello contract or the closing. O'Hara, Hodgson and Freedman all remember an emotionally charged trans-Atlantic telephone conversation on Saturday, September 8, between Maxwell and his personal London assistant, Ms. Jean Baddeley, at the Cos Cob, Connecticut residence of Aboff who was Vice-Chairman of Maxwell owned Pergamon Press. After talking to Ms. Baddeley, he told either O'Hara, Hodgson or Freedman he had decided not to go ahead with the Excello purchase. Hodgson and Freedman have no recollection of having talked to Maxwell on that occasion, so he apparently talked to O'Hara. The latter, however, has no recollection of anything being said other than that Maxwell had decided not to buy Excello. There apparently was no discussion of reasons, O'Hara's August 30 memo, etc.

Maxwell's deposition, unfortunately, raises more questions than it answers. It is clear that he erroneously believed his approval was a condition precedent to the obligation to complete the Excello purchase (dep. pp. [*75] 23, 25, 26). It is also clear that he had harbored serious reservations about the Excello purchase after Baker's visit to Chicago on August 13-14 and his return to London, when he told Maxwell about the Val Pak and New York sales tax matters (dep. pp. 52, 62).

Maxwell apparently believed, even at his deposition, that the Val Pak $ 635,000 counterclaim was material and had been concealed by the sellers at the time and before the Agreement was signed on July 25 (dep. p. 22). As previously discussed, it was a reactive claim to Promotions $ 46,000 claim, was not, in any event, a liability of Excello and had been disposed of by mutual releases. Moreover, it was first asserted by Val Pak against Promotions on July 30, five days after the contract was signed and almost immediately reported to Hodgson although it did not constitute a breach of the Agreement. It was not material and there had been no concealment.

He also, as late as his deposition, believed Excello was "defrauding" New York State on sales taxes (dep. pp. 21, 35). Since he had not seen the Coopers & Lybrand reports and had either not seen or forgotten the discussion of sales taxes in O'Hara's August 30 memo, this may be an understandable [*76] misapprehension. As we have found, Excello reasonably, though perhaps erroneously, believed it did not owe any but Illinois sales taxes since its customers took title to their printed material at the Excello plant and directed where it was to be sent. Moreover, Coopers & Lybrand were immediately advised of the inquiry received August 5 from the New York tax authorities. At the time the Agreement was signed, July 25, Excello had no reason to believe it owed sales taxes to New York or any other state but Illinois.

What is clear from Maxwell's deposition is that because of his misapprehensions, after Baker's return, about the Val Pak and New York sales tax matters, "he really lost confidence" (dep. p. 62). He went on to say, "I warned him (O'Hara) that the loss of confidence that I had suffered by this is not easily going to be remedied. Of course, I am willing to be persuaded, but it will take one hell of a lot of persuasion" (dep. p. 63). Again, he said, "It is certainly true that I was shaken in my confidence in the vendors by the disclosures made by Mr. Baker as I have al-

Case 1:04-cv-00583-GMS   Document 139-24   Filed 03/31/2006   Page 15 of 18

Page 30
1991 U.S. Dist. LEXIS 7406, *

ready testified earlier. . . . I was really concerned that if they had not disclosed those two items, what else [*77] could we find after we took over the property, that you cannot put any reliance on their warranties. . . ." (Dep. p. 67)

The facts, of which Maxwell was apparently unaware, were that the Val Pak counterclaim against Promotions was not a claim against Excello, was not asserted until July 30, five days after the Agreement was signed and Maxwell's New York representative was notified shortly thereafter. Moreover, it had been disposed of on August 19, well prior to August 31.

His belief that Excello had been defrauding the New York sales tax authorities and had concealed that fact from his representatives was contrary to the facts that New York authorities had not prior to the Agreement being signed and have not to date asserted any sales tax claims against Excello. In addition, his United States representatives were immediately and fully informed as to the New York inquiry about possible sales taxes received by Excello on August 5, well after the Agreement was signed on July 25. Moreover, his United States representatives and Coopers & Lybrand, his United States accountants, investigated intensively thereafter and, making "reasonable" assumptions, concluded that the possible sales tax [*78] liability would "not have a material impact" on Coopers & Lybrand's previously issued Excello audit reports.

An examination of his deposition leads inexorably to the conclusion that Maxwell's decision not to complete the Excello purchase was not based on accurate information with respect to the two items, the Val Pak claim against Promotions, and possible New York sales tax liability. The inaccurate information he possessed led him to lose confidence in Excello and its principals. Believing erroneously that the Agreement gave him the absolute right to veto the transaction, he decided, apparently without any significant discussion of the matter with his United States representatives, O'Hara, Hodgson and Freedman, not to complete the purchase under the Agreement. That was clearly a breach not justified by any material breach on the part of the sellers.

The Union's Claim

Having determined that BPCC breached the Agreement without justification, we turn to the Union's claim. As previously indicated, BPCC, primarily through Hodgson, its president, on several occasions stated both to representatives of Excello and of the Union that concessions by the Union in the magnitude of $ 650,000 [*79] per year were a condition precedent to the BPCC purchase of Excello. The first was to Arthur Muchin, Excello's labor counsel, and Laster some time in May. As a result, Arthur Muchin and Laster developed a list of possible union concessions which they believed would result in the $ 650,000 annual savings in labor costs which Hodgson required.

On May 24, 1985, Arthur Muchin, Hodgson and Freedman met at the latter's office in New York to discuss the list. Hodgson identified those items he deemed essential, those which were important but not mandatory and those he considered "walk-aways" which he was prepared to forego if necessary. At Hodgson's suggestion, Arthur Muchin telephoned Conlon, the Union president, from Freedman's office, and told him Excello faced "going under" within a month, BPCC was the only potential purchaser, BPCC was not out to "bust" the union contract and was willing to install new equipment but required $ 650,000 in annual concessions from the union in order to complete the purchase. Conlon indicated

Case 1:04-cv-00583-GMS   Document 139-24   Filed 03/31/2006   Page 16 of 18

Page 31
1991 U.S. Dist. LEXIS 7406, *

he was willing to meet and discuss the matter.

On May 27, Arthur Muchin again telephoned Conlon, read him the May 20 letter ANB, the bank, had sent stating that, absent [*80] a purchase, the bank would declare Excello's loans in default, told him that Union concessions were essential to the BPCC purchase and listed the specific concessions wanted. It was then agreed that Conlon, Arthur Muchin and Hodgson would meet for dinner on June 4.

They met on June 4 and Hodgson made it clear that BPCC would not purchase Excello unless the Union agreed to concessions in wages, hours and manning which he described generally. On June 7, Arthur Muchin gave Conlon a written list of the proposed concessions and they arranged for a further meeting on June 19. That meeting took place at Excello and was attended by Arthur Muchin, Hodgson, Conlon, Feldmar, Laster, Evert, the Union V.P. and Panella, one of the Union shop stewards at Excello. They discussed the urgency of the situation, the ANB May 20 letter was again read and Laster reported that Excello had lost money in May and some customers were leaving because of the company's financial problems. The Union representatives were also told that, after the purchase, Feldmar would be only a commission salesman.

Hodgson then spoke, stating that British Printing was the largest printer in Great Britain, its stock was listed on [*81] the London Stock Exchange, Sir Robert Maxwell owned 61 percent of it as well as owning the London Daily Mirror, Maxwell's companies had some 12,000 employees and were 100 percent union and if BPCC bought Excello, it would need everyone's help to turn the company around and expand. Finally, he told the Union representatives that the only obstacle to the BPCC purchase was the necessity for the union concessions which had been given to them. The parties agreed to meet the next day, June 20, with all the Excello union employees.

On June 20, Hodgson, Feldmar, Laster, Arthur Muchin, Conlon and Evert met in the Excello press room with all the union employees who were given a written summary of the proposed concessions. Feldmar introduced Hodgson and turned the meeting over to him.

Hodgson repeated his description of British Printing, stated that if the employees agreed to the concessions, BPCC would buy Excello, put in new equipment and bring in additional work. He specifically stated the only remaining condition to BPCC's purchase of Excello was the union membership's approval of the proposed concessions.

After Messrs. Hodgson, Feldmar, Muchin and Laster left the meeting, Conlon and Evert [*82] recommended that their members approve the concessions which they did. On June 25, 1985, a month before the Agreement was signed, the Union and Excello executed a Supplemental Agreement to the union contract reflecting the concessions which went into effect on July 1. Because of the concessions, the union members received less pay and suffered damages in reliance on BPCC's representations and as a result of the subsequent breach.

The Trade Creditors Claim

While six of the trade creditors originally claimed they extended credit to Excello only in reliance on BPCC's promise to purchase it and pay their accounts, only four testified to conversations on which they relied. None of the four at any time talked directly to officers or agents of BPCC. All of their conversations were either with Laster who handled Excello's purchase and credit problems or Laster's subordinates who purported to relay representations made to them by BPCC representatives, particularly Hodgson.

Case 1:04-cv-00583-GMS    Document 139-24    Filed 03/31/2006    Page 17 of 18

Page 32
1991 U.S. Dist. LEXIS 7406, *

Both Laster and Feldmar testified to conversations with Hodgson regarding Excello's cash flow and purchase problems. While Hodgson has a somewhat different recollection of their discussions, he does not deny that they [*83] took place. Laster and Feldmar's recollection is that, after they described the situation to him, Hodgson said that it was imperative that Excello continue to be a going concern, get supplies from its vendors, manufacture and deliver finished products to its customers and obtain new orders through July and August up to the closing on August 31.

They recollect further that Hodgson told Laster he was authorized to tell Excello suppliers that all trade debts would be paid after the closing and, to those who were critical of Excello's management and operations, that Peterson had already been appointed as interim president, would become the president after the closing and that Feldmar would have responsibility only in the sales area. Hodgson also told Laster, as Laster remembers, that, after the purchase, BPCC would invest approximately $ 4 million in Excello which creditors could be told. Laster also recalls that Hodgson inquired from time to time as to the trade creditors willingness to sell to Excello on credit and expressed satisfaction that, as a result of his assurances, they were doing so and Excello was able to stay in business.

Hodgson's recollection is that, while he was vitally [*84] interested in keeping Excello a going concern, he did not intend to pay old creditors in full but to negotiate settlements with them and, since Maxwell and his enterprises had many contacts with paper and other printing industry suppliers, some at least of the old Excello suppliers would be replaced. Accordingly, he does not recollect authorizing Laster, as Laster remembers. He concedes, however, that he did not tell Laster that BPCC had no intention of paying old creditors in full or continuing to use them as sources of supply. Obviously, if he had and Laster had told them, Excello would quickly have been out of business.

We conclude that Laster and Feldmar's recollections are more probably accurate. BPCC was clearly interested in keeping Excello as healthy a going concern as possible. Accordingly, Hodgson was interested in Excello having sources of supplies sufficient to enable it to fill existing orders and obtain new ones. Without the kind of assurances that Laster recalls Hodgson authorizing him to make, Excello's principal suppliers would not have extended credit and provided it with the raw materials and services necessary for it to stay in business through July and August. [*85] While Hodgson's real intentions may have been inconsistent with those assurances, we are satisfied that he authorized Laster to make them to representatives of Rickard Circular, Hobart/McIntosh, Whitaker-Carpenter and Forest-Atwood. We are also satisfied that, in reliance on those assurances, the four companies in question sold supplies, performed services and extended credit to Excello in July, August and early September which they would otherwise not have done.

The Union and the four trade creditors all assert that the defendants are liable to them under the doctrine of promissory estoppel. Under Illinois law, the essential elements of promissory estoppel are: "a promise unambiguous in terms, with [reasonable and justifiable] reliance thereon by the promisee, with such reliance being expected and foreseeable by the promisor, and with the promisee in fact relying on the promise to his injury." *Vincent Di Vito, Inc. v. Vollmar Clay Products Co.*, 179 Ill. App. 3d 325, 327-28, 534 N.E.2d 575, 577 (1989). See also *Ilan Geva v. Leo Burnett Co., Inc.*, No. 90-1418, slip op. at 5 (7th Cir. May 10, 1991) (citing and quoting

Case 1:04-cv-00583-GMS    Document 139-24    Filed 03/31/2006    Page 18 of 18

Page 33
1991 U.S. Dist. LEXIS 7406, *

Di Vito); *Restatement (Second)* [*86] *of Contracts* § 90(1) (1981).

It is clear from the facts as we have found them that agents of the defendants, specifically Hodgson, directly to the Union and its members employed at Excello and indirectly to the four trade creditors made specific promises as discussed previously. The Union relied on those promises and made substantial concessions and modifications in its collective bargaining agreement with Excello, and the Union and its members who worked at Excello were injured when the defendants failed to carry out their promises and complete the purchase of Excello.

Similarly, the four trade creditors, in reliance on promises given indirectly to them by Hodgson through Laster made sales, performed services and extended credit to Excello and were injured when the defendants failed to carry out their promises to purchase Excello and pay its debts to them.

To avoid injustice to both the Union and its members and the four trade creditors requires that the defendants compensate them for the injuries they can establish they sustained.

The other party claiming injury as a result of the defendants' breach is Feldmar. An integral part of the Agreement was that he would receive an Employment [*87] Agreement in the form annexed to the Agreement as Exhibit A. It was to be for a term of two years subject to renewal but terminable before the two years with or without cause. Feldmar was to be paid $75,000 per year plus commissions but, if terminated within two years, Feldmar would receive only the balance of his fixed salary for the period subsequent to his termination. It also provided that if Excello's business was terminated in good faith within the two-year period, Feldmar would receive no compensation after the good faith termination.

Our Findings of Fact, Conclusions of Law and Opinion decide the various issues of liability, and judgments for the plaintiffs and against the defendants will be entered consistent therewith. There remain, of course, the questions of damages. These will obviously require further hearings which will be scheduled as expeditiously as counsel and the Court's schedules permit. The case is set for a status report on June 4, 1991, at 10:00 A.M. to consider the next steps to be taken on both the entry of judgments on liability and hearings on damages.