LEXSEE 2002 DEL. SUPER. LEXIS 92

**Kathleen S. Trader v. David L. Wilson and Carolyn D. Wilson**

**C.A. No. 01A-06-002**

**SUPERIOR COURT OF DELAWARE, SUSSEX**

*2002 Del. Super. LEXIS 92*

**November 14, 2001, Submitted**
**February 1, 2002, Decided**

**DISPOSITION:** [*1] Affirmed.

**COUNSEL:** Dean A. Campbell, Esquire, Moore & Rutt, P.A., Georgetown, DE.

William F. Chasanov, Esquire, Neil F. Dignon, Esquire, BROWN, SHIELS, BEAUREGARD & CHASANOV, Georgetown, DE.

**JUDGES:** E. Scott Bradley.

**OPINIONBY:** E. Scott Bradley

**OPINION:**

This is the Court's decision on the appeal by Appellants Carolyn and David Wilson (the "Wilsons") of the decision by the Court of Common Pleas in favor of Appellee Kathleen Trader ("Mrs. Trader"). The decision by the Court of Common Pleas is affirmed for the reasons stated herein.

PROCEDURAL POSTURE

Mrs. Trader filed suit against the Wilsons in the Court of Common Pleas seeking payment of the outstanding balance due on two Promissory Notes signed by the Wilsons. The Court of Common Pleas rejected the Wilsons' argument that they had been discharged from these debts by an accord and satisfaction and ruled in favor of Mrs. Trader. The Wilsons filed a timely appeal with this Court.

STATEMENT OF FACTS

On or about May 22, 1992, Mrs. Trader, who was at that time Ms. Metz, n1 loaned $ 50,000 to the Wilsons. In exchange, the Wilsons executed a Promissory Note in favor of Mrs. Trader. Under the terms of this Note, the Wilsons were to pay interest to Mrs. [*2] Trader in monthly installments, with the principal due on demand. On or about October 7, 1992, Mrs. Trader loaned another $ 50,000 to the Wilsons. The Wilsons executed another Promissory Note with terms that were identical to those of the first Note.

> n1 Although Mrs. Trader was Ms. Metz at the time the loans were made, I will refer to her as "Mrs. Trader" throughout this opinion in the interest of consistency. However, doing so is not intended to undermine the significance of the fact that Mrs. Trader and Mr. Trader were not yet married at the time the loans were made.

Mr. Trader was a customer of the Wilsons' business, "Wilson's Auction." Between 1990 and 1995, Mr. Trader purchased numerous items on credit from Wilson's Auction. Mr. Trader's purchases made on credit totaled $ 42,607.95. Mr. Trader also boarded

three horses with the Wilsons. The Wilsons held the horses as security for Mr. Trader's debts to Wilson's Auction. Mr. Trader did not pay the Wilsons any fees toward the upkeep of the horses.

Mr. and [*3] Mrs. Trader were married in 1994. Testimony introduced below regarding how and when Mr. or Mrs. Trader approached the Wilsons to request the release of Mr. Trader's horses differed. In any event, the horses were released to Mr. Trader sometime in 1995. At the time of their release, Mr. Trader owed the Wilsons approximately $ 8,600 for storage of the horses. From October of 1995 through March of 1998, Mrs. Trader made payments totaling $ 2,900 on Mr. Trader's behalf to Wilson's Auction.

On April 1, 1998, Mrs. Trader demanded payment on the Notes. The Wilsons tendered a check to Mrs. Trader in the amount of $ 60,292.05 on April 13, 1998. The check contained the notation, "Balance on Note." The Wilsons arrived at this sum by deducting $ 39,707.95 (the $ 42,607.95 Mr. Trader owed to Wilson's Auction less the $ 2,900 in payments Mrs. Trader had made on behalf of her husband) from the original amount due on the Notes ($ 100,000.00). n2 Mrs. Trader held onto this check for several months and consulted her attorney before cashing the check on August 12, 1998. On August 18, 1998, Mrs. Trader's lawyer sent a letter to the Wilsons stating that his client expected the remainder of the monies [*4] owed. When the Wilsons refused to make further payment, Mrs. Trader filed suit in the Court of Common Pleas for the outstanding balance on the two Notes.

n2 The $ 8,600 allegedly owed for the horses was not figured into this calculation.

At trial, the Wilsons argued that Mrs. Trader had assumed her husband's debts to both them and Wilson's Auction and that the Wilsons' tendering of a check in the amount of $ 60,292.05 was an accord and satisfaction. The Court of Common Pleas found that it did not have sufficient evidence before it to conclude that Mrs. Trader had assumed responsibility for her husband's debts to the Wilsons. In reaching this decision, the court made several key factual findings:

1. Mrs. Trader often wrote checks on behalf of her husband because of his inability to read or write.
2. After Mr. Trader's horses were released from the Wilsons' care in 1995, Mrs. Trader made several payments to the Wilsons, drawn on her own account. Except for one, all of these checks bore a notation indicating [*5] that the check was paid on Mr. Trader's bill.
3. Neither Mr. nor Mrs. Trader ever received a bill which totaled the amount due for the account balance which Mr. Trader owed to the Wilsons. Furthermore, in 1995, Mrs. Trader did not have any idea as to the scope of her husband's debt to Wilson's Auction. In fact, there was no evidence presented to suggest that anyone had specific knowledge of the debt until April of 1998.

Based on the foregoing factual findings, the Court of Common Pleas concluded that Mrs. Trader did not assume the debts of her husband. Because the sum of money otherwise due on the Notes was liquidated and not subject to dispute, the Court of Common Pleas awarded Mrs. Trader the balance due on the Notes.

ISSUES PRESENTED

The Wilsons set forth the following arguments on appeal:

1. The Wilsons were discharged of their obligation to pay the Notes by

virtue of Accord and Satisfaction by Use of an Instrument pursuant to *6 Del. C.* § *3-311(d)*; n3

2. The Wilsons were discharged of their obligation to pay the Notes by virtue of Accord and Satisfaction pursuant to 6 *Del. C.* § 311(a) and 311(b); n4

3. **[*6]** The Wilsons were discharged under the common law doctrine of accord and satisfaction by instrument;

4. The Wilsons were discharged under the common law defense of accord and satisfaction; and, finally,

5. The Court of Common Pleas erred in its finding that Mrs. Trader had not assumed the debts of her husband.

n3 This text of this statute reads:

A claim is discharged if the person against whom the claim is asserted proves that within a reasonable time before collection of the instrument was initiated, the claimant, or an agent of the claimant having direct responsibility with respect to the disputed obligation, knew that the instrument was tendered in full satisfaction of the claim.

*6 Del. C.* § *3-311(d)*.

n4 These subsections follows:

(a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.
(b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

*6 Del. C.* § *3-311 (a)*, (b). Note that the requirements outlined in subsection (a) apply to subsection (d), *supra* n.3, as well.

**[*7]**

DISCUSSION

A. *Standard of Review*

The issues presented for review regard the Court of Common Pleas's rejection of the defense of accord and satisfaction. This is a mixed question of law and fact. *See Wilmington Stevedores, Inc. v. Steel Suppliers, Inc.,* Del. Supr., No. 80,1986, Walsh, J. (June 11, 1986) (ORDER).

When reviewing an appeal from the Court of Common Pleas, this Court reviews the decision below as the Supreme Court would consider an appeal. *Baker v. Connell, 488 A.2d 1303, 1309 (Del. 1985).* A two-fold standard of

review is employed. First, this Court reviews errors of law de novo. *Downs v. State, 570 A.2d 1142 (Del. 1990).* Second, this Court is bound by findings of fact made by the Court of Common Pleas which are supported by the record and which are the product of a logical and deductive process. *Id. at 1144.*

Substantial evidence must support finding of facts the Court of Common Pleas made. *Shahan v. Landing, 643 A.2d 1357 (Del. 1994).* Such evidence is that which a reasonable mind might accept to support a conclusion. *Oceanport v. Wilmington Stevedores, 636 A.2d 892 (Del. 1994).* [*8] Substantial evidence is more than a scintilla but less than a preponderance. *Olney v. Cooch, 425 A.2d 610 (Del. 1981).* If substantial evidence exists for a finding of fact, this Court must accept that ruling, as it must not make its own factual conclusions, weigh evidence, or make credibility determinations. *Johnson v. Chrysler, 59 Del. 48, 213 A.2d 64 (Del. 1965).* That this Court may have reached a different conclusion with respect to a factual issue is not enough to overturn the Court of Common Pleas's findings; rather, the Court of Common Pleas must have abused its discretion to warrant reversal. *Mooney v. Shahan*, Del. Super., C.A. No. 01A-02-002, Bradley, J. (Aug. 24, 2001).

## B. Accord and Satisfaction

The Wilsons argue on appeal that the Court of Common Pleas failed to make any findings regarding whether there was a bona fide dispute or an unliquidated debt at issue in this case. They assert that there was a bona fide dispute regarding the debt and that, because of this, the debt was unliquidated. Accordingly, the Wilsons argue that the defense of accord and satisfaction, based either in common law or on statutory provisions, is not [*9] moot, contrary to the Court of Common Pleas's legal conclusion.

Mrs. Trader counters that the defense of accord and satisfaction rested upon the Wilsons' assertion of a setoff claim against her and that the Wilsons failed to prove that their setoff claim was related to Mrs. Trader's liquidated claim against the Wilsons. Thus, according to Mrs. Trader, since the Wilsons failed to demonstrate that their setoff claim is collateral to Mrs. Trader's cause of action, there is no bona fide dispute and the defense of accord and satisfaction fails as a matter of law.

All claims the Wilsons asserted require either an unliquidated debt or a debt, liquidated or unliquidated, that is subject to a bona fide dispute. n5 The burden to prove all the elements necessary for an accord and satisfaction is on the party alleging that it took place. *Acierno v. Worthy Brothers Pipeline Corp., 693 A.2d 1066, 1068-1069 (Del. 1997); State v. Massachusetts Bonding and Ins. Co., 40 Del. 274, 9 A.2d 77, 80 (Del. Super. 1939).*

n5 The elements required for a common law accord and satisfaction are:

(1) that a bona fide dispute existed as to the amount owed that was based on mutual good faith; (2) that the debtor tendered an amount to the creditor with the intent that payment would be in total satisfaction of the debt; *and* (3) that the creditor agreed to accept the payment in full satisfaction of the debt.

*Acierno v. Worthy Brothers Pipeline Corp., 693 A.2d 1066, 1068 (Del. 1997)* (emphasis added). As noted *supra*, in order for the statutory provisions upon which the Wilsons relied to apply, the Wilsons must prove:

> (i) that [the Wilsons] in good faith tendered an instrument to [Mrs. Trader] as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) [Mrs. Trader] obtained payment of the instrument.

*6 Del. C. § 3-311(a).*

**[*10]**

**1. Liquidated v. Unliquidated**

Whether a claim is liquidated or unliquidated is generally considered a question of fact. *State v. Massachusetts, 9 A.2d at 80.* A liquidated claim is one which has been fixed by agreement or can be exactly determined by the application of rules of arithmetic or of law. *Id.* The Court of Common Pleas found that Mrs. Trader loaned the Wilsons a total of $100,000 based on two Notes, dated May 22, 1992, and October 7, 1992. Each Note was for the face amount of $50,000, with interest at nine and three quarters percent and principal payable upon demand. Substantial evidence supports this factual finding and this Court will not disturb it. Copies of the Notes were attached to the original Complaint in this matter and the Wilsons do not challenge their authenticity or accuracy. n6 The claim at issue is based upon a fixed agreement and, accordingly, it is liquidated.

> n6 In fact, the Wilsons or their agents drew up the Notes.

**2. Bona Fide Dispute**

The **[*11]** defense of accord and satisfaction may still be available to the Wilsons if the Court of Common Pleas erred in its conclusion that the money due Mrs. Trader was not the subject of a bona fide dispute. In order for a dispute to be deemed bona fide, it must be (1) honest and advanced in good faith, and (2) founded on some reasonable, tenable or plausible ground. *Acierno, 693 A.2d at 1069.* Like the question of whether a claim is liquidated, whether a claim is subject to a bona fide dispute is a factual determination. *Id.* The Wilsons argue that their setoff claim against Mrs. Trader constitutes a bona fide dispute as to the total sum owed. n7 The Court of Common Pleas found that Mrs. Trader did not assume her husband's debts and that she did not act as a guarantor of her husband's debts. Instead, she merely made payments on her husband's behalf. n8 Trial Tr. at 176-77. In effect, the Court of Common Pleas found that, because Mr. Trader's debts were unrelated to the Wilsons' debt to Mrs. Trader, there could be no dispute over the amount owed on the Notes. Since the Court of Common Pleas concluded that Mrs. Trader did not guarantee her husband's debts, it concluded that **[*12]** the defense of accord and satisfaction was moot. Trial Tr. at 178.

> n7 A setoff claim is defined as, "A defendant's counter demand against the plaintiff, arising out of a transaction independent of the plaintiff's claim."

*Black's Law Dictionary* 1376 (7th ed. 1999).

n8 The terms "guarantor" and "surety" are used interchangeably by the parties, as arguably both are at issue. *See* Trial Tr. at 12. There are legal distinctions, however. The following summary of these differences is helpful:

> While a surety and guarantor have this in common, that they are both bound for another person, yet there are points of difference. . . . A surety is usually bound with his principal by the same instrument, executed at the same time and on the same consideration. . . . On the other hand, the contract of guarantor is his own separate undertaking, in which the principal does not join. It is usually entered into before or after that of the principal, and is often founded on a separate consideration from that supporting the contract of the principal

*Black's Law Dictionary* 1455 (7th ed. 1999) (quoting 1 George W. Brandt, *The Law of Suretyship and Guaranty* § 2, at 9 (3d ed. 1905)). Presumably, the Wilsons argued that Mrs. Trader acted as a surety with respect to Mr. Trader's debt to the Wilsons for the cost of upkeep of his horses and as a guarantor with respect to Mr. Trader's debt to Wilson's Auction.

[*13]

I concur with the Court of Common Pleas's determination that the Wilsons do not have a viable claim against Mrs. Trader for the debts of her husband. The Wilsons incurred the debt to Mrs. Trader long before Mrs. Trader married Mr. Trader. There is no evidence to support a finding that Mrs. Trader knew the amount of money Mr. Trader owed Wilson's Auction at the time of the Traders' marriage or at any other time prior to the time the check at issue was presented to her. The only evidence in the record relating to any knowledge of Mrs. Trader's as to Mr. Trader's debts with the Wilsons (prior to the Wilsons' issuance of the $ 60,292.05 check) is one conversation whereby Mr. Wilson conveyed the fact that Mr. Trader owed money for the care of his horses. There is no evidence that *anyone* knew the scope of Mr. Trader's debt to Wilson's Auction at any time prior to the issuance of the check. The Court of Common Pleas found that Mrs. Trader was extremely clear and careful in conveying to the Wilsons that she considered her husband's debts, whatever they were, to be his problem. n9 In fact, not only were the debts unrelated but there is evidence that the Wilsons did not pursue their setoff [*14] claim in good faith. The amount of Mr. Trader's debt was unknown to all parties at the time Mrs. Trader allegedly agreed to assume his debts. The charge for the horse care, the one debt of which Mrs. Trader arguably had specific knowledge, was not included in the deductions taken from the $ 100,000 amount due. The Wilsons did not request that Mrs. Trader make a written guarantee for her husband's debts, despite the large dollar amount involved. Since the setoff against Mrs. Trader is without merit, there can be no bona fide dispute as to the dollar amount owed on the Notes and the defense of accord and satisfaction fails.

n9 The Court of Common Pleas placed significant emphasis on Mrs. Trader's forthrightness with the court. This is a credibility assessment which this Court may not disturb.

Although this Court affirms the Court of Common Pleas's determination that there was not a viable setoff claim against Mrs. Trader, even if the setoff claim were meritorious, public policy would be better served by requiring [*15] unrelated debts to be handled separately by the courts. If the Court were to allow every unrelated setoff claim to cancel out other debts owed to the original plaintiff in the context of an accord and satisfaction situation, then liquidated debts of all types could be called into question based on fabricated setoff claims. When other jurisdictions have been presented with similar facts, they have held that in order for a bona fide dispute to arise, a setoff claim must be related to the same transaction that is the subject of the lawsuit. *See, e.g., Cartan & Jeffrey v. WM. Thackaberry Co.,* 139 *Iowa* 586, 117 *N.W.* 953, 953-54 *(Iowa 1908)* (holding that an indebtedness alleged in a separate transaction was not sufficient to create a bona fide dispute as to the debt at issue); *Holman Mfg. Co. v. Dapin,* 181 *Wis.* 97, 193 *N.W.* 986, 987 *(Wis. 1923)* (emphasizing the import of the fact that the setoff claim brought arose out of the same transaction as the debt at issue).

In summary, the evidence presented below was insufficient to support a finding of either an unliquidated debt or a debt subject to a bona fide dispute.

*C. Mrs. Trader's Assumption of Mr.* [*16] *Trader's Debts*

The Wilsons also argue that the Court of Common Pleas erred in finding that Mrs. Trader did not assume her husband's debts. The Delaware statute of frauds provides that an agreement to answer for the debt of another must be reduced to writing to be enforceable. *6 Del. C. § 2714(a).* The contract to assume the debt of another "must not only be in writing but the writing must contain on its face enough to show that the person signing it was assuming liability." *Woodcock v. Udell,* 48 *Del.* 69, 97 *A.2d* 878, 881 *(Del. Super. 1953).* Where the promissor becomes a guarantor or surety upon a debt of a third person and promises to be personally and primarily liable for the debt, the agreement does not fall within the statute of frauds if the promissor receives a personal benefit for her promise. *Id.*

The Wilsons posit that Mrs. Trader's checks to Wilson's Auction containing the notation "Payment of Gary Trader's Bill" are sufficient to bind her to her alleged oral agreement to assume Mr. Trader's debt. The Court of Common Pleas concluded that the facts surrounding Mrs. Trader's submission of these checks to Wilson's Auction did [*17] not support a finding that Mrs. Trader was acting as a guarantor. The Court of Common Pleas, citing Mrs. Trader's testimony, found that she did not guarantee the debt of her husband. Rather, the Court of Common Pleas held that she acted merely as a conduit by accepting money from Mr. Trader as he earned it and dispersing it to his various creditors on his behalf.

The Wilsons argue that the Court of Common Pleas placed undue emphasis on its finding that there was no meeting of the minds between Mr. Wilson and Mrs. Trader as to the amount of money at stake when the Court of Common Pleas determined that Mrs. Trader did not guaranty her husband's debts. The Court of Common Pleas did, indeed, find that Mr. Wilson and Mrs. Trader did not have a meeting of the minds as to the total sum involved. However, I

find that the rationale for the Court of Common Pleas's decision rested on other factual findings, as well. The Court of Common Pleas was specific in noting that, based upon Mrs. Trader's testimony, it concluded that she was not acting as a guarantor for Mr. Trader's debts. Mrs. Trader's testimony related many facts above and beyond the fact that she did not know what Mr. Trader's total [*18] debts were. She testified that she was very clear about her money dealings with the Wilsons, that she was explicit in telling the Wilsons that Mr. Trader's debts were not her own and that she did not wish to speak with the Wilsons regarding them. Furthermore, the Court of Common Pleas found that Mrs. Trader did make an offer to the Wilsons to pay them $ 10,000 for the debt on Mr. Trader's horses. Although the Wilsons did not accept the offer, it is additional evidence that supports the Court of Common Pleas's conclusion that Mrs. Trader was consistent with respect to her financial dealings with the Wilsons and did not enter into an agreement to repay a debt of an unknown sum.

At trial, the Wilsons also argued that Mrs. Trader accepted a personal benefit from the sale of Mr. Trader's horses and that this benefit received bound her to repay the debts of Mr. Trader. The Court of Common Pleas did not make a specific finding on this issue and the argument has been abandoned on appeal. No evidence was introduced at trial to indicate that Mrs. Trader received any personal benefit from the sale of her husband's horses. In addition, the money owed for the care of the horses was due to the [*19] Wilsons in their individual capacities and the debt which Mrs. Trader allegedly assumed was owed to Wilson's Auction.

I agree with the Court of Common Pleas's conclusion. Mrs. Trader did not execute a written agreement by which she assumed Mr. Trader's debt. Her signature on the checks presented to Wilson's Auction was insufficient to support a written contract. Additionally, regarding this alleged contractual obligation, there was no meeting of the minds as Mrs. Trader could not ascertain the amount of debt at the time. Mrs. Trader did not receive any personal benefit from the alleged assumption of her husband's debt and, therefore, the guaranty is not exempt from compliance with the statute of frauds.

## D. Conclusion

Based on the foregoing. I find the conclusions of the Court of Common Pleas that Mrs. Trader did not assume the debts of her husband and that her cashing of the Wilsons' check did not constitute an accord and satisfaction were correct. Therefore, Mrs. Trader is due the balance on the Notes in the principal amount of $ 39,707.95, plus interest at the Promissory Note rate of nine three quarters percent from April 1, 1998. The decision of Court of Common Pleas [*20] rendered on May 30, 2001, is affirmed.

**IT IS SO ORDERED.**

E. Scott Bradley

LEXSEE 369 SW.2D 651

**James M. Warner, Appellant, v. The First National Bank of Waco, Texas, Appellee**

No. 14132

Court of Civil Appeals of Texas, San Antonio

*369 S.W.2d 651; 1963 Tex. App. LEXIS 2172*

June 19, 1963

OPINIONBY:    [**1]

POPE

OPINION:

[*651]   POPE, Justice.

First National Bank of Waco recovered a $204,000 judgment against James M. Warner on two written guaranties, one of which Warner executed in March, 1956, and the other on December 19, 1960.  Warner contends that the last guaranty was not cumulative but was a substitute for and in revocation of the earlier guaranty.  The case was tried without a jury.  We affirm the judgment.

[*652]   The Bank, at the time of judgment, was the holder of $204,000 worth of notes against Top O' the World, a limited partnership engaged in agriculture.  In March, 1956, Warner signed the first of four written guaranties to enable the partnership to obtain credit needed in its operations.  That guaranty provided: "this guarantee is a continuing guarantee for the said sum, including accrued interest and attorney's fees, and shall remain in force until duly revoked by us by notice in writing to said Bank or its assigns, and shall extend to and cover all renewals of any claims or demands guaranteed under this instrument or extensions of time

of payment thereof, and shall not be affected by any surrender or release by said Bank or its assigns of any other security [**2]  held by it for any claims or demands hereby guaranteed." The guaranty was limited in amount to $200,000, but was unlimited as to time or the number of transactions it covered.

During May of 1956, unsolicited by the bank, Warner delivered another guaranty to the Bank.  This second guaranty was signed by Warner and many other persons, but his liability was limited to $46,875.  It also was limited as to time, since it guaranteed the payment of funds which the bank might advance the partnership up to April 30, 1957.  The total of the guaranties by those signing the second guaranty was $300,000.  The second provided that each of the multiple guarantors was liable for the "maximum amount set opposite their individual name and signature, and no more." It is this clause which Warner claims was a revocation of his first guaranty. A third guaranty was executed February 18, 1958, with multiple guarantors. It was expressly in renewal of the second and extended to loans made the partnership up to December 31, 1959.  Warner's liability on this third guaranty was limited to $47,224.08.  It contained the same clause, quoted above from the second guaranty. A fourth guaranty was executed December  [**3]

369 S.W.2d 651, *; 1963 Tex. App. LEXIS 2172, **

19, 1960, with multiple guarantors. It was expressly in renewal of the third guaranty. Warner's liability was limited to $47,224.08, and it too contained the same clause as that quoted from the second guaranty.

The Bank brought suit upon the first continuing guaranty, and also on the fourth one, which was in renewal of the second and third guaranties. The Bank is entitled to recover under the first continuing guaranty as well as the fourth guaranty, unless the wording of any of the last three guaranties constituted notice in writing to the Bank of the revocation of Warner's first guaranty of any future loans.

The clause in the second, third and fourth guaranties, which stated that the guarantors were liable for the maximum amount set opposite the individual name and signature and no more, was not intended nor accepted as a revocation of the first guaranty. When we lay the first and second guaranties side by side, we see that they were intended to accomplish different purposes. The first was to secure the Bank in its loans to the partnership, up to $200,000, through Warner's continuing guaranty without limit as to purpose of the expenditures. It was operative from March, 1956.    [**4] The second was to secure the Bank up to $300,000, but only for the crop years 1956 and 1957, and then only for loans for designated purposes. Those stated purposes were for operating funds, investments in farm machinery, pumps and fixtures. The second guar-anty was not to secure any loans for land investments by the partnership. The first and second guaranties were for different purposes and different limits, both as to time and amount. The trial court apparently considered the first guaranty as general and continuing in nature, while the second, which was renewed by the third and fourth guaranties, was for a special and somewhat more limited purpose with a limitation of time. It appears that the second and subsequent guaranties were intended and accepted as additional ones. 24 Am.Jur., Guaranty, § 79.

"For a guarantor to be released from liability by a subsequent guaranty, it [*653] must appear that the later guaranty was intended and accepted as a substitute for the former; otherwise the creditor may resort to both guaranties." 38 C.J.S. Guaranty § 80. The fact alone that additional guaranties are provided does not prove that the original continuing guaranty was destroyed. [**5] *Bryant v. Food Machinery and Chemical Corporation, Niagara Chemical Div., (La.) 130 So.2d 132; First National Bank of Waterloo v. Story, 200 N.Y. 346, 93 N.E. 940, 34 L.R.A.,N.S., 154; Sciaballa v. Illinois Surety Co., 166 App.Div. 677, 152 N.Y.S. 760; Barnes v. Cushing, 168 N.Y. 542, 61 N.E. 902; 81 A.L.R. 793.*

Since the first guaranty was not revoked in writing, as required by its terms, the judgment upon both the first and fourth guaranties is affirmed.

LEXSEE 877 A.2D 1024

DAVID J. WEIL, on behalf of himself and all others similarly
situated, Plaintiff, v. MORGAN STANLEY DW INC., and
HARRISDIRECT LLC, Defendants.

C.A. No. 791-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

877 A.2d 1024; 2005 Del. Ch. LEXIS 109

May 25, 2005, Submitted
July 25, 2005, Decided

**SUBSEQUENT HISTORY:** Affirmed by *Weil v. Morgan Stanley DW, Inc.*, 2005 Del. LEXIS 524 (Del., Dec. 22, 2005)

**DISPOSITION:** [**1] Weil's complaint dismissed.

**COUNSEL:** Ronald A. Brown, Jr., Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Arthur T. Susman, Esquire, Charles R. Watkins, Esquire, John R. Wylie, Esquire, and Glenn L. Hara, Esquire, SUSMAN & WATKINS, Chicago, Illinois; Mark G. Slutsky, Esquire, MARK G. SLUTSKY & ASSOCIATES, Lincolnshire, Illinois, Attorneys for Plaintiff.

Jon E. Abramczyk, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; William H. Pratt, Esquire, Eric F. Leon, Esquire, and Joshua B. Simon, Esquire, KIRKLAND & ELLIS LLP, New York, New York, Attorneys for Defendants Morgan Stanley DW Inc. and HarrisDirect LLC.

**JUDGES:** STRINE, Vice Chancellor.

**OPINIONBY:** STRINE

**OPINION:** [*1025] STRINE, Vice Chancellor

In 2002, Morgan Stanley sold its online brokerage business and customer accounts to another firm, HarrisDirect. By contract with its customers -- all of whom had the unfettered right to terminate their relationship with Morgan Stanley at any time -- Morgan Stanley had clearly reserved the right to assign its customer accounts to a buyer such as HarrisDirect. [**2]

When Morgan Stanley sold to Harris-Direct, it sent information to its customers informing them of the sale and the services they would receive if they opted to continue on as HarrisDirect customers after the sale. Among those services was the option to continue to use money market sweep accounts, such as those Morgan Stanley offered. Through such accounts, customers may earn a modest amount of interest on uninvested cash in their brokerage portfolios. But for most of the former Morgan Stanley customers, like the plaintiff here, HarrisDirect intended to use its own sweep account funds, rather than the sweep account funds formerly used by Morgan Stanley.

The plaintiff here opted to stay with HarrisDirect and to use its sweep account services. He continued to use HarrisDirect's sweep account services for approximately sixteen months after the sale, and he did not suffer any

loss from doing so. The plaintiff closed his accounts with HarrisDirect in November 2003. Yet, on November 2, 2004, more than two years after the sale and a year after closing his accounts, he brought this suit alleging that Morgan Stanley breached fiduciary duties it owed to him. His theory is that part of the $ [**3] 106 million HarrisDirect paid must have been attributable to its expectation that former Morgan Stanley customers would use HarrisDirect's sweep account services. The plaintiff claims that Morgan Stanley, in profiting by selling that expectation, was disloyal to its customers.

In this opinion, I reject the legal viability of this contention. In his contract, the plaintiff agreed that whatever rights he possessed against Morgan Stanley would be governed by California law, the state [*1026] where Morgan Stanley operated its online brokerage. Under California law, Morgan Stanley did not owe wide-ranging fiduciary duties to the plaintiff, for whom it merely provided non-discretionary investment services. Moreover, it is only because of his contract with Morgan Stanley that any fiduciary relationship of any kind was established and defined. That is, the existence, in the first instance, and the scope of any fiduciary duties owed to the plaintiff by Morgan Stanley turn on the contract they entered with each other.

By that contract, Morgan Stanley clearly reserved for itself the right to do what it did: to sell its brokerage accounts to a buyer like HarrisDirect.

That it had done so and that it [**4] expected to be paid $ 106 million in exchange for those accounts was fully disclosed to the plaintiff. He -- and every other Morgan Stanley customer -- clearly knew that HarrisDirect was paying Morgan Stanley for the opportunity to persuade former Morgan Stanley customers to remain with HarrisDirect and for the opportunity to sell services -- like sweep accounts -- to them. In other words, it was obviously central to the transaction that HarrisDirect was "buying" Morgan Stanley's customers in the non-pernicious sense that it "bought" the opportunity to service those clients if those clients did not decide, as was always their right at any time, to terminate their brokerage accounts. That was also specifically true as to sweep account services, which clients like the plaintiff were free not to use. Those customers were not forced to use HarrisDirect's services, nor were they misled in any way.

To indulge this claim would be to use the fiduciary duty tool for an improper purpose, permitting the plaintiff to rework a voluntary contractual relationship and capture a windfall gain while depriving Morgan Stanley of its reasonable expectations. By so doing, this court would invent an "equitable [**5] duty" of boundless scope when there is no inequity justifying that innovation and when this novelty would undermine both the economic fairness and the efficiency that result from the freedom to contract.

I cannot fathom how Morgan Stanley breached any fiduciary duty to the plaintiff by doing what the plaintiff had contractually agreed that it could do -- assign his account agreement -- and profiting from it. By its actions, Morgan Stanley did not usurp any value rightfully belonging to the plaintiff.

I. Factual Background

These are the facts as pled in the complaint and the documents referenced therein. The plaintiff, David J. Weil, became a brokerage customer of Morgan Stanley n1 in 1999. At that time, Morgan Stanley operated an online brokerage business offering a variety of accounts to its customers. Most important for present purposes, Morgan Stanley offered a money market sweep

877 A.2d 1024, *; 2005 Del. Ch. LEXIS 109, **

feature for its customers. Unless its customers directed otherwise, Morgan Stanley swept their uninvested cash into customer-appropriate, interest-bearing money market funds operated by Alliance Capital Management. By this means, customers could earn some modest return from their undeployed cash [**6] on account with Morgan Stanley.

> n1 During the relevant period, Morgan Stanley's brokerage business went by various names, including "Morgan Stanley Dean Witter Online Inc." For ease of reference, I refer to defendant Morgan Stanley DW Inc. and its predecessors in the relevant brokerage business as "Morgan Stanley."

Weil opened two non-discretionary brokerage accounts with Morgan Stanley, the first in 1999 and the second in 2000, and used Morgan Stanley's sweep account services [*1027] in connection with both of those accounts. Weil signed applications in order to open his accounts. In those account applications, Weil specifically agreed and acknowledged that Morgan Stanley could "transfer [its Agreement with Weil] to Morgan Stanley Dean Witter Online's successors and assigns." n2 By signing the account applications, Weil also agreed to the terms of separate customer agreements that specifically stated:

> Successors. You hereby agree that this Agreement and all its terms shall be binding on your heirs, executors, [**7] administrators, personal representatives, and assigns. This Agreement will inure to the benefit of Morgan Stanley Dean Witter Online and its successors, assigns, and agents. Morgan

Stanley Dean Witter Online may assign its rights and duties under this Agreement to any of its subsidiaries or affiliates without giving you notice, or to any other entity upon prior written notice to you. n3

As important, the customer agreement gave Morgan Stanley the right to terminate Weil's accounts "at any time for any reason." n4 This made the relationship between Morgan Stanley and Weil reciprocal, as Weil retained the discretionary right to withdraw his funds at any time and to go to another broker. Neither the account applications nor the customer agreements gave Weil any right to compensation if Morgan Stanley terminated or assigned his accounts.

> n2 Def. Br. at Ex. A.
>
> n3 Def. Br. at Ex. B.
>
> n4 *Id.*

In June 2002, the events that give rise to this lawsuit began to unfold. At that time, Morgan Stanley notified [**8] its customers, including Weil, and the public that it had signed a contract with defendant HarrisDirect LLC. Under that agreement, Morgan Stanley agreed to transfer approximately 150,000 of its online brokerage accounts to HarrisDirect on July 26, 2002 and to depart the online brokerage business. In exchange, Morgan Stanley would receive $ 106 million from HarrisDirect.

As part of its effort to communicate that information, Morgan Stanley sent a letter to each of its online brokerage customers outlining the products and services that HarrisDirect offered and the effect that the agreement with HarrisDirect would have on them. That letter included descrip-

877 A.2d 1024, *; 2005 Del. Ch. LEXIS 109, **

tive information such as a copy of the new account agreement with HarrisDirect that would govern a customer's relationship with HarrisDirect if she wished to continue with them, and similar information about various kinds of accounts. This information was, of course, necessary if customers were to be afforded an opportunity to make decisions in the wake of the transaction with HarrisDirect. The letter also included a paragraph addressing customers like Weil who had sweep accounts. That paragraph stated:

> Conversion of Money Market [**9] Funds. If you currently have an Alliance Money Market Fund as your sweep fund, Harris*direct* will be offering a corresponding Alliance or Harris Insight Service Shares Money Market Fund. The enclosed prospectus and Money Fund comparison sheet are provided for your information and review. It is important that you read the prospectus and the Money Fund Comparison sheet, which outline the fees and investment objectives associated with each fund. n5

n5 Pl. Br. at Ex. A.

In addition, Weil and other customers were sent a chart that compared, in detail, the terms and conditions of the various sweep account funds that they currently were invested in with Morgan Stanley and [*1028] the new HarrisDirect sweep account funds that their cash would be transferred into as of July 26, 2002.

The chart also clearly stated:

> Enclosed is a prospectus for the Service Shares of the Harris Insight Money Market Funds. Your current money market fund holdings will be exchanged for an equivalent amount of Service Shares of the [**10] corresponding Harris Insight Money Market Fund effective July 26, 2002 unless you have previously advised us to the contrary. You do not need to take any action in connection with the transfer and exchange of your account, and you will not be charged any fees for those transactions.

> An investment in a money market fund is not a deposit in a bank and is not insured or guaranteed by the Federal Deposit Insurance Corporation (FDIC) or any other government agency. Although each money market fund seeks to preserve the value of your investment at $ 1.00 per share, it is possible to lose money by such an investment. n6

n6 Pl. Br. at Ex. B.

This aspect of the deal with HarrisDirect is not hard to understand. Unlike Morgan Stanley, which contracted with Alliance Capital Management to provide sweep accounts, HarrisDirect apparently offered sweep accounts of its own. Where possible, therefore, HarrisDirect intended to use its own sweep account services to service the new brokerage customers transferred from Morgan [**11] Stanley. Where such transfers were not possible -- for example, where customers used specialized sweep accounts (e.g., those invested in certain state-specific funds) of a type that

877 A.2d 1024, *; 2005 Del. Ch. LEXIS 109, **

HarrisDirect did not offer -- Harris-Direct intended to use the same Alliance funds that Morgan Stanley had used, even after those customers' brokerage accounts were transferred to HarrisDirect.

The plaintiff, Weil, however, and the class of other customers he seeks to represent, were among those Morgan Stanley customers whose non-specialized sweep accounts, absent an election to discontinue their sweep account services or to terminate their brokerage relationships with HarrisDirect altogether, were transferred into HarrisDirect sweep accounts on July 26, 2002.

Weil has not pointed to any false or misleading statements by Morgan Stanley in communication with customers about the transaction with HarrisDirect that induced him to use the new sweep account services. At most, Morgan Stanley made the sort of positive introductory statements that any departing owner would make about a reputable new owner buying a business whose value depended on customer retention. This sort of obvious puffery, when unaccompanied [**12] by any false or misleading statements, is utterly harmless, and not actionable as a breach of fiduciary duty.

Having had the chance to terminate his relationship with Morgan Stanley or elect not to use a HarrisDirect sweep account, Weil made, by inaction, the election to stay with HarrisDirect and use its sweep accounts. Thus, on July 26, 2002, the money in his Alliance sweep accounts was transferred into new HarrisDirect sweep accounts. Weil retained his brokerage accounts, with their related sweep accounts, with HarrisDirect until November 2003.

On November 2, 2004, a leisurely amount of time since Weil closed his accounts and an even more languorous period since Weil accepted the transfer of his accounts to HarrisDirect, Weil brought this complaint.

Oddly, no economic setback related to the performance of the HarrisDirect [*1029] sweep accounts inspired the filing of this suit. Weil does not allege that his HarrisDirect sweep accounts paid him a lower rate of return than he would have made had he remained invested in the prior Alliance funds.

It is not the case here that Weil, having suffered a loss at the hands of Morgan Stanley or HarrisDirect, now seeks redress for that injury. Weil [**13] was apparently apprised of the opportunity to prospect for upside gains, not because he was actually injured, but because certain case law in Delaware suggested to (one surmises) Weil's counsel that a windfall at Morgan Stanley's expense might be available to him and others similarly situated. That inference flows from the nature of the claim that Weil pleads in his complaint, which I describe next.

II. Weil's Claim For Breach Of Fiduciary Duty

In his brief complaint, Weil pleads only two counts. Both center on the same conduct by Morgan Stanley.

Count One is directed at Morgan Stanley and alleges that Morgan Stanley breached a fiduciary duty of loyalty it owed to Weil and other brokerage customers in entering into the HarrisDirect transaction. The essence of this claim is that a portion of the $ 106 million that Morgan Stanley received from HarrisDirect must have been attributable to Morgan Stanley's agreement to facilitate the transfer of cash in its brokerage customers' sweep accounts to HarrisDirect sweep accounts.

According to Weil, Morgan Stanley therefore accepted funds -- for whatever value HarrisDirect placed on this aspect of its agreement with Morgan Stanley -- that [**14] somehow