rightly belonged to Weil and other similarly situated customers.

Count Two of the complaint tracks Count One, and simply alleges that HarrisDirect aided and abetted Morgan Stanley's breach of fiduciary duty by negotiating the provision of the contract dealing with sweep accounts and that it therefore somehow "knowingly" participated in a breach of fiduciary duty.

III. The Defendants' Motion To Dismiss

Morgan Stanley and HarrisDirect have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. In addressing their motions, I therefore apply the settled standard applicable to motions under Rule 12(b)(6). Under that standard, I must accept all well-pled allegations of fact as true and draw all reasonable inferences in the plaintiffs' favor, but I cannot give weight to conclusory allegations of wrongdoing unsupported by pled facts. n7 In evaluating the motions, I may consider the undisputed terms of the documents fairly incorporated in the complaint, n8 various of which have been cited as indisputably authentic in the briefs of the parties.

n7 See, e.g., Solomon v. Pathe Communications Corp., 672 A.2d 35, 38 (Del. 1996).

[**15]

n8 See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc., 691 A.2d 609, 612-13 (Del. 1996); In re Santa Fe Pacific Corp. S'holder Litig., 669 A.2d 59, 69-71 (Del. 1995).

IV. From O'Malley v. Boris to Weil v. Morgan Stanley

As adverted to, Weil bases his claims on a series of decisions in another case -- O'Malley v. Boris n9 -- brought by his attorneys [*1030] that involved facts that bear some faint resemblance to the ones alleged here. The analysis of Weil's claims is best done with an understanding of those decisions in mind.

n9 The original decision in that case dismissed the complaint. O'Malley v. Boris, 1999 Del. Ch. LEXIS 21, 1999 WL 39548 (Del. Ch. Jan. 19, 1999). The Supreme Court reversed that dismissal in O'Malley v. Boris, 742 A.2d 845 (Del. 1999). Eventually, the plaintiffs were granted partial summary judgment on their claims in O'Malley v. Boris, 2002 Del. Ch. LEXIS 33, 2002 WL 453928 (Del. Ch. Mar. 18, 2002). For ease of reference, I will refer to these decisions, respectively, as "O'Malley I," "O'Malley II," and "O'Malley III."

[**16]

The culminating decision in O'Malley v. Boris, which I will call "O'Malley III," granted summary judgment for the customers of a brokerage firm whose money in sweep accounts had been transferred, with their silent consent, into new sweep accounts managed by a different adviser. In that case, the plaintiffs were brokerage clients of Everen, a full service brokerage firm.

Everen entered into a joint venture agreement with a group of financial services companies that I will refer to collectively as "Mentor." As part of the Mentor deal, a new Joint Venture would be formed to provide a variety of investment services, to Everen's existing brokerage clients, and, apparently, to other investors. For its participation in the deal, Everen was to receive at least 20% of

the Joint Venture's stock. But Everen's ownership interest in the Joint Venture was contingent, and could increase to as much as 50% if a significant proportion of Everen's customers ultimately invested their cash in funds managed by the Joint Venture.

The sweep accounts of Everen customers were important in the Mentor transaction. Before the transaction with Mentor, Everen had used money market funds managed by the [**17] Zurich Kemper fund family to provide sweep account services to its customers. In its deal with Mentor, Everen agreed to facilitate the transfer of its clients' sweep accounts to the money market funds run by the Joint Venture (i.e., the Mentor funds) as well as to include the Joint Venture's other mutual funds and private account managers on its preferred list of recommended investment services. To consummate the transaction, Everen sent each of its clients who used sweep accounts a negative consent letter by which they were told that, unless they objected by a date certain, the cash in their sweep accounts would be transferred from Zurich Kemper funds into funds managed by the Joint Venture. Only 10% or so objected. The lion's share of the cash flowed into Joint Venture-managed sweep accounts, and Everen pumped up its ownership of the Joint Venture. At all times, Everen remained the broker of the affected clients.

In his final decision in the case -- which apparently settled after the ruling -- Chancellor Chandler held that Everen had breached its fiduciary duty of loyalty by premising its choice of the Joint Venture's sweep account funds for its brokerage clients not on what was [**18] best for the clients, but on its desire to receive stock in the Joint Venture. The Chancellor recognized that Everen's duty to its clients who had sweep accounts was limited because those accounts did not vest discretionary investment authority in Everen. Nonetheless, he concluded that Everen could not premise its choice of a provider of sweep account services on its own self-interest, but rather, it had to make that choice in a manner loyal to the best interests of its clients. n10 In the circumstances before him, the Chancellor concluded that Everen's only reason for switching sweep account fund providers was to induce Mentor to provide it with 20% of the Joint Venture, and if its contractual promise to recommend the new Mentor funds persuaded enough Everen customers to agree to the transfer, as much as a 50% interest in the Joint Venture. For that reason, the Chancellor [*1031] reasoned that Everen had essentially been paid to replace its clients' current provider of sweep account services with another and to recommend that its clients to continue to use the services of the new provider.

n10 *O'Malley III*, 2002 Del. Ch. LEXIS 33, 2002 WL 453928, at *3.

[**19]
Furthermore, the Chancellor found that Everen's breach of the duty of loyalty had not been ratified by the choice of a majority of its clients to transfer their cash to the new sweep accounts provided by the Joint Venture. Bound in large measure by the Supreme Court's prior ruling in *O'Malley II*, the Chancellor concluded that Everen had not adequately disclosed its self-interest in recommending that its clients move their funds into the new Joint Venture sweep accounts. Specifically, he found that Everen had not adequately disclosed: 1) that it received 20% of the Joint Venture not for cash, but in exchange for its promise to recommend Joint Venture-provided services, such as the sweep

accounts, to its brokerage customers; and 2) that it would receive additional equity in the Joint Venture if its recommendations to use the Joint Venture's sweep accounts received sufficient assent from its clients. n11 Had Everen's clients known of the economic motivations Everen had for recommending that they permit the transfer of their cash from the Kemper Zurich sweep accounts into the accounts provided by the Joint Venture, the Chancellor believed that their decision-making process might have [**20] been affected. As a result, he concluded not only that Everen's failure to provide this material information prevented it from obtaining ratification effect, but also that the failure to disclose that material information itself constituted an additional breach of fiduciary duty.

n11 *2002 Del. Ch. LEXIS 33, [WL] at *6-7.*

The Chancellor's decision was also predicated on a determination of choice of law he had made in his original decision addressing the defendants' motion to dismiss, *O'Malley I*. In the dismissal decision, the Chancellor concluded that the customers' claims against Everen were governed by Delaware law. Everen was headquartered in Illinois and its brokerage customers were scattered throughout the nation. Everen's contracts with its clients contained an express Illinois choice of law provision. Nonetheless, the court held that Delaware had the most significant relationship to the customers because Everen was a Delaware corporation and "where a Delaware corporation is sued in a class action over a corporate law issue [**21] . . . it is proper to apply Delaware substantive law, except where there was an explicit agreement between the members of the class and the defendant to do otherwise . . . ."

n12 The choice of law determination was never appealed to the Supreme Court.

n12 *O'Malley I, 1999 Del. Ch. LEXIS 21, 1999 WL 39548, at *3.*

By analogy to the *O'Malley* line of cases, Weil argues: 1) that his and the class's claims are governed by Delaware law because Morgan Stanley is a Delaware corporation; 2) that a portion of the $ 106 million that Morgan Stanley received for selling its brokerage business to HarrisDirect must have been attributable to profits HarrisDirect expected to make from providing sweep account services to former Morgan Stanley clients like Weil, whose sweep account services HarrisDirect would provide absent an affirmative choice by the clients to the contrary; and 3) that Morgan Stanley was precluded, by its duty of loyalty to Weil and its other brokerage clients, from receiving consideration from HarrisDirect, as [**22] a purchaser of its brokerage business, attributable in any part to HarrisDirect's expectation that Morgan Stanley clients would roll over the cash in their sweep accounts into new sweep accounts managed by HarrisDirect.

[*1032] For reasons I now explain, I conclude that these arguments lack legal merit and that Weil's claims must be dismissed.

V. California Law, Not Delaware Law, Governs The Relationship Between Morgan Stanley, As A Broker, And Weil, Its Customer

Weil is a resident of Illinois. When he and other Morgan Stanley customers signed up for on-line brokerage services, they agreed to the following choice of law provision:

h. Choice of Law. This Agreement shall be deemed to

have been made in the State of California and shall be construed, and the rights and liabilities of the parties determined, in accordance with the laws of the State of California. n13

The choice of California law also had a geographic nexus to the parties' relationship, as Morgan Stanley's online brokerage business, with which Weil and the putative class he seeks to represent contracted, was headquartered in San Francisco.

n13 Def. Br. at Ex. B.

[**23]

Under Delaware law, the choice of law provision Weil assented to must be respected as long as the law selected "bears some material relationship to the transaction." n14 In this instance, Morgan Stanley was headquartered in California, and it was therefore logical for it to premise its relationship with its customers on that state's law. As important, given that Morgan Stanley was doing business nationwide, if not worldwide, it had an interest in ensuring that a single body of law governed all of its customer relationships.

n14 *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1293 (Del. 1989) (citing *Wilmington Trust Co. v. Wilmington Trust Co.*, 26 Del. Ch. 397, 24 A.2d 309, 313 (Del. 1942).

Because the California choice of law provision is valid, the question of its proper scope is also a question of California law, as it turns on how the choice of law provision should be read. n15 This is a matter of hornbook law. n16

n15 See, e.g., *Odin Shipping Ltd. v. Drive Ocean V MV*, 221 F.3d 1348 (Table), 2000 WL 576436, at *1 (9th Cir. 2000) ("The scope of [a choice of law provision] is a matter of contract construction and interpretation . . . which would in turn be governed by the law selected in the choice-of-law provision.") (citations omitted); *Washington Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 103 Cal. Rptr. 2d 320, 15 P.3d 1071, 1078 n.3 (Cal. 2001) ("the scope of a choice-of-law clause in a contract is a matter that ordinarily should be determined under the law designated therein"); *Roll Int'l Corp. v. Unilever United States, Inc.*, 2001 Cal. App. Unpub. LEXIS 2006, 2001 WL 1345012, at *5 (Cal. Ct. App. Nov. 1, 2001) ("the scope of the choice of law provision is a question of contract interpretation that should ordinarily be determined pursuant to the laws of . . . the foreign jurisdiction whose law the parties chose.").

[**24]

n16 See Restatement (Second) of Conflict of Law §§ 187, 205 (1971). Section 205 states that "The nature and extent of the rights and duties created by a contract are determined by the local law of the state selected by application of the rules of [§] 187]." Section 187 provides that parties may, through the use of choice of law provisions, designate the law of a certain state to govern their agreement.

In my view, the question of whether the parties' choice of law extends to cover claims for breach of fiduciary

duty is not a close one. Any fiduciary duties Weil claims are owed to him by Morgan Stanley arise solely out of the relationship created by his contract with Morgan Stanley. In that contract, Weil plainly agreed that the "rights and liabilities of the parties" were to be "determined . . . in accordance with the laws of the State of California."

That text should not be interpreted in a crabbed way that creates a commercially senseless bifurcation between pure contract claims and other claims that arise solely because of the nature of the [**25] relations [*1033] between the parties created by the contract. In *Nedlloyd Lines B.V. v. Superior Court of San Mateo County*, the California Supreme Court interpreted a shareholders' agreement containing a choice of law provision stating that "this agreement shall be governed by and construed in accordance with Hong Kong law . . . ." n17 Its en banc decision held that the provision was broad enough to cover all claims arising from or related to the shareholders' agreement, including a claim for breach of fiduciary duty. In so ruling, the California Supreme Court aptly noted:

> When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to *all* disputes arising out of the transaction or relationship. n18

n17 *3 Cal. 4th 459, 11 Cal. Rptr. 2d 330, 332, 834 P.2d 1148 (Cal. 1992)*.

n18 *Id.* at 336 (emphasis in original).

[**26]

That reasoning applies with full force here. The scope of any fiduciary obligations Morgan Stanley owed to Weil must be determined by reference to the contract between them. Why? Because Weil claims that Morgan Stanley, as his agent-broker, breached fiduciary duties that it owed to him as a result of the contractual relationship they had formed. Therefore, to determine whether that is so, one must look to the contract to determine "the scope of the agency set forth in the agreement" between Weil and Morgan Stanley. n19

n19 *See, e.g., Meyers v. Guarantee Savings & Loan Ass'n, 79 Cal. App. 3d 307, 144 Cal. Rptr. 616, 620 (Cal. Ct. App. 1978)*.

In this case, for example, one cannot evaluate Weil's contention without examining several relevant provisions of the contract that define the nature of the power Morgan Stanley would undertake over Weil's property. For example, an important provision of the contract reflects Weil's acknowledgement of Morgan Stanley's limited role, including the fact that Morgan Stanley would [**27] not be providing him with investment advice:

> By entering into this Agreement, you acknowledge that *decisions relating to your investments* or trading activity *must be made by you or your duly authorized representative*. Morgan Stanley Dean Witter Online *will not*

Apx. 535

*provide you with any* legal, tax or accounting advice or *advice regarding the suitability or profitability of a security or investment.* You also acknowledge that Morgan Stanley Dean Witter Online's employees are not authorized to give any such advice and that *you will not solicit or rely upon any such advice from them or from Morgan Stanley Dean Witter Online.* You agree that *Morgan Stanley Dean Witter Online* and its officers, directors, employees, agents and affiliates *will have no liability for the investment decisions made for your account.* n20

Under California law, the scope of any fiduciary duties owed by a broker to its client is (understandably) extremely narrow when the broker does not exercise any discretion over the client's accounts. In that circumstance, the broker's duty is to faithfully execute the client's desired transactions and does not include any fiduciary obligations [**28] for investment decisions or suggestions. n21

   n20 Def. Br. at Ex. B. (emphasis added).

   n21 See, e.g., Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 769 F.2d 561, 567 (9th Cir. 1985).

[*1034]  Moreover, I do not believe one can make any principled determination of what, if any, fiduciary duty Morgan Stanley owed to Weil without considering other elements of the parties' contract, including the provisions granting Morgan Stanley the right to freely assign Weil's accounts and to terminate its relationship with Weil at any time and for any reason, or Weil's reciprocal right to terminate his relationship with Morgan Stanley at any time. To a large extent, Weil now claims that a supervening fiduciary duty on Morgan Stanley's part sharply limits Morgan Stanley's right of assignment. I fail to grasp any principled basis for evaluating Weil's fiduciary duty claim under a law different from that which the parties chose to govern the contract between them, precisely because any fiduciary relationship [**29] between Weil and Morgan Stanley is defined in the first instance by their contract. Rather, what seems evident is that the parties agreed to a broad choice of law provision that would encompass all claims between them arising out of their contractual relationship.

But Weil nonetheless contends that Delaware law governs his fiduciary duty claim against Morgan Stanley. He bases that argument, however, on a fact about Morgan Stanley that has no bearing on the present case -- the fact that Morgan Stanley is a Delaware corporation.

Had Weil bought stock in Morgan Stanley and later brought a claim that its board and top managers were engaged in self-dealing, his argument would have purchase. In that instance, Weil would have every right to expect that any fiduciary duties owed to him by Morgan Stanley's directors and officers would be governed by Delaware law. The reason is that in that context Morgan Stanley's incorporation in Delaware was, in itself, a choice of law decision. By that decision, Morgan Stanley elected to have the internal affairs of the corporation governed by Delaware law. That choice means not only that its stockholders would have their *contractual rights* under the [**30] corporation's charter and by-laws determined under Delaware law, but that the scope of the *fiduciary duties* owed by the firm's directors

and officers to its stockholders would also be decided by Delaware law.

But Morgan Stanley's decision to incorporate in Delaware has no bearing on its relationship with Weil. Weil entered into a brokerage client relationship with Morgan Stanley and agreed that that relationship would be governed by California law -- the law of the state where Morgan Stanley's relevant operations were located. In no rational way could Weil have factored Morgan Stanley's status as a Delaware corporation into his decision to become a client, because Morgan Stanley's Delaware status has only the (admittedly quite important) effect of establishing that Delaware law will govern the internal affairs of that firm.

Indeed, by parity of reasoning, Weil's decision to sign the contract with a broad California choice of law provision was analogous to that of someone who purchases shares of stock in a Delaware corporation. Anyone who purchases stock in a Delaware corporation acknowledges that the fiduciary duties that the corporation owes to her as a stockholder are defined [**31] by Delaware law. Likewise, by signing the contract, Weil acknowledged that whatever duties Morgan Stanley owed to him arose out of the contractually-created relationship and would be defined by California law. He is now bound by that contractual agreement.

In his initial decision in *O'Malley v. Boris I*, the Chancellor held that Everen's status as a Delaware corporation was relevant "where a Delaware corporation is sued in a class action over a corporate law issue . . . ." n22 I do not disagree with that [*1035] general statement, but I find it inapposite here. n23 Morgan Stanley has not been sued in a class action over a corporate law issue. The only issue is whether it, as a broker, breached any fiduciary duties to its clients. That issue is one that has nothing logically to do with Morgan Stanley's status as a Delaware corporation.

n22 *1999 Del. Ch. LEXIS 21*, 1999 WL 39548, at *3.

n23 One cannot tell from reading the various *O'Malley v. Boris* decisions whether a corporate law issue was present that influenced the choice of law determination. By the express reasoning of the decision, the presence of a corporate law issue was what drove the choice of law determination. No such issue is presented in this case and the reasoning of *O'Malley v. Boris I* is therefore not pertinent here.

[**32]

It would thus be imprudent and inconsistent for a Delaware court to fail to give determinative weight to the parties' choice of California law. Our state obviously relies upon the willingness of other state courts to honor the choice of law reflected in the corporate charters of Delaware firms, even when the parties before them are not geographically situated in Delaware. When the fact of Delaware incorporation has no bearing on the parties' relationship, and they have agreed to a broad choice of law provision that logically governs the claims brought before a Delaware court and that selects another state's law to govern, that choice of law provision must and should be respected by our judiciary.

For all these reasons, California law governs Weil's claim for breach of fiduciary duty.

VI. Weil Has Failed To State A Claim For Breach Of Fiduciary Duty Under California Law

With the governing law settled, I now evaluate whether Weil has stated a claim for breach of fiduciary duty. The gist of Weil's claim is, as discussed, grounded in the decisions in *O'Malley v. Boris* and the theory that Morgan Stanley could not, as an upstanding fiduciary, be paid by Harris-Direct for any expectation [**33] by HarrisDirect that it would, as the purchaser of Morgan Stanley's online brokerage accounts, be able to provide sweep account services for former Morgan Stanley customers who elected to stay as brokerage customers of Harris-Direct.

That contention, however, does not state a claim for breach of fiduciary duty under California law. As noted previously, any fiduciary duties Morgan Stanley owed to Weil were limited by "the scope of the agency set forth in the agreement." n24 As a broker administering a non-discretionary brokerage account for Weil, Morgan Stanley owed him only very limited, transactionally-specific duties, n25 that were not implicated at all by its decision to sell its brokerage business to HarrisDirect. n26 Indeed, Weil must admit that Morgan Stanley [*1036] could have terminated Weil as a brokerage customer at any time and would simply have had the responsibility to responsibly transfer the assets in his accounts back to him, or to whatever institution he chose for their receipt. The value of his accounts at the time of such determination would have been a function of Weil's own investment decisions and not those of Morgan Stanley. Put simply, this is not a situation involving [**34] a broker with wide-ranging investment authority over a client's assets.

n24 *Meyers*, 144 Cal. Rptr. at 620. See also Restatement (Second) of Agency §§ 376, 377 (1958).

n25 See *Caravan*, 769 F.2d at 567 (holding that a stockbroker assumes no obligations over a non-discretionary account beyond the duty to faithfully execute transactions ordered by the client); *Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.2d 605, 607 (9th Cir. 1983) (ruling that California law imposes fiduciary obligations on a broker when it controls a client's account, but imposing no fiduciary duties on a stockbroker that provided its client with no investment advice and had no authority to make trades on the client's account, noting that the broker's duties to its client "were limited by the narrow extent of its agency").

n26 I put aside outrageous scenarios whereby a broker knowingly sells itself and assigns its customer accounts, not to a reputable broker, but a known looter, and, furthermore, does so without disclosing the looter's past. Those sorts of scenarios have no reasonable relationship to Morgan Stanley's sale to HarrisDirect.

[**35]

But, of course, Weil is not before the court alleging that he was injured by any imprudent investment decision (or even any bad advice) provided to him by Morgan Stanley. His argument is more extreme: Morgan Stanley could not, without breaching some vague fiduciary duty of loyalty, be paid any money attributable to a purchaser's expectation that it would, as a result of the purchase, be able to derive profits by providing sweep account services to former Morgan Stanley customers who chose to stay with the purchaser.

To analyze why this contention is untenable, it is useful to expand its

premise to its logical perimeter. If reasoning of this kind is sound, it makes no sense to single out "sweep account" services for special treatment. There is, I venture, no special duty not to profit from the sale of terminable at-will sweep account services that would not also logically apply to the sale of terminable at-will broker accounts. n27 Put simply, if Morgan Stanley was forbidden as a fiduciary from marketing the goodwill in its brokerage business -- i.e., the likelihood that a large percentage of its customers would maintain sweep accounts with and buy similar services from the buyer [**36] -- then that bar logically applies not just to sweep accounts, but to all aspects of the client relationships that Morgan Stanley was transferring to the buyer. Thus, in my view, holding that Weil has stated a claim as to the sweep account aspect of the HarrisDirect transaction would also imply that the entirety of that transaction involved a breach by Morgan Stanley of its fiduciary duty of loyalty to its customers. There can be no doubt that what HarrisDirect was paying for was the opportunity to service Morgan Stanley's client accounts, betting that it could convince those clients, by its own superior performance, to remain HarrisDirect customers after the sale.

n27 Indeed, Weil has not alleged that HarrisDirect paid any specific portion of the total $ 106 million purchase as a result of the profits expected from providing sweep account services to former Morgan Stanley customers. That failure is logical as HarrisDirect was obviously buying the opportunity to profit by selling a full range of services to the former Morgan Stanley customers, of which sweep account services was just one, likely relatively minor, type.

[**37]

To conclude so, of course, would be to embrace a legal theory having no principled ground in equity or in economic rationality. By the plain words of his contract with Morgan Stanley, Weil agreed that Morgan Stanley could assign his account agreement to a successor. He, like the class of clients he purports to represent, was therefore under no illusion that Morgan Stanley could not profit by a sale of that contractual relationship. By contract, Weil expressly acknowledged that reality. Through his current suit, Weil essentially seeks to override his contractual promise by illogically asserting that although Morgan Stanley could assign its rights under the contract, it could not be paid for that assignment.

But he pleads no facts that tug at the heartstrings of equity. Typically, fiduciary duties are imposed when someone exercises dominion and control over the assets and property of another such that the controlling [*1037] person should be prohibited from dealing with those assets and property in a manner that unfairly profits himself. But Morgan Stanley did not occupy such a position of power over Weil's assets. n28

n28 Obviously, Morgan Stanley could not steal Weil's funds. Both concepts of agency and criminal law make that plain.

[**38]

Weil was free to terminate his brokerage relationship with Morgan Stanley at any time. Indeed, when he was informed of the sale to HarrisDirect, he had the right to close his accounts. Likewise, Weil was free to continue with HarrisDirect as a brokerage client but to decide not to use its sweep account services. All that

Morgan Stanley profited from, therefore, was a right that it clearly contractually retained: the right to sell its brokerage business, including its brokerage accounts, to a buyer that would take the risk of trying to keep enough of those customers to justify the purchase price. I find nothing in California law to suggest that by doing so, Morgan Stanley breached any fiduciary duty it owed to Weil.

Likewise, there is nothing in the record suggesting that Morgan Stanley misled Weil or others into staying with HarrisDirect or using its sweep account services. In that regard, what the record reflects is that Morgan Stanley gave Weil solid, descriptive information that informed him of the material facts necessary for him to consider what to do in light of the sale to HarrisDirect. Specifically, Morgan Stanley provided factual information about HarrisDirect's sweep account [**39] funds and how those funds differed from the funds that Morgan Stanley had made available to its clients. None of Morgan Stanley's communications were factually misleading, and, at their most sales-oriented, they involved only the sort of positive introduction a seller would give its customers to a reputable buyer. In fact, the specific information Morgan Stanley provided is precisely the kind of communication that a broker has to give its clients to permit them to make reasoned decisions in the wake of the broker's decision to sell their accounts. In sum, Weil has identified nothing that was misleading or coercive about Morgan Stanley's communications to him.

As important, there can be no doubt that Weil and every other similarly situated customer knew that Morgan Stanley was being paid for transferring to HarrisDirect the right for that firm to try to retain, and profit from performing services for, the former Morgan Stanley customers. After all, Morgan Stanley was exiting the online brokerage business altogether as a result of the transaction!

Thus, even if Weil is correct, and the *O'Malley v. Boris* decisions have some relevance, those decisions would not lead to the conclusion [**40] that he has pled a claim against Morgan Stanley. In *O'Malley v. Boris*, Everen -- the defendant-broker -- changed the sweep account provider for its own ongoing clients. Everen was not exiting the business -- it continued to be its clients' broker. But Everen failed, it was found, to inform its clients that it had received 20% of the stock of a valuable new joint venture in exchange for changing sweep account providers and that it could receive up to 50% of the joint venture's stock if enough of its customers used the new sweep account provider. This information, this court held, would have been material to Everen customers assessing whether to use the new sweep account provider. In other words, the court found that a broker could not recommend a new investment provider to its clients without also informing its clients that it was being paid to do so and that it [*1038] would be paid even more if more of its clients accepted its recommendation.

This case is very different. All of Morgan Stanley's customers knew that Morgan Stanley would not be their broker at all after the HarrisDirect sale was consummated. All of them knew that Morgan Stanley had been paid $ 106 million by HarrisDirect [**41] because HarrisDirect believed that price was justified based on the later profits it would receive from providing services of all kinds -- including sweep accounts -- to those Morgan Stanley customers who chose to remain with HarrisDirect. And all of those customers received non-misleading factual information from Morgan Stanley that informed them of HarrisDirect's new services and how they compared to those Morgan Stanley provided, and

that also specifically advised them of their right to having their accounts transferred to another financial institution. Morgan Stanley also specifically informed its customers that HarrisDirect would be providing its own sweep account funds to those of the former Morgan Stanley customers for whom they could provide a fund similar to the Alliance Capital product they were using. That disclosure made absolutely clear what was already obvious -- HarrisDirect hoped to profit from the purchase by providing services to those of the Morgan Stanley customers who elected to stay, including those who opted to stay and to use the optional sweep account service.

And, of course, it should not be forgotten that Weil himself chose to stay at HarrisDirect, chose [**42] to use its sweep account services, and has not alleged that he suffered any adverse economic consequences from those decisions. Rather, Weil simply seeks a cut of the profits that Morgan Stanley legitimately obtained from selling the most valuable asset of its online brokerage business -- its customer relationships. Having contractually agreed that Morgan Stanley could do that, it comes with ill grace and no legal force for Weil to claim otherwise now.

Under California law, I therefore conclude that Weil has failed to state a claim for breach of fiduciary duty. Even if Delaware law were somehow to apply, I would still conclude that the complaint fails to state a claim. Nothing in the underlying relationship of the parties would justify the extreme finding that Morgan Stanley was duty bound to share some of the price of selling its online brokerage business with at-will clients who contractually agreed that Morgan Stanley could sell their accounts and who could protect themselves by simply refusing to do business with the purchaser.

To use the potent fiduciary duty tool to reconstruct the contractual relationship Weil knowingly forged with Morgan Stanley would be unjust, and would [**43] subvert the very purpose of this court, to ensure that equity is done. Not only that, imposing an unprincipled fiduciary duty of this kind on brokers who seek to sell their businesses would serve no useful purpose. At best, it would sharply diminish the value of brokers, while generating no appreciable benefit to their customers. At worst, it would constitute the thin edge for a new body of judicially-created fiduciary duty law. This body of law would prevent businesses who perform services that give rise to certain fiduciary duties -- for example, lawyers, bankers, doctors, and so forth -- from selling themselves to purchasers who hope, by good performance, to retain the former owners' client base -- at least, unless they somehow shared a part of the purchase price with their clients, even if the clients always possessed and continued to retain the right to use another provider. I fail to perceive in this scenario anything resembling the circumstances that traditionally warrant equity's intrusion into commercial affairs.

[*1039] VII. Weil's Claim That HarrisDirect Aided And Abetted A Breach Of Fiduciary Duty Must Also Be Dismissed

Weil also alleges that HarrisDirect aided and abetted [**44] Morgan Stanley's breach of fiduciary duty. That count must be dismissed for two reasons. First, having failed to state an underlying claim for breach of fiduciary duty against Morgan Stanley itself, Weil's aiding and abetting claim against HarrisDirect necessarily fails. n29 Second, the complaint fails to allege any facts that support an inference that HarrisDirect knowingly participated in any breach by Morgan Stanley, a required element for an aiding and abetting claim. n30 Weil's

conclusory contention that HarrisDirect must have known of the Delaware Supreme Court's decision in *O'Malley v. Boris* has no force in this regard. As I have discussed, *O'Malley v. Boris* dealt with a very different, and highly unusual, set of facts which were addressed under Delaware law. It is absurd to think that HarrisDirect, even had it read the various *O'Malley v. Boris* decisions, would have concluded that it was assisting Morgan Stanley in being fiduciarily disloyal to its customers by buying Morgan Stanley's entire on-line brokerage business when Morgan Stanley's customer contracts made plain that Morgan Stanley had the right to assign their accounts.

n29 *See, e.g., McGowan v. Ferro*, 859 A.2d 1012, 1041 (Del. Ch. 2004).

[\*\*45]

n30 *See, e.g., In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 734-5 (Del. Ch. 1999), aff'd, 757 A.2d 1278 (Del. 2000).

VIII. Conclusion

For all these reasons, Weil's complaint is dismissed. IT IS SO ORDERED.

LEXSEE 127 SW.3D 609

**WHEELER & CLEVENGER OIL COMPANY, INC., APPELLANT v. BRUCE L. WASHBURN, APPELLEE**

2001-SC-0271-DG

SUPREME COURT OF KENTUCKY

*127 S.W.3d 609; 2004 Ky. LEXIS 45*

February 19, 2004, Rendered

**PRIOR HISTORY:**

[**1] ON REVIEW FROM THE COURT OF APPEALS. 1999-CA-001190-MR. LAWRENCE CIRCUIT COURT NO. 1994-CI-0111. *Wheeler & Clevenger Oil Co. v. Washburn*, 2001 Ky. LEXIS 232 (Ky., Dec. 12, 2001)

**DISPOSITION:**

REVERSED AND REMANDED.

**COUNSEL:** FOR APPELLANT: Janet Smith Holbrook, Huddleston, Bolen, Beatty, Porter & Copen, Ashland, Kentucky.

FOR APPELLEE: Bruce L. Washburn, Nashville, Tennessee.

**JUDGES:** OPINION OF THE COURT BY JUSTICE KELLER. All concur.

**OPINIONBY:** KELLER

**OPINION:**

[*610] REVERSING AND REMANDING

I. ISSUE

To secure credit with Appellant for his company, Appellee signed guaranty agreements contained on both the front and back of an "Application for Credit." When Appellant sought enforcement of Appellee's guaranties, Appellee claimed that his guaranties were invalid and unenforceable under KRS 371.065 because they did not specify a maximum amount of liability and a termination date. Did the failure to include those provisions in the guaranties render them invalid and unenforceable? Because KRS 371.065's requirement that a guaranty contain such provisions does not apply to a guaranty set forth on the instrument being guaranteed, we [**2] hold that Appellee's guaranties are valid and enforceable. Accordingly, we reverse the Court of Appeals's opinion that affirmed the trial court's judgment finding Appellee's guaranties invalid and unenforceable.

II. BACKGROUND

Appellee was president of HICO Transport, Inc. (hereinafter HICO). On June 14, 1993, he submitted to Appellant an "Application for Credit" on behalf of HICO for the purpose of establishing a line of credit to purchase fuel and other merchandise. At the bottom of the front of the application was a section captioned "GUARANTY AGREEMENT," which Appellee signed as a guarantor of any credit extended to HICO, and it read as follows:

   IN CONSIDERATION OF CREDIT BEING EXTENDED BY WHEELER & CLEVENGER OIL CO., INC. TO THE ABOVE NAMED APPLICANT

FOR MERCHANDISE TO BE PURCHASED WHETHER APPLICANT BE AN INDIVIDUAL, A PROPRIETORSHIP, A CORPORATION OR ENTITY, THE UNDERSIGNED GUARANTOR OR GUARANTORS EACH HEREBY CONTRACT AND GUARANTEE TO WHEELER & CLEVENGER OIL CO., INC., THE FAITHFUL PAYMENT, WHEN DUE OF ALL ACCOUNTS OF SAID APPLICANT FOR PURCHASES MADE [*611] WITHIN FIVE YEARS NEXT AFTER THE DATE OF THIS APPLICATION. THE UNDERSIGNED GUARANTOR OR GUARANTORS EACH HEREBY EXPRESSLY [**3] WAIVE ALL NOTICE OF ACCEPTANCE OF THIS GUARANTY, NOTICE OF EXTENSION OF CREDIT TO APPLICANT, PRESENTMENT AND DEMAND FOR PAYMENT ON APPLICANT, PROTEST AND NOTICE TO UNDERSIGNED GUARANTOR OR GUARANTORS OR DISHONOR OR DEFAULT BY APPLICANT, PROTEST AND NOTICE TO UNDERSIGNED GUARANTOR OR GUARANTORS OR DISHONOR OR DEFAULT BY APPLICANT OR WITH RESPECT TO ANY SECURITY HELD BY WHEELER & OLE VENGER OIL CO., INC. EXTENSION OF TIME OF PAYMENT TO APPLICANT, ACCEPTANCE OF PARTIAL PAYMENT OR PARTIAL COMPROMISE. ALL OTHER NOTICES TO WHICH THE UNDERSIGNED GUARANTOR OR GUARANTORS MIGHT OTHERWISE BE ENTITLED AND DEMAND FOR PAYMENT UNDER THIS GUARANTY.

On the back of the application, another section also captioned "GUARANTY AGREEMENT" was signed by Appellee, and it read as follows:

TO: WHEELER & CLEVENGER OIL CO., INC

DATE: June 14, 1993

We, Bruce L. Washburn and Jay Crase n1 residing at HICO Transport, Inc., POB 50571, Nashville, TN, for and in consideration of your extending at our request credit to HICO Transport, Inc., hereinafter referred to as the "Company", of which Bruce L. Washburn/Jay Crase is President & Director of Operations hereby personally guarantees to you the payment [**4] at WHEELER & CLEVENGER OIL CO., INC. in the state of Kentucky of any obligation of the company and we hereby agree to bind ourselves to pay you on demand any sum which may become due to you by the Company whenever the Company shall fail to pay the same. It is understood that this guaranty shall be a continuing and irrevocable guaranty and indemnity for such indebtedness of the Company. We do hereby waive notice of default, nonpayment and notice thereof and consent to any modification or renewal of the credit agreement hereby guaranteed.

---

n1 Jay Crase, who is shown on the credit application as "Director of Operations" for HICO, was referred to in the trial court's "Findings of Fact, Conclusions of Law & Order" as "merely a 'truck driver.'" Regardless, Crase did not sign either guaranty, the personal judgment against him was vacated by the trial court, and he is not a party to this appeal. Thus, no claim is now being asserted against him under the guaranty agreements.

On September 7, 1994, Appellant filed [**5] suit against HICO and Appellee for past due amounts, totaling $ 13,551.26. Appellee defended by asserting inter alia that the guaranty agreements that he signed were not enforceable against him because "[KRS 371.065] clearly makes void any guaranty agreement that. . . does not contain provisions including a maximum amount of liability and a termination date" and the subject agreements did not contain such provisions.

After a bench trial, the trial court found that "KRS 371.065 is inapplicable to the case at hand . . . in that this does not involve a guaranty of commercial paper." Consequently, after rejecting Appellee's other defenses, on October 20, 1998, the trial court awarded Appellant judgment against HICO and Appellee. However, [*612] Appellee moved the trial court to "to Alter, Amend or Vacate its judgment" because, he asserted, the trial court erroneously relied upon APL, Inc. v. Ohio Valley Aluminum, Inc., n2 a case that interpreted KRS 371.065 prior to its later amendment, which applied the statute's requirements "to all guaranty contracts, not just-commercial paper." The trial court agreed with [**6] Appellee and held that "the guaranty agreement in question does not meet the minimum standards as required by statute because it fails to specify the maximum liability of the guarantor and does not specify a termination date which renders it invalid and unenforceable. As a result, on February 6, 1999, the trial court by amended judgment vacated "so much of the Court's Judgment. . . granting personal Judgment [against Appellee]" but let stand Appellant's judgment against HICO. Appellant's subsequent motion to alter, amend or vacate the amended judgment was overruled, and it appealed from the amended judgment.

n2 Ky. App., 839 S.W.2d 571 (1992).

The Court of Appeals agreed with the trial court's conclusions that, as a result of its amendment in 1990, KRS 371.065 applies to all guaranty agreements, including the guaranty agreement signed by [Appellee][,]" and thus "[Appellee's] guaranty does not satisfy the statute, and is, therefore, unenforceable." Accordingly, [**7] the Court of Appeals affirmed the trial court. We granted Appellant's motion for discretionary review, and we reverse.

III. ANALYSIS

The dispositive issue in this case is the interpretation of KRS 371.065, and since the construction and application of statutes is a matter of law, we interpret KRS 371.065 de novo n3 without deference to the interpretations adopted by lower courts. n4

n3 Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth, Transp. Cabinet, Ky., 983 S.W.2d 488, 490, 45 13 Ky. L. Summary 28 (1998) ("In the present case the questions to be answered deal with the interpretation of statutes. The construction and application of statutes is a matter of law and may be reviewed de novo.").

n4 Cinelli v. Ward, Ky. App., 997 S.W.2d 474, 476, 46 1 Ky. L. Summary 14 (1998) ("We review questions of law de novo and, thus, without deference to the interpretation afforded by the circuit court.").

KRS 371.065 was first enacted in 1986 n5 and the [**8] Act creating the statute was titled "AN ACT relating to commercial paper." n6 When

first enacted, *KRS 371.065* read as follows:

> No guaranty which is not written on the instrument involved shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates, provided that such termination shall not affect the liability of the guarantor with respect to:
> (1) Obligations created or incurred prior to such date, or
> (2) Extensions or renewals of, interest accruing on, or fees, costs or expenses incurred with respect to, such obligations on or after such date.
>
> n5 1986 Ky. Acts ch. 485, § 1.
> n6 Id.

Kentucky's Constitution requires that "no law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title[.]" n7 Because of the title of the Act and the [\*\*9] "constitutional mandate," the Court of Appeals in APL. Inc. v. Ohio Valley Aluminum [\*613] held that *KRS 371.065*, as first enacted, applied exclusively to guaranties of commercial paper. n8

> n7 KY. CONST. § 51.
> n8 *APL, Inc.*, 839 S.W.2d at 575.

In 1990, *KRS 371.065* was amended to read as follows:

> (1) No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates. Termination of the guaranty on that date shall not affect the liability of the guarantor with respect to:
>
> (a) Obligations created or incurred prior to the date; or
>
> (b) Extensions or renewals of, interest accruing on, or fees, costs or expenses incurred [\*\*10] with respect to, the obligations on or after the date.
>
> (2) Notwithstanding any other provision of this section, a guaranty may, in addition to the maximum aggregate liability of the guarantor specified therein, guarantee payment of interest accruing on the guaranteed indebtedness, and fees, charges and costs of collecting the guaranteed indebtedness, including reasonable attorneys' fees, without specifying the amount of the interest, fees, charges and costs. n9

127 S.W.3d 609, *; 2004 Ky. LEXIS 45, **

n9 1990 Ky. Acts ch. 38, § 1.

The 1990 Act amending the statute was titled "AN ACT relating to guaranties." [*614] Both the trial court and the Court of Appeals held that *KRS 371.065* as amended applied to all guaranties. n10 We agree. An Act's title may be considered in its interpretation. n11 The title of the 1990 Act clearly showed that its provisions applied to all guaranties. But the inquiry does not end there.

N10 The trial court based its decision on Appellee's argument that "the legislature amend[ed] the bills [sic] title to 'An Act Relating to Guaranties,['] from 'An Act relating to Commercial Paper,'" and thus, the trial court ruled that the statute "was amended and given broader application to apply to all guaranty agreements instead of just commercial paper." The Court of Appeals, however, stated that "the title of *KRS 371.065* is 'Requirements for valid, enforceable guaranty,' which implies the elements to be met therein would apply to all guaranty agreements." Although we agree with the Court of Appeals's interpretation of the statute, we would note that "title heads, chapter. heads, section and subsection heads or titles[]. . .in the Kentucky Revised Statutes, do not constitute any part of the law[.]" *KRS 446.140*. The titles of sections and subsections in the statutes, vis-a-vis the titles of Acts, are often renamed and inserted by the reviser of the statutes after the enactment of the statute, See *KRS 7.136(1)* ("The [reviser of the statutes]. . . shall not alter the sense, meaning, or effect of any act of the General Assembly, but may: . . . (b) Change the wording of headnotes[.]"), and therefore, are not part of the legislature's deliberations and debate. For that reason, unlike an *Act's* title see infra note 11, the title of any *statute*, including *KRS 371.065*, should not be used as an aid in its interpretation.
[**11]

n11 *Meyers v. Walter*, Ky., 253 S.W.2d 595, 597 (1952) ("This construction is further supported by the title of the Act. . . ."); *Fayette County Fiscal Court v. Fayette County*, 314 Ky. 595, 236 S.W.2d 455 (1950); *Ingram's Adm'r v. Advance Motor Co.*, 283 Ky. 87, 140 S.W.2d 840, 841 (1940) ("We have held frequently that in the construction of an Act its title is to be read in connection with it."); *Logsdon v. Howard*, 280 Ky. 342, 133 S.W.2d 60, 62 (1939) ("The meticulous care with which the legislature circumscribed its title to the 1938 act not only sustains the interpretation we have made of the described situation, but it even goes so far as to not admit of any other interpretation.").

Both the trial court and the Court of Appeals concluded that the guaranty agreements n12 did not satisfy the requirements of *KRS 371.065* because the agreements did not specify Appellee's maximum aggregate liability and a termination date. Accordingly, the courts held the agreements unenforceable. In support of its holding, [**12] the Court of Appeals stated that "the language of the statute, taken as a whole, refers to all guaranties, not just to those not written directly on the instruments to be guaranteed or specifically referencing those instruments." It focused on subsection (2) of the statute and stated that

"cleary, this portion of *KRS 371.065* is not meant to apply only to a certain category of guaranties but all guaranty agreements." The Court reasoned that "after all *KRS 371.065* is a statute that is obviously directed at protecting guarantors" and stated, "we see no reason why this protection should only be afforded to a certain class of guarantors and not to others." We disagree with the Court of Appeals's conclusion that the guaranty agreements were invalid and unenforceable under *KRS 371.065*.

n12 protecting guarantors" and stated, "we see no reason why this protection should only be afforded to a certain class of guarantors and not to others." We disagree with the Court of Appeals's conclusion that the guaranty agreements were invalid and unenforceable under *KRS 371.065*.

[**13]

The most commonly stated rule in statutory interpretation is that the "plain meaning" of the statute controls. n13 This Court has steadfastly adhered to the plain meaning rule n14 "unless to do so would constitute an absurd result." n15 The plain-meaning rule is consistent-with directions provided by the legislature on how to interpret the statutes enacted by it. n16

n13 RONALD BENTON BROWN & SHARON JACOBS BROWN, STATUTORY INTERPRETATION: THE SEARCH FOR LEGISLATIVE INTENT § 4.2, at 38 (NITA, 2002).

n14 *Executive Branch Ethics Com'n v. Stephens*, Ky., 92 S.W.3d 69, 73 (2002) ("The words of the statute are to be given their plain meaning unless to do so would constitute an absurd result."); *Commonwealth v. Plowman*, Ky., 86 S.W.3d 47, 49 (2002) ("[A] reviewing court. . . must interpret the statute according to the plain meaning of the act and in accordance with the legislative intent."); *County of Harlan v. Appalachian Regional Healthcare, Inc.*, Ky., 85 S.W.3d 607, 615 (2002) ("The plain text of the statutes should govern and this Court should give effect to the ordinary meaning of the words therein."); *Kentucky Registry of Election Finance v. Blevins*, Ky., 57 S.W.3d 289, 295 (2001) ("This interpretation does not offend the plain meaning of the statute."); *Hardin County Schools v. Foster*, Ky., 40 S.W.3d 865, 868 (2001) ("The proper standard of review of a question of law. . . involves the interpretation of a statute according to its plain meaning and its legislative intent."); *Bob Hook Chevrolet Isuzu, Inc.*, 983 S.W.2d at 492 ("A statute should be construed, if possible, so as to effectuate the plain meaning and unambiguous intent expressed in the law."); *Nelson Steel Corp. v. McDaniel*, Ky., 898 S.W.2d 66, 70, 42 3 Ky. L. Summary 43 (1995) ("Courts are required to give the words of a statute their plain meaning.").

[**14]

n15 *Executive Branch Ethics Com'n v. Stephens*, 92 S.W.3d at 73.

n16 *KRS 446.015* ("All bills introduced in the General Assembly after June 17, 1978, shall be written in nontechnical language and in a clear and coherent manner using words with common and everyday meanings. Enactment of a bill by the General Assembly shall be a conclusive presumption that such bill conforms to this section."); *KRS 446.080(4)* ("All

words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning.").

KRS 371.065 plainly provides that a guaranty agreement "which either is. . . written on, or. . . expressly refer[s] to, the instrument or instruments being guaranteed" is not required to specify the guarantor's [*615] maximum liability or the guaranty's termination date. The Court of Appeals's interpretation overlooks that "no guaranty [**15] of an indebtedness" is modified by a restrictive clause, i.e "which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed." Rather than considering the language of the statute as a whole as it professes, the Court of Appeals's interpretation has the effect-of deleting the modifying clause from the statute. KRS 371.065's requirement that a guaranty state the guarantor's maximum liability and the guaranty's termination date is a consumer-protection provision designed to protect the guarantor by reducing the risk of a guarantor agreeing to guarantee an unknown obligation. When the guaranty agreement is found on the document being guaranteed, however, that risk is negligible, which KRS 371.065 recognizes by exempting such guaranty agreements-from its heightened requirements. Here, the guaranty agreement is "written on" the credit application in two places. Thus, in accordance with the plain-meaning rule of statutory interpretation, we hold that, although KRS 371.065 otherwise applies to the guaranty agreements, e.g., the agreements may "guarantee payment [**16] of interest accruing on the guaranteed indebtedness, and fees, charges and costs of collecting the guaranteed indebtedness, including reasonable attorneys' fees, without specifying the amount of the interest, fees, charges and costs," n17 the agreements were not required to state either Appellee's maximum liability or a termination date.

n17 KRS 371.065(2).

IV. CONCLUSION

For the above reasons, we reverse the Court of Appeals and remand this case to the Lawrence Circuit Court for entry of a judgment in favor of Appellant.

All concur.