LEXSEE 1999 DEL. SUPER. LEXIS 220

Wilmington & Northern Railroad Co. v. Delaware Valley Railway Co., Inc. and RailAmerica, Inc.

C.A. No. 97C-09-297 -WTQ

SUPERIOR COURT OF DELAWARE, NEW CASTLE

1999 Del. Super. LEXIS 220

January 22, 1999, Argued
March 30, 1999, Decided

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court July 1, 1999.

**DISPOSITION:** Letter Opinion and Order on: 1. RailAmerica's Motion to Dismiss or for Summary Judgment -- MOTION GRANTED in part and DENIED in part. 2. Wilmington & Northern Railroad Co.'s Motion for Summary Judgment -- MOTION DENIED.

**COUNSEL:** Richard R. Wier, Jr. Esquire, Wilmington, DE.

John W. Morris, Esquire, Philadelphia, PA.

Jonathan D. Gerber, Esquire, Shutts & Bowen, LLP, West Palm Beach, FL.

Kurt M. Heyman, Esquire, Wilmington, DE.

**JUDGES:** WILLIAM T. QUILLEN, JUDGE.

**OPINIONBY:** WILLIAM T. QUILLEN

**OPINION:**

This is the Court's Opinion on defendant RailAmerica Inc.'s Motion to Dismiss, or in the alternative, Motion for Summary Judgment, and on Plaintiff Wilmington and Northern Railroad Co.'s Cross-Motion for Summary Judgment. For the reasons stated herein, RailAmerica's Motion for Summary Judgment with respect to its liability as guarantor is GRANTED, and its Motion with respect to all other claims is DENIED. Wilmington & Northern Railroad's Motion for Summary Judgment is DENIED.

**FACTS**

This case arises from the lease of a rail line ("the Lease"). The current tenant terminated the Lease under its terms but is nonetheless holding over. [*2] The primary issues concern the proper rental rate due and whether the tenant's parent corporation-guarantor is also liable for the rent.

Plaintiff Wilmington & Northern Railroad Co. ("W&NR"), owned a rail line between Elsmere, Delaware and the Pennsylvania State line. On June 6, 1994, W&NR leased this property to Co-Defendant Delaware Valley Railway Company, Inc. ("Delaware Valley"), a wholly owned subsidiary of Co-Defendant RailAmerica, Inc. ("RailAmerica"). The terms of the lease stated that the annual rent would be $ 121,800 per year, to be paid in monthly instalments of $ 10,150. This rate was subject to annual adjustments for inflation. The Lease became effective on July 1, 1994, and was to extend for a term of ten years. The specific term of the

Apx. 550

Lease is detailed in Article IV, which states:

> Section 4.02. The Lease shall be effective on the 1st day of July, 1994, and shall extend for a term of ten (10) years, and at Lessee's option for subsequent additional terms of five (5) years.
>
> * * *
>
> The Lease, and any renewals thereof, may be terminated by the Lessee, at Lessee's option, upon thirty (30) days written notice to Lessor, without penalty, in the following events: [*3]
>
> * * *
>
> (c) Termination of the operating agreement with the Commonwealth of Pennsylvania.
>
> Section 4.03. Termination by Lessee for any other reason shall require payment of a termination fee to Lessor equal to one year's rent. n1

n1 Defendant's Motion for Summary Judgment, Exhibit A, at 4-5 (Dkt. No. 20).

RailAmerica, as the sole-owner of Delaware Valley, guaranteed the rental payments under the Lease. Article VII of the lease states:

> Section 7.01. RailAmerica shall guarantee all obligations of Lessee, and provide upon execution of this Lease credit enhancement to Lessor, which will provide protection to Lessor in the event of default by Lessee, for up to twelve months' rental payments, (less any deposits or payments made by Lessee to Lessor). n2

An additional section of the Lease calls for all disputes arising from the Lease to be submitted to binding arbitration.

n2 Defendant's Motion for Summary Judgment, Exhibit A, at 6.

[*4]

During the Lease negotiations, RailAmerica negotiated on behalf of Delaware Valley. Most, if not all, correspondences appeared on RailAmerica letterhead. At one point during the negotiations, RailAmerica stated that it was willing to pay $ 10,000 per month in rent and that "all payments hereunder would be backed by RailAmerica." n3 This offer was met with a counter-offer by W&NR. n4 The ultimate Lease rate of $ 10,150 was eventually agreed to by both parties.

n3 Plaintiff's Motion for Summary Judgment, Exhibit J (Dkt. No. 26).

n4 Plaintiff's Motion for Summary Judgment, Exhibits K & L (Dkt. No. 26).

During the first two years of the Lease, the rail operation was not profitable. By letters dated May 29, 1996, and June 7, 1996, RailAmerica informed W&NR that it was terminating the Lease pursuant to Section 4.02(c), as a result of the termination of another agreement with the Commonwealth of Pennsylvania. n5 Apparently the

parties disagreed on whether Delaware Valley was required to pay the termination fee [*5] specified in Section 4.03, and submitted the dispute to binding arbitration. The arbitrator's ruling stated that "DELAWARE VALLEY RAILROAD COMPANY, INC. and RAIL AMERICA, INC. exercised the Lessee's right to terminate the Lease . . . pursuant to Section 4.03 thereof and accordingly owe CLAIMANT, WILMINGTON & NORTHERN COMPANY, the payment of a termination fee equal to one year's rent under the Lease, or $ 121,800.00" n6 This amount was eventually tendered to W&NR. n7 The arbitrator expressly refused to address any issues regarding liability after termination, including holdover rent, as they were beyond his power and authority.

    n5 Plaintiff's Motion for Summary Judgment, Exhibits Q &R (Dkt. No. 26).

    n6 Defendant's Motion for Summary Judgment, Exhibit B (Dkt. No. 20).

    n7 Over a month after the arbitrator issued his opinion, W&NR filed a suit in the Court of Chancery to enforce the order. The suit was dismissed nearly eight months later when RailAmerica tendered payment. See Defendant's Motion for Summary Judgment, Exhibits B-E (Dkt. No. 20). Thus, this Court accepts as givens that the Lease was terminated under Section 4.03 and the termination fee has been paid.

[*6]

After the termination of the Lease, Delaware Valley failed to vacate the Leased rail line and continued with its normal operation. Feeling the rental amount specified in the Lease was unreasonably high, Delaware Valley started paying W&NR what "Delaware Valley felt was fair," an amount substantially less than the Lease amount. W&NR protested this reduction in rent, but never sought ejectment of Delaware Valley. Although W&NR requested the rent specified in the original lease, it never expressly informed Delaware Valley that it wished to impose a new lease term. n8 To date, Delaware Valley is still occupying the rail line. n9

    n8 Complaint, Exhibit B (Dkt. No. 1).

    n9 An interesting twist to this landlord/tenant tale is found in the Federal regulation of rail lines. Apparently, because the rail industry is federally regulated, had W&NR ejected Delaware Valley, it would have created a "rail emergency" because there would have been an unoperated segment of rail line. In the face of such an emergency, the Federal Government may have stepped in, placed Delaware Valley on the rail line and required it to pay a rent perhaps similar to the reduced rate it was currently paying. Thus, by ejecting Delaware Valley, W&NR may have effectively given up any possibility of collecting the rental rate specified in the Lease. While this information helps explain the actions of the parties, and their apparent "all or nothing stance" in this case, it plays no real role in the case's outcome.

[*7]

Within two months of the arbitrator's ruling on the termination fee, W&NR brought an action against both Delaware Valley and its parent corporation, RailAmerica, for damages associated with their "use and occupation of the line." n10 W&NR contends that Delaware Valley is a holdover tenant and is required to pay the rental

amount specified in the Lease. W&NR also contends that RailAmerica, as guarantor, is also liable for this rent.

>    n10 Complaint, at 3 (Dkt. No. 1).

Defendants asserts that the rental amount in the Lease is unconscionable and far above the fair value. They have supplied an expert evaluation that states the fair rental value is considerable less than the rate specified in the terminated Lease. n11 RailAmerica additionally asserts that it is not liable as a guarantor because the contract giving rise to its status as guarantor was terminated, thus terminating its obligation as guarantor. W&NR claims that the facts and circumstances show that RailAmerica was understood to be the financially responsible [*8] party and the operator of the rail line because it negotiated the original Lease and because the Lease agreement was predicated on RailAmerica's excellent payment record and solid financial condition. Moreover, W&NR claims that RailAmerica directed Delaware Valley to terminate the Lease, was the force and control of Delaware Valley, and was in fact the operator of the rail line. W&NR further claims that RailAmerica has breached the covenant of good faith and fair dealing. RailAmerica now brings a Motion to Dismiss, or in the alternative, a Motion for Summary Judgment. W&NR brings a Cross-Motion for Summary Judgment.

>    n11 Defendant's Answering Brief, Exhibit C (Dkt. No. 27).

**STANDARD OF REVIEW**

By virtue of the submission of matters beyond the pleadings, a Motion to Dismiss is converted to a Motion for Summary Judgment under Superior Court Rule 56, as required by Rule 12(b). *New Castle County v. State*, Del. Super., 698 A.2d 401, 404 (1996). Because facts beyond the pleadings are being explored, [*9] RailAmerica's Motion to Dismiss will be treated as a Motion for Summary Judgment. This case thus comes before the Court on Cross-Motions for Summary Judgment. When considering a Motion for Summary Judgment, the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, Del. Super., 312 A.2d 322, 325 (1973). If after viewing the record in a light most favorable to the non-moving party, the Court finds that there are no genuine issues of material fact, Summary Judgment will be appropriate. *Id.* Summary Judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub*, Del. Supr., 54 Del. 463, 180 A.2d 467 (1962).

**DISCUSSION**

**A. DELAWARE VALLEY'S CONTINUING LIABILITY**

The first issue to be decided is the appropriate rental rate to be paid by Delaware Valley. Within every lease is a covenant, either express or implied, that a tenant will surrender possession of the leased property upon [*10] the termination of the Lease agreement. 49 Am.Jur.2d, *Landlord and Tenant* § 352 (1995) (hereinafter "49 Am.Jur.2d at § ___"). While continued occupation of the property by the tenant after the lease terminates is wrongful, it does not necessarily make the tenant a trespasser. *Id.*

The most common form of holding over probably occurs when the lease expires. "At common law, where a tenant for a year or longer holds over

after the expiration of his term, and continues to pay rent computed on an annual basis which is accepted by his landlord, the creation of a new tenancy is inferred which thereafter becomes a tenancy from year to year." *Makin v. Mack*, Del. Ch., 336 A.2d 230, 235 (1975). Moreover, "the landlord [at common law] . . . may elect solely on the basis of the tenant's improper holding over after the termination of his lease, unilaterally to hold the tenant to another term . . . ." Restatement (Second) of Property § 14.4 (1977) (hereinafter "Rest. at § ___"). Such an election requires notice to the tenant and is binding on both the landlord and tenant. Rest. at § 14.4 cmt. e. During the course of this new term, the legal relationship between the landlord [*11] and the tenant is the same as the relationship during the original lease. *Emmett S. Hickman Co. v. American Realty Enterprises, Inc.*, Del. Super., 277 A.2d 688, 689-90 (1971) (and authorities cited therein); 49 Am.Jur.2d at § 352 (1995) (citing Rest. at § 14.7). The rent due under this new term is the same as that specified in the original lease. 49 Am.Jur.2d at § 377. The length of this new term is determined by the period in which rent was computed under the original lease, but the maximum term is a year to year tenancy. Rest. at § 14.4 cmt. f.

Delaware has a statute, 25 Del. C. § 5108, which states *absent* notice of an intent to terminate (60 days by landlord and 45 days by tenant), when the term of a lease expires, all terms of the original lease remain in full effect, except that the term becomes month to month. This statute does not appear to apply here because there was a termination by the Lessee before the expiration of the term pursuant to an express provision of the Lease which carried an express consideration, i.e., the termination fee. So the question here is really, does the common law rule recited in Rest. § 14.5 apply? It is important [*12] to look at the alternative to get the full picture.

If the landlord does not express an intention to impose a new term on the tenant, the landlord may alternatively seek damages for the use and occupation of the property equal to the reasonable value of the leased property during the time the tenant occupies such property. Rest. at § 14.5 including cmt. a. The rental rate in the original lease is presumed to be the reasonable value unless either party can prove otherwise. *Id.* If either party demonstrates that the reasonable value of the leased property is either higher or lower than the rate specified in the original lease, than the recovery will be extended or limited to that amount. *Id.*; *Habib v. Thurston*, D.C. App., 517 A.2d 1, 13-14 n.16 (1985). This alternative essentially requires the tenant to provide restitution. *See* Rest. § 14.5, Reporter's Note to § 14.5, P2.

Once Delaware Valley terminated the Lease, it did not vacate the rail line. n12 It is hard to weigh the termination circumstances. On the one hand, Delaware Valley terminated the Lease and held over nonetheless. On the other hand, the Lease was clearly terminated and a price exacted for [*13] the termination by the landlord in binding arbitration. It is hard to contemplate holding the tenant to "another term" given the completeness of the total destruction of the Lease, even if "another term" be one imposed by law.

n12 For the purposes of this rental analysis, it will be assumed that only Delaware Valley was the sole tenant. Some evidence in the record can be construed to suggest that RailAmerica was also a true tenant. *See infra*, Section C.

Even if it was possible to consider a § 14.4 election, one would have to deal with Delaware Valley's claim that rent fixed in the Lease was unconscionable. The Court does not believe such consideration is necessary here because there has been no election by the landlord to hold the tenant to another term.

As noted, Delaware Valley continued to occupy the property and unilaterally reduced its rental payment. Shortly after the arbitration order was issued stating that the Lease was terminated, W&NR brought the present action against both defendants seeking [*14] damages for their "use and occupation" of the rail line. Even in the Complaint there is no mention of the imposition of a new Lease term. Additionally, nothing in the record indicates W&NR ever placed Delaware Valley on notice that it was electing to impose a new term on Delaware Valley. Although W&NR demanded the rent specified in the original Lease, there was no objective manifestation of W&NR's intention to impose a new Lease. Since W&NR did not impose a new term, it is entitled to seek damages equal to the reasonable value of the leased property. Rest. at § 14.5 cmt. a. n13

> n13 While the conduct of the landlord can amount to an assertion of the right of election under Rest. § 14.4 to impose a new term, a claim for the rental amount stated in the terminated Lease is also one measure of reasonable value in § 14.5 See next paragraph in text above. Thus, it is difficult to find an election to impose a new term on that claim alone and especially difficult given the Complaint.

Normally, there is a presumption [*15] that the reasonable value of the leased property is the rate specified in the original lease. In this case, however, Defendants have provided evidence in the form of a financial evaluation that demonstrates the reasonable value of the rail line may be substantially less than the Lease rate. Without commenting on what this Court feels is a reasonable value, Defendants have certainly placed enough evidence in the record to create a dispute of material fact. The only way to determine the reasonable value of the leased rail line is to examine the issue factually at trial. Accordingly, W&NR's Motion for Summary Judgment is DENIED.

**B. RAILAMERICA AS GUARANTOR**

The next issue is whether RailAmerica's guaranty extends to rental payments after the Lease was terminated, while Delaware Valley is a holdover tenant. One aspect of this case that distinguishes it from other similar cases is the "terminated status" of the original Lease. This is not a case were the landlord and tenant simply neglected to renew a lease at the end of its term, a situation that may, by operation of law, extend or renew the original lease. n14 Instead, this is a situation in which the tenant expressly terminated [*16] the lease, but refused to leave. As a result, statutes applicable to automatic or implied renewals of the original lease do not apply. n15

> n14 See, e.g., 25 Del. C. § 5108 (stating that absent notification of intent to terminate, when the term of a lease expires, all terms of the original lease remain in full effect in a month to month term).
>
> n15 Additionally, W&NR's argument that 25 Del. C. § 5108 operates to "renew" the Lease for failure to give timely notice fails. The "end of term" specified in the statute is the end of

the lease term as defined by the contract, i.e. ten years after the date of execution. The "end of term" is not artificially accelerated simply because one party exercises its right to terminate the lease.

### 1. The Guaranty Agreement

Generally, the relationship between the landlord and tenant in a holdover tenancy is the same as the relationship during the lease. 49 Am.Jur.2d, *Landlord and Tenant* § 352 (1995). This continuing relationship does not, however, apply [*17] to the tenant's guarantor. The relationship between a holdover tenant and a landlord derives from the fact that the tenant is occupying the land, while the relationship between the landlord and the tenant's guarantor derives solely from contract. As a result, a guarantor's relationship with the landlord during a holdover tenancy is defined exclusively by contract. See *10 A.L.R.3d 582 (1966)*, which states:.

> Although recognizing that the engagements of a guarantor should be construed strictly in his favor, many courts take the view that a surety on a lease of real property may be liable for rents accruing beyond the expiration of the original term thereof *if it can be ascertained that this was the parties' intent when the lease was executed* . . . . In any event, it seems clear that the surety can precisely delineate his liability as respects additional occupancy by wording his guaranty in such manner as to assume or avoid it.

*Id.* at 584 (emphasis supplied). In Delaware, guaranty contracts should be governed by the basic consideration that the intent of the parties must prevail. *Cooling v. Springer*, Del. Super., 42 Del. 228, 30 A.2d 466, 468 (1943). [*18] Where that intent is reasonably clear, there is no room for construction. *Id.*

In defining RailAmerica's contractual relationship with W&NR, the case of *Big Valley Assoc. v. Memories Inc.*, 1996 Del. Super. LEXIS 310, Del. Super., C.A. No. 95C-030-265, Del Pesco, J. (Apr. 29, 1996) is instructive. In *Big Valley*, this Court analyzed a guarantor's liability when a tenant remained in possession beyond the terms of the original lease. The language of the guaranty stated that it would "remain and continue in full force and effect as to any *renewal, modification*, or *extension* of the Lease." 1996 Del. Super. LEXIS 310, *2 (emphasis in original). The Court determined that given this language, the Court "would seem compelled to find that the guaranty did *not* continue during the [tenant's] month-to-month tenancy." n16 *Big Valley*, at 4 (emphasis supplied). In making this determination, the Court relied heavily on the ruling in *Trolley Square Assoc. v. Nielson*, Utah App., 886 P.2d 61 (1994).

> n16 The Court eventually found the guarantor liable, although on grounds that do not apply to this case. That Court determined that under *25 Del. C. § 5108*, the lease was automatically "extended" by operation of law. Since that guaranty expressly applied to "extensions," the Court found the guarantee was still in effect. *Big Valley*, at 6. That statute does not apply in this case. *See supra*, note 12.

[*19]

In *Trolley Square*, the Court determined that a holdover tenant's obligation to pay rent does not derive from the lease *Id*. at 69. It instead derives from the operation of law. Because the guarantee in *Trolley Square* only covered obligations under the lease, it did not cover obligations after the lease expired, including the holdover tenancy. *Id*.

When a tenant holds over after the expiration of a lease, a new tenancy "replaces" the prior lease and the guarantor has no obligation under the new agreement unless expressly stated in the guaranty. *Smith v. Cohen*, R.I. Supr., 685 A.2d 268, 269 (1996) (citing *Westcor Co. Ltd. Partnership v. Pickering*, Cal. App., 164 Ariz. 521, 794 P.2d 154, 157-58 (1990)). *See also Yearling Properties, Inc. v. Tedder*, Oh. App., 53 Ohio App. 3d 52, 557 N.E.2d 1231, 1234 (1988); *Trolley Square*, 886 P.2d at 69; 38A C.J.S. Guaranty § 58 (1996). In order for a guaranty to extend beyond the original term of the lease, to a holdover tenancy, this intention must expressly appear in the contract. In the absence of such language, the attachment of liability to the guarantor beyond the lease term would [*20] be rewriting the original guaranty, and creating a contract to which the parties did not assent.

In this case, Delaware Valley terminated the Lease. Because Delaware Valley still occupies the property, it is a holdover tenant. The language of the guaranty states that "RailAmerica shall guarantee all obligations of Lessee." While this guaranty is broad, it does not expressly provide any guaranties *beyond* the existence of the Lease. In the absence of such language, RailAmerica's guaranty does not extend beyond the terms of the Lease and does not apply to Delaware Valley's liability as a holdover tenant. The Lease terminated when Delaware Valley exercised its right to terminate, thus extinguishing its obligations under the Lease. Any liability resulting after this point derives from the operation of law, *not* the original Lease. Since RailAmerica did not expressly agree to assume liability during a separate and distinct holdover tenancy, it is not liable as a guarantor for rent accruing after Lease terminated. Accordingly, RailAmerica's Motion for Summary Judgment with respect to guarantor liability is GRANTED and W&NR's Motion for Summary Judgment with respect to guarantor liability [*21] is DENIED.

### 2. Covenant of Good Faith and Fair Dealing

W&NR alternatively claims that RailAmerica breached the covenant of good faith and fair dealing inherent in the Lease. The covenant of good faith and fair dealing requires a party in a contractual relationship to refrain from arbitrary and unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the contract. *Wilgus v. Salt Pond Investment Co.*, Del. Ch., 498 A.2d 151, 159 (1985) superseded on other grounds by statute, (citing *Restatement (Second) of Contracts* § 205 (1981)). While the covenant of good faith and fair dealing exists in every contract, subjective standards cannot override the literal terms of the agreement. *Gilbert v. El Paso Co.*, Del. Supr., 575 A.2d 1131, 1143 (1990). Furthermore, implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise. *Cincinnati SMSA Ltd. v. Cincinnati Bell Cellular Systems Co.*, Del. Supr., 708 A.2d 989, 992 (1998). As a general principle, it is not the proper role of the Court to rewrite or supply provisions to a written agreement. [*22] *Id*. The legal test for implying contractual obligations is whether it is "*clear* from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act

later complained of as a breach of the implied covenant of good faith -- had they thought to negotiate with respect to that matter." *Id.* (quoting *Katz v. Oak Industries, Inc.*, Del. Ch., 508 A.2d 873, 880 (1986)) (emphasis in original).

The literal terms of the agreement state that RailAmerica would guaranty all obligations of Delaware Valley under the Lease. While the Lease was in effect, RailAmerica did guaranty all obligations, including the termination fee. Once the Lease was terminated, however, this obligation ceased. While RailAmerica and Delaware Valley certainly used the terms of the Lease (and the Federal regulation of rail lines) to their advantage by terminating the Lease and continuing to occupy the property, they did so within the literal bounds of the contract. The contract expressly provided for termination by Delaware Valley and the guaranty failed to extend beyond termination. Had the parties thought to extend the guaranty [*23] beyond the terms of the Lease, at least some language to that effect would appear in the Lease. None does. Because nothing in the Lease addresses extensions beyond the Lease, the Court finds that RailAmerica's actions, while possibly manipulative, do not run afoul of the covenant of good faith and fair dealing. W&NR's Motion for Summary Judgment with respect to RailAmerica's breach of the covenant of good faith and fair dealing is DENIED.

### C. RAILAMERICA AS A TENANT

Notwithstanding the issues discussed above, W&NR contends that RailAmerica is in fact the actual operator and occupier of the rail line. W&NR further asserts that RailAmerica is liable to W&NR by virtue of its occupation of the rail line, not simply as a guarantor. Nothing in the original Lease prevents assignments. If RailAmerica was in fact an actual tenant, W&NR may be able to seek damages from RailAmerica directly. *See, e.g.*, Rest. at § 14.5. The amount of damages would presumably equal those owed by Delaware Valley. *See supra*, Section A.

Although evidence in the record suggests that RailAmerica may have operated the rail line, the record on this issue is not sufficiently developed in either facts or [*24] law to make a determination on summary judgment. *Ebersole v. Lowengrub*, Del. Supr., 54 Del. 463, 180 A.2d 467 (1962). The parties are, however, invited to supplement the record further on this point. Items that may prove helpful would include who actually operated and maintained the rail line, who paid the employees and who collected rents or fees, if any, from others for use of the rail line. While this effort may resemble a piercing of the corporate veil, it is instead an attempt to determine whether RailAmerica actually occupied the rail line. Accordingly, on the present record, RailAmerica's Motion for Summary Judgment with respect to its liability other than as guarantor is DENIED.

### CONCLUSION

Delaware Valley, as a holdover tenant, is obligated to pay rent as determined at trial. W&NR's Motion for Summary Judgment is DENIED in all respects. IT IS SO ORDERED.

RailAmerica is not liable as a guarantor for any rental payments accruing after the Lease terminated. Whether RailAmerica is, in fact, liable as an actual tenant is still undecided. Accordingly, RailAmerica's Motion for Summary Judgment is GRANTED in part and DENIED in part. IT IS SO ORDERED.

William [*25] T. Quillen

LEXSEE 2002 DEL. SUPER. LEXIS 445

Wilmington Trust Co. v. Kenneth W. Keith and Florence L. Keith

C.A. No. 00C-11-016

SUPERIOR COURT OF DELAWARE, NEW CASTLE

2002 Del. Super. LEXIS 445

March 22, 2002, Submitted
June 26, 2002, Decided

**DISPOSITION:** [*1] WT's Motion for Summary Judgment granted.

**COUNSEL:** Thomas G. Whalen, Jr., Esquire, Stevens & Lee, P.C., Wilmington, Delaware.

David M. McCanney, Esquire, Sevens & Lee, P.C., Reading, Pennsylvania.

Gerry Gray, Esquire, Houghton, Holly & Gray, L.L.P., Georgetown, Delaware.

William J. Wheeler, Esquire, Philadelphia, Pennsylvania.

**JUDGES:** Richard F. Stokes.

**OPINIONBY:** Richard F. Stokes

**OPINION:**

Wilmington Trust Company's Motion for Summary Judgment is granted for the reasons set forth herein.

FACTUAL BACKGROUND

Several promissory notes serve as the basis for this litigation. On November 14, 1997, Wilmington Trust ("WT") issued a commitment letter for a $ 242,000 loan (the "FirstLoan") to issue to Seville Motor Corporation ("Seville Motor"). The commitment letter required the unconditional guaranties of Kenneth W. Keith, Florence L. Keith and Kenneth J. Keith (the "Keiths"). These guaranties were to be secured by a first mortgage on real property located on Route 13 in Seaford, Delaware (the "Seaford Property"), and a second mortgage on the Keiths' residence, located at 307 Pond Road in Millsboro, Delaware (the "Millsboro property").

WT also extended a $ 125,000 line of credit to Seville [*2] Motor by way of a commitment letter dated November 14, 1997 (the "Second Loan"). The Keiths unconditionally guaranteed this line of credit and secured it with a second lien on the Seaford Property, a third lien on the Millsboro Property, and a lien on the corporate assets of Seville Motor.

The parties executed the documents pertaining to both of these loans at a closing held on November 20, 1997. The Keiths were represented by counsel at the closing.

Seville Motor apparently continued to have cash flow problems. Seville Motor enlisted Ashland Capital Group, L.L.C. ("ACG") to assist Seville Motor with the management of its financial problems. By letter dated November 18, 1998, ACG requested additional funds for Seville Motor from WT. ACG offered an assignment of accounts from Credit Acceptance Corporation ("CAC") as collateral. At the time of the letter,

ACG claimed a balance due from CAC in the amount of $ 701,365.17.

By letter dated December 31, 1998, WT agreed to extend a line of credit in the amount of $ 105,000 to Seville Motor (the "Third Loan"). Pursuant to the commitment letter sent to the Keiths regarding terms of the loan, the Third Loan would be secured by an assignment [*3] of the CAC receivables, a fourth mortgage on the Seaford Property, a second mortgage on the Millsboro Property, and a lien on Seville Motor's assets.

The closing with respect to the Third Loan occurred on January 4, 1999. The Keiths were represented by counsel at the closing. After the closing, WT and Seville Motor executed an Assignment of Proceeds prepared by the Keiths' attorney.

CAC refused to execute the initial assignment and requested that changes be made to the documents. Per the amended assignment, the amount of accounts due to Seville Motor totaled $ 468,708.00, subject to collection costs. Although this amount differed substantially from the amount originally discussed, WT did not revoke the $ 105,000 line of credit from Seville Motor.

Seville Motor failed to make loan payments as required by the various loan agreements. WT requested a meeting with CAC and the Keiths. At the meeting held on February 21, 2000, CAC asserted that no payments were due at that time. The parties were unable to resolve the issue of payment.

The loans became past due and WT demanded payment in full in October of 2000 from Seville Motor. WT filed this Complaint against the Keiths on November 22, 2000. The [*4] Keiths assert a three-pronged bad faith defense against WT. In addition, the Keiths accuse WT of tortious interference with business relations between Seville Motor and potential creditors. WT defends, asserting that no facts in evidence support the allegations.

MOTION FOR SUMMARY JUDGMENT

A. Standard of Review

This Court will grant summary judgment only when no material issues of fact exist, and the moving party bears the burden of establishing the non-existence of material issues of fact. *Moore v.. Sizemore*, 405 A.2d 679, 680 (Del. 1979). Once the moving party meets its burden, the burden shifts to the non-moving party to establish the existence of material issues of fact. *Id.* at 681. Where the moving party produces an affidavit or other evidence sufficient under Superior Court Civil Rule 56 in support of its motion and the burden shifts, the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. Super. Ct. Civ. R. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548- 323, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). If, after discovery, the non-moving [*5] party cannot make a sufficient showing of the existence of an essential element of his or her case, summary judgment must be granted. *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991), cert. denied, 504 U.S. 912, 118 L. Ed. 2d 551, 112 S. Ct. 1946 (1992); *Celotex Corp.*, supra. If, however, material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate. *Ebersole v. Lowengrub*, 54 Del. 463, 180 A.2d 467, 470, 4 Storey 463 (Del. 1962).

B. The Debts

The Keiths unconditionally guaranteed the three loans at issue in this case. Nonetheless, the Keiths allege that questions of fact remain, specifically: (1) whether WT engaged in

fraud in the execution of the First Loan to the Keiths, (2) whether WT committed fraud by failing to seek collection from CAC under the Assignment of Proceeds, and (4) whether WT tortiously interfered in the business relationships of Seville Motor.

1. Allegations of Fraud

Regarding the principle of good faith in general, the Supreme Court has recognized the "occasional necessity [*6] of implying such terms in an agreement so as to honor the parties' reasonable expectations. But those cases should be rare and fact-intensive, turning on issues of compelling fairness." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992, (Del. 1998). Indeed, "implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise." *Id.* An action based on the breach of a good faith covenant usually is pled with fraud, deceit or misrepresentation. *Id.* The *Cincinnati SMSA* case applied the analysis of the term "good faith" in the employment context to contract law, generally, specifically the area of partnership agreements. It follows that these principles apply in this case.

In order to sustain an action in fraud, the Keiths must establish: (1) WT made a false representation of a material fact, (2) WT knew the representation to be false, (3) the representation was made with the intent that the Keiths believe it to be true and rely on it, and (4) the Keiths believed the misrepresentation, acted upon it, and were damaged thereby. *Brzoska v. Olson*, 668 A.2d 1355, 1366 (Del. 1995); [*7] see also *Wilmington Trust Co. v. Amrhein*, Del. C.C.P., C.A. No. 90-12-0021, Trader, J. (Apr. 7, 2000). Delaware law provides for a legal presumption of good faith. *Murphy v. T.B. O'Toole, Inc.*, 47 Del. 99, 8 Terry 99, 87 A.2d 637, 638 (Del. Super. 1952). If the circumstances relied upon as indicia of fraud are "of a doubtful nature, or are susceptible of an innocent interpretation, or are calculated to raise but a bare suspicion of fraud . . ., they will not amount to sufficient evidence to establish the fact." *Id.* (internal quotation marks and citation omitted).

First, the Keiths assert that WT, despite awareness of the Keiths' desire to the contrary, identified Seville Motor as the Borrower in the First Loan documents. The Keiths allege WT intentionally disregarded the Keiths' instructions to have the mortgage on the Seaford Property placed in the name of Florence Keith ("Mrs. Keith"). The Keiths argue the ultimate structure of the loan damaged Seville Motor by limiting its ability to borrow additional funding after 1997 from other lending institutions. Because Seville Motor was incapable of acquiring further financing, it was forced to default on its payments to WT. [*8] Thus, the Keiths assert WT brought about Seville Motor's default by engaging in fraud.

WT sent the Keiths a commitment letter dated November 14, 1997, summarizing the terms of the First Loan. The first paragraph of the letter identified the Borrower as Seville Motor. The letter set forth the loan amount, the interest rate, the loan repayment term and conditions, the security for the loan, and all related fees, among other details. Mrs. Keith signed and accepted the terms of this letter on November 18, 1997. A closing was conducted on November 20, 1997. The Keiths were represented by counsel at the closing. Mrs. Keith had ample information and time to request that the arrangement terms be changed prior to the closing. n1 There is no evidence that Mrs. Keith questioned the structure of the loan until after the closing. n2 WT's failure to change the documents in light of the foregoing does not rise to the level of fraud, nor does it excuse the Keiths' obliga-

tions under the executed First Loan agreement.

> n1 The contention the Keiths failed to read the loan documents is ignored. *Pellaton v. Bank of New York*, 592 A.2d 473, 477 (Del. 1991); *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989).

[*9]

> n2 In their counterclaim, the Keiths assert that they were unhappy with the structure of the First Loan because it limited the borrowing capacity of Seville Motor. In support of their contention that they contacted WT on several occasions to request that the form of the loan be changed, the Keiths cite two letters sent to WT after the closing on the First Loan. These letters do not indicate an interest in securing future financing on behalf of Seville Motor but express concern regarding the personal tax liability of Mrs. Keith.

Second, the Keiths allege that WT fraudulently secured the First Loan with a mortgage on both the Millsboro and Seaford Properties, as opposed to only the Seaford Property. This claim is without merit. As previously noted, the November 14, 1997, commitment letter detailed the terms of the First Loan. This letter clearly delineated the parties, the loan amount, and the collateral security required for the loan to issue. The Keiths signed the commitment letter, the mortgage, and the security documents. "A party to a contract cannot silently accept its benefits and then object [*10] to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance." *Graham*, 565 A.2d at 913.

In their third allegation of fraud, the Keiths assert that WT's failure to seek indemnification from CAC constitutes a violation of the Assignment of Proceeds. n3 It is a tenet of contract law that a debtor remains liable for monies owed until the debt is repaid or repayment is excused by the creditor. The Assignment of Proceeds entered into and agreed to by WT, the Keiths and CAC did not waive WT's entitlement to the full sum owed under the existing loans. See *Layne v. Fort Carson Nat'l Bank*, 655 P.2d 856, 857 (Colo. Ct. App. 1982) (holding bank did not violate the good faith requirement of the UCC when it stood on its rights under the security agreement). The Assignment did not change the nature of the unconditional guaranties executed by the Keiths. Nor did the Assignment create an affirmative duty on the part of WT to recover the funds assigned from CAC.

> n3 Because the Third Loan was secured by an assignment of proceeds, the Uniform Commercial Code is implicated. 6 Del.C. § 1-201 (19) ("'Good faith' means honesty in fact in the conduct or transaction concerned.").

[*11]

Guaranty contracts are governed by the fundamental theory that the intent of the parties must prevail. *Wilmington & Northern R.R. Co.*, Del. Super., C.A. No. 97C-09-297, Quillen, J. (Mar. 30, 1999) at 9-10. When the intent of the parties is reasonably clear, there is no room for construction. *Id.* The guaranties signed by the Keiths contained the following provisions, among others:

> . This Guaranty will . . . continue in full force until all indebtedness shall have been fully and finally paid

and satisfied and all other obligations of Guarantor under this Guaranty shall have been performed in full.

. Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

. Guarantor also waives any and [*12] all rights or defenses arising by reason of . . . any defenses given to guarantors at law or in equity other than actual payment and performance of the indebtedness.

. Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

. [The Keiths] absolutely and unconditionally guarantee[] and promise[] to pay to WILMINGTON TRUST COMPANY ("Lender") . . ., on demand, in legal tender . . . the indebtedness . . . of SEVILLE MOTOR CORPORATION ("Borrower") . . . .

The Keiths availed themselves of the assistance of an attorney for the purpose of acquiring financial assistance from WT. As the President of Seville Motor, Mrs. Keith is an experienced businesswoman. The intent of the parties is clean the Keiths committed assets to WT with the hope that the loan funds would in sure the future solvency of Seville Motor. Although both the Keiths and WT worked to insure the continued success of the business, Seville Motor folded. The Keiths [*13] are now liable for the debts they secured.

2. *Tortious Interference*

The Keiths allege that WT tortiously interfered with its business relationships by refusing to release collateral for its loans to allow the Keiths to offer these assets as collateral for another loan from a different lending institution. "A claim for tortious interference with business relations must allege: (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages." *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) (internal quotation marks and citation omitted). When considering these factors, the Court takes into consideration the accused party's privilege to compete and protect his business interests in a lawful fashion. *Id.*

The Keiths fail to present any evidence of these elements. The reference to Seville Motor's missed business opportunities is vague at best. Furthermore, the withholding of collateral by a creditor does not rise to the level of "interference" with its debtor's other financial relations. The Keiths

surrendered this collateral in order to secure a loan. **[*14]** The very purpose of collateral is to provide a creditor with something of value lest the debtor default on his obligations. Creditors are not required to release their collateral unless and until the loan obligations are satisfied. This defense fails as well.

C. Conclusion

In light of the foregoing, WT's Motion for Summary Judgment is granted. It is the Court's understanding that the Keiths dispute only whether the loans are enforceable and not the amount due under the executed notes. The parties are directed to submit an order reflecting the total sum due within ten days.

**IT IS SO ORDERED.**

Richard F. Stokes

LEXSTAT DEL. CODE ANN TIT. 6, 2714

DELAWARE CODE ANNOTATED
Copyright 2005 by The State of Delaware
All rights reserved.

\*\*\* THIS DOCUMENT IS CURRENT THROUGH 75 DEL LAWS, CH 234 \*\*\*
\*\*\* ANNOTATIONS CURRENT THROUGH JANUARY 13, 2006 \*\*\*

TITLE 6.  COMMERCE AND TRADE
SUBTITLE II.  OTHER LAWS RELATING TO COMMERCE AND TRADE
CHAPTER 27.  CONTRACTS
SUBCHAPTER II.  STATUTE OF FRAUDS AND PERJURIES

**GO TO DELAWARE STATUTES ARCHIVE DIRECTORY**

6 Del. C. § 2714 (2005)

§ 2714. Necessity of writing for contracts; definition of writing; evidence

(a) No action shall be brought to charge any person upon any agreement made upon consideration of marriage, or upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them, or upon any agreement that is not to be performed within the space of one year from the making thereof, or to charge any person to answer for the debt, default, or miscarriage, of another, in any sum of the value of $ 25 and upwards, unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith, or some other person thereunto by the party lawfully authorized in writing; except for goods, wares and merchandise, sold and delivered, money loaned and other matters which are properly chargeable in an account, in which case the oath or affirmation of the plaintiff, together with a record regularly and fairly kept, shall be allowed to be given in evidence in order to charge the defendant with the sums therein contained.

(b) A contract, promise, undertaking or commitment to loan money or to grant or extend credit, or any modification thereof, in an amount greater than $ 100,000, not primarily for personal, family, or household purposes, made by a person engaged in the business of lending or arranging for the lending of money or the extending of credit shall be invalid unless it or some note or memorandum thereof is in writing and subscribed by the party to be charged or by the party's agent.  For purposes of this section, a contract, promise, undertaking or commitment to loan money secured solely by residential property consisting of 1 to 4 dwelling units shall be deemed to be for personal, family or household purposes.

(c) For the purposes of this section, "writing" includes microphotography, photography and photostating, and a microphotographic, photographic or photostatic copy of any agreement covered by this section.  Such copy or copies having been regularly made and kept in the course of business, shall be equally competent as evidence as the original of such agreement, where the original is inaccessible or has been destroyed or otherwise disposed of in good faith in the

6 Del. C. § 2714

regular course of business and where the mode of making such microphotograph, photograph or photostat was such as to justify its admission as a true copy of the original.

**HISTORY:** Code 1852, § 1167; 13 Del. Laws, c. 451; Code 1915, § 2626; 38 Del. Laws, c. 157; Code 1935, § 3106; 48 Del. Laws, c. 224, § 1; 6 Del. C. 1953, § 2714; 67 Del. Laws, c. 189, §§ 1-3; 70 Del. Laws, c. 186, § 1.