IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INACOM CORP., et al., | Bankruptcy Case No. 00-2426 (PJW) |
| Debtors. | |
| INACOM CORP., on behalf of all affiliated debtors, | Civil Action No. 04-CV-583 (GMS) |
| Plaintiff, | |
| vs. | |
| LEXMARK INTERNATIONAL, INC., | |
| Defendant. | |
| LEXMARK INTERNATIONAL, INC., | |
| Third-Party Plaintiff, | |
| vs. | |
| COMPAQ COMPUTER CORP., ITY CORP., and CUSTOM EDGE, INC., | |
| Third-Party Defendants. | |

**HEWLETT-PACKARD COMPANY'S MOTION TO
STRIKE TESTIMONY OF KEVIN SARKISIAN**

Third-party defendant Hewlett-Packard Company ("HP"), as successor in interest to Compaq Computer Corp. ("Compaq"), moves this Court for an order striking the testimony of Kevin Sarkisian ("Mr. Sarkisian") regarding his alleged understanding of a letter dated February 16, 2000 from Bill Francis of Compaq to Misty Atchison of Lexmark (the "Compaq Letter"). HP previously filed a motion *in limine* seeking

{00234423.DOC v 2}            1

exclusion of Mr. Sarkisian's testimony prior to trial. HP withdrew its motion *in limine* while reserving its right to object after Mr. Sarkisian completed his trial testimony. HP hereby renews the substance of its motion because Mr. Sarkisian's trial testimony confirms that he lacks any personal knowledge of the letter at issue and his testimony constitutes improper opinion.

## SUMMARY OF ARGUMENT

Mr. Sarkisian was the only live witness presented by Lexmark at trial in support of its third-party claims against HP. Mr. Sarkisian testified regarding his interpretation of the Compaq Letter as a "catchall" that no matter what happened Compaq would make Lexmark whole for the debts of Inacom. Trial Transcript at 48:21-24.[1]

Mr. Sarkisian's testimony should be stricken because it is not based on any personal knowledge and it is directly contradicted by the testimony of Lexmark witnesses who were responsible for the customer relationship with Inacom and who were personally involved in collection of Inacom's account at the time of the Francis Letter. Mr. Sarkisian simply had no communications with Inacom or Compaq regarding the terms of the Compaq Letter or otherwise.

## ARGUMENT

### I.  MR. SARKISIAN HAS NO PERSONAL KNOWLEDGE OF THE ASSUMPTION TRANSACTION

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.

---

[1] A copy of relevant excerpts from the Trial Transcript dated February 16, 2006 is attached as <u>Exhibit A</u>.

Fed. R. Evid. 602; *Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104, 111 (3d Cir. 1982) (a witness ought to state only those facts of which he has personal knowledge). The personal knowledge requirement reflects the common law's insistence on the most reliable source of information. Fed. R. Evid. 602, Adv. Comm. Notes (1972).

At the time of the asset sale, Mr. Sarkisian was the U.S. Credit Manager at Lexmark. His department was not responsible for communicating with customers about delinquent receivables. In fact, Mr. Sarkisian testified that he and members of his credit team no contact of any kind with Inacom or Compaq regarding Inacom's delinquent account.

>   Examination by Mr. Halliday:
>
>   Q: Did you, sir, or anybody in your credit team that you know of communicate with Inacom in late 1999 or early 2000 regarding the status of its account with Lexmark?
>   A: No.
>   Q: Did you or anyone in your team that you know of in late 1999 or early 2000 communicate with Custom Edge about the status of Inacom's account payable?
>   A: No.
>   Q: In late 1999 –early 2000, did you or to your knowledge anyone in your credit team communicate with Compaq regarding Inacom's account payable?
>   A: No.

Trial Transcript at 22:12-23.

Responsibility for communication with Inacom rested with Lexmark's sales team – an entirely different department with a different chain of command. In fact, it was Lexmark's corporate philosophy that the credit department *not* have any such customer contacts. Mr. Sarkisian testified at trial as follows:

<u>Examination by Ms. Dumas:</u>

Q:   Do you remember during your deposition us talking about Lexmark's philosophy with respect to – and I will paraphrase here – the sales team owning the customer?
A:   Yes, I do.
Q:   And what is your understanding of that corporate philosophy?
A:   That the sales team owns the relationship with the customer and typically would have **direct contact with the customer to resolve issues** as well as sell more product.
Q:   Would that include collection of past due accounts? Was the sales team ultimately **responsible for collection of past due accounts**?
A:   In that they owned the relationship, **yes, that was part of their responsibility**.
Q:   And it was also part of Lexmark's corporate philosophy that the sales team were the individuals who had contact with the customer, as opposed to your group?
A:   That's correct.

Trial Transcript at 28:25-29:18 (emphasis added).

The reason why this issue is so important is because Mr. Sarkisian's interpretation of the Compaq Letter is diametrically opposed to the interpretation of the letter given by Messrs. Kendrick and Schuette, the two individuals in Lexmark's sales team who actually had the communications with Inacom and who were responsible for the Inacom account and collections of outstanding receivables. Mr. Sarkisian had no communications whatsoever with either Inacom or Compaq. Trial Transcript at 29:19-23, 43:14-17.

Both Mr. Schuette, the district sales manager, and Mr. Kendrick, his direct supervisor and Lexmark's Vice President of Sales for North America, testified that based on discussions with Lexmark, they understood that Inacom would pay invoices that had checks written against them (the "Held Checks"), and Compaq would pay the remaining open payables. Mr. Kendrick testified as follows:

{00234423.DOC v 2}                    4

Q: If I understood your testimony correctly, you testified that Mr. Schuette informed you that the debts that were outstanding to Lexmark at this time would be debts that would be paid by Inacom; is that correct?
A: That was my understanding.
Q: Okay. And was it your understanding that those debts that were owed and outstanding to Lexmark at this time frame were debts that were going to be retired by these release [sic] checks?
A: Yes.

Kendrick Depo at 70:6-16.[2]

\* \* \*

Q: Okay. The letter goes on to say, "Additionally, Compaq will assume the liability of Lexmark invoices that have not had checks written against them." Is that consistent with your understanding of what the deal was at that time?
A: … It was consistent with what our agreement was or our implied understanding was conceptually. **The checks in the drawer would equal the old debt. The go forward amount on the 16th of February would be assumed – the liability would be assumed by Compaq.**
**Q: Was it your understanding that Compaq would assume the liability for payment of amounts that were reflected by held checks?**
A: **Not in my mind. Checks in the drawer equals the amount owed coming from Inacom, 16th on by Compaq, in my mind.** Dick Oshlo would do this part and Compaq would do that part, if I make myself clear.

Kendrick Depo at 100: 1-19 (emphasis added).

\* \* \*

Q: The next paragraph, which I think we would all agree is the meat of the coconut of the claim that Lexmark has asserted against Compaq and HP is, and I'll quote, "In connection with such purchase, Custom Edge, Inc. also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account."
   That sentence I've read, is that what you have been referring to when you've testified that Lexmark got a guarantee from Compaq?
A: Not really. . . . .
Q: When you say not really, what do you mean by that?
A: In my mind, the drawer, as we've referred to it [the Held Checks], was an **Inacom drawer in my mind, and that's why I must speak my mind. It did not relate to the outstanding amount mentioned here on this document, you see.**

---

[2] Copies of relevant excerpts from the deposition transcripts of Messrs. Kendrick and Schuette dated February 15, 2005 are attached as Exhibits B and C.

> Kendrick Depo. at 106:7-107:1-2 (emphasis added).
>
> * * *
>
> Q: When you got [the Compaq letter], was it in your mind – was it your understanding that this letter would cover a situation such as we find ourselves in now, with Inacom having filed bankruptcy and being sued for a preference, that Compaq would promise to, in essence, reimburse Lexmark under this scenario?
> A: **As I stated before, I saw this as a guarantee of payment for future liabilities** . . . .
> Q: In your personal opinion did Compaq perform on its guarantee as you understood it?
> A: **As I recall, yes**.
>
> Kendrick Depo. at 111:2-20 (emphasis added).

Thus, Mr. Kendrick, who was ultimately responsible for the Inacom account and its collection, understood from the Compaq Letter that Inacom would pay Held Checks and Compaq would pay future liabilities. Most significantly, Mr. Kendrick believes that Compaq fully performed its obligations.

Lexmark continued to pursue collection of the Held Checks from Inacom after receipt of the Compaq Letter. Schuette Depo. at 56:3-10. Inacom eventually released the Held Checks and Lexmark applied the payments to amounts owed by Inacom to Lexmark. Kendrick Depo. at 101:2-5.

Mr. Sarkisian alone testified that he believed that the wording of the Compaq Letter *changed* the transaction, and that Compaq also assumed liability for the Held Checks. Unlike Mr. Kendrick, Mr. Sarkisian had no communications with Inacom and simply has no knowledge of the context in which the Compaq Letter was sent. Mr. Sarkisian's misunderstanding of the Compaq Letter is the direct result of his lack of personal knowledge about the nature of the asset sale, and is exactly why such testimony

should be excluded under Rule 602. His testimony constitutes speculation, improper opinion and is prejudicial. As such, it should be stricken from the record.

## CONCLUSION

Mr. Sarkisian has no personal knowledge of the terms at issue in the Compaq Letter or the context in which the letter was written. For the foregoing reasons, HP requests that the Court strike all trial testimony of Mr. Sarkisian regarding the Compaq Letter.

Dated: March 31, 2006
      Wilmington, Delaware      MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ William H. Sudell, Jr.*
William H. Sudell, Jr. (No. 463)
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 N. Market Street
Wilmington, DE 19899-1347
(302) 658-9200

- and -

FRIEDMAN DUMAS & SPRINGWATER LLP
Ellen A. Friedman
Cecily A. Dumas
Gail S. Greenwood
Brandon C. Chaves
150 Spear Street, Suite 1600
San Francisco, CA 94105
(415) 834-3800