# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4    INACOM CORP. on behalf of      :    Civil Action
      all affiliated debtors,        :
 5                                   :
              Plaintiff,             :
 6                                   :
         v.                          :
 7                                   :
      LEXMARK INTERNATIONAL, INC.,   :
 8                                   :
              Defendant.             :
 9                                   :

10
      LEXMARK INTERNATIONAL, INC.,   :
11                                   :
              Third-Party            :
12            Plaintiff,             :
                                     :
13       v.                          :
                                     :
14    COMPAQ COMPUTER CORP., ITY     :
      CORP., and CUSTOM EDGE, INC.,  :
15                                   :
              Third-Party            :
16            Defendants.            :    No. 04-583 (GMS)

17                          - - -

18              Wilmington, Delaware
              Thursday, February 16, 2006
19                  9:30 a.m.

20                          - - -

21    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

22

23

24

25
```

2

```
 1   APPEARANCES:

 2           DEREK C. ABBOTT, ESQ.
             Morris, Nichols, Arsht & Tunnell
 3                       -and-
             CECILY A. DUMAS, ESQ.
 4           Friedman, Dumas & Springwater, LLP
             (San Francisco, California)
 5
                         Counsel for Compaq
 6
             THOMAS G. WHALEN, JR., ESQ.
 7           Stevens & Lee, P.C.
                     -and-
 8           CULVER V. HALLIDAY, ESQ., and
             EMILY L. PAGORSKI, ESQ.
 9           Stoll, Keenon & Park, LLP
             (Lexington, Kentucky)
10
                         Counsel for Lexmark
11
                              - - -
12        THE COURT:  Good morning.

13        (Counsel respond "Good morning.")

14        THE COURT:  We should reintroduce for the

15   record, starting with Mr. Halliday and his team.

16        MR. HALLIDAY:  Good morning, Your Honor.  Culver

17   Halliday.  Emily Pagorski, Stoll, Keenon & Park, Tom Whalen,

18   Stevens & Lee.  Bob Patton, in-house counsel for Lexmark.

19   Then, Your Honor, we have Steve Negerian (phonetic), who is

20   our tech person, then Kevin Sarkisian, who is our one live

21   witness, Your Honor.

22        THE COURT:  Ms. Dumas.

23        MS. DUMAS:  Good morning, Your Honor.  Cecily

24   Dumas, here with Derek Abbott, our Hewlett-Packard

25   representative, Ms. Anne Kennelly, is here.
```

Sarkisian - direct

1   A.  Yes. It would be a standard procedure in the credit
2   department when we are extending credit to a subsidiary,
3   based on the parent's financial statements.
4   Q.  And once again, was it Mr. Schuette then who
5   communicated with Compaq?
6   A.  Yes, it was.
7   Q.  So he relayed your request for this letter?
8   A.  That's correct.
9   Q.  Just as Mr. Schuette had previously relayed request
10  for payment?
11  A.  Yes.
12  Q.  Did you, sir, or anybody in your credit team that you
13  know of communicate with Inacom in late 1999 or early 2000
14  regarding the status of its account with Lexmark?
15  A.  No.
16  Q.  Did you or anyone in your team that you know of in
17  late 1999 or early 2000 communicate with Custom Edge about
18  the status of Inacom's accounts payable?
19  A.  No.
20  Q.  In late 199-early 2000, did you or to your knowledge
21  anyone in your credit team communicate with Compaq regarding
22  Inacom's accounts payable?
23  A.  No.
24  Q.  Sir, when you received a copy of this letter from Mr.
25  Schuette in February of 2001, at that time, as best you can

28
Sarkisian - cross

1  was in the hierarchy. I think he came in at the tail-end of
2  things here, possibly even after Custom Edge was formed.
3  Q.    But he wasn't senior to either Mr. Schuette or Mr.
4  Kendrick. Is that correct?
5  A.    No, he was not.
6  Q.    What was -- in early 2000, what was Mr. Kendrick's
7  title?
8  A.    I believe he was the vice president of sales for North
9  America. I don't recall specifically. But I know he was a
10 vice president.
11 Q.    In the sales department?
12 A.    Yes.
13 Q.    Was the Inacom account within his jurisdiction as the
14 vice president of sales for North America?
15 A.    Yes, it was.
16 Q.    And what was Mr. Schuette's position, if you recall?
17 A.    I believe it was a sales manager. I don't know if it
18 was a district sales manager or area. But it was a sales
19 manager.
20 Q.    And was the Inacom account also within Mr. Schuette's
21 area of responsibility?
22 A.    Yes, it was.
23 Q.    And Mr. Pinkston, do you know one way or the other?
24 A.    I don't know.
25 Q.    Do you remember during your deposition us talking

Sarkisian - cross

1   about Lexmark's corporate philosophy with respect to -- and
2   I will paraphrase here -- the sales team owning the
3   customer?
4   A.   Yes, I do.
5   Q.   And what is your understanding of that corporate
6   philosophy?
7   A.   That the sales team owns the relationship with the
8   customer and typically would have direct contact with the
9   customer to resolve issues as well as sell more product.
10  Q.   Would that include collection of past due accounts?
11  Was the sales team ultimately responsible for collection of
12  past due accounts?
13  A.   In that they owned the relationship, yes, that was
14  part of their responsibility.
15  Q.   And was it also part of Lexmark's corporate philosophy
16  that the sales team were the individuals who had contact
17  with the customer, as opposed to your group?
18  A.   That's correct.
19  Q.   And I think you indicated -- correct me if I am
20  wrong -- that when Mr. Halliday was asking you questions you
21  indicated that you had not had any contact with Inacom
22  relative to this delinquent account.  Is that correct?
23  A.   That's correct.
24  Q.   So that the extent to which you had concerns in this
25  time frame, late 1999-2000, the correct corporate avenue for

Sarkisian - cross

1  testimony?

2  A.  Yes.  At the time, I certainly didn't know who was

3  sending the checks and what they were dated.  And typically,

4  we don't go back and look at checks unless there is an

5  issue.  So if we get paid and the check clears and the

6  balance is gone, then we go onto the next issue.

7  Q.  So you didn't care who the payment came from as long

8  as the payment came in?

9  A.  Yeah.  I didn't care.  And the other thing is I had

10  this letter from Compaq saying if there were a problem they

11  would take care of it.

12  Q.  And that's how you understood that letter?

13  A.  Yes.

14  Q.  Did you have any discussions with Compaq?

15  A.  No.

16  Q.  At all?

17  A.  None.

18  Q.  So Compaq made no representations to you that if

19  anything happened they would take care of it?

20  A.  Well, they sent this letter.  They put it in writing.

21  Q.  But that's not what the letter says, sir.

22         THE COURT:  Counsel?

23         MR. HALLIDAY:  Objection.

24         THE COURT:  Sustained.

25         MS. DUMAS:  Withdrawn.

Sarkisian - cross

1    Ambiguous.

2             THE COURT: Sustained.

3    BY MS. DUMAS:

4    Q.    Was Compaq paying on a timely basis for new product

5    that it ordered from Lexmark?

6    A.    As I recall, they were.

7    Q.    So the reason that you would have stopped shipping to

8    Compaq was because of this outstanding Inacom delinquency.

9    Correct?

10   A.    Correct.

11   Q.    And, in fact, Lexmark didn't stop shipping to Compaq

12   even though that delinquency wasn't taken care of for, in

13   your words, several months. So why was it that you didn't

14   stop shipments to Compaq?

15   A.    Because we got paid.

16   Q.    But this was already past due in January 2000. So we

17   are talking about several months after February 16th, 2000?

18   A.    We ultimately got paid. And if we didn't, I had the

19   February 16th letter to make sure we did. So I felt

20   comfortable with the situation.

21   Q.    So you saw the February 16th letter as a catchall,

22   whatever happens to you, Compaq will make you whole? That's

23   how you read that letter?

24   A.    Yes, certainly.

25   Q.    And that, you would agree with me, is inconsistent