# EXHIBIT B

COPY

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF DELAWARE
 2                   CASE NO. 04-CV-583

 3  ─────────────────────────────────────────────────

 4             DEPOSITION OF ROBERT KENDRICK

 5  ─────────────────────────────────────────────────

 6  INACOM CORP. on behalf of all
    affiliated debtors                       PLAINTIFF
 7
    v.
 8
    LEXMARK INTERNATIONAL, INC.
 9                                           DEFENDANT
    LEXMARK INTERNATIONAL, INC.
10                                         THIRD-PARTY
    v.                                        PLAINTIFF
11
    COMPAQ COMPUTER CORP., ITY CORP.,
12  and CUSTOM EDGE, INC.                  THIRD-PARTY
                                            DEFENDANTS
13  ─────────────────────────────────────────────────

14          The deposition of ROBERT KENDRICK was taken on
    behalf of the plaintiff, Inacom Corporation, before Ann
15  Hutchison, Registered Professional Reporter and Notary
    Public in and for the State of Kentucky at Large, at the
16  law office of Stoll, Keenon & Park, 300 West Vine
    Street, Suite 2100, Lexington, Kentucky, on Tuesday,
17  February 8, 2005, beginning at the hour of 9:38 a.m.
    Said deposition was taken pursuant to Rule 30 of the
18  Federal Rules of Procedure and Rule 7030 of the Federal
    Bankruptcy Procedure.
```

ACTION COURT REPORTERS
184 North Mill Street
Lexington, Kentucky 40507
(859) 252-4004

```
 1                        APPEARANCES
 2
 3   COUNSEL FOR PLAINTIFF INACOM CORPORATION:
 4       Jeffrey P. Nolan
         Pachulski, Stang, Ziehl, Young & Jones
 5       10100 Santa Monica Boulevard, 11th Floor
         Los Angeles, California 90067-4100
 6
 7   COUNSEL FOR THIRD-PARTY DEFENDANT COMPAQ:
 8       Cecily A. Dumas
         Friedman, Dumas & Springwater, LLP
 9       One Maritime Plaza, Suite 2475
         San Francisco, California 94111
10
11   COUNSEL FOR DEFENDANT AND THIRD-PARTY PLAINTIFF
     LEXMARK INTERNATIONAL, INC.:
12
13       Culver V. Halliday
         Stoll, Keenon & Park, LLP
14       2650 Aegon Center
         400 West Market Street
15       Louisville, Kentucky 40202-3377

16   ALSO PRESENT:
17       Kevin Sarkisian
18
19
20
21
22
23
24
25
```

1    Q.    Do you have any understanding as you sit
2 here today why the person in the finance department at
3 Inacom was the one that was controlling the release of
4 checks in early 2000?
5    A.    No.
6    Q.    If I understood your testimony correctly,
7 you testified that Mr. Schuette informed you that the
8 debts that were outstanding to Lexmark at this time
9 would be debts that would be paid by Inacom; is that
10 correct?
11    A.    That was my understanding.
12    Q.    Okay.  And was it your understanding that
13 those debts that were owed and outstanding to Lexmark at
14 this time frame were debts that were going to be retired
15 by these release checks?
16    A.    Yes.
17    Q.    Did you have any understanding that there
18 were -- strike that.
19         Was it your understanding that the total
20 amount that was owed by Lexmark at this time, there was
21 a corresponding group of held checks that equalled that
22 amount?
23    A.    Yes.
24    Q.    As opposed to a proportion of it?
25    A.    That's correct.

ACTION COURT REPORTERS                                70

```
 1        Q.    Okay.  The letter goes on to say,
 2   "Additionally, Compaq will assume the liability of
 3   Lexmark invoices that have not had checks written
 4   against them."  Is that consistent with your
 5   understanding of what the deal was at that time?
 6        A.    I don't know about what the deal is.  It
 7   was consistent with what our agreement was or our
 8   implied understanding was conceptually.  The checks in
 9   the drawer would equal the old debt.  The go forward
10   amount would be paid by Inacom.  The go forward amount
11   on the 16th of February would be assumed -- the
12   liability would be assumed by Compaq.
13        Q.    Was it your understanding that Compaq
14   would assume the liability for payment of amounts that
15   were reflected by the held checks?
16        A.    Not in my mind.  Checks in the drawer
17   equals the amount owed coming from Inacom, 16th on by
18   Compaq, in my mind.  Dick Oshlo would do this part and
19   Compaq would do that part, if I make myself clear.
20        Q.    Was there any question in your mind this
21   February 15, 2000 time frame that Inacom wouldn't
22   release those held checks?
23        A.    Is there any question?
24        Q.    Yeah, that those checks wouldn't get
25   released?
```

```
 1      A.      Yes.
 2      Q.      Do you know whether they eventually all
 3  got released, all the checks that were sitting in the
 4  treasury drawer payable to Lexmark?
 5      A.      I seem to recall they all did.
 6      Q.      Was there any thought in the part of
 7  Lexmark -- or strike that.
 8              Did you have concern that when Inacom
 9  released the held checks they would bounce?
10      A.      No.
11      Q.      Why not?
12      A.      Can you repeat your question again?
13      Q.      Did you have concern in your mind that
14  when Inacom did release those held checks that they
15  would bounce for not sufficient funds?
16      A.      No question whatsoever.
17      Q.      So you didn't think that they would
18  bounce?
19      A.      I did not think they would bounce.
20      Q.      Why?
21      A.      I had no reason to believe that they
22  would.
23      Q.      Is that because Inacom had -- was
24  expecting to get or had received $369 million from
25  Compaq?
```

```
 1          Q.      And do you know whether or not Compaq
 2   issued a parent company guarantee?
 3          A.      No.
 4          Q.      There are other witnesses lined up in the
 5   lineup who I think those questions might be more
 6   appropriately directed to.
 7                  The next paragraph, which I think we would
 8   all agree is the meat of the coconut of the claim that
 9   Lexmark has asserted against Compaq and HP is, and I'll
10   quote, "In connection with such purchase, Custom Edge,
11   Inc., also assumed the obligation to pay all the
12   outstanding amount on the referenced account, subject to
13   the terms and conditions of such account."
14                  That sentence I've read, is that what you
15   have been referring to when you've testified that
16   Lexmark got a guarantee from Compaq?
17          A.      Not really.
18          Q.      Is there any other written communication
19   in which this guarantee was communicated to Lexmark?
20          A.      Not to my knowledge.
21          Q.      When you say not really, what do you mean
22   by that?
23          A.      In my mind, the drawer, as we've referred
24   to it, was an Inacom drawer in my mind, and that's why I
25   must speak my mind. It really did not relate to the
```

1   <u>outstanding amount mentioned here on this document, you</u>
2   <u>see.</u>
3       Q.      Was there some other oral communication
4   between Compaq and Lexmark that -- strike that.
5               Did you do anything or direct anybody on
6   your team to do anything after you got this letter?
7       A.      You mean after jumping for joy?  I'm sure
8   that I did.  I cannot remember.  My next recollection
9   would deal with what any M & A, merger and acquisition,
10  would be, and that is how were we going to get process,
11  fluid process on ordering and scheduling and invoicing,
12  collections, because that's kind of my background.
13      Q.      The logistics of it?
14      A.      Yes.  Working with a client.
15      Q.      I think that you testified a little while
16  ago that the post closing process of the transition from
17  Inacom to Custom Edge may not have been as smooth as
18  would have been desirable; is that a fair statement?
19      A.      Lot of confusion.
20      Q.      In connection with that transition were
21  there open payables that Custom Edge or Compaq let go
22  beyond their ordinary net 30 terms?  Do you recall
23  having delinquencies in connection with the accounts
24  payable that were assumed by Compaq in connection with
25  the transition?

1    A.    No.

2    Q.    When you got this letter, a copy of this
3  letter that Mr. Francis sent to Ms. Atchinson, was it in
4  your mind -- was it your understanding that this letter
5  would cover a situation such as we find ourselves in
6  now, with Inacom having filed bankruptcy and being sued
7  for a preference, that Compaq would promise to, in
8  essence, reimburse Lexmark under this scenario?

9    A.    As I stated before, I saw this as a
10 guarantee of payment for future liabilities and the
11 ability to work with an account and sustain its business
12 and my business and -- I thought this was a good thing.
13 I would have never speculated beyond that very fact,
14 because we had worked very hard and very long on this
15 whole issue on a daily basis now for three months we're
16 working on this particular issue.  And this was in my
17 mind a significant sign post, and that's what I recall.

18   Q.    In your personal opinion did Compaq
19 perform on its guarantee as you understood it?

20   A.    As I recall, yes.

21        MS. DUMAS:  Mr. Kendrick, I don't have
22 any more questions for you.  Thank you.

23        MR. NOLAN:  I don't have any further
24 questions, either.

25        (DEPOSITION CONCLUDED 1:41)

FEB 15 2000 13:05 FR LEXMARK-SCOTTSDALE    602 367 8222 TO 16062327003    P.03/03

# LEXMARK

Lexmark International, Inc.
8700 East Via De Ventura
Suite 302
Scottsdale, Arizona 85258
USA

February 15, 2000

Mr. Dick Oslo
Treasurer
Inacom
10810 Farnam Drive
Omaha, NE 68154

Dear Dick,

During the last week I have left several messages in your voice mail and with your assistant requesting to talk with you concerning Inacom's serious past due amount of $4,694,000 with Lexmark, International.

It is my understanding from Leon Kerkman, whom I met with last week, that any invoices that have had checks written against them, will be held until the sale is completed between Inacom and Compaq. The proceeds from the sale will then cover those checks and they will be disbursed over a period of 1-10 weeks. Additionally, Compaq will assume the liability of Lexmark invoices that have not had checks written against them.

It is requested that upon the successful completion of the Inacom and Compaq sale, that Lexmark be notified immediately the timing of the payments for our now seriously past due invoices. It is critical that these checks that have been written, and are now being held by Inacom, be released immediately upon the completion of your sale.

I would like to discuss this further with you, and can be reached at 480-367-0120.

Sincerely,

William A. Schuette
U.S. West Sales Manager

cc:   Mr. Leon Kerkman, Senior V.P. of Distribution and Operations
      Mr. Robert S. Kendrick, Lexmark V.P. of U.S. Channel Sales and Marketing



FEB-16-00 WED 06:49 PM				FAX:				PAGE 2

Compaq Computer Corporation				20555 SH 249
P.O. Box 692000				Houston, TX 77070-2698
Houston, TX 77269-2000				tel 713-370-0670

# COMPAQ

February 16, 2000

Lexmark International, Inc.
Ms. Misty Atchinson
Fax 800.732.9539

RE:   Account Payable # 117403 of Inacom Corporation

Dear Ms. Atchinson:

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of Compaq Computer Corporation purchased certain assets of Inacom Corporation. The Compaq subsidiary will operate under the name of Custom Edge, Inc., and its' A/P accounts will be funded by Compaq.

In connection with such purchase, Custom Edge, Inc, also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to John Frasca at 402.758.3822.

Thank you for your consideration in this matter.

Sincerely,

*Bill Francis*
Bill Francis
Director, Corporate Finance
Telephone: 281.514.1223
Email: bill.francis@compaq.com



EXHIBIT
3
Kendrick 2-8-05