IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INACOM CORP., et al., | Bankruptcy Case No. 00-2426 (PJW) |
| Debtors. | |
| INACOM CORP., on behalf of all affiliated debtors, | Civil Action No. 04-CV-583 (GMS) |
| Plaintiff, | |
| vs. | |
| LEXMARK INTERNATIONAL, INC., | |
| Defendant and Third-Party Plaintiff, | |
| vs. | |
| COMPAQ COMPUTER CORP., ITY CORP., and CUSTOM EDGE, INC., | |
| Third-Party Defendants. | |

**HEWLETT-PACKARD COMPANY'S PROPOSED
<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

Dated:  March 31, 2006
    Wilmington, Delaware

>                MORRIS, NICHOLS, ARSHT & TUNNELL
>                William H. Sudell, Jr. (No. 463)
>                Derek C. Abbott (No. 3376)
>                Daniel B. Butz (No. 4227)
>                1201 N. Market Street
>                Wilmington, DE  19899-1347
>                (302) 658-9200
>
>                - and -

{00234218.DOC v 3}                                1

FRIEDMAN DUMAS & SPRINGWATER LLP
Ellen A. Friedman
Cecily A. Dumas
Gail S. Greenwood
Brandon C. Chaves
150 Spear Street, Suite 1600
San Francisco, CA  94105
(415) 834-3800

Attorneys for Third-Party Defendant
Hewlett-Packard Company

Third-party defendant Hewlett-Packard Company ("HP"), as successor in interest to Compaq Computer Corporation ("Compaq") and ITY Corporation, submits the following proposed findings of fact and conclusions of law following the Court's bench trial of this matter on February 13, 2006 and in accordance with the Agreed Scheduling Order entered March __, 2006.

## INTRODUCTION

On June 16, 2000, Inacom Corp. ("Inacom") and its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On or about May 15, 2002, Inacom filed numerous complaints to recover preferences, including a complaint against Lexmark International, Inc. ("Lexmark"). On December 12, 2002, Lexmark filed a third-party complaint against Compaq and its subsidiary seeking reimbursement if it were found liable to Inacom for any preferential transfers. On October 28, 2005, Lexmark paid $990,000 to Inacom to settle the preference claims, and now seeks repayment from Compaq.

Lexmark cross-complained against Compaq on the theory that Compaq breached a letter agreement dated February 16, 2001 (the "Compaq Letter") in which Compaq allegedly guaranteed all of Inacom's outstanding debt. Lexmark argues that the Compaq Letter was a contractual guarantee of all of Inacom's obligations, including three checks that were "held" by Inacom at the time of the letter and paid to Lexmark approximately 4-6 weeks later. Alternatively, Lexmark contends that it was a third-party beneficiary to an Asset Purchase Agreement between Inacom and Compaq, pursuant to which Compaq purchased certain assets and assumed certain liabilities related to Inacom's hardware distribution business. Lexmark contends that Compaq breached the Asset Purchase Agreement by failing to reimburse Lexmark for sums that Lexmark was required to return to Inacom as preference payments.[1]

---

[1] By letter dated March 28, 2006, counsel for Lexmark advised HP that Lexmark intends to withdraw its first and third claims for relief as a third-party beneficiary under the Asset Purchase Agreement. To the extent that Lexmark does in fact withdraw such claims, the Court may disregard Conclusions of Law at paragraphs 46-51, below.

HP contends that the Compaq Letter was not a guarantee or agreement of any kind, and the letter merely confirmed the understanding between the parties that "held" checks would be paid by Inacom and open payables of Inacom would be paid by Compaq together with any amounts incurred by Compaq going forward. HP contends that Lexmark understood and acknowledged that "held" checks would be paid by Inacom after the closing of the Asset Purchase Agreement and Lexmark accepted payments from Inacom consistent with this understanding.

Based on the testimony presented at trial and other evidence submitted by the parties, the Court makes the following findings of fact and conclusions of law.

**I.      Findings of Fact**

1.   InaCom Corp. ("Inacom"), Compaq Computer Corp. ("Compaq") and ITY Corp. entered into an asset purchase agreement (the "Asset Purchase Agreement") pursuant to which Compaq acquired assets related to InaCom's distribution business. (Trial Exh. 2; Samuelson Trial Testimony at 66:17-25 and 76:18-77:4).

2.   As part of the Asset Purchase Agreement, Compaq agreed to assume responsibility for payment of certain accounts payable of Inacom, including responsibility for certain accounts payable of Inacom owed to Lexmark. (Samuelson Trial Testimony at 67:23-68:1).

3.   Inacom's Assistant Corporate Controller, Jay Samuelson, prepared the final reports that listed the specific liabilities and assets that were to be assumed by Compaq under the Asset Purchase Agreement. (Samuelson Trial Testimony at 68:2-7, 69:22-70:9).

4.   On Saturday, February 12, 2000, in connection with the closing of the asset purchase transaction, Jay Samuelson of Inacom emailed to Chris Anderson of Compaq an Accounts Payable Aging Report ("AP Report") that described Inacom's accounts payable to be

assumed by Compaq under the Asset Purchase Agreement. (Samuelson Trial Testimony at 70:7-71:14).

5. The Asset Purchase Agreement transaction between Inacom and Compaq closed on February 16, 2000. (Samuelson Trial Testimony at 83:21-24).

6. Compaq paid all of the Lexmark accounts payable listed on the AP Report. (Samuelson Trial Testimony at 72:16-73:3).

7. Prior to the closing of the asset sale, Inacom's treasury department held in a drawer certain checks that had been cut by the accounts payable department but were not immediately delivered to the vendors to whom they were payable (the "Held Checks"). (Samuelson Trial Testimony at 73:13-74:4; Oshlo Deposition at 74:1-75:9).

8. Inacom's treasury department prepared daily reports with details of the Held Checks, including the check amounts, when the checks were written, and when the checks were released. Some of the Held Checks were payable to Lexmark. (Oshlo Deposition at 78:20-80:8 and Depo Exh. 10).

9. The AP Report in connection with the asset purchase transaction did not reflect invoices paid by Held Checks because once Inacom wrote a check the invoice was no longer shown on Inacom's account payable report. (Samuelson Trial Testimony at 74:12-20, 94:15-95:8).

10. Inacom intended that Compaq would assume only the invoices shown on the AP Report under the Asset Purchase Agreement. (Samuelson Trial Testimony at 70:4-16, 74:12-20).

11. Inacom did not intend that Compaq would assume liability for Held Check amounts under the Asset Purchase Agreement. (Samuelson Trial Testimony at 74:12-20, 93:17-94:3; Trial Exhibit 5).

12. Lexmark understood that Held Checks would remain Inacom's liability after the close of the Asset Purchase Agreement. (Kendrick Deposition at 70:6-71:11 and 100:1-19) ("It was consistent with what our agreement was or our implied understanding was conceptually. The checks in the drawer would equal the old debt... The go forward amount on the 16th of February would be assumed – the liability would be assumed by Compaq.")        .

13. Lexmark's understanding is evidenced by a notation made on or about February 4, 2000 by Lexmark's Director of Finance, Todd Pinkston, in his daily calendar regarding Inacom: "Can't release prior to close" and "Compaq assumes open payables." (Pinkston Deposition at 20:19-22:7 and Depo Exh. 1).

14. When Mr. Pinkston wrote this notation, he understood that an open payable is one that has not had a check written against it. (Pinkston Deposition at 31:11-23) ("Q: So that whether or not an accounts payable report has been updated, the event pursuant to which an open payable becomes closed is the cutting of a check. Correct? A: Yes.").

15. On February 15, 2000, Lexmark's District Sales Manager, William Schuette, wrote a letter to Inacom's treasurer confirming Lexmark's understanding that invoices that had checks written against them by Inacom would be held until the completion of the asset sale between Inacom and Compaq and then released over a period of 1-10 weeks; and Compaq would assume the liability of invoices that had not had checks written against them. (Trial Exh. 7; Schuette Deposition at 71:5-72:9).

16. On February 16, 2000, Bill Francis of Compaq wrote a letter to Misty Atchison of Lexmark ("Compaq Letter") following the close of the Asset Purchase Agreement. The Compaq Letter states that in connection with the asset purchase transaction between Compaq and Inacom, Compaq "assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account." The referenced account is "Account Payable #117403 of InaCom Corporation." (Trial Exhibit 8).

17. Lexmark's U.S. Credit Manager, Kevin Sarkisian, is the only Lexmark employee who testified that the Compaq Letter was a guarantee by Compaq of Held Checks that were paid by Inacom. (Sarkisian Trial Testimony at 41:12-21, 48:21-24) (believed Compaq Letter was a catchall and whatever happened Compaq would make the company whole).

18. Mr. Sarkisian was not a party to any discussions between Inacom and Lexmark relating to which liabilities owed to Lexmark would be assumed by Compaq and which liabilities would remain with Inacom. (Sarkisian Trial Testimony at 33:24-34:4).

19. Mr. Sarkisian had no communications of any kind with Inacom regarding the status of its account with Lexmark. (Sarkisian Trial Testimony at 22:12-15, 29:19-23).

20. Mr. Sarkisian had no communications of any kind with Custom Edge or Compaq regarding Inacom's account. (Sarkisian Trial Testimony at 22:16-23, 43:14-17).

21. At Lexmark, the corporate philosophy is, "[T]he sales team owns the relationship with the customer and typically would have direct contact with the customer to resolve issues as well as sell more product." Accordingly, to the extent Mr. Sarkisian had concerns regarding a customer account, the correct corporate avenue was to notify the sales team to take some action with respect to the customer. (Sarkisian Trial Testimony at 29:5-18, 29:24-30:4).

22. The Inacom account was the responsibility of Robert Kendrick, Lexmark's Vice President of Sales for North America. (Sarkisian Trial Testimony at 28:6-15).

23. Mr. Kendrick retired from Lexmark on April 1, 2004 after working for Lexmark since its inception in late 1990. (Kendrick Deposition at 13:19-14:6, 27:22-28:10).

24. Mr. Kendrick testified that he was the primary author of the February 15 letter that was directed to Inacom's treasurer. (Kendrick Deposition at 97:16-21).

25. Mr. Kendrick understood that Compaq was not assuming Held Checks. (Kendrick Deposition at 100:13-19) (Q: "Was it your understanding that Compaq would assume the liability for payment of amounts that were reflected by the held checks? A: Not in my mind. Checks in the drawer equals the amount owed coming from Inacom, [from the] 16th on from Compaq, in my mind. Dick Oshlo would do this part and Compaq would do that part, if I make myself clear.").

26. Mr. Kendrick understood that the statement in the Compaq Letter -- "In connection with such purchase, Custom Edge, Inc. also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account." -- did not refer to Held Checks: (Kendrick Deposition at 106:4-107:2) (Inacom drawer of held checks did not relate to the outstanding amount mentioned in the Compaq Letter).

27. Mr. Kendrick understood the Compaq Letter to refer to payment of future liabilities by Compaq. (Kendrick Deposition at 111:2-17).

28. Mr. Kendrick believes that Compaq fully performed on the terms of the Compaq Letter. (Kendrick Deposition at 111:18-21).

29. Lexmark cashed the Held Checks payable to Lexmark and applied the payments to amounts owing on invoices directed to Inacom. (Kendrick Deposition at 101:2-5; Sarkisian Trial Testimony at 42;17-21).

30. When Lexmark cashed the Held Checks, Mr. Sarkisian was aware of the risks of accepting payments that were outside of the ordinary course of business from a company that might file for bankruptcy. (Sarkisian Trial Testimony at 26:12-20).

I.  **The Compaq Letter Was Not A Guarantee of Inacom's Held Checks That Were Payable to Lexmark.**

31. Where the underlying facts are undisputed, the existence of a contract is a question of law. *Gupta v. University of Rochester,* 395 N.Y.S.2d 566, 567 (App. Div. 1977).[2]

32. The meaning of the Compaq Letter must be determined from the plain language of the letter and the surrounding circumstances at the time it was written. *In re Estate of Stravinsky,* 770 N.Y.S. 2d 40, 81 (2003) ('Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions *without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish.*' Emphasis in original; citations omitted). *See generally* 3 Corbin, Contracts §554 at 223.

33. The Compaq Letter does not state that Compaq guaranteed payments made by Inacom to Lexmark, and does not otherwise commit Compaq to indemnifying Lexmark for payments received from Inacom that were alleged to be preferential payments under 11 U.S.C. § 547. (Trial Exhibit 8).

34. Based on the foregoing facts, the Court finds that Lexmark's sales team who communicated directly with Inacom understood that Account Payable #117403 excluded Inacom's Held Checks. Lexmark's sales team further understood that the term "outstanding amount on the referenced account," as set forth in the Compaq Letter, referred to amounts going forward which would be paid by Compaq, while Held Checks would be paid by Inacom.

35. There is no manifestation of mutual assent if the parties to an exchange attach materially different meanings to their manifestations and neither party knows or has reason to know the meaning attached by the other. *See generally* Restatement (Second) of Contract § 20 (effect of misunderstanding). *See also Gupta v. University of Rochester,* 395 N.Y.S.2d 566, 567

---

[2] The Asset Purchase Agreement is governed by New York law. To date, the parties have applied New York law to all of Lexmark's third-party claims against HP. *See, e.g.,* Joint Proposed Final Pretrial Order filed 8/15/05 and Lexmark's Proposed Findings of Fact and Conclusions of Law filed 8/15/05.

(App. Div. 1977) ("Where the offeror, using ambiguous language, reasonably means one thing and the offeree reasonably understands differently, there is no contract.").

36. To the extent that Lexmark contends that the Compaq Letter was a "catchall" guarantee of payment by Compaq, the Court concludes that the Compaq Letter does not constitute an enforceable contract because there was no mutual assent between the parties regarding the alleged payment obligations at issue. In particular, there was no mutual assent between Compaq and Lexmark regarding the meaning of "outstanding amount on the referenced account," Account Payable #117403 of Inacom Corporation.

37. For an agreement to be enforceable there must also be some consideration in exchange for the promise. *See, e.g., In re Johnson's Estate,* 346 N.Y.S.2d 283, 286-87 (Sur. Ct. 1973) (bank promise to serve as trustee in the future at reduced rate if it were selected did not bind either party; contract unenforceable because it lacked mutuality of obligation).

38. A guaranty that is not part of the original exchange for which the obligee bargained must be supported by separate consideration. Restatement (Third) of Suretyship and Guaranty § 9(2)(a), pp. 9-10 (ALI 1996); *United States v. Meadows,* 753 F.2d 590, 597 (7th Cir. 1985).

39. There is no evidence that the Compaq Letter was supported by consideration from Lexmark in exchanged for the alleged promise by Compaq to pay Inacom's Held Checks.

40. Judgment is granted in HP's favor on the Second, Fourth, and Fifth Causes of Action.

II.   **Lexmark Did Not Detrimentally Rely on the Compaq Letter.**

41. In order to establish a viable cause of action for promissory estoppel, the following elements must be established: (1) a promise that is sufficiently clear and unambiguous,

(2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance. *See, e.g., New York City Health and Hospitals Corp. v. St. Barnabas Hospital*, 782 N.Y.S. 2d 12, 14 (Sup. Ct. 2004) (breach of contract and promissory estoppel claims for reimbursement of medical resident salaries denied). *See generally* Restatement (Second) of Contracts § 90.

42.     The party claiming promissory estoppel must establish that its alleged acts of reliance were attributable to the promise. *Ripples of Clearview, Inc. v. Le Havre Assoc.*, 452 N.Y.S. 2d 447, 449 (Sup. Ct. 1982).

43.     The Court concludes that Lexmark has not established reasonable reliance on the Compaq Letter. There is no evidence that Lexmark relied on the Compaq Letter by, for example, delaying collection efforts against Inacom with respect to Held Checks or refusing payment from Inacom on Held Checks.

44.     Lexmark was fully compensated for products that were shipped to Compaq after receipt of the Compaq Letter. Therefore, to the extent that Lexmark continued to ship products to Compaq after February 16, 2000, there was no detrimental reliance.

45.     The Court grants judgment in HP's favor on the Seventh and Eighth Causes of Action.

III.    **Lexmark Was Not A Third-Party Beneficiary to the Asset Purchase Agreement Between Inacom and Compaq.**

46.     Where a contract's language expressly bars contractual liability to a third party, no third party right to enforce the contract may be found. *Nepco Forged Products, Inc. v. Consolidated Edison*, 470 N.Y.S.2d 680, 681 (App. Div. 1984) (holding that the clause "Nothing in this Agreement, express or implied, is intended to confer on any other person any rights or remedies, in or by reason of this Agreement" prevented a third party from bringing a breach of contract claim).

47. Section 13.08 of the Asset Purchase Agreement provides that no other party is an intended beneficiary of the agreement. (Trial Exhibit 2).

48. The Court concludes that Lexmark lacks standing to bring claims against Compaq as a third-party beneficiary of the Asset Purchase Agreement because the agreement expressly negates the intent of Inacom and Compaq to confer any rights or remedies upon third parties. Accordingly, judgment is granted in favor of HP on the First and Third Causes of Action.

IV. **The Asset Purchase Agreement Did Not Obligate Compaq to Pay Lexmark For Held Checks.**

49. When parties have entered into an unambiguous contract, the court must look to the terms expressed in the contract itself and not to extrinsic evidence in an effort to establish terms that might be preferable to one party. *See, e.g., Metropolitan Life Ins. Co. v. RJR Nabisco,* 906 F. 2d 884, 889 (2d Cir. 1990).

50. Even assuming that Lexmark had standing to bring claims under the Asset Purchase Agreement, Compaq fully performed its obligations under the agreement. In particular, the Court finds that Compaq assumed and paid open accounts payable of Inacom under the Asset Purchase Agreement, as identified in the AP Report exchanged between Jay Samuelson of Compaq and Chris Anderson of Inacom.

51. The Court grants judgment in HP's favor on Lexmark's First and Third Causes of Action.

V. **The Wells Letter Dated February 5, 2001 Did Not Obligate Compaq to Pay Lexmark For Inacom's Held Checks.**

52. When parties have entered into an unambiguous contract, the court must look to the terms expressed in the contract itself and not to extrinsic evidence. *See, e.g., Metropolitan Life Ins. Co. v. RJR Nabisco,* 906 F. 2d 884, 889 (2d Cir. 1990).

53. On February 5, 2001, Ben Wells of Compaq sent a letter to Bill Schuette of Lexmark whereby Compaq guaranteed payment of "any and all indebtedness from time to time outstanding under or in respect to transactions between Custom Edge, Inc. (CEI) and Lexmark." (the "Custom Edge Guarantee") (Trial Exhibit 8).

54. The Custom Edge Guarantee did not address transactions between Inacom and Lexmark. The express terms of the Custom Edge Guarantee did not guarantee transactions between Inacom and Lexmark, and did not otherwise obligate Compaq to pay for Inacom's Held Checks.

55. There is no evidence that Compaq breached the Custom Edge Guarantee. Accordingly, the Court grants judgment in HP's favor on the Ninth Cause of Action.

Dated: March 31, 2005                MORRIS, NICHOLS, ARSHT & TUNNELL

_____
William H. Sudell, Jr. (No. 463)
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 N. Market Street
Wilmington, DE 19899-1347
(302) 658-9200

- and -

FRIEDMAN DUMAS & SPRINGWATER LLP
Ellen A. Friedman
Cecily A. Dumas
Gail S. Greenwood
Brandon C. Chaves
One Maritime Plaza, Suite 2475
San Francisco, CA 94111
(415) 834-3800

Attorneys for Third-Party Defendant
Hewlett-Packard Company