# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

INACOM CORP., et al.

      **Plaintiffs**

v.

**LEXMARK INTERNATIONAL, INC.**

      **Defendant and Third-Party Plaintiff**

v.

**COMPAQ COMPUTER CORP., et al.**

      **Third-Party Defendants**

**Civil Action No. 04-CV-583 (GMS)**

---

## LEXMARK'S RESPONSE TO HP'S MOTION TO STRIKE TESTIMONY OF KEVIN SARKISIAN

STEVENS & LEE, P.C.

Thomas G. Whalen Jr. (No. 4034)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Tel:   (302) 425-3304
Fax:  (302) 654-5181
E-mail: tgw@stevenslee.com

STOLL KEENON OGDEN PLLC

Culver V. Halliday
Emily L. Pagorski
2650 AEGON Center
400 West Market Street
Louisville, Kentucky 40202-3377
Tel: (502) 568-9100
Fax: (502) 568-5700
E-mail: culver.halliday@skofirm.com
E-mail: emily.pagorski@skofirm.com

Dated: April 10, 2006

*Attorney's for Third-Party Plaintiff*
*Lexmark International, Inc.*

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................ 2

    *(a) The Francis Letter* .................................................................................. 2

    *(b) Lexmark Relied Upon the Francis Letter* ........................................... 3

    *(c) No Letter was Sent to Lexmark Qualifying the Representation in the
    Francis Letter that Custom Edge will Pay InaCom's Accounts Payable* ........ 5

    *(d) InaCom's Promises Were Irrelevant To Lexmark After It Received the
    Francis Letter* .............................................................................................. 6

III. ARGUMENT .................................................................................................... 8

    *(a) Mr. Sarkisian's Testimony Regarding the Francis Letter is Admissible* ........ 9

    *(b) Mr. Sarkisian's Testimony Is Not Inconsistent With That of Other Lexmark
    Employees* ..................................................................................................... 12

    *(c) Mr. Sarkisian's Testimony Is Entirely Consistent With the Underlying
    Facts and Circumstances* ............................................................................. 13

        *(1) The Francis Letter Is Not Ambiguous, and Must Therefore Be Read
        As It Is Written* ......................................................................................... 14

        *(2) The Vitols Letter Would Have Been Sent to Lexmark If the
        the Accounts Payable Obligation had Not Been Intended to Include
        "Held Checks"* .......................................................................................... 14

        *(3) There is No "Held Checks" Exclusion in the Asset Purchase
        Agreement for InaCom's Accounts Payable Liability to Lexmark* ..... 15

        *(4) HP Attacks Mr. Sarkisian's Testimony but Called No Witness to
        Testify As to a Different Understanding of the Francis Letter or to
        Dispute the Reasonableness of Lexmark's Reliance Upon It* ........... 16

IV. CONCLUSION ................................................................................................ 18

# TABLE OF AUTHORITIES

**CASES**

*Davis v. Siemens Medical Solutions USA, Inc.*, 399 F. Supp. 2d. 785
(W.D. Ky. 2005)……………………………………………………………………14

**RULES**

Federal Rule of Evidence 602………………………………………………………….9

SL1 626225v1/004907.00003

Hewlett-Packard Company ("HP"), as successor in interest to Third-Party Defendants Compaq Computer Corporation ("Compaq") and Custom Edge, Inc. ("Custom Edge"), has filed a motion for the Court to strike testimony of Kevin Sarkisian ("HP's Motion to Strike"), an employee of Third-Party Plaintiff Lexmark International, Inc. ("Lexmark").[1]  (Docket Item ("D.I.") 140).  This is Lexmark's response to HP's Motion to Strike.

## I. INTRODUCTION

A trial of the third-party complaint filed by Lexmark against Compaq and Custom Edge was held on February 16, 2006.  Mr. Sarkisian was called by Lexmark to testify at the trial because it believed that the Court should have the opportunity to see and hear Mr. Sarkisian's testimony regarding the promises underlying Lexmark's complaint, the promises contained in the (1) letter from Bill Francis, director of corporate finance for Compaq, to Lexmark dated February 16, 2000 ("Francis Letter"), and (2) letter from Ben K. Wells, acting chief financial officer, vice president and corporate treasurer of Compaq, to Lexmark dated February 5, 2001 ("Guaranty Letter").  HP moves the Court to strike Mr. Sarkisian's testimony "regarding his alleged understanding" of the Francis Letter on the ground that Mr. Sarkisian "lacks any personal knowledge of the letter at issue and his testimony constitutes improper opinion."  (D.I. 140, ¶¶ 1, 2).  HP's Motion to Strike is without basis in law or fact and should be denied.

---

[1]      Custom Edge, formerly known as ITY, Corp. ("ITY"), a wholly owned subsidiary of Compaq, was merged into Compaq, which then merged with HP, with HP the surviving entity.  HP's proposed findings of fact and conclusions of law make clear that HP does not dispute it is responsible for whatever liability Compaq and Custom Edge may have for the claims alleged by Lexmark in its third-party complaint. (D.I. 81, Tab 1 ¶ 3).

## II. STATEMENT OF FACTS

### *(a) The Francis Letter*

The Francis Letter states, in full, as follows:

February 16, 2000

Lexmark International, Inc.
Ms. Misty Atchinson
Fax 800.732.9539

RE:      Account Payable # 117403 of InaCom Corporation

Dear Ms. Atchinson:

This letter is to inform you that, effective February 16, 2000, a wholly-owned subsidiary of Compaq Computer Corporation purchased certain assets of InaCom Corporation. The Compaq subsidiary will operate under the name of Custom Edge, Inc. and its' [sic] A/P accounts will be funded by Compaq.

In connection with such purchase, Custom Edge, Inc. also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account.

Inquiries to Custom Edge, Inc., regarding your account should be directed to John Frasca at 402.758.3822.

Thank you for your consideration in this matter.

Sincerely,
/ S /
Bill Francis
Director, Corporate Finance
Telephone: 281.514.1223
Email: bill.francis@compaq.com

(Appendix ("Apx.") pg. 265).[2]  The Francis Letter was sent to other InaCom vendors, including Tech Data Corp. ("Tech Data") and Logicare, Inc. ("Logicare"). (Francis Deposition ("Depo."), 18:14-18:17, Apx. pg. 69, Wells Depo., 75:9-75:16, Apx. pg. 133). The same representation was made in each of the letters that Custom Edge "assumed the obligation to pay all the outstanding amount on the referenced account, subject to the terms and conditions of such account." (Apx. pgs. 266, 267).

---

[2]      References to the appendix are to the appendix tendered by Lexmark with its proposed findings of fact and conclusions of law. (D.I. 139).

2

The asset purchase agreement ("Asset Purchase Agreement") was entered into by InaCom with Compaq and its wholly owned subsidiary, ITY ("ITY"). (Apx. pg. 136). ITY assumed InaCom's accounts payable liabilities to several companies pursuant to Section 2.03 of the Asset Purchase Agreement. (Apx. pg. 144). The InaCom accounts payables for which ITY assumed liability are identified in Schedule 2.03 of the Asset Purchase Agreement, titled "Assumed Liabilities." (Apx. pg. 195). Lexmark is one of the named companies. (Apx. pg. 195). Section 2.04 identifies liabilities excluded under the Asset Purchase Agreement. (Apx. pg. 144). Schedule 2.04, titled "Excluded Liabilities," identifies by name companies for which the accounts payables liability of InaCom was not assumed by ITY. (Apx. pg. 196). Lexmark is not one of the companies named. (Apx. pg. 196).

Mr. Francis testified that he obtained approval before sending the Francis Letter to Lexmark and other InaCom vendors. (Francis Depo., 21:2-21:24, 22:23-23:2 Apx. pgs. 70, 71). Mr. Wells, Compaq's acting chief financial officer and vice president, corporate treasurer, testified that he authorized the sending of the Francis Letter. ( Wells Depo., 11:3-11:7, 11:11-11:13, 52:12-52:17, 54:21-55:4, 75:9-75:15, 76:15-77:3, Apx. pgs. 128, 128, 129, 131, 133, 134).

### (b)  Lexmark Relied Upon the Francis Letter

Mr. Sarkisian, as Lexmark's U.S. Credit Manager, had the "ultimate responsibility" for deciding whether to continue to ship goods to InaCom on credit. (D.I. 121, T.T. 18:21-19:17, Apx. pg. 41). Mr. Sarkisian learned that InaCom was delinquent in payment on its accounts payable with Lexmark in December 1999, when Lexmark's

3

order entry system automatically began placing orders for InaCom on hold. (D.I. 121, T.T. 7:15-8:21, Apx. pg. 33). Lexmark's order entry system automatically stops orders from being shipped if 25% or more of the customer's outstanding balance is delinquent. (D.I. 121, T.T. 7:15-8:21, Apx. pg. 33). When a shipment is placed on hold, it remains on hold until the credit department makes an affirmative decision to release it. (D.I. 121, T.T. 9:14-10:4, Apx. pg. 35).

The Francis Letter confirmed for Mr. Sarkisian that Compaq would be responsible for amounts owed by Custom Edge going forward, and that Custom Edge would pay anything that was due on the InaCom's accounts payable with Lexmark. (D.I. 121 T.T., 41:22-42:9, Apx. pg. 51). Mr. Sarkisian testified at trial regarding the letter as follows:

> A:  As I recall, since we received the letter from Compaq, it gave us a great deal of comfort knowing that they were going to be responsible for that payment – for those amounts due from Inacom. And it essentially took the pressure out of the situation. As I recall, Inacom, you know, continued to make promises to pay. And we felt that if they didn't pay us, then we could go back and ask Compaq to pay based on this letter.

(D.I. 121, T.T. 46:3-46:10, Apx. pg. 54).

\* \* \* \* \*

> Q:  So you saw the February 16th letter as a catchall, whatever happens to you, Compaq will make you whole? That's how you read the letter?
>
> A:  Yes, certainly.

(D.I. 121, T.T. 48:21-48:24, Apx. pg. 56). Mr. Sarkisian's response to the Francis Letter was that desired by Compaq. Mr. Wells, Compaq's acting chief financial officer and vice president, corporate treasurer, testified that the purpose of the Francis Letter was to

4

ensure the continued flow of products. (Wells Depo., 76:1-76:9, 53:4-54:2, Apx. pgs. 134, 130).

Tech Data also relied upon the Francis Letter. Michael Zava, Tech Data's vice president of credit and customer services for the Americas, testified that Tech Data received the Francis Letter. (Zava Depo., 6:22-7:3, 133:7-133:10, Apx. pgs. 574, 576). The Francis Letter sent to Tech Data is the same as that sent to Lexmark. (Apx. pg. 266). Mr. Zava understood the Francis Letter to mean that Compaq would be liable for everything that was owing to Tech Data by InaCom. (Zava Depo., 138:3-138:7, 137:8-137:24, Apx. pgs. 578, 577). Mr. Zava testified that, if Tech Data had not received the Francis Letter, then "we would have reacted quite differently to the entire situation." (Zava Depo., 156:17-156:20, 156:24-157:2, Apx. pg. 579). Because it received the Francis Letter, Tech Data, like Lexmark, continued to ship products on credit.[3]

### (c) No Letter was Sent to Lexmark Qualifying the Representation in the Francis Letter that Custom Edge will Pay InaCom's Accounts Payable

The Francis Letter sent to Lexmark, Tech Data and others states that "[i]n connection with such purchase, Custom Edge, Inc. also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account." (Apx. pgs. 265, 266, 267). Logicare was one of the others that

---

[3]     On February 3, 2000, John Frasca, vice president of supply chain management at InaCom, sent an e-mail to Michael Ward, Tech Data's senior credit manager. Attached to the e-mail was a copy of InaCom's Form 8-K dated January 4, 2000. (D.I. 81, Tab 1 ¶ 7). In his e-mail, Mr. Frasca stated that the Form 8-K indicated "that 100% of the payables for Tech Data will be assumed by Compaq," and "based on this contract," Mr. Frasca requested that Tech Data increase InaCom's credit line. (Apx. pg. 263).

5

received the Francis Letter. (Apx. pg. 267). However, Logicare also received another letter. (Apx. pg. 268).

On or about February 17, 2000, Nondas Vitols, a product manager for Custom Edge, sent a letter ("Vitols Letter") to a number of vendors announcing that certain assets of InaCom had been purchased by Compaq and would be operated as Custom Edge. (Vitols Depo., 8:2-8:12, Apx. pg. 112). In contrast to the Francis Letter dated just the day before, the Vitols Letter state that "Compaq is assuming the open accounts payable but NOT the held checks." (Emphasis in original). (Apx. pg. 268). Neither Lexmark nor Tech Data received the Vitols Letter. In fact, none of the InaCom vendors identified in Schedule 2.03 of the Asset Purchase Agreement, the vendors whose accounts payable liability was being assumed by ITY (Custom Edge), received the Vitols Letter. Significantly, Logicare was not one of the InaCom vendors identified in Schedule 2.03. (Apx. pg. 195).

### (d) InaCom's Promises Were Irrelevant To Lexmark After It Received the Francis Letter

At Lexmark, the sales team owns the customer relationship because it has the "best contacts" with, and "insider knowledge" of, the customer. (D.I. 121, T.T. 12:2-12:21, Apx. pg. 37). Accordingly, prior to receiving the Francis Letter, Mr. Sarkisian had been pressuring Lexmark's sales team to obtain payment from InaCom on its delinquent account. (D.I. 121, T.T. 12:2-12:21, Apx. pg. 37). The members of the sales team contacted by Mr. Sarkisian were William Schuette and Bob Kendrick. (D.I. 121, T.T. 12:2-12:21, Apx. pg. 37). Mr. Sarkisian asked them to contact InaCom to determine the reason for the delinquency. (D.I. 121, T.T. 12:2-12:21, Apx. pg. 37).

6

Mr. Schuette spoke with Leon Kerkman, a vice president of operations for InaCom, regarding InaCom's accounts payable with Lexmark. (Kerkman Depo., 11:7-11:18, 12:13-13:10, Apx. pgs. 86, 87; Schuette Depo., 47:25-48:8, Apx. pg. 101). Following the conversation, Mr. Schuette sent a letter to Dick Oshlo, InaCom's treasurer ("Schuette Letter"), reciting what Mr. Schuette had been told by Mr. Kerkman.[4] (Apx. pg. 264).    The purpose of the Schuette Letter was to confirm Mr. Kerkman's representation that InaCom had written checks payable to Lexmark for the past due amounts and these checks would be disbursed within one to ten weeks after the sale of InaCom's assets. (D.I. 121, T.T. 15:2-15:11, Apx. pg. 38; Schuette Depo., 47:25-48:8, Apx. pg. 101; Apx. pg. 264).

Mr. Sarkisian testified that he viewed the Schuette Letter as an effort by Mr. Schuette to confirm what he had been told by InaCom. (D.I. 121, T.T. 15:2-15:11, 40:23-41:8, Apx. pgs. 38, 50). Mr. Sarkisian did not place much confidence in the Schuette Letter because while "[t]he letter in whole was more information than [he] had the day before," it was not enough to make him comfortable that Lexmark was going to be paid. (D.I. 121, T.T. 39:5-39:11, Apx. pg. 49). Mr. Sarkisian testified that, after he received the Francis Letter, the Schuette Letter was of no importance to him:

> Q:    Were you concerned that these two letters, which were one day apart, expressed two different concepts in your mind as to how Lexmark was going to be paid?
>
> A:    No.    The reason is, the first letter is written by my salesperson trying to confirm a plan to someone at Inacom that apparently is not willing to talk to him.    And the second letter is from Compaq, one of my biggest — the biggest customer in the United States for Lexmark, and its

---

[4]    Mr. Oshlo's name is misspelled "Oslo" in the Schuette Letter. Mr. Sarkisian did not review the Schuette Letter before it was mailed to Mr. Oshlo. (D.I. 121, T.T. 33:14-33:20, Apx. pg. 47).

saying that they are assuming all the obligation to pay the accounts payable of Lexmark. That is something that I could rely on.

Q:    Because you knew, from the preexisting relationship, you knew Compaq well?

A:    Yes.

Q:    Did you think that there might be a misunderstanding in the expression of two different concepts between the two letters?

A:    As I recall, essentially, the February 15th letter was no longer in my thoughts. When I got this letter from Compaq, everything was, in my mind, going to be taken care of. If it weren't going to be taken care of, I could go back to Compaq and ask them to. The February 15 letter didn't have any bearing after I received the February 16th letter on my thoughts.

(D.I. 121, T.T. 40:23-41:21, Apx. pg. 50). Lexmark "continued to ship because [Mr. Sarkisian] got a letter from Compaq saying that they would be responsible." (D.I. 121, T.T. 47:3-47:12, Apx. pg. 55).

### III.    ARGUMENT

HP argues that "Mr. Sarkisian's testimony should be stricken because it is not based on any personal knowledge and it is directly contradicted by the testimony of Lexmark witnesses who were responsible for the customer relationship with InaCom and who were personally involved in collection of InaCom's account at the time of the Francis Letter." (D.I. 140, ¶ 2). For the reasons discussed below, the motion should be denied.

### (a) Mr. Sarkisian's Testimony Regarding
### the Francis Letter is Admissible

HP argues that Mr. Sarkisian's testimony regarding the Francis Letter is inadmissible under Rule 602 of the Federal Rules of Evidence ("Fed. R. Evid."), which provides as follows:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.

Fed. R. Evid. 602. According to HP, Mr. Sarksian is without personal knowledge to testify regarding the Francis Letter because "he and the members of his credit team had no contact of any kind with InaCom or Compaq regarding InaCom's delinquent account," and therefore did not understand the "context in which the [Francis] Letter was sent." (D.I. 140, ¶¶ 3, 6).

Mr. Sarksian's testimony at trial regarding the Francis Letter was introduced to show the actions taken and not taken with respect to InaCom's account following Lexmark's receipt of the Francis Letter. Mr. Sarkisian's testimony establishes the reliance that Lexmark placed on the Francis Letter. No person has more personal knowledge than Mr. Sarkisian regarding the response of Lexmark to the Francis Letter. Mr. Sarkisian testified that, as the head of U.S. credit department for Lexmark, he had ultimate responsibility for and made the final decision regarding whether credit would be continued. There can be no real dispute that Mr. Sarkisian had "personal knowledge of the matter" about which he testified.

HP's contention that Mr. Sarkisian cannot testify about the Francis Letter because he did not have contact with anyone at InaCom makes no sense. Compaq — not InaCom

9

— sent the Francis Letter to Lexmark. The Francis Letter was sent to Lexmark with Compaq's name on the letterhead, signed by an officer of Compaq and authorized by another officer of Compaq. Mr. Sarkisian's "personal knowledge of the matter" about which he testified and Lexmark's response to the Francis Letter has nothing to do with any communication he did or did not have with someone at InaCom.

According to HP, Mr. Sarkisian is without personal knowledge to testify because he did not communicate with anyone at InaCom regarding the Francis Letter and if he had done so he would have been able to view the Francis Letter in the proper "context." Apparently, it is HP's position that there is not personal knowledge sufficient to testify regarding a matter unless a witness can place it in context. Of course, it is the purpose of a trial to provide the context for the finder of fact. By reference to the testimony of each of the witnesses called to testify, not just Mr. Sarkisian, the Court will put the Francis Letter in its proper context.

HP's contends that Mr. Sarkisian should not have relied on the promises made by Compaq and Custom Edge in the Francis Letter because they are not consistent with what Lexmark's sales team was told by InaCom. HP does not attempt to explain why any rational person would rely on what InaCom, a creditor in default, was saying regarding the payment of its delinquent account, when a subsequently sent letter from Compaq, one of Lexmark's biggest customers, gave an unequivocal promise that InaCom's accounts payable with Lexmark would be paid by a Compaq subsidiary, Custom Edge.

HP argues Mr. Sarkisian is without personal knowledge to testify regarding the Francis Letter because he did not communicate with representatives of InaCom, but then points to the testimony of members of Lexmark's sales team as somehow more probative

10

than Mr. Sarkisian's with respect to the Francis Letter.  Messrs. Schuette and Kendrick, while they communicated with persons at InaCom regarding its delinquent account, had no communications with Compaq.  Mr. Schuette testified as follows:

> Q:    Did you have any communication with anybody at Compaq who was not part of the InaCom team that had moved over to Compaq, or did your --- after the closing did your communication continue to be with the people that you had previously known from when they were employed by InaCom?
>
> A:    I didn't have any contact with anybody from Compaq.  It remained just the people that were there in Omaha.

(Schuette Depo., 95:1-95:9, attached at Exhibit A).  Likewise, Mr. Kendrick testified that:

> Q:    Having that date fixed in mind, February 16, 2000, my next question is:  Did you personally have any communication with anybody at the Compaq organization about this acquisition from their perspective?
>
> A:    No.
>
> Q:    Did you direct Mr. Schuette or anyone else in your organization to contact Compaq directly?
>
> A:    No.

(Kendrick Depo., 96:7-96:19, attached at Exhibit B).  In addition, while Mr. Kendrick testified that he revised the Schuette Letter before it was sent, he also testified that did not personally communicate with Mr. Kerkman:

> Q:    My first question is, it was actually Mr. Schuette who met with Mr. Kerkman; is that correct?
>
> A:    True.
>
> Q:    Okay.  You didn't meet with Mr. Kerkman?
>
> A:    That's true.

11

> Q:    So the information in this is what Mr. Schuette relayed to
>        you that Mr. Kerkman had told him?
>
> A:    Correct.

(Kendrick Depo. at 96:20-97:11, 98:8-98:16, attached at Exhibit B).

At the trial, Mr. Sarkisian testified that in determining whether to continue to
extend credit to InaCom he relied on the Francis Letter, not the Schuette Letter:

> Q:    Were you concerned that these two letters, which were one
>        day apart, expressed two different concepts in your mind as
>        to how Lexmark was going to be paid?
>
> A:    No.  The reason is, the first letter is written by my
>        salesperson trying to confirm a plan to someone at Inacom
>        that apparently is not willing to talk to him.  And the
>        second letter is from Compaq, one of my biggest — the
>        biggest customer in the United States for Lexmark, and its
>        saying that they are assuming all the obligation to pay the
>        accounts payable of Lexmark.  That is something that I
>        could rely on.

(T.T. 40:23-41:8; Apx. pg. 50).  Thus, communications between Mr. Schuette and
InaCom employees leading up to the transmittal of the Francis Letter on February 16,
2000 are irrelevant because it was the Francis Letter on which Mr. Sarkisian testified he
relied when determining whether to continue to extend credit to InaCom.

### (b) Mr. Sarkisian's Testimony Is Not Inconsistent With That of Other Lexmark Employees

The contention that Mr. Sarkisian's testimony regarding the Francis Letter is
contrary to that of Lexmark employees Messrs. Schuette and Kendrick is simply not true.
Mr. Sarkisian testified as to his understanding and reliance upon the Francis Letter.  Mr.
Schuette, on the other hand, testified only as to what he was told by InaCom when he
pursued the issue of payment with it, and Mr. Kendrick testified to what he was told by

12

Mr. Schuette. Moreover, notwithstanding what he was being told by InaCom, Mr. Schuette also testified he believed that at the end of the day Compaq would see Lexmark was paid what it was owed by InaCom:

> Q:  Did you have any understanding about whether Compaq was also assuming the liability to make good on the held checks after they had been released and paid?
>
> A:  Well, my assumption always was that Compaq would make good the payments, but I don't think at the time I knew whether or not the checks were going to be written from Inacom. I mean, I don't think I knew the source of the money, who was actually paying for the checks, if it was going to be coming out of an Inacom account or it was going to be coming out of a Compaq account. I don't think that I knew the source of the money, but I felt like Compaq would cover the invoices.
>
> Q:  All invoices?
>
> A:  All of them, yeah.

(Schuette Depo., 69:21-70:10, Apx. pg. 103).

### (c) Mr. Sarkisian's Testimony Is Entirely Consistent With the Underlying Facts and Circumstances

Mr. Sarkisian's testimony regarding the Francis Letter is not inconsistent with the testimony given by other Lexmark employees. More importantly, Mr. Sarkisian's testimony regarding the Francis Letter, specifically Lexmark's reliance on the Francis Letter, is consistent with the evidence, both testamentary and documentary.

13

### (1) The Francis Letter is Not Ambiguous, and
### Must Therefore Be Read as It is Written

First, the Francis Letter is not ambiguous. The Francis Letter says that Custom Edge "assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account." When Mr. Sarkisian, and also Mr. Ward of Tech Data, testified that they understood from the Francis Letter that Custom Edge would see to the payment of InaCom's accounts payable with Lexmark and Tech Data, they were not reading anything into or out of the Francis Letter. It is HP — not Lexmark — that contends the Francis Letter cannot be understood to mean what it says. HP argues that the obligation described in the Francis Letter, the obligation to pay the accounts payable of InaCom to Lexmark, must be qualified by an exclusion, the exclusion that accounts payable does not include "held checks," being read into the Francis Letter. As it is not ambiguous, HP's effort to rewrite the Francis Letter with parole evidence should be rejected. *See Davis v. Siemens Medical Solutions USA, Inc.*, 399 F. Supp. 2d. 785, 793 (W.D. Ky. 2005) ("Generally, the parol evidence rule bars evidence of oral statements or writings made prior to or contemporaneous with a written agreement that contradict, vary or alter the language appearing in the writing.").

### (2) The Vitols Letter Would Have Been Sent to
### Lexmark If the Accounts Payable Obligation had
### Not Been Intended to Include "Held Checks"

Second, when HP contends that the Francis Letter must be read as excluding "held checks" from the accounts payable liability of InaCom to Lexmark assumed by Custom Edge, it is asking the Court to ignore the Vitols Letter. If the Francis Letter was meant to be read as excluding "held checks" from the accounts payable liability that was

14

assumed, there was no need to send the Vitols Letter the next day advising certain of the recipients of the Francis Letter that "Compaq is assuming the open accounts payable but NOT the held checks." (Emphasis in original). It strains all credulity for HP to contend that the Francis Letter should be read as excluding "held checks" from its scope, when the Vitols Letter was sent the very next day to other recipients of the Francis Letter telling them that liability for "held checks" was "NOT" being assumed.

Obviously, as Compaq and Custom Edge, and HP as their successor in interest, contend that the Francis Letter did not encompass "held checks," why Logicare was sent the Francis Letter and then the next day sent the Vitols Letter would have been relevant testimony. If Lexmark should have construed the Frances Letter as excluding from its scope "held checks," why was the Vitols Letter sent to Logicare the day after it was sent the Francis Letter? The answer is obvious. Compaq intended for Custom Edge to assume liability for InaCom's accounts payable with Lexmark, just as it agreed to do in the Asset Purchase Agreement, and the Francis Letter expressed that intent and because that was the intent there was no need to send the Vitols Letter to Lexmark.

### (3) There is No "Held Checks" Exclusion in the Asset Purchase Agreement for InaCom's Accounts Payable Liability to Lexmark

Third, the Asset Purchase Agreement entered into by InaCom with Compaq and ITY provides that ITY is acquiring the accounts payable liability of InaCom to Lexmark.[5] There is no exclusion from that assumed liability for "held checks." However, there is elsewhere in the Asset Purchase Agreement a reference to liability for "held checks"

---

[5]    As previously discussed, ITY was a wholly owned subsidiary of Compaq that, after it changed its name to Custom Edge, was merged into Compaq with Compaq the surviving entity.

15

being excluded. Schedule 2.04 of the Asset Purchase Agreement excludes liability for "[a]ccounts payable to Compaq or its affiliates for which checks had been written, but not yet released to Buyer by Seller (provided such checks will be delivered in the ordinary course)." (Apx. pg. 196).

Lexmark was not a party to the Asset Purchase Agreement and does not maintain that Compaq and Custom Edge, and HP as their successor in interest, are liable to Lexmark for InaCom's accounts payable because of the Asset Purchase Agreement. Lexmark claims that they are liable under the Francis Letter and Guaranty Letter. However, if HP wishes to contend that the Francis Letter should have the no "held checks" exclusion read into it, then the Court may most certainly take note that the provisions of the Asset Purchase Agreement pursuant to which the accounts payable liability was assumed, Section 2.03 and Schedule 2.03, have no such exclusion, but other provisions, Section 2.04 and Schedule 2.04, do. (Apx. pgs. 144, 144, 195, 196).

### (4) HP Attacks Mr. Sarkisian's Testimony but Called No Witness to Testify As to a Different Understanding of the Francis Letter or to Dispute the Reasonableness of Lexmark's Reliance Upon It

Fourth, while HP has attacked the credibility of Mr. Sarkisian's testimony by pretrial motion in limine, cross-examination at trial and a post-trial motion to strike, it has failed to put into the record the testimony of any present or former employees of HP, Compaq and Custom Edge that Mr. Sarkisian, and through him Lexmark, interpreted the Francis Letter incorrectly and acted unreasonably in relying upon it.

Mr. Francis, director of corporate finance for Compaq, the person who signed and sent the Francis Letter, and Mr. Wells, acting chief financial officer, vice president and

16

corporate treasurer of Compaq, the person who authorized the sending of the Francis

Letter, were not called by HP to testify at trial.  However, both Messrs. Francis and Wells

were deposed.  Neither of them testified in support of HP's theory that the Francis Letter

excluded "held checks" and should not have been relied upon by Lexmark.  Indeed, both

Mr. Francis and Mr. Wells testified that the purpose of the Francis Letter was to ensure

the continued flow of products.  Mr. Francis testified that the February 16, 2000 letter

was a "comfort letter" intended to induce vendors to continue supplying goods needed by

Custom Edge:

> Q:    You say it's what you refer to as a comfort letter?
>
> A:    That is correct.
>
> Q:    What does that mean?
>
> A:    InaCom was having some trouble with their suppliers who were reluctant to ship material or goods to InaCom because of past issues they had with InaCom so they kept asking about -- they wanted some more assurance, so this letter was developed to give them some assurance that Compaq was behind the Custom Edge portion of InaCom and they could be assured that they would be paid for the goods and services that they supplied.

(Francis Depo., 17:14-18:1, Apx. pg. 68).  Similarly, Mr. Wells admitted that the purpose

of the Francis Letter was to ensure the continued flow of products that would be

necessary to configure Compaq products at Custom Edge:

> Q:    And the reason for the letter was to ensure the continued flow of products from these vendors that would be necessary to configure Compaq products at Custom Edge?
>
> A:    That's correct.

(Wells Depo., 76:1-76:9, 53:4-54:2, Apx. pgs. 134, 130; see, also Kerkman Depo., 60:24-

61:13, Apx. pg. 89).  Consistent with the testimony of Messers. Francis and Wells

17

regarding the purpose of the Francis Letter, Mr. Sarkisian testified that he "continued to ship because [he] got a letter from Compaq saying that they would be responsible." (D.I. 121, T.T. 47:3-47:12, Apx. pg. 55).

## IV. CONCLUSION

For the foregoing reasons, HP's motion to strike testimony of Mr. Sarkisian should be denied.

SL1 626225v1/004907.00003

Dated:  April 10, 2006

Respectfully submitted,

Culver V. Halliday
Emily L. Pagorski
Stoll Keenon Ogden PLLC
2650 AEGON Center
400 West Market Street
Louisville, Kentucky 40202-3377
Tel:  (502) 568-9100
Fax:  (502) 568-5700
E-mail:  culver.halliday@skofirm.com
E-mail:  emily.pagorski@skofirm.com

and

Thomas G. Whalen Jr. (No. 4034)
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Tel:  (302) 425-3304
Fax:  (302) 654-5181
E-mail:  tgw@stevenslee.com

*Attorneys for Third-Party Plaintiff,*
*Lexmark International, Inc.*

19